# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARIE BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No.: _____  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Defendants. | ) ) ) ) |

## INTRODUCTION

1.  This is an action to compel defendants (hereinafter collectively referred to as "the Park Service") to comply with the National Environmental Policy Act of 1969 ("NEPA"), with the National Historic Preservation Act ("NHPA"), and with regulations and guidance implementing those two statutes.  Specifically, plaintiffs seek declaratory and injunctive relief to ensure that the Park Service does not demolish the historic Gettysburg Cyclorama Center (the "Cyclorama Center") in violation of NEPA and NHPA, and to force the agency to comply with specific, mandatory provisions of NHPA governing management and use of historic properties owned by federal agencies.

2.  The Park Service commissioned the Cyclorama Center as part of the agency's landmark Mission 66 program, an unprecedented and widely-celebrated initiative which brought modern architecture and environmentally sensitive design to America's national parks.  The building, located near a part of Gettysburg National Military Park known as Ziegler's Grove, was designed and sited according to the Park Service's own specifications by world-renowned architect Richard Neutra.

3.  The Cyclorama Center remains the sole example of Neutra's governmental work in the Eastern United States.  The Keeper of the National Register of Historic Places has determined that the Cyclorama Center is associated with a significant contribution to history, is the work of a master architect, and, for those reasons, is eligible for listing in the National Register of Historic Places.

4.  The Park Service has adopted a general policy calling for the "restoration" and "rehabilitation" of Ziegler's Grove.  That policy was approved as part of a 1999 General Management Plan/Environmental Impact Statement (the "GMP/EIS").  However, neither the

GMP/EIS nor any other document prepared by the Park Service discloses or evaluates any specific proposal for implementing the general policy of "restoring" and "rehabilitating" Ziegler's Grove."

5. In fact, the Park Service's GMP/EIS studiously avoided any discussion of specific means of implementing its general policy of "restoring" and "rehabilitating" Ziegler's Grove, noting instead that the document does not include "site specific details and recommendations" because "more detailed assessments of impacts" would be prepared later, "as part of necessary implementation planning."

6. Now, without disclosing to the public any "site specific details and recommendations," and without preparing any "more detailed assessments of impacts," the Park Service has issued several statements—statements that it refuses to explain, deny, or retract— indicating that the agency has decided to implement its general policy of "restoring" and "rehabilitating" Ziegler's Grove by demolishing the Cyclorama Center.

7. In doing so, the Park Service has violated NEPA and NHPA. The Park Service violated NEPA because (1) it never prepared an Environmental Impact Statement (EIS) or Environmental Assessment (EA) disclosing and evaluating the potential environmental impacts of demolishing the Cyclorama Center and (2) it never considered reasonable alternative means of implementing the general policy of "restoring" and "rehabilitating" Ziegler's Grove, including, without limitation, relocation of the Cyclorama Center to another site, prior to determining that the Cyclorama Center will be demolished. The Park Service violated NHPA because (1) it did not use the historic Cyclorama Center to the maximum extent feasible before committing to relocate agency facilities to new buildings and (2) it failed to prepare a program for proper management and maintenance of the Cyclorama Center.

8.  By this action, Plaintiffs seek to prevent the Park Service from demolishing the historic Cyclorama Center without complying with NEPA and NHPA, and to force the Park Service to comply with specific, mandatory provisions of NHPA governing management and use of historic properties owned by federal agencies.  To that end, Plaintiffs request that this Court grant declaratory and injunctive relief sufficient to ensure that the Park Service prepares an adequate Environmental Impact Statement ("EIS") or Environmental Assessment ("EA") evaluating the impacts of demolishing the Cyclorama Center and alternative means of effecting the agency's general policy of "restoring " and "rehabilitating" Ziegler's Grove, as required by NEPA, including, without limitation, relocating the building to another site; that the Park Service properly uses and preserves the Cyclorama Center, as required under section 110 of NHPA, 16 U.S.C. § 470h-2; that the Park Service uses the Cyclorama Center to the maximum extent feasible before using new buildings for purposes of carrying out agency responsibilities, as required under section 110 of NHPA, 16 U.S.C. § 470h-2; and that the Park Service prepares a program sufficient for proper management and maintenance of the Cyclorama Center, as required under section 110 of NHPA, 16 U.S.C. § 470h-2.

## JURISDICTION AND VENUE

9.  This action arises under NEPA, as amended, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, including the Council on Environmental Quality ("CEQ") NEPA Regulations, 40 C.F.R. Parts 1500-1508, and under NHPA, as amended, 16 U.S.C. § 470 *et seq.*, and its implementing regulations.

10.  Plaintiffs seek judicial review pursuant to Chapter 7 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

11.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

12.  This Court may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

14.  Plaintiff Recent Past Preservation Network ("RPPN") is a non-profit corporation dedicated to the preservation and understanding of the modern built environment.  RPPN is headquartered in Arlington, Virginia, and has more than 220 members throughout the United States, including Pennsylvania and Washington, D.C.  Members of RPPN regularly advocate for the preservation of significant examples of modern architecture, including the Cyclorama Center. Members of RPPN regularly visit the Cyclorama Center, and they use the building and surrounding areas of Gettysburg National Military Park for educational, recreational, professional, and aesthetic purposes.  RPPN and its members are and will be aggrieved and adversely affected by the actions of Defendants, and they have suffered, and will suffer, injury in fact due to Defendants' failure to comply with the law.  Such injuries are redressible by the relief requested herein.

15.  Plaintiff Dion Neutra is the architect son and partner of the late Richard Neutra.  He is Principal of Richard and Dion Neutra Architects and Executive Consultant to the Neutra Institute for Survival Through Design.  He regularly advocates for the preservation of significant examples of modern architecture, including the works of his firm and his father.  Dion Neutra was his father's collaborator and architectural partner for 30 years.  He served as project architect for the Cyclorama Center.  For many years, Dion Neutra has advocated for the preservation of the Cyclorama Center, and he continues to have a deep personal, professional, and educational interest in the building and its preservation, both as means of commemorating the battle of Gettysburg and as a means of preserving one of the most important examples of Richard

Neutra's architecture. Dion Neutra regularly visits the Cyclorama Center, and he uses the natural and physical environment of the building and surrounding areas of Gettysburg National Military Park for educational, recreational, professional, and aesthetic purposes. Dion Neutra resides in Los Angeles, California. He is and will be aggrieved and adversely affected by the actions of Defendants, and he has suffered, and will suffer, injury in fact due to Defendants' failure to comply with the law. Such injuries are redressible by the relief requested herein.

16. Plaintiff Christine Madrid French is the author of several published works on the Mission 66 program and the architecture of Richard Neutra, including the Cyclorama Center, and she continues to devote scholarly attention to those topics. Ms. French is also president of RPPN. She regularly visits the Cyclorama Center, and she uses the natural and physical environment of the building and surrounding areas of Gettysburg National Military Park for educational, recreational, professional, and aesthetic purposes including, without limitation, contemplation of the building and its historic significance. Ms. French resides in Charlottesville, Virginia. She is and will be aggrieved and adversely affected by the actions of Defendants, and she has suffered, and will suffer, injury in fact due to Defendants' failure to comply with the law. Such injuries are redressible by the relief requested herein.

17. Defendant John Latschar is sued in his official capacity as Superintendent of Gettysburg National Military Park, which includes the Cyclorama Center. His official residence is in Gettysburg, Pennsylvania.

18. Defendant Dennis Reidenbach is sued in his official capacity as Acting Regional Director, Northeast Region, of the National Park Service. His official residence is in Philadelphia, Pennsylvania.

19. Defendant Marie Bomar is sued in her official capacity as Director of the National Park Service. In that capacity she administers the National Park Service. Her official residence is in Washington, D. C.

20. Defendant Dirk Kempthorne is sued in his official capacity as Secretary of the United States Department of the Interior. In that capacity, he is responsible for the activities of the Department of the Interior and its component agencies, including the National Park Service. His official residence is in Washington, D.C.

21. Defendant National Park Service is an agency within the United States Department of the Interior with responsibility for the proper and lawful management of the national park system, including the Cyclorama Center and Gettysburg National Military Park.

22. Defendant United States Department of the Interior is an agency of the United States and is responsible for the proper and lawful management of the federal public lands committed to its control, including the lands administered by the National Park Service.

## APPLICABLE LAW

23. NEPA mandates that federal agencies identify and evaluate the environmental consequences of their actions and reasonable alternatives thereto. NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C); NEPA § 102(2)(E), 42 U.S.C. § 4332(2)(E). In applying NEPA, federal agencies must undertake a three part analysis:

- First, agencies must determine whether the action is subject to an existing categorical exclusion. Categorical exclusions are classes of actions that the agency has previously identified, in procedures adopted by the agency after consultation with the Council on Environmental Quality, as having no individually or cumulatively significant effects on the environment. 40 C.F.R. §§ 1507.3, 1508.4.

- Second, if the action does not fall within an existing categorical exclusion, the agency must determine whether an Environmental Assessment ("EA") is required. NEPA requires federal agencies to prepare an EA when necessary under their individual implementing procedures. 40 C.F.R. § 1501.3. NEPA also requires federal agencies to prepare an EA for actions that do not normally require an EIS. 40 C.F.R. § 1501.4. Required elements of an EA include, without limitation, discussions of the need for the proposed action, the environmental impacts of the proposed action, and alternatives to the proposed action. 40 C.F.R. § 1508.9. If an EA indicates that the proposed federal action will not have a significant impact on the environment, a Finding of No Significant Impact ("FONSI") must be prepared. 40 C.F.R. § 1508.13.

- Third, the agency must determine whether an Environmental Impact Statement ("EIS") must be prepared. NEPA requires preparation of an EIS if the action may have a significant impact on the environment, or if the agency's individual implementation procedures provide that an EIS is necessary. NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1507.3, 1508.3, 1508.11, 1508.27. Required elements of an EIS include, without limitation, a detailed discussion of the action's environmental impacts and an analysis of alternatives thereto. 40 C.F.R. §§ 1502.14, 1502.16.

24. NHPA governs the actions of federal agencies with respect to historic properties. Section 110 of NHPA, 16 U.S.C. § 470h-2, imposes requirements on federal agencies that own or control historic properties. Those requirements include the following:

- The heads of federal agencies are required to assume responsibility for the preservation of historic properties that are owned or controlled by such agencies, and the agencies must undertake such preservation as may be necessary to permit the assumption of that responsibility. NHPA § 110, 16 U.S.C. § 470h-2.

- As part of their assumption of responsibility for the preservation of historic properties, federal agencies must use, to the maximum extent feasible, available historic properties prior to acquiring, constructing, or leasing buildings for purposes of carrying out agency responsibilities. NHPA § 110, 16 U.S.C. § 470h-2. Agencies must undertake such preservation as may be necessary to permit the maximum feasible use of available historic properties. NHPA § 110, 16 U.S.C. § 470h-2.

- Federal agencies must establish preservation programs to protect historic properties they control. Such programs must ensure, among other things, that any historic properties under agency jurisdiction or control that are eligible for listing in the National Register of Historic Places are managed and maintained in a way that considers the properties' historic, archaeological, architectural, and cultural values. NHPA § 110, 16 U.S.C. § 470h-2.

**FACTUAL BACKGROUND**

25.  In 1955, the National Park Service began a 10-year program designed to improve infrastructure and facilities in National Parks.  According to the Park Service, this program—known as "Mission 66"—included a variety of "physical improvements adequate for expected demands but so designed and located as to reduce the impact of public use on valuable and destructible features…[i]t is intended to give the fullest possible degree of protection, both to visitors and to resources."  The Mission 66 program included some of the most significant projects ever built by the Park Service.  For example, Mission 66 funds were used to construct the Gateway Arch in St. Louis and to rehabilitate Independence Hall in Philadelphia.  Equally important was the Mission 66 program's role in establishing an entirely new building type—the visitor center—in America's national parks.  The vast majority of Mission 66 visitor centers were planned and designed by the National Park Service.  In some national parks, however, the Park Service sought to introduce world-class modern architecture—buildings designed to serve as important examples of modern architecture for many years to come—and, to that end, commissioned designs from prominent private architects of the era.  Overall, five of the 100 Mission 66 visitor centers were designed by prominent private architects.

26.  One of the five was the Cyclorama Center at Gettysburg National Military Park.  The building was intended to be used in a variety of ways:  as an area for visitor services, as museum exhibit space, as administrative offices, as a location for lectures and speeches, as a place to view the battlefield, as a commemorative monument, and as a location for the display of a cyclorama painting by Paul Phillippoteaux titled "Battle of Gettysburg" (the "Cyclorama Painting").  The Cyclorama Painting is a large canvas designed to be hung in a circle, thereby surrounding

viewers with images of the battle.  As one Park Service historian explained, the Cyclorama

Center would meet the criteria for both a sacred monument and a utilitarian public facility.

27.  After rejecting building plans from its staff architects, the Park Service hand-picked

Richard Neutra, partner of the architectural firm Neutra & Alexander, to design the project.

Neutra was, and remains, among the most famous, highly-regarded, and influential architects of

the era, as recognized by his appearance on the cover of *Time*.  Richard Neutra served as

Principal and Executive Architect for the project.  Plaintiff Dion Neutra served as project

architect from the inception of the work.

28.  During his career, Richard Neutra designed a variety of celebrated residential,

commercial and civic structures.  Overall, Neutra's oeuvre was so innovative and influential that

he was posthumously awarded the coveted American Institute of Architects Gold Medal in

recognition of "a significant body of work of lasting influence on the theory and practice of

architecture."  Of all these celebrated designs, Neutra himself considered the Cyclorama Center

to be the project closest to his heart.

29.  Although Neutra designed the Cyclorama Center, the Park Service also remained

closely involved in certain portions of the project.  Among other things, the agency considered

alternative locations for the Cyclorama Center, and ultimately selected the site for the building in

Ziegler's Grove.  The Park Service also gave Neutra detailed instructions concerning the

intended uses of the building, including explicit guidance concerning appropriate arrangements

for housing and hanging the Cyclorama Painting.  For example, the Park Service itself designed

and installed the wooden ring supporting the Cyclorama Painting, the dimensions of which

determined the diameter of the drum-shaped housing.

30.  Neutra's design respected the Park Service's instructions.  However, the architecture

of the building was indisputably his own.  The footprint of the building resembles a keyhole.  At

the north end of the structure, the curved shape of the auditorium, the outer wall of the rotunda, and the ramp used to access a viewing platform create a graceful series of concentric circles. A rectilinear office wing extends to the south, topped by a large observation deck. The building made use of a variety of materials, including glass, metal, concrete, and native Pennsylvania stone. The Cyclorama Center also included several distinctive design features, including Neutra's signature "spider legs"—L-shaped beams which anchor the building to the landscape beyond.

31. Neutra's work on the Cyclorama Center won significant praise from the Park Service. Upon receiving Neutra's drawings, the Park Service's Division of Design and Construction sent the architect a letter congratulating him and his staff "for a job well done." The letter noted that the agency was "well pleased" with Neutra's drawings and specifications, as well as the bid process for the building.

32. The Cyclorama Center was deigned, planned, and built to be ready for the centennial of the Battle of Gettysburg and the Gettysburg Address, both of which took place in 1863. The building was completed in 1962, was dedicated by Dwight D. Eisenhower, and opened to widespread approval from the Park Service and the general public. The press reported that the building was not only "one of the most handsome buildings in the area," but also served as an effective cultural resource for visitors, exhibits, and staff. For many years, the building was used as a visitor center, as administrative offices, and to the Cyclorama Painting.

33. The Park Service failed to adequately maintain and preserve the Cyclorama Center during the ensuing years. Over time, that failure resulted in damage to the building.

34. During the mid-1990's, the Park Service came to contend that the Cyclorama Center was not an historically significant structure, and therefore did not merit inclusion in the National Register of Historic Places. That contention was thoroughly inconsistent with the Park Service's

own conduct during the planning, design and construction of the building—not only did the Park Service go out of its way to hand-pick one of the most famous architects of the mid-twentieth century to design the Cyclorama Center, but it did so as part of an explicit, self-conscious attempt to bring historically important architecture to the national parks.

35.  In 1998, the Keeper of the National Register of Historic Places overturned the Park Service's assessment and declared the Cyclorama Center eligible for listing in the National Register of Historic Places.  The Keeper concluded that the building possesses exceptional historic and architectural significance for two reasons.  First, the Cyclorama Center was a central part of the Mission 66 program.  Specifically, it was "one of only five of a newly-conceived building type, the Visitor Center, designed for the National Parks System by noted, world class architects."  Second, the Cyclorama Center is "the work of a master architect."  The Keeper specifically noted that Richard Neutra "is recognized as a master architect of Modern design by scholars in numerous publications" and that the Cyclorama Center is "a rare example of Neutra's institutional design on the east coast and one of his very few Federal commissions."

36.  During the past 10 years, the Park Service has prepared several documents which discuss the future of Gettysburg National Military Park.  Among other things, these documents propose, contemplate, or assume the Park Service's general policy of "restoring" and "rehabilitating" Ziegler's Grove.  However, none of the documents proposes to implement this policy by demolishing the Cyclorama Center.  And none of the documents analyzes the potential environmental and historic impacts of such demolition and alternatives thereto, as required under NEPA and NHPA.

- Beginning in 1995, the Park Service prepared a Draft Development Concept Plan/Environmental Assessment ("Draft DCP/EA") to evaluate the facilities at Gettysburg National Military Park.  The Draft DCP/EA did not propose to

- 13 -

demolish the Cyclorama Center or evaluate the potential environmental impacts of such demolition and alternatives thereto, such as relocation. The Draft DCP/EA did not identify or evaluate reasonable, feasible uses of the Cyclorama Center and the preservation activities necessary for such uses. The Draft DCP/EA did not constitute or contain a program for proper management and maintenance of the Cyclorama Center. Moreover, the DCP/EA did not evaluate or explain the feasibility of continued use of the Cyclorama Center or identify the preservation activities necessary to permit such use. The Park Service allowed public comment on the Draft DCP/EA. But the agency never formally responded to those comments. Nor did it ever revise the Draft DCP/EA, prepare and publish a Final DCP/EA, or issue a Finding of No Significance ("FONSI"). Put simply, the Park Service failed to complete the NEPA process begun in 1995.

- On December 11, 1996, the Park Service issued a Request for Proposals for Visitor Center and Museum Facilities ("RFP"). The RFP mandated that all responses include provisions for "rehabilitating" the current site of the Cyclorama Center. However, it did not explicitly propose to demolish the Cyclorama Center or evaluate the potential environmental impacts of such demolition and alternatives thereto, such as relocation of the building. The RFP did not evaluate or explain the feasibility of continued use of the Cyclorama Center or identify the preservation activities necessary to permit such use. Nor does it constitute or contain a program for proper management and maintenance of the Cyclorama Center. Based on the RFP, the Park

Service selected a developer with whom it negotiated an agreement to plan and construct new facilities for Gettysburg National Military Park.

• Thereafter, the Park Service determined that "the issues of visitor use and interpretation at the museum complex" should be incorporated into a parkwide GMP/EIS. Among other things, the GMP/EIS includes a general policy of "restoring" and "rehabilitating" Ziegler's Grove. The GMP/EIS is, by its own terms, a "programmatic statement" concerning "a basic management framework for future decisionmaking" on a variety of issues throughout Gettysburg National Military Park. For that reason, the Park Service noted, "site specific details and recommendations are not always included" in the document, and "more detailed assessments of impacts may be prepared as part of necessary implementation planning." One of the policies for which the GMP/EIS does not include "site specific details and recommendations" is the Park Service's general policy of "restoring" and "rehabilitating" Ziegler's Grove. There is no specific plan for implementing the restoration and rehabilitation of Ziegler's Grove in the Draft GMP/EIS, the Final GMP/EIS or in the Park Service's responses to public comments on the Draft GMP/EIS. Nor do these documents propose or evaluate the potential environmental impacts of demolition of the Cyclorama Center or reasonable alternatives thereto, including relocation. Moreover, the GMP/EIS does not evaluate or explain the feasibility of continued use of the Cyclorama Center or identify the preservation activities necessary to permit such use. Nor does it constitute or contain a program for proper management and maintenance of the Cyclorama Center.

- In 1998 and 1999, the Park Service prepared a document titled "Section 106 Case Report" ("Case Report"). The Case Report was prepared in connection with the agency's consideration of the GMP/EIS under section 106 of NHPA, 16 U.S.C. § 470f. Section 106 of NHPA is separate and distinct from section 110 of NHPA. Section 106 requires general analysis of the impacts of "undertakings" that may affect any historic resources, while section 110 mandates that federal agencies take a separate set of steps to preserve a specific sub-group of historic resources—namely, historic resources under federal ownership or control. The Case Report was not a NEPA document, and did not evaluate potential environmental impacts under NEPA. Nor was it a document prepared under section 110 of NHPA, 16 U.S.C. § 470h-2. The Case Report was widely criticized for its failure to fully and accurately analyze the relationship between the GMP/EIS and historic resources at Gettysburg National Military Park. Although the Case Report contains some information about potential costs associated with rehabilitating the Cyclorama Center for continued display of the Cyclorama Painting, it does not properly identify other reasonable uses for the Cyclorama Center. Moreover, the Case Report notes that even though rehabilitation of the Cyclorama Center would be "relatively inexpensive," the Park Service has decided not to rehabilitate the historic structure because the agency preferred to locate its administrative functions in a new building constructed pursuant to the RFP—a document that predated the Case Report by more than one year. Finally, the Case Report does not contain any recommendations or policies for proper management and maintenance of the Cyclorama Center. Put simply, the Case Report did not

adequately evaluate or explain the feasibility of continued use of the
Cyclorama Center or identify the preservation activities necessary to permit
such use before the Park Service had committed to new facilities. Nor did the
Case Report constitute or contain a program for proper management and
maintenance of the Cyclorama Center.

- In July, 1999, representatives of the National Park Service, the Pennsylvania
State Historic Preservation Officer, and the Advisory Council on Historic
Preservation executed a Memorandum of Agreement ("MOA") memorializing
their review of the GMP/EIS under section 106 of NHPA, 16 U.S.C. § 470f.
Although the MOA notes that the GMP/EIS may affect the Cyclorama Center,
the document does not evaluate the potential environmental impacts of
demolishing the Cyclorama Center and does not identify or evaluate
reasonable alternatives to demolition, including relocation. Moreover, the
MOA, by its own terms, does not provide for compliance with section 110 of
NHPA, 16 U.S.C. § 470h-2. Specifically, the MOA does not adequately
evaluate or explain the feasibility of continued use of the Cyclorama Center or
identify the preservation activities necessary to permit such use. Nor does it
constitute or contain a program for proper management and maintenance of
the Cyclorama Center.

- In November, 1999, the National Park Service issued a Record of Decision
("ROD") on the Final GMP/EIS. Among other things, the ROD stated that
the Park Service would adopt a general policy of "rehabilitation of Ziegler's
Ridge [sic.]," and noted that this policy would require the "removal" of the
Cyclorama Center. It did not provide any description or definition of

"removal." Nor did it disclose or evaluate the environmental impacts of any plans to demolish the Cyclorama Center or alternatives thereto. Moreover, the ROD did not adequately evaluate or explain the feasibility of continued use of the Cyclorama Center or identify the preservation activities necessary to permit such use. Nor does it constitute or contain a program for proper management and maintenance of the Cyclorama Center.

37. Thus, none of the Park Service's documents proposes any specific plan for implementing the agency's general policy of "restoring" and "rehabilitating" Ziegler's Grove. Nor does any of the Park Service's documents evaluate the potential environmental impacts of demolishing the Cyclorama Center or reasonable alternatives thereto, such as relocating the building, as required under NEPA. Significantly, neither the GMP/EIS nor the ROD evaluated the possibility of relocating the Cyclorama Center, despite the fact that relocation would clearly achieve the Park Service's stated purpose of "restoring" and "rehabilitating" Ziegler's Grove

38. Moreover, none of the Park Service's documents demonstrates compliance with section 110 of NHPA, 16 U.S.C. § 470h-2, which governs management and use of historic properties controlled by federal agencies. Specifically, none of the Park Service's documents adequately evaluated the feasibility of continued use of the Cyclorama Center or the preservation activities that may be necessary to permit such use prior to the agency's commitment to new facilities at Gettysburg National Military Park. Nor does any of the Park Service's documents constitute a preservation program adequate to ensure that the Cyclorama Center is properly managed and maintained.

39. Although the Park Service has never formally proposed a specific means of implementing its general policy of "restoring" and "rehabilitating" Ziegler's Grove, the agency

clearly plans to demolish the historic Cyclorama Center.  Evidence of the Park Service's
determination to demolish the Cyclorama Center includes the following:

- The Gettysburg National Military Park newsletter—a document intended to
  educate the public about the Park Service's plans for the park—has reported
  that the Cyclorama Center will be demolished.

- In a letter to Dion Neutra, Superintendent Latschar inaccurately, but
  revealingly, referred to the title of the 1999 MOA as *Demolition* of the
  *Cyclorama Building and Landscape Restoration, Gettysburg National Military
  Park.*  The actual title of the 1999 MOA is "Memorandum of Agreement
  Between Gettysburg National Military Park, National Park Service, the
  Pennsylvania State Historic Preservation Officer and the Advisory Council on
  Historic Preservation."  In fact, the word "demolition" does not appear once in
  the 1999 MOA.

- In a second letter to Dion Neutra, Superintendent Latschar stated that the
  demolition of the Cyclorama Center has been authorized.

- On seven different occasions during the past two years, Plaintiffs and their
  counsel have formally requested that the Park Service clarify its plans for the
  Cyclorama Center.  Not only has the Park Service failed to clarify its plans or
  even to respond to Plaintiffs, it has refused to deny that the Cyclorama center
  will be demolished.

- The Park Service has broken ground on a new building that is designed to
  replace the Cyclorama Center.

- A large rectangular hole has been cut into the side of the Cyclorama Center, and a rough wooden construction fence erected along the building's observation deck.

- The Park Service closed the Cyclorama Center to the public on November 22, 2006. The closure took place just days after the 143rd anniversary of the Gettysburg address, an event the Cyclorama Center was deigned to commemorate.

40.  The Park Service's treatment of the Cyclorama Center is highly controversial, in that there is a substantial dispute about the nature and potential effects of the Park Service's demolition of the Cyclorama Center. The dispute includes, but is not limited to, numerous comments concerning the Cyclorama Center submitted to the Park Service by recognized experts in the fields of architecture, preservation, and history, including Frank Gehry, Sir Norman Foster, Robert A.M. Stern, Richard Longstreth, and the late J. Carter Brown. In addition, thousands of people have signed petitions objecting to the Park Service's treatment of the Cyclorama Center and disputing the agency's characterization of the effects of "rehabilitating" and "restoring" Ziegler's Grove.

41.  On June 21, 2005, the World Monument Fund, the foremost private, non-profit organization dedicated to preserving historic, artistic, and architectural heritage worldwide, listed the Cyclorama Center as one of the 100 Most Endangered Sites in the World.

42.  On October 21, 2005, Plaintiffs sent a letter to Superintendent Latschar requesting clarification of the Park Service's plans, if any, for the Cyclorama Center. Plaintiffs noted that the Park Service had not prepared an EA or EIS identifying and evaluating potential environmental impacts of demolishing the Cyclorama Center and reasonable alternatives thereto,

and that the agency had not complied with section 110 of NHPA. Plaintiffs never received a response.

43. Between November 16, 2005 and December 2, 2005, counsel for Plaintiffs attempted to reach Superintendent Latschar by telephone on three occasions. On all three occasions, counsel for Plaintiffs left a message requesting an opportunity to discuss the October 21, 2005 letter from Plaintiffs. Counsel for Plaintiffs never received a response.

44. On December 2, 2005, counsel for Plaintiffs telephoned Jake Hoogland, Chief of the Environmental Quality Division of the Park Service, requesting information about the Park Service's plans for the Cyclorama Center and the status of agency's NEPA compliance, if any, and advising Mr. Hoogland of the contents of Plaintiffs' October 21, 2005 letter to Superintendent Latschar. On December 8, 2005, Mr. Hoogland left a voice message for Plaintiffs' counsel. In that voice message, Mr. Hoogland stated that he had asked Gettysburg National Military Park for its reaction to Plaintiffs' October 21, 2005 letter to Superintendent Latschar. Mr. Hoogland also pledged to provide the information requested by counsel for Plaintiffs. Neither Plaintiffs nor their counsel ever received any further information from Mr. Hoogland.

45. On December 5, 2005, Plaintiffs sent a second letter to Superintendent Latschar repeating their concerns about the Park Service's failure to comply with NEPA and the NHPA. Plaintiffs also noted that their legal counsel had attempted to reach Superintendent Latschar by telephone on three separate occasions without receiving any reply. Plaintiffs never received a response to their December 5, 2005 letter.

46. On January 20, 2006, counsel for Plaintiffs telephoned Mr. Hoogland to remind him of Plaintiffs' request for information. Neither Plaintiffs nor their counsel ever received a response.

47.  On June 28, 2006, while visiting the Cyclorama Center, Christine Madrid French noticed that a large rectangular hole has been cut into the side of the Cyclorama Center, and a rough wooden construction fence has been erected along the building's observation deck.

48.  In June and July, 2006, plaintiffs' counsel received formal statements of interest in relocating the Cyclorama Center from two different business owners in Gettysburg.  Both business owners proposed to relocate the Cyclorama Center to available property within their control in and adjacent to Gettysburg.

49.  On or about September 18, 2006, Plaintiff Christine Madrid French sent a letter to Superintendent Latschar once again seeking information about the Park Service's plans, if any for the Cyclorama Center.  Ms. French noted that the Park Service must comply with NEPA and with section 110 of NHPA prior to demolishing the Cyclorama Center, and, further, that the agency had not yet done so.  She also provided approximately 25 documents relevant to such compliance.  Ms. French never received a reply.

50.  In light of the Park Service's failure to respond to Plaintiffs' numerous attempts, over the course of more than a year, to obtain information about the agency's plans for the Cyclorama center and its compliance, if any, with NEPA and NHPA, further pursuit of administrative remedies, if any such remedies exist, would be futile.

51.  On October 16, 2006, counsel for Plaintiffs requested, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, that the Park Service make available the following documents:

- "The preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania."

- "To the extent not covered by the foregoing request, all documents, records, and other materials related to the preparation of the preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania."

52. In a letter dated November 8, 2006, the Park Service informed counsel for Plaintiffs that "[t]here are no records responsive to your request." In other words, the Park Service has no records related to the preservation program for the Cyclorama Center required under section 110 of NHPA, 16 U.S.C. § 470h-2. Nor does the agency have any records related to the preparation of such a plan.

53. An actual, justiciable controversy exists between Plaintiffs and Defendants

54. Injunctive relief is necessary to prevent irreparable injury to Plaintiffs and damage to the public interest. In the absence of such relief, the historic Cyclorama Center, a building eligible for listing in the National Register of Historic Places, is likely to be demolished and lost forever—a prospect that the Park Service refuses to deny, and, indeed, has endorsed. Demolition of the Cyclorama Center would cause great and irreparable injury to Plaintiffs. Furthermore, Plaintiffs' remedies at law are inadequate because their claims under NEPA and NHPA would not provide a remedy if the building has already been demolished.

55. Plaintiffs do not dispute that the Cyclorama Painting should be restored and preserved in an appropriate manner. Nor would Plaintiffs object if such restoration and preservation requires that the Cyclorama Painting be removed from the Cyclorama Center and installed in a new setting. Nor does this action challenge the Park Service's general policy decision to restore or rehabilitate certain areas of the Gettysburg battlefield. Rather, Plaintiffs

contest the Park Service's failure to comply with NEPA and NHPA prior to determining that the

historic Cyclorama Center must be demolished.

## VIOLATIONS OF LAW

## COUNT I

## Violation of the National Environmental Policy Act § 102(2)(C), 42 U.S.C. § 4332(2)(C):

## Failure to Prepare an Environmental Impact Statement

56.  Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs

1 through 55 above.

57.  NEPA requires all federal agencies to prepare a detailed Environmental Impact

Statement ("EIS") on every proposal for a major federal action significantly affecting the quality

of the human environment.  NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C).  The human

environment is defined comprehensively to include both the natural and built environment, as

well as the relationship of people with the environment.  40 C.F.R. § 1508.14.  The definition of

significance involves several considerations, including, without limitation, the degree to which

effects on the human environment are likely to be controversial, the degree to which structures

listed in or eligible for listing in the National Register of Historic Places may be adversely

affected, and the potential for loss or destruction of significant cultural or historic resources.  40

C.F.R. § 1508.27.  Required elements of an EIS include, without limitation, a detailed discussion

of environmental consequences and an analysis of alternatives.  40 C.F.R. §§ 1502.14, 1502.16.

The detailed discussion of environmental consequences must analyze, among other things,

historic resources, cultural resources, and the design of the built environment, including the reuse

and conservation potential of various alternatives and mitigation measures.  40 C.F.R. § 1502.16.

58. Demolition of the Cyclorama Center does not fall within an existing categorical exclusion.

59. Demolition of the Cyclorama Center is a major federal action that may—and indeed will—have a significant impact on the quality of the human environment.

60. Defendants have not prepared an EIS containing, *inter alia*, a detailed discussion of the environmental consequences of demolishing the Cyclorama Center and an analysis of alternative means of implementing the Park Service's general policy of "restoring" and "rehabilitating" Ziegler's Grove. Relocation of the Cyclorama Center is a reasonable means of achieving the Park Service's general policy of "restoring" and "rehabilitating" Ziegler's Grove, and therefore must be among the alternatives considered in such an EIS.

61. Therefore, Defendants must prepare an adequate EIS prior to demolishing the Cyclorama Center.

## COUNT II

**Violation of the National Environmental Policy Act § 102(2)(E), 42 U.S.C. § 4332(2)(E), and of the Council on Environmental Quality's Regulations Implementing the National Environmental Policy Act, 40 C.F.R. §§ 1501.3 and 1501.4:**

**Failure to Prepare an Environmental Assessment**

62. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 61 above.

63. NEPA requires federal agencies to prepare an EA when necessary under their individual implementation procedures. *See* NEPA § 102(2)(E), 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1501.3, 1507.3.

64. Under implementation procedures adopted by the Park Service, "[a]n EA should be prepared if [] an action is not listed as a [categorical exclusion], or if the action is not listed as an

action normally requiring an EIS, and a decision to prepare an EIS has not been made." *See*
National Park Service Director's Order 12 Handbook ("DO-12 Handbook") § 5.2. The Park
Service has not listed the demolition of the Cyclorama Center as a categorical exclusion or as an
action normally requiring an EIS. *See* 516 Department of the Interior Decision Manual 2,
appendix 1; DO-12 Handbook §§ 3.3-3.4, 4.4. The Park Service has not made a decision to
prepare an EIS evaluating the demolition of the Cyclorama Center. Therefore, an EA evaluating
the demolition of the Cyclorama Center is necessary under implementation procedures approved
by the National Park Service. *See* DO-12 Handbook §§ 5.1-5.2.

65. NEPA also requires federal agencies to prepare an EA for actions that they have not
previously categorized as (1) normally requiring an EIS or (2) categorically excluded from
further analysis. 40 C.F.R. § 1501.4.

66. Defendants have not previously categorized demolition of the Cyclorama Center as
an action which normally requires an EIS or an action which is categorically excluded from
further analysis. *See* 516 Department of the Interior Decision Manual 2, appendix 1; DO-12
Handbook §§ 3.3-3.4, 4.4.

67. Required elements of an EA include, without limitation, discussions of the need for
the proposed action, the environmental impacts of the proposed action, and alternatives to the
proposed action. 40 C.F.R. § 1508.9.

68. Defendants have not prepared an EA discussing, *inter alia*, the need for demolishing
the Cyclorama Center, the environmental impacts of demolition, and alternative means of
implementing the Park Service's general policy of "restoring" and "rehabilitating" Ziegler's
Grove.

69. Therefore, if Defendants do not prepare an EIS evaluating the demolition of the
Cyclorama Center, they must prepare an EA in order to determine whether an EIS is necessary

prior to demolishing the building. *See* 40 C.F.R. §§ 1501.4(c), 1508.9(a)(1); DO-12 Handbook §

5.2. Relocation of the Cyclorama Center is a reasonable means of implementing the Park

Service's general policy of "restoring" and "rehabilitating" Ziegler's Grove, and therefore must

be among the alternatives considered in such an EA.

## COUNT III

### Violation of the National Environmental Policy Act §§ 102(2)(C) and (E), 42 U.S.C. §§

### 4332(2)(C) and (E):

### Failure to Adequately Analyze Alternatives

70. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs

1 through 69 above.

71. NEPA requires that agencies study, develop, and describe alternatives for every

major federal action significantly affecting the human environment. NEPA § 102(2)(C), 42

U.S.C. § 4332(2)(C). The human environment is defined comprehensively to include both the

natural and built environment, as well as the relationship of people with the environment. 40

C.F.R § 1508.14. The definition of significance involves several considerations, including,

without limitation, the degree to which effects on the human environment are likely to be

controversial, the degree to which structures listed in or eligible for listing in the National

Register of Historic Places may be adversely affected, and the potential for loss or destruction of

significant cultural or historic resources. 40 C.F.R. § 1508.27.

72. Demolition of the Cyclorama Center is a major federal action significantly affecting

the human environment.

73. NEPA also requires that agencies study, develop, and describe alternatives for every

proposed action involving unresolved conflicts over alternative uses of available resources.

NEPA § 102(2)(E), 42 U.S.C. § 4332(2)(E).

74. Demolition of the Cyclorama Center involves unresolved conflicts over alternative uses of available resources.

75. Defendants have not studied, developed, and described alternative means of implementing the Park Service's general policy of "restoring" and "rehabilitating" Ziegler's Grove.

76. Therefore, before demolishing the Cyclorama Center, Defendants must study, develop, and describe alternative means of implementing the Park Service's general policy of "restoring" and "rehabilitating" Ziegler's Grove. Relocating the Cyclorama Center is a reasonable means of doing so, and therefore must be among the alternatives considered.

## COUNT IV

### Violation of the National Historic Preservation Act § 110, 16 U.S.C. § 470h-2:

### Failure to Properly Use and Preserve Available Historic Properties

77. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 76 above.

78. NHPA mandates that the heads of federal agencies assume responsibility for the preservation of historic properties owned or controlled by such agencies. NHPA § 110, 16 U.S.C. § 470h-2.

79. As part of their assumption of responsibility for the preservation of historic resources, federal agencies must use, to the maximum extent feasible, available historic properties before acquiring, constructing, or leasing buildings for purposes of carrying out agency responsibilities. NHPA § 110, 16 U.S.C. § 470h-2.

80. NHPA requires federal agencies to undertake such preservation as may be necessary to permit (1) the assumption of responsibility for preservation of historic properties owned by the

agency and (2) the maximum feasible use of available historic properties.  NHPA § 110, 16 U.S.C. § 470h-2.

81.  The Cyclorama Center is an historic property, is owned or controlled by Defendants, and is available to Defendants.

82.  Defendants have not undertaken such preservation as may be necessary to assume and carry out their responsibility for the preservation of the Cyclorama Center.

83.  Defendants failed to identify or evaluate reasonable, feasible uses of the Cyclorama Center and the preservation activities necessary for such uses prior to committing to acquire, construct, or lease buildings at or near Gettysburg National Military Park for purposes of carrying out agency responsibilities.

## COUNT V

### Violation of the National Historic Preservation Act § 110, 16 U.S.C. § 470h-2:

### Failure to Establish an Adequate Preservation Program

84.  Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 83 above.

85.  NHPA mandates that each federal agency establish a preservation program for the protection of historic properties.  Such programs must ensure, among other things, that any historic properties under the jurisdiction or control of the agency which are listed in or may be eligible for listing in the National Register of Historic Places be managed and maintained in a way that considers the properties' historic, archaeological, architectural, and cultural values in compliance with 16 U.S.C. § 470f.  NHPA § 110, 16 U.S.C. § 470h-2.

86.  The Cyclorama Center is an historic property and is owned or controlled by Defendants.

87. Defendants have failed to establish a preservation program that ensures that the Cyclorama Center is managed and maintained in a way that considers the building's historic, archaeological, architectural, and cultural values in compliance with 16 U.S.C. § 470f. Indeed, Defendants conceded as much in their response to Plaintiffs' October 16, 2006 FOIA request.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue a declaratory judgment that

    (a) Defendants' failure to prepare an EIS before removing the Cyclorama Center from its present site constitutes a violation of NEPA and the APA and that NEPA requires, at minimum, that such an EIS analyze alternatives for relocating the building; or

    (b) Defendants' failure to prepare an EA before removing the Cyclorama Center from its present site constitutes a violation of NEPA and the APA and that NEPA requires, at minimum, that such an EA analyze alternatives for relocating the building.

2. Issue a declaratory judgment that Defendants' failure to consider alternative means of effecting removal of the Cyclorama Center, including, without limitation, alternatives for relocating the building, constitutes a violation of NEPA and the APA.

3. Issue a declaratory judgment that Defendants' failure to use the Cyclorama Center to the maximum extent feasible—as well as their failure to undertake preservation which may be necessary to permit such use—prior to committing to new facilities in Gettysburg National Military Park constitutes a violation of NHPA and the APA.

4. Issue a mandatory injunction requiring Defendants to comply with the provisions of NEPA by doing the following:

(a)  Preparing a legally adequate EIS evaluating the removal of the Cyclorama

Center and alternatives thereto, including, without limitation, alternatives for

relocating the building; or

(b)  Preparing a legally adequate EA evaluating the removal of the Cyclorama

Center and alternatives thereto, including, without limitation, alternatives for

relocating the building, in order to determine whether a full EIS is required under

NEPA.

5.  Issue a mandatory injunction requiring Defendants to comply with NHPA by doing

the following:

(a)  Using the Cyclorama Center to the maximum extent feasible, including, but

not limited to, undertaking such preservation as may be necessary to permit that

use; and

(b)  Undertaking such preservation as may be necessary to carry out their

responsibility for the preservation of the Cyclorama Center; and

(c)  Establishing a preservation program adequate to ensure that the Cyclorama

Center is managed and maintained in a way that considers the building's historic,

archaeological, architectural, and cultural values.

6.  Issue a preliminary injunction preventing Defendants, their officers, administrators,

agents, employees, and those in active concert or participation with them, from undertaking any

demolition, deconstruction, removal, or alteration of the Cyclorama Center or portions thereof

pending litigation of the issues raised in this Complaint.

7.  Issue a permanent injunction preventing Defendants, their officers, administrators,

agents, employees, and those in active concert or participation with them, from undertaking any

demolition, deconstruction, removal, or alteration of the Cyclorama Center or portions thereof until such time as they have complied with NEPA and NHPA.

8. Award Plaintiffs their costs, including attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and NHPA, 16 U.S.C. § 470w-4.

9. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

_____
Nicholas C. Yost (USDC-DC Bar No. 968289)[1]
Matthew G. Adams (CA Bar No. 229021)
SONNENSCHEIN NATH & ROSENTHAL LLP
Attorneys for Plaintiffs
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

---

[1] Mr. Yost is admitted to practice before this court (USDC-DC Bar No. 968289).   Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar. No. 35297).

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Recent Past Preservation Network; Dion Neutra; and Christine Madrid French. | John Latschar; Dennis Reidenbach; Marie Bomar; Dirk Kempthorne; The National Park Service; and The United States Department of the Interior. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Arlington, VA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Sonnenschein Nath & Rosenthal LLP
525 Market Street
26th Floor
San Francisco, CA 94105-2708
(415) 882-2440

ATTORNEYS (IF KNOWN)

---

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

● **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Violations of the National Environmental Policy Act and National Historic Preservation Act. Judicial review pursuant to the Administrative Procedure Act.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** _____ Check YES only if demanded in complaint

**JURY DEMAND:**    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE _Dec 4, 2006_    **SIGNATURE OF ATTORNEY OF RECORD** _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.