# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Case Number.:  1:06-CV-02077-TFH
Judge:  Thomas F. Hogan
Deck Type:  Administrative Agency
             Review
Date Filed:  12/05/2006

NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56, Plaintiffs Recent Past Preservation Network, Christine

Madrid French, and Dion Neutra ("Plaintiffs") hereby move for summary judgment.  For the

reasons fully set forth in the accompanying Memorandum of Points and Authorities in Support of

Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memorandum of Points and

Authorities"), there are no genuine issues of material fact in dispute, and Plaintiffs are entitled to

judgment.  This Motion is supported by Plaintiffs' Memorandum of Points and Authorities, by

the declarations and exhibits submitted in support of Plaintiffs' Memorandum of Points and

Authorities, by Plaintiffs' Motion to Supplement the Administrative Record or in the Alternative

Request for Judicial Notice, by Plaintiffs' Statement of Material Facts as to Which There is No

Genuine Issues, by the pleadings, by the administrative record, by the accompanying Proposed

Order, and by any other evidence or argument presented therewith.


Respectfully submitted,


/s/

_____
Nicholas C. Yost (USDC-DC Bar No. 968289)[1]
Matthew G. Adams (CA Bar No. 229021)
SONNENSCHEIN NATH & ROSENTHAL LLP
Attorneys for Plaintiffs
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

---

[1] Mr. Yost is admitted to practice before this court (USDC-DC Bar No. 968289).   Mr. Yost is
admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active
member of the California Bar and practices under that membership (Bar. No. 35297).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case Number.: 1:06-CV-02077-TFH<br>Judge: Thomas F. Hogan<br>Deck Type: Administrative Agency Review<br>Date Filed: 12/05/2006<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | ) ) ) ) | |

# TABLE OF CONTENTS

**Page**

1. Introduction ................................................................................................. 2

2. Factual Background ...................................................................................... 3

   A.   The Park Service Commissions World-Renowned Architect Richard Neutra To Design The Gettysburg Cyclorama Center As Part Of The Landmark Mission 66 Program. .................................................................................................. 3

   B.   Neutra's Design For The Cyclorama Center Wins Praise From The Park Service And Others ........................................................................................... 5

   C.   The Cyclorama Center Is Declared Eligible For Listing In The National Register Of Historic Places ................................................................................ 6

   D.   The Park Service Seeks To Give Portions Of Gettysburg National Military Park A Civil War-Era Appearance ..................................................................... 7

      1.   The 1996 Draft Development Concept Plan/Environmental Assessment ............... 7

      2.   The 1999 General Management Plan/Environmental Impact Statement ............. 8

      3.   The Section 106 Case Report ........................................................................ 9

      4.   The Section 106 Memorandum of Agreement ............................................... 9

      5.   The 1999 Record Of Decision ..................................................................... 10

   E.   The Park Service Refuses To Respond To Plaintiffs' Good-Faith Requests For Information About The Cyclorama Center .............................................. 10

   F.   Information In "The Public Domain" Clearly Indicates That The Park Service Has Decided To Demolish The Cyclorama Center ......................................... 12

   G.   Members Of The Community Express Interest In Relocating The Cyclorama Center 13

   H.   Experts Determine That The Cyclorama Center Can Be Relocated ...................... 13

   I.   Support For The Cyclorama Center Continues To Grow ...................................... 13

3. Legal Background ......................................................................................... 15

   A.   The National Environmental Policy Act ....................................................... 15

      1.   The NEPA Process ..................................................................................... 15

2.   The Purposes Of The NEPA Process ........................................................... 16

3.   Applicable Regulations ............................................................................... 17

B.   The National Historic Preservation Act ............................................................. 17

C.   The Administrative Procedure Act .................................................................... 18

D.   National Park Service Land Use Planning ......................................................... 18

4.   Standard of Review ........................................................................................... 20

A.   Summary Judgment ........................................................................................... 20

B.   NEPA, NHPA, and the APA .............................................................................. 20

5.   Argument ............................................................................................................ 20

A.   Plaintiffs Have Standing .................................................................................... 20

B.   Defendants' Decision To Demolish The Cyclorama Center Is Reviewable Under The Administrative Procedure Act ............................................................... 21

1.   NEPA Claims (Counts I, II, and III) ........................................................... 21

2.   NHPA Claims (Counts IV and V) ................................................................ 23

a)   Failure to Make Maximum Feasible Use Of The Cyclorama Center (Count IV) ....................................................................................... 23

b)   Failure to Prepare A Preservation Program (Count V) ...................... 24

C.   Defendants Failed To Prepare An EA Or An EIS Evaluating The Impacts Of Demolishing The Cyclorama Center, Thereby Violating NEPA ........................ 24

1.   The GMP/EIS Did Not Propose Or Evaluate Demolition Of The Cyclorama Center ....................................................................................... 25

a)   The Plain Language Of The GMP/EIS Clearly Indicates That The Document Did Not Propose Or Evaluate Demolition Of The Cyclorama Center ....................... 25

b)   Public Notices Regarding The GMP/EIS Do Not Mention Demolition Of The Cyclorama Center ............................................................... 28

c)   Other NEPA Documents Prepared By Defendants Demonstrate That The GMP/EIS Did Not Evaluate Demolition .................................. 30

2.   The GMP/EIS Does Not Provide A Site-Specific Environmental Analysis ........... 32

a)   The Plain Language Of The GMP/EIS Clearly Indicates That The Document Did Not Address Site-Specific Projects .......................... 33

**b)     Applicable Park Service Procedures Demonstrate That The Agency Could Not Have Proposed, Considered, Or Adopted Site-Specific Projects In The GMP/EIS** . 35

**c)     The Tower EA Demonstrates That The GMP/EIS Did Not Authorize Site-Specific Implementation Of The Intrusions MP** ........................................................ 36

**d)     The GMP/EIS Does Not Analyze Potential Site-Specific Environmental Impacts Associated With Demolition Of The Cyclorama Center** ............................ 37

**e)     Defendants' Own NEPA Procedures Explicitly Prohibit Them From Relying On A Programmatic Document To Authorize The Demolition Of The Cyclorama Center** ........................................................................................................................ 38

**D.     Defendants Failed to Consider Alternatives To The Demolition Of The Cyclorama Center, Thereby Violating NEPA** ............................................................................... 40

**E.     Defendants Failed To Properly Use And Preserve Available Historic Properties, Thereby Violating The National Historic Preservation Act** ................................. 41

**1.     The Park Service Must Demonstrate "Maximum Feasible Use" Of The Cyclorama Center Before Beginning Construction Of New Facilities** ......................... 42

**2.     The Park Service Failed To Demonstrate—Or Even Evaluate—"Maximum Feasible Use" Of The Cyclorama Center Before Beginning Construction Of New Facilities** ........................................................................................................................ 42

**F.     Defendants Failed To Prepare An Adequate Preservation Program For The Cyclorama Center, Thereby Violating The National Historic Preservation Act** ............. 44

**6.     Conclusion** ........................................................................................................ 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ALDF v. Glickman*,
154 F.3d 426 (D.C. Cir. 1998) .................................................................21

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) .................................................................................20

*Andrus v. Sierra Club*,
442 U.S. 347 (1979) .................................................................................17

*Bennett v. Spear*,
520 U.S. 154 (1997) ......................................................21, 22, 23, 24, 35

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ..................................................................38

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................................................20

*Citizens Against Burlington v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ................................................................32

*Citizens Against Rails-To-Trails v. Surface Transportation Board*,
267 F.3d 1144 (D.C. Cir. 2001) ..............................................................17

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) .................................................................................20

*City of Dania Beach v. Federal Aviation Administration*,
485 F.3d 1181 (D.C. Cir. 2007) ..............................................................23

*Coliseum Square Association v. Jackson*,
465 F.3d 215 (5th Cir. 2006) ..................................................................26

*Communities Against Runway Expansion v. FAA*,
355 F.3d 678 (D.C. Cir. 2004) ................................................................39

*Forest Service Employees for Environmental Ethics v. United States Forest Service*,
397 F. Supp. 2d 1241(D. Mont. 2005) ....................................................22

*Friends of the Earth v. Laidlaw Environmental Services*,
528 U.S. 167 (2000) .................................................................................21

*Friends of Yosemite Valley v. Norton*,
348 F.3d 789 (9th Cir. 2003) .............................................................32, 37

*Greater Yellowstone  Coalition v. Bosworth*,
209 F. Supp. 2d 156 (D.D.C. 2002) ............................................26, 27, 28

*Ilio'ulaokalani Coalition v. Rumsfeld*,
464 F.3d 1083 (9th Cir. 2006) ................................................................38

*Karst Environmental Education and Protection v. Environmental Protection Agency*,
475 F.3d 1291 (D.C. Cir. 2007) ..............................................................18

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ...........................................................................15, 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................................21

*Manitoba v. Norton*,
398 F. Supp. 2d 41 (D.D.C. 2005) ...........................................................20

*Montana Wilderness Association v. Fry,*
    310 F. Supp. 2d 1127 (D. Mont. 2004)..................................................25
*National Association of Homebuilders v. United States Army Corps of Engineers,*
    417 F.3d 1272 (D.C. Cir. 2005) ........................................................21
*Natural Resources Defense Council v. Nuclear Regulatory Commission,*
    606 F.2d 1261 (D.C. Cir. 1979)........................................................40
*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004)............................................................................22
*Pennaco Energy v. Department of the Interior,*
    377 F.3d 1147 (10th Cir. 2004) .............................................25, 36, 37
*Pit River Tribe v. United States Forest Service,*
    469 F.3d 768 (9th Cir. 2006) ................................................25, 26, 38
*Robertson v. Methow Valley Citizens' Council,*
    490 U.S. 332 (1989)...............................................................15, 16, 20

## FEDERAL STATUTES

National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f................................ passim
National Historic Preservation Act, 16 U.S.C §§ 470-470x-6.................................. passim
5 U.S.C. §§ 701-706 ........................................................................18
5 U.S.C. § 704 .................................................................................21
5 U.S.C. § 706(1) ............................................................................22
5 U.S.C. §§ 706(1), 706(2) ..............................................................18
5 U.S.C. §§ 706(1), 706(2) ..............................................................20
5 U.S.C. §§ 706(1), 706(2) ..............................................................21
40 C.F.R. § 1500.1(a)..............................................................15, 17
40 C.F.R. §§ 1500.2, 1507.3.................................................................17
40 C.F.R. §§ 1501.3, 1501.4(b), 1507.3, 1508.9 ...........................15, 22
40 C.F.R. §§ 1501.4(a)(2)......................................................15, 16
40 C.F.R. §§ 1502.14, 1502.16...............................................................16
40 C.F.R. §§ 1502.14, 1502.16, 1508.9 ....................................................40
40 C.F.R. §§ 1502.14, 1508.9...............................................................22
40 C.F.R. § 1502.20, 1508.28...............................................................37
40 C.F.R. §§ 1503.1, 1508.22(a)...........................................................28
40 C.F.R. § 1505.2................................................................16, 28, 29
40 C.F.R. § 1507.3..........................................................................16
40 C.F.R. § 1508.13.........................................................................16
40 C.F.R. §§ 1508.18(a)....................................................................22
40 C.F.R. § 1508.22(a)......................................................................29
40 C.F.R. § 1508.27(b)(8)..................................................................30
40 C.F.R. § 1508.28....................................................................37, 38
40 C.F.R. § 1508.9..........................................................................16
53 Fed. Reg. 4731 (Feb. 17, 1988) ..........................................41, 42, 44
16 U.S.C. § 1a-7(b).........................................................................19

## MISCELLANEOUS

*Webster's Third Unabridged International Dictionary* at 1921 (1993)............................26

1.    **Introduction**

The material facts of this case are neither complicated nor subject to dispute.  This case is about the National Park Service's decision to demolish the Gettysburg Cyclorama Center ("Cyclorama Center"), an historic building at Gettysburg National Military Park ("GNMP" or the "Park") which was designed by world-renowned architect Richard Neutra and is eligible for listing in the National Register of Historic Places.  During the past 15 years, the Park Service has prepared a dizzying array of studies, reports, plans, assessments, statements, and policies which are designed to help the agency give portions of the Park a Civil War-era appearance.  Although some of those documents suggest that the Cyclorama Center may be *removed from its current location*, an area of the Park known as "Ziegler's Grove," the Park Service never identified, evaluated, or disclosed to the public the potential environmental impacts of *demolishing* the Cyclorama Center, as required under the National Environmental Policy Act of 1969 ("NEPA").  Similarly, the Park Service's prodigious pile of paper does not contain a preservation program for the Cyclorama Center or an analysis of opportunities to re-use the building, both of which are required by section 110 of the National Historic Preservation Act ("NHPA").

However, in preparing the administrative record for this case, and in answering Plaintiffs' complaint, Defendants have willfully ignored the substantive legal focus of Plaintiffs' allegations.  Instead, they continue to pretend that this case is a challenge to the Park Service's general plan for managing GNMP.

Therefore, before turning to the factual and legal background of this case, we will briefly explain what this case is *not* about.  This case is not about a policy disagreement over the Park Service's management of historic resources at GNMP.  This case is not about the Park Service's desire to give portions of the Park a Civil War-era appearance.  This case is not about the Park Service's determination that creating such an appearance may require removing the Cyclorama

Center from Ziegler's Grove. This case is not about Defendants' compliance with section 106 of

NHPA. And, perhaps most importantly, this case is not about the validity of the General

Management Plan/Environmental Impact Statement prepared by the Park Service in 1999 (the

"GMP/EIS").

Instead, this case is about a document the Park Service has not yet prepared—namely, an

analysis which describes the agency's proposed demolition of the Cyclorama Center; identifies

and evaluates the significance of any environmental impacts of demolition; discusses alternative

means of removing the Cyclorama Center from its current location (e.g., moving the building);

analyzes the maximum feasible re-use of the Cyclorama Center; and includes a program for

preserving the Cyclorama Center in a manner consistent with NHPA. The Park Service never

prepared such a document. Accordingly, for the reasons set forth below, Plaintiffs respectfully

request that this Court grant summary judgment in their favor.

## 2.    Factual Background

### A.    The Park Service Commissions World-Renowned Architect Richard Neutra To Design The Gettysburg Cyclorama Center As Part Of The Landmark Mission 66 Program.

During the 1950's, the National Park Service began a 10-year program designed to

improve infrastructure and facilities in National Parks. Declaration of Christine Madrid French

Exhibit A, Attachment A.[1] According to the Park Service, this program—known as "Mission

66"—included a variety of "physical improvements adequate for expected demands but so

designed and located as to reduce the impact of public use on valuable and destructible features."

CMFD Ex. A at 2. *See also* Administrative Record ("AR") 1897-98. Put simply, it was

"intended to give the fullest possible degree of protection, both to visitors and to resources." *Id*.

---

[1] Hereinafter cited using the following format: "CMFD Ex. A, Att. A"

The Mission 66 program included some of the most significant projects ever built by the Park Service. CMFD Ex. A at 2. For example, Mission 66 funds were used to construct the Gateway Arch in St. Louis and to rehabilitate Independence Hall in Philadelphia. *Id*. Equally important was the Mission 66 program's role in establishing an entirely new building type—the visitor center—in America's national parks. *Id*.; AR 1897.

The vast majority of Mission 66 visitor centers were planned and designed by the National Park Service. CMFD Ex. A at 3. In some national parks, however, the Park Service sought to introduce world-class modern architecture—buildings designed to serve as important examples of modern architecture for many years to come—and, to that end, commissioned designs from prominent private architects of the era. *Id*. Overall, just five of the 100 Mission 66 visitor centers were designed by prominent private architects. *Id*.; AR 1897-98.

The Cyclorama Center was one of the five. AR 1896-98. The building was intended to be used in a variety of ways: as an area for visitor services, as museum exhibit space, as administrative offices, as a location for lectures and speeches, as a place to view the battlefield, as a commemorative monument, and as a location for the display of a cyclorama painting by Paul Phillippoteaux titled "Battle of Gettysburg" (the "Cyclorama Painting"). CMFD Ex. A Att. A. Essentially, the Cyclorama Center was required to meet the criteria for both a sacred monument and a utilitarian public facility. *Id*.

After rejecting building plans from its staff architects, the Park Service hand-picked Richard Neutra to design the project. CMFD Ex. A at 2. Neutra was then, and remains today, among the most famous, highly-regarded, and influential architects in the world. *Id*. *See also* AR 1572, 1896. His fame transcended the world of architecture; indeed, he once appeared on the cover of *Time*. CMFD Ex. A, Att. B. During his career, Neutra designed a variety of celebrated residential, commercial and civic structures, including some of the greatest works of

architecture in this country.  CMFD Ex. A at 2-3, Att. J, K, M, N; AR 1897-98.  Overall, his

oeuvre was so innovative and influential that he was posthumously awarded the coveted

American Institute of Architects Gold Medal in recognition of "a significant body of work of

lasting influence on the theory and practice of architecture." CMFD Ex. A at 3.  But of all his

celebrated designs, Neutra himself considered the Cyclorama Center to be the project closest to

his heart.  *Id*.  *See also* CMFD Ex. A, Att. A; Declaration of Dion Neutra ("NeutraD") ¶ 6.

Although Neutra designed the Cyclorama Center, the Park Service also remained closely

involved in certain portions of the project.  NeutraD. ¶ 4.  Among other things, the agency

considered alternative locations for the Cyclorama Center, and ultimately selected the site for the

building in Ziegler's Grove.  *Id*.  The Park Service also gave Neutra detailed instructions

concerning the intended uses of the building, including explicit guidance regarding the

appropriate arrangements for housing and hanging the Cyclorama Painting.  *Id*.  For example, the

Park Service itself designed and installed the wooden ring supporting the Cyclorama Painting,

the dimensions of which determined the diameter of the drum-shaped housing.  *Id*.

**B.**     **Neutra's Design For The Cyclorama Center Wins Praise From The Park
        Service And Others**

Neutra's design respected the Park Service's instructions.  NeutraD. ¶ 4.  However, the

architecture of the building was indisputably his own.  *Id*.  The footprint of the building

resembles a keyhole.  NeutraD. ¶ 5.  At the north end of the structure, the curved shape of the

auditorium, the outer wall of the rotunda, and the ramp used to access a viewing platform create

a graceful series of concentric circles.  *Id*.  A rectilinear office wing extends to the south, topped

by a large observation deck.  The building made use of a variety of materials, including glass,

metal, concrete, and native Pennsylvania stone.  *Id*.  The Cyclorama Center also included several

distinctive design features, including Neutra's signature L-shaped "spider leg" beams.  *Id*.

Neutra's work on the Cyclorama Center won significant praise from the Park Service. CMFD Ex A at 3, Att C.  Upon receiving Neutra's drawings, the Park Service's Division of Design and Construction sent the architect a letter congratulating him and his staff "for a job well done."  *Id*.  The letter noted that the agency was "well pleased" with Neutra's drawings and specifications, as well as the bid process for the building.  *Id*.

The Cyclorama Center was designed, planned, and built to be ready for the centennial of the Battle of Gettysburg and the Gettysburg Address, both of which took place in 1863.  CMFD Ex. A at 2.  The building was completed in 1962, and opened to widespread approval from the Park Service and the general public.  *Id*. at 2-3.  The press reported that the building was not only "one of the most handsome buildings in the area," but also served as an effective cultural resource for visitors, exhibits, and staff.  *Id*. at 3.

**C.    The Cyclorama Center Is Declared Eligible For Listing In The National Register Of Historic Places**

In 1998, the Keeper of the National Register of Historic Places declared the Cyclorama Center eligible for listing in the National Register of Historic Places.  AR 1896.  The Keeper concluded that the building possesses exceptional historic and architectural significance for two reasons.  AR 1896-98.  First, the Cyclorama Center was a central part of the Mission 66 program.  AR 1897-98.  Specifically, it was "one of only five of a newly-conceived building type, the Visitor Center, designed for the National Parks System by noted, world class architects."  *Id*.  Second, the Cyclorama Center is "the work of a master architect."  *Id*.  The Keeper specifically noted that Richard Neutra "is recognized as a master architect of Modern design by scholars in numerous publications" and that the Cyclorama Center is "a rare example of Neutra's institutional design on the east coast and one of his very few Federal commissions." AR 1898.

**D.    The Park Service Seeks To Give Portions Of Gettysburg National Military Park A Civil War-Era Appearance**

During the past 10 years, the Park Service has prepared a number of documents which discuss the future of GNMP.  *See* AR 32-50 (Record of Decision), 51-55 (Section 106 Memorandum of Agreement), 119-1484 (GMP/EIS), 1592-1609 (Section 106 Case Report), 3240-3356 (Draft Development Concept Plan/Environmental Assessment).  Among other things, these documents propose, contemplate, or assume that the Park Service will create a Civil War-era appearance in certain areas of the Park.  *See, e.g.*, AR 238 (restoration of "original grade").  Those areas include Ziegler's Grove, the current location of the Cyclorama Center.  *See*, *e.g.*, AR 18 (GMP/EIS' preferred alternative "rehabilitates" battlefield areas like Ziegler's Grove).

**1.    The 1996 Draft Development Concept Plan/Environmental Assessment**

Beginning in 1995, the Park Service prepared a Draft Development Concept Plan/Environmental Assessment ("Draft DCP/EA") to evaluate the facilities at GNMP.  *See* AR 17, 3240-3356.  The Park Service may have "considered" public feedback on the Draft DCP/EA, but there is no evidence that the agency ever published a notice alerting members of the public of the opportunity to review the document and submit comments.  *Compare* AR 17 (Park Service "considered" comments) *with* AR 3240-3544 (no record of public notice).  Nor did the agency ever respond to the comments it did happen to receive.  *See* AR 1-13 (no responses to comments listed in index to original administrative); 3057-3546 (no responses to comments in supplemental administrative record)[2].  Moreover, it never revised the Draft DCP/EA, prepared or published a Final DCP/EA, or issued a Finding of No Significant Impact ("FONSI").  *See* AR 1-13 (index to administrative record), 3057-3546 (supplemental administrative record).  On May 6, 1998, the

_____

[2] The index to the Defendants' "supplemental administrative record" does not have citeable page numbers.

Park Service prepared and distributed a memorandum and notice formally terminating the

DDCP/EA process.  AR 2311-12.

> ### 2.    The 1999 General Management Plan/Environmental Impact Statement

Thereafter, the Park Service determined that "the issues of visitor use and interpretation

at the museum complex" should be incorporated into a parkwide GMP/EIS.  AR 122.  The

GMP/EIS is, by its own terms, a "programmatic statement" concerning "a basic management

framework for future decisionmaking" on a variety of issues throughout Gettysburg National

Military Park.  AR 121.  For that reason, the Park Service noted, "site specific details and

recommendations are not always included" in the document, and "more detailed assessments of

impacts may be prepared as part of necessary implementation planning."  *Id*.

One of the policies for which the GMP/EIS did not include "site specific details and

recommendations" is a Management Prescription suggesting that "non-historic or modern

structures and intrusions [be] eliminated" (the "Intrusions MP").[3]  AR 223.[4]  The GMP/EIS does

not propose, evaluate, or approve any specific plan for implementing the Intrusions MP.  AR

223, 231.  *See also* AR 200 ("a range of actions is possible as a result of adoption of a

management prescription").  Nor does the document otherwise propose or evaluate the potential

environmental impacts of demolition of the Cyclorama Center.  *See* AR 175-448 (description of

alternatives and environmental consequences).  Moreover, the GMP/EIS does not evaluate or

explain the feasibility of continued use of the Cyclorama Center, identify the preservation

---

[3] Unfortunately, the Park Service failed to provide any numerical or symbolic means of identifying the Management Prescriptions considered in the GMP/EIS.  For that reason, "Intrusions MP," though hardly elegant, appears to be the only reasonable way to avoid repeating the entire Prescription.

[4] Confusingly, the wording of this Management Prescription varies within the GMP/EIS.  Compare AR 223 ("non-historic or modern structures and intrusions are eliminated") with AR 231-232 ("non-historic *and* non-contributing structures and intrusions are eliminated").  For purposes of clarity, and without waiving any claims, arguments, or rights, Plaintiffs will consistently use the former wording in this Motion.

activities necessary to permit such use, or contain a program for proper management and maintenance of the Cyclorama Center. *See* AR 119-1484 (complete GMP/EIS).

### 3.    The Section 106 Case Report

In 1998 and 1999, the Park Service prepared a document titled "Section 106 Case Report." *See* AR 1592-1609. The Section 106 Case Report was prepared in connection with the agency's consideration of the GMP/EIS under section 106 of NHPA.[5] *Id*. The Section 106 Case Report was not a document prepared pursuant to section 110 of NHPA. *Id*. Nor was the Section 106 Case Report a NEPA document—it did not evaluate potential environmental impacts and it was never released for public review and comment. *Id*. *See also* AR 1-13 (no record of circulation of public comment).

The Section 106 Case Report was widely criticized for its failure to fully and accurately analyze the relationship between the GMP/EIS and historic resources at Gettysburg National Military Park. *See*, *e.g*., AR 1572-73 ("an unconscionable intellectual travesty"). Although the Section 106 Case Report contains some information about potential costs associated with "continued use" and "re-use" of the Cyclorama Center, the document failed to satisfy the requirements of section 110 of NHPA because it (1) did not account for the Park Service's obligation to preserve historic properties within its control, (2) assumed the existence of new facilities at GNMP, and (3) did not contain any recommendations or policies for proper management and maintenance of the Cyclorama Center. *See* AR 1592-1609.

### 4.    The Section 106 Memorandum of Agreement

---

[5] Section 106 of NHPA is separate and distinct from section 110 of NHPA. Section 106 requires general analysis of the impacts of "undertakings" that may affect any historic resources, while section 110 mandates that federal agencies take a separate set of steps to preserve a specific sub-group of historic resources—namely, historic resources under federal ownership or control. *Compare* 16 U.S.C. § 470f *with* 16 U.S.C. § 470h-2. Plaintiffs do not challenge Defendants' compliance with section 106.

In July, 1999, representatives of the National Park Service, the Pennsylvania State Historic Preservation Officer, and the Advisory Council on Historic Preservation executed a Memorandum of Agreement ("MOA") memorializing their review of the GMP/EIS under section 106 of NHPA.  AR 51-55, 56-59.  Although the MOA notes that the GMP/EIS may affect the Cyclorama Center, the document does not evaluate the potential environmental impacts of demolishing the Cyclorama Center.  Nor does it identify or evaluate reasonable alternatives to demolition, such as relocation.  *Id*.

Moreover, the MOA, by its own terms, does not provide for compliance with section 110 of NHPA.  *See*, *e.g.*, AR 53 (failing to mention section 110).  Specifically, the MOA does not adequately evaluate or explain the feasibility of continued use of the Cyclorama Center or identify the preservation activities necessary to permit such use.  AR 51-55, 56-59.  Nor does it constitute or contain a program for proper management and maintenance of the Cyclorama Center.  AR 51-55, 56-59.

### 5.    The 1999 Record Of Decision

In November, 1999, the National Park Service issued a Record of Decision ("ROD") on the Final GMP/EIS.  AR 14-31.  Among other things, the ROD stated that the Park Service felt "compelled" to remove the Cyclorama Center from Ziegler's Grove in order to restore a Civil War-era appearance in that part of the Park.  *See* AR 18-19 (explaining intent to restore "the historic scene").  The ROD did not provide any description or definition of "removal."  AR 14-31.  Nor did it approve demolition of the Cyclorama Center or discuss alternatives to demolition.  *Id*.  Neither did the ROD evaluate the feasibility of re-using the Cyclorama or contain a program for proper management and maintenance of the Cyclorama Center.  *Id*.

### E.    The Park Service Refuses To Respond To Plaintiffs' Good-Faith Requests For Information About The Cyclorama Center

On October 21, 2005, Plaintiffs, through their counsel, sent a letter to Superintendent Latschar requesting clarification of the Park Service's plans, if any, for the Cyclorama Center. Declaration of Matthew G. Adams ("AdamsD.") ¶ 2, Ex. A.  Plaintiffs noted that the Park Service had not prepared an EA or EIS identifying and evaluating potential environmental impacts of demolishing the Cyclorama Center and reasonable alternatives thereto, and that the agency had not complied with section 110 of NHPA.  *Id.*  Neither Plaintiffs nor their counsel ever received a response.  AdamsD. ¶ 3.

Between November 16, 2005 and December 2, 2005, Plaintiffs' counsel attempted to reach Superintendent Latschar by telephone on three occasions.  AdamsD. ¶ 4.  On all three occasions, Plaintiffs' counsel left a message requesting an opportunity to discuss the October 21, 2005 letter from Plaintiffs.  *Id.*  Plaintiffs' counsel never received a response.  *Id.*

On December 2, 2005, Plaintiffs' counsel telephoned Jake Hoogland, Chief of the Environmental Quality Division of the Park Service.  Declaration of Nicholas C. Yost ("YostD.") ¶ 3.  Plaintiffs' counsel left a telephone message for Mr. Hoogland in which he requested information about the Park Service's plans for the Cyclorama Center and the status of agency's NEPA compliance, if any.  *Id.*  In that same message, Plaintiffs' counsel advised Mr. Hoogland of the contents of Plaintiffs' October 21, 2005 letter to Superintendent Latschar.  *Id.*

Six days later, Mr. Hoogland left a voice message for Plaintiffs' counsel.  YostD. ¶ 4.  In that voice message, Mr. Hoogland stated that he had "asked the Park" for its reaction to Plaintiffs' October 21, 2005 letter to Superintendent Latschar.  *Id.*  Mr. Hoogland also pledged to provide the information requested by Plaintiffs and their counsel.  *Id.*  Neither Plaintiffs nor their counsel ever received any further information from Mr. Hoogland.  *Id.*

On January 20, 2006, after failing to hear back from Mr. Hoogland for several weeks, Plaintiffs' counsel telephoned Mr. Hoogland to remind him of Plaintiffs' request for information.

YostD. ¶ 5.  Plaintiffs' counsel left Mr. Hoogland a message reiterating Plaintiffs' earlier request

for information.  *Id*.  Neither Plaintiffs nor their counsel ever received a response to the January

20 message.  YostD. ¶ 5.

Meanwhile, on December 5, 2005, Plaintiffs, through their counsel, sent a second letter to

Superintendent Latschar repeating their concerns about the Park Service's failure to comply with

NEPA and the NHPA.  AdamsD. ¶ 5, Ex. B.  Plaintiffs also noted that their counsel had

attempted to reach Superintendent Latschar by telephone on three separate occasions without

receiving any reply.  *Id*.  Neither Plaintiffs nor their counsel never received a response to their

December 5, 2005 letter.  AdamsD. ¶ 6.

On or about September 18, 2006, after waiting for a response to her questions and

concerns for nearly a full year, Plaintiff Christine Madrid French sent a letter to Superintendent.

Latschar.  CMFD. ¶ 5.  In that letter, she once again sought information about the Park Service's

plans, if any, for the Cyclorama Center.  CMFD. ¶ 5, Ex. A.  Ms. French also noted that the Park

Service had not complied with NEPA and with section 110 of NHPA.  *Id*.  She also provided

approximately 25 documents relevant to such compliance.  *Id*.  Ms. French never received a

reply to her letter.  CMFD. ¶ 5.

Defendants never explained their repeated, protracted, and thoroughly inappropriate

failure to provide any response to Plaintiffs' numerous attempts to obtain information about the

Cyclorama Center.  In their Answer to Complaint for Declaratory and Injunctive Relief ("Ans."),

however, Defendants suggested for the first time that they did not deem it necessary to respond

to Plaintiffs because "the Park Service's plans with regard to the Cyclorama Building were well-

known and in the public domain."  Ans. ¶ 49.

**F.    Information In "The Public Domain" Clearly Indicates That The Park
Service Has Decided To Demolish The Cyclorama Center**

Information in "the public domain" suggests that the Park Service has decided to demolish the Cyclorama Center. AdamsD. ¶ 15, Ex. M. The Park Service's website states that "[t]he Cyclorama Center is now closed and will not reopen." *Id.* The website contains no mention of the possibility of relocating the Cyclorama Center. *Id.*

The Park Service's website also notes that the Cyclorama Center will be emptied of its contents. *Id.* Specifically, "exhibits and offices in [the] building will be moved to the new museum and visitor center set to open in 2008." *Id.* The new museum and visitor center, in turn, will house museum exhibits, a theater, classrooms, a book store, food service, and archival storage. *Id.* Construction of the "new museum and visitor center" has begun. *Id.*

### G.    Members Of The Community Express Interest In Relocating The Cyclorama Center

In June and July, 2006, Plaintiffs and their counsel were made aware of formal statements of interest in relocating the Cyclorama Center from two different business owners in Gettysburg. YostD. ¶6. Both business owners proposed to relocate the Cyclorama Center to available property within their control in and adjacent to Gettysburg. *Id.*

### H.    Experts Determine That The Cyclorama Center Can Be Relocated

Experts in several fields have concluded that the Cyclorama Center can indeed be removed from its current location in Ziegler's Grove, relocated to nearby property, and feasibly re-used. Declaration of Jerry Matyiko ("MatyikoD.") ¶ 1-11; Declaration of David McIlnay ("McIlnayD.") ¶ 1-12; Declaration of Robert Shoaff ("ShoaffD.") ¶ 1-7. Feasible re-use of the Cyclorama Center could occur either inside GNMP or in adjacent areas of the Borough of Gettysburg. MatyikoD. ¶ 8; McIlnayD. ¶ 9; ShoaffD. ¶ 6.

### I.    Support For The Cyclorama Center Continues To Grow

The Cyclorama Center has long attracted support from prominent architects and designers. Frank Gehry urged the Park Service to make the building a National Historic

Landmark.  CMFD. Ex A, Att. K.  Robert A.M. Stern did the same, noting that "Neutra's work has been equaled perhaps only by that of Frank Lloyd Wright, his mentor and one-time employer, in its contribution toward elevating the status of American Architecture on the world stage."  CMFD. Ex. A, Att. M.

There is also a long history of significant opposition to the Park Service's stubborn refusal to adopt a transparent decisionmaking process at Gettysburg.  Indeed, the agency's unjustifiable mistreatment of those who seek information about the agency's plans for the historic battlefield apparently extends to the halls of Congress.  See CMFD Ex. A at 3.  In the late 1990's, Park Service officials, including Superintendent Latschar, repeatedly refused to provide members of the House of Representatives with information about the GMP/EIS process.  *Id*.  This state of affairs prompted Congressman George Miller[6] to express his frustration with the agency's "communication":

> I am more than a little disturbed by your response.  I expected
> better of you and the agency.  Instead, I get a letter that continues
> the pattern of omissions, and misleading and inaccurate statements
> regarding the Gettysburg proposal.

CMFD. Ex. A, Att. S.  Congressman James Hansen[7] was not nearly so charitable, characterizing Superintendent Latschar's statements in particular as "arrogant and self-serving" and "callous and contemptible."  CMFD. Ex. A, Att. T.

In recent years, however, support for the Cyclorama Center—and opposition to the Park Service's failure to care for the building—has transcended both the architecture and design community and the ranks of those disillusioned by the Park Service's unresponsiveness.  For example, Thomas Hines, generally considered the world's foremost Neutra scholar, has noted

---

[6] At the time, Congressman Miller was the Ranking Member on the House Resources Committee's Subcommittee on National Parks and Public Lands.  French Decl. Exhibit A, Attachment S.

[7] At the time, Congressman Hansen was the Chairman of the House Resources Committee's Subcommittee on National Parks and Public Lands.  French Decl. Exhibit A, Attachment T.

that both he and others now see the Cyclorama Center as a "more valuable and important" component of Neutra's work than ever before. CMFD. Ex. A, Att. O. Similarly, the World Monuments Fund recently recognized the importance of the Cyclorama Center by naming the building to its list of the world's 100 most endangered sites. CMFD. Ex. A, Att. Q.

### 3. Legal Background

#### A. The National Environmental Policy Act

##### 1. The NEPA Process

NEPA is our nation's "basic charter for protection of the environment." 40 C.F.R. § 1500.1(a). It "declares a broad national commitment to protecting and promoting environmental quality," and ensures such protection through "important 'action-forcing' procedures" applicable to federal agencies. *Robertson v. Methow Valley Citizens' Council*, 490 U.S. 332, 348-49 (1989). These "action-forcing procedures" require agencies to take a "hard look" at the environmental consequences of, and reasonable alternatives to, their proposed actions. *Robertson*, 490 U.S. at 350 citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

In applying NEPA, a federal agency must undertake a three-part analysis. First, the agency must determine whether the action is subject to an existing categorical exclusion. Categorical exclusions are classes of actions that the agency has identified, after consultation with the President's Council on Environmental Quality ("CEQ"), as having no individually or cumulatively significant effects on the environment. 40 C.F.R. §§ 1501.4(a)(2), 1507.3, 1508.4.

Second, if the action does not fall within an existing categorical exclusion, the agency must determine whether an Environmental Assessment ("EA") is required. NEPA requires federal agencies to prepare an EA when necessary under their individual implementing procedures. 40 C.F.R. §§ 1501.3, 1501.4(b), 1507.3, 1508.9. NEPA also requires federal agencies to prepare an EA for actions that do not normally require an EIS and do not fit within

an existing categorically exclusion.  40 C.F.R. § 1501.4.  Required elements of an EA include a description of the proposed action; a discussion of the need for the proposed action; an evaluation of the environmental impacts of the proposed action; and an analysis of alternatives to the proposed action and their environmental impacts.  40 C.F.R. § 1508.9.

Third, the agency must determine whether an Environmental Impact Statement ("EIS") must be prepared.  If the agency's EA indicates that the proposed federal action will not have a significant impact on the environment, no EIS is required.  Instead, a Finding of No Significant Impact ("FONSI") must be prepared.  40 C.F.R. § 1508.13.  If, on the other hand, the action may have a significant impact on the environment, an EIS must be prepared.[8]  NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1507.3, 1508.3, 1508.11, 1508.27.  Required elements of an EIS include a description of the proposed action; a detailed discussion of the proposed action's environmental consequences; and an analysis of alternatives to the proposed action and their environmental impacts.  40 C.F.R. §§ 1502.14, 1502.16.  When an agency makes a decision on the basis of information in an EIS, it must prepare a Record of Decision ("ROD").  40 C.F.R. § 1505.2.  The ROD must state the agency's decision, identify all alternatives considered by the agency, and explain whether practicable means of mitigating environmental harm were adopted.  *Id.*

### 2.    The Purposes Of The NEPA Process

The purposes of the three-step NEPA process remains constant, no matter which document (or documents) the agency prepares.  NEPA ensures that federal agencies "will carefully consider significant environmental impacts," but "it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson*, 490 U.S. at 349.

---

[8] An EIS may also be required by an agency's own NEPA regulations.  *See* 40 C.F.R. § 1507.3.

For that reason, Federal agencies must ensure that all NEPA analyses are "available to public officials and citizens *before* decisions are made and *before* actions are taken." 40 C.F.R. § 1500.1(b) (emphasis added).

### 3.    Applicable Regulations

CEQ's NEPA regulations are binding on all federal agencies, including Defendants. *See Andrus v. Sierra Club*, 442 U.S. 347, 357-58 (1979). In interpreting NEPA and the CEQ NEPA regulations, courts give "substantial deference" to CEQ and not to the agency whose conduct is regulated by NEPA. *See Andrus*, 442 U.S. at 358 (deference to CEQ), *Citizens Against Rails-To-Trails v. Surface Transportation Board*, 267 F.3d 1144, 1150 (D.C. Cir. 2001) (no deference to agency interpretation of NEPA). In addition to setting out specific, substantive requirements, the CEQ's NEPA regulations direct individual agencies to prepare their own NEPA procedures. 40 C.F.R. §§ 1500.2, 1507.3. Agency procedures which apply to Defendants include the Department of the Interior's NEPA regulations and a Park Service document known as "The Director's Order 12 Handbook" ("DO-12 Handbook" or "Handbook"). Although the DO 12 Handbook was not promulgated under procedures set forth in the APA, the Park Service has explicitly recognized that "most of the sections derive in whole or in part from the CEQ regulation[s] or [Department of the] Interior NEPA guidelines, giving them the force of law." AdamsD. Ex. L (hereinafter "DO-12 Handbook") at 2. In addition, the Handbook, by its own terms, is "binding on all NPS personnel." *Id*. Therefore, Defendants were legally required to comply with the NEPA procedures in the DO-12 Handbook.

### B.    The National Historic Preservation Act

NHPA governs the actions of federal agencies with respect to historic properties. Section 110 of NHPA imposes several requirements on federal agencies that own or control historic

properties.[9]  *See* 16 U.S.C. § 470h-2.  First, federal agencies are required to assume responsibility for the preservation of historic properties they own or control.  16 U.S.C. § 470h-2(a)(1).  In doing so, agencies must undertake "such preservation as may be necessary" for their historic properties.  *Id*.  Second, as part of their assumption of responsibility for the preservation of historic properties, federal agencies must "use, to the maximum extent feasible, available historic properties" before "acquiring, constructing, or leasing buildings for purposes of carrying out agency responsibilities."  *Id*.  Again, agencies must undertake "such preservation as may be necessary" to permit maximum feasible use of available historic properties.  Third, federal agencies must establish preservation programs to protect historic properties they control.  16 U.S.C. § 470h-2(a)(2).  Such programs must ensure, among other things, that any historic properties under agency jurisdiction or control that are eligible for listing in the National Register of Historic Places "are managed and maintained in a way that considers the properties' historic, archaeological, architectural, and cultural values."  *Id*.

### C.    The Administrative Procedure Act

Neither NEPA nor NHPA provides for a private right of action.  *See Karst Environmental Education and Protection v. Environmental Protection Agency*, 475 F.3d 1291 (D.C. Cir. 2007).  Therefore, this action is governed by the Administrative Procedure Act ("APA").  5 U.S.C. §§ 701-706.  The APA provides that reviewing courts shall "compel agency action unlawfully withheld or unreasonably delayed" and must "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §§ 706(1), 706(2)(A).

### D.    National Park Service Land Use Planning

_____
[9] As noted above, Section 106 of NHPA is separate and distinct from section 110 of NHPA. Plaintiffs do not challenge Defendants' compliance with section 106.

Plaintiffs have made it quite clear that this case is not a challenge to the GMP/EIS.  See Plaintiffs' Complaint For Declaratory and Injunctive Relief ("Complaint") ¶ 55.  As noted above, however, Defendants attach great importance to that document.  *See* Ans. ¶ 68.  Therefore, before turning to Plaintiffs' substantive arguments, we briefly review relevant aspects of the framework within which the GMP/EIS was prepared.

As their name suggests, general management plans are broad statements which provide, for each unit of the National Park System, a general statement of management priorities and desired conditions.  *See generally* 16 U.S.C. § 1a-7(b).  The statutory requirements governing the preparation of these plans are as general as the documents themselves.  *See id.*  By statute, general management plans need only include four items:  measures for the preservation of the area's resources; indications of types and general intensities of development; commitments for visitor carrying capacities; and indications of potential modifications to the external boundaries of the Park.  *Id.*

During the past 15 years, the Park Service has prepared and revised guidance documents which provide specific procedures for implementing these general statutory requirements.  *See* AdamsD. at 13, Ex. K (hereinafter "DO-2").  The Park Service procedures which were applicable to the preparation of GNMP's 1999 GMP/EIS describe General Management Plans as "the first phase of tiered planning and decision making."  DO-2 § 3.3.1.2.  For that reason, the procedures note, General Management Plans focus on broad, programmatic topics such as "why the park was established, and what resource conditions and visitor experiences should be maintained over time."  *Id.*

The procedures also distinguish between the types of actions evaluated in General Management Plans and the types of actions evaluated in subsequent implementation plans. Specifically, they provide that "[d]ecisions about site-specific actions" are not addressed in

General Management Plans, but rather "will be deferred to implementing planning." *Id*. In addition, the procedures state that "[m]ore detailed, site-specific analyses of implementation plan alternatives will be required before any major federal action is undertaken." *Id*.

**4.     Standard of Review**

**A.     Summary Judgment**

Summary judgment is proper where no genuine issues of material fact exist and the moving party is entitled to prevail as a matter of law.  F.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  The materiality of a fact is determined by referring to applicable substantive law.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Thus, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id*. at 254-55.

**B.     NEPA, NHPA, and the APA**

Violations of NEPA and NHPA are reviewable under the APA.  The APA provides relief where agency actions are "unlawfully withheld or unreasonably delayed" and where an agency has acted in a manner which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §§ 706(1), 706(2)(A).  In reviewing claims made under the APA, courts must undertake a "thorough, probing, in-depth review" of agency decisions. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).  Although courts should not substitute their judgment for that of the agency, neither can they "rubber stamp" administrative decisions.  *See Manitoba v. Norton*, 398 F. Supp. 2d 41, 54 (D.D.C. 2005). Instead, they must assure that the agency took a "hard look" at all relevant issues. *Robertson*, 490 U.S. at 350; *Kleppe,* 427 U.S. at 410 n.21 (1976).

**5.     Argument**

**A.     Plaintiffs Have Standing**

- 20 -

In order to establish standing, a plaintiff must demonstrate that (1) he or she will suffer an "injury in fact" without judicial relief; (2) the injury is "fairly traceable" to the defendant's actions; and (3) a favorable judicial ruling will "likely" redress the plaintiff's injury. *See Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992). A plaintiff must also establish that his or her claims fall within the zone of interests protected by the statutory scheme. *See Bennett*, 520 U.S. at 162. The Plaintiffs in this case meet all three requirements. CMFD. ¶ 9-12; NeutraD. ¶ 9, 10. *See also Laidlaw*, 528 U.S. at 183 (plaintiffs for whom aesthetic and recreational values of area will be lessened suffer injury in fact); *ALDF v. Glickman*, 154 F.3d 426, 434 (D.C. Cir. 1998) (en banc) (impacts on quality of environment used by plaintiffs constitute injury in fact).

### B.    Defendants' Decision To Demolish The Cyclorama Center Is Reviewable Under The Administrative Procedure Act

The APA provides for judicial review to "compel agency action unlawfully withheld or unreasonably delayed" and to "set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §§ 706(1), 706(2)(A). As a general matter, the agency "action" in question must be a "final" one. 5 U.S.C. § 704. However, the finality inquiry is a "pragmatic" and "flexible one." *National Association of Homebuilders v. United States Army Corps of Engineers*, 417 F.3d 1272, 1279 (D.C. Cir. 2005).

Plaintiffs' NEPA and NHPA claims satisfy the requirements for APA review, though for slightly different reasons.

### 1.    NEPA Claims (Counts I, II, and III)

As described more fully in the sections which follow, Plaintiffs' NEPA claims challenge the Park Service's failure to prepare (1) a site-specific EA or an EIS evaluating demolition and (2) an analysis of alternatives before it decided to demolish the Cyclorama Center. *See*

Complaint ¶ 56-76. These claims are cognizable under both section 706(1) and section 706(2) of the APA.

Plaintiffs' NEPA claims are properly considered under section 706(1) of the APA, which provides for judicial review to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Such review is proper where "a plaintiff asserts that an agency failed to take a *discrete* action that it is *required* to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) (emphasis added). Compliance with the provisions of NEPA is not discretionary, but mandatory. *See* 42 U.S.C. § 4332(2)(C) (EIS requirement mandatory); 40 C.F.R. §§ 1501.3, 1507.3, DO-12 Handbook §§ 3.3-3.4, 4.4, 5.1-5.2 (EA requirement mandatory); 42 U.S.C. §§ 4332(2)(C), (E), 40 C.F.R. §§ 1502.14, 1508.9 (alternatives analysis mandatory). Moreover, the Park Service's refusal to prepare a NEPA analysis of demolition constitutes final agency action, in that it "marks the consummation of the agency's decisionmaking process" and it creates "legal consequences." *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). *See also Forest Service Employees for Environmental Ethics v. United States Forest Service*, 397 F. Supp. 2d 1241, 1248 (D. Mont. 2005) (refusal to prepare NEPA analysis is a "final agency action" under *Bennett*). Therefore, Defendants' refusal to comply with NEPA's specific, discrete requirements is reviewable under section 706(1) of the APA. *Id.*

Even if Plaintiffs' NEPA claims were not reviewable under section 706(1) of the APA, they are nonetheless proper under section 706(2) of the Act. Section 706(2) provides for judicial review to "set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A). The Cyclorama Center is eligible for listing in the National Register of Historic Places and is owned or controlled by the National Park Service. AR 1896-98. The decision to demolish such a structure is a major federal action. *See* 40 C.F.R. §§ 1508.18(a), (b)(4). Moreover, it is a final

agency action because it "marks the consummation of the agency's decisionmaking process" and it creates "legal consequences." *See Bennett*, 520 U.S. 154, 177-78.[10] Therefore, Defendants' affirmative decision to demolish the Cyclorama Center without preparing (1) a site-specific EA or EIS evaluating demolition and (2) an analysis of alternatives is reviewable under section 706(2) of the APA.

### 2.    NHPA Claims (Counts IV and V)

As described more fully in the sections which follow, Plaintiffs' NHPA claims challenge (1) the Park Service's failure to make maximum feasible use of the Cyclorama Center before constructing new facilities and (2) the agency's failure to prepare an adequate preservation program for the Cyclorama Center. *See* Complaint ¶ 77-87. The first claim is cognizable under either section 706(1) or section 706(2) of the APA, while the latter should be reviewed under section 706(1) alone.

### a)    Failure to Make Maximum Feasible Use Of The Cyclorama Center (Count IV)

Plaintiffs' first NHPA claim alleges that the Park Service failed to make maximum feasible use of the Cyclorama Center before constructing new facilities, thereby violating section 110 of NHPA. The maximum feasible use requirement is mandatory. *See* 16 U.S.C. § 470h-2(a)(1) ("each Federal agency *shall* use, to the maximum extent feasible…") (emphasis added). Defendants' failure to meet that requirement before constructing new facilities is now a final

---

[10] Defendants' answer suggests that they may currently interpret the GMP/EIS as a document which provides a site-specific authorization for demolishing the Cyclorama Center. For reasons explained in greater detail below, such an interpretation could only have been established after the Tower EA and FONSI were completed in 2000. In other words, to the extent Defendants now interpret the GMP/EIS as providing a site-specific analysis of and authorization for demolition of the Cyclorama Center, that interpretation represents a departure from the agency's original view. As such, it too constitutes final agency action under the APA. *See City of Dania Beach v. Federal Aviation Administration*, 485 F.3d 1181, 1187-88 (D.C. Cir. 2007).

action because the facilities are in the process of being built.  Therefore, the claim should be

reviewed under section 706(1) of the APA.

Even if Plaintiffs' first NHPA claim were not reviewable under 706(1) of the APA,

review is proper under section 706(2) of the Act.  Defendants' decision to break ground on a

specific group of new facilities without first maximizing their use of the Cyclorama Center

constitutes a final agency action, and is therefore reviewable.  *See Bennett*, 520 U.S. 154, 177-78.

### b)    Failure to Prepare A Preservation Program (Count V)

Plaintiffs' second NHPA claim asserts that the Park Service failed to prepare a

preservation program for the protection of the Cyclorama Center, thereby violating section 110

of NHPA.  Complaint ¶ 84-87.  The plain language of section 110 clearly establishes that the

creation of such a plan is mandatory for historic properties such as the Cyclorama Center.  *See* 16

U.S.C. § 470h-2(a)(2) ("Each federal agency *shall* establish…a preservation program

for…historic properties") (emphasis added).  Moreover, the establishment of such a program

would constitute final agency action because it would "consummate" the Park Service's

decisionmaking process and determine "rights or obligations" or "legal consequences" with

respect to the Cyclorama Center.  *See Bennett*, 520 U.S. at 177-78 (1997).  Therefore, Plaintiffs'

second NHPA claim is reviewable under section 706(1) of the APA.

### C.    Defendants Failed To Prepare An EA Or An EIS Evaluating The Impacts Of Demolishing The Cyclorama Center, Thereby Violating NEPA

It is undisputed that the Park Service has yet to prepare an EA or an EIS whose purpose is

to evaluate the demolition of the Cyclorama Center.  The sole dispute between the parties is

whether the 1999 GMP/EIS satisfies Defendants' obligation to undertake such an evaluation.

Specifically, Defendants' Answer avers that the 1999 GMP/EIS "contains a NEPA analysis

concerning the *removal* of the Cyclorama Center."  Ans.  ¶ 64 (emphasis added).

If Defendants mean to suggest that the GMP/EIS' "analysis concerning the removal of the Cyclorama Center" satisfies their NEPA obligations, they are badly mistaken. NEPA requires agencies to evaluate the environmental consequences of their proposed actions. The GMP/EIS did not propose to demolish the Cyclorama Center. Nor did it evaluate demolition. In fact, the document, by its own terms, did not propose or evaluate any site-specific projects. Therefore, "analysis concerning removal of the Cyclorama Center" in the GMP/EIS cannot substitute for the evaluation which NEPA requires. *See* Ans. ¶ 64.

      **1.**    **The GMP/EIS Did Not Propose Or Evaluate Demolition Of The Cyclorama Center**

NEPA cases such as this one—that is to say, cases in which an agency attempts to rely on a programmatic document to avoid preparing a site-specific NEPA analysis—are relatively rare. However, a few decisions do address such disputes. In doing so, they generally undertake three distinct (though hardly unrelated) inquiries. First, they review the plain language of the programmatic document to determine whether it properly addresses the site-specific activity. *See, e.g., Montana Wilderness Association v. Fry*, 310 F. Supp. 2d 1127, 1135-39 ( D. Mont. 2004) (emphasizing plain language). Second, they examine public notices and statements issued by the agency during the programmatic NEPA process, including the ROD. *See*, *e.g.*, *Pit River Tribe v. United States Forest Service*, 469 F.3d 768, 783 (9th Cir. 2006) (analyzing ROD to determine whether site-specific NEPA analysis was required). Third, they look at other NEPA documents prepared by the agency. *See Pennaco Energy v. Department of the Interior*, 377 F.3d 1147 (10th Cir. 2004) ("*Pennaco*"); *Pit River Tribe*, 469 F.3d at 783-84. Here, all three considerations weigh in Plaintiffs' favor.

      **a)**    **The Plain Language Of The GMP/EIS Clearly Indicates That The Document Did Not Propose Or Evaluate Demolition Of The Cyclorama Center**

The proposed action identified and evaluated in the GMP/EIS consisted of a variety of land use Management Prescriptions. AR 222-255, 270-285. None of the Management Prescriptions proposes, contemplates, evaluates, or even mentions demolition of the Cyclorama Center. *Id*. Nor does the GMP/EIS evaluate any of the potential environmental impacts typically associated with demolishing a large building—impacts like dust, noise, traffic, compatibility with local zoning, and solid waste. *See*, *e.g.*, *Coliseum Square Association v. Jackson*, 465 F.3d 215, 225-38 (5th Cir. 2006) (evaluating noise, zoning, traffic and cumulative impacts associated with project involving both demolition and construction).

The Intrusions MP provides that the Cyclorama Center may be "removed" from Ziegler's Grove. AR 223, 231-32. But "removal" is not the same as "demolition." There is a clear and widely-accepted difference between the plain meanings of the two terms. Webster's Third Unabridged New International Dictionary lists twelve definitions of "remove" or "removal." *Webster's Third Unabridged International Dictionary* at 1921 (1993). *See also* AdamsD. ¶ 16, Ex. N. Of these, eight refer to the relocation of an existing person, object, or structure. *Id*. None involves demolition, destruction, or any other sort of physical damage. *Id*. In contrast, all five definitions of "demolition" and "demolish" refer to the physical destruction of an object or structure in a single place. *Webster's Third Unabridged International Dictionary* at 600 (1993). *See also* AdamsD. ¶ 16, Ex. N. None of the definitions of "demolition" and "demolish" involves relocation.[11] *Id*. Thus, the plain language of the GMP/EIS demonstrates that the document neither proposed nor evaluated demolition of the Cyclorama Center. *See Greater Yellowstone*

---

[11] Webster's Third Unabridged New International Dictionary is not alone in distinguishing between "removal" and "demolition." The Oxford English Dictionary provides 15 definitions of "remove" and "removal." None makes any reference to demolition or destruction. On the other hand, three of the four definitions of "demolish" and "destruction" specifically reference the destruction of a building. AdamsD. ¶ 12, Ex. J.

*Coalition v. Bosworth*, 209 F. Supp. 2d 156, 161 (D.D.C. 2002) (relying on *Webster's Third Unabridged New International Dictionary* to determine plain language of a document).

Moreover, the Park Service's references to "removal" were not accidental or isolated. On the contrary, the agency consistently discussed "removal"—and not "demolition"—throughout the GMP/EIS. All in all, the main volume of the GMP/EIS includes 451 pages of Park Service analysis. AR 120-570. In those 451 pages, the terms "remove," "removed," and "removal" appear 259 times.[12] *Id.* In contrast, the terms "demolish" and "demolition" appear just five times. AR 275, 366, 488, 514-15. None of the five references is related to the Cyclorama Center. *Id.*

Nor there is any reason to believe that the Park Service consistently used "remove" when it really meant "demolish." In fact, the GMP/EIS contains clear evidence that the agency understood the difference between the two terms, and could have proposed and evaluated "demolition" (as opposed to "removal") had it chosen to do so. For example, in evaluating the capital costs of Alternative D, the Park Service included both a line item for *removal* of several post-1863 structures and a line item for *demolition* of a public restroom facility. AR 488. If the Park Service had intended to consistently use "remove" to convey the meaning of "demolish," it would not have used both terms in the same GMP/EIS spreadsheet.

The dollar figures presented in Defendants' cost estimates provide further evidence that the GMP/EIS did not propose or evaluate demolition of the Cyclorama Center. Appendix 4 of the GMP/EIS presents cost estimates for the Park Service's proposed Management Prescriptions. AR 480-490. As noted above, one of those Management Prescriptions contemplates removal of the Cyclorama Center from Ziegler's Grove. AR 223, 231-32.

---

[12] Some of these instances refer to the removal of vegetation rather than the removal of buildings or objects.

As it happens, the Park Service had previously prepared a cost estimate for the demolition of the Cyclorama Center. AR 2736. In 1995, the agency prepared a "Class C" estimate for the "total demolition of [the] [] structure and surrounding walks and pavements." *Id*. The 1995 cost estimate predicted that the total cost of these activities would be $404,925.00. *Id*. There is no evidence that this cost estimate was ever circulated for public review and comment.[13] *Id*.

If, as Defendants aver, the GMP/EIS truly addressed demolition, the "removal" costs identified in the 1999 cost estimate should have been roughly equal to the "demolition" costs in the 1995 cost estimate. They were not. *Compare* AR 485 *with* AR 2376. In fact, they were not even close. *Id*. The 1999 estimate for "removal" of structures from "major battle action areas" of Gettysburg National Military Park (land which includes Ziegler's Grove) was just $81,000— approximately five times lower than the Park Service's $404,925.00 demolition estimate. *Id*.

### b)    Public Notices Regarding The GMP/EIS Do Not Mention Demolition Of The Cyclorama Center

Under NEPA, the Park Service must issue certain types of public notices during the EIS process. Specifically, the Park Service is required to publish a "Notice of Intent" before preparing a draft EIS and a "Notice of Availability" before releasing a draft EIS for public review and comment. 40 C.F.R. §§ 1503.1, 1508.22(a); DO-12 Handbook at 63, 65. The agency must also prepare a Record of Decision ("ROD") memorializing its final decision on the proposal evaluated in the EIS. 40 C.F.R. § 1505.2; DO-12 Handbook at 78-79. The public notices issued by the Park Service in connection with the GMP/EIS—like the GMP/EIS itself—

---

[13] Indeed, it is not entirely clear why Defendants placed the 1995 cost estimate in the administrative record. The document was never part of the GMP/EIS, and was never circulated for public review and comment. AR 429 (document not in GMP/EIS appendices), 471 (document not in bibliography/references section). In fact, there no evidence that the *Park Service* even reviewed or considered the 1995 cost estimate in connection with the GMP/EIS.

never mention demolition of the Cyclorama Center.  AR 14-31, 1932-33, 2549-50.  Therefore, they constitute further evidence that the document did not propose or evaluate such an activity.

The Park Service published a Notice of Intent for the GMP/EIS on May 5, 1997.  AR 2549-50.  NEPA mandates that such notices "[d]escribe the proposed action and possible alternatives."  40 C.F.R. § 1508.22(a).  The Park Service's notice of intent did, in fact, provide a brief description of the proposed project and alternatives thereto.  AR 2549-50.  It also included a short statement identifying "major issues likely to be addressed" in the document.  *Id*.  However, neither the project description nor the statement of major issues (nor the identified alternatives) mentions demolition of the Cyclorama Center.  *Id*.

On August 18, 1998, the Park Service published a public notice of the availability of the draft GMP/EIS for review and comment.  AR 1932-33.  Like the Notice of Intent, the Notice of Availability briefly described the Park Service's proposed action and identified potentially significant environmental issues.  *Id*.  And, like the Notice of Intent, the Notice of Availability never mentioned demolition of the Cyclorama Center.  *Id*.

At the conclusion of the GMP/EIS process, the Park Service prepared a ROD.  AR 14-31.  Under NEPA, a ROD must describe and explain the agency's decision.  40 C.F.R. § 1505.2.  Unlike the Notice of Intent and the Notice of Availability, the ROD does mention the Cyclorama Center several times.  AR 17-19, 26, 28.  However, it does not identify demolition of the building as a component of the Park Service's decision.  *See* AR 18-20.  Instead, it repeats information from the GMP/EIS about the possibility of removing the Cyclorama Center from Ziegler's Grove.  AR 17-19, 26, 28.  For the reasons described above, such references to *removal* do not—indeed, cannot—substitute for a specific proposal and analysis of *demolition*.

Thus, whether read individually or together, the Notice of Intent, Notice of Availability, and Record of Decision clearly establish that the Park Service did not consider demolition of the

Cyclorama Center to be part of the action proposed in the GMP/EIS.  Moreover, the Park Service

never identified demolition of the Cyclorama Center as a potentially significant environmental

issue addressed in the document despite the fact that the building is eligible for listing in the

National Register of Historic Places (a fact which would have rendered demolition a significant

impact).  *See* 40 C.F.R. § 1508.27(b)(8) (effects on structures eligible for listing in National

Register of Historic Places indicate significant impact).  In short, the GMP/EIS neither proposed

nor evaluated the consequences of demolishing the Cyclorama Center.

> ### c)    Other NEPA Documents Prepared By Defendants Demonstrate That The GMP/EIS Did Not Evaluate Demolition

Other NEPA documents prepared by Defendants also demonstrate that the GMP/EIS did

not evaluate demolition.  Specifically, the Park Service's "Environmental Assessment for the

Demolition and Removal of the National Tower" (the "Tower EA") and accompanying Finding

of No Significant Impact (the "Tower FONSI") provides clear evidence that the GMP/EIS

addressed removal rather than demolition.  *See* AdamsD. ¶ 11, Ex. H, I (hereinafter "Tower EA"

and "Tower FONSI," respectively).

The National Tower was a privately owned observation tower which, until recently, was

located on private land within the boundaries of Gettysburg National Military Park.  Tower EA

at 2.  In appearance, the National Tower was different from the Cyclorama Center in virtually

every respect.  The Cyclorama Center is a modest public building commissioned by the Park

Service and declared eligible for listing in the National Register of Historic Places.  CMFD. Ex.

A, Att. A; AR 1896-98.  In contrast, the National Tower was a 307-foot private structure of no

architectural merit which was owned and operated by a for-profit private company on private

land.  Tower EA 2-3, 7.

In spite of these outward differences, the GMP/EIS treated the National Tower and the

Cyclorama Center structures in a virtually identical fashion.  AR 223, 231-32.  The Park Service

deemed both buildings to be incompatible with the battlefield. *Id.* For that reason, the GMP/EIS suggests that they both may be "removed." AR 18-20, 233, 231.

The Park Service prepared the Tower EA just months after completing the ROD. *Compare* 14-31 *with* Tower EA at i, Tower FONSI at 2. Indeed, the EA explicitly mentions both the ROD and the GMP/EIS as "previous planning" activities for the "demolition and removal" project. Tower EA at 3.

The Tower EA and Tower FONSI provide further evidence that the GMP/EIS did not, in fact, address demolition. First, the very title of the EA ("National Tower Demolition and Removal Environmental Assessment") clearly demonstrates that "demolition" and "removal" are not the same thing. Second, and more importantly, the Tower EA clearly distinguishes between "removal" and "demolition." *See, e.g.*, Tower EA at i, 6, 10. For example, in the Tower EA, the Park Service explains its proposal as follows:

> [T]he tower structure and its surrounding buildings would be demolished and removed. Demolition itself could be could be accomplished through a variety of methods. One alternative method would be to dismantle the structure in a piece-by-piece method through use of cranes and other mechanical methods. Another demolition method would be to use an implosion method to reduce the tower and associated structures into on-site debris and then remove the debris. Under all methods, the resulting debris would be removed by truck…

Tower EA at i. Third, the Tower EA and the Tower FONSI distinguish between environmental impacts associated with "demolition and removal" and environmental impacts associated only with "removal." *See, e.g.*, Tower EA at 5 (air quality impacts would primarily be associated with removal activities), 10 (removal may disturb vegetation or topsoil). Put simply, the Park Service recognized that removal and demolition are not identical. Therefore, the EIS' analysis of removal is not an analysis of demolition.

Moreover, it is worth noting that the very existence of the Tower EA and FONSI demonstrates that "removal" and "demolition" are not the same. When the Tower EA was prepared, the Park Service had a categorical exclusion for "removal of non-historic structures." Tower FONSI at 1. Although the National Tower was not an historic structure, the Park Service did not proceed on the basis of that categorical exclusion. *Id.* Instead, "in the interests of disclosing the limited impacts associated with demolition," the agency prepared an EA. *Id.* If the Park Service truly believed that "removal" and "demolition" were the same thing, the "limited impacts associated with demolition" would have fit within the Park Service's categorical exclusion for "removal of non-historic structures." In other words, if "removal" were "demolition," there would have been no reason for the Park Service to prepare an EA in the first place.

### 2. The GMP/EIS Does Not Provide A Site-Specific Environmental Analysis

Even if the Park Service's "analysis concerning removal of the Cyclorama Center" actually constitutes an evaluation of demolition, the GMP/EIS is nonetheless insufficient to satisfy Defendants' NEPA obligations with respect to the demolition of the Cyclorama Center. NEPA requires federal agencies to evaluate the environmental consequences of their proposed actions. The scope and specificity of that evaluation is governed by the nature and scope of the action itself. *See Citizens Against Burlington v. Busey*, 938 F.2d 190 (D.C. Cir. 1991). *See also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 799 (9th Cir. 2003) (distinguishing specificity required of Park Service Management Plan from that required of subsequent implementation measures). Here, the relevant action is a site-specific demolition project. Complaint ¶ 8. Therefore, in order to satisfy its obligations under NEPA, the Park Service was required to take a "hard look" at the site-specific environmental impacts of demolition. It never did so.

a)       **The Plain Language Of The GMP/EIS Clearly Indicates That The Document Did Not Address Site-Specific Projects**

(1)       **The Plain Language Of The GMP/EIS Demonstrates That Site-Specific Environmental Analysis Is Outside The Scope Of The Document**

It is indisputable that the GMP/EIS is a programmatic document.  In defining the document's scope, the Park Service wrote:

> The Final General Management Plan/Environmental Impact Statement is a programmatic statement.  The proposed action and alternatives consist of a basic management framework for future decision making; therefore, site specific details and recommendations are not always included.  Consequently, the statement presents an overview of potential impacts relating to the proposed program for each alternative.  In the future, if [the Park Service] determines that specific actions called for by the approved plan require additional analysis of impacts, more detailed assessments of impacts may be prepared as part of necessary implementation planning.  AR 121.

Similar statements appear elsewhere in the document.  *See, e.g.*, AR 200 ("in many cases, a more detailed implementation plan must be prepared"), 400 ("this is a programmatic document").  In describing the alternatives analysis in the GMP/EIS, for example, the Park Service noted that "[t]ypically, site-specific details and recommendations are not included in the GMP alternatives, since the GMP is intended to provide a framework for more detailed management decisions." AR 149.  Put simply, the plain language of the GMP/EIS demonstrates that site-specific environmental analysis was outside the scope of the document.  Therefore, it could not have considered the site-specific impacts of demolishing the Cyclorama Center.

(2)       **The Actions Proposed And Evaluated In The GMP/EIS Are Not Site-Specific Actions**

The plain language of the actions proposed and evaluated in the GMP/EIS also demonstrates that the document addressed programmatic—and not site-specific—changes to GNMP.  *See generally* AR 176-298 (all proposals).  The GMP/EIS  proposes and evaluates a

variety of "Management Prescriptions" for the Park.  *Id*.  Management Prescriptions "provide the

policy framework for making specific decisions about resources and visitor use."  AR 200.  One

of the most important attributes of Management Prescriptions is their flexibility.  *Id*.  According

to the Park Service, "[t]hey are intended to provide managers with the flexibility to make good

decisions even when circumstances change."  *Id*.

In order to promote such flexibility, Management Prescriptions do not mandate specific

implementation actions.  *Id*.  Indeed, "a range of management prescriptions is possible as a result

of the adoption of a management prescription."  *Id*.  Although Management Prescriptions may

identify examples of appropriate implementation actions, the Prescriptions themselves "are not

development plans" and do not authorize or require any specific action by the Park Service.  *Id*.

For that reason alone, the Park Service could not possibly have approved demolition of the

Cyclorama Center on the basis of the GMP/EIS.

Moreover, even if a site-specific project could be approved in the form of a Management

Prescription, the Park Service did not do so in this case.  The agency adopted the Management

Prescriptions identified as "Alternative C" in the GMP/EIS.  AR 18-20.  Alternative C includes

33 Management Prescriptions.  AR 222-255, 270-79.  None of the 33 Management Prescriptions

mentions demolition.  *Id*.  The most (and perhaps only) substantive reference to the Cyclorama

Center in Alternative C occurs in the context of the Intrusions MP, which provides, in its

entirety, "[n]on-historic or modern structures and intrusions are eliminated" (the "Intrusions

MP").  AR 223, 231-32.  The GMP/EIS lists "examples of appropriate actions that *may* result"

from this Management Prescription.  AR 223 (emphasis added).  One of the "examples of

appropriate actions that may result" from the Intrusions MP reads "[t]he Cyclorama and Visitor Centers are removed and their sites rehabilitated."[14]

In listing "removal" of the Cyclorama Center as one of several "example[s] of appropriate actions that may result" from the Intrusions MP, the Park Service neither proposed nor approved demolition of the Cyclorama Center.  Put otherwise, the agency's approval of a Management Prescription accompanied by a list of illustrative examples does not constitute final agency action with respect to any particular site-specific project.  As discussed above, final agency actions are those which mark "the consummation of the agency's decisionmaking process" and have "legal consequences."  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The GMP/EIS acknowledged that the actions on the list of "examples" were "representative, and [did] not necessarily designate the specific actions that would be taken."  AR 222.  Therefore, approval of the list neither "consummated" agency decisionmaking nor created any "legal consequences."  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  On the contrary, the Park Service remained (and continues to remain) free to select from among "a range" of possible actions which might help implement the Intrusions MP.

> b)     **Applicable Park Service Procedures Demonstrate That The Agency Could Not Have Proposed, Considered, Or Adopted Site-Specific Projects In The GMP/EIS**

In fact, it would have been thoroughly unreasonable—if not arbitrary and capricious—for the Park Service to propose, consider, or adopt site-specific projects in the GMP/EIS.  During the preparation of the GMP/EIS, the Park Service's planning efforts were governed by a document known as Director's Order # 2.  DO-2 § 3.3.1.2.  Among other things, that document prohibited discussion of site-specific actions in General Management Plans.  *Id*.  Instead, it required that

---

[14] We note that it is far from clear that the Intrusions MP applies to the Cyclorama Center.  The Cyclorama Center is eligible for listing in the National Register of Historic Places.  AR 1896-98. Therefore, it is neither "non-historic" nor "modern."

"[d]ecisions about site-specific actions…be deferred to implementation planning." *Id*.

Furthermore, it mandated that "[m]ore detailed, site-specific analyses of implementation plan

alternatives be required before any major federal action is undertaken." *Id*.  Thus, the Park

Service could not have included a site-specific analysis of the demolition of the Cyclorama

Center in the GMP/EIS without violating its own planning procedures.

### c)    The Tower EA Demonstrates That The GMP/EIS Did Not Authorize Site-Specific Implementation Of The Intrusions MP

The Tower EA and Tower FONSI also demonstrate that the GMP/EIS failed to authorize

site-specific projects implementing the Intrusions MP.  As noted above, the GMP/EIS listed both

"removal" of the Cyclorama Center and "removal" of the National Tower are as "examples of

appropriate actions that may result" from the Intrusions MP.  AR 223.  If the GMP/EIS

authorized the Park Service to carry out site-specific actions such as "removal" of the Cyclorama

Center, it also authorized the Park Service to remove the National Tower.  Of course, the Park

Service's conduct in implementing the GMP/EIS demonstrates a very different interpretation of

the document.  Rather than simply removing the National Tower, the Park Service prepared an

EA and FONSI.  *See* Tower EA i-15; Tower FONSI 1-7.  If the Park Service truly believed that

its GMP/EIS authorized immediate implementation of the Intrusions MP, the agency would have

had no reason to prepare an EA evaluating "demolition and removal" of the National Tower.

In this respect, the instant case is similar to *Pennaco Energy*.  *Pennaco* involved a

challenge to a Bureau of Land Management ("BLM") auction of oil and gas leases.  *Pennaco*,

377 F.3d at 1150.  Instead of preparing a site-specific EA or EIS for the auctioned leases, the

BLM attempted to rely on a Resource Management Plan/Environmental Impact Statement

("RMP/EIS") which had been prepared several years before.  *Pennaco*, 377 F.3d at 1152.  The

RMP/EIS (like the GMP/EIS at issue here) was a programmatic document which did not contain

a site-specific evaluation of specific leases.  *Id*. at 1151 (RMP/EIS is "broadest level" of

decisionmaking).  In apparent recognition of that fact, the BLM had previously prepared a site-specific NEPA analysis for certain other leases which were not part of the litigation.  *Id*. at 1154.  The *Pennaco* court held that the agency's decision to prepare site-specific NEPA analyses for other leases "undercut" BLM's contention that the RMP/EIS was sufficient to authorize site-specific projects.  *Id*. at 1159.  For that reason, it concluded, the tribunal below correctly found that additional NEPA analysis was required.  *Id*. at 1162.

Like *Pennaco*, the instant case challenges a site-specific decision which is purportedly based on a programmatic document.  And, as in *Pennaco*, the programmatic document does not actually propose or evaluate the site-specific decision at issue.  Thus, the existence of the Tower EA—like the site-specific EIS in *Pennaco*—undercuts Defendants' assertion that programmatic analysis suffices for site-specific projects.

### d)    The GMP/EIS Does Not Analyze Potential Site-Specific Environmental  Impacts Associated With Demolition Of The Cyclorama Center

The GMP/EIS' failure to provide a site-specific environmental analysis is not a *per se* violation of NEPA.  An EIS for a general management plan only needs to "provide sufficient detail to foster informed decision-making."  *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 799 (9th Cir. 2003).  Moreover, NEPA explicitly allows federal agencies to eliminate potentially-duplicative environmental review through the use of tiering, a two-stage approach to NEPA review in which agencies address general policy and planning matters in broad, programmatic EISs and then evaluate subsequent implementation actions in more targeted NEPA documents.  *See* 40 C.F.R. § 1502.20, 1508.28.

But tiering does not permit agencies to avoid consideration of site-specific environmental impacts altogether.  40 C.F.R. § 1508.28; DO-12 at 88-89.  Indeed, "[t]he critical inquiry…is not whether the project's site-specific impact should be evaluated but when such detailed evaluation

should occur." *'Ilio'ulaokalani Coalition v. Rumsfeld,* 464 F.3d 1083, 1095-96 (9th Cir. 2006)

citing *California v. Block,* 690 F.2d 753, 761 (9th Cir. 1982). *See also* 40 C.F.R. § 1508.28

(tiering "ultimately" results in "site-specific statements").[15]

     Here, the Park Service did not give any consideration to site-specific environmental

impacts before deciding to demolish the Cyclorama Center. Even assuming that Defendants'

repeated and intentional references to "removal" of the Cyclorama Center from Ziegler's Grove

in fact address "demolition," the GMP/EIS fails to provide any analysis of the environmental

consequences of demolition. *See* AR 356-448 (analysis of environmental consequences fails to

account for demolition impacts). Notably, the document contains no evaluation of the potential

impacts normally associated with a large demolition project—impacts like noise, dust, traffic,

stormwater runoff, and public safety. Nor, for that matter, is there any mention of the specific

method by which the Cyclorama Center will be demolished, of mitigation measures which might

help minimize the environmental impacts of demolition, of disposal and/or recycling of the waste

which would be generated by demolishing a large structure, or of post-demolition site restoration

activities. *See* AR 386-402 (absence of analysis).

     Such an "analysis" hardly sufficient to justify a site-specific demolition project. Once a

site-specific decision is made, "vague prior programmatic statements are no longer enough." *Pit

River Tribe*, 469 F. 3d at 784. Thus, even if the GMP/EIS could have addressed site-specific

environmental impacts of demolishing the Cyclorama Center, it did not actually do so.

       **e)    Defendants' Own NEPA Procedures Explicitly Prohibit Them
           From Relying On A Programmatic Document To Authorize The
           Demolition Of The Cyclorama Center**

---

[15] Indeed, the administrative record suggests that the Park Service recognized as much. For example, the ROD noted that "more detailed [NEPA] assessments may be prepared as part of implementation planning" and that such documents would be tiered from the GMP/EIS. *See* AR 16.

Finally, even if the GMP/EIS' non-existent environmental impact analysis satisfies NEPA, it is not sufficient to satisfy the Park Service's own procedures.[16] The Park Service's NEPA procedures consist primarily of a document called the Director's Order 12 Handbook ("DO-12 Handbook"). The DO-12 Handbook addresses the differences between programmatic and site-specific NEPA reviews in considerable detail. [DO-12 Handbook at 86-89]. Most explicitly, it provides that:

> Before an on-the-ground action (e.g., grading a trail, building a campground) can be taken, there must be site-specific environmental available to a decision-maker in the form of a NEPA document. ***This means you cannot use programmatic NEPA documents to make a site-specific decision***, but must instead follow the process of tiering…

*See* DO-12 Handbook at 87 (emphasis added). Here, Defendants have attempted to do precisely that which is forbidden by the DO-12 Handbook. In relying on the "analysis concerning removal of the Cyclorama Center" in the GMP/EIS to justify demolition of the Cyclorama Center, they used a programmatic NEPA document to make a site-specific decision. That decision conflicts with the explicit direction of the DO-12 Handbook. *See* DO-12 Handbook at 87.

Defendants' failure to follow the DO-12 Handbook violates the law twice over. First, as explained above, the provisions of the DO-12 Handbook carry the force of law and are binding on all Park Service personnel. DO-2 Handbook at 2. Second, even if Defendants' blatant disregard for their own NEPA procedures were not a *per se* violation of law, their reliance on an interpretation of NEPA which is diametrically opposed to the plain language of applicable agency procedures was arbitrary and capricious, and therefore violated the APA. *See Communities Against Runway Expansion v. FAA*, 355 F.3d 678, 688 (D.C. Cir. 2004).

---

[16] The Park Service deems its procedures to be at once "consistent with" and "stricter" than the CEQ regulations. DO-12 Handbook at 2.

At most, then, the Park Service has completed the first step of a tiered NEPA process by preparing a general, programmatic GMP/EIS. However, the agency never completed (or even began) the second step—namely, site-specific analysis of the potential environmental impacts of demolition. Until the agency does so, the Cyclorama Center cannot be demolished.

### D.    Defendants Failed to Consider Alternatives To The Demolition Of The Cyclorama Center, Thereby Violating NEPA

In failing to prepare an EA or EIS addressing the demolition of the Cyclorama Center, the Park Service also violated provisions of NEPA which mandate that federal agencies identify and consider the environmental impacts of alternatives to their proposed actions. *See* NEPA §§ 102(2)(C), (E), 42 U.S.C. §§ 4332(2)(C), (E); 40 C.F.R. §§ 1502.14, 1502.16, 1508.9. In this respect, the instant case is virtually identical to *Natural Resources Defense Council v. Nuclear Regulatory Commission*, 606 F.2d 1261 (D.C. Cir. 1979) ("*NRDC*"). In *NRDC*, federal agencies decided to construct a series of radioactive waste storage tanks without performing any NEPA analysis. *NRDC*, 606 F.2d at 1264. Instead, the agencies relied upon pre-existing programmatic EISs. *Id*. at 1270. The court struck down this approach, holding that "EISs…which were devoted to program level issues [] did not relieve [the agencies] of the obligation to discuss alternatives to particular tanks." *NRDC*, 606 F.2d at 1271. This Court should do the same.

Defendants' failure to identify or evaluate any alternatives to demolishing the Cyclorama Center is particularly egregious because such alternatives are, in fact, available. Plaintiffs and their counsel have received formal statements of interest from two parties interested in relocating the Cyclorama Center. YostD. ¶ 6. Furthermore, an expert in the relocation of large, historic structures has confirmed that the Cyclorama Center can be relocated. MatyikoD. ¶ 7, 8. Moreover, an architect and site planner with considerable expertise in the re-use of historic structures found that the design and condition of the Cyclorama Center are such that the building could feasibly be re-used for a variety of purposes, including office, commercial, and museum

space.  McIlnay D. ¶ 9, 10.  Finally, it is worth noting that the larger architectural, planning, and community context of Gettysburg would accommodate long-term re-use of the Cyclorama Center, whether inside or outside of the Park.  Shoaff Decl. ¶ 6.

Relocation and re-use of the Cyclorama Center appears to accommodate all parties' interests in this matter.  Relocation would allow the Park Service to implement the Intrusions MP.  At the same time, re-use would satisfy Plaintiffs' desire to preserve the building.

Of course, Defendants—and not Plaintiffs—must prepare the alternatives analysis NEPA requires.  After evaluating alternatives to demolition, they may choose to dispute Plaintiffs' conclusions about relocating the Cyclorama Center.  On the legal issue currently before this Court, however, there can be no dispute.  Defendants failed to consider alternatives before they decided to demolish the Cyclorama Center.  Accordingly, Plaintiffs are entitled to summary judgment.

**E.    Defendants Failed To Properly Use And Preserve Available Historic Properties, Thereby Violating The National Historic Preservation Act**

Section 110 of NHPA mandates that the heads of federal agencies assume responsibility for the preservation of historic properties owned or controlled by such agencies.  16 U.S.C. § 470h-2(a).  As part of their assumption of responsibility for the preservation of historic resources, federal agencies must maximize their feasible use of available historic properties before acquiring, constructing, or leasing buildings for purposes of carrying out agency responsibilities.  *Id*.  Among other things, this mandate requires "thorough consideration [of] the use and re-use of historic properties for agency program purposes as alternatives to the construction, acquisition, or leasing of new facilities and to the demolition of historic properties." 53 Fed. Reg. 4731 (Feb. 17, 1988).  Significantly, section 110 also requires federal agencies to "undertake such preservation as may be necessary" to permit maximum feasible use of available

historic properties.  16 U.S.C. § 470h-2.  Defendants failed to take any of these steps, thereby

violating NHPA.

### 1.     The Park Service Must Demonstrate "Maximum Feasible Use" Of The Cyclorama Center Before Beginning Construction Of New Facilities

The Park Service violated NHPA by failing to make maximum feasible use of available

historic properties before acquiring, constructing, or leasing buildings for purposes of carrying

out agency responsibilities.  *Id*.  It is undisputed that the Cyclorama Center is an historic

property, is owned or controlled by Defendants, and is available to Defendants.  Def. Ans. ¶ 86.

Information obtained from the Park Service web site clearly indicates that the agency is in the

process of constructing a building for purposes of carrying out agency responsibilities.  AdamsD.

¶ 15, Ex. M.  In fact, many of the responsibilities which will be carried out in the newly

constructed building were once carried out in the Cyclorama Center.  *Id*.

The only issue in dispute, then, is whether Defendants use the Cyclorama Center "to the

maximum extent feasible."  Because the Cyclorama Center is permanently closed (and therefore

not used for anything), the answer to that question depends on whether the Cyclorama Center can

feasibly be re-used at all.  As noted above, NHPA requires federal agencies to "assume

responsibility" for historic preservation of government-owned or –controlled buildings and to

"undertake such preservation as may be necessary" to permit maximum feasible use.  6 U.S.C. §

470h-2(a)(1).  It also provides for "thorough consideration [of] the use and re-use of historic

properties for agency program purposes as alternatives to the construction, acquisition, or leasing

of new facilities and to the demolition of historic properties."  53 Fed. Reg. 4731 (Feb. 17,

1988).  Therefore, the Park Service bears the burden of properly determining whether the

Cyclorama Center can feasibly be reused.

### 2.     The Park Service Failed To Demonstrate—Or Even Evaluate— "Maximum Feasible Use" Of The Cyclorama Center Before Beginning Construction Of New Facilities

There is only one document in the record which might reasonably be considered a final analysis of the feasibility of reusing the Cyclorama Center. That document—the Section 106 Case Report—devoted approximately one and one-half pages to the subject. AR 1606-1607. First, it briefly discussed the possibility of rehabilitating the Cyclorama Center for "continued use" as a museum. *Id*. Second, and briefer still, it evaluated the potential for "adaptive re-use" of the structure. AR 1607. Neither analysis meets the requirements of section 110 of NHPA.

Defendants' "continued use" analysis evaluated the suitability of the Cyclorama Center for then-existing uses, ultimately concluding that continuing such uses was not feasible. AR 1606-1607. Section 110 requires more. The plain language of the statute provides that "each federal agency shall use, to the maximum extent feasible, historic properties available to the agency." 16 U.S.C. § 470h-2(a)(1). Thus, the "maximum use" required by statute is not limited to existing uses. *Id*. Rather, it includes both "use" and "re-use" of historic properties. *Id*. Defendants' "continued use" analysis never evaluated re-use. AR 1606-07. Nor did it account for NHPA's mandate to "undertake such preservation as may be necessary" to permit maximum feasible use. *Id.*; 16 U.S.C. § 470h-2(a)(1). Therefore, it cannot satisfy their responsibilities under section 110 of NHPA.

The Park Service's "adaptive re-use" analysis is also defective, albeit for a different reason. The analysis itself consists of just two short paragraphs. AR 1607. On the basis of this cursory evaluation, the Park Service concluded that it could not identify any "appropriate public uses" for the Cyclorama Center because "[i]n the future, all visitor services would be housed in the new visitor center/museum complex." *Id*. The agency also found that even though rehabilitation of office spaces for administrative use would be "relatively inexpensive," such re-use "would give the park far more administrative space than needed, since both headquarters and interpretive staff would be located in the proposed visitor center/museum complex." *Id*. Both

findings suffer from the same fatal flaw. Section 110 requires that maximum feasible re-use be

evaluated prior to the construction of new facilities. 16 U.S.C. § 470h-2(a)(1). But the Park

Service's adaptive re-use analysis assumes—and indeed relies upon—the fact that new facilities

will, in fact, be built. AR 1607. Such an analysis turns section 110 on its head. Rather than

"consider[ing] use and re-use of historic alternatives to the construction, acquisition, or leasing

of new facilities," as required by the NHPA, the Park Service relied on the construction of new

facilities to eliminate re-use of historic structures from further consideration. *See* 53 Fed. Reg.

4731 (Feb. 17, 1988). *See also* 16 U.S.C. § 470h-2(a)(1). Therefore, the section 106 Case

Report cannot satisfy Defendants' obligations under section 110 of NHPA.

### F.    Defendants Failed To Prepare An Adequate Preservation Program For The Cyclorama Center, Thereby Violating The National Historic Preservation Act

NHPA mandates that each federal agency establish a preservation program for the

protection of historic properties. 16 U.S.C. § 470h-2(a)(2). Such programs must ensure, among

other things, that any historic properties under the jurisdiction or control of the agency which are

listed in or may be eligible for listing in the National Register of Historic Places be managed and

maintained in a way that considers the properties' historic, archaeological, architectural, and

cultural values. *Id*.

It is undisputed that the Cyclorama Center is an historic property and is owned or

controlled by Defendants. *See* Complaint ¶ 86, Ans. ¶ 86. However, Defendants appear to

contest the fact that they have not prepared a preservation program for the Cyclorama Center.

Ans. ¶ 87. This is a novel position for them, as they previously admitted, in the context of a

Freedom of Information Act ("FOIA") request, that such a program does not exist. AdamsD. ¶

7-9, Ex. C-F. Specifically, on October 16, 2006, counsel for Plaintiffs requested, pursuant to

FOIA the Freedom of Information Act, that the Park Service make available the following

documents:

- 44 -

- "The preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania."

- "To the extent not covered by the foregoing request, all documents, records, and other materials related to the preparation of the preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania."

*Id.* The Park Service's official response was simple and clear: "[t]here are no records responsive to your request." AdamsD. ¶ 9, Ex. F. Under these circumstances, Plaintiffs are entitled to summary judgment.

## 6.      Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court grant summary judgment in their favor.

Respectfully submitted,


/s/
_____
Nicholas C. Yost (USDC-DC Bar No. 968289)[17]
Matthew G. Adams (CA Bar No. 229021)
SONNENSCHEIN NATH & ROSENTHAL LLP
Attorneys for Plaintiffs
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

---

[17] Mr. Yost is admitted to practice before this court (USDC-DC Bar No. 968289).  Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar. No. 35297).

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

RECENT PAST PRESERVATION )
NETWORK, a Virginia non-profit corporation, )
P.O. Box 100505, Arlington, VA 22210; )
DION NEUTRA, 2440 Neutra Place, Los )
Angeles, CA 90039; and CHRISTINE )
MADRID FRENCH, 2522 Willard Drive, )
Charlottesville, VA 22903, )
 )
      Plaintiffs, )
 )
      v. )
 )
JOHN LATSCHAR in his official capacity as )
SUPERINTENDENT OF GETTYSBURG )
NATIONAL MILITARY PARK, 97 )
Taneytown Rd., Gettysburg, PA 17325; )
DENNIS REIDENBACH in his official )
capacity as ACTING DIRECTOR, )
NORTHEAST REGION OF THE )    Case Number.:  1:06-CV-02077-TFH
NATIONAL PARK SERVICE, 200 Chestnut )    Judge:  Thomas F. Hogan
Street, Philadelphia, PA 19106; MARY )    Deck Type:  Administrative Agency
BOMAR in her official capacity as )              Review
DIRECTOR OF THE NATIONAL PARK )    Date Filed:  12/05/2006
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; DIRK KEMPTHORNE in his )    STATEMENT OF UNDISPUTED
official capacity as SECRETARY OF THE )    MATERIAL FACTS
UNITED STATES DEPARTMENT OF THE )
INTERIOR, 1849 C Street, N.W., Washington, )
D.C. 20240; THE NATIONAL PARK )
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; and THE UNITED STATES )
DEPARTMENT OF THE INTERIOR, 1849 C )
Street, N.W., Washington, D.C. 20240, )
 )
      Defendants. )
 )
 )

Pursuant to Rule 7.1(h), Plaintiffs Recent Past Preservation Network, Christine Madrid

French, and Dion Neutra contend that there is no genuine issue as to the following material facts:

1.      The National Park Service has decided to demolish the Cyclorama Center.  (AdamsD. ¶ 15, Ex. M).

2.      Plaintiffs have suffered, and will continue to be, injured by the Park Service's decision to demolish the Cyclorama Center in that the recreational and aesthetic values of Gettysburg National Military Park they enjoy have been, and will be, reduced.  (CMFD. ¶ 9-12; NeutraD. ¶9, 10).

3.      The decision to demolish the Cyclorama Center represents the consummation of the Park Service's decisionmaking process with respect to the building.  (AdamsD. ¶ 15, Ex. M).

4.      The Park Service has not evaluated the site-specific environmental consequences of demolishing the Cyclorama Center in a final NEPA document(AR 32-50, 51-55, 119-1484, 1592-1609).

5.      Demolition of the Cyclorama Center is not authorized under any of the National Park Service's categorical exclusions (AdamsD. ¶ 14, Ex. L).

6.      Defendants never responded to comments on the 1996 Draft Development Concept Plan/Environmental Assessment (AR 1-13, 3240-3356).

7.      Defendants never prepared a Finding of No Significant Impact in connection with the 1996 Draft Development Concept Plan/Environmental Assessment (AR 1-13, 3240-3356; ).

8.      Defendants prepared and distributed a memorandum and notice formally stating that the 1996 Draft Development Concept Plan/Environmental Assessment process was terminated.  (AR 2311-12).

9.      The 1999 General Management Plan/Environmental Impact Statement was a programmatic National Environmental Policy Act document, and did not consider site-specific actions (AR 121, 200, 400, 129, AdamsD. ¶ 13, 14, Ex. K, L).

10.     The Notice of Intent, Notice of Availability, and Record of Decision for the 1999 General Management Plan/Environmental Impact Statement do not state that Defendants will *demolish* the Cyclorama Center; rather, they state, suggest, or imply that the Cyclorama Center may be *removed* from its current location in Ziegler's Grove.  (AR 14-31, 1932-33, 2549-50).

11.     The 1999 General Management Plan/Environmental Impact Statement does not state that Defendants will *demolish* the Cyclorama Center; rather, it states, suggests or implies that the Cyclorama Center may be *removed* from its current location in Ziegler's Grove.  (AR 119-1484; AdamsD. ¶11, Ex. H, I)

12.     The General Management Plan/Environmental Impact Statement evaluates "management prescriptions."  (AR 176-298).

13.     The Alternative identified in the General Management Plan/Environmental Impact Statement as "Alternative C" consisted of management prescriptions (AR 222-255, 270-285).

14.     The Record of Decision adopted Alternative C.  (AR 18-20).

15.     The General Management Plan/Environmental Impact Statement describes "management prescriptions" as follows:  "Management prescriptions help manager of a park decide which implementing actions are appropriate.  They provide a basis for decision making on the long- and short-term issues park managers are aware of today, but also help guide solutions for future problems that are unforeseen.  They are intended to provide managers with the flexibility to make good decisions even when circumstances change.  A range of actions is possible as a result of the adoption of a management prescription, and the purpose of the prescription is to ensure that action is appropriate to protect resources and provide for visitor use and interpretation.  They are not detailed development plans."  (AR 200).

16.     Defendants prepared an Environmental Assessment and Finding of No Significant Impact for the Demolition and Removal of the National Tower (AdamsD. ¶ 10-11, Ex. H, I).

17.     The Environmental Assessment for the Demolition and Removal of the National Tower evaluates both demolition and removal.  (AdamsD. ¶ 10-11, Ex. H, I).

18.     In 1999, Defendants estimated the cost to remove "non-historic and non-contributing structures and intrusions from Battle Action Resource Areas" to be $81,000.00.  (AR 485).

19.     Ziegler's Grove is a Battle Action Resource Area (AR 194-96).

20.     In 1995, Defendants estimated the cost of demolishing the Cyclorama Center to be $404, 925.00. (AR 2376).

21.     Defendants have not considered alternatives to demolition of the Cyclorama Center.

22.     Relocation of the Cyclorama Center is feasible (MatyikoD.).

23.     Re-use of the Cyclorama Center is feasible (ShoaffD.; McIlnayD.).

24.     Property is available for the relocation of the Cyclorama Center (YostD. ¶ 6).

25.     The Cyclorama Center is eligible for listing in the National Register of Historic Places (Complaint ¶ 81, ¶ 86; Answer ¶ 81, ¶ 86; AR 1896-98).

26.     The Cyclorama Center is owned or controlled by Defendants (Complaint ¶ 81, ¶ 86; Answer ¶ 81, ¶ 86; AR 1896-98).

27.     The Cyclorama Center is available to Defendants (Complaint ¶ 81; Answer ¶ 81).

28.     Defendants have begun constructing new facilities for agency use at Gettysburg national Military Park (AdamsD. ¶ 15, Ex. M; www.nps.gov).

29.     Defendants have not prepared a preservation program for the protection of historic properties which applies to the Cyclorama Center. (AdamsD. ¶ 7-9, Ex. C-F).

30.     Defendants do not and have not maximized their feasible use of the Cyclorama Center. (AR 119-1484, 1592-1609).

Respectfully submitted,

/s/
_____
Nicholas C. Yost (USDC-DC Bar No. 968289)[1]
Matthew G. Adams (CA Bar No. 229021)
SONNENSCHEIN NATH & ROSENTHAL LLP
Attorneys for Plaintiffs
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

---

[1] Mr. Yost is admitted to practice before this court (USDC-DC Bar No. 968289).   Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar. No. 35297).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case Number.:  1:06-CV-02077-TFH

Judge:  Thomas F. Hogan

Deck Type:  Administrative Agency Review

Date Filed:  12/05/2006

MOTION TO AUGMENT RECORD, OR IN THE ALTERNATIVE, FOR JUDICIAL NOTICE

Plaintiffs Recent Past Preservation Network, Christine Madrid French, and Dion Neutra ("Plaintiffs") hereby move to augment the administrative record or, in the alternative, request judicial notice.   As described more fully in the Memorandum of Points and Authorities filed in support of their Motion for Summary Judgment, Plaintiffs challenge the National Park Service's failure to comply with the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA) before deciding to demolish the historic Gettysburg Cyclorama Center, an historic building designed by world-renowned architect Richard Neutra and eligible for listing in the National Register of Historic Places.

**1.     Augmentation of the Record**

In general, judicial review of agency action under the Administrative Procedure Act ("APA") is confined to the administrative record.  However, this circuit recognizes eight circumstances in which it may be necessary for a reviewing court to supplement the record or to examine extra-record evidence, including "cases arising under the National Environmental Policy Act" and cases "where agencies are sued for failure to take action. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).  This case is both.  For that reason alone, augmentation of the record is proper. *See Izaak Walton League of America v. Marsh*, 655 F.2d 346, 369 n. 56 (D.C. Cir. 1981) (NEPA claims "warrant" introduction of new evidence). *See also Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (NEPA claim alleging failure to act not confined to the administrative record).

Moreover, this is a case where supplementation is not just permissible, but necessary for effective judicial review.  Plaintiffs allege that the National Park Service failed to prepare discrete, mandatory analyses of environmental impacts before they decided to demolish the Cyclorama Center.  However, in preparing the administrative record in this case, Defendants have willfully ignored the substance of Plaintiffs' Complaint.  Instead, they pretend that this is a

challenge to the adequacy of the Park Service's General Management Plan (GMP) for

Gettysburg National Military Park.  For that reason, they have prepared an administrative record

which is only relevant to the GMP, and which omits documents relevant to the very issues in

dispute—namely, did the Park Service have an obligation to comply with NEPA when

implementing the GMP and, if so, did it discharge that obligation?  The administrative record

prepared by Defendants fails to include any documents which post-date the Plan's adoption.  For

that reason, it precludes effective judicial review of the agency's failure to take required actions

*during the implementation of the Plan.*

Thus, Plaintiffs respectfully request that this Court augment the record with the following

documents:

### A.    Declarations of Jerry Matyiko, Robert Shoaff, and David McIlnay

Plaintiffs contend that the Park Service did not consider alternative means of

implementing the GMP before deciding to demolish the Cyclorama Center.  Effective judicial

review requires that such a claim be accompanied by some explanation of whether such

alternatives exist, and, if so, whether they are truly feasible.  The record prepared by Defendants

cannot provide that information because it is limited to the period which pre-dates the approval

of the GMP.  These three declarations, each of which was submitted in support of Plaintiffs'

Motion for Summary Judgment, provide information about the existence and feasibility of

potential alternatives to demolition, and therefore belong in the administrative record.

### B.    Letter from Christine Madrid French To John Latschar Regarding Park Service Compliance With NEPA and the NHPA

On September 18, 2006, Plaintiff Christine Madrid French sent John Latschar,

Superintendent of Gettysburg National Military Park, a letter requesting information about the

Park Service's plans for the Cyclorama Center and its compliance with NEPA and the NHPA.

The letter also included approximately 25 documents relevant to the question of whether the Park

Service had complied with NEPA before deciding to demolish the Cyclorama Center.  The letter, which was attached to Ms. French's Declaration in Support of Plaintiffs' Motion for Summary Judgment, provides information necessary for effective judicial review of Defendants' failure to take actions required under NEPA and the NHPA.

### C.    Declaration of Matthew G. Adams and Documents Attached Thereto

On behalf of Plaintiffs, Mr. Adams has made several requests for information about the Park Service's plans, if any for the Cyclorama Center, as well as the agency's post-GMP compliance with NEPA and NHPA.  Those requests for information, along with the results of the requests, are attached to his declaration filed in support of Plaintiffs' Motion for Summary Judgment.

## 2.    Judicial Notice

The Federal Rules of Evidence permit this Court to take notice of facts "not subject to reasonable dispute" in that they are either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  If this Court does not augment the record with the documents listed above, Plaintiffs respectfully request that it take judicial notice of the those documents, all of which are official documents, public documents, or otherwise capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Respectfully submitted,


/s/
_____
Nicholas C. Yost (USDC-DC Bar No. 968289)[1]
Matthew G. Adams (CA Bar No. 229021)
SONNENSCHEIN NATH & ROSENTHAL LLP
Attorneys for Plaintiffs
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

---

[1] Mr. Yost is admitted to practice before this court (USDC-DC Bar No. 968289).   Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar. No. 35297).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Case Number.:  1:06-CV-02077-TFH
Judge:  Thomas F. Hogan
Deck Type:  Administrative Agency Review
Date Filed:  12/05/2006

DECLARATION OF MATTHEW G. ADAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Matthew G. Adams, declare as follows:

1.      I am an attorney at Sonnenschein Nath & Rosenthal LLP

2.      On October 21, 2005, I sent a letter to John Latschar, Superintendent of Gettysburg National Military Park.  In that letter, I requested, on behalf of the Recent Past Preservation Network, Christine Madrid French, and Dion Neutra, that Superintendent Latschar clarify the Park Service's plans, if any, for the Gettysburg Cyclorama Center.  A true and correct copy of the October 21, 2005 letter is attached hereto as Exhibit A.

3.      I never received a response to the October 21, 2005 letter.

4.      Between November 16, 2005 and December 2, 2005, I attempted to reach Superintendent Latschar by telephone on three occasions.  On all three occasions, I was instructed by a receptionist to leave my telephone number and my full name, which I did.  I never received a response to any of these telephone calls.

5.      On December 5, 2005, after not hearing back from Superintendent Latschar for more than a month, I sent a second letter to him on behalf of the Recent Past Preservation Network, Christine Madrid French, and Dion Neutra.  A true and correct copy of the December 5, 2005 letter is attached hereto as Exhibit B.

6.      I never received a response to the December 5, 2005 letter.

7.      On October 16, 2006, I sent two Freedom of Information Act (FOIA) requests to the National Park Service.  The two requests were identical in substance.  One was sent to the offices of the Northeast Region of the Park Service.  The other was sent to the Park Service's Administrative Program Center in Washington, D.C.  A true and correct copy of my October 16, 2006 FOIA request to the Northeast Regional Office is attached hereto as Exhibit C.   A true and correct copy of my October 16, 2006 FOIA request to the Administrative Program Center in Washington, D.C. is attached hereto as Exhibit D.

8.      In response to my FOIA request to the Administrative Program Center in Washington, D.C., I received a letter from Diane Cook, FOIA Officer.  Ms. Cook informed me that she had forwarded my FOIA request to the Northeast Regional Office.  A true and correct copy of the letter I received from Ms. Cook is attached hereto as Exhibit E.

9.      On or about November 10, 2006, I received a letter in response to my October 16, 2006 FOIA request.  The letter stated that there were no documents responsive to my request.  A true and correct copy of the letter I received in response to my October 16, 2006 FOIA request is attached hereto as Exhibit F.

10.     On September 21, 2007, I made a FOIA request to the National Park Service.  The request concerned documents related to the Environmental Assessment prepared by the Park Service for the demolition and removal of the National Tower at Gettysburg National Military Park.  A true and correct copy of my September 21, 2007 FOIA request is attached hereto as Exhibit G.

11.     On or about November 1, 2007, I received a response to my September 21, 2007 FOIA request.  One of the documents I received in response to my September 21, 2007 FOIA request is titled "National Tower Demolition and Removal Environmental Assessment: Draft".  A true and correct copy of the National Tower Demolition and Removal Environmental Assessment: Draft is attached hereto as Exhibit H.  Another document I received in response to my September 21, 2007 FOIA request is titled "Finding of No Significant Impact." A true and correct copy of the Finding of No Significant Impact is attached hereto as Exhibit I.

12.     On January 8, 2008, I visited the Oxford English Dictionary Online website at http://dictionary.oed.com .  From the website, I obtained the definitions of the following words: remove, removal, demolish, and demolition.  A true and correct copy of the definitions I obtained from the website is attached hereto as Exhibit J.

13.     On January 10, 2008, I visited the National Park Service website at www.nps.gov. From the website, I obtained a copy of a document titled "Director's Order #2:  Park Planning." A true and correct copy of Director's Order #2:  Park Planning is attached hereto as Exhibit K.

14.     On January 15, 2008, I visited the National Park Service website at www.nps.gov/policy . From the website, I obtained a copy of a document called "The DO-12 Handbook."  A true and correct copy of the DO-12 Handbook is attached hereto as Exhibit L.

15.     On January 15, 2008, I visited the National Park Service website at http://www.nps.gov . From the website, I obtained several small documents.  These documents describe or explain (1) the permanent closure of the Cyclorama Center, (2) the construction of new facilities for the Park Service at Gettysburg National Military Park, and (3) the Park Service's plan to move exhibits and offices from the Cyclorama Center to the new facilities.  A true and correct copy of these documents is attached hereto as Exhibit  M.

16.     On January 15, 2008, I obtained definitions of the following words from *Webster's Third Unabridged International Dictionary*:  remove, removal, demolish, demolition. True and correct copies of the definitions I obtained are attached hereto as Exhibit N.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 15 day of January, 2007.

Matthew G. Adams

- 4 -

# EXHIBIT A

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

685 Market Street
6th Floor
San Francisco, CA 94105
415.882.5000
415.543.5472 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, N.J.
St. Louis
Washington, D.C.
West Palm Beach

**Matthew G. Adams**
415.882.0351
madams@sonnenschein.com

October 21, 2005

<u>VIA FEDERAL EXPRESS</u>

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
97 Taneytown Road
Gettysburg, PA 17325-2804

Re:    Cyclorama Center

Dear Dr. Latschar:

We are writing on behalf of Dion Neutra, Christine Madrid French, and the Recent Past Preservation Network. Our clients are concerned about the National Park Service's plans for the Cyclorama Center, a Richard Neutra-designed building eligible for listing on the National Register of Historic Places and recently named one of the world's ten most endangered monuments by the World Monument Fund.

As experienced NEPA counsel, we reviewed environmental documentation related to the future of the Cyclorama Center, including the 1999 General Management Plan/Environmental Impact Statement for Gettysburg National Military Park ("GMP/EIS") and the National Park Service Record of Decision ("ROD") dated November 23, 1999. Those documents suggest that the National Park Service ("Park Service") plans to "remove" the Cyclorama Center from Ziegler's Grove. This letter does not address the decision to "remove" evaluated in the GMP/EIS and ROD. Rather, it focuses on what "removal" entails, and what will happen to the Cyclorama Center and its current site if and when the GMP is implemented.

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
October 21, 2005
Page 2

During the past 10 years, the Park Service has prepared several documents which discuss the future of Gettysburg National Military Park. But these documents do not explain what is meant by "removal" of the Cyclorama Center.

- Beginning in 1995, the Park Service prepared a Draft Development Concept Plan/Environmental Assessment ("DCP/EA") to evaluate the facilities at Gettysburg National Military Park. The DCP/EA did not define "removal," did not evaluate the environmental consequences of "removing" the Cyclorama Center, and did not identify and analyze alternative means of "removal" pursuant to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332(2)(C) and (E). The Park Service allowed public comment on the DCP/EA. But it never formally responded to those comments. Nor did it ever finalize the DCP/EA.

- Instead, on December 11, 1996, the Park Service issued a Request for Proposals for Visitor Center and Museum Facilities ("RFP"). The RFP did not define "removal." Based on the RFP, the Park Service selected a developer with whom it negotiated an agreement to plan and construct new visitor center and museum facilities.

- Thereafter, the Park Service determined that "the issues of visitor use and interpretation at the museum complex" should be incorporated into the GMP/EIS. The GMP/EIS is, by its own terms, a "programmatic statement" concerning "a basic management framework for future decisionmaking." For that reason, the Park Service noted, "site specific details and recommendations are not always included" in the document, and "more detailed assessments of impacts may be prepared as part of necessary implementation planning."

- One of the activities for which the GMP/EIS does not include "site specific details and recommendations" is the "removal" of the Cyclorama Center from Ziegler's Grove. There is no specific plan for implementing "removal" in the Final GMP/EIS, in the ROD, or in the Park Service's responses to comments on the Draft GMP/EIS. Nor do these documents discuss alternative means for such "removal," as required by NEPA, 42 U.S.C. §§ 4332(2)(C) and (E). We are not aware of any other document containing such a discussion.

In sum, it appears that the Park Service has not yet conducted a project-specific analysis of the environmental consequences of the "removal" of the Cyclorama Center. The GMP/EIS analyzes an alternative program which does not involve "removal." But it does not identify alternative methods of effecting "removal" or evaluate the environmental effects of the various options.

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
October 21, 2005
Page 3

NEPA requires such an analysis. The Act and its implementing regulations encourage federal agencies to use programmatic environmental impact statements to study general plans and policies. *See, e.g.*, 40 C.F.R. §§ 1502.4, 1502.20. But they also make it clear that federal agencies must prepare an environmental impact statement or environmental assessment to evaluate specific implementation actions. 42 U.S.C. §§ 4332(2)(C) and (E); 40 C.F.R. §§ 1502.3, 1501.3, 1508.9. *See also* CEQ, Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263 (Jul. 28, 1983) ("where a federal agency adopts a formal plan...and later proposes a specific activity to implement that plan in the same region, both actions need to be analyzed under NEPA to determine whether they are major actions which will significantly affect the environment").

An environmental impact statement or environmental assessment prepared for the purpose of evaluating the "removal" of the Cyclorama Center must analyze specific alternative means of effecting "removal." 42 U.S.C. §§ 4332(2)(C) and (E). Under NEPA, this analysis cannot be limited to the alternative of demolishing the building. It must also include, at minimum, the alternative of relocating this historic structure.

Furthermore, any specific project-level analysis concerning "removal" of the Cyclorama Center must comply with section 110 of the National Historic Preservation Act, 16 U.S.C. 470h-2. Section 110 mandates that "each Federal agency shall use, to the maximum extent feasible, historic properties available to the agency" before acquiring or constructing new buildings. 16 U.S.C. 470h-2. It also requires agencies to undertake "any preservation" required to do so. *Id.*

Recently, we noted that the National Park Service website indicates that the Cyclorama Center is scheduled to close on November 20, 2005. We are concerned that this closure could indicate that the Park Service might proceed with "removal" without conducting the project-level environmental review required under NEPA. We hope that is not the case, and we look forward to working together to preserve the Cyclorama Center for future generations of park visitors.

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
October 21, 2005
Page 4

We look forward to your response. Please contact our office at (415) 882-0351 if you have any questions or concerns about this matter.

Sincerely,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: *Matthew G. Adams*

Matthew G. Adams
Nicholas C. Yost

cc:    Via U.S. Mail

The Honorable George Miller
U.S. Representative
2205 Rayburn House Office Building
Washington, D.C. 20515

Fran P. Maniella
Director
National Park Service
1849 C St., NW
Washington, D.C. 20240

Jake Hoogland
Chief, Environmental Quality Division
National Park Service
1849 C St., NW
Washington, D.C. 20240

John Fowler
Executive Director
Advisory Council on Historic Preservation
1100 Pennsylvania Ave., NW, Suite 809
Washington, D.C. 20004

Don Klima
Director, Office of Federal Agency Programs
Advisory Council on Historic Preservation
1100 Pennsylvania Ave., NW, Suite 809
Washington, D.C. 20004

Richard Moe
President
National Trust for Historic Preservation
1785 Massachusetts Ave., NW
Washington, D.C. 20036

Betsy Merritt
Assistant General Counsel
National Trust for Historic Preservation
1785 Massachusetts Ave., NW
Washington, D.C. 20036

Robert Wilburn
President and Chief Executive Officer
Gettysburg National Battlefield Museum
Foundation
P.O. Box 4224
Gettysburg, PA 17325-4224

# EXHIBIT B

**Matthew G. Adams**
415.882.0351
madams@sonnenschein.com

December 5, 2005

<u>**VIA FACSIMILE TO (717) 334-1891**</u>

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
97 Taneytown Road
Gettysburg, PA 17325-2804

      Re:   Cyclorama Center

Dear Dr. Latschar:

      On October 21, 2005, we sent you, via Federal Express, a letter on behalf of Dion Neutra, Christine Madrid French, and the Recent Past Preservation Network.  In that letter, we explained that our clients are concerned about the National Park Service's plans for the Cyclorama Center, a Richard Neutra-designed building eligible for listing on the National Register of Historic Places and recently named one of the world's ten most endangered monuments by the World Monument Fund.  We also noted that the National Park Service has not yet conducted a project-specific analysis of the planned "removal" of the Cyclorama Center as required under the National Environmental Policy Act and the National Historic Preservation Act.

      We have also invited you to discuss these issues by telephone.  To that end, we left messages requesting information about plans for the Cyclorama Center with your assistant on November 16, 2005, on November 21, 2005, and again on December 2, 2005.

      We continue to look forward to your response.  Please contact our office at (415) 882-0351 so that we may begin working together to preserve the Cyclorama Center for future generations of park visitors.

                 Sincerely,

          SONNENSCHEIN NATH & ROSENTHAL LLP

      By:

               Matthew G. Adams
               Nicholas C. Yost

Dr. John A. Latschar
December 5, 2005
Page 2


cc:  Via U.S. Mail

The Honorable George Miller
U.S. Representative
2205 Rayburn House Office Building
Washington, D.C. 20515

Fran P. Mainella
Director
National Park Service
1849 C St., NW
Washington, D.C.  20240

Jake Hoogland
Chief, Environmental Quality Division
National Park Service
1849 C St., NW
Washington, D.C.  20240

John Fowler
Executive Director
Advisory Council on Historic Preservation
1100 Pennsylvania Ave., NW, Suite 809
Washington, D.C. 20004

Don Klima
Director, Office of Federal Agency Programs
Advisory Council on Historic Preservation
1100 Pennsylvania Ave., NW, Suite 809
Washington, D.C.  20004

Richard Moe
President
National Trust for Historic Preservation
1785 Massachusetts Ave., NW
Washington, D.C.  20036

Betsy Merritt
Assistant General Counsel
National Trust for Historic Preservation
1785 Massachusetts Ave., NW
Washington, D.C.  20036

Robert Wilburn
President and Chief Executive Officer
Gettysburg National Battlefield Museum Foundation
P.O. Box 4224
Gettysburg, PA  17325-4224

# EXHIBIT C

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

525 Market Street
26th Floor
San Francisco, CA 94105-2708
415.882.5000
415.882.0300 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*Phoenix*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

**Matthew Adams**
415.882.0351
madams@sonnenschein.com

October 16, 2006

<u>VIA FACSIMILE (215-597-0815) AND U.S. MAIL</u>

Annette Sasso
National Park Service
Northeast Region
200 Chestnut Street
Philadelphia, PA 19106

      Re:    Freedom of Information Act Request

Dear Ms. Sasso:

      Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, we hereby request that the National Park Service provide the following documents:

      (1) The preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania.

      (2) To the extent not covered by the foregoing request, all documents, records, and other materials related to the preparation of the preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania.

      If all or part of this request is denied, please cite the specific exemption or exemptions on which the denial is based and provide a report documenting the nature of the records withheld and the appeal procedures available. If a discrete portion of a record responsive to this request is deemed exempt from disclosure, the exempt portion may be redacted but the remainder must be produced.

      Documents, records, and other materials should be mailed to Matthew Adams, Sonnenschein Nath & Rosenthal LLP, 525 Market Street, 26th Floor, San Francisco, CA 94105-2708. We are willing to pay a fee up to and including $500.00 for copying and postage without further authorization. If the fees associated with this request are greater than $500.00, please



QUALITY · DEDICATION · INTEGRITY

Y E A R S
2 0 0 6



Annette Sasso
October 16, 2006
Page 2

contact my office at (415) 882-0351.  We are also willing to inspect the documents in person, on-site.

Thank you in advance for your prompt attention to this matter.  Please contact my office if you have any questions.

Sincerely,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: _____

Matthew G. Adams

cc:    Dion Neutra
       Christine Madrid French



# EXHIBIT D

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

525 Market Street
26th Floor
San Francisco, CA 94105-2708
415.882.5000
415.882.0300 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
Phoenix
San Francisco
Short Hills, N.J.
St. Louis
Washington, D.C.
West Palm Beach

**Matthew Adams**
415.882.0351
madams@sonnenschein.com

October 16, 2006

<u>VIA FACSIMILE (202-371-6741) AND U.S. MAIL</u>

Diane Cook
1201 (ORG CODE 2605)
Administrative Program Center
1849 C Street, N.W.
Washington, D.C. 20240

     Re:   Freedom of Information Act Request

Dear Ms. Cook:

     Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, we hereby request that the National Park Service provide the following documents:

     (1)  The preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania.

     (2)  To the extent not covered by the foregoing request, all documents, records, and other materials related to the preparation of the preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania.

     If all or part of this request is denied, please cite the specific exemption or exemptions on which the denial is based and provide a report documenting the nature of the records withheld and the appeal procedures available.  If a discrete portion of a record responsive to this request is deemed exempt from disclosure, the exempt portion may be redacted but the remainder must be produced.

     Documents, records, and other materials should be mailed to Matthew Adams, Sonnenschein Nath & Rosenthal LLP, 525 Market Street, 26th Floor, San Francisco, CA 94105-2708.  We are willing to pay a fee up to and including $500.00 for copying and postage without further authorization.  If the fees associated with this request are greater than $500.00, please



QUALITY · DEDICATION · INTEGRITY
Y E A R S
2 0 0 6

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

Diane Cook
October 16, 2006
Page 2

contact my office at (415) 882-0351.  We are also willing to inspect the documents in person, on-site.

Thank you in advance for your prompt attention to this matter.  Please contact my office if you have any questions.

Sincerely,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: _Matthew G. Adams_

Matthew G. Adams

cc:    Dion Neutra
Christine Madrid French

# EXHIBIT E



# United States Department of the Interior

NATIONAL PARK SERVICE
Northeast Region
200 Chestnut Street
Philadelphia, PA  19106-2878

IN REPLY REFER TO:

A7221 (NER)

NOV - 8 2006

Mr. Matthew G. Adams
Sonnenschein Nath & Rosenthal, LLP
525 Market Street
26th Floor
San Francisco, California 94105-2708

Dear Mr. Adams:

This is in response to your Freedom of Information Act (FOIA) request of October 16, 2006 in which you requested records from Gettysburg National Military Park (NMP) related to a preservation program for the Cyclorama building. There are no records responsive to your request.

Under 43 CFR 2.14(c), the Department is not required to create or compile a record to respond to a FOIA request.  The Act applies only to records in existence at the time the request is made.

In addition to the undersigned, Anthony Conte, U.S. Department of the Interior, Regional Solicitor, was involved in determining this response.

Under 43 CFR 2.18, you have the right to appeal this decision to:

Freedom of Information Act Appeals Officer
MS-7456, MIB
1849 C Street, N.W.
Washington, D.C. 20240

Your appeal must be in writing and received within 30 workdays after the date of this letter.  A copy of your original request and this response must accompany your letter with the legend "FREEDOM OF INFORMATION APPEAL" on both the envelope and the face of the letter. You should also include a brief statement setting forth the basis of your belief that this decision is in error.

If you have any questions regarding this information please call Katie Lawhon, Public Affairs Specialist, Gettysburg National Military Park, at (717) 334-1124 extension 452.

Sincerely,

Dennis R. Reidenbach
Acting Regional Director
Northeast Region

# EXHIBIT F



# United States Department of the Interior

**NATIONAL PARK SERVICE**
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:

A7221(2550)

OCT 1 7 2006

Mr. Matthew Adams
Sonnenschein Nath & Rosenthal LLP
525 Market Street, 26th Fl
San Francisco, CA  94105

Dear Mr. Adams:

The National Park Service received your FOIA request dated October 16, 2006 on October 17, 2006, seeking information pertaining to Cyclorama Center at Gettysburg National Military Park.  We assigned it Request No. NPS-2007-00095 and have forwarded your request to our Northeast Regional Office for a direct response to you. They will advise you of the status of their response within 20 working days if they anticipate a delay.  Unusual circumstances may warrant an additional 10-day extension. If you need to contact that office, the address is:

> National Park Service
> U.S. Customs House, 5th fl
> 200 Chestnut Street
> Philadelphia, PA 19106
> 215-597-7384
> Attn:  Annette Sasso

Sincerely,

Diane M. Cooke
FOIA Officer
NPS Headquarters

# EXHIBIT G

# Sonnenschein
### SONNENSCHEIN NATH & ROSENTHAL LLP

525 Market Street
26th Floor
San Francisco, CA 94105-2708
415.882.5000
415.882.0300 fax
www.sonnenschein.com

Matthew Adams
415.882.0351
madams@sonnenschein.com

September 21, 2007

<u>VIA FACSIMILE (202-371-6741) AND U.S. MAIL</u>

Diane Cook
1201 (ORG CODE 2605)
Administrative Program Center
1849 C Street, N.W.
Washington, D.C.  20240

Re:    Freedom of Information Act Request (Environmental Assessment on the
proposed demolition and removal of the National Tower at Gettysburg National
Military Park)

Dear Ms. Cook:

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, we hereby request that the
National Park Service provide the following documents:

(1)  The draft Environmental Assessment on the proposed demolition and removal of the
National Tower at Gettysburg National Military Park, including any appendices or other
supplements thereto.  This document is specifically identified at 65 Fed. Reg. 26,237 (May 5,
2000).

(2)  Any comments received by the National Park Service on the draft Environmental
Assessment on the proposed demolition and removal of the National Tower at Gettysburg
National Military Park, including any appendices or other supplements thereto.  As noted above,
the draft Environmental Assessment on the proposed demolition and removal of the National
Tower at Gettysburg National Military Park is specifically identified at 65 Fed. Reg. 26,237
(May 5, 2000).

(3)  The final Environmental Assessment on the proposed demolition and removal of the
National Tower at Gettysburg National Military Park, including any appendices or other
supplements thereto.  As noted above, the draft version of the Environmental Assessment on the
proposed demolition and removal of the National Tower at Gettysburg National Military Park is
specifically identified at 65 Fed. Reg. 26,237 (May 5, 2000).



**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

September 21, 2007
Page 2

(4) To the extent not covered by the previous requests, any findings by the National Park Service, including, without limitation, any Finding of No Significant Impact, based on the draft or final Environmental Assessment on the proposed demolition and removal of the National Tower at Gettysburg National Military Park. As noted above, the draft version of the Environmental Assessment on the proposed demolition and removal of the National Tower at Gettysburg National Military Park is specifically identified at 65 Fed. Reg. 26,237 (May 5, 2000).

If all or part of this request is denied, please cite the specific exemption or exemptions on which the denial is based and provide a report documenting the nature of the records withheld and the appeal procedures available. If a discrete portion of a record responsive to this request is deemed exempt from disclosure, the exempt portion may be redacted but the remainder must be produced.

Please mail documents, records, and other materials to Matthew Adams, Sonnenschein Nath & Rosenthal LLP, 525 Market Street, 26th Floor, San Francisco, CA 94105-2708. We are willing to pay a fee up to and including $750.00 for copying and postage without further authorization. If the fees associated with this request are greater than $750.00, please contact my office at (415) 882-0351. We are also willing to inspect the documents in person, on-site.

Thank you in advance for your prompt attention to this matter. Please contact my office if you have any questions.

Sincerely,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: _Matthew G. Adams_

Matthew G. Adams

# EXHIBIT H



National Tower Demolition and Removal
Environmental Assessment
D R A F T

Gettysburg National Military Park
May 2000

Draft
Environmental Assessment
May 2000

National Tower Demolition and Removal
# Gettysburg National Military Park
Pennsylvania

Gettysburg National Military Park is the site of the American Civil War Battle of Gettysburg, the Soldiers' National Cemetery and the commemoration of the great battle by Civil War veterans. The purpose of this environmental assessment is to present the alternatives for removal of the National Tower and related impacts. On December 9, 1999, the Department of Justice filed a complaint in condemnation at the U.S. District Court in Harrisburg, Pennsylvania. This action was the first formal legal step in the federal government's acquisition of the privately owned 307-foot observation tower, the land upon which it sits and its appurtenant rights-of-way. The action to acquire the National Tower, which overlooks the Gettysburg Battlefield, implements the decision made by the National Park Service as a part of its 1990 Boundary Study and its 1993 Land Protection Plan to add the site to the park, acquire the land and the tower, and remove the tower.

Removal of non-historic structures in order to restore natural conditions is listed by the NPS as a categorical exclusion under the National Park Service procedures for implementing the provisions of the National Environmental Policy Act (NEPA). However, in the interests of disclosing the limited impacts associated with the demolition of the non-historic tower structure, this environmental assessment has been prepared for public and agency review.

Alternatives analyzed in the draft Environmental Assessment include Alternative 1, (the Proposal), Tower Removal and Alternative 2, No Action. Under Alternative 1, the tower structure and its surrounding buildings would be demolished and removed. Demolition itself could be accomplished through a variety of methods. One alternative method would be to dismantle the structure in a piece-by-piece method through use of cranes and other mechanical methods. Another demolition method would be to use an implosion method to reduce the tower and associated structures into on-site debris and then remove the debris. Under all methods, the resulting debris would be removed by truck to approved scrap yards/resale facilities and landfills. Specific actions required for future site restoration are not described or analyzed within this document.

Under Alternative 2, No Action, the tower property would be acquired as stated in previous planning documents. The NPS would close the National Tower to public access and use, but the tower would not be removed. This alternative is presented for baseline purposes of comparison.

All interested agencies, organizations, and individuals are urged to provide comments on the draft Environmental Assessment. All comments received by the closing date, May 31, 2000 will be considered by NPS as it completes its NEPA and NHPA compliance. To send comments on the plan, or for further information about this document, contact the Superintendent, Gettysburg National Military Park, 97 Taneytown Road, Gettysburg, PA 17325.

Table of Contents

Purpose and Need for Action..........................................................................................2
  Background and Previous Planning................................................................................2
  Issues ...........................................................................................................................3
Derivation of Impact Topics ............................................................................................4
  Impact Topics Dismissed from Further Analysis ...........................................................5
Alternatives.....................................................................................................................6
  Alternative 1: Tower Removal.......................................................................................6
  Alternative 2: No Action ...............................................................................................6
Affected Environment .....................................................................................................6
  National Tower Site ......................................................................................................6
  Cultural Resources .......................................................................................................6
  Natural Resources........................................................................................................8
  Solid and Hazardous Waste .........................................................................................8
  Surrounding Land Use..................................................................................................8
  Surface and Subsurface Drainage................................................................................9
  Public Use and the Visitor Experience .........................................................................9
Impacts – Alternative 1 – Tower Removal ....................................................................10
  Cultural Resources .....................................................................................................10
  Natural Resources......................................................................................................10
  Visitor Use and the Visitor Experience .......................................................................10
  Public Safety...............................................................................................................10
  Hazardous/Solid Waste ..............................................................................................10
Impacts – Alternative 2 No Action.................................................................................12
  Cultural Resources .....................................................................................................13
  Natural Resources......................................................................................................13
  Visitor Use and the Visitor Experience .......................................................................13
  Public Safety...............................................................................................................13
  Hazardous/Solid Waste ..............................................................................................13
Consultation and Coordination .....................................................................................13

**Figures**

Figure 1:  Location Map................................................................................................14
Figure 2:  Site Map ......................................................................................................15

# Purpose and Need for Action

On December 9, 1999, the Department of Justice filed a complaint in condemnation at the U.S. District Court in Harrisburg, Pennsylvania. This action was the first formal legal step in the federal government's acquisition of the privately owned 307-foot observation tower, the land upon which it sits and its appurtenant rights-of-way. The action to acquire the National Tower, which overlooks the Gettysburg Battlefield, implements the decision made by the National Park Service as a part of its 1990 Boundary Study and its 1993 Land Protection Plan to add the site to the park, acquire the land and the tower, and remove the tower.

The tower is located on land that was important to the story of the Civil War Battle of Gettysburg. Union troop movements occurred on the land located immediately behind the area used as the Federal main defensive position on Cemetery Ridge. Once it has acquired the property, the National Park Service proposes to remove the visually obtrusive observation tower and later to restore the area to its 1863 appearance.

The purpose of this Environmental Assessment is to present the alternatives for removal of the tower and related impacts. Specific actions required for future site restoration are not described or analyzed within this document.

Removal of non-historic structures in order to restore natural conditions is listed by the NPS as a categorical exclusion under the National Park Service procedures for implementing the provisions of the National Environmental Policy Act (NEPA). However, in the interests of disclosing the limited impacts associated with the demolition of the non-historic tower structure, this environmental assessment has been prepared for public and agency review.

## *Background and Previous Planning*

### 1990 Boundary Study

Construction of the observation tower began in 1972 and it was opened to the public in 1974. In 1990 Congress included the tower property in the boundary of Gettysburg National Military Park, with the understanding that the National Tower, which had long been seen as an intrusion on the historic scene of the Battle of Gettysburg, would be removed.

As a part of that study, impacts from acquisition of property by the federal government were assessed. In the environmental assessment, the impact on revenue to local governments and school districts from real estate and admission taxes from federal acquisition of property and discontinuance of operations of facilities was discussed. For the National Tower, in today's dollars, the acquisition and closure of the tower means that school districts and local governments would not collect the "amusement" tax on ticket sales. This would result in a loss of approximately $34,000 per year in local tax receipts. With federal acquisition of the tower property, school districts and local

governments would not collect real estate taxes. This would result in the loss of approximately $83,000 per year in local tax receipts.

Under the Payments in Lieu of Taxes Act, the Secretary of the Interior is authorized to provide for payments to local units of government containing certain federally owned lands. These payments are designed to supplement other Federal land receipt sharing payments local governments may be receiving. Payments are based upon 1% of fair market value of the property at the time of its acquisition, with adjustments for the total acreage acquired, and continue for five years after acquisition of the property. As a result, Payments in Lieu of Taxes would partially cover tax receipts precluded by federal acquisition of the Tower property. However, such payments are dependent upon the annual appropriation of funds by Congress. In fiscal year 1999, Congress only appropriated 41% of the funds required for the Payment in Lieu of Taxes program.

Other Impacts from the acquisition of the National Tower and its closing as a fee for service enterprise include visitor and noise impacts. Tower removal would eliminate the noise intrusion from the speakers broadcasting music and recordings that cause audible intrusions on persons visiting the Soldiers' National Cemetery and Evergreen Cemetery as well as the Battlefield.

1993 Land Protection Plan

In 1993, after public review, the NPS published a Land Protection Plan that identified the National Tower property as a high priority for fee acquisition, in order to remove the tower and restore the land to its historic appearance.

1999 General Management Plan/Environmental Impact Statement

In addition, the acquisition and removal of the National Tower was described as an element common to all alternatives in the General Management Plan/EIS for Gettysburg NMP issued in 1999. A Record of Decision for that document including that action was issued on November 23, 1999.

Condemnation

In fiscal year 2000 budget appropriations, the Congress provided funds to the NPS for acquisition of the Tower. Therefore, in December of 1999 the Department of Justice filed a complaint in condemnation to implement the decision made by the 1990 Boundary Study and the 1993 Land Protection Plan and begin the acquisition of the property.

**Issues**

Issues are environmental changes that could occur if any of the alternatives for removal of the National Tower discussed in this environmental assessment are selected and implemented. The following issues associated with the proposed tower removal were identified from past NPS planning efforts concerning the tower and land use:

- Removal activities could cause construction-related impacts to the cultural and natural resources surrounding the area.

- Potential beneficial impacts to the historic setting of the Battle of Gettysburg and to the Soldiers' National Cemetery could occur as a result of the removal of the tower.

- Potential beneficial impacts to the visitors' experience within Gettysburg National Military Park and the Soldiers' National Cemetery could occur as a result of the removal of the tower.

## Derivation of Impact Topics

Impact topics are the resources that could be affected by the alternatives presented in this environmental assessment. Impact topics that were identified are based on federal laws, regulations and orders; NPS Management Policies; NPS knowledge of impacted resources; and issues identified during project development. A brief rational for the selection of each impact topic is given below, as well as the reasons for dismissing certain impact topics from further consideration.

Cultural Resources

The National Historic Preservation Act of 1966 (as amended), the National Environmental Policy Act of 1969 (NEPA), the 1988 NPS Management Policies, and Director's Order #28 (NPS Cultural Resource Management Guideline) require the NPS to consider the effects of its actions on cultural resources.

### Natural Resources

NEPA requires examination of the environmental impacts of federal actions on the components of affected ecosystems. The cultural landscape contained within Gettysburg NMP provides natural resource values and benefits and potential impacts to the natural environment generally are discussed as part of the analysis.

### Visitor Use and the Visitor Experience

The proposed action may have an effect on visitor use and experience of the Gettysburg NMP. These impacts include sound/noise impacts related to the tower's removal and visual impacts.

### Public Safety

Removal actions concerning the tower may have an effect on worker and public safety for a limited period of time. These impacts are primarily related to increased traffic during removal actions.

## *Impact Topics Dismissed from Further Analysis*

<u>Floodplains/Wetlands</u>

There are no floodplains or wetlands within the area of impact of the proposal or alternatives.

<u>Species of Special Concern</u>

There are no species of special concern within the area of impact of the proposal or alternatives.

<u>Environmental Justice</u>

There are no low income or minority communities within the area of impact of the proposal or alternatives that would be disproportionately impacted.

<u>Air Quality</u>

There would be a temporary site-specific increase in dust associated with the action alternatives. This would be primarily related to removal actions.

<u>Prime and Unique Farmlands</u>

No Prime or Unique Farmlands would be converted or impacted as a result of the proposal or its alternatives.

<u>Socio-economic Impacts</u>

There are no new socio-economic impacts related to the removal of the National Tower. (Socio-economic impacts related to the acquisition of the National Tower and its discontinuance as a fee for service facility were analyzed in the 1990 Boundary Study. Those impacts are discussed in **Background and Previous Planning**.)

## Alternatives

### Alternative 1 (Proposal): Tower Removal

Under this alternative, the tower structure and its surrounding buildings would be demolished and removed. Demolition itself could be accomplished through a variety of methods. One alternative method would be to dismantle the structure in a piece-by-piece method through use of cranes and other mechanical methods. Another demolition method would be to use an implosion method to reduce the tower and associated structures into on-site debris and then remove the debris.

Under all methods, the resulting debris would be removed by truck to approved scrap yards/resale facilities and landfills.

### Alternative 2: No Action

Under this alternative the tower property would be acquired as stated in previous planning documents. The NPS would close the National Tower to public access and use, but the tower would not be removed. This alternative is presented for baseline purposes of comparison.

## Affected Environment

### National Tower Site

The National Tower site consists of two tracts of land totalling 5.79 acres, together with three appurtenant rights-of-way that allow access to the property totalling 0.66 of an acre. The National Tower is located on the northernmost parcel (Tax lot F13-151 consisting of 2.38 acres). The southern parcel (Tax lot F14-15A consisting of 3.41 acres) includes the gift shop building and the onsite parking lot.

The tower is located on a large concrete base in the northern portion of the site. The 307-foot high tower is constructed of galvanized steel pipe and beams. Construction of the tower began in 1972 and was completed in 1974. The tower provides public access to view Gettysburg NMP and the surrounding area. Two elevators provide transport to the top of the tower.

The gift shop building is located in the central portion of the property and is comprised of a gift shop, three bathrooms, two offices, a storage loft, a snack bar and product storage areas.

### Cultural Resources

The proposed project takes place within Gettysburg National Military Park. Gettysburg NMP is nationally significant as the site of the Civil War Battle of Gettysburg, the Soldiers National Cemetery, and the commemoration and preservation of the

battleground. The battle was the largest and most costly in human terms to occur on the North American continent. It lessened the Confederacy's ability to successfully wage war and contributed to the ultimate preservation of the United States. The creation of the Soldiers' National Cemetery, and Lincoln's Gettysburg Address which was given to dedicate the cemetery, heightened Americans' sense of the meaning and importance of the war. The national park inspired by those who experienced the Civil War preserved major features of the 1863 battlefield and commemorated the valor and sacrifice of participants.

The purposes of Gettysburg National Military Park are:
- To preserve the significant topographical, natural and cultural features that were significant to the outcome of the Battle of Gettysburg
- To mark the lines of battle, and to preserve the monuments and markers that commemorate the struggle
- To provide opportunities for people to learn about the Battle of Gettysburg in the full social, political and cultural context of the Civil War and American History.
- To preserve the objects, artifacts and archives that document the battle, its aftermath and commemoration

The purposes of the Soldiers' National Cemetery is:

- To preserve and protect the Soldiers' National Cemetery as a suitable and dignified burial ground for the men and women who have been interred in it and as the site of the address delivered by Abraham Lincoln, President of the United States, at Gettysburg on November 19, 1863.

As a national military park, Gettysburg National Military Park's cultural landscape is automatically listed on the National Register of Historic Places.

The National Tower structure is not listed on the National Register of Historic Places and does not meet the criteria for listing. The criteria for evaluation considers the quality of significance in American history, architecture, archeology, engineering, and culture present in districts, sites, buildings, structures and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association and

(a) that are associated with events that have made a significant contribution to the broad patterns of our history; or

(b) that are associated with the lives of persons significant in our past; or

(c) that embody the distinctive characteristics of a type, period, or method of construction or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

(d) that have yielded, or may be likely to yield, information important in prehistory or history. (36 CFR 60.4).

The NPS has applied these evaluation criteria, and has determined that the National Tower fails to meet any of the stated criteria that would make it eligible for inclusion on the National Register of Historic Places.

The National Tower has been generally viewed as an intrusion on the historic scene.

There are no known or listed archeological sites within the tower property.

### Natural Resources

The predominant land use presently on the National Tower site is related to the tower structure and support facilities such as parking, tool shop and gift facilities. There are a few areas of non-native grasses and some wooded areas on the property. It is not anticipated that removal actions would have impacts on the wooded areas.

### Solid and Hazardous Waste

A phase I environmental Site Assessment was carried out in accord with ASTM Standard Practice. The only finding resulting from that survey was the presence of a 100-gallon gasoline above ground storage tank located adjacent to the tool shed in the eastern portion of the property. The gasoline tank is no longer used.

Electrical equipment is associated with the operation of the two elevators providing public access to the two observation decks. The elevators use only small quantities of greases and buffer oils (hydraulic oil). No PCB containing fluids are associated with the elevators.

### Surrounding Land Use

The National Tower site lies within Gettysburg National Military Park. Areas of park land lie east, west, and south of the property. North of the property is a local community cemetery, Evergreen Cemetery. Evergreen Cemetery was present during the Battle of Gettysburg. A wooden fence separates the cemetery from the National Tower property.

Adjacent to Evergreen Cemetery and north of the right-of-way from the National Tower site to Taneytown Road is the Soldiers' National Cemetery. Buried within the Soldiers' National Cemetery are many of the Union dead from the battle of Gettysburg, as well as veterans from subsequent wars.

South of the property is Hunt Avenue, an historic avenue built by the War Department in the early 20th century. Hunt Avenue is considered historic by the Pennsylvania Historic and Museum Commission.

Along Baltimore Pike and roughly northeast of the National Tower property are a hotel and restaurant. South of the National Tower's access road to Baltimore Pike is a wooded expanse and two retail businesses. The businesses are located within residential structures.

### Surface and Subsurface Drainage

The National Tower property is located within the Rock Creek Watershed.  As such, the surface water runoff and the groundwater base flow generated at the property eventually discharges into Rock Creek.  The closest surface water is an unnamed tributary to Rock Creek.  This tributary is located approximately 500 feet to the southeast of the subject property.  The tributary flows in a southeasterly direction to its confluence with Rock Creek within the Gettysburg NMP.  Rock Creek then flows in a southerly direction through Cumberland Township, Adams County.  Rock Creek is not classified as a high quality cold water fishery.

### Public Use and the Visitor Experience

A complete description of the park visitor experience is contained in the General Management Plan/Environmental Impact Statement for Gettysburg National Military Park, June 1999.

Visitation to Gettysburg NMP generally is estimated at 1,717,296 for 1999 and is expected to be in that range for the year 2000.

# Impacts – Alternative 1 (Proposal) – Tower Removal

## Cultural Resources

The National Tower structure is not on or eligible for listing on the National Register of Historic places. Removal of the tower would have a beneficial impact on the historic scene by eliminating an intrusion on the historic landscape. There is a potential for ground disturbance associated with removal activities. This disturbance would be limited, to the extent possible, to the area of current disturbance, such as the tower parking area. If ground is disturbed beyond the current area of disturbance or new ground disturbance occurs, a cultural resources specialist will be available to evaluate the potential for cultural resources associated with the Gettysburg battle.

## Natural Resources

Removal actions would be primarily limited to activities on currently developed lands. During removal there is a potential for some equipment and or debris to enter onto grassy areas or disturb topsoil and vegetation. However, these intrusions would be limited in nature and scope. If necessary, mitigation measures would be implemented to provide for temporary fences around vegetation and other areas in order to limit removal activities to currently disturbed and developed locations such as the existing parking area.

## Visitor Use and the Visitor Experience

Tower removal would restore the historic scene and would eliminate what many visitors consider an intrusion on the historic scene that detracts from the experience of visiting the battlefield.

There may be a temporary increase in visitation during the removal process. Depending on the timing of the removal and the eventual process used in demolition this increase could result in a temporary increase in traffic and related delays. Some visitors would be interested in seeing the removal of what is seen by many as an intrusion on the historic battlefield. In addition, temporary closure of some areas to visitor use and traffic restrictions may be necessary during demolition and debris removal.

## Public Safety

Hazardous/Solid Waste

The above ground storage tank located adjacent to the tool shed would be recycled or disposed of in accordance with the standards and regulations under the Pennsylvania Solid Waste Management Act.

Temporary closures or traffic restrictions may be necessary during some periods of demolition and debris removal in order to limit public access for safety reasons. These closures would be of limited duration (a day or less) and would not be extensive in size.

## Conclusion

There would be long-term, major beneficial impacts to the historic scene by the removal of the visual intrusion of the tower.

## Cumulative Impacts

There are no known cumulative impacts resulting from this proposal.

## Impacts – Alternative 2 No Action

*Cultural Resources*

Under this alternative the tower would not be removed.  As a result, the tower and its associated structures would still intrude on the historic landscape of the Battle of Gettysburg.

*Natural Resources*

Because removal actions would not take place, the paved parking area, tower structure and adjacent support facilities would remain.  Site restoration would not take place.

*Visitor Use and the Visitor Experience*

The tower would remain and continue to provide an intrusion on the historic landscape of the Battle of Gettysburg that detracts from the experience of visiting the battlefield.

*Public Safety*

Hazardous/Solid Waste

The above ground storage tank located adjacent to the tool shed would be recycled or disposed of in accordance with the standards and regulations under the Pennsylvania Solid Waste Management Act.

*Conclusion*

There tower would continue to be a visual intrusion upon the historic scene of the Gettysburg battlefield and the Soldiers' National Cemetery.

*Cumulative Impacts*

There are no known cumulative impacts resulting from this proposal.

## Consultation and Coordination

This Environmental Assessment will be made available for public and agency review for a thirty-day period.  Copies will be provided directly to affected agencies, and public review copies will be made available at the park headquarters and the Adams County Public Library.

## Preparers

Jacob Hoogland, LLD, Chief, Environmental Policy and Review, National Park Service
Deborah Darden, MA, Acting Chief, Resource Planning Division, Gettysburg National Military Park
John Latschar, PhD, Superintendent, Gettysburg National Military Park

# Gettysburg National Military Park



## National Tower Location

* **National Tower Location**
* **Visitor Center, Cyclorama**
* **Soldier's National Cemetery**
* **NPS Authorized Boundaries**

2000    0    2000 Feet

Plotted by the GNMP GIS on 19 April 2000.

14



# EXHIBIT I



# United States Department of the Interior

## NATIONAL PARK SERVICE

GETTYSBURG NATIONAL MILITARY PARK
GETTYSBURG, PENNSYLVANIA 17325

EISENHOWER NATIONAL HISTORIC SITE
GETTYSBURG, PENNSYLVANIA 17325

IN REPLY REFER TO:

L1425 (Tower)

June 5, 2000

Memorandum

To:            Regional Director, Northeast Region

From:          Superintendent, Gettysburg NMP

Reference:     Finding of No Significant Impact

I am pleased to forward for your approval and signature, the Finding of No Significant Impact for the demolition and removal of the National Tower at Gettysburg National Military Park.  The park prepared an Environmental Impact, National Tower Demolition and Removal, which was made available for a 30-day public review starting May 1, 2000.

We have analyzed both the public and agency comments received during that public review period.  It is our conclusion that the proposal to remove the National Tower does not constitute an action that would have a significant impact upon the environment, and does not require the preparation of an Environmental Impact Statement.  Consequently, it is my great pleasure and honor to recommend the attached Finding of No Significant Impact for your approval and signature.

John A. Latschar

Attachment:  Finding of No Significant Impact

# FINDING OF NO SIGNIFICANT IMPACT
# GETTYSBURG NATIONAL MILITARY PARK
# NATIONAL TOWER DEMOLITION AND REMOVAL

## PURPOSE AND NEED FOR ACTION

Gettysburg National Military Park is the site of the American Civil War Battle of Gettysburg, the Soldiers' National Cemetery, and the commemoration of the great battle by Civil War veterans. The National Tower is a 307-foot high, privately owned observation tower. It currently occupies land that is important to the story of the Gettysburg Battlefield and is an intrusion to the cultural landscape. Union troop movements occurred on the land located immediately behind the area used as the Federal main defensive position on Cemetery Ridge.

In 1990 Congress included the National Tower in the boundary of Gettysburg National Military Park, with the understanding that the tower, which had long been seen as an intrusion on the historic scene of the Battle of Gettysburg, would be removed. As a part of the Boundary Study completed by the National Park Service (NPS) at the request of Congress and prior to its passage of legislation, the impacts from acquisition of this and other properties was analyzed. In 1993, NPS prepared a Land Protection Plan that identified the National Tower as a high priority for fee acquisition, in order to remove the tower and restore the land to its historic appearance. In 1999 Congress appropriated funds so that NPS could acquire the National Tower.

On December 9, 1999, the Department of Justice filed a complaint in condemnation at the U.S. District Court in Harrisburg, Pennsylvania. This action was the first formal legal step in the federal government's acquisition of the privately owned 307-foot observation tower, the land upon which it sits and its appurtenant rights-of-way. The action to acquire the National Tower, which overlooks the Gettysburg Battlefield, implements the decision made by the National Park Service as a part of its 1990 Boundary Study and its 1993 Land Protection Plan to add the site to the park, acquire the land and the tower, and remove the tower.

The removal of non-historic structures in order to restore natural conditions is listed by the NPS as a categorical exclusion under NPS procedures for implementing the provisions of the National Environmental Policy Act of 1969. However, in the interests of disclosing the limited impacts associated with demolition of the non-historic tower structure, an environmental assessment was prepared. The environmental assessment presented alternatives for the removal of the National Tower. Future actions for specific site restoration, which are not a part of the proposed action, were not described or analyzed in that document.

The Environmental Assessment was issued on April 28, 2000, and a notice of availability was published in the federal register May 5, 2000. An addendum to the Environmental Assessment was issued on May 19, 2000. The public comment period closed on May 31, 2000.

## ALTERNATIVES CONSIDERED

Under Alternative 1 (Proposal), the tower structure, and its surrounding buildings would be demolished and removed. Demolition itself could be accomplished through a variety of methods. One alternative method would be to dismantle the structure in a piece-by-piece method with cranes and other mechanical methods. Another demolition method would be to use an implosion to reduce the tower and associated structures into on-site debris. The debris then would be removed. Under all methods, the resulting debris would be removed by truck to approved scrap yards, recycling centers, resale facilities, or landfills.

Under Alternative 2 (No Action) the tower property would be acquired by NPS as stated in previous planning documents. The NPS would close the National Tower to public access and use, but the tower would not be removed.

The removal alternative is the environmentally preferred alternative. The environmentally preferred alternative is determined by applying the criteria suggested in the National Environmental Policy Act of 1969, (NEPA) which in turn is guided by the Council on Environmental Quality (CEQ) Regulations. CEQ regulations provide direction that "[t]he environmentally preferable alternative is the alternative that will promote the national environmental policy as expressed in NEPA's Section 101. Generally this means the alternative which causes the least damage to the biological and physical environment. It also means the alternative that best protects, preserves and enhances historic, cultural and natural resources. [1]

After consideration of public comments throughout the scoping and planning process, Congress decided in 1990 that the inclusion of the National Tower in the boundary of Gettysburg National Military Park and its ultimate removal would provide the most protection for the park's cultural resources and the nationally significant landscapes of the Battle of Gettysburg, the Soldiers' National Cemetery and the commemoration of the battle by its veterans. The action proposed in the Environmental Assessment, removal of the National Tower, is necessary to accrue this benefit to the historic landscape of the Battle of Gettysburg.

---

[1] Question 6a, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" (40 CFR 1500-1508), *Federal Register* Vol. 46, No. 55, 18026-18038, March 23, 1981.

*Finding of No Significant Impact, Gettysburg National Military Park, Removal of National Tower*
*Page 2 of 7*

## WHY THE PROPOSED ACTION WILL NOT HAVE A SIGNIFICANT EFFECT ON THE HUMAN ENVIRONMENT

As defined in 40 CFR § 1508.27, significance is determined by examining certain criteria. Those criteria are listed below.

*Impacts that may be both beneficial and adverse*
Removal of the National Tower would restore the historic scene and would eliminate what many visitors consider an intrusion on the historic scene that detracts from the experience of visiting the battlefield.

Minor impacts of the proposal might include a temporary increase in visitation during the removal process. Depending on the timing of the removal and the process used in demolition, there could be a temporary increase in traffic and related minor delays. Some visitors would be interested in seeing the removal of what is seen by many as an intrusion on the historic battlefield. In addition, temporary closure of some areas to visitor use and traffic restrictions may be necessary during demolition and debris removal. These effects are minor and temporary in nature.

*Degree of effect on public health and safety*
A phase I Environmental Site Assessment was carried out in accord with ASTM standard practice. The only finding resulting from that survey was the presence of a 100-gallon gasoline above ground storage tank (now empty and no longer in use) on the property. The above ground storage tank would be recycled or disposed of in accordance with the standards and regulations under the Pennsylvania Solid Waste Management Act. One reviewer was concerned that the tower itself might include materials that would be a danger to the public during removal. However, the Site Assessment did not find any evidence of such materials. Electrical equipment associated with the operation of the two elevators requires only small quantities of greases and buffer oils. No PCB containing fluids are associated with the elevators. The greases and buffer oils will be drained prior to demolition and recycled or disposed of in accordance with federal, state and local laws and regulations.

Temporary closures or traffic restrictions may be necessary during some periods of demolition and debris removal in order to limit public access for safety reasons. These closures would be of a limited duration and would not be extensive in size. The purpose of such closures would be to ensure public safety in and around removal activities.

One reviewer questioned what would happen with debris from the tower. Under all methods of tower removal, the resulting debris would be removed by truck to approved scrap yards, recycling centers, resale facilities, or approved landfills.

One reviewer was concerned that the demolition or implosion of the National Tower would create air quality concerns for the surrounding area. Any release of particulate matter would of limited duration and would end when the demolition activity was completed. On May 26, 2000, the U.S. Environmental Protection Agency concurred with the Environmental Assessment for the project.

*Unique characteristics of the geographic areas such as proximity to historic and cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.*
The project area includes land that was important to the Battle of Gettysburg. However, almost the entire site is covered with development associated with the National Tower, its operation and parking. The site and the adjacent privately-owned areas contain no wetlands, prime farmlands, wild and scenic rivers, or ecologically critical areas.

Removal actions would occur both on currently developed lands, but also in wooded areas east of the National Tower property. During removal, there is a potential for some equipment and or debris to enter onto grassy areas or disturb topsoil and vegetation on the National Tower property. In addition, demolition and removal of the National Tower could also disturb or destroy vegetation and topsoil in the wooded, privately owned areas east of the National Tower property. No demolition or removal activities that might affect privately owned land would be undertaken without the specific permission of the property's owners.

Demolition and removal activities have the potential to impact a maximum of about 1.9 wooded acres, including about 0.7 acres of woodlands on the National Tower property and about 1.2 acres of privately owned land. However, these intrusions would be limited in nature and scope. In the wooded areas, understory vegetation may be removed to permit access for trucks removing debris from the demolition process. Some trees may be damaged or destroyed during the demolition and removal process. Equipment and personnel could temporarily disturb animals and birds in construction areas, road corridors, and demolition zones. Migration and use patterns would be expected to be reestablished following completion of the demolition and removal process. Some mortality of individual animals, such as rodents and birds, could occur during demolition and removal activities. This minor loss should not negatively affect populations of the affected species, which are common across their range and their habitat is abundant in the local area. There will be a temporary loss of habitat area because of demolition and removal activities, but this effect would be minor and localized. If necessary, mitigation measures would be implemented to provide for temporary fences around other vegetation in order to limit removal activities to the smallest possible area of vegetation, and to currently disturbed and developed locations such as the existing parking area.

*Degree to which effects on the quality of the human environment are likely to be highly controversial*
The impacts of all demolition methods are well known and understood by the scientific community, and therefore are not expected to produce effects on the quality of the human environment that are likely to be highly controversial.

*Degree to which the possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks*
The impacts of all demolition methods are well known and understood by the scientific community, and therefore are not expected to involve unique or unknown risks.

*Degree to which an action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration*
The removal of the National Tower does not establish a precedent for future actions with significant effects and does not represent a decision in principle about a future consideration.

*Whether the action is related to other actions with individually insignificant but cumulatively significant impacts*
The removal of the National Tower is not related to other actions that together would cumulatively produce a significant negative impact on the human environment. There are no known cumulative impacts resulting from this proposal.

*Degree to which the action may adversely affect districts, sites, highways, structures or objects listed on the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.*
The National Tower is not on or eligible for listing on the National Register of Historic places. One reviewer suggested that the National Tower might be historically significant. A second wanted to ensure that the Pennsylvania Historic and Museum Commission (PHMC) was appropriately involved. NPS consulted with PHMC, and on May 19, 2000, PHMC concurred with NPS' finding that the National Tower is not eligible for listing on the National Register of Historic Places and in NPS' assessment of effects on cultural resources.

There is a potential for ground disturbance associated with removal activities. This disturbance would be limited, to the extent possible, to the area of current disturbance, such as the tower parking area. If ground is disturbed beyond the current area of disturbance or new ground disturbance occurs, a cultural resources specialist would be available to monitor and evaluate the potential for cultural resources associated with the Gettysburg battle. NPS has no indication that there are significant archeological resources within the project area.

*Degree to which the action may adversely affect an endangered or threatened species or its critical habitat*
The Commonwealth of Pennsylvania Natural Diversity Inventory concurred with the finding in the Environmental Assessment that there would be no effect on Pennsylvania threatened or endangered species on June 1, 2000. No response was received from the U.S. Fish and Wildlife Service, but no threatened or endangered species are known to exist in the project area.

*Whether the action threatens a violation of Federal, state or local environmental protection law.*
This action violates no federal, state or local environmental protection laws.

## PUBLIC INVOLVEMENT
The environmental assessment was made available for public review and comment during a 30-day period ending May 31, 2000. During this period, nine responses were received. One comment was received from another federal agency, the U.S. Environmental Protection Agency, concurring with the Environmental Assessment. One comment was received from the Commonwealth of Pennsylvania Natural Diversity Inventory, concurring that no state listed species would be impacted by the action. One internal comment was received. Six comments were from the general public. No comments from park employees or from groups were received.

Compliance with § 106 of the National Historic Preservation Act was completed when the Pennsylvania State Historic Preservation Officer concurred with the NPS determination of no effect by on May 19, 2000. No response was received from the U.S. Fish and Wildlife Service.

Of the six comments received from the general public, four respondents wanted to see the National Tower remain, and two favored removal; of those, one took exception to the impacts as described. Those who disagreed with the proposal usually cited the fact that the National Tower had been in Gettysburg since the 1970s or that it had educational value.

## CONCLUSION
This proposal does not constitute an action that normally requires preparation of an environmental impact statement (EIS). Removal of non-historic structures in order to restore natural conditions is listed by the NPS as a categorical exclusion under the National Park Service procedures for implementing the provisions of the National Environmental Policy Act (NEPA). However, in the interests of disclosing the limited impacts associated with the demolition of the non-historic tower structure, this environmental assessment was prepared for public and agency review. The proposal will not have a significant effect on the human environment. Negative environmental

impacts that could occur are minor and temporary in effect. There are no unmitigated adverse impacts on public health, public safety, threatened or endangered species, sites or districts listed in or eligible for listing in the National Register of Historic Places, or other unique characteristics of the region. No highly uncertain or controversial impacts, unique or unknown risks, cumulative effects, or elements of precedence were identified. Implementation of the action will not violate any federal, state, or local environmental protection law.

Based on the foregoing, it has been determined that an Environmental Impact Statement is not required for this project and thus will not be prepared.

Approved: _____    6/5/2000
Dr. John A. Latschar, Superintendent          Date
Gettysburg National Military Park

Approved: _____    6/7/20
Marie Rust, Regional Director                 Date
Northeast Field Office

# EXHIBIT J

# Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

---

# remove, *v.*

<div align="right">SECOND EDITION 1989</div>

(rɪˈmuːv)  Forms: α. 4-5 **remeeve**, 4-6 **remeue, -meve**, (5 **-mevyn, -mewe, -mefe, -meff**). β. 4-7 **remoue**, (5 **-mouyn**), 6-7 **remooue**, 7 **-moove**, 5- **remove**; 4 **remo(u(n, remuve** (8 *Sc.*), 4-5 **remow(e**, 5 *Sc.* **ra-**), 5 **remown(e**; also *north.* and *Sc.* 5 **remofe, -muf(f**, 5-6 **-mufe**, 6 **-moif**, 5-6 **ramuff, -muif**. [a. OF. *remeuv-, remouv-* and *remov-*, the stressed and unstressed stems of *remouvoir*:—L. *removēre*, f. re- RE- + *movēre* to MOVE. On the variation of form see MOVE *v.*]

**I.** *trans.*

**1. a.** To move or shift from or out of the place occupied; to lift or push aside; to lift up and take away; to take off.

  The precise connotation varies to some extent with the nature of the object and the intention of the moving.

    *a*1300-1400 *Cursor M.* 17288 + 99 (Cott.), Who sal vus helpe to remou þat heuy stone? *c*1400 MANDEVILLE (Roxb.) xxxiii. 150 þe tendre erthe was removed fra his place and þare become a valay. *c*1460 *Towneley Myst.* xxvi. 369 Which shall of us systers thre remefe the stone? **1530** PALSGR. 685/1 Remeve this thynges out of the waye. **1535** COVERDALE *Job* vi. 17 When they be set on fyre, they shalbe remoued out of their place. **1611** BIBLE *Transl. Pref.* ¶5 Translation it is..that remooueth the couer of the well, that wee may come by the water. **1669** STURMY *Mariner's Mag.* II. vi. 65 On the other Edge make a Line of Equal Parts, with an Ear in like manner to remove at pleasure. **1683** MOXON *Mech. Exerc., Printing* xxiv. ¶19 A Spring in the Tympan removes the Paper in this interval of Time. **1775** S. J. PRATT *Liberal Opin.* lxxxi. (1783) III. 101 Having, as the tea-equipage was removing, some intention to take his leave. **1837** DICKENS *Pickw.* ii, 'What's that?' he inquired, as the waiter removed one of the covers. **1843** YOUATT *Horse* (1848) 313 The shoe having been removed, the smith proceeds to rasp the edges of the crust.

  **b.** To take away, withdraw, from a place, person, etc.; †to raise, abandon (a siege). Also *refl.* to betake oneself away.

**c1425** WYNTOUN *Cron.* III. v. 769 He..hym ramowit þan in hy, And agane hayme in Medy. **1530** PALSGR. 685/1 Remeve you from thence, my frende. *Ibid.*, I remeve my selfe out of the place I am in. **1560** J. DAUS tr. *Sleidane's Comm.* 90 So were the warders removed from the gates the same day. **1585** T. WASHINGTON tr. *Nicholay's Voy.* I. xv. 16 They resolued to remoue their siege, and to imbarke themselues with their ordinance. **1648** MILTON *Ps.* lxxxviii. 69 Lover and friend thou hast remov'd And sever'd from me far. **1667** —— *P.L.* VIII. 119 God to remove his wayes from human sense, Plac'd Heav'n from Earth so farr. **1697** DRYDEN *Virg. Georg.* I. 201 Jove..Remov'd from Humane reach the chearful Fire. **1729** LAW *Serious C.* xv. 273 We can..remove ourselves from objects that inflame our passions. **1819** SCOTT *Ivanhoe* i, [The swine] made..no haste to remove themselves from the luxurious banquet of beech-mast and acorns. **1850** McCOSH *Div. Govt.* IV. i. (1874) 464 The Epicureans removed their Gods far above the care and supervision of human affairs.

**c.** To take or convey away from a place; †to keep apart, separate. Also *removed*, taken away by death.

**1459** *Test. Ebor.* (Surtees) II. 227 Yᵗ thei..delyuere vn to George Chaworth..alle his stuffe that he hath at Alfreton,..he to remeve them at his awne wille. **1596** SHAKES. *1 Hen. IV*, II. ii. 11 That Rascall hath remoued my Horse, and tied him I know not where. **1610** —— *Temp.* II. i. 110 She too, Who is so farre from Italy remoued, I ne're againe shall see her. **1633** P. FLETCHER *Purple Isl.* IV. xi, A border citie these two coasts removing. **1748** *Anson's Voy.* II. vi. 195 Mr. Brett had hitherto gone on in collecting and removing the treasure without interruption. **1816** SOUTHEY *Ess.* (1832) I. 191 The latter was early removed from a world which his Talents..were..fitted to adorn. **1850** TENNYSON *In Mem.* Prol. 37 Forgive my grief for one removed, Thy creature, whom I found so fair.

**d.** To put (a person) out of the way; to assassinate, murder.

**1653** A. WILSON *Jas. I* 65 The Prince..being removed, the Earl of Salisbury (another obstacle) dying six moneths after the Prince [etc.]. **1655-6** T. ROSS in *Cal. St. Papers, Dom.* (1882) 196, I cannot divine how, except by removing Cromwell, to which one of them had specially devoted himself. **1889** *Times* (weekly ed.) 31 May 6/2 An elaborate article to-day, declares that Dr. Cronin was 'removed' by the Clan-na-Gael after trial and conviction.

**e.** In *pass.* Of dishes: To be replaced or followed *by*, after removal.

**1840** LADY C. BURY *Hist. of Flirt* iv, There was fish and soup, removed by boiled chickens and bacon. **1852** THACKERAY *Shabby-genteel Story* iii, Boiled haddock, removed by hashed mutton.

### f. *Cricket.* Of a bowler or ball: to dismiss (a batsman).

**1969** *Wisden's Cricketers' Almanack* 300 Underwood..accounted for Redpath and Walters, each getting an inside edge to the ball that removed him. **1976** *Eastern Even. News* (Norwich) 22 Dec. 14/2 With the fourth ball of his second over Lever removed Venkataraghavan, the ball brushing the batsman's glove before passing through to wicketkeeper Alan Knott. **1977** *Evening Post* (Nottingham) 24 Jan. 16/3 Selvey removed Sivaramakrishnan with his fourth ball.

**2. a.** To move, shift, transfer or convey from one place to another; to change the place or situation of (†also with *place* as obj.); †to lead (a force) to another place.

**13..** *Guy Warw.* (A.) ccxcvi, Lete him be stille, Neuer more remoun him y nille, No do him hennes lede. **1388** WYCLIF *2 Sam.* xx. 12 He remouyde Amasa fro the weie in to the feeld. **c1400** *Destr. Troy* 3113 Ho..beckonet hym boldly..his place to Remeve. **c1420** *Pallad. on Husb.* II. 177 Letuce is to be sette in Ianyueer.., the plantes to remeue In Feueryeer. **1494** FABYAN *Chron.* VI. clxxi. 166 Than he remeuyd his people, and in sondry places faughte with the Danys. **1523** FITZHERB. *Husb.* §129 If thou wylte remoue & set trees gete as many rotes with them as thou can. **a1548** HALL *Chron., Edw. IV* 215 He politiquely..determined in great haste to remove his whole army. **1560** J. DAUS tr. *Sleidane's Comm.* 301 You ought not to have removed or chaunged the place without the consent of the Emperour. **1613** PURCHAS *Pilgrimage* III. ii. (1614) 234 Their tents, which with themselues, their flockes, and substance, they remoued vp and downe from place to place. **1703** MOXON *Mech. Exerc.* 343 Then removing the string the space of 15 degrees in the Quadrant. **1765** *Museum Rust.* IV. 170 This row being thus planted, the line was removed two feet forwards. **1815** J. SMITH *Panorama Sc. & Art* II. 178 Remove the needle from the situation P to the situation R. **1839** KEIGHTLEY *Hist. Eng.* II. 25 Elizabeth was now removed to Canterbury. **1876** HOLLAND *Sev. Oaks* xi. 151 [He] is about to remove his residence from among us.

*refl.* **c1375** *Lay Folks Mass. Bk.* (MS. B) 301 þo prest wil after in þat place Remow [*v.r.* remo] him a litel space.

*absol.* **1615** W. LAWSON *Country Housew. Gard.* (1626) 17 The onely best

way..to haue sure and lasting Sets, is neuer to remoue: for euery remoue is an hinderance.

**†b.** *Law*. To transfer (a cause or person) for trial from one court of law to another. Also *refl.*

**1507** *Cal. Anc. Rec. Dublin* (1889) I. 394 Writes of privelage to remowe ple othir ples owte of the cowrt of the citte. **1607** COWELL *Interpr.* s.v. *Habeas Corpus*, is a writ the which a man..may haue out of the Kings bench, thereby to remooue himselfe thither..and to answer the cause there. **1627** T. POWELL (*title*) The Attornies Almanacke, provided..for..all such as shall have occasion to remove any person, cause or record, from an inferior Court to any the higher Courts at Westminster. **1744** [see REMOVER² 2].

**†c.** *Chess*. To move (a piece). Also *absol. Obs.*

**1562** J. ROWBOTHAM *Playe of Cheasts* Bij, Oftentymes the game is lost by remouinge the Rookes Paune or Knyghtes Paune one roume. *a***1585** MONTGOMERIE *Cherrie & Slae* 215, I gat sik chek, Quhilk I micht nocht remuif nor nek, Bot eyther stail or mait.

**3. a.** To send or put (a person) away; to compel (one) to go from, or quit, a place.

**c1380** WYCLIF *Serm.* Sel. Wks. I. 401 Ꝫif..þou have a wickide servaunt.., putte him out of his office and remeeve him fer awey. **c1425** WYNTOUN *Cron.* II. xvi. 1416 Of neid þaim behuffit to be banyst and ramowyt Fra þar gud, þar kyn, þar kytht. **1432-50** tr. *Higden* (Rolls) VIII. 329 A knyȝhte..promysede to brynge an hoste of Scottes to remove hym from that sege. **1567** *Gude & Godlie B.* (S.T.S.) 86 From thy face thow sall thame swyith remufe. **1581** *Reg. Privy Council Scot.* III. 396 Thay on nawyse suld..molest, rais or remove any of the auld tennentis. **c1600** SHAKES. *Sonn.* xxv, Then happy I that loue and am beloued Where I may not remoue nor be remoued. **1667** MILTON *P.L.* XI. 96 To remove him I decree, And send him from the Garden. *a***1768** ERSKINE *Inst. Law Scot.* II. vi. §49 (1773) 273 Warning must be used in order to remove a tenant in a common lease. **1838** W. BELL *Dict. Law Scot.* 848 The tenant is..entitled to continue his possession.., until legally removed by the landlord.

**b.** To put (one) away from, or out of, a position or office; to depose, dismiss.

**1388** WYCLIF *1 Kings* xv. 13 He remouyde Maacha,..that sche schulde not be princesse in the solempne thingis. **1433** *Rolls of Parlt.* IV. 477/2 That the seid Sergeauntz be remeved at the ende of every Yere. **1502** ARNOLDE *Chron.* (1811) 36 The Aldermen of the forsayd cite that eueri yere they ben remeued..and that they so remeued be not chosen ayen the next yere. **1520** *Caxton's Chron. Eng.* III. 20b/2 The Trybunes were remeued every yere. **1553** in Hakluyt *Voy.* (1886) III. 18 And the person so remoued not to be..accepted..from the time of his remoue, any more for an officer. **1775** BURKE *Sp. Conc. Amer.* 87 That the said Chief Justice and other Judges..shall hold his and their office..and shall not be removed therefrom but when [etc.]. **1874** STUBBS *Const. Hist.* xii. (1896) I. 511 *note,* None of the sheriffs now removed were employed again.

†**c.** To raise (a siege). *Obs.* (See RAISE *v.* 30.)

**1387** TREVISA *Higden* (Rolls) VIII. 329 William de Reeth..behiȝt þe kyng þat he wolde..bryng þe oost of Scottes..to remeve þe seege..of Berwyk. **1480** CAXTON *Chron. Eng.* ccxxxv. 257 This same yere the king with a grete host entred the see to remeue the sege of rochel. **1586** MARLOWE *1st Pt. Tamburl.* IV. iii, Let us..hasten to remove Damascus' siege. **1640** YORKE *Union Hon.* 245 He was sent..to remove the siege of the City of Rochel in France.

†**d.** To clear off, dispose of. *Obs. rare.*

**1609** HOLLAND *Amm. Marcell.* 131 In the high tops whereof were balists fitly placed, which removed the defendants that kept lower. **1652** NEEDHAM tr. *Selden's Mare Cl.* 168 Having thus refuted, or upon good ground removed som Opinions of antient Lawyers.

**4. a.** To take away (*from* a person), to relieve or free one from, some feeling, quality, condition, etc., esp. one of a bad or detrimental kind; †to do away with, put an end to (a practice).

**c1374** CHAUCER *Troylus* I. 691 And for-thy wolde I fayn remeve Thy wrong conceyte. **c1400** tr. *Secreta Secret., Gov. Lordsh.* 108 Gouerne hem wel, and..remowe fro hem all þaire wronges. **c1449** PECOCK *Repr.* II. ix. 196 Wherbi is excludid and wilned of Crist to be removed, that eny man schulde worschipe God bi eny outward ymagis. *Ibid.,* Crist in the same chapiter..removed pilgrimagis. **1567** *Gude & Godlie B.* (S.T.S.) 74 Lord..Remufe fra me all frawardness. **1596** SHAKES. *Tam. Shr.* I. ii. 72 She moues me not, or not remoues at least Affections edge in me. **1610** —— *Temp.* II. ii. 79 If hee haue neuer drunke wine afore, it will goe neere

to remoue his Fit. **1667** MILTON *P.L.* XII. 290 When they see Law can discover sin, but not remove. **1770** *Junius Lett.* xxxix. (1788) 217 In the repeal of those acts..the parliament have done everything but remove the offence. **1809** *Med. Jrnl.* XXI. 260 That general debility..which time and attention will in all probability very speedily remove. **1874** GREEN *Short Hist.* vii. §6. 405 The death of Norfolk and Northumberland removed the dread of civil war.

**†b.** To put away (a feeling, thought, etc.) *from* oneself; to set aside. *Obs.*

**1388** WYCLIF *Eccl.* xi. 10 Do thou awei ire fro thin herte, and remoue thou malice fro thy fleisch. **c1440** *Alph. Tales* 106 It is impossible to remofe ill thoghts fro þe with other mens prayers. **1535** COVERDALE *Eccl.* xii. 1 Put away displeasure out of thy hert, & remoue euell from thy body. [**1611** (xi. 10) Therefore remoue sorrow from thy heart, and put away euill from thy flesh]. **1703** EARL OF ORRERY *As you Find it* III. i, You had best remove this Scruple quickly.

**†5.** To change, transform, *into* something. *Obs.*‾¹

**c1430** *Pilgr. Lyf Manhode* I. xli. (1869) 25 And therfore I haue wrethe in myn herte whan ye remeeuen [F. *muez*] it in to quik flesh.

**†6.** To go away from, to quit (a place or position). *Obs. rare.*

**c1440** *Generydes* 3223 Too all his ost he gave a speciall charge,..They shuld remeve that place ij myle large. **c1450** *St. Cuthbert* (Surtees) 7514 Ane [bishop] þe whilk by symony þe se gat; with in sex moneths remoued he þat.

**†7.** To move or stir (a part of the body). *Obs.*

**1483** CAXTON *Gold. Leg.* 262b/2 Whan the tyraunte sawe that he remeuyd yet his lyppes..[he] smote hym wyth hys knyf to the herte. **1523** LD. BERNERS *Froiss.* I. ccclxix. 606 The church that day was so full of noblenesse, that a man might nat a remoued his fete. **1585** T. WASHINGTON tr. *Nicholay's Voy.* II. xxi. 58b, Pulling and remouing your ioyntes as before is said.

**†8.   a.** To move or persuade (one) *out of* or *from* a purpose or resolve. Also without const. *Obs.*

**1483** CAXTON *Gold. Leg.* 184/2 He wold haue comen vnto our presence

but that hys conscyence hath remeuyd hym. **1523** LD. BERNERS *Froiss.* I. ccxxxi. 314 They coude nat remoue him out of that purpose. *a***1548** HALL *Chron., Edw. IV* 24b, All the tounes round about, were permanent and stiffe on the parte of kyng Henry, and could not be remoued. **1647** MAY *Hist. Parl.* I. viii. 94 But the King was hard to be removed from his resolution. **1654** tr. *Martini's Conq. China* 167 Nor would he ever be removed from this unhumane sentence.

†**b.** To move, affect (the heart). *Obs. rare*$^{-1}$.

**?1600** LYLY *Love's Metam.* IV. ii, Men, whose loues are built on truth, and whose hearts are remoued by curtesie.

**II.** *intr.*

**9. a.** To go away or depart from a place; to move off to somewhere else.

α **13..** *K. Alis.* 7238 He with-seith alle homage..And bad you remeue out of his lond. *a***1400-50** *Alexander* 1975 Remefe agayn to þi realm or þou sall it rewe. **c1450** *Merlin* 61 They seide 'Sir, we haue no talents to remeue fro hens'. **1495** *Trevisa's Barth. De P.R.* VIII. xviii. xij/2 The mone makyth a man vnstable chaungeable & remeuynge abowte fro place to place.

β **c1375** *Sc. Leg. Saints* xviii. (*Mary Egypt*) 1090 þu sal na mycht haf to remofe [from the abbey]. **c1400** *Rowland & O.* 730 The Oste remowede & forthe thay ȝede,..To þaire Iournaye þay hye. **c1470** HENRY *Wallace* XI. 315 Wallace off France a gudly leiff can tak. The kyng..Gret langour tuk quhen Wallace can ramuff. **1568** GRAFTON *Chron.* II. 378 From thence they remoued to Saint Albons, and came thether on Christmas Euen. **1585** T. WASHINGTON tr. *Nicholay's Voy.* I. xv. 16 [He] remooued..to assiege the castle of Tripoli. **1629** J. COLE *Of Death* 51 Hee would rather chuse to stay here, and live in the same [earthly pleasures], then remove to enjoy the heavenly. **1661** GLANVILL *Van. Dogm.* 198 He said, he'd remove into another room. **1706** E. WARD *Wooden World Diss.* (1708) 28 He..begs a Certificate, when he removes from the Ship. **1796** *Hist. Ned Evans* II. 104 From which few ever remove but to torture.

**b.** *spec.* To change the place of one's (temporary or permanent) residence; also of a tenant, to quit a house or holding.

**1399** LANGL. *Rich. Redeles* III. 301 A new þing þat noyeth nedy men and oþer, Whanne realles remeueth and ridith þoru tounes. **1478** *Paston Lett.*

III. 229 My Lord of Suffolk is remevyd in to Suffolk..and my lady purposed to remeff after on thys day. **1530** PALSGR. 685/1, I remeve, as an armye or the trayne of a prince or gret man removeth from one place to an other. **1555** *Sc. Acts Mary* (1814) II. 494/1 The warning of all tennentis and vtheris to flit and remoue fra landis mylnis fischingis and possessiouns quhat~sumeuer. **1633** FORD *Broken H.* II. i, This house, methinks, stands somewhat too much inward; we'll remove Nearer the court. **1697** DRYDEN *Virg. Georg.* I. 57 Proserpine..importun'd by Ceres to remove, Prefers the Fields below to those above. **1722** DE FOE *Plague* (1754) 6 This Frenchman..was one who, having liv'd in Long-Acre..had removed for fear of the Distemper. **1756** *Act of Sederunt* 14 Dec., Where the tenant hath not obliged himself to remove without warning. **1838** W. BELL *Dict. Law Scot.* 848 In order to authorise judicial removing, the tenant..must be warned by the landlord to remove. **1855** BREWSTER *Newton* II. xxi. 252 Newton received this letter when he was removing from Jermyn Street to Chelsea.

**†c.** To shift one's place or position. *Obs.*

**1340** HAMPOLE *Pr. Consc.* 7365 In helle salle be þan swa gret thrang, þat nane may remow for other ne gang. **c1475** *Rauf Coilʒear* 861 The lenth of ane rude braid he gart him remufe. **a1533** LD. BERNERS *Huon* lv. 186 He remoued no more for the stroke then it had ben a strong walle. **1562** J. ROWBOTHAM *Playe of Cheasts* Avb, Their office is not to remoue but in necessitie, and chiefelye for the succoure of theyr kynge. **1595** SAVIOLO *Practise* Hijb, Remoue with your right foot a little back toward his left side. **1656** BEALE *Chess* 8 The King removeth but one house at a time.

**10. a.** Of things: To change place; to move off or away; to depart, disappear, etc.

**1423** JAS. I *Kingis Q.* clxxxviii, In perfyte Ioy, that neuir may remufe. **1481** CAXTON *Myrr.* I. vi. 29 There cheualrye contynued long, And frothens after it remeuid in to Fraunce. **1535** COVERDALE *Isa.* liv. 10 The mountaynes shall remoue, & the hilles shal fall downe. **c1586** C'TESS PEMBROKE *Ps.* LII. ix, My trust on his true love Truly attending Shall never thence remove. **1662** STILLINGFL. *Orig. Sacræ* III. ii. §17 Those particles will necessarily remove into that empty space. **1704** POPE *Autumn* 29 Ye trees that fade when autumn-heats remove. **a1792** BURNS *Posie* vii, I'll swear..That to my latest draught o' life the band shall ne'er remove. **1839-48** BAILEY *Festus* xviii. 174 And sigh That truth from that Heaven should ever remove. **1896** A. E. HOUSMAN *Shropshire Lad* xxxvi, But ere the circle homeward hies Far, far must it remove.

**†b.** To change *into* something. *Obs. rare*$^{-1}$.

**1674** PLAYFORD *Skill Mus.* III. 5 That which is an eighth shall remove into a fifth.

**†11.** To move, stir; to be in motion. *Obs.*

**a1400-50** *Alexander* 2943 Sir Dary..Rerys hym vpp & remevys in hys sete riche. **a1450** *Knt. de la Tour* (1868) 37 She might not stere nor remeue more thanne a stone. **1509** HAWES *Past. Pleas.* XXIV. (Percy Soc.) 108 These are the v. wyttes remeuing inwardly. **c1555** HARPSFIELD *Divorce Hen. VIII* (Camden) 251 The head thus being above, the body beneath in water, wagging and removing to and fro. **1601** HAKLUYT tr. *Galvano's Discov.* 46 There is further a kinde of herbe there growing, which followeth the sunne, and remooveth after it.

# Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

---

# removal

SECOND EDITION 1989

(rɪˈmuːvəl) Also 6-7 **-all**, 7 **remoou(e)all**, **-moveall**. [f. REMOVE *v.* + -AL[1].]

**1. a.** The act of taking away entirely.

> **1597** HOOKER *Eccl. Pol.* v. lxv. §19 No redresse can well be hoped for without remouall of that wherein they haue ruined themselues. **a1602** W. PERKINS *Cases Consc.* (1619) 67 The remooueall of such reasons and doubts. **1665** MANLEY *Grotius' Low C. Warres* 505 First of all, the Priests and Nobility, intreat the Removal of this miserable Destruction from their Possessions. **1725** N. ROBINSON *Th. Physick* 163 It is a most dangerous Disease, and..demands the best Assistance that can be given..for its Removal. **1745** WESLEY *Answ. Ch.* 43 You look upon both the Disorders and the Removals of them to be supernatural. **1842** J. H. MARKLAND *Remarks Eng. Ch.* 25 Good taste would suggest the removal of the wainscoting altogether. **1890-1** WOODBURY *Encycl. Photogr.* 608 Removal of Film.—The gelatine films may be removed from the glass plate [etc.].

**b.** The act of 'removing' a person by murder.

> **1655** *Cal. St. Papers, Dom.* (1881) 355, I think with you that he [Cromwell] will die a violent death,..for his removal is the only way to settle his Majesty in his 3 Kingdoms. **1897** *Hearth & Home* 14 Jan. 378/1 It is true that isolated 'removals' have small apparent effect, but they are invaluable as a demonstration of our power.

**2.** Dismissal from an office or post; also, transference to another office, etc.

> **1647** CLARENDON *Hist. Reb.* I. §96 He was advanced to be Keeper of the Great Seal of England..upon the removal of the Bishop of Lincoln. **1661** COWLEY *Cromwell* Wks. 1710 II. 641 Without disputing..the Causes, either of the Removal of the one, or the Preferment of the other. **1743** BULKELEY & CUMMINS *Voy. S. Seas* 3 Captain Norris of the Gloucester having obtained Leave to return to England,..occasioned the above

Removals. **1800** J. ADAMS *Wks.* (1854) IX. 47 When I came into office, it was my determination to make as few removals as possible. **1863** H. COX *Instit.* III. vi. 667 The appointment and removal of magistrates is left to the Lord Chancellor.

**3. a.** The act of conveying or shifting to another place; the fact of being so transferred.

*a***1639** WOTTON in *Reliq.* (1651) 117 Not many minutes after the fall of the body, and removall thereof into the first room. **1690** LOCKE *Hum. Und.* II. xxi. §11 The sitting still even of a paralytic, whilst he prefers it to a removal, is truly voluntary. **1764** BURN *Poor Laws* 108 It hath been generally understood, that removals [of the poor] were first ordained by the 13 & 14 C. 2. **1818** SHELLEY *Julian* 252 He would not bear Removal, so I fitted up for him Those rooms. **1888** F. HUME *Mme. Midas* I. ii, Slivers had pushed all the..loose papers away, and was writing a letter in the little clearing caused by their removal.

**†b.** *Chess.* A move. *Obs. rare.*

**1662** J. DAVIES tr. *Olearius' Voy. Ambass.* 298 Philometer invented the Game of Chesse, which..discover'd to him the duty of a Prince towards his Family and Subjects, by shewing him the removals of the several pieces.

**4.** The act of changing one's ground, place, or position; *esp.* change of habitation.

**1642** MILTON *Apol. Smect.* Wks. 1851 III. 288 All the judicious Panegyricks in any language extant are not halfe so prolixe. And that well appears in his next removall. **1791** MRS. RADCLIFFE *Rom. Forest* i, Such had been the precipitancy of this removal. **1811** MISS MITFORD in L'Estrange *Life* (1870) I. v. 136 This removal will cause you some additional trouble, my dear Sir William. **1899** *Green's Encycl. Sc. Law* XII. 236 Removal from urban tenements is regulated by custom.

*attrib.* **1881** *Act 44 & 45 Vict.* c. 39 §1 This Act may be cited as the Removal Terms..Act. **1886** W. A. HARRIS *Techn. Fire-Insur. Dict., Removal-damage* is allowed by Offices in cases where their agents authorise such removal. **1939** MRS. BELLOC LOWNDES *Let.* 23 Oct. (1971) 183 The removal man..told me some interesting things about the art of moving and storing furniture. **1962** J. G. BENNETT *Witness* xviii. 218 One of the removal men asked him if a sofa was to go 'up the apples'. **1973** *Times* 28 Dec. 16/1 (Advt.), Assistance with removal expenses if

necessary. **1974** M. GILBERT *Flash Point* xiii. 115 They wore corduroy trousers and jackets belted at the waist... They looked like removal men. **1979** *Homes & Gardens* June 77/2 They used his pension to buy an old removal van.

ADDITIONS SERIES 1993

**removal**, *n.*

Add:    **[3.] c.** *Anglo-Irish.* In full, ***removal of remains***. The formal taking of a body to the church for the funeral service. Cf. LIFT *n.*[2] 1 c.

> **1890** *Pall Mall Gaz.* 24 Nov. 4/2 (*heading*) The late Lady Rosebery. Removal of the remains to-day. **1939** JOYCE *Finnegans Wake* 544 Private chapel occupies return landing, removal every other quarter day. **1949** *Irish Times* 15 Oct. 12/1 The family..wish to return their sincere thanks to..all who attended removal of remains, Mass and funeral. **1967** *Irish Press* 30 Dec. 2/5 The wife and family..wish to thank most sincerely all those..who sent Mass cards, floral tributes, telegrams, letters of sympathy, attended removal, Requiem Mass and funeral. **1979** *Southern Star* (Eire) 29 Sept. 4/1 His fellow employees as well as members of Kilmac G.A.A. formed guards of honour at the removal and funeral. **1986** *Evening Press* (Eire) 21 May 2/1 Removal to Holy Family Home Chapel at 6 o'clock this (Wednesday) evening.

# Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

## demolish, *v.*

SECOND EDITION 1989

(dɪˈmɒlɪʃ) [a. F. *démoliss-*, lengthened stem of *démolir* (1383) in Littré), ad. L. *dēmōlīrī* to throw down, demolish, destroy, f. DE- I. 6 + *mōlīrī* to build, construct, erect, f. *mōles* mass, massive structure.]

**1.** *trans.* To destroy (a building or other structure) by violent disintegration of its fabric; to pull or throw down, pull to pieces, reduce to ruin.

> **1570-6** LAMBARDE *Peramb. Kent* (1826) 285 The Chapell of Hakington..was quite and cleane demolished. **1606** WARNER *Alb. Eng.* XIV. lxxxv. (1612) 353 Both twaine made hauock of their foes, demolishing their Forts. **1641** J. JACKSON *True Evang. T.* III. 181 Christ did..demolish and breake downe that partition wall. **1776** GIBBON *Decl. & F.* I. xvi. 422 They completely demolished the remainder of the edifice. **1825** MACAULAY *Milton* Ess. 1854 I. 11/1 The men who demolished the images in cathedrals have not always been able to demolish those which were enshrined in their minds.

**†b.** To break down or ruin partially. *Obs.*

> **1645** EVELYN *Mem.* (1857) I. 170 Behind this stands the great altar of Hercules, much demolished. **1656** *Ibid.* I. 331 A fair town, but now wretchedly demolished by the late siege.

**†c.** *intr.* with passive sense. *Obs. rare.*

> **1609** BIBLE (Douay) *Joel* ii. 8 Through the windowes they shal fal and shal not demolish [Vulg. *et non demolientur*].

¶ Archaic const.: *demolishing = a-demolishing*, in demolition = being demolished: cf. *building* in BUILD *v.* 7.

> **1686** *Lond. Gaz.* No. 2118/2 The House Gulicke lived in is demolishing. **1706** *Ibid.* No. 4199/3 The Castle of Nice is demolishing.

**2.** *fig.* To destroy, make an end of.

**1620** VENNER *Via Recta* viii. 193 They lesse resist extrinsecall and intrinsecall causes that demolish their health. **1651** BAXTER *Inf. Bapt.* 201 Demolishing the Church by division and contempt. **1735** BERKELEY *Def. Free-think. Math.* §32 It is directly demolishing the very doctrine you would defend. **1878** STEWART & TAIT *Unseen Univ.* vii. §214. 211 To demolish any so-called scientific objection that might be raised. **1882** *Athenæum* 23 Dec. 844 The author demolishes most of those fanciful etymologies.

**b.** *humorously.* To consume, finish up.

[**1639** MASSINGER *Unnat. Combat* III. i, As tall a trencher~man..As e'er demolished pye-fortification.] **1756** FOOTE *Eng. fr. Paris* I. Wks. 1799 I. 106 They proceed to demolish the substantials. **1879** BEERBOHM *Patagonia* iii. 41 It is on record that he demolished the whole side of a young guanacho at one sitting.

Hence **de'molished** *ppl. a.*

**1623** DONNE *Encænia* 34 That demolished Temple. **1742** YOUNG *Nt. Th.* vii. 833 Beneath the lumber of demolish'd worlds. **1840** THIRLWALL *Greece* VII. 347 On the site of the demolished theatre.

Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

---

# demolition

SECOND EDITION 1989

(dɛmə'lɪʃən, diː-) [a. F. *démolition* (14th c. in Littré), ad. L. *dēmōlītiōn-em*, n. of action from *dēmolīrī* to DEMOLISH.]

**1. a.** The action of demolishing (buildings or other structures); the fact or state of being demolished.

> **1610** HEALEY *St. Aug. Citie of God.* 125 Before this demolition the people of Alba were all transported unto Rome. **1780** JOHNSON *Let. to Mrs. Thrale* 9 June, The outrages began by the demolition of the mass-house by Lincoln's Inn. **1852** CONYBEARE & H. *St. Paul* (1862) I. v. 136 Its demolition was completed by an earthquake.

**b.** *pl.* The remains of a demolished building; demolished portions, ruins. Also *fig.*

> **1638** BAKER tr. *Balzac's Lett.* (1654) IV. 56 Out of their demolitions, Trophies might be erected. **1641** EVELYN *Mem.* (1857) I. 20 Being taken four or five days before, we had only a sight of the demolitions [of the castle]. **1668** CLARENDON *Contempl. Psalms* Tracts (1727) 734 All the breaches and demolitions they had made in his Church.

**2.** *fig.* Destruction, overthrow.

> **1549** *Compl. Scot.* xx. 184 There querellis tendit to the demolitione of the antiant public veil. **1775** GOUV. MORRIS in Sparks *Life & Writ.* (1832) I. 49 Such controversies frequently end in the demolition of those rights and privileges which they were instituted to defend. **1871** MORLEY *Voltaire* (1886) 243 The demolition of that Infamous in belief and in practice.

**3.** *attrib.* **a.**

> **1936** MENCKEN *Amer. Lang.* (ed. 4) vi. 289 In an Atlanta department-store the *News-Record* found..*demolition-engineers* who were once content to be house-wreckers. **1959** J. AUSTWICK *Murder in Borough*

*Library* iii. 21, I thought the houses in Clough Street were closed under a demolition order. **1971** A. CLARKE *Mind to Murder* xii. 179, I went first to the demolition site, told the foreman I'd got to look for a room.

**b.** Special Comb. **demolition ball** = *wrecking ball* s.v. WRECKING *vbl. n.*[1] 3; **demolition derby** chiefly *U.S.*, a contest in which old cars are battered into one another, the last one running being declared the winner; also *fig.*

**1962** *Engin. News-Rec.* 27 Sept. 19/3 Apprehensive about putting a *demolition ball on a 200-ft-plus crane boom, decided to try the helicopter approach. **1980** *Daily Tel.* 27 Aug. 3/2 Cranes with demolition balls have moved in and destroyed the factory.

**1956** *Britannica Bk. Year* (U.S.) 751 *Demolition derby*, a stock car bump-and-crash, elimination contest. **1976** *Billings* (Montana) *Gaz.* 1 July 2A/4 A demolition derby will start at 7.30 p.m. at the fairgrounds, followed by fireworks. **1982** *Listener* 20-30 Dec. 22/3 Keith Moon, the one-man demolition derby on drums, represented a physical element at the opposite end of the spectrum from Pete Townshend's lyrics.

# EXHIBIT K



# National Park Service

## DIRECTOR'S ORDER #2: PARK PLANNING

**Approved:** /s/ Robert Stanton (signed original on file)
Director, National Park Service

**Effective Date:** May 27, 1998

**Sunset Date:** May 27, 2002

### 1.0. Purpose

1.1. This director's order revises and replaces the policies and guidance included in chapter 2 of the *National Park Service Management Policies* (1988) and the NPS-2 *Planning Process Guideline* (1982) as they relate to park planning. Policies and guidelines concerning the studies of potential new additions to the national park system, the national wild and scenic rivers system, and the national trails system outlined in the *Management Policies*, NPS-2, and Special Directive 92-11 will remain in effect until revised by future actions.

1.2. This director's order documents the decision-making processes that result in the goals and actions specific to each unit of the national park system and those units of the national trails system administered by the National Park Service. Park planning is a vital intermediary step that links servicewide planning and decision making to park operations.

1.3. Coordinating and integrating all the various types of park planning is essential. The planning and decision-making framework presented here compiles and integrates all servicewide directives related to park planning, regardless of whether they are associated with the general management planning program, the resource management programs (including compliance with the National Environmental Policy Act and the National Historic Preservation Act), the visitor services program, the construction program, or the performance management system that is being implemented to comply with the Government Performance and Results Act (GPRA). This order will be closely coordinated with other director's orders and updated and revised every two to four years to ensure that direction for park planning remains consistent across the National Park Service.

1.4. The associate director for professional services is delegated the authority to establish program standards for park planning. Together Director's Order 2 and its program standards provide the information needed by park superintendents and other managers throughout the National Park Service to direct effective and efficient park planning in cooperation with the public and our partners. More detailed information about specific procedures, techniques, and tools will be compiled in a separate sourcebook (scheduled for distribution in 1998). The sourcebook will constitute the level three guidance for park planning under the new NPS directive system.

### 2.0. Authority

This director's order is issued pursuant to 16 USC 1 through 4 (the National Park Service Organic Act).

### 3.0. NPS Park Planning Policy

NPS management policies are hereby revised to read as follows.

### 3.1.0. General Principles

3.1.1. The National Park Service will take a comprehensive approach to planning for how resources, visitors, and facilities will be managed to carry out the mission of the National Park Service and each individual park. The National Park Service has a mandate in its Organic Act and other legislation to preserve resources unimpaired for the enjoyment of future generations. NPS park planning will help define what types of resource conditions, visitor uses, and management actions will best achieve that mandate.

3.1.2. The National Park Service will use planning to bring logic, analysis, public involvement, and accountability into the decision-making process.

- *Logic* - Park planning and decision making will be conducted as a continuous, dynamic process that extends from broad visions shared with the public to individual, annual work assignments and evaluations. Each park will be able to demonstrate to decision makers, staff, and the public how decisions relate to one another in terms of a logical, trackable rationale.

- *Public Involvement* - Public participation in planning and decision making will ensure that the National Park Service fully understands and considers the publics' interests in the parks as part of their national heritage, cultural traditions, and community surroundings. To the maximum extent possible, the National Park Service will actively seek out and consult with existing and potential visitors, neighbors, people with traditional cultural ties to park lands, scientists and scholars, concessioners, cooperating associations, other partners, and government agencies. The Park Service will work cooperatively with others to improve the condition of parks, to expand public service, and to integrate parks into sustainable ecological, cultural, and socioeconomic systems.

- *Accountability* - Management teams will be held accountable for identifying and accomplishing long-term goals and annual goals as incremental steps toward fully carrying out the park mission. Such planning will be a critical and essential part of the National Park Service performance management system that is designed to improve the agency's performance and results.

### 3.2.0. Major Elements of NPS Park Planning and Decision Making

1. A logical, trackable rationale for decisions will be created through several levels of planning that become increasingly detailed and complementary by agreeing first on why the park was established and what resource conditions and visitor experiences should exist there, and then by becoming increasingly focused on how those conditions should be achieved. More specifically, park managers and staffs will be able to articulate and share with the public



3.2.3. This director's order recognizes that many parks will initially lack some elements of a logical, trackable rationale as described here and that updating plans to bring them into conformance will take time. In the interim, parks will work off the information in their current approved plans and identify and fill gaps in the overall framework as quickly as feasible.

### 3.3.0. Park Planning Processes

3.3.1. The elements necessary for a logical, trackable rationale for decision making will be created and updated through four closely interrelated planning processes: general management planning, park strategic planning, implementation planning, and annual performance planning. The order of these processes will generally flow from broad-scale general management planning through progressively more specific strategic planning, implementation planning, and annual performance planning and reporting. When scoping a plan, it will be important to distinguish which issues can most appropriately be addressed by general management planning and which will most appropriately be addressed by more detailed strategic or implementation planning. The results of planning and decision making will be monitored by the park staff, and information will be fed back into the processes at appropriate junctures. If goals are not being met, management teams will seek to understand why and to identify appropriate actions for moving closer to goals. Occasionally the broadest level decisions about ultimate goals will be reassessed to reflect new knowledge or previously unforeseen circumstances, then the cycle will resume.

3.3.2. Each process will have its own particular requirements; however, to the maximum extent possible, these processes will accommodate the overarching goal of minimizing duplication and confusion in park planning. This will be accomplished by establishing uniform definitions for decision-making elements shared by more than one process and by explaining how all the elements interrelate in a single park planning and decision-making framework.

3.3.3. Elements that were previously included in other planning processes (e.g., statement for management) are now included in the four NPS park planning processes described below.

## 3.3.1.0. General Management Planning

3.3.1.1. The National Park Service will maintain an up-to-date general management plan (GMP) for each unit of the national park system. The purpose of this plan will be to ensure that each park has a clearly defined direction for resource preservation and visitor use. This basic foundation for decision making will be developed in consultation with servicewide program managers, interested parties, and the general public. It will be based on an adequate analysis of existing and potential resource conditions and visitor experiences, environmental (including natural, cultural, and socioeconomic) impacts, and costs of alternative courses of action.



3.3.1.2. General management planning will constitute the first phase of tiered planning and decision making. It will focus on why the park was established and what resource conditions and visitor experiences should be achieved and maintained over time. The general management plan will take the long view, which may be many years into the future when dealing with the time frames of natural and cultural processes. The plan will consider the park holistically (in its full ecological and cultural contexts) as a unit of the national park system and as part of a surrounding region. It will identify the importance of partnerships with others in protecting park resources and providing appropriate visitor services. The general management plan will also identify connections among the various park programs and park management districts. This will help avoid inadvertently creating new problems in one area, while attempting to solve problems in another. Decisions about site-specific actions will be deferred to implementation planning. More detailed, site-specific analyses of implementation plan alternatives will be required before any major federal action is undertaken.

3.3.1.3. General management plans will contain the following decision-making elements: mission, mission goals, and management prescriptions (refer to the program standards for a detailed description of each element). The management prescriptions will meet all of the GMP legal requirements contained in the National Parks and Recreation Act of 1978 and will address the preservation of the park resources, the types and general intensities of development, visitor carrying capacities for all areas of the unit, and the indications of potential boundary modifications (the program standards for management prescriptions address these GMP legal requirements in detail).

3.3.1.4. General management planning will be conducted by an interdisciplinary team, including park managers and technical experts, who will consult with other knowledgeable persons inside and outside the agency and with the general public. Decisions will be based on a scientific and scholarly understanding of the park ecosystems and cultural contexts (both internal and external to the park boundaries). If information is inadequate, planning and decision making will be deferred until adequate information is available for the type of decisions to be made.

3.3.1.5. During general management planning, resource values and land uses will be systematically analyzed using the best information available, and alternatives and their impacts will be rigorously explored. In reaching decisions concerning future management of park resources, planning teams will seek, to the extent possible, to reach agreement among the park staff, the NPS leadership, other agencies with jurisdiction by law or expertise, and the public.

3.3.1.6. The analysis of GMP alternatives will meet the program standards for NPS implementation of the National Environmental Policy Act (NEPA) and related legislation, including the National Historic Preservation Act (NHPA). An environmental impact statement (EIS) will be prepared for general

management plans. In a few cases, after completion of scoping and where initial analysis of alternatives and impacts clearly indicate that there is no potential for significant impact by any alternative, an exception to the general rule may be made by the associate director, natural resources stewardship and science, after consultation with the Environmental Quality Division. Where both the National Environmental Policy Act and sections 106 and 110 of the National Historic Preservation Act apply, NEPA procedures will be used to inform the public about undertakings with the potential to affect properties listed on or eligible for listing on the National Register of Historic Places, in conjunction with the Advisory Council on Historic Preservation's regulatory provisions on coordination with NEPA. (Refer to the director's orders related to compliance with the National Environmental Policy Act and to cultural resources management.)

3.3.1.7. Public involvement will be adequate to learn about the concerns, issues, expectations, and values of existing and potential visitors, park neighbors, people with traditional cultural ties to lands within the park, concessioners, cooperating associations, other partners, scientists and scholars, and other government agencies. Through public involvement the National Park Service will share information about the planning process, issues, and proposed management actions; learn about the values placed by other people and groups on the same resources and visitor experiences; and build support among local publics, visitors, Congress, and others for implementing the plan.

3.3.1.8. General management planning will be conducted as part of cooperative regional planning whenever possible. NPS participation in cooperative regional planning will be undertaken in the hope of better coordinating and focusing the independent and autonomous efforts of multiple parties. NPS participation in such planning efforts will not be intended to prevent reasonable uses of private lands and will acknowledge the rights and interests of other landowners. While being consistent with NPS management policies and park goals, plans will identify and consider potential effects outside as well as inside the park boundaries and will identify ways to enhance beneficial effects and mitigate adverse effects to the maximum extent possible.

3.3.1.9. General management plans will be reviewed and revised as necessary to keep them current. It is anticipated that such reviews will be needed every 10-15 years or sooner if conditions change more rapidly. Even in parks with strong traditions and entrenched patterns of use and development, decision makers will benefit from occasionally stepping back and reassessing their overall goals, particularly if resources are threatened, sites are crowded, or the park's built environment requires extensive rehabilitation or maintenance. This will give everyone with a major stake in the park an opportunity to revalidate the park's role in the nation and in the region and to reconfirm that the kinds of resource conditions and visitor experiences being pursued are the best possible mix for the future. An approved general management plan may be amended, rather than revised, if conditions and management prescriptions over most of the plan area remain essentially unchanged from those present when the plan was originally approved.

### 3.3.2.0. Strategic Planning

3.3.2.1. Strategic planning, required by the Government Performance and Results Act of 1993, will be conducted for the National Park Service as a whole, and every park, program, and central office will have its own strategic plan. Parks, programs, and central offices engage in strategic planning to achieve better results in their mission of protecting resources and providing for visitor enjoyment. Performance management is a way to measure real progress and the level of accomplishment related to specific park, program, or central office goals.



3.3.2.2. To fulfill the purposes for

implementing the Government Performance and Results Act in the National Park Service, park strategic plans will contain the following decision-making elements: mission, mission goals, long-term goals, and resource assessment (the elements marked with an asterisk in the chart above; refer to the program standards for a detailed description of each element). Park strategic plans will be based on the servicewide strategic plan, incorporating and reporting on the progress made toward meeting the servicewide mission goals and long-term goals.

3.3.2.3. Park strategic plans will be developed according to the eight-step performance management process developed by the National Park Service for compliance with the Government Performance and Results Act. At the park strategic planning level, analysis will be focused on understanding the park's capability to set and meet long-term goals through a resource assessment of its fiscal and human resources. This resource assessment will also include a description of the condition of the natural and cultural resources in the park and the condition (capability) of the park's infrastructure in meeting long-term goals. Managers will consider how the park mission and long-term goals might be pursued in the foreseeable future, and the answers to that question will determine the park's workload, budget, and staffing allocations for the next two to five years.

3.3.2.4. Park strategic plans need to contain all of the components required by the Government Performance and Results Act, including a description of the operational processes and resources required to meet the goals, an identification of key factors external to the park and beyond its control that could significantly affect the achievement of general goals, a description of program evaluations used in establishing or revising goals, and a record of consultation. Because information in park strategic plans is extracted for compilation into the servicewide strategic plan, these plans need to contain similar information.

3.3.2.5. Ideally, the park strategic plan will tier from the general management plan, building on the GMP mission, mission goals, and management prescriptions included in that plan, and rewriting them to be stated as outcomes, if necessary. This director's order recognizes that many parks lack a current general management plan upon which to base their initial GPRA strategic planning effort. An anticipated result of this new director's order will be a general management planning program that will support all parks in developing and maintaining this foundation for decision making. In the interim, parks will work from the information in their existing plans and identify and fill gaps in their overall planning framework as quickly as feasible.

3.3.2.6. Although it shares some elements in common with a general management plan, a park strategic plan will not be a substitute for a general management plan because it does not reflect the comprehensive resource analysis, consultation, and compliance required for a general management plan. Through strategic planning, park staffs will continuously reevaluate the adequacy of the park's general management plan as a foundation for addressing issues, and they may identify the need for a new or revised general management plan. Should a park decide, through its strategic planning process, that a major shift in direction or emphasis is needed, then the strategic plan will identify the need for a

new general management plan or a GMP addendum or amendment. Strategic plans may also identify the need for more detailed implementation plans. General management planning and implementation planning are the appropriate processes for incorporating the requirements of the National Environmental Policy Act and the National Historic Preservation Act to consider impacts on the natural, cultural, and socioeconomic environments.

### 3.3.3.0. Implementation Planning



3.3.3.1. Implementation planning focuses on how to implement an activity or project needed to achieve a long-term goal. The contents of implementation plans may vary widely, depending upon whether the plan is directing a

specific project (such as a project to reintroduce an extirpated species or to develop a trail) or an ongoing activity (such as maintaining a historic structure, managing fire within a natural system, or setting and maintaining a standard for a quality visitor experience). Developing a plan of action for dealing with a complex and sometimes controversial issue often requires a level of detail and thorough analysis that goes well beyond that which is appropriate at the general management planning or strategic planning levels. (For more information about specific types of implementation plans, see the director's orders and related guidance for each program area.)

3.3.3.2. Implementation planning will generally be deferred until the activity or project under consideration has sufficient priority to indicate that action will be taken within the next two to five years. Therefore, implementation planning will usually tier off one of the long-term goals identified in the park strategic plan, and it will analyze and describe how the long-term goal will be achieved. Deferring implementation planning until the action has been given sufficient priority to anticipate funding in the next two to five years will help ensure that decisions about how to best achieve a certain goal are relevant, timely, and based on current data.

3.3.3.3. Implementation plans for actions with the potential to significantly affect the human environment will require formal analysis of alternatives in compliance with the National Environmental Policy Act and related legislation, including the National Historic Preservation Act. Since many issues involving environmental quality and cultural resources will be resolved through implementation planning rather than general management planning, the NEPA and NHPA section 106 processes begun during general management planning will need to continue as part of implementation planning.

3.3.3.4. Implementation planning for one or more projects or activities may overlap general management planning and strategic planning if it is appropriate for the purposes of planning efficiency or public involvement. However, the decisions needed at the general management planning level and the strategic planning level will precede and direct the more detailed decisions about projects and activities. Major actions or commitments aimed at changing resource conditions or visitor use in a park, and major new development or rehabilitation, will be consistent with an approved general management plan and will be linked to a long-term goal in a current strategic plan. Even if they are conducted simultaneously, the general management plan and implementation plan(s) will be contained in separate documents or separate parts of a single document, because the general management plan needs to remain intact after the implementation plans are out of date and no longer needed for reference.

### 3.3.4.0. Park Annual Performance Planning and Annual Performance Reporting



3.3.4.1. Each park will prepare annual performance plans articulating annual goals for the upcoming fiscal year and annual performance reports describing the progress made in meeting the annual goals.

3.3.4.2. Annual performance plans will contain the following decision-making elements: (1) annual performance goals (the outcomes expected to be achieved that fiscal year), which are tiered from the park's long-term goals, (2) an annual work plan (inputs and outputs for the fiscal year) that breaks out park activities to achieve the annual goals and includes FTEs and budgets, and (3) linkages to budget formulation and executive budget documents (refer to the program standards for a detailed description of each element). Because they incorporate decisions made through other planning processes, annual plans do not require public involvement.

3.3.4.3. Annual performance reports will consist of two main parts: (1) a report on the progress made toward meeting the last fiscal year's annual performance plan, and an analysis of the present fiscal year's annual performance plan. The analysis will identify the continuing goals (carryovers) from the last fiscal year and discuss why the park did not accomplish one or more of its annual goals in the past fiscal year. The park annual performance report will relate to the servicewide annual performance report where applicable in order to aggregate park results at the servicewide level.

3.3.4.4. The development of the annual performance plan and report will be synchronized with NPS budget development. The annual performance report will specifically address park performance affected by budget change. Annual performance reports may also be used as the basis of personnel appraisals. Accountability for results should be within an employee's ability to affect results.

## 4.0. Roles, Responsibilities, and Funding

4.1. Park superintendents will be responsible for identifying planning needs, prioritizing planning work as part of unified priority setting for the park, and for securing funding. The superintendent and regional director will be accountable for accomplishing planning projects and for ensuring that they are consistent with all legal mandates, NPS management policy, generally accepted preservation standards and ·practices, and servicewide direction. The regional director will ensure that the general management plan is prepared in consultation with the associate directors and program managers in the Washington Office and will recommend further consultation with officials in the Department of the Interior on issues that may be of special interest to the secretary. Program managers in the headquarters office will be responsible for formulating and advising on NPS management policy and for managing servicewide program funds to support the planning and information needs of parks in ways that provide the most benefit for the national park system as a whole. The National Leadership Council will approve priorities for servicewide planning program funds. The national program centers and regional support offices will be responsible for completing assigned projects and for providing technical support and consulting services. Refer to table 1 for a complete listing of roles and responsibilities in NPS park planning.

4.2. Project agreements will be developed for each general management planning project and for complex implementation plans. Through these agreements the parties involved in the project, both the client and the provider of the product, will define and agree from the beginning on the scope of the planning project, the information requirements, the products and services to be produced, the roles and responsibilities for production, consultation, and review, and a project schedule, including major milestones. Project agreements will also include a cost estimate that specifies salary costs by contributing office and other costs for travel, contracts, and printing. The cost estimates will be subtotaled according to the major milestones to help determine if the project is starting to significantly exceed the cost estimate during any particular phase. Project agreements for general management plans will be recommended by the superintendent and the principal planning office(s), cleared for policy compliance by the program manager for park planning and special studies, and approved by the regional director. Project agreements for implementation plans will be agreements among the superintendent and the principal planning offices involved.

4.3. Park planning activities will be funded through a variety of sources. The key sources for each kind of planning are identified below:

- General management planning and analysis will be funded primarily through GMP project funds, although salaries of base-funded staff in regions, support offices, and parks are also expected to be a significant source of support for general management planning. GMP funds will not normally be used to collect basic inventory information about natural and cultural resources or visitor use.
- Planning data needs will be scoped in advance of an anticipated start-up to allow for the coordination with resource management and visitor service programs and the completion of an adequate database to support decision making.

- Park strategic planning and annual performance planning and reporting will be funded primarily out of the park operating base.

- Implementation planning will be undertaken using all appropriate and available NPS and non-NPS sources of funds, equipment, services, and personnel. Implementation planning generally will be funded through project funding available for the specific type of project addressed by the plan. If project funds are not available, other sources will be sought. Within the National Park Service this includes park base, regional base, challenge cost-share program, construction project planning, and the volunteers-in-parks program. Outside the National Park Service this includes collaborative projects with other federal agencies, state agencies, local governments, Indian tribes, scientific and educational institutions, and conservation and preservation organizations. Collaborative projects with partners might involve joint funding, sharing personnel and equipment, and providing services at little or no cost to the National Park Service.

4.4. Planning for imminent resource management, visitor services, or construction projects may overlap with general management planning, so long as decisions needed at the general management planning level precede and direct the more detailed decisions about projects and activities. However, only the GMP portion of this decision making will be funded through the GMP program. An exception may be granted for very small historic sites and monuments (a historic home, possibly with grounds, is a good example) if they have no major GMP issues and simple implementation planning needs (costing up to $25,000). For these parks the advantages to the National Park Service of completing implementation planning with GMP funds will be considered in computing the overall cost-effectiveness of the projects.

### Table 1: Roles and Responsibilities in NPS Park Planning

|  | General Management Planning | GPRA Strategic Planning, Annual Performance Planning, and Annual Performance Reporting | Implementation Planning |
|---|---|---|---|
| **Washington Office** | blank space | blank space | blank space |
| **Departmental and congressional liaison** | Associate director for professional services serves as the principal liaison with the department and Congress on NPS planning projects. | blank space | blank space |
| **Policy formulation and consultation** | Program manager for park planning and special studies recommends GMP planning policy in coordination with other park planning programs and provides general program guidance. Program manager for park planning and special studies advises on GMP project agreements for policy consistency. Servicewide program managers advise on GMP draft documents as determined by the project agreement. | Director of strategic planning, in coordination with the GPRA task force, recommends GPRA planning policy in coordination with other park planning programs. Director of strategic planning and GPRA task force consult with servicewide program managers on developing the NPS strategic plan, annual performance plan, and annual performance report. National Leadership Council approves the servicewide mission statement, mission goals, long-term goals, and annual goals that will be used by the arks, programs, and central offices in | Various servicewide program managers recommend program-specific implementation planning policy in coordination with other park planning programs. |

| | | | developing their strategic plans. | |
|---|---|---|---|---|
| **Budget allocation** | Program manager for park planning and special studies manages the GMP planning program (maintains servicewide GMP priority system, recommends allocation of GMP program funds, approves major program changes, and evaluates accomplishments). Associate director for professional services approves annual GMP fund allocation.<br><br>National Leadership Council approves servicewide priority list and project estimates. | blank space | | Various servicewide program managers allocate program-specific implementation planning funds to the field offices to accomplish servicewide program priorities. Funds may be allocated on a project-by-project basis or as discretionary funds to the regional director, depending on the funding source. |

| | General Management Planning | GPRA Strategic Planning, Annual Performance Planning, and Annual Performance Reporting | Implementation Planning |
|---|---|---|---|
| **Regional Directors** | blank space | blank space | blank space |
| **Budget allocation** | Propose and advance major program changes to the Washington Office.<br><br>Allocate discretionary GMP funds. | Provide linkages from the annual performance plan to budget formulation. | Allocate discretionary implementation planning funds to the field. |
| **Plan approval (policy accountability)** | Approve GMP project agreements.<br><br>Approve GMPs, certifying (based on appropriate consultations) that they are consistent with legal requirements, policy, and national direction. | Approve park strategic plans. | blank space |
| **Park Managers** | blank space | blank space | blank space |
| **Plan initiation** | Define planning needs. | Define planning needs. | Define planning needs. |
| **Plan execution** | Actively participate in all GMP planning activities and assign staff as planning team members. | Actively participate in all park strategic planning activities and assign staff as planning team members. | Actively participate in all implementation planning activities and assign staff as planning team members. |
| **Plan approval (policy accountability)** | Recommend approval of GMP project agreements and GMPs, recommending (based on appropriate consultations) that they are consistent with legal requirements, policy, and national direction. | Recommend approval of park strategic plans. | Approve implementation plans. |
| **Support Offices** | | | |

|  | blank space | blank space | blank space |
|---|---|---|---|
| **Plan Initiation** | Are engaged on a clusterwide basis to compile, concur in, and submit GMP priorities. | blank space | Are engaged on a clusterwide basis to compile, concur in, and submit plan priorities. |
| **Plan execution** | Prepare multiyear project agreements.<br><br>Execute assigned program in accordance with approved project agreements. | blank space | Execute assigned program. |
| blank space | Provide team members and technical plan review as requested by parks. | Provide team members and technical plan review as requested by parks. | Provide team members and technical plan review as requested by parks. |
| **Denver Service Center** | blank space | blank space | blank space |
| **Plan execution** | Prepare multiyear GMP project agreements.<br><br>Execute assigned program in accordance with approved project agreements. | blank space | Execute assigned program in accordance with approved project agreements. |

--------------- end of Director's Order ---------------

# EXHIBIT L

# Contents

**1.0    Introduction**
  1.1   The DO-12 Handbook and Director's Order ...................................................1
  1.2   Intent of NEPA and NPS Mission ...........................................................3
  1.3   Actions Requiring NEPA Analysis ...........................................................5
  1.4   NEPA Fundamentals ...........................................................................5
  1.5   Timing of NEPA .................................................................................8
  1.6   Specificity of Data Needed—Plans and Projects ......................................10

**2.0    Overview of the NEPA Process**
  2.1   The Analysis Process .........................................................................13
  2.2   Purpose and Need for Action ...............................................................16
  2.3   Defining the Proposal ........................................................................16
  2.4   Connected, Cumulative, and Similar Actions ..........................................17
  2.5   NEPA Issues ...................................................................................18
  2.6   Internal Scoping ..............................................................................19
  2.7   Alternatives ....................................................................................20
  2.8   Affected Environment ........................................................................23
  2.9   Impacts .........................................................................................24
  2.10  Determining the Appropriate NEPA Pathway ..........................................26
  2.11  Using Contractors ............................................................................28
  2.12  The Administrative Record ..................................................................28
  2.13  Working with Other Agencies ..............................................................29
  2.14  Emergency Actions ...........................................................................31

**3.0    Categorical Exclusions**
  3.1   Definition .......................................................................................33
  3.2   Process to Follow .............................................................................33
  3.3   CEs for Which No Formal Documentation Is Necessary ............................34
  3.4   CEs for Which a Record Is Needed .......................................................36
  3.5   Exceptions to CEs ............................................................................40
  3.6   Using the CE Lists ............................................................................42
  3.7   Public Involvement ...........................................................................43
  3.8   Administrative Process .......................................................................43
  3.9   Consideration of Multiple Actions ........................................................44

**4.0    Environmental Impact Statements**
  4.1   Introduction ....................................................................................45
  4.2   Criteria for Significant Impact .............................................................45
  4.3   Ongoing or Continuing Action .............................................................47
  4.4   Actions That Normally Require an EIS ...................................................47

4.5    EIS Format ................................................................................48
4.6    The Final EIS ...........................................................................61
4.7    Supplements to Draft and Final EISs ...................................63
4.8    Public Involvement Requirements ........................................63
4.9    Administrative Process of Review of EISs ...........................67
4.10   Terminating the EIS Process ................................................67

**5.0    Environmental Assessments**
5.1    Introduction ............................................................................69
5.2    When to Prepare an EA .........................................................70
5.3    Length of an EA ......................................................................70
5.4    Format and Content of an EA ................................................71
5.5    Public Involvement .................................................................74
5.6    Administrative Process of Review of EAs ............................76

**6.0    Decision Documents**
6.1    Categorical Exclusions ..........................................................78
6.2    Record of Decision .................................................................78
6.3    FONSI ......................................................................................79
6.4    NEPA after the Decision Document .....................................81

**7.0    Programmatic Documents and Planning**
7.1    Is NEPA Triggered by Plans? ................................................83
7.2    When to Begin NEPA on Plans .............................................86
7.3    Feasibility and Planning ........................................................87
7.4    Tiering ......................................................................................88
7.5    Programs and Policies ...........................................................89
7.6    Long-Term Resource Management .......................................89

**8.0    NPS Review of Non-NPS NEPA Documents**
8.1    Introduction ............................................................................91
8.2    Comment Requirements ........................................................91
8.3    Review Deadlines and Extension Requests .........................93
8.4    Departmental Comment Letters ...........................................94
8.5    Review Guidelines for EISs ...................................................94
8.6    Style and Format for Environmental Review Comments ...........99

**9.0    Definitions and Acronyms**
9.1    Definitions................................................................................103
9.2    Acronyms .................................................................................107

**Appendix 1**
Environmental Screening Form ........................................................109

**Appendix 2**
Categorical Exclusion Form ..............................................................113

**Index** ................................................................................................115

# 1.0 Introduction

1.1 The DO-12 Handbook and Director's Order
1.2 Intent of NEPA and NPS Mission
1.3 Actions Requiring NEPA Analysis
1.4 NEPA Fundamentals
1.5 Timing of NEPA
1.6 Specificity of Data Needed—Plans and Projects

## 1.1 The DO-12 Handbook and Director's Order

### A. NEPA and the Council on Environmental Quality

The National Environmental Policy Act (NEPA) was passed by Congress in 1969 and took effect on January 1, 1970. This landmark legislation established this country's environmental policies, including the goal of achieving productive harmony between human beings and the physical environment for present and future generations. It provided the tools to carry out these goals by mandating that every federal agency prepare an in-depth study of the impacts of "major federal actions having a significant effect on the environment" and alternatives to those actions, and requiring that each agency make that information an integral part of its decisions. NEPA also requires that agencies make a diligent effort to involve the interested and affected public before they make decisions affecting the environment. Besides setting environmental planning policy goals, NEPA created the Council on Environmental Quality (CEQ), an agency of the President's office that would be the "caretaker" of NEPA. CEQ published NEPA regulations in 1978 (40 CFR 1500–1508) and added to them in 1981 with a guidance document titled "Forty Most Asked Questions Concerning CEQ's NEPA Regulations" (40 Most Asked Questions). These regulations apply to all federal agencies, and in them CEQ requires each federal agency to "implement procedures to make the NEPA process more useful to agency decision-makers and the public" (40 CFR 1500.2). Agencies are to review and update these regulations as necessary.

### B. Interior/NPS NEPA guidance and this handbook

The Department of the Interior (Interior) produced its NEPA regulations as Part 516 of its departmental manual (DM), and the National Park Service (NPS) produced several NEPA handbooks. The last update, DO-12, was issued in 1982. Interior has also produced and continuously updates a series of environmental statement and compliance memoranda that further interpret Part 516 and need to be consulted in this process. This handbook is an update and revision of DO-12,

1

and it supersedes the 1982 version. Although it is termed a handbook, most of the sections derive in whole or in part from the CEQ regulation or Interior NEPA guidelines, giving them the force of law. The processes described in this handbook are binding on all NPS personnel. Under the terms of the National Parks Omnibus Management Act of 1998, the "Secretary shall take such measures as are necessary to assure the full and proper utilization of the results of scientific study for park management decisions. In each case in which an action undertaken by the National Park Service may cause a significant adverse effect on a park resource, the administrative record shall reflect the manner in which unit resource studies have been considered." The development of alternatives, analysis of impacts, and incorporation of the best available information, coupled with identification of environmentally preferable courses of action as called for in this handbook, are one set of steps required in meeting this obligation to the public.

This handbook never conflicts with the CEQ regulations, although the NPS has added some requirements that go beyond those imposed by CEQ to help facilitate the requirements of the law that established the NPS (the Organic Act) and other laws and policies that guide our actions.

## C.  Citations in DO-12 and Handbook

Sections of NEPA, the CEQ regulations, the 40 Most Asked Questions, and the Interior departmental manual are cited in DO-12. They are cited as follows:

(1)  NEPA—The section number is in parentheses: (sec. 102 (A)), for example.

(2)  CEQ regulations—The section number is in parentheses: (1502.1).

(3)  40 Most Asked Questions—The number of the question referenced is cited in parentheses: (Q23).

(4)  Interior departmental manual—A section is cited in parentheses as 516 DM followed by the section or appendix number: (516 DM, 7). Environmental statement memoranda are designated as ESM and the year and number: (ESM94–8). Environmental compliance memoranda are designated as ECM and the year and number: (ECM95–2).

## D.  How to use this handbook

This handbook contains the basic information you need for meeting the legal requirements of NEPA and for practicing excellent impact assessment and resource conservation. Also, NPS employees who deal with NEPA on a regular basis should receive training that is periodically updated, so that the goals of NEPA are met throughout all levels of NPS. NPS also has guidance on related topics, such as planning, cultural resource protection, and natural resource management.

Much of the handbook uses the pronoun "you" to speak to the reader. "You" may be an individual from the park, a system support office (SSO), a regional office, a member of a NEPA interdisciplinary team (IDT), a decision-maker, or any other NPS staff or contractor responsible for some piece of the NEPA process.

## 1.2  Intent of NEPA and NPS Mission

### A.  Policy

The declared purpose of NEPA and the mission of the NPS express very similar goals. Both contain language designed to result in the conservation and protection of our nation's resources for the benefit of future generations. NEPA was enacted for a simple reason: to make sure that agencies fully consider the environmental costs and benefits of their proposed actions before they make any decision to undertake those actions.

> **The purpose of NEPA** as stated in section 2 of the act that created it is to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the Nation...."

### B.  Tools

NEPA and the CEQ regulations have put two important mechanisms in place to achieve this stated intent. One is the requirement that all agencies make a careful, complete, and analytic study of the impacts of any proposal that has the potential to affect the environment, and alternatives to that proposal, well before any decisions are made. The other is the mandate that agencies be diligent in involving any interested or affected members of the public in the NEPA process.

Key features of the analysis are made available to the public in one of three types of NEPA documents, depending on the degree of impact to the environment and the process outlined in chapter 2.0 of this handbook. Generally, if the proposal clearly has no potential for measurable environmental impact, it is categorically excluded (see chapter 3.0) and a short 1- or 2-page notice is prepared. If it has the potential for significant environmental impact, an environmental impact statement, or EIS, is required (see chapter 4.0). If the proposal would have a measurable impact on the environment, or if it is unclear whether it has the potential for a significant impact, an environmental assessment (EA) is the appropriate document to prepare (see chapter 5.0). If the EA shows the proposal

> **The Organic Act creating NPS** states that NPS will "...conserve the scenery and the natural and historic objects and the wildlife therein and...provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations" (16 U.S. Code 1, the National Park Service Organic Act).

may have a significant effect, an EIS is also required (unless the provisions of section 5.2 (1) apply). NEPA imposes many additional rules and requirements beyond this simple strategy for determining which level of documentation is appropriate for any given analysis. These rules are part of this handbook and should be read carefully before you begin environmental impact work under NEPA.

## C.  Early planning

A key feature of NEPA is that under the CEQ regulations (1502.5) all analysis, public input, and documentation must be completed in time to be a useful part of decision-making. Initiating or completing environmental analysis after a decision has been made, whether formally or informally, is a violation of both the spirit and the letter of the law. NEPA's intent is to encourage planning for conservation and resource management and integration of scientific and technical information into management decisions, rather than an after-the-fact "compliance" effort. A well-done NEPA analysis provides useful information on environmental pros and cons (i.e., impacts) of a variety of reasonable choices (alternatives); this analysis is much like economic cost-benefit or technical or logistical planning. It is an essential prelude to the effective management of park resources.

## D.  A procedural act

NEPA's policies encourage agencies to incorporate environmental information and public involvement in making decisions. The detailed and scientifically valid study of impacts and alternatives, and appropriate input from the public, must be available before a federal agency makes any commitment of resources. It is up to the decision-maker how he or she will use this information. If the only way to meet an essential agency goal requires implementing an alternative with the potential for severe adverse environmental impacts, this is ultimately allowed for under NEPA. NEPA is therefore a "procedural," or process-oriented, law, rather than a "substantive," or substance-oriented, one. Other laws, including the Organic Act, are substantive and often prevent an agency from taking action or pieces of an action that have "too great" an impact on a particular resource. The process of environmental analysis under NEPA provides the information that the NPS needs to make substantive decisions for the long-term conservation of resources.

## E.  A substantive result

The information and analysis produced through the NEPA process is used by the NPS in making management decisions about NPS administered resources. In making these decisions the NPS is guided by the requirements of the National Park Service Organic Act and related laws. The requirements placed on the NPS by these laws, and especially by the Organic Act mandate that resources are passed on to future generations "unimpaired." Impacts that are likely to, or that would, result in impairment of resources must be fully described and evaluated in environmental documents. In addition, decision documents must confirm the nature and extent of impact and whether

> CEQ defines the **human environment** as the natural and physical environment, and the relationship of people with that environment (1508.14).

or not an impairment results from any of the alternatives analyzed or selected for implementation.

## 1.3   Actions Requiring NEPA Analysis

NEPA is far-reaching. Whenever the NPS considers an action that could have impacts on the human environment, NEPA is triggered. This is true whether NPS generates the action or the applicant is a private individual or another federal, state, or local agency. While NEPA is only triggered when there is a physical impact on the environment, the CEQ regulations require analysis of social and economic effects in both an EA and an EIS. Social and economic impacts should be analyzed in any NEPA document where they are affected. Socioeconomic impacts include those to minority and low-income communities as specified in the Environmental Justice Executive Order (EO 12898; Feb. 11, 1994).

Federal actions are defined as projects, activities, or programs funded in whole or in part under the direct or indirect jurisdiction of a federal agency, including those carried out by or on behalf of a federal agency; those carried out with federal financial assistance; those requiring a federal permit, license, or approval; and those subject to state or local regulation administered pursuant to a delegation or approval by a federal agency.

These are some examples of federal actions:
* adopting official policy, such as rules, regulations, and interpretations.
* adopting formal plans, such as those that guide or prescribe uses of fed-eral resources upon which future agency actions will be based.
* adopting programs.
* approving specific projects.
* approving permits for private or other agency actions on federal land or involving federal resources.
* approving grants or other funding that involves a large federal presence (i.e., much of the funding for the proposal is from federal sources).
* conducting ongoing or continuing federal actions.

If any of these actions has the potential to cause environmental impact, whether adverse or beneficial, the NEPA process must be completed before a decision is made.

## 1.4   NEPA Fundamentals

NEPA analyses that follow both the spirit and the letter of the law and that have held up to court challenges display the following characteristics:

### A.   Part of planning

NEPA is the environmental component of agency planning. Under the CEQ regu-lations, it is to be integrated with other planning "at the earliest possible time to insure planning and decisions reflect environmental values" (1501.2). The NEPA process is always triggered at the "proposal" stage, or when an agency is consid-ering a goal and is "actively pursuing different means of accomplishing that goal" (40 CFR 1508.23) if implementing the goal would have environmental impacts. The proposal stage is during or immediately following the feasibility stage

(1502.5(a)). However, environmental planning is also useful in defining goals, particularly in broader planning, such as for an entire park or park unit.

## B.  Systematic

According to NEPA (sec. 102 (A)), NEPA analyses must be systematic. The selection of appropriate issues, impact topics, mitigation strategies, analysis boundaries, and alternatives; the involvement of the interested and affected public; and other aspects of the NEPA process must be based on evidence and on sound, repeatable thought processes.

## C.  Part of a public process

CEQ requires agencies to make "diligent" efforts to involve the interested and affected public in the NEPA process (1506.6), regardless of the level of impact and/or documentation. The extent of the public involvement will change depending on the degree of impact and interest in the proposal. Agencies must also "encourage and facilitate public involvement in decisions which affect the quality of the human environment" (1500.2 (d)). If the public finds that an agency did not follow the procedural requirements of NEPA, or that the agency's analysis of a proposal in a NEPA document was lacking or inadequate, relief is often sought through legal action. The Environmental Protection Agency (EPA) reviews and rates the adequacy of all EISs, and CEQ oversees the rules and policies governing the NEPA process and resolves certain types of disputes.

## D.  Written in plain language

Because the public has been given an essential role in monitoring the NEPA process, you must write documents in language the general public can understand (1502.8). This means that all jargon, technical terms, and acronyms must be clearly defined, usually in a glossary.

## E.  Focused

CEQ requires that NEPA documents be "concise, clear, and to the point." They must "emphasize real environmental issues and alternatives" and be useful to the decision-maker and the public (1500.2). You should keep the discussion of resources that would be affected brief, and keep the length of all other discussions proportionate to the seriousness of the impact (1502.2). "Most important, NEPA documents must concentrate on the issues that are truly significant (i.e., pivotal) to the action in question, rather than amassing needless detail" (1500.1 (b)).

## F.  Problem-solving

In an effort to make NEPA documents useful to decision-makers, CEQ requires that they be "analytic rather than encyclopedic" (1500.4). This means you should focus the analysis on solving any environmental problems a proposal might create—that is, on creating reasonable alternatives or mitigation.

## G.  Objective

NEPA requires an objective, high-quality scientific analysis of impacts that the proposal or alternatives may create (1500.1 (b)). If you are basing the analysis on the scientific judgment of one expert, this judgment should be substantiated with

literature or other experts' statements and be based on data, education, or experience. Peer review of experts' research and NEPA analysis is one way to obtain input on complex environmental issues.

## H.  Based on an interdisciplinary approach

Because NEPA analyses are scientific, objective, and high quality, they must be performed by individuals with credentials appropriate to the issues (1502.6). These individuals must use the interdisciplinary or interactive team approach in defining all important features of the analysis (issues, data-gathering needs, alternatives, etc.) throughout the NEPA process. This approach includes discussions with "cross-functional" disciplines; specialists from the park and other NPS offices, contractors; and decision-makers, as appropriate (NEPA sec. 102 (A), CEQ 1502.6). Members of the interdisciplinary team may come from other federal, state, and local agencies or tribes as well. Parks may wish to use non-agency individuals to provide additional insights.

It is recognized that the park staff may be small and that resource specialists may consist of one or two individuals. The need for an IDT does not mean that a large group of specialists must be assembled for every action under consideration. What it means is that the one or two specialists should be consulting with a number of sources, staff (including maintenance, operations, etc.), and non-agency individuals as needed to make good NEPA-based decisions (see section 2.10).

## I.  Candid

A theme that runs through NEPA, case law, and CEQ regulations is that agencies must be candid in their NEPA documentation. Expert agency criticism and public scrutiny help to ensure such disclosure. If reviewing agencies indicate they disagree with the impact analysis, you should record these conflicting opinions in the NEPA document (sec. 102 (D) (iv)). If information important to the decision between alternatives is incomplete or unavailable, you should state this in a NEPA document (CEQ 1502.22).

## J.  Based on common sense

NEPA documents are meant to be short, focused, analytic, problem-solving documents that help decision-makers make informed and wise decisions about the use of resources. Alternatives and mitigation must be feasible, both technically and economically. Common sense and usability are precepts that run throughout NEPA.

## K.  Inclusive

CEQ requires that agencies examine connected actions, cumulative impacts, secondary or indirect impacts, and similar actions in their NEPA documents. Agencies are specifically prohibited from segmenting projects, also known as piecemealing. "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action" are to be evaluated in a single NEPA document (1502.4).

### L. Tools to help foster excellent action

"Ultimately, of course, it is not better documents, but better decisions, that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." (1500.1). A well-done NEPA analysis offers your decision-maker several reasonable options for resolving problems or fulfilling needs that gave rise to the proposal initially while minimizing or correcting impacts to natural resources. It is done early in the planning process, so that its results can be an integral part of the information used to make a project decision.

### M. Holistic

In its statements of purpose and policy (sec. 101), NEPA speaks of sustainability, balance, and knowledge and protection of environmental resources, including ecological systems. Congress asks NPS to use NEPA not only as a tool to look at whether to pave a road or build a trail, but as a guide in the larger aspects of NPS decision-making. Topics such as how resource use in a park will affect an entire region or ecosystem, how to preserve resources while allowing for appropriate public use and enjoyment, or how a decision now will affect park management options in the very long-term future are the kinds of issues NEPA was designed to emphasize.

### N. Ultimately site-specific

Before you choose to implement an action—to "break ground"—your decision-maker must have detailed site-specific environmental impact information (1501.2 (b)). However, NEPA analysis may be required when broader actions, such as plans, programs, or policies, are under consideration. The data collected to analyze these more general actions should be comparatively general, with progressively more specific data analyzed as you move toward implementing an action. You may rightly prepare one NEPA document to help your decision-maker in choosing between broad actions, and another to help in implementing the selection. This step-wise approach to planning and design is called "tiering" (1508.28; see section 7.4 of this guide for details), and it allows NPS to focus on the right set of alternatives or decisions at the right time.

## 1.5 Timing of NEPA

Your park may follow a NEPA-like process much of the time now. The analysis of options and the environmental pros and cons of each, whether for management prescriptions for a park or for design features of a single building, is the kind of planning that NEPA asks of all agencies, and that may already be integral to decision-making in your park unit. The essence of NEPA is a continuous "checking in" or monitoring of successive decisions to ensure proactive, rather than reactive, conservation and resource planning and management. Although the formal "NEPA process" includes active public involvement and documentation, the integration of environmental information and values into agency decision-making nonetheless helps carry out the intent of both NEPA and the

> **Knowing how early** or how late to begin a NEPA analysis is often a difficult balancing act.

Organic Act, and it should be part of planning at all levels, even for goal-setting for broad park actions such as those in a general management plan or its equivalent.

You must begin the NEPA process whenever your park is in the proposal stage of any of the federal actions described in section 1.3 of this handbook. The proposal stage is defined as the feasibility stage (40 CFR 1502.5 (a)), or the point when your park "has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated" (1508.23).

Knowing how early or how late to begin a NEPA analysis is often a difficult balancing act. You should try to start early, so that environmental information can be a valuable part of the decision-making criteria.

If your park intends to prepare a plan that would make decisions about resource uses, it may be particularly difficult to know when to begin NEPA. Two factors may be helpful in this decision. Because NEPA requires the creation and analysis of alternatives, one factor in deciding when to initiate NEPA may be when a range of options would be most useful for your decision-maker and the public. The other, and more important, factor to consider is whether the kinds of choices you will be making in the plan have the potential for impact to the human environment. If so, NEPA is required. Director's Order 2, the Park Service's planning guideline, has information about the integration of NEPA with all levels of park planning that may be useful if you are beginning a general management plan (GMP) or other plan.

Usually if a plan or project is so specific that it is the only reasonable option, this means you have waited too long to begin NEPA, because all of the important decisions have been made without benefit of environmental analysis. In this case, you may be violating NEPA by using the process "to rationalize or justify decisions already made" (1502.5).

Although **the timing** will vary on a case-by-case basis, two rules should guide you when you choose to begin a NEPA review and analysis:

- All of the steps necessary to complete the NEPA process are to be finished in time to be part of any recommendation or report on the proposal—that is, early enough so that the final document can "serve practically as an important contribution to the decision-making process."

- No action that is the subject of an ongoing NEPA analysis or that would limit the choice of alternatives undergoing NEPA scrutiny should be taken until the NEPA process is complete (1506.1). This includes design work, funding pieces of a project, choosing building contractors, and so forth.

## A.  NEPA and the project proposal/contracting process

Parks often develop project proposals to record the information that is necessary to justify, program, fund, and initiate specific tasks. When funding is requested for a construction or resource management action, the funding request cannot be approved until the NEPA process is complete or the need for environmental

analysis is adequately described and provided for within the request. This step is particularly important for those proposals where internal scoping has indicated that the potential for significant impact exists. In addition, you should not solicit bids or sign a contract for a proposal until the NEPA process is complete, or you will be in violation of the CEQ requirement that "Agencies shall not commit resources prejudicing selection of alternatives before making a final decision" (1506.1).

## B.  When to begin NEPA on plans

NEPA may be activated by many of the plans that NPS produces, including general management planning, certain types of strategic plans, wilderness and resource management actions, and implementation plans (see Director's Order 2 for information on some of these kinds of plans). If the plans are intended to make decisions that, if implemented, could have an impact on the human environment (see section 1.3), the NEPA process is triggered. Most NEPA requirements are compatible with or identical to requirements for sound management planning. In most cases, NEPA requirements are easily integrated into the planning process, and they provide the information that decision-makers need to make informed choices. Rather than create additional burdens in the planning process, following NEPA requirements should help expedite prompt and defensible decision-making.

# 1.6  Specificity of Data Needed—Plans and Projects

Because planning in the NPS includes several distinct stages and types of decisions that involve different scales, the levels of detail in each will vary. When plans are conceptual, such as in the general management plan, the NEPA analysis may be comparably conceptual. Ultimately, however, a decision-maker must have site-specific information before a plan can be implemented (e.g., the ground disturbed, the resource changed). The following are some options for collecting this site-specific information:

> **When plans are conceptual,** such as the general management plan, the NEPA analysis may be comparably conceptual. However, a decision-maker must ultimately have site-specific information before a plan can be implemented.

• Collect it as part of the EIS on a general management or other large-scale plan. Because funding to implement the plan may be delayed, you may need to update site-specific analysis several times for the same proposal. The advantages of this approach are that decisions made at the planning stage will be more fully informed, and future NEPA work to implement the plan may be minimized, unless data and planning decisions have become outdated by the time the plan is implemented.

• Collect reconnaissance-level information to make broad policy and planning decisions. Collect site-specific information to

assess implementation options as funding becomes available. The site-specific NEPA document may then be "tiered" (see section 7.4) to the EIS for the broader plan.

- Identify zoned areas within the plan that are likely to be designated for visitor use facilities based on reconnaissance-level data. Collect site-specific data for the smaller developable areas as an element of the plan.

Always include data on impacts to the park's natural and cultural resources and values that have been specifically recognized in the park's enabling legislation; to interpretive, educational, and recreational opportunities; to resources protected by federal, state, or local laws; and to other relevant resources in your park or region. Also see DO-12 section IV (4.3 and 4.4) regarding integration of proper technical and scientific studies appropriate to the decisions under consideration, and taking action when complete information is unavailable.

# 2.0 Overview of the NEPA Process

2.1 The Analysis Process

2.2 Purpose and Need for Action

2.3 Defining the Proposal

2.4 Connected, Cumulative, and Similar Actions

2.5 NEPA Issues

2.6 Internal Scoping

2.7 Alternatives

2.8 Affected Environment

2.9 Impacts

2.10 Determining the Appropriate NEPA Pathway

2.11 Using Contractors

2.12 The Administrative Record

2.13 Working with Other Agencies

2.14 Emergency Actions

## 2.1 The Analysis Process

Chapter 2 of this handbook is focused on the analysis process. Chapters 3 through 5 deal with documentation of the analysis.

CEQ does not mandate a particular analysis process. However, because NEPA is meant to be part of planning and thus should be applied early, you should carefully consider beginning NEPA when your park is framing its purpose or goals for a particular proposal. Over the years, there has been much confusion in the park service concerning the use of the terms "proposed action" and "preferred alternative." The majority of actions in the park service involving NEPA do not have a specific or even conceptual "proposed action" from the onset of the process. In fact, it can be dangerous to start into a NEPA process with a solidified proposal that precludes consideration and equal treatment of other reasonable alternatives.

Typically in the park service, purpose and need as well as objectives can be defined, and from there, a range of alternatives developed, one of which becomes "preferred" at the conclusion of the analysis process. This "preferred alternative" is then identified in the EA or EIS before it is released to the public for review and comment. In these situations, it is not necessary to use the term "proposed action" since what the park is proposing to do is essentially synonymous with the

13

**Steps** in a typical analysis process:

1. Identify your park's need for action.

2. Identify your park's goals and objectives in taking action.

3. Identify your proposal.

4. Identify issues or problems that need to be addressed to reach park goals and objectives.

5. Resolve these issues by creating reasonable alternatives.

6. Identify information gaps and needs and gather needed data.

7. Identify the impacts of each alternative.

term "preferred alternative." An exception to this might be when a park is analyzing a "proposal" or "proposed action" from an external applicant or "project proponent." For example, a park receives a "proposed action" from an applicant desiring to develop a mining claim. The park responds to the applicant's proposed action by developing a range of alternatives to mitigate impacts of the applicant's proposal. In this case, the applicant's "proposed action" may be very different from the park's preferred alternative. In either case, a simplified version of a typical analysis process is as follows:

1. The best way to begin is by clearly stating your park's need for action. Need is the proper framing of the question "why take action?" It is a "because" statement and should include a statement of problems the park is trying to solve, opportunities it is about to take advantage of, and so forth.

2. The next step is to establish the purpose and objectives, or goals the park must accomplish by taking action for the action to be considered a success. The objectives and goals, or purpose, of the action are different from the purpose of the park. They are the reasons for proposing action.

3. When you have identified what your park hopes to accomplish, the next step is to develop a proposal. CEQ defines "a proposal" as the stage where a park has defined goals and is actively pursuing different means of accomplishing its goals (1508.23). If there is no one "proposal" in mind to meeting goals and objectives, the park may keep the proposal general, such as "NPS proposes to provide visitors an extended experience at the north rim." The next step would be to create a range of alternatives (see step 5 below) that are consistent with the proposal, for instance, building a lodge, renovating cabins in the park, subsidizing overnight accommodations in the local town, etc. As a note, the decision-maker or designee is required to identify a "preferred alternative" (see sections 4.5 E (8) and 5.4 (D)) before an EA or EIS is released for public review. This is the alternative the park service believes would best accomplish its goals after the in-house NEPA analysis has been completed, when the choice of an alternative as "preferred" is appropriate.

4.  The next step is to use the interdisciplinary team (IDT) approach to identify issues or environmental problems that need to be addressed to reach park goals and objectives and resolve need for action. This step is often the beginning of internal scoping (section 2.6), and it should involve a site visit (or familiarity of team members with the site) and discussions with appropriate agencies. The Environmental Screening Form (ESF; appendix 1) may serve as a guide in determining affected resources. These may later be supplemented with input from public scoping (sections 4.8 and 5.5). The IDT should pay particular attention to focusing the issues; in other words, what specifically may affect a resource, and what about the resource might be affected. These specifics will form the basis for your impact topics. If your proposal is general, such as "providing an extended experience on the north rim," the issues may also be more generalized. An example would be "providing an extended experience for visitors may require infrastructure that could eliminate habitat and disturb archeological sites."

5.  If the issues show that the proposal would likely result in environmental impacts, the team should create a set of reasonable alternatives that mitigate or eliminate these problems, but that still fulfill the stated purpose and resolve need—for example, "create a campground, renovate existing cabins, subsidize hotels in town." The alternatives themselves may create environmental problems, which the team will need to correct by adding mitigation or refining the alternatives, or to identify as unresolved issues in the NEPA document.

6.  The team should then identify data that it has and will need to describe the affected environment and predict impacts of all alternatives. If you start collecting data before you know your purpose and need, issues, and potential alternatives, you might be spending time needlessly collecting irrelevant information.

7.  Using these data, the team predicts impacts of each action in each alternative on those specific environmental resources identified as impact topics. For those resources that may experience a discernible impact, the team uses the best available methods to predict the extent of the effect. This prediction includes a discussion of context, intensity (e.g., degree), duration, and timing (e.g., short-term vs. long-term), and a conclusion by the park staff and other experts of the relative severity of the impact (minor, moderate, or major).

This process may be modified to fit your park's particular need, and it should include agency and public involvement in identifying and reviewing the documentation of issues, alternatives, and the extent of impact. Also, some steps will be unnecessary if no potential for environmental impact exists and the process outlined in section 3.2 applies.

## 2.2  Purpose and Need for Action

Although the CEQ regulations say little about purpose and need for agency actions, defining them clearly is very important.

### A.  Purpose

Purpose is a statement of goals and objectives that NPS intends to fulfill by taking action. These goals can come from a park's statement of purpose and significance (if the action proposed is a GMP, for instance), from management objectives or mission goals, from implementing or other legislation, from a GMP or other plan, from standards and guidelines for a particular management zone, from public or staff input, and from other sources. Because some of these objectives also may resolve needs, there may be overlap between purpose and need. The discussion should be limited to those goals and objectives that are critical to meet if NPS is to consider the proposal successful.

### B.  Need

Need is a discussion of existing conditions that need to be changed, problems that need to be remedied, decisions that need to be made, and policies or mandates that need to be implemented. In other words, it explains why your park is proposing this action at this time. It may have elements you would otherwise include in a discussion of project "background." There may be one or several needs that an action will resolve. Need is not a discussion of the need for NEPA or other regulatory compliance, but rather reasons why the park must take action at this time and in this place. Although CEQ describes it as "brief," the discussion of need may require several pages.

You have great latitude in defining your proposal's purpose and need. How you define it will also define the range of alternatives (see section 2.7). If it is defined broadly—for example, "to improve the visitor experience at the north rim of the Grand Canyon"—the range of alternatives will likewise be broad. If it is very narrowly defined—for example, "to provide an extended experience for visitors at the north rim of the Grand Canyon by building a lodge"—you may have violated NEPA by making a decision before the NEPA process has been completed. Try instead to be realistic in identifying your park's reasons for taking action, and also to create a range of reasonable alternatives in which environmental impact information and public involvement would be helpful—for example, "to provide an extended experience for visitors at the north rim of the Grand Canyon."

## 2.3  Defining the Proposal

As explained above (in section 2.1 (3)), you may state your park's proposal quite generally, such as "provide an extended experience for visitors at the north rim of the Grand Canyon." This is essentially a restatement of the park's intent to accomplish its stated objectives or purpose. Alternatives would then be a range of options for fulfilling the stated proposal (e.g., lodge, campground, cabins), with no one way identified as preferred over another until the draft NEPA document is completed.

In the above example, perhaps the park examined alternatives for visitor use on the north rim in a GMP/EIS and concluded that provision of an extended visitor experience through overnight accommodations was appropriate. The implementation of the GMP would result in a subsequent planning/NEPA process defining a more specific proposal tiered from the broader approved GMP. In this case, a specific proposal to implement the GMP might be "provide extended experience at the north rim with a lodge" and the range of alternatives would include a lodge, cabins, tents, and so forth.

Whether a proposal is specific or general, in either case, alternatives should be scrutinized to ensure that environmental damage has been mitigated or eliminated to the greatest extent possible while still achieving your park's purpose in taking action.

## 2.4  Connected, Cumulative, and Similar Actions

When analyzing the proposal and alternatives, you must consider actions that result as a direct or indirect consequence—that is, connected, similar, and cumulative actions. These actions should be incorporated into the description of the proposal and alternatives if relevant.

### A.  Connected actions (1508.25)

Connected actions are those that are "closely related" to the proposal and alternatives. Connected actions automatically trigger other actions, they cannot or will not proceed unless other actions have been taken previously or simultaneously, or they are interdependent parts of a larger action and depend on the larger action for their justification. For instance, if your park proposes building housing for rangers on an existing trailhead parking lot, and the trailhead lot must be relocated as a result, this is an action connected to the proposal of building the housing. The impacts of removing the existing parking lot, relocating the lot, and reducing visitor access to the trailhead must be analyzed in the same NEPA document as the housing.

### B.  Similar actions (1508.25 (a)(3))

Similar actions are those that have similar geography, timing, purpose, or any other feature that provides a basis for evaluating their combined impacts in a single NEPA document. They can be the same as connected or cumulative actions. As an example, if in the future you intend to build a restaurant in association with the lodge on the north rim of the Grand Canyon, the restaurant and any parking, fencing, utilities, and so forth that are connected with it would be a similar action, which should be analyzed in the same NEPA document as the lodge itself.

### C.  Cumulative actions (1508.7, 1508.25 (a)(2))

Cumulative actions are those that have additive impacts on a particular environmental resource. It is irrelevant who takes these actions (i.e., they are not confined to NPS or even federal activities), or whether they took place in the past, are taking place in the present, or will take place in the reasonably foreseeable future.

As an example, if your park is proposing building a small sewage treatment plant and discharging treated wastewater into a river, other activities (i.e., cumulative actions) that also have an additive impact on the river must be included in the analysis on water quality. These activities might include disposal of wastes from recreational vehicles in the park, cattle ranching upstream of the park on public land, or release of water from a reservoir on private property downstream of the park. If you are preparing a GMP or other broad-scale plan, actions on land adjacent to, or even in the region of, the park unit may have combined impacts on resources inside the park boundaries and need to be included in the cumulative impact analysis. One source of information about methods to analyze cumulative impacts is the CEQ's January 1997 report, "Considering Cumulative Effects under the National Environmental Policy Act."

## 2.5  NEPA Issues

In NPS planning, an "issue" often describes concerns or "obstacles" to achieving a park goal. Planning "issues" might be "lack of appropriate level of funding" or "visitors desire more solitude." In NEPA, the goal is minimizing effects of proposals on the human environment and issues are possible barriers to achieving that goal. Planning issues and those issues defined in the NEPA analysis should both be incorporated into the plan/NEPA document as appropriate.

**Internal Scoping**

According to the CEQ elements of scoping (1501.7), you should use internal scoping to:

- eliminate issues that are not important.
- allocate assignments among park IDT members or other participating agencies.
- find/read any other NEPA documents related to this one.
- identify any other permits, surveys, or consultations required by other agencies.
- create a schedule that allows plenty of time to do NEPA well before a decision on the proposal is required.

To be more specific, in NEPA, an "issue" describes the relationship between actions (proposed, connected, cumulative, similar) and environmental (natural, cultural, and socioeconomic) resources. Issues are usually problems that either the "no action" alternative has caused, or that any of the alternatives might cause, but they may be questions, concerns, problems, or other relationships, including beneficial ones. As an example, "Building a lodge on the north rim could create a man-made obstacle to an otherwise untouched view of a spectacular natural scene" is an issue that details the relationship between the action (building the lodge) and an environmental resource likely to be affected (the view).

Issues do not predict the degree or intensity of harm the action might cause, but simply alert the reader as to what the environmental problems might be if action is taken. The interdisciplinary approach must be used to decide relevant issues.

In determining relevant issues, the IDT should pay particular attention to the specific action element of the alternative causing harm and the specific element of the resource that may be affected. In the example above, the concern might be "the two-story west wing of the lodge" rather than the entire lodge. The resource affected might be the "view of the Colorado River for hikers on a 200-meter stretch of the rim trail." This narrower description will help focus impact topics to just those resources affected, and mitigation measures or alternatives to just those actions causing problems for those resources.

If the team finds that certain issues that it or the public thought would be problematic will not be, it should discuss these in an EA or an EIS as "issues considered but dismissed" and drop them from the analysis.

## 2.6  Internal Scoping

### A.  Introduction

Internal scoping is simply the use of NPS staff (at the SSO, regional, park, or National Program Center level) to decide what needs to be analyzed in a NEPA document. It is an interdisciplinary process, and at a minimum it should be used to define issues, alternatives, and data needs. The IDT may also be used to formulate purpose and need; brainstorm any connected, similar, or cumulative actions associated with the proposal; decide on the appropriate level of documentation; put together a public involvement strategy; and decide other features of the overall NEPA process. The elements of internal scoping included by CEQ are listed in the box on page 18.

External scoping, or early public involvement in the NEPA process, is discussed in section 4.8 (B) of this handbook under Public Involvement.

### B.  Minimum requirements

After you have defined purpose and need, the potential actions to address purpose and need, and any connected or cumulative actions, and determined what the issues and impact topics are likely to be, the IDT should visit the site (if members are not already familiar with it) and speak with appropriate agencies or other experts to determine whether the potential for a measurable impact, significant impact, or resource conflict exists. You must record evidence of the site visit and agency communication in your project or analysis file on the ESF, or use a similar form or process. It is also important to identify a single point of contact for the IDT, in order to avoid miscommunication with other agencies.

You must complete an ESF for any project that may have an impact on the human environment. If your park's project is described on the list in section 3.3 of this handbook, and there is no potential for environmental impact, you do not need to complete an ESF. A sample ESF appears in appendix 1 of this handbook. It may be tailored for your park's use, although certain of the criteria (see appendix 1) are mandatory.

The ESF requires familiarity with the site to complete. The ESF, as well as input from agencies and other experts, is used to decide the appropriate level of documentation for the NEPA analysis (section 2.10). If all agree that no potential for measurable impact to the human environment exists, and the requirements of section 3.2 are met, the action can be categorically excluded from further documentation, and you can complete the categorical exclusion form (CEF) (appendix 2) and attach it to the ESF. If an EA or an EIS is the appropriate choice, the ESF is the beginning of the analysis, or statutory compliance, file.

### C. Actions already analyzed

The environmental impacts of an action may already have been fully examined in a previous NEPA analysis. If all impact topics have been analyzed in site-specific detail, and there are no changes to the proposal or in impacts to environmental resources from those previously analyzed, then no further environmental analysis is required, and you may prepare a memo to file, rather than an ESF. This memo should be reviewed and approved by the Superintendent or his/her designee, in consultation with the regional environmental coordinator.

## 2.7 Alternatives

### A. Range of alternatives

You must examine a full range of alternatives in the analysis documented in either an EIS or an EA. Those alternatives carried forward for analysis must meet project objectives to a large degree, although not necessarily completely. For instance, in the example above (section 2.5), you may choose to add an alternative that analyzes using hotels in the town nearest the north rim of the Grand Canyon, even if your project objective was to provide an extended experience for visitors right at the rim. The alternatives must also be developed with environmental resources (rather than cost, e.g.) as the primary determinant. In other words, they propose different means of accomplishing your park's goals, while at the same time protecting or minimizing impacts to some or all resources. Keep in mind that at this stage, the range of options you consider may not ultimately be fully analyzed as "reasonable alternatives," as explained below.

### B. Reasonable alternatives

CEQ has defined reasonable alternatives as those that are economically and technically feasible, and that show evidence of common sense (Q2a). Alternatives that could not be implemented if they were chosen, or that do not resolve the need for action and fulfill the stated purpose in taking action to a large degree, should be eliminated as unreasonable before impact analysis begins. Unreasonable alternatives may be those that are unreasonably expensive; that cannot be implemented for technical or logistic reasons; that do not meet park mandates; that are inconsistent with carefully considered, up-to-date park statements of purpose and significance or management objectives; or that have severe environmental impacts—although none of these factors automatically renders an alternative unreasonable. CEQ is also clear that agencies should not pare the list down to only those alternatives that are cheap, easy, or your park's favorite approach.

Rather, feasibility is an initial measure of whether the alternative makes sense and is achievable.

In fact, CEQ has added language cautioning against using even what may seem clear criteria for routinely dismissing alternatives as unreasonable. For instance, if an alternative is any of the following, but otherwise feasible, it must be included in the range of alternatives (Q2b):

- outside the scope of what Congress has approved or funded.

- outside the legal jurisdiction of your park.

- undesirable to an outside applicant but reasonable to the park.

- in conflict with a law.

- outside those alternatives provided for by a GMP or other park planning document (particularly if the plan or policy is older or no longer applicable to the issues the park is now facing (1500.1 (a)).

These conditions often are obstacles to implementing an action, because a law may need to be changed, an applicant may need to modify a proposal, or Congress may need to rethink approval or funding. However, CEQ notes that the EA or the EIS analyzing such alternatives may serve as the vehicle for such change.

Alternatives may also be eliminated as unreasonable as the NEPA process progresses. For instance, if initial impact analysis shows that a technically or economically feasible alternative would have profound adverse environmental impacts, it should be eliminated as "environmentally infeasible."

EAs and EISs should include a section discussing those alternatives that were considered but rejected and briefly explain the reasons for their elimination.

## C. No action

The "no action" alternative is developed for two reasons. It is almost always a viable choice in the range of reasonable alternatives, and it sets a baseline of existing impact continued into the future against which to compare impacts of action alternatives. This is important context information in determining the relative magnitude and intensity of impacts (see also, section 4.2(a)). If choosing the true no action alternative (i.e., continuing as is) would violate laws or your park's own policies, you may want to add a "minimum management" alternative to your range. This should not substitute for the no action alternative, because you may lose valuable information on existing impacts by not evaluating the impacts of ongoing activities.

1. **No action for plan modifications**—As a rule, for GMPs, assume the no action alternative would continue present management actions. No action then becomes an accurate baseline to compare against action alternatives. As allowed by CEQ (Q3), you may group all existing plans and policies into an alternative to show the impacts of implementing

them in the future. This alternative should be considered one of the action alternatives, rather than no action.

2. **No action for a project**—This would mean the proposed activity would not take place (Q3). Therefore, no action is the continuation of existing conditions and activities without a particular planning context.

3. **Impacts of no action**—The impacts of no action are the impacts of existing activities or conditions (man-made or natural) projected into the future. If the proposal is to modify a plan, the impacts are the impacts of the unmodified plan. The impacts of no action help readers understand whether the project would degrade or improve conditions in an already degraded environment, or in a relatively pristine one. Analysis of no action must also include the cumulative impacts of all past, present, and reasonably foreseeable actions.

If the proposal is to improve existing conditions, the impacts of no action are particularly important to describe, because they help to define the need for NPS action. If implementing the no action alternative would "result in predictable actions by others," this impact should be part of the effects of no action (Q3).

Impacts of no action help decision-makers understand the comparative impacts of proposals, as well as the absolute impact. For instance, if your park is analyzing the impact to wildlife of a proposal to add a trail in an area already covered with trails, the impacts to wildlife of no action (e.g., from hikers using the trails) are distinctly different from the impacts if this were the first trail into a wilderness area. Compared with the existing impacts, a new trail in the first case may have less of an impact than in the second.

Impacts of no action also provide an assessment of absolute, or total, impact to a resource. In the example above, the impacts of the proposed trail, when added to those of existing trails (no action), may impose greater impacts on wildlife than a single trail in a wilderness would.

Accurately and completely describing the impacts of existing sources— that is, of continuing actions—is critical to understanding the context, duration and intensity of new impacts. For this reason, a full analysis of no action is required in all NPS EISs and EAs. This is true even when your park is under legislative or other command to take action (Q3).

## D.  Environmentally preferred alternative

After the environmental analysis is completed, you must identify the environmentally preferred alternative or alternatives. Descriptions of these alternatives must be included as a separate heading at the end of the alternatives section of the document. The environmentally preferred alternative is the alternative that will promote the national environmental policy expressed in NEPA (Sec. 101 (b)). This includes alternatives that:

- fulfill the responsibilities of each generation as trustee of the environment for succeeding generations.

- ensure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings.

- attain the widest range of beneficial uses of the environment without degradation, risk of health or safety, or other undesirable and unintended consequences.

- preserve important historic, cultural, and natural aspects of our national heritage and maintain, wherever possible, an environment that supports diversity and variety of individual choice.

- achieve a balance between population and resource use that will permit high standards of living and a wide sharing of life's amenities.

- enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Simply put, "this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources" (Q6a). In the NPS, the No Action alternative may also be considered in identifying the environmentally preferred alternative.

Through identification of the environmentally preferable alternative, the NPS decision-makers and the public are clearly faced with the relative merits of choices and must clearly state through the decision-making process the values and policies used in reaching final decisions.

### E.  Consistency with sections 101 and 102(1) of NEPA

As required under CEQ regulations 40 CFR 1502.2(d), NEPA documents must include a section stating how each alternative analyzed in detail would or would not achieve the requirements of sections 101 and 102(1) of NEPA and other environmental laws and policies. In the park service, this requirement is met by 1) disclosing how each alternative, one of which is identified as the environmentally preferred, meets the criteria set forth in section 101(b) of NEPA (see above); and 2) any inconsistencies between the alternatives analyzed in detail and other environmental laws and policies.

## 2.8  Affected Environment

### A.  Boundary-setting

Once alternatives and issues have been defined, the analysis area boundary should be delineated for each resource. The analysis boundary will be different for each resource. For instance, the impact to soils or vegetation of grading a site for a sewage treatment plant may be confined to the building footprint. The impact to water quality may be the entire length of the river where treated waste-

water is discharged and beyond. If another source of impact to the same river exists upstream, this section of river may also be part of the analysis area for water quality.

Sometimes the analysis boundary for a particular resource will change with different alternatives. In the example above, analyzing three or four different locations for a sewage treatment plant means analyzing impacts to vegetation in those locations.

Fully describing affected environment usually requires knowledge about the extent of impacts, and the description may be refined as impact analysis on a particular proposal proceeds.

In NEPA, "affected" environment means just that—resources expected to experience environmental impacts. Therefore, you should not bother with drawing analysis boundaries or collecting data to describe resources that are not likely to be affected by the alternatives.

For those resources that will sustain impacts, collecting accurate and adequate data on their present status (location, nature, condition, scope, size, etc.) is critical in determining impacts, and must be available before helpful NEPA analysis can begin. A geographic information system or other mapping system not only can be the basis of excellent analyses, but can help parks decide how best to develop or manage resources. In other words, quality data will help in making quality decisions. The list of resources in the ESF (appendix 1) is a good beginning point in determining which resources to consider.

## 2.9  Impacts

An impact differs from an issue. An issue describes an environmental problem or relationship between a resource and an action(s). Impact analysis predicts the degree to which the resource will be affected (see 4.5(g) for more information). Impact topics are derived from issue statements, and should be quite specific. For example, if the impact of building a lodge on the north rim of the Grand Canyon to visitor views is confined to the view of the Colorado River from a 200-meter section of one trail, the impact topic should be "views of the river from a 200-meter section of the trail" rather than "views of the canyon from the north rim." This helps keep the analysis (and documents) focused and analytical.

To help decision-makers completely understand how a resource will be affected, you must include considerations of context, intensity, duration, and timing (1508.27). The following categories of impacts must be considered and analyzed for any park proposal and its alternatives, regardless of how the analysis is documented (CE, EA, or EIS). Impacts, effects, and environmental consequences are synonymous throughout this handbook and the CEQ regulations.

### A.  Direct effects (1508.8)

These are impacts that are caused by the alternatives at the same time and in the same place as the action. For example, grading a building site removes soil and

vegetation at the site and, if an archeological resource is present, destroys surface and subsurface deposits.

## B.  Indirect effects (1508.8)

Indirect effects are impacts caused by the alternatives, that occur later in time or farther in distance than the action. For instance, if allowing a utility to string a transmission line through your park to serve a nearby town is something you reasonably expect will ultimately result in increased growth and encroachment of development on park boundaries, these indirect impacts need to be included in the NEPA document analyzing the transmission line. Implementing a day-use reservation system may have indirect socioeconomic impacts on neighboring businesses or concessions inside the park. These are examples of impacts occurring later in time.

The alternatives may also have indirect effects that occur farther in distance from the action. For instance, discharging effluent into a river would affect the water quality far from the actual site of the release. You do not need to call out direct or indirect effects specifically in a NEPA document, although cumulative impacts do need to be identified separately.

## C.  Cumulative effects (1508.7)

Cumulative effects are "additive" impacts to a particular resource. An EIS or an EA analyzes them without regard to land ownership (i.e., cumulative effects may occur from actions on private or other agency land), and it includes impacts of actions in the past, the present, and the reasonable foreseeable future (see section 2.4, cumulative actions).

Although it is clear that CEQ does not want agencies to segment their proposals into pieces that have less potential for significant impact alone than when viewed together (see 1.4 (F)), the requirement to analyze cumulative impacts goes much farther than this. A complete picture of forces already acting upon a particular environmental resource is essential in making reasonable decisions about the management of that resource. If sources of impact exist, whether they are on private or public land, or whether they were taken in the past, are ongoing now, or have a reasonable chance of occurring in a future when the impacts of the proposal are also ongoing, their combined impacts give decision-makers and the public a clear idea of the "absolute" impact the resource is experiencing. For instance, if your park is proposing clearing vegetation to build a campground in the middle of important elk winter range, last year's timber cut on the adjacent federal forest in elk winter range has an additive impact on the elk population and must be part of the cumulative impact. A large housing development proposed for next year on private land in elk habitat is also going to have an adverse effect, and this should be included if you believe it is reasonable to assume the homes will be built.

For the example above, cumulative impacts can extend over entire watersheds, or thousands of square miles of elk range. Yet, because the action causing an impact is farther away from the park's proposal, in time or geographically, it often has a diminishing additive impact. The IDT is critical in deciding which

actions, activities, or sources of impact to include in a cumulative impact analysis, and the team should use common sense in deciding the extent of the cumulative impacts "boundary" (see section 2.8 (A)). Although a multitude of actions may contribute impact infinitesimally to the same resource that the NPS proposal is expected to affect, only those that resource specialists feel are clear contributors or that can feasibly be analyzed need to be included. As a general rule, the farther removed an action is from the project area or the project start date, the less need there is for detailed and exact analysis of the action's cumulative impacts.

The analysis of cumulative impacts may be particularly important for larger-scale park planning or resource management efforts. To return to the elk example, if elk winter range is a resource that you believe is important to maintain in pristine condition within the park, but a migration corridor between it and elk summer range is proposed for development, knowing how the developed corridor will affect the elk population may be important in deciding how to manage the park's winter range.

## D.  Impairment

The impact analysis must also include a finding on whether or not the actions contained in the alternatives would "impair" park resources. (See DO-55 and this handbook 1-2(E)).

# 2.10  Determining the Appropriate NEPA Pathway

## A.  Documentation

A NEPA review includes documentation of the analysis, which then becomes available to the public. The degree of public input and the detail included in the documentation varies depending on the severity, in context, of the environmental impacts of the proposal and alternatives.

## B.  Five options

Five options to document a NEPA analysis are available:

1.  Memo to file—Prepare a memo to file when the proposal has already been analyzed in site-specific detail in a previous NEPA document, no different impacts or changes to the project are expected, and environmental conditions have not changed. A notation to this effect should be prepared and placed in the project files.

2.  CEs for which no formal documentation is necessary—This option is applicable when the action is described using one of the categories in section 3.3 and no exceptions (section 3.5) exist. If appropriate, and if a project file exists, a memo to file may be placed in the project file.

3.  CEs for which a record is needed—Prepare these records when the action is described using one of the categories in section 3.4 and no

exceptions (section 3.5) exist. Complete the ESF (appendix 1) and the CEF (appendix 2) and include them with the project file.

4. EIS—Prepare an EIS when the potential for significant impact to the human environment exists (see section 4.2), as indicated by an EA, an ESF, or other scoping, or because the proposed action or alternative is described in section 4.4.

5. EA—Prepare when:

   (a) the significance of impacts is unknown (e.g., to determine whether an EIS is required).

   (b) the proposed action is not described on either of the CE lists (sections 3.3 and 3.4) or the list of actions that normally require an EIS (section 4.4).

   (c) the proposed action would take several CE categories to describe fully, would involve one or more of the exceptions described in section 3.5, or would involve unresolved conflicts concerning the use of resources.

Each of these options has specific content and public involvement requirements. For options 3, 4, and 5, you should complete the clear definition of objectives, an initial range of alternatives and actions including connected and cumulative actions, internal interdisciplinary scoping (see section 2.6), and an ESF (see section 2.6 (B) (1)) before you determine the appropriate NEPA pathway. For options 1 or 2, no ESF is required, although you should consult the list of exceptions to categorical exclusions (see section 3.5) to see whether any apply.

## C. The choice of pathways

1. If you believe option 1 above applies, the IDT should re-read the NEPA document that it believes already describes and analyzes the impacts of the action. If it does so in site-specific detail, and the analysis is up-to-date (see section 2.6 (C)), no further documentation is required, although for the administrative record, you must write a memo to file as described above. (Also note that this memo should be approved by the Superintendent or his/her designee after consultation with the regional environmental coordinator.)

2. If option 1 does not apply, but you believe option 2 does, check the list of actions in section 3.3. If it is described on this list (and no exceptions in section 3.5 apply), you may take action without further paperwork.

3. If the action is not on the list in section 3.3, or if it is described and analyzed in a previous NEPA document, you should complete internal scoping, complete the ESF form, and check the list of actions in section 3.4.

4. If the action is described in section 3.4, and no exceptional circumstances (section 3.5) exist, the CE is likely the appropriate pathway. Section 3.2

of this handbook describes the categorical exclusion process in more detail.

5. If the action is not described on the CE list, check the list of actions that normally require the preparation of an EIS (section 4.4). If it is on the list, or the potential for significant impacts exists as indicated by the ESF, you must write an EIS. Chapter 4.0 of this handbook details the process to follow in preparing an EIS.

6. You should prepare an EA if the action is not described on any list, or if one of the following applies:

   - one or more of the categories on the ESF apply or are checked "data needed" or "yes," but you do not know if any will result in significant impacts;

   - several categories in section 3.4 are required to completely describe the project;

   - the action is described in section 3.3 or 3.4, but one or more of the exceptions in section 3.5 apply;

   - unresolved conflicts concerning the use of resources exist; or

   - the significance of impacts is unknown.

If the EA indicates there may be significant impacts, you must prepare an EIS, unless the unique and limited circumstances described in section 5.4 (F)(3) apply and a proposal can be modified with mitigation measures to lessen the severity of impact, sometimes referred to as a "mitigated EA." The use of the terms "significant" and "significance" over the years has become quite contentious in NEPA documents. It is highly recommended that these terms be avoided in EAs and EISs, since these terms apply primarily to the determination of the most appropriate NEPA pathway.

## 2.11  Using Contractors

A NEPA document may be prepared by a contractor for either internally or externally generated proposals if no conflict of interest exists. If a contractor prepares an EIS or an EA, there must be a waiver prepared by NPS and signed by the contractor indicating the contractor has "no financial or other interest in the outcome of the project." (1506.5). Even when a NEPA document is prepared by a contractor, NPS has the responsibility for ensuring its adequacy.

## 2.12  The Administrative Record

The administrative record or project file is a critical part of the decision-making process, because Freedom of Information Act requests and/or litigation will require an organized and complete record for response. All cited documents in the text, as well as complete references that have been summarized or incorpo-

rated by reference in the EIS or the EA, need to be reasonably available for public inspection if NPS receives such a request. Litigation may focus almost entirely on the contents of the record.

At a minimum, items that should be kept in the record include notes of IDT meetings where key decisions about the content of the document, issues to be examined in detail, alternatives, and so forth were made; notes, public comment letters, minutes of meetings, phone calls, e-mail, and documentation of public involvement efforts; copies of EAs or EISs that were circulated within NPS, or to other agencies or entities outside NPS, for review or comment; and drafts of sections written that were later used to create an EA or an EIS. Issues identified by the IDT team or individual members should be included with follow-up documentation on how the issue was resolved.

## 2.13  Working with Other Agencies

### A.  Lead and cooperating agencies

More than one federal agency may be involved in approving a given proposal. Yet, NEPA requires agencies to work together to produce only one NEPA document. The agency in charge of preparing the document is the lead agency, and all others with jurisdiction by law (every agency with permitting or funding authority over some aspect of the proposal) or special expertise who are designated as such by the lead are called cooperating agencies. The CEQ regulations include criteria for designating a lead agency if a conflict exists (1501.5), as well as the rights and responsibilities of cooperating agencies (1501.6). Chapter 8.0 of this handbook also has information on lead and cooperating agencies (see also 516 DM, 2.4.).

NPS may act as a joint lead agency with either another federal agency (1501.5 (b)) or a state or local agency (see section 2.13(B)). However, CEQ regulations clearly encourage the lead and cooperating concept for two or more federal agencies and the joint approach for federal-state documents. In addition, the NPS has committed, along with other major land management agencies, to provide for opportunities for inclusion of state, local, and tribal governments as cooperators in the preparation of environmental documents.

### B.  State agencies

CEQ also asks federal agencies to work closely with state agencies that have requirements for impact analysis, and to make every effort to combine efforts with them (1506.2), including the preparation of a joint state-federal impact document.

### C.  Other environmental and regulatory requirements

Other federal, state, and local laws may have information requirements that overlap with NEPA. The study of these resources and information about their present status (i.e., affected environment), or the impact they may experience from your park's proposal, should be integrated into your NEPA document. Some of these laws and executive orders are listed below, but you must consult local, state, and

other federal agencies as part of scoping to determine all of the applicable requirements and any permits needed for project completion.

1. **Endangered Species Act (ESA)**—Section 7 of the ESA requires that a federal agency consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service on any action that may affect endangered or threatened species or candidate species, or that may result in adverse modification of critical habitat. An EA or an EIS may provide sufficient information to serve as a biological assessment for section 7 purposes. If a separate biological assessment is prepared, it must be part of any NEPA document.

2. **Executive Orders 11988 and 11990, Floodplain Management and Wetland Protection**—These executive orders direct NPS to avoid, to the extent possible, the long- and short-term adverse impacts associated with modifying or occupying floodplains and wetlands. They also require NPS to avoid direct or indirect support of floodplain or wetland development whenever there is a practical alternative. If implementing your park's proposal would result in an adverse impact to a regulated floodplain or wetland, you must include a statement of findings with the finding of no significant impact (FONSI) or the record of decision (ROD).

3. **National Historic Preservation Act (NHPA) section 106**—Section 106 of NHPA requires federal agencies to consider the effects of their proposals on historic properties, and to provide state historic preservation officers, tribal historic preservation officers, and, as necessary, the Advisory Council on Historic Preservation a reasonable opportunity to review and comment on these actions. Section 106 review and NEPA are two separate, distinct processes. They can and should occur simultaneously, and documents can be combined, but one is not a substitute for the other. They should, however, be coordinated to avoid duplication of public involvement or other requirements. The information and mitigation gathered as part of the 106 review must be included in the NEPA document, and the 106 process must be completed before a FONSI or an ROD can be signed on a proposal that affects historic properties.

4. **Executive Order 12898, Environmental Justice in Minority and Low-Income Populations**—This executive order directs federal agencies to assess whether their actions have disproportionately high and adverse human health or environmental effects on minority and low-income populations. You must specifically analyze and evaluate the impact of your proposal on minority and low-income populations and communities, as well as the equity of the distribution of the benefits and risk of the decision in your NEPA document. If it does not apply, this should be noted in the "issues dismissed" section of the NEPA document (see ECM95–3 and ECM98–2).

5. **Secretarial Order 3175 and ECM95–2**—These memoranda require bureaus to explicitly address environmental impacts of their proposed actions on Indian Trust Resources in any environmental document.

## 2.14 Emergency Actions

Emergencies requiring immediate action are exempt from CEQ's regulatory provisions for implementing NEPA (1506.11; 516 DM, 5.8), regardless of whether the actions have the potential for significant impact. In the event of an emergency, you should immediately take any action needed to prevent or reduce either risks to public health or safety or serious resource losses. CEQ and the Department require that both CEQ and OEPC (the Department's Office of Environmental Policy and Compliance) be consulted as soon as possible about NEPA compliance in such an event. If an action is one that would normally require an EIS, consult CEQ as soon as possible for approval of alternative arrangements. The NPS Environmental Quality Division coordinates these requests.

It is important to note that only those actions required to resolve the emergency are exempt. Other related actions (follow-up, connected, long-term, etc.) remain subject to the requirements of NEPA.

Examples of emergency actions are cleanup of immediately threatening hazardous materials spills, fire suppression, and prevention or repair of damage by unanticipated floods or other natural disasters (ESM97–3).

# 3.0 Categorical Exclusions

3.1 Definition

3.2 Process to Follow

3.3 CEs for Which No Formal Documentation Is Necessary

3.4 CEs for Which a Record Is Needed

3.5 Exceptions to CEs

3.6 Using the CE Lists

3.7 Public Involvement

3.8 Administrative Process

3.9 Consideration of Multiple Actions

## 3.1 Definition

In NPS, CEs are applicable to actions that, under normal circumstances, are not considered major federal actions and that have no measurable impacts on the human environment. However, under exceptional circumstances (see section 3.5), these same actions may have measurable or even significant impacts, and a CE would no longer be applicable. Therefore, each time you consider a CE for a park action, it is important to decide whether any exceptional circumstances exist.

Departmental legal activities—including arrests, investigations, patents, claims, and legal opinions—are not considered actions for the purposes of NEPA. Similarly, regulatory and enforcement actions—including inspections, administrative hearings, and related decisions—are not NEPA-related actions.

## 3.2 Process to Follow

NPS has two lists of categorically excluded actions. One (section 3.3) requires no formal documentation. If an action that your park unit is proposing is on this list, you do not need to complete any NEPA-related documentation, and no evidence of internal scoping is required. You may wish to prepare a memo to the project file (if one exists) to show that environmental effects were considered.

In the vast majority of cases, the actions in section 3.3 have no potential for environmental impact. However, you must check the list of exceptions in section 3.5 before you exclude an action listed in section 3.3. If any of these criteria apply, or if you believe the potential for environmental impact exists, you must go through the internal scoping process described in section 2.6 and complete the requirements in sections 3.2, or for an EA or an EIS if appropriate.

The process in using the second list (section 3.4) is more involved. Whereas the actions in section 3.3 would almost never cause environmental impact, these (section 3.4) actions do have the potential for measurable impacts. To be sure no measurable impacts would occur, follow these steps if your park's proposal is described on the list in section 3.4:

1.  Using an interdisciplinary approach, determine whether any connected, cumulative, or similar actions are part of the proposed action. In other words, carefully consider whether it is a piece of a larger action that should be analyzed in a NEPA document.

2.  Use the ESF to ascertain the important environmental issues, and visit the site if the IDT is not familiar with it.

3.  If no exceptional (see section 3.5) circumstances exist, and this fact is confirmed by the ESF, contact interested and affected local, state, and/or federal agencies to see whether any object to the NPS determination that there is no potential for measurable impact.

4.  If interested or affected public exist, make a diligent effort to contact them and obtain their input.

5.  If all (the NPS team, other agencies, and the public) agree there is no potential for measurable impact, document this in the categorical exclusion form (CEF) shown in appendix 2. The CEF requires a brief description of the proposal, identification of the category used in excluding the action from further NEPA analysis, and a signature block. The ESF is attached to and becomes part of the CEF.

6.  If extensive mitigation is required to avoid triggering one of the exceptional circumstances criteria (section 3.5), you must prepare an EA. If minimum mitigation is acceptable to appropriate agencies and any interested or affected public, it should be fully integrated into the project description on the CEF.

7.  You should consider changed environmental circumstances in determining the level of NEPA documentation, and in deciding if the criteria in section 3.4 would apply.

## 3.3  CEs for Which No Formal Documentation Is Necessary

The following list shows actions that usually have no potential for impact to the human environment, and that therefore are not routinely subject to NEPA review and documentation. The list is included here to reinforce the idea that many routine federal government actions are exempt from NEPA. Under normal circumstances, no NEPA-related documentation (including an ESF) is required in order to perform the actions on this list. However, if the criteria in section 3.5 apply, or if for any other reason you believe the action listed below may have an impact on the human environment, procedures described in section 3.2 apply. Some of

these actions (A through H) are substantially the same as the Departmental CEs (516 DM, 2, appendix 1). Others (J through O) have been added by NPS.

A. Personnel actions and investigations and personnel services contracts.

B. Internal organizational changes and facility and office reductions and closings.

C. Routine financial transactions—for example, salaries and expenses, procurement contracts, guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties.

D. Routine and continuing government business—for example, supervision, administration, operations, maintenance, and replacement activities having limited context and intensity, meaning the activities are limited in size and magnitude or have short-term effects.

E. Management, formulation, allocation, transfer, and reprogramming of the Department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required.)

F. Legislative proposals of an administrative or technical nature—for example, changes in authorizations for appropriations; minor boundary changes and land transactions; proposals that would have primarily economic, social, individual, or institutional effects; and comments and reports on referrals of legislative proposals.

G. Policies, directives, regulations, and guidelines of an administrative, financial, legal, technical, or procedural nature, the environmental effects of which are too broad, speculative, or conjectural to lend themselves to meaningful analysis and which will be subject later to the NEPA process, either collectively or case-by-case.

H. Activities that are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

I. Land and boundary surveys.

J. Preparation and issuance of publications.

K. Technical assistance to other federal, state, and local agencies or the general public.

L. Preparation of routine reports required by law or regulation.

M. Day-to-day maintenance, resource management, and research activities that have no potential for environmental impact or are not otherwise listed in section 3.4.

N.  Issuance of individual hunting or fishing licenses in accordance with state and federal regulations.

O.  Changes in interpretive and environmental education programs.

## 3.4  CEs for Which a Record Is Needed

See section 3.2 for the process to follow when the proposed action is described in one of the following categories:

### A.  Actions related to general administration

(1)  Changes or amendments to an approved action when such changes would cause no environmental impact.

(2)  Minor boundary changes that are accomplished through existing statutory authorities and that result in no change in land use.

**Be sure to check** for exceptional circumstances (section 3.5) and consult the Warning section (3.6) before you decide that your park's action should be categorically excluded!

(3)  Reissuance/renewal of permits, rights-of-way, or easements not involving new environmental impacts, provided that the impacts of the original actions were evaluated in an environmental document.

(4)  Conversion of existing permits to rights-of-way, when such conversions neither continue nor potentially initiate adverse environmental conditions, provided that the impacts of the original actions were evaluated in an environmental document.

(5)  Issuances, extensions, renewals, reissuances, or minor modifications of concession contracts or permits that do not entail new construction or any potential for new environmental impact as a result of concession operations.

(6)  Incidental business permits (formerly called commercial use licenses) involving no construction or potential for new environmental impact.

(7)  Leasing of historic properties in accordance with 36 CFR 18 and NPS-38.

(8)  Modifications or revisions to existing regulations, or the promulgation of new regulations for NPS—administered areas, provided the modifications, revisions, or new regulations do not:

(a)  increase public use to the extent of compromising the nature and character of the area or cause physical damage to it.

(b) introduce non-compatible uses that might compromise the nature and characteristics of the area or cause physical damage to it.

(c) conflict with adjacent ownerships or land uses.

(d) cause a nuisance to adjacent owners or occupants.

(9) At the direction of the NPS responsible official, actions where NPS has concurrence or co-approval with another bureau and the action is a CE for that bureau, and where NPS agrees that there is no potential for environmental impact.

(10) Routine transfers of jurisdiction between the NPS and the District of Columbia accomplished through existing statutory authority, where no change of use in the land is anticipated upon transfer.

## B. Plans, studies, and reports

(1) Changes or amendments to an approved plan, when such changes have no potential for environmental impact.

(2) Cultural resources maintenance guides, collection management plans, and historic furnishings reports.

(3) Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).

(4) Plans, including priorities, justifications, and strategies, for non-manipulative research, monitoring, inventorying, and information-gathering.

(5) Agreements between NPS offices for plans and studies.

(6) Authorization, funding, or approval for the preparation of statewide comprehensive outdoor recreation plans.

(7) Adoption or approval of academic or research surveys, studies, reports, and similar documents that do not contain and will not result in NPS recommendations.

(8) Land protection plans that propose changes to existing land or visitor use when the changes have no potential for environmental impact.

## C. Actions related to development

(1) Land acquisition within established park boundaries, if future anticipated uses would have no potential for environmental impact.

(2) Land exchanges that will not lead to anticipated changes in the use of land and that have no potential for environmental impact.

(3) Routine maintenance and repairs to non-historic structures, facilities, utilities, grounds, and trails.

(4)  Routine maintenance and repairs to cultural resource sites, structures, utilities, and grounds if the action falls under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide, or if the action would not adversely affect the cultural resource.

(5)  Installation of signs, displays, and kiosks.

(6)  Installation of navigation aids.

(7)  Experimental testing of short duration (no more than one season) of mass transit systems, and changes in operation of existing systems, that have no potential for environmental impact.

(8)  Replacement in kind of minor structures and facilities with little or no change in location, capacity, or appearance—for example, comfort stations, pit toilets, fences, kiosks, signs, and campfire circles.

(9)  Repair, resurfacing, striping, installation of traffic control devices, and repair/replacement of guardrails, culverts, signs, and other minor existing features on existing roads when no potential for environmental impact exists.

(10)  Changes in sanitary facilities operation resulting in no new environmental effects.

(11)  Installation of wells, comfort stations, and pit or vault toilets in areas of existing use and in developed areas.

(12)  Minor trail relocation or development of compatible trail networks on logging roads or other established routes.

(13)  Upgrading or adding new overhead utility facilities on existing poles, or on replacement poles that do not change existing pole line configurations.

(14)  Issuance of rights-of-way for overhead utility lines to an individual building or well from an existing line where installation will not result in visual intrusion and will involve no clearance of vegetation other than for placement of poles.

(15)  Issuance of rights-of-way for minor overhead utility lines not involving placement of poles or towers and not involving vegetation management or visual intrusion in an area administered by NPS.

(16)  Installation of underground utilities in areas showing clear evidence of recent human disturbance or areas within an existing road prism or within an existing overhead utility right-of-way.

(17)  Minor landscaping in areas showing clear evidence of recent human disturbance.

(18)  Installation of fencing enclosures, exclosures, or boundary fencing posing no effect on wildlife migrations.

### D.  Actions related to visitor use

(1)  Minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.

(2)  Minor changes in programs and regulations pertaining to visitor activities.

(3)  Issuance of permits for demonstrations, gatherings, ceremonies, concerts, arts and crafts shows, and so forth, entailing only short-term or readily remediable environmental disturbance.

(4)  Designation of trailside camping zones with minimal or no improvements.

### E.  Actions related to resource management and protection

(1)  Archeological surveys and permits involving only surface collection or small-scale test excavations.

(2)  Restoration of noncontroversial (based on internal scoping requirements in section 2.6) native species into suitable habitats within their historic range.

(3)  Removal of individual members of a non-threatened/endangered species or populations of pests and exotic plants that pose an imminent danger to visitors or an immediate threat to park resources.

(4)  Removal of non-historic materials and structures in order to restore natural conditions when the removal has no potential for environmental impacts, including impacts to cultural landscapes or archeological resources.

(5)  Development of standards for, and identification, nomination, certification, and determination of, eligibility of properties for listing in the National Register of Historic Places, the National Historic Landmark and National Natural Landmark Programs, and biosphere reserves.

(6)  Non-destructive data collection, inventory (including field, aerial, and satellite surveying and mapping), study, research, and monitoring activities (this is also a Departmental CE).

(7)  Designation of environmental study areas and research natural areas, including those closed temporarily or permanently to the public, unless the potential for environmental (including socioeconomic) impact exists.

### F.  Actions related to grant programs

(1)  Proposed actions essentially the same as those listed in paragraphs A–E above.

(2) Grants for acquisition of areas that will continue in the same use or lower density use with no additional disturbance to the natural setting or type of use.

(3) Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical, or cultural resources of the area or the integrity of the existing setting.

(4) Grants for construction of facilities on lands acquired under a previous NPS or other federal grant, provided that the development is in accord with plans submitted with the acquisition grant, and that environmental documents have been completed on the impacts of the proposal funded by the original grant.

(5) Grants for the construction of new facilities within an existing park or recreation area, provided that the facilities will not:

    (a) conflict with adjacent ownerships or land use, or cause a nuisance to adjacent owners or occupants, such as would happen if use were extended beyond daylight hours.

    (b) introduce motorized recreation vehicles, including off-road vehicles, personal water craft, and snowmobiles.

    (c) introduce active recreation pursuits into a passive recreation area.

    (d) increase public use or introduce non-compatible uses to the extent of compromising the nature and character of the property or causing physical damage to it.

    (e) add or alter access to the park from the surrounding area.

(6) Grants for the restoration, rehabilitation, stabilization, preservation, and reconstruction (or the authorization thereof) of properties listed on or eligible for listing on the National Register of Historic Places, at their same location, and provided that such actions:

    (a) will not alter the integrity of the property or its setting.

    (b) will not increase public use of the area to the extent of compromising the nature and character of the property.

    (c) will not cause a nuisance to adjacent property owners or occupants.

## 3.5  Exceptions to CEs

If the IDT or the NPS decision-maker determines that any of the following exceptions apply to a proposed action, it may not be categorically excluded, and you must prepare either an EA or an EIS. Items A through O are adapted from the list of Departmental exceptions (516 DM, 2, appendix 2). Items N through R are NPS additions. The exceptions apply if any proposed actions:

A.   have material adverse effects on public health or safety.

B.   have adverse effects on such unique geographic characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; or ecologically significant or critical areas.

C.   have highly controversial environmental effects.

D.   have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

E.   establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

F.   are directly related to other actions with individually insignificant, but cumulatively significant, environmental effects.

G.   have adverse effects on properties listed or eligible for listing on the National Register of Historic Places.

H.   have adverse effects on species listed or proposed to be listed on the List of Endangered or Threatened Species, or have adverse effects on designated Critical Habitat for these species.

I.   require compliance with Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act.

J.   threaten to violate a federal, state, local, or tribal law or requirement imposed for the protection of the environment.

K.   involve unresolved conflicts concerning alternative uses of available resources (NEPA sec. 102 (2) (E)).

L.   have a disproportionate, significant adverse effect on low-income or minority populations (EO 12898).

M.   restrict access to and ceremonial use of Indian sacred sites by Indian religious practitioners or adversely affect the physical integrity of such sacred sites (EO 13007).

N.   contribute to the introduction, continued existence, or spread of federally listed noxious weeds (Federal Noxious Weed Control Act).

O.   contribute to the introduction, continued existence, or spread of non-native invasive species or actions that may promote the introduction, growth, or expansion of the range of non-native invasive species (EO 13112).

P.    require a permit from another agency to proceed, unless the agency from whom the permit is required agrees that a CE is appropriate, the action is described in section 3.3 or 3.4, and no exceptional circumstances in section 3.5 apply.

Q.    have the potential for significant impact as indicated by a federal, state, or local agency or Indian tribe.

R.    have the potential to be controversial because of disagreement over possible environemental effects.

## 3.6  Using the CE Lists

You should keep the following issues in mind when you are considering categorically excluding a proposed action:

A.    If two or more categories are required to cover elements of the proposed action, you should consider carefully whether the entire action may have the potential for environmental impact and be better analyzed in an EA or an EIS. To be excludable, the action should easily fit in one category and clearly have no potential for environmental impact.

B.    If an action is described on the list, but has the potential for measurable environmental impact, you must prepare an EA or an EIS.

C.    If an action is described on the list, but mitigation is required to avoid the potential for environmental impact, you should consider an EA or an EIS. Only minimal mitigation should be part of an action categorically excluded, and the effectiveness and enforcement of the mitigation must carry a high degree of certainty.

D.    If a local, state, or federal agency with jurisdiction by law over an affected resource believes the potential for measurable environmental impact exists for an action that a park initially intends to categorically exclude from further analysis, you must prepare an EA or an EIS.

E.    If the action involves "unresolved conflicts concerning alternative uses of available resources (NEPA, sec 102 (E))," alternatives to the proposed action must be developed and studied. If an NPS action described on the list in sec. 3.4 does involve such conflicts, you must prepare an EA or an EIS.

F.    The definition of categorically excluded actions includes those actions that cumulatively do not have the potential for measurable impact on the human environment. If the action is a part of a broader action, or one in a series of similar or related actions, the broader policy, program, or proposal must be the subject of a NEPA analysis first. Elements of the action may subsequently be analyzed more specifically using the tiering approach.

G. If a project requires surveys or permits under other laws, in particular the National Historic Preservation Act and the Endangered Species Act, it is not a categorical exclusion unless all appropriate agencies agree that a CE is appropriate.

H. If you will be taking many actions throughout the years that have very little or no potential for environmental impact and would qualify as a CE, it may be a better and more efficient approach to address them programmatically (see sections 3.9 and 7.5 of this handbook).

I. As a general rule, construction actions are not within the scope of categorical exclusions. However, maintenance activities may be included if listed in section 3.4. Generally, these are maintenance activities that are designed to preserve the integrity of an existing structure or facility. Maintenance activities do not include additions to structures or facilities, or changes in location or capacity.

## 3.7  Public Involvement

No specific public involvement steps are required when you are categorically excluding an action from further NEPA analysis and documentation. However, CEQ requires agencies to always make a "diligent" effort to involve any interested and affected public that exist (1506.6). You should include an internal scoping step to brainstorm whether any interested or affected public exist, and discuss the best method to involve them if they do.

## 3.8  Administrative Process

(Also see section 3.2, Process to Follow)

The decision to categorically exclude an action from further NEPA analysis is documented using the CEF (see appendix 2). This form is signed by the park superintendent or his or her designee. You should attach the CEF to the ESF, and make sure both are available for public inspection upon request. The action may be implemented immediately upon approval and signature of the park superintendent or designee. Because no specific public involvement is required for CE, it is often difficult for those who may be interested to know what actions a park has taken. One way to comply with the diligence requirement (see above) is for parks to maintain a current list of categorically excluded actions and update it quarterly. This list could be sent to a mailing list of interested members of the public, or simply made available upon request.

Any relevant permit information or documentation of consultation with other agencies should be attached to your completed CEF and ESF and become a permanent part of the project files.

## 3.9  Consideration of Multiple Actions

Each year, parks undertake a variety of routine actions and activities that are similar in nature. For example, trails are cleared in the spring, fences are repaired, potholes are filled. These activities should be reviewed in conjunction with the park's budgetary process. Normally, budgets for these activities are developed for a given fiscal year, money is appropriated, and the work gets done. Park staff should consult with each other, develop a list of activities that would most likely be accomplished in the fiscal year, or by season, and consider covering these activities, if they meet the criteria established for a CE, in one CE document.

# 4.0 Environmental Impact Statements

4.1 Introduction
4.2 Criteria for Significant Impact
4.3 Ongoing or Continuing Action
4.4 Actions That Normally Require an EIS
4.5 EIS Format
4.6 The Final EIS
4.7 Supplements to Draft and Final EISs
4.8 Public Involvement Requirements
4.9 Administrative Process of Review of EISs
4.10 Terminating the EIS Process

## 4.1  Introduction

NEPA (sec. 102(2)(C)) requires you to prepare an EIS whenever your park proposes or approves an action whose impacts on the human environment may be significant. CEQ defines actions as "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." Federal approvals of permits for private applicants are also considered actions that trigger the need for NPS NEPA analysis (1508.18).

## 4.2  Criteria for Significant Impact

If something your park is proposing might have a significant impact on the human environment, you must prepare an EIS. It is important, then, to understand how the significance of an impact is gauged. Although significance may often be a subjective judgment, to the maximum extent possible it must be based on the scientific evidence and public input that NEPA provides. Section 4.2 (B) contains the CEQ criteria you should use in deciding whether an EIS may be required. CEQ requires you to evaluate the severity of impacts in several different contexts, if two or more apply.

### A.  Context

Evaluating impacts in particular contexts gives valuable comparative information. Context may be temporal (i.e., short-term impacts vs. long-term), but it is

**Are these special resources affected?**
- Public safety or health.
- Wetlands, floodplains, or ecologically sensitive areas.
- Important scientific, cultural, or historic resources.
- Threatened or endangered species or their habitat.

**Is the proposal**
- Likely to be highly controversial or its impact analysis highly debated?
- Likely to involve highly uncertain impacts or unique or unknown risks?
- Likely to pave the way for future actions?
- Part of a larger proposal?
- Likely to violate any law or requirement imposed to protect the environment?

**If so, consider** an EIS rather than an EA or a CE.

most often geographical. For instance, the temporary closure of a 1,000-acre recreation area may have only minor impacts on the nation's recreation users but severe impacts on local residents who depend on the area as the sole source of outdoor recreation for many miles around. Or, building 30 homes in Denver may not have a major impact, whereas building them in Denali National Park could.

## B. Criteria

Your team or park decision-maker must consider the following criteria when determining whether an impact may be significant in helping to determine if an EIS is appropriate (1508.27):

(1) Impacts that may have both beneficial and adverse aspects and which on balance may be beneficial, but that may still have significant adverse impacts which require analysis in an EIS.

(2) The degree to which public health and safety are affected.

(3) Any unique characteristics of the area (proximity to historic or cultural resources, wild and scenic rivers, ecologically critical areas, wetlands or floodplains, and so forth).

(4) The degree to which impacts are likely to be highly controversial.

(5) The degree to which the potential impacts are highly uncertain or involve unique or unknown risks.

(6) Whether the action may establish a precedent for future actions with significant effects, or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions that may have individual insignificant impacts but cumulatively significant effects. Significance cannot be avoided by terming an action temporary or breaking it down into small component parts.

(8) The degree to which the action may adversely affect historic properties in or eligible for listing in the National Register of Historic Places, or other significant scientific, archeological, or cultural resources.

(9) The degree to which an action may adversely affect an endangered or threatened species or its habitat.

(10) Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.

## 4.3  Ongoing or Continuing Action

CEQ defines federal actions subject to NEPA evaluation to include "continuing activities" (1508.18) in addition to new projects or programs. If your park is making an explicit or a tacit decision to continue with an activity that may have significant impacts to the environment, and either NEPA has never been done or an outdated or inadequate document was used in deciding to take the original action, you should initiate the NEPA process and prepare a document for public review. A change in an ongoing activity should be considered a new action, and the NEPA process should be followed.

## 4.4  Actions That Normally Require an EIS

You must prepare an EIS for the following proposals:

A. Wild and Scenic Rivers proposals when any of the following conditions are met:

(1) Congress has authorized a study of a river segment for inclusion in the system (under sec. 5(a) of the Wild and Scenic Rivers Act) and one of the alternatives being considered is either of the following:

(a) direct federal management as a component of the National Park System or the National Wildlife Refuge System.

...always prepare an EIS for any NPS proposal that has the potential for significant impacts to the human environment.

(b) management by state and/or local government, in line with an active federal water resource development proposal, permit, license, or grant pending before a federal agency which, if constructed, would render some or all of the study segment ineligible for the national system.

(2) The Secretary has designated a river segment (under sec. 2(a) (ii)) as part of an active water resource development proposal that, if constructed, would render some or all of the proposed segment ineligible for the national system.

In no case will an EIS be required for a river that has been determined ineligible for designation because it is not free-flowing or because it has no outstandingly remarkable values.

B.  Proposals for legislative action to make additions to the National Trails system if the proposed trail meets eligibility criteria, even if the trail is not ultimately recommended for designation by the Secretary.

C.  Special resource studies when the following conditions are met:

(1)  The resource being studied meets the criteria for inclusion in the National Park System (i.e., it is nationally significant and is deemed feasible and suitable for inclusion in the system).

(2)  One of the alternatives being considered is designation as a National Park System unit, even if that is ultimately not the recommendation of the Secretary.

D.  A GMP or its equivalent. GMPs may need to be amended for various reasons. Amendments should follow the same procedures in determining the appropriate NEPA pathway on a case-by-case basis.

E.  Wilderness proposals.

F.  Grants, including multi-year grants, whose size or scope will result in major natural or physical changes, including interrelated social and economic changes and residential and land use changes within the project area or its immediate environs.

G.  Parkwide oil and gas management plans.

In addition to the specific conditions listed, you must always prepare an EIS for any proposal that has the potential for significant impacts to the human environment. In rare circumstances, the Environmental Quality Division, through the Associate Director for Natural Resources Stewardship and Science, may grant an exception to the requirement that EISs be prepared for some of the above named actions on a case by case basis, when it is clear that site-specific data indicate that the potential for significant impact does not exist. This determination may only be made after public scoping, initial development of alternatives and impact analysis. In addition, the FONSI on such a document must be made available for public review for 30 days before the agency's final determination whether to prepare an EIS (Q37b).

## 4.5  EIS Format

Unless there is a "compelling reason to do otherwise" (CEQ 1502.10), CEQ requires that you follow its format (laid out in this section) for all EISs. Variations from the CEQ format described in this section must first be approved by the Environmental Quality Division (EQD) and the Department's OEPC.

### A.  Cover sheet (1502.10)

You must make sure the cover sheet does not exceed 1 page. It must include the following:

(a) a list of responsible agencies including the lead agency and any cooperating agencies.

(b) the title and location of the proposed action that is the subject of the statement.

(c) the name, address, and telephone number of an NPS contact person.

(d) designation of the statement as a draft, final, or supplement.

(e) a one-paragraph abstract of the statement that identifies significant impacts and alternatives to the proposed action/proposal.

(f) the date by which comments must be received.

### B.  Summary (1502.12)

Each EIS must contain a summary that adequately and accurately summarizes the statement. You must stress the major conclusions, the areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives) in the summary. Normally, you should not allow the summary to exceed 15 pages.

### C.  Table of contents (1502.10)

You should make sure the table of contents is sufficiently detailed to allow the reader to quickly locate major subject matter in the EIS, particularly specific impact topics and alternatives analyzed in the document.

### D.  Purpose and need for action (1502.13, DM, 4.9)

"Purpose and need for action" is usually the title of chapter 1 of an EIS, although "introduction" may be more appropriate. In this chapter, you must specify the underlying purpose and need to which your park is responding in its proposal (see section 2.2), and you should describe the issues identified by the IDT (see section 2.5). This chapter may introduce a number of factors, including economic or technical considerations, or service or departmental statutory, or legislative mandates. Take care to ensure that this is an objective presentation and not a justification of the proposal.

In the section of this chapter on issues (1500.4 (C), 1502.2 (b)), you should discuss important environmental issues and also dismiss unimportant issues. Important issues may be raised by the public, other agencies, or the IDT. You should include a corresponding impact section for all issues that the IDT retained for full analysis.

If the team found that some issues were not relevant to the scope of the document and decided to drop them from further analysis, this should be stated in the document. You may wish to do this in a paragraph or two at the end of the discussion of issues. You should also include a short statement on the reason the

issues were dropped. Supporting documentation on why an issue was analyzed or not analyzed must be included in the administrative record.

### E. Alternatives (1502.14)

Chapter 2 of an EIS describes the proposal (can be general or specific as defined in section 2.1 of this handbook) and alternatives. It also includes a discussion of the range of reasonable alternatives and mitigation measures and a summary of impacts of each alternative. You must describe and evaluate the no action alternative, and all reasonable alternatives retained for analysis in comparative detail.

1. **Introduction**—Alternatives are different ways of meeting park goals or objectives. They are considered the most important section of an EIS. Because alternatives fulfill park objectives to a large degree, they are directly related to the purpose and need. Because they also reduce impacts to important resources, they also are tied to issues. In an EIS or an EA, the no action alternative should be described first as all other alternatives are then compared against changes in the environment from conditions described under the no action alternative projected into the future.

2. **Range of alternatives** (see section 2.7 (A) for more information)—An EIS should include a discussion at the beginning of the alternatives chapter that describes how the IDT arrived at the final range of reasonable alternatives. This discussion should include factors such as agency or environmental constraints; references to policy in planning documents, legislation, or elsewhere; site characteristics; and factors such as sensitive environmental resources that narrowed the range of possibilities. Making reference to purpose (i.e., goals and objectives) and need may be appropriate.

3. **Reasonable alternatives**—CEQ defines reasonable alternatives as those that are technically and economically feasible and that show evidence of common sense (Q2). They also meet project objectives, resolve need, and alleviate potentially significant impacts to important resources. An alternative is not automatically rendered unreasonable if it requires the amending of a park plan or policy; causes a potential conflict with local, state, or federal law; or lies outside the scope of what Congress has approved or funded or outside the legal jurisdiction of the NPS.

   Another point to consider when identifying reasonable alternatives is how they meet the policies set forth in section 101 of NEPA (see section 2.7(D) of this handbook).

4. **Proposed action**—CEQ uses the term "proposal" synonymously with proposed action (1508.23). As described in section 2.3 of this handbook, a proposal may be a specific method of accomplishing objectives or fulfilling need, or it may be a general restatement of NPS's purpose in taking action.

**50**    The DO-12 Handbook

5. **No action** (see section 2.7(C) for more information on no action)—The no action alternative must be fully analyzed in all EAs and EISs, even if another law prohibits the adoption of the no action alternative or the park is under legislative or other command to act. The no action alternative is usually a viable alternative, but even when it is not, it sets a baseline for comparing the impacts of existing actions with those proposed.

6. **Alternatives eliminated from further study**—Following the description of alternatives retained for analysis, you should describe alternatives considered but eliminated from further study. This should be limited to those alternatives initially thought to be viable or suggested by the public, but later dismissed. Briefly state in this section the reasons they have been eliminated, and fully document supporting reasons in the administrative record. Reasons to eliminate alternatives include:

   (a) technical or economic infeasibility.

   (b) inability to meet project objectives or resolve need.

   (c) duplication with other, less environmentally damaging or less expensive alternatives.

   (d) conflict with an up-to-date and valid park plan, statement of purpose and significance, or other policy (see section 7.3 of this handbook), such that a major change in the plan or policy would be needed to implement.

   (e) too great an environmental impact.

7. **Cost**—If a cost-benefit analysis has been developed and is important to the decision-maker or the public in choosing between alternatives, either the entire analysis should be appended to the draft EIS or it should be summarized and incorporated by reference into the body of the EIS (1502.23). It is appropriate to include costs of each alternative in the alternatives chapter.

8. **Preferred alternative**—The preferred alternative is the agency-preferred course of action at the time a draft EIS or a public review EA is released.

   Unless your decision-maker has no preference, the preferred alternative must be identified in the draft EIS "so that agencies and the public can understand the lead agency's orientation" (1502.14 (e), Q4a). You may identify the preferred alternative in an explanatory cover letter to the draft EIS or in the text of the EIS. All final EISs must identify the preferred alternative. Therefore, if no preferred alternative exists at the time the draft EIS is released, you must identify it in the final EIS. For all externally initiated (i.e., non-NPS) proposals, you must identify the NPS-preferred alternative in the draft (and final) EIS (516 DM, 4.10 (2)).

It is important to remember that all alternatives in an EIS must be treated with the same level of detail in the analysis of impacts. (1502.14(b), Q5b).

9. **Environmentally preferred alternative**—You must identify in a draft EIS and EA what the environmentally preferred alternative is so that the public can have the opportunity to comment on it (see section 2.7 (D)).

10. **Summaries**—You should summarize the following in the alternatives chapter:

(a) the degree to which each alternative meets purpose, need, and objectives.

(b) the important features of each alternative.

(c) the impacts of each alternative, including a determination of potential improvement to park resources (see DO-55).

(d) how each alternative achieves requirements of sections 101 and 102(1) of NEPA, including the environmentally preferred alternative, and any potential conflicts between each alternative and other environmental laws and policies.

Items (c) and (d) are mandatory (1502.14). The summary usually includes a matrix for easy comparison of alternatives. Although a chart is not required, the comparison must "sharply define" differences between alternatives (1502.14).

It is helpful to readers if the discussion of issues dismissed and issues kept for further analysis, and the corresponding impact topics, precede the summary of impacts in the alternatives chapter.

## F. Affected environment

CEQ requires that NEPA documents "succinctly describe the environment of the area(s) to be affected or created by alternatives under consideration (1502.15)." This description forms chapter 3 of an EIS. Although you should present enough information to give the reader a general understanding of the environment affected, the length of this chapter should not normally exceed 20 percent of the total EIS.

Describe only those resources that may experience or cause impact or be affected if the proposal or alternatives are implemented. If specific resources would not be affected (e.g., threatened and endangered species) or impacts would be negligible (impact is at a low level of detection), you should list them in the issues discussion as "issues and impact topics considered but dismissed." You should keep data and analyses in this section commensurate with the intensity, context, and duration of the impact.

1. **Incorporation by reference**—An EIS is to be analytic rather than encyclopedic. You should either append, summarize, or incorporate by reference background material, highly technical material, and less important

descriptive information. NPS can incorporate many different kinds of material by reference, and this should be done when "the effect will be to cut down on bulk without impeding agency and public review of the action" (1502.21). Besides written material of all kinds, you can refer in an EIS (or an EA) to conversations, conference proceedings, taped hearings or workshops, and so forth. If you decide to incorporate by reference, you must provide a summary of the relevant text in the NEPA document, and the resource itself must be "reasonably available for inspection by potentially interested persons within the time allowed for comment" on the draft EIS (or EA).

Materials that should be incorporated by reference (and available as part of the project file) include other NEPA documents, lists of common plants and animals, historic resource studies, detailed air and water quality data and standards, separate scientific studies, compilations of demographic and socioeconomic data, and published works.

2. **Mandatory topics**—You must consider all of the following in an EIS:

(a) possible conflicts between the proposal and land use plans, policies, or controls for the area concerned (including local, state, or Indian tribe) (1502.16, 1506.2(d)), and the extent to which your park will reconcile the conflict.

(b) energy requirements and conservation potential (1502.16).

(c) natural or depletable resource requirements and conservation potential (1502.16).

(d) urban quality, historic and cultural resources, and design of the built environment (1502.16).

(e) socially or economically disadvantaged populations (see Environmental Justice EO 12898 for more information).

(f) wetlands and floodplains (100-year, and 500-year when critical actions as defined in the NPS floodplain management guides are involved) (1508.27).

(g) prime and unique agricultural lands (1508.27).

(h) endangered or threatened plants and animals and their habitats (including those proposed for listing, or on state lists) (1508.27).

(i) important scientific, archeological, and other cultural resources, including historic properties listed or eligible for the National Register of Historic Places (1508.27).

(j) ecologically critical areas, Wild and Scenic Rivers, or other unique natural resources (1508.27).

(k) public health and safety (1508.27).

Environmental Impact Statements    **53**

(l)  sacred sites (EO 13007).

(m) Indian Trust resources (ECM95–2).

If these are irrelevant issues in your EIS, include them in the discussion of issues and impact topics dropped from the analysis.

## G.  Impacts

Although alternatives are important, they are useless unless you clearly and correctly assess their impacts in an EIS or an EA. The prediction of impacts of each alternative is the basis of chapter 4 of an EIS.

This discussion must be accurate and focused. If it rambles on about non-issues, or if the data are wrong or mislead the reader, it wastes the reader's time and the park's money. The impacts discussion is not just a reiteration of the proposal or actions, but rather a discussion of the impact should the proposal and alternatives be implemented. For instance, instead of "there will be a bridge from A to B," the discussion will focus on "the impact of building a bridge from A to B" on each resource identified as an issue and impact topic.

Whereas issues describe the impact relationship between actions and resources, impact analysis predicts the magnitude of that relationship. For instance, "building a bridge will disrupt riverbank soils and make the water muddy" is an issue. "Suspended solids in the river will increase from its present 10–15 ppm to 1000 ppm for 2–3 weeks during construction" is the kind of information that belongs in the impact chapter.

CEQ requires that the impact analysis:

(a)  be concise, clear, and to the point (1500.2 (b)).

(b)  emphasize real environmental issues (1500.2 (b)).

(c)  provide reasonable alternatives to the proposed action (or proposal, whether generally or specifically described) that minimize adverse impacts (1500.2 (d)).

(d)  be of high quality, using accurate scientific analyses (1500.1 (b)).

(e)  be scrutinized by other agencies and the public (1500.1 (b)).

(f)  include direct, indirect, and cumulative impacts (1502.16).

You must analyze both beneficial and adverse impacts for the resource in question.

1.  **Displaying impact information**—The role of NPS NEPA documents is to fairly, objectively, and candidly display the projected impacts of each alternative. If you can meaningfully and accurately quantify the magnitude of this impact, this is the best way to present the information. If you have little confidence in an absolute number, you may want to use a range of reasonable impacts; rather than conveying false confidence, docu-


You should give the public and the decision-maker a true picture of how well you can predict an impact.

ments should give the decision-maker and the public a true picture of how well you can predict an impact. You must support qualitative and quantitative impact analyses with the scientific literature and/or other experts' testimony. Such references should be cited liberally in the impact section. CEQ requires that impacts be quantified as much as possible and described in terms of their context, duration, and intensity (see below).

If impacts to a particular resource for one alternative are the same as for another alternative, making reference to that section in the EIS is preferable to repeating the information. You may briefly summarize information in the referenced section to help readers track impacts.

2.  **Context**—You should analyze impacts in several contexts, if the severity varies geographically, over time, or in some other way (CEQ (1508.27 (a))). See section 4.2(a) for more information on context.

3.  **Incomplete or unavailable information**—CEQ (1502.22) requires agencies to obtain information if it is "relevant to reasonably foreseeable significant adverse impacts," if it is "essential to a reasoned choice among alternatives," and if "the overall costs of obtaining it are not exorbitant." The costs are measured not only in money, but also in time (to complete a research study or survey, for instance). If such information is unavailable or if the costs of obtaining it are exorbitant, an EIS must include statements to let the public know this and its effect on NPS's ability to predict impacts to the particular resource. In addition, the proposal may need to be amended or adjusted to ensure that action is not initiated without proper resource information. Existing credible scientific evidence should then be summarized and the impact predicted based on this evidence. CEQ says that reasonably foreseeable impacts include those that have catastrophic consequences, even if their probability of occurrence is low (1502.22, modified in 1986). Also see Director Order 12, Section IV, regarding use of scientific data and information in making resource decisions.

**EISs and EAs** should routinely inform the public when data are lacking, models are error-prone, or insufficient research or experience is available for predicting impacts accurately.

Although the CEQ case applies only when the information is "essential" and the impacts significant, EISs and EAs should routinely inform the public when data are lacking, models are error-prone, or insufficient research or experience is available for predicting impacts accurately.

4.  **Impact indicators**—The measurement of impact must be accurate, scientifically credible, and understandable to a lay readership. This is why it

Environmental Impact Statements   55

is helpful to include a methodology section preceding the impact analysis for each topic. That section can lay out the criteria or thresholds used to draw a conclusion on the context, intensity, and duration of impact. Defining thresholds and impact indicators requires consultation with resource experts, literature searches in some cases, and best professional judgment. In the case of the suspended solids in the river, an impact topic might be the effect of the muddy water on visitor experience. This impact is more difficult to measure than turbidity itself, but not impossible. One indicator might be the number of visitors passing through the area in the context of the rest of the park—for instance, "Fewer than 2% of the total visitors to the park would be able to see the construction on the river."

5.  **Impact thresholds**—Impacts must be quantified as much as possible and interpreted in terms of their context, duration, and intensity. For instance, in the example in section 4.5 (g), the impact is quantified as "suspended solids in the river would increase from its present 10–15 ppm to 1000 ppm for 2–3 weeks during construction." This is adequate for intensity and duration. However, the reader needs a context to understand the full extent and relative importance of the impact. This can be provided by comparing the impact to a relevant standard, such as the state's water quality standards for suspended solids. The methodology section would define the threshold as "any increases in suspended solids that violate the state's water quality standard for this parameter would be considered a 'major' impact." The analysis would follow with "the increase in suspended solids from 10–15 ppm to 1000 ppm is well below the state's water quality standard for this river (3000 ppm)." The analyst should also interpret the quantitative information for a lay audience. In this example, the specialist might conclude, "Because the impact would last only 2–3 weeks and be well below the standard, it would be a minor, short-term adverse impact to water quality."

    Notice that criteria were cited (state standards) in the determination of the intensity (in this case, minor) of the impact. Criteria, or thresholds, help to establish the sideboards for understanding the severity and magnitude of the impact. If the analysis simply stated that the suspended solids would increase from 10–15 ppm to 1000 ppm for 2–3 weeks, the public and the decision-maker would be unable to fully understand the extent of the impact.

6.  **Mitigation**—In an EIS, you must develop and analyze mitigation "even for impacts that by themselves would not be considered significant" (Q19a). All "relevant, reasonable mitigation measures that could improve the project are to be identified," even if they are outside the jurisdiction of the agency (Q19b). You must also analyze the effectiveness of mitigation measures proposed, and the impacts if the project were to proceed without mitigation. For instance, it should be clear whether mitigation is integral to the project and therefore included as part of the alternative, or dependent on factors such as funding or permission from another agency.

CEQ (1508.20) defines mitigation measures as:

(a) avoiding the impact altogether by not taking a certain action or parts of an action.

(b) minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) compensating for the impact by replacing or providing substitute resources or environments.

7. **Organizing the impact chapter**—The impact section can be organized by alternative, with impact topics as subheadings, or by impact topic, with alternatives as subheadings.

(a) **Methodology section**—You should begin the discussion of impacts by describing methods used to predict impact. As indicated above, if the methods used are the best available, but they require many assumptions that may not be correct or that have been criticized by other professionals, these assumptions should be explained in the methodology section.

This section is also a good place to define or explain how data were interpreted. In other words, you should define terms such as "minor" or "major" for a particular impact topic. If relevant, explain the reasoning behind this interpretation—why, say, 100 ppm is a "major" impact but 50 ppm is a "minor" impact (i.e., your methodology included relevant state water quality standards). This is a discussion of thresholds of impact.

(b) **Regulations and policies section**—Following the methodology section, you may include a separate section that details relevant laws, regulations, and/or park or other policies for each impact topic. This section may help clarify why a particular impact topic is important to discuss, or help support the reasoning for the impact threshold discussion in the methodology section. This section may be placed in the alternatives or purpose and need chapter if more appropriate.

(c) **Cumulative impact section**—CEQ requires the analysis of cumulative impacts to each resource and for each alternative. This discussion should be identified separately from, but follow the same order as the discussion of, direct or indirect impacts. It should precede the conclusions section (see 6 (d) below).

Cumulative impact information may be less exact than information on direct and indirect impacts of the alternatives, but a good faith

Environmental Impact Statements    **57**

effort to accurately and completely assess major sources of impact and their contribution to resources affected by the proposal and alternatives should be part of any EIS or EA. For plans or other larger-scope federal actions, the analysis of cumulative effect may be a major focus of the NEPA document requiring regional resource data by which to analyze impacts.

(d) **Conclusions**—At the end of the discussion of impacts of each alternative on each impact topic (e.g., resource), a brief "conclusions" section should summarize all major findings, including whether or not an impairment of resources or values is likely or would occur. It should focus on those impacts that would be major, but include a statement that resources examined would experience less severe impacts as well (if this is true). The conclusions section should not contain information that is not already in the impact section.

8. **Sustainability and long-term management**—Considerations of long-term impact and the effect of foreclosing future options should pervade any EIS or EA, because these are ideas that Congress put forward as the purpose of both NEPA (sec. 101 (b)), and the NPS Organic Act. However, for each alternative no action, you must also include a separate section that focuses on the following required discussions:

> "**Sustainable development** is that which meets the needs of the present without compromising the ability of future generations to meet their needs."
> *World Commission on Environment and Development*

(a) **The relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity** (Sec. 102 (c) (iv))—In other words, are any long-term management possibilities, or the productivity of park resources, being traded for the immediate use of land? Will taking action in this case in combination with other actions have an impact on a particular ecosystem? Is the action being taken something that will affect future generations—is it a sustainable action that can continue over the long term without environmental problems?

(b) **Any irreversible or irretrievable commitments of resources that would be involved if the alternative were implemented** (sec. 102(c)(v))—Irreversible impacts are those effects that cannot be changed over the long term or are permanent. An effect to a resource is irreversible if it (the resource) cannot be reclaimed, restored, or otherwise returned to its condition before the disturbance. For example, a proposal to restore a cultural feature (building) involving construction adjacent to habitat for nesting birds may have irreversible impacts on the birds if they abandon the nests and

do not return to nest. An irretrievable commitment of resources refers to the effects to resources that, once gone, cannot be replaced. In this construction example, if the park chose to avoid potential irreversible impacts to the birds, and deterioration of the building continued, the loss of the building's cultural significance and integrity may not be returned or retrieved in the future. It is important to not worry about the semantics of these terms and instead be thorough in the disclosure to the public of any long-term, permanent effects to park resources.

(c) **Any adverse impacts that could not be avoided if the action were implemented** (sec. 101(c) (ii))—If the action will result in impacts that cannot be fully mitigated or avoided, you should describe these impacts in this section. You should focus this section on "real" environmental issues, or those that would involve major impacts if action were taken.

## H. Consultation and coordination

This section should include a brief history of public involvement, a list of preparers and their expertise, and a list of recipients of the EIS. If it is the final EIS, it must include a response to comments section.

1. **History of public involvement**—In this section you should briefly:

    (a) summarize important consultations that occurred during the evolution of the proposal, the alternatives, and the EIS.

    (b) describe any public scoping sessions or other public involvement efforts.

    (c) include names of any federal, state, or local agencies; major organizations; or experts consulted.

    (d) identify environmental issues or conflicts discussed during consultation that remain.

    (e) include a brief summary of major issues raised during scoping.

    (f) describe any relevant existing or proposed cooperative agency mechanisms, or consultation undertaken in compliance with other laws or regulations. (Memoranda of agreement, memoranda of understanding, formal agreements, major cooperative agreements, or documentation indicating final compliance with applicable laws or regulations, such as comments from the state historic preservation office, should be appendixes to the EIS or readily available for public inspection.)

    (g) summarize steps taken to identify and involve low-income and minority communities that would be affected by the proposal and alternatives.

Environmental Impact Statements    **59**

2. **List of preparers**—The EIS must include a list of persons primarily responsible for preparing the document or "significant background papers" (1502.17). You should identify people responsible for preparing a particular section and include the qualifications of the preparers—their expertise, experience, and professional disciplines. Normally the list will be no longer than 2 pages.

3. **List of recipients**—You should include a list of all agencies, organizations, and people to whom copies will be sent. The list should be organized alphabetically under "federal agencies," "state and local agencies," "Indian tribes," "organizations," and "individuals." If the list of individuals is longer than 3 pages, it may be placed in the project file instead of the EIS, with a notation in the EIS that the complete list is available from the issuing office. In the final EIS, an updated list of recipients is provided as necessary to indicate who will be receiving the final EIS.

4. **Response to comments**—See section 4.6, "Final EIS," below.

## I. References

The last section of the EIS is dedicated to references, and it should include a bibliography, glossary, index of key words, and appendixes.

1. **Bibliography**—You should include a list of all references cited in the EIS including written material and personal communications.

2. **Glossary**—Define in a glossary any technical or other terms not understandable to an average lay reader. Be sure to define them in plain language. If agency or other acronyms are used in the EIS, define them either in the glossary or in a separate list of acronyms.

3. **Index of key words**—You should include an index that contains (in alphabetical order) enough key words from the EIS to allow the reader to find the information. The entries should relate to the subject matter of the text and should not repeat the general topic headings of the table of contents.

4. **Appendixes** (1502.18)—Appendixes are for amplification or support of critical analyses in the EIS. They are not a data bank or library for total reference support. They should contain only major substantiating data, essential relevant descriptions of environmental components, important professional reports, and copies of major legislative and executive documents, agency agreements, or other information necessary for a complete use of the EIS for analytical/decision-making purposes. If the audience reading the EIS is not likely to be interested in the supporting material, consider keeping a copy of it in the file and readily available if requested rather than sending it out as an appendix.

## 4.6 The Final EIS

Following public review of the draft EIS (see section 4.8 for more information), the office issuing the EIS must finalize the document (unless a decision is made to terminate the EIS, see section 4.10). The final EIS is to be a thorough and correct documentation of the analysis completed by the NPS IDT, with all issues explained or resolved.

### A. Substantive comments

You are required to respond to all substantive written and oral comments raised by the public or by agencies as part of finalizing the EIS, and to make every reasonable attempt to consider the issues or alternatives raised.

Substantive comments are defined as those that do one or more of the following:

(a) question, with reasonable basis, the accuracy of information in the EIS.

(b) question, with reasonable basis, the adequacy of environmental analysis.

(c) present reasonable alternatives other than those presented in the EIS.

(d) cause changes or revisions in the proposal.

In other words, they raise, debate, or question a point of fact or policy. Comments in favor of or against the proposed action or alternatives, or comments that only agree or disagree with NPS policy, are not considered substantive.

### B. Response options

CEQ (1503.4) recognizes several options for responding to comments, including:

(a) modifying the alternatives as requested.

(b) developing and evaluating suggested alternatives.

(c) supplementing, improving, or modifying the analysis.

(d) making factual corrections.

(e) explaining why the comments do not warrant further agency response, citing sources, authorities, or reasons that support the agency's position.

**Format of responses**—Responses to public or agency substantive comments that add clarifying or new information should be made in text wherever possible, rather than as lengthy responses to individual comments in a separate section (Q29a).

However, because members of the public or agencies may wish to know how NPS responded to their comment, a short response to each substantive comment, and a section or page citation where the change was made, may be appropriate as well. It is particularly important **for the public and agencies** to be able to track NPS responses, and either a subject or author index or page/section citation or a direct and complete response to agency or tribe comments is required. You may also choose to summarize similar comments and respond to them once, or use a

side-by-side comment-and-response format. In any of these formats, you may refer commentors to other responses or summarize similar comments and respond only once.

You are required to reprint in full any federal, state, or local agency or tribal letters. All public substantive letters must also be reprinted in a final EIS; however, if you have received an exceptionally voluminous number, these comments may be summarized. If you choose to, you may reprint all comment letters in full as part of the final EIS. Reprinted letters should appear in the "consultation and coordination" chapter, or if necessary, in a separate volume of the final EIS.

## C.  Cooperating agency comments

When a cooperating agency comments on an NPS document, or when NPS is a cooperating agency on another project, it must (1503.3):

(a)  describe alternative methods for analyzing impacts if it criticizes methodology in the EIS; and

(b)  specify mitigation measures it finds acceptable if it criticizes the level of impact.

## D.  Abbreviated final EIS

If all comments on a draft EIS require only minor responses, you may choose to prepare an errata sheet containing the responses and attach it to the draft (1503.4 (c)) as a final EIS. This is referred to as the "abbreviated" final EIS. Minor is defined as making factual corrections, or explaining why comments do not warrant further agency response.

In deciding whether an abbreviated EIS is appropriate, you should also consider whether the project is controversial or is of national interest, the number of substantive comments received, and the scope of the project. As a general rule, a full final EIS is preferable for NPS documents. Because a draft EIS is often required to understand changes in an abbreviated EIS, send the appropriate number of draft EISs with the abbreviated final EISs to EPA when filing the final.

An abbreviated final EIS must contain a cover sheet, a foreword sheet that explains the document (this must be combined with the draft EIS to be complete), the errata sheets, any responses to comments, and copies of substantive and agency comment letters. You must consult with OEPC through EQD before you prepare an abbreviated final EIS, unless this authority has been delegated.

## E.  Changes in the selected alternative

If an NPS decision-maker chooses to modify one of the alternatives after the final EIS has been released and ultimately selects it for implementation, additional analysis is required unless the alternative will have no additional impacts on the human environment or will have impacts that are different from those stated in the EIS. The analysis of this new alternative will usually take the form of a supplement to the EIS (see section 4.7).

## 4.7  Supplements to Draft and Final EISs

When substantial new information is discovered or substantial changes with environmental ramifications are made to the proposal and alternatives, you should prepare a supplement to the EIS. Either a draft or a final EIS may be supplemented. Supplements may be prepared on previous final EISs if they still contain information that is 80 to 90 percent correct but require changes and updating on the remaining 10 to 20 percent. They may also be prepared on draft EISs where agency or public comments have raised substantial new issues that require full-blown analysis and many pages to address fully. Also, as stated above, if a decision-maker modifies an alternative after the EIS has been released as a final document, a supplement is required if the changes result in impacts not analyzed in the EIS.

You must circulate a supplement in the same manner as a draft or final EIS. If there is good reason to believe the interested and affected public will have a copy of the draft or final, you need only circulate the supplement. However, if the supplement has been prepared on an older EIS, or if there is reason to believe the public will not have the entire EIS, both the supplement and the EIS itself must be circulated. It should be made clear to the public whether the entire EIS and supplement are open to comment, or whether the supplement only is the subject of public scrutiny. If the EIS is older (2–3 years in most cases), the entire EIS and supplement should be available for public inspection and comment. You should consider a longer comment period for the supplement if the public needs to request the previously prepared EISs. If the EIS is seriously outdated, you should revise and update the entire document, and release it as a new draft, rather than attempting to supplement the EIS.

## 4.8  Public Involvement Requirements

This section describes the minimum NPS public involvement requirements for an EIS. However, you are encouraged to be "diligent" and creative in your efforts to involve the public in your NEPA procedures and resource planning. Ways of involving the public include issuing quarterly newsletters to update the public on anticipated park actions and opportunities for involvement, using the Internet to facilitate the review of documents or have a dialogue with a commentor, and setting aside handouts or information for park visitors to keep them informed of planning efforts or chances to comment. Park staff often use park friends' groups to keep the public involved in decision-making that may have environmental consequences.

> **Be diligent** and creative in your efforts to involve the public in your NEPA procedures and resource planning.

### A.  Notice of intent

CEQ (1508.22) specifies that a notice of intent (NOI) to prepare an EIS must be placed in the *Federal Register*. The notice must:

(a) describe the proposed action and alternatives, if any, developed to date.

(b) describe the intended scoping process and tell when and where any scoping meetings might be held.

(c) give the name and address of an NPS contact.

(d) state whether the proposed EIS is delegated or non-delegated (see 516 DM, 6.3(b), and ESM95–2), unless you submit a memo to OEPC giving NPS's position at the same time the NOI is issued.

Scoping that has been conducted on an EA which then leads to an EIS does not usually substitute for the official required scoping of the EIS. However, if you stated in the public notice for scoping on the EA that an EIS might be prepared, and the NOI for the EIS indicates that comments on the scope of the alternative and impacts will continue to be considered, scoping for the EA may substitute for additional scoping of the EIS (Q13).

The NOI must include a statement advising the public that individual names and addresses may be included as part of the public record.

## B. Scoping

Scoping is an early and open process to determine the scope of environmental issues and alternatives to be addressed in an EIS. You should conduct both internal scoping (see section 2.6) with appropriate NPS staff (including the IDT) and external scoping with the interested and affected public.

Scoping is done to:

(a) determine important issues.

(b) eliminate issues that are not important or relevant.

(c) divide up assignments.

(d) identify relationships to other planning efforts or documents.

(e) define a time schedule of document preparation and decision-making.

(f) "size the analysis box," which includes defining purpose and need, agency objectives and constraints, and the range of alternatives.

1. **External scoping**—The public plays an integral role in scoping, and external, or public, scoping is required for any EIS. Scoping is a process, not an event or a single meeting. Parks and other issuing offices are encouraged to use public scoping sessions as well as other means to gather early input on EISs. Examples are direct mailings to park visitors, interested organizations, or park neighbors. These letters should include a project description, a map (if relevant), a description of alternatives and issues to date, a request for any additional issues or alternatives, and the commentor's rationale for suggesting they be analyzed. Newsletters, ads in local or national

media, open houses, or literature available for park visitors are also means of gathering early public input.

2. **Scoping with agencies**—Scoping with interested federal, state, and local agencies and Indian tribes should be part of the internal scoping process (see section 2.6 and section 2.13 on cooperating agencies).

   (a) **Historic preservation officers**—You should invite the early participation of the state or tribal historic preservation officer by letter when historic properties are associated with any NPS alternative under consideration in an EA or an EIS.

   (b) **Other agencies**—Any interested agency, or any agency with jurisdiction by law or expertise, must be contacted to obtain early input and should be solicited to be cooperating agencies. This could include federal, state, local or tribal agencies or units of government. If the agency has jurisdiction by law, it must be contacted in writing. If not, it can be involved less formally.

   (c) **Indian tribes**—Early in the scoping of an EIS, the involved decision-maker and members of the IDT should identify potential American Indian issues and the likelihood of tribal/state agency formal interests in NPS proposed actions. Any affected tribes must be invited to scoping meetings and provided with review copies of documents.

## C.  Draft EIS notice of availability/filing with EPA (see ECM95–3)

NPS requires that draft EISs be available for public review for a minimum of 60 calendar days from the day the EPA Notice of Availability (NOA) is published in the *Federal Register* (1506.10). CEQ also requires that you file draft (and final) EISs with EPA (1506.9).

After the draft or final EIS is filed, EPA publishes a NOA in the *Federal Register* to inform the public that a draft or final EIS is ready for public review. In addition, you are required to file an NOA with the *Federal Register* at the same time you send the appropriate number of copies of the EIS to EPA. The publication of the EPA NOA in the *Federal Register* (and *not* the NPS notice) serves as the beginning of the 60-day public review period on the draft (and a 30-day waiting period before the record of decision is signed on the final).

The draft or final EIS must have been transmitted to all appropriate agencies, it must be available to the general public, and the NPS NOA must have been filed with the *Federal Register* before copies of the EIS are filed with the EPA.

## D.  Recipients of draft EIS

You must send a copy of the draft EIS to:

   (a) all federal agencies that have jurisdiction by law or special expertise, and all appropriate federal, state, or local agencies or Indian tribes.

   (b) any interested or affected individuals or organizations.

(c) anyone who requests a copy.

It is acceptable to send an electronic copy or make an electronic copy available if the person requesting has access to such a copy. After all printed copies have been distributed, persons requesting the EIS should be directed to the nearest library or government office that has a record copy.

For the other departmental requirements for distribution that you must follow, see Procedures for Processing NPS Draft and Final EIS in the field guide.

## E. Timelines for review of draft EIS

NPS provides a 60-day period for review of its draft EISs, beginning on the date when the EPA publishes its notice of availability in the *Federal Register*. Park offices are encouraged to take late comments if possible. The review period can be extended at the discretion of the responsible federal official with appropriate notification of the EPA (1506.10). The decision may be based on some or all of the following considerations:

1. Will the extension cause undue delays in projects with life or safety issues?

2. Will granting the extension jeopardize the overall public participation effort?

3. Will granting the extension jeopardize decisions that must be made immediately?

4. Will the extension adversely affect natural, cultural, or even funding resources?

You may also wish to collect comments that arrive a few days after the review period has ended without formally extending the period.

## F. Public meeting/hearing

You may provide an opportunity for oral input on a draft EIS. If you choose to do this, the meeting/hearing should take place no sooner than 30 days from the time EPA's notice of availability is published. Under 1506.6, you are required to hold a public input session if:

(a) substantial environmental controversy over the proposed action or substantial interest in holding the session exists.

(b) another agency with jurisdiction over the action has requested a session and has provided supporting reasons for its request.

The format may be a "workshop," "meeting," "hearing," or other option, but attendees must be allowed to express reasonable substantive concerns with the draft EIS. Speakers may be limited to a certain number of minutes to ensure that all who wish to speak are heard in a reasonable amount of time. Attendees should be reminded that the purpose of the session is to collect input on the adequacy of the EIS and not to express preferences for or against the proposal. NPS may pro-

vide an opportunity for attendees to declare their support or opposition in writing at the public input session, or simply encourage participants to write during the remaining comment-and-review period.

The meeting should be advertised by a reliable method such as a purchased ad, direct mail, Internet electronic mail, notices posted in local gathering spots, or community or other organizations spreading the word. Press releases are published or aired at the discretion of the media, and are not considered as reliable or effective as an advertisement.

## G. Final EIS NOA/filing with EPA

When you have adequately responded to all comments received during the 60-day review and are ready to release the final EIS, you must file the final EIS with EPA and send an NOA to the *Federal Register*. As with the filing requirements for a draft EIS (see 4.8(C)), EPA will publish a separate NOA. Your park must wait at least 30 days from the time EPA publishes the NOA before the park signs a record of decision. When a summary of the ROD, or the entire record, is published in the *Federal Register*, your park may begin to implement the selected alternative or approved plan.

## H. Recipients of final EIS

You should send a full final EIS to:

(a) any individual or organization that has made a substantive comment.

(b) all agencies or tribes that have commented.

(c) anyone who requests it.

It is acceptable to send an electronic copy or make an electronic copy available if the person requesting has access to such a copy. A summary of the final EIS may be sent to all others, including those who received a full draft EIS but did not comment. After all printed copies have been distributed, those requesting the EIS should be directed to the nearest library or government office that has a record copy.

## 4.9  Administrative Process of Review of EISs

The review, distribution, and approval of EISs and their RODs is handled by the Regional Director, unless the proposal is a Secretarial proposal (such as a proposed addition to the National Wild and Scenic Rivers system or the Wilderness System). If a Secretarial proposal is involved, the Secretary or his or her designee handles review and processing (see section 6.2).

## 4.10  Terminating the EIS Process

Terminating the EIS process, for purposes of this section, occurs when the preparation of either a draft or a final EIS is stopped. If appropriate (i.e., there is no potential for significant environmental effects), an EA and a FONSI may be issued instead of a draft EIS to satisfy NEPA requirements. Termination may be done

without consultation outside NPS following publication of the NOI and before public distribution of the draft EIS. If the draft EIS has been released, NPS should normally proceed to follow the EIS process and respond to comments in a final, unless the proposal is abandoned.

Before a GMP EIS can be terminated, you must obtain the approval of the EQD in Washington. Send enough information to EQD so that the division can reasonably determine whether the implementation of any of the alternatives considered in the GMP/EIS meets the criteria for adequate coverage in an environmental assessment (an in-house draft or its equivalent) (see section 4.4 on actions that normally require an EIS).

If an EIS is terminated, the Regional Director or another responsible NPS official must prepare a *Federal Register* notice announcing the termination. The notice should include a brief description of the proposal, a reference to the earlier *Federal Register* NOI, NEPA analysis completed to date, and the reason for terminating the EIS. If the reason for terminating the EIS is the abandonment of the proposal, the *Federal Register* notice should indicate that the NEPA process will be reinitiated if the proposal is revived at a future date.

If an EA and a FONSI are subsequently prepared and substituted for what was originally envisioned to be a draft EIS, the FONSI must be made available for 30 days' public review before the action may be implemented. (The EA would also be available for its normal 30-day public review before you prepare a FONSI.)

NPS normally should take action to cancel an EIS after the draft EIS has been out for three years without being published in final form.

# 5.0 Environmental Assessments

5.1 Introduction
5.2 When to Prepare an EA
5.3 Length of an EA
5.4 Format and Content of an EA
5.5 Public Involvement
5.6 Administrative Process of Review of EAs

## 5.1 Introduction

CEQ originally created the EA primarily to be used when you do not have enough information to decide whether the proposal may have significant impacts. From its original purpose, however, an EA has evolved into a useful planning tool. An EA must lead to a FONSI or an NOI and an EIS. Therefore, if you find through the use of an EA that a proposal does have the potential for significant impact, you must prepare an EIS (unless section 5.4(f)(3) applies). On the other hand, if you find that the alternatives analyzed in the EA would not significantly affect the environment, prepare a FONSI.

The stated purposes of an EA (CEQ 1508.9) are to:

(a)  briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI (described above).

(b)  aid an agency's compliance with NEPA when no EIS is necessary.

(c)  facilitate preparation of an EIS if one is necessary.

However, an EA can be prepared at any time to assist in planning and decision-making (1501.3(b)).

Determining whether an EIS is needed is only one of the purposes of an EA. In fact, today it is clear that the most common rationale for preparing an EA is to aid in an agency's compliance with NEPA, particularly section 102(2)(E), when an EIS may not be necessary. Section 102(2)(E) requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

## 5.2  When to Prepare an EA

An EA should be prepared if:

- an action is not listed as a CE (i.e., in section 3.3 or 3.4), or if the action is not listed as an action normally requiring an EIS (section 4.4), and a decision to prepare an EIS has not been made.

- additional analysis and public input is needed to know whether the potential for significant impact exists.

- preliminary analysis indicates there is no scientific basis to believe significant impacts would occur, but some level of controversy over the use of one or more environmental resources exists.

- the action is described on the list of actions normally categorically excluded, but one of the exceptional circumstances described in section 3.5 applies.

If a proposal analyzed by an EA is found to have significant impacts, instead of requiring an EIS, CEQ (Q40) allows agencies to employ mitigation to reduce impacts to below significance in case of any of the following:

(a) the mitigation is imposed by statute or regulation.

(b) the proposal is rewritten to include mitigation as an integral part of the description.

(c) the proposal is fundamentally changed to avoid the impact.

The effectiveness and enforceability of the mitigation must be guaranteed, and a new EA analyzing only the impacts of the mitigated or changed proposal must be prepared. This is referred to by CEQ as a "mitigated EA."

CEQ warns against trying to avoid an EIS rather than reducing impact through "mitigated EAs." If you need several mitigation measures to avoid a significant impact, or if the mitigation measures are highly speculative or distant in time, you should carefully consider preparing an EIS instead of a mitigated EA. As an example: Construction of a proposed parking lot would result in a loss of a large number of old growth trees. In order to mitigate the loss, the park proposes planting seedlings and waiting 500 years for the lost tree stand to be replaced. This effort at mitigation is too speculative and distant to adequately lessen the significance of the impact.

## 5.3  Length of an EA

It is not uncommon for an NPS proposal to be complex enough that an EA of 30, 40, or even 50-plus pages is needed to fully examine impacts. An EA that is longer than 50 pages may just be an EIS in disguise. You should carefully consider whether this is true of your park's EA, and prepare the EIS if it would be more appropriate (Q36b).

## 5.4 Format and Content of an EA

Although CEQ does not require a particular format for EAs, the format of an NPS EA should be similar to that of an EIS. There are some differences between NPS EAs and EISs, however. For instance, EAs do not require a separate affected environment section, although the baseline information needed to compare impacts must appear somewhere in the EA. Also, unless the EA is more than 50 pages, a summary, an abstract, and a table of contents are not needed. Following is the suggested format for an EA. Many of the sections also detail required content, and they should be read carefully. More detail on the suggested contents and organization of each chapter is presented in the EIS format section (4.5) of this handbook.

### A. Abstract or summary

If the EA is longer than 50 pages, a one- to two-page summary of important issues and major findings may be appropriate. The summary should stand alone; the reader should not need to read the entire EA to understand the conclusions outlined in it. See section 4.5 of this handbook for more information about summaries.

### B. Table of contents

If an EA is longer than 50 or so pages, it must include a table of contents following the summary.

### C. Purpose and need

Sections 2.2 and 4.5 (d) should be consulted in preparing the purpose and need sections of an EA. Usually the first chapter or section of an EA is titled either Purpose and Need or Introduction. This section may also be an appropriate place to discuss issues that were dismissed and issues that were kept for analysis and led to impact topics.

### D. Alternatives

EAs must fully describe the proposal (general or specific), no action, and a range of reasonable alternatives that meet objectives as laid out in the purpose section, and that reduce or eliminate impacts to important environmental resources. If your park has a preferred alternative at the time an EA is released for public review, it should be identified.

1. **Range of Alternatives**—Normally, an EA should fully analyze a range of reasonable alternatives (see section 4.5 (e)). However, if the IDT finds that no reasonable alternatives exist and that the proposal does not have the potential for significant impacts, the EA may instead include a discussion of alternatives considered but rejected, and the reasons why these were rejected. In this case, the EA would analyze only the no action alternative and the park's proposal.

2. **Defining the range of alternatives**—If the range of alternatives is quite narrow because objectives have been defined narrowly, the IDT may wish to take a second look at the objectives and whatever led the

team to define the objectives (a park plan, for instance). For example, if the EA is examining different building materials, colors, and styles for a proposed visitor center because the GMP or another plan has stated that any buildings in the park must blend with the natural environment, but the location of the visitor center is a poor one, the team should re-examine the project purpose, the need for the project, and the plan itself. Often GMPs and other plans, or their accompanying NEPA documents, are outdated or are the result of reconnaissance data that, upon site-specific analysis, may turn out to be incorrect or too generalized to be useful. Although the GMP may dictate a visitor center location, if the team finds the location infeasible for technical, economic, or environmental reasons, the EA should examine other sites as alternatives, rather than a narrow range of building materials. Although a modification to the GMP would be required in this example, this kind of constant monitoring and updating of park plans leads to the excellent decision-making that NEPA requires and to the conservation of resources that the NPS Organic Act mandates.

3. **Comparative summaries**—To facilitate review, EAs should include comparative summaries of impacts, features of alternatives, and a discussion of the degree to which each alternative accomplishes the purpose or fulfills the need identified in the purpose and need section.

4. **Costs and benefits**—If a cost-benefit or other economic report has been completed, and relative costs and benefits of alternatives will be used in making decisions between alternatives in an EA, relevant information should be summarized in the EA or the cost-benefit analysis should be attached as an appendix.

5. **No action alternative**—The impacts of the no action alternative are important for comparison purposes, and must be part of any NPS EA. For additional information on how to analyze the impacts of no action, see section 2.7 (c).

6. **Environmentally preferable alternative**—See section 2.7.

## E. Affected environment

Information about the existing environment relevant to understanding the impact of no action, or other alternatives must appear in an EA (see section 2.8).

## F. Impacts

Like an EIS, an EA is focused on "real" environmental issues, it is concise and clear, and it is meant to be a useful tool to decision-makers and the public. Also like an EIS, the analysis in an EA must discuss direct, indirect, and cumulative impacts (see section 2.9). Beneficial impacts should also be analyzed. Also, as in an EIS, the context, duration, and intensity of impacts should be defined and quantified as much as possible (see section 4.5 (g)).

1. **Objectivity** (also see section 2.9)—An EA that results in the issuance of a FONSI must provide adequate support for the statement that no signif-

icant impacts are likely if the proposal or any alternative is implemented. Therefore the objective and accurate presentation of data is particularly important, as is the interpretation of those data in all appropriate contexts (see below). Court battles on EAs have been lost on the basis that the EA included undocumented information, that methods or data were controversial, or that the EA depended on mitigation to reduce impacts to below a "significance" threshold.

2. **Context** (also see sec. 4.2(a))—CEQ says that one reason EAs are prepared is to determine whether the potential for significant impact exists. If the potential for significant impact exists, an EIS is the more appropriate NEPA document (see section 5.1). Significance is often a relative term, so the context, duration, and intensity of impacts must be measured and compared to impacts of ongoing activities (such as the impact of no action). Without these comparisons, it is difficult or impossible to determine the significance of impact.

3. **Mitigation**—An environmental assessment is a valuable planning tool in designing a project or proposal with minimal adverse effects to resources. Mitigation should be included as part of the proposal and alternatives and be analyzed in terms of its effectiveness. See section 5.2 for more information.

4. **Methodology section**—EAs should briefly summarize the methods used to predict impacts.

5. **Regulations and policies section**—EAs should briefly detail relevant laws, regulations, and park or other policies for each impact topic.

6. **Cumulative impact section**—A discussion of cumulative impacts is important in EAs and must be included (see sections 2.4(c), 2.9(c)).

7. **Sustainability and long-term management**—NPS EAs are not required to include separate sections as described in 4.5 (g)(8), although the balancing of short-term needs with long-term ecosystem health, biodiversity, and sound resource planning should be themes that pervade any park EA or EIS.

8. **Conclusions**—At the end of the discussion of impacts of each alternative on each environmental resource, a brief "conclusions" section should summarize all major findings, including whether or not an impairment of resources or values is likely or would occur.

9. **Organization**—For EAs shorter than about 30–40 pages, many readers find the impact section is more readable if it is organized by alternative, with impact topics as subheadings. For EAs longer than this, the impact section may be followed more easily if it is organized by impact topic, with alternatives as subheadings. Either is acceptable. Impacts may also be combined with affected environment information in an EA.

### G.   Consultation and coordination

This section should list persons, organizations, and agencies that were contacted for information and that assisted in identifying important issues, developing alternatives, or analyzing impacts. Memoranda of agreement or understanding, formal agreements, major cooperative agreements, or documentation indicating final compliance with applicable laws or regulations should be appendixes to the EA or readily available for public inspection. Any scoping or other public involvement efforts should also be detailed, and a brief summary of major issues should be included.

A list of preparers and their qualifications is recommended, as is a list of recipients of the EA.

### H.   References

A bibliography, a glossary of terms and acronyms, and appendixes should be part of an EA.

## 5.5   Public Involvement

Regional Directors are delegated the authority to approve the EA prior to its release for public review. Regardless of the specific requirements described in this section, NPS should always make a "diligent" effort to involve the interested and affected public (1506.6 (a)) on a proposal for which an EA is prepared. This is a requirement of NEPA, and in the NPS, it means public scoping sessions, public review of EAs, responses to comments, and other measures normally reserved for EISs if the issuing office believes such measures are needed to comply with the diligence standard.

### A.   Scoping

Scoping, or requesting early input before the analysis formally begins, is required on all EAs prepared by NPS. Although public scoping is encouraged where an interested or affected public exists, issuing offices are only required to involve appropriate federal, state, and local agencies and any affected Indian tribe. It is up to you to decide the method of scoping (see DO-12 field guide for suggestions).

### B.   Public review

The EA is to be sent out for review by the interested and affected public, including affected agencies and tribes, for a minimum of 30 days. The notice that an EA is available for review is, at a minimum, to be published in the local newspaper of record, posted on the NPS web site, noticed in the *Federal Register*, or otherwise made broadly known to the public. This action, coupled with public distribution through mailing, begins the 30-day review period. The notice should appear in a visible location in the paper (i.e., not in the legal notices section), and anyone who requests a copy of the EA should receive one, until a reasonable number of copies have been distributed. Those who request a copy after this time should be referred to the nearest library or NPS or other government office that has a record copy. It is acceptable to send an electronic copy or make an electronic copy available if the person requesting has access to such a copy.

### C. Public meetings

Workshops, meetings, hearings, or other opportunities to give oral input on an NPS EA are not required, but they may be appropriate if there is large-scale interest in a proposal. If such a meeting is scheduled, it should take place no sooner than 15 days from the time it is advertised or the notice of availability of the EA is published in the local paper of record, whichever is later. The review period for EAs must extend a minimum of 15 days beyond the date of such a meeting. NPS officials should track comments made at public meetings for later response. Any reliable means of advertising the meeting, including but not limited to publishing in a visible location in the local paper of record, is acceptable.

### D. Response to comments

If reviewers send written comments, or submit comments at the discretionary public meetings, workshops, and so forth, the issuing office should screen them to determine whether any important new issues or reasonable alternatives or mitigation measures have been suggested. If major substantive issues not covered adequately in the EA are raised, or new alternatives the park wishes to consider are suggested, the EA must be rewritten to incorporate them and reissued for a second 30-day review upon completion. If any of the issues point to the potential for significant impacts, a NOI to prepare an EIS should be prepared and submitted to the *Federal Register*.

If commentors correct or add factual information that has no bearing on the determination of significant impact, the information should be added to the text of the EA when possible. The issuing office may also respond through the use of errata sheets to comments that do not increase the degree of impact described in the EA. The combination of the EA and the errata sheets forms the complete and final record on which the FONSI or decision to prepare an EIS is based. The FONSI itself is not an appropriate document to use to respond to public comments; rather, responses should be attached to the FONSI to complete the record.

Issuing offices are encouraged to make text changes correcting or adding factual information to the EA and attaching the EA, along with the responses to public comments, to the approved FONSI to complete the administrative record.

### E. Supplemental EAs

CEQ does not recognize supplemental EAs, because an EA should be concise enough so that it can easily be rewritten to accommodate major changes. You should not issue supplements to EAs; either rewrite and reissue the EA, or follow the approach outlined in section 5.5 (D) to finalize the EA.

### F. Completing the EA process

The combination of the EA, the errata sheets correcting statements of fact as a result of public review of the EA, and responses to public comments form the complete and final record on which the FONSI or decision to prepare an EIS is based. You must notify the public that the EA process has been completed and a FONSI issued, if such is the case. Notification may be through mailings,

publication in a visible location in the local paper of record, a *Federal Register* notice, a news release, or a meeting with concerned agencies and individuals. No waiting period is required following the notice that the completed EA and FONSI are available before the proposal is implemented, unless section 6.3(G) of this handbook applies.

## 5.6 Administrative Process of Review of EAs

After you prepare and finalize an EA, and if the decision-maker selects an alternative with no potential for significant impacts, you must prepare a FONSI. The FONSI describes the selected alternative and states why it was selected and substantiates why it will have no significant impacts (see section 6.3).

A FONSI or notice of intent to prepare an EIS following the completion of an EA must be signed and dated. The signatory for either rests with the Regional Director. In addition, the Regional Director is responsible for deciding when an EA is adequate for public review. Parks must obtain clearance from the Regional Director before releasing an EA for public review and beginning the 30-day review period.

# 6.0 Decision Documents

6.1 Categorical Exclusions
6.2 Record of Decision
6.3 FONSI
6.4 NEPA after the Decision Document

Decision documents record the reasons for selecting a particular alternative. They also supply the support for deciding that no significant impacts would result from alternatives analyzed in an EA. For the five levels of documentation described in section 2.10(B), the following decision documents are prepared:

- For a memo to file—No decision document is required.

- For a CE for which no formal documentation is needed—No decision document is required.

- For a CE requiring documentation—A CEF (appendix 2) must be completed and signed.

- For an EA—A FONSI must be signed.

- For an EIS—A record of decision must be signed.

Impairment determinations and decision documents – In both Findings of No Significant Impact and Records of Decision, the National Park Service has a requirement of affirmatively stating whether or not an impairment to park resources — actions prohibited under the NPS Organic Act—will result from any direct, indirect, or cumulative impact of the action to be selected for implementation. If such an impairment does exist or is likely, a Finding of No Significant Impact cannot be approved. If a preferred alternative has impairment impacts at the EIS/ROD level, that alternative may not be selected for implementation. Both FONSIs and RODs need to provide information on general levels of impact and conclusions as to degrees of impact and any potential for impairment. Both documents must affirmatively state, and contain supporting information in the analysis, that the preferred alternative for selection will not impair park resources or values and, as a result, will not constitute a violation of the NPS Organic Act. Actions that are likely to, or would, cause an impairment may not use a memo to file or Categorical Exclusion as an appropriate vehicle for decision making.

77

## 6.1  Categorical Exclusions

With the exception of those actions named in section 3.3 (CEs for which no formal documentation is required), the decision to categorically exclude an action from further NEPA analysis is formalized with the signature of the Park Superintendent or his or her designee on a CEF (see appendix 2). This form is attached to the completed ESF form and is the minimum required contents of a NEPA project file for an action described in section 3.4 of this handbook.

## 6.2  Record of Decision

When an EIS has been prepared, the ultimate choice of an alternative, mitigation measures, and the decision rationale are documented in an ROD.

### A.  CEQ requirement

Besides stating the decision, CEQ (1505.2) requires that a ROD include the following:

(1) a summary description of all alternatives analyzed in the EIS.

(2) identification of the environmentally preferable alternative.

(3) the decision rationale—what were the criteria (e.g., cost, degree of environmental impact, technical considerations, degree to which objectives were met, logistics) used in selecting an alternative, how did each alternative measure up against these criteria, how were the criteria weighted, and so forth.

(4) a clear statement of which mitigation measures will be implemented if they are not obviously integral to the alternative selected, and a summary of any monitoring or other enforcement programs or plans. The description of mitigation and monitoring should be specific enough to enable the public to determine whether measures have been effectively implemented, but not be so specific as to duplicate the EIS.

(5) a statement of whether all practical means to avoid or minimize environmental harm from the selected alternative have been adopted, and if not, why not.

### B.  Length

An average ROD should be 10 pages. It should give enough information on the alternatives and their impacts, the decision-maker's rationale in selecting the chosen alternative, and the extent of mitigation and monitoring the public can expect, so that the reader can understand these major issues without referring to the EIS.

### C.  Notice

The ROD or a summary of the ROD must be published in the *Federal Register* as well as in the local newspaper of record.

### D. Signatory

The signatory of RODs is the Regional Director. In some circumstances, the signatory of RODs rests with the Director or Assistant Secretary for Fish, Wildlife and Parks. Recent changes to Departmental procedures regarding "delegated and non-delegated EISs" are to be considered. Consult the EQD to determine the appropriate signatory level.

### E. Wetlands and floodplains

If a preferred alternative proposes actions that would be located in or have adverse effects on a floodplain or wetland, a wetland/floodplain statement of findings must be combined with the draft and final EIS. When it has been signed by the Regional Director, the Statement of Findings is attached to the ROD as a separately identifiable document.

### F. Compliance with section 106 of the National Historic Preservation Act

If the preferred alternative affects a historic property and thus requires consultation under section 106 of the National Historic Preservation Act, the information gathered as part of the section 106 review must be included in the EIS, and the section 106 process must be completed before an ROD can be signed. The ROD must include a statement on consultation under section 106. Revisions made to 36 CFR 800, June 17, 1999, further explain the integration of section 106 with NEPA requirements.

### G. Section 7 of the Endangered Species Act

All consultation requirements defined under section 7 of the Endangered Species Act must be completed before an ROD can be signed.

### H. Impairment

From the facts presented in the analysis in the environmental impact statement and summarized in the ROD, the ROD must indicate that, after a review of the impacts, the alternative selected for implementation will not impair park resources or values and will not violate the NPS Organic Act.

## 6.3 FONSI

When an EA is prepared, the decision-maker must determine prior to public release whether the alternatives have the potential for significant impact. If so, the preparation of an EIS begins, and an NOI to prepare an EIS is sent to the *Federal Register*. If not, the EA proceeds, public comments are solicited, and upon completion of response to comments, a FONSI is signed.

A FONSI is an explanation of why the selected action will have no significant effects on the human environment. It is based on the EA and comments of agencies and the public. The FONSI states which alternative has been selected, very briefly describes other alternatives considered in the EA and discusses how criteria were used and how they were weighed in the selection process. The FONSI is separate from the EA, and it is detailed enough in drawing from sections in the

EA to stand alone. The FONSI is signed by the Regional Director. The FONSI's signature block may also include a line for approval recommendation from the Park Superintendent to the Regional Director.

## A.  Content

A FONSI serves two functions in the NPS. It is the "proof" that no significant impacts would occur if the proposal is implemented, and explains the rationale used in selecting the alternative for implementation. Therefore, after describing the proposed action, a FONSI should follow the list of significance criteria (Section 4.2), and any measures integrated into the selected alternative that apply should be explained. For instance, if the proposal is to allow visitors to view an ongoing archeological excavation, and public safety is an issue (criterion 2 in the list of significance criteria), the alternative selected may include "fencing the site," or "only allow visitation on guided tours with park rangers," and note that "these measures have proven nearly 100% effective in other parks (e.g., Park X, Park Y)" in protecting public safety. This kind of synopsis of information taken from the EA assures readers (including NPS decision-makers and any reviewing court) that concerns that could mean significant impact have been adequately addressed. In most cases, 5 pages are adequate to provide the specific proof required in a FONSI. In cases in which a "mitigated EA" has been prepared—that is, the impact has been reduced to below a "significance threshold" through the use of mitigation—5 pages may not be adequate. The environmentally preferable alternative as indicated in the EA must also be identified. If it is not the selected alternative, reasons for non-selection must be clearly stated. In a FONSI, the reasons must be described for rejecting all alternatives except the one ultimately selected similar to the process described in section 6.2(A) for Records of Decision.

## B.  Mitigation

Because an EA is an analysis document, simply identifying mitigation measures does not commit NPS to adopting or implementing them. If mitigation is integral to an alternative, and this is clearly stated in the EA, adopting the alternative in the FONSI does automatically mean the mitigation is binding. Any mitigation that is dependent on funding or other factors must be specifically adopted and stated as such in the FONSI. It is suggested that a matrix or table be attached to the FONSI itemizing mitigations, critical milestones, and responsible party.

## C.  Errata sheets

If factual corrections need to be made to the EA as a result of comments, you can use errata sheets instead of republishing the entire document. If substantive comments have been made, but do not necessarily require a change in the text of the EA, NPS should respond to these comments in an errata sheet. Because errata sheets in combination with the EA form the completed EA, errata sheets should be sent to all who have commented with a letter noting that the errata sheets and the original EA form the final document. The errata sheets are attached to the FONSI and distributed. See 5.5(D) for more information on use of errata sheets and completion of the record.

### D. Wetlands and floodplains

If the preferred alternative would be located in or adversely affect a floodplain or wetland, and if the EA has led to a FONSI, a wetland/floodplain SOF must be combined with the public review copy of the EA. If the final preferred alternative still results in adverse impact to a floodplain or a wetland but results in a FONSI, a final SOF must be attached to the FONSI as a separately identifiable document.

### E. Section 106 of the NHPA compliance

If the preferred alternative affects a historic property and thus requires consultation under section 106 of NHPA, the information gathered as part of the section 106 review must be included in the NEPA document and the section 106 process must be completed before a FONSI can be signed. The FONSI must include a statement about consultation under section 106.

### F. Section 7 of the Endangered Species Act

All consultation requirements must be completed, as defined by section 7 of the Endangered Species Act, before a FONSI can be signed. It is highly recommended that consultation documentation accompany the public review EA document.

### G. Waiting period for FONSIs (1501.4 (e))

In certain limited cases, NPS must make the FONSI available for a 30-day minimum public review before it decides whether to prepare an EIS or implement the project. If a FONSI has been prepared, the issuing office must wait 30 days before it implements the project or prepares an EIS for the project if the selected alternative (a) is an NPS project, or closely similar to an NPS project, that normally requires an EIS (see section 4.4) or has in the past required an EIS, or (b) is without precedence in the NPS. Notice of such a waiting period should be published in the *Federal Register*, but it must also be published in the local newspaper of record.

### H. Impairment

From the facts presented in the analysis in the environmental assessment and summarized in the FONSI, the FONSI must indicate that, after a review of the impacts, the alternative selected for implementation will not impair park resources or values and will not violate the NPS Organic Act.

### I. Signatory

The signatory authority for a FONSI rests with the Regional Director.

## 6.4 NEPA after the Decision Document

### A. Monitoring

Writing and signing the decision document does not signal the end of the NEPA process, because assumptions are often made that only after-the-fact monitoring can validate. A park may have based its EA and FONSI on actions it will take if monitoring reveals a greater degree of impact than the EA predicts. Monitoring is also important in verifying predictions of impact, or of the effectiveness of miti-

gation measures in a NEPA document. The park preparing the EA or the EIS is responsible for making sure that impacts are no greater than the document says, and that mitigation measures will work as promised. The ROD or FONSI is, in some respects, a "contract" with the public, committing the agency to implement the mitigation and monitoring included in the project. Therefore, it is important that the agency consider budgetary projections when making this commitment. Any monitoring or mitigation must be spelled out in the ROD or the FONSI.

## B. Changes in the selected action

If changes in the selected alternative are made after the FONSI or the ROD has been approved, additional NEPA analysis may be required. These changes may be small ones, such as for design purposes, or on a larger scale. If the changes would result in any changes in environmental impact, you should consider supplementing the EIS, or preparing a new EA or CE.

# 7.0 Programmatic Documents and Planning

7.1 Is NEPA Triggered by Plans?
7.2 When to Begin NEPA on Plans
7.3 Feasibility and Planning
7.4 Tiering
7.5 Programs and Policies
7.6 Long-Term Resource Management

## 7.1  Is NEPA Triggered by Plans?

In the past, NPS has called NEPA a "compliance" action, making you think it only documents a separate NPS planning procedure. This is not true. In fact, NEPA is the law that requires NPS to undertake a specific, scientifically valid conservation planning and impact assessment process. NEPA is only a "compliance" action because it is legally required.

The steps detailed in the CEQ regulations and this handbook are all to be done early in NPS decision-making, as part of the planning process, rather than the traditional permitting or compliance process. According to CEQ, "Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts" (1501.2). You plan based on your park's purpose and significance, its visitor needs, and other resource management or maintenance objectives. NEPA requires that you also follow the steps CEQ has laid out in including resource conservation and environmental impact information as part of the basis for your park's long- and short-term choices. This information is considered essential to NPS decision-making, and it is to be combined with other planning (1501.2(a), 1502.25, Q21). Physically, a plan and a NEPA document may and should be prepared and distributed simultaneously (1501.2 (b)). However, it should be clear, if the two are combined, which sections constitute the NEPA document.

> **You should apply** the same criteria to decide whether NEPA is required for plans as you would for projects, legislation, and so forth; that is, would an alternative contemplated in the plan ultimately affect the human environment?

83

Despite this clear message from CEQ, it is sometimes less clear in real-life NPS planning whether the "formal" NEPA process, complete with a CE, EA, or EIS and public input, is needed. For instance, you may wish to study the condition of resources or the feasibility of certain park goals or objectives. These studies may not require NEPA analysis, yet they would benefit from some form of environmental planning. Integrating environmental information into the earliest form of park decision-making will result in better decisions, and often in more streamlined subsequent NEPA analyses as well.

When decisions about resource use having the potential for environmental effects are being contemplated, or another kind of planning (housing feasibility studies, parkwide zoning, etc.) is ongoing, a NEPA review process is almost certainly required. In fact, CEQ includes plans as major federal actions (1508.18) requiring NEPA analysis.

Section 4.4 identifies several types of plans that normally require an EIS. NPS plans not on this list are not necessarily exempt from NEPA. Rather, you should apply the same criteria to decide whether environmental analysis is required for plans as you would for projects, legislation, and so forth; that is, would a choice being contemplated in the plan, such as the action, ultimately affect the human environment (section 1.3)?

It may be tempting to assume that only the implementation of a plan, rather than the choices the plan itself represents, will have environmental impact and therefore require NEPA analysis. However, if decisions affecting future land or resource use are being made in a plan or program, NEPA is triggered. This is because CEQ recognizes that a discussion of, and public input on, options (alternatives) and their environmental pros and cons (impacts) would be valuable in making even broad policy-level decisions.

Some examples of NPS planning elements that do not normally require NEPA are collecting and mapping sensitive resource data or determining needs for future planning. Some that do trigger NEPA are GMPs, project and activity plans, establishment of a carrying capacity, zoning of a park or part of a park for future use, implementation plans, concession plans, and climbing management plans.

If it is still unclear whether your park's planning effort requires NEPA analysis, ask yourself these questions:

- Will decisions made in this plan ultimately have an impact on the environment when this plan or program is implemented?

- Is this a formal planning process in some other way?

- Will this plan examine options?

- Would the examination of environmental costs and benefits of these options be helpful in making decisions contemplated in this plan?

- Would resource data be useful in making decisions contemplated in this plan?

- Will this planning effort include public participation?

- Will decisions made in this plan commit resources?

- Will decisions made in this plan preclude future choices?

If the answer to the first question is yes, you should consider the NEPA process outlined in this handbook to be legally required and begin the environmental planning process early enough so the information you gather can be used "as an important contribution to the decision-making process" (1502.5). If the answer to one or more of the other questions is yes (but the answer to the first is no), your IDT or decision-maker should carefully consider whether information on options and the environmental pros and cons of each and/or public input would be valuable. If so, you should initiate the NEPA planning process.

## A.  EISs for general management plans

It is standard NPS practice and policy to prepare an EIS with your park's GMP. This is because a GMP is a major federal action, with long-term management implications for a unit of the NPS. The public considers National Parks to represent the highest standard of federally protected resources. There may not be significant public controversy associated with the GMP, and scoping may not reveal potential for significant impacts, but the act of long-term planning and implementation of park-wide courses of action in and of itself is more appropriately presented in an EIS.

The implementing legislation for NPS, unlike that for other land and resource management agencies, requires *conservation* of park resources. The resources in our care are unique, and so, according to Congress, they deserve this protection. It follows that decisions affecting these special resources have greater potential for significant impact than if they occurred on federal lands managed by other agencies. Decisions made in a GMP or another broad planning document affect proportionately more of these special resources, and so they are even more likely than smaller-scale park actions to have significant impacts and qualify as major federal actions. These are the kind of decisions CEQ believed would benefit from an EIS and its associated full-fledged environmental planning and public involvement effort. Courts have been consistent in requiring EISs for this kind of large-scale agency (including NPS) decision-making.

Another important reason parks should prepare GMP EISs is that they are used to narrow the range of future choices. In other words, parks often use the GMP NEPA document to "tier" (see section 7.4) to more site-specific projects that implement some part of the GMP. As the park collects site-specific information, it may find that the project will have significant impacts and that an EIS is required. However, you may not refer to or tier the GMP NEPA document in this case unless it too was an EIS. This is because preparing an EA/FONSI for the park GMP assures the public that no significant impacts would take place from its implementation. Preparing a subsequent EIS to implement the plan counters and invalidates the original GMP FONSI.

Finally, NEPA documents prepared for broad NPS decision-making, such as those associated with GMPs, are of interest to a larger public audience. This also means they are more likely to be the subject of litigation. EAs and their accompanying FONSIs do poorly in court because they must provide "proof" that significant impact will not occur if the agency takes action. Yet, particularly in the case of programmatic or planning decisions made over very large areas, the data collected are reconnaissance-level, and it is difficult or impossible to prove that no future significant impacts will occur from implementation of that program or policy. The EIS allows you to admit that you do not know the exact nature of future impacts and that they may prove significant when site-specific data are collected.

The Environmental Quality Division, through the Associate Director for Natural Resources Stewardship and Science, may grant an exception to the requirement that EISs be prepared for GMPs on a case-by-case basis, when it is clear that site-specific data indicate that the potential for significant impact does not exist.

## B.  NEPA documents as building blocks

When preparing NEPA documents for plans, you should build on EISs and EAs already completed for broader actions. For example, your park GMP identifies an area of the park as a good spot for hikes because views are excellent, but a few fragile resources exist. When it comes time to prepare a trails plan for this area, you may initially use the GMP EIS as an appropriate source of general information in beginning your park's NEPA document. You can also assume that the range of alternatives for the trails NEPA analysis has been defined by the GMP, if the data and subsequent conclusions were valid. Your data collection efforts should be more site-specific for the trails NEPA work than for the GMP EIS, but only as detailed as required to make the decisions needed, such as what are the best spots to locate the trail system in this area.

A third NEPA document may be required when it comes time to build one of the trails, because site-specific data are required before the plan can be implemented. (Another approach is to collect site-specific data at the time the trails plan is created—see section 7.2 for a discussion of timing.) Because the decisions are much more specific, the data you collect should be also. You may wish to move a trail a few hundred feet one way or another to avoid affecting a special environmental resource, or you may want to design a section of trail a certain way to avoid, for instance, drainage problems. However, the general location of the trail should be determined by the programmatic trails plan and data collected for it. This process of going from general to specific data collection, and from broad to narrow decision-making, is called tiering. Tiering is explained further in section 7.4.

## 7.2  When to Begin NEPA on Plans

You should be able to integrate NEPA's environmental planning requirements with other park planning easily, and to follow the CEQ regulations requirement to begin "at the earliest possible time to insure that planning and decisions reflect

environmental values.." (CEQ 1501.2). The information provided by a well-done NEPA analysis is vital in making park resource use or management decisions.

NEPA begins on plans as soon as your proposal can be defined. NEPA documents must be prepared early enough so they are "relevant to policy and timed to coincide with meaningful points in agency planning and decision-making" (1502.4). In the GMP process, this is when your park has defined its purpose and significance and is now considering mission goals, management prescriptions, or management zones.



**A. Level of detail**

Before an "on-the-ground" action (e.g., grading a trail, building a campground) can be taken, there must be site-specific environmental information available to a decision-maker in the form of a NEPA document. This means you cannot use programmatic NEPA documents to make site-specific decisions, but must instead follow the process of tiering described in section 7.4.

The timing of this site-specific environmental analysis should be designed to be as close as possible to the point of making real and irrevocable commitments to a project or a course of action. Many NPS plans suggest that certain types of use or development may take place, but recognize that action to pursue a preferred alternative may not be possible for 5, 10, or 20 years, until funds are made available or until other conditions beyond the park's control are satisfied. Many detailed plans and studies have been rendered obsolete as time passes and circumstances change so that environmental analyses are repeated several times for the same project or proposed action. Following the procedure outlined in Section 7.4 (tiering)—collecting reconnaissance-level data for conceptual decisions, for instance, and site-specific information for implementation decisions—will help alleviate this problem.

## 7.3  Feasibility and Planning

NEPA begins at the "proposal" stage—that is, when NPS "has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and the effects can be meaningfully evaluated" (1508.23). Feasibility analysis to define a realistic proposal or goal is sometimes required before NEPA can begin. In the GMP planning process, the definition of the "corral" bounded by the park purpose, significance, and special legislation is a form of feasibility analysis.

For projects or implementation plans, early in the process you can eliminate alternatives that are not feasible because they are unreasonably expensive, are not implementable for technical or logistic reasons, do not meet park mandates,

or are not within legal or other mandatory constraints. This does not mean that alternatives must be cheap or easy, or that those actions within another agency's jurisdiction can be eliminated if they are reasonable in other respects. Rather, it is an initial step to ensure that alternatives that could not be implemented are not subjected to extensive environmental analysis. Likewise, if it appears that a technically or economically feasible alternative would have profound adverse environmental impacts or would not be allowed by another agency from which a permit is required, it should be eliminated as "environmentally infeasible."

Agencies often mistake this winnowing process as one that allows them to choose only their favorite alternatives for analysis without having first completed NEPA. Rather, it is a procedure for eliminating infeasible or duplicative alternatives while still leaving a "full spectrum of reasonable choices" ready to undergo the objective environmental analysis that NEPA dictates.

> **Agencies often mistake** this weeding-out process as one that allows them to choose only their favorite alternatives for analysis without having first completed NEPA.

## 7.4 Tiering

CEQ encourages agencies to use a tiering process, working from broad, general NEPA environmental impact analysis documents to more site-specific ones in decision-making (1502.20). When preparing a large-scale plan that determines broad direction, such as the GMP, information can be less detailed and site-specific, because decisions are made on a gross scale. When land identified as potentially suitable for development is planned for a set of visitor-related facilities, the decision to develop the area is not revisited. Instead, the NEPA document prepared in conjunction with the development plan proposal is "tiered," or procedurally connected to the large-scale plan NEPA document. This narrows the range of alternatives in the development plan analysis to those that explore how and where to site facilities within the designated development area. The decision to designate this as an area for development has already been made. Tiering allows NPS "to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe" (1508.28).

Tiering is not the appropriate tool to use when you are dealing with a previous, broad-scale NEPA document that is outdated or for which there is new information requiring the original decisions to be revisited. For example, a programmatic decision made to develop an area for visitor facilities and evaluated in a previous NEPA analysis would require reanalysis and reevaluation if it is subsequently learned that the site is subject to "flash floods," is the critical habitat of endangered species, or is the location of extensive archeological remains.

The original, or programmatic, NEPA document from which subsequent documents are tiered is almost always an EIS. This is because larger-scale decisions often have larger-scale impacts, and courts are more likely to deem them "major federal actions." Also, if the programmatic document is an EA and not an EIS,



The original or programmatic NEPA document from which subsequent documents are tiered is almost always an EIS. This is because larger-scale decisions often have larger-scale impacts, and courts are more likely to deem them "major federal actions." Also, if the programmatic document is an EA and not an EIS, subsequent NEPA documents tiered to it cannot be EISs without invalidating the original EA.

subsequent NEPA documents tiered to it cannot be EISs without invalidating the original EA (see section 7.1).

Tiering may also help in examining cumulative impacts in proper context. For instance, the cumulative impacts of developing all areas designated as suitable should be part of a large-scale planning NEPA analysis, but it does not need to be repeated as part of a development plan NEPA document. Instead, the development plan EA or EIS should make reference to the appropriate pages of the broader plan NEPA document and note that they are tiered.

## 7.5  Programs and Policies

CEQ includes plans, policies, procedures, and programs in its definition of major federal actions that require NEPA environmental analysis and documentation (1508.18). The time to prepare such documentation is "before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives" (1502.4 (c )(3)). If an NPS-wide or region-wide policy with the potential for environmental impact is proposed (such as "prescribe burning to maintain fuel at natural level," or "use any means short of introducing toxic substances to control exotic weeds"), a programmatic NEPA document should be prepared before parks are charged with implementing it. The park may need to prepare its own subsequent site-specific document and tier (see section 7.4) to the regional or other programmatic document.

Programmatic documents are useful in discussing strategies for implementing many smaller actions, such as road, building, or other park maintenance or vegetation management. Adequately evaluating several years' worth of site-specific impacts in a single EA or EIS from these kinds of day-to-day activities may be the best approach to environmentally sound planning.

## 7.6  Long-Term Resource Management

Programmatic documents on plans, policies, or programs are often ideal places to discuss ecosystem sustainability and management, biodiversity, global warming, community or regional land use planning, and other larger-scale issues. Decisions on land and resource management that take into account maintenance and enhancement of long-term productivity are bound to be more in line with the policy set forth in NEPA (see sec. 102(c)(iv)).

# 8.0 NPS Review of Non-NPS NEPA Documents

8.1 Introduction
8.2 Comment Requirements
8.3 Review Deadlines and Extension Requests
8.4 Departmental Comment Letters
8.5 Review Guidelines for EISs
8.6 Style and Format for Environmental Review Comments

## 8.1 Introduction

NEPA requires that other federal agencies obtain NPS comments on their EISs when NPS has jurisdiction by law over some aspect of the project or special expertise on an environmental impact of the project (1503.1). In addition to NEPA requirements, many federal undertakings require other "environmental" comments and clearances. Examples are Department of Transportation section 4(f) statements and review of the "recreation exhibits" of Federal Energy Regulatory Commission license and permit applications for water projects.

This chapter gives guidance on how you should review and comment on NEPA documents that are prepared by other agencies but that may affect your park unit. In reviewing other agency documents, your primary aims should be to aid other agencies in making the best possible decisions based on quality environmental analyses; to maintain the integrity of the National Park System; and to espouse the full range of other recreation, natural, and cultural resource stewardship roles of the NPS.

## 8.2 Comment Requirements

### A. How comments should be focused

Your comments on other agencies' environmental documents should:

1. encourage those agencies to contribute to the protection, preservation, maintenance, safety, and enhancement of existing and potential units of the National Park System; other significant park and recreation values; and historic structures, archeological resources, and other cultural resources including historic properties listed on the National Register of Historic Places, unique cultural resource values including properties

91

listed on the National Register of Historic Landmarks, and unique natural resource values including areas listed in the National Registry of Natural Landmarks.

2.  ensure that the sponsoring agency recognizes benefits and adverse effects to resources within our areas of jurisdiction and expertise, and that those effects are presented in an understandable form to the general public and to decision-makers.

3.  adequately describe practicable alternatives that are less damaging to NPS interests and concerns, and see that these are evaluated realistically and adopted where feasible.

4.  discuss mitigation measures to offset unavoidable adverse effects, and propose them as an integral part of the proposal or alternatives.

## B. Early involvement

Your ability to influence the proposals of other agencies is greatest at the early stages, before they invest in extensive planning and become committed to a specific alternative means of accomplishing an objective. For this reason, make every effort to provide input and technical assistance at the scoping stage or earlier. This will greatly enhance the credibility of your comments on the draft EIS or a later document. Consultation should continue up through the completion of the decision document.

## C. Commenting as a cooperating (or joint lead) agency vs. as a reviewing agency

1.  **Cooperating agency**—If the NPS has jurisdiction by law (having permitting or funding authority over some aspect of the proposal) or special expertise, you should request that the NPS be made a cooperating agency in preparation and review of an EIS. The request should be sent to the lead agency (the federal agency preparing the document), and rights and responsibilities should be defined between NPS and the lead agency in a memorandum of understanding or a memorandum of agreement. As a cooperating agency, you may ask for the right to either prepare or review with "veto" authority a section of the document where NPS has particular expertise or interest. You may also ask or be asked to join in IDT meetings, public involvement sessions, or other integral pieces of the NEPA process. You should request permission to become a cooperating agency as early as possible, so that you can participate fully. You may also share the analysis and document preparation responsibility by becoming a joint lead with another federal or state agency (1506.2 (c)). Your park's responsibility may be expanded to research or write several sections of the document if this is the case.

    If you are affected by or interested in a proposal, but do not have jurisdiction by law or special expertise, you may still request cooperating agency status.

2. **Reviewing agency**—As a reviewing agency, NPS may request changes in the document, additional information, mitigation measures, analysis of additional alternatives, and so forth. The degree of response to these requests is largely at the discretion of the lead agency.

### D. Administrative process for review

The administrative process for review of non-NPS EISs is contained in the field guide.

## 8.3 Review Deadlines and Extension Requests

### A. CEQ requirements; screening and review schedules

EISs and some other environmental documents have periods for review and comment set by law or regulation. Section 1506.10 of the CEQ regulations provides 45 days for review and comment on draft EISs and a 30-day no action period following release of final EISs. These times are calculated from the date that EPA publishes a notice of availability in the *Federal Register*. These notices normally appear in the *Federal Register* on Fridays and include the date when comments are due. The CEQ regulations (1501.9) require that EISs be filed with EPA no earlier than they are transmitted to agencies and the public for comment.

Review periods for revised and supplemental draft and final EISs of other agencies are calculated like those for draft and final EISs. Because agencies that circulate draft EISs are under no legal obligation to include in the final EIS comments received after the established deadline passes, you must comment within the set deadline if your concerns are to be given consideration.

When controlled documents arrive from the EQD for review, they should be screened quickly to determine deadlines and relative priority. Review preparation responsibility should be assigned immediately. If screening determines that the proposal is of no consequence to NPS areas of jurisdiction or expertise, and comments are to be routed to EQD or to another Interior bureau that has been designated as lead, a simple "no comment" response may be made. Such a response may be made in writing or telephone or electronic no comment responses may be acceptable at the discretion of the lead agency.

Review schedules should provide intermediate offices such as EQD, OEPC, or other Interior lead bureaus sufficient time to review and process proposed comments. The possibility of mail delays and holiday and weekend "down time" should be considered.

### B. Extensions

Extensions of review deadlines occasionally are needed because of unusual routing or mail delays; required field studies; necessary coordination with other federal, state, or local agencies; or the discovery of unforeseen problems with the proposal. Extensions are obtained from the other agency by OEPC (516 DM, 7B). The need for an extension should be determined early in the review process, and the extension should be requested shortly after receipt of the controlled docu-

ment. The closer the deadline, the more difficult it normally is to obtain an extension. Deadline extensions should be requested only when you anticipate you will be making substantive comments, or when expected impacts require substantive field inspection or coordination. Procedures for obtaining extensions are in appendix G of the field guide.

## 8.4  Departmental Comment Letters

Review of all external proposals, EISs, reports, permits, regulations, and so forth is controlled by OEPC under 516 DM, 7 and the Environmental Review Memorandum series (e.g., ERM 94–2) published by OEPC. Instructions for consolidated review are distributed to bureaus by memorandum from OEPC. Unless direct reply has been established, a consolidated Departmental reply will be prepared. When an NPS office has a document for review, but no Departmental distribution memorandum, that office should contact EQD or OEPC to determine the status.

Comments of NPS and other Interior bureaus, when consolidated into a Departmental review letter, either by a designated lead bureau or by OEPC, are signed either in Washington or by the designated Departmental Regional Environmental Officer (REO). Copies of comment letters signed in WASO are provided through EQD to appropriate field and program offices. REOs supply a signed environmental review letter to the NPS field office, a copy of which the office should in turn send to EQD. EQD and REOs distribute copies of review letters so that NPS analysts and reviewers will know the department's position and can compare it with the comments they submitted. Any time a substantive change to review comments is being considered, the original author of the review comment must be consulted.

## 8.5  Review Guidelines for EISs

### A.  Draft EISs

Review comments on draft EISs or related documents should be confined to NPS areas of jurisdiction and expertise. They should be based on fact, published research, or professionally supported opinion. Your opinions as to the acceptability of project impacts on areas of NPS jurisdiction and expertise should consider both the severity of the impacts and the practicability of proposed mitigating measures. You should urge adoption of measures that are compatible with both NPS interests and project purposes. See DO-12 (IV)(4.6).

1.  **Key sections for reviewers' attention**—EISs are prepared in the format required by section 1502.10 of the CEQ regulations or an approved variation. This format allows a realistic, adequate assessment of project impacts and provides for inclusion of measures to minimize adverse impacts. Sections 1502.11 through 1502.19 of the CEQ regulations and section 4-5 of this handbook explain requirements for individual sections of an EIS. The EIS sections requiring particular NPS review attention are

(a) purpose and need, (b) alternatives including the proposed action, (c) affected environment, and (d) environmental consequences.

2. **Comment requirements for key sections**—Reviewers of EISs should ensure that the above sections satisfactorily address:

    (a) NPS concerns previously expressed during scoping or when participating as a cooperating agency.

    (b) NPS positions outlined in providing planning aid and technical assistance, especially those related to alternatives preferred by NPS and to suggested mitigating and enhancement measures.

    (c) evidence of coordination and consultation with NPS when proposals might affect NPS areas of jurisdiction or expertise, especially when NPS technical assistance or expertise might lead to enhancement or protection of park, recreation, historic, archeological, architectural, or significant natural area values within or associated with proposals, including world heritage sites and biosphere reserves.

    (d) consultation with other appropriate groups, including the state historic preservation officer, the Land and Water Conservation Fund state liaison officer, the Advisory Council on Historic Preservation, local historical societies, state heritage program officials, and local authorities, including those that have received grant assistance from NPS.

    (e) a "reasonably foreseeable" analysis of potentially significant adverse impacts on areas of NPS jurisdiction and expertise, when impacts are uncertain (1502.22). Reasonably foreseeable includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

    (f) a clearly defined listing of impacts for each alternative, presented on a comparable basis to allow ready identification of the alternative promising the least damage to NPS interests.

    (g) location of the proposal in relation to units of the National Park System and affiliated areas, or of designated National Wild and Scenic Rivers or National Trails under NPS management.

    (h) measures that would mitigate, reduce, or eliminate adverse impacts or enhance beneficial impacts of the proposal on NPS areas of jurisdiction and expertise. Impacts may be direct, indirect, primary, and secondary. They include, but are not limited to, changes in air quality, including Class I area visibility; land uses impairing park, recreation, natural, and cultural resource values; water quality; noise levels; wildlife varieties, numbers, migration routes, and habitats within and near areas administered by NPS; park access and regional trans-

portation systems; natural and cultural resource visual settings; regional socioeconomic conditions; and patterns of park visitor use.

(i) location and potential impacts of the proposal in relation to non-federal lands in which the Secretary of the Interior has a legal interest through NPS under terms of a federal deed, grant, or other conveyance. This includes areas that have received grants-in-aid from the Land and Water Conservation Fund (Section 6(f)), the Urban Park and Recreation Recovery Program, and the Historic Preservation Fund. It also includes park, recreation, and historic properties transferred under the Federal Surplus Property statutes or the Recreation Demonstration Projects Act.

(j) location of the proposal relative to historic properties listed on or eligible for listing on the National Register of Historic Places, including National Historic Landmarks.

3.  **Reviewing tiered EISs**—The CEQ regulations (1502.20) encourage tiering of EISs. A definition of tiering (producing a programmatic EIS that addresses broad policy issues, followed by other site-specific EISs, each of which does not need to reevaluate, but needs only to refer to the broad policy matters addressed in the programmatic EIS) appears in the CEQ regulations (1508.28). Reviewers should be alert to attempts to substitute tiering for adequate analysis of site-specific impacts. Site-specific analysis may reveal impacts of greater magnitude than those anticipated in programmatic EISs.

4.  **Reviews of state and local plans**—The CEQ regulations (1506.2(d)) require that EISs discuss inconsistencies of proposed actions with approved state or local plans or laws. NPS responsibilities relate to a number of state and local plans, including statewide comprehensive outdoor recreation plans, state historic preservation plans, and recreation recovery action plans. Proposals should address measures to reconcile situations where these plans and the proposed actions are at odds.

5.  **Secondary, indirect, and cumulative impacts**—You should consider long-term secondary and indirect impacts of proposals as they affect NPS areas of jurisdiction and expertise. You also should consider cumulative effects and be alert to possible project segmentation that could distort or mask them.

6.  **NPS EIS comment coordination**—If impacts of a proposal require coordination across NPS program areas (e.g., a proposed HUD regional plan), all affected units should comment.

7.  **Permit identification requirements**—Proposals requiring NPS permits, easements, and so forth should be coordinated through the agency's NEPA process. The CEQ regulations (1505.25(b)) call for identification of federal permit, license, and other approval requirements during scoping, and again in review and comments on draft EISs.

When you identify a need for an NPS permit, you should inform the agency proposing the project. State why the permit is required and state a probable NPS position, based on information available at the time.

If you have serious concerns, or if the probable NPS position would be to deny the permit, the applicant should be urged to consult with the appropriate NPS office (provide a name and/or title, address, and telephone number) as early as possible. Mitigation measures or conditions that likely would be imposed before a permit would be issued should be stated in NPS comments on the draft EIS. These concerns and conditions should have been surfaced during the scoping process, and NPS should be a cooperating or joint lead agency, so that the document also covers NPS environmental analysis needs. NPS comments should address site-specific project impacts, measures necessary to minimize harm, or recommended project alternatives. The comments should explicitly indicate any tentative objection, or reservations (or lack of reservations), with reasons stated clearly. The reasons for objections should be based on explicit effects that NPS anticipates, their magnitude (use estimates if necessary), and their significance. Comments based on generalities, frustration with poor procedures, and similar "non-effect" remarks are not useful.

8.  **Types of NPS comments on draft EISs**—NPS must respond if it anticipates further involvement with the proposal (e.g., review of permit applications). NPS reviewers may also provide the following types of comments on draft EISs:

    (a) No comment—You may send a simple "no comment" response when responding to EQD, if a draft EIS presents an adequate analysis of expected impacts on areas of NPS jurisdiction and expertise (assuming that the proposed action or preferred alternative is acceptable to NPS). A no comment response also is appropriate when a proposal has no known impact on areas of NPS jurisdiction and expertise.

    (b) Incomplete or inaccurate EIS—You may respond with a finding that the draft EIS is incomplete or inaccurate in some major and relevant way in its description of the predicted impacts on areas of NPS jurisdiction and expertise. If the draft EIS is so inadequate as to preclude meaningful analysis, and the proposal appears to threaten serious adverse effects on NPS park, recreation, historic, archeological, architectural, or significant natural area interests, your comments should state explicitly how to make the document adequate, and in exceptional cases you may request the proposing agency to prepare and circulate a revised or supplemental draft EIS according to the CEQ regulations (1502.9(a)).

    (c) CEQ referral—If there is a possibility that NPS may seek to refer a project to CEQ under provisions of 40 CFR 1504, this must be pointed out to the agency proposing the undertaking at the earliest possible

time in the planning process, but no later than when NPS comments on the draft EIS.

(d) Additional alternatives—You may respond that the draft EIS fails to identify reasonable alternatives or alternative project components with lesser adverse impacts to areas of NPS jurisdiction or expertise, or that NPS favors an alternative other than the alternative preferred in the draft EIS.

(e) Mitigation inadequate—You may respond that you do not believe that adverse impacts will be mitigated adequately.

(f) Inadequate address of concerns raised during scoping—You may respond that concerns you expressed during the scoping process or as a cooperating agency were not addressed adequately or accurately in the draft EIS.

(g) Of course, positive or supportive comments where warranted should be included.

9. **Consequences of declining to review**—NPS reviewers should be extremely cautious about giving up future options by declining to review and comment on EISs or related documents involving proposals that may affect areas of NPS jurisdiction or expertise. Failure to review and comment may be interpreted by sponsoring agencies to mean that (a) NPS has no concerns in a proposed action; (b) the proposal will not significantly affect NPS areas of jurisdiction or expertise; or (c) NPS will issue any permits required for project construction.

## B. Final EISs

During the draft EIS stage, you should identify significant omissions, errors, or unaddressed concerns. Ideally, these concerns will be addressed in the final EIS, making further comment unnecessary. Normally no comments are made on final EISs, unless NPS objects to the proposal itself or to one of its major features. Proposed comments on a final EIS are forwarded through EQD to the OEPC. Depending on the nature and extent of NPS concerns, the comments may request the sponsoring agency to prepare a supplement to its final EIS. Because the sponsoring agency may take action 30 days after release of its final EIS, comments on a final EIS must be handled expeditiously.

1. **Responses to comments made by NPS on draft EISs**
   The CEQ regulations (1502.9(b)) require lead agencies to respond in final EISs to comments made on draft EISs, including discussion on responsible opposing views at appropriate points in the final EIS. NPS review of a final EIS should determine whether

   (a) the final EIS adequately assesses all important issues raised by NPS on the draft EIS, including documentation on appropriate historical and archeological consultation requests and response letters.

(b) the selected alternative and any accompanying mitigation features are compatible with concerns, recommendations, and objections raised previously by NPS.

(c) new information that is contained in the final EIS, or that became available to NPS only after it released its draft EIS comments, has revealed a significant change in potential impacts of the proposal.

(d) the preferred alternative or the mitigation to be employed eliminates significant or adverse impacts on areas of NPS jurisdiction or expertise.

2. **Justification for comments on finals**
   Comments on final EISs may be justified by one or more of the following:

(a) NPS objects to the project because the preferred alternative is unacceptable to NPS, or it fails to incorporate NPS recommendations for mitigation or monitoring requirements after project completion.

(b) changes have been made in the proposed action, aside from adopting mitigating measures, that require additional assessment of environmental impacts on areas of NPS jurisdiction and expertise.

(c) changes in the final EIS are needed because the sponsoring agency has failed to understand the significance of NPS comments and concern on the draft EIS, and it continues to offer the project or proposal in a form that is unacceptable to NPS in whole or in part (see the "Responses to Comments" section above).

(d) Important new information that is consequential to the decision-making process becomes available, or erroneous or obsolete data presented in the final EIS need to be corrected or challenged because of NPS concerns about, or objections to, the project.

# 8.6   Style and Format for Environmental Review Comments

NPS environmental review comments on NEPA and related documents should normally be organized in the format described in this section, although the format occasionally will not fit some of the comments that NPS prepares. Individual review instructions are provided in the EQD and OEPC transmittal forms that accompany the document to the NPS reviewing office.

NPS comments being prepared for submission to other Interior bureaus, including responses to requests for technical assistance, should be in a memorandum format. Comments going directly to non-Interior agencies should be in letter form.

Comments prepared for consolidation with those of other Interior bureaus (e.g., comments addressed to OEPC, the REO, or an Interior lead bureau) should be prepared in memorandum format for signature as directed in the EQD trans-

mittal. The subject line of the memorandum should be identical to that of the incoming OEPC memorandum, and it should include the document's ER or DEC number, which should also appear at the upper left corner of the memorandum.

The comments on NEPA and related documents can be logically arranged under four headings: general comments, interrelated review comments, specific comments, and summary comments, unless the review is only a page or two and these headings would produce needless repetition and a stilted appearance. The reviewer should choose a format that conveys NPS or Departmental information and views, and pinpoints changes the recipient should make. The four headings recommended for use in longer NEPA and related reviews are discussed below. The locations of the interrelated review comments and specific NEPA comments may be interchanged as necessary to produce the most coherent review.

## A. General comments

This topic heading, if used, should summarize any major NPS concerns with the adequacy and accuracy of the document and should provide comments of a general nature. Any major concerns about the project itself should appear here, concentrating on, but not necessarily limited to, the recommended or selected alternative and its impacts.

This section should include any specific comments that otherwise occur repeatedly throughout the review. Any previous technical assistance, cooperation, reports, or other planning information provided by NPS for the project should be noted.

## B. Interrelated review comments

The CEQ regulations (1502.25) require that NEPA analyses be integrated with those for other environmental laws and executive orders (e.g., section 4(f) comments, Endangered Species Act comments, Fish and Wildlife Coordination Act comments). Reviewers should ascertain whether the document under review is intended to fulfill such other requirements. If so, address compliance, as appropriate, with such requirements in separate sections of the review. When NPS serves as lead bureau in consolidating the Department's comments, it is especially important to be aware of these interrelated review requirements so that other Interior bureau review responsibilities are adequately represented in the consolidated departmental comments.

## C. Specific NEPA comments

The format of this section containing EIS or EA comments should follow the organization of the document being reviewed. Page and paragraph numbers should be cited to relate comments to the text. Comments should be written in a form designed to help the sponsoring agency in modifying the next draft or the final work.

Assertions of omissions or inadequacies should be specific, not general, and should suggest how to correct the deficiency. Needed additions or deletions should be stated precisely. If you criticize a lead agency's predictive methods, you

are obligated to describe the methods you prefer, and to give the reasons why, as the CEQ regulations point out (1503.3).

Comments should address significant overlooked or downplayed impacts of a proposed action. They also should ensure that alternatives that would benefit or have less adverse impact on NPS concerns are included and presented adequately. Comments on the EIS section describing the affected environment are appropriate only if a significantly affected component is not described adequately.

## D. Summary comments

If you favor an alternative or project modification that would be beneficial to or have less adverse impact on areas of NPS jurisdiction and expertise, this should be highlighted in the summary section.

Comments and positions on the acceptability of project impacts on areas of NPS jurisdiction or expertise should be included in this section. Comments on the proposal should consider

(1) the intensity, severity, and duration of the impacts.

(2) the objectives and importance of the project.

(3) the practicability of mitigation measures.

Insofar as possible, this section should point out how to make the proposal acceptable with regard to our areas of jurisdiction and expertise. On draft documents, this section should indicate what our position might be unless recommended changes are made.

Summary comments should always state any action relating to the proposal that the Department or NPS has taken, or may take, in accordance with the requirements of various statutes, rules, and regulations for which the department or NPS holds jurisdiction by law. The comments also should note any potential further reviews that NPS may make in considering the issuance of easements or other permits that the proposal would require, and the likely NPS position. If a CEQ referral on a project appears likely, the summary comments should so indicate, and state the particular concern.

This section should close with an offer to meet with the sponsoring agency to discuss comments and concerns. The offer of continued cooperation and assistance is especially important if significant resources are involved or if NPS has complex views and positions that are difficult to describe thoroughly in a letter. Names of NPS personnel who can be of assistance should be listed along with their titles, addresses, and telephone numbers.

# 9.0 Definitions and Acronyms

## 9.1 Definitions

**The controlling definitions for terms under CEQ's NEPA regulations are contained at 40 CFR. The numbers in parentheses refer to the appropriate section of 40 CFR. These definitions are provided as a supplement to those regulatory definitions.**

**Categorical exclusion (CE) (1508.4)**—An action with no measurable environmental impact which is described in one of the categorical exclusion lists in section 3.3 or 3.4 and for which no exceptional circumstances (section 3.5) exist. NPS also uses the acronym "CX" to denote a categorical exclusion.

**Connected actions (1508.25)**—Actions that are closely related. They automatically trigger other actions that have environmental impacts, they cannot or will not proceed unless other actions have been taken previously or simultaneously, or they are interdependent parts of a larger action and/or depend on the larger action for their justification.

**Conservation planning and impact assessment**—Within NPS, this process is synonymous with the NEPA process. This process evaluates alternative courses of action and impacts so that decisions are made in accord with the conservation and preservation mandate of the NPS Organic Act.

**Cooperating agency (1508.5)**—A federal agency other than the one preparing the NEPA document (lead agency) that has jurisdiction over the proposal by virtue of law or special expertise and that has been deemed a cooperating agency by lead agency. State or local governments, and/or Indian tribes, may be designated cooperating agencies as appropriate (see 1508.5 and 1502.6).

**Cultural resources (NPS-28, appendix A)**—Aspects of a cultural system that are valued by or significantly representative of a culture or that contain significant information about a culture. A cultural resource may be a tangible entity or a cultural practice. Tangible cultural resources are categorized as districts, sites, buildings, structures, and objects for the National Register of Historic Places, and as archeological resources, cultural landscapes, structures, museum objects, and ethnographic resources for NPS management purposes.

**Cumulative actions (1508.25)**—Actions that, when viewed with other actions in the past, the present, or the reasonably foreseeable future regardless of who has undertaken or will undertake them, have an additive impact on the resource the proposal would affect.

103

**Cumulative impact** (1508.7)—The impacts of cumulative actions.

**Direct effect** (1508.8)—An impact that occurs as a result of the proposed action or alternative in the same place and at the same time as the action.

**Environmental assessment (EA)** (1508.9)—A brief NEPA document that is prepared to (a) help determine whether the impact of a proposed action or alternatives could be significant; (b) aid NPS in compliance with NEPA by evaluating a proposal that will have no significant impacts, but that may have measurable adverse impacts; or (c) evaluate a proposal that either is not described on the list of categorically excluded actions, or is on the list but exceptional circumstances (section 3.5) apply.

**Environmental impact statement (EIS)** (1508.11)—A detailed NEPA document that is prepared when a proposed action or alternatives have the potential for significant impact on the human environment.

**Environmental screening process**—The analysis that precedes a determination of the appropriate level of NEPA documentation. The minimum requirements of the environmental screening process are a site visit, consultation with any agency that has jurisdiction by law or special expertise, and the completion of a screening checklist. The process must be complete for all NPS actions that have the potential for environmental impact and are not described in section 3.3.

**Environmentally preferred alternative** (1505.2, Q6a)—Of the action alternatives analyzed, the one that would best promote the policies in NEPA section 101. This is usually selected by the IDT members. CEQ encourages agencies to identify an environmentally preferable alternative in the draft EIS or EA, but only requires that it be named in the ROD.

**Exceptional circumstances**—Circumstances that, if they apply to a project described in the NPS categorical exclusion lists (sections 3.3 and 3.4), mean a CE is inappropriate and an EA or an EIS must be prepared because the action may have measurable or significant impacts. Exceptional circumstances are described in section 3.5.

**Finding of no significant impact (FONSI)** (1508.13)—A determination based on an EA and other factors in the public planning record for a proposal that, if implemented, would have no significant impact on the human environment.

**Human environment** (1508.14)—Defined by CEQ as the natural and physical environment, and the relationship of people with that environment (1508.14). Although the socioeconomic environment receives less emphasis than the physical or natural environment in the CEQ regulations, NPS considers it to be an integral part of the human environment.

**Impact topics**—Specific natural, cultural, or socioeconomic resources that would be affected by the proposed action or alternatives (including no action). The magnitude, duration, and timing of the effect to each of these resources is evaluated in the impact section of an EA or an EIS.

**Indirect impact** (1508.8)—Reasonably foreseeable impacts that occur removed in time or space from the proposed action. These are "downstream" impacts, future impacts, or the impacts of reasonably expected connected actions (e.g., growth of an area after a highway to it is complete).

**Issues**—In NEPA, issues are environmental, social, and economic problems or effects that may occur if the proposed action or alternatives (including no action) are implemented or continue to be implemented.

**Lead agency** (1508.16)—The agency either preparing or taking primary responsibility for preparing the NEPA document.

**Major federal action** (1508.18)—Actions that have a large federal presence and that have the potential for significant impacts to the human environment. They include adopting policy, implementing rules or regulations; adopting plans, programs, or projects; ongoing activities; issuing permits; or financing projects completed by another entity.

**Memo to file**—A memo to the planning record or statutory compliance file that NPS offices may complete when (a) NEPA has already been completed in site-specific detail for a proposal, usually as part of a document of larger scope, or (b) a time interval has passed since the NEPA document was approved, but information in that document is still accurate.

**Mitigated EA** (Q40)—An EA that has been rewritten to incorporate mitigation into a proposal or to change a proposal to reduce impacts to below significance.

**Mitigation** (1508.20)—A modification of the proposal or alternative that lessens the intensity of its impact on a particular resource.

**NEPA process**—The objective analysis of a proposed action to determine the degree of its environmental and interrelated social and economic impacts on the human environment, alternatives and mitigation that reduce that impact, and the full and candid presentation of the analysis to, and involvement of, the interested and affected public.

**Notice of intent** (1508.22)—The notice submitted to the *Federal Register* that an EIS will be prepared. It describes the proposed action and alternatives, identifies a contact person in NPS, and gives time, place, and descriptive details of the agency's proposed scoping process.

**Notices of availability**—Separate notices submitted to the *Federal Register* that the draft EIS and the final EIS are ready for distribution.

**Preferred alternative** (1502.14 (e))—The alternative an NPS decision-maker has identified as preferred at the draft EIS stage. It may be the same as the initial proposal or proposed action, or it may be different. It is identified to show the public which alternative is likely to be selected to help focus its comments.

**Programmatic documents**—Broader scope EAs or EISs that describe the impacts of proposed policy changes, programs, or plans.

**Proposal** (1508.23)—The stage at which NPS has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal. The goal can be a project, plan, policy, program, and so forth. NEPA begins when the effects can be meaningfully evaluated.

**Record of decision (ROD)** (1505.2)—The document that is prepared to substantiate a decision based on an EIS. It includes a statement of the decision made, a detailed discussion of decision rationale, and the reasons for not adopting all mitigation measures analyzed, if applicable.

**Scoping** (1508.25)—Internal NPS decision-making on issues, alternatives, mitigation measures, the analysis boundary, appropriate level of documentation, lead and cooperating agency roles, available references and guidance, defining purpose and need, and so forth. External scoping is the early involvement of the interested and affected public.

**Significantly** (1508.27)—A subjective interpretation of the intensity of impact, in several contexts, of the proposed action or alternatives.

**Tiering** (1508.28)—The use of broader, programmatic NEPA documents to discuss and analyze cumulative regional impacts and define policy direction, and the incorporation by reference of this material in subsequent narrower NEPA documents to avoid duplication and focus on issues "ripe for decision" in each case.

## 9.2    Acronyms

| | |
|---|---|
| **CE** | categorical exclusion |
| **CEF** | categorical exclusion form |
| **CEQ** | President's Council on Environmental Quality |
| **CX** | categorical exclusion |
| **DEC** | Division Environmental Comment request issued by NPS Environmental Quality Division-WASO |
| **DM** | departmental manual |
| **DOI** | Department of the Interior |
| **EA** | environmental assessment |
| **ECM** | environmental compliance memorandum |
| **EIS** | environmental impact statement |
| **EO** | executive order |
| **EPA** | Environmental Protection Agency |
| **EQD** | Environmental Quality Division |
| **ER** | Environmental Review issued by the Department of the Interior |
| **ERM** | environmental review memorandum |
| **ESA** | Endangered Species Act |
| **ESM** | environmental statement memorandum |
| **ESF** | environmental screening form |
| **FONSI** | finding of no significant impact |
| **GMP** | general management plan |
| **IDT** | interdisciplinary team |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NMFS** | National Marine Fisheries Service |
| **NOA** | notice of availability |
| **NOI** | notice of intent |
| **NPS** | National Park Service |
| **OEPC** | Office of Environmental Policy and Compliance |
| **REO** | regional environmental officer |
| **ROD** | record of decision |
| **SSO** | system support office |
| **WASO** | Washington DC Office of the National Park Service |

# Appendix 1 — Environmental Screening Form (August 2003)

This form should be attached to all documents sent to the regional director's office for signature. Sections A and B should be filled out by the project initiator (may be coupled with other park project initiation forms). Sections C, D, E, and G are to be completed by the interdisciplinary team members. While you may modify this form to fit your needs, you must ensure that the form includes information detailed below and must have your modifications reviewed and approved by the regional environmental coordinator.

## A. PROJECT INFORMATION

Park Name _____
Project Number _____

Project Type (Check):

☐ Cyclic        ☐ Cultural Cyclic        ☐ Repair/Rehab        ☐ ONPS

☐ NRPP        ☐ CRPP        ☐ FLHP

☐ Line Item        ☐ Fee Demo        ☐ Concession Reimbursable

☐ Other (specify)_____

Project Location _____
Project Originator/Coordinator _____
Project Title _____
Contract # _____
Contractor Name _____
Administrative Record Location _____
Administrative Record Contact _____

## B. PROJECT DESCRIPTION/LOCATION [To begin the statutory compliance file, attach to this form, maps, site visit notes, agency consultation, data, reports, categorical exclusion form (if relevant), or other relevant materials.]

_____
_____
_____
_____
_____
_____
_____
_____

Preliminary drawings attached? ☐ Yes ☐ No
Background info attached? ☐ Yes ☐ No
Date form initiated _____
Anticipated compliance completion date _____
Projected advertisement/Day labor start _____
Construction start _____

**C. RESOURCE EFFECTS TO CONSIDER** (Tailor the following to meet individual park/unit project needs.)

Please see section F (Instructions for Determining Appropriate NEPA Pathway) prior to completing this section.  Also, use the process described in DO-12, 2.9 and 2.10; 3.5; 4.5(G) to (G)(5) and5.4(F) to help determine the context, duration and intensity of effects on resources.

| Are any measurable impacts possible on the following physical, natural or cultural resources? | Yes | No | Data Needed to Determine |
|---|---|---|---|
| 1. Geological resources-soils, bedrock, streambeds, etc. | | | |
| 2. From geohazards | | | |
| 3. Air quality | | | |
| 4. Soundscapes | | | |
| 5. Water quality or quantity | | | |
| 6. Streamflow characteristics | | | |
| 7. Marine or estuarine resources | | | |
| 8. Floodplains or wetlands | | | |
| 9. Land use, including occupancy, income, values, ownership, type of use | | | |
| 10. Rare or unusual vegetation-old growth timber, riparian, alpine | | | |
| 11. Species of special concern (plant or animal; state or federal listed or proposed for listing) or their habitat | | | |
| 12. Unique ecosystems, biosphere reserves, World Heritage sites | | | |
| 13. Unique or important wildlife or wildlife habitat | | | |
| 14. Unique or important fish or fish habitat | | | |
| 15. Introduce or promote nonnative species (plant or animal) | | | |
| 16. Recreation resources, including supply, demand, visitation, activities, etc. | | | |
| 17. Visitor experience, aesthetic resources | | | |
| 18. Cultural resources, including cultural landscapes, ethnographic resources | | | |
| 19. Socioeconomics, including employment, occupation, income changes, tax base, infrastructure | | | |
| 20. Minority and low-income populations, ethnography, size, migration patterns, etc. | | | |
| 21. Energy resources | | | |
| 22. Other agency or tribal land use plans or policies | | | |
| 23. Resource, including energy, conservation potential | | | |
| 24. Urban quality, gateway communities, etc. | | | |
| 25. Long-term management of resources or land/resource productivity | | | |
| 26. Other important environmental resources (e.g., geothermal, paleontological resources) | | | |

| D.  Mandatory Criteria: If implemented, would the proposal: | Yes | No | Data Needed to Determine |
|---|---|---|---|
| A. Have material adverse effects on public health or safety? | | | |
| B. Have adverse effects on such unique characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; or ecologically significant or critical areas, including those listed on the National Register of Natural Landmarks? | | | |
| C. Have highly controversial environmental effects? | | | |
| D. Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | | | |
| E. Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | | | |
| F. Be directly related to other actions with individually insignificant, but cumulatively significant, environmental effects? | | | |
| G. Have adverse effects on properties listed or eligible for listing on the National Register of Historic Places? | | | |
| H. Have adverse effects on species listed or proposed to be listed on the List of Endangered or Threatened Species, or have adverse effects on designated Critical Habitat for these species? | | | |
| I. Require compliance with Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act? | | | |
| J. Threaten to violate a federal, state, local, or tribal law or requirement imposed for the protection of the environment? | | | |
| K. involve unresolved conflicts concerning alternative uses of available resources (NEPA sec. 102(2)(E). | | | |
| L. Have a disproportionate, significant adverse effect on low income or minority populations (EO 12898). | | | |
| M. Restrict access to and ceremonial use of Indian sacred sites by Indian religious practitioners or adversely affect the physical integrity of such sacred sites (EO 130007) | | | |
| N. Contribute to the introduction, continued existence, or spread of federally listed noxious weeds (Federal Noxious Week Control Act). | | | |
| O. Contribute to the introduction, continued existence, or spread of non-native invasive species or actions that may promote the introduction, growth or expansion of the range of nonnative invasive species (EO 13112). | | | |
| P. Require a permit from a federal, state, or local agency to proceed, unless the agency from which the permit is required agrees that a CE is appropriate? | | | |
| Q. Have the potential for significant impact as indicated by a federal, state, or local agency or Indian tribe? | | | |

| R. Have the potential to be controversial because of disagreement over possible environmental effects. | | | |
|---|---|---|---|
| S. Have the potential to violate the NPS Organic Act by impairing park resources or values? | | | |

**Please answer the following questions:**

1. Are the personnel preparing this form familiar with the site, and/or has a site visit been conducted? (Attach additional pages noting when site visit took place, staff attending, etc.)

2. Has consultation with all affected agencies or tribes been completed? (Attach additional pages detailing the consultation, including the name, date, and summary of comments from other agency or tribal contacts.)

**E. OTHER INFORMATION (Please answer the following questions/provide requested information.)**

Are personnel preparing this form familiar with the site? ☐Yes ☐No

Did personnel conduct a site visit? ☐Yes ☐No (*If yes, attach meeting notes or additional pages noting when site visit took place, who attended, etc.*)

Is the project in an approved plan such as a General Management Plan or an Implementation Plan with an accompanying environmental document? ☐Yes ☐No
If so, plan name _____

Is the project still consistent with the approved plan? ☐Yes ☐No (*If no, prepare plan/EA or EIS.*)

Is the environmental document accurate and up-to-date? ☐Yes ☐No (*If no, prepare plan/EA or EIS.*) FONSI/ ROD ☐(Check) Date approved _____

Are there any interested or affected agencies or parties? ☐Yes ☐No

Did you make a diligent effort to contact them? ☐Yes ☐No

Has consultation with all affected agencies or tribes been completed? ☐Yes ☐No
(*If so, attach additional pages detailing the consultation, including the name, the dates, and a summary of comments from other agencies or tribal contacts.*)
Are there any connected, cumulative, or similar actions as part of the proposed action?

☐Yes ☐No   (*If so, attach additional pages detailing the other actions.*)

## F. INSTRUCTIONS FOR DETERMINING APPROPRIATE NEPA PATHWAY

First, always check DO-12, section 3.2, "Process to Follow" in determining whether the action is categorically excluded from additional NEPA analyses. Other sections within DO-12, including sections 2.9 and 2.10; 3.5; 4.5(G)(4) and (G)(5), and 5.4(F), should also be consulted in determining the appropriate NEPA pathway. Complete the following tasks: conduct a site visit or ensure that staff is familiar with the site's specifics; consult with affected agencies, and/or tribes; and interested public and complete this environmental screening form.

If your action is described in DO-12 section 3.3, "CE's for Which No Formal Documentation is Necessary," follow the instructions indicated in that section.

If your action is not described in DO-12, section 3.3, and IS described is section 3.4, AND you checked yes or identified "data needed to determine" impacts in any block in section D (Mandatory Criteria), this is an indication that there is potential for significant impacts to the human environment, therefore, you must prepare an EA or EIS or supply missing information to determine context, duration and intensity of impacts.

If your action is described in section 3.4 and NO is checked for all boxes in section D (Mandatory Criteria), BUT you have initially checked "yes" in section C (Resource Effects to Consider) during internal scoping, this means that the team should do additional analyses to determine the context, duration and intensity of effects. If the magnitude of effects is then determined to be at the negligible or minor level, then usually there is no potential for significant impacts, then an EA or EIS is not required. If, however, during internal scoping and further investigation, resource effects still remain unknown, or are at the minor to moderate level of intensity, and the potential for significant impacts may be likely, an EA or EIS is required.

In all cases, data collected to determine the appropriate NEPA pathway must be included in the administrative record.

## G. INTERDISIPLINARY TEAM SIGNATORY (All interdisciplinary team members must sign.)

By signing this form, you affirm the following: you have either completed a site visit or are familiar with the specifics of the site; you have consulted with affected agencies and tribes; and you, to the best of your knowledge, have answered the questions posed in the checklist correctly.

| Interdisciplinary Team Leader Name | Field of Expertise | Date Signed |
|---|---|---|
|  |  |  |
| Technical Specialists Names | Field of Expertise | Date Signed |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**H. SUPERVISORY SIGNATORY**

Based on the environmental impact information contained in the statutory compliance file and in this environmental screening form, environmental documentation for the subject project is complete.

Recommended:

| Compliance Specialist | Telephone Number | Date |
|---|---|---|
|  |  |  |

Approved:

| Superintendent | Telephone Number | Date |
|---|---|---|
|  |  |  |

# Appendix 2

## Categorical Exclusion Form

**Project** _____    **Date** _____

Describe project, including location (reference the attached Environmental Screening Form (ESF), if appropriate):

Describe the category used to exclude action from further NEPA analysis and indicate the number of the category (see section 3–4 of DO-12):

Describe any public or agency involvement effort conducted (reference the attached ESF):

On the basis of the environmental impact information in the statutory compliance file, with which I am familiar, I am categorically excluding the described project from further NEPA analysis. No exceptional circumstances (i.e., all boxes in the ESF are marked "no") or conditions in section 3-6 apply, and the action is fully described in section 3-4 of DO-12.

_____    _____
**Park Superintendent or Designee**    **Date**

_____
**Title**

_____    _____
**NPS Contact Person**    **Title**

_____    _____
**Address**    **Phone Number**

# Index

**A**

Acronyms..................................................................107
Administrative records........................................28–29
Advisory Council on Historic Preservation..................30
Analysis boundaries............................................23–24

**B**

Budgetary projections, decision documents and................82

**C**

Categorical Exclusion Forms
    formalization of,........................................................78
    sample...................................................................113
    use of........................................................................43
    use with Environmental Screening Forms...............20, 43
Categorical exclusions
    actions related to development and ......................37–38
    actions related to general administration and...........36–37
    actions related to grant programs and....................39–40
    actions related to resource management protection and .........39
    actions related to visitor use and.............................39
    administrative process .........................................43–44
    consideration of multiple actions ...........................44
    decision document filing and ..............................77–78
    description ........................................................3, 33, 42
    documentation process ......................................33–34
    documenting a NEPA analysis and ......................26–28
    exceptions to ....................................................40–42
    list of CEs for which no formal documentation is necessary ........34–36
    plans, studies, and reports and.............................37
    public involvement in actions ..............................43
    using the CE lists ..............................................42–43
CEFs. *See* Categorical exclusion forms
CEQ. *See* Council on Environmental Quality
CEs. *See* Categorical exclusions
Connected actions.....................................................17
"Considering Cumulative Effects under the National Environmental
    Policy Act,".........................................................18
Construction actions................................................43
Contractors.............................................................28
Cooperating agencies........................................29, 92
Council on Environmental Quality
    creation of............................................................1
    criteria for designating a lead agency ....................29

115

emergency actions and................................................................31
NEPA planning process and ..............................................83–84
Cumulative actions ......................................................................17–18
Cumulative effects ......................................................................25–26
Cyclic Maintenance Guide................................................................38

**D**

Decision documents
budgetary projections and ......................................................82
categorical exclusions ..............................................................78
changes in the selected action and ........................................82
findings of no significant impact............................................79–81
monitoring and .........................................................................81–82
records of decision ...................................................................78–79
Definitions of terms ..................................................................103–106
Direct effects ................................................................................24–25

**E**

EAs. See Environmental assessments
EISs. See Environmental impact statements
Emergency actions ........................................................................31
Endangered Species Act
categorical exclusions and......................................................43
federal agency cooperation and ............................................30
findings of no significant impact and ....................................81
records of decision and............................................................79
Environmental assessments
administrative process of review of ......................................76
administrative record and .......................................................28–29
alternatives and .......................................................................21, 71–72
categorical exclusions and .....................................................40, 42
completing the EA process ......................................................75–76
consultation and coordination section...................................74
description .................................................................................3
environmental impact statements and...................................67–69, 71
findings of no significant impact and ...................................77, 80
format and content of..............................................................71–74
for general management plans ...............................................85–86
length of ...................................................................................70
mitigated EAs ...........................................................................70
preferred alternatives and......................................................13
public involvement in ..............................................................74–76
public meetings about ............................................................75
public review of........................................................................74
purposes of ..............................................................................69
references section.....................................................................74
response to comments .............................................................75
scoping and...............................................................................74
supplemental .............................................................................75

tiering and .................................................................................88–89
uses for .........................................................................................69
when to prepare .....................................................................27–28, 70
Environmental impact statements
abbreviated final version..............................................................62
actions that normally require an EIS............................................47–48
administrative record and.............................................................28–29
alternatives and.............................................................................21
categorical exclusions and ..........................................................40, 42
changes in the selected alternative................................................62
contractor preparation of..............................................................28
cooperating agency comments......................................................62
criteria for significant impact.......................................................45–47
description.....................................................................................3
draft EIS notice of availability/filing with EPA...........................65
environmental assessments and....................................................67–69, 71
exceptions to.................................................................................48
final filing with EPA.....................................................................67
final version.............................................................................61–62, 98–99
findings of no significant impact and............................................79
format of...................................................................................48–60
for general management plans.......................................................85–86
historic properties and..................................................................79
notice of intent to prepare............................................................63–64
ongoing or continuing action........................................................47
preferred alternatives and.............................................................13
public involvement requirements..................................................63–67
public meetings/hearings on.........................................................66–67
recipients of draft versions...........................................................65–66
recipients of final versions...........................................................67
records of decision and.............................................................77, 79
response options.......................................................................61–62
review guidelines.......................................................................94–98
review process...............................................................................67
scoping.....................................................................................64–65
substantive comments...................................................................61
supplements to..............................................................................63
termination process...................................................................67–68
tiering and................................................................................88–89
timelines for review of draft versions...........................................66
when to prepare.........................................................................27, 45
Environmental Justice in Minority and Low-Income Populations,
Executive Order 12898.................................................................30
Environmental Protection Agency, environmental impact
statements and.........................................................6, 65–67, 93
Environmental Review Memorandum series.....................................94
Environmental Screening Forms
NEPA analysis and....................................................................15, 27

reasons for completing.................................................................................19–20

sample.................................................................................................109–112

use with the categorical exclusion form..........................................................20, 43

uses of.........................................................................................................20

Environmentally preferred alternatives............................................................22–23

ESA. See Endangered Species Act

ESFs. See Environmental Screening Forms

External scoping, environmental impact statements and ...................................64–65

**F**

Federal Noxious Weed Control Act....................................................................41

*Federal Register*

environmental assessments and...................................................................74–76

environmental impact statements and.....................................................63–68, 93

findings of no significant impact, publication...............................................79, 81

records of decision, publication in.................................................................78

Findings of no significant impact (FONSI)

content.......................................................................................................80

as contracts with the public ..........................................................................82

description..................................................................................................79

endangered species and................................................................................81

environmental impact statements and.................................................67–69, 75

errata sheets...............................................................................................80

floodplains and wetlands and.........................................................................30

functions of...............................................................................................80

for general management plans...................................................................85–86

historic properties and.................................................................................81

impairment of park resources and..................................................................81

impairment potential and.............................................................................77

mitigation and............................................................................................80

signatory for...............................................................................................81

waiting period for........................................................................................81

wetlands and floodplains and.........................................................................81

Fish and Wildlife Coordination Act....................................................................41

Floodplain Management, Executive Order 11988

categorical exclusions and.............................................................................41

NEPA document cooperation and....................................................................30

FONSI. See Findings of no significant impact

Format of environmental impact statements

affected environment...............................................................................52–54

alternatives............................................................................................50–52

consultation and coordination section........................................................59–60

cover sheet.................................................................................................49

impact chapter........................................................................................54–59

mandatory topics.....................................................................................53–54

purpose and need for action......................................................................49–50

references section.........................................................................................60

summary....................................................................................................49

"Forty Most Asked Questions Concerning CEQ's NEPA Regulations," ..............................1
Freedom of Information Act .................................................................................................28

**G**

General management plans
  EISs for.................................................................................................................85–86
  reasons to prepare EISs .............................................................................................85
Grant programs
  categorical exclusions and.....................................................................................39–40
  environmental impact statements and .........................................................................48

**H**

Handbook
  citations in DO-12 and...............................................................................................2
  DO-12 and................................................................................................................1–2
  use of ........................................................................................................................2
Historic Structures Preservation Guide ...............................................................................38

**I**

IDTs. See Interdisciplinary teams
Impact chapter of the EIS
  context analysis.........................................................................................................55
  criteria for ...........................................................................................................45–47
  displaying impact information.................................................................................54–55
  impact indicators..................................................................................................55–56
  impact thresholds.......................................................................................................56
  incomplete or unavailable information .......................................................................55
  mitigation analysis .........................................................................................56–57, 97
  organizing the impact chapter...............................................................................57–58
  sustainability and long-term management considerations .........................................58–59
Impact chapter of the environmental assessment.............................................................72–73
Impairment of park resources
  decision document filing............................................................................................26
  findings of no significant impact and.........................................................................81
  process review and ....................................................................................................26
Indian Trust resources, evaluating impact of the proposal on .......................................31, 54
Indirect effects..................................................................................................................25
Interdisciplinary teams
  cumulative effects and ..........................................................................................25–26
  identifying issues or environmental problems ...........................................................15
  issue definition .........................................................................................................19
  membership of............................................................................................................7
  memos to file and.......................................................................................................27
  site visitation ............................................................................................................19
  Internal scoping
  description and process .............................................................................19–20, 27, 33
  environmental impact statements and .................................................................64–65
Issue definition..........................................................................................................18–19

**L**

Lead agencies ........................................................................................29
List of Endangered or Threatened Species ...........................................41
Low-income populations, evaluating impact of the proposal on ...........30

**M**

Memos to file
   decision document filing and ...........................................................77
   documenting a NEPA analysis and .................................................26
   using instead of the ESF .................................................................20
Minority populations, evaluating impact of the proposal on .................30

**N**

National Environmental Policy Act. *See also* Review of non-NPS NEPA documents
   activating...........................................................................................10
   agency planning and ......................................................................5–6
   analytic rather than encyclopedic nature of documents ...................6
   common sense basis ...........................................................................7
   Council on Environmental Quality creation.......................................1
   documentation candor .......................................................................7
   early planning requirement................................................................4
   federal action examples .....................................................................5
   focus of documents ...........................................................................6
   holistic nature of ..............................................................................8
   inclusivity requirement......................................................................7
   interdisciplinary approach.................................................................7
   National Park Service Organic Act and.......................................4, 8–9
   NEPA documents as building blocks.................................................86
   objectivity of ..................................................................................6–7
   procedural qualities ...........................................................................4
   project proposal/contracting process............................................9–10
   public process and .............................................................................6
   purpose of .........................................................................................3
   requirements of .................................................................................1
   site-specific environmental impact information requirement.......8, 10, 87
   specificity of data needed ................................................................10
   systematic analyses requirement .......................................................6
   tiering and ....................................................................86, 88–89, 96
   timing of implementation..........................................8–9, 83, 86–87
   tools for implementing .....................................................................3
   tools to help foster excellent action..................................................8
National Historic Landmark Program, categorical exclusions and.........38
National Historic Preservation Act
   categorical exclusions and................................................................43
   federal agency cooperation and.......................................................30
   findings of no significant impact and ..............................................81
   records of decision and....................................................................79
National Marine Fisheries Service...........................................................30
National Natural Landmark Program, categorical exclusions and.........38

National Park Service Organic Act.............................................................4, 8–9, 77
National Parks Omnibus Management Act of 1998 ...............................................2
National Register of Historic Places
    categorical exclusions and ......................................................................38, 41
    environmental impact statements and ..........................................................47
National Trails system, environmental impact statements and...........................48
NHPA. *See* National Historic Preservation Act
"No action" alternatives ................................................................................21–22

**O**

Office of Environmental Policy and Compliance, review of non-NPS
    NEPA documents..................................................................................93–94

**P**

Preferred alternatives, environmental impact statements or environmental
    assessments and .............................................................................13–14, 51–52
Process overview
    administrative record or project file.........................................................28–29
    analysis boundaries...................................................................................23–24
    analysis process .......................................................................................13–15
    choice of pathways...................................................................................27–28
    connected actions ..........................................................................................17
    consistency with sections 101 and 102(1) of NEPA .....................................23
    cumulative actions ...................................................................................17–18
    cumulative effects ....................................................................................25–26
    defining the proposal................................................................................16–17
    direct effects ............................................................................................24–25
    emergency actions .........................................................................................31
    environmentally preferred alternatives.....................................................22–23
    external scoping .............................................................................................19
    federal, state, and local laws that overlap with NEPA...............................29–31
    impact categories...........................................................................................24
    impairment of park resources.........................................................................26
    indirect effects...............................................................................................25
    internal scoping .......................................................................................19–20
    issue description ......................................................................................18–19
    lead and cooperating agencies and................................................................29
    need definition...............................................................................................16
    "no action" alternative.............................................................................21–22
    options to document a NEPA analysis ......................................................26–27
    purpose definition..........................................................................................16
    range of alternatives......................................................................................20
    reasonable alternatives.............................................................................20–21
    similar actions ...............................................................................................17
    state agencies and..........................................................................................29
    using contractors ...........................................................................................28
    working with other agencies ...................................................................29–31
Programmatic documents and planning
    EISs for general management plans ..........................................................85–86

feasibility and planning ..................................................87–88
long-term resource management and ...................................89
NEPA as a compliance action..........................................83
NEPA documents as building blocks................................86
programs and policies ....................................................89
questions to ask............................................................84–85
tiering ..........................................................86, 88–89, 96
Project files..................................................................28–29
Proposed actions, environmental impact statements or environmental
    assessments and ...............................................13–14, 50
Protection of Wetlands, Executive Order 11990
categorical exclusions and.............................................41
NEPA cooperation and...................................................30

**R**

Reasonable alternatives, environmental impact statements or
    environmental assessments and ..........................20–21, 50
Records of decision
CEQ requirements........................................................78
as contracts with the public ..........................................82
endangered species and ................................................79
floodplains and wetlands and........................................30
historic properties and ..................................................79
impairment potential and ..........................................77–79
length..........................................................................78
notice publication ........................................................78
signatory for.................................................................79
wetland/floodplain statements and..................................79
Review agencies.............................................................93
Review of non-NPS NEPA documents
comment requirements...............................................91–93
consequences of declining to review...............................98
departmental comment letters .......................................94
extensions of review deadlines ...................................93–94
final EISs.................................................................98–99
review deadlines...........................................................93
review guidelines for EISs .........................................94–98
specific NEPA comments.........................................100–101
style and format for environmental review comments ....99–101
summary contents.........................................................101
types of NPS comments on draft EISs .........................97–98
RODs. See Records of decision

**S**

Secretarial Order 3175 and ECM95-2 ...............................31
Similar actions...............................................................17
State agencies................................................................28

**T**

Tiering ......................................................86, 88–89, 96

**U**

U.S. Fish and Wildlife Service ................................................................................30

**W**

Wetlands and floodplains

    findings of no significant impact and ............................................................81

    records of decision and..................................................................................79

Wild and Scenic Rivers proposals, environmental impact statements and.................47–48

# EXHIBIT M



**National Park Service**
**U.S. Department of the Interior**

## Gettysburg National Military Park
# Visitor Centers



(NPS)
Visitor Center

The **Gettysburg National Military Park Visitor Center** at 97 Taneytown Road in Gettysburg is open all year. Regular Visitor Center hours are from 8 AM to 5 PM. During the summer months, from mid-June through mid-August, the center is open from 8 AM to 6 PM. After that date, the center reverts back to its 8 AM to 5 PM schedule. Phone (717) 334-1124 for further information on location and closures.

**Closures**
The Visitor Center is closed on Thanksgiving Day, Christmas Day, and New Year's Day.

**Special Programs**
The Electric Map program, a 30 minute orientation program is shown every 45 minutes throughout the day. (Fee)
Licensed Battlefield Guide Services are available at the Visitor Center.
The shuttle to **Eisenhower National Historic Site** is located at the Visitor Center.

**Exhibits**
The Gettysburg Museum of the Civil War, featuring one of the largest collections of Civil War relics in the world, is available for viewing during regular hours. (Free of charge)

**Facilities**
The Visitor Center has restrooms accessible from outside the building and in the museum area, public phones, information service desk and a book store. Handicapped parking available adjacent to the building, which also has provisions for **mobility, hearing or sight impaired visitors.**



(NPS)
Cyclorama Center

The **Cyclorama Center,** located adjacent to the National Park Service Visitor Center at 97 Taneytown Road in Gettysburg, Pennsylvania, is now closed. Exhibits and offices in this building will be moved to the new museum and visitor center set to open in 2008.



**Did You Know?**
President Abraham Lincoln was not the featured speaker at the dedication of the Soldiers' National Cemetery at Gettysburg. He was asked to provide "a few appropriate remarks", recognized today as one of the greatest speeches of his presidency.

Last Updated: November 19, 2007 at 09:08 EST

Case 1:06-cv-02267 FH  Document 28-7  Filed 01/19/2008  Page 4 of 12



**National Park Service**
**U.S. Department of the Interior**

Gettysburg National Military Park
# Operating Hours & Seasons

## PARK GROUNDS AND ROADS
The park is open daily from 6:00 a.m. to 10:00 p.m. April 1 to October 31, and 6:00 a.m. to 7:00 p.m. November 1 to March 31.

## VISITOR CENTER
The park visitor center is open daily from 8:00 a.m. to 5:00 p.m. with summer hours from 8:00 a.m. to 6:00 p.m. daily. Closed Thanksgiving Day, Christmas Day, and New Years Day.

## CYCLORAMA CENTER
The Cyclorama Center is now closed and will not reopen.

## SOLDIERS' NATIONAL CEMETERY (Gettysburg National Cemetery)
The Soldiers' National Cemetery is open at dawn and closes at sunset daily.



**Did You Know?**
President Abraham Lincoln was not the featured speaker at the dedication of the Soldiers' National Cemetery at Gettysburg. He was asked to provide "a few appropriate remarks", recognized today as one of the greatest speeches of his presidency.

Last Updated: November 19, 2007 at 09:16 EST

Case 1:00-cv-01898 Document 2977 Filed 05/28/2008 Page 5 of 12



**National Park Service**
**U.S. Department of the Interior**

## Gettysburg National Military Park
# New Museum and Visitor Center Project



(GETTYSBURG FOUNDATION)
The New Museum and Visitor Center now under construction at Gettysburg.

*This is the beginning of a very exciting venture. A venture that I hope will help renew Americans' appreciation for our common heritage, for the battle that took place here, and its impact on our nation."* - Robert Wilburn, President of the Gettysburg National Battlefield Museum Foundation

### About the New Gettysburg Museum and Visitor Center At Gettysburg National Military Park

The Gettysburg Foundation, in partnership with the National Park Service at Gettysburg, is working to restore, preserve and enhance the consecrated ground of America's most revered Civil War battlefield. Gettysburg holds a special place in American history, not only as a turning point in the war, but as the site of Lincoln's Gettysburg Address, in which he outlined his vision for the nation. Completion of this $125 million project will enable the Foundation and the National Park Service to make Gettysburg a classroom of democracy: a place that educates and inspires; a place that honors America by promoting a better understanding of the forces that shaped our national character.

The new museum and visitor center will allow Gettysburg National Military Park to accomplish its critical preservation goals:

**Care for the park's collection of 300,000 Civil War artifacts and 700,000 archival items** – one of the largest and most significant Civil War era collections in the nation.

**Care for the magnificent Cyclorama painting.**

**Rehabilitate portions of the battlefield,** including removal of outdated and poorly sited visitor facilities and parking lots from the Union battle line on Cemetery Ridge, where nearly 1,000 Union soldiers were killed, wounded, or captured.

**Provide visitors with a better understanding of the Battle of Gettysburg** and what it means to the nation.

The heart of the Gettysburg Foundation's Campaign to Preserve Gettysburg is the new Museum and Visitor Center, which will help protect the resources of the park and help visitors better understand the sacred ground of America's most revered Civil War battlefield. By properly preserving the park's extensive collection of Civil War artifacts and archives and returning portions of the battlefield, as closely as possible, to their 1863 appearance, we can give visitors a deeper, more lasting appreciation of the events and the meaning of Gettysburg. In the process, we also will help them connect the battle with America's continuing commitment to freedom around the world.

The 139,000-square-foot facility has been designed to blend into the rural Pennsylvania countryside. Cooper Robertson & Partners of New York City is the design architect. LSC Design of York, Pa., is the architect of record.

The new Museum and Visitor Center is adjacent to the battlefield, but sited at a low point in the terrain so it will not be visible from the major interpretive points. Located near the intersection of Hunt Avenue and Baltimore Pike, a short distance from the current visitor center, the new facility is on ground that saw no major battle action. It will open to visitors in early 2008.



(MUSEUM FOUNDATION)

The Museum and Visitor Center site plan. The complex is situated between Taneytown Road (Rt. 134) to the west and the Baltimore Pike (Rt. 97) on the east.

## Creating a 21st-Century Museum Experience

"We want to create a sense of place that evokes the emotions of 1863, while also meeting visitors' expectations of a 21st-century museum experience," said Foundation President Robert C. Wilburn. "The building is designed to showcase the battlefield, and encourage visitors to go outside and explore the historic landscape. Our goal is to help every visitor better appreciate the significance of what happened here."

A rotunda gallery will welcome visitors and set the stage for the museum experience. That will be followed by a main museum gallery, which will be organized to help visitors understand and appreciate the museum's major themes:

> The unfinished work of the Declaration of Independence, the causes of the Civil War, and the War until June 1863

> The Campaign and Battle of Gettysburg, which will comprise about two-thirds of the exhibit galleries

> The Gettysburg Address, the Civil War from Gettysburg to Appomattox, reconciliation, and the consequences of the War.

The new facility also will include a feature film experience that will immerse the audience in the sights, sounds and emotions of the battle and its aftermath, while theaters in the galleries will offer short films that focus on each of the three days of battle. Interactive stations located throughout the new museum will give visitors access to information about the people, the battle, the collection and the monuments.

A new Cyclorama Gallery will display the completely restored Gettysburg Cyclorama painting, including the original skyline, the canopy and the original three-dimensional diorama that have been missing for more than 40 years. For the first time in decades, visitors will be able to view the restored painting as the artist originally intended. On the mezzanine level, visitors will encounter exhibits on the history of the Gettysburg Cyclorama painting and its restoration, as well as the history of the original Cyclorama Building.

New multi-purpose educational facilities will provide much-needed space for teacher workshops, classroom use and distance learning programs.

An expanded book and museum store, along with food service, will be among the visitor amenities available. At the "Refreshment Saloon," visitors will have an opportunity to experience for themselves Civil War-era foods and recipes, as well as the role played by the volunteers who supplemented government-issue rations. Civilians in major Northern cities set up what they called "volunteer refreshment saloons" to provide food to troops passing through. Many local volunteers, including merchants, contributed their time and their merchandise to support the troops.

**Using the Voices of the Participants to Tell the Gettysburg Story**

State-of-the-art exhibits will immerse visitors in the stories of the Civil War era, as well as of the battle. And the exhibits will tell these stories -- in the words of the participants -- from a number of important perspectives:

**From those of the commanders** - Abraham Lincoln and George Meade, Jefferson Davis and Robert E. Lee

**From the soldiers**, each of whom had his own reasons for fighting

**From the war correspondents**, through whose eyes America - and the world - viewed the war

**And from the civilians**, especially the citizens of Gettysburg, the small crossroads town that found itself overrun by 165,000 soldiers -- the conflict literally entering their homes.

Throughout the 11 exhibit galleries, visitors still will encounter the popular displays of weaponry and uniforms, along with a great deal more. State-of-the-art galleries will use a greater variety of objects and artifacts from Gettysburg National Military Park's extensive collection — and from other museums and private collections from around the country — to offer perspective, and a greater appreciation for the sacrifices of those who became a part of the greatest battle ever fought in North America.

For additional information on the Gettysburg Foundation and its efforts with the museum project, visit the **Gettysburg Foundation web site**.

**Museum Updates, November 2007:**

**Media Statement Regarding Display of the Rosensteel Plaques in the New Museum and Visitor Center** by Superintendent John Latschar, November 29, 2007.



**Did You Know?**
President Abraham Lincoln was not the featured speaker at the dedication of the Soldiers' National Cemetery at Gettysburg. He was asked to provide "a few appropriate remarks", recognized today as one of the greatest speeches of his presidency.

Last Updated: November 30, 2007 at 10:00 EST

# EXHIBIT N



Webster's
Third New
International
Dictionary

UNABRIDGED

**de·mog·ra·pher** \də'mägrəfə(r), dē'-\ *n* -s : one who specializes in demography

**de·mo·graph·ic** \ˌdēmə'grafik, ˌdem-\ *adj* [F *démographique*, fr. *démographie* + *-ique* -ic] : of or relating to demography : relating to the dynamic balance of a population esp. with regard to density and capacity for expansion or decline ⟨∼ pressures determining trends⟩ — **de·mo·graph·i·cal·ly** \-fək(ə)lē\ *adv*

**de·mog·ra·phy** \də'mägrəfē, dē'-\ *n* -ES [F *démographie*, fr. *démo-* dem- + *-graphie* -graphy] : the statistical study of the characteristics of human populations esp. with reference to size and density, growth, distribution, migration, and vital statistics and the effect of all these on social and economic conditions

**de·moid** \'dēˌmȯid\ *adj* [dem- + -oid] : common or abundant esp. in a given geological formation — used of fossils

**dem·oi·selle** \ˌdem(w)ə'zel, 'ᵉ⁼ˌ⁼\ *n* -s [F, fr. OF *dameisele*, *damoisele* — more at DAMSEL] **1 a** : a young lady : DAMSEL **2 a** : a crane (*Anthropoides virgo*) of rather small size with long flowing secondaries and breast feathers and white plumes behind the eyes that is widely distributed in Asia, No. Africa, and southeast Europe **b** : LOUISIANA HERON **3** : DAMSELFLY; *esp* : one of the genus *Agrion* **4** : DAMSELFISH **5** : EARTH PILLAR

**de moi·vre's theorem** \də'mȯivə(r)z-\ *n, cap D&M* [after Abraham *De Moivre* †1754 Fr. mathematician] : a theorem of complex numbers: the *n*th power of a complex number has for its absolute value its absolute value and its argument respectively the *n*th power of the absolute value and *n* times the argument of the given complex number

**de·mo·lay** \ˌdēmə'lā\ *n* -s *usu cap D&M* [after Jacques B. *de Molay* †1314 Fr. grand master of the Knights Templar] : a member of the Order of DeMolay for Boys sponsored by Masonic orders as a secret society for boys aged 14 to 21

**de·mol·ish** \də'mälish, dē'-, -lēsh\ *vt* -ED/-ING/-ES [MF *demoliss-*, stem of *demolir* to demolish, fr. L *demoliri*, fr. *de-* + *moliri* to construct, set in motion, toil, fr. *moles* mass, massive structure — more at MOLE] **1 a** : to pull or tear down (as a building) : RAZE ⟨built in 1706 and ∼ed in 1859 to make way for the present building —*Amer. Guide Series: N.J.*⟩ **b** : to break to pieces or apart usu. with force or violence : ruin completely : SHATTER, SMASH ⟨∼ing the fortifications and the harbor⟩ **2 a** : to do away with : put an end to : DESTROY ⟨his research has been painstaking and he ∼es a good many legends —Fletcher Pratt⟩ ⟨a filibuster which would effectively ∼ the issue —*Current Biog.*⟩ **b** : to divest of any claim or pretense to merit, truth, credence, or acceptability ⟨I heard him on another occasion ∼ a city financier of more wealth than probity —David Williamson⟩ **c** : to eat up ⟨they ∼ed the roast⟩ **syn** see DESTROY

**dem·o·li·tion** \ˌdemə'lishən, ˌdēm-\ *n* -s [MF & L; MF, fr. L *demolition-*, *demolitio*, fr. *demolitus* (past part. of *demoliri* to demolish) + *-ion-*, *-io* -ion] **1** : the act or process of demolishing or the state of being demolished **2 demolitions** *pl, obs* : RUINS, REMAINS **3 a** : destruction of structures, areas, or targets esp. in warfare by means of explosives ⟨∼ of vital communication units⟩ ⟨∼ experts⟩ **b demolitions** *pl* : the explosives used for such destruction

**demolition bomb** *n* : a bomb used against installations and materiel — used esp. of heavy bombs and bombs for which a lapse of time between impact and detonation is desirable

**¹de·mon** *also* **dae·mon** \'dēmən\ *n* -s [ME *demon*, fr. LL & L; LL *daemon*, *demon* evil spirit, fr. L *daemon* spirit, fr. Gk *daimōn* spirit, deity; prob. akin to Gk *daiesthai* to distribute — more at TIDE] **1** : an attendant, ministering, or indwelling power or spirit : DAIMONION, GENIUS ⟨the only one of our five authors who writes because he has a ∼ —*New Republic*⟩ **2 a** : an evil spirit : DEVIL ⟨a magical observance whose aim is to banish the ∼s of pain, psychosis and bad luck —Paul Bowles⟩ **b** : an undesirable or evil emotion, trait, or state personified ⟨melancholy is a kind of ∼ that haunts our island —Joseph Addison⟩ **3** *in late biblical Judaism and early Christianity* **a** : a pagan spirit **b** : an unclean spirit or evil superhuman being below a god but believed to be capable of inhabiting and actuating the bodies of men **4** *usu* daemon : a supernatural being in ancient Greek mythology whose nature is intermediate between that of a god and that of a man : an inferior divinity **5** : one that possesses extraordinary drive, enthusiasm, or effectiveness in respect to some activity or function ⟨he is a positive ∼ for work —William Ridsdale⟩

ception by the successive elimination of what is extraneous ]⟨**re·mo·tive** *adj* ⟩ **re·moins** (*past part.* of **remove** to remove) + E *-ive*⟩ **1** : REMOVING **2** : REMOVABLE

**remotive proposition** *n* : PRIVATIVE PROPOSITION; *esp* : one that asserts the absence of something to be of the essence of the subject

**re·mou·lade** *also* **re·mo·lade** \ˌrämə'läd\ *n* -s [F *rémolade, rémoulade,* fr. F dial. *rémola, rémoula* horseradish (modif. of L *armoracea, armoracium*) + F *-ade*] : a pungent sauce or dressing resembling mayonnaise but usu. made with cooked egg yolks and often with savory herbs or condiments

**1re·mount** \(')rē+\ *vb* [ME *remounten,* partly fr. *re-* + *mounten* to mount, partly fr. MF *remonter* to remount, fr. *re-* + *monter* to mount — more at MOUNT] *vt* **1** : to mount (something) again ⟨~ this map on the other wall⟩ ⟨reaching the mouth of the stream, they ~ed it to its source⟩ **2** : to furnish remounts to ⟨the regiment must be ~ed⟩ ~ *vi* **1** : to mount again ⟨~ at once and ride back⟩ **2** : to go back (as during a study) to a point or period

**2re·mount** \'rē+,-, -'-\ *n* **1** : a fresh horse to replace one no longer available (as by reason of fatigue, disablement, loss, or age); *specif* : a green or incompletely trained cavalry horse **2** : a group, stud, or supply of remounts

**3remount** \"\ *adj* [2*remount*] : of or relating to a remount

**re·mov·abil·i·ty** \rə‚müvə'biləd-ē, rē‚-, -'lətē, -i-\ *n* : the quality or state of being removable

**re·mov·able** \rə'müvəbəl, rē'-\ *adj* [1*remove* + *-able*] : capable of being removed, displaced, transferred, dismissed, or eradicated ⟨~ partition⟩ ⟨a ~ bed⟩ ⟨a headman appointed and ~ by the mayor —G.M.Harris⟩ — **re·mov·able·ness** *n* -ES — **re·mov·ably** \-blē\ *adv*

**removable truck-type switchboard** *n* : a switchboard in which the instruments and main control equipment are mounted upon a removable structure that runs on guide rails

**re·mov·al** \rə'müvəl, rē'-\ *n* -S [*remove* + *-al*] : the act of removing or fact of being removed ⟨surgical ~ of the growth⟩ : dismissal from office : shift of location : change of residence

**removal of causes** **1** : the taking of pending cases from a state to a federal court because of diversity of citizenship or because of federal question **2 a** : the transfer of a case from one federal court to another **b** : the transfer of a case from one to another court within the same state for original hearing or trial — compare APPEAL, REVIEW

**1re·move** \rə'müv, rē'-\ *vb* [ME *removen, remeven,* fr. OF *remouvoir, removoir,* fr. L *removēre,* fr. *re-* + *movēre* to move — more at MOVE] *vt* **1** : to change or shift the location, position, station, or residence of (as in order to reestablish) : SHIFT, TRANSFER — usu. used with *to* and specified place ⟨~ the troops to the front⟩ ⟨~ the family to the seashore⟩; *specif* : to transfer (a pending case) for original hearing or trial from one court to another in the same or another jurisdiction — compare REMOVAL OF CAUSES **2** : to move by lifting, pushing aside, or taking away or off : put aside, apart, or elsewhere ⟨~s his hat in the house⟩ ⟨~ a book from a shelf to examine it⟩ **3** : to force (one) to leave a place or to go away: as **a** : to dismiss from office **b** : ASSASSINATE **c** : to take away by death **4** : to get rid of as though by moving : ERADICATE, ELIMINATE ⟨~ the causes of poverty⟩ ~ *vi* **1** : to change location, station, or residence ⟨~ from their town house to the country⟩ **2** : to go away : DISAPPEAR, DEPART **3** : to be capable of being removed ⟨a bottle cap that ~s easily⟩ **syn** see MOVE

**2remove** \"\ *n* -S **1 a** : REMOVAL; *specif* : the transfer of one's business or of one's domestic belongings from one location or dwelling house to another : MOVE **b** *archaic* : the act of removing a horse's shoe to dress the hoof **c** *Brit* : a change of dishes during a meal **d** *Brit* : promotion of a pupil to the next form **2 a** : a distance (as a space, time, or divergence of state) separating one person or thing from another : distance apart or away ⟨at a short ~ upon the same platform was an officer —Ambrose Bierce⟩ ⟨her poems . . . work best at a slight ~ from the personal —Richard Wilbur⟩ **b** (1) : a degree distant (as in derivation or relationship) : a grade or stage of separation from the immediate or direct : a step apart or away ⟨such a popular song . . . simply repeats, at many ~s, a motif of the conventional behavior of the courtly lover —R.A.Hall b.1911⟩ ⟨a primary and intense experience . . . which men at best know only at second ~ —M.F.A. Montagu⟩ — compare FIRSTHAND (2) : a degree of lineal consanguinity : a generation removed ⟨only at one ~ from the villager —G.M.Trevelyan⟩ ⟨the sixteen sire lines . . . of these famous racehorses at the fourth ~ —Dennis Craig⟩ **3** *obs* : ABSENCE **4** : an intermediate form between two others in an English school

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECENT PAST PRESERVATION )
NETWORK, a Virginia non-profit corporation, )
P.O. Box 100505, Arlington, VA 22210; )
DION NEUTRA, 2440 Neutra Place, Los )
Angeles, CA 90039; and CHRISTINE )
MADRID FRENCH, 2522 Willard Drive, )
Charlottesville, VA 22903, )
                 )
        Plaintiffs, )
                 )
        v. )
                 )
JOHN LATSCHAR in his official capacity as )
SUPERINTENDENT OF GETTYSBURG )
NATIONAL MILITARY PARK, 97 )
Taneytown Rd., Gettysburg, PA 17325; )
DENNIS REIDENBACH in his official )
capacity as ACTING DIRECTOR, )
NORTHEAST REGION OF THE )      Case Number.:  1:06-CV-02077-TFH
NATIONAL PARK SERVICE, 200 Chestnut )      Judge:  Thomas F. Hogan
Street, Philadelphia, PA 19106; MARY )      Deck Type:  Administrative Agency
BOMAR in her official capacity as )                     Review
DIRECTOR OF THE NATIONAL PARK )      Date Filed:  12/05/2006
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; DIRK KEMPTHORNE in his )
official capacity as SECRETARY OF THE )      DECLARATION OF CHRISTINE
UNITED STATES DEPARTMENT OF THE )      MADRID FRENCH IN SUPPORT OF
INTERIOR, 1849 C Street, N.W., Washington, )    PLAINTIFFS' MOTION FOR
D.C. 20240; THE NATIONAL PARK )      SUMMARY JUDGMENT
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; and THE UNITED STATES )
DEPARTMENT OF THE INTERIOR, 1849 C )
Street, N.W., Washington, D.C. 20240, )
                 )
        Defendants. )
                 )
                 )

I, Christine Madrid French, declare as follows:

1.     I currently reside in Charlottesville, Virginia.

2.     I received a masters degree in Architectural History from the University of Virginia in 1998.

3.     I am the President of the Recent Past Preservation Network ("RPPN"), a non-profit corporation dedicated to the preservation and understanding of the modern built environment.  RPPN is headquartered in Arlington, Virginia, and has over 220 members throughout the United States, including Pennsylvania and Washington, D.C.  RPPN regularly advocates for the preservation of significant examples of modern architecture, including the Gettysburg Cyclorama Center ("Cyclorama Center").

4.     I am also the author of several published works on the Mission 66 program and the architecture of Richard Neutra, including the Cyclorama Center.  My interest in Mission 66 and the Cyclorama Center began in 1993, while I was working for the National Park Service as an architectural historian with the Historic American Buildings Survey/Historic American Engineering Record.  I later worked for the National Park Service at the National Capital Regional office in Washington, D.C.  I am currently working on the preservation and documentation of Mission 66 buildings that exemplify modern architecture and post-World War II development in the national parks, particularly the Cyclorama Center.  I am completing a book on Mission 66 and the development of the visitor centers, including the Cyclorama Center, between 1956-1966.

5.     On or about September 18, 2006, I sent a letter to John Latschar, Superintendent of the Gettysburg National Military Park, requesting clarification of the Park Service's plans, if any, for the Cyclorama Center.  In my letter, I explained that the Park Service had not prepared either an environmental assessment or an environmental impact statement identifying and

evaluating the potential environmental impacts of demolishing the Cyclorama Center and reasonable alternatives thereto, as required by the National Environmental Policy Act of 1969 ("NEPA"), and that the agency had failed to comply with section 110 of the National Historic Preservation Act ("NHPA"). I also provided Superintendent Latschar with approximately 25 documents relevant to compliance with NEPA and NHPA. A true and correct copy of my letter to Superintendent Latschar, including all documents attached to that letter, is attached as Exhibit A. A true and correct list of the attachments to that letter is attached as Exhibit B.

6.    Superintendent Latschar never responded to the letter I sent on or about September 18, 2006. Nor did I receive a response from any other employee or representative of the Park Service.

7.    I regularly visit the Cyclorama Center, and use the natural and physical environment of the building and the surrounding areas of Gettysburg National Military Park for educational, recreational, professional, and aesthetic purposes, including, without limitation, contemplation of the Cyclorama Center and its historic significance.

8.    As the President of the RPPN, I represent many members throughout the United States who care deeply about protecting important buildings from the recent past, including the Cyclorama Center. Many of our members regularly visit the Cyclorama Center and use the Cyclorama Center and surrounding areas of Gettysburg National Military Park for educational, recreational, professional, and aesthetic purposes. I want to assure that our members will be able to continue to enjoy the aesthetic and educational values of this exceptional building.

9.    The demolition of the Cyclorama Center would cause irreparable injury to the ability of myself and other RPPN members to enjoy the educational and aesthetic benefits of an irreplaceable structure.

10.    The Park Service's failure to use or re-use the Cyclorama Center, its refusal to evaluate alternatives to demolition, its failure to create a preservation program for the building, and its refusal to evaluate the demolition under NEPA have already reduced the recreational and aesthetic value of the Cyclorama Center.  In recent years, access to the building has been increasingly limited.  Now, the building is closed.  When I visited the Cyclorama Center on June 28, 2006, I noticed that a large hole had been cut into the side of the building and a rough wooden fence erected along the building's observation deck.  Moreover, the Park Service has allowed the building to become stained with tree sap.  It is as if the agency wishes the building to fall down on its own.  All of these things interfere with the recreational and aesthetic value of the Cyclorama Center and surrounding areas of Gettysburg National Military Park.

11.    If the building is demolished, the entire recreational and aesthetic value of the Cyclorama Center will be destroyed as well.

12.    The Cyclorama Center is also valuable in the sense that was one of just five Mission 66 visitor centers to be designed by notable private architects.  The Park Service has already demolished other such visitor centers.  Therefore, the demolition of the Cyclorama Center would not only compromise the aesthetic values of Gettysburg National Military Park, but also of the architectural record of the Mission 66 program as a whole.

13.    I am very concerned about the Park Service's attempt to avoid the clear requirements of NEPA and the NHPA, both of which are designed to protect the public welfare.

14.     For these reasons, I believe that immediate and permanent action is required to prevent the demolition of the Cyclorama Center, and to prevent the Park Service from violating Federal laws.  If such action is not taken, great injury to the aesthetic and recreational value of Gettysburg National Military Park and to the entire system of Mission 66 visitor centers will result.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of January, 2008.

_____
Christine Madrid French

# EXHIBIT A

September 18, 2006

**<u>Via Federal Express</u>**

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
97 Taneytown Road
Gettysburg, PA 17325-2804

      Re:   Cyclorama Center

Dear Dr. Latschar:

      I am writing to inquire about the National Park Service's future plans, if any are currently in place, for the 1961 Cyclorama Center at Gettysburg, an historic structure designed by acclaimed architect Richard Neutra and determined eligible for listing in the National Register of Historic Places for its "exceptional historic and architectural significance."

      In 1999, the Park Service issued a broad, programmatic General Management Plan/Environmental Impact Statement (GMP/EIS) and Record of Decision (ROD) for Gettysburg National Military Park. Those documents noted that the Park Service plans to "rehabilitate" certain areas of the Park, and that this "rehabilitation" would require removing the Cyclorama Center from its current location. However, neither the GMP/EIS, nor the ROD, nor any other National Park Service document has evaluated the environmental impacts of removing the Cyclorama Center from its current location or analyzed alternative means of effecting such removal as required under the National Environmental Policy Act (NEPA).

      For eleven months, I have made numerous attempts, through my attorneys, to obtain information on the Parks Service's plans, if any, to remove the Cyclorama Center from its current location, including several requests for an outline of the agency's compliance with NEPA. Those attempts include two letters and three telephone calls to your office and two telephone calls to Jake Hoogland, Chief of the Environmental Quality Division of the National Park Service. To date, neither you nor Mr. Hoogland has responded.

      The Park Service's failure to respond to my inquiries is particularly troubling in light of public statements indicating that the agency intends to demolish the Cyclorama Center. As you know, demolition of the Cyclorama Center is a major federal action and, as such, triggers NEPA. Because the Cyclorama Center is eligible for listing in the National Register of Historic Places and is owned by a federal agency, the Park Service's management of the Cyclorama Center must also be consistent with section 110 of the National Historic Preservation Act (NHPA).

      I would like to make it clear that I am not disputing the validity of the 1999 GMP/EIS and ROD. Rather, I seek to make sure that the Park Service complies with NEPA and NHPA before demolishing the Cyclorama Center. Together, those statutes require that *before* the Park Service takes any steps that may irreversibly harm the Cyclorama Center, the agency must (1) identify, evaluate, and disclose to the public the environmental and historic impacts of demolition, (2) identify and analyze alternative means of removing the building from its current location, (3) use the building to the maximum extent feasible, and (4) establish a preservation

program ensuring that the building is managed and maintained in a manner consistent with the NHPA.

In undertaking mandatory reviews under NEPA and NHPA, the Park Service must consider the following facts:

1.    The Park Service promoted the Cyclorama Center as a flagship architectural landmark during its Mission 66 program, a billion-dollar, ten-year modernization campaign timed to end with the celebration of the 50th anniversary of the founding of the agency in 1966 (see attachment A).  Approved by President Eisenhower and funded through Congress, Mission 66 changed the character of the national parks by introducing a wealth of new services for public and employee use. According to the Park Service, physical improvements associated with the Mission 66 program were designed to be "adequate for expected demands but so designed and located as to reduce the impact of public use on valuable and destructible features…[they are] intended to give the fullest degree of protection, both to visitors and resources."[1]  The program was intended to give the fullest possible degree of protection, both to visitors and to park resources.

2.    The Mission 66 program funded many significant building projects at Park Service sites nationwide, including the construction of the Gateway Arch in St. Louis (Eero Saarinen, 1947, 1961-66), the restoration of Independence Hall in Philadelphia, and the completion of the Blue Ridge Parkway.  The architectural significance of Mission 66 lay in its exclusive use of modern design and the introduction of an innovative new building type called the visitor center. Gettysburg, a crown jewel of the American park system, required a premiere building to accommodate the throngs of visitors expected for the 1963 Civil War centennial celebration of the battle.

3.    The Cyclorama Center posed a number of site and design challenges.  The Park Service required that the structure include staff offices, public restrooms, an information station, an auditorium, a museum, and an enclosed gallery for the 1883 cyclorama painting "Battle of Gettysburg" (see attachment A).  Essentially, the building was required to meet the criteria for both a sacred monument and a utilitarian public facility.

4.    After calling for, and rejecting, building plans from its staff architects, the Park Service hand-picked Richard Neutra, of the firm Neutra & Alexander, to design the Cyclorama Center (see attachment A).  Neutra was one of the most famous, highly-regarded, and influential architects of the era, and his buildings stand alongside those of fellow architect and friend Frank Lloyd Wright in the history of American architecture.  Indeed, Neutra and Wright are the only architects to be featured on the cover of Time Magazine (see attachment B).  Neutra's contributions to American design include some of the greatest works of architecture in this country, and, indeed, in the world.  Iconic Neutra residential commissions include the Lovell "Health" House and the VDL House in Los Angeles and the Kaufmann House in Palm Springs,

---

[1] This text was included in the formatted statement titled "What is Mission 66?" which was included at the front of every National park Service unit submission for projected improvements—including those submitted by and for Gettysburg National Military Park.  See "Mission 66 for Gettysburg National Military Park." (Gettysburg, PA: U.S. Department of the Interior, National Park Service, n.d.).

as well as structures in twenty states, Guam, Indonesia, Pakistan, France, Switzerland, Germany, Venezuela, and Cuba. During his fifty years as a practicing architect, Neutra also designed churches, schools, civic structures, and an observatory, all innovative buildings that have inspired generations of architects. Significantly, Neutra himself considered the Cyclorama Center to be the project closest to his heart (see attachment A).

5.    Richard Neutra was the recipient of numerous architectural awards, including the coveted American Institute of Architects Gold Medal, awarded posthumously in 1977 in recognition of a significant body of work of lasting influence on the theory and practice of architecture.

6.    Although Neutra designed the Cyclorama Center, the Park Service remained closely involved with certain portions of the project. Among other things, the agency selected the site for the building and gave detailed guidance concerning appropriate arrangements for housing and hanging the "Battle of Gettysburg."

7.    Neutra's work on the Cyclorama Center won significant praise from the Park Service and the public. Upon receiving the architect's drawings, the agency's Division of Design and Construction sent him a letter congratulating him and his staff for a job well done (see attachment C). The letter also noted that the Park Service was "well pleased" with Neutra's drawings and specifications as well as the bid process for the building (see attachment C). Neutra shunned architectural convention and envisioned the building as a "place of cultural interchange" that celebrated Lincoln's concept of reconciliation in a global context (see attachment A). The *New York Times* praised the building as an example of the federal government's new architectural identity and predicted it would "become one of the showplaces of the National Park System" (see attachment A). The Washington Post reported that the Cyclorama Center is not only "one of the most handsome buildings in the area," but also an effective cultural resource for visitors, exhibits, and staff. (see attachment D). In 1970, the American Institute of Architects honored Mission 66 and the National Park Service for the innovative development of modern facilities "in harmony with the architectural theme" of America's national parks.

8.    The Cyclorama Center is one of the first examples of a new building type – the visitor center – developed by the Park Service and introduced to the public during Mission 66 in an effort to streamline and standardize visitor services nationwide. The Park Service utilized in-house architects as well as regional professionals to design the initial 100 visitor centers planned for the parks. The Park Service commissioned heralded private architectural firms to design five high-profile projects at select national park sites. Neutra and Alexander designed two of these five visitor centers: the Cyclorama Center at Gettysburg National Military Park in Pennsylvania (1958-61), and the "Painted Desert Community" at Petrified Forest National Park in Arizona (1959-62).

9.    The Cyclorama Center is recognized by architects and historians for its importance within the context of American architecture. A diverse group of architects, design professionals, and historians, including, but not limited to, Dr. Richard Longstreth, Frank Gehry, Sir Norman Foster, Terence Riley, Robert A.M. Stern, Thomas Hines, and the late J. Carter Brown have issued written statements detailing the importance of the Cyclorama Center and of Neutra's place in American architecture (see attachments G, I, J, K, L, M, N, and O). The building is an important contributor to a complex commemorative and commercial landscape that developed over the course of more than a century at Gettysburg.

- 3 -

10.     The Mission 66 visitor centers are recognized by the National Park Service for their architectural significance. In October 1998, the Keeper of the National Register determined the five high-profile visitor centers (including the Cyclorama Center) eligible for the National Register of Historic Places.  Several Mission 66 visitor centers have already been designated as National Historic Landmarks, and the National Park System Advisory Board Landmarks Committee has recommended that the Cyclorama Center also be so designated (see attachments H and I).

11.     The Cyclorama Center is recognized as an important architectural monument worldwide. On June 21, 2005, the World Monuments Fund, the foremost private, non-profit organization dedicated to preserving historic, artistic, and architectural heritage worldwide, included the Cyclorama Center on its 2006-07 Watch List of 100 Most Endangered Sites (see attachment Q). Since its founding in 1965, WMF has helped save more than 430 sites in 83 countries. The 2006 Watch list features sites from 55 countries on all seven continents. The Cyclorama Center is one of eight designated in North America this year. A total of nine modern sites are included, reflecting the increasing understanding of the importance of twentieth-century architecture as part of our cultural heritage, and an awareness of its fragile status.

12.     In 1998 and 1999, the Park Service prepared a document titled "Section 106 Case Report" in connection with the agency's consideration of a General Management Plan/Environmental Impact Statement (GMP/EIS) under section 106 of the NHPA.  A large number of prominent architects, historians, and elected officials have criticized the Park Service's failure to comply with NHPA and, more specifically, the agency's failure to properly identify and analyze the historic nature of the Cyclorama Center (see attachments E through P). Practical strategies to re-use the building, restore original elements to functional use, or renovate the structure for continued public enjoyment were never seriously considered nor explored during the decision process.

13.     In 1999, Congressman James Hansen, Chairman of the United States House of Representatives Committee on Resources, Subcommittee on National Parks and Public Lands conducted an investigation of the National Park Service's plans for Gettysburg National Military Park.  As part of that investigation, Congressman Hansen's Subcommittee held a hearing at which Park Service officials were required to answer questions about the GMP/EIS.  Park Service officials did not provide adequate responses to members of the Subcommittee (see attachments R through T).  As a result, Chairman Hansen submitted twenty additional questions to the Park Service about the agency's plans for Gettysburg National Military Park.  In responding to those questions, the Park Service made the following representations to Congress:

A.     The GMP/EIS proposes new facilities to be used for carrying out agency responsibilities (see attachment T).

B.     Section 110 of NHPA requires federal agencies to consider maximum feasible use of historic properties such as the Cyclorama Center during agency planning processes (see attachment T).

C.     As of April 2, 1999, the Park Service had not determined whether to protect and preserve the Cyclorama Center (see attachment T).

D.      Between 1993 and 1999, the Park Service never requested any funds to preserve the Cyclorama Center (see attachment T).

E.      The GMP/EIS does not contain—and the Park Service did not consider—specific cost estimates for repair and/or preservation of the Cyclorama Center (see attachment T).

14.     I regularly visit Gettysburg National Military Park, and I use the natural and physical environment of the Park, including the Cyclorama Center, for educational, recreational, professional, and aesthetic purposes. Unfortunately, the Park Service has failed to adequately maintain and preserve the Cyclorama Center. To cite just one example, the agency has allowed a large portion of the exterior of the building to be stained by streaks of dirt and tree sap (see attachment U).

15.     On June 28, 2006, while visiting the Cyclorama Center, I noticed that a large rectangular hole has been cut into the side of the Cyclorama Center and a rough wooden fence has been erected along the building's observation deck (see attachments V and W). The hole represents a significant alteration of the building (see attachments X and Y). As noted above, management of and alterations to the Cyclorama Center must be consistent with NEPA and NHPA. The Park Service must comply with those statutes *before* taking any steps that may irreversibly harm the building.

Clearly, the future of this building must be addressed by the Park Service. I look forward to hearing from you.

Sincerely,

Christine Madrid French
2522 Willard Drive
Charlottesville, VA  22903

Enclosures

- 5 -

# ATTACHMENT A



# modernism

DECO > MIDCENTURY > POP > POST-MODERN

MAGAZINE

HERBERT BAYER

**STREAMLINING DOMESTIC ARTS**

**PRISM REDUX**

**PAUL LASZLO IN OREGON**

U.S. $6.95 CAN. $9.95 EURO C10.

5 2>

0 74470 94634 2

**Summer 2005**
www.modernismmagazine.com

**LAST CHANCE TO SEE?**



<div style="text-align: right; font-size: small;">Image courtesy National Park Service</div>

# Bulldozing a Masterpiece
# Richard Neutra's Modernist Gettysburg Memorial

By Christine Madrid French

Last summer, the federally sponsored Historic American Buildings Survey dispatched a team of architectural experts to document — in words, measured drawings and archival photographs — the Cyclorama Center at Gettysburg, Pennsylvania. The Cyclorama is one of several showpiece visitor centers, erected by the National Park Service in the 1960s as part of a widespread effort to upgrade the parks for heavy tourist use after the lean years of World War II.

Designed by modernist pioneer Richard Neutra (1892–1970), the 1961 building is listed on the National Register of Historic Places for "its exceptional historic and architectural significance." If all goes as planned, however, drawings will soon be all that is left of this venerable structure. The Park Service intends to demolish Neutra's modernist monument and construct a new visitor center nearby in the style of a 19th-century farm as part of a privately funded $100 million comprehensive redevelopment scheme. Historians, joined by renowned architects Frank Gehry and Sir Norman Foster, among others, vehemently oppose the building's destruction. The Park Service, however, maintains that it is an "intrusion" that must be removed.

The Gettysburg Battlefield is among the most hallowed historical sites in America. It was there, in July 1863, at the height of the Civil War, that more than 51,000 men were killed or wounded in a bloody clash between the Union army, led by Gen. Joseph Hooker, and the Confederates, guided by

***Above*** *Gettysburg Visitor Center, View from the East, drawing, 1959. Neutra and Alexander, architects.*

***Opposite*** Ramp leading to the Cyclorama Gallery, illuminated by a curving path of light which directs visitors to a 360° circular painting of the Battle of Gettysburg by Paul Philippoteaux, completed in 1883. The exhibit area is visible beyond the wall of stainless-steel tubes. The interior (pictured in 2003) is remarkably intact, with virtually no changes to the structure.



# LAST CHANCE TO SEE?



Construction of the Cyclorama Center, in 1961. Small structure with flag is a viewing tower (later demolished).

Gen. Robert E. Lee. On the third day of fighting, Gen. George E. Pickett led 11,000 Confederate soldiers in a final, desperate charge against entrenched Union lines at the Angle on Cemetery Ridge; only one in three of his men emerged safely from the disastrous attempt. Lee's troops retreated, their final position at Gettysburg forever recorded as the high water mark of the Confederacy. The State of Pennsylvania quickly acquired land to create a "national" cemetery for 3,500 dead Union troops at the site; Confederate dead were buried in the fields. President Abraham Lincoln, invited to make "a few appropriate remarks" at the dedication ceremony, used the occasion to confirm the equality of all men and declare that "government of the people, by the people, for the people, shall not perish from the earth." Lincoln's Gettysburg Address lasted less than two minutes, but his words remain some of the most poignant in recorded history.

Today, Gettysburg bears little resemblance to the humble hamlet of Lincoln's day. A million tourists from around the world visit the adjacent battlefield each year to stand on the ground where Hooker, Lee and Pickett fought, and to reflect on Lincoln's solemn words. More than 1,400 monuments, statues, period cannons and markers of every description dot the surrounding fields, forests and hills, erected by veterans groups

and landscape stewards. A complicated network of Victorian-era touring roads snakes past Devil's Den and the National Cemetery, and leads into "America's Most Famous Small Town." A thriving tourist industry supports more than 20 museums, dozens of motels, a bevy of restaurants (including General Pickett's All-U-Can-Eat Buffet) and innumerable gift shops, antique stores, galleries and boutiques.

Amid this array of buildings, monuments and highways stands Neutra's Cyclorama Center. There is no interpretive marker, no plaque, not even a dedicatory cornerstone to help the public understand this landmark. But there is much to learn here, about the battlefield's commemorative history, the architect's later-life aspirations and the Park Service itself.

The Park Service became part of Gettysburg's history in 1933 when Congress transferred a collection of the nation's Civil War parks to the federal agency. For 25 years, the staff at Gettysburg had made do with hand-me-down quarters at the local post office. But a rapid increase in the number of visitors, fueled by post-World War II economic prosperity, overstressed facilities throughout the parks system. In response to this crisis, Congress approved the ten-year Mission 66 program in 1966, a billion-dollar initiative that changed the face of the national parks. Its

architectural significance lay in its exclusive use of contemporary design for all construction and the introduction of an innovative new building type — the visitor center — designed to consolidate services and staff offices in one centralized structure. Gettysburg, a crown jewel of the park system, required a premier building to accommodate the throngs of visitors expected for its 1963 centennial celebration. Mission 66 provided the funding and inspired the style for the new structure.

After calling for, and rejecting, building plans from its staff architects, the Park Service hand-picked the firm of Neutra and Alexander of Los Angeles to design the visitor center. Richard Neutra, an Austrian-born immigrant who became one of the most significant architects of this century, excitedly accepted the commission. Neutra is perhaps best known for his Southern California houses, most notably the Lovell "Health" House in Los Angeles (1927–29) and the Kaufman "Desert" House in Palm Springs (1946–47), projects that influenced residential design throughout the country. A self-proclaimed "bio-realist," Neutra worked tirelessly for more than 60 years to create environments that enhanced basic human relationships and promoted mankind's connection to nature. He described himself as "walking on air" upon receiving the news of the Gettysburg commission in 1958. Here was a rare opportunity to explore his architectural and humanist theories on a monumental scale. The project quickly engulfed the full energies of the architect. He kept copious notes of his aspirations for the site and referred to the Cyclorama Center as the building "closest to my heart."

The Gettysburg project posed considerable challenges of site and design. The new visitor center had to include staff offices,



Photo by Christine Madrid French

**Above**  Rotunda, containing the Cyclorama Gallery, and rear wall of the auditorium (foreground), showing deterioration, are rendered in ribbed concrete and coated with a white silica-infused paint. The sand particles glitter in the sun and when illuminated by nighttime lights. Photo from 1998.

**Below**  The Cyclorama Center, 1965. Note spider leg at far left of office wing.



# LAST CHANCE TO SEE?



*Above* First-floor circular exhibit area at the base of the ramp leading up to the Cyclorama Gallery, 1962.

*Below* A portion of the *Gettysburg Cyclorama* painting.



public restrooms, an information station, auditorium, museum and an enclosed gallery for the 1883 "circular panorama," or cyclorama painting, of the last day of the Battle of Gettysburg by French artist Paul Philippoteaux. The enormous canvas, measuring nearly 40 feet high and more than 100 feet in diameter, was first displayed in Boston and traveled to various sites during its history. The Park Service acquired the painting in the late 1940s after it ended up in Gettysburg, displayed in a building which resembled an oversized grain silo. The painting was the centerpiece of the new visitor center plan. Park officials insisted that the building be constructed on a prominent site overlooking the field where Pickett made his famous charge — the same location depicted in Philippoteaux's brilliant scenography and historically one of the most popular places from which to view the battlefield.

In designing the Cyclorama Center, Neutra drew inspiration from symbolic spaces of the past, creating a memorial intended to encourage quiet contemplation of the battle and initiate new discussions about the meaning of Lincoln's timeless Gettysburg Address. The building is gracefully rendered in plan, its footprint resembling a keyhole. At the north end, a series of concentric circles is created by the curved shape of the auditorium, the outer wall of a stark white rotunda, and a darkened ramp spiraling to the upper floor of the rotunda and emerging onto an elevated 360-degree circular viewing platform surrounded by the cyclorama painting. Extending to the south is a rectangular office wing topped by an observation deck intended to provide an immediate, three-dimensional view of the landscape rendered in the painting. Descriptive plaques along the deck help visitors link the tangled story of the battle with the panoramic view laid out before them. Here Neutra addressed the solemnity of the commemorative landscape by blurring the boundaries between the physical and the ethereal. From the observation deck, the reflections of the bold white surfaces of the ribbed rotunda and the ever-changing sky could be seen smudged together in the rippling water of a shallow pool running the length of the office wing. The water originally flowed to another series of pools at the base of the rotunda, but the Park Service, citing maintenance headaches, drained and disabled the pool features years ago. The building form is further linked to the battlefield through the use of a massive "spider leg," a signature Neutra element seen in many of his buildings. The concrete form, composed of a vertical and horizontal beam in the shape of an upside-down "L," reaches beyond the observation deck to anchor the building with the earth below. Behind the spider leg is a wall of native Pennsylvania stone which disguises the scale and presence of the building when seen from the battlefield.



Photo courtesy National Park Service

Stairs leading into the second floor lobby from the Cyclorama Gallery. Photographer unknown, 1961.

# LAST CHANCE TO SEE?



Photo courtesy National Park Service

The ceiling structure of the Cyclorama Gallery under construction. Bethlehem Steel provided the supporting cables for the hung roof which were strung from the base of the 18-foot center column hub to connectors around the top of the perimeter wall.

After a visit to Gettysburg in April 1960, Neutra found himself "more than ever devoted to this project." In his hands, the Cyclorama Center became more than the typical tourist rest stop. In the dark years of the Cold War, Neutra sought to create a place of "cultural interchange" and envisioned the building as an international site of reconciliation. The "focus of the composition" became the Rostrum of the Prophetic Voice, an elevated speaker's platform set beneath projecting letters spelling out the last words of Lincoln's inspiring address. Neutra created a series of sliding windows and walls that would open to reveal the rolling landscapes of the battlefield to the east of the building and expose the rostrum to an audience on the lawn. The architect imagined that a procession of world leaders, such as India's Jawaharlal Nehru, Brazil's Juscelino Kubitschek or China's Chou En-Lai, would be invited to Gettysburg to present stirring speeches promoting global unanimity. "We should invite every year one of the great statesmen of the Nations," he wrote in his notes. "It may be even a 'Cold War' enemy nation to speak before thirty thousand people about: 'What Shall Not Perish from the Earth.'" Where Lincoln spoke of the shattered Union

between the northern and southern states, Neutra dedicated his latter-day Lincoln Memorial to the cause of international harmony in a age threatened with atomic annihilation.

More than 100 new visitor centers were completed during the ten years of the Park Service's Mission 66 campaign, but only a handful rated as highly as Neutra and Alexander's design. *The New York Times* heralded this "handsome new $1,000,000 Park Visitor Center" as "the first port of call for all visitors," a structure optimistically predicted "to become one of the showplaces of the National Park System." *Washington Post* architectural critic Wolf Von Eckardt praised the "quietly monumental but entirely unsentimental" Neutra design. He cited the Gettysburg building as one of a set of "exceptionally distinguished and fearlessly modern" buildings in the national parks, each deserving of an architectural excellence award. In 1970, the American Institute of Architects agreed, honoring Mission 66 and the Park Service for the innovative development of modern facilities "in harmony with the architectural theme" of each park.

Though Neutra dreamed of enormous international audiences converging upon his building, his vision of the

Cyclorama Center as a "Shrine of the American Nation" never materialized. The Park Service hosted only one major event at Neutra's memorial — its dedication in 1962 on the 99th anniversary of the Gettysburg Address — before quietly abandoning the commemorative concept. For decades the Cyclorama Center has deteriorated, under the Park Service's policy of benign neglect. The once-white rotunda is streaked black with dirt and sap; the ceiling near the west entry is water damaged and pock-marked. Park employees have shoved a storage shed under the rotunda overhang and created an ad hoc break area — a ratty collection of office chairs and stacked hay bales — under the office wing in full view of the visiting public. The steady degradation of the building is regularly cited as evidence of its inadequacy, as all the more reason to remove this modernist "eyesore" from the historic battlefield and construct new facilities in a more "appropriate" location and architectural style.

Park officials have shown little, if any, appreciation for the cultural and historic significance of the building and its architect. The Park Service has never completed a thorough cost analysis for rehabilitation or reuse of the Cyclorama Center, nor has the agency ever, in the last 42 years, contacted Neutra's firm, now run by his son Dion, for consultation on the alleged deficiencies of the building. In the mid-1990s, the Park Service (and its supervisory agency, the U.S. Department of the Interior) agreed with an in-house analysis that the building lacked merit and approved its demolition. Historians and preservationists, outraged by the prospective loss of an architectural treasure, turned to the Keeper of the National Register of Historic Places, who later declared the building eligible for listing in 1998. This designation did not guarantee that the building would be saved, but the positive determination triggered a series of regulatory actions required by the 1966 National Historic Preservation Act. Section 106 of the act requires federal review of any proposals that include alteration or demolition of structures listed on the National Register. The Advisory Council on Historic Preservation, the federal agency charged with review, agreed with the Park Service assessment of the situation and approved the park plan, including destruction of the Cyclorama Building. Two years later, the Society of Architectural Historians nominated the building as a National Historic Landmark, the highest status for an historic building in

**Left** The two-story glass windows with louvers and second floor lobby, right, provide an open view for interpretation of the battlefield in adverse weather conditions. The automated, adjustable sun louvers extend the length of the office wing.

**Right** The Cyclorama Gallery sits atop a tiled cylinder, right. The ramp leading to the painting is surrounded by stainless-steel tubes; brilliant flashes of sunlight from the battlefield, at left, confront visitors as they ascend the ramp. Indirect interior lighting and reflective surfaces contribute to the quiet atmosphere of a memorial.



# LAST CHANCE TO SEE?



**Above** Employee break area with oil drum trash can, hay bale and old chairs under office wing near the main entrance to the building in full view of visiting tourists, 1998.

**Opposite top** Cyclorama rotunda and observation deck from the south end of the ramp, 1962. Photographer unknown.

Photo by Christine Madrid French

this country, hoping that designation might provide the additional ammunition needed to save the building. The landmark nomination was approved by a committee of architectural experts, but the Park Service refused to pass it on to the Secretary of the Interior for final approval and signature, thus clearing the way for demolition yet again.

Many question the Park Service's objectivity in this case, given its hand in developing the new visitor center designed by Cooper, Robertson & Partners of New York, and its disregard for expert testimony on behalf of saving Neutra's Cyclorama. During a subcommittee review of park procedures, Utah Congressman James V. Hansen excoriated the Park Service for making a "mockery" of cultural resource protective regulations and charged Gettysburg park superintendent John Latschar with "arrogant" and "unprofessional" conduct in his handling of the matter. Equally disturbing, according to Hansen, was the purposeful "withholding [of] comments which oppose this plan, especially by people of prestige," such as the late J. Carter Brown, former chairman of the U.S. Commission of Fine Arts, and Museum of Modern Art curator Terence Riley. Such actions, he said, are "unfair to the public who deserve an unbiased assessment of the Cyclorama building by federal agencies."

But it is exactly this popular bias against modern buildings that gives the Park Service argument its strength. The very characteristics that distinguish modern buildings make them more vulnerable to demolition as they age and lose their original context. The progressive intent, the unusual mix of materials and the divergence from traditional construction methods — the architectural hallmark of American innovation and leadership at mid century — are frequently viewed as anachronistic today. These ugly modernist intrusions, so the idea goes, must be removed in order to restore the otherwise historic integrity of our small towns, big cities and rural

landscapes. In this framework, the restoration of a Civil War battlefield conclusively trumps the preservation of a modernist masterpiece.

But why not save both? Other Mission 66-era visitor centers are also located close to or on historic landscapes. Many of these buildings, once in danger of demolition, are now recognized as national historic landmarks. The sweeping concrete forms of Mitchell/Giurgola's 1960 visitor center, at the site of the Wright Brothers' first flight in North Carolina, nearly met the wrecking ball before the Park Service reversed course and protected the building. It is now undergoing an extensive restoration. Unfortunately, in the eight years since the Park Service unveiled its new plans for Gettysburg, it has only hardened in its resolve to demolish the Cyclorama Center, much to the consternation of modernist fans everywhere.

Neutra's homage to Lincoln may not fit the average American's idea of a battlefield memorial, but it contributes invaluably to our understanding of the principles that guided 1960s-era society, both architecturally and politically. The Cyclorama Center, as architect Frank Gehry asserted, "is a frame for the events that inspired it." The structure "reflects the highest ideals of [that] time and deserves the highest appreciation of ours." This place of memory is an important contributor to the collection of monuments, statuary and tributes erected across the landscape over the last 140 years. As caretaker of the site, the Park Service would better serve the people by embracing each of these various expressions — including those that may be out of fashion — and ensuring that their intentions are interpreted and incorporated into the continuing story of Gettysburg. ⬛

*Christine Madrid French has a master's degree in architectural history from the University of Virginia. A former historian at the National Park Service, she is a founder of the Recent Past Preservation Network and is involved in historic preservation nationwide.*



# ATTACHMENT B

# TIME

## THE WEEKLY NEWSMAGAZINE



### ARCHITECT RICHARD NEUTRA
What will the neighbors think?

# ATTACHMENT C



UNITED STATES
DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
Eastern Office
Division of Design and Construction
120 South Third Street
Philadelphia 6, Pa.

IN REPLY REFER TO
D3415

October 8, 1959

Attention: Mr. Dion Neutra

AIR MAIL

Richard J. Neutra and Robert E. Alexander, Architects
2379 Glendale Boulevard
Los Angeles 39, California

Dear Mr. Neutra:

I thought that you, and more particularly your staff that
worked on the drawings and specifications for the Gettysburg Visitor
Center and Cyclorama, would be interested in knowing how well pleased
we are, not only with the results of the bid opening, but with the
actual content of the drawings and specifications.

At several points during the five-week bid period, we had
comments from contractors as to the completeness and readability of
the project. At the bid opening several contractors also were very
complimentary as to the way the drawings and specifications had
been planned and presented. There were comments that some of the
information was hard to find at first but, when the contractors
became familiar with your system, they found it very satisfactory.

I would like you to pass my personal word of thanks to
your staff for the job well done.

Cordially yours,

John B. Cabot

John B. Cabot
Supervising Architect

# ATTACHMENT D

# The Washington Post

**G 6**   Sunday, March 29, 1964   THE WASHINGTON POST



Richard Neutra's Gettysburg Visitors Center.

## Cityscape

# The Park Service Dares to Build Well

### By Wolf Von Eckardt
Architectural Writer and Critic

IT IS quite a surprise to find one of the most handsome modern buildings in this general area on, of all places, the Gettysburg battlefield. But it is no accident.

The recently completed Gettysburg National military Park Visitors Center is one of several outstanding contemporary buildings by outstanding modern architects the National Park Service has constructed.



Von Eckardt

The quietly monumental but entirely unsentimental Gettysburg Center was de-

> Wolf Von Eckardt reviews "The American Conscience" exhibit of paintings and presents a selection of the works on Page E5 in the Outlook Section.

signed by Richard Neutra in partnership with Robert Alexander. Neutra is one of of the three or four living great masters of modern architecture.

CABOT

feels visitor centers and museums should, most of all, "create a pleasant human response." They should take us out of the humdrum and combine recreation with stimulation. A museum should not irritate and overwhelm us with too many choices about where to go and what to see. The atmosphhere should be free of the "static" of confusion and distraction. The visitor should know at once where he is, why he is there and where the toilet is.

Neutra's Gettysburg Center is just such a place. As you enter this architectural abstraction it immediately becomes a clear and logical means of orienting you and setting the mood for your visit to the battlefield. The big white cylinder, which resounds in the landscape like a somber drum beat, houses a 18th century cyclorama painting of the battle by Paul Philippoteaux.

The wing of the building provides services and administration. An elegantly designed ramp leads you to its roof terrace where you can view nature's setting for a decisive historic event.

This building is indeed a manifestation of "cultural effectiveness."

S-24

# ATTACHMENT E



**NATIONAL TRUST**
*for* HISTORIC PRESERVATION

April 7, 1999
By Fax

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
Gettysburg Pennsylvania 17325

        Re:   Comments on Revised Section 106 Case Report, Cyclorama Building
                Removal

Dear Dr. Latschar:

    Thank you for providing the National Trust for Historic Preservation the opportunity to comment on the National Park Service's Revised Section 106 Case Report for the proposed demolition of the Cyclorama Building and relocation of the Cyclorama Painting.

    In our letter of January 19, 1999, we highlighted three principal areas that we suggested should be given more detailed consideration in the Case Report. We have reviewed the Revised Case Report in light of our previous comments, and offer the following additional observations.

    First, we recommended in our previous letter that the report describe more fully the specific impacts of the Cyclorama Building on the character-defining features of the 1863 cultural landscape, and the feasibility of restoring those features. While we would defer to the considerable expertise of the National Park Service to identify and determine the feasibility of restoring historic landscape features relating to the 1863 battlefield, our previous comments were intended to stress that it is incumbent on the Park Service to explain how it makes such a determination, especially when this determination is central to its case for removal of a National Register-eligible property of "exceptional" significance. In Section 4.3, the Revised Case Report provides better documentation of the sources and methods available for identifying the character-defining features of the 1863 landscape for restoration. In Section 4.5.2, the Revised Case Report also provides more detailed information concerning features of the 1863 landscape that were altered or affected by the original construction of the Cyclorama Building. In this respect, we believe that the Park Service's Revised Case Report provides a stronger rationale for its position that removal of the Cyclorama Building would permit the restoration of character-defining features of the 1863 cultural landscape.

*Protecting the Irreplaceable*



1785 MASSACHUSETTS AVENUE. NW · WASHINGTON. DC 20036
202.588.6000 · FAX· 202.588.6038 · TTY: 202.588.6200 · WWW.NATIONALTRUST.ORG

Dr. John A. Latschar
Page 2

In our second comment, we stated that the Case Report should more accurately reflect the separate historical significance of the later cultural landscape associated with the construction of the Cyclorama Building. The Revised Case Report now appears to acknowledge that the landscape associated with the Cyclorama is one of the historic landscapes of the Park. For example, in Section 4.5.1, the Revised Case Report states that a new "element" of historically significant landscape—that of Mission 66—has been added to the list of "significant landscapes of the park" (a list which was previously comprised of the historic field of battle, the Soldier's National Cemetery, and the commemoration of the battle by its veterans).

However, while the revised report thus reflects a more accurate depiction of the evolution of historic landscapes at the Park, it continues to treat the Cyclorama Building itself as merely one of the "non-historic intrusions" (Section 4.6.1). This "intrusion" should more accurately be considered (and addressed) within the Report as later modifications to the 1863 landscape that has achieved historic significance in its own right. As we stated in our previous letter, we agree with the Park Service's decision concerning the primary significance of the landscape associated with the historic field of battle (and we support the goal of restoring that landscape). However, the decision to restore that landscape should be made with full recognition of the effect of that restoration on the later historic landscape, including the Cyclorama Building. The Park Service's consideration of preservation and/or mitigation options should reflect an appropriate recognition of the significance of this later landscape.

Our third comment related to the application of the Secretary's Standards for the Treatment of Historic Properties. We raised the issue of whether the Park Service's plan for the restoration of Ziegler's Grove by removing the Cyclorama Building would be fully consistent with the Standards for Restoration, since it would selectively retain certain natural features and commemorative structures not present in 1863, while restoring other features to their 1863 appearance. In apparent response, the Revised Case Report states summarily that "the Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes is most useful in Addressing the any rehabilitation, restoration or reconstruction efforts." (Section 4.6.1). While we have no reason to doubt the accuracy of this statement, we continue to believe that it would be helpful for the National Park Service to address more fully how those standards and guidelines would apply in this case.

For example, if the Park Service plans to retain memorial and commemorative structures related to the veterans' commemorative period, it may be more accurate to describe the project as a restoration to that period (which itself may contain features associated with the 1863 battlefield landscape) by the removal of structures and landscape features associated with the later Mission 66 historic period  rather than simply a restoration of the 1863 landscape. Alternatively, the Park Service may have in mind the restoration of different landscape zones (either distinct areas or overlay

Dr. John A. Latschar
Page 3

zones) to different periods (i.e., some to the 1863 battlefield landscape, and others to
the commemorative period), with appropriate public interpretation of the different
zones. A more detailed discussion of the Park Service's plans with reference to the
applicable standards and guidelines would help to establish that the net result will be
an appropriate preservation treatment.

Again, we appreciate the opportunity to comment on this important and difficult
decision for the future of Gettysburg Battlefield, and we thank you for considering the
National Trust's views.

Sincerely,

Richard Moe
President

cc:    Mr. Robert G. Stanton, Director, National Park Service
       Ms. Cathryn Buford Slater, Chairman,
           Advisory Council on Historic Preservation
       Dr. Brent D. Glass, Pennsylvania SHPO

# ATTACHMENT F





*a statewide voice for Pennsylvania's heritage*

March 18, 1999

Dr. John A. Latschar
Superintendent
Gettysburg National Military Park
97 Taneytown Road
Gettysburg, PA 17325

Re: Comments on Revised Section 106 Report on the Cyclorama Building

Dear Dr. Latschar:

Thank you for your letter of February 19, 1999 and the accompanying material relative to the revised Section 106 review of the Cyclorama Building. Although the material provided was substantial, it is the opinion of Preservation Pennsylvania that the concerns expressed in our comment letter of January 8, 1999 have not yet been suitably addressed.

We note that most of the material sent to us in February was produced *prior to* the current review and appears to treat the decision to relocate the painting as a *fait accompli*. Preservation Pennsylvania continues to believe that the question of whether or not the painting can be conserved in the existing building has neither been properly posed nor adequately addressed. We continue to call for an independent entity to consider this question. We are also in agreement with the specific points made by Richard Longstreth, president of the Society of Architectural Historians, in his letter to you of March 5, 1999. We call on the National Park Service to convene the promised meeting of all interested parties to discuss these concerns and other issues related to the future of the Cyclorama Building. If the Park Service is unable or unwilling to arrange such a gathering in a timely fashion, Preservation Pennsylvania will consider hosting such a meeting.

Moving beyond the now-firmly-established significance and the ultimate fate of the Cyclorama Building, Preservation Pennsylvania remains deeply concerned about the nature of this review process. We call upon the National Park Service and the Gettysburg National Military Park to comply fully with Section 106 of the National Historic Preservation Act of 1966, as amended. The Section 106 process is one of the cornerstones of historic preservation practice in the United States, and we believe the National Park Service should set a positive example of compliance for other public agencies. The future of the Cyclorama Building is not the only issue at stake. Indeed,

John A. Latschar
March 18, 1999
Page 2

the credibility of the National Park Service, the fate of other historic properties under Park Service jurisdiction, and the integrity of the entire Section 106 process are at stake.

In closing, we do want to reiterate that Preservation Pennsylvania concurs that improved visitor facilities are needed at Gettysburg.  We do, however, see this as a separate issue from the future of the Cyclorama Building.

We look forward to your prompt response and to our continuing role as an active participant in discussions concerning this important issue.

Sincerely,

David L. Taylor
President

cc:    Martha Catlin, Advisory Council on Historic Preservation
       Brent Glass, Pennsylvania State Historic Preservation Officer
       Janet Klein, Chair, Pennsylvania Historical and Museum Commission
       Brenda Barrett, Bureau for Historic Preservation
       David Morrison, AIA Pennsylvania
       Richard Longstreth, Society of Architectural Historians
       Richard Moe, National Trust for Historic Preservation
       Honorable James V. Hansen, U.S. House of Representatives

# ATTACHMENT G



MARGARITA JERABEK-WUELLNER

*Architectural History ~ Historic Preservation ~ Cultural Resources Management*
30150 MORNING VIEW DRIVE, MALIBU, CA 90265
PHONE: (310) 589-5608  E-MAIL: WUELLNER@UCLA.EDU
VOICE MAIL/FAX: (310) 388-1285

Dr. John A. Latschar, Superintendent
Gettysburg National Military Park
97 Taneytown Road
Gettysburg, Pennsylvania 17325

March 19, 1999

RE:   Revised Section 106 Case Report,
      Cyclorama Building and Painting,
      Gettysburg National Military Park

Dear Dr. Latschar,

Thank you for offering me the opportunity to comment as an interested party on the Revised Section 106 Case Report, dated 18 February 1999, for the Cyclorama Painting "Battle of Gettysburg," and the Cyclorama Building, Gettysburg National Military Park, Adams County, Pennsylvania. This is an important step in the process of determining appropriate preservation treatment and adverse effects mitigation for this National Register object and eligible building. I am pleased to spend a little time from final academic preparations for the end of Winter Quarter to record my comments.

The quality of the Revised Case Report is considerably improved. In my mind, this reflects the positive efforts of all the parties involved, including the Park, the Advisory Council and the interested parties, to raise its content to a level of consideration more appropriate for these nationally significant resources.

However, I am still concerned about the treatment the Neutra Cyclorama Building has received in the Revised Case Report. There are a few remaining problems with the report where the Cyclorama Building is concerned that I would like to bring to your attention. In my capacity as an experienced architectural historian and historic preservationist, I feel it is most appropriate to restrict my comments to technical points that are primarily concerned with the architectural history methodology and technical analysis applied to the Cyclorama Building in the Revised Case Report. I am well aware of the problems involved in drafting reports of this type, as I have authored numerous Section 106 reports in the last ten years that were well-received by governmental agencies, including some for historic landscapes and properties associated with the Civil War.

As an advanced student of Modern architecture, I would also like to comment on the essential importance of continuing to develop the most complete understanding currently possible of the architectural and historical significance of the Neutra Cyclorama Building. This knowledge and documentation should be thoroughly considered as an integral part of the Section 106 process for determining the appropriate future treatment of the building, and in the decisions that establish the procedures for mitigation of

adverse effects to the building. Future treatment and mitigation decisions should be based on the best knowledge and understanding of the building presently possible. This includes the clearly recognized and well-documented international importance of the architect, Richard Neutra, and the still emerging national significance of his relatively young Gettysburg Cyclorama Building within his oeuvre and the larger context of architectural history and discourse. It also includes the significance of this architect's unique design concept and its material execution in the Cyclorama Building within the following historical contexts:

1) the national and international history of the building type (19th-20th century panoramas/cycloramas and 20th-century multi-media architecture);
2) the national and international history of Modern commemorative public architecture (memorials and museums); and
3) the national history of Modern National Park architecture in the United States (Mission 66 Visitors Centers, and other similar multi-purpose administrative/museum/multi-media display buildings).

The terms panorama, or cyclorama, can be correctly used to describe very different but closely interrelated material resources. The first is a large painting executed in wide perspective, often in the shape of a cylinder or cone. The second is a building within which a panoramic or cycloramic painting is displayed. The building shelters, contains, supports, and displays the painting. Most importantly, the panorama or cyclorama building provides strategically designed access to a viewing platform of specific height and distance in direct relation to the painting. Without the material and visual support of the building, it would be impossible for viewers to receive the full-intended affect of the wide perspective that characterizes a panoramic or cycloramic painting. An excellent source for the history of panorama buildings and paintings is Stephan Oettermann, *The Panorama*, MIT/Zone Books, 1997.

The Neutra Cyclorama Building at Gettysburg is the third in a series of panorama buildings to display the painting, *Pickett's Charge*, by painter Paul Dominique Philippoteaux. The first building to display the painting is still extant in Boston. The second building was located at Gettysburg and displayed the painting until 1960. It is generally accepted methodology in architectural history to investigate the history of a building type when undertaking an architectural evaluation and analysis, especially in a case such as this when earlier resources exist(ed) that are directly related to those currently under consideration. To my knowledge, this has yet to be done in the case of the Neutra Cyclorama Building at Gettysburg. The historical relationship between the Gettysburg panorama painting and the buildings which have housed it is a fundamental context which should be developed for the Neutra Cyclorama Building before treatment or mitigation decisions are finalized for the painting or the building. It is only when the relationship between the painting and building is fully investigated that both cultural resources can be properly considered in their full art historical and architectural contexts, and their significance in American history properly established.

The Neutra Cyclorama Building at Gettysburg is a multi-purpose, multi-media building. In addition to the display of the panorama painting, the Cyclorama was designed to house museum displays on the ground-floor level, and to provide for

administrative offices in the horizontal wing. In concept and execution, the design of the building is far more intricate than these three primary functions suggest. From the spiral viewing ramp that was originally designed to provide for a continuous stream of thousands of viewers daily, to the rooftop terrace and its strategically placed waterfall, the building is a masterful example of the internationally recognized and highly advanced Modern design developed by the architect, Richard Neutra. Perhaps due to under-utilization, misunderstanding, improper use, or other reasons, these and other important elements of the design program have been unused, misused, neglected or allowed to deteriorate.

Neither the current condition nor the history of use constitutes a loss of integrity or significance. Changes in function or deterioration in condition cannot be considered to reduce the degree of integrity, since the building still possess the elements, qualities and character that make it significant. Furthermore, historical changes in use and function do not detract from the significance of the building, because these changes have not resulted in alterations to the building that would detract from its original architectural significance. Technically, the rationale and argument presented in section 4.6.2 of the Revised Case Report is fundamentally flawed. The change is function does not compromise the significance of the building and does not mitigate the adverse effects of the proposed undertaking.

It is accepted methodology in architectural history to review the documentary materials associated with a building's history, including its design and later alterations. Written documentation by the architect about the design concept is normally considered to be exceptional in value. These documents exist for the Cyclorama Building. Published sources on the design and history of a building are generally consulted. It is unclear from the Revised Case Report if efforts have been made to review any of this material. Finally, oral histories with people who personally remember the resource and interviews with experts on the resource type are generally conducted. Oral histories are one of the ways to research contemporary events and details of a resource that are not otherwise reflected in the documentary sources. It is a rare and special opportunity to interview a living member of an original architectural design team, since in most cases buildings have outlasted their creators before architectural history investigations take place. Of all authorities and experts one can interview, the original architect and his associates are normally considered one of the most important primary sources in an architectural investigation. There is no evidence of any effort to consult with the original project architect, Dion Neutra, who is carrying on his father's architectural practice and was intimately involved in the design and construction of the Gettysburg Cyclorama Building.

In my two interviews with Dion Neutra over the past two months, I have determined that the Park Service stipulations for the architectural program and design requirements did not include the design of the independent superstructure that currently supports the panorama painting within the building. The building was designed and constructed to meet the specifications required by Park Service. The deteriorated condition of the painting is indisputable. All efforts should be taken to preserve this nationally significant resource. However, it is illogical to predicate the justification for removal of the Neutra Cyclorama building on the basis that the building design caused the deterioration of the painting. This does not take into consideration the state of

painting conservation technology at the time the painting was installed. Understanding the technology of the time could help us understand why the Park Service chose to install the painting as they did. Nor does this reasoning consider the state of climate-control technology at the time. It is true later efforts were made to compensate for climate-control needs. However, the technology of climate control, especially for museums, has advanced rapidly over the last decade. It is not unreasonable to suggest that the climate control in the existing building is a situation that could be adequately addressed now or in the future.

The rejection of the alternative to rehabilitate the building for continued use is premature. Problems such as bringing fire exits and access routes up to current code requirements are not insurmountable and are commonly dealt with in historic buildings, while still preserving the integrity of the original design. These issues have been identified as design problems in the Revised Case Report. It must be clarified that these problems arose years after the building was completed and are a result of the natural evolution and improvement of the building code. Fire exits, accommodations for safety and access for the physically challenged, as currently required, were not included in the building code in 1961.

The present condition of the building cannot be attributed to design flaws, as is suggested. There is no clear evidence in the Revised Case Report that architectural experts who are specialists in Modern architecture and construction techniques have been asked to examine the building. Additionally, state-of-the-art understanding of currently emerging preservation practices and technical advancements in the treatment of Modern buildings have not been developed and appropriately applied to the Cyclorama Building. These studies should be completed before the option to rehabilitate is rejected, and treatment and mitigation decisions are finalized.

Information on the current practices and techniques for preserving and restoring Modern architecture is readily available from the ICCROM library. A bibliography can be requested from Edda Trettin, Librarian, at the e-mail address: library@iccrom.org. A special course on the preservation of Modern architecture is being offered by ICCROM this summer. During my interviews with Dion Neutra, he presented me with copies of letters from architects expert in Modern architecture who clearly dispute the Parks opinion that the present condition of the building is a result of design inadequacies. They also do not feel the building is in such poor condition that it cannot be restored for a reasonable cost.

Efforts to develop appropriate public uses for the building as recorded in the Revised Case Report appear sadly inadequate. Especially in a case such as this, where the architectural practice of the architect who designed the building survives, it is not uncommon that the original architectural firm be consulted, at least preliminarily, to consider the various options that may be available for adaptive reuse of the building. Architectural firms with the required experience and expertise should be offered the opportunity to present their proposals.

The planning philosophy at the basis of the Revised Case Report is to "restore" the Civil War period landscape. While this effort is commendable, I find the planning philosophy problematic and highly debatable. In areas where the landscape has been altered or destroyed by later development or activities, the original landscape has been irretrievably lost. Whether or not complete documentation exists for the historical

appearance of the landscape during the periods of significance, the portions of landscape that are altered or destroyed can never be "restored". The planning philosophy presented by the Park should be more properly characterized as a "reconstruction"--especially since the thrust of the project is to recreate as closely as possible the appearance of the landscape during the few years of the Civil War.

The historic resources associated with the historical evolution over time of the landscape of the Gettysburg National Military Park, from the first historic occupation of the site to the present, are important elements for interpreting how this cultural landscape has been perceived and revered as a part of American culture for many generations. Added to this is the potential importance of the earlier period of prehistoric occupation. Nevertheless, the narrowly established periods of significance appear logical and appropriate as they are developed in the Revised Case Report for the purpose of the undertaking.

Section 4.4.5 of the Revised Case Report documents the project history concerning the question of eligibility of the Cyclorama Building. It is not uncommon for historic resources outside of the established primary periods of significance to be considered contributing resources in a historic district, property or site. It is not unusual for unanticipated, previously unknown, or previously unevaluated resources to be discovered in the course of a preservation project. It is unfortunate that these unanticipated resources are discovered many times late in the progress of a project. However, the problems they present are not insurmountable and can usually be accommodated without jeopardizing the progress of the project. Since the primary goals of the General Management Plan and Case Report were to consider the preservation of the landscape within the established periods of significance, it is not surprising these documents are heavily weighted towards the resources under consideration for those periods of significance. Now that the Neutra Cyclorama Building has been determined eligible, it is hoped that efforts will continue to give the building appropriate consideration.

The mid-century decision to locate the Neutra Cyclorama in an area of primary significance in the Civil War history of the site may be unfortunate; however, the building exists today and has become part of the history of the landscape. It is a masterpiece of Modern architecture that represents a significant mid-century architectural and cultural response to the appreciation and commemoration of the site for the mass public.

Current work underway by architectural scholars, Dr. Sylvia Lavin (Professor of Architecture, University of California, Los Angeles), and Dr. Beatriz Colomina (Professor of Architecture, Princeton University), considers the roles of architects Richard Neutra and Charles Eames in advancing the design and technology of multi-media architecture for the mass public. The Neutra Cyclorama Building is a highly significant example of mass-media architecture. Its role in the history of public mass-media architecture should not remain unrecognized.

The siting of the Neutra Cyclorama Building on Cemetery Ridge is inextricably tied to the relationships between the building, painting and landscape. According to Dion Neutra, a primary concept was to provide visitors with a view of the panorama painting, which depicts the artist's rendition of a significant moment in the history of the battle; and then to bring the visitors up to the viewing platform on the roof where they could see the

same existing landscape from a similar point of view. Removal of the painting will compromise the integrity of this experience and destroy a primary design concept. This could be mitigated by developing an appropriate compatible use for the space that carries on the significant relationship of the building to the historic landscape and continues the mass-media function of the Cyclorama space.

The Park has consistently resisted any discussion of the Neutra Cyclorama as an example of commemorative architecture. Perhaps this derives from a misunderstanding of the definition of commemorative architecture. Memorials and museums, for example, are building types that are commonly considered commemorative. The original function and design of the Neutra Cyclorama included both museum and memorial aspects, such as the artifact display area on the ground floor, accommodation of the panorama painting and facilities for viewing the painting, and a moveable rostrum designed to be opened for annual celebrations commemorating Lincoln's Gettysburg address. These design elements and many others reflect not only the National Park's programmatic requirements, but also represent the architect's personal and profound interpretation of what it meant to him to be a naturalized American citizen, and how he could provide all Americans who visited his building with an opportunity to personally experience and interpret for themselves the cultural landscape history of Gettysburg National Military Park.

While the historical use of the building has not completely followed the architect's original conception, this does not detract from the significance of the design concept or the extant elements associated with these concepts. The Neutra Cyclorama is highly significant precisely because the building was designed with a commemorative purpose. This means the architect considered the role of history in the design of the building. The codification of the utopian myth that a fundamental premise of Modern architecture is its antihistorical stance, combined with our post-modernist perspectives, makes it difficult to imagine that a work of Modern architecture could be intimately tied to the question of historical context. However, the Neutra Cyclorama Building does address the question of history and historical context in many ways. Because of this, it is a highly important international masterpiece of Modern architecture from which we can learn a great deal about the question of the role of history in Modernism.

Numerous recently published articles detail the special problems involved in preserving Modern buildings, not least of which is the problem presented by the prevalence of the popular myth that Modern architecture is not historic and therefore undeserving of preservation. The decision made at Gettysburg on the fate of the Neutra Cyclorama Building will likely become an important precedent for future development projects of properties that include similarly significant monuments of America's Modern architectural heritage.

It is logical that the majority of the public comments have been in favor of the removal of the Neutra Cyclorama Building. Until recently, the building was not considered a significant resource, and the public knew little about its architectural importance. I applaud the Park for developing a proposal to ensure the preservation of the Gettysburg National Military Park for years to come. However, considering the recent recognition of the Neutra Cyclorama Building as an eligible resource and the still emerging scholarship and recognition of the building and architect's importance in the history of Modern architecture, it would be inappropriate and premature to demolish the

building now or in the future until a full understanding of the its significance in the history of American and international architecture and culture has been achieved.

I will be abroad until the end of September 1999, to conduct dissertation research. I will retrieve my messages and correspondence regularly by remote internet link. If possible, please forward your future correspondence by electronic mail or telefacsimile to the e-mail address and phone number listed below. Thank you for the opportunity to comment.

Sincerely,

Margarita Jerabek-Wuellner
Ph.D. Candidate
Department of Art History
University of California, Los Angeles

E-mail: wuellner@ucla.edu
FAX: (310) 388-1285

# ATTACHMENT H

05/17/00  15:56  FAX                    FAX                                    ☒001

06/17/00  15:48  ☎          REP PARKS 812 O                          ☒002/003

JAMES V. HANSEN
1ST DISTRICT UTAH

COMMITTEES:
ARMED SERVICE
RESOURCES
VETERANS' AFFAIRS

WASHINGTON OFFICE:
ROOM 242
CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-4401
(202) 225-0453

# Congress of the United States
## House of Representatives
### Washington, DC 20515–1401

DISTRICT OFFICES:
1017 FEDERAL BUILDING
324 25TH STREET
OGDEN, UT 84401
(801) 625-0107
(801) 625-0107
FAX: 621-2515

435 EAST TABERNACLE
SUITE 201
ST. GEORGE, UT 84770
(435) 628-1071

May 16, 2000

The Honorable John Berry
Assistant Secretary
Policy, Management & Budget
U.S. Department of the Interior
1849 C Street, NW #6117
Washington, DC 20240

Dear Assistant Secretary Berry:

An issue of great importance has come to my attention that I would like you to consider. This issue deals with the Cyclorama Building at Gettysburg National Military Park in Pennsylvania and its designation as a National Historic Landmark.

On December 13, 1999 the National Park System Advisory Board Landmarks Committee voted on and recommended to list the Cyclorama Building as a National Historic Landmark because of its national and extraordinary architectural significance. This recommendation was forwarded to the National Park System Advisory Board who rejected the recommendation of their own committee and voted not to forward the recommendation to the Secretary of the Interior. The Advisory Board rarely, if ever, rejects a committee's approval. This decision has not set well with the Landmarks Committee, the Society of Architectural Historians, nor the Commission on Fine Arts.

Therefore, I am strongly urging that the National Park System Advisory Board be directed to review anew the listing of the Cyclorama Building as a National Historical Landmark. I would also ask that the Advisory Board make their determination, if reconsidered, based on the merits of national significance of this building and strongly weigh the recommendation of the Landmarks Committee.

Sincerely,

James V. Hansen, Chairman
Subcommittee on National Parks
and Public Lands

# ATTACHMENT I

U N I V E R S I T Y    O F    V I R G I N I A
S C H O O L    O F    A R C H I T E C T U R E

January 26, 2000

Bruce Babbitt
Secretary
Department of the Interior
1849 C Street, N. W.
Washington, D. C.  20240

Dear Secretary Babbitt,

I am writing a letter of concern regarding the National Landmarks Committee on which I was appointed and serve and the method by which our recommendation on landmark status for the Gettysburg Cyclorama was handled by the National Park System Advisory Board.

I was appointed to this committee because of my academic and scholarly credentials. I am not going to rehearse them again here, but I enclose my short resume. If you want my longer resume, please let me know. I have previously served on this National Landmarks Committee.

Why do we serve and for what reason? At the meeting on December 13th after much testimony and lengthy discussion the committee overwhelmingly approved the Cyclorama Building for National Landmark status. Yet, on the 15th of December without even reading the nomination it was rejected by the National Park System Advisory Board. The vote against it was by individuals with little or no experience in architectural history, historic preservation, or landmarks.  They apparently did not even have the nomination.

I (and I assume my fellow committee members) spent at least a day in travel time (in some cases more) and a day sitting in Washington listening to presentations. We all spent many hours prior to the meeting reading the reports—which while good, are frankly a chore to read—evaluating them, and in many cases making recommendations for their improvement.  I had even visited the Cyclorama, I knew what I was evaluating.  This was at my expense. I have taught the subject of American architectural history at the collegiate level for over twenty-five years.

Why in the devil do I do this if somebody up the road with no knowledge can say "thumbs down!"

Apparently some of those who voted against the Gettysburg Cyclorama did not like its looks, it was "too modern." The issue isn't the style of the building and whether one likes it or not, but is it significant? I vote to approve a number of buildings whose style I don't care for.

Bruce Babbitt
Secretary
Department of the Interior
Page two


Now, I suppose it might be said, well, "Its politics, welcome to the real world kid." But then, don't involve me, you don't need me.

Further, the superintendent of the Gettysburg Park, John Latschar, should be disciplined. He told our committee, "that building is coming down, I don't care what you do here." In other words, we make no difference, this was a charade.

Apparently the superintendent has some scheme for redevelopment. Fine, but that has nothing to do with whether a building is a National Historic Landmark. You have overwhelming support of knowledgeable experts from across the country that Cyclorama is significant, and the recommendation of the committee, and yet individuals who know nothing reject it.   This is stupid!

I frankly don't know what to do, I really don't need this added commitment, but I have always supported history, and historic preservation at the Federal level. And I have been proud to be a part, but this makes me question, why?

You must send this entire procedure back to the committee and start it all over again. If the planned demolition goes ahead, the National Park Service will have a blot on its record that will never go away.

Sincerely,

Richard Guy Wilson
Commonwealth Professor and Chair
Department of Architectural History

# ATTACHMENT J

# THE COMMISSION OF FINE ARTS

### ESTABLISHED BY CONGRESS 17 MAY 1910

NATIONAL BUILDING MUSEUM
441 F STREET, N W , SUITE 312
WASHINGTON, D C. 20001-2728

202-504-2200

March 17, 1999

Ms. Martha Catlin
Advisory Council on Historic Preservation
Old Post Office Building
1100 Pennsylvania Ave., NW, #809
Washington, DC 20004

Dear Ms. Catlin:

I read with considerable distress that Richard Neutra's Cyclorama Building at Gettysburg is threatened. As a trustee for twenty-three years of the National Trust for Historic Preservation, and appointed and re-appointed by the last six presidents in my present capacity as chairman of the U.S. Commission of Fine Arts, I believe that building to represent one of the high-water marks of the federal government's involvement with architecture. It has become a landmark of tremendous value, not only architecturally, but to the whole question of how we interpret our historic sites.

I well recognize there are practical problems, but it is a question of will, and of understanding the significance of a period in American architecture that is at an awkward distance from us, but is as fully worthy of preservation as the more traditionally espoused earlier styles.

As chairman for the last twenty-one years of the Pritzker Prize in Architecture, now considered the Nobel Prize in that field, I can assure you that Neutra would be a prime candidate if we were not limited to living architects. I was invited to speak at a symposium jointly held by the University of California at Los Angeles and the Getty Institute for the Humanities celebrating the 100th anniversary of Richard Neutra's birth. As a winner of the AIA's Gold Medal, its highest award for lifetime achievement, Neutra stands as a towering figure in the history of American and world architecture. He was one of the first Europeans fully to appreciate the leadership of the United States in this field, voting with his feet to emigrate for that reason, and become a U. S. citizen, long before the wave who came here as refugees. His passion for American history, and his appreciation of the significance of Gettysburg and Lincoln's address there in a world context embody everything of which this nation of immigrants–voluntary and not–can be justly proud.

The theme-park concept of falsely recreating a landscape that can never be put back to 1863 is an unconscionable intellectual travesty. Let us hope that clearer thinking prevails in the months ahead. Every conceivable effort should be made to protect and restore this exceptional building.

Sincerely,

J. Carter Brown
Chairman
Director *emeritus*,
National Gallery of Art

cc:    The Secretary of the Interior, The Hon. Bruce Babbitt
       Robert Stanton, Director, National Park Service

# ATTACHMENT K

FRANK O. GEHRY & ASSOCIATES, INC.

November 13, 2000

Ms. Carol Shull
Keeper
National Register of Historic Places
National Park Service
1849 C Street, N.W., NC400
Washington, D.C. 20240

FAX: 202-343-1244

Dear Ms. Shull:

I urge the National Park System Advisory Board to heed the advice of its own expert committee, supported by leading architects from around the world, and designate Richard Neutra's Cyclorama Building at Gettysburg a National Historic Landmark.

Architecture is a small piece of the human equation, but for those of us who practice it, we believe in its potential to make a difference, to enlighten and to enrich the human experience, and to penetrate the barriers of misunderstanding. The Cyclorama building at Gettysburg, designed by one of the greatest architects of the twentieth century, embodies the transcendent qualities of fine art in its composition of elements, and its selection of forms, scale, and materials. Surely a building of this stature, a pre-eminent modern contribution to the commemorative history of the Civil War, merits landmark designation.

Richard Neutra envisioned the Cyclorama Building as a site for solemn contemplation of Lincoln's Gettysburg Address and a frame for the events that inspired it. His building reflects the highest ideals of his own time, and deserves the highest appreciation of ours.

Sincerely,

Frank Gehry
Architect

1520-B CLOVERFIELD BOULEVARD, SANTA MONICA, CALIFORNIA 90404
TELEPHONE: 310-828-6088     FAX: 310-828-2098

# ATTACHMENT L

# The Museum of Modern Art

Terence Riley
Chief Curator
Department of
Architecture and Design

March 23, 1999

Ms. Martha Catlin
Advisory Council on Historic Preservation
Old Post Office Building
1100 Pennsylvania Avenue, N.W. # 809
Washington, D.C. 20004

Dear Ms. Catlin,

I am writing in reference to the Cyclorama Building (former Visitor Center) designed by Richard Neutra at Gettysburg. I understand this building is undergoing the "106 review process" with your agency, and I encourage you to support the maintenance and restoration of the building to ensure its future.

While I share the view of many of my colleagues regarding the significance of this public work by Neutra, I also find it ironic that the Park Service considers the building a desecration of hallowed ground which they would like to restore to its original character. Of course, such a proposition is virtually impossible, and their approach coupled with the proposed destruction of the Neutra building presents a disturbing distortion of twentieth century history as well. Rather, I strongly urge the Park Service to restore the building and if necessary to take advantage of the professional expertise of those architects and historians who had first-hand experience with Neutra.

Thank you for your consideration.

Sincerely,

Terence Riley
Chief Curator

# ATTACHMENT M

460 West 34th Street, New York, NY 10001 Tel 212 967 5100 Fax 212 967 5588

December 14, 1999

Ms. Carol Shull, Director
National Historic Landmarks Program
1849 C Street, N.W., NC-400
Washington, D.C. 20240

Robert A.M. Stern Architects    Dear Ms. Shull:

I am writing to lend a strong voice of support to the proposed designation of the Gettysburg National Military Park Visitor Center, also known as the Gettysburg Cyclorama Building (1962), as a National Historic Landmark. This building is a difficult one to like now--but it is, in its way, a great building. Fashions in taste have to be put aside if we are to act responsibly by saving the best of American architecture for future generations to use, debate, learn from, and enjoy. While not everyone is currently able to appreciate the Gettysburg Cyclorama's merits, the building, built by the federal government to serve the public, was designed by an undeniably great and influential architect, Richard Neutra, whose work was seminal in the introduction, interpretation, and popularization of International Style Modernism in America. Neutra's work has been equaled perhaps only by that of Frank Lloyd Wright, his mentor and one-time employer, in its contribution toward elevating the status of American architecture on the world stage. Interestingly, like Wright's late work, the building, though unabashedly Modernist, resonates with history. Just as Wright's Guggenheim Museum echoes and reinterprets the Pantheon in Rome, so too does the Gettysburg Cyclorama, whose main interior space, using a cylindrical form to create a spatially impressive room, is also a modern-day Pantheon dedicated to the interpretation of one of the most significant events in our nation's history.

The central idea of the Gettysburg National Military Park is preservation--to protect and present a fragment of history in a compelling and broadly comprehensible manner, so that we, as a nation, might better understand where we came from and where we are going. To contemplate the destruction of Neutra's building, as some do, is to fly in the face of the essential mission of our military parks: to preserve and commemorate. We cannot thoughtlessly throw away a well-considered and well-realized part of the Gettysburg park, simply because a particular architectural style is out of fashion at the moment. With the proper care, this building can no doubt be adapted to function effectively far into the future. I urge that this nomination be accepted and that the Gettysburg Cyclorama Building be protected as the landmark that it most certainly is.

Sincerely,

Robert A.M. Stern

# ATTACHMENT N

Singapore     London SW11 4AN

Ms Carol Shull
Keeper
National Register of Historic Places
National Park Service
1849 C Street, N.W. NC 400
Washington D. C. 20240
USA

By Fax and post : 00 1 202 343 1244

20 October 2000

Dear Ms Shull

I write in urgent and impassioned support for the preservation of the Cyclorama Building at Gettysburg.

After becoming aware of the circumstances and threat to Richard Neutra's landmark Visitor's Centre I am appalled to hear that it may be demolished. Please advise me if there is _anything_ that I or my architect colleagues here in the United Kingdom can do to help ensure its preservation for present and future generations.

The legacy of modern architecture by architects of the stature of Richard Neutra is critical beyond your shores. I speak as a parent as well as an architect when I implore you to grant landmark status for this important fragment of your Nation's cultural heritage. Once gone it could never be returned.

Here in Europe we look to you for inspiration and leadership in more matters than heritage issues. It gives me no satisfaction to tell you that if Neutra's building were here in the European Union it would have been listed and preserved decades ago.

Yours sincerely

Lord Foster of Thames Bank O.M.

Foster and Partners Limited  Registered in England No. 1644989                                        www.fosterandpartners.com

# ATTACHMENT O

UNIVERSITY OF CALIFORNIA, LOS ANGELES



UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO                    SANTA BARBARA • SANTA CRUZ

27 March 1998

Ms. Carol Shull
Keeper, National Register of Historic Places
National Park Service, Suite NC 400
1849 C Street NW
Washington, D.C. 20240

SCHOOL OF THE ARTS AND ARCHITECTURE
DEPARTMENT OF ARCHITECTURE AND URBAN DESIGN
1317 PERLOFF HALL
BOX 951467
LOS ANGELES, CALIFORNIA 90095-1467
(310) 885-7857
FAX: (310) 885-8959

Dear Ms. Shull:

I am writing to endorse with enthusiasm the eligibility of Richard Neutra's Gettysburg Visitors Center for the National Register of Historic Places. I teach cultural, urban, and architectural history in the departments of history and architecture at UCLA. In 1982, I was co-curator of an exhibition at the Museum of Modern Art, New York: "The Architecture of Richard Neutra: From International Style to California Modern," and the author, the same year, of Richard Neutra and the Search for Modern Architecture: A Biography and History (Oxford University Press).

The Gettysburg building is an important work of Neutra's late career, which many historians, including me, tended to view for many years as being less interesting and perhaps less significant than his seminal work of the thirties and forties. I researched and conceptualized my book more than twenty years ago in the late 1970s, and while, on the whole, I still agree with most of what I wrote, my opinion has changed on Neutra's late public work, which I, and others, now see as much more valuable and important than we did then. Were I writing the book now, I would give very high marks to the Gettysburg building. Its bold, but uninsistent, abstractness, seems just the right approach for a structure on the edge of the sacred ground of the famous battlefield. I must have been, more than I realized, under the sway of "post-modernist" critical theory to suggest, as I did, that the building could have used more "historic allusions." On the contrary, I now see its modernist neutrality as an asset. I shudder to think of the potential for kitschy "neo-bellum" historicism to which it might have descended in the hands of certain "post modernist" architects.

I understand that Neutra's fine structure has been badly maintained and is need of repair. I urge you to list it, restore it, and use it proudly as an important example of mid-twentieth century American modernism that ably and unobtrusively offers an appropriate setting for introducing and interpreting Gettysburg.

Sincerely,

Thomas S. Hines, Professor of History and Architecture

# ATTACHMENT P

DON YOUNG, CHAIRMAN

# U.S. House of Representatives
## Committee on Resources
### Washington, DC 20515

March 29, 1999

Robert Stanton, Director
National Park Service
1849 C Street, N.W.
Washington, D.C. 20040

Dear Director Stanton,

We are writing to express our ongoing concerns regarding the Gettysburg National Military Park (the Park), its Draft General Management Plan (Draft GMP), and the proposed visitor center and museum complex. The oversight hearing on February 11 clearly demonstrated that many questions regarding these matters are unanswered, and will remain so, if the National Park Service (NPS) continues its current plan to finalize, and then implement, the Draft GMP.

The deleterious and divisive effects which the NPS' current course of action is having on the Borough of Gettysburg and its residents, along with a number of Civil War battlefield and historic preservation groups and associations, are extremely troubling. These issues are tearing the Gettysburg community apart and alienating the very individuals and organizations with whom the Park should be in partnership.

Furthermore, the NPS's apparent willingness to proceed with the Kinsley proposal, even as modified, raises serious questions about the administration of the park and the commitment to the values associated with its establishment. Rather than revising the Park's GMP and then exploring specific proposals which flowed from the new plan, it appears that in this instance, a specific development plan was selected and the GMP was then revised to accommodate that proposal. Reversing these critical steps raises serious questions about this entire process.

Based on the highly contentious issues surrounding the Draft GMP, and its sole reliance on the Kinsley Proposal, we are strongly urging the Park to alter its current course of action. We request that a hold be placed on the current Draft GMP/EIS, or that it be withdrawn altogether.

Secondly, we strongly suggest that the Park either develop a new Draft GMP/EIS, or proceed with the development of a supplemental EIS to the current Draft GMP, which addresses the many issues not fully discussed in the current Draft EIS. Any final GMP would be considered inadequate unless it addresses the following:

2

- Development of a full range of alternatives which explore the need for, siting and management of a visitor center/museum/storage facility, not limited to one, predetermined facility and location;

- A detailed cash flow analysis (not just an operations pro forma) of the construction and subsequent operation of any proposed visitor center;

- A full discussion of any fund-raising campaign, should one be required;

- A full discussion of secondary development issues associated with the alternatives, especially any development along the Baltimore Pike;

- A full discussion of the future of the National Tower;

- A full discussion of the Cyclorama building and its historic significance;

- A full discussion of the LeVan tract and its historic significance, if the tract is to be part of any alternative and;

- A full discussion of the condition and future of the Rosensteel-Eckert Civil War artifact collection.

In closing, we want to emphasize that Gettysburg National Military Park, its future, and the surrounding community is very important to us. We want to ensure that the resources within the park are protected and preserved. In order for this to be accomplished, a GMP/EIS for the future of the park which is honest, open, and discusses a full range of alternatives must be developed. We hope and expect that the National Park Service agrees.

Thank you very much for your attention to this letter and we look forward to receiving a timely response.

Sincerely,

George Miller
Senior Democratic Member
Committee on Resources

James V. Hansen, Chairman
Subcommittee on National
Parks and Public Lands

# ATTACHMENT Q

95 Madison Avenue
New York, NY 10016
Telephone: 646 424 9594
Fax: 646 424 9593
www.wmf.org

# WORLD MONUMENTS FUND

**Media Inquiries**
Holly Evarts, Director of Public Relations
646-424-9594, hevarts@wmf.org
Libby Mark, Jeanne Collins & Associates, LLC
646-486-7050, lmark@jcollinsassociates.com

---

### WORLD MONUMENTS FUND ANNOUNCES
### 2006 WORLD MONUMENTS WATCH LIST OF 100 MOST ENDANGERED SITES

#### FOR FIRST TIME, BIENNIAL WATCH LIST
#### INCLUDES AN ENTIRE COUNTRY IN IMMINENT PERIL: IRAQ

*For Immediate Release—New York, NY, June 21, 2005* . . . The **World Monuments Fund** (WMF), the foremost private, nonprofit organization dedicated to preserving the historic, artistic, and architectural heritage worldwide, today released its 2006 **World Monuments Watch** list of **100 Most Endangered Sites**. The biennial Watch list is a call to action on behalf of threatened cultural-heritage monuments worldwide. By bringing the sites to international attention, the list helps to raise the funds needed for their rescue and often spurs local governments and communities to take an active role in protecting cultural icons in their regions. For many landmarks, inclusion on the Watch list is the best—and perhaps the only—hope for survival.

This year—**for the first time in the 10-year history of the World Monuments Watch**— the list includes **an entire country whose cultural heritage is at great risk: Iraq**, within whose borders lie some of the world's most significant archaeological and architectural sites. Decades of political isolation, a protracted war with Iran, and, more recently, the conflict begun in 2003 have put this extraordinary heritage at grave risk. Widespread looting, military occupation, artillery fire, vandalism, and other acts of violence are devastating Iraq, long considered the "cradle of human civilization."

"The World Monuments Watch provides a valuable barometer of the state of heritage preservation worldwide," said **World Monuments Fund President Bonnie Burnham**. "The biennial Watch list tells us not only which sites are in peril, but also what kinds of threats—natural disaster, war, pollution, neglect, or other issues—are endangering the world's heritage. By focusing attention on imperiled sites, the World Monuments Watch helps bring local communities, governments, and preservation professionals together in order to save the places that speak of

human history. It is difficult to think of a more important time than today for diverse groups to unite in the preservation of our shared heritage."

The 2006 Watch list features sites from **55 countries on all seven continents**, including, for the **first time, sites in Bangladesh, Cape Verde, Eritrea, Iran, Mauritania, Samoa,** and **Sierra Leone,** demonstrating both growing awareness of the World Monuments Watch program and increased recognition worldwide of the importance of preserving cultural landmarks. Taken together, the sites on the list comprise a **diversity of building types**—from citadels and palaces to a prison, from churches and a synagogue to cemeteries, from ancient cities and medieval mosques to a modern airport and fairground; **periods**—from the earliest human settlements some eight thousand years ago to constructions of the mid-twentieth century; and **threats**—from rising water tables to urban sprawl, earthquakes to planned governmental demolition, unsustainable tourism to vandalism, looting, and war. The 2006 list encompasses:

- 22 sites in Africa and the Middle East,
- 26 in the Americas,
- 1 in Antarctica,
- 18 in Asia,
- 1 in Australia, and
- 32 in Europe.

*(For more detail, see list of highlighted sites.)*

**2006 Endangered Sites**

The 2006 Watch list includes more **modern buildings than ever before**, reflecting the increasing understanding of the importance of twentieth-century architecture as part of our cultural heritage, and an awareness of its fragile status. Nine modern sites are listed, including the historic center of **Asmara, Eritrea,** a unique urban environment that fuses Italian modernism with African highland culture; the **International Fairground at Tripoli, Lebanon,** designed by Brazilian architect Oscar Niemeyer; Lisbon's Art Deco theater, the **Teatro Capitolio;** and New York City's **2 Columbus Circle,** designed by Edward Durrell Stone and currently at the center of an intense debate about the decision to significantly modify it.

A **broad array of historic Islamic sites** is included on the 2006 Watch list, eight in addition to those in Iraq. These include the ninth-century **Haji Piyada Mosque** in Afghanistan, one of the earliest structures in the eastern Islamic world; **two sites in historic Cairo,** the sixteenth-century **Tarabay al-Sharify** complex and the seventeenth-century **Sabil Ruqayya Dudu;** the thirteenth-century **Chinguetti Mosque** in Chinguetti, Mauritania, considered the "seventh city" of Islam and home to a unique collection of important Islamic manuscripts; and

two monumental medieval tomb complexes in Pakistan, the **Mian Nasir Mohammed Graveyard** and the **Thatta Monuments**. **Two twelfth-century citadels, built during the Crusades,** are also listed: the **Chehabi Citadel** of Hasbaya, Wadi Taym, Lebanon, erected by the Crusaders and wrested away in the 1170s by the Chehabi Emirs, whose descendents have occupied it to this day; and the **Shayzar Castle**, near Hama, Syria, defended in the time of Nur al-Din against the Franks during the Crusades. In addition, the Watch list includes the **Historic Center of Prizren,** Kososvo's most important historic town, which features architecture that represents both Christian and Islamic traditions.

A number of archaeological sites on the Watch list exemplify the geographical sweep of the Roman Empire at its height. These range from the **Segovia Aqueduct,** a miracle of Roman engineering at the Empire's western edge, to Roman cities in the east, including the renowned archaeological site of **Aphrodisias,** in Turkey, which features some of the best-preserved examples of Greco-Roman architecture in the eastern Mediterranean. In the capital is the **Temple of Portunus**—one of the best preserved early Roman temples in the world. Archaeological sites in other parts of the world that are on the Watch list include **Chalcatzingo,** one of the most important early Olmec sites in Mexico, and **Naranjo,** Guatemala's second-largest Mayan site.

## World Monuments Watch List

Launched in 1995, the biennial World Monuments Watch, with its list of **100 Most Endangered Sites,** is one of the major program areas of the World Monuments Fund. In order to create the Watch list, WMF calls for nominations of sites from ministries of culture and international and local preservation groups and professionals. All nominations must include not only information on the value of the site and the threats it confronts, but also a concrete proposal for action that has local support.

The World Monuments Fund then convenes an independent panel of international experts to review the hundreds of nominations received and select 100 of them for inclusion on the list. The selection is based on the significance of the sites, the urgency of the need for support, and the viability of the conservation and/or advocacy plans. *(See list of 2006 panel members.)*

Previous lists were released in 1996, 1998, 2000, 2002, and 2004 and included sites ranging from widely known landmarks such as the Taj Mahal, the Great Wall of China, Pompeii,

4

Teotihuacan, and the Valley of the Kings (now part of the West Bank 2006 Watch listing), to such lesser-known sites as the Larabanga Mosque, in Ghana, and the National Art Schools, in Cuba. Many endangered sites on previous lists have been rescued or are well on their way to being preserved, thanks to timely intervention. Among previous Watch-list sites where WMF is currently working are the Angkor temples, in Cambodia; Petra, in Jordan; the Chateau of Chantilly, in France; St. George's Bloomsbury, in London; and the Jesuit Guaráni Missions, located in Argentina, Brazil, and Paraguay.

The World Monuments Fund is grateful to American Express, founding sponsor of the World Monuments Watch, for its commitment of $10 million dollars to the World Monuments Watch over the past ten years. Together with funds for the Watch from other major donors, WMF has distributed about $35 million since 1996 and has leveraged more than $118 million, resulting in a 75 percent success rate in bringing heritage sites back from the brink of extinction.

**World Monuments Fund**

The New York City-based World Monuments Fund—which celebrates its fortieth anniversary this year—has achieved an unmatched record of successful conservation in more than 80 countries. In 2003, WMF established WMF Europe, based in Paris, in order to coordinate the work of the organization's affiliates in France, Italy, Portugal, and Spain, and to expand its activities in Continental Europe. WMF in Britain, located in London, addresses WMF's agenda in the United Kingdom. Working with these offices and affiliates, as well as with partners around the world, WMF brings together public and private support to implement a comprehensive conservation effort that includes project planning, field surveys, fieldwork, on-site training in the building crafts, advocacy, and the development of long-term strategies for the protection of sites. For additional information about WMF and its programs, the public can visit www.wmf.org.

#    #    #

95 Madison Avenue
New York, NY 10016
Telephone: 646 424 9594
Fax: 646 424 9593
www.wmf.org

# WORLD MONUMENTS FUND

**Media Inquiries:**
Holly Evarts, Director of Public Relations
646-424-9594, hevarts@wmf.org
Libby Mark, Jeanne Collins & Associates, LLC
646-486-7050, lmark@jcollinsassociates.com

**June 2005**

---

## 2006 WORLD MONUMENTS WATCH
## LIST OF 100 MOST ENDANGERED SITES

### Facts and Figures

**World Monuments Watch**
The World Monuments Watch program, launched in 1995, calls attention to imperiled cultural-heritage sites around the world and directs timely financial support and expertise to their preservation.

**Selection Process**
Every two years, the World Monuments Fund convenes an independent panel of experts who select the sites for the list from nominations submitted by governments, local and international preservation groups, nongovernmental organizations, and individuals. For the 2006 list, 234 nominations from around the world were considered, including the 100 from the previous list. Twenty-six sites on the 2006 list—not counting individual sites in Iraq—were on the previous list but continue to be endangered.

**Threats**
Threats to endangered sites range from natural disasters (earthquakes, floods, fire) and deterioration caused by age and the elements to man-made threats such as war, acts of terrorism, neglect and mismanagement, inappropriate development, and governmental policies.

**Regional Breakdown**
Every continent is represented on the 2006 list. The regional breakdown is: Africa and the Middle East (22 sites), the Americas (26), Antarctica (1), Asia (18), Australia (1), and Europe (32). Nine countries are represented for the first time: **Bangladesh, Cape Verde, Eritrea, Iran, Mauritania, Samoa, and Sierra Leone.**

**Best-Known Sites**
The 2006 list includes such well-known landmarks as the West Bank of the Nile in Egypt, which includes such sites as the Valley of the Kings; Mexico City Historic Center; the Panama Canal Area; Finca Vigia, Ernest Hemingway's house in Cuba; and all the cultural heritage sites in Iraq, of which there are more than 10,000.

*(more)*

2

**Oldest Site**

The oldest site is the Dampier Rock Art Complex, in Australia, which dates to c. 10,000 B.C.

**Twentieth-century Sites**

Nine examples of modern architecture are listed: the **historic center of Asmara** (1916–1941), Eritrea; the **Ennis Brown House** (1924), United States; **Melnikov's House Studio** (1927–29), Russia; the **Narkomfin Building**, Russia (1928); the **Helsinki-Malmi Airport** (1936), Finland; the **Teatro Capitolio** (1925–1931), Portugal; the **Cyclorama Center at Gettysburg National Military Park** (1958–1961), United States; **2 Columbus Circle** (1960–1964), United States; and the **International Fairground at Tripoli** (1963–1975), Lebanon.

**Site Types**

The list includes religious, industrial, and archaeological sites; rock art; urban and cultural landscapes; civil buildings and engineering works; and dwellings and palaces; along with an aqueduct, a flume, a concentration camp, a fairground, an airport, and a fortress.

**Progress around the World**

Since its founding in 1995, the World Monuments Watch has awarded 407 grants, totaling more than $34.3 million, to 195 sites in 73 countries. In addition, millions more in funds have been leveraged directly to the sites. Many of the sites—more than 75 percent—on the first five lists have been rescued or are on their way to being rescued as a result of timely intervention.

**Sponsors**

The World Monuments Fund is grateful to American Express, founding sponsor of the World Monuments Watch, for its commitment of $10 million dollars to the World Monuments Watch over the past ten years.

For the complete list and information on each site, please visit www.wmf.org.

#    #    #

# WORLD MONUMENTS WATCH
## 100 MOST ENDANGERED SITES 2006

**AFGHANISTAN**
Haji Piyada Mosque, Balkh

**ANTARCTICA**
Sir Ernest Shackleton's Expedition Hut, Antarctica

**AUSTRALIA**
Dampier Rock Art Complex,
Dampier, Burrup Peninsula

**BANGLADESH**
Sonargaon-Panam City, Sonargaon

**BOSNIA/HERZEGOVINA**
Mehmed-Pasha Sokolovic Bridge, Visegrad

**BRAZIL**
Convent of San Francisco and Historic Olinda,
Olinda, Pernambuco

**CAMEROON**
Bafut Palace, Bafut

**CAPE VERDE**
Tarrafal Concentration Camp, Tarrafal

**CHILE**
Tulor Village, Antofagasta
Cerros Pintados, Tarapaca

**CHINA**
Cockcrow Post Town, Cockcrow Post, Huailai
Lu Mansion, Dong Yang
Qikou Town, Shanxi Province
Stone Towers of Southwest China, Various
Tianshui Traditional Houses, Tianshui,
Qincheng, Gansu
Tuanshan Historical Village, Yunnan Province

**CROATIA**
Novi Dvori Castle, Zapresic
Saint Blaise Church, Dubrovnik

**CUBA**
Finca Vigia (Hemingway's House),
San Francisco de Paula

**EGYPT**
Sabil Ruqayya Dudu, Cairo
Tarabay al-Sharify, Cairo
West Bank, Luxor

**EL SALVADOR**
San Miguel Arcangel & Santa Cruz de Roma,
Panchimalco & Huizucar

**ERITREA**
Asmara Historic City Center and Theater, Asmara
Kidane-Mehret Church, Senafe
Massawa Historic Town, Massawa

**FINLAND**
Helsinki-Malmi Airport, Helsinki

**GEORGIA**
Jvari Monastery, Mtshekta

**GREECE**
Helike Archaeological Site, Rizomylos & Eliki, Achaia

**GUATEMALA**
Naranjo, El Peten

**INDIA**
Dalhousie Square, Calcutta
Dhangkar Gompa, Himachal Pradesh
Guru Lhakhang and Sumda Chung Temples,
Sumda Chung
Watson's Hotel, Mumbai

**INDONESIA**
Omo Hada, Nias Island

**IRAN**
Bam, Bam

**IRAQ**
Cultural Heritage Sites, Country-wide

**IRELAND**
Wonderful Barn, Kildare

**ITALY**
Academy of Hadrian's Villa, Tivoli
Cimitero Acattolico, Rome
Civita di Bagnoregio, Bagnoregio
Murgia dei Trulli, Murgia dei Trulli
Portici Royal Palace, Naples
Santa Maria in Stelle Hypogeum, Verona
Temple of Portunus, Rome

**KENYA**
Mtwapa Heritage Site, Kilifi, Mtwapa

**LAOS**
Chom Phet Cultural Landscape, Luang Prabang

**LATVIA**
Riga Cathedral, Riga

**LEBANON**
Chehabi Citadel, Hasbaya
International Fairground at Tripoli, Tripoli

**MACEDONIA**
Treskavec Monastery and Church, Treskavec

**MAURITANIA**
Chinguetti Mosque, Chinguetti

**MEXICO**
Chalcatzingo, Morelos
Mexico City Historic Center, Mexico City
Pimeria Alta Missions, Sonora
San Juan Bautista Cuauhtinchan, Puebla
San Nicolas Obispo, Morelia, Michoacan

**NEPAL**
Patan Royal Palace Complex, Patan

**NIGERIA**
Benin City Earthworks, Edo State

**NORWAY**
Sandviken Bay, Bergen

**PAKISTAN**
Mian Nasir Mohamad Graveyard, Dadu District
Thatta Monuments, Thatta

**PALESTINIAN TERRITORIES**
Tell Balatah (Shechem or Ancient Nablus),
Nablus, West Bank

**PANAMA**
Panama Canal Area, Panama Canal area

**PERU**
Cajamarquilla, Lima
Presbitero Maestro Cemetery, Lima
Quinta Heeren, Lima
Revash Funerary Complex, Santo Tomas de Quillay
Tucume Archaeological Site, Lambayeque

**POLAND**
Jerusalem Hospital of the Teutonic Order, Malborka
Mausoleum of Karol Scheibler, Lodz

**PORTUGAL**
Teatro Capitolio, Lisbon

**ROMANIA**
Oradea Fortress, Oradea

**RUSSIA**
Melnikov's House Studio, Moscow
Narkomfin Building, Moscow
Semenovskoe-Otrada, Moscow Region

**SAMOA**
Pulemelei Mound, Palauli, Letolo Plantation

**SERBIA/MONTENEGRO**
Prizren Historic Center, Prizren
Subotica Synagogue, Subotica

**SIERRE LEONE**
Old Fourah Bay College, Freetown

**SLOVAKIA**
Lednicke-Rovne Historical Park, Lednicke-Rovne

**SOUTH AFRICA**
Richtersveld Cultural Landscape,
Northern Cape Province

**SPAIN**
Segovia Aqueduct, Segovia

**SUDAN**
Suakin, Suakin Island

**SYRIA**
Amrit Archaeological Site, Amrit
Shayzar Castle, Shayzar
Tell Mozan (Ancient Urkesh)

**TURKEY**
Aphrodisias, Aphrodisias
Little Hagia Sophia, Istanbul

**UNITED KINGDOM**
Saint Mary's Stow Church, Stow, Lincolnshire
Saint Vincent's Street Church, Glasgow, Scotland

**UNITED STATES**
2 Columbus Circle, New York, New York
Bluegrass Cultural Landscape of Kentucky,
Central Kentucky
Cyclorama Center, Gettysburg
Dutch Reformed Church, Newbergh, New York
Ellis Island Baggage and Dormitory Building,
New York, New York
Ennis Brown House, Los Angeles, California
Hanging Flume, Montrose County, Colorado
Mount Lebanon Shaker Village, New Lebanon, NY

**VENEZUELA**
La Guaira Historic City, Vargas

**FOR IMMEDIATE RELEASE**

**CONTACT:**
Christine Madrid French
Recent Past Preservation Network
2522 Willard Drive
Charlottesville, VA 22903-4231
434-293-2872
madridfrench@recentpast.org

**TITLE:**
**GETTYSBURG'S CYCLORAMA CENTER SELECTED FOR 2006 WORLD MONUMENTS FUND WATCH LIST OF 100 MOST ENDANGERED SITES**
**U.S. National Park Service Intends to Demolish Internationally Significant Building**

**TEXT:**
Gettysburg, Pennsylvania - June 30, 2005
This week, at the 142nd anniversary of the Battle of Gettysburg, preservationists are renewing their call for the restoration of the Cyclorama Center, a premiere American modern building that overlooks the famous battlefield and commemorates Abraham Lincoln's Gettysburg Address. On June 21, the World Monuments Fund (WMF), the foremost private, non-profit organization dedicated to the preservation of historic art and architecture worldwide, included the imperiled Cyclorama Center at Gettysburg on its biennial Watch List of 100 Most Endangered Sites.

Preservationists have labored for nearly a decade to save this building, one of the first "visitor centers" ever built in the national park system and a landmark in the work of famed architect Richard Neutra. The National Park Service, the primary public agency charged with protecting significant American sites, has so far refused to preserve the structure, one recognized by the U.S. National Register of Historic Places for "its exceptional historic and architectural significance." The Cyclorama Center remains on a short list for demolition; the Gettysburg National Battlefield Museum Foundation, a private partner of the National Park Service headed by Robert A. Kinsley and Robert C. Wilburn, plans to raze the structure.

The Recent Past Preservation Network (RPPN), a non-profit, volunteer organization, nominated the Cyclorama Center for inclusion on the World Monuments Watch List, supported by preservation groups, such as Preservation Pennsylvania and DOCOMOMO-US, as well as Dion Neutra, project architect for the Cyclorama and head of the Neutra design firm, which celebrates its eightieth year of service in 2006. Architectural historian Christine Madrid French, president of RPPN and a Neutra scholar, hailed the Cyclorama Center's listing as a major victory in the group's campaign to save the building and raise public awareness for the preservation of postwar American architecture. "We applaud the World Monuments Fund for recognizing the significance of this building and highlighting the threat posed to it by the National Park Service. In this case, we cannot cross our fingers and hope for the best. The building needs strong advocates and public support. With this listing in hand, we will urge the President and the U.S. Congress to act in time to save this unique structure."

Neutra's Cyclorama has suffered from years of deferred maintenance and benign neglect at the hands of park administrators. Promoters of demolition, led by Gettysburg

Park superintendent John Latschar, argue that the building is a modern intrusion on the historic landscape.  Supporters of the building, backed by prominent architects (Frank Gehry, Robert A.M. Stern, Sir Norman Foster), historians (Richard Longstreth, Richard Guy Wilson, William McDonough, Tom Hines), and curators (Terence Riley, the late J. Carter Brown), maintain that the building is an architectural treasure, worthy of preservation and adaptive reuse. They compare the tree-enshrined Cyclorama Center – which Neutra envisioned as a Cold War-era memorial  to Abraham Lincoln's Gettysburg Address -- to the many post-Civil War statues and plaques that dot the commemorative landscape.

In 1958, the National Park Service commissioned Richard Neutra (1892–1970) and his partner Robert Alexander, with Dion Neutra, to design a landmark visitor center in preparation for the centennial anniversary of the Battle of Gettysburg, an event expected to draw millions of visitors to the site.  Neutra shunned convention and envisioned the building as a "place of cultural interchange" that celebrated Lincoln's concept of reconciliation in a global context; the *New York Times* praised the building as an example of the federal government's new architectural identity and predicted it would "become one of the showplaces of the National Park System." Opened in 1961, the Cyclorama Center at Gettysburg was built as part of the Park Service's "Mission 66" program, a billion-dollar postwar government initiative aimed at improving America's national parks with the construction of new facilities. Considered among Neutra's most important public commissions, the Cyclorama Center takes its name from a large-scale, 360-degree panoramic painting by the French artist Paul Philippoteaux, which depicts Pickett's Charge, the famous last battle of Gettysburg. To house the painting, Neutra designed a cylindrical drum, 109 meters in circumference and eight meters high. Accessed by a monumental ramp, the roof of the Cyclorama Center's office wing overlooks key points of the battlefield, as seen from the vantage point of the painting, and, for forty-five years now, has been an integral part of the interpretive experience at the park.

Richard Neutra's buildings stand alongside those of fellow architect and friend Frank Lloyd Wright in the history of American architecture. Featured on the cover of Time Magazine in 1949, Neutra's contributions to American design include some of the greatest works of architecture in this country and, indeed, in the world. Iconic Neutra residential commissions include the Lovell "Health" House (1929) and the VDL House (1932-66) in Los Angeles and the Kaufmann House (1946) in Palm Springs, as well as structures in twenty states, Guam, Indonesia, Pakistan, France, Switzerland, Germany, Venezuela, and Cuba. During his fifty years as a practicing architect, Neutra also designed churches, schools, civic structures, and an observatory, all innovative buildings that have inspired generations of architects. He was the recipient of many architectural awards, including the coveted American Institute of Architects Gold Medal, awarded posthumously in 1977 "in recognition of a significant body of work of lasting influence on the theory and practice of architecture."

Since its founding in 1965, WMF has helped save more than 430 irreplaceable sites in 83 countries. The World Monuments Watch, a global program launched in 1995, calls attention to imperiled cultural heritage sites around the world. The 2006 Watch list features sites from 55 countries on all seven continents. The Cyclorama Center is one of eight designated in North America this year. A total of nine modern sites are included, reflecting the increasing understanding of the importance of twentieth-century architecture as part of our cultural heritage, and an awareness of its fragile status.

**For photographs, supporting documents, and updates, please visit:**
http://www.mission66.com/cyclorama

## BACKGROUND INFORMATION:

**Christine Madrid French, Architectural Historian/Preservation Activist**
**www.mission66.com**
Ms. French has a master's degree in architectural history from the University of Virginia. A former historian at the National Park Service, she is a founder of the Recent Past Preservation Network and is involved in historic preservation advocacy nationwide. She currently lives in Charlottesville, Virginia and is completing a book on the national park visitor centers of Mission 66.

**Recent Past Preservation Network, www.recentpast.org**
Media Inquiries: Christine Madrid French, President
434-293-2872, madridfrench@recentpast.org
The Recent Past Preservation Network (RPPN) is an all-volunteer, non-profit organization dedicated to saving structures of the recent past, particularly postwar buildings that are not yet widely recognized as significant. The group promotes preservation education, assistance, and activism to encourage a contextual understanding of our modern built environment. RPPN members and member organizations rally together to develop practical strategies to document, preserve, and re-use historic places of the recent past. The "National Windshield Survey" on the RPPN website contains hundreds of member-submitted photographs as a reference point for preservation projects and scholarly studies.

**World Monuments Fund, www.wmf.org**
Media Inquiries: Holly Evarts, Director of Public Relations
646-424-9594, hevarts@wmf.org
The World Monuments Fund, founded in 1965, is the foremost private, non-profit organization dedicated to the preservation of historic art and architecture worldwide through fieldwork, advocacy, grantmaking, education, and training. Launched in 1995, the biennial World Monuments Watch, with its list of 100 Most Endangered Sites, is one of the major programs of the World Monuments Fund. An independent panel of international experts reviews the hundreds of nominations received and selects 100 for inclusion on the list based on the significance of the sites, the urgency of the need for support, and the viability of the conservation and/or advocacy plans. Previous lists included sites such as the Taj Mahal, the Great Wall of China, and Pompeii.

**Preservation Pennsylvania, www.preservationpa.org**
Media Inquiries: Susan Shearer, President
717-234-2310, sshearer@preservationpa.org
Preservation Pennsylvania is the Commonwealth's only statewide, private non-profit organization dedicated to the protection of historically and architecturally significant properties. The organization, through creative partnerships, targeted educational and advocacy programs, advisory assistance, and special projects, assists Pennsylvania communities to protect and utilize the historic resources they want to preserve for the future. In 1999, Preservation Pennsylvania listed the Cyclorama Center on its annual "Pennsylvania at Risk" list of endangered properties.

# ATTACHMENT R

ONE HUNDRED FIFTH CONGRESS

DON YOUNG, ALASKA, CHAIRMAN
W.J. (BILLY) TAUZIN, LOUISIANA
JAMES V. HANSEN, UTAH
JIM SAXTON, NEW JERSEY
ELTON GALLEGLY, CALIFORNIA
JOHN J. DUNCAN, JR., TENNESSEE
JOEL HEFLEY, COLORADO
JOHN T. DOOLITTLE, CALIFORNIA
WAYNE T. GILCHREST, MARYLAND
KEN CALVERT, CALIFORNIA
RICHARD W. POMBO, CALIFORNIA
BARBARA CUBIN, WYOMING
HELEN CHENOWETH, IDAHO
LINDA SMITH, WASHINGTON
GEORGE P. RADANOVICH, CALIFORNIA
WALTER B. JONES, JR., NORTH CAROLINA
WILLIAM M. (MAC) THORNBERRY, TEXAS
JOHN B. SHADEGG, ARIZONA
JOHN E. ENSIGN, NEVADA
ROBERT F. SMITH, OREGON
CHRIS CANNON, UTAH
KEVIN BRADY, TEXAS
JOHN PETERSON, PENNSYLVANIA
RICK HILL, MONTANA
BOB SCHAFFER, COLORADO
JIM GIBBONS, NEVADA
MICHAEL D. CRAPO, IDAHO

## U.S. House of Representatives
### Committee on Resources
### Washington, DC 20515

May 28, 1998

GEORGE MILLER, CALIFORNIA
RANKING DEMOCRATIC MEMBER
EDWARD J. MARKEY, MASSACHUSETTS
NICK J. RAHALL II, WEST VIRGINIA
BRUCE F. VENTO, MINNESOTA
DALE E. KILDEE, MICHIGAN
PETER A. DeFAZIO, OREGON
ENI F.H. FALEOMAVAEGA, AMERICAN SAMOA
NEIL ABERCROMBIE, HAWAII
SOLOMON P. ORTIZ, TEXAS
OWEN B. PICKETT, VIRGINIA
FRANK PALLONE, JR., NEW JERSEY
CALVIN M. DOOLEY, CALIFORNIA
CARLOS A. ROMERO-BARCELÓ, PUERTO RICO
MAURICE D. HINCHEY, NEW YORK
ROBERT A. UNDERWOOD, GUAM
SAM FARR, CALIFORNIA
PATRICK J. KENNEDY, RHODE ISLAND
ADAM SMITH, WASHINGTON
WILLIAM D. DELAHUNT, MASSACHUSETTS
CHRIS JOHN, LOUISIANA
DONNA CHRISTIAN-GREEN, VIRGIN ISLANDS
RON KIND, WISCONSIN
LLOYD DOGGETT, TEXAS

LLOYD A. JONES
CHIEF OF STAFF

ELIZABETH MEGGINSON
CHIEF COUNSEL

JOHN LAWRENCE
DEMOCRATIC STAFF DIRECTOR

Mr. Robert Stanton, Director
National Park Service
ms 3220-MIB
1849 C St. NW
Washington, D.C. 20240

Dear Director Stanton:

Recent news articles and other information that has come to light regarding the financial aspects of the Kinsley proposal for the Gettysburg visitor complex raise serious questions on how the NPS has handled this project and whether Congress and the public have been misled. I am particularly concerned that some of the assertions appear to contradict assurances I was personally given in my meeting with you last fall on the Gettysburg proposal, and I would appreciate your immediate response to my questions in order to establish the facts of the matter.

USA TODAY in its May 26 edition is reporting that Rep. Bill Goodling is seeking an initial $1.75 million in appropriated Federal funds for the project, based on numbers supplied by the NPS. Further, Rep. Goodling is quoted as saying that even more public money would be needed in future years. If accurate, these statements conflict with the repeated assurances by the NPS that this project would be built without Federal funds. If Rep. Goodling is correct that public monies are now required, I would appreciate your providing me with a complete breakdown of the Federal and other costs.

For more than six months, the NPS has withheld from the public the financial data accompanying the Kinsley proposal. The public has been asked to comment on the plan without knowing any of the financial details involved or even an accurate statement on the size of what I now know is a proposal for a 145,802 sq. ft. complex. Why the secrecy? Is it because, as USA TODAY reports, the commercial enterprises cannot even cover the debt service on their loan? I can find no legitimate reason for the NPS to summarily withhold from the public critical financial aspects of the Kinsley proposal. Mr. Kinsley's personal financial data, as well as the projected land costs could easily have been excluded. Further, the NPS withholding of the Kinsley drawing of the complex that the NPS views as casting unfavorable light on the project calls into question the stated reasons for withholding any aspects of the proposal. If the public is to have any meaningful

input into the Kinsley proposal, the financial details of the proposal must be immediately released to the public.

Deputy Director Denis Galvin testified at the Senate hearing on Gettysburg that no new fees would be instituted at the park. Yet the Kinsley proposal relies on a new parking/entrance fee to generate nearly *one-quarter* of the complex's annual revenue. I have also been informed that the NPS is contemplating charging a $5 fee for admission to the NPS museum, with even more costs to the public for the Cyclorama and the Electric Map.

Furthermore, NPS staff has given contrary statements on the cost of the Gettysburg complex in the Kinsley proposal. Superintendent Latschar has stated that the $40.4 million price tag for the complex did not include the payment of Davis-Bacon labor rates, but evaluation panel chairman Adlerstein stated that the figure did include such costs. I have since come to learn that the $40.4 million price tag does not include required Davis-Bacon rates. Please clarify the NPS position on the applicability and associated costs of David-Bacon coverage.

I am also deeply concerned about the land acquisition component of the Kinsley proposal. Various news reports and other documentation have pegged the acquisition cost at $3.75 million for the 45 acres, or more than $83,000 an acre for undeveloped land. I understand this is more than 25 times the going rate for undeveloped land in the area. If the parcel were acquired at anywhere near that cost, NPS land and easement acquisition costs within the park's boundaries would likely skyrocket, adding a significant public financial burden to the protection of the battlefield.

I raised a number of similar concerns about this entire project with you last fall in our discussion in my office. I now question whether I was provided a complete and accurate account of the Gettysburg plan. The pattern of omissions and misleading and inaccurate information in dealing with the Congress and with the public has seriously undermined the public's right to know what the agency is doing at this important national park site. I would appreciate your providing me with complete and accurate answers on all aspects of the Kinsley proposal.

Sincerely,

GEORGE MILLER
Senior Democratic Member


cc: Secretary Babbitt

# ATTACHMENT S

# U.S. House of Representatives
## Committee on Resources
### Washington, DC 20515

June 18, 1998

Mr. Robert Stanton, Director
National Park Service
ms-3220-MIB
1849 C St. NW
Washington, D.C. 20240

Dear Director Stanton:

I have received your June 10 letter responding to my letter on the proposed Gettysburg visitor center/museum complex.

I am more than a little disturbed by your response. I expected better of you and the agency. Instead, I get a letter that continues the pattern of omissions, and misleading and inaccurate statements regarding the Gettysburg proposal.

On the very day you write to me to say that new cost estimates and pro formas would not be made available to Congress till August, your staff was on Capitol Hill providing detailed revised financial information to certain Members of Congress. Now, a week later, I understand your staff has offered to brief House and Senate staff on this new financial information that I have, no thanks to your agency, already received from other sources.

Your defense of the public meetings held on the Kinsley proposal misses the point of my letter. It was not a question of whether you held public meetings on the proposal. It is the fact that the NPS withheld key information necessary for the public to have any meaningful involvement in the review process. I am also deeply concerned with some of the information that the NPS is conveying to the public. I am aware of materials used in NPS presentations to service clubs that assert that Gettysburg NMP is broke and that the entire NPS is bankrupt. These documents further go on to blame Congress for not providing the NPS with funds.

Based on the NPS Request for Proposals, your response regarding the release of the Kinsley proposal is just simply wrong. Please refer to Attachment D of the Request for Proposals whereby the NPS states to proposers "Your failure to mark information contained in your proposal as trade secret or confidential commercial and financial information will be treated by the NPS as evidence that the information is not exempt from disclosure under the Freedom of Information Act . . . " Except for Mr. Kinsley's personal financial statement, no such markings appear on the Kinsley proposal. On that fact alone you had no basis under FOIA ,as you claim, to deny the information to the public.

Furthermore, Mr. Kinsley is quoted on Dec. 17 as stating that he was sending his proposal to Congress. Despite repeated requests, that information was not provided for almost four months. It was only after Senator Bumpers personally asked Secretary Babbitt was the proposal delivered to the House and Senate authorizing committees. I find it odd that you state you are going to send me the Kinsley proposal when you agency has already supplied me with that information prior to my May 28 letter to you.

On funding, your letter avoids responding on the agency's involvement in the request by Rep. Goodling for Federal funds for the project. Was the NPS, as Rep. Goodling has publicly asserted, involved in revising the request from $3 million to $1.75 million? What have you or your staff told the Appropriations Committee with regards to these funds? Furthermore, the NPS's public statements on how such funds would be used are misleading and inaccurate. The NPS's Gettysburg spokesperson is quoted as saying the project did not include $1.75 million in engineering and design costs for such things as utilities, and museum exhibits. I suggest you go back and read the Kinsley proposal, which most certainly includes such costs.

I find it incredible that you have negotiated with the developer for more than seven months and prepared revised cost estimates and pro formas, yet you still cannot tell me whether Davis-Bacon will be applied. Is there any resistence on the part of the developer to using Davis-Bacon? Do the revised cost estimates include Davis-Bacon? Please provide me with the page numbers in the Request for Proposals where your statements on Davis-Bacon can be found.

Your assertion that the NPS does not believe that the high land costs associated with the Kinsley proposal will have a significant "spillover" effect is highly suspect. Please provide me with a breakdown of the acquisition costs for each parcel the developer will acquire, as well as the cost of comparable land sales in the area. The proposed complex is located in the portion of the park that the park's land protection plan identifies as involving numerous easement and fee simple acquisitions. The land acquisitions for the visitor center/museum complex will become the new comparable for other NPS acquisitions in the area.. NPS appraisals of these other parcels can't ignore the land acquisitions that are being done for the project. Is the NPS going to stand by and let land be acquired within the park boundary at costs that far exceed other land costs in the area?

Director Stanton, if, as you state, your goal is to provide complete and accurate information, your June 10 letter falls far short. I am still waiting for the NPS to be forthright and end this pattern of omissions and misleading and inaccurate statements on the Gettysburg proposal.

Sincerely,

GEORGE MILLER
**Senior Democratic Member**

cc: Secretary Babbitt

# ATTACHMENT T

JAMES V. HANSEN
1ST DISTRICT, UTAH

COMMITTEES:
NATIONAL SECURITY
RESOURCES
STANDARDS OF
OFFICIAL CONDUCT

WASHINGTON OFFICE:
ROOM 2447
RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-4401
(202) 225-0453

DISTRICT OFFICES:
1017 FEDERAL BUILDING
324 25TH STREET
OGDEN, UT 84401
(801) 625-0453
(801) 625-5677

435 EAST TABERNACLE
SUITE 331
ST. GEORGE, UT 84770
(801) 628-1071

# Congress of the United States
## House of Representatives
### Washington, DC 20515—4401

May 7, 1999

Robert Stanton, Director
National Park Service
1849 C Street N.W.
Washington, D.C. 20040

Dear Director Stanton:

I would like to thank the National Park Service for responding to the twenty questions I submitted dealing with Gettysburg National Military Park. Although some of the questions were adequately responded to, I still find that many others were not. As such, I feel compelled to respond to the Park Service response (dated April 2, 1999).

Questions #1, #2, and #3 are all related as to how supportive the public is of this proposal and that half of the Gettysburg residents are in support. Yet, the flip side is equally valid, i.e., half of the Gettysburg residents are opposed, as is the Borough, and the many other Civil War groups and associations. The point is that there is a great deal of clear and unmistakable opposition to this and the Park Service needs to step back and take another look at the proposal and the GMP. It is agreed that any project probably will not get 100% support, but having the Borough of Gettysburg and many of its residents in adamant opposition should send a clear message to the Park Service that there is something very wrong with both the proposal and the process used to get where you are today. Instead of being divisive, the Park Service needs to be forging partnerships with those most affected by their actions – the local residents and the community. Moving ahead with this project in its current form will certainly exacerbate an already deteriorating situation with the local government at Gettysburg.

Furthermore, it must be mentioned that the Letter of Intent the Park Service signed with the Borough of Gettysburg is not part of the GMP; therefore, its mention in your response is irrelevant. In no manner should this Letter of Intent be construed as endorsement or support for the proposed visitor center and GMP.

Clearly, arrogant and self-serving statements such as those made by Superintendent Latschar that "there's nothing in our mission statement that says we're supposed to look out for businesses surrounding the park" are needless and unproductive in anyone's opinion. The Park Service's attempt in trying to justify this callous and contemptible comment is convincing no one, especially me. Statements such as these made by Superintendent Latschar are justly simply uncalled for and unprofessional.

Questions #4, 5, and 6 regard the GMP, DCP, and the EIS and EA which accompany these documents. Instead of fully answering the questions, the Park Service chose to restate their position. The fact is, in terms of timing, the DCP EA, which had different alternatives from the Kinsley proposal, was withdrawn, then the Kinsley proposal was selected, and finally the DEIS was issued. All the alternatives in the DEIS had the Kinsley proposal as a central component, except the no action alternative. Without debate, the Park Service had chosen the Kinsley proposal before the GMP EIS. Without debate, all the action alternatives mandated the Kinsley proposal. NEPA states (as a matter of fact, twice) that EISs shall not serve to rationalize or justify decisions already made (40 CFR §§ 1502.2(g) and 1502.5). Unarguably, the Park Service selected the Kinsley visitor center <u>before</u> the issuance of the DEIS. Clearly, this is a NEPA violation and is also counter to Park Service planning policy. For example, Director's Order 2 essentially states that general management planning (which the GMP is) will be the first phase in decision making followed by decisions for site-specific actions (which the Kinsley proposal is). Like NEPA, the Park Service has clearly violated their own policy guidelines in moving forward with and in defense of this project.

A primary reason the NEPA regulations prohibit the use of a predetermined decision in developing an EIS is so that a full range of alternatives can be developed and so that the public has a choice in providing meaningful input. This full range of alternatives is, the heart of any EIS (40 CFR § 1502.14). By selecting the Kinsley proposal beforehand and making it part of all the action alternatives, the Park Service has effectively violated NEPA once again and has prohibited the public from commenting on other reasonable alternatives that could have been developed and, in fact, were developed in the DCP EA.

The Park Service states that the "findings" of the DCP were brought into the GMP EIS because it better served the public interest. First of all, I am not aware of any "findings" of the DCP or the EA. If there are findings please send them to me. Secondly, it is impossible to simply "bring in" or apply public comment on alternatives to a document (the EIS) which has completely different alternatives from the alternatives the public commented on (the DCP EA).

The Park Service also responds that the public has had ample opportunity to comment on the EA, the Kinsley proposal, and EIS. However, one document, the EA, was withdrawn. Details on another, the Kinsley proposal, were not forthcoming from the Park Service and only released via FOIA requests after the proposal was already selected. And the other, the EIS, really only gave the public one choice to comment on - the Kinsley proposal. Taken together, the way the Park Service proceeded makes a mockery of NEPA, public comment, and public concern.

In Question #7, the Park Service states that their policies provide for the construction of this visitor facility within the park. However, the 1990 <u>law</u> states otherwise - that the lands within the boundaries are to be protected. Thus, it seems as the contention of the Park Service is that policy supercedes law. I certainly do not believe this to be the case, especially when coupled with another Park Service policy that states if adequate facilities exist to serve the park visitors' needs for commercial services outside park boundaries, then these facilities will not be developed within the park. In the first case the Park Service uses policy to trump the law, then turn right around and disregard its own policy. This is not consistent application of Park Service policy and seems to me to possibly be illegal.

In the response to Question #9, the Park Service, in regard to Section 110 of the NHPA, states that federal agencies must use, to the maximum extent feasible, historic properties. I am not sure how the Park Service can use the historic Cyclorama building "to the maximum extent feasible" and simultaneously plan for its demolition. At the very least, this is very poor planning on the part of the Park Service and, at the most, would seem to be a violation of the law.

Regarding Question #10, it was the Park Service, no one else, which stated at the Senate hearings that Mr. Kinsley, when accepted as the cooperator, would get the construction contract. The response also states that the Board of Directors of the the Gettysburg National Battlefield Museum Foundation will select the construction company - not Mr. Kinsley. I can hardly see a difference between Mr. Kinsley, the contractor, and Mr. Kinsley, who is the president of the Board of Directors of the Gettysburg National Battlefield Museum Foundation. The Park Service is playing word games and not being fully honest.

The Park Service chooses yet again not to come clean in its response to Question # 12. The question was - will there be commercial activity in the proposed visitor center or not? The obvious answer to anyone but the Park Service is "yes" - there will be some commercial activity at the proposed visitor center. And, instead of stating the full truth that the food service being proposed at the Kinsley visitors center will seat the largest number of people compared to any other food service establishment in Gettysburg, the Park Service states that the food service is only "5%" of the space of the proposed facility. More of the same pattern of not being completely forthright.

With Question #14, the Park Service again skirts the truth. Regardless of whether the Peer Review Panel was specifically asked for their opinions on the appropriateness of siting a new visitors center facility on the LeVan Tract, the fact is that many of them voiced this opinion anyway. The Park Service ignored this in answering this question. In fact, at least three of the reviewers, Snell, Pfanz, and Rollins, have considerable concerns with constructing the Kinsley proposal on the LeVan Tract. Of course, the Park Service never admits that these experts are opposed to constructing the Kinsley visitors center on the LeVan Tract.

The response to Question #15, yet again, follows the Park Service pattern of avoiding answers which are completely truthful. The Park Service responds that, indeed, an estimate was conducted in regard to rehabilitating the Cyclorama Building insofar as only correcting health, life-safety, and accessability deficiencies. However, the estimate, conducted in 1993, did much more than this. That estimate was a package for the rehabilitation of the Cyclorama Center which, among other things, would remove and replace the roof, remove the asbestos ceiling (which was the cause of closing the building down recently), patching the cracks and treating the masonry material, and included a redesign of the building's interior for greater efficiency of visitor use and for better design of exhibit space. This was to be done for a net cost of $2.7 million. Of course, the Park Service never mentions any of this.

Interestingly, the estimate proposal also states that "[i]n the last 30 years, no major rehab of the building's exterior has been undertaken, and significant masonry, roof, and cleaning/painting work is needed" and also that "[f]urther delay on mitigation of study and corrective action will lead to accelerated structural problems as interior steel rusts, cracks widen, and the threat of serious asbestos contamination increases". Obviously, serious problems existed at the Cyclorama Building since at least

1993, yet the Park Service never included rehabilitation of this building in their service-wide construction priority list, nor did they bother to tell the Subcommittee any of these problems.

Of last note, recent information has surfaced that the Park Service has received a copy of a letter from J. Carter Brown, chairman of the U.S. Commission of Fine Arts, indicating his strong opposition to the demolition of the Cyclorama Building. In that letter (dated March 17, 1999), Mr. Brown concludes "[e]very conceivable effort should be made to protect and restore this exceptional building." Although nearly two months old, this letter was never publicized or made known by the Park Service. Yet they were quick to send to my office letters of support for the GMP and Kinsley proposal by some noted historians. J. Carter Brown's sentiments were echoed on March 23rd by Terence Riley, Chief Curator for the Museum of Modern Art. Purposely withholding comments which oppose this plan, especially by people of prestige, is simply unfair to the public who deserve an unbiased assessment of the Cyclorama Building by federal agencies. It is these sorts of tactics used by the Park Service at Gettysburg which has plagued this project from the beginning.

The simple and sufficient answer to Question #20 would have been "no", a specific economic analysis was not done for the Borough of Gettysburg. The Park Service responds further that they were not asked to do this analysis and that this analysis would not have provided additional useful information. The fact is that the Borough of Gettysburg is so tightly tied to the Military Park it is difficult to separate the two, especially economically. Concerns of the businesses in the Borough were voiced by the business community to the Park Service time and time again, yet the Park Service paid little heed. I was not aware that a community necessarily had "to ask" for a separate economic analysis. However, it should be obvious to anyone to include a more detailed economic analysis for communities which have such close ties to any park like the relationship exhibited by the Borough and the Military Park. Contrary to the opinion of the Park Service, I believe that a Borough specific economic analysis would provide useful information.

All in all I am not pleased with the answers given by the Park Service to most of the questions that were asked relative to the oversight hearing I held on Gettysburg National Military Park. In fact, most of the answers were incomplete and seemed to be written purposely to dance around a fair and honest answer. As a result, my opinion has not changed and I continue to strongly suggest and highly recommend to the Park Service that they either withdraw the current EIS or supplement the existing one in order to address significant deficiencies and inadequacies.

Thank you for your attention to this letter.

Sincerely,

James V. Hansen, Chairman
Subcommittee on National Parks
and Public Lands

**RESPONSES TO QUESTIONS POSED BY SUBCOMMITTE ON NATIONAL PARKS AND PUBLIC LANDS OF THE HOUSE RESOURCES COMMITTEE AS A FOLLOW-UP TO THE OVERSIGHT HEARING OF FEBRUARY 11, 1999, REGARDING GETTYSBURG NATIONAL MILITARY PARK'S GENERAL MANAGEMENT PLAN AND VISITOR CENTER/MUSEUM PROPOSAL.**

1. *In regard to the entire public process dealing with the Draft General Management Plan, Environmental Impact Statement, and the Kinsley Proposal the Park Service has stated frequently as to how much community involvement there was, how many public meetings were held, and how many supporting comments were submitted, and so forth.*

   *How does the Park Service explain then, that the Borough of Gettysburg, as well as the Gettysburg Merchant Association, the Convention Center, the Gettysburg Battlefield Preservation Association, along with many other Civil War organizations, and a host of citizens have all come out against this proposal?*

   **Response:** Almost 75% of those responding orally or in writing to the draft GMP/EIS support it. Organizations favoring the proposal include the National Trust for Historic Preservation, the National Parks and Conservation Association, Cumberland Township (the township within which the current and proposed visitor centers and most of the park lie), the Friends of the National Parks at Gettysburg, 13 national and regional Civil War organizations, the Gettysburg National Military Park Advisory Commission, and many others. In addition, as stated by Deputy Director Galvin at the hearing, a zip code analysis of the greater Gettysburg area indicates that fully half of the local respondents support the draft GMP/EIS. In his testimony, Senator Santorum also indicated that the large majority of the input he has received remains positive and supportive.

   Although NPS would certainly prefer to have unanimous support for its proposals, this is not always possible. The Borough of Gettysburg, as stated in its testimony, is opposed to the proposal due to fears that there will be negative economic impacts upon businesses located within the Borough and upon the Borough tax base. The Gettysburg Retail Merchants Association has echoed those fears. However, the economic impact analysis commissioned by the NPS determined that the opposite would be the case. The analysis indicates that overall tax revenues for the greater Gettysburg area will increase as a result of this plan, since visitor spending will be increased by 21%, or by $23 million per year, in the local economy.

   The Gettysburg Visitor and Convention Bureau did not provide formal comments upon the draft GMP, so the NPS is unable to state whether it supports or opposes the proposed plan.

Thirteen (13) regional and national Civil War organizations have provided written comments in support of the plan. In contrast only one Civil War organization, the Gettysburg Battlefield Preservation Association, has provided the NPS with written or oral comments opposing the plan.

2. *The Park Service has asserted that this project has overwhelming support in the form of written comments, but isn't it true that most of these supporting letters came from one group, the Friends of the National Parks at Gettysburg, who currently has a very friendly and unique relationship with the Military Park? Is it not also true that the comments were basically "form letters" and that these "form letter" comment cards were sent to the members of this organization before the release of the Draft GMP?*

**Response:** Of the more than 500 individual written and oral comments, approximately 102 were comment cards sent to NPS by members of the Friends of the National Parks at Gettysburg. Each card included handwritten comments. Of the 102 comment cards, 97 were generally in favor of the plan and 5 were generally opposed to the plan. The mail date for the Friend's issue of their newsletter that included the comment cards was September 15, 1998. The draft GMP/EIS was released for public review on August 14, 1998.

3. *The Park Service has testified that the preferred alternative "proposed many measures to partner with local communities, particularly the Borough of Gettysburg." However, Superintendent Latschar has stated that "there's nothing in our mission statement that says we're supposed to look out for businesses surrounding the park." How does the Park Service reconcile these two statements?*

**Response:** The mission of the National Park Service, as contained in the Organic Act of 1916, is "to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." It is this mission statement that Superintendent Latschar was referring to, by emphasizing that the driving force behind the draft GMP/EIS is to improve the NPS's ability to preserve and interpret the nationally significant resources at Gettysburg NMP.

To that end, NPS has proposed significant measures in the draft GMP (pages 76, 91-2) to partner with local communities, particularly the Borough of Gettysburg. These initiatives are intended to improve the interpretation of the town of Gettysburg, its citizens and their role during the battle and its aftermath, and to improve visitor services. NPS has entered into a Letter of Intent with the Borough of Gettysburg to accomplish these initiatives. Proposals include:

- Expand the historic pathway and related media and programs [in downtown Gettysburg]
- Cooperate with local entities to preserve, rehabilitate and interpret the Lincoln Train Station [in downtown Gettysburg]

- Establish a partnership with local governments, the Commonwealth of Pennsylvania and private groups to acquire, preserve, interpret and operate the Wills House [in downtown Gettysburg]
- Establish a NPS presence downtown [Gettysburg]
- Develop, in coordination with local entities, an active menu of programs, interpretation, living history and tours to educate visitors about the town's [Gettysburg's] role in the battle, its aftermath and the preservation of the battlefield.
- Provide information about the town of Gettysburg, the historic pathway, and other sites in the park Visitor Center, along with information about local and regional visitor services (hotels, restaurants, etc.)
- Work with the community and private entities to provide regular shuttle service between the Visitor Center and downtown Gettysburg.
- Incorporate the community in the park's auto tour.

NPS considers that these activities will help to achieve the Service's mission at Gettysburg National Military Park. NPS studies indicate that visitor spending will likely be increased by 21%, or by $23 million per year, in the local communities as a result of these and other activities included in the draft GMP.

4. *According to Park Service, Director's Order 2, "General management planning will constitute the first phase of tiered planning and decision making....Decisions about site-specific actions will be deferred to implementation planning. More detailed, site-specific analyses of implementation plan alternatives will be required before any major federal action is undertaken."*

*In this case, it is clear that the Park Service used the Kinsley proposal to develop the GMP. Is it not more appropriate to complete the GMP and then to generate a Concept Plan for the construction of new facilities? In fact, is this not the way that it is supposed to work according to Park Service policy?*

**Response:** Inclusion of the proposed Visitor Center/Museum complex in the draft GMP does not violate NPS policy. The Collections Storage, Museum and Visitor Center DCP was prepared under Gettysburg National Military Park's existing 1982 GMP. Development Concept Plans are a tool NPS can use to solve facilities concerns. The findings of the DCP were brought into the new GMP when it became clear that the public interest could best be served by doing so.

5. *According to NEPA, Environmental Impact Statements are to be used to contribute to the decision-making process and cannot be used to rationalize or justify decisions already made.*

*In this case, didn't the Park Service make a decision to go with the Kinsley plan and then rationalized and formed the GMP EIS around it?*

**Response:** Development Concept Plans are tools that NPS uses to solve facility concerns. During the draft Development Concept Plan/Environmental Assessment, NPS developed and reviewed with the public four alternatives for solving the facility concerns at Gettysburg National Military Park. The public had an opportunity to review and comment upon alternatives for resolving the facility problem, and had the opportunity to review and comment upon the criteria that NPS proposed for evaluation of the site and selection of a proposal. After a proposal was selected for negotiation, NPS sought public comment on the specifics of that proposal. During this NEPA process, the public had many opportunities to comment on alternatives, criteria, specifics of the proposal, and other issues.

In April 1997, while the RFP process was underway, NPS began the planning for a new General Management Plan/Environmental Impact Statement (GMP/EIS) to replace the park's 1982 GMP. Because the RFP was underway, NPS announced that it would defer consideration of new facilities as a part of the GMP until proposals were received and evaluated. The proposal selected for negotiation in response to the RFP would be incorporated into the GMP/EIS. Working with the public, NPS established goals for the GMP (pgs. 7-9). Those are:

- The land and resources of Gettysburg NMP are protected, rehabilitated and maintained.
- Visitors understand and appreciate the significant events associated with the Gettysburg Campaign and its impact on the development of the nation.
- Visitors safely enjoy high-quality and accessible educational experiences.
- Public and private entities understand the park's mission and act cooperatively to protect and interpret the park and other resources related to the Gettysburg Campaign and its commemoration.

As a part of the process NPS held public scoping meetings, workshops and focus group meetings; prepared and presented new mapping and resource work to explain the 1863 battle landscape and the changes it had undergone; and evaluated five preliminary concepts. Because of public comment, a sixth combined concept was developed. This combined concept eventually became NPS' preferred alternative.

6. *The Park Service terminated the Development Concept Plan and EA, then incorporated these into the GMP. However, the alternatives in the DCP/EA are vastly different from the ones expressed in the draft GMP, where all but the "No Action" alternative implements the Kinsley plan.*

*Do you believe that eliminating all the other alternatives expressed in the DCP/EA, which effectively limited what the public could comment on, follows the letter and intent of NEPA to develop a "full range of alternatives"?*

*How is it possible that the Park Service could fold the comments made relative to the DCP/EA into the EIS when those comments were on completely different alternatives?*

**Response:** NPS developed a reasonable range of alternatives during the draft Development Concept Plan/Environmental Assessment. As part of the DCP/EA process, NPS developed and reviewed with the public four alternatives for solving the facility concerns at Gettysburg National Military Park. The public had an opportunity to review and comment upon those alternatives and to review and comment upon the criteria that NPS proposed for evaluation of the site and selection of a proposal. After a proposal was selected for negotiation, NPS sought public comment on the specifics of that proposal. During this NEPA process, the public had many opportunities to comment on alternatives, criteria, specifics of the proposal, and other issues. NPS considered public comment, and the proposal included in the draft GMP/EIS reflects changes made because of public comment. NPS considers that the environmental review procedures followed in this matter, including the consideration of public comment as a part of the process, comply with NEPA.

7. *The 1990 Gettysburg National Military Park Boundary Legislation addressed and set the boundaries of the Park and with the purpose to preserve, conserve and protect the grounds of the Park and other important sites. This legislation resulted in boundaries being set that included private land, including the LeVan tract, that was deemed to have historic significance within the Park. In fact, subsequent actions to the passage of this legislation reinforced the intent for the Park Service to preserve and protect the lands within the boundaries.*

*How then is it possible for the Park Service to propose massive construction and development of a site that has remained virtually undisturbed since at least 1863? Is not this contrary and in direct conflict with the 1990 legislation?*

**Response:** NPS management policies call for NPS to provide "appropriate facilities necessary for resource protection and required for visitor enjoyment of parks." (Chapter 9 page 1). In the large majority of natural and historic parks, parklands are utilized for the purpose of providing visitor facilities.

Both NPS and independent historians have reviewed the LeVan site and concluded that no significant battle action took place there. Archeological, endangered species, and wetland surveys have been conducted to ensure that the site can be developed without impacts to the site's natural or cultural resources. The topography of the site will ensure that the facility will not present a physical intrusion upon the historic landscapes of the park, and will not be visible from any of the primary interpretive areas of the park. Relocating these facilities from their current sites along some of the most hallowed ground of the battlefield will remove major visual intrusions from the heart of the historic battlefield. Therefore, NPS considers that the LeVan tract is an appropriate site for visitor facilities development.

8.  *According to NPS Management Policies, if adequate facilities exist or can feasibly be developed by private enterprise to serve park visitors' needs for commercial services outside park boundaries, such facilities will not be expanded or developed within parks.*

   *Although this policy may apply to concessions, this situation presents about the same situation. If so, how does the Park justify the expansion and development of commercial services inside the boundaries of the park when adequate, and in fact many, facilities currently exist outside park boundaries?*

   **Response:**  NPS, in its prepared testimony stated that the proposed project would not result in "commercialism" of the park.  Rather, the project would include necessary and appropriate facilities for visitors.  The existing visitor facilities at the park include a visitor center with an antiquated museum and collections storage facility, the Electric Map Program, the Cyclorama Gallery, a conventional theater in which we present an old film, a licensed battlefield guide tour center, and the Eastern National bookstore.  The new facility will continue these uses, providing enough space to make these operations more efficient.  The new facility will also include food service.  In the new facility, 86% of the space will be used for the visitor center, museum, collections storage and associated uses; 9% for the Eastern National book/museum store and the Licensed Battlefield Tour Center; and 5% for food service.  NPS considers that these uses are necessary and appropriate incidental services that enhance the visitor experience, and as such are appropriate inclusions in the proposed facility that do not violate NPS policy.

9.  *Has the Cyclorama building been determined to be eligible for listing on the National Register of Historic Places?*

   **Response:**  In December, 1995, the NPS prepared a Determination of Eligibility for the Cyclorama Building, which concluded that the structure was not eligible for listing on the National Register of Historic Places.  In May 1996, the Pennsylvania State Historic Preservation Officer (SHPO) concurred with that determination of non-eligibility.  The concurrence of the Pennsylvania SHPO fulfilled the requirements of the regulations of the Advisory Council on Historic Preservation (ACHP) (36 CFR Part 800) for compliance with the National Historic Preservation Act, as amended.  Based upon that compliance, the 1996 Development Concept Plan and the Request for Proposals presumed that the Cyclorama Building was not eligible to the National Register.

   In February 1997, the Society of Architectural Historians appealed the determination of non-eligibility, and formally requested that the ACHP seek the opinion of the Keeper of the National Register of Historic Places.  The ACHP acceded to that request.  On September 24, 1998, the Keeper reversed the findings of the NPS and the Pennsylvania SHPO and determined that the Cyclorama Building was eligible for listing on the National Register of Historic Places.

*Is the Park Service planning to use some of the space offered at the new visitors center complex, that is, be a tenant?*

**Response:** As described on pages 85-90 of the Draft General Management Plan, 112,100 square feet or 95% of the total area of the proposed Visitor Center/Museum complex would be used for NPS activities, including the Eastern National Bookstore and the Licensed Battlefield Guide Tour Center.   However, the NPS would not be a "tenant" in the normal definition of that word, but would have a cooperative arrangement for management of the facility with the Gettysburg National Battlefield Museum Foundation.  The purpose behind the partnership is for the Museum Foundation to fund, build, and maintain the proposed complex for the benefit of the NPS and the visiting public.

*Is it true that federal agencies, like the Park Service must use, to the maximum extent feasible, historic properties available, before acquiring, construction, or leasing buildings for purposes of carrying out agency responsibilities, as per the National Historic Preservation Act? Because the Park Service must use historic buildings, like the Cyclorama, does this prevent its proposed demolition?*

*Response:* Section 110 of the National Historic Preservation Act, as amended, requires federal agencies to use, to the maximum extent feasible, historic properties. However, this provision of the law does not absolutely prevent the demolition of historic buildings.  Rather it requires consideration in the planning process to determine if it is appropriate to demolish an historic building.

*10. The Park Service has testified before the Senate, that once Mr. Kinsley is accepted as the cooperator, then Mr. Kinsley and his company or a contractor of his choice would do the construction.*

*Can we assume then that federal bidding procedures and construction guidelines will not be followed in the construction of the complex? Since the complex will eventually be turned over to the NPS, should construction contracts follow federal bidding and construction guidelines?*

**Response:** The Board of Directors of the Gettysburg National Battlefield Museum Foundation, not Mr. Kinsley, will make the decision regarding what contractor will be awarded the contract to build the facility.  The Board of Directors would represent national preservation groups, educators, Civil War historians, the national business community, the Park's Advisory Commission and others.  The details of a final arrangement have not yet been negotiated because a final general management plan has not been approved.  NPS has made no decision regarding these issues.

*11. If this project proceeds will the Park Service allow construction to begin, in any manner or form, before the entire amount of funds, that is, all of the approximately $40 million, are absolutely secured by Mr. Kinsley and the Foundation?*

**Response**: No construction will begin until 100% of the funding for the project has been secured.

*What assurance can you give us that this will be the case?*

**Response**: NPS and the Gettysburg National Battlefield Museum Foundation have signed a letter of intent noting that no construction will begin until all of the funds for the project are secured.

*If a reasonable amount of time passes, let's say 4 or 5 years, and the money has not been secured, what, if any, actions does the NPS plan to take?*

**Response**: The GMP describes the type, use, and benefits of a proposed new visitor center/museum complex, and suggests that the proposed partnership between the NPS and the Gettysburg National Battlefield Museum Foundation is the most feasible method of accomplishing those goals. The Foundation has indicated that it would be able to raise the needed funds for the facility. However, if the Foundation is unable to secure sufficient funds to construct the complex, it would not change the overall goals identified in the GMP. In that case, the NPS would pursue all other feasible alternatives to achieve its goals.

12. *The Park Service has testified before the Senate hearings that "there will be no 'commercialization' of the park", yet even the pared down version of the Kinsley proposal has a cafeteria style restaurant and the tour bus area which is clearly going to be a commercial enterprise.*

   *Can you clarify this – is there going to be commercial activity or not? There seems to be a clear policy direction from the Park Service to move commercial activity away from and out of park boundaries, especially in western parks. What is the rational to buck this approach for Gettysburg, especially in light of the fact that there were other proposals which did not require commercialization within the unit?*

**Response**: NPS in its prepared testimony stated that the proposed project would not result in "commercialism" of the park. Rather, the project would include necessary and appropriate facilities for visitors. The existing visitor facilities at the park include a visitor center with an antiquated museum and collections storage facility, the Electric Map Program, the Cyclorama Gallery, a conventional theater in which we present an old film, a licensed battlefield guide tour center, and the Eastern National bookstore. The new facility will continue these uses, providing enough space to make these operations more efficient. The new facility will also include food service. In the new facility, 86% of the space will be used for visitor center, museum, collections storage and associated uses; 9% for the Eastern National book/museum store and the Licensed Battlefield Tour Center; and 5% for food service. NPS considers that these uses are necessary and appropriate incidental services that enhance the visitor experience, and as such are appropriate inclusions in the proposed facility that do not violate NPS policy.

13. *The Park Service testified before the Senate stating that "under the Kinsley deal, there would be no new fees for – fees that the Park Service charges would be exactly the same."*

*However, in a staff briefing in June of 1998, the Park Service states "the only new interpretive fee would be for the film and is estimated at $4.00 for an adult."*

*Can you clarify this – Are there going to be new fees for the visitors at Gettysburg?*

**Response**: At the time of Deputy Director Galvin's testimony, NPS interpretive fees would have remained the same, but a new fee for an I-MAX film would have been charged by a third party. Under the revised proposal presented to interested members of Congress in June 1998, and included in the GMP, the I-MAX theatre was eliminated, and a conventional theater with a new NPS interpretive fee was included. The new interpretive fee would be $4.00. This new feature at the park would be voluntary. Other interpretive fees at the park, which are also voluntary fees, would remain the same.

We provide the following display of current and proposed NPS fees for the park:

| Fee | Current | Proposed |
|---|---|---|
| NPS (Interpretive Fee collected by Eastern National Cooperating Assn.) | | |
| . Electric Map | $3.00/adult | $3.00/adult |
| | $1.00/child (6-16) | $1.00/child (6-16) |
| . Cyclorama Program | $3.00/adult | $3.00/adult |
| | $1.00/child (6-16) | $1.00/child (6-16) |
| . Interpretive Film | not available | $4.00/adult |
| | | $1.00/child (6-16) |
| . Combination Interpretive Fee (3 venues) | not available | $7.75/adult |
| Entrance Fee | none | none |
| Parking Fee | none | none |

14. *Were all comments made by the Peer Review Panel of Historians that was convened by the GNMP Advisory Commission in January and February of 1998 in favor of developing the LeVan tract? How many were opposed?*

**Response**: The Peer Review panel of Historians convened by the GNMP Advisory Commission was not asked for their opinions regarding development of the LeVan tract. The peer review panel was asked to evaluate the methodology, sources and process used to understand the extent of landscape change and the significance of

features to the outcome of the battle; to suggest improvements to the methodology, sources and process; to advise if the process was sufficient basis for General Management Plan level decision-making; and to advise if there was evidence of battle action or battle activity that NPS missed in its evaluation of the LeVan tract.

The Peer Review Panel endorsed the validity of the methodological design, agreed with the use of source material and the applicability of NPS' methods of analysis to identify crucial terrain features affecting the outcome of the battle. The panel concluded that the information developed as a result of the analysis provided a sufficient basis for GMP level decisions. The panel agreed with the park historians' assessment of battle-related activity experienced on the LeVan tract. The panel also unanimously agreed that the site of Kinzie's and Rugg's batteries, which are marked by monuments and lie at the eastern edge of the 45-acre tract, should be protected. Protection of these sites is considered mandatory by NPS, and the Gettysburg National Battlefield Museum Foundation has agreed to protect the site of these batteries from development.

15. *When was the last time that estimates were obtained for the repair of the Cyclorama Center? Why was this information not presented in the GMP? Would this information have been helpful in giving a more accurate perspective of options available for the park?*

Response: A "Class C" estimate for correction of health, life-safety, and accessibility deficiencies for the Cyclorama Building was prepared in May 1996. Since that time, however, NPS studies have determined that irrespective of costs to correct health, life-safety and accessibility deficiencies, the cyclorama painting cannot be adequately preserved and maintained within the building. The size of the gallery is too small for the adequate display and ongoing conservation of the painting. NPS considers that the physical inadequacies of the Cyclorama building cannot be corrected without complete demolition and reconstruction of the entire drum area of the building. In light of this discussion (included in the draft GMP, pgs. 12, 170) NPS does not consider that the specific dollar amount for repairs to correct health, life-safety and accessibility deficiencies to the Cyclorama Center would have been helpful.

16. *How does the Park Service respond to the fact that the Cyclorama Center has been declared an architecturally important building and a decision that, as such, it merits protection and preservation?*

Response: NPS fully recognizes that the Cyclorama Building has been declared significant and in accordance with law and policy is taking that into account in reaching its decision about whether or not to retain it. NPS has not yet reached a decision regarding this issue.

17. *Did the Park Service relate to the public at the public meetings held in October of this year, the fact that the Cyclorama Building was determined eligible for the National Register of Historic Places as a structure of "exceptional historic and architectural*

*significance"? Does the NPS believe this to be important information to have when deciding the fate of the building?*

**Response:** The draft GMP, which was released on August 14, 1998, informed the public that the Cyclorama Building might be considered eligible to the National Register of Historic Places (p. 238). The draft GMP also stated that if the Keeper determined the building to be eligible, then the NPS would consult with the Pennsylvania SHPO and the ACHP, in accordance with 36 CFR Part 800 and the National Historic Preservation Act, as amended, to determine the future of the building. The Keeper's determination was dated September 24, 1998 and received by the park on September 25, 1998, after the first six public meetings held during the public comment period were completed. The keeper's decision was widely reported in the newspapers, and was discussed by speakers during the October 1, 1998 public hearing.

18. *How often have funds been requested from Congress for any significant improvements or repairs to the Cyclorama building in the last 6 years?*

**Response:** In 1993, Gettysburg NMP formally requested line-item construction funds for rehabilitation of the Cyclorama building. Again, in 1996, the park formally requested line-item construction funds for its rehabilitation. However, neither request successfully competed against the other backlog items of the NPS on a national basis, and consequently neither request was included in the NPS' service-wide construction priority list. Therefore, the President has not formally requested any funds from the Congress for rehabilitation of the Cyclorama building, as part of the Administration's budget request, in the last six years.

19. *Have funds been requested in recent years to address the need for improved collection storage and maintenance? If not, why not?*

**Response:** In the past seven years, Gettysburg NMP has requested and received $703,500 for a variety of projects to improve the care of the museum collections at the park. These projects range from the installation of a fire-suppression system in the collection storage area to purchase of improved storage cabinets and cases and the rehousing of artifacts in acid-free holders.

20. *Was a Borough –specific economic analysis completed in order to ascertain the true impact of the proposed development on the municipality? If not, why not?*

**Response:** NPS defined the area affected by the proposed alternatives as the communities within which the park is located and those that are adjacent to it. Portions of the park are located within five townships, and commercial services for tourists are located in these townships, adjacent townships and the Borough of Gettysburg. For this reason, the economic assessment incorporated all of the communities that might be affected by the alternatives incorporated in the draft GMP/EIS.

NPS discussed the affected area it felt was appropriate during public scoping and resource workshops. During the various public workshops, NPS was asked to consider the impacts of the proposal on specific segments of the tourism economy, and this was done. However, NPS was not asked to perform separate economic assessments for each municipality during these scoping meetings.

The draft GMP/EIS notes that although some individual businesses may be affected by the proposal, the overall economic impacts from the action alternatives on the economy of the affected area are positive. Therefore, NPS does not believe that a separate analysis of the economic impact from the proposal on the Borough of Gettysburg would provide additional useful information.

# ATTACHMENT U

# Attachment U

# Stains on exterior of Cyclorama Center (north side)



# ATTACHMENT V

**Attachment V**

**Photograph of large rectangular hole cut into the south side of the
Cyclorama Center**



# ATTACHMENT W

## Attachment W

**Photograph of large rectangular hole cut into the south side of the Cyclorama Center and rough wooden fence erected along observation deck**



# ATTACHMENT X

## Attachment X

## Exterior of Cyclorama Center prior to alteration (south side)



# ATTACHMENT Y

**Attachment Y**

**Exterior of Cyclorama Center prior to alteration (south side)**



# EXHIBIT B

**List of Attachments To The September 18, 2006 Letter From Christine Madrid French to Dion Neutra**

Attachment A to the September 18 letter is <u>Bulldozing a Masterpiece - Richard Neutra's Modernist Gettysburg Memorial</u> Summer 2005 article in *Modernism Magazine*.

Attachment B to the September 18 letter is the August 15, 1949 cover of *Time* featuring Architect Richard Neutra.

Attachment C to the September 18 letter is October 8, 1959 letter from John B. Cabot, United States Department of the Interior, National Park Service, to Richard J. Neutra and Robert E. Alexander.

Attachment D to the September 18 letter is <u>The Park Service Dates to Build Well</u> March 29, 1964 article in *The Washington Post*.

Attachment E to the September 18 letter is an April 7, 1999 letter to Dr. John A. Latschar from Richard Moe, National Trust for Historic Preservation.

Attachment F to the September 18 letter is a March 18, 1999 letter to Dr. John A. Latschar from David L. Taylor, Preservation Pennsylvania.

Attachment G to the September 18 letter is a March 19, 1999 letter to Dr. John A. Latschar from Margarita Jerabek-Wuellner, Department of Art History, University of California, Los Angeles.

Attachment H to the September 18 letter is a May 16, 2000 letter to The Honorable John Berry from James V. Hansen, Chairman, Subcommittee on National Parks and Public Lands.

Attachment I to the September 18 letter is a January 26, 2000 letter to Bruce Babbitt from Richard Guy Wilson Department of Architectural History, University of Virginia School of Architecture.

Attachment J to the September 18 letter is a March 17, 1999 letter to Martha Catlin from J. Carter Brown, National Gallery of Art.

Attachment K to the September 18 letter is a November 13, 2000 letter to Carol Shull from Frank Gehry, Architect.

Attachment L to the September 18 letter is a March 23, 1999 letter to Martha Catlin from Terence Riley, The Museum of Modern Art.

Attachment M to the September 18 letter is a December 14, 1999 letter to Carol Shull from Robert A.M. Stern.

Attachment N to the September 18 letter is an October 20, 2000 letter to Carol Shull from Lord Foster of Thames Bank O.M.

Attachment O to the September 18 letter is a March 27, 1998 letter to Carol Shull from Thomas S. Hines, University of California, Los Angeles.

Attachment P to the September 18 letter is a March 29, 1999 letter to Robert Stanton from George Miller, Senior Democratic Member, Committee on Resources, and James V. Hansen, Chairman, Subcommittee on National Parks and Public Lands.

Attachment Q to the September 18 letter is a June 21, 2005 World Monuments Fund news release, 2006 World Monuments Watch List of 100 Most Endangered Species.

Attachment R to the September 18 letter is a May 28, 1998 letter to Robert Stanton from George Miller, Senior Democratic Member, Committee on Resources.

Attachment S to the September 18 letter is a June 18, 1998 letter to Robert Stanton from George Miller, Senior Democratic Member, Committee on Resources.

Attachment T to the September 18 letter is a May 17, 1999 letter to Robert Stanton from James V. Hansen, Chairman, Subcommittee on National Parks and Public Lands.

Attachment U to the September 18 letter is a photograph of stains on exterior of Cyclorama Center (north side).

Attachment V to the September 18 letter is a photograph of large rectangular hole cut into the south side of the Cyclorama Center.

Attachment W to the September 18 letter is a photograph of large rectangular hole cut into the south side of the Cyclorama Center and rough wooden fence erected along observation deck.

Attachment X to the September 18 letter is a photograph of exterior of Cyclorama center prior to alteration (south side).

Attachment  to the September 18 letter is a photograph of exterior of Cyclorama Center prior to alteration (south side).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case Number.:  1:06-CV-02077-TFH<br>Judge:  Thomas F. Hogan<br>Deck Type:  Administrative Agency Review<br>Date Filed:  12/05/2006<br><br>DECLARATION OF JERRY MATYIKO IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | ) ) ) ) | |

Under penalty of perjury, I, Jerry Matyiko, declare as follows:

1.    I am President and owner of Expert House Movers of MD, Inc, a company which specializes in moving structures.

2.    I am a member of the International Association of Structural Movers, and have been a member since that organization's founding.

3.    I have more than forty years of experience in moving structures.  During that time, I have successfully moved a wide variety of historic and architecturally significant structures, including, but not limited to, houses, theaters, lighthouses, and an airport terminal. My experience with moving historic and architecturally significant structures includes relocation of poured-in-place concrete buildings such as the Gettysburg Cyclorama Center.

4.    Some of the relocations for which I have been responsible are recognized as especially innovative, or even unprecedented.  For example, I was responsible for relocating the tallest masonry structure ever to be moved.  I was also responsible for relocating the heaviest structure ever moved on dolly wheels and for the longest relocation of a lighthouse ever, both of which are recognized as Guinness World Records.

5.    In connection with this matter, I have reviewed detailed architectural plans and documents related to the design of the Cyclorama Center.

6.    I have also conducted an on-site evaluation of the Cyclorama Center.  As part of that evaluation, I met with Katie Lawhon, Public Affairs Specialist for Gettysburg National Military Park.  I also examined both the exterior and the interior of the Cyclorama Center.  In addition, I examined areas of Gettysburg National Military Park and the Borough of Gettysburg in the vicinity of the Cyclorama Center.

7.    The Cyclorama Center, or portions thereof, can be removed from Ziegler's Grove and relocated to another site using dolly wheels and a grid of steel beams

8.      There is at least one location outside of Gettysburg National Military Park to which the Cyclorama Center could be moved.  Additional locations—both inside and outside of Gettysburg National Military Park—may also be possible, but cannot be confirmed at this time. The feasibility of additional locations would depend on a variety of factors such as topography, distance from the Cyclorama Center's current location, applicable land use restrictions, and the location of physical constraints like utilities and roads.

9.      Site planning would be required before the Cyclorama Center is removed and relocated from Ziegler's Grove.  The site planning process would be used to determine the specific details of the method by which the Cyclorama Center will be removed and relocated. The site planning process would also determine the precise route and timing of the move.

10.      Site preparation would also be required prior to removing and relocating the Cyclorama Center.  Specific site preparation activities would depend on the outcome of the site planning process.  At a minimum, however, such activities would include construction work on the interior and exterior of the Cyclorama Center, temporary grading, and temporary and permanent landscaping.

11.      The cost of removing the Cyclorama Center or portions thereof from Ziegler's Grove and relocating it to another location would be approximately $5 million.  This figure does not include landscape work, construction of a temporary gravel pathway wide enough to accommodate the Cyclorama Center, any work that may be required on other buildings or structures, or preparation of the Cyclorama Center for relocation.  Total and exact costs for the entire process of relocating and re-using the Cyclorama Center are likely to depend on a variety of factors, including how much of the Cyclorama Center will be moved, the exact location to which the building is relocated, permitting requirements, and the outcome of the site planning process.

Executed this 15 day of January, 2007.

Jerry Matyiko

Export House Mover of MD inc.

-4-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

RECENT PAST PRESERVATION )
NETWORK, a Virginia non-profit corporation, )
P.O. Box 100505, Arlington, VA 22210; )
DION NEUTRA, 2440 Neutra Place, Los )
Angeles, CA 90039; and CHRISTINE )
MADRID FRENCH, 2522 Willard Drive, )
Charlottesville, VA 22903, )
      )
      Plaintiffs, )
      )
      v. )
      )
JOHN LATSCHAR in his official capacity as )
SUPERINTENDENT OF GETTYSBURG )
NATIONAL MILITARY PARK, 97 )
Taneytown Rd., Gettysburg, PA 17325; )
DENNIS REIDENBACH in his official )
capacity as ACTING DIRECTOR, )
NORTHEAST REGION OF THE )    Case Number.:  1:06-CV-02077-TFH
NATIONAL PARK SERVICE, 200 Chestnut )    Judge:  Thomas F. Hogan
Street, Philadelphia, PA 19106; MARY )    Deck Type:  Administrative Agency
BOMAR in her official capacity as )                Review
DIRECTOR OF THE NATIONAL PARK )    Date Filed:  12/05/2006
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; DIRK KEMPTHORNE in his )
official capacity as SECRETARY OF THE )    DECLARATION OF DAVID
UNITED STATES DEPARTMENT OF THE )    MCILNAY IN SUPPORT OF
INTERIOR, 1849 C Street, N.W., Washington, )    PLAINTIFFS' MOTION FOR
D.C. 20240; THE NATIONAL PARK )    SUMMARY JUDGMENT
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; and THE UNITED STATES )
DEPARTMENT OF THE INTERIOR, 1849 C )
Street, N.W., Washington, D.C. 20240, )
      )
      Defendants. )
      )
      )

Under penalty of perjury, I, David McIlnay, declare as follows:

1.      I am a Principal at The Office for Planning and Architecture ("OPA"), an architecture and planning firm in Harrisburg, Pennsylvania.  OPA provides architectural design and master planning services for individual buildings, building groups, non-building architectural projects, urban, suburban, and rural land areas.  Among other things, the firm performs a variety of pre-design work, including land analysis, economic analysis, real estate analysis, space programming, program analysis, and general project research.  OPA's work combines physical, cultural and organizational analysis with economic evaluations.

2.      I hold a Bachelor of Architecture degree from The Pennsylvania State University. I also hold a Bachelor of Art History and Literature from Dickinson College.  As part of my degree work at Dickinson College, I also studied at the Architectural Association in London, England.

3.      I am a licensed architect and a member of the American Institute of Architects ("AIA").  I served on the Board of Directors of the Central Pennsylvania Chapter of the AIA for six years.

4.      I have 16 years of professional experience in the field of architecture.  That experience includes dozens of projects involving the renovation, restoration, and re-use of historic and architecturally significant structures, including poured-in-place concrete structures such as the Gettysburg Cyclorama Center ("Cyclorama Center").  It also includes projects involving structural repairs to buildings which have been lifted from their foundations.

5.      Several of my renovation, restoration, and re-use projects have been awarded significant honors.  To cite just one example, I was Lead Designer for the adaptive re-use of a 1903 cigar factory in York, Pennsylvania, a project which received the 2006 Design Award from 10,000 Friends of Pennsylvania.

6.    I have considerable experience and expertise in the area of due diligence, feasibility, and site selection.  That experience includes projects involving re-use of structures which were originally designed for government or public use.

7.    I am familiar with the method which Jerry Matyiko of Expert House Movers of MD, Inc. has suggested for removing the Cyclorama Center from Ziegler's Grove and relocating the building to a different location.

8.    I have conducted an on-site evaluation of the Cyclorama Center.  As part of that evaluation, I met with Katie Lawhon, Public Affairs Specialist for Gettysburg National Military Park.  I also examined the exterior and interior of the Cyclorama Center, as well as nearby areas of Gettysburg National Military Park and the Borough of Gettysburg.

9.    The Cyclorama Center, or portions thereof, can feasibly be re-used either inside or outside of Gettysburg National Military Park.  There is at least one site outside of Gettysburg National Military Park on which the Cyclorama could, from an architecture and design perspective, feasibly be re-used.  Additional sites may also exist.  The feasibility of such sites would depend on a variety of factors, including, without limitation, the location of the site, the size of the site, the characteristics of the site, and the characteristics of the environment surrounding the site.

10.    The design and condition of the office wing of the Cyclorama Center is such that it could feasibly be re-used for office, retail, or restaurant use.  The design and condition of the remaining portion of the Cyclorama Center, including the portion of the building in which the Cyclorama Painting was hung, could feasibly be re-used as a theater, a museum, an art gallery, or other purposes which require a large display area.

11.    Additional design and feasibility studies would be required before proceeding with a specific re-use project. Such studies would focus on architecture and design issues specific to the project proponent, the project proponent's proposed use or uses of the Cyclorama Center, and the location where the Cyclorama Center will be re-used.

12.    I have conducted a preliminary investigation of potential funding sources for re-use of the Cyclorama Center. Several such source exist, including, without limitation, various grant programs administered by state and local governments.

Executed this 14 day of January, 2007.

David McIlnay

- 4 -

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903,<br><br>     Plaintiffs,<br><br>     v.<br><br>JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240,<br><br>     Defendants. | Case Number.:  1:06-CV-02077-TFH<br>Judge:  Thomas F. Hogan<br>Deck Type:  Administrative Agency Review<br>Date Filed:  12/05/2006<br><br>DECLARATION OF DION NEUTRA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

I, Dion Neutra, declare as follows:

1.     I am the son and professional Partner of the late Richard Neutra and successor principal of the firm, now in its 8th decade of practice.  I worked professionally with my father for approximately 30 years, including the years of his partnership with Robert Alexander.  As part of that work, I served as project architect for the Gettysburg Cyclorama Center ("Cyclorama Center").

2.     I am a licensed architect, and I have more than 60 years of experience in the field of architecture.  Currently, I am Principal of Richard and Dion Neutra Architects, aka Dion Neutra Inc.  I am also Executive Consultant to the Neutra Institute for Survival Through Design.

3.     I currently reside in Los Angeles, California.

4.     As project architect for the Cyclorama Center, I have personal knowledge of the Park Service's role in the design of the building.  Although the design of the building was my father's, the agency was closely involved in certain aspects of the project.  Among other things, the Park Service selected the site for the Cyclorama Center, identifying every field stone wall in the vicinity to be respected.  It provided detailed instructions concerning the intended uses of the building, and prepared explicit guidance concerning arrangements for housing and hanging the Cyclorama Painting.  For example, the Park Service itself designed, sized, and installed the wooden ring

supporting the Cyclorama Painting.  The dimensions of that ring, with their requirements for clearance in the rear, in turn, determined the painting's drum-shaped housing.  Our design followed the Park Service's instructions to the inch.  There was never any thought that more space might someday be required.

5.      The footprint of the Cyclorama Center resembles a keyhole.  At the north end of the structure a series of curved features—the auditorium, the outer wall of the rotunda, and the ramp used to access a viewing platform—create a graceful series of concentric circles.  To the south, there is the rectilinear office wing topped by an observation deck.  The building uses a variety of materials, including glass, metal, concrete, and native Pennsylvania stone.  The Cyclorama Center also includes several distinctive design features, including Neutra's signature L-shaped "spider leg" beams and an innovative amphitheater and speaking hall known as "The Rostrum."

6.      I regularly advocate for the preservation of significant examples of modern architecture, including the works of our firm.  I have spent many years and countless hours advocating for the preservation of the Cyclorama Center, a structure very dear to both me and my father.  My interest in the Cyclorama Center and its preservation is personal, professional, and educational.  I view the structure as a means of commemorating the most famous speech ever given in our country as well as the battle of Gettysburg and as a means of preserving in context one of the most important examples of Richard Neutra's architecture.  My father considered the Cyclorama Center

to be the project closest to his heart. He was very proud to have grasped how best to unify a divided country in this structure by emphasizing the fact of the Gettysburg Address, which was uttered a mere hundred yards away.

7.      My father's work on the Cyclorama Center won great praise from the Park Service, the press, architecture critics, and the public in general.

8.      I visit the Cyclorama Center and surrounding areas of Gettysburg National Military Park.  I use the natural and physical environment of the building and surrounding areas  educational, recreational, professional, and aesthetic purposes, including contemplation of the Cyclorama Center and its personal and historic significance.  As my children and grandchildren grow older, I want to assure that they will be able to continue to enjoy the aesthetic and educational values of this building and its historic relationship to Gettysburg.

9.      The Park Service's failure to use or re-use the Cyclorama Center, its refusal to evaluate alternatives to demolition, its failure to create a preservation program for the building, and its failure to evaluate the demolition under NEPA have already reduced the recreational and aesthetic value of the Cyclorama Center.  The Park Service has not taken responsibility for properly maintaining the building.  In recent years, access to the building has been increasingly limited.  The building is now closed, and can only be experienced from the outside.  If the Park Service had complied with NHPA and NEPA in good faith, some of these injuries—both to the building and to the

recreational and aesthetic values of the Cyclorama Center and surrounding areas—might have been avoided. Even the restoration of the painting has been so organized as to take it out of view of the public, many of whom travel vast distances just to see it. Keeping this mind seems not to have occurred to this administration.

10.     The demolition of the Cyclorama Center would cause irreparable injury to my ability to enjoy a structure to which I and my father devoted tremendous physical and emotional energy not to speak of years of our productive lives. Demolition would also prevent me from further sharing this important building with my children and grandchildren. In addition, demolition would permanently destroy the aesthetic and recreational values of the building and surrounding areas of Gettysburg National Military Park. Removing just this one monument while leaving all the others in plain view, would make a mockery of the history of this battlefield area.

11.     I am very concerned that the Park Service has not prepared either an environmental assessment or an environmental impact statement identifying and evaluating the potential environmental impacts of demolishing the Cyclorama Center and reasonable alternatives thereto, as required by the National Environmental Policy Act of 1969 ("NEPA"), and that the agency has failed to comply with section 110 of the National Historic Preservation Act ("NHPA"). These failures have caused, and will continue to cause, damage to the Cyclorama Center and injury to me and those I hold dear.

12.    I am very concerned about the Park Service's attempt to avoid the clear requirements of NEPA and the NHPA, both of which are designed to protect the public welfare. I am interested in making certain that the Park Service immediately complies with both laws, and indeed with all relevant provisions of federal law.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14th__ day of January, 2008.

Dion Neutra

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECENT PAST PRESERVATION           )
NETWORK, a Virginia non-profit corporation, )
P.O. Box 100505, Arlington, VA 22210;   )
DION NEUTRA, 2440 Neutra Place, Los   )
Angeles, CA 90039; and CHRISTINE    )
MADRID FRENCH, 2522 Willard Drive,   )
Charlottesville, VA 22903,          )
                                    )
       Plaintiffs,              )
                                    )
       v.                       )
                                    )
JOHN LATSCHAR in his official capacity as )
SUPERINTENDENT OF GETTYSBURG      )
NATIONAL MILITARY PARK, 97         )
Taneytown Rd., Gettysburg, PA 17325;    )
DENNIS REIDENBACH in his official   )
capacity as ACTING DIRECTOR,        )
NORTHEAST REGION OF THE            )    Case Number.: 1:06-CV-02077-TFH
NATIONAL PARK SERVICE, 200 Chestnut )    Judge: Thomas F. Hogan
Street, Philadelphia, PA 19106; MARY    )    Deck Type: Administrative Agency
BOMAR in her official capacity as      )               Review
DIRECTOR OF THE NATIONAL PARK    )    Date Filed: 12/05/2006
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; DIRK KEMPTHORNE in his )    DECLARATION OF ROBERT
official capacity as SECRETARY OF THE  )    SHOAFF IN SUPPORT OF
UNITED STATES DEPARTMENT OF THE )    PLAINTIFFS' MOTION FOR
INTERIOR, 1849 C Street, N.W., Washington, )    SUMMARY JUDGMENT
D.C. 20240; THE NATIONAL PARK     )
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; and THE UNITED STATES  )
DEPARTMENT OF THE INTERIOR, 1849 C )
Street, N.W., Washington, D.C. 20240,    )
                                    )
       Defendants.             )
                                    )
                                    )

I, Robert Shoaff, declare as follows:

1.      I am a Senior Designer at The Office for Planning and Architecture, an architecture and planning firm in Harrisburg, Pennsylvania.  Among other things, the firm provides a variety of pre-design services, including land analysis, economic analysis, real estate analysis, space programming, program analysis, and general project research.  OPA's work combines physical, cultural and organizational analysis with economic evaluations

2.      I hold a Master of Science degree in Architectural Studies from the Massachusetts Institute of Technology, where my substantive focus was in the Architecture and Urbanism Discipline.  I also hold a Bachelor of Architecture degree from the New York Institute of Technology and an Associate of Arts Degree in Architecture from the Harrisburg Area Community College.

3.      I have eight years of experience in architecture and urban design.  That experience includes several projects which involve re-use of historic structures.  I have particular expertise in the area of preparing pre-design studies used to determine the feasibility of re-use.  This work involves consideration of both the specific building to be re-used and the larger architectural, planning, and community context of re-use.

4.      I am familiar with the method Jerry Matyiko of Expert House Movers of MD, Inc. has suggested for removing the Cyclorama Center from Ziegler's Grove and relocating the building to a different location.

5.      I have conducted an on-site evaluation of the Gettysburg Cyclorama Center ("Cyclorama Center").  As part of that evaluation, I met with Katie Lawhon, Public Affairs Specialist for Gettysburg National Military Park.  I also examined the exterior and interior of the Cyclorama Center, as well as nearby areas of Gettysburg National Military Park and the Borough of Gettysburg.

6.    The architectural, planning, and community context of the Cyclorama Center is such that the Cyclorama Center could feasibly be re-used either inside or outside of Gettysburg National Military Park.  There is at least one site outside of the park where the Cyclorama Center could be re-used in a manner consistent with the zone of transition between the central portion of the Borough of Gettysburg and Gettysburg National Military Park.

7.    Before proceeding with a specific re-use project, additional project-specific studies of the architectural, planning, and community context of the Cyclorama Center and its proposed location would be required.

Under penalty of perjury, I declare that the foregoing is true and correct.

Executed this 14th day of January, 2007.

Robert Shoaff

- 3 -

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECENT PAST PRESERVATION )
NETWORK, a Virginia non-profit corporation, )
P.O. Box 100505, Arlington, VA 22210; )
DION NEUTRA, 2440 Neutra Place, Los )
Angeles, CA 90039; and CHRISTINE )
MADRID FRENCH, 2522 Willard Drive, )
Charlottesville, VA 22903, )
             )
        Plaintiffs, )
             )
        v. )
             )
JOHN LATSCHAR in his official capacity as )
SUPERINTENDENT OF GETTYSBURG )
NATIONAL MILITARY PARK, 97 )
Taneytown Rd., Gettysburg, PA 17325; )
DENNIS REIDENBACH in his official )
capacity as ACTING DIRECTOR, )
NORTHEAST REGION OF THE )    Case Number.: 1:06-CV-02077-TFH
NATIONAL PARK SERVICE, 200 Chestnut )    Judge: Thomas F. Hogan
Street, Philadelphia, PA 19106; MARY )    Deck Type: Administrative Agency
BOMAR in her official capacity as )                Review
DIRECTOR OF THE NATIONAL PARK )    Date Filed: 12/05/2006
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; DIRK KEMPTHORNE in his )
official capacity as SECRETARY OF THE )    DECLARATION OF NICHOLAS C.
UNITED STATES DEPARTMENT OF THE )    YOST IN SUPPORT OF PLAINTIFFS'
INTERIOR, 1849 C Street, N.W., Washington, )    MOTION FOR SUMMARY
D.C. 20240; THE NATIONAL PARK )    JUDGMENT
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; and THE UNITED STATES )
DEPARTMENT OF THE INTERIOR, 1849 C )
Street, N.W., Washington, D.C. 20240, )
             )
        Defendants. )
             )
             )

I, Nicholas C. Yost, declare as follows:

1.      I am a partner at Sonnenschein Nath & Rosenthal LLP, and am counsel for Plaintiffs Recent Past Preservation Network, Dion Neutra, and Christine Madrid French.  I represent Plaintiffs on a pro bono basis.

2.      By way of background, I served as General Counsel of the Council on Environmental Quality (CEQ) from 1977 to 1981, during which time I was the principal draftsperson of the CEQ NEPA regulations, 40 C.F.R. parts 1500 to1508.

3.      On December 2, 2005, I telephoned Jake Hoogland, Chief of the Environmental Quality Division of the National Park Service.  I did not reach Mr. Hoogland.  Instead, I left him a message in which I requested information from him regarding the Park Service's plans, if any, for the Gettysburg Cyclorama Center.  I also requested information about the status of the agency's NEPA compliance, if any.  I also informed Mr. Hoogland that Matthew Adams, an attorney who also practices at Sonnenschein Nath & Rosenthal, had, on October 21, 2005, sent a letter requesting the same information to John Latchar, Superintendent of Gettysburg National Military Park.

4.      On or about December 8, 2005, I received a voicemail from Mr. Hoogland.  In that voicemail, he mentioned that he had asked "the Park" for its reaction to the October 21, 2005 letter.  He also pledged to provide the information I had requested in my voicemail.

5.      I did not hear back from Mr. Hoogland for several weeks.  On January 20, I decided to call Mr. Hoogland.  I did not reach Mr. Hoogland.  Instead, I left a message reminding him of my earlier request and of his pledge.  I never heard anything further from Mr. Hoogland.

6.      In June and July, 2006, I was made aware of formal statements of interest in relocating the Cyclorama Center.  Specifically, during a trip to Gettysburg, I met with a local businessperson who specifically offered his property in the Borough of Gettysburg as a site to

which the Cyclorama Center could be moved.  At that meeting, I was also informed of another

offer of property in the Borough of Gettysburg from a second businessperson.  Christine Madrid

French and Matthew Adams also attended that meeting.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of January, 2007.

_____
Nicholas C. Yost

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECENT PAST PRESERVATION                    )
NETWORK, a Virginia non-profit corporation, )
P.O. Box 100505, Arlington, VA 22210;       )
DION NEUTRA, 2440 Neutra Place, Los         )
Angeles, CA 90039; and CHRISTINE            )
MADRID FRENCH, 2522 Willard Drive,          )
Charlottesville, VA 22903,                  )
                                            )
      Plaintiffs,                    )
                                            )
      v.                             )
                                            )
JOHN LATSCHAR in his official capacity as   )
SUPERINTENDENT OF GETTYSBURG                )
NATIONAL MILITARY PARK, 97                  )
Taneytown Rd., Gettysburg, PA 17325;        )
DENNIS REIDENBACH in his official           )
capacity as ACTING DIRECTOR,                )
NORTHEAST REGION OF THE                     )    Case Number.:  1:06-CV-02077-TFH
NATIONAL PARK SERVICE, 200 Chestnut         )    Judge:  Thomas F. Hogan
Street, Philadelphia, PA 19106; MARY        )    Deck Type:  Administrative Agency
BOMAR in her official capacity as           )                    Review
DIRECTOR OF THE NATIONAL PARK               )    Date Filed:  12/05/2006
SERVICE, 1849 C Street, N.W., Washington,   )
D.C. 20240; DIRK KEMPTHORNE in his          )    [PROPOSED] ORDER GRANTING
official capacity as SECRETARY OF THE       )    PLAINTIFFS' MOTION FOR
UNITED STATES DEPARTMENT OF THE             )    SUMMARY JUDGMENT
INTERIOR, 1849 C Street, N.W., Washington,  )
D.C. 20240; THE NATIONAL PARK               )
SERVICE, 1849 C Street, N.W., Washington,   )
D.C. 20240; and THE UNITED STATES           )
DEPARTMENT OF THE INTERIOR, 1849 C          )
Street, N.W., Washington, D.C. 20240,       )
                                            )
      Defendants.                    )
                                            )
                                            )
_____

The Motion for Summary Judgment filed by Plaintiffs Recent Past Preservation Network, Christine Madrid French, and Dion Neutra ("Plaintiffs") came on regularly for hearing before the Honorable Thomas F. Hogan on _____, 2008 in the above-named court.  Based upon the pleadings, the moving, opposition and reply papers, arguments of counsel, and all other matters presented to the Court, and good cause appearing therefor,

THE COURT HEREBY FINDS THAT, for the reasons set forth in Plaintiffs' motion, no triable issue of fact exists and Plaintiffs are entitled to summary judgment on Counts One through Five of their Complaint for declaratory and injunctive relief.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment should be, and hereby is, GRANTED.

IT IS SO ORDERED.

DATED: _____, 2008

_____
Hon. Thomas F. Hogan