UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2422 Willard Drive, Charlottesville, VA 22903, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN LATSCHAR, in his official capacity as Deck Type:  Administrative Agency SUPERINTENDENT OF GETTYSBURG Review NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325 DENNIS REIDENBACH, in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR,[1/] in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, DC 20240; DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C.  20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case Number: 1:06-CV-02077-TFH <br> Judge:  Thomas F. Hogan <br> Deck Type:  Administrative Agency <br> Review |

**FEDERAL DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT ON ALL CLAIMS**

---

[1/] Federal Defendants note that the correct name of the Director of the National Park Service is Mary Bomar, not Marie Bomar. Dennis Reidenbach is now the director of the Northeast Region.

JOHN LATSCHAR, in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, DENNIS REIDENBACH, in his official capacity as DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, MARY BOMAR, in her official capacity a DIRECTOR OF THE NATIONAL PARK SERVICE, DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, the NATIONAL PARK SERVICE, and the UNITED STATES DEPARTMENT OF THE INTERIOR (collectively referred to herein as "Federal Defendants"), by and through their counsel, hereby respectfully move this Court for an order dismissing the above-captioned action pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiffs' motion is barred by the statute of limitations contained in 28 U.S.C. § 2401(a), and further the agency complied with the requirements of the National Environmental Policy Act and the National Historic Preservation Act.  The grounds for this motion are set forth in the accompanying memorandum and the administrative record filed with the Court in this action.

Dated:  March 14, 2008.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Samantha Klein
SAMANTHA KLEIN
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Phone: (202) 305-0474
Fax:    (202) 305-0506
E-mail: samantha.klein@usdoj.gov

Of Counsel:

MARTHA F. ANSTY
Attorney
Office of the Solicitor, N.E. Region

U.S. Department of the Interior
Winston Prouty Federal Building
11 Lincoln Street
Essex Junction, VT 05452
Telephone:  (802) 872-0629
Fax:  (802) 872-9704

Counsel for Federal Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2422 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOHN LATSCHAR, in his official capacity as Deck Type: Administrative Agency SUPERINTENDENT OF GETTYSBURG Review NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325 DENNIS REIDENBACH, in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR,[1] in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, DC 20240; DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) Case Number: 1:06-CV-02077-TFH ) Judge: Thomas F. Hogan ) Deck Type: Administrative Agency )               Review ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) ) |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

[1] Federal Defendants note that the correct name of the Director of the National Park Service is Mary Bomar, not Marie Bomar. Dennis Reidenbach is now the director of the Northeast Region.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Battle of Gettysburg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Commemorative Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Park Service Planning Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    The Planning Process Continued with the 1996 EA . . . . . . . . . . . . . . . . . . . . . . . . . 7
    The Park Service Initiates Review for New GMP . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 106 Review of Cyclorama Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Record of Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.  National Historic Preservation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.       THE PARK SERVICE COMPLIED WITH NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.    Plaintiffs' NEPA Claims Are Barred by the Statute of Limitations
             Because the ROD Was Approved More Than Six Years Prior to
             This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.    The Park Services' Internal Guidance Documents Are Not Judicially
             Enforceable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        C.    The Park Service Conducted a NEPA Analysis and Took a "Hard Look"
             Prior to the Decision to Adopt and Alternative That Included Demolition
             of the Cyclorama Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

             1.    The 1995 EA and 1996 EA for the DCP Evaluated Alternatives
                  That Included Demolition of the Cyclorama Building . . . . . . . . . 26

             2.    The Analysis of the 1995 EA and 1996 EA Are Incorporated
                  in the GMP/EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

             3.    The GMP/EIS Included An Analysis of Potential Impacts
                  of Demolition of the Cyclorama Building and the MOA Set
                  Forth the Appropriate Mitigation . . . . . . . . . . . . . . . . . . . . . . . . 30

i

4.      The Park Service Properly Considered Alternatives to
        Demolition to the Cyclorama Building . . . . . . . . . . . . . . . . . . . . . 34


II.     THE PARK SERVICE IS IN COMPLIANCE WITH THE NHPA . . . . . . . . . . . . . . . . .36

        A.      Plaintiffs' NHPA Section 110(a)(1) Claims Are Barred by the
                Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        B.      The Park Service Complied with Section 110(a)(1) . . . . . . . . . . . . . . . 38

        C.      Plaintiffs' NHPA Section 110(a)(2) Claims Are Barred by the
                Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        D.      The Park Service Compiled with Section 110(a)(2) . . . . . . . . . . . . . . . 41

        CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

Cabinet Mountains Wilderness v. Peterson,
    685 F.2d 678 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Camps v. Pitts,
    411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Celotex v. Catrett,
    477 U.S. 317 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Coalition of 9/11 Families, Inc. v. Rampe,
    2005 WL 323747 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 36

Coliseum Square Association, Inc. v. Jackson,
    465 F.3d 215 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Communities Against Runway Expansion v. FAA,
    355 F.3d 678 (D.C.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Daingerfield Island Protective Soc. v. Lujan,
    797 F. Supp. 25 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 36

Florida Power & Light Co. v. Lorion,
    470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Franklin v. Massachusetts,
    505 U.S. 788 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Gersman v. Group Health Ass'n, Inc.,
    975 F.2d 886 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Humane Society of the United States v. Hodel,
    840 F.2d 45 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Impro Products, Inc. v. Block,
    722 F.2d 845 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jackson Hole Conservation Alliance v. Babbitt,
    96 F. Supp. 2d 1288 (D.Wyo. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

Jersey Heights Neighborhood Ass'n v. Glendening,
    174 F.3d 180 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iii

Kleppe v. Sierra Club,
    427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Lake Mohave Boat Owners Ass'n v. National Park Service,
    78 F.3d 1360 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Lee v. Thornburgh,
    877 F.2d 1053 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lewis v. Lujan,
    826 F. Supp. 1302 (D. Wyo. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Littlewolf v. Hodel,
    681 F. Supp. 929 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Marsh v. Oregon Natural Res. Council,
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,11

Menominee Tribe v. United States,
    726 F.2d 718 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

National Mining Ass'n v. Fowler,
    324 F.3d 752 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

National Trust for Historic Preservation v. Blanck,
    938 F. Supp. 908 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12, 36, 38, 41

National Wildlife Fed'n, v E.P.A.,
    286 F.3d 554 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Natural Resources Defense Council v. Administrator,
    451 F. Supp. 1245 (D.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Natural Resources Defense Council, Inc. v. U.S. Nuclear Regulatory Commission,
    606 F.2d 1261 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 34

Nevada v. Department of Energy,
    457 F.3d 78 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

New Mexico ex rel. Richardson v. Bureau of Land Management,
    459 F. Supp. 2d 1102  (D.N.M. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Oregon Natural Resources Council v. Harrell,
    52 F.3d 1499 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Ouachita Watch League v. Jacobs,
        463 F.3d 1163 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

P&V Enterprises v. US Army Corps of Engineers,
        – F.3d – , 2008 WL 425523 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Pennaco Energy, Inc. v. U.S. Department of Interior,
        377 F.3d 1147 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25, 33

Public Utilities Com'n of State of Cal. v. F.E.R.C.,
        900 F.2d 269 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rease v. Harvey,
        238 Fed. Appx. 492 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Rivers Unlimited v. U.S. Dept. of Transp.,
        F. Supp. 2d 2008 WL 80364 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Runway Expansion v. F.A.A.,
        355 F.3d 678 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Salmon River Concerned Citizens v. Robertson,
        32 F.3d 1346 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25

Sierra Club v. Slater,
        120 F.3d 623(6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Sierra Club v. U.S. Army Corps of Engineers,
        446 F.3d 808 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Spannaus v. U.S. Dep't of Justice,
        824 F.2d 52 (D.C.Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Stevens County v. U.S. Dep't of Interior,
        507 F. Supp. 2d 1127 (E.D. Was. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Turtle Island Restoration Network v. U.S. Dep't of Commerce,
        438 F.3d 937 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. 162.20 Acres of Land, More or Less, Situated in Clay County,
State of Mississippi,
        733 F.2d 377 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25

Wilderness Society v. Norton,
        434 F.3d 584 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

**FEDERAL STATUTES**

5 U.S.C. § 701, et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
5 U.S.C. § 706 (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
16 U.S.C. §§ 4321-4372f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
16 U.S.C. § 470f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
16 U.S.C. § 470h-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**FEDERAL RULES**

Fed. R. Civ. P. Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**FEDERAL REGULATIONS**

36 C.F.R. Part 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
36 C.F.R. § 800.6(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 37, 38
40 C.F.R. § § 1500-1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**FEDERAL REGISTER**

49 Fed Reg 9273 (Mar. 12, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
49 Fed Reg 39233 (Oct. 4, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
53 Fed Reg 4727 (Feb. 17, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 43
61 Fed Reg 29133 (Jun. 7, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
63 Fed Reg 20496 (Apr. 24, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40, 42
65 Fed Reg 2984 (Jan. 19, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
66 Fed Reg 7507 (Jan. 23, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**OTHER AUTHORITIES**

Stephen Barr, <u>Gettysburg Restoration Marches On</u>, The Washington Post, November 25, 1999, available at 1999 WLNR 2832900

Edward Gunts, <u>Calendar</u>, Los Angeles Times, December 30, 2002, available at 2002 WLNR 12413439

Cindi Lash, <u>Emanci-Painting Restoration to Give 'Battle of Gettysburg' New Life at Battlefield</u>, Pittsburgh Post-Gazette (PA), February 29, 2004, available at 2004 WLNR 4802912

Timothy D. May, <u>Beauty Put First at Gettysburg</u>, Long Beach Press-Telegram (CA), January 13, 2002, available at 2002 WLNR 1610182

Timothy D. May, <u>Gettysburg Facility</u>, Houston Chronicle, January 13, 2002, available at 2002 WLNR 13576809

Robert Moran, <u>Gettysburg Visitor Center Gets Approval</u>, Philadelphia Inquirer, November 25, 1999, available at 1999 WLNR 2569201

Mark Rozzo, <u>Who Chooses History?</u>, Los Angeles Times, June 27, 2004, available at 2004 WLNR 19756355.

Amy Worden, <u>A New Battle of Gettysburg</u>, Philadelphia Inquirer (PA), December 30, 2003, available at 2003 WLNR 14779846

Associated Press, <u>New Gettysburg Museum</u>, Pittsburgh Post-Gazette (PA), January 20, 2002, available at 2002 WLNR 4222308

<u>Gettysburg Museum Plans Unveiled</u>, Los Angeles Times, January 13, 2002, available at 2002 WLNR 12417280

**INTRODUCTION**

This case concerns a challenge to the National Park Service's ("Park Service" or "NPS") decision to adopt a general management plan ("GMP") that was intended to restore historic battle lines at Gettysburg National Military Park.  Plaintiffs attempt to narrow the Court's focus to one aspect of this park-wide restoration, the demolition of the Cyclorama Building, asserting that the Park Service failed to provide an analysis of the impacts of that demolition.  However, consideration of that allegation is barred by the statute of limitations in 28 U.S.C. § 2401(a), which sets out a very generous six-year statute of limitations for civil actions against the government, including for claims brought pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and the National Historic Preservation Act ("NHPA"),16 U.S.C. §§ 470 et seq.  Plaintiffs commenced their lawsuit in December 2006, more than seven years after the NEPA and NHPA reviews were completed and the Park Service had complied with Section 110 of the NHPA, 16 U.S.C. § 470h-2.  Plaintiffs cannot avoid the statute of limitations bar by asserting their claims concern a failure to act.  The Park Service adopted an alternative for the GMP that included demolition of the Cyclorama Building in November 1999 when it approved the Record of Decision ("ROD"), which constituted a final agency action subject review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.  Any alleged failure by the Park Service to comply with NEPA and the NHPA prior to taking that action could have been adjudicated at that time under the Section 706(2) of the APA, which provides a review of an agency action under the arbitrary and capricious standard.

The question is when Plaintiffs first had a right to resort to the Court to complain that the Park Service failed to comply with NEPA and the NHPA before making a final decision.  Here, the public was fully on notice that the Park Service contemplated demolition of the Cyclorama Building in conjunction with its plans for Gettysburg National Military Park under the GMP, and it is clear from the administrative record that Plaintiffs themselves appreciated this fact.  The public was also fully on notice that in adopting the ROD in November 1999, the Park Service had selected an

1

alternative that included demolition of the Cyclorama Building.

The Park Service began its review of the impacts associated with demolition of the Cyclorama Building in the 1995 Draft Development Concept Plan and Environmental Assessment, Gettysburg Museum of the Civil War ("1995 EA"), which was supplemented by the 1996 Draft Development Concept Plan Environmental Assessment, Collections Storage, Visitor & Museum Facilities ("1996 EA"). This review was incorporated into the 1999 General Management Plan and Environmental Impact Statement, Gettysburg National Military Park ("GMP/EIS"), which examined the environmental impacts of a park-wide plan that contains multiple components. One of the components is the restoration of Ziegler's Grove, the scene of the second and third days of historic Battle of Gettysburg, which has necessitated the demolition of the Cyclorama Building. The Park Service adopted the ROD in November 1999, which selected an alternative that included demolition of the Cyclorama Building. Therefore, Federal Defendants strongly urge the Court to find that Plaintiffs' claims under NEPA and the NHPA are barred by the six-year statute of limitations.

At this point Plaintiffs are simply too late to challenge the adequacy of the Park Service's environmental and historic resource reviews. An agency has discretion to undertake a review of environmental impacts in either a programmatic or site-specific document. See Natural Resources Defense Council, Inc. v. U.S. Nuclear Regulatory Commission, 606 F.2d 1261, 1271 (D.C. Cir. 1979). Here, the review of impacts associated with demolition occurred in both formats. Further, multiple circuits have stated that where an agency has adequately analyzed the impacts of a particular action in a programmatic environmental impact statement, the agency is not required to subsequently prepare a project or site-specific review. See, e.g, Pennaco Energy, Inc. v. U.S. Department of Interior, 377 F.3d 1147, 1151 (10th Cir. 2004); Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994); United States v. 162.20 Acres of Land, More Or Less, Situated in Clay County, State of Mississippi, 733 F.2d 377, 377 (5th Cir. 1984).

In addition, the Park Service undertook a review of potential adverse effects on the

2

Cyclorama Building under Section 106 of the NHPA, 16 U.S.C. § 470f, which included consultation with the State Historic Preservation Officer ("SHPO"), the Advisory Council on Historic Preservation ("ACHP") and other consulting parties, including the individual plaintiffs. That review culminated in the execution of a Memorandum of Agreement ("MOA") in July 1999, which set forth the appropriate mitigation for adverse impacts to the Cyclorama Building. In setting out their challenges under Section 110 of the NHPA, Plaintiffs have clearly stated that they are not challenging the Park Service's compliance with Section 106 of the NHPA. Thus, their Section 110 claims must fail, as "Section 110(a) cannot be read to create new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA...." National Trust for Historic Preservation v. Blanck, 938 F.Supp. 908, 922 (D.D.C. 1996) (internal quotations omitted), aff'd 203 F.3d 53 (D.C. Cir. 1999). Rather, when an agency complies with its obligations under Section 106 through a memorandum of agreement or programmatic agreement, the agency has also complied with Section 110. See Coalition of 9/11 Families, Inc. v. Rampe, 2005 WL 323747 at *3 (S.D.N.Y. 2005). Further, the Park Service fully complied with Sections 110(a)(1) and 110(a)(2) prior to completion of the Section 106 process. Once again, the question is when Plaintiffs had a right to first resort to the courts to complain that the Park Service failed to comply with the NHPA before making a final decision. The answer is, at the time of the execution of the MOA under Section 106 and the adoption of ROD, which selected an alternative that included demolition of the building.

Therefore, this Court should grant the Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion.

## STATEMENT OF FACTS

Gettysburg National Military Park's mission is to preserve and protect the resources associated with the Battle of Gettysburg and the Soldiers' National Cemetery, and to provide an understanding of the events that occurred in the park, within the context of American history. AR

000153.[2]  The Park Service has identified four purposes for Gettysburg National Military Park:  (1) to preserve the significant topographical, natural and cultural features that were significant to the outcome of the Battle of Gettysburg; (2) to mark the lines of battle, and to preserve the monuments and markers that commemorate the struggle; (3) to provide opportunities for people to learn about the Battle of Gettysburg in the full social, political and cultural context of the Civil War and American History; (4) to preserve the objects, artifacts and archives that document the battle, its aftermath and commemoration.  AR 000151.

### The Battle of Gettysburg

The Battle of Gettysburg commenced on July 1, 1863.  Ziegler's Grove, the present day site of the Cyclorama Building, played a pivotal role in this battle, particularly on the second and third days, July 2 and 3, 1863.  On July 3, General Lee led the famed attack on the Union defensive line on Cemetery Hill, known as Picketts' Charge.  AR 000134-139.  The focal point of Lee's attack was Ziegler's Grove.  AR 000019.  The Union defenses, anchored on Cemetery Hill and Ziegler's Grove, held their ground and the stone wall which marked the Confederacy's farthest point of advance has forevermore been know as the "High Water Mark of the Confederacy."  AR 000137-139; 003253.

### Commemorative Activity

The tremendous significance of the Battle of Gettysburg is underscored by the almost instantaneous commencement of commemorative activity. Within weeks of the battle, members of the local community convinced the Governor of Pennsylvania to establish what eventually became one of our nation's first national cemeteries.  AR 000140.  By May 1893, the U.S. Congress appointed a commission to survey, locate and preserve battle lines of both the Union and Confederate armies, and in 1895, Congress passed legislation to establish a national military park at Gettysburg, Pennsylvania, specifically authorizing the federal government to preserve for the

---

[2] References to the Administrative Record are denoted as "AR."

American people the "important topographical features of the battlefield" and to preserve and mark battle positions.  AR 000142.

In 1945, the Park Service acquired the 356 foot long Cyclorama Painting entitled "Battle of Gettysburg."  AR 000145.  The work depicts "the High Tide of the Confederacy" on July 3, 1863.  AR 003256-57; 000145.  After this significant acquisition, the Park Service decided to build a gallery to display the painting.  AR  000145.  In the late 1950s, as part of the National Park Service's Mission 66 initiative,[3] the architectural firm of Neutra and Alexander was selected to design a building to display the painting. Id. Richard Neutra is recognized as a master architect of Modern design and posthumously received the Gold Medal for lifetime achievement from the American Institute of Architects.  AR 00898.  Construction commenced in 1960, and the Cyclorama Building was opened to the public March of 1962.  AR 000145.  However, in 1971, the Cyclorama Building ceased to function as the park's Visitor Center and Museum.  AR 000145.

### Park Service Planning Process

In June of 1977, the ACHP published the "Plan to Preserve the Historic Resources of the Gettysburg Area," which included a recommendation for the Park Service to remove the Cyclorama Building from Ziegler's Grove.  AR 000145-146.  All Park Service planning efforts through the 1970s and into the early 1980s, including the 1982 General Management Plan, were consistent in proposing the eventual elimination of these buildings. AR 000146.

In 1994, the park began an assessment of critical needs, including the need to: (1) tell a more complete story of the Civil War; (2) provide adequate storage facilities for the park's collection of archival and curatorial collections; (3) protect and preserve the Cyclorama Painting (a National Historic Object); and (4) remove modern intrusions from the significant historic landscapes of the

---

[3] The "Mission 66" program was a ten year, multi-million dollar plan to provide the NPS with new and upgraded visitor facilities for the 50th anniversary of the Park Service in 1966.   An adequate visitor center greatly enhances the Park Service's mission to provide interpretive programs to the public, as well as, showcasing the individual parks' historic collections.  AR 0003286-3289

battlefield.  AR 003069.  In April 1995, the Park Service issued for public comment the 1995 EA for a Development Concept Plan ("DCP") to address visitor use, resource protection and park development issues surrounding the proposed construction of a museum and theater in an area of Gettysburg National Military Park that had little historic significance.[4]  AR 003059-3060.  The 1995 EA served as a continuation of the process that began with the Park's 1982 GMP and 1989 DCP, and was intended to address several critical issues including the lack of appropriate storage and display space for the park's priceless collection of archives of artifacts, including the Cyclorama Painting, and the continuing concerns regarding inappropriate modern intrusions on the historic scene of the 1863 battle.  AR 003067-3071.  The 1995 EA also considered a new partnership offer to privately fund the congressionally approved but never funded Gettysburg Museum of the Civil War and the relocation of the Cyclorama Painting to a new facility. AR 003072-3073.  The 1995 EA analyzed the potential environmental impacts of the various alternatives in a variety of areas, including on the Cyclorama Building, the museum and archival collections, the Cyclorama Painting, the historic battlefields, natural resources, cultural resources, as well as cumulative impacts.  AR 003104-3113.

Both action alternatives considered in the 1995 EA proposed the removal of the Cyclorama Building from the Union Battle line and the restoration or rehabilitation of Ziegler's Grove to the 1863 landscape.  AR 003061; 003083; 003087.  The Park Service concluded the removal of the Cyclorama Building would eliminate a major intrusion on the historic setting of the battlefield.  AR 003060-3061.  On August 31, 1995, the Park Service held a press conference announcing its decision to defer additional consideration of the DCP analyzed in the 1995 EA in favor of a new, broader look at the park's needs and a nationwide call for proposals. Public meetings and scoping meetings ensued. AR 002270.

---

[4] A DCP is a tool used by the Park Service to solve facility concerns.  AR000638.

**The Planning Process Continued with the 1996 EA**

In April 1996, the Park Service issued the 1996 EA.  AR 003240.  The purpose of the 1996 EA was to respond to comments on the 1995 EA and to suggest strategies for finding suitable partners to help the Park Service fund, build, operate and maintain the museum and visitor facilities.  AR 003244.  The 1996 EA also examined the environmental consequences of the four alternatives in a variety of areas including on the Cyclorama Building, as well as on natural resources, cultural resource, visual resources, socioeconomic and visitor uses.  AR 003304-3305.  The Agency selected Option D as the preferred option because it provided for a new complex to house the park's Visitor Center, museum, Cyclorama Painting and collections storage.  All visitor functions in the existing centers would be relocated and the new museum complex would allow the appropriate conservation and preservation of the Cyclorama Painting, which was then housed in the Cyclorama Building.  AR 003243. The 1996 EA noted that because environmental conditions in the Cyclorama Building could not be adequately controlled, the painting was sustaining damage from excess moisture collecting between the lining and the painting itself  AR 003257.  The preferred Option D also proposed the removal of both the Cyclorama Building and the Visitor Center from the Union battle line and the restoration of Ziegler's Grove, in keeping with the park's purpose of conserving the historic landscape. AR 003265

In May 1998, the Park Service noticed the termination of the Environmental Assessment process, stating that the issues concerning storage, museum and Visitor Center facilities would be incorporate into a park-wide general management plan/environmental impact statement.   AR 0002311-12.  While, it does not appear that this notice was ever published in the Federal Register, the Park Service also notified the public of this decision in a newsletter dated January 4, 1998, which was sent to approximately 3,800 people and announced the decision in public meetings held in December 1997 and March 1998.  AR 000646.

7

**The Park Service Initiates Review for New GMP**

In 1997, the Park Service commenced the planning process to develop a new GMP to set forth the basic management philosophy and framework for future decision-making at Gettysburg NMP.  AR 001953.  On May 5, 1997, the Park Service published a notice of intent to begin a GMP/EIS for Gettysburg National Military Park in the Federal Register, requesting public comment AR 002267.  The Park Service sought vigorous public involvement in this process as evidenced by the 22 meetings and open houses sponsored by the agency to discuss the formulation of the draft GMP/EIS and the Park Service newsletters sent to a mailing list of 3,800.  AR 000451-454. Notably, more than 1,200 people attended these public meetings and 3,728 written comments were submitted between April 1997 and August 1998.  Id.  The Agency released the Draft GMP/EIS in August of 1998, which set forth four alternatives that responded directly to the park's mission goals. AR 001953-1954.  Following the issuance of the draft GMP/EIS, the Park Service held twelve additional meetings attended by hundreds of people. AR 000454-455.

In June of 1999, the Agency published the Final GMP/EIS, which identified Alternative C as the preferred alternative.  AR 000123.  This plan proposed rehabilitation of: (1) the large scale landscape elements present during the battle; (2) major landscape features; (3) small scale landscape elements (fences, woodlots, and orchards) significant to the outcome of the battle; and (4) the circulation of the Soldiers' National Cemetery.  Id.  One element of the Park Service's extensive landscape rehabilitation effort included the demolition of the Cyclorama Building, in order to effectuate the restoration of Ziegler's Grove.  AR 000038.  As the GMP/EIS made clear, the Park Service folded the analysis in 1996 EA and the public comments received thus far into the planning process for the GMP. AR 000636-39.  Further, the GMP/EIS contained an analysis of impacts of demolition of the Cyclorama Building. See, e.g., AR 000386-387; 000401.

**Section 106 Review of Cyclorama Building**

In the period between the 1995 and 1996 EAs, the Park Service prepared a Determination

8

of Eligibility for the Cyclorama Building under the NHPA , finding that the building was not eligible

for listing on the National Register of Historic Places ("National Register" ). AR 001600; 001604.

On May 26, 1996, the SHPO concurred with this determination and also concurred with the Park

Service's Preferred Alternative (D) of the DCP/EA.  AR 001600.  However, on September 28, 1998,

the Keeper of the National Register of Historic Places found that the Cyclorama Building to be

eligible for listing on the National Register, AR 001604, and therefore, the Park Service began the

Section 106 review process with respect to the Cyclorama Building.

In accordance with the Section 106 review process, the Park Service notified potential

consulting parties (which included the two of named plaintiffs) and invited their participation.  AR

001651-1653; 001648-1650.  The agency also prepared and distributed a Section 106 Case

Report, Cyclorama Painting, Battle of Gettysburg Cyclorama Building Gettysburg National Military

Park ("Section 106 Report") on February 18, 1999.  AR 001592; AR 001586-1588. The Section 106

Report recommended removal of the Cyclorama Building in order to rehabilitate the historic

landscapes of Ziegler's Grove and allow for the restoration of the Cyclorama Painting.  AR 001604.

The Section 106 Report also contained an assessment of the possibility of rehabilitating the building

for continued use and for adaptive reuse.  AR 001606-07.  On April 11, 1999, the Park Service

issued a response to comments on the Section 106 Case Report, which included responses to

comments by the plaintiff Dion Neutra. AR 001520-1532.  On April 20, 1999, the Park Service held

a Section 106 meeting to discuss, inter alia, plans for the Cyclorama Building, including the

response to comments on the Section 106 Case Report. AR 001516-17; 001519.  Plaintiff Christine

Madrid French attended this meeting, including on behalf of Mr. Neutra. AR 001517; 001515.

June 16, 1999, the Park Service invited the consulting parties to comment on the draft

memorandum of agreement before it was executed by the Park Service, SHPO and ACHP.  AR

000114-115.  On July 29, 1999, the Park Service, SHPO and ACHP entered into the MOA which

served as the culmination of this Section 106 review process.  AR 000053-55. The MOA set forth

9

the appropriate mitigation for the adverse impacts to the Cyclorama Building under the GMP/EIS, which included documenting the building pursuant to the standards in the Historic American Buildings Survey and providing a permanent exhibit on the development of the park within the new museum that includes a section featuring the Cyclorama Building as an example of the Mission 66 period of the Park Service. Id.

<div align="center">**Record of Decision**</div>

On November 23, 1999, the Park Service issued the ROD announcing its decision to implement Alternative C of the GMP, which included demolition of the Cyclorama Building, because it provided the most desirable combination of resource preservation, visitor interpretation and experience, and cost effectiveness among the four considered alternatives for meeting the legislative purposes and mission of the park. AR000020. The Park Service indicated that Alternative C was selected to rehabilitate the Gettysburg Battlefield so that the features that were significant to the outcome of the battle and its commemoration more nearly reflect their historic conditions. AR000018. The selected action provided for improved protection and rehabilitation of the large-scale and small-scale elements of the park's historic landscapes, as well as, the Cyclorama Painting and the park's extensive collections and archives. AR000018-19. An element of Alternative C included the removal of the Cyclorama Building because it is located on Ziegler's Grove, one of the most historically significant areas of the battlefield. AR000018. The adoption of the ROD was the final agency action approving an alternative that included demolition of the Cyclorama Building.

<div align="center">**REGULATORY BACKGROUND**</div>

**A.    National Environmental Policy Act**

NEPA is intended to focus the attention of federal agencies and the public on a proposed action so that the environmental consequences of the action may be studied before a decision is made. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989). NEPA achieves this by

<div align="center">10</div>

imposing procedural requirements, not substantive ones.  Id.  "Under NEPA, the 'role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'"  Nevada v. Department of Energy, 457 F.3d 78, 87–88 (D.C. Cir. 2006) (internal citation omitted).  In short, the question is whether the agency took a "hard look" at the environmental consequences of a project.  Public Utilities Com'n of State of Cal. v. F.E.R.C., 900 F.2d 269, 282 (D.C. Cir. 1990), quoting Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976).  NEPA provides that federal agencies should prepare a detailed environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  "NEPA's EIS requirement is governed by the rule of reason....."  Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 682 (D.C. Cir. 1982) (citation omitted).  Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500-08, provide guidance in the application of NEPA, and the regulations are entitled to substantial deference.  Oregon Natural Res. Council, 490 U.S. at 372.

**B.    National Historic Preservation Act**

The NHPA is designed to take into account the impacts of a proposed action on properties eligible for or listed on the National Register.  Like NEPA, the NHPA is a procedural statute. National Mining Ass'n v. Fowler, 324 F.3d 752, 755 (D.C. Cir. 2003).  36 C.F.R. Part 800 sets forth a four-step procedure for compliance with Section 106, which includes identification of historic properties, the assessment of whether there are adverse effects on those historic properties, and the resolution of such effects.  This process often culminates in a memorandum of agreement, which reflects the understanding of the agency, SHPO, and consulting parties as to how historic properties are to be managed, including references to mitigation.  See 36 C.F.R. §§ 800.6(c), 800.16(o).  Execution and implementation of a memorandum of agreement "evidences the agency official's compliance with section 106."  36 C.F.R. § 800.6(c).

"Section 110 was originally added to the NHPA in 1980 to 'clarif[y] and codif[y] the minimum

11

responsibilities expected of Federal agencies in carrying out the purposes of th[e] Act.'" Blanck, 938 F.Supp.at 916, quoting Lee v. Thornburgh, 877 F.2d 1053, 1057 (D.C. Cir. 1989). Section 110 "represents an elucidation and extension of the Section 106 process," but does not itself impose "new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA." Blanck, 938 F.Supp. at 920, 922. Section 110(a)(1) provides in relevant part that "[p]rior to acquiring, constructing, or leasing buildings for purposes of carrying out agency responsibilities, each Federal agency shall use, to the maximum extent feasible, historic properties available to the agency...." 16 U.S.C. § 470h-2(a)(1). Section 110(a)(2) provides in relevant part that a federal agency shall establish "a preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties." 16 U.S.C. § 470h-2(a)(2).

## STANDARD OF REVIEW

Summary judgment may be granted to a moving party when it shows that there are no material facts in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. Rule 56; Celotex v. Catrett, 477 U.S. 317 (1988). Judicial review of challenges under NEPA and the NHPA are afforded by the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 702, 704; see also Lujan, 497 U.S. at 882-83; Blanck, 938 F. Supp. at 916. In reviewing final agency action under the APA, the relevant facts, with few exceptions, are limited to those presented in the administrative record of the agency. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); see also Camps v. Pitts, 411 U.S. 138, 142 (1973).

In addition to the scope of judicial review, the APA provides a highly deferential standard for review of a challenge to an agency action. In examining such a challenge, a reviewing court applies the standard in 5 U.S.C. § 706(2)(A), and determines whether the action, such as the issuance of a ROD, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In contrast, if there is a claim of agency inaction, the court reviews the

allegations of failure to act under 5 U.S.C. § 706(1), which provides for judicial review of "agency action unlawfully withheld or unreasonably delayed." The question is not whether the Court itself would have made the same decision, because "the Court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971). Rather, the Court must uphold the decision if the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision which did not constitute a clear error of judgment or exceed the bounds of its statutory authority. Id. It is the plaintiff's burden to prove that these criteria are not met and that the agency's decision was arbitrary and capricious. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).

## ARGUMENT

### I.    THE PARK SERVICE COMPLIED WITH NEPA

### A.    Plaintiffs' NEPA Claims Are Barred by the Statute of Limitations Because the ROD Was Approved More Than Six Years Prior to This Lawsuit

The civil action statute of limitations provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a) (emphasis added). The D.C. Circuit "has long held that Section 2401(a) creates a jurisdictional condition attached to the government's waiver of sovereign immunity." P&V Enterprises v. U.S. Army Corps of Engineers, – F.3d – , 2008 WL 425523 at *5 (D.C. Cir. 2008). Accordingly, courts "do not have jurisdiction over suits brought against the United States that are barred by Section 2401(a)." Rease v. Harvey, 238 Fed. Appx. 492, 496 (11th Cir. 2007) (citation omitted). "As the language of § 2401(a) makes clear, the section applies to both equitable and legal claims." Impro Products, Inc. v. Block, 722 F.2d 845, 850 (D.C. Cir. 1983) (internal citations omitted); Daingerfield Island Protective Soc. v. Lujan, 797 F.Supp. 25, 28 (D.D.C. 1992) ("the law of this Circuit could not be clearer with respect to the applicability of § 2401(a) to claims raised pursuant to the APA"), aff'd 40 F.3d 442 (D.C. Cir. 1994). This statute of limitations

13

applies to NEPA claims.  See Humane Society of the United States v. Hodel, 840 F.2d 45, 50 (D.D.C. 1988).

In deciding an issue on the grounds of statute of limitations, the proper focus is on "first accrual," the 28 U.S.C. § 2401(a) condition of the waiver of sovereign immunity.  Accordingly, the relevant question is when did events first transpire entitling the claimant to bring suit alleging the breach.  Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 56 (D.C.Cir.1987); see also Menominee Tribe v. United States, 726 F.2d 718, 720-22 (Fed. Cir. 1988) (it is when the operative facts exist and are not inherently unknowable that dictates first accrual under the statute of limitations in 28 U.S.C. § 2501).

The Supreme Court has noted that in making a determination about a final agency action that is fit for review, "[t]he core question is whether the agency has completed its decision making process, and whether the result of that process is one that will directly affect the parties." Franklin v. Massachusetts, 505 U.S. 788, 797 (1992); Sierra Club v. U.S. Army Corps of Engineers, 446 F.3d 808, 815-16 (8th Cir. 2006).  Here, the approval of the ROD in November 1999, was the final agency action approving the selection of an alternative that included demolition of the Cyclorama Building.  See Ouachita Watch League v. Jacobs,  463 F.3d 1163, 1173 (11th Cir. 2006) ("It is well settled that 'a final EIS or the record of decision issued thereon constitute[ ] final agency action.'"); Sierra Club v. Slater, 120 F.3d 623, 631 (6th Cir. 1997) (same); Oregon Natural Resources Council v. Harrell, 52 F.3d 1499, 1503-04 (9th Cir. 1995) (same).  It was at that point that the Park Service completed its decision-making process and Plaintiffs' cause of action first began to accrue.  It was at that point that the clock began to run on a suit regarding the adequacy of the environmental and historic resource reviews and compliance with applicable laws, as well as on a suit that alleged that no review ever took place prior to the decision to adopt alternative that included the demolition of the Cyclorama Building.  Plaintiffs had six years to bring such claims.  However, they chose instead to commence this action on December 5, 2006, more than seven years after the ROD was

14

approved and the decision was made to adopt an alternative that included demolition of the Cyclorama Building. See Complaint (Doc. 1).

Plaintiffs attempt to make an end-run around the jurisdictional obstacle presented by the statute of limitations by claiming that the Park Service's refusal to prepare a NEPA analysis of the demolition of the Cyclorama Building is the final agency action that is at issue here. See Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Summary Judgement ("Pl. Mem.") (Doc. 28) at 21-22, citing 5 U.S.C. § 706(1). Plaintiffs cannot by seeking to characterize their claims as "failure to act" in performing a proper NEPA analysis defer the limitation period where a decision is made that is claimed to be deficient on the grounds of inadequate NEPA analysis. Plaintiffs' cause of action "first accrues" when the decision, allegedly uninformed by the environmental consequences, is made. That is when Plaintiffs could first resort to the courts, and they must do so within six years of that time. Plaintiff cannot get around the issue of statute of limitations through artful pleading. Such actions are prohibited and frowned upon by the courts: "To allow parties to avoid this limitation through manipulation of form...would permit parties through careful pleading ... [to] avoid the strict jurisdictional limits imposed by Congress." Turtle Island Restoration Network v. U.S. Dep't of Commerce, 438 F.3d 937, 945 (9th Cir. 2006) (internal citations and quotation marks omitted).

The final agency action at issue here was the decision to adopt an alternative that included demolition of the Cyclorama Building, and that was made with the adoption of the ROD in November 1999. "Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 187 (4th Cir. 1999). Thus, in that case the court found that the statute of limitations period began running when the plaintiffs "knew or should have known of their alleged injuries," which occurred when the agency issued its project decision in the form of a ROD, not when the plaintiffs later began feeling the adverse effects of that

15

decision during implementation. Id. at 187-88.  The court also noted that the record demonstrated that some of the plaintiffs had actual knowledge of what the agency contemplated doing prior to the issuance of the ROD, and thus supported a conclusion that the plaintiffs knew or should have known of their alleged injuries by the adoption of the ROD.  Id.  Similarly, here, the public, including Plaintiffs, was on notice that the agency was considering the issue of the fate of the Cyclorama Building in the GMP/EIS and under the Section 106 review process, and that a decision was made with the adoption of the ROD.  If Plaintiffs believed that no NEPA analysis was done to support that decision, they should have sued within the six year statute of limitations.

Plaintiffs readily admit that the GMP/EIS provides that the Cyclorama Building may be "removed" from Ziegler's Grove.  Pl. Mem. at 26.  They argue that removal "is not the same" as demolition, relying on definitions in dictionaries.  Id. at 26-27.  However, it is clear that Plaintiffs and the public were on notice that "removal" of the Cyclorama Building encompassed demolition, and at least one of the individual plaintiffs himself clearly understood this to be the case.  For example, in a January 1999 letter regarding the Cyclorama Building, plaintiff Dion Neutra questioned what the actual costs of the plans "involving demolition" would be.  AR 001630 (emphasis added).  Two months later, in a March 1999 letter providing comments on the Section 106 Report, Mr. Neutra stated that "[s]hould the decision be made to honor and preserve [the Cyclorama Building], I'm assuming things would change especially were the project to have about the same funds available to spend as are proposed to demolish it and construct its substitute elsewhere."  AR 001574 (emphasis added).  In an undated letter concerning the April 20, 1999 Section 106 meeting, Mr. Neutra stated that "[i]t seems to me important that the issue of whether the building now suitably houses the painting needs to be separated from its demolition 'as a symbol of its failure.'"  AR 001515 (emphasis added).  Similarly, in a July 1999 letter, Mr. Neutra stated "I would say that the recent decision to destroy the Cyclorama Center is an outrage that will be charged to your administration if it is not rescinded."  AR 000105 (emphasis added).  Mr. Neutra also stated that

16

"demolition will become a national debate on the news."  Id.

The Park Service, in providing responses to comments on the Section 106 Case Report, included responses to comments by plaintiff Neutra in his March 1999 letter.  On of Mr. Neutra's comments concerned alternatives, to which the Park Service stated that it "is considering alternatives other than demolition for the Cyclorama Building.... however, NPS has selected as its preferred proposal an alternative that demolished the Cyclorama Building because it believes that the accomplishment of the park's legislative purpose, and the overriding public interest, comes with the preservation of the cyclorama painting and with the restoration of the historic landscapes of the Battle of Gettysburg."  AR 001527 (emphasis added); see AR 001574 (March 16, 1999 letter from Dion Neutra).  On April 20, 1999, the Park Service held a Section 106 meeting to discuss, inter alia, plans for the Cyclorama Building, including the Response to Comments on the Section 106 Case Report. AR 001516-17; 001519.  Plaintiff Christine Madrid French attended this meeting, including on behalf of Mr. Neutra. AR 001517; 001515.  Thus, there can be no question that Plaintiffs understood at that point that the Park Service contemplated demolition of the Cyclorama Building.

Further, there are numerous examples where other members of the public and preservation experts made clear they understood that the GMP/EIS contemplated demolition of the Cyclorama Building.  See, e.g., Comment letters at AR 002552; 002413; 002406; 002404; 002401; 002399; 002344; 001903; 001738; 001745; 001705; 001629; 001623; 001621; 001619; 001615; 001583; 001577; 001579; 001558; 001555; 001545; 001511-12; 000090.  In particular, ACHP was well aware that the proposal was to demolish the building.  See AR 001660-62 (noting in its Report to the Members that the Parks Services' "proposal has been paired with a plan to demolish the existing visitor center and the Cyclorama Building"); AR 000056-57 (letter from ACHP to Superintendent Latschar attaching the executed Section 106 MOA for the demolition of the Cyclorama Building).

There are also numerous instances in the administrative record where the Park Service or

17

others contrasted the proposed treatment of the Cyclorama Building with that of the Cyclorama Painting, where the building was to be "removed," versus the painting being "relocated." For example, the 1995 EA noted that "[a]fter the Cyclorama Painting and associated functions are relocated to the new facility, the Cyclorama Center building would be removed." AR 003087 (emphasis added). In ACHP's report, "A Problem of Common Ground," which was included in Appendix 11 in the GMP/EIS, ACHP noted that in the same paragraph the Park Service's proposal to "relocate the Cyclorama Painting," versus the proposal to "remove the Cyclorama Building." AR 000558-559 (emphasis added). The GMP/EIS also discussed the fact that the Cyclorama Painting would be displayed in the new visitor center and museum facilities, whereas the museum complex construction would include removal of the existing Cyclorama Building. AR 000237-38. Similarly, the MOA noted that the GMP proposed the relocation of the Cyclorama Painting and the removal of the Cyclorama Building. AR 000053; see also AR 000051-52 (transmitting the signed MOA to interested parties, including Dion Neutra). The ROD provides the final answer to the question of where the Cyclorama Painting would be removed, stating that the selected action will include a new museum complex that would contain a gallery for the Cyclorama Painting, whereas the Cyclorama Building would be removed from the Ziegler's Grove in order to rehabilitate the key battlefield site. AR 000019.[9]

Plaintiffs appear to argue that they were unaware that the Park Service intended to demolish the Cyclorama Building until sometime in 2005 or 2006. See, e.g., Complaint, ¶ 6, 39; Pl. Mem. at

---

[9] Further, in an April 7, 1999 letter from the National Trust for Historic Preservation to Superintendent Latschar commenting on the Section 106 Report, the National Trust differentiated between the proposed demolition of the Cyclorama Building and relocation of the Cyclorama Painting. AR 001545 (Plaintiffs attach a copy of this letter to the Declaration of Christine Madrid French in Support of Plaintiff's Motion for Summary Judgment ("French Declaration") (Doc. 28-8) as Exhibit E). Finally, in Mr. Neutra's letter to Superintendent Latschar, dated July 1, 1999, Mr. Neutra inquired as to (1) when the cyclorama painting would be removed and to where and (2) when the Park Service would be ready to demolish the Cyclorama Building, demonstrating that he understood the difference between how the two resources would be treated. AR 000106.

10-12.  However, the decision to adopt an alternative that included demolition of the Cyclorama

Building was made at the time of the adoption of the ROD, and inn in addition to Park  Service

documents, this information was available in "the public domain" in newspaper articles from all over

the country, starting from the day that the ROD was adopted, running through the generous six-year

statute of limitations afforded to NEPA claims.[9]   See Littlewolf v. Hodel, 681 F. Supp. 929, 943

(D.D.C. 1988) ("all persons are charged with knowledge of events that receive widespread

publicity").  In fact, one article published in December 2003, stated that the Cyclorama Building "is

to be demolished in 2007," and noted that "fans of modern architecture, led by the architect son,

have protested the decision to destroy the building." See Amy Worden, A New Battle of Gettysburg,

Philadelphia Inquirer (PA), December 30, 2003, available at 2003 WLNR 14779846.  In an article

published in June 2004, which included an interview with plaintiff Dion Neutra and quotes by plaintiff

Christine Madrid French, stated that the Cyclorama Building was slated for demolition in early

---

[9]See, e.g., Stephen Barr, Gettysburg Restoration Marches On, The Washington Post,
November 25, 1999, available at 1999 WLNR 2832900 (stating that under the plan, the Park
Service "will tear down" the Cyclorama Building) (also published in the Mobile Register (AL),
available at 1999 WLNR 7251559); Robert Moran, Gettysburg Visitor Center Gets Approval,
Philadelphia Inquirer, November 25, 1999, available at 1999 WLNR 2569201 (noting that private
funds to pay for the demolition of the existing Cyclorama Building will soon be able to be raised).
In the next few years following the ROD, newspaper article after newspaper article appeared
discussing the planned demolition of the Cyclorama Building.  See, e.g., Gettysburg Museum
Plans Unveiled, Los Angeles Times, January 13, 2002, available at 2002 WLNR 12417280 (the
"Cyclorama Center will be demolished after the new museum is completed in about four years");
Timothy D. May, Beauty Put First at Gettysburg, Long Beach Press-Telegram (CA), January 13,
2002, available at 2002 WLNR 1610182 (same); Timothy D. May, Gettysburg Facility, Houston
Chronicle, available at 2002 WLNR 13576809 (same); New Gettysburg Museum, Pittsburgh
Post-Gazette (PA), January 20, 2002, available at 2002 WLNR 4222308 (same); Edward Gunts,
Calendar, Los Angeles Times, December 30, 2002, available at 2002 WLNR 12413439 ("[t]he
National Park Service threw its support behind a plan to demolish Neutra's 1961 Cyclorama
Center"); Cindi Lash, Emanci-Painting Restoration to Give 'Battle of Gettysburg' New Life at
Battlefield, Pittsburgh Post-Gazette (PA), February 29, 2004, available at 2004 WLNR 4802912
(the new visitor center "will make it possible for the park service to demolish the current visitor
center, Cyclorama building and parking lots").

2007.[7]  See Mark Rozzo, Who Chooses History?, Los Angeles Times, June 27, 2004, available at

2004 WLNR 19756355.  Thus, Plaintiffs were clearly aware of the Park Services' plans to demolish

the Cyclorama Building during the relevant statute of limitations.

     Further, it is clear that this decision was made on the basis of NEPA and NHPA reviews that

were conducted and completed by November 1999, and which were subject to public review and

comment.  The Park Service undertook a NEPA analysis in the GMP/EIS of action alternatives that

included demolition of the Cyclorama Building, and which also incorporated earlier NEPA analyses

from the 1995 EA and 1996 EA for the DCP, which examined the potential impacts of the demolition

of the Cyclorama Building, as discussed below in Section I(C).  Additionally, as soon as the

Cyclorama Building was found to be eligible for listing on the National Register, the Park Service

undertook a review of potential impacts to the Cyclorama Building under Section 106 of the NHPA,

concurrently with the NEPA review.  If the Park Service had intended to undertake additional site-

specific review for demolition of the Cyclorama Building following completion of the GMP/EIS, there

would have been no need to complete the Section 106 process in 1999.  Thus, there is no action

unreasonably withheld or delayed and Plaintiffs' attempt to avoid the statute of limitations

jurisdictional bar must fail.

     Plaintiffs argue in the alternative that their NEPA claims are reviewable under 5 U.S.C. §

706(2), which allows a court to set aside an action if it is found to be arbitrary or capricious,

because they claim the decision to demolish the Cyclorama Building without preparing a NEPA

analysis was arbitrary and capricious.  See Pl. Mem. at 22-23.  However, the Park Service did

analyze the impacts of demolition of the Cyclorama Building, and the time to challenge the

_____

[7] Further, reCyclorama, of which Ms. French is the Executive Director, stated on its website that
the "Cyclorama Building is slated for demolition under the preferred alternative in the recently
approved GMP for Gettysburg National Military Park.  See Exhibit 1 at 1-2.  The website also
stated that in 1996 the Park Service "announced their intention to demolish" the Cyclorama
Building, presumably referring to the 1996 EA.  See id. at 3.

adequacy of the GMP/EIS had long passed by the time Plaintiffs initiated their lawsuit. The decision to demolish the Cyclorama Building was made at the time of the adoption of the ROD, and that is the time at which the action began to accrue. Therefore, Plaintiffs' NEPA claims are time-barred under either of these theories and Federal Defendants' motion for summary judgment should be granted on Plaintiffs' NEPA claims.

**B.    The Park Services' Internal Guidance Documents Are Not Judicially Enforceable**

Plaintiffs assert that if the Park Service did include an analysis of impacts of demolition of the Cyclorama Building in the GMP/EIS, such an inclusion was a violation of the Park Service's Director's Order 2 and Director's Order 12. Pl. Mem. at 35-36, 39. They argue, in essence, that the director's orders have the force and effect of law, imposing clear statutory duties upon the Park Service. However, the director's orders are non-binding internal guidance, and as such are not enforceable against the Park Service.

Neither NPS-12, which was in effect at the time of the GMP/EIS and ROD,[9] nor Director's Order 2 provide for judicially enforceable guidelines. Rather, they serve as a nonbinding internal policy guidance. In a case directly on point, a Wyoming district court found that NPS-12 and NPS-2, the direct predecessor of Director's Order 2,[9] "'do not have the force of law and create no

---

[9] Plaintiffs rely on Director's Order 12. Pl. Mem. at 17, 28, 38-40. However, it was the predecessor of Director's Order 12, NPS-12, "NEPA Compliance," that was in effect at the time of the GMP/EIS and ROD. See http://www.nps.gov/policy/DOrders/DOrder12.html (setting the effective date of Director's Order 12 as January 8, 2001, and stating that it superseded and replaced NPS-12). Plaintiffs' reliance on Director's Order 12 is in error, as it was not in effect, and further gave no indication that it was intended to have retroactive effect. See Gersman v. Group Health Ass'n, Inc., 975 F.2d 886, 897-898, (D.C. Cir. 1992) ("generally congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result...retrospective laws are...generally unjust; and...neither accord with sound legislation nor with the fundamental principles of the social compact") (internal citations and quotation marks omitted). Further, the GMP/EIS specifically states that its analysis was conducted in accordance with NPS-12, AR 000358, not Director's Order 12.

[9] See http://www.nps.gov/refdesk/DOrders/DOrder2.html (stating it revises and replaces NPS-2).

21

substantive rights in favor of any party.'" <u>Jackson Hole Conservation Alliance v. Babbitt</u>, 96 F. Supp. 2d 1288, 1297 (D.Wyo. 2000) (internal citations omitted). The district court found that NPS-2 and NPS-12 are not intended "to regulate the conduct of the general public, but to assist NPS officials in complying with their discretionary duties arising under various statutes, regulations, and internal policies." <u>Id</u>. As such, NPS-2 and NPS-12 "afford no rights" and "any deviation from the dictates of NPS-2 or NPS-12 by NPS would not, in and of itself, constitute arbitrary or capricious action." <u>Id</u>. (internal citations omitted); <u>see also</u> <u>Lake Mohave Boat Owners Ass'n v. National Park Service</u>, 78 F.3d 1360, 1369 (9th Cir. 1996) (Park Service policy NPS-48 "fits within the 'general statement of policy' exception"); <u>Lewis v. Lujan</u>, 826 F. Supp. 1302, 1307 (D. Wyo. 1992) (holding NPS Guidelines are "general statements of policy" that "do not create a duty enforceable at law against the NPS"), <u>aff'd</u> 998 F.2d 880 (10th Cir. 1993).

The D.C. Circuit similarly found in <u>Wilderness Society v. Norton</u>, 434 F.3d 584 (D.C. Cir. 2006), that the Park Service's 2001 Management Policies are a "guidance manual for NPS managers and staff the does not create enforceable regulations or modify existing legal rights."[19] 434 F.3d at 596-97. In reaching that conclusion, the D.C. Circuit set out the following test:

> In determining whether an agency has issued a binding norm or merely a statement of policy, we are guided by two lines of inquiry. One line of analysis focuses on the effects of the agency action, asking whether the agency has (1) imposed any rights and obligations, or (2) genuinely left the agency and its decision-makers free to exercise discretion. The language actually used by the agency is often central to making such determinations. The second line of analysis under this line of cases looks to three factors: (1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency.

---

[19] The Park Service has three levels of internal instructions and guidance documents. Level 1 consists of Management Policies. Level 2 is Director's Orders. Level 3 includes handbooks and reference manuals. Management Policies are the "primary source of NPS policy," which reflect [the Park Service's] management philosophy." "Director's Orders supplement and may amend Management Policies." <u>See</u> http://www.nps.gov/policy/DOrders/thingstoknow.html at Nos. 1, 7.

Id. at 595 (internal citations, quotation marks, and brackets omitted).  Under this test, the D.C. Circuit found it "particularly noteworthy" that the Management Policies were not issued through notice and comment rulemaking under 5 U.S.C. § 553 of the APA.  The "real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations...." Id. at 596 (internal citations and quotation marks omitted).  The D.C. Circuit also examined the agency's characterization, which made clear the agency did not intend "limit its discretion and create enforceable rights."  Id.

Similarly, Director's Order 2 and NPS-12 do not create enforceable regulations or modify existing legal rights.  Like the 2001 Management Policies at issue in Wilderness Society, 435 F.3d at 596, the Park Service requested public comments on Director's Order 2 in the Federal Register, but a final version of Director's Order 2 was never published in the Federal Register or the Code of Federal Regulations.  See 62 Fed. Reg. 65712 (Dec. 15, 1997).  In that Federal Register notice, the Park Service stated it was "updating its current system of internal instructions," and that Director's Order 2 "establishes new policies and procedural guidance concerning planning activities for units of the National Park System."  Id. (emphasis added).  An earlier Federal Register notice similarly stated the revised guidelines were intended to provide guidance.  See 61 Fed. Reg. 29133 (June 7, 1996).  Further, the language of Director's Order 2 evidences that the Park Service did not intend to limit its discretion and create enforceable rights.  Section 1.0, Purpose, states that Director's Order 2 "revises and replaces the policies and guidance" in the 1988 Management Policies and NPS-2.  See http://www.nps.gov/policy/DOrders/DOrder2.html (emphasis added).  The D.C. Circuit has found that the 2001 Management Policies are nonbinding, and at least one district court has found that NPS-2 is similarly nonbinding.  The plain language of Director's Order 2 and the Federal Register notices evidence that the Park Service views Director's Order 2 in the same vein, namely that of "policy and guidance."  Indeed, as the Park Service stated in the GMP/EIS, Director's Order 2 provides "general guidance for compliance with various laws," including NEPA.

23

AR 000358.

Plaintiffs concede that Director's Order 12 was not "promulgated" in accordance with the procedural requirements of the APA.  Pl. Mem. at 17.  Similarly, NPS-12 was not promulgated in compliance with the APA.  Further, NPS-12 specifically states that its guidelines are "strictly advisory and do not create, amend, or otherwise modify any legal requirements."[11]  See NPS-12, attached hereto as Exhibit 2, at 12.  The Park Service also noted in the GMP/EIS that NPS-12 provides "general guidance for compliance with various laws," including NEPA.  AR 000358.  The Park Service clearly did not intend for NPS-12 to create enforceable rights.  See Jackson Hole Conservation Alliance, 96 F. Supp. 2d at 1297.

As Director's Order 12 was not in effect at the time of the approval of the ROD, Plaintiffs' claims of any violations should be disregarded.[12]  Further, any claims of violations of Director's Order 2 and NPS-12 should be dismissed, as it is nonbinding internal policy guidance that does not create any substantive legal rights.[13]

C.    **The Park Service Conducted a NEPA Analysis and Took a "Hard Look" Prior to the Decision to Adopt an Alternative That Included Demolition of the Cyclorama Building**

Plaintiffs' assertion that the Park Service failed to evaluate the impact of demolition of the

---

[11] As the Department of the Interior stated in two Federal Register notices regarding its Department Manual, NPS-12 provides a "handbook of technical guidance."  49 Fed. Reg. 39233 (Oct. 4, 1984); 49 Fed. Reg. 9273, 9274 (March 12, 1984).

[12] Further, even if Director's Order 12 had been in effect, it similarly was not intended to create substantive rights.  As the Park Service stated in its notice of availability for Director's Order 12 and its handbook, the Park Service was in the process of converting and updating "its current system of internal instructions in conformance with the new system of NPS internal guidance documents."  66 Fed. Reg. 7507 (Jan. 23, 2001) (emphasis added).

[13] Plaintiffs further argue that the Park Service's interpretation of NEPA was arbitrary and capricious, and in violation of the APA, relying on Communities against Runway Expansion v. F.A.A., 355 F.3d 678, 688 (D.C. Cir. 2004).  Pl. Mem. at 39.  Plaintiffs' reliance on this case is puzzling, as there does not appear to be anything in that case at the page to support Plaintiffs' proposition.

Cyclorama Building, Pl. Mem. at 24-25, is flatly contradicted by the record.  As discussed in detail below, the Park Service evaluated potential impacts of the demolition of the Cyclorama Building in the 1995 EA, the 1996 EA and the GMP/EIS, as well as under the NHPA Section 106 review process.  Plaintiffs apparently argue that if the Park Service did not perform this evaluation in a single document that looked at no other issues, it simply could not satisfy NEPA.  However, a number of circuits have stated that where an agency has analyzed the impacts of a particular action in a programmatic environmental impact statement, the agency is not required to subsequently prepare a site- or project- specific review.  See, e.g., Pennaco Energy, Inc., 377 F.3d at 1151("an agency need not prepare a new EIS to address a proposed action as long as it already has taken a 'hard look' at the action's potential environmental consequences"); Salmon River Concerned Citizens, 32 F.3d at 1356 (a "comprehensive programmatic impact statement  generally obviates the need for a subsequent site-specific or project- specific impact statement, unless new and significant environmental impacts arise that were not previously considered").

     For example, the Fifth Circuit, in 162.20 Acres of Land, More Or Less, held that a "site-specific impact statement is not necessary...if the programmatic impact statement contains all the analysis required by Section 102(2)(C) of NEPA."  733 F.2d at 381, citing Natural Resources Defense Council v. Administrator, 451 F. Supp. 1245, 1259 (D.D.C. 1978), aff'd 606 F.2d 1261, 1271-72 (D.C. Cir. 1979) (finding where discussion in a programmatic document was sufficient, additional environmental analysis was not required).  In that case, the Fifth Circuit upheld a district court decision finding that an agency was not required to undertake a site-specific analysis where an earlier programmatic EIS had adequately analyzed the impacts concerning the plaintiffs, and when viewed in conjunction with other documents, including studies performed pursuant to the NHPA, which were incorporated by reference, demonstrated in-depth attention to particular features which merited individualized attention.  Id.  Similarly, in Stevens County v. U.S. Department of Interior, an Eastern District of Washington district court found that the Department of the Interior

25

was not required to issue an additional EIS or EA prior to limiting livestock grazing in a national

wildlife refuge where the agency had previously issued a programmatic EIS covering this issue.

507 F. Supp. 2d 1127, 1135-36 (E.D. Was. 2007) ("a subsequent EIS is unnecessary if an earlier

EIS has addressed the impact of a given agency action").

As discussed below, the Park Service analyzed impacts associated with the demolition of

the Cyclorama Building both in the NEPA and the NHPA review processes, which culminated in the

the MOA in July 1999 and the ROD in November 1999.  Thus, the Park Service is not required to

perform any additional review with regard to the Cyclorama Building.

1.    **The 1995 EA and 1996 EA for the DCP Evaluated Alternatives That Included Demolition of the Cyclorama Building**

The environmental review of action alternatives that included demolition of the Cyclorama

Building began in 1995 with the issuance of the 1995 EA.  AR 003057-003124.  The 1995 EA

addressed the visitor use, resource protection and park development issues of constructing a new

museum and theater and included the proposed demolition of the Cyclorama Building.  AR 003060.

It analyzed the potential environmental impacts of the various alternatives in a variety of areas,

including on the Cyclorama Building, the museum and archival collections, the Cyclorama Painting,

the historic battlefields, natural and cultural resources, and cumulative impacts.  AR 003104-3113.

In examining the no action alternative, which left the Cyclorama Building in Ziegler's Grove,

the Park Service found that not removing the building would lead to negative impacts to the historic

battlefields in terms of visual resources, adding to the cumulative impacts of the historic setting of

the battle.  AR 003104-3105.  In examining the action alternatives that included demolition of the

Cyclorama Building, the Park Service found that there would be positive impacts to (1) historic

battlefields, (2) the museum and archival collections, which would be moved into new state-of-the-

art facilities, and (3) the Cyclorama Painting, which would be displayed in a way that would halt

further damage.  AR 003105-3110.  With regard to impacts on the Cyclorama Building, the 1995

EA stated that the building might be found eligible for listing on the National Register, in which case, appropriate mitigation would be instituted following the NHPA Section 106 review process.  AR 003106.  The 1995 EA also noted that asbestos containing materials were known to exist in the Cyclorama Building and that safe methods for disposal would be determined.  AR 003107.  The 1995 EA contained an appendix listing development costs, including for "Demolition of Cyclorama," which was estimated to cost $404,000.[14]  AR 003121 (emphasis added).

In 1996, the Park Service issued a second EA for public review to respond to comments to the 1995 EA and suggest strategies for finding suitable partners to help the Park Service fund, build, operate and/or maintain the museum and visitor facilities.  AR 003244-45; 003252.  Just as in the 1995 EA, 1996 EA looked at the environmental consequences of the various alternatives on the Cyclorama Building, as well as natural, cultural and visual resources, socioeconomics, visitor use, local services and infrastructure and park service administration and operations.  AR 003304-05.  Two of the three action alternatives, including the preferred alternative, contemplated demolition of the Cyclorama Building.  AR 003241-43.  Indeed, the 1996 EA expressly stated on the first page that under Option C, the existing Cyclorama Building "would be demolished, and its site rehabilitated, to reflect the historic setting of the battlefield."  AR 003241 (emphasis added).

In examining the no action alternative (Option A) and Option B, both of which left the Cyclorama Building in Ziegler's Grove, the Park Service again found that not removing the building would lead to negative impacts to the historic battlefields in terms of visual resources, adding to the cumulative impacts of the historic setting of the battle.  AR 003331-3333; 003334-3336.  The Park Service also found that there would be adverse impacts to the museum and archival collections, as well as to the Cyclorama Painting under the no action alternative.  Id.  In examining the action

_____

[14] This figure was based on a NPS Class C cost estimate from 1995.  See AR003121; 002736. Therefore, this Class C cost estimates belongs in the record, despite Plaintiffs' assertions to the contrary.  See Pl. Mem. at 28, n. 13.  The cost estimate included consideration of the asbestos encapsulated in the Cyclorama Building.  AR 001653.

alternatives that included demolition of the Cyclorama Building (Options C and D), the Park Service found that there would be positive impacts to the historic battlefields, to the museum and archival collections, which would be moved into new state-of-the-art facilities, to the Cyclorama Painting, which would be displayed in a way that would halt further damage, as well as small improvements with regard to certain natural resources. AR 003337-3345.

With regard to impacts on the Cyclorama Building, the 1996 EA again noted that the Park Service had determined that the Cyclorama Building was not eligible for listing on the National Register, however if it was found to be eligible the Park Service would consult with SHPO and ACHP pursuant to the NHPA. AR 003338; 003342. The 1996 EA also noted that asbestos containing materials were known to exist in the Cyclorama Building and that safe methods for disposal would be determined. Id. The 1996 EA also contained a cost estimate for the restoration of Ziegler's Grove, AR 003285; AR 003290. which necessarily entails removal of the Cyclorama Building.

## 2.    The Analysis of the 1995 EA and 1996 EA Are Incorporated in the GMP/EIS

Following the issuance of the 1996 EA, the Park Service requested funding proposals from nonfederal partners to pay for the new museum and visitor center and ultimately selected one proposal. AR 000169. On May 6, 1998, the Park Service sent a notice to the Federal Register stating that based on the evaluation of the public comments received on the 1996 EA, the scoping sessions on the GMP/EIS and other public comments, the Park Service "has determined that is desirable to consider the environmental impacts of the proposal selected for negotiations as an element of the forthcoming GMP/EIS. All prior planning efforts and environmental analysis completed and public comment received on the [1996 EA] will be used in formulating this element for the GMP/EIS." AR 002311-12 (emphasis added). The Park Service also explicitly stated in the GMP/EIS that "[b]ased on the public input received on the DCP, the GMP/EIS and other public comment, NPS determined that it was desirable to incorporate the issues of visitor use and

28

interpretation at the visitor center and museum facilities as an element of its forthcoming GMP/EIS."[15]  AR 000171.  The GMP/EIS went on to explain that the funding proposal by a nonfederal partner for the museum and visitor facilities ultimately selected for consideration by the Park Service had been revised and "incorporated into the action alternatives developed in the GMP/EIS."  AR 000172.  The ROD also stated that the Park Service combined the review of the DCP with the review of the GMP.  AR 000016-17.

The Park Service also made clear in response to public comments on the draft GMP/EIS, that it intended to fold the 1996 EA evaluating the DCP and the public review thus far into the planning process for the GMP/EIS.  As the Park Service stated in response to public comments:

> Development Concept Plans are tools that NPS uses to solve facility concerns. During the draft Development Concept Plan/Environmental Assessment, NPS developed and reviewed with the public a reasonable range of four alternatives for solving the facility concerns at Gettysburg NMP.  The public had an opportunity to review and comment upon alternatives, and the criteria that NPS proposed for evaluation of the site and selection of a proposal.  After a proposal was selected for negotiation, NPS gave the public a chance to comment on the specifics of that proposal.  During this NEPA process, the public had many opportunities to comment on alternatives, criteria, specifics of the proposal, and other issues.
> ***
> As part of the process, NPS held public scoping meetings, workshops and focus group meetings; prepared and presented new mapping and resource work to explain the 1863 Battle landscape and the changes it had undergone; and evaluated 5 preliminary concepts.  Because of public comment, a sixth combined concept was developed.  This combined concept eventually became NPS' preferred alternative. NPS considers that the environmental review procedures followed in this matter, including consideration of public comment as part of the process, comply with NEPA.
> ***
> Inclusion of the proposed museum complex in the draft GMP does not violate NPS policy.  The Collections Storage, Museum and Visitor Center DCP was prepared under the existing Gettysburg 1982 GMP.  Development Concept Plans are a tool NPS can use to solve facilities concerns.  The findings of the DCP were brought into the draft GMP/EIS when it became clear that the public interest could best be served by doing so.  The National Parks and Recreation Act of 1978, the law that mandates GMPs for all national parks, requires that NPS indicate the types and general intensities of development.  Therefore, inclusion of information regarding the

---

[15] The public and agency involvement in the 1995 EA and 1996 EA process was considerable, as outlined in the GMP/EIS.  AR 000457-460.

location and size of visitor facilities is appropriate for a GMP.

AR 000638-639 (emphasis added); see also AR 000870.

### 3.  The GMP/EIS Included An Analysis of Potential Impacts of Demolition of the Cyclorama Building and the MOA Set Forth the Appropriate Mitigation

The GMP/EIS served to review the impacts of the proposed alternatives under the GMP. AR 000148 ("To help the public and NPS understand what would happen if an alternative [of the GMP] were adopted, the impacts of each alternative on the natural and cultural environment are described and compared."). While typically, specific details are not included in a review of GMP, here, the Park Service made clear that it intended to fold the analyses of the 1995 EA and the 1996 EA for the DCP, which included an analysis of the impacts of demolishing the Cyclorama Building. AR 000638-39; 002311-12; 000646.

Further, the description of impacts common to all the action alternatives in the GMP/EIS included removal of the Cyclorama Building, which would allow for the restoration and rehabilitation of the historic battlefields and would significantly improve the historic setting. AR 000386-87. It also would result in some minor benefits to natural resources. AR 000401 ("Development of a museum complex would remove some areas from natural productivity; however, the removal of existing facilities would restore more land to natural productivity than would be used to develop the new facility."). With regard to the Cyclorama Building, the GMP/EIS explained that following the issuance of the draft GMP/EIS, the Cyclorama Building was found to be eligible for listing on the National Register, and therefore the Park Service began consultations with the SHPO, ACHP and interested parties to develop appropriate mitigation with regard to removal of the building. AR 000387. In a May 14, 1999 letter, ACHP "announced its support of the draft GMP/EIS proposed treatment for the park's cultural landscapes, the Cyclorama Painting and the Cyclorama Building.[19] Id.; see AR 001488. ACHP's decision to endorse the GMP/EIS with regard to its treatment of those

---

[19] The GMP/EIS incorrectly stated May 14, 1998, which was corrected in the ROD. AR 000026.

30

three historic resources was made based on a report prepared by ACHP members entitled, "A Problem of Common Ground," which was included in Appendix 11 of the GMP/EIS.[17]  AR 000558-561.  In July 1999, the Park Service, SHPO and ACHP executed the MOA, which detailed the appropriate mitigation for demolition of the Cyclorama Building.  AR 00053-55.

Further, in the ROD, which was adopted in November 1999, the Park Service announced that Alternative C would be implemented, and stated that as part of the selected action, the Park Service "is compelled" to remove the Cyclorama Building from Ziegler's Grove, and that such action will significantly improve resource protection by allowing for the restoration of the historic battlefield.  AR 000018-19; 000026.  The Park Service noted that this action, along with the rest of the selected action, will allow it to meet the legislative purposes of the park.  AR 000019.  The ROD noted that while the new museum and visitor facilities would permanently remove 18 acres of land, including up to two acres of wetlands, at the new site as wildlife habitat, it would be able to restore about 38 acres of meadow, orchard and woodlands that were very significant to the outcome of the battle at the sites of the current facilities, including the Cyclorama Building.  AR 000024; 000026.

The Park Service concluded in the ROD that the selected action "best protects, preserves and enhances the historic, cultural and natural resources at Gettysburg NMP," by allowing the Park Service to preserve and rehabilitate the resources considered significant to the outcome of the battle, to protect the Cyclorama Painting, collections and archives.  The selected action also allows

---

[17] The last two pages of this report, found at pages 432-433 of the GMP/EIS were inadvertently omitted from the administrative record. They are attached hereto as Exhibit 3.  In addition, the full report may be found in the administrative record at AR 001489-94.

In the report, ACHP stated that removal of the Cyclorama Building would have "an adverse – indeed fatal – effect" on the Cyclorama Building, but found that the proposal contained in the GMP was based on the park's legislative purpose, the determination of eligibility for the Cyclorama Building, historic documentation and substantial public involvement.  AR 000559.  ACHP further noted that the determination of eligibility for the Cyclorama Building did not change its conclusion because it "is focused on the building in isolation from, and not on its relationship to, a paramount historical objective: the rehabilitation of this key battlefield area." See Ex. 3 at 1; see also AR 001493.

31

the Park Service "fully to meet the requirements of Gettysburg NMP's legislation at the least cost

the environment, park visitors and the Federal budget."  AR 000024.

Plaintiffs' argument that the cost estimate in the GMP/EIS provided evidence that there was

no proposal or evaluation of demolition of the Cyclorama Building, see Pl. Mem. at 27-28, is based

on an apparent misunderstanding of who would be funding particular actions.  As the Park Service

explained in Appendix 4 of the GMP/EIS, non-federal partners would provide assistance, labor and

funding for many projects, including the new museum and visitors Center and restoration of

Ziegler's Grove.  To help the public understand the extent of that assistance, the cost estimates

were divided into three categories: costs funded by NPS, costs funded by partners, and costs

funded by both. AR 000480.  Because the Gettysburg National Battlefield Museum Foundation had

agreed to, inter alia, assume responsibility for removal of the Cyclorama Building and restoration

of Ziegler's Grove, the cost of demolition of the Cyclorama Building was included under

"Construction or Land Acquisition Funded by Partners On Behalf Of NPS," which totaled

$39,285,000, rather than under "Construction by NPS," which totaled $81,000.[19]  AR 000485-487.

In further support of their erroneous argument that the GMP/EIS could not contain an

analysis of the demolition of the Cyclorama Building, Plaintiffs also point to the statement in the

GMP/EIS that in "the future, if NPS determines that specific actions called for by the approved plan

require additional analyses of impacts, more detailed assessments of impacts may be prepared as

part of necessary implementation planning."   AR 000121.   However, this statement does not

---

[19] A copy of the Letter of Intent setting forth the responsibilities of the Gettysburg National
Battlefield Museum Foundation and the Park Service were included in the GMP/EIS in Appendix
6.  The letter set out assumption of responsibilities by the Foundation to remove the Cyclorama
Building and rehabilitate Ziegler's Grove.  AR 000494-497.  As the letter states, one of the
overall objectives was to "rehabilitate the historic appearance and setting of Ziegler's Grove and
high water mark of the battle by removing the existing visitor center and Cyclorama buildings
and their associated entry roads and parking, and by restoring the historic landscapes."  AR
000495.  In furtherance of that objective, "it is the intention of the Foundation to...construct the
facilities agreed upon in the agreement and remove the existing facilities and rehabilitate
Ziegler's Grove."  AR 000495.

support their argument that the document could not contain such an analysis, but rather supports the Park Service's position that it retains the discretion to determine whether a particular action is covered by the analysis in GMP/EIS.  Here, the demolition of the Cyclorama Building had been reviewed in the 1995 EA, 1996 EA and the GMP/EIS.[19]

Plaintiffs' argument seems to rest on the presumption that the analysis required would have to concentrate solely on impacts to the building or should only disclose negative impacts.  However, the GMP/EIS, which as explained above, incorporated by reference the 1995 EA and the 1996 EA, examined multiple types of impacts potentially resulting from demolition of the Cyclorama Building. For example, as discussed above, the 1995 EA, 1996 EA and GMP/EIS examined impacts to the historic landscapes, as well as the Cyclorama Painting.  These documents also analyzed the impacts of demolition on the Cyclorama Building itself, and MOA provided the appropriate mitigation for such impacts. Balancing those impacts, and multiple others, the Park Service selected an alternative that included demolition of the Cyclorama Building. That decision was not arbitrary or

---

[19] Plaintiffs also point to the Environmental Assessment  for demolition of the National Tower prepared subsequently to the ROD, asserting that because the Park Service prepared an EA for the National Tower, it was required to do so for the Cyclorama Building, and that the GMP/EIS treated the National Tower and the Cyclorama Building "in a virtually identical fashion."  Pl. Mem. at 30-32, 36-37.  However, the GMP/EIS did not treat the two buildings alike, as the National Tower had not yet been acquired by the Park Service at the time of the environmental review, as noted in the GMP/EIS.  AR 000223, 000231.  In fact, as the National Tower EA stated on the first page, it was not until December 9, 1999, that the United States even instituted condemnation proceedings to acquire the National Tower.  See declaration of Matthew G. Adams in Support of Plaintiff's Motion for Summary Judgment ("Adams Declaration")  (Doc. 28-2), Exhibit H.  A declaration of takings was not filed until May 17, 2000.  See Exhibit 4. More importantly, neither the 1995 EA and 1996 EA, nor the GMP/EIS provided any analysis for the demolition of the National Tower, whereas they did for the demolition of the Cyclorama Building. For the same reasons, Plaintiffs' reliance on Pennaco, Pl. Mem. at 36-37, where the court found that the previous reviews did not adequately analyze the issuance of several leases, is similarly in error.  Furthermore, the Pennaco court did not appear to find that the agency decision to conduct a post-leasing environmental review "undercut" the agency's contention that additional review was not needed for the particular leases in question.  See Pl. Mem. at 37.  Rather, the word "undercut" appears where the court was quoting portions of the IBLA's opinion that was at issue on the case.  See 377 F.3d at 1154.

33

capricious and should be upheld.[29]   Plaintiffs had six years from that point to challenge the

adequacy of the review, or if they so believed, the absence of such a review.  However, they did

not, and at this point, they are simply out of time to do so.

> **4.    The Park Service Properly Considered Alternatives to Demolition to the Cyclorama Building**

The selection of alternatives is governed by a rule of reason.  "Only options that meet the

purpose and need of the project within the reasonable judgment of the agency need be considered.

Circuit law is clear that the agency's determination, both of what the purpose and need are and of

whether a proposed alternative meets them, is reviewed with considerable deference."  Rivers

Unlimited v. U.S. Dept. of Transp., – F. Supp. 2d –, 2008 WL 80364, *1 (D.D.C. 2008) (internal

citations omitted).

Plaintiffs rely on Natural Resources Defense Council, Inc., 606 F.2d 1261, arguing that the

D.C. Circuit "struck down" the agency's attempt to rely on pre-existing programmatic EISs, and

alleging it presented a case "virtually identical" to the instant case.  Pl. Mem. at 40.  However, while

the D.C. Circuit found that  the safety features and design alternative at issue was not not

adequately explored, a particular alternative regarding tank type and storage technique was

sufficiently discussed, and therefore the agency was not required to do additional analysis on the

latter topic.  606 F.2d at 1270-72.  The D.C. Circuit also explicitly stated that the agency had

discretion to explore alternatives to particular tanks in either a programmatic or site-specific format.

Id. at 1271.  Thus, the D.C. Circuit did not find that agencies cannot perform site-specific analysis

in a programmatic document.

---

[29] Plaintiffs' reliance on Coliseum Square Association, Inc. v. Jackson, 465 F.3d 215 (5th Cir. 2006), to assert that the Park service's analysis was inadequate, Pl. Mem. at 26, is misplaced, as that case concerned the demolition of a 64-acre housing development consisting of 121 buildings.  465 F.3d at 225-26.  In contrast here, Plaintiffs are concerned with the demolition of one building.  Further, the court in Coliseum Square appeared to be concerned with the analysis of impacts of construction, as most of the demolition had been completed by the time of the lawsuit.  See id. at 227-28; see also id. at 232-239

Here, the Park Service presented a reasonable range of four alternatives for solving facility concerns in the 1996 EA, which was incorporated into the GMP/EIS.  AR 000638-639 The public was given the opportunity to comment on those alternatives, and likewise the public was able to comment on the alternatives presented in the GMP/EIS.  Plaintiffs participated in this process, as well as in the Section 106 review process for the Cyclorama Building, where alternatives to demolition were also explored.   During these reviews, the Park Service considered multiple possibilities with regard to the treatment of the Cyclorama Building, including taking no action, demolition, continued use of the building and adaptive reuse of the building.[21]   See, e.g., AR 00157; 000210-215; 00022-224; 000231; 000233-234; 000256-257; 000264-265; 001605-1607; 003277-96.  As the Park Service stated in response to comments by plaintiff Dion Neutra on the Section 106 Case Report, "NPS is considering alternatives other than demolition for the Cyclorama Building.... however, NPS has selected as its preferred proposal an alternative that demolished the Cyclorama Building because it believes that the accomplishment of the park's legislative purpose, and the overriding public interest, comes with the preservation of the cyclorama painting and with the restoration of the historic landscapes of the Battle of Gettysburg. The history of its consideration of those other alternatives is described in the Revised Section 106 Case Report on pages 14-16 [AR 01605-1607 ]."  AR 0001527.  The Section 106 Case Report explains the various alternatives explored in the 1996 EA, as well as the use and adaptive use analysis under Section 106.  AR 01605-1607.

At no point during these reviews did Plaintiffs appear to raise the possibility of relocating the building.  Rather, they raise it in this litigation, attempting to rely on affidavits clearly outside the scope of the administrative record, and to which Federal Defendants have opposed any inclusion in the administrative record or extra-record review thereof.  Thus, Plaintiffs are barred from raising

---

[21] The analysis of use and adaptive reuse is discussed in detail below in Section II(B).

this issue at this point.  See National Wildlife Fed'n, v E.P.A., 286 F.3d 554,562 (D.C. Cir. 2002) ("[i]t is well established that issues not raised in comments before the agency are waived and this Court will not consider them").  Once again, the question is whether the public was on notice that the agency was evaluating alternatives to demolition to the Cyclorama Building.  They were, and further the Park Service considered a reasonable range of alternatives with regard to the Cyclorama Building and, given the park's mission, the Park Service's decision to ultimately adopt an alternative that included demolition of the building was not arbitrary or capricious.

For the above reasons, this Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment on Plaintiffs' NEPA claims.

## II.    THE PARK SERVICE IS IN COMPLIANCE WITH THE NHPA

### A.    Plaintiffs' NHPA Section 110(a)(1) Claims Are Barred by the Statute of Limitations

The civil action statute of limitations in 28 U.S.C. § 2401(a) also bars Plaintiffs' NHPA claims, which are brought pursuant to the APA.  See Daingerfield Island Protective Soc., 797 F. Supp. at 28.  All critical steps under the NHPA took place more than seven years prior to the filings of the Complaint and like in their NEPA claims, Plaintiffs cannot attempt to avoid the statute of limitations by alleging their claims concern a failure to act.  Plaintiffs specifically assert that they are not challenging the Park Service's compliance with Section 106 of the NHPA.  Pl. Mem. at 3, 9, n.5, 18, n.9.  And indeed, they cannot assert such a challenge at this point, as the MOA was executed by the Park Service, SHPO, and ACHP in July, 1999 (AR 000053-55), more than six years prior to the commencement of Plaintiffs' lawsuit.  Nor can Plaintiffs now challenge the Park Service's compliance with Section 110 of the NHPA, as that section "was not intended to change the preservation responsibilities of Federal agencies as required by any other laws, executive orders or regulations."  Blanck, 938 F. Supp.  at 916 (internal quotations omitted).   Rather, when an agency complies with its obligations under Section 106 through a memorandum of agreement or programmatic agreement, the agency has also complied with Section 110.  See Coalition of 9/11

36

Families, Inc. v. Rampe, 2005 WL 323747 at *3 (finding where agency complied with its programmatic agreement under Section 106, it also complied with Section 110(b)). Here, the Park Service entered into the MOA in July, 1999, thus satisfying its Section 106 responsibilities at that point. See 36 C.F.R. § 800.6(c).

In Blanck, a D.C. district court rejected the very argument being made by Plaintiffs, namely that Section 110 creates an independent substantive requirement for agencies, finding instead that "Section 110(a) cannot be read to create new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA as described by every court that has considered the Act." 938 F. Supp. at 917, 922; see also New Mexico ex rel. Richardson v. Bureau of Land Management, 459 F. Supp. 2d 1102, 1128-29 (D.N.M. 2006) (the "broad mandates contained in Section 110, as well as the broad discretion granted to federal agencies in that provision, cannot be the basis of the type of substantive claim urged by Plaintiffs"). In reaching that conclusion, the court found that reading the section as a whole "suggests that Section 110 represent an elucidation and extension of the Section 106 process but not its replacement by new and independent substantive obligations of a different kind." Id. at 920-21. The court also looked at the legislative history of Section 110, which explicitly stated that the section "is not intended to change the preservation responsibilities of Federal agencies as required by other laws...." Id. at 922. Indeed, Section 110 does not require a federal agency "to undertake any preservation beyond what was necessary to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process." Id. at 925.

Here, the Park Service consulted under Section 106 and entered into an MOA to set forth the proper mitigation for the Cyclorama Building. In particular, the MOA requires the Park Service to document the Cyclorama Building according to the standards of the Historic American Buildings Survey and provide a permanent exhibit discussing the Cyclorama Building as an example of the Mission 66 period of the Park Service in the new museum. AR 000054. Execution of the MOA

37

evidences the agency's compliance with Section 106. 36 C.F.R. § 800.6(c); see also AR00503-000506. Further, in 1999 prior to execution of the MOA, the Park Service undertook the very analysis that Plaintiffs assert are lacking or deficient under Section 110(a)(1) regarding the use or reuse of the building, Pl. Mem. at 41-44, and Plaintiffs are likewise time-barred from challenging the sufficiency of an analysis that was part of the Section 106 process. Therefore, Plaintiffs' claims with respect to compliance with Section 110(a)(1) are time barred by the generous six year statute of limitations. See 28 U.S.C. § 2401(a).

**B.    The Park Service Complied with Section 110(a)(1)**

Plaintiffs argue that the Park Service failed to "properly use and preserve" the Cyclorama Building. Pl. Mem. at 41-42. However, as the court found in Blanck, an agency cannot be commanded to preserve historic buildings under the NHPA. See 938 F. Supp. at 925. Rather, "Section 110 is to be read in conjunction with Section 106 which constitutes the main thrust of the NHPA," and "embod[ies] the requirement that agencies thoroughly consider preservationist goals in all aspects of agency decisionmaking," but "does not itself affirmatively mandate the preservation of historic buildings or other resources." Id. Thus, if this Court were to reach such a challenge, it would find that the Park Service satisfied its responsibility under Section 110(a)(1) to "use, to the maximum extent feasible," the Cyclorama Building prior to its decision to adopt an alternative that included demolition of the building. Indeed, the Park Service thoroughly consider the use and re-use of the building as an alternative to construction of new facilities and demolition of the building, despite Plaintiffs' assertions to the contrary. See Pl. Mem. at 41, citing 53 Fed. Reg. 4727, 4731 (February 17, 1988).[29] The Park Service properly assessed both the possibility of rehabilitating the

---

[29] Plaintiffs cite to guidelines published by the Park Service in 1988. However, on April 24, 1998, the Park Service published revisions to those guidelines. See 63 Fed. Reg. 20496 (April 24, 1998). These were the guidelines that were in effect at the time of the execution of the MOA.

building for continued use and for adaptive reuse.[23]   AR 001606-07.

Specifically, in its Section 106 Case Report, the Park Service, after a detailed study, found that the option of rehabilitating the building for continued use was not feasible because such rehabilitation "would require solutions to several major design problems, the practicality of which could not be determined and the costs which seemed excessive."[24]   AR 001606.   Additionally, "rehabilitation of the building would require almost complete demolition and reconstruction, thereby affecting its integrity of design and materials."   Id.   The Section 106 Report stated that an 1996 estimate of construction costs to correct the design deficiencies for continued public use was estimated to be over $8 million, which did not include the cost of demolition and reconstruction of the display drum portion of the building in order to make it suitable for display of the Cyclorama Painting.   AR001607.   These deficiencies exist despite considerable effort expended by the Park Service to repair and maintain the building, including completing more than 30 major repairs on the building since 1962.[25]   AR 001528.   Further, the size of the Cyclorama Building's drum could not be expanded without complete demolition and reconstruction of almost the entire structure.   AR 001606.   As the drum portion of the building was insufficiently sized to allow the painting to be

---

[23] Plaintiffs argument that the analysis of rehabilitation of the building did not include an evaluation of the "re-use" of this building, Pl. Mem. at 43, is puzzling, as they do not explain what they perceive to be the difference between "re-use," and continued use or adaptive use.

[24] Critical design problems include (1) the lack of fire exits, which would be required to be installed, and which would severely compromise the interpretive program and the 360 degree view of the Cyclorama Painting, (2) new ramps that would need to be built, as the existing ramps were not compliant with federal standards, (3) deformations of the structure that are permanent, and perhaps most importantly, (4) the Cyclorama Painting after restoration could not be reinstalled in the Cyclorama Building, as proper conservation would require restoring the painting to its original hyperbolic shape, which cannot be accommodated in the current space. AR 001606-07.

[25] This includes work done to repair, reseal and replace roofs and reflecting pools, and to repair, upgrade or replace mechanical systems or provide insulation to improve the operation of the systems.  In addition, in 1993, Gettysburg National Military Park requested, but never received, major funding to bring the building into compliance with health and safety and energy conservation codes, abate asbestos and other purposes.  AR 001528.

properly hung and preserved, "the option of rehabilitating the Cyclorama Building as an exhibit gallery for the Cyclorama Painting was rejected."  AR 001607.

Following this determination, the Park Service considered rehabilitation of the building for adaptive reuse, but "was unable to identify any other appropriate public uses for the building."[29] AR001607.   The building had not served as the visitor's center since 1971, AR 001604, and was not suitable for those purposes.  The Park Service considered other non-public uses, including administrative office space.  Id.  "However, a very minor percentage of the building square footage was designed or is readily usable as office space, as compared to space that was designed for public use and display of the painting," and while the cost of rehabilitation would be relatively inexpensive, "continued use of those spaces would be expensive given the annual operating costs of heating and maintaining the entire structure...."  Id.  Further, the Park Service determined that "it would be inappropriate to house administrative staff in a structure which represents a visual intrusion on the historic landscapes that the park was created to preserve."  Id.

As the Park Service stated in its response to comments on the Section 106 Report, while Section 110 "requires federal agencies to use, to the maximum extent feasible, historic properties," it "does not absolutely prevent the removal of historic buildings." AR 001526.  "Rather it requires consideration in the planning process to determine if such actions are appropriate."  Id.  The Park Service went on to state that such a process was currently underway under Section 106 with ACHP, SHPO and interested parties (which included the individual plaintiffs), and was "intended to balance competing preservation priorities and determine how the park's mission can best be accomplished,

_____

[29] The Secretary of the Interior's Standards and Guidelines state that where it is no longer feasible to continue the use of a historic structure, the agency should consider an adaptive use that is compatible with the historic property, and that such proposals must be reviewed in accordance with Section 106.  63 Fed. Reg. at 20496 (emphasis added).

and how public interest can best be served."  AR 001526-27.[27]

Thus, it is clear that the preservation of historic resources was properly considered throughout the review process and prior to adopting the alternative that included demolition of the Cyclorama Building.  Plaintiffs assertion that this report does not meet the requirements of Section 110(a)(1) misses the point, as it is not simply the report and the Park Service's response to comments on the report that evidences compliance with Section 110, but also the Section 106 review process, which culminated in the execution of the MOA.   As the Park Service's analysis and conclusions fully comply with Section 106, the adequacy of which has not been challenged by Plaintiffs, and Section 110, the decision to not use or reuse the building is supported by the record and was not arbitrary or capricious.

## C.    Plaintiffs' NHPA Section 110(a)(2) Claims Are Barred by the Statute of Limitations

Plaintiffs are similarly time-barred from challenging the sufficiency of the Park Service's compliance with Section 110(a)(2).  See Blanck,  938 F. Supp. at 925 (Section 110 does not require a federal agency "to undertake any preservation beyond what was necessary to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process.")

## D.    The Park Service Complied with Section 110(a)(2)

However, if this Court were to reach such a challenge, the Park Service also complied with Section 110(a)(2).  Section 110(a)(2) provides in relevant part that a federal agency shall establish "a preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties."  16 U.S.C. § 470h-2(a)(2).  Such a program must ensure, inter alia, that "historic properties under the jurisdiction or control of the agency, are identified, evaluated, and nominated to the National Register," that such properties are "managed and maintained in a way that considers the preservation of their historic, archaeological,

---

[27] Although the Park Service responded to comments on the Section 106 Report, it does not appear that the Section 106 Report was revised prior to execution of the MOA.

architectural, and cultural values in compliance with [Section 106] and gives special consideration to the preservation of such values in the case of properties designated as having National significance," and "that the agency's preservation-related activities are carried out in consultation with other Federal, State, and local agencies, Indian tribes, Native Hawaiian organizations carrying out historic preservation planning activities, and with the private sector."  16 U.S.C. § 470h-2(a)(2)(A), (B), and (D).

Plaintiffs appear to be operating under the mistaken impression that Gettysburg National Military Park was required to have its own preservation program specifically concerning the Cyclorama Building.  See Pl. Mem. at 23, 44.  However, the plain text of the statute requires an agency to establish an agency-wide program.  This is supported by the Secretary of the Interior's standards and guidelines for federal agencies historic preservation programs, which states that an "agency historic preservation program is embodied in agency-wide policies, procedures, and activities." 63 Fed. Reg. at 20500 (emphasis added).  The Federal Register notice goes on to state that "the [historic preservation] program is not an activity carried out separate and apart from the activities mandated by the agency mission."  Id.   Further, a preservation program under Section 110(a)(2) "is an agency-wide approach to achieving the goals set forth in the NHPA [and] it should be fully integrated into both the general and specific operating procedures of the agency."  Id. at 20500-01.

The Park Service's 1988 Management Policies set forth their Cultural Resource Management policy for the agency.  It states that the Park Service "will preserve and foster appreciation of the cultural resources in its custody through appropriate programs of research, treatment, protection, and interpretation."  See Management Policies, U.S. Department of the Interior, National Park Service, 1988 at Chapter 5:1, pertinent excerpts attached hereto as Exhibit

42

5.[28]  The Cultural Resource Management Policy required the Park Service to identify and evaluate cultural resources in each park in order to provide, inter alia, the data for nominating resources to the National Register, for general park planning and specific cultural resource management proposals and for compliance with legal requirements.  Id.  The policy states that actions that effect cultural resources may only be taken if it meets certain criteria, including relevant sections of the Section 106 regulations and the Guidelines for Federal Responsibilities under Section 110 of the National Historic Preservation Act, 53 Fed. Reg. 4728.  Id. at Chapter 5-4.  Further, as the Park Service stated in the GMP/EIS, "Director's Order 28 (formerly Cultural Resources Management Guidelines NPS-28) dictates NPS policy in regard to the preservation and treatment of archeological, cultural and historic properties included within a park."[29]  AR 000357.  Thus, the Park Service had an agency-wide preservation program in place.[30]

Further, the Park Service took steps with the Cyclorama Building with respect to Section 110(a)(2). In 1994, the Park Service developed a list of classified structures for Gettysburg National Military Park, which evaluated park resources and determined that the Cyclorama Building was not eligible for listing on the National Register.  In December 1995, the Park Service prepared a Determination of Eligibility for the Cyclorama Building, which concluded it was not eligible for listing

[28] The 1988 Management Policies were the internal guidelines that were in effect at the time of the publication of the EIS and approval of the ROD.   65 Fed. Reg. 2984-01 (January 19, 2000) (availability of Draft National Park Service Management Policies, last updated in 1988).

[29] See http://www.nps.gov/policy/DOrders/DOrder28.html and http://www.nps.gov/history/history/online_books/nps28/28contents.htm.

[30] Plaintiffs argued that the Park Service's response to a Freedom of Information Act request proves that the Park Service violated Section 110(a)(2). Pl. Mem. at 44-45.  However, as explained in the Declaration of John Latschar, Superintendent of Gettysburg NMP ("Latschar Decl."), attached to Federal Defendants' Opposition to Plaintiffs' Motion to Augment the Record, Or in the Alternative for Judicial Review, as Exhibit A, the Park Service stated that it did not have documents responsive to a request regarding a preservation program specifically for the Cyclorama Building.  See Latschar Decl.¶ 6 (emphasis added).  Section 110(a)(2) addresses agency responsibilities, and not individual parks. Id. Therefore, Mr. Adams was informed that the Park Service did not have any records responsive to such a request.

43

on the National Register, and the SHPO concurred in May 1996.  However, in 1998, the Keeper of the National Register of Historic Places determined that the Cyclorama Building was eligible for listing on the National Register, and therefore the Park Service began consultations with the ACHP, SHPO and consulting parties under Section 106, which ultimately culminated in the execution of the MOA setting forth the appropriate mitigation for adverse impacts to the Cyclorama Building.[31/]  AR 001532.

As stated above, this process balanced competing preservation priorities and the park's mission and how to best serve the public interest.  AR 001526.  The Park Services' Management Policies further reflect this process, noting that "[a]chievement of other park purposes may sometimes conflict with and outweigh the value of cultural resource preservation.  The planning process will be the vehicle for weighing conflicting objectives and deciding that cultural resource should not be preserved."  AR 001527.   Here, following consultation, the Park Service ultimately chose the alternative that included demolition of the Cyclorama Building, which was considered to be a Priority 5 Resource (other resources that must be considered by law or federal policy).  AR 001527; see AR 000228 (listing the ranking of historic resources at Gettysburg National Military Park, as required by the Government Performance and Results Act of 1993).  This decision was in keeping with the preservation goals for the park, namely that of rehabilitating Ziegler's Grove.

Therefore, this Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment with respect to Plaintiffs' NHPA claims.

---

[31/] In addition, the Park Service entered into a Programmatic Agreement For Gettysburg National Military Park in July 1999, in which Park Service agreed to coordinate with SHPO to identify cultural resources under Section 110.  AR 000062.

**CONCLUSION**

For the reasons stated above, this Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiff's motion for summary judgment.

Dated:  March 14, 2008.

<div style="margin-left: 40%;">

Respectfully submitted,
RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

</div>

Of Counsel:                     /s/ *Samantha Klein*
                                SAMANTHA KLEIN
MARTHA F. ANSTY                 United States Department of Justice
Attorney                        Environment and Natural Resources Division
Office of the Solicitor, N.E. Region   Natural Resources Section
U.S. Department of the Interior  P.O. Box 663
Winston Prouty Federal Building  Washington, D.C.  20044-0663
11 Lincoln Street                Phone: (202) 305-0474
Essex Junction, VT 05452         Fax:    (202) 305-0506
Telephone:  (802) 872-0629       E-mail: samantha.klein@usdoj.gov
Fax:  (802) 872-9704             Counsel for Federal Defendants

45

**LIST OF EXHIBITS TO THE FEDERAL DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

| Exhibit No. | Description of Exhibits |
|---|---|
| 1 | Excerpts from reCyclorama website |
| 2 | NPS-12 |
| 3 | Excerpts from Appendix 11 of the GMP/EIS |
| 4 | Notice of A Declaration of Takings, <u>United States of America v. 6.45 Acres of Land, More or Less, Situated in Cumberland Township, Adams County, Commonwealth or Pennsylvania,</u> 1:CV-99-2128 (M.D. Pa.) |
| 5 | Excerpts from Management Policies, U.S. Department of the Interior, National Park Service, 1988 at Chapter 5:1 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2422 Willard Drive, Charlottesville, VA 22903, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN LATSCHAR, in his official capacity as Deck Type:  Administrative Agency SUPERINTENDENT OF GETTYSBURG Review NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325 DENNIS REIDENBACH, in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR,[1/] in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, DC 20240; DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C.  20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) Case Number: 1:06-CV-02077-TFH ) Judge:  Thomas F. Hogan ) Deck Type:  Administrative Agency )         Review ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS STATEMENT OF UNDISPUTED MATERIAL FACTS AND FEDERAL DEFENDANTS STATEMENT OF MATERIAL FACTS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

---

[1/] Federal Defendants note that the correct name of the Director of the National Park Service is Mary Bomar, not Marie Bomar. Dennis Reidenbach is now the director of the Northeast Region.

Local Civil Rule 7(h) provides that each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue. Plaintiff, however, seeks judicial review of an agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 554, 701-706. Complaint (Doc. 1-1) at ¶ 10. In APA cases, the district court sits as an appellate tribunal. University Medical Center of Southern Nevada v. Shalala, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999), citing Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1225-26 (D.C. Cir.1993).  The district court does not act as a fact finder.  Florida Power and Light Co. v. Lorion, 470 U.S. 729, 744 (1985). Under the APA, judicial review is normally confined to the administrative record already in existence, and does not contemplate a factual record developed de novo in federal district court. Community for Creative Non-Violence v. Lujan, 908 F.2d 992,998 (D.C. Cir. 1990).  Instead, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." Florida Power and Light Co., 470 U.S. at 743-44.  In order to facilitate the Court's review and adjudication of Federal Defendants' cross- motion for summary judgment, Federal Defendants submit a response to Plaintiffs' Statement of Undisputed Material Facts (Doc. 28) and the following statements by Federal Defendants of relevant, undisputed facts, which have been drawn from the administrative record in this matter. (Docs. 20, 26, 27).

Indeed, review is properly limited to the record.  It is well-settled Supreme Court precedent that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973); see also Florida Power & Light Co., 470 U.S. at 743-44.  This Court has followed this principle, explaining the judicial review is to be based on the administrative record "'that was before the Secretary at the time he made his decision.'" Walter O. Boswell Memorial Hosp. v. Heckler, 749 F.2d 780, 792 (D.C. Cir. 1984), quoting Citizens To Preserve Overton

1

Park v. Volpe, 401 U.S. 402, 420 (1971) (emphasis by the court); see also Environmental

Defense Fund v. Costle, 657 F.2d 275, 284 (D.C. Cir. 1981).  "The task of the reviewing court is

to apply the appropriate APA standard of review, 5 U.S.C. § 706(2), to the agency decision

based on the record the agency presents to the reviewing court."  Florida Power & Light Co.,

470 U.S. at 743-44.   In short, consideration of administrative action on the basis of extra-record

material is "incompatible with the orderly functioning of the process of judicial review,"

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 169 (1962), because it substitutes a

new record for the one upon which the agency acted and imposes upon the court the role

assigned by Congress to the agency.

        Thus, on the basis of well established precedent in this Court and the Supreme Court,

review of the final rule at issue in this case is confined to the record before the Commission at

the time the final rule was promulgated.  Plaintiffs' reliance on extra-record and post-decisional

documents is improper, and those documents, and all references to extra-record documents in

Plaintiffs' Statement of Undisputed Material Facts (Doc. 28) must be ignored, as well as any

such references in Plaintiffs' Memorandum of Points and Authorities In Support of Plaintiffs'

Motion for Summary Judgment (Doc. 28), as explained in further detail in Federal Defendants'

Memorandum in Opposition to Plaintiffs' Motion to Augment the Record, or in the Alternative, for

Judicial Notice.

## A.      Response to Plaintiffs' Statement of Undisputed Material Facts

        Federal Defendants do not believe there can be any issue of disputed fact that could

preclude entry of judgment on cross-motions in an APA case, where de novo review is not

permitted.  There is either substantial evidence to support material findings in the record, in

which case the findings must be sustained and judgment entered accordingly, or if insufficient

evidence, judgment may be entered in the case remanded to the agency for further fact-finding.

        While there cannnot be issues of genuine fact to be litigated, that does not mean that

2

Plaintiffs' statement of fact are conceded.  Numerous of Plaintiffs' statements of fact are improper and should be ignored.  For example, many of Plaintiffs' statements are mixed statements of fact and law and should be ignored.  A number of statements are also based on extra-record evidence and should be ignored.  In a number of instances, Federal Defendants have also disputed Plaintiffs' statements, with references to the administrative record, as outlined in Federal Defendants' Statement of Material Facts contained in Section B, below.

Plaintiffs' statements in paragraph 1 depend on extra-record evidence.  Further, the decision to adopt an alternative that included demolition of the Cyclorama Building was made at the time of the adoption of the Record of Decision ("ROD") in November 1999.  See Federal Defendants' Statement of Material Facts ¶¶ 72-78.

Plaintiffs' statements in paragraph 2 depend on extra-record evidence.  They are also mixed statements of fact and law.  Further, Federal Defendants are without knowledge as to the accuracy of such statements.

Plaintiffs' statements in paragraph 3 depend on extra-record evidence.  They are also mixed statements of fact and law.

Federal Defendants dispute Plaintiffs' statements in paragraph 4. The impacts of demolition of the Cyclorama Building were analyzed in the General Management Plan and Environmental Impact Statement, Gettysburg National Military Park ("GMP/EIS") under the National Environmental Policy Act ("NEPA"), as well as during the National Historic Preservation Act ("NHPA") review.  See Federal Defendants and Statement of Material Facts ¶¶ 12-78.

Plaintiffs' statements in paragraph 5 depend on extra-record evidence.  They are also mixed statements of fact and law.

Federal Defendants dispute Plaintiffs' statements in paragraph 6. See Federal Defendants and Statement of Material Facts ¶¶ 35-36.

Plaintiffs' statements in paragraph 9 depends in part on extra-record evidence.  Federal

3

Defendants dispute that GMP/EIS did not consider site-specific actions with regard to demolition of the Cyclorama Building.  <u>See</u> Federal Defendants and Statement of Material Facts ¶¶ 12-23, 25-54, 72-78.

Plaintiffs' statements in paragraphs 10, 11, 12, 13, 15 are an incomplete recharacterization and/or quotation of documents contained in the administrative record.  To the extent the statements imply that Federal Defendants did not evaluate impacts of demolition of the Cyclorama Building, Federal Defendants dispute such statements.  <u>See</u> Federal Defendants and Statement of Material Facts ¶¶ 12-78.

Plaintiffs' statements in paragraphs 16 and 17 depend on extra-record evidence and are not material to the instant dispute.

Plaintiffs' statements in paragraph 18 are incomplete recharacterizations of the GMP/EIS and are a misleading, as the figure cited covers only costs to be assumed by the Park Service. That figure does not include the cost of demolition of the Cyclorama Building because that cost has been assumed by a non-federal partner.  <u>See</u> Federal Defendants and Statement of Material Facts ¶¶ 52-54.

Federal Defendants dispute Plaintiffs' statements in paragraph 21.  Federal Defendants considered multiple alternatives to demolition of the Cyclorama Building in reviews conducted pursuant to NEPA and the NHPA.  <u>See</u> Federal Defendants and Statement of Material Facts ¶¶ 15, 30, 40, 51, 67.

Plaintiffs' statements in paragraphs 22 and 23 depend on extra-record evidence.

Plaintiffs' statements in paragraph 24 depend on extra-record evidence.  Federal Defendants are without knowledge regarding such statements.

Plaintiffs' statements in paragraph 28 depend on extra-record evidence.

Plaintiffs' statements in paragraph 29 depends on extra-record evidence.  They are also mixed statements of fact and law.  Federal defendants dispute these statements.  <u>See</u> Federal

4

Defendants and Statement of Material Facts ¶ 24.

Plaintiffs' statements in paragraph 30 are mixed statements of fact and law.  Federal Defendants dispute Plaintiffs' statements in paragraph 30.  <u>See</u> Federal Defendants and Statement of Material Facts ¶¶ 55-66.

**B.    Federal Defendants' Statement of Material Facts**

1.    Gettysburg National Military Park's mission is to preserve and protect the resources associated with the Battle of Gettysburg and the Soldiers' National Cemetery, and to provide an understanding of the events that occurred in the park.  AR 000153

2.    The Park Service has identified four purposes for Gettysburg National Military Park:  (1) to preserve the significant topographical, natural and cultural features that were significant to the outcome of the Battle of Gettysburg; (2) to mark the lines of battle, and to preserve the monuments and markers that commemorate the struggle; (3) to provide opportunities for people to learn about the Battle of Gettysburg in the full social, political and cultural context of the Civil War and American History; (4) to preserve the objects, artifacts and archives that document the battle, its aftermath and commemoration.  AR 000151.

3.    The Battle of Gettysburg commenced on July 1, 1863.  On July 3, General Lee led the famed attack on the Union defensive line on Cemetery Hill, known as Picketts' Charge.  AR 000134-139.  The focal point of Lee's attack was Ziegler's Grove. AR 000019.

4.    The Union defenses, anchored on Cemetery Hill and Ziegler's Grove, held their ground and the stone wall which marked the Confederacy's farthest point of advance has forevermore been know as the "High Water Mark of the Confederacy." AR 000137-139; AR 003253.

5.    Within weeks of the battle, members of the local community convinced the Governor of Pennsylvania to establish what eventually became one of our nation's first national

cemeteries. AR 000140.  By May 1893, the U.S. Congress appointed a commission to

survey, locate and preserve battle lines of both the Union and Confederate armies, and

in 1895, Congress passed legislation to establish a national military park at Gettysburg,

Pennsylvania, specifically authorizing the federal government to preserve for the

American people the "important topographical features of the battlefield" and to preserve

and mark battle positions.  AR 000142.

6.    In 1945, the Park Service acquired the 356 foot long Cyclorama Painting entitled "Battle

of Gettysburg."  AR 000145.  The work depicts "the High Tide of the Confederacy" on

July 3, 1863.  AR  003256-3257.

7.    After this significant acquisition, the Park Service decided to build a gallery to display the

painting. AR  000145.

8.    In the late 1950s, as part of the National Park Service's Mission 66 initiative, the

architectural firm of Neutra and Alexander was selected to design a building to display

the painting.  Construction of the Cyclorama Building commenced in 1960, and the

building was opened to the public March of 1962.  AR 000145.

9.    In 1971, the building ceased to function as the park's Visitor Center and Museum.  AR

000145.

10.    In June of 1977, the ACHP published the "Plan to Preserve the Historic Resources of

the Gettysburg Area," which included a recommendation for the Park Service to

Cyclorama Building from Ziegler's Grove.  AR 000145-146.  All Park Service planning

efforts through the 1970s and into the early 1980s, including the 1982 General

Management Plan, were consistent in proposing the eventual elimination of these

buildings. AR 000146.

11.    In 1994, the park began an assessment of critical needs, including the need to: (1) tell a

more complete story of the Civil War; (2) provide adequate storage facilities for the

park's collection of archival and curatorial collections; (3) protect and preserve the Cyclorama Painting (a National Historic Object); and (4) remove modern intrusions from the significant historic landscapes of the battlefield.  AR 003069.

12.    In April 1995, the Park Service issued for public comment the 1995 Draft Development Concept Plan and Environmental Assessment, Gettysburg Museum of the Civil War ("1995") EA for a Development Concept Plan ("DCP") to address visitor use, resource protection and park development issues surrounding the proposed construction of a museum and theater in an area of Gettysburg National Military Park that had little historic significance.  AR 003059-3060.  The 1995 EA served as a continuation of the process that began with the Park's 1982 General Management Plan and 1989 DCP, and was intended to address several critical issues including the lack of appropriate storage and display space for the park's priceless collection of archives of artifacts, including the Cyclorama Painting, and the continuing concerns regarding inappropriate modern intrusions on the historic scene of the 1863 battle.  AR 003067-3071.

13.    The 1995 EA analyzed the potential environmental impacts of the various alternatives in a variety of areas including on the Cyclorama Building, the museum and archival collections, the Cyclorama Painting, the historic battlefields, natural and cultural resources, as well as, cumulative impacts.  AR 003104-3113.

14.    The 1995 EA also considered a new partnership offer to privately fund the congressionally approved but never funded Gettysburg Museum of the Civil War and the relocation of the Cyclorama Painting to a new facility. AR 003072-3073.

15.    In examining the no action alternative, which left the Cyclorama Building in Ziegler's Grove, the Park Service found that not removing the building would lead to negative impacts to the historic battlefields in terms of visual resources, adding to the cumulative impacts of the historic setting of the battle.  AR 003104-05.

7

16.   Both action alternatives considered in the 1995 EA proposed the removal of the Cyclorama Building from the Union Battle line and the restoration or rehabilitation of Ziegler's Grove to the 1863 landscape.  AR 003061; 003083; 003087.

17.   In examining the action alternatives that included demolition of the Cyclorama Building, the Park Service found that there would be positive impacts to (1) historic battlefields, (2) the museum and archival collections, which would be moved into new state-of-the-art facilities, and (3) the Cyclorama Painting, which would be displayed in a way that would halt further damage.  AR 003105-3110.

18.   With regard to impacts on the Cyclorama Building, the 1995 EA stated that the building might be found eligible for listing on the National Register, in which case, appropriate mitigation would be instituted following the NHPA Section 106 review process.  AR 003106.

19.   The 1995 EA also noted that asbestos containing materials were known to exist in the Cyclorama Building and that safe methods for disposal would be determined.  AR 003107.

20.   The 1995 EA contained an appendix listing development costs, including for "Demolition of Cyclorama," which was estimated to cost $404,000.  AR 003121.  This figure was based on a NPS Class C cost estimate from 1995.  See AR003121; AR 002736.  The cost estimate included consideration of the asbestos encapsulated in the Cyclorama Building.  AR 001653.

21.   The Park Service concluded that the removal of the Cyclorama Building would eliminate a major intrusion on the historic setting of the battlefield.  AR 003060-3061.

22.    On August 31, 1995, the Park Service held a press conference announcing its decision to defer additional consideration of the DCP analyzed in the 1995 EA in favor of a new, broader look at the park's needs and a nationwide call for proposals. AR 002270.

8

23.    Public meetings and scoping meetings ensued.  AR 002271.

24.    Following the 1995 EA, the Park Service prepared a Determination of Eligibility ("DOE")

for the Cyclorama Building, finding that the building was not eligible for listing on the

National Register of Historic Places ("National Register"). AR 001600; 1604.  The Park

Service then sought the concurrence of SHPO, stating that because the Cyclorama

Building was located within the Gettysburg National Military Park Historic District, the

DOE was being submitted for review under Section 110 of the NHPA.  AR 002609.  On

May 26, 1996, the SHPO concurred this determination and also concurred with the Park

Service's Preferred Alternative (D) of the DCP/EA.  AR 001600.  However, on

September 28, 1998, the Keeper of the National Register of Historic Places found the

Cyclorama Building eligible for listing on the National Register.  AR 001604.

25.    In April 1996, the Park Service issued the 1996 Draft Development Concept Plan

Environmental Assessment, Collections, Storage, Visitor & Museum Facilities ("1996

EA").  AR 003240.

26.    The purpose of the 1996 EA was to respond to comments on the 1995 EA and to

suggest strategies for finding suitable partners to help the Park Service fund, build,

operate and maintain the museum and visitor facilities.  AR 003244.

27.    The 1996 EA examined the environmental consequences of the four alternatives in a

variety of areas including on Cyclorama Building, as well as on natural resources,

cultural resource, visual resources, socioeconomic and visitor uses.  AR 003304-05.

28.    Two of the three action alternatives, including the preferred alternative, contemplated

demolition of the Cyclorama Building.  AR 003241-43.

29.    The 1996 EA stated on the first page that under Option C, the existing Cyclorama

Building "would be demolished, and its site rehabilitated, to reflect the historic setting of

the battlefield."  AR 003241.

9

30.    In examining the no action alternative (Option A) and Option B, both of which left the Cyclorama Building in Ziegler's Grove, the Park Service again found that not removing the building would lead to negative impacts to the historic battlefields in terms of visual resources, adding to the cumulative impacts of the historic setting of the battle.  AR 003331-3333; 003334-3336.  The Park Service also found that there would be adverse impacts to the museum and archival collections, as well as to the Cyclorama Painting under the no action alternative.  Id.

31.    In examining the action alternatives that included demolition of the Cyclorama Building (Options C and D), the Park Service found that there would be positive impacts to the historic battlefields, to the museum and archival collections, which would be moved into new state-of-the-art facilities, to the Cyclorama Painting, which would be displayed in a way that would halt further damage, as well as small improvements with regard to certain natural resources.  AR 003337-3345.

32.    With regard to impacts on the Cyclorama Building, the 1996 EA noted that the Park Service had determined that the Cyclorama Building was not eligible for listing on the National Register, however if it was found to be eligible the Park Service would consult with SHPO and ACHP pursuant to the NHPA.  AR 003338; 003342.

33.    The 1996 EA also contained a cost estimate for the restoration of Ziegler's Grove.  AR 003285; AR 003290.

34.    Following the issuance of the 1996 EA, the Park Service requested funding proposals from nonfederal partners to pay for the new museum and visitor center and ultimately selected one proposal.  AR 000169.

35.    In May 1998, the Park Service noticed the termination of the Environmental Assessment process, stating that the issues concerning storage, museum and Visitor Center facilities would be incorporated into a park-wide general management plan/environmental impact

statement. AR 0002311-12. While, it does not appear that this notice was ever
published in the Federal Register, the Park Service also notified the public of this
decision in a newsletter dated January 4, 1998, which was sent to approximately 3,800
people and announced the decision in public meetings held in December 1997 and
March 1998. AR 000646.

36. The Park Service also stated in the GMP/EIS that "[b]ased on the public input received
on the DCP, GMP/EIS and other public comment, NPS determined that it was desirable
to incorporate the issues of visitor use and interpretation at the visitor center and
museum facilities as an element of its forthcoming GMP/EIS." AR 000171. The
GMP/EIS went on to explain that the funding proposal by a nonfederal partner for the
museum and visitor facilities ultimately selected for consideration by the Park Service
had been revised "and incorporated into the action alternatives developed in the
GMP/EIS." AR 000172. The ROD also stated that the Park Service combined the
review of the DCP with the review of the GMP. AR 000016-17.

37. In 1997, the Park Service commenced the planning process to develop a new GMP to
set forth the basic management philosophy and framework for future decision making at
Gettysburg NMP. AR 001953.

38. On May 5, 1997, the Park Service published a notice of intent to begin a GMP/EIS for
Gettysburg National Military Park in the Federal Register, requesting public comment.
AR 002267.

39. The Park Service sought public involvement in this process as evidenced by the 22
meetings and open houses sponsored by the agency to discuss the formulation of the
draft GMP and the Park Service newsletters sent to a mailing list of 3,800. AR 000451-
454. More than 1,200 people attended these public meetings and 3,728 written
comments were submitted. Id.

40.    The Agency released the Draft GMP/EIS in August of 1998, which set forth four
       alternatives that responded directly to the park's mission goals. AR 001953-1954. This
       included consideration of a no action alternative.  AR 000210-221.

41.    Following the issuance of the draft GMP/EIS, the Park Service held twelve additional
       meetings attended by hundreds of people. AR 000454-455.

42.    The Park Service received numerous comments during the GMP/EIS process
       referencing the planned demolition of the Cyclorama Building.  See, e.g., Comment
       letters at AR 002552; 002413; 002406; 002404; 002401; 002399; 002344; 001903;
       001738; 001745; 001705;  001660-62; 001629; 001623; 001621; 001619; 001615;
       001583; 001577; 001579; 001558; 001555; 001545; 001511-12; 000090.

43.    In June of 1999, the Agency published the Final GMP/EIS. AR 00123.

44.    The GMP/EIS stated "[t]o help the public and NPS understand what would happen if an
       alternative [of the GMP] were adopted, the impacts of each alternative on the natural
       and cultural environment are described and compared."  AR 000148.

45.    This GMP proposed rehabilitation of: (1) the large scale landscape elements present
       during the battle; (2) major landscape features; (3) small scale landscape elements
       (fences, woodlots, and orchards) significant to the outcome of the battle; and (4) the
       circulation of the Soldiers' National Cemetery.  AR 000123.  One element of the Park
       Service's extensive landscape rehabilitation effort included the demolition of the
       Cyclorama Building, in order to effectuate the restoration of Ziegler's Grove.  AR 000038

46.    The description of impacts common to all the action alternatives in the GMP/EIS
       included removal of the Cyclorama Building, which would allow for the restoration and
       rehabilitation of the historic battlefields and would significantly improve the historic
       setting. AR 000386-87.  It also would result in some minor benefits to natural resources.
       AR 000401.

12

47.    The GMP/EIS also stated that "The findings of the DCP were brought into the draft
       GMP/EIS when it became clear that the public interest could best be served by doing
       so."  AR 000639.

48.    The GMP/EIS explained that following the issuance of the draft GMP/EIS, the Cyclorama
       Building was found to be eligible for listing on the National Register, and therefore the
       Park Service began consultations with the SHPO, ACHP and interested parties to
       develop appropriate mitigation with regard to removal of the building.  AR 000387.

49.    In a May 14, 1999 letter, federal Advisory Council on Historic Preservation ("ACHP")
       "announced its support of the draft GMP/EIS proposed treatment for the park's cultural
       landscapes, the Cyclorama Painting and the Cyclorama Building.[2/]  AR 00387; 001488.
       ACHP's decision to endorse the GMP/EIS with regard to its treatment of those three
       historic resources was made based on a report prepared by ACHP members entitled, "A
       Problem of Common Ground," which was included in Appendix 11 of the GMP/EIS.[3/]  AR
       000558-561.

50.    ACHP stated in the report "A Problem of Common Ground," that removal of the
       Cyclorama Building would have "an adverse – indeed fatal – effect" on the Cyclorama
       Building, but found that the proposal contained in the GMP was based on the park's
       legislative purpose, the determination of eligibility for the Cyclorama Building, historic
       documentation and substantial public involvement.  AR 000559.  ACHP further noted
       that the determination of eligibility for the Cyclorama Building did not change its

---

[2/] The GMP/EIS incorrectly stated May 14, 1998, which was corrected in the ROD.  AR 000026.

[3/] The last two pages of this report, found at pages 432-433 of the GMP/EIS were inadvertently
omitted from the administrative record. The full report may be found in the administrative record
at AR 0011489-94.

conclusion because it "is focused on the building in isolation from, and not on its

relationship to, a paramount historical objective: the rehabilitation of this key battlefield

area."  AR 001493.

51.    The Park Service also considered multiple alternatives with regard to the treatment of

the Cyclorama Building, including taking no action, demolition, continued use of the

building and adaptive reuse of the building.  AR 000210-215; 00022-224; 000231;

000233-234; 000256-257; 000264-265; 003277-96.

52.    Appendix 4 of the GMP/EIS stated that non-federal partners would provide assistance,

labor and funding for many projects, including the new museum and visitors center and

restoration of Ziegler's Grove.  To help the public understand the extent of that

assistance, the cost estimates were divided into three categories: costs funded by NPS,

costs funded by partners, and costs funded by both. AR 000480.

53.    A copy of the Letter of Intent setting forth the responsibilities of the Gettysburg National

Battlefield Museum Foundation and the Park Service were included in the GMP/EIS in

Appendix 6.  The letter sets out assumption of responsibilities by the Foundation to

remove the Cyclorama Building and rehabilitate Ziegler's Grove.  AR 000494-497.  As

the letter states, one of the overall objectives was to "rehabilitate the historic appearance

in setting of Ziegler's Grove and high water mark of the battle by removing the existing

visitor center and Cyclorama buildings and their associated entry roads and parking, and

by restoring the historic landscapes."  AR 000495.  In furtherance of that objective, "it is

the intention of the Foundation to...construct the facilities agreed upon in the agreement

and remove the existing facilities and rehabilitate Ziegler's Grove."  AR 000495.

54.    Because the Gettysburg National Battlefield Museum Foundation had to agree to, inter

alia, assume responsibility for removal of the Cyclorama Building and restoration of

Ziegler's Grove, the cost of demolition of the Cyclorama Building was included under

"Construction or Land Acquisition Funded by Partners On Behalf Of NPS," which totaled $39,285,000, rather than under "Construction by NPS," which totaled $81,000.   AR 000485-487.

55.    The Park Service also prepared and distributed a Section 106 Case Report Cyclorama Painting, Battle of Gettysburg Cyclorama Building Gettysburg National Military Park ("Section 106 Report") on February 18, 1999.  AR 001592; AR 001586-88.

56.    The Section 106 Report recommended removal of Cyclorama Building in order to rehabilitate the historic landscapes of Ziegler's Grove and the restoration of the Cyclorama Painting.  AR 001604.

57.    The Section 106 Report also contained an assessment of the possibility of rehabilitating the building for continued use and for adaptive reuse.  AR 001606-07.

58.     In the report, Park Service found that the option of rehabilitating the building for continued use was not feasible because such rehabilitation "would require solutions to several major design problems, the practicality of which could not be determined and the costs which seemed excessive."  AR 001606.

59.     Critical design problems include (1) the lack of fire exits, which would be required to be installed, and which would severely compromise the interpretive program and the 360 degree view of the Cyclorama Painting, (2) new ramps that would need to be built, as the existing ramps were not compliant with federal standards, (3) deformations of the structure that are permanent, and perhaps most importantly, (4) the Cyclorama Painting after restoration could not be reinstalled in the Cyclorama Building, as proper conservation would require restoring the painting to its original hyperbolic shape, which cannot be accommodated in the current space.  AR 001606-07; see also AR 001523, 001525.

60.    The Park Service determined that the rehabilitation of the building would require almost

15

complete demolition and reconstruction, thereby affecting its integrity of design and materials.  AR 001606.

61.    The Section 106 Report stated that a 1996 estimate of construction costs to correct the design deficiencies for continued public use was estimated to be over $8 million, which did not include the cost of demolition and reconstruction of the display drum portion of the building in order to make it suitable for display of the Cyclorama Painting.  Id. at AR001607.

62.    These deficiencies exist despite considerable effort expended by the Park Service to repair and maintain the building, including completing more than 30 major repairs on the building since 1962.  AR 001528.  This includes work done to repair, reseal and replace roofs and reflecting pools, and to repair, upgrade or replace mechanical systems or provide insulation to improve the operation of the systems.  Id.  In addition, in 1993, Gettysburg National Military Park requested major funding to bring the building into compliance with health and safety and energy conservation codes, abate asbestos and other purposes, although no funding was received.  AR 001528.

63.    The size of the Cyclorama Building's drum could not be expanded without complete demolition and reconstruction of almost the entire structure.  AR 001606.  As the drum portion of the building was insufficiently sized to allow the painting to be properly hung and preserved, "the option of rehabilitating the Cyclorama Building as an exhibit gallery for the Cyclorama Painting was rejected."  AR 1607.

64.    The Park Service also considered rehabilitation of the building for adaptive use, but "was unable to identify any other appropriate public uses for the building."  Id. at AR001607.

65.    The building had not served as the visitor's center since 1971, AR 001604, and was not suitable for those purposes.  The Park Service also considered other non-public uses for the Cyclorama Building, including administrative office space.  AR 001607.  However, a

very minor percentage of the building square footage was designed or is readily usable as office space, as compared to space that was designed for public use and display at the painting," and while the cost of rehabilitation would be relatively inexpensive, "continued use of those spaces would be expensive given the annual operating costs of heating and maintaining the entire structure...." Id.

66. The Park Service also determined that "it would be inappropriate to house administrative staff in a structure which represents a visual intrusion on the historic landscapes that the park was created to preserve." AR 001607.

67. On April 11, 1999, the Park Service issued a Response to Comments on the Section 106 Case Report. AR 001520-1532. This included responses to comments by plaintiff Neutra. Mr. Neutra commented on alternatives, to which the Park Service stated that it "is considering alternatives other than demolition for the Cyclorama Building.... however, NPS has selected as its preferred proposal an alternative that demolished the Cyclorama Building because it believes that the accomplishment of the park's legislative purpose, and the overriding public interest, comes with the preservation of the cyclorama painting and with the restoration of the historic landscapes of the Battle of Gettysburg. The history of its consideration of those other alternatives is described in the Revised Section 106 Case Report on pages 14-16 [AR 01605-1607 ]." AR 0001527. The referenced pages in the Section 106 Case Report explains the various alternatives explored in the 1996 EA, as well as the use and adaptive use analysis for the Cyclorama Building under Section 106. AR 01605-1607.

68. On April 20, 1999, the Park Service held a Section 106 meeting to discuss, inter alia, plans for the Cyclorama Building, including the Response to Comments on the Section 106 Case Report. AR 001516-17; 001519. Plaintiff Christine Madrid French attended this meeting, including on behalf of Mr. Neutra. AR 001517; 001515.

17

69.     On June 16, 1999, the Park Service invited the consulting parties to comment on the
        draft memorandum of agreement before it was executed by the Park Service, the
        Pennsylvania State Historic Preservation Officer ("SHPO") and ACHP. AR 000114-115.

70.     On July 29, 1999, the Park Service, SHPO and ACHP entered into the MOA which
        served as the culmination of this Section 106 review process.  AR 000056.

71.     The MOA set forth mitigation for the adverse impacts to the Cyclorama Building under
        the GMP/EIS, which included documenting the building pursuant to the standards in the
        Historic American Buildings Survey and providing a permanent exhibit on the
        development of the park withing the new museum that includes a section featuring the
        Cyclorama Building as an example of the Mission 66 period of the Park Service.  AR
        000053-55.

72.     On November 23, 1999, the Park Service issued the Record of Decision ("ROD")
        announcing its decision to implement Alternative C of the GMP because it provided the
        most desirable combination of resource preservation, visitor interpretation and
        experience, and cost effectiveness among the four considered alternatives for meeting
        the legislative purposes and mission of the park.  AR000020.

73.     The ROD indicated that Alternative C was selected to rehabilitate the Gettysburg
        Battlefield so that the features that were significant to the outcome of the battle and its
        commemoration more nearly reflect their historic conditions.  AR000018.

74.     The selected action also provided for improved protection and rehabilitation of the large-
        scale and small-scale elements of the park's historic landscapes, as well as, the
        Cyclorama Painting and the park's extensive collections and archives.  AR000018-19.

75.     The Park Service noted that this action, along with the rest of the selected action, will
        allow it to meet the legislative purposes of the park.  AR 000019.

76.     The ROD noted that while the new museum and visitor facilities would permanently

18

remove 18 acres of land, including up to two acres of wetlands, at the new site as wildlife habitat, it would be able to restore about 38 acres of meadow, orchard and woodlands that were very significant to the outcome of the battle at the sites of the current facilities, including the Cyclorama Building.  AR 000024; see also AR 000026.

77.    The Park Service concluded in the ROD that the selected action "best protects, preserves and enhances the historic, cultural and natural resources at Gettysburg NMP," by allowing the Park Service to preserve and rehabilitate the resources considered significant to the outcome of the battle, to protect the Cyclorama Painting, collections and archives.  The selected action also allows the Park Service "fully to meet the requirements of Gettysburg NMP's legislation at the least cost the environment, park visitors and the Federal budget."  AR 000024.

78.    An element of Alternative C included the removal of the Cyclorama Building because it is located on Ziegler's Grove, one of the most historically significant areas of the battlefield. AR000018-19; 000026.

Dated:  March 14, 2008.

Respectfully submitted,
RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Samantha Klein
SAMANTHA KLEIN
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Phone: (202) 305-0474
Fax:    (202) 305-0506
E-mail: samantha.klein@usdoj.gov

Of Counsel:

MARTHA F. ANSTY
Attorney

19

Office of the Solicitor, N.E. Region
U.S. Department of the Interior
Winston Prouty Federal Building
11 Lincoln Street
Essex Junction, VT 05452
Telephone:  (802) 872-0629
Fax:  (802) 872-9704

                                            Counsel for Federal Defendants

Exhibit 1

# reCyclorama
The Campaign to Save Richard Neutra's
Cyclorama Building at Gettysburg

## Sign on to Save!



**Home**              **Our Mission**              **News & Documents**              History & P

**reCyclorama** is an advocacy group working towards the preservation of Richard Neutra's
Cyclorama Building at Gettysburg in cooperation with community organizations, the National Park
Service, preservation professionals, architectural historians, and members of the public.

## BUILDING HISTORY

The Cyclorama Building is slated for demolition under the preferred alternative in the recently
approved General Management Plan (GMP) for Gettysburg National Military Park. Architect Richard
Neutra (of Neutra and Alexander) designed the structure in 1961 to house the 1883 Cyclorama
painting of the Battle of Gettysburg, a circular panorama by Paul Philippoteaux. The building was a
showpiece of the "Mission 66" building program, a $1 billion effort to improve visitor facilities
nationwide in celebration of the fiftieth anniversary of the National Park Service in 1966. During
Mission 66, the Park Service introduced the "visitor center" as a new building type designed
specifically to house an auditorium, interpretive exhibits, bookstores, and staff offices in one
centralized structure. The Park Service constructed one hundred new visitor centers between 1956
and 1966; a series of distinct buildings representative of post-World War II prosperity and modern
architectural design in the mid twentieth century.

## CURRENT PLAN

In September 1998, the Cyclorama Building was determined eligible for the National Register of
Historic Places as a structure of "exceptional historic and architectural significance" within the Mission
66 context. In June 1999 the Society of Architectural Historians nominated the building as a National
Historic Landmark. Despite testimonies from professionals and the public regarding the significance
of the structure in U.S. history, the National Park Service is steadfast in its desire to demolish the
building and construct a new 120,000 square-foot center. The new center will occupy a 45-acre intact
parcel of the Civil War battlefield landscape and will encourage sprawl in an otherwise undeveloped
agricultural area. reCyclorama and other interested groups believe that the GMP should be redrafted
to include alternatives to demolition of the Cyclorama Building. reCyclorama also calls for
reconsideration of the preferred alternative in the GMP in light of stated public opposition to the
proposed plan.

## reCYCLORAMA GOALS and ACTIVITIES:

* Research and develop alternatives for the re-use and restoration of the Cyclorama Building at
Gettysburg in consultation with professionals and conservationists.
* Redraft the General Management Plan for Gettysburg National Military Park to include alternatives
to demolition for the Cyclorama Building.
* Expand the park's mission statement to include recognition of the historical significance of the post-
Civil War battlefield landscape at Gettysburg, including the Cyclorama Building.
* Restoration of the 1883 Cyclorama painting, reconstruction of the interior framework for hanging the
artwork, and development of a new interpretive public program. (see photos)
* Maintain and expand related web sites to distribute current information on the debate at Gettysburg.
See also "Mission 66: Modern Architecture in the National Parks"

**CONTACT US:**

If you have any information to post on the web site or questions regarding reCyclorama, please contact Christine Madrid French, Executive Director.

| Home | Our Mission | News & Documents | History & P |

 This site composed and administered by Christine Madrid French 2004.

# reCyclorama
The Campaign to Save Richard Neutra's
Cyclorama Building at Gettysburg



### Sign on to Save!

| Home | Our Mission | News & Documents | History & P |

### More photographs, drawings, and sketches here

### High Resolution Downloads for Publication
ask CM French for permission before printing

History:



In 1996, the National Park Service officials announced their intention to demolish Neutra and Alexander's 1961 modernist Cyclorama Building at Gettysburg, Pennsylvania, a premiere first generation "visitor center" and a stunning example of a master architect's late-life aspirations. Despite its recent listing on the National Register of Historic Places for its ""its exceptional historic and architectural significance," the long-neglected building stands in the way of National Park Service plans to "restore" the battlefield landscape and move visitor facilities into a new interpretive center designed in a "more appropriate" architectural style.

The Gettysburg project posed considerable challenges for architect Richard Neutra. Commissioned as a flagship building for the National Park Service's "Mission 66" program -- a nationwide, billion-dollar program to modernize the U.S. parks -- the new visitor center had to house a massive 1883 panoramic painting depicting the battle of Gettysburg and occupy one of the most famous sites in American history. Neutra created a drum-shaped concrete rotunda to house the 40-foot high circular canvas; a glass, concrete, and stone wing accommodates ranger's offices and information services. Park officials insisted that the building be constructed on a prominent site overlooking the field where Pickett made his famous charge during the pivotal 1883 battle - the same spot depicted in the painting's brilliant scenography and a location deemed most convenient for the multitudes expected to visit the building during the 100th anniversary of the Civil War.



At its opening The New York Times predicted that this "handsome new $1,000,000 Park Visitor Center" would "become one of the showplaces of the National Park System." The Washington Post praised the "quietly monumental but entirely unsentimental" Neutra design, citing the Cyclorama Center as one of a set of "exceptionally distinguished and fearlessly modern" buildings in the national parks, each deserving of an architectural excellence award. In 1970, the American Institute of Architects agreed, honoring Mission 66 and the Park Service for the innovative development of modern facilities "in harmony with the architectural theme" of each park.



Gettysburg today is viewed as hallowed ground, a nationalist shrine to both victor and vanquished, Lincoln's triumphant "Union" and Jefferson Davis's valiant "Lost Cause." But Neutra rightly interpreted the battlefield legacy in a much larger sense, one that uniquely applied Lincoln's vision to a contemporary international political context. The U.S. Civil War Centennial Commission, created in 1957, set the tone when they emphasized that the upcoming anniversary celebrations be devoted to "keeping peace through international understanding." Neutra incorporated this message wholeheartedly in the Cyclorama Building -- one of his last major public commissions. In his hands, the visitor center became a place of "cultural interchange" rather than a mere tourist trap. Crowds of up to 30,000 people could be accommodated outside the building which opened up to reveal an elevated "Rostrum of the Prophetic Voice." The visionary architect imagined that a procession of "great statesmen of the Nations…may be even a 'Cold War' enemy nation" such as India's Jawaharlal Nehru or China's Chou En-Lai, would present stirring speeches promoting global unanimity at the yearly anniversary of the Gettysburg Address. Where Lincoln spoke poignantly of the shattered Union between northern and southern states, Neutra dedicated his latter-day Lincoln Memorial to the cause of international harmony in a world threatened with atomic annihilation and a nation consumed with internal issues of civil rights.

Although Neutra's memorial concept resonated with America's international ambitions at mid century, changing social and political environments quickly rendered its utopian message ineffective. Today the Park Service maintains that the building must be removed from the battlefield. Yet Neutra's intentions for the structure and his humanistic theories behind its development -for years suppressed and unexplored -- are just beginning to be understood in the context of his period and ours.



In November, 2000, the National Parks Advisory Board refused to grant National Historic Landmark status to the Cyclorama Building, but approved the nominations for three other Mission 66-era visitor centers with identical historic contexts and statements of significance: Dinosaur, Utah; Wright Brothers, North Carolina; and Rocky Mountain, Colorado. Politics?

A renewed effort to save the building is underway, led by the Recent Past Preservation Network in cooperation with the Neutra Institute of Survival Through Design, DOCOMOMO, and other allied organizations. This coalition of preservationists is calling upon key public officials, including Pennsylvania Gov. Edward Rendell, to "pardon" the building and provide funds for its restoration. Only public support can save this building now. **Sign on here to save the Cyclorama!**

[by Christine Madrid French for the DOCOMOMO U.S. newsletter; photographs ©Boris Starosta]



**See also select measured drawings of the building,**
**recently completed by the Historic American Buildings Survey**
**on our HABS Drawings page**
**featuring downloadable PDFs of each image.**

## Other sites with images:

**Photo Gallery of Images on the Richard and Dion Neutra Architecture site.**

## Other Documents:

Landscape Preservation and Interpretation: Issues of Use, Historical Experience, and Myth at Gettysburg National Military Park. Thesis by Nathan Jefferson Riddle (Columbia University, 1998). Critical analysis of National Park Service interpretive policies at Gettysburg NMP with special coverage of Neutra's Cyclorama Building (ca. 1961) and its place on the battlefield of Gettysburg.

"The Gettysburg park staff tendentiously approached writing the DOE with the intention of portraying the building's mechanical and maintenance problems as inherent design flaws. The motive of the park service was to portray the building as a lesser, pitiful example of Neutra's work, designed when he was in poor health and at the end of his partnership with Robert Alexander. Based upon an anti-modern conceit of the park Superintendent, the analysis is slanted and misleading. Latschar's intentions and the arguments used to support his proposals pose dangers more general than to just Neutra's building. The National Park Service acts as a preservation mentor for the nation, and in this regard, if the argument becomes accepted that the technical failings of a structure render that work of negligible significance, then the country would lose many cherished architectural icons." Read more...

| Home | Our Mission | News & Documents | History & P |

 This site composed and administered by Christine Madrid French 2004.

Exhibit 2
(1 of 3)

WASO—12
R(9/78)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

## GUIDELINE TRANSMITTAL SHEET

| GUIDELINE NUMBER | TITLE | RELEASE NO. |
|---|---|---|
| NPS-12 | NEPA Compliance Guideline | 2 |
| OFFICE OF ORIGIN Division of Environmental Compliance | | AMENDMENT NO. |
| | | DATE September 1982 |

Explanation of material transmitted:

This release of NPS-12, NEPA Compliance Guideline, explains requirements contained in the Novemeber 29, 1978, Council on Environmental Quality (CEQ) Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (NEPA) (40 CFR 1500 et seq.), and in Part 516 of the Departmental Manual (516 DM).

These requirements apply to the majority of National Park Service (NPS) proposed actions and this guideline is intended to facilitate the NEPA process, reduce paperwork and minimize delays.

This guideline covers preparation of environmental documentation for proposed NPS actions and contains guidance for NPS involvement in the NEPA coordination and early review process for other agency actions which will or may affect areas of NPS jurisdiction or expertise.

This guideline replaces Release No. 1 of NPS-12, and NPS-13, Other Federal Agency EIS Review Guideline.

ACTING

Assistant Director, Personnel & Administrative Services

# NATIONAL

# ENVIRONMENTAL POLICY ACT

# GUIDELINE

# NPS-12



Release No. 2

September 1982

3

NEPA COMPLIANCE GUIDELINE
NPS-12

## CONTENTS

List of Abbreviations Used in This Guideline..........................vi

CHAPTER                                                          PAGE

1.  INTRODUCTION

    1-1 Background and Purpose........................................ 1

    1-2 Overview of the NEPA Process.................................. 1

    1-3 Use and Organization of This Guideline........................ 2
        A.  Relation to Other Directives and Guidance............... 2
        B.  NPS Program-Specific NEPA Guidance...................... 3

    1-4 Changes to This Guideline..................................... 3

    1-5 Responsibilities and Authorities.............................. 4
        A.  Assistant Secretary for Policy, Budget and Administration...... 4
        B.  Assistant Secretary for Fish and Wildlife and Parks............ 4
        C.  Director, NPS.......................................... 4
        D.  Chief, Office of Park Planning and Environmental Quality....... 4
        E.  Chief, Division of Environmental Compliance................... 5
        F.  Regional Directors..................................... 5
        G.  Regional Environmental Coordinators......................... 6
        H.  Denver Service Center-Legislative Compliance Division.......... 7
        I.  Superintendents........................................ 7
        J.  Contracting Officers................................... 7

    EXHIBIT 1 Environmental Impact Statement Process

2.  INITIATING THE NEPA PROCESS

    2-1 Categorical Exclusions........................................ 1

    2-2 Notice of Intent to Prepare an EIS............................ 1

    2-3 Lead and Cooperating Agencies................................. 2
        A.  NPS Areas of Jurisdiction by Law....................... 2
        B.  NPS Areas of Special Expertise......................... 2
        C.  Requests for NPS to be a Cooperating Agency................... 4
        D.  NPS Responsibilities as a Cooperating Agency................. 4
        E.  Cooperating Agency Agreements.......................... 4
        F.  Cooperation Regarding NPS Special Expertise.................. 4
        G.  Decisions Not to Become a Cooperating Agency................. 5
        H.  Decisions Regarding Cooperating Agency Status................ 5
        I.  Provision of Notice of Intent to Other Agencies.............. 5

NEPA COMPLIANCE GUIDELINE                                              Guideline
NPS-12                                                                Page ii
Contents

CHAPTER                                                                 PAGE

    2-4 Scoping................................................ 5
        A.  Scoping and NPS Proposals.......................... 5
        B.  Scoping and Other Agency Proposals................. 6

    2-5 Writing Style.......................................... 7
        A.  General............................................ 7
        B.  Referenced Information............................. 7

3.  ENVIRONMENTAL ASSESSMENTS AND FINDINGS OF NO SIGNIFICANT IMPACT

    3-1 When to Prepare an Environmental Assessment............ 1
        A.  Applicability to NPS Projects...................... 1
        B.  Identifying the Need for an Assessment............. 1
        C.  Exceptions to Categorical Exclusions............... 1

    3-2 Preparing an Environmental Assessment................. 1
        A.  Purpose of an Environmental Assessment............. 1
        B.  Length of an Environmental Assessment.............. 1
        C.  Format and Content of NPS Environmental Assessments. 2
        D.  Other Guidance.................................... 3

    3-3 Public Involvement in the EA Process.................. 3
        A.  Public Notification............................... 3
        B.  Public Reviews.................................... 4

    3-4 Finding of No Significant Impact...................... 4
        A.  Description and Content; Signature Authority...... 4
        B.  Public Review..................................... 4
        C.  Distribution..................................... 5
        D.  Combining With Wetland/Floodplain Statement of Findings. 5
        E.  Timing of Preparation............................ 5

    EXHIBIT 1 Environmental Assessment Process

4.  ENVIRONMENTAL IMPACT STATEMENTS

    4-1 Format................................................ 1
        A.  Cover Sheet....................................... 1
        B.  Summary........................................... 1
        C.  Table of Contents................................ 1
        D.  Purpose of and Need for Action................... 1
        E.  Alternatives Including the Proposed Action........ 1
        F.  Affected Environment............................. 3
        G.  Environmental Consequences....................... 4

NEPA COMPLIANCE GUIDELINE
NPS-12
Contents

CHAPTER                                                                    PAGE

    H.  List of Preparers.................................................. 5
    I.  Consultation and Coordination in the Development of the
        Proposal and in the Preparation of the Environmental
        Impact Statement.............................................. 6
        1.  List of Agencies, Organizations and Persons to Whom
            Copies of the Statement are Sent........................ 6
        2.  Public and Other Agency Comment and Response.............. 6
    J.  Index............................................................. 7
    K.  Appendices........................................................ 7

    4-2 Supplemental and Revised Statements............................. 7
    A.  Outdated Draft Statements......................................... 7
    B.  Content........................................................... 8
    C.  Responses to Comments on the Draft Statement...................... 8
    D.  Revisions and Supplements to Multiple Related Statements.......... 8
    E.  Consultations with OEPR and SOL................................... 8

    4-3 Processing Environmental Impact Statements...................... 8

    4-4 Termination of the EIS Process.................................. 9

    4-5 Abbreviated Final EIS's......................................... 9

5.  RELATIONSHIP TO DECISIONMAKING

    5-1 Predecision Referrals to CEQ.................................... 1

    5-2 Record of Decision.............................................. 1

6.  MANAGING THE NEPA PROCESS

    6-1 Organization for Environmental Quality.......................... 1

7.  REVIEW OF NON-NPS DOCUMENTS

    7-1 Duty to Comment................................................. 1
    A.  Policies.......................................................... 1
    B.  Comment Requirements.............................................. 1
    C.  Early Involvement ................................................ 1

    7-2 Administrative Procedures....................................... 2
    A.  Office of Environmental Project Review (OEPR)
        Responsibilities................................................. 2
    B.  OEPR Regional Environmental Officers (REO's)..................... 2
    C.  OEPR Assignments to Interior Bureaus............................. 2
    D.  OEPR "Lead Bureau" Assignments................................... 2
    E.  WASO-135 Review Assignments to NPS Offices....................... 2
    F.  Shifts in NPS Assignments........................................ 2

NEPA COMPLIANCE GUIDELINE
NPS-12
Contents

CHAPTER                                                                    PAGE

7-3 Processing Flow.................................................. 3
   A.  Documents of Non-Interior Origin.............................. 3
   B.  Documents Originating in Interior or Documents Not
       Controlled Through OEPR...................................... 3

7-4 Definitions and Related Procedures.............................. 4
   A.  ER Numbers.................................................... 4
   B.  DEC Numbers................................................... 4
   C.  OEPR Distribution Memorandum.................................. 4
   D.  WASO-135 Instruction Form..................................... 4
   E.  Lead Agency/Lead Bureau....................................... 4
   F.  "Uncontrolled" Reviews........................................ 5
   G.  Advance Copies................................................ 5
   H.  Technical Assistance.......................................... 5
   I.  Review Deadlines and Extension Requests....................... 6
      1.  CEQ Requirements; Screening and Review Schedules.......... 6
      2.  Extensions................................................ 6
   J.  Departmental Comment Letters.................................. 7

7-5 Review Guidelines for EIS's.................................... 8
   A.  Draft EIS's................................................... 8
      1.  Key Sections for Reviewers' Attention..................... 8
      2.  Comment Requirements for Key Sections..................... 8
      3.  Reviewing "Tiered" EIS's.................................. 9
      4.  Reviews and State and Local Plans.........................10
      5.  Secondary and Indirect Impacts............................10
      6.  NPS EIS Comment Coordination..............................10
      7.  Permit Identification Requirements........................10
      8.  Types of NPS Comments on Draft EIS's......................11
      9.  Consequences of Declining to Review.......................12
   B.  Final EIS's...................................................12
      1.  When NPS Comments on Final EIS's..........................12
      2.  Responses to Draft EIS Comments...........................12
      3.  Justification for Comments on Finals......................13

7-6 Interrelated Reviews............................................13
   A.  Section 4(f) (as amended) of the Department of Transportation
       Act of 1966..................................................14
      1.  Meaning of Feasible and Prudent...........................14
      2.  NPS Section 4(f) Lead Responsibility......................14
      3.  Mandatory Response Requirement............................14
      4.  Objecting to Section 4(f) Approval........................15
      5.  Types of Section 4(f) Documents...........................15
      6.  Commenting on Section 4(f) Statement Inadequacies.........15
      7.  Format for Section 4(f) Comment...........................16
      8.  Questioning Section 4(f) Applicability....................17
      9.  Withholding Approval for NPS Transportation Easements.....17

NEPA COMPLIANCE GUIDELINE                                    Guideline
NPS-12                                                       Page v
Contents

CHAPTER                                                         PAGE

    B.  Licensing, Permitting and Development of Water-Related
        Projects.................................................17
        1.  Federal Energy Regulatory Commission Reviews...............17
        2.  Federal Water Project Recreation Act (Public Law 89-72)
            Reviews.............................................18
        3.  Section 201(g) of the Clean Water Act (Public Law 95-217)
            Reviews.............................................19
    C.  Reviewing of Proposed Federal Legislation, Rulemaking,
        Regulations, Executive Orders, Guidelines, Handbooks,
        and Other Procedures....................................20
    D.  Reviewing of Land Use Plans....................................20
    E.  Reviewing of State, Local and Private Environmental Documents..20

 7-7 Style and Format for Environmental Review Comments.................21
    A.  General Comments...........................................21
    B.  Interrelated Review Comments...............................21
    C.  Specific NEPA Comments.....................................22
    D.  Summary Comments...........................................22

EXHIBIT 1 WASO-135 Instruction Form
EXHIBIT 2 No-Comment Response Form
Exhibit 3 Section 4(f) of the DOT Act

APPENDICES

1.  Council on Environmental Quality Regulations (40 CFR 1500-1508)

2.  Part 516, Department of the Interior Manual, Section 1-7 (including
    NPS appendices)

3.  Scoping Guidance by Council on Environmental Quality (4/30/81)

4.  Procedures for Processing Draft and Final Environmental Impact Statements

5.  Approved NEPA Format Variations
    A.  General Management Plans for Units of the National Park System
    B.  Wild and Scenic River Studies
    C.  National Trail Studies



9

NEPA COMPLIANCE GUIDELINE
NPS-12

## ABBREVIATIONS USED IN THIS GUIDELINE

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| CFDA | Catalog of Federal Domestic Assistance |
| CFR | Code of Federal Regulations |
| COE | Corps of Engineers |
| CEQ | Council on Environmental Quality |
| DEC | Division of Environmental Compliance |
| DSC | Denver Service Center |
| DOI | Department of the Interior |
| DOT | Department of Transportation |
| DEIS | Draft Environmental Impact Statement |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ER | Environmental Review |
| FWP | Assistant Secretary for Fish and Wildlife and Parks |
| FERC | Federal Energy Regulatory Commission |
| FEIS | Final Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| GMP | General Management Plan |
| HCRS | Heritage Conservation and Recreation Service |
| LCD | Legislative Compliance Division (of Denver Service Center) |
| NEPA | National Environmental Policy Act of 1969 |
| NPS | National Park Service |
| NOI | Notice of Intent |
| OEPR | Office of Environmental Project Review |

Release No. 2

NEPA COMPLIANCE GUIDELINE
NPS-12

<div align="right">Guideline
Page vii</div>

Abbreviations used in This Guideline

PBA    Assistant Secretary for Policy, Budget and Administration

REC    Regional Environmental Coordinator (NPS)

REO    Regional Environmental Officer (DOI)

ROD    Record of Decision

516 DM    Part 516 of the Department of the Interior Manual

WASO    Washington Office of National Park Service

NEPA COMPLIANCE GUIDELINE
NPS-12

## INTRODUCTION

### 1-1 BACKGROUND AND PURPOSE

The National Environmental Policy Act of 1969 (NEPA) requires consideration of the environmental effects of proposed Federal actions. NEPA procedures insure that environmental information is available to public officials and members of the public before decisions are made and before actions are taken. Regulations for implementing the procedural provisions of NEPA have been issued by the Council on Environmental Quality (CEQ) (40 CFR Parts 1500-1508). Further compliance procedures to be followed by the National Park Service (NPS) are contained in Part 516 of the Department of the Interior Manual (516 IM).

These guidelines are published according to Section 1507.3 of the CEQ regulations and Section 6.4A of Part 516 of the Departmental Manual. They explain require-ments contained in NEPA, the CEQ regulations and 516 IM. All proposed NPS actions should be considered in relation to the provisions of these guidelines.

While these guidelines constitute a permanent directive to NPS personnel, they are strictly advisory and do not create, add to, or otherwise modify any legal requirement. The procedures described in these guidelines were devised solely to aid NPS officials in the internal administration of the bureau, and are subject to reinterpretation, revision or suspension by NPS in its discretion at any time without notice. Users of these guidelines should resolve any conflict with its content in favor of the applicable legal requirements.

### 1-2 OVERVIEW OF THE NEPA PROCESS

The need for NEPA compliance must be considered whenever the NPS proposes an action. The initial step is identification of a proposed action, which must be analyzed to determine the need for and the type of NEPA compliance required. Once the proposed action is defined, existing environmental documents and the NPS "categorical exclusions" (516 IM 2, Appendix 1; 516 IM 6, Appendices 3 & 7) should be examined to see if the action (a) has already been adequately evaluated, or (b) is categorically excluded from the NEPA process.

If the proposed action is adequately evaluated in a previous environmental document, or is contained in the Departmental and/or NPS lists of categorical exclusions, and is not a Departmental exception (516 IM 2.3A(3)), further NEPA compliance is not required. If an action is not categorically excluded, an environmental assessment (EA) and/or environmental impact statement (EIS) must be prepared. EA's are prepared in order to determine whether an EIS is required. In addition, EA's can serve to assist NPS planning and decisionmaking. EIS's

NEPA COMPLIANCE GUIDELINE
NPS-12
Introduction

Guideline
Chapter 1
Page 2

are prepared on proposed actions which may or will have a significant impact
on the quality of the human environment.  Following preparation of an EA,
responsible NPS officials will examine it to determine the significance of the
environmental impacts of the proposed action.  If they determine the impacts
not to be significant, NPS prepares a finding of no significant impact (FONSI).
If the impacts are significant, preparation of an EIS is initiated.  If it is
clear from the outset that an EIS is needed, no EA should be prepared.

The EIS process begins with a Federal Register Notice of Intent (NOI) announcing
that the National Park Service will prepare an EIS.  "Scoping" is a process to
narrow and define the significant environmental effect issues and alternatives
to be analyzed in the EIS.  The EIS process proceeds to develop draft and final
forms of a single document:  a draft environmental impact statement (DEIS),
which is normally circulated for 60 days (from the date of filing with EPA) for
public and interagency review and comment; and a final environmental impact
statement (FEIS), which includes (or summarizes) and responds to comments
received on the draft EIS.  The process normally is the same with supplements
to an EIS.  No sooner than 30 days following release of the FEIS, a Record of
Decision (ROD) is prepared to document the NPS decision.  The process described
briefly above is presented in graphic form in Exhibit 1 of this chapter.

## 1-3 USE AND ORGANIZATION OF THIS GUIDELINE

### A.  Relation to Other Directives and Guidance

The Council on Environmental Quality (CEQ) published Regulations for Implementing
the Procedural Provisions of NEPA on November 29, 1978 (40 CFR Parts 1500-1508).
The Department of the Interior (DOI) has published Part 516 of the Departmental
Manual (516 DM) to further facilitate NEPA compliance.  In January 1981, DOI
published Appendix 7 to 516 DM 6, containing NEPA procedures specific to NPS;
and in March 1981, DOI published Appendix 3 to 516 DM 6 containing NEPA procedures
specific to the Heritage Conservation and Recreation Service (HCRS), now merged
with NPS.  This guideline explains the above NEPA compliance procedures as they
apply to proposed NPS actions.  A copy of each of the above-mentioned documents
is appended for easy reference.  All previous versions of NPS-12, NPS-13, Special
Directive 80-3, all guidance memoranda and other written NPS NEPA guidance
preceding the effective date of these guidelines are superseded by the
instructions contained herein.

These guidelines are organized to correspond chapter-by-chapter with 516 DM.
They do not stand alone, but must be used in conjunction with 516 DM and the
CEQ Regulations.  Any apparent conflict between these guidelines and either the
CEQ Regulations or 516 DM shall be resolved in favor of the CEQ Regulations
and Departmental Manual.  The CEQ Regulations and Departmental Manual are cross-
referenced by identifying the appropriate sections in parentheses.



NPS compliance with NEPA should be integrated with other legislative and
executive requirements and with NPS policies.  Therefore, NPS-12 should be
used in conjunction with instructions issued in such Service guidance as the
Planning Process Guidelines (NPS-2), Guidelines for Public Participation
(NPS-3), Guidelines for Cultural Resources Management (NPS-28), NPS Management
Policies, current Staff and Special Directives, and relevant NPS and
Departmental memoranda.

B.  NPS Program-Specific NEPA Guidance

Three National Park Service grant programs have published further program-
specific environmental compliance guidance which supplements information in
this guideline:

    1.  Land and Water Conservation Fund Program, Catalog of
        Federal Domestic Assistance (CFDA) #15.400:  Chapter 1,
        Part 650 of the Grants-in-Aid Manual.

    2.  Historic Preservation Grants Program, CFDA #15.411:  Chapter 4
        of the Grants Manual for the Historic Preservation Fund.

    3.  Urban Park and Recreation Recovery Program (UPARR),
        CFDA #15.919:  Chapter 11 of the UPARR Grants Manual.

In cases where the above supplementary NEPA guidance appears to conflict
with this guideline, the provisions of this guideline, 516 DM and the CEQ
Regulations shall govern.


1-4 CHANGES TO THIS GUIDELINE

Recommendations for amendments to this guideline may be submitted for
consideration to the Chief, Environmental Compliance Division (WASO-135),
at any time.  WASO-135 will clear proposed amendments with the Office of
Environmental Project Review (OEPR), the Solicitor, and Assistant Secretary
for Fish and Wildlife and Parks prior to their publication.

NEPA COMPLIANCE GUIDELINE                                    Guideline
NPS-12                                                       Chapter 1
Introduction                                                 Page 4

1-5 RESPONSIBILITIES AND AUTHORITIES
(516 DM 1.3, 1.6, 6.3, 6.4; Appendix 7.1 to 516 DM 6)

A.  Assistant Secretary for Policy, Budget and Administration (PBA)

The Assistant Secretary, PBA, has approval authority for NPS EIS's which
require Secretarial action, such as proposals for legislation.  These EIS's
include but are not limited to those covering:  wilderness proposals, wild
and scenic river proposals, trail proposals, and proposed major boundary
adjustments.

B.  Assistant Secretary for Fish and Wildlife and Parks (FWP)

The Assistant Secretary (FWP) is responsible for compliance with NEPA, the
CEQ Regulations, and Executive Order 11514.  The Assistant Secretary retains
approval authority for EIS's prepared jointly by NPS and the U.S. Fish and
Wildlife Service (Assistant Secretary FWP memorandum of September 19, 1979).

C.  Director, NPS

The Director, NPS, must comply with NEPA and the CEQ Regulations, and is
responsible for administering NPS compliance.  The Director has been delegated
authority to approve all NPS EIS's except those reserved for Secretarial
approval (see above).  The Director retains approval and signature authority
for programmatic EIS's for proposals of nationwide application such as the
promulgation of new Servicewide regulations.  In order to comply with
520 DM 1.6C(6), the Director retains approval and signature authority for any
environmental document which is combined with a single signature block with a
statement of findings pertaining to floodplain and/or wetland involvements
under Executive Orders 11988 and 11990.  The Director also retains signature
(as opposed to approval) authority for EIS's relating to legislative proposals,
such as for wild and scenic rivers, trails and wilderness.  While Regional
Directors are delegated authority to approve and sign other site-specific EIS's,
the Director may assume signature authority for any such EIS which is of an
unusually controversial nature, or which involves major policy issues.  The
Director is also responsible for providing overall management and policy
guidance for NPS involvement in NEPA early coordination and in review processes
regarding non-NPS proposals, and for compliance with other authorities cited
herein.

D.  Chief, Office of Park Planning and Environmental Quality (WASO-130)

The Chief, Office of Park Planning and Environmental Quality, develops and
publishes NPS guidance for compliance with NEPA and related requirements.
This office provides policy review of, and must clear, all proposed NPS EIS's

prior to signature by either the Director or a Regional Director, or before
referral to the Office of Environmental Project Review (OEPR) for those
reserved for Secretarial approval. WASO-130 also serves as the focal point
for referral of all NPS environmental matters to the Department, CEQ, and
other Federal agencies. The Chief, WASO-130, also has signature authority
from the Director to sign or surname certain NEPA environmental review
comments as outlined in Chapter 7 of this guideline.

E.  Chief, Division of Environmental Compliance (WASO-135)

The Chief, Division of Environmental Compliance, oversees NPS compliance with
the procedural requirements of NEPA, including preparation of NPS environmental
documents; NPS involvement in other agencies' NEPA scoping and other early
coordination activity; and the review of environmental documents from other
agencies. This office reviews all proposed draft and final NPS EIS's and
makes recommendations to the Chief, Office of Park Planning and Environmental
Quality, regarding clearance for printing.

The Chief, WASO-135, is responsible to the Chief, WASO-130, for development and
preparation of NPS guidelines for NPS NEPA compliance. The Chief, WASO-135,
provides Servicewide technical and procedural assistance and training on NPS
NEPA compliance. WASO-135 receives and controls the flow of other agencies'
environmental and related documents referred to NPS for review purposes, and
assigns participation roles (in NEPA and related early coordination and review
processes) to regional and program offices as appropriate.

F.  Regional Directors

Regional Directors are responsible for assuring the quality of NEPA document
preparation and review carried on within their regions, parallel to authorities
exercised nationally by the Director. Regional Directors should designate
Regional Environmental Coordinators for their particular regions. Regional
Directors are delegated authority to:

1.  Approve and sign NPS site-specific EIS's prepared for actions
    proposed in their regions, after obtaining printing clearance
    from WASO-130 and the Office of the Solicitor. Where a proposed
    action involves two or more regions, all responsible Regional
    Directors will sign the document. This authority may not be
    redelegated.

    Exceptions to this delegated authority occur for (a) legislative
    proposals (wilderness, wild and scenic rivers, trails, etc.) or
    other Secretarial actions, and (b) for documents, combined with a
    wetland-floodplain Statement of Findings (See 1-5(C)).

NEPA COMPLIANCE GUIDELINE
NPS-12
Introduction

Guideline
Chapter 1
Page 6

2.  Approve environmental assessments (no signature needed), and
    approve and sign findings of no significant impact (FONSI's).
    The authority to approve environmental assessments may be
    redelegated to superintendents; however, authority to approve
    and sign FONSI's may not be redelegated beyond the Regional
    Office.  An exception to the Regional Director's approval/
    signature authority occurs when an environmental assessment or
    FONSI is combined (with a single signature block) with a state-
    ment of findings pertaining to floodplains and/or wetlands.
    In these cases the Director, NPS, retains approval and signature
    authority, per 520 DM 1.6C(6).

3.  Accept or decline requests for NPS participation as a cooperating
    or joint lead agency in the preparation of EIS's by other agencies.
    This authority may not be redelegated.

4.  Provide technical assistance to other Federal agencies or other
    entities involved in preparation of an environmental document.
    This authority may be redelegated.

5.  Review and comment directly on environmental assessments (but not
    EIS's) of other agencies.  This authority may be redelegated.  It
    is overridden if contrary instruction is received through the
    normal environmental review process from WASO-135 and/or OEPR.
    (Reviews of other agency EIS's must be coordinated through OEPR
    according to 516 DM 7.7 - no direct NPS response is allowed.)

G.  Regional Environmental Coordinators (REC's)

Regional Environmental Coordinators are designated by the Regional Director
within each region.  Subject to the direction of the Regional Director, the REC's
shall have oversight responsibility for all environmental compliance activities
within the region.  Regional Environmental Coordinators are responsible for
knowing the status of NPS plans and other matters requiring supporting environ-
mental documentation.  The REC serves as the focal point for coordination of all
regional environmental matters with the Washington Office, and provides
professional advice and direction on environmental matters to other regional
personnel.  REC's provide, or arrange for provision of, appropriate regional
review of environmental documents from other agencies and relate such review
activities to all areas of NPS jurisdiction and expertise, including regional
park planning and compliance work.  Regional and park participation in NEPA-
related early coordination/technical assistance activities should be coordinated
by the REC, as should interrelationships (including time frames) with other
compliance requirements such as for endangered species, cultural resources,
wetlands-floodplains, coastal zone management, etc.

H. Denver Service Center (DSC) - Legislative Compliance Division (LCD)

The Legislative Compliance Division is responsible for procedural NEPA
oversight on all DSC activities.  The LCD, through early review and consulta-
tion, monitors procedural aspects of all DSC projects for compliance with
legal and administrative requirements governing natural and cultural resources.
This division also provides the environmental specialists on the various teams
with current NEPA and other compliance guidance.  The division delegates
procedural monitoring functions to team members as appropriate.

I. Superintendents

Superintendents are responsible for assuring that all proposed park actions are
in compliance with NEPA and other environmental requirements.  They are to insure
that such compliance needs are identified in Forms 10-238 or other instructions
for programming and implementing park actions.  The superintendent should consult
regularly with the Regional Environmental Coordinator (REC) about compliance
needs for specific projects and how they should be met; request assistance as
necessary from the REC in preparing documentation; and keep the REC informed about
ongoing park projects.  The superintendent shall provide the Regional Director
(attn:  REC) with a copy of all environmental assessments prepared by the park
and submit all proposed findings of no significant impact for signature by the
Regional Director or designee.

J. Contracting Officers

Contracting Officers in park areas, in regions, and in the DSC are responsible
for including in contract documents and specifications, all mitigating measures
identified in an environmental assessment and necessary to support a FONSI for
an action; or identified and committed to as part of the decision on an action
in an EIS.  Contracting Officers are also responsible for assuring that NEPA
clearance and appropriate cultural resource clearances are obtained on all
change orders.

## INITIATING THE NEPA PROCESS

### 2-1 CATEGORICAL EXCLUSIONS
(516 DM 2.3A; 40 CFR 1508.4)

Proposed actions with no potential, either individually or cumulatively, for significant environmental impact may be categorically excluded from the NEPA process. Categorical exclusions for NPS actions are listed in 516 DM 2, Appendix 1; and in 516 DM 6, Appendices 3 and 7. NPS actions which appear to be excluded from the NEPA process must also be carefully checked against the list of "exceptions" to categorical exclusions in 516 DM 2.3A(3). If a proposed action is covered by one or more of the exceptions, an EA and/or EIS is required.

When a proposed NPS action is categorically excluded from the NEPA process, the responsible NPS official (Regional Director, WASO Program Manager, or their designee) may (but need not) prepare a brief (usually less than one page) memo to the file describing the nature of the proposal and its associated effects, citing the applicable categorical exclusion, and possibly even referring to the list of exceptions in 516 DM 2.3A(3) if such a reference is reasonable and useful. Normally, such information is contained in the NPS Form 10-238 or the task directive for NPS planning proposals.

### 2-2 NOTICE OF INTENT (NOI) TO PREPARE AN EIS
(516 DM 2.3D; 40 CFR 1508.22)

Regional Directors and/or responsible WASO program office chiefs should prepare (in consultation with any involved park) and submit the original and two copies of each NOI (and a memo indicating completion of the legal sufficiency review by the Solicitor) to the Chief, Administrative Services Division (WASO-230) with a request for publication in the Federal Register. Concurrently, copies of the NOI and request for publication should be provided through WASO-135 to the OEPR. The NOI may serve to initiate the scoping process by soliciting public comment on issues and concerns regarding the proposal. Information in the NOI should also be made available to appropriate State and local entities designated according to Executive Order 12372, and to known interested agencies, groups, individuals, and the general public through appropriate media. Where another Federal agency has jurisdiction by law over some aspect of the proposed action, transmit a copy of the NOI with a letter specifically asking that they become a cooperating agency (see next section.)

2-3 LEAD AND COOPERATING AGENCIES
(516 DM 2.4, 2.5; 40 CFR 1501.5, 1501.6)

A.  NPS Areas of Jurisdiction by Law

When an EIS is to be prepared by another agency for a Federal proposal over
which NPS has jurisdiction by law, the NPS is required to become a cooperating
agency if so requested.  Areas of NPS jurisdiction by law include (but are not
limited to):

   Mining operations and exercise of non-federal oil and gas rights within
   units of the National Park System;

   Mineral leasing within units of the National Park System;

   Grazing in NPS-administered areas;

   Issuance of FERC licenses and permits in NPS-administered areas;

   Issuance of special use permits and right-of-way easements for
   non-park uses in NPS-administered areas;

   Other activities within units of the National Park System and
   affiliated areas; and

   Protection of lands acquired, developed or conveyed through the Land
   and Water Conservation Fund, the Urban Park and Recreation Recovery
   Program, the Federal Surplus Property Program, and the Recreation
   Demonstration Projects Act.

For NEPA purposes, "jurisdiction by law" means that an agency (NPS) has authority
to approve, veto, or finance all or part of a proposal.

B.  NPS Areas of Special Expertise

NPS also has "special expertise" with respect to several environmental concerns
which often must be considered in EIS's; and NPS administers several statutory
authorities not involving approval, veto, or financing of another agency's
proposal.  For other agency actions requiring an EIS and involving a proposal for
which NPS possesses either special expertise or statutory authority not involving
approval, veto, or financing of the other agency's proposal, NPS may become a
cooperating agency if determined appropriate by the responsible NPS official.
When the responsible NPS official finds it appropriate for NPS to become a
cooperating agency, a written notification should be provided to the lead agency
with a copy to WASO-135 and OEPR.  Areas of NPS special expertise or statutory
authority not involving approval, veto, or financing of another agency's proposal
include but are not limited to:

NEPA COMPLIANCE GUIDELINE
NPS-12
Initiating the NEPA Process

Guideline
Chapter 2
Page 3

Park and recreation planning and management;

Historic and archeological resource planning and management;

National Wild and Scenic Rivers and National Trails;

Dynamics and management of coastal barrier islands;

National Environmental Education Landmarks;

National Natural and Historic Landmarks;

World Heritage List areas;

Man and the Biosphere/Biosphere Reserves;

Section 6(f) of the Land and Water Conservation Fund Act of 1965;

Section 4(f) of the Department of Transportation Act of 1966;

Urban Mass Transportation Assistance Act;

Federal Power Act;

National Historic Preservation Act;

National Register of Historic Places;

Section 8 of the General Authorities Act;

Railroad Revitalization Act;

Economic Recovery Tax Act of 1981;

Urban Park and Recreation Recovery Act of 1978;

Historic Preservation Fund grants;

Antiquities Act;

Historic Sites Act;

Archeological and Historic Preservation Act;

Archeological Resources Protection Act;

Historic Sites Act;

Tax Reform Act; and

NEPA COMPLIANCE GUIDELINE
NPS-12
Initiating the NEPA Process

Guideline
Chapter 2
Page 4

Proposals which may affect units of the National Park System; e.g.,
upstream water management practices or power plants near Class I
air quality areas.

## C. Requests for NPS to be a Cooperating Agency

A request for NPS to become a cooperating agency may involve only technical
assistance or review of early planning efforts, such as is required in scoping.
Or it might include a request to develop specific information and to prepare
analyses, including writing portions of the requesting agency's EIS. The NPS
level of commitment beyond that required by 40 CFR 1501.6 must be determined
on a case-by-case basis. This may require deliberations between the lead agency
and one or more NPS officials, including the Chief, WASO-135, the NPS Regional
Director or Regional Environmental Coordinator, or park superintendent. When a
major commitment of resources will be necessary, the responsible NPS official
should negotiate with the requesting agency for a transfer of funds.

## D. NPS Responsibilities as a Cooperating Agency

During negotiations with an agency that has requested NPS participation as a
cooperating agency, NPS should be responsive and helpful to the extent that
available personnel resources and funding allow. NPS can provide available
information, professional judgements, and technical assistance. NPS should
advise sponsoring agencies of resources available through State and local park,
recreation, and historic preservation agencies and organizations. Negotiations
for NPS participation should establish time limits within which NPS will provide
studies and analyses. Services and data available from NPS cooperative research
units at universities should be used as appropriate.

## E. Cooperating Agency Agreements

Agencies with a continuing need for NPS cooperation should be encouraged to
make formal long-term commitments (by agreement) for supplying needed funds and/or
personnel. Such cooperating agency agreements should outline the scope of the
work to be provided, including descriptions of the level of effort, the products
to be delivered, deadlines for delivery, and the amount, if any, of funds to be
transferred. Funding sought should pertain only to NPS participation as a
cooperating agency. Costs of participating in normal scoping and of reviewing and
commenting on environmental documents are to be borne by NPS.

## F. Cooperation Regarding NPS Special Expertise

When areas of NPS special expertise are involved (as opposed to jurisdiction by
law), NPS normally should agree to become a cooperating agency to the extent that
personnel and funding allow. When cooperation beyond NPS fiscal capability is
requested, reimbursement may be sought. The benefits of early participation in
other agency planning which may affect NPS interests and concerns can be
significant. Such cooperation can result in better agency relationships as well
as in actions which are environmentally more acceptable to NPS. The Service
should carefully assess, on a preliminary basis, resources to be impacted and the

NEPA COMPLIANCE GUIDELINE                                    Guideline
NPS-12                                                       Chapter 2
Initiating the NEPA Process                                  Page 5

magnitude and severity of potential effects before declining a request to
cooperate. While input into the scoping process will satisfy some NPS concerns,
the Service should formally become a cooperating agency if we may later find it
necessary to object to the project.

G.   Decisions Not to Become a Cooperating Agency

If NPS is precluded from cooperating because of other program commitments, or
if a mutually satisfactory agreement as to the level of involvement (e.g.,
transfer of funds or personnel), cannot be reached, the responsible Washington
or regional official should notify the requesting agency of the NPS decision in
writing with copies to WASO-135 and the OEPR. This should be done as early as
possible, but not later than 30 days from the date that the request to cooperate
is received.

H.   Decisions Regarding Cooperating Agency Status

When Regional Directors or WASO program managers act on requests to assume either
joint lead or cooperating agency status on an EIS, a copy of the decision should
be sent through WASO-135 to the OEPR.

I.   Provision of Notice of Intent to Other Agencies

When NPS proposes an action requiring an EIS, provide copies of the NOI to those
agencies with jurisdiction by law or special expertise and invite them to become
cooperating agencies. Where an agency's jurisdiction is by law, transmit the
NOI with a letter specifically asking that they become a cooperating (or joint
lead) agency.

2-4 SCOPING
(516 DM 2.6; 40 CFR 1501.7)

A.   Scoping and NPS Proposals

Scoping is an early and open process to determine the range of actions,
alternatives and impacts to be addressed in an EIS. Scoping for all NPS proposals
should also include a determination of permits and other entitlements which must
be obtained from any Federal, State or local source prior to implementation of the
NPS proposal. Scoping is a process and not simply a single event or meeting,
although scoping meetings are sometimes held. Public participation may provide
input to the scoping process, but is not the only element of it. The scoping
process sifts all input for critical environmental/decision significance, decides
upon the issues and alternatives to be documented in the EIS and provides the
reasons for dropping lesser environmental issues and alternatives from further
consideration.

The NPS has agreed to invite the participation of the Advisory Council on Historic Preservation when historic properties* are associated with alternatives under consideration in connection with an NPS proposal.  In addition, all other known interested or affected parties (Federal, State, local and private) should be notified and invited to participate in the early consultation process for NPS EIS's. With the exceptions of the Advisory Council and the State Historic Preservation Officer, who should be formally invited by letter, this notification may be satisfied through the NOI provided it is sufficiently informative to set forth the proposed action under consideration, its alternatives, and principal impact issues identified at that stage in the process.  Written notification should also be provided to appropriate State and local entities designated according to Executive Order 12372 and to agencies with statutory or regulatory involvement. Other known interested parties may be formally or informally contacted, as appropriate.  The NPS official responsible for maintaining the administrative record should include a record of contacts made and responses received.  The scoping process may also be applied to preparation of environmental assessments; and should preparation of an EIS be necessary, a more limited scoping process may then be adequate for that EIS.

Please refer to the detailed CEQ guidance on scoping in Appendix 3 to these guidelines.

B.  Scoping and Other Agency Proposals

For the EIS's of other agencies, scoping provides an early opportunity to identify NPS interests and concerns, and to define the depth to which these concerns should be addressed in the EIS.  When NPS learns through an NOI that another agency's proposal may affect NPS interests, it is not appropriate for NPS to simply advise the agency that it will become involved when a draft EIS becomes available.  The intent of the CEQ regulations is to produce coordination as early and as fully as possible prior to production of a draft EIS.  At a minimum, initial NPS input should indicate general concerns or a determination of no objection if there appears to be little or no potential effect on areas of NPS jurisdiction or expertise.

*Historic Property:  Historic property, as referred to in programmatic memorandums of agreement with the Advisory Council on Historic Preservation, includes all property, historic and prehistoric, on the Cultural Sites Inventory, on the List of Classified Structures, included on or eligible for the National Register of Historic Places, or determined by Park Service regional office cultural resources specialists to meet the criteria for inclusion on the National Register.  (The specific criteria that a given property has met will be identified and the evaluation documented.)  Historic (and prehistoric) properties can include districts, objects, and historic documents, as well as structures and sites.  All historic properties are managed in accordance with NPS-28 and NPS "Management Policies."  Note that this definition is much broader than that contained in the National Historic Preservation Act, Section 301(5).

NEPA COMPLIANCE GUIDELINE                                              Guideline
NPS-12                                                                Chapter 2
Initiating the NEPA Process                                           Page 7

If the proposal appears to affect resources or matters for which NPS has
jurisdiction by law, the responsible NPS official shall advise the sponsoring
agency that NPS wishes to participate in the scoping process and become a
cooperating agency; and a cooperative process should be established to resolve
concerns and assure adequate compliance for any related action NPS would have
to take.

If NPS was coordinating with the sponsoring agency prior to the NOI stage, a
simple reply to that effect and an indication of continued NPS cooperation is
a proper response.

NPS should coordinate its participation in scoping with appropriate State agencies.
Reports and project recommendations should be forwarded to sponsoring agencies to
allow sufficient time for their incorporation into project plans and draft decision
documents, including the draft EIS. NPS responses to scoping should be documented
in the draft EIS's for which they are submitted, and NPS comments on draft EIS's
should indicate omissions or discrepancies in the use of NPS input.


## 2.5 WRITING STYLE
(40 CFR 1502.8)

### A.  General

NPS environmental documents should be readable and communicate well. Bureaucratic
jargon should be excluded. Where feasible, use the active voice in preference to
the passive. Use "would" in lieu of "will" in descriptions of the effects which
would result from implementation of the proposal and the alternatives. This usage
indicates that final decisions have not yet been made regarding the proposal.
Exceptions to this usage include FONSI's and records of decision, where the use of
"will" is appropriate. Write NPS environmental documents for an educated lay
public which is generally informed about the topics being discussed, rather than
for an audience of scientific or professional peers.

### B.  Referenced Information

Pages of text from other documents should not be reproduced and incorporated
verbatim into environmental documents unless they are absolutely essential for
understanding the issues. Normally, information needed from other documents
should be referenced and/or summarized in the NPS document. Place emphasis on
producing analytic instead of encyclopedic documents. Long lists and tables
(if necessary for the document) and other supportive material should normally
be placed in an appendix.

NEPA COMPLIANCE GUIDELINE
NPS-12

Guideline
Chapter 3
Page 1

## ENVIRONMENTAL ASSESSMENTS AND
## FINDINGS OF NO SIGNIFICANT IMPACT

### 3-1 WHEN TO PREPARE AN ENVIRONMENTAL ASSESSMENT

A.  Applicability to NPS Projects

An Environmental Assessment (EA) shall be prepared for all proposed NPS actions
which are not categorically excluded from the NEPA process or adequately covered
in a previous NEPA document, unless a decision has been made to prepare an EIS
(see 516 DM, Appendix 7.3A for NPS actions normally requiring an EIS).  The purpose
of an EA is to determine whether a proposed action may or will have a significant
impact on the quality of the human environment and require the preparation of an
EIS.  In addition, an EA may be prepared on any action at any time in order to
assist in planning and decisionmaking.

The Environmental Assessment process is displayed graphically in Exhibit 1 of this
chapter.

B.  Identifying the Need for an Assessment

The need for an EA should be identified in any Forms 10-238, Task Directives,
instructional memoranda, or similar documents outlining the proposal or task to
be done.  EA preparation should begin at the earliest reasonable time prior to
decisionmaking.

C.  Exceptions to Categorical Exclusions

Although a proposed action may normally be categorically excluded from the NEPA
process, it will still require an EA and/or an EIS if it is covered by the list
of exceptions to categorical exclusions which appear in 516 DM 2.3A(3).

### 3-2 PREPARING AN ENVIRONMENTAL ASSESSMENT
(516 DM 3.4; 40 CFR 1508.9)

A.  Purpose of an Environmental Assessment

An EA should briefly provide sufficient evidence and analysis for determining
whether to prepare an environmental impact statement or a finding of no significant
impact.

B.  Length of an Environmental Assessment

The length of an EA will depend on the complexity of issues being addressed and
consequences being analyzed.  The document length should normally vary from a few
pages on a simple project, to no more than 50 pages on complex projects.  The use
of graphics, tables, incorporation by reference and tiering on other documents,
when appropriate, should substantially reduce the need for lengthy descriptions.

September 1982

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Assessments and
Findings of No Significant Impact

Guideline
Chapter 3
Page 2

C.  Format and Content of NPS Environmental Assessments

There is no required format for an EA, except when EA's are combined with certain planning or study documents (see Section 4 and Appendix 5 of this guideline). An EA may also be combined with any other NPS document. Whether combined or standing alone, however, that part of the EA detailing environmental impacts of the proposal and alternatives must be clearly separable and identifiable. All EA's (whether combined or standing alone) must contain the following information:

1.  Need for the proposal: This section briefly outlines the issues or problems requiring action and/or what the proposed action is intended to accomplish. Solutions should not be proposed here, but rather in the following section. The length of this section need not exceed one or two pages, and in many instances, it can probably be concluded in one or two paragraphs.

2.  Alternatives: As is indicated in 40 CFR 1508.9(b), an EA should evaluate alternatives as required by Section 102(2)(E) of NEPA. This section of NEPA requires agencies to study, develop and describe alternatives to recommended courses of action "in any proposal which involves unresolved conflicts concerning alternative uses of available resources." It is thus possible to have an EA which evaluates only the proposed action, if it meets the criterion of having no unresolved conflicts concerning alterna- tive uses of available resources. Other EA's may evaluate a number of alternative ways of accomplishing a proposed action. Although a preferred alternative need not be identified in an EA with more than one alternative, a preferred alternative may be necessary in assessments where compliance with the Endangered Species Act or Executive Orders 11988 or 11990 (wetlands/floodplains) is also required. A no-action alternative may be useful in certain EA's in order to provide a comparative analysis of existing conditions. "No-action" means the continuation of present trends and conditions, rather than taking action to discontinue a present practice or remove existing development. Park plans and the related EA may have several series of alternatives relating to management of various natural and cultural resources, visitor use activities, etc. Mitigating measures should be incorporated into the alternatives. Alternatives considered should be distinctly different, rather than minor variations of each other; and should be reasonable in terms of such things as cost and time required for implementation.

3.  Environmental Impacts of the Alternatives: Impacts discussed should indicate some understanding of the degree of environmental effects expected and may include beneficial and adverse effects, direct and indirect effects, short or long term effects, and cumulative effects. Suitable methods such as text, charts, tables, matrices, or other graphic displays should be used to present the information concisely. Categories of impor- tant impacts often encountered in NPS planning include ecological, aesthe- tic, historic/cultural, economic, social and health. However, analyses should focus on specific issues and not generalize. For EA's with three or

more alternatives, the use of comparative charts for summary and overview purposes is recommended. Written text should also be provided where the comparative extent of impacts is not immediately obvious from a matrix presentation. The impact analyses should specifically indicate whether endangered species, floodplains, wetlands, historic properties as defined in NPS-28 (see footnote, Chapter 3, Page 6) or other unique resources will be affected. Where historic properties are affected, the process set forth in 36 CFR 800 should be initiated and the resulting determinations should be included in the EA.

4. List of Persons and Agencies Consulted: Persons, organizations and agencies contacted for information, or that assisted in identifying important issues, developing alternatives, or analyzing impacts should be listed.

No separate description of the environment is required in an EA, as this information can be woven into the text of the sections on need for the proposal, discussion of alternatives and impact. For large or complex projects, a more extensive format similar to that of an EIS may be used; but the text should still concentrate primarily on the major consequences which may be significant enough to require EIS preparation.

D. Other Guidance

To reduce paperwork and duplication, an EA may be combined with any other NPS document as a dual-titled document. However, the portion of an EA which contains the analysis of environmental impacts should be clearly separated and identified. Where there is a need to present non-environmental considerations to the decision-maker, such information may be attached as appendices or woven into the description of the alternatives. EA's and FONSI's do not normally require WASO involvement except in cases where they are combined with a park plan, a wetland/floodplain statement of findings or other document requiring WASO action. Although EA's need not be signed, any FONSI or Notice of Intent following completion of an EA must be signed and dated. Authority to approve EA's may either be retained by the Regional Director, or redelegated to superintendents.

3-3 PUBLIC INVOLVEMENT IN THE EA PROCESS
(516 DM 3.3; 40 CFR 1506.6)

A. Public Notification

Public notice of EA availability should be provided, although public review of EA's for actions not normally requiring an EIS is at the discretion of the decision-maker. Where appropriate, environmental agencies, applicants and the public should be involved in the EA process. Any appropriate method of notice including mailings, a Federal Register notice, a news release, or a meeting with concerned agencies and individuals may be used. The preparing office should determine the best method to reach the affected public, with emphasis placed on interested

groups and individuals, including those likely to be opposed to one or more
alternatives. EA availability should be announced in the Federal Register for an
NPS action likely to be of national interest.

Public notice of availability should indicate the subject of the EA; the
location(s) where a copy of the document can be obtained or inspected; the closing
date for any comment period; the time and places of public meetings (if any); and
the name(s), address(es) and telephone number(s) of the individual(s) from whom
further information may be obtained, and to whom comments on the EA should be
submitted.

B.  Public Reviews

On EA's for which a public review period is planned, a 30-day review period is
customary. Longer or shorter review periods may be designated, depending on
the anticipated level of interest or controversy, or to meet other requirements.
If public meetings are held, the review period should extend from at least 15
days prior to the first meeting to at least 15 days after the last meeting. This
type of review can also be used to fulfill at least a portion of the requirements
for scoping should it be determined that an EIS will be prepared for the proposal.


3-4 FINDING OF NO SIGNIFICANT IMPACT (FONSI)
(516 DM 2.3C; 40 CFR 1508.13)

A.  Description and Content; Signature Authority

If, based on an analysis of an EA and any public comments, the responsible
NPS official determines that the proposed action will not significantly affect
the quality of the human environment, a Finding of No Significant Impact (FONSI)
will be prepared. There is no set format for a FONSI; however, it must meet the
content requirements of 40 CFR 1508.13. Additionally, if the proposed action
requires compliance with other legislation (such as the Endangered Species Act
or the National Historic Preservation Act) or Executive requirements, evidence of
such compliance should be completed and documented prior to the approval and
signing of the FONSI. The FONSI should conclude with a statement that the project
does not constitute a major Federal action significantly affecting the quality of
the human environment, and that an EIS will thus not be prepared. A FONSI should
be brief, generally less than two pages, and must be a separate document rather
than part of the EA. Although EA's may be prepared by park superintendents,
FONSI's for such EA's must be signed in the regional office.


B.  Public Review

Comments generally are not solicited on a FONSI; however, the FONSI should be
available on request from the originator's file. A copy of the EA and FONSI
should be sent to those who have requested it. In addition, the preparing office
should as a matter of course send copies of the FONSI to persons who commented
on the EA.

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Assessments and
Findings of No Significant Impact

Guideline
Chapter 3
Page 5

For projects which normally require an EIS, and for proposed actions without precedent, proposed FONSI's should be circulated for a minimum of 30 days' public review, as required by 40 CFR 1501.4(e).

C.  Distribution

A copy of the FONSI should be attached to its EA as directed by 516 DM 2.3C. If a person or agency was sent the EA at the time of its release, and if you wish to send them the FONSI, a second copy of the EA need not be sent. A cover letter can simply suggest that the FONSI be attached to the previously-received EA.

D.  Combining With Wetland/Floodplain Statement of Findings

If the proposed action would be located in a floodplain or wetland, and if an analysis of the EA by the Regional Director results in a FONSI, a wetland/floodplain Statement of Findings may be combined with the FONSI as a separately identifiable document and the entire package forwarded to WASO for the Director's approval and signature.

E.  Timing of Preparation

For simple projects not involving a public review, the FONSI may be prepared immediately following NPS consideration of the EA. On more complex projects, the FONSI should be prepared following the close of the EA public comment period.

NEPA Compliance
NPS 12

EXHIBIT 1
Chapter 3

# ENVIRONMENTAL ASSESSMENT (EA)



## ENVIRONMENTAL IMPACT STATEMENTS

**4-1 FORMAT**
(516 DM 4; 40 CFR 1502.10)

The format prescribed in 40 CFR 1502.10 must be used unless WASO-135 and the Office of Environmental Project Review (OEPR) approve a format variation. Approved variations are published in Appendix 5 to this guideline. At the time of original printing (1982), three variations were approved - for NPS General Management Plans, Wild and Scenic River Studies, and Trail Studies. Other variations may be approved by amendment to Appendix 5. All other EIS's should use the standard format explained below.

**A. Cover Sheet**
(516 DM 4.7; 40 CFR 1502.11)

The format of 40 CFR 1502.11 should be used except for EIS's for grant proposals, which may use SF-424.

**B. Summary**
(516 DM 4.8; 40 CFR 1502.12)

**C. Table of Contents**
(40 CFR 1502.10)

The table of contents should be sufficiently detailed to allow the reader to quickly locate major subject matter in the EIS, particularly specific impact topics and alternatives analyzed by the document. The format elements in this section should be used as first-order headings, and supplemented by subordinate-order headings appropriate to the type of action being evaluated.

**D. Purpose of and Need for Action**
(516 DM 4.9; 40 CFR 1502.13)

**E. Alternatives Including the Proposed Action**
(516 DM 4.10; 40 CFR 1502.14)

1. The introduction to this section of the EIS should describe all compliance requirements pertinent to the proposal and the alternatives being evaluated under applicable environmental, historic preservation and other laws, regulations and Executive Orders. The introduction section should also describe those elements of the proposed action and alternatives which stem from legislative direction or prior actions on which compliance has already been completed.

2. The introduction is followed by a full range of reasonable alternatives designed to resolve pertinent issues and reach the objective of the proposed action. These may include alternatives requiring legislation or actions beyond the ability of the National Park Service to accomplish.

NEPA COMPLIANCE GUIDELINE    :
NPS-12
Environmental Impact Statements

Guideline
Chapter 4
Page 2

EIS's should include alternatives identified as the proposed action and as the preferred alternative, according to the guidance in 516 DM 4.10A.

3. The alternative of no-action, or continuing the status quo, must always be evaluated in the EIS. For park planning and management activities, the no-action alternative does not involve dropping present activity, but assumes that the NPS will respond to future needs and problems without major actions or changes in course.

4. The no-action alternative provides a basis for comparing the impacts of other "action" alternatives. Because the involved issues and objectives may be complex and sometimes competing, a particular alternative may not be able to address or resolve all of them. Each alternative should be a distinctly different approach to addressing important issues, and may thus emphasize the achievement of some objectives at the expense of others. Minor variations on each alternative should be considered sub-alternatives rather than alternatives in and of themselves. For clarity, each major alternative should be given a descriptive name and a number or letter. Any reasonable alternative with anticipated environmental consequences that differ significantly from those of the proposed action, should be considered a major alternative and analyzed fully.

5. The no-action alternative and the proposed action (and if applicable, the preferred alternative per 516 DM 4.10A) should normally be presented first. All alternatives not eliminated from detailed study should receive equal analysis, although the text allotted to subsequent alternatives can often be reduced by reference to the descriptions of the proposed action and the no-action alternatives. Mitigating measures to reduce or eliminate adverse environmental consequences should be integrated into the proposed action and alternatives. (516 DM 4.10B)

6. A summary display, normally in matrix form, of the proposal and alternatives, their significant environmental impacts, and other consequences as appropriate, should be used at the end of this section to bring issues, alternatives, and consequences into clear comparative focus, thereby promoting effective communication with other agencies and the public, and facilitating executive decisionmaking. Where impacts are displayed in a matrix, a narrative comparison should also be provided where the comparative significance of the impacts is not immediately obvious.

An exception to this practice occurs in EIS's which are combined with a General Management Plan, Wild and Scenic River Study or Trail Study, in which case the summary of impacts is presented in the consequences section (see Appendix 5).

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Impact Statements

Guideline
Chapter 4
Page 3

F. **Affected Environment**
(40 CFR 1502.15)

1. This section of the EIS should describe the environmental values that may or will be affected by the proposed action and alternatives. It should also describe or highlight those values or areas where the consequences of the proposed action or alternatives are potentially controversial or sensitive.

2. Sufficient information should be presented to give the reader a general understanding of the environment affected, but the length of this section should normally not exceed 20 percent of the total statement. Specific environmental information essential for developing the impact analysis (consequences section) should be incorporated into that section. Descriptive and background material helpful, but not essential, to the evaluation of impacts may be placed in an appendix. Other background and supporting material should simply be incorporated by reference in a standard bibliographic format. Typical material that should be incorporated by reference includes other NEPA documents, lists of common plants and animals, historic resource studies, detailed air and water quality data and standards, separate scientific studies, compilations of demographic and socioeconomic data, published works, and other references reasonably available for public inspection. When material is incorporated by reference, its applicable content should be very briefly summarized in the EIS and the material should be reasonably available to the public throughout the comment period on the EIS.

3. Descriptive information about a National Park System unit is usually drawn from the unit's existing information base, although additional information may occasionally be needed to provide an adequate basis for impact evaluation and decisionmaking. Descriptions of physical remains should be limited to those that may or will be affected, and National Register properties should be described only with respect to those qualities which make them eligible for the National Register. This section also typically describes such environmental factors as air and water quality, soil suitability for construction and plant growth, geologic conditions, topography, vegetation, climate, wildlife, and socioeconomic resources. The existing public use of the park, the socioeconomic environment of the region, park visitors, employees, inholders, and other park users are also described if affected by the proposal, as are ecological, jurisdictional, legislative, and other constraints on management, development, interpretation, energy use, and other uses of park lands or resources. The degree of detail for each value should be commensurate with the significance of the anticipated impact upon it.

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Impact Statements

Guideline
Chapter 4
Page 4

4.  The description of the affected environment should also contain, or
    reference, a descriptive inventory of historic properties as defined in
    NPS-28 (see footnote, Chapter 2, Page 6) within the potential impact area
    as well as a description of all affected historic properties, modern
    developments, and other existing manmade facilities. Specific locations
    need not, and in most cases should not, be given for archeological sites,
    but such information should be available for examination by the State
    Historic Preservation Officer and recognized professional institutions
    and individuals. When specific locations are intentionally omitted, the
    reason for the omission should be explained in the text. Locations
    should occasionally be included or made available to allow proper
    planning and/or understanding by reviewers. (See Chapter 3, NPS-28,
    "Cultural Resources Management," for detailed guidance.)

5.  Prime and unique agricultural lands and known endangered or threatened
    species of plants and animals and their critical habitats should be
    listed in this section. Specific locations of occurrence as well as
    descriptions of specific habitats of endangered species should at times,
    however, be omitted; and such omission is often requested by the U.S.
    Fish and Wildlife Service (FWS). Where locations are intentionally omitted,
    the reason should be explained and such information made available
    separately to FWS and other appropriate reviewers. One-hundred-year
    (100-year) floodplains (and 500-year floodplains, where critical actions
    are involved), flash flood areas, and possible effects of dam failure or
    misoperation should be delineated on appropriate maps if they occur in
    areas impacted by the range of alternative actions, as should areas of
    known geologic or other natural hazards. Affected wetlands and other areas
    of sensitive or significant resource value should also be located on
    area topographic maps. Where potential exists for impacts upon the global
    environment or upon the territory or resources of other nations, this
    broader environment should be described and evaluated in the same manner
    as domestic resources. (Forthcoming Departmental guidelines (516 DM 8)
    will establish procedures for compliance with E.O. 12114, "Environmental
    Effects Abroad of Major Federal Actions.")

G.  Environmental Consequences
    (40 CFR 1502.16)

1.  This section provides analytic scientific evaluation of the adverse
    and/or beneficial environmental consequences which may or would follow
    implementation of the proposed action or any of its reasonable alternatives.
    The evaluation should include direct, indirect, and cumulative environment-
    al effects; and should provide conclusions on impacts and the basis for
    those conclusions. Site-specific environmental data or descriptive infor-
    mation should be integrated into the analysis, to support impact conclu-
    sions. The effects of any mitigating measures included in the earlier
    descriptions of the proposed action and alternatives should also be
    evaluated.

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Impact Statements

Guideline
Chapter 4
Page 5

2. The evaluation of impacts on various environmental values should include (a) any beneficial and/or adverse impact remaining after mitigation, (b) the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (c) any irreversible or irretrievable commitments of resources which would occur if the alternative is implemented. These considerations can be woven into the analysis, rather than listed separately. The analysis of each alternative should conclude with a summarization of the impacts previously analyzed in detail, without drawing any conclusion about the desirability of a particular alternative.

3. Discussions of environmental consequences on cultural resources should be done in a manner similar to that for natural resources. In addition, if the resource is a historic property as defined in NPS-28 (see footnote, Chapter 2, Page 6), a determination of effect should be made in consultation with the appropriate State Historic Preservation Officer using the criteria of effect as defined in 36 CFR 800.3, and should be documented in an appendix. It should be clearly stated that the criteria for determination of effect are a classification of the Advisory Council on Historic Preservation, and thus may not equate directly with the level of apparent physical effect. Documentation of actions taken to comply with 36 CFR 800, along with final determinations made regarding historic properties and any comments from the Advisory Council, should be included in the final EIS.

4. The evaluation and analysis of environmental consequences for each alternative should include a discussion of any substantial conflicts with existing laws, and the objectives of Federal, regional, State, Indian tribe, or local land use plans, policies, and controls for the affected area. The analysis should also include, as appropriate, energy requirements, effects on urban quality and the design of the built environment, as well as the reuse, recycling, and conservation potentials of each alternative. Particular concern should be given to the effects of the alternative upon natural or depletable resources. Information on cost, technical feasibility, park management and operations, and other non-environmental factors relevant to the evaluation of alternatives should be included in the alternatives section rather than in the environmental consequences section. Means to mitigate adverse environmental impacts should be included if they were not described in the alternatives section.

H. List of Preparers
(516 DM 4.6B; 40 CFR 1502.17)

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Impact Statements

Guideline
Chapter 4
Page 6

I.  Consultation and Coordination in the Development of the Proposal and in the Preparation of the Environmental Impact Statement

This section should briefly discuss the important consultations during the evolution of the proposal, the alternatives and the EIS (including scoping); and should include all Federal, State, and local agencies, and major organizations and experts consulted.  Brief summaries of public involvement should also be included. Important environmental issues discussed during consultation should be described whenever conflicts are apparent or whenever issues remain unresolved.  If the consultations resulted in formal agreements, the agreements or their substance should be appended to the EIS.  A description of any pertinent existing and proposed coordinating mechanisms should also be included.  Consultations undertaken in compliance with other legislative and executive requirements should be discussed in the draft EIS rather than in an appendix; but a memorandum of agreement, etc. would be appendix material.  Appendices to the final EIS should contain major cooperative agreements, memoranda of agreement or understanding, and agency documentation indicating final compliance with applicable executive and legislative requirements, such as the comments of the Advisory Council on Historic Preservation in the form of a memorandum of agreement or a comment issued after a Council meeting.

This section should also include two major subsections as follows:

1.  List of Agencies, Organizations, and Persons to Whom Copies of the Statement are Sent (516 IM 4.6C; 40 CFR 1502.10) - In a draft EIS this list includes those to whom initial distribution of the draft EIS will be made.  The final EIS includes the draft EIS list plus any additions as a result of requests for copies of the draft EIS made through the end of the public review period.  List sections should be alphabetical with Federal agencies listed as the first section, followed by State and local agencies, Indian tribes, organizations, and individuals.  When the listing of individuals is longer than 3 pages, it may be deleted entirely and a note made that a complete list is available from the issuing office.  In final EIS's, asterisk (*) notation should be used to identify respondents to the draft EIS.

2.  A Public and Other Agency Comment and Response subsection should normally form the last major part of a final EIS.  All written comments on the draft EIS from Federal, State and local agencies and Indian tribes should be printed in full and not summarized, even if voluminous.  All other substantive written comments should either be printed in the final EIS or summarized if exceptionally voluminous.  Comments are considered to be substantive when they:  (a) question, with reasonable basis, the accuracy of information in the EIS; (b) question, with reasonable basis, the adequacy of environmental analysis; (c) present reasonable alternatives other than those presented in the EIS; or (d) cause changes or revisions in the proposal.  Substantive comments should be responded to in this comment/response section, using

a bracket and number in the commenting document keyed to either a response column printed alongside or following the document. Comments may also be characterized by issue, numerically keyed to the commenting document, and addressed in unified NPS responses. Comments from Federal, State and local agencies and Indian Tribes should still be addressed individually and cross-referenced to any summary responses.

The NPS will print enough draft and final EIS copies to distribute to interested parties. Ordinarily no more than 500 copies of an EIS need be printed. Copies of the EIS should be available for public inspection at the NPS WASO and Regional Offices, any involved parks(s), and at appropriate government offices and local libraries. Multiple copies need not normally be sent to individuals and organizations unless they pay the cost of extra reproduction.

J. Index
(40 CFR 1502.10)

The index should contain (in alphabetical sequence) enough key words from the EIS to allow easy location of information. The entries should relate to the subject matter of the text and should not repeat the general topical headings of the Table of Contents.

K. Appendices
(516 DM 4.11; 40 CFR 1502.18)

Appendices are for amplification or support of critical analyses in the EIS, rather than being a data bank and library for its total reference support. They should contain only major substantiating data, essential relevant descriptions of environmental components, important professional reports, copies of major legislative and executive documents, and other information necessary for a complete use of the EIS for analytical/decision purposes; but not necessarily all material essential to comprehend the analysis and conclusions reached, or support every statement in the document. Negotiated agreements regarding various compliance requirements (endangered species, cultural resources, etc.) are also appendix material.

4-2 SUPPLEMENTAL AND REVISED STATEMENTS
(516 DM 4.5; 40 CFR 1502.9)

A. Outdated Draft Statements

When a draft EIS becomes seriously outdated, a revised or supplemental draft EIS should be prepared and issued before the final EIS is prepared. It should be termed a "revised draft" if it is a complete rewrite of the previous draft, and

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Impact Statements

Guideline
Chapter 4
Page 8

a "supplemental draft" if it simply updates or adds to the information and analysis of the initial draft. A draft EIS is considered outdated and should normally be cancelled by WASO-135 (in consultation with the originating office) three years after its issuance, if no final EIS has been published.

B.  Content

When it is reasonable to assume that reviewers still have available copies of the draft EIS being supplemented, the material in the new document can be limited to that necessary to identify and discuss significant changes or additions. When this assumption cannot reasonably be made, the document should include a duplicate or a detailed summary of the initial draft.

C.  Responses to Comments on the Draft Statement

Comments received on the initial draft should be responded to in the revised or supplemental draft EIS. Comments on the revised or supplemental draft EIS are responded to in the final EIS.

D.  Revisions and Supplements to Multiple Related Statements

When it is necessary to revise or supplement two or more closely related draft EIS's, this should be done in a single document if possible.

E.  Consultations with OEPR and SOL

Consultations with OEPR and the Solicitor concerning the preparation of final EIS supplements or revisions should be coordinated through WASO-135. Supplements to final EIS's normally will be prepared in draft and final form (516 DM 4.5B; 40 CFR 1502.9(c)).


4-3 PROCESSING ENVIRONMENTAL IMPACT STATEMENTS

NPS EIS's fall into two categories which determine procedures for review and approval:

   1.  EIS's on proposed actions for which approval authority rests with NPS; and

   2.  EIS's which involve a Secretarial decision or recommendation or for which approval authority has otherwise been retained at the Departmental level.

The second category includes but is not limited to legislative proposals (such as those for wilderness, wild and scenic rivers, national trails) and other EIS's encompassing the jurisdictional involvement of two or more Assistant Secretaries.

The procedures for internal processing of NPS EIS's are included in Appendix 4.

NEPA COMPLIANCE GUIDELINE                                    Guideline
NPS-12                                                       Chapter 4
Environmental Impact Statements                              Page 9

## 4-4 TERMINATION OF THE EIS PROCESS

As used in this section, termination of the EIS process means to discontinue
preparation of a draft or final EIS; and if appropriate, prepare and issue
an environmental assessment and FONSI to satisfy NEPA requirements. This may
be done without consultation outside NPS following publication of the NOI and
before public distribution of the draft EIS. After the draft EIS is distributed
and comments received, however, NPS should normally respond to the comments
received, and complete the EIS unless the proposal is abandoned. In general,
the EIS process should be terminated due to lack of significant environmental
effects ONLY prior to public distribution of the draft EIS. WASO-135 should
consult with OEPR before terminating an EIS which has gone out for public review.

If an EIS is terminated, the Regional Director or other responsible NPS official
should prepare a Federal Register notice announcing the termination. The notice
should include a brief description of the proposal, a reference to the earlier
Federal Register Notice of Intent, NEPA compliance completed to date, and the
reason(s) for terminating the EIS.

If the reason for termination is abandonment of the proposal, the Federal Register
notice should indicate that the NEPA process will be reinitiated if the proposal
is revived at a future date.

The original and three copies of the proposed Federal Register notice should be
transmitted, with the appropriate Solicitor's approval, to the Administrative
Services Division (WASO-230) with a request for publication. Concurrently, a
copy of the notice should be provided through WASO-135 to the Office of Environ-
mental Project Review (OEPR).

If an EA and FONSI are subsequently prepared and substituted for what was
originally envisioned to be a draft EIS, the FONSI must be made available
for 30 days' public review according to procedures in 40 CFR 1501.4(e)(2).

WASO-135 normally should take action to cancel an EIS after the draft EIS has been
out for three years without being published in final form. See discussion in
Section 4-2, Supplemental and Revised Statements.

## 4-5 ABBREVIATED FINAL EIS'S
(516 DM 4.17C; 40 CFR 1503.4(c))

For EIS's requiring the approval of the Assistant Secretary for Policy, Budget
and Administration according to 516 DM 6.3 and Chapter 1 of these guidelines,
consultation should be undertaken with OEPR through WASO-135 when preparation of
an abbreviated final EIS is proposed.

Release No. 2                                              September 1982

NEPA COMPLIANCE GUIDELINE
NPS-12
Environmental Impact Statements

Guideline
Chapter 4
Page 10

When preparation of an abbreviated final EIS is proposed for initiatives whose EIS's require only NPS approval, the following format should normally be used:

1. Cover Sheet prepared according to 40 CFR 1502.11

2. Foreword Sheet which carefully explains that this document is an abbreviated FEIS and the contents of it must be integrated with the DEIS (giving name and date of issuance) to be considered a complete document reflecting the full proposal, its alternatives and all significant environmental impacts.

3. Errata Sheets prepared according to 40 CFR 1503.4(c)

4. Comments and responses prepared according to 40 CFR 1503.4 and 516 IM 4.17, and organized according to Section 4-1(I) of this guideline.

NEPA COMPLIANCE GUIDELINE
NPS-12

Guideline
Chapter 5
Page 1

## RELATIONSHIP TO DECISIONMAKING

### 5-1 PREDECISION REFERRALS TO CEQ
(516 DM 5.1; 40 CFR 1504.3)

In cases of both referral (by another Federal agency) of an NPS matter to CEQ, and referral by NPS of other agency matters to CEQ, WASO-135 is the focal point for NPS contact with other agencies, the Department and CEQ. WASO-135 shall fully coordinate with the appropriate Regional and Washington program office(s). Any reviewing office contemplating a referral by NPS should contact WASO-135 as early as possible. The scoping process for non-NPS projects provides an early opportunity for NPS to become aware of potential referrals and alert WASO-135 to the need to track them continually through the NEPA process so that if referral becomes necessary, NPS can prepare the requisite documentation in a timely manner. Ideally, such projects should be brought to the attention of WASO-135 before the final EIS stage. In all cases with the potential for referral, the administrative record for the proposal should provide a well-documented "trail" indicating attempted coordination by NPS with the involved agency prior to the final EIS stage.

### 5-2 RECORD OF DECISION
(516 DM 5.4; 40 CFR 1505.2)

Records of Decision should normally be signed by the same official signing the EIS. They need not be cleared by WASO-130 prior to signature. Copies of each completed Record of Decision shall be provided through WASO-135 to the Office of Environmental Project Review (OEPR).

NPS officials need not, but may, publish any Record of Decision in the Federal Register. Public notice of Records of Decision may also be provided through other appropriate means to ensure widespread notification to involved agencies, organizations and communities. Copies of Records of Decision usually should be provided to substantive commenters on the draft EIS and to others known to have a strong interest in the proposal. A Record of Decision may not be issued until the 30-day no-action period has elapsed following the filing of the final EIS. Record of Decision requirements are contained in 40 CFR 1505.2.

September 1982

NEPA COMPLIANCE GUIDELINE
NPS-12

Guideline
Chapter 6
Page 1

## MANAGING THE NEPA PROCESS

### 6-1 ORGANIZATION FOR ENVIRONMENTAL QUALITY

Interested persons can obtain information on the NPS NEPA process by
contacting:

Chief, Office of Park Planning and Environmental Quality
National Park Service (WASO-130)
U.S. Department of the Interior
18th and C Streets, N.W.
Washington, D.C. 20240
Phone:  202-343-6741

Similar information and copies of NPS NEPA documents can be obtained from
the appropriate National Park Service Regional Director.

NEPA COMPLIANCE GUIDELINE
NPS-12

## REVIEW OF NON-NPS DOCUMENTS

### 7-1 DUTY TO COMMENT
(516 DM 7.1, 7.2)

#### A. Policies

This chapter implements the policies and directives of CEQ and the Department of the Interior relating to National Park Service review and comment on non-NPS NEPA and related documents. The objectives of this review function are to aid other agencies in making the best possible decisions based on quality environmental analyses; to maintain the integrity of the National Park System; and to espouse the full range of other recreation, natural and cultural resource stewardship roles of the National Park Service.

#### B. Comment Requirements

NPS comments on other agencies' NEPA and related documents should:

1. Encourage those agencies to contribute to the protection, preservation, maintenance, safety, and enhancement of existing and potential units of the National Park System; other significant park and recreation values; historic, archeological, and architectural properties including those listed on the National Register of Historic Places; and unique natural resource values, including those areas listed in the National Registry of Natural Landmarks;

2. Assure that the sponsoring agency recognizes benefits and adverse effects relating to our areas of jurisdiction and expertise, and that those effects are presented in an understandable form to the general public and to decisionmakers;

3. Adequately describe practicable alternatives which are less damaging to NPS interests and concerns, and see that these are evaluated realistically and adopted where feasible;

4. Discuss mitigation measures to offset unavoidable adverse effects, and propose them as an integral part of the proposed action.

#### C. Early Involvement

The Service's ability to influence the proposals of other agencies is greatest at the early stages, before they invest in extensive planning and become committed to a specific alternative means of accomplishing an objective. For this reason, emphasis should be placed on early involvement and technical assistance, including inputs to other agencies' EIS scoping processes. If NPS has responded to an earlier notice or request for input, the credibility of our comments on the draft EIS or other later document is enhanced. See Section 2-4(B) for guidance regarding participation in other agencies' scoping processes.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

7-2 ADMINISTRATIVE PROCEDURES

A. Office of Environmental Project Review (OEPR) Responsibilities

The Department of the Interior's Office of Environmental Project Review (OEPR), which administratively is under the Assistant Secretary for Policy, Budget, and Administration (AS/PBA), is responsible for managing and coordinating Departmental reviews of other agency environmental documents. One of OEPR's principal responsibilities is to ensure that consolidated, consistent Departmental review responses are prepared for Department-level signature in accordance with 516 DM 7.

B. OEPR Regional Environmental Officers (REO's)

In addition to its Washington staff, OEPR includes Regional Environmental Officers (REO's). They are stationed in eight locations nationwide. They handle many regional problems, serve on interagency task forces and regional commissions, and are authorized to sign Departmental review comment letters to other agencies on items of regional concern.

C. OEPR Assignments to Interior Bureaus

OEPR receives all draft and final EIS's from non-Interior sources, and assigns them for review to Interior bureaus having jurisdiction or expertise regarding the proposed actions and their impacts. OEPR also receives and distributes for review various other documents such as DOT Section 4(f) statement requests for comments, license and permit applications for water projects, and proposed rulemaking and regulations.

D. OEPR "Lead Bureau" Assignments

OEPR gives other agency documents a preliminary screening to determine which Interior bureau, by virtue of jurisdiction or expertise, will be assigned lead responsibility for consolidating all Interior comments on the document into a single response for signature of the REO, the Director of OEPR, the AS/PBA, or the Secretary. In some cases this "lead bureau" role is retained by OEPR.

E. WASO-135 Review Assignments to NPS Offices

The National Park Service Division of Environmental Compliance (WASO-135) receives all documents which OEPR assigns to NPS for review, and in turn assigns responsibility within Washington and Regional NPS offices for review and comment.

F. Shifts in NPS Assignments

If an NPS office receives a review assignment which is in error, or if another NPS office is considered to have superior expertise in the subject under review, the document should be forwarded to the proper office. WASO-135 should be notified immediately so that necessary changes in records can be made.

NEPA COMPLIANCE GUIDELINE                                    Guideline
NPS-12                                                       Chapter 7
Review of Non-NPS Documents                                  Page 3

7-3 PROCESSING FLOW

A.  Documents of Non-Interior Origin

For EIS's and other documents received by OEPR from non-Interior agencies:

   1.  OEPR assigns an Environmental Review (ER) control number;

   2.  OEPR routes the document to appropriate Interior bureaus via memorandum;

   3.  In NPS, WASO-135 receives the document, prepares an instruction form, and routes the form and incoming document to reviewer(s);

   4.  Designated NPS reviewing office(s) reviews document;

   5.  Designated NPS office prepares comments for signature as directed in WASO-135 form and routes them as directed, with appropriate surnaming;

   6.  Authorized NPS signer reviews comments and signs;

   7.  Signer forwards comment letter as instructed in WASO-135 instructions, with copy to WASO-135;

   8.  Interior bureau assigned lead responsibility for consolidating Department's comments prepares Departmental review letter for REO, OEPR, AS/PBA, or Secretary, as instructed, and forwards letter through channels to designated Departmental signer;

   9.  Designated Departmental signer reviews letter, signs, and forwards it to agency evaluating the proposed undertaking.

B.  Documents Originating in Interior or Documents Not Controlled Through OEPR

For Interior bureau EIS's and other documents received by WASO-135 which are not controlled through OEPR:

   1.  WASO-135 receives document and assigns an NPS control number (DEC #) (Division of Environmental Compliance);

   2.  WASO-135 prepares instruction form and routes to reviewing office(s);

   3.  Designated NPS office consolidates and prepares comments for signature as indicated in WASO-135 instruction form;

   4.  Reviewing office forwards comments to authorized NPS signer;

   5.  Authorized NPS signer reviews comments and signs;

   6.  Authorized NPS signer forwards comments according to WASO-135 transmittal instructions, with copy to WASO-135.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 4

## 7-4 DEFINITIONS AND RELATED PROCEDURES

### A. ER Numbers

Environmental documents forwarded by OEPR to NPS and other Interior bureaus for review and comment are assigned an Environmental Review (ER) number by OEPR. These controlled documents are numbered sequentially; with the number before the slash representing the year and the number after the slash representing the sequential order within the year (e.g., ER 82/167). OEPR memoranda generally cross-reference earlier related ER-numbered documents.

### B. DEC Numbers

WASO-135 assigns sequential "DEC" (Division of Environmental Compliance) numbers to review documents which are not under OEPR control. These DEC-controlled documents are reviewed in a manner similar to ER-numbered documents. Most documents under "DEC" control numbers originate in other Interior bureaus.

### C. OEPR Distribution Memorandum

This is the cover document used to transmit controlled review documents from OEPR to Interior bureaus. It contains specific review instructions, such as requirements for interrelated reviews, assignment of an Interior bureau to serve as lead in consolidating comments of bureaus of the Department, and comment deadlines.

### D. WASO-135 Instruction Form

A WASO-135 instruction form (Exhibit 1 of this chapter), is used for distributing and controlling documents, whether OEPR-controlled or not. It contains instructions on deadlines, routing, and guidance to reviewers as appropriate. Questions about WASO-135 instructions should reference the appropriate control number.

### E. Lead Agency/Lead Bureau

These terms are used for two different purposes, and are easily confused. In the CEQ Regulations (40 CFR 1508.16), "Lead Agency" means a Federal agency which has primary responsibility for preparing an EIS. When OEPR refers to a "Lead Bureau," it means the Interior bureau which has been assigned lead responsibility for consolidating the review comments of all Interior bureaus involved in a review. In the latter case, comments provided by the U.S. Fish and Wildlife Service pursuant to the Fish and Wildlife Coordination Act are typical of those which NPS incorporates into proposed Departmental reponses when we are assigned as lead bureau.

When it becomes apparent during a review of a proposal that two or more bureaus' positions conflict, Interior's lead bureau should consult with the Interior bureaus involved in an effort to resolve the disparate positions. If this proves unsuccessful, the lead bureau and other bureaus in dispute should consult with the REO in the field. If the REO cannot resolve the internal controversy, the REO and each involved bureau should refer the matter through its WASO office to OEPR. Conflicts among bureau WASO offices are taken directly to OEPR.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 5

Any NPS office handling a lead bureau review assignment should attach the original of each Interior bureau's comments to the consolidated comments prepared for Departmental signature. This is so that the originals will be filed with OEPR, which maintains the Department's review archives. Notes of telephone "no comments" and "no comment" memoranda should be included.

F.  "Uncontrolled" Reviews

OEPR does not assign EIS's and other documents prepared by Interior bureaus to other Interior bureaus for review. Instead, these documents are sent directly among bureaus for review and comment. OEPR does require an Interior bureau preparing an EIS to obtain comments from all potentially affected Interior bureaus. EIS's, proposed rulemakings, and other documents which other Interior bureaus have prepared may be received by NPS Washington or field offices directly from the originating Interior bureau. When an NPS field office receives an EIS from another Interior bureau with no indication that it has been assigned a DEC control number, notice should be given to WASO-135 through the Regional Environmental Coordinator. A DEC control number and review instructions will be set up to assure a single coordinated NPS review.

G.  Advance Copies

Washington and Regional NPS offices often receive courtesy or advance copies of official draft or final EIS's, project plans, Section 4(f) statements, or other documents which OEPR or WASO-135 will control and assign for formal review. Advance copies of such documents provide additional review time. NPS offices receiving advance copies should look for WASO-135 instruction memoranda within approximately one week. If WASO-135 instructions do not arrive within that time, or if there is reason to believe the originating agency has not supplied copies to OEPR or WASO-135, both the Departmental Regional Environmental Officer (REO) and WASO-135 should be notified through the appropriate NPS Regional Environmental Coordinator. Washington offices should notify WASO-135 directly.

H.  Technical Assistance

NPS encourages other agencies and other bureaus to consult with its Washington and field offices during early planning for proposed undertakings. This can help ensure full consideration of NPS interests. Requests for technical assistance and documents received as part of scoping efforts should be reviewed by the NPS office receiving them and comments sent directly to the requesting agency. This includes review of "preliminary" or "working draft" license and permit applications for water projects, and EIS's which are not considered the formal draft EIS. The originating agency should be reminded that such informal consultation and coordination are technical assistance only, and do not necessarily represent the final position of NPS or the Department. The Regional Environmental Coordinator and WASO-135 should be advised of significant or controversial issues surfaced during such technical assistance efforts.

Some requests for technical assistance reach NPS through the Department and are distributed with ER control numbers. NPS offices receiving these should respond according to WASO-135 instructions.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 6

I.    Review Deadlines and Extension Requests

    1.   CEQ Requirements; Screening and Review Schedules

        EIS's and some other environmental documents have periods for review and comment set by law or regulation.   Section 1506.10 of the CEQ Regulations (Appendix 1) provides 45 days for review and comment on draft EIS's, and a 30-day no-action period following release of final EIS's.   These times are calculated from the date that a Notice of Availability is published in the Federal Register by EPA.   These notices normally appear in the Federal Register on Fridays and include the date when comments are due.   Section 1501.9 of the CEQ Regulations requires that EIS's be filed with EPA no earlier than they are transmitted to agencies and the public for comment.

        Review periods for revised and supplemental draft and final EIS's of other agencies are calculated like those for draft and final EIS's.

        Since agencies which circulate draft EIS's are under no legal obligation to include in the final EIS comments received after the established deadline passes, NPS must comment within the set deadline if its concerns are to be given consideration.

        When controlled documents arrive from WASO-135 for review, they should be screened quickly to determine deadlines and relative priority.   Review preparation responsibility should be assigned immediately.   If screening determines that the proposed undertaking is of no consequence to NPS areas of jurisdiction or expertise, and comments are to be routed to WASO-135, a simple "no comment" response may be made using the form shown in Exhibit 2 of this chapter.

        Review schedules should provide intermediate offices such as WASO-135 and OEPR sufficient time to review and process proposed comments.   The possibility of mail delays and holiday and weekend "down time" should be considered.

    2.   Extensions

        Extensions of review deadlines occasionally are needed because of unusual routing or mail delays, required field studies, necessary coordination with other Federal, State, or local agencies, or the discovery of unforeseen problems with the proposed undertaking.   The need for an extension should be determined early in the review process and the extension requested shortly after receipt of the controlled document.   The closer the deadline, the more difficult it normally is to obtain an extension.   Deadline extensions should be requested only when it is anticipated that reviewers will be making substantive comments, or when expected impacts require substantive field inspection or coordination.   Procedures for obtaining extensions follow:

        (a)   Extensions from agencies outside Interior will be negotiated by WASO-135 through OEPR for reviews returning through WASO; and by

the Department's Regional Environmental Officers (REO's) (located
in Boston, Atlanta, Chicago, Albuquerque, Denver, San Francisco,
Anchorage, and Portland, OR) for reviews which they are to sign
at the regional level. Extensions of one or two weeks generally
can be requested and confirmed verbally. An NPS office requiring
a longer extension must prepare a written request with adequate
justification for WASO-135 to forward to OEPR, which then requests
the extension from the agency proposing the undertaking. Justifi-
cation might include the need to attend public meetings which are
scheduled after the comment due date, the need to obtain a
Regional or Washington office Solicitor's opinion, or the need to
coordinate with a State resource agency. WASO-135 or the REO will
notify the requesting NPS office when the agency sponsoring the
proposed undertaking acts on an extension request.

(b) An NPS field office needing an extension of a date when NPS
    comments are due to an Interior lead bureau regional office should
    ask the NPS Regional Environmental Coordinator (REC) to obtain it.
    WASO-135 performs the same role in the Washington Office.
    Requesting offices should be notified immediately by phone of
    extensions obtained.

(c) NPS REC's will negotiate for extensions from the Departmental
    Regional Environmental Officer (REO) when the NPS regional office
    is assigned lead in consolidating Interior comments for the REO's
    signature.

(d) Deadline extensions from other Interior bureaus (for DEC reviews)
    should be requested directly by regional offices in cases where
    WASO-135 has instructed that comments be sent directly from the NPS
    regional office to the originating Interior bureau's regional or
    field office. The NPS REC should handle all regional extension
    requests.

J.  Departmental Comment Letters

Comments of NPS and other Interior bureaus, when consolidated into a Departmental
review letter by either a designated lead bureau or by OEPR, are signed either in
Washington or by the designated Departmental REO. Copies of comment letters signed
in WASO are provided through WASO-135 to appropriate regional and program offices.
REO review distribution practices vary. If a copy of an REO's signed environmental
review letter is sent only to the NPS region, the region should in turn send a
copy to WASO-135. WASO-135 and REO's distribute copies of review letters so that
NPS analysts and reviewers will know the Department's position and can compare it
with the comments which they submitted. NPS reviewers should seek clarification
from subsequent reviewers or processors, if substantial comment changes are made
without consultation.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 8

7-5 REVIEW GUIDELINES FOR EIS'S

A.  Draft EIS's

Review comments on draft EIS's or other related documents should be confined to NPS
areas of jurisdiction and expertise.  They should be based on fact, published
research, or professionally-supported opinion.  NPS opinions as to the acceptabili-
ty of project impacts on areas on NPS jurisdiction and expertise should consider
both the severity of the impacts and the practicability of proposed mitigating
measures.  NPS should urge adoption of measures which are compatible with both NPS
interests and project purposes.

   1.  Key Sections for Reviewers' Attention

       EIS's are prepared in the format required by Section 1502.10 of the CEQ
       Regulations, or an approved variation.  This format allows a realistic,
       adequate assessment of project impacts and provides for inclusion of
       measures to minimize adverse impacts.  Sections 1502.11 through 1502.19
       of the CEQ Regulations explain requirements for individual sections of an
       EIS.  The EIS sections requiring particular NPS review attention include
       (a) Purpose and Need, (b) Alternatives Including the Proposed Action,
       (c) Affected Environment, and (d) Environmental Consequences.

   2.  Comment Requirements for Key Sections

       Reviewers of EIS's should ensure that the above sections satisfactorily
       address:

      (a)  NPS concerns previously expressed during scoping or when
           participating as a cooperating agency;

      (b)  NPS positions outlined in providing planning aid and technical
           assistance, especially those related to alternatives preferred
           by NPS and to suggested mitigating and enhancement measures;

      (c)  Evidence of coordination and consultation with NPS when proposed
           undertakings might affect NPS areas of jurisdiction or expertise,
           especially when NPS technical assistance or expertise might lead
           to enhancement or protection of park, recreation, historic,
           archeological, architectural, or significant natural area values
           within or associated with proposed undertakings, including World
           Heritage Sites and Biosphere Reserves;

      (d)  Consultation with other appropriate groups, including the State
           Historic Preservation Officer, the Land and Water Conservation
           Fund State Liaison Officer, the Advisory Council on Historic
           Preservation, local historical societies, state heritage program
           officials, and local authorities, including those which have
           received grant assistance from NPS;

(e)  A "worst case" analysis of potentially significant adverse impacts
     on areas of NPS jurisdiction and expertise, when impacts are
     uncertain (Section 1502.22 of the CEQ Regulations);

(f)  A clearly-defined listing of impacts for each alternative,
     presented on a comparable basis to allow ready identification of
     the alternative promising the least damage to NPS interests;

(g)  Location of the proposed undertaking in relation to units of the
     National Park System and affiliated areas, or of designated
     National Wild and Scenic Rivers or National Trails under NPS
     management;

(h)  Measures which would mitigate, reduce, or eliminate adverse
     impacts or enhance beneficial impacts of the proposed undertaking
     on NPS areas of jurisdiction and expertise.  Impacts may be
     direct, indirect, primary and secondary.  They include, but are
     not limited to, changes in:  air quality, including Class I area
     visibility; land uses impairing park, recreation, natural, and
     cultural resource values; water quality; noise levels; wildlife
     varieties, numbers, migration routes and habitats within and near
     areas administered by NPS; park access and regional transportation
     systems; natural and cultural resource visual settings; regional
     socio-economic conditions; and patterns of park visitor use;

(i)  Location and potential impacts of the proposed undertaking in
     relation to non-Federal lands in which the Secretary of the
     Interior has a legal interest through NPS under terms of a Federal
     deed, grant, or other conveyance.  This includes areas which have
     received grants-in-aid from the Land and Water Conservation Fund
     (Section 6(f)), the Urban Park and Recreation Recovery Program,
     and the Historic Preservation Fund.  It also includes park, recreation
     and historic properties transferred under the Federal Surplus Property
     statutes or the Recreation Demonstration Projects Act;

(j)  Location of the proposed undertaking relative to properties listed
     on or eligible for listing on the National Register of Historic
     Places, including National Historic Landmarks.

3.  Reviewing "Tiered" EIS's

    Section 1502.20 of the CEQ Regulations encourages tiering of EIS's.  A
    definition of "tiering" (e.g., producing a programmatic EIS which addresses
    broad policy issues, followed by other site-specific EIS's, each of which
    need not re-evaluate, but only refer to the broad policy matters addressed
    in the programmatic EIS) appears in 1508.28, CEQ Regulations.  Reviewers
    should be alert to attempts to substitute tiering for adequate analysis of
    site-specific impacts.  Site-specific analysis may reveal impacts of
    greater magnitude than those anticipated in programmatic EIS's.

Case 1:06-cv-02077-TFH    Document 30-3    Filed 03/14/2008    Page 52 of 68

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 10

4. Reviews and State and Local Plans

Section 1506.2(d) of the CEQ Regulations requires EIS's to discuss inconsistencies of proposed actions with approved State or local plans or laws. NPS responsibilities relate to a number of State and local plans, including Statewide Comprehensive Outdoor Recreation Plans, State Historic Preservation Plans, and Recreation Recovery Action Plans. Proposed undertakings should address measures to reconcile situations where the above plans and the proposed actions are at odds.

5. Secondary and Indirect Impacts

NPS reviewers should consider long-term secondary and indirect impacts of proposed undertakings as they affect NPS areas of jurisdiction and expertise. They also should consider cumulative effects and should be alert to possible project segmentation which could distort or mask them.

6. NPS EIS Comment Coordination

Potential impacts of proposed undertakings which require coordination across NPS program areas (e.g., a proposed HUD regional plan affecting both NPS general historic concerns and a unit of the National Park System) should occasion    input comments from both the Superintendent of the site concerned and the archeological and historic preservation unit of NPS. In such cases, the Regional Environmental Coordinator usually coordinates preparation of NPS comments.

7. Permit Identification Requirements

Proposed undertakings requiring NPS permits, easements, etc., are subject to Section 1502.25(b) of the CEQ Regulations, which is designed to improve Federal permitting processes through coordination in the NEPA process. The CEQ Regulations call for identification of Federal permit, license, and other approval requirements during scoping, and again in review and comments on draft EIS's.

When NPS identifies a need for an NPS permit, it should inform the agency proposing the undertaking as to why the permit is required and should state a probable NPS position, based on information available at the time.

If NPS expresses serious concerns or if the probable NPS position would be to deny the permit, the applicant should be urged to consult with the appropriate NPS office (provide a name and/or title, address, and telephone number) as early as possible. Mitigation measures or conditions which likely would be imposed before a permit would be issued should be stated in NPS comments on the draft EIS. These concerns and conditions should, of course, have been surfaced during the scoping process; and NPS should be a cooperating or joint lead agency, so that the document also covers NPS compliance needs. NPS comments should address site-specific project impacts, measures necessary to minimize harm, or recommended project

alternatives. The comments should explicitly indicate any tentative
objection, or reservations (or lack of same), with reasons stated clearly.
The reasons for objections should be based on explicit effects which NPS
anticipates, their magnitude (use estimates if necessary), and their
significance. Comments based on generalities, frustration with poor
procedures, and similar "non-effect" remarks are not useful.

8. Types of NPS Comments on Draft EIS's

NPS reviewers may, for example, provide comments on draft EIS's as follows:

(a) No-Comment Response. Reviewers may send a simple "no-comment"
response form (Exhibit 2 of this chapter) when responding to WASO-135,
if a draft EIS presents an adequate analysis of expected impacts on
areas of NPS jurisdiction and expertise (assuming that the
proposed action or preferred alternative is acceptable to NPS).
A "no-comment" response also is appropriate when a proposal has
no known impact on areas of NPS jurisdiction and expertise.

(b) NPS may respond with a finding that the draft EIS is incomplete
or inaccurate in some major and relevant way in its description
of the predicted impacts on areas of NPS jurisdiction and expertise.
If the draft EIS is so inadequate as to preclude meaningful analysis,
and the proposed undertaking appears to threaten serious adverse
effects on NPS park, recreation, historic, archeological, architec-
tural, or significant natural area interests, the NPS comments should
state explicitly how to make the document adequate, and in exceptional
cases may request the proposing agency to prepare and circulate a
revised or supplemental draft EIS according to Section 1502.9(a) of
the CEQ Regulations;

(c) If there is a possibility that NPS may seek to refer a project
to CEQ under provisions of 40 CFR 1504, this must be pointed out
to the agency proposing the undertaking at the earliest possible
time in the planning process, but no later than when NPS comments
on the draft EIS;

(d) NPS may respond that the draft EIS fails to identify reasonable
alternatives or alternative project components with lesser
adverse impacts to areas of NPS jurisdiction or expertise, or
that NPS favors an alternative other than the alternative
preferred in the draft EIS.

(e) NPS may respond that it does not believe that adverse impacts
will be mitigated adequately;

(f) NPS must respond if it anticipates further involvement with the
proposed undertaking (e.g., review of permit applications);

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 12

(g) NPS may respond that concerns it expressed during the scoping process or as a cooperating agency were not addressed adequately or accurately in the draft EIS.

9. Consequences of Declining to Review

National Park Service reviewers should be extremely cautious about giving up future options by declining to review and comment on EIS's or related documents involving undertakings which may affect areas of NPS jurisdiction or expertise. Failure to review and comment may be interpreted by sponsoring agencies (a) to mean that NPS has no concerns in a proposed action; or (b) to believe that it will not significantly affect NPS areas of jurisdiction or expertise; or (c) to mean that NPS will issue any permits required for project construction.

B. Final EIS's

1. When NPS Comments on Final EIS's

During the draft EIS stage, NPS reviews should identify significant omissions, errors, or unaddressed concerns. Ideally, these concerns will be addressed in the final EIS, making further comment unnecessary. Normally no comments are made on final EIS's, unless NPS objects to the proposal itself or to one of its major features. Proposed comments on a final EIS are forwarded through WASO-135 to the Office of Environmental Project Review (OEPR). Depending on the nature and extent of NPS concerns, the comments may request the sponsoring agency to prepare a supplement to its final EIS. Because the sponsoring agency may take action 30 days after release of its final EIS, comments on a final EIS must be handled expeditiously.

2. Responses to Draft EIS Comments

Section 1502.9(b) of the CEQ Regulations requires sponsoring agencies to respond in final EIS's to comments made on draft EIS's, including discussion on responsible opposing views at appropriate points in the final EIS. NPS review of a final EIS should determine whether:

(a) The final EIS adequately assesses all important issues raised by NPS on the draft EIS, including documentation on appropriate historical and archeological consultation requests and response letters;

(b) The selected alternative and any accompanying mitigation features are compatible with concerns, recommendations, and objections raised previously by NPS;

(c) New information contained in the final EIS, or which became available to NPS only after it released its draft EIS comments, has revealed a significant change in potential impacts of the proposed undertaking; and

Release No. 2

September 1982

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 13

(d)  The preferred alternative or the mitigation to be employed
eliminates significant or adverse impacts on areas of NPS
jurisdiction or expertise.

3.  Justification for Comments on Finals

Comments on final EIS's may be justified by one or more of the following:

(a)  NPS objects to the project because the preferred alternative is
unacceptable to NPS, or it fails to incorporate NPS recommendations
for mitigation or monitoring requirements after project completion;

(b)  Changes have been made in the proposed action, aside from adopting
mitigating measures, which require additional assessment of
environmental impacts on areas of NPS jurisdiction and expertise;

(c)  Changes in the final EIS are needed because the sponsoring agency
has failed to understand the significance of NPS comments and
concern on the draft EIS, and continues to offer the project or
proposal in a form which is unacceptable to NPS in whole or in part
(see Section 7-5(B)(2) above);

(d)  Important new information consequential to the decisionmaking
process becomes available, or erroneous or obsolete data presented
in the final EIS needs to be corrected or challenged because of
NPS concerns about or objections to the project.

## 7-6 INTERRELATED REVIEWS

In addition to NEPA requirements, many Federal undertakings require other
"environmental" comments and clearances.  Department of Transportation (DOT)
Section 4(f) Statements and review of the "recreation exhibits" of Federal Energy
Regulatory Commission license and permit applications for water projects are
examples.

A discussion of some of the more pertinent non-NEPA environmental review
responsibilities of NPS, procedures for those reviews, and their interrelation-
ships with the NEPA process follows.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 14

A.  Section 4(f) (as amended) of the Department of Transportation Act of 1966

This section (Exhibit 3 of this chapter) declares that the Secretary of the
Department of Transportation (DOT) shall cooperate and consult with the Secretary
of the Interior (et al) and shall not approve any program or project requiring use
of any lands from a public park or recreation area, public wildlife or waterfowl
refuge, or public or privately-owned historical site of national, State, or local
significance unless the following two provisions are met:  there is no feasible
and prudent alternative; and, such program or project includes all possible
planning to minimize harm.

1.  Meaning of Feasible and Prudent

"Feasible" is usually interpreted as meaning consistent with sound
engineering practice.  "Prudent" is more difficult to define.
Generally, a prudent alternative is one that does not present unique
problems that would cause costs or community disruption to reach extra-
ordinary magnitudes.  We usually hold that a project must not use
Section 4(f) lands unless a prudent person concerned with the quality
of the human environment and sound land use planning is convinced that
there is no way to avoid doing so.  Note, however, that the Supreme
Court in the Overton Park decision specifically rejected the argument
that there should be a wide-range balancing of competing interests in
making Section 4(f) determinations.  The values of 4(f) lands are to be
considered of paramount importance.

Section 4(f) "use" has been construed to mean direct physical use as well
as indirect effects on 4(f) properties (e.g., increased noise levels,
adverse aesthetic impacts, restricted access, etc.).

2.  NPS Section 4(f) Lead Responsibility

NPS is usually assigned as the Department's lead bureau in preparing the
Secretary of the Interior's responses to DOT requests for Section 4(f)
consultation comments on projects affecting park, recreation and cultural
resources.  This includes responses to DOT documents containing only
preliminary 4(f) information.  When NPS serves as lead bureau, the
Departmental comments must incorporate concerns and views from all
concerned Interior bureaus.

3.  Mandatory Response Requirement

Interior response to a DOT Section 4(f) request is mandatory.  A
"no-comment" is never appropriate, since the purpose of the consultation
is to either concur or disagree that either or both of the Section 4(f)
provisions have been satisfied for a proposed transportation project
which affects park, recreation, wildlife, or cultural areas of
significance.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 15

4.   Objecting to Section 4(f) Approval

Section 4(f) review comments should state specifically that the Department
of the Interior has no objection to Section 4(f) approval of a project by
the Secretary, DOT, if we concur that the proposed undertaking meets the
two 4(f) provisions listed above.  If we do not concur that the first
provision has been satisfied, i.e., if NPS believes that feasible and
prudent alternatives to the use of 4(f) lands do exist, the comments which
NPS prepares for the Department should state what those alternatives are,
and advise that Interior objects to Section 4(f) approval.  If we do not
concur that adequate planning to minimize harm has been adopted, Interior
should also object to Section 4(f) approval, or make our non-objection
contingent upon the adoption of such measures.  The Interior response
should always specify the measures we think are needed to minimize harm,
and should not leave the development of such measures to others.

5.   Types of Section 4(f) Documents

Department of Transportation requests for Section 4(f) review may
reach Interior as a separate document or may be combined with an EA or an
EIS.  In either case, when NPS is serving as Interior's lead response
bureau, it prepares a comment letter for Departmental signature.  This
letter first includes comments on the Section 4(f) request, and then
on the EA or draft EIS if the documents were forwarded together.

6.   Commenting on Section 4(f) Statement Inadequacies

Section 4(f) comments for Departmental signature should, as appropriate,
evaluate and address any inadequacies in the following:

(a)  Identification of 4(f) properties in a proposed transportation
     project's zone of adverse impact;

(b)  Assessment of environmental impacts on those properties;

(c)  Determination of the significance of the properties which may be
     affected (check all units of the National Park System; all non-
     Federal areas in which the Secretary of the Interior holds a
     legal interest through grants, etc.; all properties listed on or
     eligible for listing on the National Register of Historic Places;
     as well as other park, recreation, historical, archeological,
     architectural, and significant natural areas);

(d)  Accuracy and completeness of information furnished in support of
     DOT's determination that there is no feasible and prudent alterna-
     tive to the proposal as presented;

(e)  Identification and evaluation of alternatives to the use of
     Section 4(f) properties; and documentation supporting any

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 16

conclusion that use of alternative routes, rather than the one
proposed, would present unique problems and result in extraordinary
cost or community disruption;

(f)  Determination of measures to minimize harm and professional
     evaluation of whether they would provide replacement of, or
     compensation equal to the cost of replacing, Section 4(f) land
     and improvements that would be lost to the proposed undertaking;
     and that the replacement lands/facilities would be of reasonably
     equivalent utility;

(g)  Determination of whether proposals to minimize harm (e.g.,
     improving or restoring pedestrian, bicycle, or vehicular access;
     landscaping; planting; noise abatement installations; tunnelling;
     cut-and-cover; cut-and-fill; data recovery; moving of historically
     important structures; bridging such structures; altering traffic
     flows; installation of devices such as centerstrip "New Jersey-
     type" barriers; and use of paint designed to help blend intrusive
     structures into a site) incorporate design features enhancing
     the Section 4(f) land or lessening adverse effects;

(h)  Determination of whether proposals to minimize harm coordinate
     construction procedures with recreation activities in a manner
     permitting orderly transition and continual use of Section 4(f)
     lands and facilities;

(i)  Evidence of consultation and coordination with NPS and/or other
     appropriate Interior agencies, the administrator of the 4(f)
     property, and/or other appropriate groups on measures to minimize
     harm to NPS or other interests.

Additional information on alternatives needed from DOT should be
outlined clearly and specifically. When such information is required,
Interior Section 4(f) concurrence should be deferred.

Similarly, inadequacies in measures to minimize harm should be
identified explicitly. NPS should point out needed additional measures,
such as land replacement, landscaping, fencing, facility replacement,
relocation, etc.

7.  Format for Section 4(f) Comment

The detailed response regarding Interior's concurrence with the two key
Section 4(f) provisions and the propriety of DOT Section 4(f) approval
should be contained in the initial portion of the Interior comment letter,
entitled "Section 4(f) Comments." Interior's lack of objection, objection,
objection with reservations, or objection because of inadequate information
should be restated in a separate (last) portion of the letter entitled
"Summary Comments." When the review letter is short (one or two pages),
the summary section may be omitted as redundant.

Case 1:06-cv-02077-TFH    Document 30-3    Filed 03/14/2008    Page 59 of 68

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 17

8. Questioning Section 4(f) Applicability

In some situations, the applicability of Section 4(f) may be questionable
because of the nature of the area or because of difficulty in determining
whether the DOT proposal would constitute a "use." In such circumstances,
the Departmental comments should provide facts and information, express
Interior's opinion and request a General Counsel's opinion relative to
the applicability of Section 4(f).

9. Withholding Approval for NPS Transportation Easements

National Park Service managers should not issue right-of-way easements for
DOT-assisted or approved transportation projects requiring use of areas
under NPS jurisdiction, nor approve the use of lands in which NPS has a
grant-in-aid or comparable interest (through the L&WCF, etc.) until the
Department of the Interior has reviewed and concurred in the DOT
Section 4(f) Statement, and evidence of Section 4(f) approval has been
received.

B. Licensing, Permitting and Development of Water-Related Projects

NPS reviews a variety of water and related land resource reports and plans prepared
by Federal and State agencies as well as private interests seeking to obtain a
Federal license or permit. These include Federal Energy Regulatory Commission
(FERC) applications, Federal water project studies, EPA water-related studies,
and Federal permit applications. (The permit applications are handled regionally.)
The primary purpose of these reviews is to determine whether NPS park, recreational,
historic, archeological, and significant natural area responsibilities and concerns
have been considered appropriately in the plans and proposals. The reviews also
determine if the proposed actions are consistent with national, regional, State,
and local plans and objectives relating to NPS interests. The reports, studies,
and permit applications reviewed in this category may be received independently
or with an EA or EIS. With the exception of some preliminary reports, license
applications, and permits, which are sent directly to NPS regions by originating
agencies and organizations, these materials reach NPS from OEPR, where they are
given "ER" control numbers.

1. Federal Energy Regulatory Commission Reviews

License, preliminary permit, and exemption applications assigned by OEPR
for formal comment will have control numbers, and should be examined to
determine whether the proposed action:

(a) Complies with requirements relating to recreation and cultural
resource project aspects. Evidence of compliance will be
contained in an applicant's Exhibit E;

(b) Provides for full public use of the project during the period
for which the license is sought;

(c)  Includes enough land within project boundaries to assure optimum
development and management of its recreation potential and protection
of its environmental integrity;

(d)  Calls for acquiring fee title to, or equivalent interest in, all lands
immediately adjacent to the exterior margin of a reservoir, all
islands, and all areas specified in the recreation use plan, consis-
tent with the project's economic well-being and its public interest
requirements;

(e)  Provides for developing, operating, and maintaining facilities called
for in the recreation plan;

(f)  Conflicts with provisions of the Wild and Scenic River Act, Section
7(b), which protects rivers designated for study as possible
additions to the Wild and Scenic Rivers System. A similar provision
in Section 7(a) applies to rivers already in the National System;

(g)  Affects units administered by the National Park Service;

(h)  Affects rivers included in the Nationwide Rivers Inventory. If such
rivers are included in the projects, the application should identify
what river values would be impacted and what measures could be
incorporated to avoid or mitigate any adverse impacts;

License, exemption, or preliminary permit pre-application materials
are sometimes sent for review directly to NPS regional offices without
OEPR control numbers. Regional offices should regard them as requests
for technical assistance and handle them accordingly, responding
directly to the applicant. The response should give the applicant
a preliminary NPS position on potential environmental impacts and on
proposed mitigating measures. Copies of replies should be sent to
WASO-135.

2.  Federal Water Project Recreation Act (Public Law 89-72) Reviews

This Act requires Federal agencies studying or proposing water-related
projects to obtain the views of the Secretary of the Interior with respect
to the outdoor recreation and fish and wildlife development of the project.
The Secretary also is required to report on the extent to which the recrea-
tion and related development conforms to and is in accord with the
appropriate Statewide Comprehensive Outdoor Recreation Plan. Preparation
of the Secretary's comments on these matters is assigned to NPS. The Act
covers planning for Federal navigation, flood control, reclamation, hydro-
electric, or multi-purpose water resource projects. Projects of TVA or
proposed under the Small Reclamation Project Act or the Watershed Protec-
tion and Flood Prevention Act are exempt.

The Act requires Federal agencies planning water-related projects to give
full consideration to opportunities for outdoor recreation and for fish
and wildlife enhancement; and when the project can reasonably serve either
or both of those purposes to construct, operate, and maintain the project
accordingly.

NPS reviews, therefore, should state:

(a)  The views of the Secretary as to whether the sponsoring agency has
     fully considered and provided appropriately for outdoor recreation
     and fish and wildlife recreational use;

(b)  Whether the plan conflicts with water resource requirements of NPS;

(c)  The extent to which the sponsoring agency's proposal is in accord
     with appropriate Statewide Comprehensive Outdoor Recreation Plan(s).

Reviews of projects proposed pursuant to this Act are assigned through
OEPR, and are given "ER" control numbers. Some are accompanied by an EA
or EIS. When this is the case, comments on both documents should be
incorporated in one letter. Within the letter, comments on the project
report should be clearly separate from comments on the environmental
document.

On occasion, a sponsoring agency may send a preliminary plan to a regional
office for comment. As stated above in the Section on FERC applications,
these should be regarded as requests for technical assistance and handled
in the same manner as FERC preliminary permit applications.

Section 6(a) of the Federal Water Project Recreation Act serves to extend
to most Federal agencies engaging in water development projects authority
to include provisions for public recreation and conservation of fish and
wildlife which had been contained in Section 4 of the earlier Flood Control
Act of 1944. The 1944 Act included the recreation, fish and wildlife
provisions and authorization for opening flood control reservoirs to the
public for boating, fishing, and other recreation purposes; and authorized
provisions for ready access to and exit from such areas so long as the
public interest was served. NPS comments can cite the 1944 authorization
when dealing with Corps of Engineers flood control projects which fail to
recognize the Recreation Act authorization.

3.  Section 201(g) of the Clean Water Act (Public Law 95-217) Reviews

This Act requires the EPA Administrator to obtain from applicants for
grants satisfactory proof that potential recreation and open space
opportunities at proposed treatment works have been satisfactorily
analyzed. The EPA grants are provided to States, municipalities, or
intermunicipal or interstate agencies. Those organizations frequently
request NPS help in analyzing recreation potential. Such requests should
be treated as requests for technical assistance similar to those mentioned
in the above sections on FERC and Federal Water Project Recreation Act
reviews.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 20

Formal requests for NPS reviews of the recreation components of EPA grant applications usually arrive through the NEPA process, since they normally are included in or accompanied by EIS's. They are processed by OEPR and assigned control numbers. Procedures for reviewing EIS's apply.

C. Reviewing of Proposed Federal Legislation, Rulemaking, Regulations, Executive Orders, Guidelines, Handbooks, and Other Procedures

Most of these reach NPS through OEPR channels and are given control numbers, although some come directly to NPS from agencies which originate them.

Regulations and procedures come in infinite variety, and are seldom accompanied by EIS's. Generalizations on how NPS should review them are difficult. The general rule to follow is to apply the yardstick of NPS areas of jurisdiction and expertise. Might they affect units of the National Park System? Will they affect NPS operational and/or recreation, historic, archeological, architectural, or significant natural area interests?

NPS often is assigned leadership in assembling Departmental comments on these proposals because of the wide range of NPS jurisdiction and expertise.

Since these proposals often lie outside NEPA processes, NPS can exercise more latitude in responding to them than might be possible otherwise. The Office of Environmental Project Review (OEPR) Departmental mechanism for resolving conflicts is available, and should often be used in preference to unilateral NPS consultation with non-Interior agencies - particularly when there is any chance that an NPS position or comment may be in conflict with that of another Interior bureau.

D. Reviewing of Land Use Plans

NPS examines such plans from the standpoint of their effects on areas of NPS jurisdiction and expertise: park, recreation, historic, archeological, architectural, and significant natural areas. NPS should be particularly alert to long-range cumulative concerns involving NPS interests.

E. Reviewing of State, Local, and Private Environmental Documents

A number of documents prepared to meet State and local environmental requirements are submitted to NPS for review and comment. NPS is free to respond to those documents to the extent that its policy and programmatic interests require and to the extent that staff time is available. To avoid duplicative reviews, the appropriate Regional Environmental Coordinator (REC) should be consulted before any response is made.

As with comments on Federal rulemaking, proposed guidelines and other Federal documents, the variety of State, local, and private documents precludes useful generalization on how to handle them. The text in Section C above may be useful.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 21

## 7-7 STYLE AND FORMAT FOR ENVIRONMENTAL REVIEW COMMENTS

NPS environmental review comments on NEPA and related documents should normally be organized in the format described in this section, although the format occasionally will not fit some of the comments which NPS prepares. Individual review instructions are provided in WASO-135 and OEPR transmittal forms which accompany the document to the NPS reviewing office.

NPS comments being prepared for submission to other Interior bureaus, including responses to requests for technical assistance, should be typed as a memorandum. Comments going directly to non-Interior agencies should be typed in letter form.

Comments prepared for consolidation with those of other Interior bureaus (e.g., comments addressed to OEPR, the REO, or an Interior lead bureau) should be prepared in memorandum format for signature as directed in the WASO-135 transmittal. The subject line of the memorandum should be identical with that of the incoming OEPR memorandum, and should include the document's ER or DEC number, which should also appear at the upper left corner of the memorandum.

The comments on NEPA and related documents can be logically arranged under four headings: General Comments, Interrelated Review Comments, Specific Comments, and Summary Comments, unless the review is only a page or two and these headings would produce needless repetition and a stilted appearance. The reviewer should choose a format that conveys NPS or Departmental information and views, and pinpoints changes the recipient should make. The four headings recommended for use in longer NEPA and related reviews are discussed below. The locations of the Interrelated Review Comments and Specific NEPA Comments may be interchanged as necessary to produce the most coherent review.

### A.  General Comments

This topic heading, if used, should summarize any major NPS concerns with the adequacy and accuracy of the document and should provide comments of a general nature. Any major concerns about the project itself should appear here, concentrating on, but not necessarily limited to, the recommended or selected alternative and its impacts.

This section should include any specific comments which otherwise occur repeatedly throughout the review. Any previous technical assistance, cooperation, reports, or other planning information provided by NPS for the project should be noted.

### B.  Interrelated Review Comments

Section 1502.25 of the CEQ Regulations requires that NEPA analyses be integrated with those for other environmental laws and Executive Orders (e.g., Section 4(f) comments, Endangered Species Act comments, Fish and Wildlife Coordination Act comments, etc.). Reviewers should ascertain whether the document under review is intended to fulfill such other requirements. If so, address compliance, as appropriate, with such requirements in separate sections of the review. See Section 7-6 of this guideline for specific guidance on some of the requirements where NPS has jurisdiction or special expertise. When NPS serves as lead bureau

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 22

in consolidating the Department's comments, it is especially important to be
aware of these interrelated review requirements so that other Interior bureau
review responsibilities are adequately represented in the consolidated
Departmental comments.

## C.  Specific NEPA Comments

The format of this section (e.g., EIS or EA comments) should follow the
organization of the document being reviewed.  Page and paragraph numbers should be
cited to relate comments to the text.  Comments should be written in a form de-
signed to help the sponsoring agency in modifying the next draft or the final work.

Assertions of omissions or inadequacies should be specific, not general, and
should suggest how to correct the deficiency.  Needed additions or deletions
should be stated precisely.  If NPS criticizes a sponsoring agency's predictive
methods, we are obligated to describe the methods we prefer, and to give the
reasons why, as the CEQ Regulations point out in Section 1503.3.

Comments should address significant overlooked or downplayed impacts of a proposed
action.  They also should assure that alternatives which would benefit or have
less adverse impact on NPS concerns are included and presented adequately.
Comments on the EIS section describing the affected environment are appropriate
only if a significantly-impacted component is not described adequately.

## D.  Summary Comments

If NPS favors an alternative or project modification which would be beneficial
to or have less adverse impact on areas of NPS jurisdiction and expertise, this
should be highlighted in the summary section.

Comments and positions on the acceptability of project impacts on areas of NPS
jurisdiction or expertise should be included in this section.  Comments on the
proposed undertaking should consider:  (1)  the intensity, severity, and duration
of the impacts, (2) the objectives and importance of the project, and (3) the
practicability of mitigation measures.  Insofar as possible, this section should
point out how to make the proposed undertaking acceptable with regard to our areas
of jurisdiction and expertise.

On draft documents, this section should indicate what our position might be unless
recommended changes are made.

Summary comments should always state any action relating to the proposed under-
taking which the Department or NPS has taken, or may take, in accordance with the
requirements of various statutes, rules, and regulations for which the Department
or NPS holds jurisdiction by law.  The comments also should note any potential
further reviews which NPS may make in considering the issuance of easements or
other permits which the proposed undertaking would require, and the likely NPS
position.  If a CEQ referral on a project appears likely, the summary comments
should so indicate, and state the particular concern.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
Page 23

This section should close with an offer to meet with the sponsoring agency to discuss comments and concerns.  The offer of continued cooperation and assistance is especially important if significant resources are involved or if NPS has complex views and positions which are difficult to describe thoroughly in a letter. Names of NPS personnel who can be of assistance should be listed along with their titles, addresses, and telephone numbers.

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
EXHIBIT 1

## WASO-135 INSTRUCTION FORM

United States Department of the Interior

**NATIONAL PARK SERVICE**
**WASHINGTON, D.C. 20240**

DATE _____

EIS/RELATED DOCUMENT REVIEW

IN REPLY REFER TO:

ENVIRONMENTAL ASSESSMENT _____

TITLE OF DOCUMENT: _____

TYPE OF DOCUMENT:
☐ DRAFT EIS  ☐ FINAL EIS  ☐ 4(f)  ☐ PERMIT  ☐ NOI  ☐ COE REPORT  ☐ OTHER _____

NPS Review assigned to:

| | | | | |
|---|---|---|---|---|
| 135 Dougherty | 022 ____ | 500 ____ | 723 ____ | ARO – Stoddard |
| 135 Isa | 130 ____ | 501 ____ | 760 ____ | PNWRO – Matbon |
| 135 Jarvis | 170 ____ | 535 ____ | 765 ____ | NRO – Muddlestun |
| 135 Ramirez | 190 ____ | 545 ____ | 775 ____ | SWRO – Lucke |
| 135 Stout | 470 ____ | 560 ____ | 780 ____ | RMRO – Powell |
| 135 Verstraete | 492 ____ | 610 ____ | | NARO – Arains |
| | 493 ____ | 640 ____ | | MWRO – Strain |
| | 494 ____ | 670 ____ | | SERO – Garner |
| | 497 ____ | 700 ____ | | NARO – Karsen |
| | 498 ____ | 720 ____ | | NARO – Clark |
| | | | | NCP – Clement |
| | | | | DSC – Wall |

(Please call WASO-135 ASAP if review should be reassigned -- FTS 343-2163)

**REVIEW INSTRUCTIONS:**

☐ Provide comments or other requested input, if any, directly to requesting agency with copy to WASO-135, the Office of Environmental Project Review and appropriate Regional Environmental Officer.    DATE DUE _____

☐ Provide NPS comments directly to lead bureau office, _____, as directed (with copy to WASO-135).    DATE DUE _____

☐ NPS, as lead bureau, should assemble the Departmental letter for signature by the appropriate Regional Environmental Officer: _____    DATE DUE _____

☐ As lead bureau, assemble the Departmental comments as a final-typed Secretarial letter, and send to WASO-135, _____, for routing to OEPR by _____.    DATE DUE _____

☐ Comments to be routed back through NPS WASO-135, _____ to the Office of Environmental Project Review (OEPR) by _____. Provide final-typed NPS comments on WASO letterhead to WASO-135, set up for signature by the Chief, Office of Park Planning and Environmental Quality. (If NPS has no comment, you may use a pre-printed "No Comment" form. WASO-135 will send a copy to OEPR.)    DATE DUE _____

☐ Comments to be routed back through NPS WASO-135 to _____    DATE DUE _____

☐ Provide final-typed NPS comments on WASO letterhead to WASO-135, _____, set up for signature by the Chief, Office of Park Planning and Environmental Quality.

☐ NPS WASO to serve as lead bureau to prepare Departmental letter. Provide your input comments to WASO-135, _____    DATE DUE _____

☐ Final _____. No comment unless NPS has problem with project. Provide any comments in final-typed form on WASO letterhead to WASO-135, _____, set up for signature by the Chief, Office of Park Planning and Environmental Quality. (To OEPR by _____)    DATE DUE _____

☐ Other Instructions: (REMARKS)    DATE DUE _____

Date received in the Division of Environmental Compliance _____.
One copy of document sent to: ( ✓ above).

Release No. 2

September 1982

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
EXHIBIT 2

## NO-COMMENT RESPONSE FORM

NATIONAL PARK SERVICE

FOR USE IN PROVIDING A "NO COMMENT" RESPONSE TO WASO-135

(Send to arrive at WASO-135 by deadline date)
(May be hand printed)

ENVIRONMENTAL ASSIGNMENT: _____

TITLE OF DOCUMENT: _____

_____

_____

REVIEWING OFFICE: _____

Document has been reviewed by: _____
                              (Print or Type Name & Telephone Number)

_____

Brief description of proposal: _____

_____

_____

_____

The subject document adequately addresses NPS concerns, including any Federal,
State, Regional or local park, recreation, cultural or natural area in which
NPS has a mandated interest or jurisdiction.  This includes units of the
National Park System; existing and proposed units of the Wild and Scenic
Rivers System; National Trails System; archeological, historical, natural, or
recreation resources protected by the Antiquities Act of 1906; the Historic
Sites Act of 1935; Land and Water Conservation Act of 1965, as amended;
Federal Water Project Recreation Act of 1965; National Historic Preservation
Act of 1966, as amended; Federal Surplus Lands for Parks and Recreation
Act of 1970; Section 4(f), Department of Transportation Act of 1966, as
amended; Urban Park and Recreation Recovery Act of 1978; and other appropriate
park, recreation and historic area legislation, Executive Orders and regulations.

_____          _____
(SIGNATURE)                   (DATE)

_____
(TITLE)

September 1982

NEPA COMPLIANCE GUIDELINE
NPS-12
Review of Non-NPS Documents

Guideline
Chapter 7
EXHIBIT 3

## SECTION 4(f) of the DOT ACT

### (23 U.S.C. 138 and 49 U.S.C. 1653(f))

Section 4(f) of the Department of Transportation Act (80 Stat. 931; Public Law 89-670) as amended in Section 18 of the Federal-Aid Highway Act of 1968 (82 Stat. 815; Public Law 90-495):

"(f)  It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.  The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed.  After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge or national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

Exhibit 2
(2 of 3)

NEPA COMPLIANCE GUIDELINE
NPS-12

## COUNCIL ON ENVIRONMENTAL QUALITY REGULATIONS

### (40 CFR 1500-1508)

Council on Environmental Quality
Executive Office of the President

# REGULATIONS

For Implementing The Procedural Provisions Of The

# NATIONAL
# ENVIRONMENTAL
# POLICY ACT

Reprint
43 FR 55978–56007
November 29, 1978
40 CFR Parts 1500–1508

# CONTENTS

| | Page |
|---|---|
| Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act . . | 1 |
| The National Environmental Policy Act of 1969, as Amended . . . . . . . . . . . . | 34 |
| The Environmental Quality Improvement Act of 1970 . | 39 |
| The Clean Air Act § 309 . . . . . . . . . | 41 |
| Executive Order 11514, as Amended by Executive Order 11991 . . . . . . . . . . . . | 42 |

For further information, contact:

Nicholas C. Yost, General Counsel
Council on Environmental Quality
Executive Office of the President
722 Jackson Pl. N.W.
Washington, D.C. 20006
(202) 633-7032

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

Stock Number 041-011-00042-4

# TABLE OF CONTENTS

## PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

## PART 1501—NEPA AND AGENCY PLANNING

1501.1  Purpose.
1501.2  Apply NEPA early in the process.
1501.3  When to prepare an environmental assessment.
1501.4  Whether to prepare an environmental impact statement.
1501.5  Lead agencies.
1501.6  Cooperating agencies.
1501.7  Scoping.
1501.8  Time limits.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

1502.1  Purpose.
1502.2  Implementation.
1502.3  Statutory requirements for statements.
1502.4  Major Federal actions requiring the preparation of environmental impact statements.
1502.5  Timing.
1502.6  Interdisciplinary preparation.
1502.7  Page limits.
1502.8  Writing.
1502.9  Draft, final, and supplemental statements.
1502.10  Recommended format.
1502.11  Cover sheet.
1502.12  Summary.
1502.13  Purpose and need.
1502.14  Alternatives including the proposed action.
1502.15  Affected environment.
1502.16  Environmental consequences.
1502.17  List of preparers.
1502.18  Appendix.
1502.19  Circulation of the environmental impact statement.
1502.20  Tiering.
1502.21  Incorporation by reference.
1502.22  Incomplete or unavailable information.

Sec.
1502.23  Cost-benefit analysis.
1502.24  Methodology and scientific accuracy.
1502.25  Environmental review and consultation requirements.

## PART 1503—COMMENTING

1503.1  Inviting comments.
1503.2  Duty to comment.
1503.3  Specificity of comments.
1503.4  Response to comments.

## PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

1504.1  Purpose.
1504.2  Criteria for referral.
1504.3  Procedure for referrals and response.

## PART 1505—NEPA AND AGENCY DECISIONMAKING

1505.1  Agency decisionmaking procedures.
1505.2  Record of decision in cases requiring environmental impact statements.
1505.3  Implementing the decision.

## PART 1506—OTHER REQUIREMENTS OF NEPA

1506.1  Limitations on actions during NEPA process.
1506.2  Elimination of duplication with State and local procedures.
1506.3  Adoption.
1506.4  Combining documents.
1506.5  Agency responsibility.
1506.6  Public involvement.
1506.7  Further guidance.
1506.8  Proposals for legislation.
1506.9  Filing requirements.
1506.10  Timing of agency action.
1506.11  Emergencies.
1506.12  Effective date.

## PART 1507—AGENCY COMPLIANCE

1507.1  Compliance.
1507.2  Agency capability to comply.
1507.3  Agency procedures.

## PART 1508—TERMINOLOGY AND INDEX

1508.1  Terminology.
1508.2  Act.

1

Sec.
1508.3   Affecting.
1508.4   Categorical exclusion.
1508.5   Cooperating agency.
1508.6   Council.
1508.7   Cumulative impact.
1508.8   Effects.
1508.9   Environmental assessment.
1508.10  Environmental document.
1508.11  Environmental impact state-
         ment.
1508.12  Federal agency.
1508.13  Finding of no significant
         impact.
1508.14  Human environment.
1508.15  Jurisdiction by law.
1508.16  Lead agency.
1508.17  Legislation.
1508.18  Major Federal action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA process.
1508.22  Notice of intent.
1508.23  Proposal.
1508.24  Referring agency.
1508.25  Scope.
1508.26  Special expertise.
1508.27  Significantly.
1508.28  Tiering.
Index.

## PART 1500—PURPOSE, POLICY, AND MANDATE

1500.1   Purpose.
1500.2   Policy.
1500.3   Mandate.
1500.4   Reducing paperwork.
1500.5   Reducing delay.
1500.6   Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970 as amended by Executive Order 11991, May 24, 1977).

§ 1500.1   Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement Section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

§ 1500.2   Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run con-

73

currently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

§ 1500.3 Mandate.

Parts 1500-1508 of this Title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91-190, 42 U.S.C. 4321 et seq.) (NEPA or the Act) except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.) Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to Sec. 102(2)(C) (environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will

result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

§ 1500.4 Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Reducing the length of environmental impact statements (§ 1502.2(c)), by means such as setting appropriate page limits (§§ 1501.7(b)(1) and 1502.7).

(b) Preparing analytic rather than encyclopedic environmental impact statements (§ 1502.2(a)).

(c) Discussing only briefly issues other than significant ones (§ 1502.2(b)).

(d) Writing environmental impact statements in plain language (§ 1502.8).

(e) Following a clear format for environmental impact statements (§ 1502.10).

(f) Emphasizing the portions of the environmental impact statement that are useful to decisionmakers and the public (§§ 1502.14 and 1502.15) and reducing emphasis on background material (§ 1502.16).

(g) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.7).

(h) Summarizing the environmental impact statement (§ 1502.12) and circulating the summary instead of the entire environmental impact statement if the latter is unusually long (§ 1502.19).

(i) Using program, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1502.4 and 1502.20).

(j) Incorporating by reference (§ 1502.21).

(k) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(l) Requiring comments to be as specific as possible (§ 1503.3).

3

(m) Attaching and circulating only changes to the draft environmental impact statement, rather than rewriting and circulating the entire statement when changes are minor (§ 1503.4(c)).

(n) Eliminating duplication with State and local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(o) Combining environmental documents with other documents (§ 1506.4).

(p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (§ 1508.4).

(q) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§ 1508.13).

§ 1500.5  Reducing delay.

Agencies shall reduce delay by:

(a) Integrating the NEPA process into early planning (§ 1501.2).

(b) Emphasizing interagency cooperation before the environmental impact statement is prepared, rather than submission of adversary comments on a completed document (§ 1501.6).

(c) Insuring the swift and fair resolution of lead agency disputes (§ 1501.5).

(d) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.7).

(e) Establishing appropriate time limits for the environmental impact statement process (§§ 1501.7(b)(2) and 1501.8).

(f) Preparing environmental impact statements early in the process (§ 1502.5).

(g) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(h) Eliminating duplication with State and local procedures by providing for joint preparation (§ 1506.2) and with other Federal procedures by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(i) Combining environmental documents with other documents (§ 1506.4).

(j) Using accelerated procedures for proposals for legislation (§ 1506.8).

(k) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment (§ 1508.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(l) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1508.13) and is therefore exempt from requirements to prepare an environmental impact statement.

§ 1500.6  Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to insure full compliance with the purposes and provisions of the Act. The phrase "to the fullest extent possible" in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

———

## PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1  Purpose.
1501.2  Apply NEPA early in the process.

4

Sec.
1501.3  When to prepare an environmental assessment.
1501.4  Whether to prepare an environmental impact statement.
1501.5  Lead agencies.
1501.6  Cooperating agencies.
1501.7  Scoping.
1501.8  Time limits.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24 1977).

§ 1501.1  Purpose.

The purposes of this part include:

(a) Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b) Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c) Providing for the swift and fair resolution of lead agency disputes.

(d) Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e) Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

§ 1501.2  Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in

planning and in decisionmaking which may have an impact on man's environment," as specified by § 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

§ 1501.3  When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

§ 1501.4  Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

5

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

§ 1501.5  Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action.

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agency shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

6

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

§ 1501.6  Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

(2) Participate in the scoping process (described below in § 1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance

the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b) (3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

§ 1501.7  Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

(2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review

(§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (§ 1502.7).

(2) Set time limits (§ 1501.8).

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

**§ 1501.8   Time limits.**

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by § 1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: *Provided,* That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

(1) Consider the following factors in determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic techniques.

(iv) Degree of public need for the proposed action, including the consequences of delay.

(v) Number of persons and agencies affected.

(vi) Degree to which relevant information is known and if not known the time required for obtaining it.

(vii) Degree to which the action is controversial.

(viii) Other time limits imposed on the agency by law, regulations, or executive order.

(2) Set overall time limits or limits for each constituent part of the NEPA process, which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).

(ii) Determination of the scope of the environmental impact statement.

(iii) Preparation of the draft environmental impact statement.

(iv) Review of any comments on the draft environmental impact statement from the public and agencies.

(v) Preparation of the final environmental impact statement.

(vi) Review of any comments on the final environmental impact statement.

8

(vii) Decision on the action based in part on the environmental impact statement.

(3) Designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(c) State or local agencies or members of the public may request a Federal Agency to set time limits.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1  Purpose.
1502.2  Implementation.
1502.3  Statutory  Requirements  for Statements.
1502.4  Major Federal Actions Requiring the Preparation of Environmental Impact Statements.
1502.5  Timing.
1502.6  Interdisciplinary Preparation.
1502.7  Page Limits.
1502.8  Writing.
1502.9  Draft, Final, and Supplemental Statements.
1502.10  Recommended Format.
1502.11  Cover Sheet.
1502.12  Summary.
1502.13  Purpose and Need.
1502.14  Alternatives Including the Proposed Action.
1502.15  Affected Environment.
1502.16  Environmental Consequences.
1502.17  List of Preparers.
1502.18  Appendix.
1502.19  Circulation of the Environmental Impact Statement.
1502.20  Tiering.
1502.21  Incorporation by Reference.
1502.22  Incomplete or Unavailable Information.
1502.23  Cost-Benefit Analysis.
1502.24  Methodology  and  Scientific Accuracy.
1502.25  Environmental Review and Consultation Requirements.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

## § 1502.1  Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

## § 1502.2  Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact

statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

§ 1502.3 Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report

On proposals (§ 1508.23)

For legislation and (§ 1508.17)

Other major Federal actions (§ 1508.18)

Significantly (§ 1508.27)

Affecting (§§ 1508.3, 1508.8)

The quality of the human environment (§ 1508.14).

§ 1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.7), tiering (§ 1502.20), and other methods listed in §§ 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

§ 1502.5 Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately

10

after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

§ 1502.6  Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

§ 1502.7  Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

§ 1502.8  Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

§ 1502.9  Draft, final, and supplemental statements.

Except for proposals for legislation as provided in § 1506.8 environmen-

tal impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in Part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in Part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in

the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

§ 1502.10  Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of Contents.

(d) Purpose of and Need for Action.

(e) Alternatives Including Proposed Action (secs. 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected Environment.

(g) Environmental Consequences (especially sections 102(2)(C) (i), (ii), (iv), and (v) of the Act).

(h) List of Preparers.

(i) List of Agencies, Organizations, and Persons to Whom Copies of the Statement Are Sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§ 1502.11–1502.18, in any appropriate format.

§ 1502.11  Cover sheet.

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the

agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

§ 1502.12  Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

§ 1502.13  Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

§ 1502.14  Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action

so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

## § 1502.15  Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

## § 1502.16  Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by secs. 102(2)(C) (i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of sec. 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irre-

versible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

## § 1502.17  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

## § 1502.18  Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

13

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

## § 1502.19  Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

## § 1502.20  Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision

at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included with in the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Sec. 1508.28).

## § 1502.21  Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

## § 1502.22  Incomplete or unavailable information.

When an agency is evaluating significant adverse effects on the human environment in an environmental impact statement and there are gaps in relevant information or scientific uncertainty, the agency shall always make clear that such information is lacking or that uncertainty exists.

(a) If the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are not exorbitant, the agency shall include the information

14

85

in the environmental impact statement.

(b) If (1) the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are exorbitant or (2) the information relevant to adverse impacts is important to the decision and the means to obtain it are not known (e.g., the means for obtaining it are beyond the state of the art) the agency shall weigh the need for the action against the risk and severity of possible adverse impacts were the action to proceed in the face of uncertainty. If the agency proceeds, it shall include a worst case analysis and an indication of the probability or improbability of its occurrence.

## § 1502.23   Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with sec. 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

## § 1502.24   Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

## § 1502.25   Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. Sec. 661 et seq.), the National Historic Preservation Act of 1966 (16 U.S.C. Sec. 470 et seq.), the Endangered Species Act of 1973 (16 U.S.C. Sec. 1531 et seq.), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

---

## PART 1503—COMMENTING

Sec.
1503.1   Inviting Comments.
1503.2   Duty to Comment.
1503.3   Specificity of Comments.
1503.4   Response to Comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

## § 1503.1   Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdic-

tion by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A-95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10.

§ 1503.2  Duty to comment.

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in §1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

§ 1503.3  Specificity of comments.

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

§ 1503.4  Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do

not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a) (4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§ 1502.19). The entire document with a new cover sheet shall be filed as the final statement (§ 1506.9).

---

PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1 Purpose.
1504.2 Criteria for Referral.
1504.3 Procedure for Referrals and Response.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

§ 1504.1 Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council and the public.

§ 1504.2 Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as possible in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies.
(b) Severity.
(c) Geographical scope.
(d) Duration.
(e) Importance as precedents.
(f) Availability of environmentally preferable alternatives.

§ 1504.3 Procedure for referrals and response.

(a) A Federal agency making the referral to the Council shall:
(1) Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.

17

(2) Include such advice in the referring agency's comments on the draft environmental impact statement, except when the statement does not contain adequate information to permit an assessment of the matter's environmental acceptability.

(3) Identify any essential information that is lacking and request that it be made available at the earliest possible time.

(4) Send copies of such advice to the Council.

(b) The referring agency shall deliver its referral to the Council not later than twenty-five (25) days after the final environmental impact statement has been made available to the Environmental Protection Agency, commenting agencies, and the public. Except when an extension of this period has been granted by the lead agency, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it, and requesting that no action be taken to implement the matter until the Council acts upon the referral. The letter shall include a copy of the statement referred to in (c)(2) below.

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any material facts in controversy and incorporate (by reference if appropriate) agreed upon facts.

(ii) Identify any existing environmental requirements or policies which would be violated by the matter.

(iii) Present the reasons why the referring agency believes the matter is environmentally unsatisfactory.

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason.

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time, and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) Not later than twenty-five (25) days after the referral to the Council the lead agency may deliver a response to the Council and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral.

(2) Be supported by evidence.

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Interested persons (including the applicant) may deliver their views in writing to the Council. Views in support of the referral should be delivered not later than the referral. Views in support of the response shall be delivered not later than the response.

(f) Not later than twenty-five (25) days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Hold public meetings or hearings to obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of

agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f) (2), (3), or (5) of this section.

(h) When the referral involves an action required by statute to be determined on the record after opportunity for agency hearing, the referral shall be conducted in a manner consistent with 5 U.S.C. 557(d) (Administrative Procedure Act).

---

## PART 1505—NEPA AND AGENCY DECISIONMAKING

Sec.
1505.1 Agency decisionmaking procedures.
1505.2 Record of decision in cases requiring environmental impact statements.
1505.3 Implementing the decision.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

### § 1505.1 Agency decisionmaking procedures.

Agencies shall adopt procedures (§ 1507.3) to ensure that decisions are made in accordance with the policies and purposes of the Act. Such procedures shall include but not be limited to:

(a) Implementing procedures under section 102(2) to achieve the requirements of sections 101 and 102(1).

(b) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment

and assuring that the NEPA process corresponds with them.

(c) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(d) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that agency officials use the statement in making decisions.

(e) Requiring that the alternatives considered by the decisionmaker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decisionmaker consider the alternatives described in the environmental impact statement. If another decision document accompanies the relevant environmental documents to the decisionmaker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

### § 1505.2 Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.10) or, if appropriate, its recommendation to Congress, each agency shall prepare a concise public record of decision. The record, which may be integrated into any other record prepared by the agency, including that required by OMB Circular A-95 (Revised), part I, sections 6 (c) and (d), and part II, section 5(b)(4), shall:

(a) State what the decision was.

(b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how

19

those considerations entered into its decision.

(c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

### § 1505.3   Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or commenting agencies on progress in carrying out mitigation measures which they have proposed and which were adopted by the agency making the decision.

(d) Upon request, make available to the public the results of relevant monitoring.

---

## PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.
1506.1  Limitations on actions during NEPA process.
1506.2  Elimination of duplication with State and local procedures.
1506.3  Adoption.
1506.4  Combining documents.
1506.5  Agency responsibility.
1506.6  Public involvement.
1506.7  Further guidance.
1506.8  Proposals for legislation.
1506.9  Filing requirements.
1506.10  Timing of agency action.
1506.11  Emergencies.
1506.12  Effective date.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

### § 1506.1   Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of

20

minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

§ 1506.2 Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsisten-

cy of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

§ 1506.3 Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.

§ 1506.4 Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

§ 1506.5 Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of

21

G2

information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this subparagraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or

to prohibit any person from submitting information to any agency.

§ 1506.6  Public involvement.

Agencies shall: (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A-95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appro-

22

priate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

§ 1506.7  Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a) A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b) Publication of the Council's Memoranda to Heads of Agencies.

(c) In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

(1) Research activities;

(2) Meetings and conferences related to NEPA; and

(3) Successful and innovative procedures used by agencies to implement NEPA.

§ 1506.8  Proposals for legislation.

(a) The NEPA process for proposals for legislation (§ 1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b) Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

(1) There need not be a scoping process.

(2) The legislative statement shall be prepared in the same manner as a draft statement, but shall be considered the "detailed statement" required by statute; Provided, That when any of the following conditions exist both the draft and final environmental impact statement on the legislative proposal shall be prepared and circulated as provided by §§ 1503.1 and 1506.10.

(i) A Congressional Committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C.

23

1271 et seq.) and the Wilderness Act (16 U.S.C. 1131 et seq.)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(c) Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.

§ 1506.9  Filing requirements.

Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities (A-104), 401 M Street SW., Washington, D.C. 20460. Statements shall be filed with EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its responsibilities under this section and § 1506.10 below.

§ 1506.10  Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the FEDERAL REGISTER each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b) No decision on the proposed action shall be made or recorded under § 1505.2 by a Federal agency until the later of the following dates:

(1) Ninety (90) days after publication of the notice described above in

paragraph (a) of this section for a draft environmental impact statement.

(2) Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement.

An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

(c) If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies shall allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy

reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see § 1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

### § 1506.11   Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

### § 1506.12   Effective date.

The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under sec. 102(2)(D) of the Act or under sec. 104(h) of the Housing and Community Development Act of 1974 an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

(a) These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need be redone by reason of these regulations. Until these regulations are applicable, the Council's guidelines published in the FEDERAL REGISTER of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the

guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time.

(b) NEPA shall continue to be applicable to actions begun before January 1, 1970, to the fullest extent possible.

---

## PART 1507—AGENCY COMPLIANCE

Sec.
1507.1   Compliance.
1507.2   Agency Capability to Comply.
1507.3   Agency Procedures.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

### § 1507.1   Compliance.

All agencies of the Federal Government shall comply with these regulations. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by § 1507.3 to the requirements of other applicable laws.

### § 1507.2   Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to evaluate what others do for it. Agencies shall:

(a) Fulfill the requirements of Sec. 102(2)(A) of the Act to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on the human environment. Agencies shall designate a person to be responsible for overall review of agency NEPA compliance.

(b) Identify methods and procedures required by Sec. 102(2)(B) to

25

insure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to Sec. 102(2)(C) and comment on statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of Sec. 102(2)(E) extends to all such proposals, not just the more limited scope of Sec. 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.

(e) Comply with the requirements of Sec. 102(2)(H) that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of the Act and of Executive Order 11514, Protection and Enhancement of Environmental Quality, Sec. 2.

§ 1507.3  Agency procedures.

(a) Not later than eight months after publication of these regulations as finally adopted in the FEDERAL REGISTER, or five months after the establishment of an agency, whichever shall come later, each agency shall as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the FEDERAL REGISTER for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting simi-

lar information from applicants. The procedures shall be adopted only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations. The Council shall complete its review within 30 days. Once in effect they shall be filed with the Council and made readily available to the public. Agencies are encouraged to publish explanatory guidance for these regulations and their own procedures. Agencies shall continue to review their policies and procedures and in consultation with the Council to revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(b) Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(c) Agency procedures may include specific criteria for providing limited exceptions to the provisions of these regulations for classified proposals. They are proposed actions which are specifically authorized under criteria established by an Executive Order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order or statute. Environmental assessments and environmental impact statements which address classified proposals may be safeguarded and restricted from public dissemination in accordance with agencies' own regulations applicable to classified information. These documents may be organized so that classified por-

26

tions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in § 1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by § 1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

---

## PART 1508—TERMINOLOGY AND INDEX

Sec.
1508.1   Terminology.
1508.2   Act.
1508.3   Affecting.
1508.4   Categorical Exclusion.
1508.5   Cooperating Agency.
1508.6   Council.
1508.7   Cumulative Impact.
1508.8   Effects.
1508.9   Environmental Assessment.
1508.10  Environmental Document.
1508.11  Environmental Impact Statement.
1508.12  Federal Agency.
1508.13  Finding of No Significant Impact.
1508.14  Human Environment.
1508.15  Jurisdiction by Law.
1508.16  Lead Agency.
1508.17  Legislation.
1508.18  Major Federal Action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA Process.
1508.22  Notice of Intent.
1508.23  Proposal.
1508.24  Referring Agency.
1508.25  Scope.
1508.26  Special Expertise.
1508.27  Significantly.
1508.28  Tiering.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

§ 1508.1   Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

§ 1508.2   Act.

"Act" means the National Environmental Policy Act, as amended (42 U.S.C. 4321, et seq.) which is also referred to as "NEPA."

§ 1508.3   Affecting.

"Affecting" means will or may have an effect on.

§ 1508.4   Categorical exclusion.

"Categorical Exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

§ 1508.5   Cooperating agency.

"Cooperating Agency" means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in § 1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

§ 1508.6   Council.

"Council" means the Council on Environmental Quality established by Title II of the Act.

## § 1508.7  Cumulative impact.

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

## § 1508.8  Effects.

"Effects" include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

## § 1508.9  Environmental assessment.

"Environmental Assessment":

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

## § 1508.10  Environmental document.

"Environmental document" includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

## § 1508.11  Environmental impact statement.

"Environmental Impact Statement" means a detailed written statement as required by Sec. 102(2)(C) of the Act.

## § 1508.12  Federal agency.

"Federal agency" means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

## § 1508.13  Finding of no significant impact.

"Finding of No Significant Impact" means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

## § 1508.14  Human Environment.

"Human Environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§ 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

## § 1508.15  Jurisdiction By Law.

"Jurisdiction by law" means agency authority to approve, veto, or finance all or part of the proposal.

## § 1508.16  Lead agency.

"Lead Agency" means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

## § 1508.17  Legislation.

"Legislation" includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

## § 1508.18  Major Federal action.

"Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

§ 1508.19  Matter.

"Matter" includes for purposes of Part 1504:

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in Section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

§ 1508.20  Mitigation.

"Mitigation" includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

§ 1508.21  NEPA process.

"NEPA process" means all measures necessary for compliance with the requirements of Section 2 and Title I of NEPA.

§ 1508.22  Notice of intent.

"Notice of Intent" means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

§ 1508.23  Proposal.

"Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

§ 1508.24  Referring agency.

"Referring agency" means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

§ 1508.25  Scope.

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when

30

viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include: (1) No action alternative. (2) Other reasonable courses of actions. (3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct. (2) Indirect. (3) Cumulative.

## § 1508.26 Special expertise.

"Special expertise" means statutory responsibility, agency mission, or related program experience.

## § 1508.27 Significantly.

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

## § 1508.28 Tiering.

"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on

31

102

the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

## Index

| | |
|---|---|
| Act | 1508.2 |
| Action | 1508.3, 1508.25 |
| Action-forcing | 1500.1, 1502.1 |
| Adoption | 1500.4(n), 1506.6(h), 1506.3 |
| Affected Environment | 1502.10(f), 1502.15 |
| Affecting | 1502.3, 1508.3 |
| Agency Authority | 1500.6 |
| Agency Capability | 1501.2(a), 1507.2 |
| Agency Compliance | 1507.1 |
| Agency Procedures | 1505.1, 1507.3 |
| Agency Responsibility | 1505.5 |
| Alternatives | 1501.2(c), 1502.2, 1502.10(e), 1502.14, 1505.1(e), 1508.2, 1507.2(d), 1508.25(b) |
| Appendices | 1502.10(k), 1502.18, 1502.24 |
| Applicant | 1501.2(d)(1), 1501.4(b), 1501.8(a), 1502.19(b), 1503.1(a)(3), 1504.3(a), 1506.1(d), 1506.5(a), 1506.5(b) |
| Apply NEPA Early in the Process. | 1501.2 |
| Categorical Exclusion | 1500.4(p), 1500.5(k), 1501.4(a), 1507.3(b), 1508.4 |
| Circulating of Environmental Impact Statement. | 1502.19, 1506.3 |
| Classified Information | 1507.3(c) |
| Clean Air Act | 1504.1, 1506.10(a) |
| Combining Documents | 1500.4(o), 1500.5(i), 1506.4 |
| Commenting | 1503.19, 1503.1, 1503.2, 1503.3, 1503.4, 1506.6(f) |
| Consultation Requirement. | 1501.7(a)(6), 1502.25 |
| Context | 1508.27(c) |
| Cooperating Agency | 1500.5(b), 1501.5(b), 1501.5(c), 1501.5(f), 1501.6, 1503.1(a)(1), 1503.2, 1503.3, 1506.3(c), 1506.5(a), 1508.5 |
| Cost-Benefit | 1502.23 |
| Council on Environmental Quality. | 1506.5, 1501.3(e), 1501.5(f), 1501.6(e), 1502.9(c)(4), 1504.1, 1504.2, 1504.3, 1506.6(f), 1506.9, 1506.10(e), 1506.11, 1507.3, 1508.6, 1508.24 |

## Index

| | |
|---|---|
| Cover Sheet | 1502.19(a), 1502.11 |
| Cumulative Impact | 1508.7, 1508.25(a), 1508.25(c) |
| Decisionmaking | 1505.1, 1506.1 |
| Decision points | 1505.1(b) |
| Dependent | 1508.25(a) |
| Draft Environmental Impact Statement. | 1502.9(a) |
| Early Application of NEPA. | 1501.2 |
| Economic Effects | 1508.8 |
| Effective Date | 1506.12 |
| Effects | 1502.16, 1508.8 |
| Emergencies | 1506.11 |
| Endangered Species Act | 1502.25, 1508.27(b)(9) |
| Energy | 1502.16(e) |
| Environmental Assessment. | 1501.3, 1501.4(b), 1501.4(c), 1501.7(b)(3), 1506.5(b), 1508.4, 1508.9, 1508.10, 1508.13 |
| Environmental Consequences. | 1502.19(g), 1502.16 |
| Environmental Consultation Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c) |
| Environmental Documents. | 1508.10 |
| Environmental Impact Statement. | 1500.4, 1501.4(e), 1501.7, 1502.1, 1502.1, 1502.2, 1502.3, 1502.4, 1502.5, 1502.6, 1502.7, 1502.8, 1502.9, 1502.10, 1502.11, 1502.12, 1502.13, 1502.14, 1502.15, 1502.16, 1502.17, 1502.18, 1502.19, 1502.20, 1502.21, 1502.22, 1502.23, 1502.24, 1502.25, 1506.2(b)(4), 1506.3, 1508.8, 1508.11 |
| Environmental Protection Agency. | 1502.11(f), 1504.1, 1504.3, 1504.7(c), 1506.9, 1506.10, 1506.10(a) |
| Environmental Review Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c) |
| Expediter | 1501.8(b)(2) |
| Federal Agency | 1508.12 |
| Filing | 1506.9 |
| Final Environmental Impact Statement. | 1502.9(b), 1503.1, 1503.4(b) |
| Finding of No Significant Impact. | 1500.3, 1500.4(c), 1500.5(l), 1501.4(e), 1508.13 |
| Fish and Wildlife Coordination Act. | 1502.25 |
| Format for Environmental Impact Statement. | 1502.10 |
| Freedom of Information Act. | 1506.6(f) |
| Further Guidance | 1506.7 |
| Generic | 1502.4(c)(2) |
| General Services Administration. | 1506.8(b)(5) |
| Geographic | 1502.4(c)(1) |
| Graphics | 1502.8 |
| Handbook | 1506.7(a) |
| Housing and Community Development Act. | 1506.12, 1508.12 |
| Human Environment | 1502.3, 1502.22, 1508.14 |
| Impacts | 1508.8, 1508.25(c) |
| Implementing the Decision. | 1505.3 |
| Incomplete or Unavailable Information. | 1502.22 |
| Incorporation by Reference. | 1500.4(j), 1502.21 |
| Index | 1502.10(j) |
| Indian Tribes | 1501.2(d)(2), 1501.7(a)(1), 1502.15(c), 1503.1(a)(2)(ii), 1506.6(b)(3)(ii), 1508.5, 1508.12 |

**Index**

Intensity — 1508.27(b)
Interdisciplinary Preparation — 1502.6, 1502.17
Interim Actions — 1506.1
Joint Lead Agency — 1501.5(b), 1506.2
Judicial Review — 1500.3
Jurisdiction by Law — 1508.15
Lead Agency — 1500.5(c), 1501.1(c), 1501.5, 1501.6, 1501.7, 1501.8, 1504.3, 1506.2(b)(4), 1506.8(a), 1506.10(c), 1508.16
Legislation — 1500.5(j), 1502.3, 1506.8, 1508.17, 1508.18(a)
Limitation on Action During NEPA Process — 1506.1
List of Preparers — 1502.10(h), 1502.17
Local or State — 1500.4(n), 1500.5(h), 1501.2(d)(2), 1501.5(b), 1501.5(d), 1501.7(a)(1), 1501.8(c), 1502.16(c), 1503.1(a)(2), 1506.2(b), 1506.6(b)(3), 1508.5, 1508.12, 1508.18
Major Federal Action — 1502.3, 1508.18
Mandate — 1500.3
Matter — 1504.1, 1504.2, 1504.3, 1508.19
Methodology — 1502.24
Mitigation — 1502.14(h), 1502.16(h), 1503.3(d), 1505.2(c), 1505.3, 1508.20
Monitoring — 1505.2(c), 1505.3
National Historic Preservation Act. — 1502.25
National Register of Historical Places. — 1508.27(b)(3)
Natural or Depletable Resource Requirements. — 1502.16(f)
Need for Action — 1502.10(d), 1502.13
NEPA Process — 1508.21
Non-Federal Sponsor — 1501.2(d)
Notice of Intent — 1501.7, 1507.3(e), 1508.22
OMB Circular A-95 — 1503.1(a)(2)(iii), 1506.2, 1506.6(b)(3)(i)
102 Monitor — 1506.6(b)(2), 1506.7(c)
Ongoing Activities — 1506.12
Page Limits — 1500.4(a), 1501.7(b), 1502.7
Planning — 1500.5(a), 1501.2(b), 1502.4(a), 1508.18
Policy — 1500.2, 1502.4(b), 1508.18(a)
Program Environmental Impact Statement. — 1500.4(i), 1502.4, 1502.20, 1508.18
Programs — 1502.4, 1508.18(b)
Projects — 1508.18
Proposal — 1502.4, 1502.5, 1506.8, 1508.23
Proposed Action — 1502.10(e), 1502.14, 1506.2(c)

Public Health and Welfare. — 1504.1
Public Involvement — 1501.4(e), 1503.1(a)(3), 1506.6
Purpose — 1500.2, 1501.1, 1502.1, 1504.1
Purpose of Action — 1502.10(d), 1502.13
Record of Decision — 1505.2, 1506.1
Referrals — 1504.1, 1504.2, 1504.3, 1506.3(d)
Referring Agency — 1504.1, 1504.2, 1504.3
Response to Comments — 1503.4
Rural Electrification Administration. — 1506.1(d)
Scientific Accuracy — 1502.24
Scope — 1502.4(a), 1502.9(a), 1508.25
Scoping — 1500.4(b), 1501.1(d), 1501.4(d), 1501.7, 1502.9(a), 1506.8(a)
Significantly — 1502.3, 1508.27
Similar — 1508.25
Small Business Associations. — 1506.6(b)(3)(vi)
Social Effects — 1508.2
Special Expertise — 1508.26
Specificity of Comments — 1500.4(l), 1503.3
State and Areawide Clearinghouses. — 1501.4(e)(2), 1503.1(a)(2)(iii), 1506.6(b)(3)(i)
State and Local — 1500.4(n), 1500.5(h), 1501.2(d)(2), 1501.5(b), 1501.5(d), 1501.7(a)(1), 1501.8(c), 1502.16(c), 1503.1(a)(2), 1506.2(b), 1506.6(b)(3), 1508.5, 1508.12, 1508.18
State and Local Fiscal Assistance Act. — 1508.18(a)
Summary — 1500.4(h), 1502.10(b), 1502.12
Supplements to Environmental Impact Statements. — 1502.9(c)
Table of Contents — 1502.10(c)
Technological Development. — 1502.4(c)(3)
Terminology — 1508.1
Tiering — 1500.4(i), 1502.4(d), 1502.20, 1508.28
Time Limits — 1500.5(e), 1501.1(e), 1501.7(b)(2), 1501.8
Timing — 1502.4, 1502.5, 1506.10
Treaties — 1508.17
When to Prepare an Environmental Impact Statement. — 1501.3
Wild and Scenic Rivers Act. — 1506.8(b)(3)
Wilderness Act — 1506.8(b)(3)
Writing — 1502.8

1 of 4

# THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969, AS AMENDED*

An Act to establish a national policy for the environment, to provide for the establishment of a Council on Environmental Quality, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "National Environmental Policy Act of 1969."

## PURPOSE

**SEC. 2.** The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

## TITLE I

### DECLARATION OF NATIONAL ENVIRONMENTAL POLICY

**SEC. 101.** (a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

*Pub. L. 91-190, 42 U.S.C. 4321-4347, January 1, 1970, as amended by Pub. L. 94-52, July 3, 1975, and Pub. L. 94-83, August 9, 1975.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

(A) Utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) Identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) Include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) The environmental impact of the proposed action,

(ii) Any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) Alternatives to the proposed action,

(iv) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

(d) Any detailed statement required under subparagraph (c) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this Act; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

(e) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(f) Recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(g) Make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(h) Initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(i) Assist the Council on Environmental Quality established by title II of this Act.

SEC. 103. All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this Act and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this Act.

SEC. 104. Nothing in section 102 or 103 shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

SEC. 105. The policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal agencies.

# TITLE II

## COUNCIL ON ENVIRONMENTAL QUALITY

SEC. 201. The President shall transmit to the Congress annually beginning July 1, 1970, an Environmental Quality Report (hereinafter referred to as the "report") which shall set forth (1) the status and condition of the major natural, manmade, or altered environmental classes of the Nation, including, but not limited to, the air, the aquatic, including marine, estuarine, and fresh water, and the terrestrial environment, including, but not limited to, the forest, dryland, wetland, range; urban, suburban and rural environment; (2) current and foreseeable trends in the quality, management and utilization of such environments and the effects of those trends on the social, economic, and other requirements of the Nation; (3) the adequacy of available natural resources for fulfilling human and economic requirements of the Nation in the light of expected population pressures; (4) a review of the programs and activities (including regulatory activities) of the Federal Government, the State and local governments, and nongovernmental entities or individuals with particular reference to their effect on the environment and on the conservation, development and utilization of natural resources; and (5) a program for remedying the deficiencies of existing programs and activities, together with recommendations for legislation.

SEC. 202. There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in title I of this Act; to be conscious of and responsive to

the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment.

Sec. 203. The Council may employ such officers and employees as may be necessary to carry out its functions under this Act. In addition, the Council may employ and fix the compensation of such experts and consultants as may be necessary for the carrying out of its functions under this Act, in accordance with section 3109 of title 5, United States Code (but without regard to the last sentence thereof).

Sec. 204. It shall be the duty and function of the Council—

(1) to assist and advise the President in the preparation of the Environmental Quality Report required by section 201 of this title;

(2) to gather timely and authoritative information concerning the conditions and trends in the quality of the environment both current and prospective, to analyze and interpret such information for the purpose of determining whether such conditions and trends are interfering, or are likely to interfere, with the achievement of the policy set forth in title I of this Act, and to compile and submit to the President studies relating to such conditions and trends;

(3) to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in title I of this Act for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy, and to make recommendations to the President with respect thereto;

(4) to develop and recommend to the President national policies to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation;

(5) to conduct investigations, studies, surveys, research, and analyses relating to ecological systems and environmental quality;

(6) to document and define changes in the natural environment, including the plant and animal systems, and to accumulate necessary data and other information for a continuing analysis of these changes or trends and an interpretation of their underlying causes;

(7) to report at least once each year to the President on the state and condition of the environment; and

(8) to make and furnish such studies, reports thereon, and recommendations with respect to matters of policy and legislation as the President may request.

Sec. 205. In exercising its powers, functions, and duties under this Act, the Council shall—

(1) Consult with the Citizens' Advisory Committee on Environmental Quality established by Executive Order No. 11472, dated May 29, 1969, and with such representatives of science, industry, agriculture, labor, conservation organizations, State and local governments and other groups, as it deems advisable; and

(2) Utilize, to the fullest extent possible, the services, facilities and information (including statistical information) of public and private agencies and organizations, and individuals, in order that duplication of effort and expense may be avoided, thus assuring that the Council's activities will not unnecessarily overlap or conflict with similar activities authorized by law and performed by established agencies.

Sec. 206. Members of the Council shall serve full time and the Chairman of the Council shall be compensated at the rate provided for Level II of the Executive Schedule Pay Rates (5 U.S.C. 5313). The other members of the Council shall be compensated at the rate provided for Level IV of the Executive Schedule Pay Rates (5 U.S.C. 5315).

Sec. 207. The Council may accept reimbursements from any private nonprofit organization or from any department, agency, or instrumentality of the Federal Government, any State, or local government, for the reasonable travel expenses incurred by an officer or employee of the Council in connection with his attendance at any conference, seminar, or similar meeting conducted for the benefit of the Council.

Sec. 208. The Council may make expenditures in support of its international activities, including expenditures for: (1) international travel; (2) activities in implementation of international agreements; and (3) the sup-

37

port of international exchange programs in the United States and in foreign countries.

SEC. 209. There are authorized to be appropriated to carry out the provisions of this chapter not to exceed $300,000 for fiscal year 1970, $700,000 for fiscal year 1971, and $1,000,000 for each fiscal year thereafter.

38

# THE ENVIRONMENTAL QUALITY IMPROVEMENT ACT OF 1970*

## TITLE II—ENVIRONMENTAL QUALITY
## (OF THE WATER QUALITY IMPROVEMENT ACT OF 1974)

### SHORT TITLE

SEC. 201. This title may be cited as the "Environmental Quality Improvement Act of 1970."

### FINDINGS, DECLARATIONS, AND PURPOSES

SEC. 202. (a) The Congress finds—

(1) That man has caused changes in the environment;

(2) That many of these changes may affect the relationship between man and his environment; and

(3) That population increases and urban concentration contribute directly to pollution and the degradation of our environment.

(b)(1) The Congress declares that there is a national policy for the environment which provides for the enhancement of environmental quality. This policy is evidenced by statutes heretofore enacted relating to the prevention, abatement, and control of environmental pollution, water and land resources, transportation, and economic and regional development.

(2) The primary responsibility for implementing this policy rests with State and local governments.

(3) The Federal Government encourages and supports implementation of this policy through appropriate regional organizations established under existing law.

(c) The purposes of this title are—

(1) To assure that each Federal department and agency conducting or supporting public works activities which affect the environment shall implement the policies established under existing law; and

(2) To authorize an Office of Environmental Quality, which, notwithstanding any other provision of law, shall provide the professional and administrative staff for the Council on Environmental Quality established by Public Law 91–190.

### OFFICE OF ENVIRONMENTAL QUALITY

SEC. 203. (a) There is established in the Executive Office of the President an office to be known as the Office of Environmental Quality (hereafter in this title referred to as the "Office"). The Chairman of the Council on Environmental Quality established by Public Law 91–190 shall be the Director of the Office. There shall be in the Office a Deputy Director who shall be appointed by the President, by and with the advice and consent of the Senate.

(b) The compensation of the Deputy Director shall be fixed by the President at a rate not in excess of the annual rate of compensation payable to the Deputy Director of the Bureau of the Budget.

(c) The Director is authorized to employ such officers and employees (including experts and consultants) as may be necessary to enable the Office to carry out its functions under this title and Public Law 91–190, except that he may employ no more than 10 specialists and other experts without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and pay such specialists and experts without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but no such specialist or

*Pub. L. 91–224, 42 U.S.C. 4371–4374, April 3, 1970.

expert shall be paid at a rate in excess of the maximum rate for GS–18 of the General Schedule under section 5330 of title 5.

(d) In carrying out his functions the Director shall assist and advise the President on policies and programs of the Federal Government affecting environmental quality by—

(1) Providing the professional and administrative staff and support for the Council on Environmental Quality established by Public Law 91–190;

(2) Assisting the Federal agencies and departments in appraising the effectiveness of existing and proposed facilities, programs, policies, and activities of the Federal Government, and those specific major projects designated by the President which do not require individual project authorization by Congress, which affect environmental quality;

(3) Reviewing the adequacy of existing systems for monitoring and predicting environmental changes in order to achieve effective coverage and efficient use of research facilities and other resources;

(4) Promoting the advancement of scientific knowledge of the effects of actions and technology on the environment and encourage the development of the means to prevent or reduce adverse effects that endanger the health and well-being of man;

(5) Assisting in coordinating among the Federal departments and agencies those programs and activities which affect, protect, and improve environmental quality;

(6) Assisting the Federal departments and agencies in the development and interrelationship of environmental quality criteria and standards established through the Federal Government;

(7) Collecting, collating, analyzing, and interpreting data and information on environmental quality, ecological research, and evaluation.

(e) The Director is authorized to contract with public or private agencies, institutions, and organizations and with individuals without regard to sections 3618 and 3709 of the Revised Statutes (31 U.S.C. 529; 41 U.S.C. 5) in carrying out his functions.

## REPORT

Sec. 204. Each Environmental Quality Report required by Public Law 91–190 shall, upon transmittal to Congress, be referred to each standing committee having jurisdiction over any part of the subject matter of the Report.

## AUTHORIZATION

Sec. 205 There are hereby authorized to be appropriated not to exceed $500,000 for the fiscal year ending June 30, 1970, not to exceed $750,000 for the fiscal year ending June 30, 1971, not to exceed $1,250,000 for the fiscal year ending June 30, 1972, and not to exceed $1,500,000 for the fiscal year ending June 30, 1973. These authorizations are in addition to those contained in Public Law 91–190.

Approved April 3, 1970.

# THE CLEAN AIR ACT § 309[*]

## § 7609.  Policy review

(a) The Administrator shall review and comment in writing on the environmental impact of any matter relating to duties and responsibilities granted pursuant to this chapter or other provisions of the authority of the Administrator, contained in any (1) legislation proposed by any Federal department or agency, (2) newly authorized Federal projects for construction and any major Federal agency action (other than a project for construction) to which section 4332(2)(C) of this title applies, and (3) proposed regulations published by any department or agency of the Federal Government. Such written comment shall be made public at the conclusion of any such review.

(b) In the event the Administrator determines that any such legislation, action, or regulation is unsatisfactory from the standpoint of public health or welfare or environmental quality, he shall publish his determination and the matter shall be referred to the Council on Environmental Quality.

---

[*]July 14, 1955, c. 360, § 309, as added Dec. 31, 1970, Pub. L. 91–604 § 12(a), 42 U.S.C. § 7609 (1970).

Executive Order 11514. March 5, 1970

# PROTECTION AND ENHANCEMENT OF ENVIRONMENTAL QUALITY

**As amended by Executive Order 11991. (Secs. 2(g) and (3(h)). May 24, 1977°.**

By virtue of the authority vested in me as President of the United States and in furtherance of the purpose and policy of the National Environmental Policy Act of 1969 (Public Law No. 91-190, approved January 1, 1970), it is ordered as follows:

Section 1. *Policy.* The Federal Government shall provide leadership in protecting and enhancing the quality of the Nation's environment to sustain and enrich human life. Federal agencies shall initiate measures needed to direct their policies, plans and programs so as to meet national environmental goals. The Council on Environmental Quality, through the Chairman, shall advise and assist the President in leading this national effort.

Sec. 2. *Responsibilities of Federal agencies.* Consonant with Title I of the National Environmental Policy Act of 1969, hereafter referred to as the "Act", the heads of Federal agencies shall:

(a) Monitor, evaluate, and control on a continuing basis their agencies' activities so as to protect and enhance the quality of the environment. Such activities shall include those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment. Agencies shall develop programs and measures to project and enhance environmental quality and shall assess progress in meeting the specific objectives of such activities. Heads of agencies shall consult with appropriate Federal, State and local agencies in carrying out their activities as they affect the quality of the environment.

(b) Develop procedures to ensure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties. These procedures shall include, whenever appropriate, provision for public hearings, and shall provide the public with relevant information, including information on alternative courses of action. Federal agencies shall also encourage State and local agencies to adopt similar procedures for informing the public concerning their activities affecting the quality of the environment.

(c) Insure that information regarding existing or potential environmental problems and control methods developed as part of research, development, demonstration, test, or evaluation activities is made available to Federal agencies, States, counties, municipalities, institutions, and other entities, as appropriate.

---

°The Preamble to Executive Order 11991 is as follows:

By virtue of the authority vested in me by the Constitution and statutes of the United States of America, and as President of the United States of America, in furtherance of the purpose and policy of the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321 *et seq.*), the Environmental Quality Improvement Act of 1970 (42 U.S.C. 4371 *et seq.*), and Section 309 of the Clean Air Act, as amended (42 U.S.C. 1857h-7), it is hereby ordered as follows:

(d) Review their agencies' statutory authority, administrative regulations, policies, and procedures, including those relating to loans, grants, contracts, leases, licenses, or permits, in order to identify any deficiencies or inconsistencies therein which prohibit or limit full compliance with the purposes and provisions of the Act. A report on this review and the corrective actions taken or planned, including such measures to be proposed to the President as may be necessary to bring their authority and policies into conformance with the intent, purposes, and procedures of the Act, shall be provided to the Council on Environmental Quality not later than September 1, 1970.

(e) Engage in exchange of data and research results, and cooperate with agencies of other governments to foster the purposes of the Act.

(f) Proceed, in coordination with other agencies, with actions required by section 102 of the Act.

(g) In carrying out their responsibilites under the Act and this Order, comply with the regulations issued by the Council except where such compliance would be inconsistent with statutory requirements.

Sec. 3. *Responsibilities of Council on Environmental Quality.* The Council on Environmental Quality shall:

(a) Evaluate existing and proposed policies and activities of the Federal Government directed to the control of pollution and the enhancement of the environment and to the accomplishment of other objectives which affect the quality of the environment. This shall include continuing review of procedures employed in the development and enforcement of Federal standards affecting environmental quality. Based upon such evaluations the Council shall, where appropriate, recommend to the President policies and programs to achieve more effective protection and enhancement of environmental quality and shall, where appropriate, seek resolution of significant environmental issues.

(b) Recommend to the President and to the agencies priorities among programs designed for the control of pollution and for enhancement of the environment.

(c) Determine the need for new policies and programs for dealing with environmental problems not being adequately addressed.

(d) Conduct, as it determines to be appropriate, public hearings or conferences on issues of environmental significance.

(e) Promote the development and use of indices and monitoring systems (1) to assess environmental conditions and trends, (2) to predict the environmental impact of proposed public and private actions, and (3) to determine the effectiveness of programs for protecting and enhancing environmental quality.

(f) Coordinate Federal programs related to environmental quality.

(g) Advise and assist the President and the agencies in achieving international cooperation for dealing with environmental problems, under the foreign policy guidance of the Secretary of State.

(h) Issue regulations to Federal agencies for the implementation of the procedural provisions of the Act (42 U.S.C. 4332(2)). Such regulations shall be developed after consultation with affected agencies and after such public hearings as may be appropriate. They will be designed to make the environmental impact statement process more useful to decisionmakers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives. They will require impact statements to be concise, clear, and to the point, and supported by evidence that agencies have made the necessary environmental analyses. The Council shall include in its regulations procedures (1) for the early preparation of environmental impact statements, and (2) for the referral to the Council of conflicts between agencies concerning the implementation of the National Environmental Policy Act of 1969, as amended, and

43

Section 309 of the Clean Air Act, as amended, for the Council's recommendation as to their prompt resolution.

(i) Issue such other instructions to agencies, and request such reports and other information from them, as may be required to carry out the Council's responsibilities under the Act.

(j) Assist the President in preparing the annual Environmental Quality Report provided for in section 201 of the Act.

(k) Foster investigations, studies, surveys, research, and analyses relating to (i) ecological systems and environmental quality, (ii) the impact of new and changing technologies thereon, and (iii) means of preventing or reducing adverse effects from such technologies.

Sec. 4. *Amendments of E.O. 11472.* Executive Order No. 11472 of May 29, 1969, including the heading thereof, is hereby amended:

(1) By substituting for the term "the Environmental Quality Council", wherever it occurs, the following: "the Cabinet Committee on the Environment".

(2) By substituting for the term "the Council", wherever it occurs, the following: "the Cabinet Committee".

(3) By inserting in subsection (f) of section 101, after "Budget,", the following: "the Director of the Office of Science and Technology,".

(4) By substituting for subsection (g) of section 101 the following:

"(g) The Chairman of the Council on Environmental Quality (established by Public Law 91-190) shall assist the President in directing the affairs of the Cabinet Committee."

(5) by deleting subsection (c) of section 102.

(6) By substituting for "the Office of Science and Technology", in section 104, the following: "the Council on Environmental Quality (established by Public Law 91-190)".

(7) By substituting for "(hereinafter referred to as the 'Committee')", in section 201, the following: "(hereinafter referred to as the 'Citizens' Committee')".

(8) By substituting for the term "the Committee", wherever it occurs, the following: "the Citizens' Committee".

44

NEPA COMPLIANCE GUIDELINE
NPS-12

<div align="right">Guideline
APPENDIX 2</div>

## PART 516, DEPARTMENT OF THE INTERIOR MANUAL,

## SECTION 1-7 (INCLUDING NPS APPENDICES)

---

**DEPARTMENTAL MANUAL**  **TRANSMITTAL SHEET**

| PART | SUBJECT | RELEASE NUMBER |
|---|---|---|
| 516 DM 1-7 | Environmental Quality | 2214 |
| FOR FURTHER INFORMATION, CONTACT Office of Environmental Project Review | | DATE MAR 18 1980 |

**EXPLANATION OF MATERIAL TRANSMITTED:**

This release completely revises the Department's procedures for compliance with the National Environmental Policy Act (NEPA). The procedures adopt the regulations of the Council on Environmental Quality (CEQ) and Chapters 2-6 cannot be read independently from CEQ's regulations.

In addition the procedures reflect the Secretary's decision that there be only one set of NEPA procedures for the Department, that environmental impact statements be approved at the organizational levels responsible for decisionmaking on proposals, and that decisionmakers be held accountable for NEPA compliance.

Procedures specific to each bureau will be promulgated as appendices to Chapter 6.

Larry E. Meierotto
Assistant Secretary of the Interior

**Filing Instructions**

| Remove: | Insert: |
|---|---|
| 516 DM 1 (2 sheets) | 516 DM 1 (4 sheets) |
| 516 DM 2 (10 sheets) | 516 DM 2 (2 sheets) |
| Appendices A-E (11 sheets) | Appendix 1 (1 sheet) |
| | 516 DM 3 (1 sheet) |
| | 516 DM 4 (3 sheets) |
| | Appendix 1 (2 sheets) |
| | Appendix 2 (1 sheet) |
| | 516 DM 5 (1 sheet) |
| | 516 DM 6 (2 sheets) |

Pen and Ink Change:
516 DM 3          change to 516 DM 7

---

Release No. 2

<div align="right">September 1982</div>

116

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental Policy Act of 1969 |
|---|---|
| Protection and Enhancement Chapter 1   of Environmental Quality | 516 DM 1.1 |

1.1  Purpose.  This Chapter establishes the Department's policies for complying with Title 1 of the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321-4347) (NEPA); Section 2 of Executive Order 11514, Protection and Enhancement of Environmental Quality, as amended by Executive Order 11991; and the regulations of the Council on Environmental Quality (CEQ) implementing the procedural provisions of NEPA (40 CFR 1500-1508).

1.2  Policy.  It is the policy of the Department:

A.  To provide leadership in protecting and enhancing those aspects of the quality of the Nation's environment which relate to or may be affected by the Department's policies, goals, programs, plans, or functions in furtherance of national environmental policy;

B.  To use all practicable means, consistent with other essential considerations of national policy, to improve, coordinate, and direct its policies, plans, functions, programs, and resources in furtherance of national environmental goals;

C.  To interpret and administer, to the fullest extent possible, the policies, regulations, and public laws of the United States administered by the Department in accordance with the policies of NEPA;

D.  To consider and give important weight to environmental factors, along with other essential considerations, in developing proposals and making decisions in order to achieve a proper balance between the development and utilization of natural, cultural, and human resources and the protection and enhancement of environmental quality;

E.  To consult, coordinate, and cooperate with other Federal agencies and State, local, and Indian tribal governments in the development and implementation of the Department's plans and programs affecting environmental quality and, in turn, to provide to the fullest extent practicable, these entities with information concerning the environmental impacts of their own plans and programs;

3/18/80 #2224
Replaces 9/18/70 #1222 and 9/27/71 #1341

Department of the Interior

DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental Policy Act of 1969 |
|---|---|
| Chapter 1   Protection and Enhancement of Environmental Quality | 516 DM 1.2F |

F.  To provide, to the fullest extent practicable, timely information to the public to better assist in understanding Departmental plans and programs affecting environmental quality and to facilitate their involvement in the development of such plans and programs; and

G.  To cooperate with and assist the CEQ.

1.3  General Responsibilities.  The following responsibilities reflect the Secretary's decision that the officials responsible for making program decisions are also responsible for taking the requirements of NEPA into account in those decisions and will be held accountable for that responsibility:

A.  Assistant Secretary--Policy, Budget and Administration.

(1)  Is the Department's focal point on NEPA matters and is responsible for overseeing the Department's implementation of NEPA.

(2)  Serves as the Department's principal contact with the CEQ.

(3)  Assigns to the Director, Office of Environmental Project Review, the responsibilities outlined for that Office in this Part.

B.  Solicitor.  Is responsible for providing legal advice in the Department's compliance with NEPA.

C.  Assistant Secretaries.

(1)  Are responsible for compliance with NEPA, E.O. 11514, as amended, the CEQ regulations, and this Part for bureaus and offices under their jurisdiction.

(2)  Will insure that, to the fullest extent possible, the policies, regulations, and public laws of the United States administered under their jurisdiction are interpreted and administered in accordance with the policies of NEPA.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

|  |  |
|---|---|
| Environmental Quality | Part 516  National Environmental Policy Act of 1969 |

|  |  |
|---|---|
| Chapter 1  Protection and Enhancement of Environmental Quality | 516 DM 1.3D |

D. <u>Heads of Bureaus and Offices.</u>

(1) Must comply with the provisions of NEPA, E.O. 11514, as amended, the CEQ regulations and this Part.

(2) Will interpret and administer, to the fullest extent possible, the policies, regulations, and public laws of the United States administered under their jurisdiction in accordance with the policies of NEPA.

(3) Will continue to review their statutory authorities, administrative regulations, policies, programs, and procedures, including those related to loans, grants, contracts, leases, licenses, or permits, in order to identify any deficiencies or inconsistencies therein which prohibit or limit full compliance with the intent, purpose, and provisions of NEPA and, in consultation with the Solicitor and the Legislative Counsel, shall take or recommend, as appropriate, corrective actions as may be necessary to bring these authorities and policies into conformance with the intent, purpose, and procedures of NEPA.

(4) Will monitor, evaluate, and control on a continuing basis their activities so as to protect and enhance the quality of the environment. Such activities will include those directed to controlling pollution and enhancing the environment and designed to accomplish other program objectives which may affect the quality of the environment. They will develop programs and measures to protect and enhance environmental quality and assess progress in meeting the specific objectives of such activities as they affect the quality of the environment.

1.4 <u>Consideration of Environmental Values.</u>

A. <u>In Departmental Management.</u>

(1) In the management of the natural, cultural, and human resources under its jurisdiction, the Department must consider and balance a wide range of economic, environmental, and social objectives at the local, regional, national, and international levels, not all of which are quantifiable in comparable terms. In considering and balancing these objectives, Departmental plans, proposals,

Department of the Interior

## DEPARTMENTAL MANUAL

| | Part 516   National Environmental |
|---|---|
| Environmental Quality | Policy Act of 1969 |

Protection and Enhancement
Chapter 1   of Environmental Quality          516 DM 1.4A(1)

and decisions often require recognition of complements and resolution of conflicts among interrelated uses of these natural, cultural, and human resources within technological, budgetary, and legal constraints.

(2)   Departmental project reports, program proposals, issue papers, and other decision documents must carefully analyze the various objectives, resources, and constraints, and comprehensively and objectively evaluate the advantages and disadvantages of the proposed actions and their reasonable alternatives.   Where appropriate, these documents will utilize and reference supporting and underlying economic, environmental, and other analyses.

(3)   The underlying environmental analyses will factually, objectively, and comprehensively analyze the environmental effects of proposed actions and their reasonable alternatives.   They will systematically analyze the environmental impacts of alternatives, and particularly those alternatives and measures which would reduce, mitigate or prevent adverse environmental impacts or which would enhance environmental quality.   However, such an environmental analysis is not, in and of itself, a program proposal or the decision document, is not a justification of a proposal, and will not support or deprecate the overall merits of a proposal or its various alternatives.

B.   In Internally Initiated Proposals.   Officials responsible for development or conduct of planning and decisionmaking systems within the Department shall incorporate to the maximum extent necessary environmental planning as an integral part of these systems in order to insure that environmental values and impacts are fully considered and in order to facilitate any necessary documentation of those considerations.

C.   In Externally Initiated Proposals.   Officials responsible for development or conduct of loan, grant, contract, lease, license, permit, or other externally initiated activities shall require applicants, to the extent necessary and practicable, to provide environmental information, analyses, and reports as an integral part of their applications.   This will serve to encourage applicants to incorporate environmental considerations into their planning

3/18/80 #224
Replaces 9/17/70 #1222 and 9/27/71 #1341

120

Department of the Interior

## DEPARTMENTAL MANUAL

|  | Part 516  National Environmental |
|---|---|
| Environmental Quality | Policy Act of 1969 |

Protection and Enhancement
Chapter 1  of Environmental Quality          516 DM 1.4C

processes as well as provide the Department with necessary information to meet its own environmental responsibilities.

1.5  Consultation, Coordination, and Cooperation with Other Agencies and Organizations.

   A.   Departmental Plans and Programs.

       (1)  Officials responsible for planning or imple-menting Departmental plans and programs will develop and utilize procedures to consult, coordinate, and cooperate with relevant State, local, and Indian tribal governments; other bureaus and Federal agencies; and public and private organizations and individuals concerning the environmental effects of these plans and programs on their jurisdictions or interests.

       (2)  Bureaus and offices will utilize, to the maximum extent possible, existing notification, coordination and review mechanisms established by the Office of Manage-ment and Budget, the Water Resources Council, and CEQ. However, use of these mechanisms must not be a substitute for early and positive consultation, coordination, and cooperation with others, especially State, local, and Indian tribal governments.

   B.   Other Departmental Activities.

       (1)  Technical assistance, advice, data, and information useful in restoring, maintaining, and enhancing the quality of the environment will be made available to other Federal agencies, State, local, and Indian tribal governments, institutions, and individuals as appropriate.

       (2)  Information regarding existing or potential environmental problems and control methods developed as a part of research, development, demonstration, test, or evaluation activities will be made available to other Federal agencies, State, local, and Indian tribal govern-ments, institutions and other entities as appropriate.

       (3)  Recognizing the worldwide and long-range character of environmental problems, where consistent with the foreign policy of the United States, appropriate support will be made available to initiatives, resolutions, and

/21

Department of the Interior

DEPARTMENTAL MANUAL

| Environmental Quality | Part 516     National Environmental Policy Act of 1969 |
|---|---|
| Chapter 1     Protection and Enhancement of Environmental Quality | 516 DM 1.5B(3) |

programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of the world environment.

C.   Plans and Programs of Other Agencies and Organizations

(1)   Officials responsible for protecting, conserving, developing, or managing resources under the Department's jurisdiction shall coordinate and cooperate with State, local, and Indian tribal governments, other bureaus and Federal agencies, and public and private organizations and individuals, and provide them with timely information concerning the environmental effects of these entities' plans and programs.

(2)   Bureaus and offices are encouraged to participate early in the planning processes of other agencies and organizations in order to insure full cooperation with and understanding of the Department's programs and interests in natural, cultural, and human resources.

(3)   Bureaus and offices will utilize to the fullest extent possible, existing Departmental review mechanisms to avoid unnecessary duplication of effort and to avoid confusion by other organizations.

1.6   Public Involvement.   Bureaus and offices, in consultation with the Office of Public Affairs, will develop and utilize procedures to insure the fullest practicable provision of timely public information and understanding of their plans and programs with environmental impact including information on the environmental impacts of alternative courses of action.   These procedures will include, wherever appropriate, provision for public meetings or hearings in order to obtain the views of interested parties.   Bureaus and offices will also encourage State and local agencies and Indian tribal governments to adopt similar procedures for informing the public concerning their activities affecting the quality of the environment.   (See also 301 DM 2.)

3/18/80 #2264
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516  National Environmental Policy Act of 1969 |
|---|---|
| Chapter 1   Protection and Enhancement of Environmental Quality | 516 DM 1.7 |

1.7  Mandate.

A.  This Part provides Department-wide instructions for complying with NEPA and Executive Orders 11514, as amended by 11991 (Protection and Enhancement of Environmental Quality) and 12114 (Environmental Effects Abroad of Major Federal Actions).

B.  The Department hereby adopts the regulations of the CEQ implementing the procedural provisions of NEPA (Sec. 102(2)(C)) except where compliance would be inconsistent with other statutory requirements.  In the case of any apparent discrepancies between these procedures and the mandatory provisions of the CEQ regulations, the regulations shall govern.

C.  Instructions supplementing the CEQ regulations are provided in Chapters 2-7 of this Part.  Citations in brackets refer to the CEQ regulations.  Instructions specific to each bureau are appended to Chapter 6.  In addition, bureaus may prepare a handbook(s) or other technical guidance for their personnel on how to apply this Part to principal programs.

D.  Instructions implementing Executive Order 12114 will be provided in Chapter 8.

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental Policy Act of 1969 |
|---|---|

| Chapter 2   Initiating the NEPA Process | 516 DM 2.1 |
|---|---|

2.1  Purpose.  This Chapter provides supplementary instructions for implementing those portions of the CEQ regulations pertaining to initiating the NEPA process.

2.2  Apply NEPA Early [1501.2].

A.  Bureaus will initiate early consultation and coordination with other bureaus and any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved, and with appropriate Federal, State, local and Indian tribal agencies authorized to develop and enforce environmental standards.

B.  Bureaus will also consult early with interested private parties and organizations, including when the bureau's own involvement is reasonably foreseeable in a private or non-Federal application.

C.  Bureaus will revise or amend program regulations or directives to insure that private or non-Federal applicants are informed of any environmental information required to be included in their applications and of any consultation with other Federal agencies, and State, local, or Indian tribal governments required prior to making the application.  A list of these regulations or directives will be included in each Bureau Appendix to Chapter 6.

2.3  Whether to Prepare an EIS [1501.4].

A.  Categorical Exclusions [1508.4].

(1)  The following criteria will be used to determine actions to be categorically excluded from the NEPA process:

(a)  The action or group of actions would have no significant effect on the quality of the human environment, and

(b)  The action or group of actions would not involve unresolved conflicts concerning alternative uses of available resources.

(2)  Based on the above criteria, the classes of actions listed in Appendix 1 to this Chapter are categorically excluded, Department-wide, from the NEPA process.  A list of categorical exclusions specific to bureau programs will be included in each Bureau Appendix to Chapter 6.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental<br>Policy Act of 1969 |
|---|---|

| Chapter 2   Initiating the NEPA Process | 516 DM 2.3A(3) |
|---|---|

(3)  The following exceptions apply to individual actions within categorical exclusions.  Environmental assessments must be prepared for actions which may:

(a)  Have significant adverse effects on public health or safety.

(b)  Adversely affect such unique geographic characteristics as historic or cultural resources, park, recreation, or refuge lands, wilderness areas, wild or scenic rivers, sole or principal drinking water aquifers, prime farmlands, wetlands, floodplains, or ecologically significant or critical areas, including those listed on the Department's National Register of Natural Landmarks.

(c)  Have highly controversial environmental effects.

(d)  Have highly uncertain environmental effects or involve unique or unknown environmental risks.

(e)  Establish a precedent for future action or represent a decision in principle about a future consideration with significant environmental effects.

(f)  Be related to other actions with individually insignificant but cumulatively significant environmental effects.

(g)  Adversely affect properties listed or eligible for listing in the National Register of Historic Places.

(h)  Affect a species listed or proposed to be listed on the List of Endangered or Threatened Species.

(i)  Threaten to violate a Federal, State, local, or tribal law or requirements imposed for the protection of the environment or which require compliance with Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| | Part 516   National Environmental |
|---|---|
| Environmental Quality | Policy Act of 1969 |

| Chapter 2   Initiating the NEPA Process | 516 DM 2.3A(4) |
|---|---|

(4)  Notwithstanding the criteria and exceptions above, extraordinary circumstances may dictate or a responsible Departmental or bureau official may decide to prepare environmental assessments.

B.  Environmental Assessment (EA) [1508.9]. See 516 DM 3.

C.  Finding of No Significant Impact (FONSI) [1508.13]. A FONSI will be prepared as a separate covering document based upon a review of an EA.  Accordingly, the words include(d) in Section 1508.13 should be interpreted as attach(ed).

D.  Notice of Intent (NOI) [1508.22].  A NOI will be prepared as soon as practicable after a decision to prepare an environmental impact statement and shall be published in the Federal Register, with a copy to the Office of Environmental Project Review, and made available to the affected public in accordance with Section 1506.6.  Publication of a NOI may be delayed if there is proposed to be more than three (3) months between the decision to prepare an environmental impact statement and the time preparation is actually initiated.  The Office of Environmental Project Review will periodically publish a consolidated list of these notices in the Federal Register.

E.  Environmental Impact Statement (EIS) [1508.11]. See 516 DM 4.  Decisions/actions which would normally require the preparation of an EIS will be identified in the Bureau Appendix to Chapter 6.

2.4  Lead Agencies [1501.5].

A.  The Assistant Secretary--Policy, Budget and Administration will designate lead bureaus within the Department when bureaus under more than one Assistant Secretary are involved and will represent the Department in consultations with CEQ or other Federal agencies in the resolution of lead agency determinations.

B.  Bureaus will inform the Office of Environmental Project Review of any agreements to assume lead agency status.

3/18/80 #2242
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

|  | Part 516  National Environmental |
|---|---|
| Environmental Quality | Policy Act of 1969 |

| Chapter 2  Initiating the NEPA Process | 516 DM 2.4C |
|---|---|

C.  A non-Federal agency will not be designated as a joint lead agency unless it has a duty to comply with a local or State environmental impact statement requirement that is comparable to a NEPA statement.  Any non-Federal agency may be a cooperating agency by agreement.  Bureaus will consult with the Solicitor's Office in cases where such non-Federal agencies are also applicants before the Department to determine relative lead/cooperating agency responsibilities.

2.5  Cooperating Agencies [1501.6].

A.  The Office of Environmental Project Review will assist bureaus and coordinate requests from non-Interior agencies in determining cooperating agencies.

B.  Bureaus will inform the Office of Environmental Project Review of any agreements to assume cooperating agency status or any declinations pursuant to Section 1501.6(c).

2.6  Scoping [1501.7].

A.  The invitation requirement in Section 1501.7(a)(1) may be satisfied by including such an invitation in the NOI.

B.  If a scoping meeting is held, consensus is desirable; however, the lead agency is ultimately responsible for the scope of an EIS.

2.7  Time Limits [1501.8].  When time limits are established they should reflect the availability of personnel and funds.

Department of the Interior

## DEPARTMENTAL MANUAL

---

516 DM 2
Appendix 1

---

DEPARTMENTAL CATEGORICAL EXCLUSIONS

The following actions are categorical exclusions pursuant to 516 DM 2.3A(2). However, environmental documents will be prepared for individual actions within these categorical exclusions if the exceptions listed in 516 DM 2.3A(3) apply.

1.1  Personnel actions and investigations and personnel services contracts.

1.2  Internal organizational changes and facility and office reductions and closings.

1.3  Routine financial transactions, including such things as salaries and expenses, procurement contracts, guarantees, financial assistance, income transfers, and audits.

1.4  Law enforcement and legal transactions, including such things as arrests; investigations; patents; claims; legal opinions; and judicial proceedings including their initia-tion, processing and/or settlement.

1.5  Regulatory and enforcement actions, including inspections, assessments, administrative hearings, and decisions; when the regulations themselves or the instru-ments of regulations (leases, permits, licenses, etc.) have previously been covered by the NEPA process or are exempt from it.

1.6  Non-destructive data collection, inventory (including mapping), study, research and monitoring activities.

1.7  Routine and continuing government business, including such things as supervision, administration, operations, maintenance, and replacement.

1.8  Management, formulation, and allocation of the Department's budget at all levels.  (This does not exempt the preparation of environmental documents for proposals included in the budget when otherwise required.)

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

# DEPARTMENTAL MANUAL

| Environmental Quality | Part 516    National Environmental<br>Policy Act of 1969 |
|---|---|

Chapter 3  Environmental Assessments                    516 DM 3.1

3.1 Purpose. This Chapter provides supplementary instructions for implementing those portions of the CEQ regulations pertaining to environmental assessments (EA).

3.2 When to Prepare [1501.3].

    A.  An EA will be prepared for all actions, except those covered by a categorical exclusion, covered sufficiently by an earlier environmental document, or for those actions for which a decision has already been made to prepare an EIS.  The purpose of such an EA is to allow the responsible official to determine whether to prepare an EIS.

    B.  In addition, an EA may be prepared on any action at any time in order to assist in planning and decisionmaking.

3.3 Public Involvement.

    A.  Public notification must be provided and, where appropriate, the public involved in the EA process [1506.6].

    B.  The scoping process may be applied to an EA [1501.7].

3.4 Content.

    A.  At a minimum, an EA will include brief discussions of the need for the proposal, of alternatives as required by Section 102(2)(E) of NEPA, of the environmental impacts of the proposed action and such alternatives, and a listing of agencies and persons consulted [1508.9(b)].

    B.  In addition, an EA may be expanded to describe the proposal, a broader range of alternatives, and proposed mitigation measures if this facilitates planning and decisionmaking.

    C.  The level of detail and depth of impact analysis should normally be limited to that needed to determine whether there are significant environmental effects.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental Policy Act of 1969 |

| Chapter 3   Environmental Assessments | 516 DM 3.4D |

D.   An EA will contain objective analyses which support its environmental impact conclusions.  It will not, in and of itself, conclude whether or not an EIS will be prepared. This conclusion will be made upon review of the EA by the responsible official and documented in either a NOI or FONSI.

3.5   Format.

A.   An EA may be prepared in any format useful to facilitate planning and decisionmaking.

B.   An EA may be combined with any other planning or decisionmaking document; however, that portion which analyzes the environmental impacts of the proposal and alternatives will be clearly and separately identified and not spread throughout or interwoven into other sections of the document.

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental Policy Act of 1969 |
|---|---|

| Chapter 4   Environmental Impact Statements | 516 DM 4.1 |
|---|---|

4.1 <u>Purpose</u>.  This Chapter provides supplementary instructions for implementing those portions of the CEQ regulations pertaining to environmental impact statements (EIS).

4.2 <u>Statutory Requirements</u> [1502.3].  NEPA requires that an EIS be prepared by the responsible Federal official.  This official is normally the lowest-level official who has overall responsibility for formulating, reviewing, or proposing an action or, alternatively, has been delegated the authority or responsibility to develop, approve, or adopt a proposal or action.  Preparation at this level will insure that the NEPA process will be incorporated into the planning process and that the EIS will accompany the proposal through existing review processes.

4.3 <u>Timing</u> [1502.5].

   A.  The feasibility analysis (go/no-go) stage, at which time an EIS is to be completed, is to be interpreted as the stage prior to the first point of major commitment to the proposal.  For example, this would normally be at the authorization stage for proposals requiring Congressional authorization, the location or corridor stage for transportation, transmission, and communication projects, and the leasing stage for mineral resources proposals.

   B.  An EIS need not be commenced until an application is essentially complete; e.g., any required environmental information is submitted, any consultation required with other agencies has been conducted, and any required advance funding is paid by the applicant.

4.4 <u>Page Limits</u> [1502.7].  Where the text of an EIS for a complex proposal or group of proposals appears to require more than the normally prescribed limit of 300 pages, bureaus will insure that the length of such statements is no greater than necessary to comply with NEPA, the CEQ regulations, and this Chapter.

4.5 <u>Supplemental Statements</u> [1502.9].

   A.  Supplements are only required if such changes in the proposed action or alternatives, new circumstances, or resultant significant effects are not adequately analyzed in the previously prepared EIS.

3/18/80 #2844
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental Policy Act of 1969 |
|---|---|

| Chapter 4   Environmental Impact Statements | 516 DM 4.5B |
|---|---|

B.  A bureau and/or the appropriate program Assistant Secretary will consult with the Office of Environmental Project Review and the Office of the Solicitor prior to proposing to CEQ to prepare a final supplement without preparing an intervening draft.

C.  If, after a decision has been made based on a final EIS, a described proposal is further defined or modified and if its changed effects are minor or still within the scope of the earlier EIS, an EA and FONSI may be prepared for subsequent decisions rather than a supplement.

4.6   Format [1502.10].

A.  Proposed departures from the standard format described in the CEQ regulations and this Chapter must be approved by the Office of Environmental Project Review.

B.  The section listing the preparers of the EIS will also include other sources of information, including a bibliography or list of cited references, when appropriate.

C.  The section listing the distribution of the EIS will also briefly describe the consultation and public involvement processes utilized in planning the proposal and in preparing the EIS, if this information is not discussed elsewhere in the document.

D.  If CEQ's standard format is not used or if the EIS is combined with another planning or decisionmaking document the section which analyzes the environmental consequences of the proposal and its alternatives will be clearly and separately identified and not interwoven into other portions of or spread throughout the document.

4.7   Cover Sheet [1502.11].  The cover sheet will also indicate whether the EIS is intended to serve any other environmental review or consultation requirements pursuant to Section 1502.25.

4.8   Summary [1502.12].  The emphasis in the summary should be on those considerations, controversies, and issues which significantly affect the quality of the human environment.

Department of the Interior

## DEPARTMENTAL MANUAL

|                        | Part 516   National Environmental |
| Environmental Quality  | Policy Act of 1969 |

Chapter 4   Environmental Impact Statements                516 DM 4.9

4.9  Purpose and Need [1502.13].  This section may introduce
a number of factors, including economic and technical consi-
derations and Departmental or bureau statutory missions,
which may be beyond the scope of the EIS.  Care should be
taken to insure an objective presentation and not a
justification.

4.10  Alternatives Including the Proposed Action [1502.14].

      A.  As a general rule, the following guidance will
apply:

          (1)  For internally initiated proposals; i.e., for
those cases where the Department conducts or controls the
planning process, both the draft and final EIS shall
identify the bureau's proposed action.

          (2)  For externally initiated proposals; i.e., for
those cases where the Department is reacting to an applica-
tion or similar request, the draft and final EIS shall
identify the applicant's proposed action and the bureau's
preferred alternative unless another law prohibits such an
expression.

          (3)  Proposed departures from this guidance must
be approved by the Office of Environmental Project Review
and the Office of the Solicitor.

      B.  Mitigation measures are not necessarily independent
of the proposed action and its alternatives and should be
incorporated into and analyzed as a part of the proposal and
appropriate alternatives.  Where appropriate, major mitiga-
tion measures may be identified and analyzed as separate
alternatives in and of themselves where the environmental
consequences are distinct and significant enough to warrant
separate evaluation.

4.11  Appendix [1502.18].  If an EIS is intended to serve
other environmental review or consultation requirements
pursuant to Section 1502.25, any more detailed information
needed to comply with these requirements may be included
as an appendix.

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516    National Environmental Policy Act of 1969 |
|---|---|

| Chapter 4   Environmental Impact Statements | 516 DM 4.12 |
|---|---|

4.12 Incorporation by Reference [1502.21].   Citations of specific topics will include the pertinent page numbers. All literature references will be listed in the bibliography.

4.13 Incomplete or Unavailable Information [1502.22].   The references to overall costs in this section are not limited to market costs, but include other costs to society such as social costs due to delay.

4.14 Methodology and Scientific Accuracy [1502.24].   Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public.

4.15 Environmental Review and Consultation Requirements [1502.25].

   A.   A list of related environmental review and consultation requirements is attached as Appendix 1 to this Chapter.

   B.   If the EIS is intended to serve as the vehicle to fully or partially comply with any of these requirements, the associated analyses, studies, or surveys will be identified as such and discussed in the text of the EIS and the cover sheet will so indicate.   Any supporting analyses or reports will be referenced or included as an appendix and shall be sent to reviewing agencies as appropriate in accordance with applicable regulations or procedures.

4.16 Inviting Comments [1503.1].

   A.   Comments from State agencies will be requested through the State Clearinghouse established by the Governor pursuant to OMB Circular A-95, unless the Governor has designated an alternative review process, and may be requested from local agencies through Areawide Clearinghouses to the extent that they include the affected local jurisdiction.

Department of the Interior

## DEPARTMENTAL MANUAL

Environmental Quality

Part 516   National Environmental
Policy Act of 1969

Chapter 4   Environmental Impact Statements          516 DM 4.16B

B.   When the proposed action may affect the environment of an Indian reservation, comments will be requested from the Indian tribe through the tribal governing body, unless the tribal governing body has designated an alternate review process.

4.17 Response to Comments [1503.4].

A.   Preparation of a final EIS need not be delayed in those cases where a Federal agency, from which comments are required to be obtained [1503.1(a)(1)], does not comment within the prescribed comment period.  Informal attempts will be made to determine the status of any such comments and every reasonable attempt should be made to include the comments and a response in the final EIS.

B.   When other commentors are late, their comments should be included in the final EIS to the extent practicable.

C.   For those EISs requiring the approval of the Assistant Secretary--Policy, Budget and Administration pursuant to 516 DM 6.3, bureaus will consult with the Office of Environmental Project Review when they propose to prepare an abbreviated final EIS [1503.4(c)].

4.18 Elimination of Duplication with State and Local Procedures [1506.2].   Bureaus will incorporate in their appropriate program regulations provisions for the preparation of an EIS by a State agency to the extent authorized in Section 102(2)(D) of NEPA.  Eligible programs are listed in Appendix 2 to this Chapter.

4.19 Combining Documents [1506.4].  See 516 DM 4.6D.

4.20 Departmental Responsibility [1506.5].  Following the responsible official's preparation or independent evaluation of and assumption of responsibility for an environmental document, an applicant may print it provided the applicant is bearing the cost of the document pursuant to other laws.

4.21 Public Involvement [1506.6].  See 516 DM 1.6 and 301 DM 2.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516  National Environmental Policy Act of 1969 |
|---|---|

Chapter 4  Environmental Impact Statements          516 DM 4.22

4.22 Further Guidance [1506.7].  The Office of Environmental Project Review may provide further guidance concerning NEPA pursuant to its organizational responsibilities (110 DM 22) and through supplemental directives (015 DM 6).

4.23 Proposals for Legislation [1506.8].  The Legislative Counsel, in consultation with the Office of Environmental Project Review, shall:

     A.  Identify in the annual submittal to OMB of the Department's proposed legislative program any requirements for and the status of any environmental documents.

     B.  When required, insure that a legislative EIS is included as a part of the formal transmittal of a legislative proposal to the Congress.

4.24 Time Periods [1506.10].

     A.  The minimum review period for a draft EIS will be sixty (60) days from the date of transmittal to the Environmental Protection Agency.

     B.  For those EISs requiring the approval of the Assistant Secretary--Policy, Budget and Administration pursuant to 516 DM 6.3, the Office of Environmental Project Review will be responsible for consulting with the Environmental Protection Agency and/or CEQ about any proposed reductions in time periods or any extensions of time periods proposed by those agencies.

Department of the Interior

## DEPARTMENTAL MANUAL

516 DM 4
Appendix 1

LIST OF OTHER ENVIRONMENTAL REVIEW AND CONSULTATION
REQUIREMENTS

1.1   Cultural Resources

      Archeological Resources Protection Act of 1979
         16 U.S.C. § 470aa et seq.

      Archeological and Historic Preservation Act of 1974
         16 U.S.C. § 469a-1

      National Historic Preservation Act of 1966 (Sec. 106)
         16 U.S.C. § 470f

      Antiquities Act of 1906
         16 U.S.C. § 431

      Executive Order 11593 (Protection and Enhancement of
         the Cultural Environment)

      American Indian Religious Freedom Act
         92 Stat. 469

1.2   Water and Related Land Resources

      Marine Protection, Research and Sanctuaries Act of
      1972
         (Sec. 102, 103, 301)
         16 U.S.C. § 1431 et seq.

      Safe Drinking Water Act of 1974
         42 U.S.C. § 300f

      Flood Disaster Protection Act of 1973
         12 U.S.C. § 24, 1701-1 Supp
         42 U.S.C. § 4001 et seq.

      Coastal Zone Management Act of 1972
         16 U.S.C. § 1451, 1456

      Estuary Protection Act
         16 U.S.C. § 1221

      Executive Order 11988 (Floodplain Management)

3/18/80 #2242
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

# DEPARTMENTAL MANUAL

---

516 DM 4
Appendix 1

---

Executive Order 11990 (Wetlands Protection)

Federal Water Project Recreation Act (Ss 6(a))
16 U.S.C. § 4601-17

Clean Water Act (§ 208, 303, 401, 402, 404, 405, 511)
33 U.S.C. §§ 1288, 1314, 1341, 1342, 1344

Rivers and Harbors Act of 1899 (§ 9 and § 10)
33 U.S.C. § 401 et seq.

Wild and Scenic Rivers Act of 1968 (Sec. 7)
16 U.S.C. § 1274 et seq.

Federal Power Act
16 U.S.C. § 797

Water Resources Planning Act of 1965
42 U.S.C. § 1962 et seq.

Water Resources Council's Principles and Standards

1.3    Wildlife

Endangered Species Act (Sec. 7)
16 U.S.C. § 1531 et seq.

Fish and Wildlife Coordination Act
16 U.S.C. § 661, 662

Fish and Wildlife Conservation at Small Watershed
Projects
16 U.S.C. § 1001, 1005(4), 1008

1.4    Public Lands, Open Space, Recreation

Federal Land Policy and Management Act
43 U.S.C. § 1701, 1761-1771

Mineral Leasing Act Amendments of 1973
30 U.S.C. § 185

Forest and Rangeland Renewable Resources Act
16 U.S.C. § 1601 et seq.

Department of the Interior

## DEPARTMENTAL MANUAL

|  | 516 DM 4 |
|---|---|
|  | Appendix 1 |

Land and Water Conservation Fund Act of 1965(Sec. 6(f))
16 U.S.C. § 4601-8(f)

Open Space Lands
42 U.S.C. § 1500a(d)

Urban Park and Recreation Recovery Act
16 U.S.C. § 2501 et seq.

National Trails System Act
16 U.S.C. § 1241

1.5    Marine Resources

Deepwater Port Act
33 U.S.C. § 1501, 1503-1505

Ocean Dumping
33 U.S.C. § 1401, 1412, 1413, 1414

Marine Protection, Research and Sanctuaries Act
16 U.S.C. § 1431-1434

1.6    Transportation

Department of Transportation Act of 1966 (Sec. 4(f))
49 U.S.C. § 1653(f)

Federal Aid Highway Act of 1958
23 U.S.C. § 128, 138

Urban Mass Transportation Act of 1964
49 U.S.C. § 1602, 1610

Airport and Airway Development Act of 1970
49 U.S.C. § 1716

Federal Aviation Act
49 U.S.C. § 3334

1.7    Air Quality

Clean Air Act
42 U.S.C. § 7401 et seq.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

---

516 DM 4
Appendix 1

---

1.8    Miscellaneous

Intergovernmental Coordination Act of 1968
42 U.S.C. 8 4201, 4231, 4233
(A-95 review process, including urban impact
analysis)

Demonstration Cities and Metropolitan Development Act
of 1966
42 U.S.C. 8 3334

Surface Mining Control and Reclamation Act of 1977
30 U.S.C. 8 1201 et seq.

Resources Conservation and Recovery Act of 1976
42 U.S.C. 8 3251 et seq.

Noise Control Act of 1972, as amended
42 U.S.C. 8 4901 et seq.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

516 DM 4
Appendix 2

PROGRAMS OF GRANTS TO STATES IN WHICH STATE AGENCIES HAVING
STATEWIDE JURISDICTION MAY PREPARE EISs

2.1  Fish and Wildlife Service

    A.  Anadromous Fish Conservation [#15.600]

    B.  Fish Restoration [#15.605]

    C.  Wildlife Restoration [#15.611]

    D.  Endangered Species Conservation [#15.612]

2.2  Heritage Conservation and Recreation Service

    A.  Outdoor Recreation--Acquisition, Development and
       Planning [#15.400]

    B.  Historic Preservation Grants-in-Aid [#15.411]

    C.  Urban Park and Recreation Recovery Program Grants
       (not yet incorporated in CFDA)


Note:  Citations in brackets refer to the Catalog of
       Federal Domestic Assistance, Office of Management
       and Budget, 1979

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental Policy Act of 1969 |
|---|---|

| Chapter 5   Relationship to Decisionmaking | 516 DM 5.1 |
|---|---|

5.1  Purpose.  This Chapter provides supplementary instructions for implementing those portions of the CEQ regulations pertaining to decisionmaking.

5.2  Predecision Referrals to CEQ [1504.3].

A.  Upon receipt of advice that another Federal agency intends to refer a Departmental matter to CEQ, the lead bureau will immediately meet with that Federal agency to attempt to resolve the issues raised and expeditiously notify its Assistant Secretary and the Office of Environmental Project Review.

B.  Upon any referral of a Departmental matter to CEQ by another Federal agency, the Office of Environmental Project Review will be responsible for coordinating the Department's position.

5.3  Decisionmaking Procedures [1505.1].

A.  Procedures for decisions by the Secretary/Under Secretary are specified in 301 DM 1.  Assistant Secretaries should follow a similar process when an environmental document accompanies a proposal for their decision.

B.  Bureaus will incorporate in their formal decision-making procedures and NEPA handbooks provisions for consideration of environmental factors and relevant environmental documents.  The major decision points for principal programs likely to have significant environmental effects will be identified in the Bureau Appendix to Chapter 6.

C.  Relevant environmental documents, including supplements, will be included as part of the record in formal rulemaking or adjudicatory proceedings.

D.  Relevant environmental documents, comments, and responses will accompany proposals through existing review processes so that Departmental officials use them in making decisions.

E.  The decisionmaker will consider the environmental impacts of the alternatives described in any relevant environmental document and the range of these alternatives must encompass the alternatives considered by the decision-maker.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental<br>Policy Act of 1969 |
|---|---|

| Chapter 5   Relationship to Decisionmaking | 516 DM 5.4 |
|---|---|

5.4   Record of Decision [1505.2].

A.   Any decision documents prepared pursuant to
301 DM 1 for proposals involving an EIS may incorporate all
appropriate provisions of Section 1505.2(b) and (c).

B.   If a decision document incorporating these provi-
sions is made available to the public following a decision,
it will serve the purpose of a record of decision.

5.5   Implementing the Decision [1505.3].   The terms
"monitoring" and "conditions" will be interpreted as being
related to factors affecting the quality of the human
environment.

5.6   Limitations on Actions [1506.1].   A bureau will notify
its Assistant Secretary, the Solicitor, and the Office of
Environmental Project Review of any situations described in
Section 1506.1(b).

5.7   Timing of Actions [1506.10].   For those EISs requiring
the approval of the Assistant Secretary--Policy, Budget and
Administration pursuant to 516 DM 6.3, the responsible
official will consult with the Office of Environmental
Project Review before making any request for reducing the
time period before a decision or action.

5.8   Emergencies [1506.11].   In the event of an unantici-
pated emergency situation, a bureau will immediately take
any necessary action to prevent or reduce risks to public
health or safety or serious resource losses and then
expeditiously consult with its Assistant Secretary, the
Solicitor, and the Office of Environmental Project Review
about compliance with NEPA.   The Office of Environmental
Project Review and the bureau will jointly be responsible
for consulting with CEQ.

Department of the Interior

## DEPARTMENTAL MANUAL

| | Part 516   National Environmental |
|---|---|
| Environmental Quality | Policy Act of 1969 |

| Chapter 6   Managing the NEPA Process | 516 DM 6.1 |
|---|---|

6.1 <u>Purpose</u>.  This Chapter provides supplementary instruc-
tions for implementing those provisions of the CEQ regula-
tions pertaining to procedures for implementing and managing
the NEPA process.

6.2 <u>Organization for Environmental Quality</u>.

A. <u>Office of Environmental Project Review</u>.  The
Director, Office of Environmental Project Review, reporting
to the Assistant Secretary--Policy, Budget and Administra-
tion (PBA), is responsible for providing advice and assis-
tance to the Department on matters pertaining to environ-
mental quality and for overseeing and coordinating the
Department's compliance with NEPA, E.O. 11514, the CEQ
regulations, and this Part.  (See also 110 DM 22.)

B. <u>Bureaus and Offices</u>.  Heads of bureaus and offices
will designate organizational elements or individuals, as
appropriate, at headquarters and regional levels to be
responsible for overseeing matters pertaining to the
environmental effects of the bureau's plans and programs.
The individuals assigned these responsibilities should have
management experience or potential, understand the bureau's
planning and decisionmaking processes, and be well trained
in environmental matters, including the Department's
policies and procedures so that their advice has signifi-
cance in the bureau's planning and decisions.  These
organizational elements will be identified in the Bureau
Appendix to this Chapter.

6.3 <u>Approval of EISs</u>.

A.  A program Assistant Secretary is authorized to
approve an EIS in those cases where the responsibility for
the decision for which the EIS has been prepared rests with
the Assistant Secretary or below.  The Assistant Secretary
may further assign the authority to approve the EIS if he
or she chooses.  The Assistant Secretary--PBA will make
certain that each program Assistant Secretary has adequate
safeguards to assure that the EISs comply with NEPA, the
CEQ regulations, and the Departmental Manual.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516   National Environmental |
|---|---|
|  | Policy Act of 1969 |

Chapter 6  Managing the NEPA Process                516 DM 6.3B

B.  The Assistant Secretary--PBA is authorized to approve an EIS in those cases where the decision for which the EIS has been prepared will occur at a level in the Department above an individual program Assistant Secretary.

6.4  Underline Underline List of Specific Compliance Responsibilities.

A.  Bureaus and offices shall:

(1)  Prepare NEPA handbooks providing guidance on how to implement NEPA in principal program areas.

(2)  Prepare program regulations or directives for applicants.

(3)  Propose categorical exclusions.

(4)  Prepare and approve EAs.

(5)  Decide whether to prepare an EIS.

(6)  Prepare and publish NOIs and FONSIs.

(7)  Prepare and, when assigned, approve EISs.

B.  Assistant Secretaries shall:

(1)  Approve bureau handbooks.

(2)  Approve regulations or directives for applicants.

(3)  Approve categorical exclusions.

(4)  Approve EISs pursuant to 516 DM 6.3.

C.  The Assistant Secretary--Policy, Budget and Administration shall:

(1)  Concur with regulations or directives for applicants.

(2)  Concur with categorical exclusions.

(3)  Approve EISs pursuant to 516 DM 6.3.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516  National Environmental Policy Act of 1969 |
|---|---|

| Chapter 6  Managing the NEPA Process | 516 DM 6.5 |
|---|---|

6.5  Bureau Requirements.

A.  Requirements specific to bureaus appear as appendices to this Chapter and include the following:

(1)  Identification of officials and organizational elements responsible for NEPA compliance (516 DM 6.2B).

(2)  List of program regulations or directives which provide information to applicants (516 DM 2.2B).

(3)  Identification of major decision points in principal programs (516 DM 5.3B) for which an EIS is normally prepared (516 DM 2.3E).

(4)  List of categorical exclusions (516 DM 2.3A).

B.  Appendices are attached for the following bureaus:

(1)  Fish and Wildlife Service (Appendix 1).

(2)  Geological Survey (Appendix 2).

(3)  Heritage Conservation and Recreation Service (Appendix 3).

(4)  Bureau of Indian Affairs (Appendix 4).

(5)  Bureau of Land Management (Appendix 5).

(6)  Bureau of Mines (Appendix 6).

(7)  National Park Service (Appendix 7).

(8)  Office of Surface Mining (Appendix 8).

(9)  Water and Power Resources Service (Appendix 9).

C.  The Office of the Secretary and other Departmental Offices do not have separate appendices, but must comply with this Part and will consult with the Office of Environmental Project Review about compliance activities.

3/18/80 #2264
Replaces 9/17/70 #1222 and 9/27/71 #1341

Department of the Interior

## DEPARTMENTAL MANUAL

Environmental Quality

Part 516    National Environmental
Policy Act of 1969

Chapter 6   Managing the NEPA Process                516 DM 6.6

6.6   Information About the NEPA Process.  The Office of
Environmental Project Review will publish periodically a
Departmental list of contacts where information about the
NEPA process and the status of EISs may be obtained.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

Exhibit 2
(3 of 3)

Department of the Interior

# DEPARTMENTAL MANUAL

516 DM 6
Appendix 3

Heritage Conservation and Recreation Service

**516 DM 6   Appendix 3—Heritage Conservation and Recreation Service**

**3.1** *NEPA Responsibility*

A. The *Director* is responsible for NEPA compliance for Heritage Conservation and Recreation Service (HCRS) activities.

B. *Associate Directors* (Natural, Recreation, and Cultural Programs and Administration) are responsible for general environmental guidance and for NEPA compliance in their areas of responsibility.

C. *Regional and Area Directors* are responsible for overall management and guidance of HCRS environmental procedures within their areas of jurisdiction. Each is responsible for designating a chief environmental officer for the regional/area office.

D. The *Division of Environmental and Compliance Review* (Washington), which reports to the Associate Director for Administration, serves as the bureau focal point for all NEPA related environmental activities. It advises the Directorate, ensures bureau-wide compliance, approves all bureau EISs, and manages the review of all EISs referred to the bureau for comment. Information about HCRS NEPA documents or the NEPA process can be obtained by contacting this office.

**3.2   Guidance to Applicants**

A. *Federal Aid.*

(1) The HCRS administers grant funds to States, local governments, and private organizations/individuals for outdoor recreation acquisition, development, and planning (CFDA #15.400), historic preservation (CFDA #15.411) and urban, park and recreation recovery (CFDA #15.417).

(2) The following program guidelines and regulations list environmental requirements which applicants must meet:

(a) Land and Water Conservation Fund grants manual—Part 650.

(b) Historic Preservation grants-in-aid manual (under preparation).

(c) Urban Park and Recovery Program—36 CFR Part 1228.

(3) Copies of the grants manuals have been provided to all State Liaison Officers for outdoor recreation and all State Historic Preservation Officers. Current copies are also available for inspection in each HCRS Regional Office as well as in Washington.

(4) Many State agencies with State-wide jurisdiction which seek HCRS funding may prepare related EISs pursuant to Section 102(2)(D) of NEPA. Such agencies should consult with the appropriate regional/area office.

B. *Conversion of Acquired Recreation Lands.*

(1) The HCRS must approve the conversion of certain acquired recreation lands. These include:

(a) All local and State lands, and interests therein, and certain Federal lands under lease to the States, acquired or developed in whole or in part with monies from the Land and Water Conservation Fund Act are subject to Section 6(f) of the Act requiring approval of conversion of use.

(b) All recreation areas and facilities (as defined in Section 1004) developed or improved, in whole or in part, with a grant under the Urban Park and Recreation Recovery Act of 1978 (Title 10 of Pub. L. 95-625) are subject to Section 1010 of the Act which requires approval for a conversion to other than public recreation uses.

(c) Most Federal surplus real property which has been deeded to State and local governments for use and management as park demonstration areas or recreation areas, and all historic monuments and properties so deeded, under the Recreation Demonstration Act of 1942, or the Federal Property and Administrative Services Act of 1949, as amended, are subject to approval of conversion of use.

(d) All abandoned railroad rights-of-way acquired by State and local governments for recreational and/or conservation uses with grants under Section 809(b) of the Railroad Revitalization and Regulatory Reform Act of 1976 are subject to approval of conversion of use.

3/2/81  #2320
New

Heritage Conservation and Recreation Service

(2) Applications for approval of conversion of the use of these lands must be submitted through the State Liaison Officer to the appropriate Regional Director of HCRS. Early consultation with the Regional Office is encouraged to insure that the application is accompanied with any required environmental documents.

3.3  *Major Actions Normally Requiring an EIS*

A. The following types of HCRS proposed actions and decisions will normally require the preparation of an EIS:

(1) Actions, including multi-year actions, whose size or scope will or may result in major natural or physical changes, including interrelated social and economic changes and residential and land use changes, within the project area or its immediate environs.

(2) Actions which foreclose other beneficial uses of mineral, agricultural, timber, water, energy, or transportation resources critical to the Nation's or a State's welfare.

B. If for any of these proposals it is initially decided not to prepare an EIS, an EA will be prepared and handled in accordance with Section 1501.4(e)(2). 3.4 *Categorical Exclusions.* In addition to the actions listed in the Departmental categorical exclusions outlined in Appendix 1 of 516 DM 2, many of which the Service also performs, the following HCRS actions are designated categorical exclusions unless the action qualifies as an exception under 516 DM 2.3A(3):

A. Routine internal management functions, including preparation of internal surveys, studies, reports, and similar documents used in evaluating effectiveness or extent of HCRS activities. Examples: Preparing regular Regional reports to the Director; maintaining grants-in-aid status reports; listing progress in promoting cooperative recreation management of areas under the jurisdiction of the Department of Defense.

B. Preparing routine reports required by law or regulation. Examples: Report on the Recreation Fee Program to the Congress; report on the status of properties disposed of for park and recreation purposes under the provisions of Federal Surplus Properties legislation.

C. Preparation or funding of surveys, studies, reports, and similar documents which do not recommend, propose, prescribe, or proscribe future actions. Examples: Statistical reports providing information on the types of professionals engaged in heritage conservation work; surveys to gather data on existing conditions, such as determining the number, acreage, and visitor volume at recreation or historic areas; analytical studies which try to develop rule-of-thumb formulae for estimating visitor carrying capacity of public areas; data collection for inventorying historic and archeological sites.

D. Preparation of internal reports, plans, studies, and other documents containing recommendations for action which HCRS develops preliminary to the process of preparing a specific proposal or set of alternatives for decision.

Example: Preliminary to developing an energy program pursuant to the President's initiatives, HCRS asked each of its Divisions and its Regional and Area Offices to propose directions which the program should take. Such proposals, since they were prepared preliminary to actual program planning and development, qualify for categorical exclusion from environmental documentation requirements.

E. Funding of proposed non-Federal actions which replace, or renovate, facilities at their same location: *Provided,* That they do not alter the integrity of the setting or increase public use of the area to the extent of compromising the nature and character of the property or cause physical damage to it, introduce motorized

Department of the Interior

# DEPARTMENTAL MANUAL

516 DM 6
Appendix 3

## Heritage Conservation and Recreation Service

recreation vehicles, introduce active recreation pursuits into a passive recreation area, or cause a nuisance to adjacent property owners or occupants. These actions use monies from the Land and Water Conservation Fund, the Historic Preservation Fund, or the Urban Park and Recreation Recovery Fund. Examples: Resurfacing tennis courts; restoring a historic building; replacing and upgrading playground equipment; removing an architecturally incompatible addition to a historic structure; improving the lighting system of an indoor recreation structure.

F. Funding for construction or rehabilitation work on existing non-Federal properties which is required to meet health, safety and handicapped regulations. Examples: Improving sanitary systems or bathhouses, adding ramps to provide wheelchair access.

G. Funding for construction of new facilities within an existing recreation, historic, archeological, or natural area: *Provided,* That the new facilities will not increase public use of the area to the extent of compromising the nature and character of the property or causing physical damage to it; institute non-compatible uses which might compromise the nature and characteristics of the property or cause physical damage to it; introduce motorized recreation vehicles; introduce active recreation pursuits into a passive recreation area; or cause a nuisance to adjacent property owners or occupants. Examples: Installing paths to public facilities; installing picnic shelters designed for single family use; planting hedgerows to screen out unsightly adjacent areas; installing underground lawn sprinkling systems; installing fencing to guide or redirect foot or vehicular traffic or to provide security.

H. Providing technical assistance in historic, architectural, and archeological preservation; recreation; or natural area

preservation to other Federal, State and local agencies and to the general public.

I. Identifying, nominating, certifying, and determining the eligibility of properties for the National Register of Historic Places and the National Historic Landmark and National Natural Landmark programs.

[FR Doc. 80-36227 Filed 11-19-80; 8:45 am]

BILLING CODE 4310-83-M

Department of the Interior

# DEPARTMENTAL MANUAL

516 DM 6
APPENDIX 7

## National Park Service

### National Park Service

**7.1 NEPA Responsibility.**

A. *Director* is responsible for NEPA compliance for National Park Service (NPS) activities.

B. *Regional Directors* are responsible to the Director for integrating the NEPA process into all regional activities and for NEPA compliance in their regions.

C. *Denver Service Center* performs most major planning efforts for the National Park Service and integrates NEPA compliance and environmental planning consistent with project planning direction and oversight provided by the appropriate Regional Director.

D. *Office of Park Planning and Environmental Quality (Washington)* serves as the focal point for all matters relating to NEPA compliance; coordinates NPS review of NEPA documents prepared by other agencies and provides policy review for NPS NEPA documents. Information concerning NPS NEPA documents or the NEPA process can be obtained by contacting this office.

**7.2 Guidance to Applicants.**

Actions in NPS areas that are initiated by private or non-Federal entities include the following:

A. *Mining Operations and Exercise of Non-Federal Oil and Gas Rights*

All NPS areas are closed to mineral entry, and mining operations are limited to valid, prior existing rights. Prior to conducting mining operations under the authority of the 1872 Mineral Law or the exercise of non-Federally owned oil and gas rights within the National Park System, operators must provide to the Service information required to understand the scope of proposed operations, evaluate the impacts on parklands, prepare stipulations and conditions for operations, and make a decision on approval/denial/modification of the plan of operations. Detailed informational requirements are contained in 36 CFR 9.

B. *Mineral Leasing*

Mineral leasing is restricted to five national recreation areas in the National Park System. The Bureau of Land Management (BLM) administers leases on these lands and the Geological Survey (GS) controls and monitors operations. Applicable BLM general leasing procedures are contained in 43 CFR 3100 and 3500. Regulations governing operations are found in 43 CFR 23 and 30 CFR 231 for minerals other than oil and gas; and in 30 CFR 231 for oil and gas. The NPS, as the surface management agency, is consulted at all stages of the leasing and operating process, and can require special lease stipulations for protecting the environment. In addition, the NPS participates with BLM and GS in preparing environmental analyses of all activities and sets forth the reclamation requirements. Also, the NPS controls access to leases over parklands through special permit procedures.

Note.—NPS special regulations in 43 CFR regarding mineral leasing are currently being revised. Substantial changes to the established procedures are not expected.

C. *Grazing in NPS-Administered Areas*

Grazing management plans for NPS units subject to legislatively authorized grazing are normally prepared by the BLM which presently determines informational requirements from applicants for BLM permits. the issuance of which requires prior concurrence by NPS. Applicants for grazing allotments must provide the BLM with such information as may be required to enable preparation of environmental documents or grazing management plans.

Additionally, grazing is permitted in some NPS areas as a condition of land acquisition in instances where grazing rights were held prior to Federal acquisition. The availability of these grazing rights is limited and information should be sought through individual park superintendents.

Department of the Interior

## DEPARTMENTAL MANUAL

516 DM 6
APPENDIX 7

### National Park Service

D. *Issuance of Special Use Permits, Rights-of-Way, and Easements for non-Park Uses in NPS-Administered Areas.*
Informational requirements are determined on a case-by-case basis, and applicants should consult with the park superintendent before making formal application. The applicant must provide sufficient information on the proposed non-park use, as well as park resources and resource-related values to be affected directly and indirectly by the proposed use, in order to allow the Service to evaluate the application, assess the impacts of the proposed use on the NPS unit, develop restrictions/ stipulations to mitigate impacts, and

reach a final decision on issuance of the instrument. Authorities for such permits, rights-of-way, etc., are found in the enabling legislation for individual National Park System units and in 16 U.S.C. 5 and 79 and 23 U.S.C. 317. Right-of-way and easement regulations are found at 36 CFR 14. Policies concerning regulation of special uses are described in the NPS Management Policies Notebook.

7.3 *Major Actions Normally Requiring Environmental Impact Statements*
A. The following types of NPS proposals will normally require the preparation of an EIS:
(1) Wild and Scenic River proposals
(2) Wilderness proposals
(3) National Trail proposals
(4) Proposals for major boundary adjustments to existing units of the National Park System; and
(5) General Management Plans for National Parks, National Recreation Areas, National Seashores, National Lakeshores, and National Preserves.
B. If, for any of these proposals it is initially decided not to prepare an EIS, an EA will be prepared and handled in accordance with Section 1501.4(c)(2).

7.4 *Categorical Exclusions*
In addition to the actions listed in the Departmental categorical exclusions outlined in Appendix 1 of 516 DM 2, many of which the Service also performs, the following NPS actions are designated categorical exclusions unless the action qualifies as an exception under 516 DM 2.3A(3):

A. *Plans and Studies*
(1) Changes or amendments in approved plans, when such changes have no potential for causing significant environmental impact.
(2) Cultural resources maintenance guides, collections, management plans, and historic furnishings reports.
(3) Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).
(4) Plans for non-manipulative research.
(5) Statements for management, outlines of planning requirements, and task directives for plans and studies.
B. *Actions Related to General Administration*
(1) Land and boundary surveys.
(2) Reissuance of special use permits not entailing environmental disturbance.
(3) Extensions or minor modifications of concession contracts or permits, not entailing construction.
(4) Commercial use licenses involving no construction within NPS areas.
(5) Park publications.
C. *Actions Related to Development*
(1) Land acquisition not involving condemnation.
(2) Day-to-day maintenance and repairs to non-historic structures, facilities, utilities, grounds, and trails.
(3) Day-to-day maintenance and repairs to cultural resource sites, structures, utilities, and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide.
(4) Installation of signs, displays, kiosks, etc.
(5) Installation of navigation aids in open waters.
(6) Experimental testing of mass transit systems and changes in operation of existing systems (routes and schedule changes).
(7) Replacement in kind for minor structures and facilities with no change in location, capacity, or appearance.
(8) Road repair, resurfacing, striping, installation of traffic control devices, repair/replacement of guardrails.
(9) Sanitary facilities operation.

## DEPARTMENTAL MANUAL

516 DM 6
APPENDIX 7

National Park Service

(10) Installation of single-unit pit toilet sanitation in areas of existing use.

(11) Minor trail relocations.

D. *Actions Related to Visitor Use*

(1) Carrying capacity analyses.

(2) Minor noncontroversial changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.

(3) Changes in interpretive and environmental education programs.

(4) Minor noncontroversial changes in programs and regulations pertaining to visitor activities.

(5) Issuance of short-term permits for small demonstrations, gatherings, concerts, arts and crafts shows, etc.

(6) Designation of trailside camping zones with no, or minimal, improvements.

(7) Designation of small (10-car or less) improved parking areas.

E. *Actions Related to Resource Management*

(1) Archeological surveys, including small-scale test excavations.

(2) Day-to-day resource management and research activities.

(3) Designation of environmental study areas and research natural areas.

(4) Dune stabilization of small areas by planting of native plant species.

(5) Issuance of individual hunting and/or fishing licenses in accordance with State and Federal regulations.

(6) Planting of native species in natural and development zones.

F. *Actions Related to Grant Programs*

(1) Grants for land acquisition not involving condemnation, when it is known that such lands will be conveyed to the Service for administration and any development activity.

(2) Grants for acquisition of areas which will continue in the same use or in a lower density use with no greater disturbance to the natural setting.

(3) Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical or cultural opportunities provided; or the integrity of the existing setting and cultural resources of the area.

(4) Grants for construction at a park or recreation area required to meet health or safety regulations, or to meet requirements for making facilities accessible to the handicapped.

(5) Grants for construction of new facilities within an existing recreation area provided that the facilities will not:

(a) introduce motorized recreation vehicles; or

(b) introduce active recreation pursuits into a passive recreation area;

(c) increase public use to the extent of compromising the nature and character of the property or causing physical damage to it; or

(d) cause a nuisance to adjacent owners or occupants; or

(e) institute noncompatible uses which might compromise the nature and characteristics of the property, or cause physical damage to it; or

(f) extend use beyond daylight hours; or

(g) add or alter access to the park from the surrounding areas; or

(h) conflict with adjacent ownerships or land use.

(6) Grants for construction of facilities on lands acquired under a previous NPS grant project, provided that the development is in accord with plans submitted with the acquisition project.

[FR Doc. 80-40765 Filed 12-31-80; 8:45 am]

BILLING CODE 4310-70-M

Department of the Interior
DEPARTMENTAL MANUAL

| | Part 516 National Environmental |
|---|---|
| Environmental Quality | Policy Act of 1969 |

Review of Environmental Statements
Chapter 7 Prepared by Other Federal Agencies          516.7.1

.1  Purpose.  These procedures are to implement the policy and directives of Section 102(2)(C) of the National Environmental Policy Act of 1969 (P.L. 91-190, 83 Stat. 852, January 1, 1970); Section 2(f) of Executive Order No. 11514 (March 5, 1970); the Guidelines issued by the Council on Environmental Quality (36 F.R. 7724, April 23, 1971); Bulletin No. 72-6 of the Office of Management and Budget (September 14, 1971); and provide guidance to bureaus and offices of the Department in the review of environmental statements prepared by and for other Federal agencies.

.2  Policy.  The Department considers it a priority responsibility to provide competent and timely review comments on environmental statements prepared by other Federal agencies for their major actions which significantly affect the quality of the human environment.  These reviews are predicated on the Department's jurisdiction by law or special expertise with respect to the environmental impact involved and shall provide constructive comments to other Federal agencies to assist them in meeting their environmental responsibilities.

.3  Responsibilities.

   A.  The Assistant Secretary - Program Policy:

      (1)  Shall be the Department's contact point for the receipt of requests for reviews of draft and final environmental statements prepared by or for other Federal agencies;

      (2)  Shall determine whether such review requests are to be answered by a Secretarial officer or by a Field Representative, and determine which bureaus and/or offices shall perform such reviews;

      (3)  Shall prepare, or where appropriate, shall designate a lead bureau responsible for preparing the Department's review comments.  The lead bureau may be a bureau, Secretarial office, other Departmental office, or task force and shall be that organizational entity with the most significant jurisdiction or environmental expertise in regard to the requested review;

      (4)  Shall set review schedules and target dates for responding to review requests and monitor their compliance;

Department of the Interior
DEPARTMENTAL MANUAL

Part 516 National Environmental
Environmental Quality                    Policy Act of 1969
                Review of Environmental Statements          516.7.5A
Chapter 7 Prepared by Other Federal Agencies               (cont.)

(5) Shall review, sign, and transmit the Department's review comments to the requesting agency and to the Council on Environmental Quality, unless he designates otherwise.

(6) Shall follow through on the Department's review comments transmitted to the requesting agency to ensure resolution of the Department's concerns, unless he designates otherwise; and

(7) Shall consult with the Legislative Counsel and the Solicitor when environmental reviews pertain to legislative or legal matters, respectively.

B. The Legislative Counsel:

(1) Shall ensure that requests for reviews of environmental statements prepared by other Federal agencies that accompany or pertain to legislative proposals are immediately referred to the Assistant Secretary – Program Policy.

C. Field Representatives:

(1) When designated by the Assistant Secretary – Program Policy, shall review, sign, and transmit the Department's review comments to the requesting agency and to the Council on Environmental Quality.

D. Assistant Secretaries and
   Heads of Bureaus and Offices:

(1) Shall designate officials and organizational elements responsible for the coordination and conduct of environmental reviews and report this information to the Assistant Secretary – Program Policy;

(2) Shall provide the Assistant Secretary – Program Policy with appropriate information and material concerning their delegated jurisdiction and special environmental expertise in order to assist him in assigning review responsibilities:

(3) Shall conduct reviews based upon their areas of jurisdiction or special environmental expertise and provide comments to designated lead bureaus assigned responsibilities for preparing Departmental comments;

3/15/72 (Release No. 1407)
Replaces 9/17/70 (Release No. 1222)

165

Department of the Interior
DEPARTMENTAL MANUAL

Part 516 National Environmental
Environmental Quality                      Policy Act of 1969
              Review of Environmental Statements        516.1.3D
Chapter 7 Prepared by Other Federal Agencies            (cont.)

(4)  When designated lead bureau by the Assistant
Secretary - Program Policy, shall prepare and forward the
Department's review comments as instructed; and

(5)  Shall assure that review schedules for discharging
assigned responsibilities are met, and promptly inform other
concerned offices if established target dates cannot be met
and when they will be met.

.4  **Types of Reviews**

A.  **Descriptions of Proposed Actions**:

(1)  Descriptions of proposed actions are not sub-
stitutes for environmental statements.  Federal agencies and
applicants for Federal assistance may circulate such
descriptions, for the purpose of soliciting information con-
cerning environmental impact in order to determine whether or
not to prepare environmental statements.

(2)  Requests for reviews of descriptions of proposed
actions are not required to be processed through the
Assistant Secretary - Program Policy.  Review comments may
be handled independently by bureaus and offices, with the
Field Representative and Assistant Secretary - Program Policy
being advised of significant or highly controversial issues.
Review comments are for the purpose of providing technical
assistance to the requesting agency and should reflect this
fact.

B.  **Environmental Assessments or Reports**:

(1)  Environmental assessments or reports are not sub-
stitutes for environmental statements.  These assessments or
reports may be prepared by Federal agencies, their consultants,
or applicants for Federal assistance.  They are prepared
either to provide information in order to determine whether
or not an environmental statement should be prepared, or to
provide input into an environmental statement.  If they are
separately circulated, it is generally for the purpose of
soliciting additional information concerning environmental
impact.

3/15/72  (Release No. 1407)
Replaces 9/17/70  (Release No. 1222)

156

Department of the Interior
DEPARTMENTAL MANUAL

| | Part 516 National Environmental |
|---|---|
| Environmental Quality | Policy Act of 1969 |

| | Review of Environmental Statements | 516.3.4B |
|---|---|---|
| Chapter 3 | Prepared by Other Federal Agencies | (cont.) |

(2)  Requests for reviews of environmental assessments or reports are not required to be processed through the Assistant Secretary – Program Policy.  Review comments may be handled independently by bureaus and offices, with the Field Representative and Assistant Secretary – Program Policy being advised of significant or highly controversial issues.  Review comments are for the purpose of providing technical assistance to the requesting agency and should reflect this fact.

C.  Negative Declarations:

(1)  Negative declarations are prepared in lieu of environmental statements by Federal agencies and, in some cases, by applicants for Federal assistance.  A negative declaration is a statement for the record by the proponent Federal agency that it has reviewed the environmental impact of its proposed action, that it determines that the action will not significantly affect the quality of the human environment, and that an environmental statement is not required.  Such declarations are not normally circulated.

(2)  Requests for reviews of negative declarations are not required to be processed through the Assistant Secretary – Program Policy.  Review comments may be handled independently by bureaus and offices and shall concur or not concur with the requesting agency.  If a bureau or office does not concur, the Field Representative and Assistant Secretary – Program Policy will be advised promptly by copy of the comments with a copy of the negative declaration attached.

D.  Preliminary, Proposed, or Working Draft Environmental Statements:

(1)  Preliminary, proposed, or working draft environmental statements are sometimes prepared and circulated by Federal agencies and applicants for Federal assistance for consultative purposes.

(2)  Requests for reviews of these types of draft environmental statements are not required to be processed through the Assistant Secretary – Program Policy.  Review comments may be handled independently by bureaus and offices with the Field Representative and Assistant Secretary – Program Policy being advised of significant or highly controversial issues.  Review comments are for the purpose of providing informal technical assistance to the requesting agency and should state that they do not represent the review comments of the Department on the draft environmental statement.

3/15/72  (Release No. 1407)
Replaces 9/17/70  (Release No. 1222)

156

Department of the Interior
## DEPARTMENTAL MANUAL

Part 516 National Environmental
Environmental Quality                    Policy Act of 1969
                Review of Environmental Statements        516.7.5A
Chapter 7 Prepared by Other Federal Agencies        (cont.)

**(d)  Detailed Comments**

The format of this section shall follow the organization of the other agency's statement. These comments shall not approve, disapprove, support, or object to proposed actions of other Federal agencies, but shall constructively and objectively comment on the environmental impact of the proposed action, and on the adequacy of the statement in describing the environmental impacts of the action, the alternatives, and the impacts of the alternatives.

**(e)  Summary Comments, if any**

In general, the Department will not take a position on the proposed action of another Federal agency, but will limit its comments to those above. However, in those cases where the Department has jurisdiction by statute, executive order, memorandum of agreement, or other authority the Department may comment on the proposed action. These comments shall be provided in this section and may take the form of support for, concurrence with, concern over, or objection to the proposed action and/or the alternatives.

**B.  Bureau and Office Comments:**

(1) Bureau and office reviews of environmental statements prepared by other Federal agencies are considered informal inputs to the Department's comments and their content will generally conform to paragraph .5A of this chapter with the substitution of the bureau's or office's delegated jurisdiction or special environmental expertise for that of the Department.

**C.  Relationship to Other Concurrent Reviews:**

(1) Where the Department, because of other authority or agreement, is concurrently requested to review a proposal as well as its environmental statement, the Department's comments on the proposal shall be separately identified and precede the comments on the environmental statement. A summary of the Department's position, if any, on the proposal and its environmental impact shall be separately identified and follow the review comments on the environmental statement.

3/15/72  (Release No. 1407)
Replaces 9/17/70  (Release No. 1222)

Department of the Interior
DEPARTMENTAL MANUAL

|  |  | Part 516 National Environmental |
|---|---|---|
| Environmental Quality | | Policy Act of 1969 |
| | Review of Environmental Statements | 516.3.5C |
| Chapter 3 | Prepared by Other Federal Agencies | (cont.) |

(2)  Where another Federal agency elects to combine other related reviews into the review of the environmental statement by including additional or more specific information into the statement, the introduction to the Department's review comments will acknowledge the additional review request and the review comments will be incorporated into appropriate parts of the combined statement review.  A summary of the Department's position, if any, on the environmental impacts of the proposal and any alternatives shall be separately identified and follow the detailed review comments on the combined statement.

.6  Availability of Review Comments

A.  Prior to the public availability of another Federal agency's final environmental statement, the Department shall not independently release to the public its comments on that agency's draft environmental statement.  In accordance with Section 10(f) of the Council on Environmental Quality's Guidelines [516 DM 2, App. A], the agency that prepared the statement is responsible for making the comments available to the public, and requests for copies of the Department's comments shall be referred to that agency.  Exceptions to this procedure shall be made only by the Assistant Secretary – Program Policy in consultation with the Solicitor and the Director of Communications.

B.  Various internal Departmental memoranda, such as the review comments of bureaus, offices, task forces, and individuals, which are used as inputs to the Department's review comments are generally available to the public in accordance with the Freedom of Information Act (5 U.S.C. Section 552) and the Departmental procedures established by 43 C.F.R. 2.  Upon receipt of such requests and in addition to following the procedures above, the responsible bureau or office shall notify and consult the Assistant Secretary – Program Policy.

.7  Procedures for Processing Environmental Reviews

A.  General Procedures:

(1) All requests for reviews of draft and final environmental statements prepared by or for other Federal agencies shall be received and controlled by the Assistant Secretary – Program Policy.

3/15/72  (Release No. 1407)
Replaces 9/17/70  (Release No. 1222)

758

Department of the Interior
DEPARTMENTAL MANUAL

Part 516 National Environmental
Environmental Quality                          Policy Act of 1969
Review of Environmental Statements          516.3.7A
Chapter 3 Prepared by Other Federal Agencies          (cont.)

(2) If a bureau or office, whether at headquarters
or field level, should receive an environmental statement for
review directly from outside of the Department, it should
ascertain whether the statement is a preliminary, proposed,
or working draft circulated for technical assistance or input
in order to prepare a draft statement or whether the state-
ment is in fact a draft environmental statement, or in some
cases, a final statement circulated for official review.

(a) If the document is a preliminary, proposed,
or working draft, the bureau or office should handle indepen-
dently and provide whatever technical assistance possible,
within the limits of their resources, to the requesting agency.
The response should clearly indicate the type of assistance
being provided and state that it does not represent the
office's or the Department's review of the draft environmental
statement. Each bureau or office should provide the Field
Representative and the Assistant Secretary - Program Policy
copies of any comments involving significant or controversial
issues.

(b) If the document is a draft or final environ-
mental statement circulated for official review, the bureau
or office should inform the requesting agency of the
Department's procedures in subparagraph (1) above and promptly
refer the request and the statement to the Assistant Secretary -
Program Policy for processing.

(3) All bureaus and offices processing and reviewing
environmental statements of other Federal agencies will do so
within the time limits specified by the Assistant Secretary -
Program Policy. From thirty (30) to forty-five (45) days are
normally available for responding to other Federal agency
review requests. Whenever possible the Assistant Secretary -
Program Policy shall seek a forty-five (45) day review period.
Further extensions shall be handled in accordance with
paragraph .7B(3) of this chapter.

(4) The Department's review comments on other Federal
agencies' environmental statements shall reflect the full and
balanced interests of the Department in the protection and
enhancement of the environment. Lead bureaus shall be
responsible for resolving any intra-Departmental differences
in bureau or office review comments submitted to them. The
Office of Environmental Project Review is available for
guidance and assistance in this regard. In cases where agree-
ment cannot be reached, the matter shall be referred through
channels to the Assistant Secretary - Program Policy or to
the Field Representative, if appropriate.

3/15/72 (Release No. 1407)
Replaces 9/17/70 (Release No. 1222)

Department of the Interior
DEPARTMENTAL MANUAL

|                         | Part 516 National Environmental |
| Environmental Quality   | Policy Act of 1969 |

Review of Environmental Statements
Chapter 7 Prepared by Other Federal Agencies         516.7.7B

B.   Processing Environmental Reviews:

(1) The Assistant Secretary – Program Policy has
delegated to the Director, Office of Environmental Project
Review, the responsibility for distributing and monitoring
the review of all environmental statements referred to the
Department by other Federal agencies.  In carrying out this
responsibility, the Director, Office of Environmental Project
Review, shall determine which bureaus and offices will review
the statements, shall designate lead bureaus which shall
prepare the Department's comments, shall indicate the intended
signator of the comments, and shall set and monitor review
schedules.

(2) The Office of Environmental Project Review shall
secure and distribute sufficient copies of environmental state-
ments for Departmental review.  Bureaus and offices should
keep the Office of Environmental Project Review informed as to
their needs for review copies, which shall be kept to a minimum,
and shall develop internal procedures to efficiently and
expeditiously distribute environmental statements to reviewing
offices.

(3) Reviewing bureaus and offices which cannot meet
the review schedule shall so inform the lead bureau and shall
provide the date that the review will be delivered.  The lead
bureau shall inform the Office of Environmental Project Review
in cases of headquarters-level response, or the Field
Representative in cases of field-level response, if it cannot
meet the schedule, why it cannot, and when it will.  The
Office of Environmental Project Review or the Field Representa-
tive shall be responsible for informing the other Federal
agency of any changes in the review schedule.

(4) Reviewing offices shall route their review comments
through channels to the lead bureau, with a copy to the Office
of Environmental Project Review.  When, in cases, of head-
quarters-level response, review comments cannot reach the lead
bureau within the established review schedule, reviewing
bureaus and offices shall send a copy marked "Advance Copy"
directly to the lead bureau.

3/15/72  (Release No. 1407)
Replaces 9/17/70  (Release No. 1222)

Department of the Interior
DEPARTMENTAL MANUAL
Part 516 National Environmental
Policy Act of 1969

| Environmental Quality | |
|---|---|
| Chapter 7 Prepared by Other Federal Agencies | 516.3.7B (cont.) |

Review of Environmental Statements

(5) In cases of headquarters-level response:

(a) The lead bureau shall route the completed comments through channels to the Office of Environmental Project Review. Copies shall be prepared and attached for all bureaus and offices from whom review comments were requested, for the Office of Environmental Project Review, and for the Field Representative when the review pertains to a project within his geographic jurisdiction. In addition, legible copies of all review comments received shall accompany the Department's comments through the clearance process and shall be retained by the Office of Environmental Project Review;

(b) The Office of Environmental Project Review shall review, secure any necessary additional surnames, sur- name, and transmit the Department's comments to the Assistant Secretary – Program Policy for signature or for his forwarding to another appropriate Secretarial Officer for signature. Upon signature, the Office of Environmental Project Review shall transmit the comments to the requesting agency, and shall reproduce and send ten (10) copies of the signed original to the Council on Environmental Quality.

(6) In cases of field-level response:

(a) The lead bureau shall route the completed comments to the appropriate Field Representative. Copies shall be prepared and attached for all offices from whom review comments were requested and for the Office of Environ- mental Project Review. In addition legible copies of all review comments received shall be attached to the Office of Environmental Project Review's copy and to the Field Representative's file copy;

(b) The Field Representative shall review, sign, and transmit the Department's comments to the agency requesting the review. In addition he shall reproduce and send ten (10) copies of the signed original to the Council on Environmental Quality and send a copy of the CEQ transmittal memorandum, the Department's comments, and the bureau review comments to the Office of Environmental Project Review.

3/15/72 (Release No. 1407)
Replaces 9/17/70 (Release No. 1222)

161

# Department of the Interior
## DEPARTMENTAL MANUAL

| Environmental Quality | Part 516 National Environmental Policy Act of 1969 |
|---|---|
| Chapter 7 Prepared by Other Federal Agencies | Review of Environmental Statements  516.7.7B (cont.) |

(c)  If the Field Representative determines in the course of his review of the Department's comments that the review involves policy matters of Secretarial significance, he shall not sign and transmit the comments as provided in sub-paragraph (b) above, but shall forward the review to the Assistant Secretary – Program Policy.

NEPA COMPLIANCE GUIDELINE
NPS-12

## SCOPING GUIDANCE BY COUNCIL ON

## ENVIRONMENTAL QUALITY (4/30/81)

**EXECUTIVE OFFICE OF THE PRESIDENT**
COUNCIL ON ENVIRONMENTAL QUALITY
722 JACKSON PLACE N W
WASHINGTON D C 20006

April 30, 1981

MEMORANDUM FOR GENERAL COUNSELS, NEPA LIAISONS AND PARTICIPANTS IN SCOPING

SUBJECT:     Scoping Guidance

As part of its continuing oversight of the implementation of the NEPA
regulations, the Council on Environmental Quality has been investigating
agency experience with scoping.  This is the process by which the scope of
the issues and alternatives to be examined in an EIS is determined.  In a
project led by Barbara Bramble of the General Counsel's staff, the Council
asked federal agencies to report their scoping experiences; Council staff
held meetings and workshops in all regions of the country to discuss
scoping practice; and a contract study was performed for the Council to
investigate what techniques work best for various kinds of proposals.

Out of this material has been distilled a series of recommendations for
successfully conducting scoping.  The attached guidance document consists
of advice on what works and what does not, based on the experience of many
agencies and other participants in scoping.  It contains no new legal
requirements beyond those in the NEPA regulations.  It is intended to make
generally available the results of the Council's research, and to encourage
the use of better techniques for ensuring public participation and effici-
ency in the scoping process.

NICHOLAS C. YOST
General Counsel

September 1982

163

# INDEX

|  | Page |
|---|---|

I.   Introduction ......................................... 1
  A.   Background of this document ....................... 1
  B.   What scoping is and what it can do ................ 2

II.  Advice for Government Agencies
       Conducting Scoping ............................... 3
  A.   General context ................................... 3
  B.   Step-by-step through the process .................. 4
       1.   Start scoping after you have enough
              information ............................... 4
       2.   Prepare an information packet ............... 4
       3.   Design the scoping process for
              each project .............................. 5
       4.   Issuing the public notice ................... 7
       5.   Conducting a public meeting ................. 8
       6.   What to do with the comments ............... 10
       7.   Allocating work assignments and
              setting schedules ......................... 12
       8.   A few ideas to try ......................... 12
            a.   Route design workshop ................. 12
            b.   Hotline ............................... 12
            c.   Videotape of sites .................... 13
            d.   Videotape meetings .................... 13
            e.   Review committee ...................... 13
            f.   Consultant as meeting moderator ....... 13
            g.   Money savings tips .................... 13
  C.   Pitfalls .......................................... 13
       1.   Closed meetings ............................ 13
       2.   Contacting interested groups ............... 14
       3.   Tiering .................................... 15
  D.   Lead and Cooperating Agencies ..................... 15

III. Advice for Public Participants ...................... 17
  A.   Public input is often only negative .............. 18
  B.   Issues are too broad .............................. 18
  C.   Impacts are not identified ........................ 18

IV.  Brief Points for Applicants ......................... 18

164

## I. Introduction

### A. Background of this document.

In 1978, with the publication of the proposed NEPA regulations (since adopted as formal rules, 40 C.F.R. Parts 1500-1508), the Council on Environmental Quality gave formal recognition to an increasingly used term — scoping. Scoping is an idea that has long been familiar to those involved in NEPA compliance: In order to manage effectively the preparation of an environmental impact statement (EIS), one must determine the scope of the document — that is, what will be covered, and in what detail. Planning of this kind was a normal component of EIS preparation. But the consideration of issues and choice of alternatives to be examined was in too many cases completed outside of public view. The innovative approach to scoping in the regulations is that the process is open to the public and state and local governments, as well as to affected federal agencies. This open process gives rise to important new opportunities for better and more efficient NEPA analyses, and simultaneously places new responsibilities on public and agency participants alike to surface their concerns early. Scoping helps insure that real problems are identified early and properly studied; that issues that are of no concern do not consume time and effort; that the draft statement when first made public is balanced and thorough; and that delays occasioned by re-doing an inadequate draft are avoided. Scoping does not create problems that did not already exist; it ensures that problems that would have been raised anyway are identified early in the process.

Many members of the public as well as agency staffs engaged in the NEPA process have told the Council that the open scoping requirement is one of the most far-reaching changes engendered by the NEPA regulations. They have predicted that scoping could have a profound positive effect on environmental analyses, on the impact statement process itself, and ultimately on decisionmaking.

Because the concept of open scoping was new, the Council decided to encourage agencies' innovation without unduly restrictive guidance. Thus the regulations relating to scoping are very simple. They state that "there shall be an early and open process for determining the scope of issues to be addressed" which "shall be termed scoping," but they lay down few specific requirements. (Section 1501.7*). They require an open process with public notice; identification of significant and insignificant issues; allocation of EIS preparation assignments; identification of related analysis requirements in order to avoid duplication of work; and the planning of a schedule for EIS preparation that meshes with the agency's decisionmaking

---

\* All citations are to the NEPA regulations, 40 C.F.R. Parts 1500-1508 unless otherwise specified.

schedule. (Section 1501.7(a)). The regulations encourage, but do not require, setting time limits and page limits for the EIS, and holding scoping meetings. (Section 1501.7(b)). Aside from these general outlines, the regulations left the agencies on their own. The Council did not believe, and still does not, that it is necessary or appropriate to dictate the specific manner in which over 100 federal agencies should deal with the public. However, the Council has received several requests for more guidance. In 1980 we decided to investigate the agency and public response to the scoping requirement, to find out what was working and what was not, and to share this with all agencies and the public.

The Council first conducted its own survey, asking federal agencies to report some of their scoping experiences. The Council then contracted with the American Arbitration Association and Clark McGlennon Associates to survey the scoping techniques of major agencies and to study several innovative methods in detail.* Council staff conducted a two-day workshop in Atlanta in June 1980, to discuss with federal agency NEPA staff and several EIS contractors what seems to work best in scoping of different types of proposals, and discussed scoping with federal, state and local officials in meetings in all 10 federal regions.

This document is a distillation of all the work that has been done so far by many people to identify valuable scoping techniques. It is offered as a guide to encourage success and to help avoid pitfalls. Since scoping methods are still evolving, the Council welcomes any comments on this guide, and may add to it or revise it in coming years.

B. What scoping is and what it can do.

Scoping is often the first contact between proponents of a proposal and the public. This fact is the source of the power of scoping and of the trepidation that it sometimes evokes. If a scoping meeting is held, people on both sides of an issue will be in the same room and, if all goes well, will speak to each other. The possibilities that flow from this situation are vast. Therefore, a large portion of this document is devoted to the productive management of meetings and the de-fusing of possible heated disagreements.

Even if a meeting is not held, the scoping process leads EIS preparers to think about the proposal early on, in order to explain it to the public and affected agencies. The participants respond with their own concerns about significant issues and suggestions of alternatives. Thus as the draft EIS is prepared, it will include, from the beginning, a reflection or at least an acknowledgement of the cooperating agencies' and the public's concerns. This reduces the need for changes after the draft is finished, because it

---

* The results of this examination are reported in "Scoping the Content of EISs: An Evaluation of Agencies' Experiences," which is available from the Council or the Resource Planning Analysis Office of the U.S. Geological Survey, 750 National Center, Reston, Va. 22092.

11/6

reduces the chances of overlooking a significant issue or reasonable alternative. It also in many cases increases public confidence in NEPA and the decisionmaking process, thereby reducing delays, such as from litigation, later on when implementing the decisions. As we will discuss further in this document, the public generally responds positively when its views are taken seriously, even if they cannot be wholly accomodated.

But scoping is not simply another "public relations" meeting requirement. It has specific and fairly limited objectives: (a) to identify the affected public and agency concerns; (b) to facilitate an efficient EIS preparation process, through assembling the cooperating agencies, assigning EIS writing tasks, ascertaining all the related permits and reviews that must be scheduled concurrently, and setting time or page limits; (c) to define the issues and alternatives that will be examined in detail in the EIS while simultaneously devoting less attention and time to issues which cause no concern; and (d) to save time in the overall process by helping to ensure that draft statements adequately address relevant issues, reducing the possibility that new comments will cause a statement to be rewritten or supplemented.

Sometimes the scoping process enables early identification of a few serious problems with a proposal, which can be changed or solved because the proposal is still being developed. In these cases, scoping the EIS can actually lead to the solution of a conflict over the proposed action itself. We have found that this extra benefit of scoping occurs fairly frequently. But it cannot be expected in most cases, and scoping can still be considered successful when conflicts are clarified but not solved. This guide does not presume that resolution of conflicts over proposals is a principal goal of scoping, because it is only possible in limited circumstances. Instead, the Council views the principal goal of scoping to be an adequate and efficiently prepared EIS. Our suggestions and recommendations are aimed at reducing the conflicts among affected interests that impede this limited objective. But we are aware of the possibilities of more general conflict resolution that are inherent in any productive discussions among interested parties. We urge all participants in scoping processes to be alert to this larger context, in which scoping could prove to be the first step in environmental problem-solving.

Scoping can lay a firm foundation for the rest of the decisionmaking process. If the EIS can be relied upon to include all the necessary information for formulating policies and making rational choices, the agency will be better able to make a sound and prompt decision. In addition, if it is clear that all reasonable alternatives are being seriously considered, the public will usually be more satisfied with the choice among them.

## II.  Advice for Government Agencies Conducting Scoping

### A.  General context.

Scoping is a process, not an event or a meeting. It continues throughout the planning for an EIS, and may involve a series of meetings, telephone conversations, or written comments from different interested groups. Because it is a process, participants must remain flexible. The scope of an EIS occasionally may need to be modified later if a new issue surfaces,

no matter how thorough the scoping was. But it makes sense to try to set
the scope of the statement as early as possible.

Scoping may identify people who already have knowledge about a site or an
alternative proposal or a relevant study, and induce them to make it avail-
able. This can save a lot of research time and money. But people will not
come forward unless they believe their views and materials will receive
serious consideration. Thus scoping is a crucial first step toward build-
ing public confidence in a fair environmental analysis and ultimately a
fair decisionmaking process.

One further point to remember: the lead agency cannot shed its responsi-
bility to assess each significant impact or alternative even if one is
found after scoping. But anyone who hangs back and fails to raise some-
thing that reasonably could have been raised earlier on will have a hard
time prevailing during later stages of the NEPA process or if litigation
ensues. Thus a thorough scoping process does provide some protection
against subsequent lawsuits.

B.    Step-by-step through the process.

1.    Start scoping after you have enough information.

Scoping cannot be useful until the agency knows enough about the proposed
action to identify most of the affected parties, and to present a coherent
proposal and a suggested initial list of environmental issues and alterna-
tives. Until that time there is no way to explain to the public or other
agencies what you want them to get involved in. So the first stage is to
gather preliminary information from the applicant, or to compose a clear
picture of your proposal, if it is being developed by the agency.

2.    Prepare an information packet.

In many cases, scoping of the EIS has been preceded by preparation of an
environmental assessment (EA) as the basis for the decision to proceed with
an EIS. In such cases, the EA will, of course, include the preliminary
information that is needed.

If you have not prepared an EA, you should put together a brief information
packet consisting of a description of the proposal, an initial list of
impacts and alternatives, maps, drawings, and any other material or refer-
ences that can help the interested public to understand what is being pro-
posed. The proposed work plan of the EIS is not usually sufficient for
this purpose. Such documents rarely contain a description of the goals of
the proposal to enable readers to develop alternatives.

At this stage, the purpose of the information is to enable participants to
make an intelligent contribution to scoping the EIS. Because they will be
helping to plan what will be examined during the environmental review, they
need to know where you are now in that planning process.

Include in the packet a brief explanation of what scoping is, and what pro-
cedure will be used, to give potential participants a context for their
involvement. Be sure to point out that you want comments from participants

on very specific matters. Also reiterate that no decision has yet been made on the contents of the EIS, much less on the proposal itself. Thus, explain that you do not yet have a preferred alternative, but that you may identify the preferred alternative in the draft EIS. (See Section 1502.14(e)). This should reduce the tendency of participants to perceive the proposal as already a definite plan. Encourage them to focus on recommendations for improvements to the various alternatives.

Some of the complaints alleging that scoping can be a waste of time stem from the fact that the participants may not know what the proposal is until they arrive at a meeting. Even the most intelligent among us can rarely make useful, substantive comments on the spur of the moment. Don't expect helpful suggestions to result if participants are put in such a position.

3. Design the scoping process for each project.

There is no established or required procedure for scoping. The process can be carried out by meetings, telephone conversations, written comments, or a combination of all three. It is important to tailor the type, the timing and the location of public and agency comments to the proposal at hand.

For example, a proposal to adopt a land management plan for a National Forest in a sparsely populated region may not lend itself to calling a single meeting in a central location. While people living in the area and elsewhere may be interested, any meeting place will be inconvenient for most of the potential participants. One solution is to distribute the information packet, solicit written comments, list a telephone number with the name of the scoping coordinator, and invite comments to be phoned in. Otherwise, small meetings in several locations may be necessary when face-to-face communication is important.

In another case, a site-specific construction project may be proposed. This would be a better candidate for a central scoping meeting. But you must first find out if anyone would be interested in attending such a meeting. If you simply assume that a meeting is necessary, you may hire a hall and a stenographer, assemble your staff for a meeting, and find that nobody shows up. There are many proposals that just do not generate sufficient public interest to cause people to attend another public meeting. So a wise early step is to contact known local citizens groups and civic leaders.

In addition, you may suggest in your initial scoping notice and information packet that all those who desire a meeting should call to request one. That way you will only hear from those who are seriously interested in attending.

The question of where to hold a meeting is a difficult one in many cases. Except for site specific construction projects, it may be unclear where the interested parties can be found. For example, an EIS on a major energy development program may involve policy issues and alternatives to the program that are of interest to public groups all over the nation, and to agencies headquartered in Washington, D.C., while the physical impacts might be expected to be felt most strongly in a particular region of the country. In such a case, if personal contact is desired, several meetings

169

would be necessary, especially in the affected region and in Washington, to
enable all interests to be heard.

As a general guide, unless a proposal has no site specific impacts, scoping
meetings should not be <u>confined</u> to Washington. Agencies should try to
elicit the views of people who are closer to the affected regions.

The key is to be flexible. It may not be possible to plan the whole scop-
ing process at the outset, unless you know who 'll be the potential players
are. You can start with written comments, move on to an informal meeting,
and hold further meetings if desired.

There are several reasons to hold a scoping meeting. First, some of the
best effects of scoping stem from the fact that all parties have the oppor-
tunity to meet one another and to listen to the concerns of the others.
There is no satisfactory substitute for personal contact to achieve this
result. If there is any possibility that resolution of underlying con-
flicts over a proposal may be achieved, this is always enhanced by the
development of personal and working relationships among the parties.

Second, even in a conflict situation people usually respond positively when
they are treated as partners in the project review process. If they feel
confident that their views were actually heard and taken seriously, they
will be more likely to be satisfied that the decisionmaking process was
fair even if they disagree with the outcome. It is much easier to show
people that you are listening to them if you hold a face-to-face meeting
where they can see you writing down their points, than if their only con-
tact is through written comments

If you suspect that a particular proposal could benefit from a meeting with
the affected public at any time during its review, the best time to have
the meeting is during this early scoping stage. The fact that you are
willing to discuss openly a proposal before you have committed substantial
resources to it will often enhance the chances for reaching an accord.

If you decide that a public meeting is appropriate, you still must decide
what type of meeting, or how many meetings, to hold. We will discuss meet-
ings in detail below in "Conducting a Public Meeting." But as part of
designing the scoping process, you must decide between a single meeting and
multiple ones for different interest groups, and whether to hold a separate
meeting for government agency participants.

The single large public meeting brings together all the interested parties,
which has both advantages and disadvantages. If the meeting is efficiently
run, you can cover a lot of interests and issues in a short time. And a
single meeting does reduce agency travel time and expense. In some cases
it may be an advantage to have all interest groups hear each others' con-
cerns, possibly promoting compromise. It is definitely important to have
the staffs of the cooperating agencies, as well as the lead agency, hear
the public views of what the significant issues are; and it will be diffi-
cult and expensive for the cooperating agencies to attend several meetings.
But if there are opposing groups of citizens who feel strongly on both
sides of an issue, the setting of the large meeting may needlessly create
tension and an emotional confrontation between the groups. Moreover, some

people may feel intimidated in such a setting, and won't express themselves at all.

The principal drawback of the large meeting, however, is that it is generally unwieldy. To keep order, discussion is limited, dialogue is difficult, and often all participants are frustrated, agency and public alike. Large meetings can serve to identify the interest groups for future discussion, but often little else is accomplished. Large meetings often become "events" where grandstanding substitutes for substantive comments. Many agencies resort to a formal hearing-type format to maintain control, and this can cause resentments among participants who come to the meeting expecting a responsive discussion.

For these reasons, we recommend that meetings be kept small and informal, and that you hold several, if necessary, to accomodate the different interest groups. The other solution is to break a large gathering into small discussion groups, which is discussed below. Using either method increases the likelihood that participants will level with you and communicate their underlying concerns rather than make an emotional statement just for effect.

Moreover, in our experience, a separate meeting for cooperating agencies is quite productive. Working relationships can be forged for the effective participation of all involved in the preparation of the EIS. Work assignments are made by the lead agency, a schedule may be set for production of parts of the draft EIS, and information gaps can be identified early. But a productive meeting such as this is not possible at the very beginning of the process. It can only result from the same sort of planning and preparation that goes into the public meetings. We discuss below the special problems of cooperating agencies, and their information needs for effective participation in scoping.

    4.  Issuing the public notice.

The preliminary look at the proposal, in which you develop the information packet discussed above, will enable you to tell what kind of public notice will be most appropriate and effective.

Section 1501.7 of the NEPA regulations requires that a notice of intent to prepare an EIS must be published in the Federal Register prior to initiating scoping.* This means that one of the appropriate means of giving

---

*    Several agencies have found it useful to conduct scoping for environmental assessments. EAs are prepared where answering the question of whether an EIS is necessary requires identification of significant environmental issues; and consideration of alternatives in an EA can often be useful even where an EIS is not necessary. In both situations scoping can be valuable. Thus the Council has stated that scoping may be used in connection with preparation of an EA, that is, before publishing any notice of intent to prepare an EIS. As in normal scoping, appropriate public notice is required, as well as adequate information on the proposal to make scoping worthwhile. But scoping at this early stage cannot substitute for the normal scoping process unless the earlier public notice stated clearly that this would be the case, and the notice of intent expressly provides that written comments suggesting impacts and alternatives for study will still be considered.

1-71

public notice of the upcoming scoping process could be the same Federal
Register notice. And because the notice of intent must be published
anyway, the scoping notice would be essentially free. But use of the
Federal Register is not an absolute requirement, and other means of public
notice often are more effective, including local newspapers, radio and TV,
posting notices in public places, etc. (See Section 1506.6 of the
regulations.)

What is important is that the notice actually reach the affected public. If
the proposal is an important new national policy in which national environ-
mental groups can be expected to be interested, these groups can be con-
tacted by form letter with ease. (See the Conservation Directory for a
list of national groups.**) Similarly, for proposals that may have major
implications for the business community, trade associations can be helpful
means of alerting affected groups. The Federal Register notice can be
relied upon to notify others that you did not know about. But the Federal
Register is of little use for reaching individuals or local groups inter-
ested in a site specific proposal. Therefore notices in local papers, let-
ters to local government officials and personal contact with a few known
interested individuals would be more appropriate. Land owners abutting any
proposed project site should be notified individually.

Remember that issuing press releases to newspapers, and radio and TV sta-
tions is not enough, because they may not be used by the media unless the
proposal is considered "newsworthy." If the proposal is controversial, you
can try alerting reporters or editors to an upcoming scoping meeting for
coverage in special weekend sections used by many papers. But placing a
notice in the legal notices section of the paper is the only guarantee that
it will be published.

   5. Conducting a public meeting.

In our study of agency practice in conducting scoping, the most interesting
information on what works and doesn't work involves the conduct of meet-
ings. Innovative techniques have been developed, and experience shows that
these can be successful.

One of the most important factors turns out to be the training and experi-
ence of the moderator. The U.S. Office of Personnel Management and others
give training courses on how to run a meeting effectively. Specific tech-
niques are taught to keep the meeting on course and to deal with confron-
tations. These techniques are sometimes called "meeting facilitation
skills."

When holding a meeting, the principle thing to remember about scoping is
that it is a process to initiate preparation of an EIS. It is not con-
cerned with the ultimate decision on the proposal. A fruitful scoping pro-
cess leads to an adequate environmental analysis, including all reasonable

_____

** The Conservation Directory is a publication of the National Wildlife
Federation, 1421 16th St., N.W., Washington, D.C. 20036, $4.00.

alternatives and mitigation measures. This limited goal is in the interest of all the participants, and thus offers the possibility of agreement by the parties on this much at least. To run a successful meeting you must keep the focus on this positive purpose.

At the point of scoping therefore, in one sense all the parties involved have a common goal, which is a thorough environmental review. If you emphasize this in the meeting you can stop any grandstanding speeches without a heavy hand, by simply asking the speaker if he or she has any concrete suggestions for the group on issues to be covered in the EIS. By frequently drawing the meeting back to this central purpose of scoping, the opponents of a proposal will see that you have not already made a decision, and they will be forced to deal with the real issues. In addition, when people see that you are genuinely seeking their opinion, some will volunteer useful information about a particular subject or site that they may know better than anyone on your staff.

As we stated above, we found that informal meetings in small groups are the most satisfactory for eliciting useful issues and information. Small groups can be formed in two ways: you can invite different interest groups to different meetings, or you can break a large number into small groups for discussion.

One successful model is used by the Army Corps of Engineers, among others. In cases where a public meeting is desired, it is publicized and scheduled for a location that will be convenient for as many potential participants as possible. The information packet is made available in several ways, by sending it to those known to be interested, giving a telephone number in the public notices for use in requesting one, and providing more at the door of the meeting place as well. As participants enter the door, each is given a number. Participants are asked to register their name, address and/or telephone number for use in future contact during scoping and the rest of the NEPA process.

The first part of the meeting is devoted to a discussion of the proposal in general, covering its purpose, proposed location, design, and any other aspects that can be presented in a lecture format. A question and answer period concerning this information is often held at this time. Then if there are more than 15 or 20 attendees at the meeting, the next step is to break it into small groups for more intensive discussion. At this point, the numbers held by the participants are used to assign them to small groups by sequence, random drawing, or any other method. Each group should be no larger than 12, and 8-10 is better. The groups are informed that their task is to prepare a list of significant environmental issues and reasonable alternatives for analysis in the EIS. These lists will be presented to the main group and combined into a master list, after the discussion groups are finished. The rules for how priorities are to be assigned to the issues identified by each group should be made clear before the large group breaks up.

Some agencies ask each group member to vote for the 5 or 10 most important issues. After tallying the votes of individual members, each group would only report out those issues that received a certain number of votes. In this way only those items of most concern to the members would even make the list compiled by each group. Some agencies go further, and only let

each group report out the top few issues identified. But you must be careful not to ignore issues that may be considered a medium priority by many people. They may still be important, even if not in the top rank. Thus instead of simply voting, the members of the groups should rank the listed issues in order of perceived importance. Points may be assigned to each item on the basis of the rankings by each member, so that the group can compile a list of its issues in priority order. Each group should then be asked to assign cut-off numbers to separate high, medium and low priority items. Each group should then report out to the main meeting all of its issues, but with priorities clearly assigned.

One member of the lead agency or cooperating agency staff should join each group to answer questions and to listen to the participants' expressions of concern. It has been the experience of many of those who have tried this method that it is better not to have the agency person lead the group discussions. There does need to be a leader, who should be chosen by the group members. In this way, the agency staff member will not be perceived as forcing his opinions on the others.

If the agency has a sufficient staff of formally trained "meeting facilitators," they may be able to achieve the same result even where agency staff people lead the discussion groups. But absent such training, the staff should not lead the discussion groups. A good technique is to have the agency person serve as the recording secretary for the group, writing down each impact and alternative that is suggested for study by the participants. This enhances the neutral status of the agency representative, and ensures that he is perceived as listening and reacting to the views of the group. Frequently, the recording of issues is done with a large pad mounted on the wall like a blackboard, which has been well received by agency and public alike, because all can see that the views expressed actually have been heard and understood.

When the issues are listed, each must be clarified or combined with others to eliminate duplication or fuzzy concepts. The agency staff person can actually lead in this effort because of his need to reflect on paper exactly what the issues are. After the group has listed all the environmental impacts and alternatives and any other issues that the members wish to have considered, they are asked to discuss the relative merits and importance of each listed item. The group should be reminded that one of its tasks is to eliminate insignificant issues. Following this, the members assign priorities or vote using one of the methods described above.

The discussion groups are then to return to the large meeting to report on the results of their ranking. At this point further discussion may be useful to seek a concensus on which issues are really insignificant. But the moderator must not appear to be ruthlessly eliminating issues that the participants ranked of high or medium importance. The best that can usually be achieved is to "deemphasize" some of them, by placing them in the low priority category.

6. What to do with the comments.

After you have comments from the cooperating agencies and the interested public, you must evaluate them and make judgments about which issues are in

fact significant and which ones are not. The decision of what the EIS should contain is ultimately made by the lead agency. But you will now know what the interested participants consider to be the principal areas for study and analysis. You should be guided by these concerns, or be prepared to briefly explain why you do not agree. Every issue that is raised as a priority matter during scoping should be addressed in some manner in the EIS, either by in-depth analysis, or at least a short explanation showing that the issue was examined, but not considered significant for one or more reasons.

Some agencies have complained that the time savings claimed for scoping have not been realized because after public groups raise numerous minor matters, they cannot focus the EIS on the significant issues. It is true that it is always easier to add issues than it is to subtract them during scoping. And you should realize that trying to _eliminate_ a particular environmental impact or alternative from study may arouse the suspicions of some people. Cooperating agencies may be even more reluctant to eliminate issues in their areas of special expertise than the public participants. But the way to approach it is to seek consensus on which issues are less important. These issues may then be deemphasized in the EIS by a brief discussion of why they were not examined in depth.

If no concensus can be reached, it is still your responsibility to select the significant issues. The lead agency cannot abdicate its role and simply defer to the public. Thus a group of participants at a scoping meeting should not be able to "vote" an insignificant matter into a big issue. If a certain issue is raised and in your professional judgment you believe it is not significant, explain clearly and briefly in the EIS why it is not significant. There is no need to devote time and pages to it in the EIS if you can show that it is not relevant or important to the proposed action. But you should address in some manner all matters that were raised in the scoping process, either by an extended analysis or a brief explanation showing that you acknowledge the concern.

Several agencies have made a practice of sending out a post-scoping document to make public the decisions that have been made on what issues to cover in the EIS. This is not a requirement, but in certain controversial cases it can be worthwhile. Especially when scoping has been conducted by written comments, and there has been no face-to-face contact, a post-scoping document is the only assurance to the participants that they were heard and understood until the draft EIS comes out. Agencies have acknowledged to us that "letters instead of meetings seem to get disregarded easier." Thus a reasonable quid pro quo for relying on comment letters would be to send out a post-scoping document as feedback to the commentors.

The post-scoping document may be as brief as a list of impacts and alternatives selected for analysis; it may consist of the "scope of work" produced by the lead and cooperating agencies for their own EIS work or for the contractor; or it may be a special document that describes all the issues and explains why they were selected.

7.   Allocating work assignments and setting schedules.

Following the public participation in whatever form, and the selection of
issues to be covered, the lead agency must allocate the EIS preparation
work among the available resources.  If there are no cooperating agencies,
the lead agency allocates work among its own personnel or contractors.  If
there are cooperating agencies involved, they may be assigned specific
research or writing tasks.  The NEPA regulations require that they normally
devote their own resources to the issues in which they have special exper-
tise or jurisdiction by law.  (Sections 1501.6(b)(3), (5), and
1501.7(a)(4)).

In all cases, the lead agency should set a schedule for completion of the
work, designate a project manager and assign the reviewers, and must set a
time limit for the entire NEPA analysis if requested to do so by an appli-
cant.  (Section 1501.8).

8.   A few ideas to try.

a.   Route design workshop

As part of a scoping process, a successful innovation by one agency
involved route selection for a railroad.  The agency invited representa-
tives of the interested groups (identified at a previous public meeting) to
try their hand at designing alternative routes for a proposed rail segment.
Agency staff explained design constraints and evaluation criteria such as
the desire to minimize damage to prime agricultural land and valuable wild-
life habitat.  The participants were divided into small groups for a few
hours of intensive work.  After learning of the real constraints on alter-
native routes, the participants had a better understanding of the agency's
and applicant's viewpoints.  Two of the participants actually supported
alternative routes that affected their own land because the overall impacts
of these routes appeared less adverse.

The participants were asked to rank the five alternatives they had devised
and the top two were included in the EIS.  But the agency did not permit
the groups to apply the same evaluation criteria to the routes proposed by
the applicant or the agency.  Thus public confidence in the process was not
as high as it could have been, and probably was reduced when the
applicant's proposal was ultimately selected.

The Council recommends that when a hands-on design workshop is used, the
assignment of the group be expanded to include evaluation of the reason-
ableness of all the suggested alternatives.

b.   Hotline

Several agencies have successfully used a special telephone number, essen-
tially a hotline, to take public comments before, after, or instead of a
public meeting.  It helps to designate a named staff member to receive
these calls so that some continuity and personal relationships can be
developed.

### c. Videotape of sites

A videotape of proposed sites is an excellent tool for explaining site differences and limitations during the lecture-format part of a scoping meeting.

### d. Videotape meetings

One agency has videotaped whole scoping meetings. Staff found that the participants took their roles more seriously and the taping appeared not to precipitate grandstanding tactics.

### e. Review committee

Success has been reported from one agency which sets up review committees, representing all interested groups, to oversee the scoping process. The committees help to design the scoping process. In cooperation with the lead agency, the committee reviews the materials generated by the scoping meeting. Again, however, the final decision on EIS content is the responsibility of the lead agency.

### f. Consultant as meeting moderator

In some hotly contested cases, several agencies have used the EIS consultant to actually run the scoping meeting. This is permitted under the NEPA regulations and can be useful to de-fuse a tense atmosphere if the consultant is perceived as a neutral third party. But the responsible agency officials must attend the meetings. There is no substitute for developing a relationship between the agency officials and the affected parties. Moreover, if the responsible officials are not prominently present, the public may interpret that to mean that the consultant is actually making the decisions about the EIS, and not the lead agency.

### g. Money saving tips

Remember that money can be saved by using conferer e calls instead of meetings, tape-recording the meetings instead of hiring a stenographer, and finding out whether people want a meeting be  e announcing it.

## C. Pitfalls.

We list here some of the problems that have been experienced in certain scoping cases, in order to enable others to avoid the same difficulties.

### 1. Closed meetings.

In response to informal advice from CEQ that holding separate meetings for agencies and the public would be permitted under the regulations and could be more productive, one agency scheduled a scoping meeting for the cooperating agencies some weeks in advance of the public meeting. Apparently, the lead agency felt that the views of the cooperating agencies would be more candidly expressed if the meeting were closed. In any event, several members of the public learned of the meeting and asked to be present. The lead agency acquiesced only after newspaper reporters were able to make a

14

story out of the closed session. At the meeting, the members of the public
were informed that they would not be allowed to speak, nor to record the
proceedings. The ill feeling aroused by this chain of events may not be
repaired for a long time. Instead, we would suggest the following
possibilities:.

    a.    Although separate meetings for agencies and public groups may be
more efficient, there is no magic to them. By all means, if someone
insists on attending the agency meeting, let him. There is nothing as
secret going on there as he may think there is if you refuse him
admittance. Better yet, have your meeting of cooperating agencies <u>after</u>
the public meeting. That may be the most logical time anyway, since only
then can the scope of the EIS be decided upon and assignments made among
the agencies. If it is well done, the public meeting will satisfy most
people and show them that you are listening to them.

    b.    Always permit recording. In fact, you should suggest it for
public meetings. All parties will feel better if there is a record of the
proceeding. There is no need for a stenographer, and tape is inexpensive.
It may even be better then a typed transcript, because staff and decision-
makers who did not attend the meeting can listen to the exchange and may
learn a lot about public perceptions of the proposal.

    c.    When people are admitted to a meeting, it makes no sense to refuse
their requests to speak. However, you can legitimately limit their state-
ments to the subject at hand—scoping. You do not have to permit some
participants to waste the others' time if they refuse to focus on the
impacts and alternatives for inclusion in the EIS. Having a tape of the
proceedings could be useful after the meeting if there is some question
that speakers were improperly silenced. But it takes an experienced moder-
ator to handle a situation like this.

    d.    The scoping stage is the time for building confidence and trust on
all sides of a proposal, because this is the only time when there is a
common enterprise. The attitudes formed at this stage can carry through
the project review process. Certainly it is difficult for things to get
better. So foster the good will as long as you can by listening to what is
being said during scoping. It is possible that out of that dialogue may
appear recommendations for changes and mitigation measures that can turn a
controversial fight into an acceptable proposal.

    2.    Contacting interested groups.

Some problems have arisen in scoping where agencies failed to contact all
the affected parties, such as industries or state and local governments.
In one case, a panel was assembled to represent various interests in
scoping an EIS on a wildlife-related program. The agency had an excellent
format for the meeting, but the panel did not represent industries that
would be affected by the program or interested state and local governments.
As a result, the EIS may fail to reflect the issues of concern to these
parties.

Another agency reported to us that it failed to contact parties directly
because staff feared that if they missed someone they would be accused of

favoritism. Thus they relied on the issuance of press releases which were not effective. Many people who did not learn about the meetings in time sought additional meeting opportunities, which cost extra money and delayed the process.

In our experience, the attempt to reach people is worth the effort. Even if you miss someone, it will be clear that you tried. You can enlist a few representatives of an interest group to help you identify and contact others. Trade associations, chambers of commerce, local civic groups, and local and national conservation groups can spread the word to members.

## 3. Tiering.

Many people are not familiar with the way environmental impact statements can be "tiered" under the NEPA regulations, so that issues are examined in detail at the stage that decisions on them are being made. See Section 1508.28 of the regulations. For example, if a proposed program is under review, it is possible that site specific actions are not yet proposed. In such a case, these actions are not addressed in the EIS on the program, but are reserved for a later tier of analysis. If tiering is being used, this concept must be made clear at the outset of any scoping meeting, so that participants do not concentrate on issues that are not going to be addressed at this time. If you can specify when these other issues will be addressed it will be easier to convince people to focus on the matters at hand.

### 4. Scoping for unusual programs.

One interesting scoping case involved proposed changes in the Endangered Species Program. Among the impacts to be examined were the effects of this conservation program on user activities such as mining, hunting, and timber harvest, instead of the other way around. Because of this reverse twist in the impacts to be analyzed, some participants had difficulty focusing on useful issues. Apparently, if the subject of the EIS is unusual, it will be even harder than normal for scoping participants to grasp what is expected of them.

In the case of the Endangered Species Program EIS, the agency planned an intensive 3 day scoping session, successfully involved the participants, and reached accord on several issues that would be important for the future implementation of the program. But the participants were unable to focus on impacts and program alternatives for the EIS. We suggest that if the intensive session had been broken up into 2 or 3 meetings separated by days or weeks, the participants might have been able to get used to the new way of thinking required, and thereby to participate more productively. Programmatic proposals are often harder to deal with in a scoping context than site specific projects. Thus extra care should be taken in explaining the goals of the proposal and in making the information available well in advance of any meetings.

### D. Lead and Cooperating Agencies.

Some problems with scoping revolve around the relationship between lead and cooperating agencies. Some agencies are still uncomfortable with these

roles. The NEPA regulations, and the 40 Questions and Answers about the NEPA Regulations, 46 Fed. Reg. 18026, ( March 23, 1981) describe in detail the way agencies are now asked to cooperate on environmental analyses. (See Questions 9, 14, and 30.) We will focus here on the early phase of that cooperation.

It is important for the lead agency to be as specific as possible with the cooperating agencies. Tell them what you want them to contribute during scoping: environmental impacts and alternatives. Some agencies still do not understand the purpose of scoping.

Be sure to contact and involve representatives of the cooperating agencies who are responsible for NEPA-related functions. The lead agency will need to contact staff of the cooperating agencies who can both help to identify issues and alternatives and commit resources to a study, agree to a schedule for EIS preparation, or approve a list of issues as sufficient. In some agencies that will be at the district or state office level (e.g., Corps of Engineers, Bureau of Land Management, and Soil Conservation Service) for all but exceptional cases. In other agencies you must go to regional offices for scoping comments and commitments (e.g., EPA, Fish and Wildlife Service, Water and Power Resources Service). In still others, the field offices do not have NEPA responsibilities or expertise and you will deal directly with headquarters (e.g., Federal Energy Regulatory Commission, Interstate Commerce Commission). In all cases you are looking for the office that can give you the answers you need. So keep trying until you find the organizational level of the cooperating agency that can give you useful information and that has the authority to make commitments.

As stated in 40 Questions and Answers about the NEPA Regulations, the lead agency has the ultimate responsibility for the content of the EIS, but if it leaves out a significant issue or ignores the advice and expertise of the cooperating agency, the EIS may be found later to be inadequate. (46 Fed. Reg. 18030, Question 14b.) At the same time, the cooperating agency will be concerned that the EIS contain material sufficient to satisfy its decisionmaking needs. Thus, both agencies have a stake in producing a document of good quality. The cooperating agencies should be encouraged not only to participate in scoping but also to review the decisions made by the lead agency about what to include in the EIS. Lead agencies should allow any information needed by a cooperating agency to be included, and any issues of concern to the cooperating agency should be covered, but it usually will have to be at the expense of the cooperating agency.

Cooperating agencies have at least as great a need as the general public for advance information on a proposal before any scoping takes place. Agencies have reported to us that information from the lead agency is often too sketchy or comes too late for informed participation. Lead agencies must clearly explain to all cooperating agencies what the proposed action is conceived to be at this time, and what present alternatives and issues the lead agency sees, before expecting other agencies to devote time and money to a scoping session. Informal contacts among the agencies before scoping gets underway are valuable to establish what the cooperating agencies will need for productive scoping to take place.

Some agencies will be called upon to be cooperators more frequently than others, and they may lack the resources to respond to the numerous requests. The NEPA regulations permit agencies without jurisdiction by law (i.e., no approval authority over the cooperating agency role. (Section 1501.6(c)). But agencies that do have jurisdiction by law cannot opt out entirely and may have to reduce their cooperating effort devoted to each EIS. (See Section 1501.6(c) and 40 Questions and Answers about the NEPA Regulations, 46 Fed. Reg. 18030, Question 14a.) Thus, cooperators would be greatly aided by a priority list from the lead agency showing which proposals most need their help. This will lead to a more efficient allocation of resources.

Some cooperating agencies are still holding back at the scoping stage in order to retain a critical position for later in the process. They either avoid the scoping sessions or fail to contribute, and then raise objections in comments on the draft EIS. We cannot emphasize enough that the whole point of scoping is to avoid this situation. As we stated in 40 Questions and Answers about the NEPA Regulations, "if the new alternative [or other issue] was not raised by the commentor during scoping, but could have been, commentors may find that they are unpersuasive in their efforts to have their suggested alternative analyzed in detail by the [lead] agency." (46 Fed. Reg. 18035, Question 29b.)

### III. Advice for Public Participants

Scoping is a new opportunity for you to enter the earliest phase of the decisionmaking process on proposals that affect you. Through this process you have access to public officials before decisions are made and the right to explain your objections and concerns. But this opportunity carries with it a new responsibility. No longer may individuals hang back until the process is almost complete and then spring forth with a significant issue or alternative that might have been raised earlier. You are now part of the review process, and your role is to inform the responsible agencies of the potential impacts that should be studied, the problems a proposal may cause that you foresee, and the alternatives and mitigating measures that offer promise.

As noted above, and in 40 Questions and Answers, no longer will a comment raised for the first time after the draft EIS is finished be accorded the same serious consideration it would otherwise have merited if the issue had been raised during scoping. Thus you have a responsibility to come forward early with known issues.

In return, you get the chance to meet the responsible officials and to make the case for your alternative before they are committed to a course of action. To a surprising degree this avenue has been found to yield satisfactory results. There's no guarantee, of course, but when the alternative you suggest is really better, it is often hard for a decisionmaker to resist.

There are several problems that commonly arise that public participants should be aware of:

## A.    Public input is often only negative

The optimal timing of scoping within the NEPA process is difficult to judge.  On the one hand, as explained above (Section II.B.1.), if it is attempted too early, the agency cannot explain what it has in mind and informed participation will be impossible.  On the other, if it is delayed, the public may find that significant decisions are already made, and their comments may be discounted or will be too late to change the project.  Some agencies have found themselves in a tactical cross-fire when public criticism arises before they can even define their proposal sufficiently to see whether they have a worthwhile plan.  Understandably, they would be reluctant after such an experience to _invite_ public criticism early in the planning process through open scoping.  But it is in your interest to encourage agencies to come out with proposals in the early stage because that enhances the possibility of your comments being used.  Thus public participants in scoping should reduce the emotion level wherever possible and use the opportunity to make thoughtful, rational presentations on impacts and alternatives.  Polarizing over issues too early hurts all parties.  If agencies get positive and useful public responses from the scoping process, they will more frequently come forward with proposals early enough so that they can be materially improved by your suggestions.

## B.    Issues are too broad

The issues that participants tend to identify during scoping are much too broad to be useful for analytical purposes.  For example, "cultural impacts" — what does this mean?  What precisely are the impacts that should be examined?  When the EIS preparers encounter a comment as vague as this they will have to make their own judgment about what you meant, and you may find that your issues are not covered.  Thus, you should refine the broad general topics, and specify which issues need evaluation and analysis.

## C.    Impacts are not identified

Similarly, people (including agency staff) frequently identify "causes" as issues but fail to identify the principal "_effects_" that the EIS should evaluate in depth.  For example, oil and gas development is a cause of many impacts.  Simply listing this generic category is of little help.  You must go beyond the obvious causes to the specific effects that are of concern.  If you want scoping to be seen as more than just another public meeting, you will need to put in extra work.

## IV.  Brief Points For Applicants.

Scoping can be an invaluable part of your early project planning.  Your main interest is in getting a proposal through the review process.  This interest is best advanced by finding out early where the problems with the proposal are, who the affected parties are, and where accomodations can be made.  Scoping is an ideal meeting place for all the interest groups if you have not already contacted them.  In several cases, we found that the compromises made at this stage allowed a project to move efficiently through the permitting process virtually unopposed.

The NEPA regulations place an affirmative obligation on agencies to "pro-
vide for cases where actions are planned by private applicants" so that
designated staff are available to consult with the applicants, to advise
applicants of information that will be required during review, and to
insure that the NEPA process commences at the earliest possible time.
(Section 1501.2(d)).  This section of the regulations is intended to ensure
that environmental factors are considered at an early stage in the appli-
cant's planning process.  (See 40 Questions and Answers about the NEPA
Regulations, 46 Fed. Reg. 18028, Questions 8 and 9.)

Applicants should take advantage of this requirement in the regulations by
approaching the agencies early to consult on alternatives, mitigation
requirements, and the agency's information needs.  This early contact with
the agency can facilitate a prompt initiation of the scoping process in
cases where an EIS will be prepared.  You will need to furnish sufficient
information about your proposal to enable the lead agency to formulate a
coherent presentation for cooperating agencies and the public.  But don't
wait until your choices are all made and the alternatives have been
eliminated.  (Section 1506.1).

During scoping, be sure to attend any of the public meetings unless the
agency is dividing groups by interest affiliation.  You will be able to
answer any questions about the proposal, and even more important, you will
be able to hear the objections raised, and find out what the real concerns
of the public are.  This is, of course, vital information for future nego-
tiations with the affected parties.

NEPA COMPLIANCE GUIDELINE
NPS-12

## PROCEDURES FOR PROCESSING DRAFT AND FINAL

### ENVIRONMENTAL IMPACT STATEMENTS

Step 1.  Regional Director or WASO program office, after clearing the preliminary draft or final EIS, distributes copies (along with the proposed action document if separately prepared) concurrently to:

    A.  Appropriate Regional, field or WASO Solicitor, with a request for review and approval for legal sufficiency;

    B.  Any other NPS participants in preparation, plus other appropriate NPS reviewers such as park superintendents, Denver Service Center's Legislative Compliance Division, etc.;

    C.  Appropriate Department of the Interior Regional Environmental Officer(s);

    D.  Any other cooperating agency; and

    E.  Chief, Office of Park Planning and Environmental Quality (WASO-130).  Send 14 copies of preliminary draft/final EIS's.  WASO-130 sends preliminary EIS to the Chief, Division of Environmental Compliance (WASO-135), and initiates any necessary policy review of the action document.  WASO-135 transmits the preliminary EIS to the Department's Office of Environmental Project Review for review and any clearance.

Step 2.  Regional Director or WASO program office transmits Solicitor's review/approval and other review inputs received, along with any reaction or further input of their own, to WASO-135.

Step 3.  WASO-135 provides any germane input to the Office of Environmental Project Review, completes EIS review, and clears the EIS for printing.  EIS's for actions which are approvable within NPS (park plans, grants, etc.) are cleared by WASO-135.  Printing clearance must also be obtained from the Office of Environmental Project Review for EIS's involving a Secretarial action or recommendation, such as wilderness proposals and recommendations for additions to the National Trails System and the National Wild and Scenic Rivers System.

WASO-135 may clear a preliminary EIS with or without conditions, or may deny printing clearance.  If clearance is denied, WASO-135 will work closely with the preparer to correct deficiencies.

When an EIS deals with a park plan which is undergoing concurrent policy review by WASO-130, WASO-135 printing clearance will usually be combined with the policy review response.  This occurs primarily at the draft EIS stage.

NEPA COMPLIANCE GUIDELINE                                    Guideline
NPS-12                                                       APPENDIX 4
Procedures for Processing Draft and                         Page 2
Final Environmental Impact Statements

Step 4.  Regional Director or WASO program office transmits the following to
WASO-135:  the printed EIS (15 copies) along with copies of the printed action
document (if separately prepared), (2) a copy of a signed Federal Register notice,
and (3) a signed original undated letter transmitting five copies of the EIS to
the EPA Office of Federal Activities.  Samples of a Federal Register notice and EPA
transmittal letter are attached.

The original and two copies of the Federal Register notice (along with Solicitor
clearance per 318 IM 2.7) are sent simultaneously to the Administrative Services
Division (WASO-230).

Step 5.  WASO-135 secures Departmental EIS control number, and advises WASO-230
and either the Regional Environmental Coordinator or WASO program office.  WASO-230
transmits the Federal Register notice to the Register.  Two other actions are to
be taken by the time the NPS Federal Register notice appears:

A.  WASO-135 dates the EPA transmittal letter, and delivers it to EPA with
    five copies of the EIS and advises Regional Environmental Coordinator
    or WASO program office of filing date;

B.  Regional Environmental Coordinator or WASO program office arranges for
    immediate distribution.

EIS control number and date filed with EPA must be stamped on EIS copies sent to
other Federal agencies and appropriate State and local entities designated accord-
ing to Executive Order 12372.

Special Procedures - Secretarial Proposals

When an EIS deals with a Secretarial proposal (such as a proposed addition to the
National Wild and Scenic Rivers, National Trails or Wilderness Systems, etc.), the
Federal Register notice and EPA transmittal letter must be set up for Secretarial
rather than NPS signature.  The original and all copies of the Federal Register
notice should come to WASO-135 (none to WASO-230).  WASO-135 obtains Secretarial
signatures (generally by routing through Assistant Secretary for Fish and Wildlife
and Parks for signature by Assistant Secretary, Policy, Budget and Administration).
The signed Federal Register notice may then be filed either through WASO-230, or
directly by the Secretary's office.

Secretarial proposals usually also involve special letters of transmittal to
Federal and State agencies and/or the Congress.  The proposing office (usually
a WASO program office) should advise WASO-135 of such requirements early in the
process, and arrange for coordination of the environmental transmittals with other
desired or required transmittals.  At the draft EIS stage, this usually means
special transmittals to State and other Federal agencies.  At the final EIS stage,
it typically involves transmittal of a proposal from the President to the Congress,
and a special arrangement has been made for most such proposals.  Under this
arrangement, the Office of Environmental Project Review (OEPR) holds the final EIS
and the Federal Register notice until advised by WASO-135 that the action document

NEPA COMPLIANCE GUIDELINE
NPS-12
Procedures for Processing Draft and
Final Environmental Impact Statements

has been signed by the President for transmittal to the Congress.  OEPR then
assigns a control number to the final EIS, and arranges with WASO-135 and the NPS
program office for the Federal Register notice and EPA transmittal to go out
simultaneously with the President's transmittal to the Congress.


Attachments (2):
Sample Federal Register Notice
Sample Transmittal Letter to EPA

NEPA COMPLIANCE GUIDELINE
NPS-12

### SAMPLE FEDERAL REGISTER NOTICE

Department of the Interior

National Park Service

(Title and General Location of Proposal)

Action: Notice of Availability of (Draft, Final) Environmental Impact Statement

Summary: This notice announces the availability of a (draft, final) environmental impact statement (EIS) for (proposal). This notice also announces (public meeting(s), hearing(s)) for the purpose of receiving public comments on the draft EIS.

Dates: (for draft EIS's) Comments on the draft EIS should be received no later than _____. The date(s) of the public meeting(s)/hearing(s) regarding the draft EIS is/are _____. (for final EIS's) The 30-day no-action period following the Environmental Protection Agency's notice of availability of the final EIS will end _____.

Addresses: Comments on the draft EIS should be submitted to (name(s), address(es), phone number(s)). The public meeting(s)/hearing(s) will be held at (address(es)). Public reading copies of the (draft, final) EIS will be available for review at the following location(s).

<div align="center">
Office of Public Affairs<br>
National Park Service<br>
Department of the Interior<br>
18th and C Streets, N.W.<br>
Washington, D.C. 20240<br>
(Telephone 202-343-6843)<br>
Other locations - Region, park, etc.
</div>

Release No. 2

September 1982

NEPA COMPLIANCE GUIDELINE
NPS-12
Sample Federal Register Notice

A limited number of copies of the statement are available on request from

(name, title, address, phone).


Supplementary Information:  (Brief description of proposal, alternatives

considered, and significant environmental effects expected.)



Date _____     Signed _____
                                            (Title - Regional Director, etc.)

NEPA COMPLIANCE GUIDELINE
NPS-12

Guideline
APPENDIX 4
Attachment 2
Page 1

## SAMPLE TRANSMITTAL LETTER TO EPA

Director, Office of Environmental Review (A-104)
U.S. Environmental Protection Agency
Room 2119 Waterside Mall
401 M Street, S.W.
Washington, D.C. 20024

Dear Sir:

In compliance with Section 102(2)(C) of the National Environmental Policy

Act and Section 1516.9 of the Council on Environmental Quality Regulations,

we are enclosing five copies of the (Draft or Final) Environmental Impact

Statement for (title and general location of proposal).

Sincerely,


Regional Director

Release No. 2

September 1982

## APPROVED NEPA FORMAT VARIATIONS

The Department has approved special formats for combining National Park Service General Management Plans, Wild and Scenic River Studies and National Trail Studies with an Environmental Assessment (EA) or Environmental Impact Statement (EIS). The formats to be used are described below, along with related study/planning guidance. Note that these are the only approved variations of the standard CEQ format for EIS's. Other format variations may be sought by application to WASO-135, which will obtain Departmental approval and publish the variation as an amendment to this appendix.

A. Generaï Management Plans (GMP) for Units of the National Park System

   1. GMP's should be combined with an EA or EIS in the following formats. For more detailed instructions on the content for each section, refer to the appropriate section of NPS-2.

      Title Page/Cover Sheet containing all the information required by 40 CFR 1502.11.

      Summary as required by 40 CFR 1502.12.

      Table of Contents.

      Purpose and Need for the Plan (Issues). (40 CFR 1502.13)

      Brief Description of the Park - size, significance, etc. This may be incorporated in the foregoing section.

      The Proposal and Alternatives Addressing the Issues (40 CFR 1502.14) - including costs for development, operation and maintenance, and staffing; other requirements for implementation; capacity-limiting information; etc. The introduction of this section should state that the Service's proposed general management plan constitutes the proposed action. The description of each alternative should include the proposed NPS management zoning scheme that it would involve.

      The Affected Environment (40 CFR 1502.15) - should contain, as necessary for understanding the proposed action, alternatives, and related issues for each particular park, the following subheadings:

         Natural Resources - description of geological, air, water and plant and animal resources including any endangered species, with emphasis on those resources that would be affected by the proposed action and alternatives.

         Cultural Resources - description of archeology, history and architecture, including historic properties as defined in NPS-28 (see footnote, Chapter 2, page 6), with discussions limited to those

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 2

resources that would be affected by the proposed action and alternatives, and to those qualities that make them historic properties (see Chapter 3, NPS-28);

Visitor Use Data - data required for an understanding of the levels and trends of park and facility use, including information on the seasonal nature of park use;

Facility Analysis - a brief description of the purpose and use of facilities (including trails, roads, and appurtenant structures, as well as buildings and utilities) and their condition (The description should be placed in an appendix to the document if it is lengthy.); and;

Regional Land Use - including regional visitor facilities and services and other agency programs related to the proposed action and alternatives.

Where planning issues are few and not complex, this material may be covered in other sections, or in an appendix if the GMP is being combined with an EA.

Environmental Consequences of the Proposed Action and Alternatives (40 CFR 1502.16) - This is the section that should contain the major analytical evaluations of environmental impact by specific topic. In addition to describing the consequences of the proposed action and alternatives, this section should conclude with a summary comparison of consequences of the proposed action and alternatives so that major environmental issues are highlighted and easily identified.

List of Preparers (40 CFR 1502.17).

List of Agencies, Organizations, and Persons to Whom Copies of the Document Were Sent. (See NPS-12, Section 4-1(I) where a GMP/EIS is involved.)

Index (need not be provided for GMP/EA).

Appendices (See 40 CFR 1502.18 and NPS-12, Section 4-1(K) where a GMP/EIS is involved).

2. Every combined General Management Plan/environmental document must address three classes of alternatives:

- no action (business-as-usual);

- minimum requirements to meet legislative and executive mandates; and

- a full range of other reasonable alternatives.

Normally the no-action alternative will not be the NPS proposed action at the EA or draft EIS stage, but as a result of public review and comment

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 3

it may become the NPS proposal by the final EIS or decision stage.  It is
not a do-nothing or shut-down alternative, but rather a business-as-usual
alternative.  The "minimum requirements" alternative outlines minimum
actions required for:

(1) continued operation of a park that already has a reasonable
infrastructure for visitor use, management, and resource protection; or
(2) the minimum actions and developments needed to make a new or undeve-
loped park operational in a way that provides, consistent with its purpose,
for primary visitor use, park management, and resource protection.  The
minimum requirements alternative reflects a balanced judgement of the
necessary level and method of providing for the effective operation of
the park, considering periodic replacement or rehabilitation of facilities,
necessary new development, staffing requirements, health and safety, and
resource protection.  Other reasonable alternatives may address actions,
consistent with law and NPS policy, necessary to meet park objectives
for visitor use and resource protection including new development for
access, circulation, interpretation, accommodations, visitor use, park
administration, and resource management and protection.  Each alternative
should constitute a distinctly different approach to the issues and may
thus emphasize the achievement of some objectives at the expense of others.
Minor variations on each alternative should be considered as options under
that alternative rather than as alternatives in and of themselves.

Wild and Scenic River Studies

Wild and Scenic River Studies should be combined with an EA or EIS (as appropriate)
in the following format:

Title Page/Cover Sheet containing all the information required by
40 CFR 1502.11.

Summary as required by 40 CFR 1502.12.  Content should be a clear, comprehen-
sive description distilled from pertinent sections of the report document to
provide a briefing on those factors which constitute the basis for decision.

Table of Contents.

Purpose of Study and Characteristics Which Make the Area a Worthy
Addition to the National Wild and Scenic Rivers System - This evaluation
is conducted as an initial part of the study effort.  First, it is determined
whether the study area or any part thereof is eligible for addition to the
National System (i.e., whether the river is free-flowing and together with its
immediate environment possesses one or more outstandingly remarkable values).

Second, given a finding of eligibility, a preliminary assessment is to be
made as to whether the river area is suitable for addition to the National
System.  This preliminary assessment of suitability is developed giving
consideration to such factors as extent of public lands in the river area;

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 4

costs required for acquisition, development, management and operation; public, local or state interest in acting to protect and manage the river; the feasibility and timeliness of such action, etc. The preliminary assessment of suitability should be well documented. The determination of suitability will be made by the Office of the Secretary after review of the preliminary assessment and consideration of any other appropriate factors.

If the river is found ineligible or if the Secretary finds the river nonsuitable prior to expiration of the stipulated study period, further study effort is terminated and a study document, upon which the determination was made, is prepared for the Secretary to utilize in notifying the appropriate committees of Congress. While this determination, given Congressional concurrence, would preclude further consideration by the Department of protection of a river as a component of the National System, other assistance to concerned interests and jurisdictions in suggesting, developing or implementing other measures or techniques for river protection is not necessarily foreclosed.

As required by Section 7(b) of the Wild and Scenic Rivers Act, 180 days after notification to Congress of a determination that a river should not be included in the system, the Secretary shall publish a notice to that effect in the Federal Register. This notice should also include reference to termination of any related NEPA compliance activity, thereby concurrently terminating activities for which a Notice of Intent had earlier been published in the Federal Register per CEQ regulations.

Proposal and Alternatives Considered - Formulation of Proposal and Alternatives - so that the proposal and alternatives reflect pertinent issues, conditions and needs, it is essential to begin analysis with the existing condition in order to determine the impacts of a continuation of present trends and conditions (no-action alternative). The proposal and alternatives should flow out of this analysis.

Alternatives should be developed and discussed in accordance with 40 CFR 1502.14 and will vary depending on the problems, opportunities and issues associated with each specific river area. However, every study report must present at least three classes of alternatives:

- addition of eligible and suitable river segments to the National System;

- reasonable alternative(s) for protecting the river without inclusion in the National System;

- no-action.

Innovative, practical and cost-effective solutions to problems, opportunities and issues should be included among the alternatives. Sufficient specific data and concise analyses here, as elsewhere, are required to facilitate comprehension and to guide decisions.

As part of the scoping process (40 CFR 1501.7) a variety of possible
alternatives may be suggested.  Additional alternatives may be advanced
by the public and other agencies at other junctures in the planning
process, e.g., review of the draft study/NEPA document.  From these a
set of reasonable alternatives will be selected for rigorous exploration
and objective evaluation.  Consistent with 40 CFR 1502.14(a), those
alternatives which are eliminated from detailed study will be discussed
briefly and the reasons for their having been eliminated described.
Reasons for eliminating alternatives from detailed study can include:
(1) conflict with the intent and purposes of the Wild and Scenic Rivers Act
or other pertinent statutes and regulations; (2) costs related to establish-
ment or annual operation and maintenance (for local, State or Federal
governments); and (3) nonsuitable utilization of land and water resources.

Alternatives other than no-action should clearly address the factors involved
in their implementation, including means of administration and costs.  Costs
should include operation and maintenance costs as well as those for develop-
ment and acquisition.  Costs will reflect the size and composition of
projected operational staff and the extent of necessary facilities and
development.

The Affected Environment - Descriptions and illustrations should be included
only to the extent necessary for understanding the issues, proposal and
alternatives, and differences in environmental impacts among the alternatives
for the river area and for the following subjects:

  Natural Resources - Content should be limited to brief statements about
  the scenery, geology, plants and animals (including any endangered
  species) and similar values for those resources that would be affected
  by the proposal and alternatives.

  Cultural Resources - If applicable, include a brief description of the
  condition, significance and use of cultural resources within the river
  area.

  Existing Public Use - Describe the quantity and type of public use,
  including periods during the year when it occurs.

  Status of Land Ownership and Use - Show specific information on maps and
  briefly describe by category, e.g., private, public, and commercial,
  agricultural, residential, etc.

Environmental and Economic Consequences.  Environmental consequences should
be evaluated according to 40 CFR 1502.16.  The proposal and alternatives should
be evaluated equally and through analysis that is objective rather than
subjective or conjectural.  In addition to concise text describing the environ-
mental and economic consequences of the proposal and each alternative, this
section should conclude with a summary tabular presentation by alternative so
that the current and reasonably foreseeable uses of the affected environment

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 6

which would be enhanced, foreclosed, or curtailed are measured, valued and specified in terms appropriate for a basis of decision.

It is important to contact appropriate Federal, State and local agencies (e.g., COE, FERC, SCS, State/local departments of parks and recreation) to determine what current uses as well as potential future uses might be affected by a designation or an alternative to designation. Effects may result upstream as well as downstream of a designation; thus the area of the affected environment must be carefully determined.

List of Preparers (516 DM 4.6B; 40 CFR 1502.17).

List of Agencies, Organizations, and Persons to Whom Copies of the Statement Were Sent (40 CFR 1502.10) In accordance with 516 DM 4.6C, this section also should briefly describe consultation and coordination efforts with the public.

Index (40 CFR 1502.10).

Appendices (516 DM 4.11; 40 CFR 1502.18).


C.  National Trail Studies

National Trail Studies should be combined with an EA or EIS (as appropriate) in the following format.

Title Page/Cover Sheet containing all the information required by 40 CFR 1502.11.

Summary as required by 40 CFR 1502.12. Content should be a clear, comprehensive description distilled from pertinent sections of the study document to provide a briefing on those factors which constitute the basis for decision.

Table of Contents.

Purpose of the Study and Characteristics Which Make the Trail Route a Worthy Addition to the National Trails System - This evaluation is conducted as an initial part of the study effort. First it is determined if the trail route or any part thereof is eligible for addition to the National System (i.e., for National Scenic Trails - whether the extended trail route is so located as to provide for maximum outdoor recreation potential and for the conservation and enjoyment of the nationally significant scenic, historic, natural or cultural qualities of the area through which it passes; for National Historic Trails - the route must have been established by historic use and be historically significant with respect to a broad facet of American history; and have significant potential for public recreational use of historic interest based on historic interpretation and appreciation).

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 7

In addition, a determination must be made as to whether a potential National
Scenic or National Historic Trail route found eligible for inclusion in the
national system should be proposed for inclusion on the basis of feasibility
and desirability. Determinations of feasibility and desirability are made
through consultation and coordination with Federal agencies administering
lands through which the trail would pass and with affected State and local
Government agencies, public and private organizations, and landowners and
users. Factors considered include but are not limited to costs of establish-
ment and operation, competing or conflicting land uses, existing supply of
public trail opportunity and support by entities which would be affected were
the trail established.

Characteristics which make the trail route eligible for inclusion in the
system and the factors related to the feasibility and desirability of inclusion
should be documented in the study report.

Proposal and Alternatives Considered - Formulation of Proposal and
Alternatives - So that the proposal and alternatives reflect pertinent issues,
conditions and needs, it is essential to begin analysis with the existing
condition in order to determine the impacts of a continuation of present
trends and conditions (no-action alternative). The proposal and alternatives
should flow out of this analysis.

Alternatives should be developed and discussed in accordance with 40 CFR
1502.14 and will vary depending on the problems, opportunities and issues
associated with each specific trail route. However, every study report must
present at least three classes of alternatives:

- addition of eligible trail route segments to the National System under
  Federal and/or State administration;

- reasonable concepts for protecting the trail route without inclusion in
  the National System;

- no-action.

Innovative, practical and cost-effective solutions to problems, opportunities
and issues should be incorporated among the alternatives. Sufficient
specific data and concise analyses here, as elsewhere, are required to
facilitate comprehension of issues and to guide decisions.

As part of the scoping process (40 CFR 1501.7), a variety of possible
alternatives may be suggested. Additional alternatives may be advanced by the
public and other agencies at other junctures in the planning process, e.g.,
review of the draft study/NEPA document. From these a set of reasonable
alternatives will be selected for rigorous exploration and objective evaluation.
Consistent with 40 CFR 1502.14(a), those alternatives which are eliminated
from detailed study will be discussed briefly and the reasons for their being
eliminated described. Reasons for eliminating alternatives from detailed
study can include (1) conflict with the intent and purposes of the National

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 8

Trails System Act or other pertinent statutes and regulations; (2) level of costs related to establishment and/or annual operation and maintenance (for local, State or Federal Governments); and (3) nonsuitable utilization of land and water resources.

Alternatives other than no-action should clearly address the factors involved in implementation including ways and means of administration and costs. Costs should include operation and maintenance costs as well as those for development and acquisition. Costs will reflect the size and composition of projected operational staff and the extent of necessary facilities and development.

The Affected Environment - Descriptions and illustrations should be included only to the extent necessary for understanding the issues, proposal and alternatives, and differences in environmental impacts among the alternatives for the trail route and for the following subjects:

   Natural Resources - Content should include statements about the scenery, geology, plants and animals, including any endangered species, and similar values for those resources that would be affected by the proposal and alternatives.

   Cultural Resources - If applicable, include a brief description of the condition, significance and use of cultural resources within the trail route.

   Existing Public Use - Describe the quantity and type of public use including periods during the year when it occurs.

   Status of Land Ownership and Use - Show specific information on maps and briefly describe by category, e.g., private, public, etc., and commercial, agricultural, residential, etc.

Environmental Consequences - The proposal and alternatives should be evaluated equally, and through analysis that is supported rather than conjectural, according to 40 CFR 1502.16.

In addition to concise text describing the economic and environmental consequences of the proposal and each alternative, this section concludes with a summary tabular presentation by alternative so that the reasonably foreseeable potential uses of the land and water which would be enhanced, foreclosed, or curtailed are valued, measured and specified in appropriate terms.

List of Preparers (516 DM 4.6B; 40 CFR 1502.17).

List of Agencies, Organizations and Persons to Whom Copies of the Statement Were Sent (516 DM 4.6C; 40 CFR 1502.10).

Index (40 CFR 1502.10).

Appendices (40 CFR 1502.18).

*U.S. GOVERNMENT PRINTING OFFICE: 1982-0-392-847/252

Exhibit 3

of the Cyclorama Building is prominent in the viewshed, and from certain points this and the long office wing with its ramp and observation deck introduce a discordant and disturbing note in an otherwise pastoral landscape dotted with memorials that are themselves testimony to the emotions stirred directly by the events that took place.

The Council should not reverse its 1977 recommendation in the absence of compelling reasons to do so. The Keeper's determination of the building's eligibility (even accepting the premise that the Mission 66 program made a "significant contribution to the broad patterns of our history") does not rise to this level of persuasiveness because it is focused on the building in isolation from, and not on its relationship to, a paramount historical objective: the rehabilitation of this key battlefield area. Those who would question the historic value of such rehabilitation appear to believe that the Building does not diminish or intrude upon visitors' understanding of the battlefield events or, even if so, future generations may not focus on the military as distinguished from the political significance of Gettysburg, and that the re-creation of the conditions of 1863 is unrealistic in any event. To accept this view would open the door conceptually to further construction in the future that substantially changes the topography and viewshed. Public and scholarly interest with battlefield events has continued unabated for long after the survivors have died. There is no basis to suggest that this would change in the future, and this kind of speculation could undermine historic preservation objectives generally.

It is no criticism of Neutra to give priority to this rehabilitation objective. The architect was responding to the client's directive. The massive drum was a direct expression of the function that was to be served by the Building. In other hands the work would doubtless have been done less admirably but just as intrusively because of the massing required to achieve its purpose. With rare exceptions, the millions of people who have visited the GNMP since 1962 have come to see the battlefield and not Neutra's architecture. Neutra has a secure place in the pantheon of American architectural history. There are other Neutra buildings; there is only one Gettysburg Battlefield. The proper treatment of the Building would be considered under quite different criteria, of course, were it on some other site without superior historical competition.

The continued existence of the Building is consequently pre-empted by another controlling historic preservation objective. In such circumstances it is not necessary to enter upon any examination of whether the building can be adapted to another use or can feasibly be altered to accommodate the Cyclorama Painting or whether the Painting can be accommodated without any such alteration. To engage in this examination is to presuppose that the Building can trump the objective of battlefield restoration and rehabilitation. It is also not necessary to evaluate, accept, or reject the asserted defects of the Building in either design, construction or maintenance. For the purpose of the unpleasant choice posed by its unfortunate siting, it should be assumed that the building is completely functional in all these respects. The result is the same. The Building must yield.

Page 5

**F.    Conclusion**

Accordingly, it is our recommendation that the Council endorse the GNMP General Management Plan in regard to the treatment of the three historic resources in question. It is not necessary, in our view, for the Council at this time to concern itself with the controversy regarding certain aspects of the new proposed Visitor Center other than to endorse the plan to house within it the Cyclorama Painting under conditions suitable for its proper preservation and display. This should be the focus of future Section 106 consultations, along with other mitigation policies as suggested by the National Trust for Historic Preservation, to include review of the landscape restoration plans.

Submitted by:

    Council Member Working Group

        Herbert M. Franklin
        Bruce D. Judd
        Parker Westbrook

Date:   May 10, 1999

Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,     )
                                       )

             Plaintiff,      )
                                       )

   vs.                            )
                                       )

6.45 ACRES OF LAND, MORE OR  )      **CIVIL NO. 1:CV-99-2128**
LESS, SITUATED IN CUMBERLAND  )      (Rambo, J.)
TOWNSHIP, ADAMS COUNTY,     )
COMMONWEALTH OF             )
PENNSYLVANIA,               )

                                      )
   and                          )
                                      )

HANS G. ENGGREN AND CHRISTINA )    **Tracts 04-203, 04-204, 04-108,**
A. ENGGREN, HUSBAND AND WIFE, )    **04-109 and 04-220**
THEIR HEIRS AND/OR ASSIGNS,   )

                                        )
   and                          )
                                      )

UNKNOWN OWNERS,          )
                                      )
   and                          )
                                      )

UNKNOWN LESSEES, et al.,     )
                                      )

             Defendants.     )

## NOTICE OF FILING DECLARATION OF TAKING

      Plaintiff, the United States of America, hereby gives notice that it has filed a

Declaration of Taking and deposited estimated just compensation in the amount of $3,000,000.00

into the registry of the Court.  Said Declaration of Taking has been filed to obtain immediate

possession of the 6.45 acres of land condemned.

Respectfully submitted,

DAVID M. BARASCH
United States Attorney

*Michael Baker/DD*

MICHAEL K. BAKER
Attorney, Department of Justice
Environment & Natural Resources Division
P.O. Box 561 - Ben Franklin Station
Washington, D. C.  20044
(202) 305-0289

JOSEPH J. TERZ
DULCE DONOVAN
Assistant United States Attorneys
P.O. Box 11754
Harrisburg, Pa 17108
(717) 221-4482

Dated: May 17, 2000

2

IN THE

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
        Plaintiff, )
)
    vs. )    CIVIL NO. 1:CV-99-2128
)
6.45 ACRES OF LAND, MORE )
OR LESS, SITUATED IN )
CUMBERLAND TOWNSHIP, ADAMS )
COUNTY, COMMONWEALTH OF )
PENNSYLVANIA, )
)
and )
)
HANS G. ENGGREN AND CHRISTINA )
A. ENGGREN, HUSBAND AND WIFE, )
THEIR HEIRS AND/OR ASSIGNS, )
)
and )
)
UNKNOWN OWNERS, )
)
and )
)
UNKNOWN LESSEES, et al., )
)
       Defendants. )

## DECLARATION OF TAKING

    TO THE HONORABLE, THE UNITED STATES DISTRICT COURT:

    Pursuant to the authority delegated by the Secretary of the Interior to the Solicitor of the Department of the Interior on February 17, 1959, under subparagraphs (6) an (7) of 210.2.2, Departmental Manual of the Department of the Interior, 24 F.R. 1348, as renumbered (5) and (6) of 209.3.2A in the Departmental Manual, and redelegated by the Solicitor, I do hereby make and cause to be filed this Declaration of Taking and declare that:

1.    The land hereinafter described is taken under and in accordance with the authority set forth in Schedule "A" annexed hereto and made a part hereof.

2.    The public uses for which said land is taken are also set forth in said Schedule "A".

3.    A description of the tracts of land taken, the estimated just compensation therefor, and the estates taken for said public uses are set forth in Schedule "B" annexed hereto and made a part hereof.

4.    Plats showing the land taken are annexed hereto as Schedule "C" and made a part hereof.

5.    The gross sum estimated as just compensation for said lands, which aggregate 6.45 acres, including any and all interests taken in said land, is THREE MILLION ($3,000,000.00) DOLLARS, which sum I cause to be deposited in the registry of the court for the use and benefit of the persons entitled thereto.   I am of the opinion that the ultimate awards for said land probably will be within any limits prescribed by law on the price to be paid therefor.

IN WITNESS WHEREOF, I have signed this Declaration of Taking in the City of Newton, Commonwealth of Massachusetts, this 3rd day of May, 2000.

Regional Solicitor
Department of the Interior

## SCHEDULE "A"

## GETTYSBURG NATIONAL MILITARY PARK

### AUTHORITY FOR TAKING

The authority for the taking of the land is under and in accordance with the Act of Congress

approved August 1, 1888, 25 Stat. 357, as amended, 40 U.S.C., Sec. 257; the Act of Congress

approved February 26, 1931, 46 Stat. 1421, as amended, 40 U.S.C. Sec. 258a; the Land and

Water Conservation Fund Act of 1965, 78 Stat. 897, as amended, 16 U.S.C., Sec. 4601-4, et seq.;

and under the further authority of the Act of Congress approved August 17, 1990, 104 Stat. 464,

16 U.S.C. Sec. 430g-4,  et seq., an Act to revise the boundary of Gettysburg National Military

Park in the Commonwealth of Pennsylvania, and for other purposes.  Funds are available from

the Omnibus Consolidation Rescissions and Appropriations Act of 1996, 110 Stat. 1321-163; the

Fiscal Year 1998 Interior and Related Agencies Appropriations Act, November 14, 1997, 111

Stat. 1610; and the Consolidation and Emergency Appropriations Act, 1999, October 21, 1998,

112 Stat. 2681-241, for payment of an award based on the estimate of just compensation for the

land to be condemned.

### PUBLIC USES

The public uses for which said land is to be taken are as follows:   The land is required for the

proper administration, preservation, and development of Gettysburg National Military Park for

the use, benefit, and enjoyment of the public.  The said land has been selected for acquisition by

the United States of America for said purposes, and for such other uses as may be authorized by

Congress or by Executive Order.

SCHEDULE "B"

GETTYSBURG NATIONAL MILITARY PARK

DESCRIPTIONS:

### Tract 04-203

All that certain tract or parcel of land lying and being situated in Cumberland Township, Adams County, Pennsylvania, and being more particularly described as follows:

Beginning at a 24" Walnut tree, a common corner of lands now or formerly of James E. and Susan M. Schaeffer and lands now or formerly of Overview Limited Partnership; thence along the line of said Overview Limited Partnership, South 87° 30' 43" West, 195.12 feet to a set rebar, being a common corner of said Overview Limited Partnership and lands now or formerly of Evergreen Cemetery Association of Gettysburg; thence along the line of said Cemetery Association the following two (2) bearings and distances:

North 38° 26' 23" East, 468.63 feet to a found drill hole in a rock; and
North 22° 06' 57" East, 102.54 feet to a set rebar, being a common corner of lands of said Cemetery Association and lands now or formerly of Jayjyoti Corporation; thence along the line of said Jayjyoti Corporation the following three (3) bearings and distances:

South 20° 32' 29" East, 119.10 feet to a found iron pipe;
South 38° 37' 50" East, 215.67 feet to a found iron pin; and
South 00° 12' 29" West, 75.11 feet to a set rebar, being a common corner of said Jayjyoti Corporation and said Schaeffer; thence along the line of said Schaeffer, South 72° 26' 25" West, 326.38 feet to a 24" Walnut tree, being the point of beginning.

Containing 2.38 acres, more or less.

The above description was based on a survey by C. S. Davidson, Inc. entitled "National Park Service, Gettysburg National Military Park, National Tower Site, Enggren and Overview Limited Partnership Properties, Cumberland Township, Adams County, Pennsylvania," Dwg. No. 3237204A, dated June 10, 1999, revised June 22, 1999, July 7, 1999, and July 16, 1999, and recorded July 19, 1999 in Plat Book 76, Page 59 in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

The above-described parcel, designated as Tract 04-203, Gettysburg National Military Park, is a portion of the same property conveyed unto Hans G. Enggren from Stonehenge Lodge and Restaurant, Inc., by deed dated November 1, 1974 and recorded November 8, 1974 in Deed Book 316, Page 253 in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

TOGETHER WITH all right, title, and interest in that certain 35 foot wide permanent easement or permanent right-of-way (Tract 04-220, Gettysburg National Military Park) over a tract or parcel of land lying and being situated in Cumberland Township, Adams County, Pennsylvania, the centerline of which is more particularly described as follows:

1

Commencing at a found P.K. Nail located in the centerline of State Route 2035, a.k.a. U.S. Route 140 (Baltimore Pike), being the Southeast corner of property formerly of Stonehenge Lodge & Restaurant, Inc., now Jayjyoti Corporation, and the Northeast corner of property formerly of Merle Rudisill, now John and Rosemary Bartlett; thence with the said centerline of State Route 2035, North 33° 50' 02" West, 33.13 feet to the current centerline of the existing easement or right-of-way and being the Point of Beginning; thence South 55° 24' 02" West, 134.11 feet to a point; thence by a curve to the right having a radius of 119.34 feet, an arc length of 73.71 feet and a chord bearing and distance of South 75° 42' 30" West, 72.54 feet to a point; thence South 87° 41' 58" West, 38.33 feet to a point; thence by a curve to the left having a radius of 142.81 feet, an arc length of 142.35 feet and a chord bearing and distance of South 66° 57' 39" West, 136.53 feet to a point on the property line of lands now or formerly of Hans G. Enggren, said point being located North 38° 37' 50" West, 23.70 feet from a found iron pin, being a common corner of said Enggren and said Jayjyoti Corporation.

Containing 0.30 of an acre, more or less.

The above description was based on a survey by C. S. Davidson, Inc. entitled "Gettysburg National Military Park, Plan Showing Easement Along Existing Centerline Entrance To The National Tower, Cumberland Township, Adams County, Pennsylvania," Dwg. No. 3237204C, dated September 30, 1999, attached hereto and made part hereof.

The above-described unrestricted permanent easement or permanent right-of-way (Tract 04-220, Gettysburg National Military Park) was excepted and reserved in a deed from Hans G. Enggren and Christina A. Enggren, his wife, as individuals, and Hans G. Enggren and Christina A. Enggren, a co-partnership, trading as Stonehenge, unto Hasu P. Shah and Harsha H. Shah, his wife, dated and recorded March 27, 1986 in Record Book 420, Page 941, and being the same property as the unrestricted temporary easement or temporary right-of-way (Tract 04-108, Gettysburg National Military Park) described in a Grant of Easement from Stonehenge Lodge and Restaurant, Inc., unto Overview Limited Partnership dated March 22, 1974 and recorded March 25, 1974 in Miscellaneous Book 20, Page 411 and shown as right-of-way "B" on a plan of lots recorded in Plat Book 26, Page 32. The above-mentioned instruments being of record in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

### Tract 04-204

All that certain tract or parcel of land lying and being situated in Cumberland Township, Adams County, Pennsylvania, and being more particularly described as follows:

Beginning at a found iron pin along Hunt Avenue (a Gettysburg National Military Park street), being a common corner of lands now or formerly of the United States of America, Gettysburg National Military Park, Tract 04-170 and Tract 04-171, said point of beginning being located South 84° 38' 29" West, 52.11 feet from a found U.S.D.I.- N.P.S. Monument; thence along the line of said Tract 04-171, North 30° 08' 44" West, 655.78 feet to a found iron pipe on the line of lands now or formerly of Evergreen Cemetery Association of Gettysburg; thence along the line of said Cemetery Association, North 78° 22' 39" East, 179.28 feet to a set rebar,

2

being a common corner of said Cemetery Association and lands now or formerly of Hans G. Enggren; thence along the line of said Enggren, North 87° 30' 43" East, 195.12 feet to a 24" Walnut tree, being a common corner of said Enggren and lands now or formerly of James E. and Susan M. Schaeffer; thence along the line of said Schaeffer, South 83° 46' 46" East, 99. 78 feet to a found iron pin, being a common corner of said Schaeffer and lands now or formerly of Hannah L. Owens and David M. LeVan; thence along the line of said Owens and LeVan the following two (2) bearings and distances:

South 46° 57' 15" West, 131.15 feet to a found iron pin; and
South 06° 15' 16" East, 505.01 feet to a found iron pin; thence along the lands of said Owens, LeVan and the United States, South 84° 38' 29" West, passing a found U.S.D.I.-N.P.S. Monument at 47.90 feet, in all a total distance of 100.01 feet to a found iron pin, being the point of beginning.

Containing 3.41 acres, more or less.

The above description was based on a survey by C. S. Davidson, Inc. entitled "National Park Service, Gettysburg National Military Park, National Tower Site, Enggren and Overview Limited Partnership Properties, Cumberland Township, Adams County, Pennsylvania," Dwg. No. 3237204A, dated June 10, 1999, revised June 22, 1999, July 7, 1999, and July 16, 1999, and recorded July 19, 1999 in Plat Book 76, Page 59 in the Office of the Recorder of Deeds of Adams County, Pennsylvania, attached hereto and made part hereof.

The above-described parcel, designated as Tract 04-204, Gettysburg National Military Park, is all of the same property conveyed unto Overview Limited Partnership from National Gettysburg Battlefield Tower Properties Limited Partnership by deed dated March 22, 1974 and recorded March 25, 1974 in Deed Book 312, Page 482 in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

TOGETHER WITH all right, title, and interest in that certain 35 foot wide temporary easement or temporary right-of-way (Tract 04-108, Gettysburg National Military Park) over a tract or parcel of land lying and being situated in Cumberland Township, Adams County, Pennsylvania, the centerline of which is more particularly described as follows:

Commencing at a found P.K. Nail located in the centerline of State Route 2035, a.k.a. U.S. Route 140 (Baltimore Pike), being the Southeast corner of property formerly of Stonehenge Lodge & Restaurant, Inc., now Jayjyoti Corporation, and the Northeast corner of property formerly of Merle Rudisill, now John and Rosemary Bartlett; thence with the said centerline of State Route 2035, North 33° 50' 02" West, 33.13 feet to the current centerline of the existing easement or right-of-way and being the Point of Beginning; thence South 55° 24' 02" West, 134.11 feet to a point; thence by a curve to the right having a radius of 119.34 feet, an arc length of 73.71 feet and a chord bearing and distance of South 75° 42' 30" West, 72.54 feet to a point; thence South 87° 41' 58" West, 38.33 feet to a point; thence by a curve to the left having a radius of 142.81 feet, an arc length of 142.35 feet and a chord bearing and distance of South 66° 57' 39" West, 136.53 feet to a point on the property line of lands now or formerly of Hans G.

3

Enggren, said point being located North 38° 37' 50" West, 23.70 feet from a found iron pin, being a common corner of said Enggren and said Jayjyoti Corporation.

Containing 0.30 of an acre, more or less.

The above description was based on a survey by C. S. Davidson, Inc. entitled "Gettysburg National Military Park, Plan Showing Easement Along Existing Centerline Entrance To The National Tower, Cumberland Township, Adams County, Pennsylvania," Dwg. No. 3237204C, dated September 30, 1999, attached hereto and made part hereof.

The above-described unrestricted temporary easement or temporary right-of-way (Tract 04-108, Gettysburg National Military Park) was acquired by Overview Limited Partnership from Stonehenge Lodge & Restaurant, Inc. by Grant of Easement dated March 22, 1974 and recorded March 25, 1974 in Miscellaneous Book 20, Page 411 in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

The temporary easement or temporary right-of-way described above shall expire on June 29, 2071, on which date said temporary easement or temporary right-of-way shall be and become automatically released, extinguished and of no further force and effect, as set forth in Miscellaneous Book 20, Page 411.

TOGETHER WITH all right, title, and interest in that certain conditional easement or conditional right-of-way (Tract 04-109, Gettysburg National Military Park) over a tract or parcel of land lying and being situated in Cumberland Township, Adams County, Pennsylvania, and being more particularly described as follows:

Beginning at a point in the centerline of Taneytown Road (S.R. 0134), being a common corner of lands now or formerly of the United States of America, Gettysburg National Military Park, Tract 04-171 and Tract 04-172; thence along the line of said Tract 04-172, and continuing along the line of lands now or formerly of Evergreen Cemetery Association of Gettysburg, North 78° 50' 00" East, 699.95 feet crossing over a found iron pin and a found concrete monument to a found iron pipe, being a common corner of said Cemetery Association and lands now or formerly of Overview Limited Partnership; thence along the line of said Overview Limited Partnership, South 30° 08' 44" East, 23.26 feet to a point on the line of said Overview Limited Partnership and said Tract 04-171; thence through said Tract 04-171, South 78° 50' 00" West, 708.27 feet to a point in the centerline of said Taneytown Road; thence along the centerline of said Taneytown Road, North 09° 11' 42" West, 22.01 feet to the point of beginning.

Containing 0.36 of an acre, more or less (15,531.51 square feet).

The above description was based on a survey by C. S. Davidson, Inc. entitled "National Park Service, Gettysburg National Military Park, National Tower Site, Enggren and Overview Limited Partnership Properties, Cumberland Township, Adams County, Pennsylvania," Dwg. No. 3237204A, dated June 10, 1999, and revised June 22, 1999, July 7, 1999, and July 16, 1999, and recorded July 19, 1999 in Plat Book 76, Page 59 in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

It is the intention that the foregoing description to describe the boundary of the existing road and pedestrian walkway. This 22 foot wide unrestricted vehicular and pedestrian right-of-way or easement is over a portion of Tract 04-171, Gettysburg National Military Park, the same land acquired by the United States of America in condemnation proceedings entitled "The United States of America v. 10 acres 43 perches of land, more or less, in the County of Adams, Commonwealth of Pennsylvania, National Civil War Wax Museum, Inc., a Pennsylvania Corporation, et al., Civil No. 7035," filed July 20, 1960, in the United States District Court for the Middle District of Pennsylvania and the Declaration of Taking in the said Civil No. 7035 was filed for record on July 28, 1960, in Deed Book 229, Page 417, in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

The above-described conditional easement or conditional right-of-way (Tract 04-109, Gettysburg National Military Park) is described in an Agreement dated July 2, 1971, and recorded in Deed Book 14, Page 211; and was conveyed by the United States of America to Thomas R. Ottenstein, Trustee, by document dated June 18, 1976 and recorded June 28, 1976, in Deed Book 25, Page 736; and was assigned by the said Thomas R. Ottenstein, Trustee, to Overview Limited Partnership by Assignment of Easement dated and recorded June 28, 1976, in Deed Book 25, Page 741. All of the above referenced documents are of record in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

ESTATE TO BE ACQUIRED:

The fee simple title to Tracts 04-203, and 04-204; and right of way easements over three tracts of lane, namely: 1) Tract 04-108 by virtue of Grant of Easement dated March 22, 1974, and recorded in Miscellaneous Book 20, Page 411; 2) Tract 04-109 by virtue of Agreement and Land Exchange granted in instruments recorded in Misc. Book 14 page 211 and Misc. Book 25, page 736 vested by virtue of assignment of lease dated 6/28/76 and recorded in Deed Book 25, page 741; and 3) Tract 04-220 by virtue of Deed dated March 27, 1986, and recorded in Record Book 420, page 941; and subject to existing easements for public roads, highways, rights-of-way for railroads, pipelines, utilities, flumes, canals, ditches, telephone, telegraph and power transmission lines, and also subject to the following outstanding rights in third parties:

1. A water drainage easement to Evergreen Cemetery Association of Gettysburg dated July 30, 1979, recorded in Miscellaneous Book 33, page 10, in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

2. A right of way imposed by Plat Book 26 at page 32, Right of Way "C", notes 3 and 5, in favor of Stonehenge Restaurant, Inc., Dale Gross, John Eyler, Marvin Simpson, Hasu P. Shah, Harsha H. Shah, Jayjyoti Corporation

3. Rights of access, interment and sepulcher to any portion of the premises used for burial purposes as noted on survey prepared by C. S. Davidson, Inc., recorded in Adams County Plat Book 76 at page 59 in favor of Unknown Parties.

NAMES AND ADDRESSES OF PURPORTED OWNERS:

| | |
|---|---|
| Hans G. Enggren & Christina A. Enggren, husband & wife their heirs and/or assigns<br>Meadow Branch Farm<br>P. O. Box 367<br>996 Centennial Road<br>New Oxford, PA  17350 | Owners in fee of 04-203 by virtue of deed in Deed Book 316, page 253 and an easement interest in 04-220 by virtue of deed in Record Book 420, page 941 |
| Jayjyoti Corporation, its successors and/or assigns<br>c/o Jayanti Patel, President/Owner<br>387 Heritage Drive<br>Gettysburg, PA 17325 | Owners of fee to easements 04-108 and 04-220, by virtue of Deed dated 2/21/89 in Record Book 515, page 249. |
| Overview Limited Partnership, a Maryland Limited Partnership, its successors and/or assigns<br>The Rotunda Suite 455<br>711 West 40th Street<br>Baltimore, MD 21211 | Owner in fee of 04-204 by virtue of deed in Deed Book 312, page 482; an easement interest in Tract 04-108, recorded in Deed Book 20, page 411, expires 6/29/2071; an easement interest in 04-109 by virtue of Agreement and Land Exchange granted in instruments recorded in Misc. Book 14 page 211 and Misc. Book 25, page 736 vested by virtue of assignment of lease dated 6/28/76 and recorded in Deed Book 25, page 741;  Lease Agreement dated 3/22/74 recorded in Miscellaneous Book 20, page 408 and Assignment of Lease dated 3/22/74; and Memorandum of Agreement dated 9/20/97 recorded in Record Book 1501, page 295. |
| Hasu P. Shah and Harsha H. Shah, husband and wife, their heirs and/or assigns<br>525 South Front Street<br>Harrisburg, PA 17104 | Owner of Fee in Tract 04-220, by virtue of reservation & condition set forth in Deed Book 420, page 941; and judgment filed in Prothohotary's Office in  93N696 against Stonehenge co-partnership |
| Hans G. Enggren & Christina A. Enggren, co-partners trading as STONEHENGE, their heirs and/or assigns<br>Meadow Branch Farm<br>P. O. Box 367<br>996 Centennial Road<br>New Oxford, PA  17350 | Owner of Easement in Tract 04-220, by virtue of reservation & condition set forth in Deed Book 420, page 941. |

| | |
|---|---|
| Stonehenge Restaurant, Inc.<br>985 Baltimore Street<br>Gettysburg, PA 17325 | Owner of Equitable title by virtue of<br>Land Installment Contract in Tract 04-<br>220, recorded in Record Book 457, page<br>1142. |
| John Eyler and spouse, if any<br>985 Baltimore Street<br>Gettysburg, PA 17325 | Guarantor of Stonehenge<br>Restaurant, Inc. |
| Dale Gross and spouse, if any<br>985 Baltimore Street<br>Gettysburg, PA 17325 | Guarantor of Stonehenge<br>Restaurant, Inc. |
| Marvin Simpson and spouse, if any<br>985 Baltimore Street<br>Gettysburg, PA 17325 | Guarantor of Stonehenge<br>Restaurant, Inc. |

## NAMES AND ADDRESSES OF OTHER PARTIES WHO MAY HAVE OR CLAIM AN INTEREST IN THE LAND:

| | |
|---|---|
| Adams County National Bank, its successors and/or<br>assigns<br>675 Old Harrisburg Road<br>Gettysburg, PA  17325 | By virtue of two mortgages given by<br>Jayanti S. Patel and Jyoti J. Patel,<br>husband and wife, and Jayjyoti<br>Corporation, (1) dated 2/21/89, recorded<br>Record Book 515, page 253; and (2)<br>Dated 2/12/96, Record Book 1302, page<br>152. |
| Adams County Tax Office<br>Adams County Courthouse – 2nd Floor<br>111-117 Baltimore Pike<br>Gettysburg, PA  17325-2398 | County Taxes |
| Adams County Tax Claim Bureau<br>111 Baltimore Street<br>Gettysburg, PA 17325 | By virtue of overdue taxes on<br>Map F13 parcel 152 owned by<br>Hasa P. Shah and Harsha H. Shah |
| Bank of Hanover and Trust Company, its successors<br>and/or assigns<br>25 Carlisle Street<br>Hanover, PA  17331 | By virtue of Assignment of Rents to<br>collect rent from Hans G. Enggren,<br>pursuant to Loan Agreement of 2/16/84,<br>recorded in Record Book 375, page 328,<br>and, Assignment of Rental Under Lease<br>Agreement in Misc. Book 21, page<br>1029. |

7

John P. Bartlett and Rose Mary C. Bartlett, their heirs
    and assigns.
381 Long Road
Gettysburg, PA 17325

By virtue of owning adjacent land

James B. Bender, his heirs or assigns
Address Unknown

Possible interest in 04-108 and 04-220 by
virtue of being co-partner referenced
in Miscellaneous Book 23, page 889.

Commonwealth of Pennsylvania
Office of Attorney General
Litigation Section, 15th Floor,
Attn: Greg, Neuhauser
Strawberry Square
Harrisburg, PA 17109

Tax Liens filed in Adams County
Prothonotary's Office at:
94TLNN34, 94TLNN526,
94TLOO565, 93TLNN466;
Possible corporate tax liens

Community National Bank of Southern Pennsylvania
    succeeded by The Gettysburg National Bank,
    succeeded by PNC Bank, N.A., its successors
    and/or assigns
2730 Liberty Avenue
Pittsburgh, PA 15222
1-800-878-0027

By virtue of assignments dated
5/26/87 recorded in Record Book
458, page 1; and dated 12/4/87
recorded in Record Book 475,
page 577.

Cumberland Township
1370 Fairfield Road
Gettysburg, PA 17325

Township & School Taxes
Admission Taxes

John Sexton Company, its successors and/or assigns
c/o Corporations Service
319 Market Street
Harrisburg, PA 17101

By virtue of judgment filed
in Adams County Prothonotary's
Office No. 93S201 against
Stonehenge Restaurant, Inc.

Evergreen Cemetery Association of Gettysburg, its
    successors and/or asigns
799 Baltimore Street
Gettysburg, PA 17325

By virtue of owning adjacent land

Clyde R. Laughman, his heirs and/or assigns
630 Beaver Creek Road
Hanover, PA 1733

By virtue of judgment filed in Adams
County Prothonotary's Office No.
99N694 against Marv Simpson

8

David M. LeVan, his heirs and/or assigns
117 Queen Street
Philadelphia, PA 19147

By virtue of a covenant running with
the land with restrictions and conditions
in Deed Book 307, page 628; and by virtue of
owning adjacent land

Darryl Matulevich, his heirs and/or assigns
P. O. Box 43
Falls, PA 18615

By virtue of judgment filed in Adams
County Prothonotary's Office No.
93N570 against Stonehenge Restaurant

Monarch/Sky Brothers, Inc., its successors and/or assigns
Now U.S. Foodservice, formerly Monarch/Sky Bros., Inc.
P. O. Box 6322
Altoona, PA 16603

By virtue of judgment filed
in Adams County Prothonotary's
Office No. 93N695 against
Stonehenge Restaurant, Inc.

National Gettysburg Battlefield Properties
      Limited Partnership, its successors and/or assigns
7323 Arrowood Road
Bethesda, MD 200334

By virtue of Assignment of lease
agreement dated 3/2/73; and Sublease of
Lease Agreement, dated 3/14/73; and,
Assignments of lease agreement, dated
3/22/74.

National Gettysburg Battlefield Properties
7323 Arrowood Road
Bethesda, MD 200334

By virtue of Agreement and Land Exchange
dated 6/12/71 recorded in Misc. Book 14,
page 211 and Easement dated 6/18/76
recorded in Misc. Book 25, page 736.

National Gettysburg Battlefield Properties, Inc.
7323 Arrowood Road
Bethesda, MD 200334

By virtue of Lease Agreement
underlying Memorandum of lease
agreement dated 6/29/72, recorded in
Miscellaneous Book 16, page 419;
Assignment of Lease, dated 3/2/73; and
Easement dated 6/18/76 recorded in Misc.
Book 25, page 736.

National Gettysburg Battlefield Tower, its successors
      and/or assigns
R.D. 1
Gettysburg, PA 17325

By virtue of that reference in Plat
Book 26, page 32, Note 2

National Gettysburg Battlefield Tower, Inc., its
      successors and/or assigns
7323 Arrowood Road
Bethesda, MD 20034

By virtue of an Agreement and Land
Exchange dated 6/12/71 recorded in
Misc. Book 14, page 211; a Sub-
lease, dated 3/14/73; and,
Assignment of lease agreement dated
3/22/74; and Easement dated 6/18/76
recorded in Misc. Book 25, page
736.

9

Ottenstein, Thomas R., his heirs and assigns
5203 MacArthur Terrace NW
Washington, DC 20016-2617

By virtue of an Agreement and Land
Exchange dated 6/12/71 recorded
in Misc. Book 14, page 211; and
Easement dated 6/18/76 recorded in
Misc. Book 25, page 736.

Ottenstein, Thomas R., Trustee for National Gettysburg
    Battlefield Tower Properties, his successors
    and/or assigns
5203 MacArthur Terrace NW
Washington, DC 20016-2617

By virtue of an Agreement and Land
Exchange dated 6/12/71 recorded
in Misc. Book 14, page 211; and
Easement dated 6/18/76 recorded
in Misc. Book 25, page 736.

Hannah LeVan Owens, her heirs and/or assigns
8227 Ruxton Crossing
Towson, MD 21204

By virtue of owning adjacent land

Pennsylvania Cellular Telephone Corp., a North
    Carolina Corp., its successors and/or assigns
2002 Pisgah Church Road, Suite 300
Greensboro, NC 27455

Memorandum of Agreement dated
9/20/97 and recorded in Record
Book 1501, page 295.

James E. Schaeffer and Susan M. Schaeffer, their
    heirs and/or assigns
497 Heritage Drive
Gettysburg, PA 17325

By virtue of owning adjacent land

Jolene M. Shrader, her heirs and/or assigns
4 East Locust Lane
New Oxford, PA 17350

By virtue of judgment filed in
Adams County Prothonotary's
Office No. 95N801 against Dale
Gross

Stonehenge Lodge & Restaurant, Inc., its successors
    and/or assigns
985 Baltimore Street
Gettysburg, 17325

By virtue of a Memorandum of Lease
Agreement underlying Memorandum of
Lease recorded in Miscellaneous Book
16, page 419; Lease Agreement dated
3/22/74 recorded in Misc. Book 20, page
408; Grant of Easement dated 3/22/74
recorded in Misc. Book 20, page 411; and
underlying Lease Agreement dated 6/29/72.

United States of America
Internal Revenue Service
United States Federal Building
228 Walnut Street
Harrisburg, PA 17108

By virtue of IRS tax liens filed in Adams
County Prothonotary's Office
No. 94TLNN61 against
Stonehenge Restaurant, Inc., and
No. 98TLRR390 against
Marvin R. Simpson

10

Weikert's Meat Market, Inc., its successors and/or assigns    By virtue of judgment filed in Adams
285 S. Franklin Street                                        County Prothonotary's Office No.
Gettysburg, PA 17325                                          93N92 against Stonehenge Restaurant

Gettysburg Area School District                              By virtue of school taxes
Administration Building
900 Biglerville Road
Gettysburg, PA 17325

D&E/Omni Point Joint Venture, LP                             By virtue of unrecorded lease to install
c/o John J. Mahoney, Esq.                                    Personal Communications Service &
Saul, Ewing, Remick and Saul                                 associated antenna
Suite 150, 1055 Westlake Drive
Berwyn, PA 19312

Omnipoint Communications Enterprises, Inc.                   By virtue of unrecorded lease to install
95 Highland Ave.                                             Personal Communications Service &
Bethlehem, PA                                                associated antenna

Unknown Owners

Unknown Lessees

Exhibit 5

# Management Policies

U.S. Department of the Interior
National Park Service
1988






# 5 Cultural Resource Management



# 5 Cultural Resource Management

*The National Park Service will preserve and foster appreciation of the cultural resources in its custody through appropriate programs of research, treatment, protection, and interpretation.*

All NPS programs affecting cultural resources are subject to the provisions of the National Historic Preservation Act (16 USC 470 et seq.), the National Environmental Policy Act (42 USC 4371 et seq.), the American Indian Religious Freedom Act (42 USC 1996), the Advisory Council on Historic Preservation's regulations regarding "Protection of Historic Properties" (36 CFR 800), the Secretary of the Interior's "Standards and Guidelines for Archeology and Historic Preservation" (FR 48:44716-40), and "Federal Agency Responsibilities under Section 110 of the National Historic Preservation Act" (FR 53:4727-46).    Other applicable legislation and regulations and specific management procedures are detailed in the *Cultural Resources Management Guideline* (NPS-28).

## RESOURCE IDENTIFICATION, EVALUATION, AND REGISTRATION

The National Park Service will identify and evaluate the cultural resources of each park as required parts of the park's information base.  The resulting inventories will provide the substantive data for nominating resources to the National Register of Historic Places; for general park planning and specific cultural resource management proposals; for land acquisition, development, interpretation, and maintenance activities; and for compliance with legal requirements.

*(See Information Base 2:5)*

### Inventories

The following cultural resource inventories will be maintained for the national park system:  (1) a List of Classified Structures encompassing historic and prehistoric structures; (2) a Cultural Sites Inventory consisting of both prehistoric/historic archeological resources and ethnographic resources (cultural and natural) associated with contemporary native Americans and other ethnic groups; and (3) a National Catalog of Museum Objects encompassing all cultural and natural history objects in NPS collections.

*(See Information Base 2:5, Museum Objects and Library Materials 5:9, Ethnographic Research and Inventories 5:12)*

### Evaluation and Categorization

To assist in management decisions about the treatment and use of cultural resources, all resources will be professionally evaluated and categorized according to criteria of significance established by the National Park Service and listed in the *Cultural Resources Management Guideline*.

National Register Nomination

All resources that appear to meet the criteria for the National Register of Historic Places will be nominated individually, as components of historic districts, or within multiple property nominations. Parks significant primarily for their cultural resources are automatically entered in the National Register upon establishment, but nomination forms will still be submitted to document the qualifying features of such parks.

National Historic Landmark Designation

Resources eligible for the National Register that appear to possess national significance may qualify for national historic landmark designation if they are unrelated to the primary purposes or themes of their parks (that is, if they lie within predominantly natural or recreational parks or within cultural parks focusing on other themes). National Register forms documenting the case for possible landmark designation will be submitted for such resources.

World Heritage Site Designation

Cultural properties believed to possess international significance may be nominated to the World Heritage List. Inclusion in the Indicative Inventory of Potential U.S. World Heritage Nominations will be a prerequisite for nomination. U.S. recommendations are approved by an interagency panel chaired by the Assistant Secretary for Fish and Wildlife and Parks, based on criteria promulgated by the World Heritage Committee. These criteria and the rules for U.S. participation in the Convention Concerning the World Cultural and Natural Heritage are published in 36 CFR 73.

*(See World Heritage Sites 4:5)*

## RESEARCH

The National Park Service will conduct a coordinated program of basic and applied research to support planning for and management of park cultural resources. The principal goals of such mission-oriented research will be

> to ensure a systematic and fully adequate park information base

> to identify and evaluate cultural resources

> to develop appropriate technologies and methods for monitoring, treating, and protecting cultural resources

> to ensure accurate treatment and interpretation of cultural resources employing the best current scholarship

> to develop ethnographically appropriate approaches to conserving park cultural and natural resources

Adequate research to support planning and legal compliance will precede any final decisions about the preservation or treatment of cultural resources or about park development or operational activities that might affect cultural resources. Research needs will be identified and justified in an approved park resource management plan.

Execution of research will be preceded by approved documentation of the work to be performed. The documentation will address the relationship of the research to management objectives; the theoretical orientation and methodology of the research; how data will be recorded, ensuring confidentiality when warranted; the dissemination of results; the preservation of physically affected resources, including data recovery; and the cataloging of collections.

All research, whether conducted by NPS personnel, contractors, cooperative researchers, or independent researchers, will conform to current standards of scholarship. It will be administered and conducted only by fully qualified personnel. The Park Service will support its research personnel in maintaining and improving their disciplinary knowledge and skills.

The data and knowledge acquired through research will be made widely available within and outside the National Park Service through such media as professional and technical reports, professional journals, popular publications, exhibits, and audiovisual productions. The status of current research and significant findings will be publicized through workshops, seminars, conferences, journal articles, and the news media. Certain research data may be withheld from public disclosure to protect sensitive archeological, historic, or ethnographic resources. The National Park Service will maintain a centralized cultural resource management bibliography of all research reports and planning documents addressing park cultural resources.

*(See Information Base 2:5, Science and Research 4:2, Planning and Proposal Formulation 5:4, Library Materials 5:11, Ethnographic Research and Inventories 5:12, Consultation and Confidentiality 5:12, Confidentiality of Resource Data 5:13)*

## Cooperative and Independent Research

The National Park Service will promote cooperative relationships with recognized educational and scientific institutions and qualified individuals, encouraging them to direct their research toward park management objectives. Where appropriate, the Park Service will affiliate its cultural resource preservation and research facilities and activities with recognized institutions. The Service will encourage and, where appropriate, support independent research pertinent to the broader contexts within which park resources exist. NPS facilities and assistance will be made available to qualified scholars conducting NPS-authorized research as long as park operations will not be impeded or park resources impaired.

Research unrelated to NPS requirements will not be undertaken or funded by the National Park Service, but may be conducted by qualified independent investigators. The issuance of a permit for independent research involving physical intervention into the fabric of cultural resources or the collection of objects in parks will be subject to compelling evidence that the proposal is essential to significant research concerns and that the purpose of this research can be reasonably achieved only by using park resources.

All cooperative and independent research must conform to NPS policies and guidelines.

*(See Conduct of Research 4:3, Research and Collection Activities 8:15)*

## Preservation of Data and Collections and Protection of Research Potential

The National Park Service will not take or allow any action that reduces the research potential of cultural resources without an appropriate level of research and documented data recovery. Because research involving physical intervention into cultural resources or removal of objects is a destructive process entailing an irretrievable commitment of the resources, research in parks will employ nondestructive methods to the maximum extent feasible.

Field data, objects, specimens, and features of structures retrieved for preservation during cultural resource research and treatment projects, together with associated records and reports, will be managed within the park museum collection. Where practical, the features of sites and structures will be left in place.

*(See Museum Objects and Library Materials 5:9)*

## CONSULTATION

Other federal agencies, state and local governments, potentially affected native American and other communities, interest groups, and entities specified by law or regulation, including state historic preservation officers and the Advisory Council on Historic Preservation, will be given opportunities to become informed about and comment on anticipated NPS actions at the earliest practicable time. The National Park Service will also encourage the continuing informal exchange of views with concerned local communities on cultural resource matters.

## PLANNING AND PROPOSAL FORMULATION

Overall direction for the identification, evaluation, protection, treatment, and use of cultural resources will be provided in the basic planning document(s) for each park.

Each park with cultural resources will prepare and periodically update a cultural resource component of the park's resource management plan, defining and programming the activities required to perpetuate and provide for the public enjoyment of those resources.

Any action that might affect cultural resources will be undertaken only if it meets all the following criteria:

> The action is consistent with the park's purposes and applicable NPS policies and guidelines.

> Cultural resource specialists have participated in planning, and sufficient data have been gathered to assess the probable effects.

> Relevant sections of the National Historic Preservation Act have been complied with in accordance with the regulations of the Advisory Council on Historic Preservation (36 CFR 800) and the "Guidelines for Federal Responsibilities under Section 110 of the National Historic Preservation Act" (FR 53:4728).

> In cases involving ethnographic resources, associated native American and other ethnic groups have been consulted, and their concerns have been taken into account.

Any action that will affect cultural resources adversely will be undertaken only if the following additional criteria are also met:

> There is no reasonable alternative.

> All reasonable measures to limit adverse effects will be taken, including recovery of data and salvage of materials, as appropriate.

*(See Implementation Plans 2:9, Treatment of Cultural Resources 5:5, Ethnographic Resources 5:11)*

TREATMENT OF CULTURAL RESOURCES

With some differences by type, cultural resources are subject to several basic treatments, including preservation as is, restoration to earlier appearances by the removal of later accretions and replacement of missing elements, and reconstruction or reproduction to replicate absent original resources. The fundamental question of which treatments will best provide for the preservation and public enjoyment of particular cultural resources will be decided through planning. No treatment project will be undertaken unless supported by an approved proposal, plan, or report appropriate to the proposed action. The significance of the resource, its condition, its interpretive value, its research potential, and the availability of data will all be weighed in determining the appropriate treatment. The appearance and condition of the resource before treatment and changes made during treatment will be appropriately documented. Pending planning decisions, all cultural resources will be protected and preserved in their existing conditions.

As a basic principle, anything of historical appearance that the National Park Service presents to the public in a park will be either an authentic survival from the past or an accurate representation of that which formerly existed there. Reconstructions and reproductions will be clearly identified as such.

Achievement of other park purposes may sometimes conflict with and outweigh the value of cultural resource preservation. The planning process will be the vehicle for weighing conflicting objectives and deciding that a cultural resource should not be preserved. Following such a decision, significant resource data and materials will be retrieved. The resource will then be permitted to deteriorate naturally, unless its destruction or direct removal is necessary for public safety or to eliminate an unacceptable intrusion. This policy does not apply to museum objects.

Policies applicable to specific cultural resource classes follow.

*(See Planning Process and Products 2:4, Planning and Proposal Formulation 5:4, Cultural Resources 6:7)*

## ARCHEOLOGICAL RESOURCES

### Treatment

Archeological resources will be left undisturbed unless removal of artifacts or intervention into fabric is justified by protection, research, interpretive, or development requirements. They will be preserved in a stable condition to prevent degradation and loss of research values or in-situ exhibit potential. Structures of archeological significance and recovered archeological objects are also subject to the treatment policies for structures and museum objects.

*(See Museum Objects and Library Materials 5:9)*

### Archeological Data Recovery

Significant archeological data that would be lost as a result of resource treatment projects, park development, uncontrollable degradation or destruction from natural or human causes, or other activities will be recovered in accordance with appropriate research proposals.

# CULTURAL LANDSCAPES

## Treatment

**Preservation.**  A cultural landscape will be preserved in its present condition if (1) that condition allows for satisfactory protection, maintenance, use, and interpretation, or (2) another treatment is warranted but cannot be accomplished until some future time.

**Rehabilitation.**  A cultural landscape may be rehabilitated for contemporary use if (1) it cannot adequately serve an appropriate use in its present condition, and (2) rehabilitation will retain its essential features and will not alter its integrity and character or conflict with park management objectives.

**Restoration.**  A cultural landscape may be restored to an earlier appearance if (1) restoration is essential to public understanding of the cultural associations of a park, and (2) sufficient data exist to permit restoration with minimal conjecture.

**Reconstruction.**  An obliterated cultural landscape may be reconstructed if (1) reconstruction is essential to public understanding of the cultural associations of a park established for that purpose, and (2) sufficient data exist to permit reconstruction with minimal conjecture.

## General Management

The management of cultural landscapes will recognize and protect significant historic, archeological, ethnographic, and design values.  Treatment decisions will take into account both the natural and built features of the landscape and the dynamics inherent in natural processes and continued human and animal occupation.  The perpetuation of significant vistas and historic parkway and park road landscape design features will receive special emphasis.

Every effort will be made to ensure that routine park operations do not intrude unnecessarily on a cultural landscape by introducing visible, audible, or atmospheric elements out of character with the historic environment. Trash disposal, storage of materials, parking of vehicles, and other operational activities will be conducted out of public view to the maximum extent feasible.

Cultural landscapes, like other cultural resources, will not be "beautified" to suit modern aesthetic tastes through decorative plantings or other modifications not reflecting historic conditions.

*(See Revegetation and Landscaping 9:4)*

# STRUCTURES

## Treatment

**Preservation.**  A structure will be preserved in its present condition if (1) that condition allows for satisfactory protection, maintenance, use, and interpretation, or (2) another treatment is warranted but cannot be accomplished until some future time.

**Rehabilitation.**  A structure may be rehabilitated for contemporary functional use if (1) it cannot adequately serve an appropriate use in its present condition, and (2) rehabilitation will not alter its integrity and character or conflict with park management objectives.  Rehabilitation does not apply to prehistoric structures.

Restoration.  A structure may be restored to an earlier appearance if (1) restoration is essential to public understanding of the cultural associations of a park, and (2) sufficient data exist to permit restoration with minimal conjecture.

Reconstruction.  A vanished structure may be reconstructed if (1) reconstruction is essential to public understanding of the cultural associations of a park established for that purpose, (2) sufficient data exist to permit reconstruction on the original site with minimal conjecture, and (3) significant archeological resources will be preserved in situ or their research values will be realized through data recovery.  A vanished structure will not be reconstructed to appear damaged or ruined. Generalized representations of typical structures will not be attempted.

*(See Physical Access for Disabled Persons 5:14, Ruins 5:8, Environmental Monitoring and Control 5:14)*

## Movement of Historic Structures

Proposals for moving historic structures to or within parks will consider the effects of movement on the structures, their present environments, their proposed environments, and the archeological research value of the structures and their sites.   No historic structure will be moved if its preservation would be adversely affected or until the appropriate recovery of significant archeological data has occurred.  Prehistoric structures will not be moved.

A historic structure may be acquired for relocation to a park only if (1) a comparable structure existed there historically, and (2) the acquired structure is essential to public understanding of the park's cultural associations.  No structure will be acquired to substitute for a missing structure of national significance.  In general, the acquisition of historic structures for parks will be governed by the policies for reconstruction of historic structures, including provisions for data recovery.

A nationally significant structure may be moved only if (1) it cannot practically be preserved on its present site, or (2) the move constitutes a return to a previous historic location, and the previous move and present location are unimportant to the structure's significance.  A structure of less-than-national significance may be moved if (1) it cannot practically be preserved on its present site, or (2) its present location is unimportant to its significance, and its relocation is essential to public understanding of the park's cultural associations.

In moving a historic structure, every effort will be made to reestablish its historic orientation, immediate setting, and general relationship to its environment.  If several structures are moved, they may be arranged in an ensemble appropriate to their character, if they are comparable to structures formerly present there and if their assembly is essential to public understanding of the park's cultural associations.  The artificial nature of the ensemble will be clearly identified.

## New Construction

In preference to new construction, every reasonable consideration will be given to using historic structures for park purposes compatible with their preservation and public appreciation.  Additions may be made to historic structures when essential to their continued use.  Structural additions will harmonize with but be readily distinguishable from the older work and will not intrude upon the historic scene; other additions, such as lightning protection, security equipment, heating, and air conditioning, will meet the requirements for rehabilitation.

New structures, landscape features, and utilities will be constructed in cultural zones only if (1) existing structures and improvements do not meet essential management needs, and (2) new construction is designed and sited to preserve the integrity and character of the area.  Unless

associated with an approved restoration or reconstruction, new construction will harmonize with historic features in scale, texture, and continuity but will not imitate them.

*(See Management Zoning 2:6, Rehabilitation 5:7, Adaptive Use 9:2)*

## Use of Historic Structures

Because unused structures are susceptible to neglect and vandalism accelerating their deterioration, compatible uses for historic structures will be found where appropriate.

All uses of historic structures are subject to preservation and public safety requirements. No administrative or public use will be permitted that would threaten the stability or character of a structure, the museum objects within it, or the safety of its users or that would entail alterations significantly compromising its integrity.

*(See Planning and Proposal Formulation 5:4, Fire Detection and Suppression 5:13, Physical Access for Disabled Persons 5:14, Adaptive Use 9:2, Energy Management 9:7, Use of Historic Structures 9:16)*

## Structures Owned or Managed by Others

Historic structures and related historic property owned but not occupied by the National Park Service, or structures and property owned by others in which the National Park Service has a less-than-fee interest or major management or preservation role, will be studied, inventoried, protected, treated, maintained, and used in accordance with NPS policies, guidelines, and standards to the extent permitted by the Service's interest. Whenever feasible and appropriate, interests acquired or retained by the National Park Service will enable application of this policy.

*(See Land Protection Plans 3:1, Historic Property Leases 5:15, Leasing of Historic Structures 10:4)*

## Damaged or Destroyed Structures

Prehistoric and historic structures damaged or destroyed by fire, storm, earthquake, war, or other accident may be preserved as ruins or may be rehabilitated, restored, or reconstructed in accordance with these policies.

*(See Shoreline Management 4:20)*

## Ruins

The stabilization of ruins will be preceded by studies to recover any data that would be affected by stabilization work. Ruins and related features on unexcavated archeological sites will be stabilized only to the extent necessary to preserve research values or to arrest structural deterioration. Archeological ruins to be exhibited will not be excavated until adequate provisions are made for data recovery and stabilization.

Structures will not be deliberately reduced to ruins, nor will missing structures be reconstructed to simulate ruins.

Earthworks

Appropriate vegetation will be maintained when necessary to prevent erosion of prehistoric and historic earthworks, even when the historic condition might have been bare earth. Because earthwork restorations and reconstructions can obliterate surviving remains and are often difficult to maintain, other means of representing and interpreting the original earthworks will receive first consideration.

*(See Landscapes and Plants 4:8, Exotic Plants and Animals 4:11)*

## Outdoor Sculpture

Outdoor statues, monuments, memorials, and plaques will be managed with the same consideration as other historic structures. Because their surface textures and finishes are important to their character and integrity, special care will be exercised in protecting, maintaining, and treating them.

*(See Commemorative Works and Plaques 9:17)*

## Ships

To remain watertight and weather resistant, historic ships may require more extensive and frequent replacement of historic fabric than other structures. Their historic character will nevertheless be retained through the use of appropriate materials and fabrication methods.

## MUSEUM OBJECTS AND LIBRARY MATERIALS

The National Park Service will collect, protect, preserve, and use objects, documents, and specimens in the disciplines of archeology, ethnography, history (includes archives), biology, geology, and paleontology to aid understanding among park visitors and to advance knowledge in the humanities and sciences.

## Treatment of Museum Objects

**Preservation.** A museum object will be preserved in its present condition through ongoing preventive conservation if (1) that condition is satisfactory for exhibit or research, or (2) another treatment is warranted but cannot be accomplished until some future time. Interventional measures will be taken when preventive conservation measures are insufficient to reduce deterioration to a tolerable level, or when the object is so fragile as to be endangered under any circumstances. Intervention will be minimized to reduce the possibility of compromising the object's integrity.

**Restoration.** A museum object may be restored to an earlier appearance if (1) restoration is required for exhibit or research purposes, (2) sufficient data exist to permit restoration with minimal conjecture, and (3) restoration will not modify the object's known original character. Restoration will be accomplished using the techniques and materials that least modify the object and in such manner that the materials will be removable at a later time with minimal adverse effect. Restored areas will be distinguishable from original material and documented. Restoration will take into account the possible importance of preserving signs of wear, damage, former maintenance, and other historical and scientific evidence.

Reproduction. Museum objects needed for interpretive presentations will be reproduced for such use when the originals are unavailable or would be subject to undue deterioration or loss. The National Park Service will observe copyright laws with respect to reproduction.

## Acquisition, Management, and Disposition of Museum Objects

Objects and related documentation essential to achieving the purposes and objectives of the parks will be acquired and maintained in accordance with approved scope of collection statements for each park. Archeological objects systematically collected within a park and natural history specimens systematically collected within a park for exhibit or permanent retention will be managed as part of the museum collection. Museum collection management and care will be addressed at all appropriate levels of planning.

Museum objects will be acquired and disposed of in conformance with legal authorizations and current NPS curatorial procedures. The National Park Service will acquire only collections having legal and ethical pedigrees, and each park will maintain complete and current accession records to establish the basis for legal custody of the objects in its possession. Museum catalog records will be prepared by each park to record basic property management data and other documentary information for museum objects. Objects will be inventoried in accordance with current procedures.

The National Park Service may cooperate with qualified institutions in the management of museum objects and, under existing legal authorities, may loan objects to and exchange objects with such institutions for approved purposes. The National Park Service will repatriate museum objects when lawful and when it can be demonstrated by a native American group that the materials are its inalienable communal property.

Interested persons will be permitted to inspect and study NPS museum objects and records in accordance with standards for the preservation and use of collections and subject to the policies regarding confidentiality of resource data.

*(See Natural Resource Collections 4:4, Inventories 5:1, Preservation of Data and Collections... 5:3, Consultation and Confidentiality 5:12, Confidentiality of Resource Data 5:13, Fire Detection and Suppression 5:13, Environmental Monitoring and Control 5:14, Nonpersonal Services and Media 7:3, Interpretation and Native Americans 7:5, Curatorial Facilities 9:15)*

## Historic Furnishings

When the historic furnishings of a structure are present in their original arrangement, they will not be moved or replaced unless required for their protection or preservation, or unless the structure is designated for another use in an approved planning document. A structure may be refurnished in whole or in part if (1) its history is significantly related to a primary park theme, (2) refurnishing is the best way to interpret that history to the public, and (3) sufficient evidence of furniture design and placement exists to refurnish with minimal conjecture. Reproductions will be used only when prototypes exist to ensure the accurate re-creation of historic pieces.

*(See Planning Process and Products 2:4, Planning and Proposal Formulation 5:4, Nonpersonal Services and Media 7:3)*

## Archives and Manuscripts

Archival and manuscript collections are considered museum property and will be managed in ways that preserve them intact for the future while providing current access.

When an archival collection not owned by the National Park Service falls within a park's approved scope of collection statement, every reasonable effort will be made to acquire it if (1) an appropriate storage facility will be provided by the Park Service or a cooperating institution, (2) the facility will be staffed by at least one archivist, curator, librarian, or other person experienced in caring for documentary materials, and (3) the collection will be made available to serious researchers under conditions that maximize both preservation and use and ensure security against theft and vandalism.

If the foregoing acquisition criteria cannot be met, the National Park Service will encourage transfer or donation of the collection to an appropriate local or regional repository or, in the case of a collection important to a park's administrative history, to the National Park Service History Collection at the Harpers Ferry Center.

Placement of historical documents owned by the National Park Service into repositories managed by others will be subject to the procedures concerning loans of museum property and any conditions of access or other restrictions to which the Park Service may have agreed or is bound by law.

Parks will retain notes or copies of records significant to their administrative histories when they periodically ship their official records to federal record centers.

*(See Acquisition, Management, and Disposition of Museum Objects 5:10)*

## Library Materials

Parks and other NPS offices may establish libraries to organize, store, and make available books and other information sources serving their reference and research needs. Library collections will be properly housed and maintained, and adequate space for users will be provided. All books and other recorded informational materials acquired for reference purposes will be organized and accounted for by a standard library cataloging and classification system, whether or not they remain physically in the library. Surplus library materials will be disposed of according to current guidelines.

Books and other library materials used in exhibits or as historic furnishings will be managed as museum objects. In addition, they may be separately cataloged and classified to facilitate access to their informational content.

*(See Research 5:2, Acquisition, Management, and Disposition of Museum Objects 5:10)*

## ETHNOGRAPHIC RESOURCES

Certain contemporary native American and other communities are permitted by law, regulation, or policy to pursue customary religious, subsistence, and other cultural uses of park resources with which they are traditionally associated. Such continuing use is often essential to the survival of family, community, or regional cultural systems, including patterns of belief and economic and religious life. Recognizing that its resource protection mandate affects this human use and cultural context of park resources, the National Park Service will plan and execute programs in ways that safeguard cultural and natural resources while reflecting informed concern for the contemporary peoples and cultures traditionally associated with them.

*(See Native American Use 8:8, Subsistence 8:16)*

Ethnographic Research and Inventories

To ensure that NPS plans and actions reflect contemporary knowledge about the cultural context of sites, structures, certain natural areas, and other ethnographic resources, the National Park Service will conduct appropriate cultural anthropological research in cooperation with park-associated groups. The purposes of this research will be to meet management needs for information about such groups; to develop inventories of traditional ethnographic resources associated with them; to determine the effects of their traditional ceremonial and consumptive uses of park resources; to evaluate the factors guiding their traditional systems for managing natural resources and creating cultural properties; to define their traditional and contemporary relationships to these resources; and to assess the effects of NPS activities on these groups. Research findings will be used to support planning, resource management decisions, and activities; to develop interpretive programs accurately reflecting native American and other cultures; and to facilitate consultation with and meet management responsibilities to park-associated communities.

*(See Park Planning Process and Products 2:4, Park Planning in a Regional Context 2:9, Inventories 5:1, Research 5:2, Interpretation and Native Americans 7:5, Native American Use 8:8)*

## Consultation and Confidentiality

The fundamental relationships that often exist between park resources and the integrity of contemporary native American and other cultures necessitate that the National Park Service consult with affected communities before reaching decisions about the treatment of traditionally associated resources. The identities of community consultants and information about sacred and other culturally sensitive places and practices will be kept confidential when research agreements or other circumstances warrant. The research use of community consultants or respondents will be subject to their informed consent.

*(See Research 5:2, Confidentiality of Research Data 5:13)*

## SUBMERGED CULTURAL RESOURCES

The National Park Service will identify, evaluate, register, monitor, and protect the submerged cultural resources in its custody. Each park with submerged cultural resources will develop a program to protect them and to provide for their interpretation to the public.

Submerged cultural resources will be left in place unless removal of artifacts or intervention into fabric is compellingly justified by overriding protection, research, or interpretive requirements. No submerged cultural resource will be removed if its preservation would be adversely affected or unless provision has been made for its appropriate conservation and curation. All such resources collected from park waters will be managed within NPS museum collections. The National Park Service will not permit treasure hunting or salvage activities at or around shipwrecks or other submerged resources.

Programs will be conducted to enhance public understanding of submerged cultural resources. Parks may provide recreational diving access to submerged resources not susceptible to damage or the removal of artifacts from such access.

The National Park Service will take care to ensure that activities by other agencies in coastal areas or along major rivers do not inadvertently impact submerged park cultural resources.

The National Park Service will honor the sovereignty of other nations over wrecks of their commissioned vessels and will work with their governments through the U.S. Department of State in dealing with such shipwrecks.

*(See Chapter 7: Interpretation and Education; see also Museum Objects and Library Materials 5:9, Recreational Activities 8:2)*

## BURIAL SITES AND CEMETERIES

Historic and prehistoric burial areas, whether or not formally plotted and enclosed as cemeteries, will be identified and protected. They will not be disturbed or archeologically investigated unless threatened with destruction by park development, operational activities, or natural forces.

The National Park Service will consult with native Americans and other individuals and groups linked by ties of kinship or culture to ethnically identifiable human remains when such remains may be disturbed or are encountered on park lands. Their preference for the treatment or disposition of such remains will be followed insofar as feasible. Decisions will be based on full consideration of alternatives, including project redesign to avoid disturbance, removal and reburial of remains with or without recordation or study, and removal of remains for study and retention in a museum collection. Reinterment at the same park may be permitted.

*(See Interpretation and Native Americans 7:5, Cemeteries and Burials 8:16)*

## SECURITY AND PROTECTIVE MEASURES

The National Park Service will employ the most effective concepts, techniques, and equipment to protect cultural resources against theft, fire, vandalism, environmental impacts, and other threats without compromising their integrity or unduly limiting their appreciation by the public.

### Confidentiality of Resource Data

Information regarding the location, nature, and cultural context of archeological, historic, and ethnographic resources may be exempted from public disclosure. Documentation is required for decisions to disseminate such information or to withhold it if it has been determined that dissemination will have substantial adverse effects on the resources.

*(See Research 5:2, Acquisition, Management, and Disposition of Museum Objects 5:10, Consultation and Confidentiality 5:12)*

### Fire Detection and Suppression

Measures to protect cultural resources from fire will be developed as part of a park's fire management planning process, and prudent action will be taken to prevent harm to cultural resources by either fire or fire-suppression activities.

In the preservation of historic structures, every attempt will be made to comply with servicewide standard building and fire codes. When these cannot be met without significantly impairing a structure's integrity and character, the management and use of the structure, rather than the structure itself, will be modified to minimize the potential hazards.

When warranted by the significance of a historic structure or of the museum objects in a nonhistoric structure, adequate fire detection, warning, and suppression systems will be installed. Fire-fighting personnel will be advised of any peculiarities or dangers inherent in a structure and any objects to be given priority for protection or rescue. Park personnel will receive training in fire prevention and suppression with hand-held extinguishers at historic structures and museums, and designated personnel will be trained to respond to all emergencies involving museum collections.

Smoking will not be permitted in spaces housing museum collections or in historic structures other than those adapted for modern residential and administrative uses.

*(See Structural Fire Protection and Suppression 9:7)*


## Environmental Monitoring and Control

When necessary for the preservation of a historic structure or a museum collection, appropriate measures will be taken to control relative humidity, temperature, light, and air quality. When museum objects are housed in a historic structure, an evaluation of the needs of both the collection and the structure will be made before introducing environmental control measures. All areas housing museum objects will be continuously monitored to determine whether appropriate levels of relative humidity, temperature, and light are being maintained.

*(See Air Quality 4:17)*


## Pest Management

The National Park Service will follow the integrated pest management approach in addressing pest problems related to cultural resources. All feasible nonchemical methods will be exhausted before resorting to the use of chemicals. Any use of pesticides for cultural resources will conform to the NPS pesticide use policy.

*(See Pests 4:13)*


## Emergency Management

The emergency operations plan for each park with cultural resources will address their protection or rescue in the event of an emergency or disaster.

*(See Emergency Preparedness and Emergency Operations 8:6)*


# PHYSICAL ACCESS FOR DISABLED PERSONS

The National Park Service will provide the highest feasible level of physical access for disabled persons to historic properties, consistent with the preservation of the properties' significant historical attributes. Access modifications for disabled persons will be designed and installed to least affect the features of a property that contribute to its significance. Some impairment of some features will be accepted in providing access. If it is determined that modification of particular features would destroy a property's significance, however, such modifications will not be made.

*(See Interpretation for Special Populations 7:4, Accessibility for Disabled Persons 8:5, Accessibility for Disabled Persons 9:3, Accessibility for Disabled Persons 10:6)*

## HISTORIC PROPERTY LEASES

In accordance with section 111 of the National Historic Preservation Act and its implementing regulations (36 CFR 18), the National Park Service may lease a park historic property listed in or eligible for the National Register of Historic Places if the lease will ensure its preservation. The Park Service will offer a property for lease if the proposed use will meet this requirement and will not unduly limit public appreciation of the property, interfere with visitor use and enjoyment of the park, or preclude use of the property for park administration, employee housing, or other management purposes judged more appropriate or cost-effective.

Each lease will be competitively offered. The government will receive at least fair market rental value based on an appraisal of the property, adjusted for investments required of the lessee. The term of the lease will be the shortest time needed for the proposed use, taking into account required lessee investments, common practice for the type of lease, possible future alternatives for the property, and other relevant factors. No lease will exceed 99 years. If a lease requires or allows the lessee to maintain, repair, rehabilitate, restore, or build upon the property, it will require the work to be done in accordance with applicable NPS policies, guidelines, and standards. Leasing of historic structures to provide visitor facilities and services is also subject to all applicable laws, policies, and guidelines related to concession operations.

*(See Leasing of Historic Structures 10:4)*


## ROLES OF VOLUNTEERS AND PARAPROFESSIONALS

Volunteers and paraprofessionals assisting with cultural resource studies and treatments will be directly supervised by qualified cultural resource professionals of the appropriate disciplines, and their work will conform to applicable NPS policies, guidelines, and standards. They will receive documented training in the technical aspects of their work.

*(See Volunteers in Parks 7:4)*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2422 Willard Drive, Charlottesville, VA 22903,<br><br>                    Plaintiffs,<br><br>          v.<br><br>JOHN LATSCHAR, in his official capacity as Deck Type:  Administrative Agency SUPERINTENDENT OF GETTYSBURG Review NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325 DENNIS REIDENBACH, in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR,[1/] in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, DC 20240; DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C.  20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case Number: 1:06-CV-02077-TFH<br>) Judge:  Thomas F. Hogan<br>) Deck Type:  Administrative Agency<br>)                 Review<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

[PROPOSED] ORDER

On this day, the Court considered the Federal Defendants' Cross-Motion for Summary Judgement and Plaintiffs' Notice of Motion and Motion for Summary Judgment and, having reviewed the motion and cross-motion and all other matters relevant to said motions, the Court

---

[1/] Federal Defendants note that the correct name of the Director of the National Park Service is Mary Bomar, not Marie Bomar. Dennis Reidenbach is now the director of the Northeast Region.

is of the opinion that Federal Defendants' Cross-Motion for Summary Judgment is hereby

GRANTED and Plaintiffs' Motion for Summary Judgment is hereby DENIED.

IT IS SO ORDERED.


      SIGNED, this _____ day of _____, 2008.



      _____
      UNITED STATES DISTRICT COURT JUDGE