UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2422 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOHN LATSCHAR, in his official capacity as Deck Type:  Administrative Agency SUPERINTENDENT OF GETTYSBURG Review NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325 DENNIS REIDENBACH, in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR,[y] in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, DC 20240; DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C.  20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) ) |

Case Number: 1:06-CV-02077-TFH
Judge:  Thomas F. Hogan
Deck Type:  Administrative Agency
                 Review

**Notice of Errata Filing**

Federal Defendants, JOHN LATSCHAR, in his official capacity as SUPERINTENDENT

OF GETTYSBURG NATIONAL MILITARY PARK, DENNIS REIDENBACH, in his official

capacity as DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, MARY

---

[y] Federal Defendants note that the correct name of the Director of the National Park Service is Mary Bomar, not Marie Bomar. Dennis Reidenbach is now the director of the Northeast Region.

1

BOMAR, in her official capacity a DIRECTOR OF THE NATIONAL PARK SERVICE, DIRK

KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES

DEPARTMENT OF THE INTERIOR, the NATIONAL PARK SERVICE, and the UNITED

STATES DEPARTMENT OF THE INTERIOR (collectively referred to herein as "Federal

Defendants"), hereby submit the instant NOTICE OF ERRATA, attaching a portion of Exhibit 2

(Doc.30-3 through 30-5)  to the FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF

THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. 30), which was inadvertently

omitted during the original filing.


Date:   March 17, 2008                          Respectfully submitted,
                                                RONALD J. TENPAS
                                                Assistant Attorney General
                                                United States Department of Justice
                                                Environment and Natural Resources Division

                                                /s/ Samantha Klein
                                                SAMANTHA KLEIN
                                                United States Department of Justice
                                                Environment and Natural Resources Division
                                                Natural Resources Section
                                                P.O. Box 663
                                                Washington, D.C.  20044-0663
                                                Phone: (202) 305-0474
                                                Fax:    (202) 305-0506
                                                E-mail: samantha.klein@usdoj.gov

Of Counsel:

MARTHA F. ANSTY
Attorney
Office of the Solicitor, N.E. Region
U.S. Department of the Interior
Winston Prouty Federal Building
11 Lincoln Street
Essex Junction, VT 05452
Telephone:  (802) 872-0629
Fax:  (802) 872-9704

Exhibit 2
(1 of 2)

WASO-12
R(8/82)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

## GUIDELINE TRANSMITTAL SHEET

| GUIDELINE NUMBER | TITLE | RELEASE NO. |
|---|---|---|
| NPS-12 | NEPA Compliance Guideline | 2 |
| OFFICE OF ORIGIN | | AMENDMENT NO. |
| Division of Environ-mental Compliance | | 1 |
| | | DATE |
| | | October 1984 |

**Explanation of material transmitted:**

The NEPA Compliance Guideline, NPS-12, released September 1982, is herewith amended as follows:

Pen and Ink Changes

| Chapter | Date | Action |
|---|---|---|
| 1 - 7 | Sep. 82 | Line out all references to "Chief, Office of Park Planning and Environmental Quality" and insert "Associate Director for Planning and Development." |
| 1 - 7 | Sep. 82 | Line out all references to "WASO-135" and insert "WASO-774." |

Page Changes

| Remove Old Pages | Insert New Pages |
|---|---|
| Pages v-vi | Pages v-vi |
| | Appendix 2, 516 DM 7.4E-7.5A |
| | Appendix 2, 516 DM - As directed in the attached May 21, 1984, Federal Register Notice. |
| Appendix 2, 516 DM 6, Appendix 7 | Appendix 2, 516 DM 6, Appendix 7 |
| Appendix 5, pages 4-8 | Appendix 5, pages 4-9 |
| | Appendix 6, pages 46 FR 18026 - 46 FR 18038 |
| | Appendix 7, pages 1-25 |

Please keep this and all future transmittal sheets in the front of the guideline.

Richard E. Powers

Assistant Director, Personnel & Administrative Services

1 ϩx

NEPA COMPLIANCE GUIDELINE

NPS-12

Contents

CHAPTER                                                                      PAGE

   B. Licensing, Permitting and Development of Water-Related
        Projects.........................................................17
      1. Federal Energy Regulatory Commission Reviews................17
      2. Federal Water Project Recreation Act (Public Law 89-72)
           Reviews....................................................18
      3. Section 201(g) of the Clean Water Act (Public Law 95-217)
           Reviews....................................................19
   C. Reviewing of Proposed Federal Legislation, Rulemaking,
        Regulations, Executive Orders, Guidelines, Handbooks,
        and Other Procedures............................................20
   D. Reviewing of Land Use Plans.......................................20
   E. Reviewing of State, Local and Private Environmental Documents..20

7-7 Style and Format for Environmental Review Comments.................21
   A. General Comments..................................................21
   B. Interrelated Review Comments......................................21
   C. Specific NEPA Comments............................................22
   D. Summary Comments.................................................22

   EXHIBIT 1 WASO-135 Instruction Form
   EXHIBIT 2 No-Comment Response Form
   EXHIBIT 3 Section 4(f) of the DOT Act

APPENDICES

1. Council on Environmental Quality Regulations (40 CFR 1500-1508)

2. Part 516, Department of the Interior Manual, Section 1-7 (including
   NPS appendices)

3. Scoping Guidance by Council on Environmental Quality (4/30/81)

4. Procedures for Processing Draft and Final Environmental Impact Statements

5. Approved NEPA Format Variations
   A. General Management Plans for Units of the National Park System
   B. Wild and Scenic River Studies
   C. National Trail Studies

6. Forty Most Asked Questions Concerning CEQ's National Environmental Policy
   Act Regulations

7. CEQ July 22, 1983, Memorandum; Regarding:  Guidance Regarding NEPA
   Regulations

3

NEPA COMPLIANCE GUIDELINE
NPS-12

## ABBREVIATIONS USED IN THIS GUIDELINE

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| CFDA | Catalog of Federal Domestic Assistance |
| CFR | Code of Federal Regulations |
| COE | Corps of Engineers |
| CEQ | Council on Environmental Quality |
| DEC | Division of Environmental Compliance |
| DSC | Denver Service Center |
| DOI | Department of the Interior |
| DOT | Department of Transportation |
| DEIS | Draft Environmental Impact Statement |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ER | Environmental Review |
| FWP | Assistant Secretary for Fish and Wildlife and Parks |
| FERC | Federal Energy Regulatory Commission |
| FEIS | Final Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| GMP | General Management Plan |
| HCRS | Heritage Conservation and Recreation Service |
| LCD | Legislative Compliance Division (of Denver Service Center) |
| NEPA | National Environmental Policy Act of 1969 |
| NPS | National Park Service |
| NOI | Notice of Intent |
| OEPR | Office of Environmental Project Review |

Release No. 2

number, when it is assigned, will be announced by separate notice in the Federal Register.

Authority: Section 7(d), Department of Housing and Urban Development Act, 42 U.S.C. 3535(d); Section 222, Housing and Urban-Rural Recovery Act of 1983, Pub. L. 98-181, 97 Stat. 1153, Approved November 30, 1983.

Dated: May 16, 1984.

**Samuel R. Pierce, Jr.,**
*Secretary.*

[FR Doc. 84-13573, Filed 5-18-84; 8:45 am]

BILLING CODE 4210-32-M

---

**DEPARTMENT OF THE INTERIOR**

[516 DM 2–4]

**National Environmental Policy Act; Revised Implementing Procedures**

**AGENCY:** Department of the Interior.

**ACTION:** Notice of revised instructions.

**SUMMARY:** This notice announces revised instructions for implementing the National Environmental Policy Act (NEPA) within the Department of the Interior. These procedures were previously published in the Federal Register on April 23, 1980 (45 FR 27541) and the proposed revisions were published on September 29, 1983 (48 FR 44661).

**EFFECTIVE DATE:** May 11, 1984.

**FOR FURTHER INFORMATION CONTACT:** Bruce Blanchard, Director, Office of Environmental Project Review, Office of the Secretary, Department of the Interior, Washington, D.C. 20240, Telephone (202) 343-3891.

**SUPPLEMENTARY INFORMATION:** The Department's implementing instructions for NEPA appear in the Federal Register at 45 FR 27541 (April 23, 1980) and revisions were proposed at 48 FR 44661 (September 29, 1983). These revisions are a result of a continuing process of updating our NEPA procedures to reduce unnecessary paperwork and to improve the consideration of environmental factors in decisionmaking. For example, the following revisions have been made since the original procedures, including Bureau appendices, were completed in January 1981:

516 DM 6, Appendix 1 (FWS), 47 FR 28841, July 1, 1982
516 DM 6, Appendix 5 (BLM), 48 FR 43731, September 26, 1983
516 DM 6, Appendix 9 (BuRec), 48 FR 17151, April 21, 1983
516 DM 6, Appendix 7 (NPS), 49 FR 9273, March 12, 1984 (proposed)

Later this year we expect to propose changes to the Bureau appendices for the Bureau of Indian Affairs, Office of Surface Mining, and Minerals Management Service.

When we proposed this revision we received only one comment as a result of our Federal Register notice, from the Environmental Protection Agency (EPA). The EPA endorsed the proposed revisions, identified a possible shortcoming, and offered several other recommendations for changes.

The EPA felt that the lack of a reporting or documentation procedure and a consultative process with affected agencies for categorically excluded actions was a possible shortcoming. We disagree. The Department's categorical exclusions cover several hundred thousand actions each year which in our experience do not cause significant environmental effects. A Departmental requirement to report or document each of these exclusions would not improve the consideration of significant environmental effects and would substantially increase costs and unnecessary paperwork. In addition we believe that the many existing program requirements for consulting with affected agencies are sufficient for these types of actions. On the other hand the EPA may not be aware that some of our Bureaus do prepare checklists for certain categorical exclusions of particular interest to them and these appear in their handbooks.

The EPA also recommended clarifications that (1) environmental documents be prepared "pursuant to NEPA" in 516 DM 2.3A (3), (2) "proposed or designated" wilderness areas, wild and scenic rivers and National Landmarks be added to 516 DM 2, Appendix 2.2, and (3) "minor" be defined narrowly in 516 DM 2, Appendix 1.9 because land transactions and boundary changes in the West can be highly controversial. We have not adopted these suggestions for the following reasons: (1) The Department's procedures adopt (516 DM 1.7B) and supplement (516 DM 2.1) the CEQ regulations and "environmental documents" are always prepared pursuant to NEPA because they are defined in those regulations in § 1508.10. (2) Appendix 2.2 pertains to unique geographic characteristics, identifies generic examples of some, and is based on § 1508.27(b)(3) of the CEQ regulations. The recommendation implies formal designations, raises an unnecessary issue about who proposes such characteristics and would be inconsistent with CEQ's regulations. (3)

If "minor" land transactions and boundary changes have highly controversial environmental effects then the exception in Appendix 2.3 applies and an environmental document must be prepared.

In addition to the revisions proposed in September we have made a few minor technical, formatting and conforming changes in the procedures. This revision now makes changes in the following sections of the Departmental Manual:

1. It revises §§ 1.3, 1.4, 1.6, 1.7 and 1.8 and adds §§ 1.9, 1.10 and 1.11 in Appendix 1 of 516 DM 2 which lists Department-wide categorical exclusions. These changes reflect our experience over the past several years and are meant to clarify and identify categories of actions which apply to all elements of the Department.

2. It amends 516 DM 2.3A(3) which establishes exceptions to the categorical exclusions listed in Appendix 1 to Chapter 2 (Department-wide) and Appendices 1–9 to Chapter 6 (Bureaus), and places these exceptions in a new Appendix 2 of 516 DM 2. Non-editorial changes occur in §§ 2.4, 2.5, 2.6 and 2.8. The substantive effect of the amendments reduces the scope of some of the exceptions and will lead to fewer unnecessary environmental assessments (EA). It will not reduce the number of environmental impact statements (EIS).

3. It adds a new § 3.6 to 516 DM 3 to provide for the adoption of EA's prepared by others. We believe this is a necessary addition and it is consistent with the recent guidance promulgated by the Council on Environmental Quality (48 FR 34263).

4. It deletes the previous Appendix 1 to 516 DM 4. This appendix provided no substantive guidance in preparing EIS's and required too much paperwork to keep current in the Departmental Manual. We will update and reissue it as a supplemental directive of the Office of Environmental Project Review.

5. It updates the previous Appendix 2 to 516 DM 4 and redesignates it as Appendix 1. The revision merely updates the appendix to reflect the current edition of the Catalog of Federal Domestic Assistance.

6. It makes minor technical and conforming changes to 516 DM 2 and 516 DM 4. For convenience 516 DM 2 with Appendices 1 and 2, 516 DM 3, and Appendix 1 to 516 DM 4 are printed in their entirety.

Dated: May 11, 1984.
Joseph W. Gorrell,
*Deputy Assistant Secretary, Policy, Budget & Administration.*

## DEPARTMENTAL MANUAL

**Part 516 National Environmental Policy Act of 1969**

*Chapter 2 Initiating the NEPA Process*

2.1 *Purpose.* This Chapter provides supplementary instructions for implementing those portions of the CEQ regulations pertaining to initiating the NEPA process.

2.2 *Apply NEPA Early* (1501.2).

A. Bureaus will initiate early consultation and coordination with other bureaus and any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved, and with appropriate Federal, State, local and Indian tribal agencies authorized to develop and enforce environmental standards.

B. Bureaus will also consult early with interested private parties and organizations, including when the Bureau's own involvement is reasonably foreseeable in a private or non-Federal application.

C. Bureaus will revise or amend program regulations or directives to insure that private or non-Federal applicants are informed of any environmental information required to be included in their applications and of any consultation with other Federal agencies, and State, local or Indian tribal governments required prior to making the application. A list of these regulations or directives will be included in each Bureau Appendix to Chapter 6.

2.3 *Whether to Prepare an EIS* (1501.4).

A. *Categorical Exclusions (CX)* (1508.4).

(1) The following criteria will be used to determine actions to be categorically excluded from the NEPA process:

(a) The action or group of actions would have no significant effect on the quality of the human environment, and

(b) The action or group of actions would not involve unresolved conflicts concerning alternative uses of available resources.

(2) Based on the above criteria, the classes of actions listed in Appendix 1 to this Chapter are categorically excluded, Department-wide, from the NEPA process. A list of CX specific to Bureau programs will be included in each Bureau Appendix to Chapter 6.

(3) The exceptions listed in Appendix 2 to this Chapter apply to individual actions within CX. Environmental

documents must be prepared for any actions involving these exceptions.

(4) Notwithstanding the criteria, exclusions and exceptions above, extraordinary circumstances may dictate or a responsible Departmental or Bureau official may decide to prepare an environmental document.

B. *Environmental Assessment (EA)* (1508.9). See 516 DM 3.

C. *Finding of No Significant Impact (FONSI)* (1508.13). A FONSI will be prepared as a separate covering document based upon a review of an EA. Accordingly, the words *include(d)* in Section 1508.13 should be interpreted as *attach(ed)*.

D. *Notice of Intent (NOI)* (1508.22). A NOI will be prepared as soon as practicable after a decision to prepare an environmental impact statement and shall be published in the Federal Register, with a copy to the Office of Environmental Project Review, and made available to the affected public in accordance with Section 1506.6. Publication of a NOI may be delayed if there is proposed to be more than three (3) months between the decision to prepare an environmental impact statement and the time preparation is actually initiated. The Office of Environmental Project Review will periodically publish a consolidated list of these notices in the Federal Register.

E. *Environmental Impact Statement (EIS)* (1508.11). See 516 DM 4. Decisions/actions which would normally require the preparation of an EIS will be identified in each Bureau Appendix to Chapter 6.

2.4 *Lead Agencies* (1501.5).

A. The Assistant Secretary-Policy, Budget and Administration will designate lead Bureaus within the Department when Bureaus under more than one Assistant Secretary are involved and will represent the Department in consultations with CEQ or other Federal agencies in the resolution of lead agency determinations.

B. Bureaus will inform the Office of Environmental Project Review of any agreements to assume lead agency status.

C. A non-Federal agency will not be designated as a joint lead agency unless it has a duty to comply with a local or State EIS requirement that is comparable to a NEPA statement. Any non-Federal agency may be a cooperating agency by agreement. Bureaus will consult with the Solicitor's Office in cases where such non-Federal agencies are also applicants before the Department to determine relative lead/cooperating agency responsibilities.

2.5 *Cooperating Agencies* (1501.6).

A. The Office of Environmental Project Review will assist Bureaus and coordinate requests from non-Interior agencies in determining cooperating agencies.

B. Bureaus will inform the Office of Environmental Project Review of any agreements to assume cooperating agency status or any declinations pursuant to Section 1501.6(c).

2.6 *Scoping* (1501.7).

A. The invitation requirement in Section 1501.7(a)(1) may be satisfied by including such an invitation in the NOI.

B. If a scoping meeting is held, consensus is desirable; however, the lead agency is ultimately responsible for the scope of an EIS.

2.7 *Time Limits* (1501.8). When time limits are established they should reflect the availability of personnel and funds.

*Chapter 2 Appendix 1, Departmental Categorical Exclusions*

The following actions are categorical exclusions (CX) pursuant to 516 DM 2.3A(2). However, environmental documents will be prepared for individual actions within these CX if the exceptions listed in 516 DM 2, Appendix 2, apply.

1.1 Personnel actions and investigations and personnel services contracts.

1.2 Internal organizational changes and facility and office reductions and closings.

1.3 Routine financial transactions including such things as salaries and expenses, procurement contracts, guarantees, financial assistance, income transfers, audits, fees, bonds and royalties.

1.4 Law enforcement and legal transactions, including such things as arrests, investigations, patents, claims, legal opinions, and judicial activities including their initiation, processing, settlement, appeal or compliance.

1.5 Regulatory and enforcement actions, including inspections, assessments, administrative hearings and decisions; when the regulations themselves or the instruments of regulations (leases, permits, licenses, etc.) have previously been covered by the NEPA process or are exempt from it.

1.6 Non-destructive data collection, inventory (including field, aerial and satellite surveying and mapping), study, research and monitoring activities.

1.7 Routine and continuing government business, including such things as supervision, administration, operations, maintenance and replacement activities having limited context and intensity; e.g. limited size and magnitude or short-term effects.

1.8  Management, formulation, allocation, transfer and reprogramming of the Department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required.)

1.9  Legislative proposals of an administrative or technical nature, including such things as changes in authorizations for appropriations, and minor boundary changes and land transactions; or having primarily economic, social, individual or institutional effects; and comments and reports on referrals of legislative proposals.

1.10  Policies, directives, regulations and guidelines of an administrative, financial, legal, technical or procedural nature; or the environmental effects of which are too broad, speculative or conjectural to lend themselves to meaningful analysis and will be subject later to the NEPA process, either collectively or case-by-case.

1.11  Activities which are educational, informational, advisory or consultative to other agencies, public and private entities, visitors, individuals or the general public.

### Chapter 2  Appendix 2. Exceptions to Categorical Exclusions

The following exceptions apply to individual actions within categorical exclusions (CX). Environmental documents must be prepared for actions which may:

2.1  Have significant adverse effects on public health or safety.

2.2  Have adverse effects on such unique geographic characteristics as historic or cultural resources, park, recreation or refuge lands, wilderness areas, wild or scenic rivers, sole or principal drinking water aquifers, prime farmlands, wetlands, floodplains, or ecologically significant or critical areas, including those listed on the Department's National Register of Natural Landmarks.

2.3  Have highly controversial environmental effects.

2.4  Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

2.5  Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

2.6  Be directly related to other actions with individually insignificant but cumulatively significant environmental effects.

2.7  Have adverse effects on properties listed or eligible for listing on the National Register of Historic Places.

2.8  Have adverse effects on species listed or proposed to be listed on the List of Endangered or Threatened Species, or have adverse effects on designated Critical Habitat for these species.

2.9  Require compliance with Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act.

2.10  Threaten to violate a Federal, State, local or tribal law or requirement imposed for the protection of the environment.

### Chapter 3  Environmental Assessments

3.1  Purpose. This Chapter provides supplementary instructions for implementing those portions of the CEQ regulations pertaining to environmental assessments (EA).

3.2  When to Prepare (1501.3).

A. An EA will be prepared for all actions, except those covered by a categorical exclusion, covered sufficiently by an earlier environmental document, or for those actions for which a decision has already been made to prepare an EIS. The purpose of such an EA is to allow the responsible official to determine whether to prepare an EIS.

B. In addition, an EA may be prepared on any action at any time in order to assist in planning and decisionmaking.

3.3  Public Involvement.

A. Public notification must be provided and, where appropriate, the public involved in the EA Process (1506.6).

B. The scoping process may be applied to an EA (1501.7).

3.4  Content

A. At a minimum, an EA will include brief discussions of the need for the proposals, of alternatives as required by section 102(2) of NEPA, of the environmental impacts of the proposed action and such alternatives, and a listing of agencies and persons consulted (15.8.9(b)).

B. In addition, an EA may be expanded to describe the proposal, a broader range of alternatives, and proposed mitigation measures if this facilitates planning and decisionmaking.

C. The level of detail and depth of impact analysis should normally be limited to that needed to determine whether there are significant environmentals effects.

D. An EA will contain objective analyses which support its environmental impact conclusions. It will not, in and of itself, conclude whether or not an EIS will be prepared. This conclusion will be made upon

review of the EA by the responsible official and documented in either a NOI or FONSL.

3.4  Format.

A. An EA may be prepared in any format useful to facilitate planning and decisionmaking.

B. EA may be combined with any other planning or decisionmaking document; however, that portion which analyzes the environmental impacts of the proposal and alternatives will be clearly and separately identified and to spread throughout or interwoven into other section of the document.

3.8  Adoption.

A. An EA prepared for a proposal before the Department by another agency, entity or person, including an applicant, may be adopted if, upon independent evaluation by the responsible official, it is found to comply with this Chapter and relevant provisions of the CEQ regulations.

B. When appropriate and efficient, a responsible official may augment such an EA when it is essentially but not entirely in compliance in order to make it so.

C. If such an EA or augmented EA is adopted, the responsible official must pepare his/her own NOI or FONSI which also acknowledges the origin of the EA and takes full responsibility for its scope and content.

### Chapter 4  Environmental Impact Statements

Revise 516 DM 4.15 to read: A. A list of related environmental review and consultation requirements is available from the Office of Environmental Project Review.

Revise 516 DM 4.16A to read: A. Comments from state agencies will be requested through procedures established by the Governor pursuant to Executive Order 12372, and may be requested from local agencies through these procedures to the extent that they include the affected local jurisdictions. See 511 DM.

In 516 DM 4.18 change the reference to Appendix 2 to Appendix 1.

In 516 DM 4.22 change the reference to (015 DM 6) to (381 DM 4.5B).

### Chapter 4  Appendix 1, Programs of Grants to States in Which Agencies Having Statewide Jurisdiction May Prepare EISs.

1.1  Fish and Wildlife Service.

A. Anadromous Fish Conservation (=15.600).

B. Fish Restoration (=15.605).

C. Wildlife Restoration (=15.611).

D. Endangered Species Conservation (=15.612).

E. Marine Mammal Grant Program (#15.613).

1.2 Bureau of Land Management.

A. Wildlife Habitat Management Technical Assistance (#15.219).

1.3 National Park Service.

A. Historic Preservation Grants-in-Aid (#15.904).

B. Outdoor Recreation—Acquisition. Development and Planning (#15.916).

1.4 Bureau of Reclamation.

A. National Water Research and Development Program (#15.505).

1.5 Office of Surface Mining.

A. Regulation of Surface Coal Mining and Surface Effects of Underground Coal Mining (#15.250).

B. Abandoned Mine Land Reclamation (AMLR) Program (#15.252).

1.6 Office of Territorial and International Affairs.

A. Economic and Political Development of the Territories and the Trust Territory of the Pacific Islands (#15.875).

Note.—Citations in parenthesis refer to the Catalog of Federal Domestic Assistance. Office of Management and Budget. 1983.

*Chapter 4  Appendix 2*

Delete.

[FR Doc. 84-13551 Filed 5-18-84; 8:45 am]

**BILLING CODE 4310-10-M**

---

**National Strategic Materials and Minerals Program Advisory Committee; Meeting**

Notice is hereby given in accordance with the Federal Advisory Committee Act, as amended, that a meeting of the National Strategic Materials and Minerals Program Advisory Committee will be held from 9:00 a.m. to 4:00 p.m. on Friday, May 25, 1984, in the Main Interior Building, 18th and C Streets NW., Washington, D.C. in Room 7000A-B. The purpose of this meeting is to present an outline as to scope and elements of the Committee mission and organization.

This meeting will be open to the public, however, facilities and space to accommodate members of the public are limited. Interested press are requested to notify the contact below of attendance.

Uncertainty of acceptance of appointment from the final member of the Committee prevented the committee meeting notice to be published at least 15 days prior to the meeting.

Further information concerning this meeting may be obtained from Wayne Marchant, Executive Director, National Strategic Materials and Minerals

Program Advisory Committee, 18th and C Streets NW., Washington, D.C. 20240 (202-343-5791).

Dated: May 15, 1984.

Ann Dore McLaughlin,

*Under Secretary, U.S. Department of the Interior.*

**Preliminary Agenda**

9:00 a.m., May 25, 1984

Room 7000A-B, Department of the Interior

*Morning: Government Perspective*

8:30   Coffee and registration

9:30   Secretary Clark (15')
  Background; overview; charter; National Security implications; EEZ; expectations; introduce Chairman Mott.

9:15   Assistant Secretary Broadbent (15')
  President's plan:
  —what was promised
  —what has been accomplished
  —what remains
  introduce agency representatives; cite committee members' concerns.

9:30   Admiral Mott (20')
  Broad outline as to scope and subelements of Committee mission, organization of effort, and timetable (all to be amplified during PM session.) Introduction of first agency briefer.

9:50   Department of Defense representative (20')
  National Security and Defense requirements, actions.

10:10   FEMA representative (20')
  Annual Materials Plan process & organization; status of Stockpile goals and disposition/acquisition activities; Defense Production Act (DPA).

10:30   Break (15')

10:45   Department of Commerce representative (20')
  Commerce overview: trade policy factors; stockpile reviews; industrial sectors case studies; DPA Title I activities.

11:05   Department of the Interior (40')
  Bureau of Mines (10')—Domestic & International minerals perspectives; R & D
  U.S. Geological Survey (10')—EEZ; geologic reserves
  Assistant Secretary—Land and Minerals Management (10')—Withdrawals; EEZ and OCS leasing; onshore leasing
  Bureau of Indian Affairs (10')—Minerals on Indian lands; availability; legality of extraction, etc.

11:45   Lunch
  (Vans at C Street entrance).
  Metropolitan Club, courtesy of

National Strategy Information Center.

*Afternoon: Members' Perspectives*

1:30   Committee Members (60')
  OPEN: Discussion by Members
  —private sector concerns;
  —State and local issues; etc.

2:30   W. C. Mott and Members (45') (2:45: 15 minute break)
  Select issues for attack;
  Appoint lead members; formulate strategies; identify product and timetable, etc.

3:30   Wrapup; "housekeeping;"

4:00   Adjourn (FIRM)
  (Vans at C Street Entrance; one to National Airport, one to Dulles Airport).

[FR Doc. 84-13552 Filed 5-18-84; 8:45 am]

**BILLING CODE 4310-10-M**

---

**Bureau of Land Management**

[C-7-84; C-10-84]

**California; Filing of Plat of Survey**

May 11, 1984.

1. This plat of survey of the following described land will be officially filed in the California State Office, Sacramento, California, immediately:

Mount Diablo Meridian, Siskiyou/Madera Counties

T. 45 N., R. 7 W.

T. 9 S., R. 22 E.

2. These supplemental plats of (2) Section 6, Township 9 South, Range 22 East, Mount Diablo Meridian, and (2) Section 1, Township 45 North, Range 7 West, Mount Diablo Meridian, California, were accepted May 2, 1984.

3. These plats will immediately become the basic record for describing the land for all authorized purposes. These plats have been placed in the open files and are available to the public for information only.

4. These supplemental plats were executed to meet certain administrative needs of the Bureau.

5. All inquiries relating to this land should be sent to the California State Office, Bureau of Land Management, Federal Office Building, 2800 Cottage Way, Room E-2841, Sacramento, California 95825.

Herman J. Lyttge,

*Chief, Records & Information Section.*

[FR Doc. 84-13579 Filed 5-18-84; 8:45 am]

**BILLING CODE 4310-40-M**

(4310-70)

Office of the Secretary
(516 DM 6, Appendix 7)
**National Environmental Policy Act**
Revised Implementing Procedures

**AGENCY:** Department of the Interior

**ACTION:** Notice of revised instructions for the National Park Service

**SUMMARY:** This notice announces a revised appendix to the Department's National Environmental Policy Act (NEPA) procedures for the National Park Service (NPS). The revised appendix includes instructions for traditional NPS functions and for functions assumed by NPS with the abolishment of the Heritage Conservation and Recreation Service (HCRS). It replaces the present Appendices 3 and 7 to Chapter 6 of part 516 of the Departmental Manual (516 DM 6) which prescribes the Department's NEPA procedures. The Department's procedures were published in the <u>Federal Register</u> on April 23, 1980 (45 FR 27541) and revised on May 21, 1984 (49 FR 21437). Appendix 3 for HCRS was published on November 20, 1980 (45 FR 76801), the current Appendix 7 for NPS was published on January 5, 1981 (46 FR 1042), and the proposed revised Appendix was published on March 12, 1984 (49 FR 9273).

**DATE:** Effective

**FOR FURTHER INFORMATION CONTACT:** Mr. Bruce Blanchard, Director of Environmental Project Review, Office of the Secretary, Department of the Interior, Washington, D.C. 20240; Telephone (202) 343-3891, FTS 343-3891. For NPS, contact Mr. David Jervis, Chief, Environmental Compliance Division, (202) 343-2163, FTS 343-2163.

**SUPPLEMENTARY INFORMATION:** This revised appendix to the Departmental Manual (516 DM 6, Appendix 7) provides specific NEPA compliance instructions to the National Park Service. In particular it provides information about NPS organizational responsibilities for NEPA compliance, advice to applicants, actions normally requiring the preparation of an EIS, and categorical exclusions from the NEPA process. The revision consolidates in one appendix the NPS NEPA responsibilities and updates and revises the instructions to reflect the NPS's continued experience with the NEPA process.

9

-2-

The appendix must be taken in conjunction with the Departmental procedures (516 DM 1-6) and the Council on Environmental Quality Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (40 CFR 1500-1508). In addition, the NPS has prepared a handbook of technical guidance, NEPA Compliance Guideline (NPS-12), on how to apply these procedures to its programs.

We received three comments on the proposed revision (49 FR 9273, March 4, 1984) from the electric utility industry which supported the categorical exclusions pertaining to transmission lines. We have added categorical exclusions for minor boundary changes (7.4A(3)) and concurrence with actions categorically excluded by other Departmental bureaus (7.4A(11)). These additions are consistent with Appendix 1 to 516 DM 2 and conform with other bureau appendices, and are subject to the exceptions to categorical exclusions contained in Appendix 2 to 516 DM 2. Other minor clarifying and technical changes have also been made to the Appendix. The Department welcomes any further comments to help improve the NEPA process in the National Park Service.

9/28/84
——————
Date

Deputy Assistant Secretary
Policy, Budget and Administration

10

516 DM 6, Appendix 7

# NATIONAL PARK SERVICE

## 7.1    NEPA Responsibilities

A.    The Director is responsible for NEPA compliance for National Park Service (NPS) activities.

B.    Regional Directors are responsible to the Director for integrating the NEPA process into all regional activities and for NEPA compliance in their regions.

C.    The Denver Service Center performs most major planning efforts for the National Park Service and integrates NEPA compliance and environmental considerations with project planning, consistent with direction and oversight provided by the appropriate Regional Director.

D.    The Environmental Compliance Division (Washington), which reports to the Associate Director - Planning and Development, serves as the focal point for all matters relating to NEPA compliance; coordinates NPS review of NEPA documents prepared by other agencies; and provides policy review and clearance for NPS EISs. Information concerning NPS NEPA documents or the NEPA process can be obtained by contacting this office.

## 7.2    Guidance to Applicants

Actions in areas of NPS jurisdiction that are initiated by private or non-Federal entities include the following:

A.    Minerals

Mineral exploration, leasing and development activities are not permitted in most units of the National Park System. There are exceptions where mineral activities are authorized by law and all mineral activities conducted under these exceptions require consultation with and evaluation by officials of the NPS and are subject to NEPA compliance. Some procedures whereby mineral activities are authorized are outlined below. For site-specific proposals, interested parties should

-2-

contact the appropriate NPS Regional Director for a determination of whether authorities for conducting other types of mineral activities in particular areas exist and, if so, how to obtain appropriate permits. For further information about NPS minerals policy, interested parties should contact the Energy, Mining and Minerals Division (Denver, Colorado).

(1)    Mining Claims and Associated Mining Operations

All units of the National Park System are closed to mineral entry under the 1872 Mining Law, and mining operations associated with mining claims are limited to the exercise of valid prior existing rights. Prior to conducting mining operations on patented or unpatented mining claims within the National Park System, operators must obtain approval of the appropriate NPS Regional Director. The Regional Directors base approvals on information submitted by potential operators that discusses the scope of the proposed operations, evaluates the potential impacts on park resources, identifies measures that will be used to mitigate adverse impacts, and meets other requirements contained in 36 CFR 9, Subpart A, which governs mining operations on mining claims under the authority of the Mining in the Parks Act of 1976.

(2)    Non-Federal Mineral Rights

Privately-held oil, gas and mineral rights on private land or split estates (Federally-owned surface estate and non-Federally owned subsurface estate) exist within some park unit boundaries. Owners of outstanding subsurface oil and gas rights are granted reasonable access on or across park units through compliance with 36 CFR 9, Subpart B. These procedures require an operator to file a plan of operations for approval by the appropriate NPS Regional Director. An approved plan of operations serves as the operator's access permit.

(3)    Federal Mineral Leasing and Mineral Operations

(a)    Leasing of Federally-owned minerals is restricted to five national recreation areas in the National Park System, where leasing is authorized in the

enabling legislation of the units. According to current regulations (43 CFR 3100.0-3(g)(4); 43 CFR 3500.0-3(c)(7)). these areas are: Lake Mead, Glen Canyon, Ross Lake, Lake Chelan and Whiskeytown National Recreation Areas. However, Lake Chelan was designated in 1981 as an "excepted area" under the regulations and is closed to mineral leasing. The Bureau of Land Management (BLM) issues leases on these lands and controls and monitors operations. Applicable general leasing and operating procedures for oil and gas are contained in 43 CFR 3100, et seq. and for minerals other than oil and gas in 43 CFR 3500, et seq. Within units of the National Park System, the NPS, as the surface management agency, must consent to the permitting and leasing of park lands and concur with operating conditions established in consultation with the BLM. Leases and permits can only be granted upon a finding by the NPS Regional Director that the activities authorized will not have a significant adverse effect on the resources and administration of the unit. The NPS can also require special lease and permit stipulations for protecting the environment and other park resources. In addition, the NPS participates with BLM in preparing environmental analyses of all proposed activities and in establishing reclamation requirements for park unit lands.

(b)    Glen Canyon National Recreation Area is the only unit of the National Park System containing special tar sands areas as defined in the Combined Hydrocarbon Leasing Act of 1981. In accordance with the requirements of this Act, the BLM has promulgated regulations governing the conversion of existing oil and gas leases located in special tar sands areas to combined hydrocarbon (oil, gas and tar sands) leases and for instituting a competitive combined hydrocarbon leasing program in the special tar sands areas. Both of these activities, lease conversions and new leasing, may occur within the Glen Canyon NRA provided that they take place commensurate with the unit's minerals management plan and that the Regional Director of the NPS makes a finding of no significant adverse impact on the resources and administration of the unit or on other contiguous units of the National Park System. If the Regional Director does not make such a finding, then the BLM cannot authorize lease conversions or issue new leases

-4-

within the Glen Canyon NRA. The applicable regulations are contained in 43 CFR Parts 3140.7 and 3141.4-2, respectively. Intra-Departmental procedures for processing conversion applications have been laid out in a Memorandum of Understanding (MOU) between the BLM and the NPS. For additional information about combined hydrocarbon leasing, interested parties should contact the Energy Mining and Minerals Division (Denver, Colorado).

B.     Grazing

Grazing management plans for NPS units subject to legislatively-authorized grazing are normally prepared by the NPS or jointly with the BLM. Applicants for grazing allotments must provide the NPS and/or the BLM with such information as may be required to enable preparation of environmental documents on grazing management plans.

Grazing is also permitted in some NPS areas as a condition of land acquisition in instances where grazing rights were held prior to Federal acquisition. The availability of these grazing rights is limited and information should be sought through individual Park Superintendents.

C.     Permits, Rights-of-Way, and Easements for Non-Park Uses

Informational requirements are determined on a case-by-case basis, and applicants should consult with the Park Superintendent before making formal applica-tion. The applicant must provide sufficient information on the proposed non-park use, as well as park resources and resource-related values to be affected directly and indirectly by the proposed use in order to allow the Service to evaluate the application, assess the impact of the proposed use on the NPS unit and other environmental values, develop restrictions/stipulations to mitigate adverse impacts, and reach a final decision on issuance of the instrument. Authorities for such permits, rights-of-way, etc., are found in the enabling legislation for individual National Park System units and 16 U.S.C. 5 and 79 and 23 U.S.C. 317. Right-of-way and easement regulations are found at 36 CFR 14.

-5-

Policies concerning regulation of special uses are described in the NPS Management Policies Notebook.

D.    Archaeological Permits

Permits for the excavation or removal of archaeological resources on public and Indian lands owned or administered by the Department of the Interior, and by other agencies that may delegate this responsibility to the Secretary, are issued by the Director of the NPS.   These permits are required pursuant to the Archaeological Resources Protection Act of 1979 (P.L. 96-95) and implementing regulations (43 CFR 7), whenever materials of archaeological interest are to be excavated or removed.  These permits are not required for archaeological work that does not result in any subsurface testing and does not result in the collection of any surface or subsurface archaeological materials.   Applicants should contact the Departmental Consulting Archeologist in Washington about these permits.

E.    Federal Aid

The NPS administers financial and land grants to States, local governments and private organizations/individuals for outdoor recreation acquisition, development and planning (Catalog of Federal Domestic Assistance (CFDA #15.916), historic preservation (CFDA #15.904), urban park and recreation recovery (CFDA #15.919) and Federal surplus real property for park, recreation and historic monument use (CFDA #15.403).

The following program guidelines and regulations list environmental requirements which applicants must meet:

(1)    Land and Water Conservation Fund Grants Manual, Part 650.2;

(2)    Historic Preservation Grants-in-Aid Manual, Chapter 4;

(3)    Urban Park and Recreation Recovery Guidelines, NPS-37;

(4)    Policies and Responsibilities for Conveying Federal Surplus Property (draft) Manual, Part 271.

15

-6-

Copies of documents related to the Land and Water Conservation Fund and the Historic Preservation Fund have been provided to all State Liaison Officers for outdoor recreation and all State Historic Preservation Officers. Copies of these and documents related to the Urban Park and Recreation Recovery Program are available for inspection in each NPS Regional Office as well as the NPS Office of Public Affairs in Washington, D.C.

Many State agencies which seek NPS grants may prepare related EISs pursuant to Section 102(2)(D) of NEPA. Such agencies should consult with the appropriate NPS Regional Office.

F.    Conversion of Acquired and Developed Recreation Lands

The NPS must approve the conversion of certain acquired and developed lands prior to conversion. These include:

(1)    All State and local lands and interests therein, and certain Federal lands under lease to the States, acquired or developed in whole or in part with monies from the Land and Water Conservation Fund Act are subject to Section 6(f) of the Act which requires approval of conversion of use.

(2)    All recreation areas and facilities (as defined in Section 1004), developed or improved, in whole or in part, with a grant under the Urban Park and Recreation Recovery Act of 1978 (P.L. 95-625, Title 10) are subject to Section 1010 of the Act which requires approval for a conversion to other than public recreation uses.

(3)    Most Federal surplus real property which has been conveyed to State and local governments for use as recreation demonstration areas, historic monuments or public park and recreation areas (under the Recreation Demonstration Act of 1942 or the Federal Property and Administrative Services Act of 1949, as amended) are subject to approval of conversion of use.

16

(4)    All abandoned railroad rights-of-way acquired by State and local governments for recreational and/or conservation uses with grants under Section 809(b) of the Railroad Revitalization and Regulatory Reform Act of 1976, are subject to approval of conversion of use.

Application for approval of conversion of the use of these lands must be submitted to the appropriate Regional Director of the NPS. Early consultation with the Regional Office is encouraged to insure that the application is accompanied by any required environmental documentation. If the property was acquired through the Land and Water Conservation Fund, then the application must be submitted through the appropriate State Liaison Officer for Outdoor Recreation. If the property was acquired under the Federal Property and Administrative Services Act of 1949, as amended, approval of an application for conversion of use must also be concurred in by the General Services Administration.

## 7.3    Major Actions Normally Requiring Environmental Impact Statements

A.    The following types of NPS proposals will normally require the preparation of an EIS:

(1)    Wild and Scenic River proposals;

(2)    National Trail proposals;

(3)    Wilderness proposals;

(4)    General Management Plans for major National Park System units;

(5)    Grants, including multi-year grants, whose size and/or scope will result in major natural or physical changes, including interrelated social and economic changes and residential and land use changes within the project area or its immediate environs.

-8-

(6)    Grants which foreclose other beneficial uses of mineral, agricultural, timber, water, energy or transportation resources important to National or State welfare.

B.    If for any of these proposals it is initially decided not to prepare an EIS, an EA will be prepared and made available for public review in accordance with Section 1501.4(e)(2).

## 7.4    Categorical Exclusions

In addition to the actions listed in the Departmental categorical exclusions in Appendix 1 of 516 DM 2, many of which the Service also performs, the following NPS actions are designated categorical exclusions unless the action qualifies as an exception under Appendix 2 to 516 DM 2:

A.    Actions Related to General Administration

(1)    Changes or amendments to an approved action when such changes would cause no or only minimal environmental impact.

(2)    Land and boundary surveys.

(3)    Minor boundary changes.

(4)    Reissuance/renewal of permits, rights-of-way or easements not involving new environmental impacts.

(5)    Conversion of existing permits to rights-of-way, when such conversions do not continue or initiate unsatisfactory environmental conditions.

(6)    Issuances, extensions, renewals, reissuances or minor modifications of concession contracts or permits not entailing new construction.

(7)    Commercial use licenses involving no construction.

(8)    Leasing of historic properties in accordance with 36 CFR 18 and NPS-38.

18

(9)    Preparation and issuance of publications.

(10)    Modifications or revisions to existing regulations, or the promulgation of new regulations for NPS-administered areas, provided the modifications, revisions or new regulations do not:

(a)    Increase public use to the extent of compromising the nature and character of the area or causing physical damage to it;

(b)    Introduce noncompatible uses which might compromise the nature and characteristics of the area, or cause physical damage to it;

(c)    Conflict with adjacent ownerships or land uses; or

(d)    Cause a nuisance to adjacent owners or occupants.

(11)    At the direction of the NPS responsible official, actions where NPS has concurrence or coapproval with another bureau and the action is a categorical exclusion for that bureau.

B.    Plans, Studies and Reports

(1)    Changes or amendments to an approved plan, when such changes would cause no or only minimal environmental impact.

(2)    Cultural resources maintenance guides, collection management plans and historic furnishings reports.

(3)    Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).

(4)    Plans, including priorities, justifications and strategies, for non-manipulative research, monitoring, inventorying and information gathering.

(5)    Statements for management, outlines of planning requirements and task directives for plans and studies.

(6)    Technical assistance to other Federal, State and local agencies or the general public.

18

(7)      Routine reports required by law or regulation.

(8)      Authorization, funding or approval for the preparation of Statewide Comprehensive Outdoor Recreation Plans.

(9)      Adoption or approval of surveys, studies, reports, plans and similar documents which will result in recommendations or proposed actions which would cause no or only minimal environmental impact.

(10)     Preparation of internal reports, plans, studies and other documents containing recommendations for action which NPS develops preliminary to the process of preparing a specific Service proposal or set of alternatives for decision.

(11)     Land protection plans which propose no significant change to existing land or visitor use.

(12)     Documents which interpret existing mineral management regulations and policies, and do not recommend action.

C.    Actions Related to Development

(1)      Land acquisition within established park boundaries.

(2)      Land exchanges which will not lead to significant changes in the use of land.

(3)      Routine maintenance and repairs to non-historic structures, facilities, utilities, grounds and trails.

(4)      Routine maintenance and repairs to cultural resource sites, structures, utilities and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource.

(5)      Installation of signs, displays, kiosks, etc.

(6)      Installation of navigation aids.

-11-

(7)    Establishment of mass transit systems not involving construction, experimental testing of mass transit systems, and changes in operation of existing systems (e.g., routes and schedule changes).

(8)    Replacement in kind of minor structures and facilities with little or no change in location, capacity or appearance.

(9)    Repair, resurfacing, striping, installation of traffic control devices, repair/replacement of guardrails, etc., on existing roads.

(10)    Sanitary facilities operation.

(11)    Installation of wells, comfort stations and pit toilets in areas of existing use and in developed areas.

(12)    Minor trail relocation, development of compatible trail networks on logging roads or other established routes, and trail maintenance and repair.

(13)    Upgrading or adding new overhead utility facilities to existing poles, or replacement poles which do not change existing pole line configurations.

(14)    Issuance of rights-of-way for overhead utility lines to an individual building or well from an existing line where installation will not result in significant visual intrusion and will involve no clearance of vegetation other than for placement of poles.

(15)    Issuance of rights-of-way for minor overhead utility lines not involving placement of poles or towers and not involving vegetation management or significant visual intrusion in an NPS-administered area.

(16)    Installation of underground utilities in previously disturbed areas having stable soils, or in an existing overhead utility right-of-way.

(17)    Construction of minor structures, including small improved parking lots, in previously disturbed or developed areas.

(18)    Construction or rehabilitation in previously disturbed or developed areas, required to meet health or safety regulations, or to meet requirements for making facilities accessible to the handicapped.

(19)    Landscaping and landscape maintenance in previously disturbed or developed areas.

(20)    Construction of fencing enclosures or boundary fencing posing no effect on wildlife migrations.

D.    Actions Related to Visitor Use

(1)    Carrying capacity analyses.

(2)    Minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.

(3)    Changes in interpretive and environmental education programs.

(4)    Minor changes in programs and regulations pertaining to visitor activities.

(5)    Issuance of permits for demonstrations, gatherings, ceremonies, concerts, arts and crafts shows, etc., entailing only short-term or readily mitigable environmental disturbance.

(6)    Designation of trailside camping zones with no or minimal improvements.

E.    Actions Related to Resource Management and Protection

(1)    Archeological surveys and permits, involving only surface collection or small-scale test excavations.

(2)    Day-to-day resource management and research activities.

(3)    Designation of environmental study areas and research natural areas.

(4)    Stabilization by planting native plant species in disturbed areas.

(5)    Issuance of individual hunting and/or fishing licenses in accordance with State and Federal regulations.

(6)    Restoration of noncontroversial native species into suitable habitats within their historic range, and elimination of exotic species.

(7)    Removal of park resident individuals of non-threatened/endangered species which pose a danger to visitors, threaten park resources or become a nuisance in areas surrounding a park, when such removal is included in an approved resource management plan.

(8)    Removal of non-historic materials and structures in order to restore natural conditions.

(9)    Development of standards for, and identification, nomination, certification and determination of eligibility of properties for listing in the National Register of Historic Places and the National Historic Landmark and National Natural Landmark Programs.

F.    Actions Related to Grant Programs

(1)    Proposed actions essentially the same as those listed in paragraphs A-E above.

(2)    Grants for acquisition of areas which will continue in the same or lower density use with no additional disturbance to the natural setting.

(3)    Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical or cultural resources of the area; or the integrity of the existing setting.

(4)    Grants for construction of facilities on lands acquired under a previous NPS or other Federal grant provided that the development is in accord with plans submitted with the acquisition grant.

-14-

(5)    Grants for the construction of new facilities within an existing park or recreation area, provided that the facilities will not:

(a)    conflict with adjacent ownerships or land use, or cause a nuisance to adjacent owners or occupants; e.g., extend use beyond daylight hours;

(b)    introduce motorized recreation vehicles;

(c)    introduce active recreation pursuits into a passive recreation area;

(d)    increase public use or introduce noncompatible uses to the extent of compromising the nature and character of the property or causing physical damage to it; or

(e)    add or alter access to the park from the surrounding area.

(6)    Grants for the restoration, rehabilitation, stabilization, preservation and reconstruction (or the authorization thereof) of properties listed on or eligible for listing on the National Register of Historic Places, at their same location and provided that such actions:

(a)    will not alter the integrity of the property or its setting;

(b)    will not increase public use of the area to the extent of compromising the nature and character of the property; and

(c)    will not cause a nuisance to adjacent property owners or occupants.

Case 1:06-cv-02077-TEH   Document 32-2   Filed 03/17/2008   Page 25 of 37

Department of the Interior

DEPARTMENTAL MANUAL

Environmental Quality

Part 516 National Environmental
Policy Act of 1969

Chapter 7 Prepared by Other Federal Agencies

Review of Environmental Statements

516.7.4E

E.  Draft Environmental Statements:

(1)  Draft environmental statements are prepared by Federal agencies under the provisions of Section 102(2)(C) of the National Environmental Policy Act and provisions of the Guidelines of the Council on Environmental Quality. They are officially circulated to other Federal agencies for review from their jurisdiction by law or special environmental expertise.

(2)  All requests from other Federal agencies for review of draft environmental statements shall be made through the Assistant Secretary - Program Policy. Review comments shall be handled in accordance with his instructions and the provisions of this chapter.

F.  Final Environmental Statements:

(1)  Final environmental statements are prepared by Federal agencies following receipt and consideration of review comments. They are filed with the Council on Environmental Quality and are generally circulated for information purposes and sometimes for comment.

(2)  The Assistant Secretary - Program Policy shall review final environmental statements to determine whether they reflect adequate consideration of the Department's comments. Bureaus and offices shall not comment independently on final environmental statements, but shall inform the Assistant Secretary - Program Policy of their views. Any review comments shall be handled in accordance with his instructions.

.5  Content of Review Comments on Draft Environmental Statements

A.  Departmental Comments:

(1)  Departmental comments on draft environmental statements prepared by other Federal agencies shall be based upon the Department's jurisdiction by law or special expertise with respect to the environmental impact of the proposed action or alternatives to the action. The adequacy of the statement in regard to the Act and the Council on Environmental Quality's Guidelines is the responsibility of the Federal agency that prepared the statement and any comments on its adequacy shall be limited to the Department's jurisdiction or environmental expertise.

3/15/72  (Release No. 1407)
Replaces 9/17/70  (Release No. 1222)

25

Department of the Interior
**DEPARTMENTAL MANUAL**

| Environmental Quality | Part 516 National Environmental Policy Act of 1969 |
|---|---|
| Review of Environmental Statements | |
| Chapter 7 Prepared by Other Federal Agencies | 516.7.5A (cont.) |

(2)  Reviews shall be conducted in sufficient detail to insure that both potentially beneficial and adverse environmental effects of the proposed action, including cumulative and secondary effects, are adequately identified. Wherever possible, and within the Department's competence and resources, other agencies will be advised on ways to avoid or minimize adverse impacts of the proposed action and on alternatives to the proposed action that may have been over-looked or inadequately treated.

(3)  Review comments should not capsulize or restate the environmental statement, but should provide clear, concise, substantive, and complete comments on the stated or unstated environmental impacts of the proposed action and, if appropriate, on alternatives to the action.  Comments, either positive or negative, shall be objective and constructive.

(4)  Departmental review comments shall be organized as follows:

(a)  Control Number

The Departmental review control number shall be typed in the upper lefthand corner below the Departmental seal on the letterhead page of the comments.

(b)  Introduction

The introductory paragraph shall reference the other Federal agency's review request, including the date, the type of review requested, the subject of the review, and, where appropriate, the geographic location of the subject and the other agency's control number.

(c)  General Comments, if any

This section will include those comments of a general nature and those which occur throughout the review which ought to be consolidated in order to avoid needless repetition.

3/15/72  (Release No. 1407)
Replaces 9/17/70  (Release No. 1222)

26

Case 1:06-cv-02077-TFH    Document 32-2    Filed 03/17/2008    Page 27 of 37

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 4

costs required for acquisition, development, management and operation; public, local or state interest in acting to protect and manage the river; the feasibility and timeliness of such action, etc. The preliminary assessment of suitability should be well documented. The determination of suitability will be made by the Office of the Secretary after review of the preliminary assessment and consideration of any other appropriate factors.

If the river is found ineligible, or if the Secretary finds the river nonsuitable prior to expiration of the stipulated study period, further study effort is terminated and a report documenting the basis for the determination is prepared. Normally, this report will be submitted to the President for his transmittal to Congress along with his recommendation and proposal according to Section 4(a) of the Wild and Scenic Rivers Act. Alternatively, the Secretary may utilize the report to notify the appropriate Congressional committees of his findings. As required by Section 7(b) of the Act, 180 days after notification to Congress of a determination that a river should not be included in the system, the Secretary shall publish a notice to that effect in the Federal Register. This notice also should include reference to termination of any related NEPA activity, thereby concurrently terminating activities for which a Notice of Intent had earlier been published in the Federal Register according to CEQ Regulations. While this action would preclude further consideration by the Department of protection of a river as a component of the National System, other assistance to concerned interests and jurisdictions in suggesting, developing or implementing other measures or techniques for river protection is not necessarily foreclosed.

If the Secretary uses the notification process authorized by Section 7(b)(i) of the Act to shorten the study period, he must still report to the President, and the President, in turn, to Congress as specified in Section 4(a) of the Act.

Proposal and Alternatives Considered - Formulation of Proposal and Alternatives - so that the proposal and alternatives reflect pertinent issues, conditions and needs, it is essential to begin analysis with the existing condition in order to determine the impacts of a continuation of present trends and conditions (no-action alternative). The proposal and alternatives should flow out of this analysis.

Alternatives should be developed and discussed in accordance with 40 CFR 1502.14 and will vary depending on the problems, opportunities and issues associated with each specific river area. However, every study report must present at least three classes of alternatives:

- addition of eligible and suitable river segments to the National System;

- reasonable alternative(s) for protecting the river without inclusion in the National System;

- no-action.

NEPA/COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Guideline
APPENDIX 5
Page 5

Innovative, practical and cost-effective solutions to problems, opportunities and issues should be included among the alternatives. Sufficient specific data and concise analyses here, as elsewhere, are required to facilitate comprehension and to guide decisions.

As part of the scoping process (40 CFR 1501.7) a variety of possible alternatives may be suggested. Additional alternatives may be advanced by the public and other agencies at other junctures in the planning process, e.g., review of the draft study/NEPA document. From these a set of reasonable alternatives will be selected for rigorous exploration and objective evaluation. Consistent with 40 CFR 1502.14(a), those alternatives which are eliminated from detailed study will be discussed briefly and the reasons for their having been eliminated described. Reasons for eliminating alternatives from detailed study can include: (1) conflict with the intent and purposes of the Wild and Scenic Rivers Act or other pertinent statutes and regulations; (2) costs related to establishment or annual operation and maintenance (for local, State or Federal governments); and (3) nonsuitable utilization of land and water resources.

Alternatives other than no-action should clearly address the factors involved in their implementation, including means of administration and costs. Costs should include operation and maintenance costs as well as those for development and acquisition. Costs will reflect the size and composition of projected operational staff and the extent of necessary facilities and development.

The Affected Environment - Descriptions and illustrations should be included only to the extent necessary for understanding the issues, proposal and alternatives, and differences in environmental impacts among the alternatives for the river area and for the following subjects:

Natural Resources - Content should be limited to brief statements about the scenery, geology, plants and animals (including any endangered species) and similar values for those resources that would be affected by the proposal and alternatives.

Cultural Resources - If applicable, include a brief description of the condition, significance and use of cultural resources within the river area.

Existing Public Use - Describe the quantity and type of public use, including periods during the year when it occurs.

Status of Land Ownership and Use - Show specific information on maps and briefly describe by category, e.g., private, public, and commercial, agricultural, residential, etc.

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Environmental and Economic Consequences. Environmental consequences should be evaluated according to 40 CFR 1502.16. The proposal and alternatives should be evaluated equally and through analysis that is objective rather than subjective or conjectural. In addition to concise text describing the environmental and economic consequences of the proposal and each alternative, this section should conclude with a summary tabular presentation by alternative so that the current and reasonably foreseeable uses of the affected environment which would be enhanced, foreclosed, or curtailed are measured, valued and specified in terms appropriate for a basis of decision.

It is important to contact appropriate Federal, State and local agencies (e.g., COE, FERC, SCS, State/local departments of parks and recreation) to determine what current uses as well as potential future uses might be affected by a designation or an alternative to designation. Effects may result upstream as well as downstream of a designation; thus the area of the affected environment must be carefully determined.

List of Preparers (516 DM 4.6B; 40 CFR 1502.17).

List of Agencies, Organizations, and Persons to Whom Copies of the Statement Were Sent (40 CFR 1502.10) In accordance with 516 DM 4.6C, this section also should briefly describe consultation and coordination efforts with the public.

Index (40 CFR 1502.10).

Appendices (516 DM 4.11; 40 CFR 1502.18).

C. National Trail Studies

National Trail Studies should be combined with an EA or EIS (as appropriate) in the following format.

Title Page/Cover Sheet containing all the information required by 40 CFR 1502.11.

Summary as required by 40 CFR 1502.12. Content should be a clear, comprehensive description distilled from pertinent sections of the study document to provide a briefing on those factors which constitute the basis for decision.

Table of Contents.

Purpose of the Study and Characteristics Which Make the Trail Route a Worthy Addition to the National Trails System - This evaluation is conducted as an initial part of the study effort. First it is determined if the trail route or any part thereof is eligible for addition to the National System (i.e., for National Scenic Trails - whether the extended trail route is so located as to provide for maximum outdoor recreation potential and for the conservation and enjoyment of the nationally significant scenic, historic, natural or

---

cultural qualities of the area through which it passes; for National Historic
Trails - the route must have been established by historic use and be
historically significant with respect to a broad facet of American history;
and have significant potential for public recreational use of historic
interest based on historic interpretation and appreciation).

In addition, a determination must be made as to whether a potential National
Scenic or National Historic Trail route found eligible for inclusion in the
national system should be proposed for inclusion on the basis of feasibility
and desirability. Determinations of feasibility and desirability are made
through consultation and coordination with Federal agencies administering
lands through which the trail would pass and with affected State and local
Government agencies, public and private organizations, and landowners and
users. Factors considered include but are not limited to costs of establish-
ment and operation, competing or conflicting land uses, existing supply of
public trail opportunity and support by entities which would be affected were
the trail established.

Characteristics which make the trail route eligible for inclusion in the
system and the factors related to the feasibility and desirability of inclusion
should be documented in the study report.

Proposal and Alternatives Considered - Formulation of Proposal and
Alternatives - So that the proposal and alternatives reflect pertinent issues,
conditions and needs, it is essential to begin analysis with the existing
condition in order to determine the impacts of a continuation of present
trends and conditions (no-action alternative). The proposal and alternatives
should flow out of this analysis.

Alternatives should be developed and discussed in accordance with 40 CFR
1502.14 and will vary depending on the problems, opportunities and issues
associated with each specific trail route. However, every study report must
present at least three classes of alternatives:

- addition of eligible trail route segments to the National System under
  Federal and/or State administration;

- reasonable concepts for protecting the trail route without inclusion in
  the National System;

- no-action.

Innovative, practical and cost-effective solutions to problems, opportunities
and issues should be incorporated among the alternatives. Sufficient
specific data and concise analyses here, as elsewhere, are required to
facilitate comprehension of issues and to guide decisions.

As part of the scoping process (40 CFR 1501.7), a variety of possible
alternatives may be suggested. Additional alternatives may be advanced by the
public and other agencies at other junctures in the planning process, e.g.,
review of the draft study/NEPA document. From these a set of reasonable

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

Case 1:06-cv-02077-TFH    Document 32-2    Filed 03/17/2008    Page 31 of 37

APPENDIX 5
Page 8

alternatives will be selected for rigorous exploration and objective evaluation. Consistent with 40 CFR 1502.14(a), those alternatives which are eliminated from detailed study will be discussed briefly and the reasons for their being eliminated described. Reasons for eliminating alternatives from detailed study can include (1) conflict with the intent and purposes of the National Trails System Act or other pertinent statutes and regulations; (2) level of costs related to establishment and/or annual operation and maintenance (for local, State or Federal Governments); and (3) nonsuitable utilization of land and water resources.

Alternatives other than no-action should clearly address the factors involved in implementation including ways and means of administration and costs. Costs should include operation and maintenance costs as well as those for development and acquisition. Costs will reflect the size and composition of projected operational staff and the extent of necessary facilities and development.

The Affected Environment - Descriptions and illustrations should be included only to the extent necessary for understanding the issues, proposal and alternatives, and differences in environmental impacts among the alternatives for the trail route and for the following subjects:

   Natural Resources - Content should include statements about the scenery, geology, plants and animals, including any endangered species, and similar values for those resources that would be affected by the proposal and alternatives.

   Cultural Resources - If applicable, include a brief description of the condition, significance and use of cultural resources within the trail route.

   Existing Public Use - Describe the quantity and type of public use including periods during the year when it occurs.

   Status of Land Ownership and Use - Show specific information on maps and briefly describe by category, e.g., private, public, etc., and commercial, agricultural, residential, etc.

Environmental Consequences - The proposal and alternatives should be evaluated equally, and through analysis that is supported rather than conjectural, according to 40 CFR 1502.16.

In addition to concise text describing the economic and environmental consequences of the proposal and each alternative, this section concludes with a summary tabular presentation by alternative so that the reasonably foreseeable potential uses of the land and water which would be enhanced, foreclosed, or curtailed are valued, measured and specified in appropriate terms.

List of Preparers (516 DM 4.6B; 40 CFR 1502.17).

NEPA COMPLIANCE GUIDELINE
NPS-12
Approved NEPA Format Variations

List of Agencies, Organizations and Persons to Whom Copies of the
Statement Were Sent (516 DM 4.6C; 40 CFR 1502.10).

Index (40 CFR 1502.10).

Appendices (40 CFR 1502.18).

FORTY MOST ASKED QUESTIONS

CONCERNING CEQ'S NATIONAL

ENVIRONMENTAL POLICY ACT REGULATIONS

(46 FR 18026 - 46 FR 18038)

18026    Federal Register / Vol. 46, No. 55 / Monday, March 23, 1981 / Rules and Regulations

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508**

**Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations**

March 17, 1981.

**AGENCY:** Council on Environmental Quality, Executive Office of the President.

**ACTION:** Information Only: Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations.

**SUMMARY:** The Council on Environmental Quality, as part of its oversight of implementation of the National Environmental Policy Act, held meetings in the ten Federal regions with Federal, State, and local officials to discuss administration of the implementing regulations. The forty most asked questions were compiled in a memorandum to agencies for the information of relevant officials. In order efficiently to respond to public inquiries this memorandum is reprinted in this issue of the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Nicholas C. Yost, General Counsel, Council on Environmental Quality, 722 Jackson Place NW., Washington, D.C. 20006: 202–395–5750.

March 16, 1981.

Memorandum for Federal NEPA Liaisons, Federal, State, and Local Officials and Other Persons Involved in the NEPA Process

Subject: Questions and Answers About the NEPA Regulations

During June and July of 1980 the Council on Environmental Quality, with the assistance and cooperation of EPA's EIS Coordinators from the ten EPA regions, held one-day meetings with federal, state and local officials in the ten EPA regional offices around the country. In addition, on July 10, 1980, CEQ conducted a similar meeting for the Washington, D.C. NEPA liaisons and persons involved in the NEPA process. At these meetings CEQ discussed (a) the results of its 1980 review of Draft EISs issued since the July 30, 1979 effective date of the NEPA regulations, (b) agency compliance with the Record of Decision requirements in Section 1505 of the NEPA regulations, and (c) CEQ's preliminary findings on how the scoping process is working. Participants at these meetings received copies of materials prepared by CEQ summarizing its oversight and findings.

These meetings also provided NEPA liaisons and other participants with an opportunity to ask questions about NEPA and the practical application of the NEPA regulations. A number of these questions were answered by CEQ representatives at the regional meetings. In response to the many requests from the agencies and other participants, CEQ has compiled forty of the most important or most frequently asked questions and their answers and reduced them to writing. The answers were prepared by the General Counsel of CEQ in consultation with the Office of Federal Activities of EPA. These answers, of course, do not impose any additional requirements beyond those of the NEPA regulations. This document does not represent new guidance under the NEPA regulations, but rather makes generally available to concerned agencies and private individuals the answers which CEQ has already given at the 1980 regional meetings. The answers also reflect the advice which the Council has given over the past two years to aid agency staff and consultants in their day-to-day application of NEPA and the regulations.

CEQ has also received numerous inquiries regarding the scoping process. CEQ hopes to issue written guidance on scoping later this year on the basis of its special study of scoping, which is nearing completion.

Nicholas C. Yost,
*General Counsel.*

### Index

1. Range of Alternatives
2. Alternatives Outside the Capability of Applicant or Jurisdiction of Agency
3. No-Action Alternative
4. Agency's Preferred Alternative
5. Proposed Action v. Preferred Alternative
6. Environmentally Preferable Alternative
7. Difference Between Sections of EIS on Alternatives and Environmental Consequences
8. Early Application of NEPA
9. Applicant Who Needs Other Permits
10. Limitations on Action During 30-Day Review Period for Final EIS
11. Limitations on Actions by an Applicant During EIS Process
12. Effective Date and Enforceability of the Regulations
13. Use of Scoping Before Notice of Intent to Prepare EIS
14. Rights and Responsibilities of Lead and Cooperating Agencies
15. Commenting Responsibilities of EPA
16. Third Party Contracts
17. Disclosure Statement to Avoid Conflict of Interest
18. Uncertainties About Indirect Effects of A Proposal
19. Mitigation Measures
20. Worst Case Analysis
21. Combining Environmental and Planning Documents
22. State and Federal Agencies as Joint Lead Agencies
23. Conflicts of Federal Proposal With Land Use Plans, on Policies and Controls
24. Environmental Impact Statements on Policies, Plans or Programs
25. Appendices and Incorporation by Reference
26. Index and Keyword Index In EISs
27. List of Preparers
28. Advance or Xerox Copies of EIS
29. Responses to Comments
30. Adoption of EISs
31. Application of Regulations to Independent Regulatory Agencies
32. Supplements To Old EISs
33. Referrals
34. Records of Decision
35. Time Required for the NEPA Process
36. Environmental Assessments (EA)
37. Findings of No Significant Impact (FONSI)
38. Public Availability of EAs v. FONSIs
39. Mitigation Measures Imposed in EAs and FONSIs
40. Propriety of Issuing EA When Mitigation Reduces Impacts

### Questions and Answers About the NEPA Regulations (1981)

1a. Q. What is meant by "range of alternatives" as referred to in Sec. 1505.1(e)? [1]

A. The phrase "range of alternatives" refers to the alternatives discussed in environmental documents. It includes all reasonable alternatives, which must be rigorously explored and objectively evaluated, as well as those other alternatives, which are eliminated from detailed study with a brief discussion of the reasons for eliminating them. Section 1502.14. A decisionmaker must not consider alternatives beyond the range of alternatives discussed in the relevant environmental documents. Moreover, a decisionmaker must, in fact, consider all the alternatives discussed in an EIS. Section 1505.1(e).

1b. Q. How many alternatives have to be discussed when there is an infinite number of possible alternatives?

[1] References throughout the document are to the Council on Environmental Quality's Regulations For Implementing The Procedural Provisions of the National Environmental Policy Act. 40 CFR Parts 1500–1508.

35

A. For some proposals there may exist a very large or even an infinite number of possible reasonable alternatives. For example, a proposal to designate wilderness areas within a National Forest could be said to involve an infinite number of alternatives from 0 to 100 percent of the forest. When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the *full spectrum* of alternatives, must be analyzed and compared in the EIS. An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness. What constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case.

2a. Q. If an EIS is prepared in connection with an application for a permit or other federal approval, must the EIS rigorously analyze and discuss alternatives that are outside the capability of the applicant or can it be limited to reasonable alternatives that can be carried out by the applicant?

A. Section 1502.14 requires the EIS to examine all reasonable alternatives to the proposal. In determining the scope of alternatives to be considered, the emphasis is on what is "reasonable" rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are *practical or feasible* from the technical and economic standpoint and using common sense, rather than simply *desirable* from the standpoint of the applicant.

2b. Q. Must the EIS analyze alternatives outside the jurisdiction or capability of the agency or beyond what Congress has authorized?

A. An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable, although such conflicts must be considered. Section 1506.2(d). Alternatives that are outside the scope of what Congress has approved or funded must still be evaluated in the EIS if they are reasonable, because the EIS may serve as the basis for modifying the Congressional approval or funding in light of NEPA's goals and policies. Section 1500.1(a).

3. Q. What does the "no action" alternative include? If an agency is under a court order or legislative command to act, must the EIS address the "no action" alternative?

A. Section 1502.14(d) requires the alternatives analysis in the EIS to "include the alternative of no action."

There are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed. Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

Where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the "no action" alternative.

In light of the above, it is difficult to think of a situation where it would *not* be appropriate to address a "no action" alternative. Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. Section 1502.14(c). See Question 2 above. Inclusion of such an analysis in the EIS is necessary to inform the Congress, the public, and the President as intended by NEPA. Section 1500.1(a).

4a. Q. What is the "agency's preferred alternative"?

A. The "agency's preferred alternative" is the alternative which the agency believes would fulfill its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors. The concept of the "agency's preferred alternative" is different from the "environmentally preferable alternative," although in some cases one alternative may be both. See Question 6 below. It is identified so that agencies and the public can understand the lead agency's orientation.

4b. Q. Does the "preferred alternative" have to be identified in the Draft EIS and the Final EIS or just in the Final EIS?

A. Section 1502.14(e) requires the section of the EIS on alternatives to "identify the agency's preferred alternative if one or more exists, in the draft statement, and identify such alternative in the final statement . . ." This means that if the agency has a preferred alternative at the Draft EIS stage, that alternative must be labeled or identified as such in the Draft EIS. If the responsible federal official in fact has no preferred alternative at the Draft EIS stage, a preferred alternative need not be identified there. By the time the Final EIS is filed, Section 1502.14(e) presumes the existence of a preferred alternative and requires its identification in the Final EIS "unless another law prohibits the expression of such a preference."

4c. Q. Who recommends or determines the "preferred alternative?"

A. The lead agency's official with line responsibility for preparing the EIS and assuring its adequacy is responsible for identifying the agency's preferred alternative(s). The NEPA regulations do not dictate which official in an agency shall be responsible for preparation of EISs, but agencies can identify this official in their implementing procedures, pursuant to Section 1507.3.

Even though the agency's preferred alternative is identified by the EIS preparer in the EIS, the statement must be objectively prepared and not slanted to support the choice of the agency's preferred alternative over the other reasonable and feasible alternatives.

5a. Q. Is the "proposed action" the same thing as the "preferred alternative"?

A. The "proposed action" may be, but is not necessarily, the agency's "preferred alternative." The proposed action may be a proposal in its initial form before undergoing analysis in the EIS process. If the proposed action is

internally generated, such as preparing a land management plan, the proposed action might end up as the agency's preferred alternative. On the other hand the proposed action may be granting an application to a non-federal entity for a permit. The agency may or may not have a "preferred alternative" at the Draft EIS stage (see Question 4 above). In that case the agency may decide at the Final EIS stage, on the basis of the Draft EIS and the public and agency comments, that an alternative other than the proposed action is the agency's "preferred alternative."

5b. Q. Is the analysis of the "proposed action" in an EIS to be treated differently from the analysis of alternatives?

A. The degree of analysis devoted to each alternative in the EIS is to be substantially similar to that devoted to the "proposed action." Section 1502.14 is titled "Alternatives including the proposed action" to reflect such comparable treatment. Section 1502.14(b) specifically requires "substantial treatment" in the EIS of each alternative including the proposed action. This regulation does not dictate an *amount* of information to be provided, but rather, prescribes a *level of treatment*, which may in turn require varying amounts of information, to enable a reviewer to evaluate and compare alternatives.

6a. Q. What is the meaning of the term "environmentally preferable alternative" as used in the regulations with reference to Records of Decision? How is the term "environment" used in the phrase?

A. Section 1505.2(b) requires that, in cases where an EIS has been prepared, the Record of Decision (ROD) must identify all alternatives that were considered, ". . . specifying the alternative or alternatives which were considered to be environmentally preferable." The environmentally preferable alternative is the alternative that will promote the national environmental policy as expressed in NEPA's Section 101. Ordinarily, this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources.

The Council recognizes that the identification of the environmentally preferable alternative may involve difficult judgments, particularly when one environmental value must be balanced against another. The public and other agencies reviewing a Draft EIS can assist the lead agency to develop and determine environmentally

preferable alternatives by providing their views in comments on the Draft EIS. Through the identification of the environmentally preferable alternative, the decisionmaker is clearly faced with a choice between that alternative and others, and must consider whether the decision accords with the Congressionally declared policies of the Act.

6b. Q. Who recommends or determines what is environmentally preferable?

A. The agency EIS staff is encouraged to make recommendations of the environmentally preferable alternative(s) during EIS preparation. In any event the lead agency official responsible for the EIS is encouraged to identify the environmentally preferable alternative(s) in the EIS. In all cases, commentors from other agencies and the public are also encouraged to address this question. The agency must identify the environmentally preferable alternative in the ROD.

7. Q. What is the difference between the sections in the EIS on "alternatives" and "environmental consequences"? How do you avoid duplicating the discussion of alternatives in preparing these two sections?

A. The "alternatives" section is the heart of the EIS. This section rigorously explores and objectively evaluates all reasonable alternatives including the proposed action. Section 1502.14. It should include relevant comparisons on environmental and other grounds. The "environmental consequences" section of the EIS discusses the specific environmental impacts or effects of each of the alternatives including the proposed action. Section 1502.16. In order to avoid duplication between these two sections, most of the "alternatives" section should be devoted to describing and comparing the alternatives. Discussion of the environmental impacts of these alternatives should be limited to a concise descriptive summary of such impacts in a comparative form, including charts or tables, thus sharply defining the issues and providing a clear basis for choice among options. Section 1502.14. The "environmental consequences" section should be devoted largely to a scientific analysis of the direct and indirect environmental effects of the proposed action and of each of the alternatives. It forms the analytic basis for the concise comparison in the "alternatives" section.

8. Q. Section 1501.2(d) of the NEPA regulations requires agencies to provide for the early application of NEPA to cases where actions are planned by

private applicants or non-Federal entities and are, at some stage, subject to federal approval of permits, loans, loan guarantees, insurance or other actions. What must and can agencies do to apply NEPA early in these cases?

A. Section 1501.2(d) requires federal agencies to take steps toward ensuring that private parties and state and local entities initiate environmental studies as soon as federal involvement in their proposals can be foreseen. This section is intended to ensure that environmental factors are considered at an early stage in the planning process and to avoid the situation where the applicant for a federal permit or approval has completed planning and eliminated all alternatives to the proposed action by the time the EIS process commences or before the EIS process has been completed.

Through early consultation, business applicants and approving agencies may gain better appreciation of each other's needs and foster a decisionmaking process which avoids later unexpected confrontations.

Federal agencies are required by Section 1507.3(b) to develop procedures to carry out Section 1501.2(d). The procedures should include an "outreach program", such as a means for prospective applicants to conduct pre-application consultations with the lead and cooperating agencies. Applicants need to find out, in advance of project planning, what environmental studies or other information will be required, and what mitigation requirements are likely, in connection with the later federal NEPA process. Agencies should designate staff to advise potential applicants of the agency's NEPA information requirements and should publicize their pre-application procedures and information requirements in newsletters or other media used by potential applicants.

Complementing Section 1501.2(d), Section 1506.5(a) requires agencies to assist applicants by outlining the types of information required in those cases where the agency requires the applicant to submit environmental data for possible use by the agency in preparing an EIS.

Section 1506.5(b) allows agencies to authorize preparation of environmental assessments by applicants. Thus, the procedures should also include a means for anticipating and utilizing applicants' environmental studies or "early corporate environmental assessments" to fulfill some of the federal agency's NEPA obligations. However, in such cases the agency must still evaluate independently the environmental issues

and take responsibility for the environmental assessment.

These provisions are intended to encourage and enable private and other non-federal entities to build environmental considerations into their own planning processes in a way that facilitates the application of NEPA and avoids delay.

9. Q. To what extent must an agency inquire into whether an applicant for a federal permit, funding or other approval of a proposal will also need approval from another agency for the same proposal or some other related aspect of it?

A. Agencies must integrate the NEPA process into other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Specifically, the agency must "provide for cases where actions are planned by . . . applicants," so that designated staff are available to advise potential applicants of studies or other information that will foreseeably be required for the later federal action; the agency shall consult with the applicant if the agency foresees its own involvement in the proposal; and it shall insure that the NEPA process commences at the earliest possible time. Section 1501.2(d). (See Question 8.)

The regulations emphasize agency cooperation early in the NEPA process. Section 1501.6. Section 1501.7 on "scoping" also provides that all affected Federal agencies are to be invited to participate in scoping the environmental issues and to identify the various environmental review and consultation requirements that may apply to the proposed action. Further, Section 1502.25(b) requires that the draft EIS list all the federal permits, licenses and other entitlements that are needed to implement the proposal.

These provisions create an affirmative obligation on federal agencies to inquire early, and to the maximum degree possible, to ascertain whether an applicant is or will be seeking other federal assistance or approval, or whether the applicant is waiting until a proposal has been substantially developed before requesting federal aid or approval.

Thus, a federal agency receiving a request for approval or assistance should determine whether the applicant has filed separate requests for federal approval or assistance with other federal agencies. Other federal agencies that are likely to become involved should then be contacted, and the NEPA process coordinated, to insure an early and comprehensive analysis of the

direct and indirect effects of the proposal and any related actions. The agency should inform the applicant that action on its application may be delayed unless it submits all other federal applications (where feasible to do so), so that all the relevant agencies can work together on the scoping process and preparation of the EIS.

10a. Q. What actions by agencies and/or applicants are allowed during EIS preparation and during the 30-day review period after publication of a final EIS?

A. No federal decision on the proposed action shall be made or recorded until at least 30 days after the publication by EPA of notice that the particular EIS has been filed with EPA. Sections 1505.2 and 1506.10. Section 1505.2 requires this decision to be stated in a public Record of Decision.

Until the agency issues its Record of Decision, no action by an agency or an applicant concerning the proposal shall be taken which would have an adverse environmental impact or limit the choice of reasonable alternatives. Section 1506.1(a). But this does not preclude preliminary planning or design work which is needed *to support an application* for permits or assistance. Section 1506.1(d).

When the impact statement in question is a program EIS, no major action concerning the program may be taken which may significantly affect the quality of the human environment, unless the particular action is justified independently of the program, is accompanied by its own adequate environmental impact statement and will not prejudice the ultimate decision on the program. Section 1506.1(c).

10b. Q. Do these limitations on action (described in Question 10a) apply to state or local agencies that have statutorily delegated responsibility for preparation of environmental documents required by NEPA, for example, under the HUD Block Grant program?

A. Yes, these limitations do apply, without any variation from their application to federal agencies.

11. Q. What actions must a lead agency take during the NEPA process when it becomes aware that a non-federal applicant is about to take an action within the agency's jurisdiction that would either have an adverse environmental impact or limit the choice of reasonable alternatives (e.g., prematurely commit money or other resources towards the completion of the proposal)?

A. The federal agency must notify the applicant that the agency will take strong affirmative steps to insure that the objectives and procedures of NEPA

are fulfilled. Section 1506.1(b). These steps could include seeking injunctive measures under NEPA, or the use of sanctions available under either the agency's permitting authority or statutes setting forth the agency's statutory mission. For example, the agency might advise an applicant that if it takes such action the agency will not process its application.

12a. Q. What actions are subject to the Council's new regulations, and what actions are grandfathered under the old guidelines?

A. The effective date of the Council's regulations was July 30, 1979 (except for certain HUD programs under the Housing and Community Development Act, 42 U.S.C. 5304(h), and certain state highway programs that qualify under Section 102(2)(D) of NEPA for which the regulations became effective on November 30, 1979). All the provisions of the regulations are binding as of that date, including those covering decisionmaking, public participation, referrals, limitations on actions, EIS supplements, etc. For example, a Record of Decision would be prepared even for decisions where the draft EIS was filed before July 30, 1979.

But in determining whether or not the new regulations apply to the preparation of a *particular environmental document*, the relevant factor is the date of filing of the draft of that document. Thus, the new regulations do not require the redrafting of an EIS or supplement if the draft EIS or supplement was filed before July 30, 1979. However, a supplement prepared after the effective date of the regulations for an EIS issued in final before the effective date of the regulations would be controlled by the regulations.

Even though agencies are not required to apply the regulations to an EIS or other document for which the draft was filed prior to July 30, 1979, the regulations encourage agencies to follow the regulations "to the fullest extent practicable," i.e., if it is feasible to do so, in preparing the final document. Section 1506.12(a).

12b. Q. Are projects authorized by Congress before the effective date of the Council's regulations grandfathered?

A. No. The date of Congressional authorization for a project is not determinative of whether the Council's regulations or former Guidelines apply to the particular proposal. No incomplete projects or proposals of any kind are grandfathered in whole or in part. Only certain environmental documents, for which the draft was issued before the effective date of the regulations, are grandfathered and

Exhibit 2
(2 of 2)

subject to the Council's former Guidelines.

12c. Q. Can a violation of the regulations give rise to a cause of action?

A. While a trivial violation of the regulations would not give rise to an independent cause of action, such a cause of action would arise from a substantial violation of the regulations. Section 1500.3.

13. Q. Can the scoping process be used in connection with preparation of an environmental assessment, i.e., before both the decision to proceed with an EIS and publication of a notice of intent?

A. Yes. Scoping can be a useful tool for discovering alternatives to a proposal, or significant impacts that may have been overlooked. In cases where an environmental assessment is being prepared to help an agency decide whether to prepare an EIS, useful information might result from early participation by other agencies and the public in a scoping process.

The regulations state that the scoping process is to be preceded by a Notice of Intent (NOI) to prepare an EIS. But that is only the minimum requirement. Scoping may be initiated earlier, as long as there is appropriate public notice and enough information available on the proposal so that the public and relevant agencies can participate effectively.

However, scoping that is done before the assessment, and in aid of its preparation, cannot *substitute* for the normal scoping process after publication of the NOI, unless the earlier public notice stated clearly that this possibility was under consideration, *and* the NOI expressly provides that written comments on the scope of alternatives and impacts will still be considered.

14a. Q. What are the respective rights and responsibilities of lead and cooperating agencies? What letters and memoranda must be prepared?

A. After a lead agency has been designated (Sec. 1501.5), that agency has the responsibility to solicit cooperation from other federal agencies that have jurisdiction by law or special expertise on any environmental issue that should be addressed in the EIS being prepared. Where appropriate, the lead agency should seek the cooperation of state or local agencies of similar qualifications. When the proposal may affect an Indian reservation, the agency should consult with the Indian tribe. Section 1508.5. The request for cooperation should come at the earliest possible time in the NEPA process.

After discussions with the candidate cooperating agencies, the lead agency and the cooperating agencies are to

determine by letter or by memorandum which agencies will undertake cooperating responsibilities. To the extent possible at this stage, responsibilities for specific issues should be assigned. The allocation of responsibilities will be completed during scoping. Section 1501.7(a)(4).

Cooperating agencies must assume responsibility for the development of information and the preparation of environmental analyses at the request of the lead agency. Section 1501.6(b)(3). Cooperating agencies are now required by Section 1501.6 to devote staff resources that were normally primarily used to critique or comment on the Draft EIS after its preparation, much earlier in the NEPA process—primarily at the scoping and Draft EIS preparation stages. If a cooperating agency determines that its resource limitations preclude any involvement, or the degree of involvement (amount of work) requested by the lead agency, it must so inform the lead agency in writing and submit a copy of this correspondence to the Council. Section 1501.6(c).

In other words, the potential cooperating agency must decide early if it is able to devote any of its resources to a particular proposal. For this reason the regulation states that an agency may reply to a request for cooperation that "other program commitments preclude any involvement or the degree of involvement requested in the *action* that is the subject of the environmental impact statement." (Emphasis added). The regulation refers to the "action," rather than to the EIS, to clarify that the agency is taking itself out of all phases of the federal action, not just draft EIS preparation. This means that the agency has determined that it cannot be involved in the later stages of EIS review and comment, as well as decisionmaking on the proposed action. For this reason, cooperating agencies with jurisdiction by law (those which have permitting or other approval authority) cannot opt out entirely of the duty to cooperate on the EIS. See also Question 15, relating specifically to the responsibility of EPA.

14b. Q. How are disputes resolved between lead and cooperating agencies concerning the scope and level of detail of analysis and the quality of data in impact statements?

A. Such disputes are resolved by the agencies themselves. A lead agency, of course, has the ultimate responsibility for the content of an EIS. But it is supposed to use the environmental analysis and recommendations of cooperating agencies with jurisdiction by law or special expertise to the maximum extent possible, consistent

with its own responsibilities as lead agency. Section 1501.6(a)(2).

If the lead agency leaves out a significant issue or ignores the advice and expertise of the cooperating agency, the EIS may be found later to be inadequate. Similarly, where cooperating agencies have their own decisions to make and they intend to adopt the environmental impact statement and base their decisions on it, one document should include all of the information necessary for the decisions by the cooperating agencies. Otherwise they may be forced to duplicate the EIS process by issuing a new, more complete EIS or Supplemental EIS, even though the original EIS could have been prepared if it had been properly done at the outset. Thus, both lead and cooperating agencies have a stake in producing a document of good quality. Cooperating agencies also have a duty to participate fully in the scoping process to ensure that the appropriate range of issues is determined early in the EIS process.

Because the EIS is not the Record of Decision, but instead constitutes the *information* and *analysis* on which to base a decision, disagreements about conclusions to be drawn from the EIS need not inhibit agencies from issuing a joint document, or adopting another agency's EIS, if the analysis is adequate. Thus, if each agency has its own "preferred alternative," both can be identified in the EIS. Similarly, a cooperating agency with jurisdiction by law may determine in its own ROD that alternative A is the environmentally preferable action, even though the lead agency has decided in its separate ROD that Alternative B is environmentally preferable.

14c. Q. What are the specific responsibilities of federal and state cooperating agencies to review draft EISs?

A. Cooperating agencies (i.e., agencies with jurisdiction by law or special expertise) and agencies that are authorized to develop or enforce environmental standards, must comment on environmental impact statements within their jurisdiction, expertise or authority. Sections 1503.2, 1508.5. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should simply comment accordingly. Conversely, if the cooperating agency determines that a draft EIS is incomplete, inadequate or inaccurate, or it has other comments, it should promptly make such comments, conforming to the requirements of specificity in section 1503.3.

14d. Q. How is the lead agency to treat the comments of another agency with jurisdiction by law or special expertise which has failed or refused to cooperate or participate in scoping or EIS preparation?

A. A lead agency has the responsibility to respond to all substantive comments raising significant issues regarding a draft EIS. Section 1503.4. However, cooperating agencies are generally under an obligation to raise issues or otherwise participate in the EIS process during scoping and EIS preparation if they reasonably can do so. In practical terms, if a cooperating agency fails to cooperate at the outset, such as during scoping, it will find that its comments at a later stage will not be as persuasive to the lead agency.

15. Q. Are EPA's responsibilities to review and comment on the environmental effects of agency proposals under Section 309 of the Clean Air Act independent of its responsibility as a cooperating agency?

A. Yes. EPA has an obligation under Section 309 of the Clean Air Act to review and comment in writing on the environmental impact of any matter relating to the authority of the Administrator contained in proposed legislation, federal construction projects, other federal actions requiring EISs, and new regulations. 42 U.S.C. Sec. 7609. This obligation is independent of its role as a cooperating agency under the NEPA regulations.

16. Q. What is meant by the term "third party contracts" in connection with the preparation of an EIS? See Section 1506.5(c). When can "third party contracts" be used?

A. As used by EPA and other agencies, the term "third party contract" refers to the preparation of EISs by contractors paid by the applicant. In the case of an EIS for a National Pollution Discharge Elimination System (NPDES) permit, the applicant, aware in the early planning stages of the proposed project of the need for an EIS, contracts directly with a consulting firm for its preparation. See 40 C.F.R. 6.604(g). The "third party" is EPA which, under Section 1506.5(c), must select the consulting firm, even though the applicant pays for the cost of preparing the EIS. The consulting firm is responsible to EPA for preparing an EIS that meets the requirements of the NEPA regulations and EPA's NEPA procedures. It is in the applicant's interest that the EIS comply with the law so that EPA can take prompt action on the NPDES permit application. The "third party contract" method under EPA's NEPA procedures is purely voluntary, though most applicants have

found it helpful in expediting compliance with NEPA.

If a federal agency uses "third party contracting," the applicant may undertake the necessary paperwork for the solicitation of a field of candidates under the agency's direction, so long as the agency complies with Section 1506.5(c). Federal procurement requirements do not apply to the agency because it incurs no obligations or costs under the contract, nor does the agency procure anything under the contract.

17a. Q. If an EIS is prepared with the assistance of a consulting firm, the firm must execute a disclosure statement. What criteria must the firm follow in determining whether it has any "financial or other interest in the outcome of the project" which would cause a conflict of interest?

A. Section 1506.5(c), which specifies that a consulting firm preparing an EIS must execute a disclosure statement, does not define "financial or other interest in the outcome of the project." The Council interprets this term broadly to cover any known benefits other than general enhancement of professional reputation. This includes any financial benefit such as a promise of future construction or design work on the project, as well as indirect benefits the consultant is aware of (e.g., if the project would aid proposals sponsored by the firm's other clients). For example, completion of a highway project may encourage construction of a shopping center or industrial park from which the consultant stands to benefit. If a consulting firm is aware that it has such an interest in the decision on the proposal, it should be disqualified from preparing the EIS, to preserve the objectivity and integrity of the NEPA process.

When a consulting firm has been involved in developing initial data and plans for the project, but does not have any financial or other interest in the outcome of the decision, it need not be disqualified from preparing the EIS. However, a disclosure statement in the draft EIS should clearly state the scope and extent of the firm's prior involvement to expose any potential conflicts of interest that may exist.

17b. Q. If the firm in fact has no promise of future work or other interest in the outcome of the proposal, may the firm later bid in competition with others for future work on the project if the proposed action is approved?

A. Yes.

18. Q. How should uncertainties about indirect effects of a proposal be addressed, for example, in cases of disposal of federal lands, when the

identity or plans of future landowners is unknown?

A. The EIS must identify all the indirect effects that are known, and make a good faith effort to explain the effects that are not known but are "reasonably foreseeable." Section 1508.8(b). In the example, if there is total uncertainty about the identity of future land owners or the nature of future land uses, then of course, the agency is not required to engage in speculation or contemplation about their future plans. But, in the ordinary course of business, people do make judgments based upon reasonably foreseeable occurrences. It will often be possible to consider the likely purchasers and the development trends in that area or similar areas in recent years; or the likelihood that the land will be used for an energy project, shopping center, subdivision, farm or factory. The agency has the responsibility to make an informed judgment, and to estimate future impacts on that basis, especially if trends are ascertainable or potential purchasers have made themselves known. The agency cannot ignore these uncertain, but probable, effects of its decisions.

19a. Q. What is the scope of mitigation measures that must be discussed?

A. The mitigation measures discussed in an EIS must cover the range of impacts of the proposal. The measures must include such things as design alternatives that would decrease pollution emissions, construction impacts, esthetic intrusion, as well as relocation assistance, possible land use controls that could be enacted, and other possible efforts. Mitigation measures must be considered even for impacts that by themselves would not be considered "significant." Once the proposal itself is considered as a whole to have significant effects, all of its specific effects on the environment (whether or not "significant") must be considered, and mitigation measures must be developed where it is feasible to do so. Sections 1502.14(f), 1502.16(h), 1508.14.

19b. Q. How should an EIS treat the subject of available mitigation measures that are (1) outside the jurisdiction of the lead or cooperating agencies, or (2) unlikely to be adopted or enforced by the responsible agency?

A. All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies, and thus would not be committed as part of the RODs of these agencies. Sections 1502.16(h), 1505.2(c). This will serve to

alert agencies or officials who can implement these extra measures, and will encourage them to do so. Because the EIS is the most comprehensive environmental document, it is an ideal vehicle in which to lay out not only the full range of environmental impacts but also the full spectrum of appropriate mitigation.

However, to ensure that environmental effects of a proposed action are fairly assessed, the probability of the mitigation measures being implemented must also be discussed. Thus the EIS and the Record of Decision should indicate the likelihood that such measures will be adopted or enforced by the responsible agencies. Sections 1502.16(h), 1505.2. If there is a history of nonenforcement or opposition to such measures, the EIS and Record of Decision should acknowledge such opposition or nonenforcement. If the necessary mitigation measures will not be ready for a long period of time, this fact, of course, should also be recognized.

20a. Q. When must a worst case analysis be included in an EIS?

A. If there are gaps in relevant information or scientific uncertainty pertaining to an agency's evaluation of significant adverse impacts on the human environment, an agency must make clear that such information is lacking or that the uncertainty exists. An agency must include a worst case analysis of the potential impacts of the proposal and an indication of the probability or improbability of their occurence if (a) the information relevant to adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining the information are exorbitant, or (b) the information relevant to adverse impacts is important to the decision and the means to obtain it are not known.

NEPA requires that impact statements, at a minimum, contain information to alert the public and Congress to all known *possible* environmental consequences of agency action. Thus, one of the federal government's most important obligations is to present to the fullest extent possible the spectrum of consequences that may result from agency decisions, and the details of their potential consequences for the human environment.

20b. Q. What is the purpose of a worst case analysis? How is it formulated and what is the scope of the analysis?

A. The purpose of the analysis is to carry out NEPA's mandate for full disclosure to the public of the potential consequences of agency decisions, and

to cause agencies to consider those potential consequences when acting on the basis of scientific uncertainties or gaps in available information. The analysis is formulated on the basis of available information, using reasonable projections of the worst possible consequences of a proposed action.

For example, if there are scientific uncertainty and gaps in the available information concerning the numbers of juvenile fish that would be entrained in a cooling water facility, the responsible agency must disclose and consider the possibility of the loss of the commercial or sport fishery.

In addition to an analysis of a low probability/catastrophic impact event, the worst case analysis should also include a spectrum of events of higher probability but less drastic impact.

21. Q. Where an EIS or an EA is combined with another project planning document (sometimes called "piggybacking"), to what degree may the EIS or EA refer to and rely upon information in the project document to satisfy NEPA's requirements?

A. Section 1502.25 of the regulations requires that draft EISs be prepared concurrently and integrated with environmental analyses and related surveys and studies required by other federal statutes. In addition, Section 1506.4 allows any environmental document prepared in compliance with NEPA to be combined with any other agency document to reduce duplication and paperwork. However, these provisions were not intended to authorize the preparation of a short summary or outline EIS, attached to a detailed project report or land use plan containing the required environmental impact data. In such circumstances, the reader would have to refer constantly to the detailed report to understand the environmental impacts and alternatives which should have been found in the EIS itself.

The EIS must stand on its own as an analytical document which fully informs decisionmakers and the public of the environmental effects of the proposal and those of the reasonable alternatives. Section 1502.1. But, as long as the EIS is clearly identified and is self-supporting, it can be physically included in or attached to the project report or land use plan, and may use attached report material as technical backup.

Forest Service environmental impact statements for forest management plans are handled in this manner. The EIS identifies the agency's preferred alternative, which is developed in detail as the proposed management plan. The detailed proposed plan accompanies the EIS through the review process, and the

documents are appropriately cross-referenced. The proposed plan is useful for EIS readers as an example, to show how one choice of management options translates into effects on natural resources. This procedure permits initiation of the 90-day public review of proposed forest plans, which is required by the National Forest Management Act.

All the alternatives are discussed in the EIS, which can be read as an independent document. The details of the management plan are not repeated in the EIS, and vice versa. This is a reasonable functional separation of the documents: the EIS contains information relevant to the choice among alternatives; the plan is a detailed description of proposed management activities suitable for use by the land managers. This procedure provides for concurrent compliance with the public review requirements of both NEPA and the National Forest Management Act.

Under some circumstances, a project report or management plan may be totally merged with the EIS, and the one document labeled as both "EIS" and "management plan" or "project report." This may be reasonable where the documents are short, or where the EIS format and the regulations for clear, analytical EISs also satisfy the requirements for a project report.

22. Q. May state and federal agencies serve as joint lead agencies? If so, how do they resolve law, policy and resource conflicts under NEPA and the relevant state environmental policy act? How do they resolve differences in perspective where, for example, national and local needs may differ?

A. Under Section 1501.5(b), federal, state or local agencies, as long as they include at least one federal agency, may act as joint lead agencies to prepare an EIS. Section 1506.2 also strongly urges state and local agencies and the relevant federal agencies to cooperate fully with each other. This should cover joint research and studies, planning activities, public hearings, environmental assessments and the preparation of joint EISs under NEPA and the relevant "little NEPA" state laws, so that one document will satisfy both laws.

The regulations also recognize that certain inconsistencies may exist between the proposed federal action and any approved state or local plan or law. The joint document should discuss the extent to which the federal agency would reconcile its proposed action with such plan or law. Section 1506.2(d). (See Question 23).

Because there may be differences in perspective as well as conflicts among

federal, state and local goals for resources management. The Council has advised participating agencies to adopt a flexible, cooperative approach. The joint EIS should reflect all of their interests and missions, clearly identified as such. The final document would then indicate how state and local interests have been accommodated, or would identify conflicts in goals (e.g., how a hydroelectric project, which might induce second home development, would require new land use controls). The EIS must contain a complete discussion of scope and purpose of the proposal, alternatives, and impacts so that the discussion is adequate to meet the needs of local, state and federal decisionmakers.

23a. Q. How should an agency handle potential conflicts between a proposal and the objectives of Federal, state or local land use plans, policies and controls for the area concerned? See Sec. 1502.16(c).

A. The agency should first inquire of other agencies whether there are any potential conflicts. If there would be immediate conflicts, or if conflicts could arise in the future when the plans are finished (see Question 23(b) below), the EIS must acknowledge and describe the extent of those conflicts. If there are any possibilities of resolving the conflicts, these should be explained as well. The EIS should also evaluate the seriousness of the impact of the proposal on the land use plans and policies, and whether, or how much, the proposal will impair the effectiveness of land use control mechanisms for the area. Comments from officials of the affected area should be solicited early and should be carefully acknowleged and answered in the EIS.

23b. Q. What constitutes a "land use plan or policy" for purposes of this discussion?

A. The term "land use plans," includes all types of formally adopted documents for land use planning, zoning and related regulatory requirements. Local general plans are included, even though they are subject to future change. Proposed plans should also be addressed if they have been formally proposed by the appropriate government body in a written form, and are being actively pursued by officials of the jurisdiction. Staged plans, which must go through phases of development such as the Water Resources Council's Level A, B and C planning process should also be included even though they are incomplete.

The term "policies" includes formally adopted statements of land use policy as embodied in laws and regulations. It also includes proposals for action such as the initiation of a planning process, or a formally adopted policy statement of the local, regional or state executive branch, even if it has not yet been formally adopted by the local, regional or state legislative body.

23c. Q. What options are available for the decisionmaker when conflicts with such plans or policies are identified?

A. After identifying any potential land use conflicts, the decisionmaker must weigh the significance of the conflicts, among all the other environmental and non-environmental factors that must be considered in reaching a rational and balanced decision. Unless precluded by other law from causing or contributing to any inconsistency with the land use plans, policies or controls, the decisionmaker retains the authority to go forward with the proposal, despite the potential conflict. In the Record of Decision, the decisionmaker must explain what the decision was, how it was made, and what mitigation measures are being imposed to lessen adverse environmental impacts of the proposal, among the other requirements of Section 1505.2. This provision would require the decisionmaker to explain any decision to override land use plans, policies or controls for the area.

24a. Q. When are EISs required on policies, plans or programs?

A. An EIS must be prepared if an agency proposes to implement a specific policy, to adopt a plan for a group of related actions, or to implement a specific statutory program or executive directive. Section 1508.18. In addition, the adoption of official policy in the form of rules, regulations and interpretations pursuant to the Administrative Procedure Act, treaties, conventions, or other formal documents establishing governmental or agency policy which will substantially alter agency programs, could require an EIS. Section 1508.18. In all cases, the policy, plan, or program must have the potential for significantly affecting the quality of the human environment in order to require an EIS. It should be noted that a proposal "may exist in fact as well as by agency declaration that one exists." Section 1508.23.

24b. Q. When is an area-wide or overview EIS appropriate?

A. The preparation of an area-wide or overview EIS may be particularly useful when similar actions, viewed with other reasonably foreseeable or proposed agency actions, share common timing or geography. For example, when a variety of energy projects may be located in a single watershed, or when a series of new energy technologies may be developed through federal funding, the overview or area-wide EIS would serve as a valuable and necessary analysis of the affected environment and the potential cumulative impacts of the reasonably foreseeable actions under that program or within that geographical area.

24c. Q. What is the function of tiering in such cases?

A. Tiering is a procedure which allows an agency to avoid duplication of paperwork through the incorporation by reference of the general discussions and relevant specific discussions from an environmental impact statement of broader scope into one of lesser scope or vice versa. In the example given in Question 24b, this would mean that an overview EIS would be prepared for all of the energy activities reasonably foreseeable in a particular geographic area or resulting from a particular development program. This impact statement would be followed by site-specific or project-specific EISs. The tiering process would make each EIS of greater use and meaning to the public as the plan or program develops, without duplication of the analysis prepared for the previous impact statement.

25a. Q. When is it appropriate to use appendices instead of including information in the body of an EIS?

A. The body of the EIS should be a succinct statement of all the information on environmental impacts and alternatives that the decisionmaker and the public need, in order to make the decision and to ascertain that every significant factor has been examined. The EIS must explain or summarize methodologies of research and modeling, and the results of research that may have been conducted to analyze impacts and alternatives.

Lengthy technical discussions of modeling methodology, baseline studies, or other work are best reserved for the appendix. In other words, if only technically trained individuals are likely to understand a particular discussion then it should go in the appendix, and a plain language summary of the analysis and conclusions of that technical discussion should go in the text of the EIS.

The final statement must also contain the agency's responses to comments on the draft EIS. These responses will be primarily in the form of changes in the document itself, but specific answers to each significant comment should also be included. These specific responses may be placed in an appendix. If the comments are especially voluminous, summaries of the comments and responses will suffice. (See Question 29 regarding the level of detail required for responses to comments.)

Case 1:06-cv-02077-TFH    Document 32-3    Filed 03/17/2008    Page 6 of 37

25b. Q. How does an appendix differ from incorporation by reference?

A. First, if at all possible, the appendix accompanies the EIS, whereas the material which is incorporated by reference does not accompany the EIS. Thus the appendix should contain information that reviewers will be likely to want to examine. The appendix should include material that pertains to preparation of a particular EIS. Research papers directly relevant to the proposal, lists of affected species, discussion of the methodology of models used in the analysis of impacts, extremely detailed responses to comments, or other information, would be placed in the appendix.

The appendix must be complete and available at the time the EIS is filed. Five copies of the appendix must be sent to EPA with five copies of the EIS for filing. If the appendix is too bulky to be circulated, it instead must be placed in conveniently accessible locations or furnished directly to commentors upon request. If it is not circulated with the EIS, the Notice of Availability published by EPA must so state, giving a telephone number to enable potential commentors to locate or request copies of the appendix promptly.

Material that is not directly related to preparation of the EIS should be incorporated by reference. This would include other EISs, research papers in the general literature, technical background papers or other material that someone with technical training could use to evaluate the analysis of the proposal. These must be made available, either by citing the literature, furnishing copies to central locations, or sending copies directly to commentors upon request.

Care must be taken in all cases to ensure that material incorporated by reference, and the occasional appendix that does not accompany the EIS, are in fact available for the full minimum public comment period.

26a. Q. How detailed must an EIS index be?

A. The EIS index should have a level of detail sufficient to focus on areas of the EIS of reasonable interest to any reader. It cannot be restricted to the most important topics. On the other hand, it need not identify every conceivable term or phrase in the EIS. If an agency believes that the reader is reasonably likely to be interested in a topic, it should be included.

26b. Q. Is a keyword index required?

A. No. A keyword index is a relatively short list of descriptive terms that identifies the key concepts or subject areas in a document. For example it could consist of 20 terms which describe

the most significant aspects of an EIS that a future researcher would need: type of proposal, type of impacts, type of environment, geographical area, sampling or modelling methodologies used. This technique permits the compilation of EIS data banks, by facilitating quick and inexpensive access to stored materials. While a keyword index is not required by the regulations, it could be a useful addition for several reasons. First, it can be useful as a quick index for reviewers of the EIS, helping to focus on areas of interest. Second, if an agency keeps a listing of the keyword indexes of the EISs it produces, the EIS preparers themselves will have quick access to similar research data and methodologies to aid their future EIS work. Third, a keyword index will be needed to make an EIS available to future researchers using EIS data banks that are being developed. Preparation of such an index now when the document is produced will save a later effort when the data banks become operational.

27a. Q. If a consultant is used in preparing an EIS, must the list of preparers identify members of the consulting firm as well as the agency NEPA staff who were primarily responsible?

A. Section 1502.17 requires identification of the names and qualifications of persons who were primarily responsible for preparing the EIS or significant background papers, including basic components of the statement. This means that members of a consulting firm preparing material that is to become part of the EIS must be identified. The EIS should identify these individuals even though the consultant's contribution may have been modified by the agency.

27b. Q. Should agency staff involved in reviewing and editing the EIS also be included in the list of preparers?

A. Agency personnel who wrote basic components of the EIS or significant background papers must, of course, be identified. The EIS should also list the technical editors who reviewed or edited the statements.

27c. Q. How much information should be included on each person listed?

A. The list of preparers should normally not exceed two pages. Therefore, agencies must determine which individuals had *primary* responsibility and need not identify individuals with minor involvement. The list of preparers should include a very brief identification of the individuals involved, their qualifications (expertise, professional disciplines) and the specific portion of the EIS for which they are responsible. This may be done in tabular

form to cut down on length. A line or two for each person's qualifications should be sufficient.

28. Q. May an agency file xerox copies of an EIS with EPA pending the completion of printing the document?

A. Xerox copies of an EIS may be filed with EPA prior to printing only if the xerox copies are simultaneously made available to other agencies and the public. Section 1506.9 of the regulations, which governs EIS filing, specifically requires Federal agencies to file EISs with EPA no earlier than the EIS is distributed to the public. However, this section does not prohibit xeroxing as a form of reproduction and distribution. When an agency chooses xeroxing as the reproduction method, the EIS must be clear and legible to permit ease of reading and ultimate microfiching of the EIS. Where color graphs are important to the EIS, they should be reproduced and circulated with the xeroxed copy.

29a. Q. What response must an agency provide to a comment on a draft EIS which states that the EIS's methodology is inadequate or inadequately explained? For example, what level of detail must an agency include in its response to a simple postcard comment making such an allegation?

A. Appropriate responses to comments are described in Section 1503.4. Normally the responses should result in changes in the text of the EIS, not simply a separate answer at the back of the document. But, in addition, the agency must state what its response was, and if the agency decides that no substantive response to a comment is necessary, it must explain briefly why.

An agency is not under an obligation to issue a lengthy reiteration of its methodology for any portion of an EIS if the only comment addressing the methodology is a simple complaint that the EIS methodology is inadequate. But agencies must respond to comments, however brief, which are specific in their criticism of agency methodology. For example, if a commentor on an EIS said that an agency's air quality dispersion analysis or methodology was inadequate, and the agency had included a discussion of that analysis in the EIS, little if anything need be added in response to such a comment. However, if the commentor said that the dispersion analysis was inadequate because of its use of a certain computational technique, or that a dispersion analysis was inadequately explained because computational techniques were not included or referenced, then the agency would have to respond in a substantive and meaningful way to such a comment.

If a number of comments are identical or very similar, agencies may group the comments and prepare a single answer for each group. Comments may be summarized if they are especially voluminous. The comments or summaries must be attached to the EIS regardless of whether the agency believes they merit individual discussion in the body of the final EIS.

29b. Q. How must an agency respond to a comment on a draft EIS that raises a new alternative not previously considered in the draft EIS?

A. This question might arise in several possible situations. First, a commentor on a draft EIS may indicate that there is a possible alternative which, in the agency's view, is not a reasonable alternative. Section 1502.14(a). If that is the case, the agency must explain why the comment does not warrant further agency response, citing authorities or reasons that support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response. Section 1503.4(a). For example, a commentor on a draft EIS on a coal fired power plant may suggest the alternative of using synthetic fuel. The agency may reject the alternative with a brief discussion (with authorities) of the unavailability of synthetic fuel within the time frame necessary to meet the need and purpose of the proposed facility.

A second possibility is that an agency may receive a comment indicating that a particular alternative, while reasonable, should be modified somewhat, for example, to achieve certain mitigation benefits, or for other reasons. If the modification is reasonable, the agency should include a discussion of it in the final EIS. For example, a commentor on a draft EIS on a proposal for a pumped storage power facility might suggest that the applicant's proposed alternative should be enhanced by the addition of certain reasonable mitigation measures, including the purchase and setaside of a wildlife preserve to substitute for the tract to be destroyed by the project. The modified alternative including the additional mitigation measures should be discussed by the agency in the final EIS.

A third slightly different possibility is that a comment on a draft EIS will raise an alternative which is a minor variation of one of the alternatives discussed in the draft EIS, but this variation was not given any consideration by the agency. In such a case, the agency should develop and evaluate the new alternative, if it is reasonable, in the final EIS. If it is qualitatively within the spectrum of

alternatives that were discussed in the draft, a supplemental draft will not be needed. For example, a commentor on a draft EIS to designate a wilderness area within a National Forest might reasonably identify a specific tract of the forest, and urge that it be considered for designation. If the draft EIS considered designation of a range of alternative tracts which encompassed forest area of similar quality and quantity, no supplemental EIS would have to be prepared. The agency could fulfill its obligation by addressing that specific alternative in the final EIS.

As another example, an EIS on an urban housing project may analyze the alternatives of constructing 2,000, 4,000, or 6,000 units. A commentor on the draft EIS might urge the consideration of constructing 5,000 units utilizing a different configuration of buildings. This alternative is within the spectrum of alternatives already considered, and, therefore, could be addressed in the final EIS.

A fourth possibility is that a commentor points out an alternative which is not a variation of the proposal or of any alternative discussed in the draft impact statement, and is a reasonable alternative that warrants serious agency response. In such a case, the agency must issue a supplement to the draft EIS that discusses this new alternative. For example, a commentor on a draft EIS on a nuclear power plant might suggest that a reasonable alternative for meeting the projected need for power would be through peak load management and energy conservation programs. If the permitting agency has failed to consider that approach in the Draft EIS, and the approach cannot be dismissed by the agency as unreasonable, a supplement to the Draft EIS, which discusses that alternative, must be prepared. (If necessary, the same supplement should also discuss substantial changes in the proposed action or significant new circumstances or information, as required by Section 1502.9(c)(1) of the Council's regulations.)

If the new alternative was not raised by the commentor during scoping, but could have been, commentors may find that they are unpersuasive in their efforts to have their suggested alternative analyzed in detail by the agency. However, if the new alternative is discovered or developed later, and it could not reasonably have been raised during the scoping process, then the agency must address it in a supplemental draft EIS. The agency is, in any case, ultimately responsible for

preparing an adequate EIS that considers all alternatives.

30. Q. When a cooperating agency with jurisdiction by law intends to adopt a lead agency's EIS and it is not satisfied with the adequacy of the document, may the cooperating agency adopt only the part of the EIS with which it is satisfied? If so, would a cooperating agency with jurisdiction by law have to prepare a separate EIS or EIS supplement covering the areas of disagreement with the lead agency?

A. Generally, a cooperating agency may adopt a lead agency's EIS without recirculating it if it concludes that its NEPA requirements and its comments and suggestions have been satisfied. Section 1506.3(a), (c). If necessary, a cooperating agency may adopt only a portion of the lead agency's EIS and may reject that part of the EIS with which it disagrees, stating publicly why it did so. Section 1506.3(a).

A cooperating agency with jurisdiction by law (e.g., an agency with independent legal responsibilities with respect to the proposal) has an independent legal obligation to comply with NEPA. Therefore, if the cooperating agency determines that the EIS is wrong or inadequate, it must prepare a supplement to the EIS, replacing or adding any needed information, and must circulate the supplement as a draft for public and agency review and comment. A final supplemental EIS would be required before the agency could take action. The adopted portions of the lead agency EIS should be circulated with the supplement. Section 1506.3(b). A cooperating agency with jurisdiction by law will have to prepare its own Record of Decision for its action, in which it must explain how it reached its conclusions. Each agency should explain how and why its conclusions differ, if that is the case, from those of other agencies which issued their Records of Decision earlier.

An agency that did not cooperate in preparation of an EIS may also adopt an EIS or portion thereof. But this would arise only in rare instances, because an agency adopting an EIS for use in its own decision normally would have been a cooperating agency. If the proposed action for which the EIS was prepared is substantially the same as the proposed action of the adopting agency, the EIS may be adopted as long as it is recirculated as a final EIS and the agency announces what it is doing. This would be followed by the 30-day review period and issuance of a Record of Decision by the adopting agency. If the proposed action by the adopting agency is not substantially the same as that in

the EIS (i.e., if an EIS on one action is being adapted for use in a decision on another action), the EIS would be treated as a draft and circulated for the normal public comment period and other procedures. Section 1506.3(b).

31a. Q. Do the Council's NEPA regulations apply to independent regulatory agencies like the Federal Energy Regulatory Commission (FERC) and the Nuclear Regulatory Commission?

A. The statutory requirements of NEPA's Section 102 apply to "all agencies of the federal government." The NEPA regulations implement the procedural provisions of NEPA as set forth in NEPA's Section 102(2) for all agencies of the federal government. The NEPA regulations apply to independent regulatory agencies, however, they do not direct independent regulatory agencies or other agencies to make decisions in any particular way or in a way inconsistent with an agency's statutory charter. Sections 1500.3, 1500.6, 1507.1, and 1507.3.

31b. Q. Can an Executive Branch agency like the Department of the Interior adopt an EIS prepared by an independent regulatory agency such as FERC?

A. If an independent regulatory agency such as FERC has prepared an EIS in connection with its approval of a proposed project, an Executive Branch agency (e.g., the Bureau of Land Management in the Department of the Interior) may, in accordance with Section 1506.3, adopt the EIS or a portion thereof for its use in considering the same proposal. In such a case the EIS must, to the satisfaction of the adopting agency, meet the standards for an adequate statement under the NEPA regulations (including scope and quality of analysis of alternatives) and must satisfy the adopting agency's comments and suggestions. If the independent regulatory agency fails to comply with the NEPA regulations, the cooperating or adopting agency may find that it is unable to adopt the EIS, thus forcing the preparation of a new EIS or EIS Supplement for the same action. The NEPA regulations were made applicable to all federal agencies in order to avoid this result, and to achieve uniform application and efficiency of the NEPA process.

32. Q. Under what circumstances do old EISs have to be supplemented before taking action on a proposal?

A. As a rule of thumb, if the proposal has not yet been implemented, or if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the

criteria in Section 1502.9 compel preparation of an EIS supplement.

If an agency has made a substantial change in a proposed action that is relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts, a supplemental EIS must be prepared for an old EIS so that the agency has the best possible information to make any necessary substantive changes in its decisions regarding the proposal. Section 1502.9(c).

33a. Q. When must a referral of an interagency disagreement be made to the Council?

A. The Council's referral procedure is a *pre-decision* referral process for interagency disagreements. Hence, Section 1504.3 requires that a referring agency must deliver its referral to the Council not later than 25 days after publication by EPA of notice that the final EIS is available (unless the lead agency grants an extension of time under Section 1504.3(b)).

33b. Q. May a referral be made after this issuance of a Record of Decision?

A. No, except for cases where agencies provide an internal appeal procedure which permits simultaneous filing of the final EIS and the record of decision (ROD). Section 1506.10(b)(2). Otherwise, as stated above, the process is a pre-decision referral process. Referrals must be made within 25 days after the notice of availability of the final EIS, whereas the final decision (ROD) may not be made or filed until after 30 days from the notice of availability of the EIS. Sections 1504.3(b), 1506.10(b). If a lead agency has granted an extension of time for another agency to take action on a referral, the ROD may not be issued until the extension has expired.

34a. Q. Must Records of Decision (RODs) be made public? How should they be made available?

A. Under the regulations, agencies must prepare a "concise *public* record of decision," which contains the elements specified in Section 1505.2. This public record may be integrated into any other decision record prepared by the agency, or it may be separate if decision documents are not normally made public. The Record of Decision is intended by the Council to be an environmental document (even though it is not explicitly mentioned in the definition of "environmental document" in Section 1508.10). Therefore, it must be made available to the public through appropriate public notice as required by Section 1506.6(b). However, there is no specific requirement for publication of

the ROD itself, either in the Federal Register or elsewhere.

34b. Q. May the summary section in the final Environmental Impact Statement substitute for or constitute an agency's Record of Decision?

A. No. An environmental impact statement is supposed to inform the decisionmaker before the decision is made. Sections 1502.1, 1505.2. The Council's regulations provide for a 30-day period after notice is published that the final EIS has been filed with EPA before the agency may take final action. During that period, in addition to the agency's own internal final review, the public and other agencies can comment on the final EIS prior to the agency's final action on the proposal. In addition, the Council's regulations make clear that the requirements for the summary in an EIS are not the same as the requirements for a ROD. Sections 1502.12 and 1505.2.

34c. Q. What provisions should Records of Decision contain pertaining to mitigation and monitoring?

A. Lead agencies "shall include appropriate conditions [including mitigation measures and monitoring and enforcement programs] in grants, permits or other approvals" and shall "condition funding of actions on mitigation." Section 1505.3. Any such measures that are adopted must be explained and committed in the ROD.

The reasonable alternative mitigation measures and monitoring programs should have been addressed in the draft and final EIS. The discussion of mitigation and monitoring in a Record of Decision must be more detailed than a general statement that mitigation is being required, but not so detailed as to duplicate discussion of mitigation in the EIS. The Record of Decision should contain a concise summary identification of the mitigation measures which the agency has committed itself to adopt.

The Record of Decision must also state whether all practicable mitigation measures have been adopted, and if not, why not. Section 1505.2(c). The Record of Decision must identify the mitigation measures and monitoring and enforcement programs that have been selected and plainly indicate that they are adopted as part of the agency's decision. If the proposed action is the issuance of a permit or other approval, the specific details of the mitigation measures shall then be included as appropriate conditions in whatever grants, permits, funding or other approvals are being made by the federal agency. Section 1505.3 (a), (b). If the proposal is to be carried out by the

federal agency itself, the Record of Decision should delineate the mitigation and monitoring measures in sufficient detail to constitute an enforceable commitment, or incorporate by reference the portions of the EIS that do so.

34d. Q. What is the enforceability of a Record of Decision?

A. Pursuant to generally recognized principles of federal administrative law, agencies will be held accountable for preparing Records of Decision that conform to the decisions actually made and for carrying out the actions set forth in the Records of Decision. This is based on the principle that an agency must comply with its own decisons and regulations once they are adopted. Thus, the terms of a Record of Decision are enforceable by agencies and private parties. A Record of Decision can be used to compel compliance with or execution of the mitigation measures identified therein.

35. Q. How long should the NEPA process take to complete?

A. When an EIS is required, the process obviously will take longer than when an EA is the only document prepared. But the Council's NEPA regulations encourage streamlined review, adoption of deadlines, elimination of duplicative work, eliciting suggested alternatives and other comments early through scoping, cooperation among agencies, and consultation with applicants during project planning. The Council has advised agencies that under the new NEPA regulations even large complex energy projects would require only about 12 months for the completion of the entire EIS process. For most major actions, this period is well within the planning time that is needed in any event, apart from NEPA.

The time required for the preparation of program EISs may be greater. The Council also recognizes that some projects will entail difficult long-term planning and/or the development of certain data which of necessity will require more time for the preparation of the EIS. Indeed, some proposals should be given more time for the thoughtful preparation of an EIS and development of a decision which fulfills NEPA's substantive goals.

For cases in which only an environmental assessment will be prepared, the NEPA process should take no more than 3 months, and in many cases substantially less, as part of the normal analysis and approval process for the action.

36a. Q. How long and detailed must an environmental assessment (EA) be?

A. The environmental assessment is a concise public document which has

three defined functions. (1) It briefly provides sufficient evidence and analysis for determining whether to prepare an EIS; (2) it aids an agency's compliance with NEPA when no EIS is necessary, i.e., it helps to identify better alternatives and mitigation measures; and (3) it facilitates preparation of an EIS when one is necessary. Section 1508.9(a).

Since the EA is a concise document, it should not contain long descriptions or detailed data which the agency may have gathered. Rather, it should contain a brief discussion of the need for the proposal, alternatives to the proposal, the environmental impacts of the proposed action and alternatives, and a list of agencies and persons consulted. Section 1508.9(b).

While the regulations do not contain page limits for EA's, the Council has generally advised agencies to keep the length of EAs to not more than approximately 10–15 pages. Some agencies expressly provide page guidelines (e.g., 10–15 pages in the case of the Army Corps). To avoid undue length, the EA may incorporate by reference background data to support its concise discussion of the proposal and relevant issues.

36b. Q. Under what circumstances is a lengthy EA appropriate?

A. Agencies should avoid preparing lengthy EAs except in unusual cases, where a proposal is so complex that a concise document cannot meet the goals of Section 1508.9 *and* where it is extremely difficult to determine whether the proposal could have significant environmental effects. In most cases, however, a lengthy EA indicates that an EIS is needed.

37a. Q. What is the level of detail of information that must be included in a finding of no significant impact (FONSI)?

A. The FONSI is a document in which the agency briefly explains the reasons why an action will not have a significant effect on the human environment and, therefore, why an EIS will not be prepared. Section 1508.13. The finding itself need not be detailed, but must succinctly state the reasons for deciding that the action will have no significant environmental effects, and, if relevant, must show which factors were weighted most heavily in the determination. In addition to this statement, the FONSI must include, summarize, or attach and incorporate by reference, the environmental assessment.

37b. Q. What are the criteria for deciding whether a FONSI should be made available for public review for 30 days before the agency's final

determination whether to prepare an EIS?

A. Public review is necessary, for example, (a) if the proposal is a borderline case, i.e., when there is a reasonable argument for preparation of an EIS; (b) if it is an unusual case, a new kind of action, or a precedent setting case such as a first intrusion of even a minor development into a pristine area; (c) when there is either scientific or public controversy over the proposal; or (d) when it involves a proposal which is or is closely similar to one which normally requires preparation of an EIS. Sections 1501.4(e)(2), 1508.27. Agencies also must allow a period of public review of the FONSI if the proposed action would be located in a floodplain or wetland. E.O. 11988, Sec. 2(a)(4); E.O. 11990, Sec. 2(b).

38. Q. Must (EAs) and FONSIs be made public? If so, how should this be done?

A. Yes, they must be available to the public. Section 1506.6 requires agencies to involve the public in implementing their NEPA procedures, and this includes public involvement in the preparation of EAs and FONSIs. These are public "environmental documents" under Section 1506.6(b), and, therefore, agencies must give public notice of their availability. A combination of methods may be used to give notice, and the methods should be tailored to the needs of particular cases. Thus, a Federal Register notice of availability of the documents, coupled with notices in national publications and mailed to interested national groups might be appropriate for proposals that are national in scope. Local newspaper notices may be more appropriate for regional or site-specific proposals.

The objective, however, is to notify all interested or affected parties. If this is not being achieved, then the methods should be reevaluated and changed. Repeated failure to reach the interested or affected public would be interpreted as a violation of the regulations.

39. Q. Can an EA and FONSI be used to impose enforceable mitigation measures, monitoring programs, or other requirements, even though there is no requirement in the regulations in such cases for a formal Record of Decision?

A. Yes. In cases where an environmental assessment is the appropriate environmental document, there still may be mitigation measures or alternatives that would be desirable to consider and adopt even though the impacts of the proposal will not be "significant." In such cases, the EA should include a discussion of these measures or alternatives to "assist

agency planning and decisionmaking" and to "aid an agency's compliance with [NEPA] when no environmental impact statement is necessary." Section 1501.3(b), 1508.9(a)(2). The appropriate mitigation measures can be imposed as enforceable permit conditions, or adopted as part of the agency final decision in the same manner mitigation measures are adopted in the formal Record of Decision that is required in EIS cases.

40. Q. If an environmental assessment indicates that the environmental effects of a proposal are significant but that, with mitigation, those effects may be reduced to less than significant levels, may the agency make a finding of no significant impact rather than prepare an EIS? Is that a legitimate function of an EA and scoping?

A. Mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement. Sections 1508.8, 1508.27.

If a proposal appears to have adverse effects which would be significant, and certain mitigation measures are then developed during the scoping or EA stages, the existence of such *possible* mitigation does not obviate the need for an EIS. Therefore, if scoping or the EA identifies certain mitigation possibilities without altering the nature of the overall proposal itself, the agency should continue the EIS process and submit the proposal, and the potential mitigation, for public and agency review and comment. This is essential to ensure that the final decision is based on all the relevant factors and that the full NEPA process will result in enforceable mitigation measures through the Record of Decision.

In some instances, where the proposal itself so integrates mitigation from the beginning that it is impossible to define the proposal without including the mitigation, the agency may then rely on the mitigation measures in determining that the overall effects would not be significant (e.g., where an application for a permit for a small hydro dam is based on a binding commitment to build fish ladders, to permit adequate down stream flow, and to replace any lost wetlands, wildlife habitat and recreational potential). In those instances, agencies should make the FONSI and EA available for 30 days of

public comment before taking action. Section 1501.4(e)(2).

Similarly, scoping may result in a redefinition of the entire project, as a result of mitigation proposals. In that case, the agency may alter its previous decision to do an EIS, as long as the agency or applicant resubmits the entire proposal and the EA and FONSI are available for 30 days of review and comment. One example of this would be where the size and location of a proposed industrial park are changed to avoid affecting a nearby wetland area.

[FR Doc. 81-8734 Filed 3-20-81; 8:45 am]
BILLING CODE 3125-01-M

---

# DEPARTMENT OF TRANSPORTATION

## National Highway Traffic Safety Administration

### 49 CFR Part 531

[Docket No. LVM 77-05; Notice 5]

**Passenger Automobile Average Fuel Economy Standards; Exemption From Average Fuel Economy Standards**

**AGENCY:** National Highway Traffic Safety Administration, Department of Transportation.

**ACTION:** Final decision to grant exemption from fuel economy standards.

**SUMMARY:** This notice exempts Excalibur Automobile Corporation (Excalibur) from the generally applicable average fuel economy standards of 19.0 miles per gallon (mpg) and 20.0 mpg for 1979 and 1980 model year passenger automobiles, respectively, and establishes alternative standards. The alternative standards are 11.5 mpg in the 1979 model year and 16.2 mpg in the 1980 model year.

**DATES:** The exemptions and alternative standards set forth in this notice apply in the 1979 and 1980 model years.

**FOR FURTHER INFORMATION CONTACT:** Robert Mercure, Office of Automotive Fuel Economy Standards, National Highway Traffic Safety Administration, 400 Seventh Street SW., Washington, D.C. 20590 (202-755-9384).

**SUPPLEMENTARY INFORMATION:** The National Highway Traffic Safety Administration (NHTSA) is exempting Excalibur from the generally applicable average fuel economy standards for the 1979 and 1980 model year and establishing alternative standards applicable to that company in those model years. This exemption is issued under the authority of section 502(c) of the Motor Vehicle Information and Cost

Savings Act, as amended (the Act) (15 U.S.C. 2002(c)). Section 502(c) provides that a manufacturer of passenger automobiles that manufactures fewer than 10,000 passenger automobiles annually may be exempted from the generally applicable average fuel economy standard for a particular model year if that standard is greater than the low volume manufacturer's maximum feasible average fuel economy and if the NHTSA establishes an alternative standard applicable to that manufacturer at the low volume manufacturer's maximum feasible average fuel economy. Section 502(e) of the Act (15 U.S.C. 2002(e)) requires the NHTSA to consider:

(1) Technological feasibility;

(2) Economic practicability;

(3) The effect of other Federal motor vehicle standards on fuel economy; and

(4) The need of the Nation to conserve energy.

This final rule was preceded by a notice announcing NHTSA's proposed decision to grant an exemption to Excalibur for the 1979 and 1980 model years (45 FR 50840, July 31, 1980). No comments were received during the 45-day comment period.

Based on its conclusions that it is not technologically feasible and economically practicable for Excalibur to improve the fuel economy of its 1979 and 1980 model year automobiles above an average of 11.5 and 16.2 mpg, respectively, that other Federal automobile standards did not affect achievable fuel economy beyond the extent considered in this analysis, and that the national effort to conserve energy will be negligibly affected by the granting of the requested exemptions, this agency concludes that the maximum feasible average fuel economy for Excalibur in the 1979 and 1980 model years is 11.5 mpg and 16.2 mpg, respectively. Therefore, NHTSA is exempting Excalibur from the generally applicable standards and is establishing alternative standards of 11.5 mpg for the 1979 model year and 16.2 mpg for the 1980 model year.

In consideration of the foregoing, 49 CFR Part 531 is amended by revising § 531.5(b)(5) to read as follows:

**§ 531.5   Fuel economy standards.**

* * * * *

(b) The following manufacturers shall comply with the fuel economy standards indicated below for the specified model years:

* * * *

(5) Excalibur Automobile Corporation.

## CEQ July 22, 1983, Memorandum Regarding

### GUIDANCE REGARDING NEPA REGULATIONS

---

**EXECUTIVE OFFICE OF THE PRESIDENT**
COUNCIL ON ENVIRONMENTAL QUALITY
722 JACKSON PLACE, N. W.
WASHINGTON, D. C. 20006

July 22, 1983

MEMORANDUM

FOR:      HEADS OF FEDERAL AGENCIES

FROM:     A. ALAN HILL
          CHAIRMAN

RE:       GUIDANCE REGARDING NEPA REGULATIONS

The Council on Environmental Quality (CEQ) regulations
implementing the National Environmental Policy Act (NEPA)
were issued on November 29, 1978. These regulations became
effective for, and binding upon, most federal agencies on
July 30, 1979, and for all remaining federal agencies on
November 30, 1979.

As part of the Council's NEPA oversight responsibilities it
solicited through an August 14, 1981, notice in the _Federal
Register_ public and agency comments regarding a series of
questions that were developed to provide information on the
manner in which federal agencies were implementing the CEQ
regulations. On July 12, 1982, the Council announced the
availability of a document summarizing the comments received
from the public and other agencies and also identifying
issue areas which the Council intended to review. On August
12, 1982, the Council held a public meeting to address those
issues and hear any other comments which the public or other
interested agencies might have about the NEPA process. The
issues addressed in this guidance were identified during
this process.

There are many ways in which agencies can meet their
responsibilities under NEPA and the 1978 regulations. The
purpose of this document is to provide the Council's
guidance on various ways to carry out activities under the
regulations.

Attachment

---

49

**EXECUTIVE OFFICE OF THE PRESIDENT**
COUNCIL ON ENVIRONMENTAL QUALITY
722 JACKSON PLACE, N W
WASHINGTON, D. C. 20006

July 22, 1983

<u>MEMORANDUM</u>

FOR:        HEADS OF FEDERAL AGENCIES

FROM:       A. ALAN HILL
            CHAIRMAN

RE:         GUIDANCE REGARDING NEPA REGULATIONS

The Council on Environmental Quality (CEQ) regulations
implementing the National Environmental Policy Act (NEPA)
were issued on November 29, 1978.  These regulations became
effective for, and binding upon, most federal agencies on
July 30, 1979, and for all remaining federal agencies on
November 30, 1979.

As part of the Council's NEPA oversight responsibilities it
solicited through an August 14, 1981, notice in the <u>Federal</u>
<u>Register</u> public and agency comments regarding a series of
questions that were developed to provide information on the
manner in which federal agencies were implementing the CEQ
regulations.  On July 12, 1982, the Council announced the
availability of a document summarizing the comments received
from the public and other agencies and also identifying
issue areas which the Council intended to review.  On August
12, 1982, the Council held a public meeting to address those
issues and hear any other comments which the public or other
interested agencies might have about the NEPA process.  The
issues addressed in this guidance were identified during
this process.

There are many ways in which agencies can meet their
responsibilities under NEPA and the 1978 regulations.  The
purpose of this document is to provide the Council's
guidance on various ways to carry out activities under the
regulations.

Attachment

5C

## SCOPING

The Council on Environmental Quality (CEQ) regulations
direct federal agencies which have made a decision to
prepare an environmental impact statement to engage in a
public scoping process. Public hearings or meetings,
although often held, are not required; instead the manner in
which public input will be sought is left to the discretion
of the agency.

The purpose of this process is to determine the scope
of the EIS so that preparation of the document can be
effectively managed. Scoping is intended to ensure that
problems are identified early and properly studied, that
issues of little significance do not consume time and
effort, that the draft EIS is thorough and balanced, and
that delays occasioned by an inadequate draft EIS are
avoided. The scoping process should identify the public and
agency concerns; clearly define the environmental issues and
alternatives to be examined in the EIS including the
elimination of nonsignificant issues; identify related
issues which originate from separate legislation,
regulation, or Executive Order (e.g. historic preservation
or endangered species concerns); and identify state and
local agency requirements which must be addressed. An
effective scoping process can help reduce unnecessary
paperwork and time delays in preparing and processing the

1

EIS by clearly identifying all relevant procedural requirements.

In April, 1981, the Council issued a "MEMORANDUM FOR GENERAL COUNSELS, NEPA LIAISONS AND PARTICIPANTS IN SCOPING" on the subject of Scoping Guidance. The purpose of this guidance was to give agencies suggestions as to how to more effectively carry out the CEQ scoping requirement. The availability of this document was announced in the Federal Register at 46 F.R. 25461. It is still available upon request from the CEQ General Counsel's office.

The concept of lead agency (§1508.16) and cooperating agency (§1508.5) can be used effectively to help manage the scoping process and prepare the environmental impact statement. The lead agency should identify the potential cooperating agencies. It is incumbent upon the lead agency to identify any agency which may ultimately be involved in the proposed action, including any subsequent permitting actions. Once cooperating agencies have been identified they have specific responsibility under the NEPA regulations (40 C.F.R. 1501.6). Among other things cooperating agencies have responsibilities to participate in the scoping process and to help identify issues which are germane to any subsequent action it must take on the proposed action. The ultimate goal of this combined agency effort is to produce an EIS which in addition to fulfilling the basic intent of NEPA, also encompasses to the maximum extent possible all the environmental and public involvement requirements of

2

state and federal laws, Executive Orders, and administrative policies of the involved agencies. Examples of these requirements include the Fish and Wildlife Coordination Act, the Clean Air Act, the Endangered Species Act, the National Historic Preservation Act, the Wild and Scenic Rivers Act, the Farmland Protection Policy Act, Executive Order 11990 (Protection of Wetlands), and Executive Order 11998 (Floodplain Management).

It is emphasized that cooperating agencies have the responsibility and obligation under the CEQ regulations to participate in the scoping process. Early involvement leads to early identification of significant issues, better decisionmaking, and avoidance of possible legal challenges. Agencies with "jurisdiction by law" must accept designation as a cooperating agency if requested (40 C.F.R. 1501.6).

One of the functions of scoping is to identify the public involvement/public hearing procedures of all appropriate state and federal agencies that will ultimately act upon the proposed action. To the maximum extent possible, such procedures should be integrated into the EIS process so that joint public meetings and hearings can be conducted. Conducting joint meetings and hearings eliminates duplication and should significantly reduce the time and cost of processing an EIS and any subsequent approvals. The end result will be a more informed public cognizant of all facets of the proposed action.

3

53

It is important that the lead agency establish a process to properly manage scoping. In appropriate situations the lead agency should consider designating a project coordinator and forming an interagency project review team. The project coordinator would be the key person in monitoring time schedules and responding to any problems which may arise in both scoping and preparing the EIS. The project review team would be established early in scoping and maintained throughout the process of preparing the EIS. This review team would include state and local agency representatives. The review team would meet periodically to ensure that the EIS is complete, concise, and prepared in a timely manner.

A project review team has been used effectively on many projects. Some of the more important functions this review team can serve include: 1) a source of information, 2) a coordination mechanism, and 3) a professional review group. As an information source, the review team can identify all federal, state, and local environmental requirements, agency public meeting and hearing procedures, concerned citizen groups, data needs and sources of existing information, and the significant issues and reasonable alternatives for detailed analysis, excluding the non-significant issues. As a coordination mechanism, the team can ensure the rapid distribution of appropriate information or environmental studies, and can reduce the time required for formal consultation on a number of issues (e.g., endangered species

4

54

the team can assist in establishing and monitoring a tight
time schedule for preparing the EIS by identifying critical
points in the process, discussing and recommending solutions
to the lead agency as problems arise, advising whether a
requested analysis or information item is relevant to the
issues under consideration, and providing timely and
substantive review comments on any preliminary reports or
analyses that may be prepared during the process. The
presence of professionals from all scientific disciplines
which have a significant role in the proposed action could
greatly enhance the value of the team.

The Council recognizes that there may be some problems
with the review team concept such as limited agency travel
funds and the amount of work necessary to coordinate and
prepare for the periodic team meetings. However, the
potential benefits of the team concept are significant and
the Council encourages agencies to consider utilizing
interdisciplinary project review teams to aid in EIS
preparation. A regularly scheduled meeting time and
location should reduce coordination problems. In some
instances, meetings can be arranged so that many projects
are discussed at each session. The benefits of the concept
are obvious: timely and effective preparation of the EIS,
early identification and resolution of any problems which
may arise, and elimination, or at least reduction of, the
need for additional environmental studies subsequent to the
approval of the EIS.

5

55

Since the key purpose of scoping is to identify the issues and alternatives for consideration, the scoping process should "end" once the issues and alternatives to be addressed in the EIS have been clearly identified. Normally this would occur during the final stages of preparing the draft EIS and before it is officially circulated for public and agency review.

The Council encourages the lead agency to notify the public of the results of the scoping process to ensure that all issues have been identified. The lead agency should document the results of the scoping process in its administrative record.

The NEPA regulations place a new and significant responsibility on agencies and the public alike during the scoping process to identify all significant issues and reasonable alternatives to be addressed in the EIS. Most significantly, the Council has found that scoping is an extremely valuable aid to better decisionmaking. Thorough scoping may also have the effect of reducing the frequency with which proposed actions are challenged in court on the basis of an inadequate EIS. Through the techniques identified in this guidance, the lead agency will be able to document that an open public involvement process was conducted, that all reasonable alternatives were identified, that significant issues were identified and non-significant issues eliminated, and that the environmental public involvement requirements of all agencies were met, to the extent possible, in a single "one-stop" process.

6

CATEGORICAL EXCLUSIONS

Section 1507 of the CEQ regulations directs federal agencies when establishing implementing procedures to identify those actions which experience has indicated will not have a significant environmental effect and to categorically exclude them from NEPA review. In our August 1981 request for public comments, we asked the question "Have categorical exclusions been adequately identified and defined?"

The responses the Council received indicated that there was considerable belief that categorical exclusions were not adequately identified and defined. A number of commentators indicated that agencies had not identified all categories of actions that meet the categorical exclusion definition (§1508.4) or that agencies were overly restrictive in their interpretations of categorical exclusions. Concerns were expressed that agencies were requiring too much documentation for projects that were not major federal actions with significant effects and also that agency procedures to add categories of actions to their existing lists of categorical exclusions were too cumbersome.

The National Environmental Policy Act and the CEQ regulations are concerned primarily with those "major federal actions significantly affecting the quality of the human environment" (42 U.S.C. §§ 4332). Accordingly, agency procedures, resources, and efforts should focus on

7

57

determining whether the proposed federal action is a major federal action significantly affecting the quality of the human environment. If the answer to this question is yes, an environmental impact statement must be prepared. If there is insufficient information to answer the question, an environmental assessment is needed to assist the agency in determining if the environmental impacts are significant and require an EIS. If the assessment shows that the impacts are not significant, the agency must prepare a finding of no significant impact. Further stages of this federal action may be excluded from requirements to prepare NEPA documents.

The CEQ regulations were issued in 1978 and most agency implementing regulations and procedures were issued shortly thereafter. In recognition of the experience with the NEPA process that agencies have had since the CEQ regulations were issued, the Council believes that it is appropriate for agencies to examine their procedures to insure that the NEPA process utilizes this additional knowledge and experience. Accordingly, the Council strongly encourages agencies to re-examine their environmental procedures and specifically those portions of the procedures where "categorical exclusions" are discussed to determine if revisions are appropriate. The specific issues which the Council is concerned about are (1) the use of detailed lists of specific activities for categorical exclusions, (2) the excessive use of environmental assessments/findings of no significant impact and (3) excessive documentation.

8

59

The Council has noted some agencies have developed lists of specific activities which qualify as categorical exclusions. The Council believes that if this approach is applied narrowly it will not provide the agency with sufficient flexibility to make decisions on a project-by-project basis with full consideration to the issues and impacts that are unique to a specific project. The Council encourages the agencies to consider broadly defined criteria which characterize types of actions that, based on the agency's experience, do not cause significant environmental effects. If this technique is adopted, it would be helpful for the agency to offer several examples of activities frequently performed by that agency's personnel which would normally fall in these categories. Agencies also need to consider whether the cumulative effects of several small actions would cause sufficient environmental impact to take the actions out of the categorically excluded class.

The Council also encourages agencies to examine the manner in which they use the environmental assessment process in relation to their process for identifying projects that meet the categorical exclusion definition. A report[1] to the Council indicated that some agencies have a very high ratio of findings of no significant impact to environmental assessments each year while producing only a handful of EIS's. Agencies should examine their decisionmaking process to ascertain if some of these actions

9

59

do not, in fact, fall within the categorical exclusion definition, or, conversely, if they deserve full EIS treatment.

As previously noted, the Council received a number of comments that agencies require an excessive amount of environmental documentation for projects that meet the categorical exclusion definition. The Council believes that sufficient information will usually be available during the course of normal project development to determine the need for an EIS and further that the agency's administrative record will clearly document the basis for its decision. Accordingly, the Council strongly discourages procedures that would require the preparation of additional paperwork to document that an activity has been categorically excluded.

Categorical exclusions promulgated by an agency should be reviewed by the Council at the draft stage. After reviewing comments received during the review period and prior to publication in final form, the Council will determine whether the categorical exclusions are consistent with the NEPA regulations.

## ADOPTION PROCEDURES

During the recent effort undertaken by the Council to review the current NEPA regulations, several participants indicated federal agencies were not utilizing the adoption

60

procedures as authorized by the CEQ regulations.  The
concept of adoption was incorporated into the Council's NEPA
Regulations (40 CFR 1506.3) to reduce duplicative EISs
prepared by Federal agencies.  The experiences gained during
the 1970's revealed situations in which two or more agencies
had an action relating to the same project; however, the
timing of the actions were different.  In the early years of
NEPA implementation, agencies independently approached their
activities and decisions.  This procedure lent itself to two
or even three EISs on the same project.  In response to this
situation the CEQ regulations authorized agencies, in
certain instances, to adopt environmental impact statements
prepared by other agencies.

In general terms, the regulations recognize three
possible situations in which adoption is appropriate.  One
is where the federal agency participated in the process as a
cooperating agency.  (40 CFR 1506.3(c)).  In this case, the
cooperating agency may adopt a final EIS and simply issue
its record of decision.[2]  However, the cooperating agency
must independently review the EIS and determine that its own
NEPA procedures have been satisfied.

A second case concerns the federal agency which was not
a cooperating agency, but is, nevertheless, undertaking an
activity which was the subject of an EIS.  (40 CFR
1506.3(b)).  This situation would arise because an agency
did not anticipate that it would be involved in a project
which was the subject of another agency's EIS.  In this

11

61

instance where the proposed action is substantially the same as that action described in the EIS, the agency may adopt the EIS and recirculate (file with EPA and distribute to agencies and the public) it as a final EIS. However, the agency must independently review the EIS to determine that it is current and that its own NEPA procedures have been satisfied. When recirculating the final EIS the agency should provide information which identifies what federal action is involved.

The third situation is one in which the proposed action is not substantially the same as that covered by the EIS. In this case, any agency may adopt an EIS or a portion thereof by circulating the EIS as a draft or as a portion of the agency's draft and preparing a final EIS. (40 CFR 1506.3(a)). Repetitious analysis and time consuming data collection can be easily eliminated utilizing this procedure.

The CEQ regulations specifically address the question of adoption only in terms of preparing EIS's. However, the objectives that underly this portion of the regulations -- i.e., reducing delays and eliminating duplication -- apply with equal force to the issue of adopting other environmental documents. Consequently, the Council encourages agencies to put in place a mechanism for adopting environmental assessments prepared by other agencies. Under such procedures the agency could adopt the environmental assessment and prepare a Finding of No Significant Impact

12

based on that assessment, guided by several principles:

-- First, when an agency adopts such an analysis it must independently evaluate the information contained therein and take full responsibility for its scope and content.

-- Second, if the proposed action meets the criteria set out in 40 CFR 1501.4(e)(2), a Finding of No Significant Impact would be published for 30 days of public review before a final determination is made by the agency on whether to prepare an environmental impact statement.

## CONTRACTING PROVISIONS

Section 1506.5(c) of the NEPA regulations contains the basic rules for agencies which choose to have an environmental impact statement prepared by a contractor. That section requires the lead or cooperating agency to select the contractor, to furnish guidance and to participate in the preparation of the environmental impact statement. The regulation requires contractors who are employed to prepare an environmental impact statement to sign a disclosure statement stating that they have no financial or other interest in the outcome of the project. The responsible federal official must independently evaluate the statement prior to its approval and take responsibility for its scope and contents.

13

64

During the recent evaluation of comments regarding agency implementation of the NEPA process, the Council became aware of confusion and criticism about the provisions of Section 1506.5(c). It appears that a great deal of misunderstanding exists regarding the interpretation of the conflict of interest provision. There is also some feeling that the conflict of interest provision should be completely eliminated.[3]

## Applicability of Section 1506.5(c)

This provision is only applicable when a federal lead agency determines that it needs contractor assistance in preparing an EIS. Under such circumstances, the lead agency or a cooperating agency should select the contractor to prepare the EIS.[4]

This provision does not apply when the lead agency is preparing the EIS based on information provided by a private applicant. In this situation, the private applicant can obtain its information from any source. Such sources could include a contractor hired by the private applicant to do environmental, engineering, or other studies necessary to provide sufficient information to the lead agency to prepare an EIS. The agency must independently evaluate the information and is responsible for its accuracy.

14

Conflict of Interest Provisions

The purpose of the disclosure statement requirement is to avoid situations in which the contractor preparing the environmental impact statement has an interest in the outcome of the proposal.  Avoidance of this situation should, in the Council's opinion, ensure a better and more defensible statement for the federal agencies.  This requirement also serves to assure the public that the analysis in the environmental impact statement has been prepared free of subjective, self-serving research and analysis.

Some persons believe these restrictions are motivated by undue and unwarranted suspicion about the bias of contractors.  The Council is aware that many contractors would conduct their studies in a professional and unbiased manner.  However, the Council has the responsibility of overseeing the administration of the National Environmental Policy Act in a manner most consistent with the statute's directives and the public's expectations of sound government.  The legal responsibilities for carrying out NEPA's objectives rest solely with federal agencies.  Thus, if any delegation of work is to occur, it should be arranged to be performed in as objective a manner as possible.

Preparation of environmental impact statements by parties who would suffer financial losses if, for example, a "no action" alternative were selected, could easily lead to a public perception of bias.  It is important to maintain the public's faith in the integrity of the EIS process, and avoidance of

15

65

conflicts in the preparation of environmental impact statements is an important means of achieving this goal.

The Council has discovered that some agencies have been interpreting the conflicts provision in an overly burdensome manner. In some instances, multidisciplinary firms are being excluded from environmental impact statements preparation contracts because of links to a parent company which has design and/or construction capabilities. Some qualified contractors are not bidding on environmental impact statement contracts because of fears that their firm may be excluded from future design or construction contracts. Agencies have also applied the selection and disclosure provisions to project proponents who wish to have their own contractor for providing environmental information. The result of these misunderstandings has been reduced competition in bidding for EIS preparation contracts, unnecessary delays in selecting a contractor and preparing the EIS, and confusion and resentment about the requirement. The Council believes that a better understanding of the scope of Section 1506.5(c) by agencies, contractors and project proponents will eliminate these problems.

Section 1506.5(c) prohibits a person or entity entering into a contract with a federal agency to prepare an EIS when that party has at that time and during the life of the contract pecuniary or other interests in the outcomes of the proposal. Thus, a firm which has an agreement to prepare an EIS for a construction project cannot, at the same time, have an agreement to perform the construction, nor could it be the owner of the

16

construction site. However, if there are no such separate interests or arrangements, and if the contract for EIS preparation does not contain any incentive clauses or guarantees of any future work on the project, it is doubtful that an inherent conflict of interest will exist. Further, Section 1506.5(c) does not prevent an applicant from submitting information to an agency. The lead federal agency should evaluate potential conflicts of interest prior to entering into any contract for the preparation of environmental documents.

## SELECTION OF ALTERNATIVES
## IN
## LICENSING AND PERMITTING SITUATIONS

Numerous comments have been received questioning an agency's obligation, under the National Environmental Policy Act, to evaluate alternatives to a proposed action developed by an applicant for a federal permit or license. This concern arises from a belief that projects conceived and developed by private parties should not be questioned or second-guessed by the government. There has been discussion of developing two standards to determining the range of alternatives to be evaluated: the "traditional" standard for projects which are initiated and developed by a Federal agency, and a second standard of evaluating only those alternatives presented by an applicant for a permit or license.

17

67

Neither NEPA nor the CEQ regulations make a distinction between actions initiated by a Federal agency and by applicants. Early NEPA case law, while emphasizing the need for a rigorous examination of alternatives, did not specifically address this issue.  In 1981, the Council addressed the question in its document, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations".[5]  The answer indicated that the emphasis in determining the scope of alternatives should be on what is "reasonable".  The Council said that, "Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense rather than simply desirable from the standpoint of the applicant."

Since issuance of that guidance, the Council has continued to receive requests for further clarification of this question. Additional interest has been generated by a recent appellate court decision.  Roosevelt Campobello International Park Commission v. E.P.A.[6] dealt with EPA's decision of whether to grant a permit under the National Pollutant Discharge Elimination System to a company proposing a refinery and deep-water terminal in Maine.  The court discussed both the criteria used by EPA in its selecting of alternative sites to evaluate, and the substantive standard used to evaluate the sites.  The court determined that EPA's choice of alternative sites was "focused by the primary objectives of the permit applicant . . ." and that EPA had limited its consideration of sites to only those sites which were considered feasible, given the applicant's stated

18

68

alternative sites was sufficient to meet its NEPA responsibilities.

This decision is in keeping with the concept that an agency's responsibilities to examine alternative sites has always been "bounded by some notion of feasibility" to avoid NEPA from becoming "an exercise in frivolous boilerplate".[7] NEPA has never been interpreted to require examination of purely conjectural possibilities whose implementation is deemed remote and speculative. Rather, the agency's duty is to consider "alternatives as they exist and are likely to exist."[8] In the Roosevelt Campobello case, for example, EPA examined three alternative sites and two alternative modifications of the project at the preferred alternative site. Other factors to be developed during the scoping process -- comments received from the public, other government agencies and institutions, and development of the agency's own environmental data -- should certainly be incorporated into the decision of which alternatives to seriously evaluate in the EIS. There is, however, no need to disregard the applicant's purposes and needs and the common sense realities of a given situation in the development of alternatives.

## TIERING

Tiering of environmental impact statements refers to the process of addressing a broad, general program, policy or

19

proposal in an initial environmental impact statement (EIS), and analyzing a narrower site-specific proposal, related to the initial program, plan or policy in a subsequent EIS.  The concept of tiering was promulgated in the 1978 CEQ regulations; the preceding CEQ guidelines had not addressed the concept.  The Council's intent in formalizing the tiering concept was to encourage agencies, "to eliminate repetitive discussions and to focus on the actual issues ripe for decisions at each level of environmental review."[9]

Despite these intentions, the Council perceives that the concept of tiering has caused a certain amount of confusion and uncertainty among individuals involved in the NEPA process.  This confusion is by no means universal; indeed, approximately half of those commenting in response to our question about tiering[10] indicated that tiering is effective and should be used more frequently.  Approximately one-third of the commentators responded that they had no experience with tiering upon which to base their comments.  The remaining commentators were critical of tiering.  Some commentators believed that tiering added an additional layer of paperwork to the process and encouraged, rather than discouraged, duplication.  Some commentators thought that the inclusion of tiering in the CEQ regulations added an extra legal requirement to the NEPA process.  Other commentators said that an initial EIS could be prepared when issues were too broad to analyze properly for any meaningful consideration.  Some commentators believed that the concept was simply not applicable to the types of projects with which they worked; others were

20

concerned about the need to supplement a tiered EIS. Finally, some who responded to our inquiry questioned the courts' acceptance of tiered EISs.

The Council believes that misunderstanding of tiering and its place in the NEPA process is the cause of much of this criticism. Tiering, of course, is by no means the best way to handle all proposals which are subject to NEPA analysis and documentation. The regulations do not require tiering; rather, they authorize its use when an agency determines it is appropriate. It is an option for an agency to use when the nature of the proposal lends itself to tiered EIS(s).

Tiering does not add an additional legal requirement to the NEPA process. An environmental impact statement is required for proposals for legislation and other major Federal actions significantly affecting the quality of the human environment. In the context of NEPA, "major Federal actions" include adoption of official policy, formal plans, and programs as well as approval of specific projects, such as construction activities in a particular location or approval of permits to an outside applicant. Thus, where a Federal agency adopts a formal plan which will be executed throughout a particular region, and later proposes a specific activity to implement that plan in the same region, both actions need to be analyzed under NEPA to determine whether they are major actions which will significantly affect the environment. If the answer is yes in both cases, both actions will be subject to the EIS requirement, whether tiering is used or not. The agency then has one of two alternatives:

21

71

either preparation of two environmental impact statements, with the second repeating much of the analysis and information found in the first environmental impact statement, or tiering the two documents.  If tiering is utilized, the site-specific EIS contains a summary of the issues discussed in the first statement and the agency will incorporate by reference discussions from the first statement.  Thus, the second, or site-specific statement, would focus primarily on the issues relevant to the specific proposal, and would not duplicate material found in the first EIS.  It is difficult to understand, given this scenario, how tiering can be criticized for adding an unnecessary layer to the NEPA process; rather, it is intended to streamline the existing process.

The Council agrees with commentators who stated that there are stages in the development of a proposal for a program, plan or policy when the issues are too broad to lend themselves to meaningful analysis in the framework of an EIS.  The CEQ regulations specifically define a "proposal" as existing at, "that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing the goal <u>and the effects can be meaningfully evaluated</u>."[11]  Tiering is not intended to force an agency to prepare an EIS before this stage is reached; rather, it is a technique to be used once meaningful analysis can be performed.  An EIS is not required before that stage in the development of a proposal, whether tiering is used or not.

22

72

The Council also realizes that tiering is not well suited to all agency programs. Again, this is why tiering has been established as an <u>option</u> for the agency to use, as opposed to a requirement.

A supplemental EIS is required when an agency makes substantial changes in the proposed action relevant to environmental concerns, or when there are significant new circumstances or information relevant to environmental concerns bearing on the proposed action, and is optional when an agency otherwise determines to supplement an EIS.[12]  The standard for supplementing an EIS is not changed by the use of tiering; there will no doubt be occasions when a supplement is needed, but the use of tiering should not affect the number of those occasions.

Finally, some commentators raised the question of courts' acceptability of tiering. This concern is understandable, given several cases which have reversed agency decisions in regard to a particular programmatic EIS. However, these decisions have never invalidated the concept of tiering, as stated in the CEQ regulations and discussed above. Indeed, the courts recognized the usefulness of the tiering approach in case law before the promulgation of the tiering regulation. Rather, the problems appear when an agency determines not to prepare a site-specific EIS based on the fact that a programmatic EIS was prepared. In this situation, the courts carefully examine the analysis contained in the programmatic EIS. A court may or may not find that the programmatic EIS contains appropriate analysis of impacts and alternatives to meet the adequacy test for the

23

73

site-specific proposal. A recent decision by the Ninth Circuit Court of Appeals[13] invalidated an attempt by the Forest Service to make a determination regarding wilderness and non-wilderness designations on the basis of a programmatic EIS for this reason. However, it should be stressed that this and other decisions are not a repudiation of the tiering concept. In these instances, in fact, tiering has _not_ been used; rather, the agencies have attempted to rely exclusively on programmatic or "first level" EISs which did not have site-specific information. No court has found that the tiering process as provided for in the CEQ regulations is an improper manner of implementing the NEPA process.

In summary, the Council believes that tiering can be a useful method of reducing paperwork and duplication when used carefully for appropriate types of plans, programs and policies which will later be translated into site-specific projects. Tiering should not be viewed as an additional substantive requirement, but rather a means of accomplishing the NEPA requirements in an efficient manner as possible.

24

74

**FOOTNOTES:**

1.  Environmental Law Institute, <u>NEPA In Action Environmental Offices in Nineteen Federal Agencies</u>, A Report To the Council on Environmental Quality, October 1981.

2.  Records of decision must be prepared by each agency responsible for making a decision, and cannot be adopted by another agency.

3.  The Council also received requests for guidance on effective management of the third-party environmental impact statement approach. However, the Council determined that further study regarding the policies behind this technique is warranted, and plans to undertake that task in the future.

4.  There is no bar against the agency considering candidates suggested by the applicant, although the Federal agency must retain its independence. If the applicant is seen as having a major role in the selection of the contractor, contractors may feel the need to please both the agency and the applicant. An applicant's suggestion, if any, to the agency regarding the choice of contractors should be one of many factors involved in the selection process.

5.  46 Fed. Reg. 18026 (1981)

6.  684 F.2d 1041 (1st Cir. 1982)

7.  <u>Vermont Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519, 551 (1978).

8.  <u>Monarch Chemical Works, Inc. v. Exon</u>, 466 F.Supp. 639, 650 (1979), quoting <u>Carolina Environmental Study Group v. U.S.</u>, 510 F.2d 796, 801 (1975).

9.  Preamble, Fed. Reg., Vol. 43, No. 230, p. 55984, 11/29/78.

10. "Is tiering being used to minimize repetition in an environmental assessment and in environmental impact statements?", 46 Fed. Reg. 41131, August 14, 1981.

11. 40 C.F.R. 1508.23 (emphasis added).

12. 40 C.F.R. 1502.9(c)

13. <u>California v. Block</u>, 18 ERC 1149 (1982).

25

75