# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2522 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOHN LATSCHAR in his official capacity as SUPERINTENDENT OF GETTYSBURG NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325; DENNIS REIDENBACH in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; DIRK KEMPTHORNE in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case Number.:  1:06-CV-02077-TFH
Judge:  Thomas F. Hogan
Deck Type:  Administrative Agency
                Review
Date Filed:  12/05/2006

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.    Defendants Failed To Evaluate the Project-Level Environmental Impacts of Demolishing the Cyclorama Center, Thereby Violating NEPA........................................................................... 3

    A.    NEPA Requires Defendants to Evaluate the Project-Level Environmental Impacts of Demolishing the Cyclorama Center........................................................................................... 3

    B.    The GMP/EIS Did Not Propose or Evaluate Demolition of the Cyclorama Center........... 6

        1.    The Plain Language of the GMP/EIS Establishes That The Document Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center.................................................................................................................................... 6
            a)    The GMP/EIS Does Not Propose Or Evaluate Demolition Of  Cyclorama Center.... 7
            b)    The GMP/EIS Is Not An Implementation-Stage Document...................................... 9
            c)    Defendants Do Not Seriously Dispute That The Plain Language Of The GMP/EIS Does Not Include "Demolition" Or That The Plain Language Of The GMP/EIS Establishes That It Is A Programmatic Document…………………………………...11
            d)    Defendants Fail To Establish That The GMP/EIS Otherwise Contains An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Cent………………………………………………………………………………….11
        2.    Public Notices and Documents Prepared By The Park Service In Connection With NEPA Review Of The GMP/EIS Establish That The Document Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center.................................................................................................................................... 14
        3.    NEPA Documents Prepared By The Park Service For A Subsequent Project Establish That The GMP/EIS Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center ........................................................................ 16
    C.    The Cost Estimates In The GMP/EIS Confirm That The Document Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center 19

    D.    The GMP/EIS Does Not Incorporate By Reference The Draft EAs ................................ 22

    E.    Director's Order 2 and the Director's Order 12 Handbook Further Establish That The Park Service Violated NEPA ..................................................................................................... 26

        1.    Director's Order 2 Prohibits Consideration of Implementation-Level Documents in a GMP/EIS.................................................................................................................................. 26
        2.    The DO-12 Handbook Also Indicates That The Park Service Violated NEPA .......... 28
    F.    Plaintiffs' NEPA Claims Are Not Barred By The Statute Of Limitations On Challenging The GMP/EIS and ROD ................................................................................................................ 30

        1.    Plaintiffs Are Not Subject To The Statute Of Limitations On Challenging The ROD  30

2.    Plaintiffs' Longstanding Concerns About The Future Of The Cyclorama Center Did Not Trigger The Statute Of Limitations On Their NEPA Claims ........................................ 31

3.    Defendants' Purported Responses To Comments On A National Historic Preservation Act Document Did Not Trigger The Statute Of Limitations On Plaintiffs' NEPA Claims . 33

4.    "Information In The Public Domain" Did Not Trigger The Statute Of Limitations On Plaintiffs' NEPA Claims...................................................................................................... 35

II.    Defendants Failed To Propose Or Evaluate Alternatives To Demolishing The Cyclorama Center, Thereby Violating NEPA ................................................................................................. 35

III.   Defendants Failed To Comply With Section 110 Of The National Historic Preservation Act ............................................................................................................................................. 38

A.    Defendants Failed to Properly Address Re-Use And Preservation of the Cyclorama Center.................................................................................................................................... 38

B.    Defendants Failed to Prepare An Adequate Preservation Program ................................. 42

IV.   Conclusion ....................................................................................................................... 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Bus Association v. United States*,
   627 F.2d 525 (D.C. Cir. 1980) ..................................................................................2
*Atlanta Coalition v. Atlanta Regional Commission*,
   599 F.2d 1333 (5th Cir. 1979) ...................................................................................3
*Bennett v. Spear*,
   520 U.S. 154 (1997)...............................................................................................2, 3
*Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission*,
   449 F.2d 1109 (D.C. Cir. 1971).............................................................................3, 7
*Citizens Against Burlington v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991)...............................................................................3, 5
*City of Carmel-By-The-Sea v. Department of Transportation*,
   1998 U.S. Dist. LEXIS 21441 (N.D. Cal. 1998) ......................................................23
*Coliseum Square Association, Inc. v. Jackson*,
   465 F.3d 215 (5th Cir. 2006) ....................................................................................13
*Community Nutrition Institute v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) ...................................................................................2
*Ecology Center v. Austin*,
   430 F.3d 1057 (9th Cir. 2005) ...................................................................................1
*Ecology Law Center v. United States Forest Service*,
   192 F.3d 922 (9th Cir. 1999) .....................................................................................3
*Environmental Protection Information Center v. Blackwell*,
   389 F. Supp. 2d 1174 (N.D. Cal. 2004) ...................................................................24
*Flint Ridge Development Company v. Scenic Rivers Association*,
   426 U.S. 776 (1976)....................................................................................................3
*Friends of Yosemite Valley v. Norton*,
   348 F.3d 789 (9th Cir. 2003) ..................................................................................3, 4
*Greater Yellowstone Coalition v. Bosworth*,
   209 F. Supp. 2d 156 (D.D.C. 2002)............................................................................7
*Jackson Hole Conservation Alliance v. Babbitt*,
   96 F. Supp. 2d 1288 (D. Wyo. 2000).........................................................................2
*Jersey Heights Association v. Glendening*,
   174 F.3d 180 (4th Cir. 1999) .....................................................................................2
*LaFlamme v. Federal Energy Regulatory Commission*,
   852 F.2d 389 (9th Cir. 1988) ...................................................................................23
*Lake Mohave Boat Owners Association v. National Park Service*,
   78 F.3d 1360 (9th Cir. 1996) .....................................................................................2
*Lemon v. Geren*,
   514 F.3d 1312 (D.C. Cir. 2008) .................................................................................7
*Lewis v. Lujan*,
   826 F. Supp. 1302 (D. Wyo. 1992).............................................................................2
*Montana Wilderness Association v. Fry*,
   310 F. Supp. 2d 1127 (D. Mont. 2004).......................................................................6
*Muscarello v. United States*,
   524 U.S. 125 (1998)....................................................................................................7

*National Resources Defense Council v. Administrator,*
    451 F. Supp. 1245 (D.D.C. 1978) ....................................................................5
*National Trust for Historic Preservation v. Blanck,*
    938 F. Supp. 908 (D.D.C. 2003) ...............................................................10, 11
*Natural Resources Defense Council v. Duvall,*
    777 F. Supp. 1533 (E.D. Cal. 1991) ........................................................23, 24
*Natural Resources Defense Council v. United States Nuclear Regulatory*
    *Commission,*
    606 F.2d 1261 (D.C. Cir. 1979) ...........................................................5, 6, 7
*Nevada v. Department of Energy,*
    457 F.3d 78 (D.C. Cir. 2006) ..................................................................3, 4
*Pennaco Energy v. United States Department,*
    377 F.3d 1147 (10th Cir. 2004) ..............................................................5, 6
*Pit River Tribe v. United States Forest Service,*
    469 F.3d 768 (9th Cir. 2006) ..............................................................5, 6, 12
*Salmon River Concerned Citizens v. Robertson,*
    32 F.3d 1346 (9th Cir. 1994) ....................................................................5
*Sierra Club v. Babbitt,*
    69 F. Supp. 2d 1202 (E.D. Cal. 1999).........................................................23
*Stevens County v. United States Department of Interior,*
    507 F. Supp. 2d 1127 (E.D. Wash. 2007) ...................................................5
*United States v. 162.20 Acres of Land,*
    733 F.2d 377 (5th Cir. 1984) ....................................................................5
*Wilderness Society v. Norton,*
    434 F.3d 584 (D.C. Cir. 2006) ..................................................................2

## FEDERAL STATUTES

5 U.S.C. § 704 ......................................................................................2
16 U.S.C. § 1a-7(b) ...............................................................................2
16 U.S.C. § 470h-2(a) ...................................................................... passim
42 U.S.C. § 4331(b)(4) ........................................................................13
42 U.S.C. § 4332(2) ...................................................................3, 5, 6, 13
40 C.F.R. parts 1500-1508.......................................................................3
40 C.F.R. § 1500.1(b) ..........................................................................20
40 C.F.R. § 1502.21 ...........................................................7, 23, 24, 25, 26
40 C.F.R. §§ 1503.1, 1508.22(a).............................................................14
40 C.F.R. § 1505.2.............................................................................14
40 C.F.R. § 1508.13 .............................................................................8
40 C.F.R. § 1508.28 .............................................................................3
40 C.F.R. § 1508.8 .............................................................................13
40 C.F.R. § 1508.9 .............................................................................8
63 Fed. Reg. 20496 ............................................................................10
63 Fed. Reg. 20505 ..............................................................................8
66 Fed. Reg. 7507 ...............................................................................2

## MISCELLANEOUS

Scot Andrew Pitzer, *Top Battlefield Steward*, Gettysburg Times, Feb. 1, 2008 .........20, 21

In a last ditch effort to avoid discharging their Congressionally-mandated duties under the National Environmental Policy Act ("NEPA"), Defendants claim that the 1999 General Management Plan/Environmental Impact Statement for Gettysburg National Military Park (the "GMP/EIS") neither means what it says, nor says what it means.

By its own terms, the GMP/EIS is a programmatic document that does not propose, consider, or approve specific, on-the-ground agency implementation actions.  Consistent with this programmatic focus, the GMP/EIS plainly requires the Park Service to undertake a subsequent review and approval process for any specific implementation actions that would result in the removal of the Gettysburg Cyclorama Center from the building's current location in a portion of Gettysburg National Military Park (the "Park") known as Ziegler's Grove.  The administrative record contains no evidence that any such review or approval process ever took place.

Nonetheless, Defendants stubbornly insist that the GMP/EIS, standing alone, authorizes the National Park Service not simply to remove the Cyclorama Center from its current location, but to completely demolish the building.  NEPA allows no such thing.  Before deciding to demolish the Cyclorama Center, the Park Service was required to evaluate the project-specific environmental impacts of, and alternatives to, demolition.  Because the agency did not do so, Plaintiffs are entitled to summary judgment.

At the same time, Defendants seek to completely erase Section 110 of the National Historic Preservation Act ("NHPA") from the United States Code.  In their view, Section 110 imposes no requirements of any kind beyond those imposed by other sections of the NHPA. Moreover, Defendants contend that potential plaintiffs must allege violations of other sections of the Act before proceeding under Section 110.

Defendants' positions are fundamentally incompatible with NEPA, the NHPA, and applicable regulations, controlling case law, and even their own regulations. Therefore, THIS Court should award Plaintiffs summary judgment and deny Defendants' Cross-Motion for Summary Judgment in its entirety.

## I. Defendants Failed To Evaluate the Project-Level Environmental Impacts of Demolishing the Cyclorama Center, Thereby Violating NEPA

### A. NEPA Requires Defendants to Evaluate the Project-Level Environmental Impacts of Demolishing the Cyclorama Center

NEPA "makes environmental protection a part of the mandate of every federal agency and department." *Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission*, 449 F.2d 1109, 1112 (D.C. Cir. 1971). *See also Flint Ridge Development Company v. Scenic Rivers Association*, 426 U.S. 776, 787 (1976) ("deliberate command" that NEPA obligation "to consider environmental factors not be shunted aside in the bureaucratic shuffle"). It requires federal agencies to identify, evaluate, and disclose the environmental impacts of their proposed actions, and to consider alternatives to those actions. 42 U.S.C. § 4332(2); 40 C.F.R. parts 1500-1508. The scope and specificity of an agency's NEPA analysis is governed by the nature of the proposed action under consideration. *Nevada v. Department of Energy*, 457 F.3d 78, 91-92 (D.C. Cir. 2006); *Atlanta Coalition v. Atlanta Regional Commission*, 599 F.2d 1333, 1344 (5th Cir. 1979). *See also Citizens Against Burlington v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) (scope of alternatives analysis governed by nature of action). In analyzing the environmental consequences of a general plan or programmatic proposal, an agency's NEPA review may focus on broad policy considerations. *Nevada*, 457 F.3d at 91-92; *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 799 (9th Cir. 2003); *Ecology Law Center v. United States Forest Service*, 192 F.3d 922, 923 n.2 (9th Cir. 1999). *See also* 40 C.F.R. § 1508.28 (encouraging "coverage of general matters in broader environmental impact statements" with "subsequent narrower

statements or environmental analyses" addressing project-specific issues).   However, before approving a site-specific project implementing a general plan or programmatic proposal, an agency must prepare a  more specific NEPA analysis.  *Nevada*, 457 F.3d at 91-92; *Friends of Yosemite Valley*, 348 F.3d at 801 (9th Cir. 2003).

Thus, just as there are two distinct levels of agency planning and management, so too are there two distinct levels of NEPA review.  The Ninth Circuit described the two levels of planning by the Park Service in *Friends of Yosemite Valley*.  *See Friends of Yosemite Valley*, 348 F.3d at 801.  At the programmatic level, the appellate panel noted, the agency "develops alternative management scenarios responsive to public concerns, analyzes the costs, benefits and consequences of each alternative in an Environmental Impact Statement, and adopts…[a] management plan."  *Id*.  At the implementation stage, "individual site specific projects, consistent with the management plan, are proposed and assessed."  *Id*.  Both stages are subject to NEPA.  *See Id*.  *See also Nevada,* 457 F.3d at 91-92 ("[w]hereas the programmatic EIS looks ahead and assimilates broad issues relevant to the program, the site-specific EIS addresses more particularized considerations").

This case involves a challenge to the National Park Service's failure to satisfy—or even consult—NEPA during the second stage.[1]  Specifically, Plaintiffs challenge the Park Service's failure to undertake any NEPA analysis whatsoever of the project-specific, implementation-stage impacts of demolishing the Gettysburg Cyclorama Center, a building designed by world-renowned architect Richard Neutra and eligible for listing in the National Register of Historic Places.  Plaintiffs' Complaint ("Complaint") at 1-4.  It is undisputed that Defendants have never prepared a stand-alone NEPA analysis addressing the second (or implementation) stage of their

---

[1] Courts and agencies refer to the second stage using terms such as "implementation", "site-specific," or "project-specific."  There is no meaningful difference between these terms, and, in order to avoid repetition, we use them interchangeably.

decision to demolish the Cyclorama Center.  The sole dispute between the parties is whether the GMP/EIS, a broad, programmatic-stage document, provides the necessary project specific, implementation-stage NEPA analysis for the demolition of the Cyclorama Center.

As a preliminary matter, Defendants appear to suggest that the very existence of a programmatic NEPA document obviates the need for an implementation-level analysis.  Federal Defendants' Cross-Motion for Summary Judgment on All Claims ("Def. Motion") at 24-26. They are mistaken.  Once a "critical decision" is made to act on site development, "any vague prior programmatic statements are no longer enough."  *Pit River Tribe v. United States Forest Service*, 469 F.3d 768, 784 (9th Cir. 2006).  Indeed, each of the cases cited by Defendants clearly states that a programmatic NEPA document may only authorize an implementation-stage proposal if the NEPA document contains not only a programmatic analysis, but also a full evaluation of all project- and site-specific impacts.  *See* Def. Motion at 24-26.[2]

---

[2] Defendants cite five cases in support of their position.  Def. Motion at 24-26.  None holds that the existence of a programmatic NEPA analysis renders site-specific NEPA analysis unnecessary.  In *Pennaco Energy v. United States Department*, 377 F.3d 1147 (10th Cir. 2004), the Tenth Circuit upheld an administrative decision which *prohibited* the Bureau of Land Management from relying on a programmatic document to authorize a specific implementation-stage project.  *Pennaco Energy*, 377 F.3d at 1153-60 (10th Cir. 2004).  *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346 (9th Cir. 1994), unlike the instant case, involved a challenge to a programmatic document.  It is worth noting, however, that in *Salmon River*, the Forest Service conceded that future implementation-stage projects would be subject to evaluation under NEPA.  *Salmon River*, 32 F.3d at 1357-58.  In *United States v. 162.20 Acres of Land*, 733 F.2d 377, 380-81 (5th Cir. 1984), the Fifth Circuit upheld the use of a programmatic document for site-specific purposes precisely because the programmatic document contained "in-depth," "site-specific" analysis, as required by NEPA for all implementation projects.  In *National Resources Defense Council v. Administrator*, 451 F. Supp. 1245, 1259 (D.D.C. 1978), the court held that "a follow-up site-specific EIS" is required for implementation actions unless all project-specific impacts have already been evaluated.  Like the *Salmon River* case, *Stevens County v. United States Department of Interior*, 507 F. Supp. 2d 1127, 1135-36 (E.D. Wash. 2007) involves a challenge to a programmatic decision, and therefore is not directly applicable to the instant case. Even so, it is worth noting that the *Stevens County* court observed that reliance on a previously-prepared programmatic document is only appropriate where all environmental impacts for a specific project have already been considered.  *Stevens County*, 507 F. Supp. 2d at 1135-36.

For the reasons described in the sections which follow, the GMP/EIS—a programmatic document—fails to provide such an analysis.  Nor does the Park Service identify any other final NEPA document which does so.  Therefore, Defendants have violated NEPA.

**B.  The GMP/EIS Did Not Propose or Evaluate Demolition of the Cyclorama Center**

In determining whether a programmatic NEPA document is sufficient to authorize implementation-level actions, the courts generally consider three things:  the plain language of the programmatic document; the public notices and statements prepared by the agency in connection with NEPA review of the programmatic document (including the agency's Notice of Intent, Notice of Availability, and Record of Decision); and NEPA documents prepared by the agency for subsequent proposals.  *See, e.g., Natural Resources Defense Council v. United States Nuclear Regulatory Commission*, 606 F.2d 1261, 1270-71 (D.C. Cir. 1979) (considering plain language of environmental analysis); *Pit River Tribe*, 469 F.3d at 783-84 (analyzing ROD and other NEPA documents); *Pennaco Energy Development v. Department of the Interior*, 377 F.3d 1147, 1153-60 (10th Cir. 2004) (upholding administrative decision which evaluated subsequent NEPA documents); *Montana Wilderness Association v. Fry*, 310 F. Supp. 2d 1127, 1135-39 (D. Mont. 2004) (emphasizing the importance of plain language).  Here, all three considerations clearly establish that the GMP/EIS did not contain an implementation-level proposal or evaluation of the demolition of the Cyclorama Center.

**1.  The Plain Language of the GMP/EIS Establishes That The Document Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center**

The plain language of the GMP/EIS clearly establishes that the document did not contain an implementation-level proposal or evaluation of the demolition of the Cyclorama Center.

### a) The GMP/EIS Does Not Propose Or Evaluate Demolition Of The Cyclorama Center

The most important words in this entire case—"demolition of the Cyclorama Center"—appear nowhere in the plain language of the GMP/EIS. Throughout the GMP/EIS, the Park Service consistently discussed "removal" of the Cyclorama Center from its current location in Ziegler's Grove and not "demolition" of the building. *See*, *e.g.*, AR 223 ("Cyclorama and Visitor Centers are **removed**"), 386 ("**[r]emoval** of the Cyclorama"), 387 ("**removal** of the…buildings at Ziegler's Grove") (emphasis added). Indeed, the words "demolish" and "demolition" appear just five times in the entire 451-page main volume of the GMP/EIS, and never in the context of the Cyclorama Center. AR 275, 366, 488, 514-15. In contrast, the Park Service references "remove," "removed," or "removal" more than 250 times in that same text.[3] AR 120-570.

This distinction is critically important because, as explained more fully in Plaintiffs' Motion for Summary Judgment, there is a clear and widely-accepted difference between the plain meanings of the two terms. *See* Pl. Motion at 26-27. Removal generally refers to the movement of an existing person or object from one place to another. *Id*. Demolition, by contrast, refers to the destruction of an object or structure in a single place. *Id*.[4]

---

[3] As noted in Plaintiffs' Motion for Summary Judgment, not all references to "removal" refer to the Cyclorama Center. *See* Pl. Motion at 27 n.12.

[4] Defendants do not seriously dispute that the meanings of "removal" and "demolition" differ. Instead, they dismissively note that Plaintiffs' argument relies on "definitions in dictionaries." Def. Motion at 16. Of course, Defendants do not cite authority for the proposition that dictionaries are inappropriate resources for determining the plain meaning of words. Indeed, courts regularly refer to dictionaries to determine plain meaning. In fact, both the Supreme Court and the courts of this District have referred to the very dictionary cited in Plaintiffs' Motion for Summary Judgment. *See, e.g., Muscarello v. United States*, 524 U.S. 125, 128-35 (1998) (relying on *Webster's Third Unabridged New International Dictionary* to determine plain language); *Greater Yellowstone Coalition v. Bosworth*, 209 F. Supp. 2d 156, 161 (D.D.C. 2002) (same).

Nor is there any reason to believe that the Park Service consistently used "remove" when it really meant "demolish."  In fact, the administrative record contains clear evidence that the agency was familiar with the difference between the two terms and could have proposed and evaluated "demolition" (as opposed to "removal") had it wanted to do so.  As Defendants themselves point out, the 1996 *Draft Development Concept Plan/Environmental Assessment for Collections Storage, Visitor & Museum Facilities* (the "1996 Draft EA") "expressly stated on the first page that…the existing Cyclorama Building would be demolished and its site rehabilitated." Def. Motion at 27 (citing AR 3241).

The conspicuous presence of "demolition" in the 1996 Draft EA, combined with the equally conspicuous absence of that term in the GMP/EIS, indicates that the Park Service made a conscious decision not to include "demolition" in the latter document.[5]  The Park Service could have finalized the 1996 Draft EA and reached a conclusion about the significance of potential impacts on the Cyclorama Center.  *See* 40 C.F.R. § 1508.9 (purpose of EA is to determine whether proposal will cause significant effects requiring preparation of EIS).  It appears that the agency originally intended to do so.  *See* AR 3245 (Park Service intends to seek public comment on 1996 Draft EA, "reevaluate" environmental issues in light of comments, and prepare either a Finding of No Significant Impact or an EIS.  But the Park Service never did finalize the 1996 Draft EA or prepared a Finding of No Significant Impact.[6]  40 C.F.R. § 1508.13.  Instead, it abandoned the 1996 Draft EA (with that document's discussion of "demolition") in favor of proceeding with the general, programmatic GMP/EIS (with that document's policy-level discussion of "removal" and studious avoidance of "demolition").  *Compare* AR 3241 ("The

---

[5] This conclusion would apply with particular force if, as Defendants urge, the 1996 Draft EA and the GMP/EIS are considered pieces of an on-going Park Service planning process.
[6] Nor, for that matter, did the Park Service ever finalize the 1995 Draft Development Concept Plan/Environmental Assessment for the Gettysburg Museum of the Civil War (the "1995 Draft EA").

existing Cyclorama Center would be demolished") *with* AR 223, 231-32 ("appropriate actions

that may result" include "[t]he Cyclorama and Visitor Centers are removed").

### b)  The GMP/EIS Is Not An Implementation-Stage Document

Indeed, the Park Service had good reason to avoid including a project-specific,

implementation–stage analysis of demolition in the GMP/EIS.   By its own terms, the

GMP/EIS—unlike the 1996 Draft EA—is not an implementation-level document.  *Compare* AR

121 (GMP/EIS is "a programmatic document") *with* Def. Motion at 6 n.6 (Development Concept

Plans specifically designed to "address facility concerns"). The plain language of the GMP/EIS

provides that it is "a programmatic document" which consists of "a basic management

framework for future decision making," and therefore lacks "site specific details and

recommendations."  Pl. Motion at 33 (citing AR 121).[7]  Indeed, the proposals evaluated in the

GMP/EIS do not consist of specific actions, but rather of "Management Prescriptions."  *See* AR

176-298 (presenting Management Prescriptions).  According to the Park Service, Management

Prescriptions provide a general policy framework for future decision making about resources and

visitor use. AR 200.  For that reason, Management Prescriptions do not mandate specific

implementation actions.  *Id*.  Indeed, "a range of actions is possible as a result of the adoption of

a [M]anagement [P]rescription."  *Id*.  As clearly stated in the GMP/EIS, Management

Prescriptions "are not detailed development plans."  *Id*.

It should come as no surprise, then, that the Management Prescriptions adopted by the

Park Service do not propose, evaluate, authorize or mandate demolition of the Cyclorama Center.

*See* AR 18-20, 222-255, 270-79.  The Park Service adopted the Management Prescriptions in

Alternative C of the GMP/EIS.  AR 18-20.  Alternative C contains 33 Management

Prescriptions.  AR 222-255, 270-79.  None of the 33 Management Prescriptions mentions

---

[7] Thus, while a narrow, site-specific demolition project could, in theory, be evaluated in a draft EA, that same project would not be appropriate for a GMP/EIS.  *See infra* at 26-30.

demolition.  *Id*.  In fact, only one of the 33 Management Prescriptions in Alternative C even mentions the Cyclorama Center, and it does so indirectly.  AR 223, 231-32 (Management Prescription mentioning Cyclorama Center); AR 222-255 (presenting all Management Prescriptions).  Specifically, the "Intrusions Management Prescription"[8] provides, in its entirety, that "[n]on-historic or modern structures and intrusions are eliminated."  AR 223, 231-32.  The GMP/EIS lists "examples of appropriate actions that **may** result" from this management prescription.  AR 223 (emphasis added).  One of the "examples of appropriate actions that **may** result" from the Intrusions Management Prescription is "[t]he Cyclorama and Visitor Centers are **removed** and their sites rehabilitated."  *Id*. (emphasis added).  However, the Intrusions Management Prescription does not mention demolition.  *Id*.  Nor does it mandate any particular kind of removal.  *Id*.

The absence of any detail about the removal process is significant because, as explained below, there are multiple feasible means of removing the Cyclorama Center from its current site and rehabilitating Ziegler's Grove.  *See infra* at 35-38.  At least one of the feasible means of removing the Cyclorama Center from its current site—namely, moving the building—would not involve demolition.  Therefore, **it is feasible for the Park Service to comply with the GMP/EIS, including the Intrusions Management Prescription, without demolishing the Cyclorama Center.**  *See* AR 223, 231-32; Declaration of Jerry Matyiko ("Matyiko Dec."); Declaration of Robert Shoaff ("Shoaff Dec."); Declaration of David McIlnay ("McIlnay Dec.").  *See also* Pl. Motion at 13, 40-41.

---

[8] The Management Prescriptions in the GMP/EIS are not numbered.  Nor does the document provide any other means of identifying or referring to individual Management Prescriptions.  In the absence of any Park Service system of identification, we have dubbed the Management Prescription which references "[n]on-historic or modern intrusions" the "Intrusions Management Prescription."

- 10 -

### c) Defendants Do Not Seriously Dispute That The Plain Language Of The GMP/EIS Does Not Include "Demolition" Or That The Plain Language Of The GMP/EIS Establishes That It Is A Programmatic Document

Also significant is the fact that Defendants' Cross-Motion does not seriously dispute the propositions set forth above. Defendants do not dispute that the plain language of the GMP/EIS labels the document "programmatic." Defendants do not dispute that the GMP/EIS, by its own terms, proposes and evaluates Management Prescriptions. Defendants do not dispute that the GMP/EIS clearly states that Management Prescriptions "are not development plans." Defendants do not dispute that the GMP/EIS clearly states that "a range of actions is possible as a result of the adoption of a [M]anagement [P]rescription." Defendants do not dispute that of the 33 Management Prescriptions adopted by the Park Service, only the Intrusions Management Prescription mentions the Cyclorama Center. Defendants do not dispute that the Intrusions Management Prescription does not mention demolition. Defendants do not dispute that the Intrusions Management Prescription does not define removal. And, finally, Defendants do not dispute that moving the Cyclorama Center is a feasible means of complying with the GMP/EIS without demolishing the building.

### d) Defendants Fail To Establish That The GMP/EIS Otherwise Contains An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center

Instead, Defendants identify three locations where the GMP/EIS mentions the Cyclorama Center, and suggest that those brief references constitute an implementation-level analysis of demolition.[9] First, Defendants point to two pages of section 4.4.1 of the GMP/EIS. *See* Def. Motion at 386-87 (citing AR 386-87). Those pages include a programmatic-level analysis of the Park Service's desired resource conditions on the Gettysburg battlefield, including the removal

---

[9] Defendants also suggest that the plain language of the ROD contains or suggests an implementation-stage demolition proposal and/or analysis. Def. Motion at 31. Plaintiffs address claims related to the ROD in section I.B.2, below.

of the Cyclorama Center from its current location. AR 386-87. Neither of the two pages proposes demolition of the Cyclorama Center. *Id*. Nor does either page evaluate the environmental consequences of demolition. *Id*.

Second, Defendants suggest that page 257 of the GMP/EIS indicates that removal of the Cyclorama Center "would result in some minor benefits to natural resources." Def. Motion at 30 (citing AR 401). Apparently, Defendants are relying on a passage which reads, in its entirety, "[d]evelopment of a museum complex would remove some areas from natural productivity; however, the removal of existing facilities would restore more land to natural productivity than would be used to develop the new facility." AR 401. This passage does not even remotely resemble a site-specific, implementation-level NEPA analysis of the demolition of an historic building. *See Pit River Tribe*, 469 F.3d at 784 ("vague prior programmatic statements" insufficient to authorize site-specific projects). It neither proposes to demolish the Cyclorama Center nor specifies the implementation-stage impacts of such a demolition project.

Third, Defendants assert that a comment letter and report from the Advisory Council on Historic Preservation (ACHP) provide an implementation-level analysis of the demolition of the Cyclorama Center. Def. Motion at 30-31 (citing AR 558-61, 1488). The ACHP report appears as Appendix 11 of the final GMP/EIS, while the letter (along with another copy of the report) appears in the Park Service's responses to comments on the GMP/EIS. AR 558-61, 1488. But neither the comment letter nor the report contains an implementation-stage NEPA analysis. *Id*. While the ACHP materials provide a thoughtful perspective on the programmatic conflict between co-located historic resources, they do not propose, evaluate, or authorize demolition of the Cyclorama Center. AR 1488-94.

After reviewing the portions of the GMP/EIS that reference the Cyclorama Center, Defendants suggest—without citation—that Plaintiffs have improperly assumed that the Park

Service's NEPA analysis "would have to concentrate solely on impacts to the building or should only disclose negative impacts." Def. Motion at 33. Defendants are simply mistaken. Plaintiffs do not claim that the Park Service failed to "concentrate solely on impacts to the building"; rather, they claim that the Park Service failed to propose or evaluate any implementation-stage demolition project whatsoever. Complaint at 24-27; Pl. Motion at 2-3. Likewise, Plaintiffs do not challenge Defendants' analysis of the positive impacts of removing the Cyclorama Center from its current location; rather, they contend that the negative, implementation-specific impacts of demolition have never been evaluated. *Id.*

Finally, in a footnote, Defendants suggest that "Plaintiffs' reliance on *Coliseum Square Association, Inc. v. Jackson,* 465 F.3d 215 (5th Cir. 2006), to assert that the Park Service's analysis was inadequate is misplaced." Def. Motion at 34, n.20. Defendants then seek to distinguish *Coliseum Square* by noting "that case concerned the demolition of a 64-acre housing development consisting of 121 buildings…[i]n contrast here, Plaintiffs are concerned with the demolition of one building." *Id.* But Defendants fail to explain why the proper application of NEPA should depend on the number of buildings scheduled for demolition. *Id.* Indeed, they cannot possibly do so, for NEPA applies to all demolition projects (indeed, to all Federal projects, period) which might significantly affect the human environment. 42 U.S.C. § 4332(2). In this case, the building in question is eligible for listing in the National Register of Historic Places. Therefore, demolition clearly has the potential to significantly affect the human environment. *See* 42 U.S.C. §§ 4331(b)(4) (purposes of NEPA include historic preservation), 4332(2)(A) (scope of NEPA includes "environmental design arts"); 40 C.F.R. §§ 1508.8 ("effect" includes impacts on historic resources), 1508.27(b)(8) (determination of environmental significance includes impacts on historic resources). That being so, the Park Service must comply with NEPA, no matter how many (or few) buildings are involved. *Id.*

**2. Public Notices and Documents Prepared By The Park Service In Connection With NEPA Review Of The GMP/EIS Establish That The Document Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center**

Under NEPA, federal agencies must issue certain types of public notices during the EIS process. Specifically, agencies are required to publish a Notice of Intent before preparing a draft EIS and an Notice of Availability before releasing a draft EIS for public review and comment. 40 C.F.R. §§ 1503.1, 1508.22(a). These documents describe the proposed agency action, alternatives thereto, and any significant environmental issues involved. *Id.* Agencies must also prepare a ROD to memorialize final decisions made on the basis of an EIS. 40 C.F.R. § 1505.2.

As explained more fully in Plaintiffs' Motion for Summary Judgment, the Notice of Intent and Notice of Availability for the GMP/EIS establish that the document did not contain an implementation-level proposal or evaluation of the demolition of the Cyclorama Center. Pl. Motion at 29. In fact, neither document even mentions specific actions involving, or impacts to, the building. AR 1932-33, 2549-50. The ROD does mention the Cyclorama Center, but only to repeat general, programmatic information about removing the Cyclorama Center from its current location. *See* AR 17-19, 26, 28. The ROD does not propose, evaluate, authorize, or mandate demolition of the building. AR 13-30.

Defendants do not discuss the Notice of Intent or Notice of Availability for the GMP/EIS, but instead focus on the ROD. *See* Def. Motion at 24-34. First, they note that "[t]he ROD provides the final answer to the question of where the Cyclorama Painting would be removed, stating that the selected action will include a new museum complex that would contain a gallery for the Cyclorama Painting, whereas the Cyclorama Building would be removed from the Ziegler's Grove in order to rehabilitate the key battlefield site." Def. Motion at 18 (citing AR 19). But the fate of the Cyclorama Painting is not relevant to this case. Plaintiffs have always maintained that their concern is with the Cyclorama Center and not the Cyclorama Painting.

- 14 -

More fundamentally, the fact that the Cyclorama Painting will no longer be housed in the Cyclorama Center does not constitute evidence that the ROD authorizes an implementation-level demolition project. Instead, it is consistent with the idea that the ROD memorializes a programmatic-level decision about incompatible resources. [10]

Second, Defendants assert that the ROD demonstrates that the Park Service is "compelled" to remove the Cyclorama Center from Ziegler's Grove, and that removal will "improve resource protection by allowing for the restoration of the historic battlefield." Def. Motion at 31 (citing AR 18-19, 26). Once again, neither of these statements constitutes—or even suggests—a specific, implementation-level demolition project. The fact that the Park Service felt "compelled" to remove the Cyclorama Center from Ziegler's Grove has no bearing on whether the ROD authorized an implementation-level project. Nor does the cited language regarding resource protection constitute evidence of an implementation-level approval. Indeed, vague statements about improved resource protection and battlefield restoration indicate a programmatic-level decision, and not an implementation-level approval.

Third, Defendants note that the ROD "will allow [the Park Service] to meet the legislative purposes of the park." It is not clear why Defendants believe that this statement authorizes demolition of the Cyclorama Building. Indeed, the ROD's reference to broad legislative purpose seems more consistent with a programmatic or policy decision than an implementation-level determination.

Finally, Defendants claim that "[t]he ROD noted that while the new museum and visitor facilities would permanently remove 18 acres of land, including up to two acres of wetlands, at the new site as wildlife habitat, it would be able to restore about 38 acres of meadow, orchard

---

[10] Defendants' attempt to contrast the Park Service's references to the Cyclorama Painting with the agency's references to the Cyclorama Center is similarly misguided, and for essentially the same reasons. *See* Def. Motion at 17-18.

and woodlands that were very significant to the outcome of the battle at the sites of the current facilities, including the Cyclorama Center." Def. Motion at 31 (citing AR 24, 26). This analysis addresses the parkwide, programmatic impacts of the entirety of Alternative C. The removal of "18 acres of land, including up to two acres of wetlands" has nothing to do with the Cyclorama Center. *See* AR 24, 26. And while removing the Cyclorama Center might contribute to the land restoration referenced by the Park Service, such removal does not account for anything close to 38 acres. *Id.* Indeed, the cited statement provides no information about the impacts specific to the Cyclorama Center. *Id.* More fundamentally, the cited sections of the ROD do not purport to authorize any sort of specific, implementation-level demolition project. *Id.* Nor do they evaluate the potential environmental impacts of such a project. *Id.* Quite simply, the plain language of the ROD provides neither an implementation-level approval of demolition nor an explanation of how or where the Park Service prepared an implementation-level evaluation of the impacts of demolition.

### 3. NEPA Documents Prepared By The Park Service For A Subsequent Project Establish That The GMP/EIS Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center

Other NEPA documents prepared by Defendants also demonstrate that the GMP/EIS did not contain an implementation-level proposal or evaluation of the demolition of the Cyclorama Center. Specifically, the Park Service's "Environmental Assessment for the Demolition and Removal of the National Tower" (the "Tower EA") and accompanying Finding of No Significant Impact (the "Tower FONSI") provide clear evidence that the agency never prepared an implementation-level NEPA evaluation of the demolition of the Cyclorama Center. *See* Pl. Motion at 36-37.

As described in detail in Plaintiffs' Motion for Summary Judgment, the relevant portion of the GMP/EIS—namely, the Intrusions Management Prescription—provides that both the

Cyclorama Center and the National Tower may be removed from their locations. *Id.* Thus, the very existence of the Tower EA and Tower FONSI demonstrates that the GMP/EIS (and, more particularly, the Intrusions Management Prescription) does not propose or evaluate an implementation-level demolition project. *See* Pl. Motion at 30-32, 36-37. If the GMP/EIS truly proposed, evaluated, and authorized implementation-stage actions, there would have been no reason for the Park Service to prepare the Tower EA and Tower FONSI. *See Id.*

Moreover, the content of the Tower EA and Tower FONSI clearly establishes that "removal"—the term used in the Intrusions Management Prescription and other portions of the GMP/EIS—is not the same as "demolition." *Id.* For example, the Tower EA explains the Park Service's proposed implementation-stage actions as follows:

> [T]he tower structure and its surrounding buildings would be demolished and removed. Demolition itself could be accomplished though a variety of methods. One alternative method would be to dismantle the structure in a piece-by-piece method through use of cranes and other mechanical methods. Another demolition method would be to use an implosion method to reduce the tower and associated structures into on-site debris and then remove the debris. Under all methods, the resulting debris would be removed by truck.

Declaration of Matthew Adams ("Adams Declaration"), Ex. H at i. This language contrasts starkly with the Park Service's description of the Intrusions Management Prescription, which states only "[t]he Cyclorama and Visitor Centers are removed and their sites rehabilitated." AR 223.

Defendants also suggest that the Tower EA is irrelevant because the GMP/EIS treats the National Tower and the Cyclorama Center differently. Def. Motion at 33 n.19. Once again, they are mistaken. For purposes of this case—in other words, for purposes of determining whether the GMP/EIS contains an implementation-level demolition proposal—the Cyclorama Center and the National Tower are treated in the same fashion. *See* AR 223, 231-32. Both buildings are

- 17 -

identified as intrusions on the historic battlefield.  AR 223, 231.  Both buildings are named in the

Intrusions Management Prescription.  *Id*.  And both buildings are slated for "removal."  AR 223,

231, 273.  The only significant difference between the Park Service's treatment of the Cyclorama

Center and its treatment of the National Tower is the agency's preparation of an implementation-

stage NEPA analysis prior to approving the Tower's demolition.

Defendants also note that "the National Tower had not yet been acquired by the Park

Service at the time of the environmental review, as noted in the GMP/EIS."  Def. Motion at 33

n.19 (citing AR 223, 231).  It not entirely clear how or why that fact indicates that the GMP/EIS

contained an implementation-level proposal or evaluation of the demolition of the Cyclorama

Center.  Presumably, Defendants mean to suggest that the Park Service could not prepare an

implementation-level analysis of the demolition of the National Tower until the agency had

acquired the Tower property.  If that is indeed their position, it is a weak one.  By Defendants'

own admission, the Park Service prepared several documents addressing the National Tower

long before the agency acquired the Tower property.  AR 223, 231 (noting 1993 Land Protection

Plan).  Moreover, the Tower EA and FONSI—documents which indisputably address the

Tower's demolition—were prepared and made available to the public prior to the date on which

the United States filed a declaration of takings for the National Tower property.  *Compare* Def.

Motion at 33 n.19 (notice of taking filed May 17, 2001) *with* Adams Dec., Ex. I (Tower EA

circulated for public review on May 1, 2000).  Therefore, the date on which the National Tower

was finally acquired cannot explain why the Park Service prepared an implementation-stage

NEPA review for one "removal" project identified in the Intrusions Management Prescription

but not the other.

**C.  The Cost Estimates In The GMP/EIS Confirm That The Document Did Not Contain An Implementation-Level Proposal Or Evaluation Of The Demolition Of The Cyclorama Center**

The cost estimates in the GMP/EIS also confirm that the document neither proposed nor evaluated an implementation-level demolition project involving the Cyclorama Center.  As explained in greater detail in Plaintiffs' Motion for Summary Judgment, the GMP/EIS estimated that the total cost of "removal" of structures from "major battle action areas" such as Ziegler's Grove would be just $81,000.  *See* Pl. Mot. at 27-28 (citing GMP/EIS cost estimate at AR 485). Several years earlier, however, the agency had estimated the cost of "total demolition of the structure and surrounding walks and pavements" at the Cyclorama Center to be more than $400,000.  *Id.* (citing cost estimate of unclear provenance at AR 2736).  The significant difference between these two figures confirms that the "removal" referenced in the GMP/EIS did not include "total demolition" of the Cyclorama Center.  *Id.*

Defendants seek to explain away this discrepancy by asserting that the estimated cost of demolishing the Cyclorama Center is actually included in a cost estimate titled "Construction or Land Acquisition Funded By Partners on behalf of NPS."  Def. Mot. at 32.  Although Defendants never specifically identify any documentary evidence of a partnership agreement for construction or land acquisition, their argument appears to be based on a Letter of Intent between the Park Service and the Gettysburg National Battlefield Museum Foundation (the "Letter of Intent").[11] *See* Def. Motion at 32 (failing to identify partnership); AR 494-97 (Letter of Intent).  The Letter of Intent, which appears in Appendix 6 of the final GMP/EIS, purports to assign responsibility for "restoration of Ziegler's Grove" to the Foundation.  *Id.*

---

[11] Defendants' reluctance to direct this Court's attention to the Letter of Intent is understandable. As discussed on the pages which follow, the Letter clearly establishes that the Park Service must undertake an additional, implementation-stage review of any specific action to remove the Cyclorama Center from Ziegler's Grove.  *See also* AR 494-96.

While the existence of the Letter of Intent may explain who is responsible for "restoration of Ziegler's Grove," it does not establish that the GMP/EIS included an implementation-level cost estimate for demolishing the Cyclorama Center. First of all, the Park Service's position simply defies logic. There is no reason (and, indeed, the agency has articulated none) why the cost of demolishing an existing building within Park boundaries should be part of "construction and land acquisition costs," particularly where, as here, there will be no subsequent construction on or near the site of the building and no land will be acquired. Still more difficult to swallow is the notion that the agency truly expected the public to understand that implementation-level demolition costs were included in a $39-million lump sum budget for "construction and land acquisition." At minimum, this approach defeats the fundamental informational purpose of NEPA. *See* 40 C.F.R. § 1500.1(b). More likely, it represents another of the Park Service's *post hoc* rationalizations. *See infra* at 42-44.

Second, the explanation of cost estimates in Defendants' Cross-Motion for Summary Judgment is flatly contradicted by a separate explanation offered by Defendant John Latschar. Dr. Latschar is the Superintendent of Gettysburg National Military Park, and was the head of the Park Service planning team which prepared the GMP/EIS. AR 461. In a two-part interview published on the front page of the Gettysburg Times on February 1 and 2, 2008, Dr. Latschar explained the cost estimates for various on-going projects at the Park. *See* Scot Andrew Pitzer, *Top Battlefield Steward*, Gettysburg Times, Feb. 1, 2008, at A5. He noted that the original fundraising goal for Park Service "partners"[12] was $42 million, a target roughly consistent with the $39 million estimated in the GMP/EIS for "Construction or Land Acquisition Funded By

---

[12]The Letter of Intent references a partnership between the Park Service and the Gettysburg National Battlefield Museum Foundation. AR 494-97. It appears that the Foundation merged with the Friends of the National Parks at Gettysburg at some later date. In order to avoid unnecessary confusion, we will simply refer to the entity with which the Park Service had a partnership as the Park Service's "partners."

Partners on behalf of NPS." *Id.  See also* AR 487 (original estimate in GMP/EIS).  Dr. Latschar also noted that the original estimate had been revised upward, first to $95 million and then to $125 million.  *Id.*  In explaining these revisions, he stated that the original cost estimates—the estimates in the GMP/EIS, that is—had only considered "planning estimates" rather than project-specific or implementation-stage costs.  *Id.*  Thus, the $95 million estimate—and not the $39 million estimate in the GMP/EIS—represented the estimate of implementation-stage costs.  *Id.* As for the $125 million estimate, he explained, "now, we're also talking about the costs of taking down the old visitor center and Cyclorama buildings."  *Id.*  Thus, Dr. Latschar's explanation makes it clear that the estimated cost of "taking down the…Cyclorama building" was not included in the original programmatic cost estimates in the GMP/EIS.  *Id.*

Third, the Letter of Intent cited by Defendants actually supports Plaintiffs' contention that the GMP/EIS never proposed or evaluated an implementation-stage demolition project.  The Letter of Intent was intended to describe the Park Service's understanding of "the scope and content" of the proposed relationship between the agency and its partners.  One of the goals of the partnership was to "rehabilitate the historic appearance and setting of Ziegler's Grove…by removing the existing visitor center and Cyclorama buildings and their associated entry roads and parking, and by restoring the historic landscapes."  AR 495.  However, the Letter of Intent—like the GMP/EIS—does not propose, authorize, evaluate, or require, *demolition* of the Cyclorama Center.  AR 494-97.  In fact, the letter does not mention any specific implementation actions whatsoever.  *Id.*

Instead, the letter contemplates that the partners will prepare project-specific implementation plans at some future date and, more importantly, that those project-specific implementation plans will be subject to subsequent review and approval by the Park Service. AR 495-97.  For example, the Letter of Intent states that the partners' duty to "remove existing

facilities and rehabilitate Ziegler's Grove" must take place "[i]n accordance with plans and specifications approved by [the Park Service]." AR 495. No such plans or specifications were published in the GMP/EIS. AR 494-97 (Letter of Intent); 119-571 (final GMP/EIS). Instead, under the "specific terms and conditions" of the Letter of Intent, the partners agreed that they would "develop a complete set of design plans for…removal of existing facilities, which shall be subject to the review and approval of the [Park Service]." AR 495. At the same time, the Park Service agreed that it would, at a future date, "provide the [partners] with the plans, drawings, and specifications for the restoration of the historic landscapes of Ziegler's Grove." AR 496. Again, no "plans, drawings, or specifications" appear in the GMP/EIS. AR 494-97 (Letter of Intent); 119-571 (final GMP/EIS).

It is clear, then, that the Letter of Intent does not authorize demolition of the Cyclorama Center. Nor does it provide evidence that the estimated costs of demolishing the Cyclorama Center are included in the $39 million "construction or land acquisition budget." Instead, the Letter of Intent contemplates—indeed, requires—that the Park Service undertake a subsequent, implementation-level review of the specific plans for "removing" the Cyclorama Center from Ziegler's Grove.

### D. The GMP/EIS Does Not Incorporate By Reference The Draft EAs

Perhaps recognizing the absence of any implementation-stage demolition proposal or analysis in the plain language of the GMP/EIS, Defendants claim that this required information can be found in the 1995 *Draft Development Concept Plan/Environmental Assessment for the Gettysburg Museum of the Civil War* and the 1996 *Draft Development Concept Plan/Environmental Assessment for Collections Storage, Visitor & Museum Facilities* (collectively, the "Draft EAs"). Def. Motion at 28-30. As an initial matter, we note that Defendants must have adopted this position quite recently. During the preparation of the

administrative record, they did not even identify the Draft EAs or comments thereon as documents relevant to this case.[13] In a sudden reversal of field, however, Defendants now claim that the Draft EAs were actually made part of the GMP/EIS—the very document they persistently (and incorrectly) claim is being challenged. Def. Motion at 28-30. For this reason alone, Defendants' "incorporation" argument rings hollow, and should be rejected. *See City of Carmel-By-The-Sea v. Department of Transportation*, 1998 U.S. Dist. LEXIS 21441 at * 7-11 (N.D. Cal. 1998) (agency failure to include copies of purportedly incorporated documents in the administrative record).

In any event, the Draft EAs were never actually incorporated in the GMP/EIS because the Park Service never followed the mandatory procedures for incorporation by reference under NEPA. *See* 40 C.F.R. § 1502.21. Agencies may incorporate material into an Environmental Impact Statement ("EIS") by reference, but only if the incorporated material is reasonably available for public inspection within the time allowed for comment on the EIS, the incorporated material is cited in the EIS and its content is briefly described, and the incorporation meets a general standard of reasonableness. *See* 40 C.F.R. §§ 1502.21 (authorizing incorporation by reference); *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202 (E.D. Cal. 1999) (discussing requirements for incorporation by reference). At least one federal court has described these requirements as "relatively rigid." *Natural Resources Defense Council v. Duvall*, 777 F. Supp. 1533, 1538 (E.D. Cal. 1991). Moreover, because Defendants allege that the Draft EAs were

---

[13] In fact, it was Plaintiffs who requested that the 1996 Draft EA (but not the 1995 Draft EA) be included in the record. Plaintiffs did so because they had referenced the 1996 Draft EA in their Complaint, and they wanted to ensure that this Court had access to the documents identified in that pleading.. Plaintiffs' request in no way suggests that they believe the Draft EAs were properly incorporated by reference in the GMP/EIS. Nor does the fact that the Draft EAs now appear in the administrative record mean that those documents were necessarily incorporated by reference in the GMP/EIS. *Natural Resources Defense Council v. Duvall*, 777 F. Supp. 1533, 1538 n.10 (E.D. Cal. 1991) citing *LaFlamme v. Federal Energy Regulatory Commission*, 852 F.2d 389, 399 (9th Cir. 1988).

incorporated by reference, it is they who bear the burden of persuasion on this issue. *Duvall*, 777 F. Supp. at 1539 n.14.

Here, there is no evidence in the administrative record that the Draft EAs were "reasonably available for inspection by potentially interested persons within the time allowed for comment" on the Draft GMP/EIS. *Compare* AR 3353 (listing "information resources available to the public" during public review of 1995 Draft EA) *with* AR 1951-2304 (no listing of resources available during public review of draft GMP/EIS). *See also* 40 C.F.R. § 1502.21 (requiring availability). Nor can previously-submitted public comments on the Draft EAs substitute for the availability of the purportedly incorporated material during the public comment period for the GMP/EIS. *See* 40 C.F.R. § 1502.21 (incorporated material must be available during the public comment period on the EIS). Moreover, Plaintiffs never commented on either of the Draft EAs, and, in fact, did not receive those documents prior to the public comment period for the Draft GMP/EIS.[14]

The Park Service also failed to cite and describe the purportedly incorporated material in the GMP/EIS. *See* 40 C.F.R. § 1502.21 ("[t]he incorporated material shall be cited in the [EIS] and its content briefly described"). Defendants contend that two different portions of the GMP/EIS reference the incorporation of the Draft EAs. *See* Def. Motion at 28-30 (citing AR 171-72, 638-39). But neither actually describes the purportedly incorporated material's

---

[14] This case does not present the unusual facts present in *Environmental Protection Information Center v. Blackwell*, 389 F. Supp. 2d 1174, 1203-04 (N.D. Cal. 2004). In *Blackwell*, the court found that plaintiffs were not prejudiced by the alleged omission of certain wildlife reports from an Environmental Assessment because they had already obtained the reports through the Freedom of Information Act. *See Blackwell*, 389 F. Supp. 2d at 1204 (reports "were all available to the public as demonstrated by [plaintiffs'] ability to obtain the documents through the FOIA process"). Here, on the other hand, Plaintiffs did not file FOIA requests for the Draft EAs during the GMP/EIS process.

treatment of the Cyclorama Center.  AR 171-72, 638-39.[15]  Nor does the "analysis" (such as it is) of the Cyclorama Center elsewhere in the GMP/EIS reference any evaluation of the building in the Draft EAs.  *See* AR 223, 231, 386-87.  Put simply, while some portions of the GMP/EIS mention the Draft EAs in the course of describing the history of planning processes at Gettysburg, the Park Service never actually provided the public with a brief summary of the Draft EAs' environmental conclusions about the Cyclorama Center.

Defendants also cite two other documents as evidence that the GMP/EIS incorporated the Draft EAs.  First, they suggest that "[t]he ROD also stated that the Park Service combined the review of the [EAs] with the review of the GMP."  Def. Motion at 29.  The ROD does not clearly state that the EAs and the GMP/EIS were "combined."  AR 16-17 (heading includes "combination" but text fails to state GMP/EIS was a combination of the Draft EAs).  But even if it had, such a statement would not satisfy the requirements of 40 C.F.R. § 1502.21.  The ROD contains no evidence that the Draft EAs were "reasonably available for inspection by potentially interested persons within the time allowed for comment" on the Draft GMP/EIS.  AR 14-30.  Nor does it cite or briefly describe the Draft EAs' environmental evaluation of the Cyclorama Center or explain where such a description appears in the draft or final GMP/EIS.  *Id.*

Next, Defendants cite a letter to the Federal Register by which they claim to have announced that the process of preparing the Draft EAs had been terminated.  Def. Motion at 28 (citing AR 2311-12).  However, it appears that the letter to the Federal Register never actually resulted in a published Federal Register notice.  AR 1-13 (index contains no published Federal

---

[15] It is also worth noting that the document which appears at AR 638-39 appears to be part of the park Service's responses to comments on the GMP/EIS.  In light of the requirement that incorporated material be available for public review *during the public comment period*, the agency's responses to comments should cannot reasonably be cited as evidence of incorporation.  Indeed, the fact that a commenter apparently had to be informed of the Park Service's desire to incorporate the Draft EAs clearly suggests that the public notice and availability requirements of 40 C.F.R. § 1502.21 were never satisfied.

Register notice).  For that reason alone, the letter cannot possibly be evidence of incorporation.[16]

Moreover, the letter did not make the Draft EAs available to the public during the comment

period for the Draft GMP/EIS.[17]  *Id*.  Finally, because the purported "announcement of

termination" took place prior to the release of the Draft GMP/EIS to the public, it cannot have

provided the description of incorporated material which NEPA requires.  *See* 40 C.F.R. §

1502.21 (incorporated material must be cited and described in the text of an EIS).

### E.  Director's Order 2 and the Director's Order 12 Handbook Further Establish That The Park Service Violated NEPA

The Park Service's own documents and procedures further establish that the agency

violated NEPA by failing to prepare an implementation-level evaluation of the demolition of the

Cyclorama Center.

#### 1.  Director's Order 2 Prohibits Consideration of Implementation-Level Documents in a GMP/EIS

During the preparation of the GMP/EIS, the Park Service's planning efforts were

governed by a document known as Director's Order 2 ("DO-2").[18]  AR 358.  Among other

things, DO-2 prohibits discussion of implementation-level actions like demolition in General

Management Plans.  DO-2 § 3.3.1.2.  Instead, DO-2 requires that "[d]ecisions about site-specific

---

[16] Defendants essentially concede as much by noting that "[w]hile it does not appear that this notice was ever published in the Federal Register, the Park Service also notified the public of this decision in a newsletter dated January 4, 1998, which was sent to approximately 3,800 people and announced the decision in public meetings held in December 1997 and March 1998."  Def. Motion at 7.  The Park Service  appears to have omitted the newsletter in question from the administrative record, a decision that casts further doubt on the agency's actual incorporation by reference of the Draft EAs.  If, as Defendants urge, (1) the GMP/EIS incorporated the Draft EAs and (2) this case is a challenge to the GMP/EIS, the agency should surely have included in the record all documents bearing on the relationship between the Draft EAs and the GMP/EIS.  In any event, the newsletter cannot save Defendants' incorporation by reference claim because it cannot substitute for either public availability of the Draft EAs or citation and description of the Draft EAs' contents.  *See* 40 C.F.R. § 1502.21.
[17] If anything, the termination of the EA process would have added an additional layer of opacity to the park Service's purported incorporation.
[18] DO-2 is available at http://www.nps.gov/refdesk/DOrders/DOrder2.html .

actions…be deferred to implementation planning." *Id*. Furthermore, DO-2 mandates that "[m]ore detailed, site-specific analyses of implementation plan alternatives be required before any major federal action is undertaken." *Id*. Thus, the Park Service could not have considered an implementation-level proposal to demolish the Cyclorama Center in the GMP/EIS.

The GMP/EIS plainly states that it was prepared in accordance with DO-2. AR 358. This explicit reference is significant for two reasons. First, it constitutes further evidence that the GMP/EIS did not actually contain an implementation-level proposal or evaluation of the demolition of the Cyclorama Center. After all, such an analysis would be inconsistent with the very guidance explicitly cited by the Park Service. AR 358; DO-2 § 3.3.1.2. Second, the Park Service's explicit reference to DO-2 demonstrates that even if the GMP/EIS contained an implementation-level demolition proposal or evaluation,[19] the agency could not properly rely on that document to authorize demolition of the Cyclorama Center. *See Ecology Center v. Austin*, 430 F.3d 1057, 1069 (9th Cir. 2005) (arbitrary and capricious for agency to rely on document prepared in contravention of (non-binding) agency guidance explicitly cited therein).

Defendants mischaracterize these arguments as an attempt to enforce an informal guidance document. Def. Motion at 21-24. Plaintiffs do not seek to invalidate the GMP/EIS through judicial enforcement of DO-2. Pl. Motion at 2-3 ("this case is not about the validity of the GMP/EIS"). Instead, they cite DO-2 as evidence that the Park Service could not have subsequently relied on the programmatic GMP/EIS for purposes of authorizing an implementation-stage demolition project. Pl. Motion at 35-36. In other words, Plaintiffs do not use DO-2 to attack the validity of the GMP/EIS, but rather to demonstrate the document's programmatic nature and scope.

---

[19] As discussed throughout this Memorandum in Opposition and Reply Memorandum, Plaintiffs contend that the GMP/EIS does not include such a proposal.

For that reason, this Court need not reach the question of the enforceability of DO-2. For the record, however, DO-2 is, in fact, judicially enforceable. The Park Service uses mandatory language throughout DO-2, and especially in the sections of the document addressing general management plans. *See* DO-2 § 3.3.1.2 ("General management planning **will** constitute the first phase of tiered planning and decision making…[d]ecisions about site-specific actions **will** be deferred to implementation planning") (emphasis added). *See also Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam) (importance of mandatory language); *American Bus Association v. United States*, 627 F. 2d 525, 532 (D.C. Cir. 1980) (decisive weight to "will"). Moreover, the requirements of DO-2 ultimately flow from a Congressional directive, further indicating that the document is binding. *See Wilderness Society v. Norton*, 434 F.3d 584, 595-96 (D.C. Cir. 2006) (congressional mandate indicates binding norms); 16 U.S.C. § 1a-7(b) (statutory language regarding general management plans).[20]

## 2. The DO-12 Handbook Also Indicates That The Park Service Violated NEPA

Defendants rightly note that the DO-12 Handbook did not take effect until January 8, 2001.[21] At the same time, however, their own Cross-Motion for Summary Judgment clearly demonstrates the relevance of that document to this case. Defendants claim that the Park Service retains ongoing discretion "to determine whether a particular action is covered by a particular action in GMP/EIS [sic]." Def. Motion at 33. They also assert that implementation of the Intrusions Management Prescription is governed by the Letter of Intent. Def. Motion at 32. As

---

[20] None of the cases cited by Defendants actually establishes that DO-2 is unenforceable. *Jackson Hole Conservation Alliance v. Babbitt*, 96 F. Supp. 2d 1288, 1297 (D. Wyo. 2000) does not address DO-2; rather, it discusses outdated guidance previously withdrawn by the Park Service. *Lake Mohave Boat Owners Association v. National Park Service*, 78 F.3d 1360, 1369 (9th Cir. 1996) and *Lewis v. Lujan*, 826 F. Supp. 1302, 1307 (D. Wyo. 1992) address NPS-48, a wholly separate policy. By Defendants' own admission, *Wilderness Society v. Norton*, 434 F.3d 584 (D.C. Cir. 2006) addresses the topic of Park Service Management Policies, and not DO-2 (or any other Director's Order). *See* Def. Motion at 22-23.

[21] The DO-12 Handbook is available at http://www.nps.gov/policy/DOrders/RM12.pdf

described, above, the Letter of Intent required that the Park Service conduct a detailed, implementation-level review subsequent to the GMP/EIS. AR 495. *See also supra* at 18-22. The DO-12 Handbook applies to any such review conducted after January 8, 2001.[22]

The DO-12 Handbook is important because it prohibits Defendants from relying on a programmatic document like the GMP/EIS to authorize in implementation-level project like demolition. Most explicitly, the DO-12 Handbook provides that:

> Before an on-the-ground action (e.g., grading a trail, building a campground) can be taken, there must be site-specific environmental analysis available to the decision-maker in the form of a NEPA document. **This means you cannot use programmatic NEPA documents to make a site-specific decision**, but must instead follow the process of tiering described in [applicable documents].

DO-12 Handbook at 87 (emphasis added). Thus, DO-12 Handbook would have prohibited the Park Service from proceeding with the review and approval process required by the Letter of Intent unless the agency prepared an implementation-level NEPA analysis.

The provisions of the DO-12 Handbook are judicially enforceable, and would therefore render such a decision illegal. The Park Service itself has recognized that "most of the sections derive in whole or in part from the CEQ regulations or [Department of the] Interior NEPA guidelines, **giving them the force of law**." DO-12 Handbook at 2 (emphasis added). Similarly, the Handbook clearly states that it is "binding on all agency personnel." *Id.* Moreover, the DO-

---

[22] Of course, the administrative record contains no record of any such analysis. Indeed, it is silent as to the date of any Park Service review and approval of implementation-level documents pursuant to the Letter of Intent. However, in light of the fact that demolition has yet to occur, it is hard to believe that the agency obtained, reviewed, circulated to the public, and approved implementation-level documents related to the demolition of the Cyclorama Center in the 13 months between the November 23, 1999 ROD and the January 8, 2001 implementation of the DO-12 Handbook. In any event, there is no record of any such review and approval process. And, because Defendants allege that the DO-12 Handbook does not apply to this case, it is they who bear the burden of establishing that the review and approval of implementation-level demolition documents pursuant to the Letter of Intent took place before the Handbook's implementation. They have not done so.

12 Handbook was circulated for public review and comment, and notice of the final document was published in the Federal Register. *See* 66 Fed. Reg. 7507.

Defendants ignore the Handbook itself, and instead point to language in a Federal Register notice which stated the Park Service's intent to convert and update "its current system of internal instructions in conformance with a new system of NPS internal guidance documents." Def.. Motion at 24 n.12. This is a general statement, and does not specifically label the DO-12 Handbook non-binding. *See* 66 Fed. Reg. 7507. More importantly, in focusing on the Federal Register notice, Defendants overlook the clear, mandatory language of the Handbook itself.[23]

### F. Plaintiffs' NEPA Claims Are Not Barred By The Statute Of Limitations On Challenging The GMP/EIS and ROD

Defendants also claim that Plaintiffs' NEPA claims are barred by the 6-year statute of limitations on claims brought under the APA. *See* Def. Motion at 14-21. On this subject, too, they are mistaken.

#### 1. Plaintiffs Are Not Subject To The Statute Of Limitations On Challenging The ROD

Defendants assert that Plaintiffs' claims are barred because they were filed more than six years after the ROD. Def. Motion at 14-16. Defendants' position reveals their stubborn ignorance of the fact that Plaintiffs do not actually challenge the GMP/EIS, the approval of GMP/EIS Alternative C, or the ROD. *See* Complaint at 23-24, 30-32; Pl. Motion at 3 ("perhaps most importantly, this case is not about the validity of the General Management Plan/Environmental Impact Statement prepared by the Park Service in 1999"). Plaintiffs'

---

[23] Defendants also ignore the context of the Park Service's statements. The agency felt compelled to "convert" and "update" its guidance because of gross, repeated violations of NEPA. Director's Order 12 (DO-12), available at: http://www.nps.gov/policy/DOrders/DOrder12.html . As the Park Service itself admitted, "[t]he courts have cited a lack of, or failure to incorporate, critical information in decisions." DO-2 at 1. "In some cases," the agency conceded, "there has been a basic disregard for laws, regulations, and policies designed to foster resource preservation and conservation." *Id.*

Complaint, Plaintiffs' Motion for Summary Judgment, and this Opposition and Reply Brief all contain explicit statements to that effect. *Id*.

Further, the relief requested by Plaintiffs does not include invalidation of the GMP/EIS, the ROD, or any other decision or document published in 1999.  Complaint at 30-32. Instead, Plaintiffs challenge the absence of a document which has yet to be prepared—namely, an implementation-level NEPA analysis of the demolition of the Cyclorama Center.  *Id*.  *See also* Pl. Motion at 2-3.  Therefore, the six-year statute of limitations on lawsuits seeking to invalidate the GMP/EIS or the ROD does not bar Plaintiffs' NEPA claims.

### 2.  Plaintiffs' Longstanding Concerns About The Future Of The Cyclorama Center Did Not Trigger The Statute Of Limitations On Their NEPA Claims

Next, Defendants claim that the statute of limitations bars Plaintiffs' NEPA claims because Plaintiffs "understood…that the Park Service contemplated demolition of the Cyclorama Center."  Def. Motion at 17.  In support of that argument, Defendants cite several documents in which Plaintiff Dion Neutra inquires about the fate of the Cyclorama Center and expresses concern that Park Service might wish to destroy or damage the building.  *See* Def. Motion at 16-17.

There is no question that Plaintiffs (and Mr. Neutra, in particular) have a longstanding interest in, and affection for, the Cyclorama Center.  Their concern for the building predates the ROD, the GMP/EIS, the Draft EAs, and nearly every other document discussed in this case.  In fact, Mr. Neutra's interest in the Cyclorama Center began before the building ever opened to the public.  It is hardly surprising, then, that Plaintiffs have always been concerned about the Park Service's plans for the Cyclorama Center.  By 1999, those concerns had been heightened by many years of debate over the future of the Park.  *See* AR 169-74 (reviewing planning processes dating back to 1982).  It was only natural that Plaintiffs had become worried that the Park Service might be "contemplating" demolition of the building.

But neither Plaintiffs' concerns nor Defendants' "contemplation" are sufficient, by law, to trigger the statute of limitations for filing a NEPA suit.[24] The statute of limitations can only be triggered by final agency action. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177 (1997). The six-year limitations period runs from the time of that final action, and not from the time at which an agency contemplates action or the moment an interested member of the public grows concerned. *Id.* Defendants' reliance on *Jersey Heights Association v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) for the contrary proposition is, to be quite blunt, a misrepresentation of that case. *See* Def. Motion at 15 (citing *Glendening*). *Glendening* involved multiple sets of claims, including both claims brought under the Civil Rights Act of 1964 and NEPA claims brought under the APA. *Glendening*, 174 F.3d at 187-88. The *Glendening* court made it clear that the "sufficient facts" language cited by Defendants applied only to the Civil Rights Act claims. *Id.* at 188. *See also* Def. Motion at 15 ("a cause of action accrues when the plaintiff possesses sufficient facts about the harm done"). In contrast, the *Glendening* court held that plaintiffs' NEPA claims accrued upon the occurrence of final agency action. *Id.* at 186 ("Conduct becomes reviewable under the APA unpon final agency action").

Here, the ROD constituted final agency action with respect to the adoption of Alternative C of the GMP/EIS. AR 18-20; *Glendening*, 174 F.3d at 187. However, as described in detail above, Alternative C did not propose, evaluate, authorize, or mandate demolition of the Cyclorama Center. *See* AR 223, 231-32. Instead, Alternative C contained a Management Prescription which provided for the possible "removal" of "modern or non-historic intrusions." *Id.* As the Park Service itself has stated, "a range of actions is possible as a result of the adoption of a [M]anagement [P]rescription" because Management Prescriptions "are not detailed development plans." AR 200.

---

[24] If it were otherwise, the statute of limitations for challenging an agency's approval would vary according to the most extreme hopes and fears of the commenting public.

Thus, the ROD was the final agency action for the adoption of the Intrusions

Management Prescription, but was not the final agency action with respect to any of the specific

actions which might implement the Intrusions Management Prescription. *Bennett v. Spear*, 520

U.S. at 177. For that reason, the 6-year statute of limitations triggered by the ROD only applies

to actions challenging the adoption of the Intrusions Management Prescription (or some other

provision of GMP/EIS Alternative C). This case does not include such a challenge, so Plaintiffs'

NEPA claims are not barred by the statute of limitations.

### 3. Defendants' Purported Responses To Comments On A National Historic Preservation Act Document Did Not Trigger The Statute Of Limitations On Plaintiffs' NEPA Claims

Defendants also rely on a document which they identify as the Park Service's "responses

to comments on the Section 106 Case Report" provided by the Park Service. *See* Def. Motion at

17 (citing AR 1527). In particular, they emphasize a portion of that document which purports to

be a response to a previous comment by Mr. Neutra on the draft Section 106 Case Report.[25] The

Park Service's document notes, among other things, that the preferred proposal in the Section

106 Case Report involves demolition of the Cyclorama Center.

Defendants' reliance on the "responses to comments" document is misplaced. First of

all, the document appears to be nothing more than an internal draft. *See* AR 1520. The title of

the document is "DRAFT Responses to Comments, Revised Section 106 Case Report." *Id*. (caps

in original). The word "DRAFT," in capital letters, appears on every page of the document. AR

1532. There is no evidence in the administrative record that this document was ever finalized or

distributed to the general public. Nor was the document included or cited in the draft GMP/EIS,

the final GMP/EIS, or the ROD. AR 14-30 (ROD), 119-571 (final GMP/EIS), 2416-2539 (draft

---

[25] The Draft Section 106 Case Report was a document prepared for purposes of compliance with section 106 of the NHPA. It was not circulated with or incorporated in the draft GMP/EIS. AR 2416-2539. Nor was it published in the final GMP/EIS. AR 119-571.

GMP/EIS).  Put simply, the administrative record does not establish that the Park Service actually used this document to respond to anyone.

Defendants contend that the Park Service "issued" the "DRAFT Responses to Comments, Revised Section 106 Case Report" document on April 11, 1999.  Def. Motion at 9.  This appears to be an erroneous statement.  The document is dated April 19, 1999, and therefore could not possibly have been circulated on April 11, 1999.  AR 1520.  Moreover, the portion of the administrative record cited by Defendants in support of their claim do not actually provide any evidence that the "DRAFT Responses to Comments, Revised Section 106 Case Report" document was "issued" to anyone at all.  *See* Def. Motion at 9 (citing only the "DRAFT Responses to Comments" itself).

Indeed, the only shred of evidence suggesting that the document could have been seen by anyone other than its preparers is an agenda item for an April 20, 1999 "meeting with consulting parties" on the Section 106 Case Report.  AR 1519.  The agenda item in question reads, in its entirety "NPS Responses and Discussion, Closeout."  *Id*.  There is no evidence that the "NPS Responses" referenced in the agenda is the written document cited by Defendants.  *Id*.  In fact, it seems far more likely that the "NPS Responses" agenda item refers instead to the agenda item which immediately preceded it: "Other Comments from the Consulting Parties and Interested Persons."  *Id*.

In any event, the "DRAFT Responses to Comments, Revised Section 106 Case Report" does not in any way change the fact that the ROD approved GMP/EIS Alternative C, rather than an implementation-level demolition project involving the Cyclorama Center.  AR 18-20.  For that reason, the document also fails to address the fundamental problem with defendants' statute of limitations argument—namely, the limitations period triggered by the ROD cannot bar a suit which does not challenge the decision memorialized in the ROD.

**4. "Information In The Public Domain" Did Not Trigger The Statute Of Limitations On Plaintiffs' NEPA Claims**

Finally, Defendants suggest that "information in the public domain" renders this action tardy. Def.. Motion at 19. Specifically, they identify several newspaper articles which, Defendants assert, demonstrate that Plaintiffs "were clearly aware of the Park Service's plans to demolish the Cyclorama Building." Def. Motion at 20. Defendants' emphasis on the "public domain" is absurd. Only those decisions within the scope of the ROD and the GMP/EIS are subject to the statute of limitations triggered by the ROD. The scope of the ROD and the GMP/EIS is determined by those documents, and not by newspaper or magazine articles.[26] For the reasons detailed above, the documents clearly do not propose, evaluate, approve, or require demolition of the Cyclorama Center. *See supra* at 6-30. Therefore, Plaintiffs' NEPA claims are not barred by the statute of limitations triggered by the ROD.

**II. Defendants Failed To Propose Or Evaluate Alternatives To Demolishing The Cyclorama Center, Thereby Violating NEPA**

In failing to prepare an implementation-stage evaluation of the demolition of the Cyclorama Center, the Park Service also violated the provisions of NEPA which mandate that federal agencies identify and consider the environmental impacts of their proposed actions. *See* 42 U.S.C. §§ 4332(2)(C), (E); 40 C.F.R. §§ 1502.14, 1502.16, 1508.9. The scope of an agency's alternatives analysis is determine by the scope of its proposed action. *See Citizens Against Burlington*, 938 F.2d at 196-98 (D.C. Cir. 1991). Therefore, alternatives to a proposed federal action—like the proposed federal actions themselves—can be either programmatic-stage or implementation-stage alternatives. *Natural Resources Defense Council v. Nuclear Regulatory Commission*, 606 F.2d 1261, 1271 (D.C. Cir. 1979) ("*NRDC*").[27] When an agency is considering

---

[26] Otherwise, the scope of an agency's authority would vary from news cycle to news cycle.

[27] In a futile attempt to distinguish *NRDC* from the instant case, Defendants seriously mischaracterize Plaintiffs' reliance on that case. *See* Def. Motion at 34. Plaintiffs did not (as

a specific implementation action, the existence of a programmatic alternatives analysis does not obviate the need to consider specific, implementation-stage alternatives. *Id*. ("the EISs [the agency] prepared, which were devoted to program level issues, did not relieve [the agency] of the obligation to discuss alternatives to particular [actions] prior to adopting a [] proposal").

Here, Defendants utterly failed to consider alternative means of removing the Cyclorama Center from Ziegler's Grove. That failure is especially reprehensible because there is at least one reasonable, feasible way to remove the Cyclorama Center from Ziegler's Grove without demolishing the building. *See* Shoaff Dec.; Matyiko Dec.; McIlnay Dec. As discussed in Plaintiffs' Motion for Summary Judgment, Plaintiffs and their counsel have received statements of interest from two parties interested in relocating the Cyclorama Center. *See* Pl. Motion at 40-41. Furthermore, experts in the fields of structural relocation, architecture, and site planning have confirmed that the Cyclorama Center can feasibly be relocated and re-used. Shoaff Dec.; Matyiko Dec.; McIlnay Dec. Relocation would be consistent with the Park Service's implementation of the Intrusions Management Prescription and other elements of GMP/EIS Alternative C. *See* AR 223, 231. At the same time, it would avoid demolition of an irreplaceable historic resource. Put simply, it is a feasible and attractive alternative to demolition.

Of course, Congress has assigned Defendants—and not Plaintiffs—the task of evaluating alternatives under NEPA. 42 U.S.C. §§ 4332(2)(C), (E). *See also* 40 C.F.R. §§ 1502.14, 1502.16, 1508.9. After evaluating alternatives to demolition, the Park Service may choose to dispute Plaintiffs' conclusions about the attractiveness of moving the Cyclorama Center. But the

Defendants misleadingly suggest) cite *NRDC* for the proposition that "agencies cannot perform site-specific analysis in a programmatic document." *Compare* Pl. Motion at 40-41 *with* Def. Motion at 34. Instead, Plaintiffs accurately noted that the *NRDC* court struck down an agency's attempt to rely on a previously-prepared programmatic alternatives analysis without performing any implementation-level alternatives analysis. Pl. Motion at 40-41. *See also NRDC*, 606 F.2d at 1271.

agency may not "simply [] sit back, like an umpire." *Calvert Cliffs'*, 449 F.2d at 1119. Instead, it must "take the initiative of considering environmental values at every distinctive and comprehensive stage of the process." *Id*. After all, "[t]he idea behind NEPA is that if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed." *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008).

Amazingly, Defendants remain thoroughly uninterested in exploring an alternative which appears capable of accommodating the interests of all parties in this matter. They do not seriously dispute the assertion that the Cyclorama Center can feasibly moved. Def. Motion at 34-36. Nor do they contend that moving the building would not provide an alternative to demolition. *Id*. Instead, they assert that the Draft EAs provide a thorough analysis of alternatives to demolishing the Cyclorama Center, and, therefore, that the Park Service has satisfied NEPA. Def. Motion at 35. For the reasons set forth in section I.D., however, the Draft EAs were never incorporated in the GMP/EIS, and therefore cannot satisfy NEPA's alternatives analysis requirements. *See supra* at 22-26. *See also* 40 C.F.R. § 1502.21.

Finally, Defendants suggest that Plaintiffs waived their alternatives arguments by failing to propose relocation of the Cyclorama Center during the public comment period on the GMP/EIS. Def. Motion at 35-36. But Plaintiffs were not required to propose alternatives to an implementation action that was never proposed, evaluated, or approved in the Park Service's programmatic GMP/EIS. *See NRDC*, 606 F.2d at 1270-71 (rejecting claim that plaintiff was obligated to raise implementation-stage concerns during programmatic NEPA process).

More importantly, Defendants' cynical and misleading suggestion that Plaintiffs failed to suggest the possibility of relocating the Cyclorama Center conveniently ignores multiple letters in which Plaintiffs made that very proposal. *See* Complaint at 20-23; Pl. Motion at 11-12.

Defendants refused to respond, or even to acknowledge any of those proposals, leaving Plaintiffs

no choice but to file this suit. *Id.* But Defendants' duplicity does not stop there. Ignoring the

plain language of the Complaint (not to mention several collegial requests), they prepared the

administrative record as if this case were a direct challenge to the GMP/EIS. Now, in their

Cross-Motion for Summary Judgment, Defendants react with mock surprise and indignation to

any arguments, documents, or events which post-date the GMP/EIS and ROD. *See* Def. Motion

at 35-36. Defendants have buried their heads in the sand in an effort to avoid Plaintiffs'

questions, proposals, and claims about the Cyclorama Center. They cannot now claim that they

were unaware of Plaintiffs' efforts to raise the issue of relocating the Cyclorama Center.

### III. Defendants Failed To Comply With Section 110 Of The National Historic Preservation Act

#### A. Defendants Failed to Properly Address Re-Use And Preservation of the Cyclorama Center

Section 110 of NHPA mandates that federal agencies assume responsibility for the

preservation of historic properties owned or controlled by such agencies. 16 U.S.C. § 470h-2(a).

As part of their assumption of responsibility for the preservation of historic properties, federal

agencies must ensure that "[p]rior to acquiring, constructing, or leasing buildings for purposes of

carrying out agency responsibilities, [they] use, to the maximum extent feasible, historic

properties available." *Id.* Section 110 also requires federal agencies to "undertake such

preservation as may be necessary" to permit feasible use of available historic properties, thereby

indicating that agencies must take a broad view of feasibility in this context. *Id. See also* 63

Fed. Reg. 20505 (uses of historic properties not limited to those "directly associated" with

agency's mission; agencies "should be open to the possibility of other uses"), 20506 (agency

consideration of "leases, exchanges, and management agreements with other parties as means of

providing for the continuing or adaptive use of historic properties").

Here, the Park Service failed to demonstrate—or even evaluate—maximum feasible use of the Cyclorama Center. As discussed in Plaintiffs' Motion for Summary Judgment, there is only one document in the administrative record which might reasonably be considered evidence of a final analysis of the feasibility of reusing the Cyclorama Center. Pl. Motion at 43-44. That document, the Section 106 Case Report, devoted approximately one and one-half pages to the subject, briefly discussing the possibility of rehabilitating the Cyclorama Center for "continued use," then (even more briefly) evaluating the potential for "adaptive re-use" of the structure. *Id*.; AR 1606-07. Both analyses are fundamentally flawed. The Park Service's "continued use" analysis never evaluated the possibility that the Cyclorama Center serve a non-museum purpose. AR 1606-07. At the same time, the "adaptive re-use" analysis concluded that the building was unnecessary because "[i]n the future, all visitor services would be housed in the new visitor center/museum complex." AR 1607. This approach turns section 110 on its head. Rather than considering re-use of historic alternatives to new construction, as the statute demands, the Park Service relied on the construction of new facilities to eliminate from consideration any potential re-use of the Cyclorama Center. AR 1606-07.

In response to these claims, Defendants present a long list of methods by which the Park Service supposedly evaluated maximum feasible use of the Cyclorama Center. Def. Motion at 38-40. It is worth noting that the "analysis" to which Defendants cite comes from the Section 106 Case Report. *Id*. They do not identify any other document evaluating re-use. *Id*. More importantly, Defendants' laundry list does not actually address Plaintiffs' contentions. *Id*. Specifically, it does not provide any justification for the Park Service's failure to evaluate the possibility of "continued use" of the Cyclorama Center for non-museum purposes. *Id*. Nor does it explain why the construction of new agency facilities precludes adaptive re-use. *Id*. Put simply, the Section 106 Case Report does not provide the analysis required under Section 110.

Defendants also suggest that Plaintiffs' Section 110 claims are barred because the Park Service has complied with Section 106 of the NHPA. Def. Motion at 36-38. Specifically, they contend that "when an agency complies with its obligations under Section 106 through a memorandum of agreement or programmatic agreement, the agency has also complied with Section 110." Def. Motion at 36.

Defendants' position appears to be based on a misreading of *National Trust for Historic Preservation v. Blanck*, 938 F. Supp. 908 (D.D.C. 2003). *See* Def. Motion at 37 ("In *Blanck*, a D.C. district court rejected the very argument being made by Plaintiffs"). The *Blanck* plaintiffs made two arguments under Section 110. *Blanck*, 938 F. Supp. 908 at 923. First, they asserted that the United States Army had a substantive duty to spend money on the rehabilitation of certain structures at Walter Reed Army Medical Center. *Blanck*, 938 F. Supp. at 920-23. Second, they contended that the Army failed to prepare a Historic Preservation Plan as required by the statute. *Id.* at 923-24. In the context of the first argument, the *Blanck* court observed that "Section 110(a) cannot be read to create new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA." *Blanck*, 938 F. Supp. at 922 (emphasis added). For that reason, the court held, Section 110 did not impose a substantive duty on the Army to expend funds on preservation activities at Walter Reed. *Id.*

It does not follow, however, that *Blanck* also restricts the procedural requirements of Section 110 to those necessary for compliance with Section 106. Indeed, to interpret *Blanck* in that fashion would be to render Section 110 a nullity. Nor would such an interpretation be consistent with the Park Service's own published guidance on Section 110, which notes that "federal agencies have affirmative responsibilities under [S]ection 110 that go beyond the responsibility for compliance with Section 106." 63 Fed. Reg. 20496.

Defendants' interpretation of *Blanck* also conflicts with the plain language of Judge Friedman's opinion in that case. Defendants invite this Court's attention to a portion of the opinion concluding that Section 110 does not impose any substantive mandate on federal agencies and, in that sense, has a scope consistent with that of Section 106. Blanck, 938 F. Supp. at 922. However, Defendants ignore Judge Friedman's other conclusion—namely, that the Army had, in fact, violated Section 110. *Id*. at 924. Indeed, between 1984 and 1992, "Walter Reed was in compliance neither with Section 110 nor with its own regulations." *Id*.[28] Those two holdings are fully reconcilable by concluding that Section 110 imposes mandatory procedural requirements on federal agencies and, further, that agency obligations under Section 110 stand separate and apart from agency obligations under Section 106.[29]

Thus, *Blanck* stands for the proposition that Section 110, like Section 106, is procedural in nature. In that sense—and that sense only—*Blanck* restricts the scope of Section 110 to the scope of Section 106. In a procedural sense, however, the two statutory sections remain distinct. *Blanck* does not stand for the proposition that Section 110 imposes no procedural responsibilities beyond those found in Section 106.

This distinction is important because Plaintiffs' Section 110 claims are procedural in nature. Plaintiffs do not argue that Section 110 absolutely prohibits demolition of the Cyclorama Center. Pl. Motion at 43-44 (Park Service process for determining maximum feasible use flawed). Nor do they contend that Section 110 bars the Park Service from building new facilities

---

[28] The Army finally cured the violation in 1992 by preparing the required plan. *Blanck*, 938 F. Supp. at 924 ("Walter Reed's 1992 Cultural Resource Management Plan, while belated, rectifies the procedural and informational harm done by the Army's failure [to comply]"). In contrast, there has been no subsequent compliance in this case.

[29] Plaintiffs do not mean to suggest that agency activities conducted for purposes of compliance with Section 106 can never satisfy Section 110. Rather, they claim that *in this case*, the Park Service's asserted Section 106 compliance did not satisfy Section 110 and, further, that compliance with Section 106 does not, as a matter of law, provide a bar to claims brought under Section 110.

at Gettysburg.  *Id*.  *See also* Complaint at 28-32.  Rather, Plaintiffs claim that the Park Service

failed to properly evaluate maximum feasible use of the Cyclorama Center before constructing

new facilities.  Pl. Motion at 43-44.  Because this is a fundamentally procedural claim,

Defendants' asserted compliance with Section 106 does not provide them with an absolute

defense against claims under Section 110.[30]  And, for the same reason, Plaintiffs' decision not to

challenge Defendants' Section 106 compliance does not bar their Section 110 claims.  *See* Def.

Motion at 36, 38 (suggesting that Plaintiffs are too late to challenge Section 106 compliance).

### B.  Defendants Failed to Prepare An Adequate Preservation Program

NHPA also mandates that each federal agency establish a preservation program for the

protection of historic properties.  16 U.S.C. § 470h-2(a)(2).  Such programs must ensure, among

other things, that any historic properties under the jurisdiction or control of the agency which are

listed in or may be eligible for listing in the National Register of Historic Places be managed and

maintained in a way that considers the properties' historic, archaeological, architectural, and

cultural values.  *Id*.

Defendants contend that they have implemented an agency-wide preservation program

for the protection of historic properties, and that any suggestion to the contrary is based on a

"mistaken impression."  Def. Motion at 42.  But Defendants have only themselves to blame for

any misunderstanding.  On October 16, 2006, counsel for Plaintiffs requested that the Park

Service make available, pursuant to the Freedom of Information Act ("FOIA"), the following

documents:

> • "The preservation program for the protection of historic properties, as
> required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the
> Cyclorama Center at Gettysburg National Military Park in Gettysburg,
> Pennsylvania."

---

[30] For that same reason, Defendants' asserted compliance with section 106 does not bar
Plaintiffs' Section 110 claims on statute of limitations grounds.  *See* Def. Motion at 36-37.

- "To the extent not covered by the foregoing request, all documents, records, and other materials related to the preparation of the preservation program for the protection of historic properties, as required by and defined in 16 U.S.C. § 470h-2(a)(2), that applies to the Cyclorama Center at Gettysburg National Military Park in Gettysburg, Pennsylvania."

Pl. Motion at 44-45; Pl. Complaint at 22-23; Adams Dec. at ¶7, 8; Ex. C, D, E.  The Park Service responded "[t]here are no records responsive to your request."  *Id.*

In response to Plaintiffs' Motion for Summary Judgment, however, Defendants have provided a very different answer.  They have identified several documents which, they claim, form a preservation program for the protection of historic properties sufficient to satisfy Section 110.  Def. Motion at 42-43.  In addition, they assert that the Park Service "took steps with the Cyclorama Building with respect to Section 110(a)(2)."  Def. Motion at 43-44.

Defendants seek to explain away the discrepancy between their two responses by suggesting that the Park Service truthfully "did not have documents responsive to a request regarding a preservation program specifically for the Cyclorama Building."  Def. Motion at 43 n.30.  But Plaintiffs did not request information "regarding a preservation program specifically for the Cyclorama Building."  *Compare* Def. Motion at 43 n.30 ("preservation program specifically for the Cyclorama Building") *with* Pl. Motion at 44-45 (program…that applies to the Cyclorama Center").  Rather, as explained above, they asked to review the program "that applies to the Cyclorama Center."  *Id.*  If Defendants believe they have prepared an agency-wide program which satisfies Section 110, that program must, by definition, be one that "applies to the Cyclorama Center."

Defendants' explanation is simply too cute to be convincing.  Such avoidance of direct responses to direct questions it has been a prominent feature of Defendants' approach to NEPA from the beginning of the GMP/EIS process.  From the outset, the Park Service has refused to provide straightforward explanations about the GMP/EIS and other Park planning efforts—even

when testifying before Congress—thereby prompting Congressman George Miller (then the ranking member of the House Resources Subcommittee on National Parks and Public Lands) to criticize the agency's "pattern of omissions, and misleading and inaccurate statements regarding the Gettysburg proposal." *See* Declaration of Christine Madrid French ("French Dec.") at Ex. A, attachments S and T.[31]

Defendants' treatment of Plaintiffs in this matter has been similarly cavalier. Prior to filing this action, Plaintiffs and their counsel attempted to reach Superintendent Latschar, both in writing and by telephone, on at least six occasions between October, 2005 and September, 2006 in order to discuss the Park Service's plans for the Cyclorama Center and its compliance with NEPA and the NHPA. *See* Pl. Motion at 10-12; Complaint at 20-23. Plaintiffs also tried to reach the agency's Chief of Environmental Quality, and while the Chief initially promised to obtain the information Plaintiffs requested, he never did so. *Id.* In fact, he never provided any response whatsoever. *Id.*

Indeed, Defendants have never satisfactorily explained their repeated failure to provide any response to Plaintiffs' collegial, non-adversarial requests for information about the Park Service's plans for the Cyclorama Center. When finally forced—by this litigation—to disclose those plans and the agency decision-making processes which produced them, Defendants have largely provided illogical, internally-inconsistent explanations reeking of *post hoc* rationalization. It is little wonder that they utterly and completely failed to comply with their Congressionally-mandated duties to identify, evaluate, and disclose to the public the environmental impacts of demolishing the Cyclorama Center.

---

[31] Congressman James Hansen, then Chairman of that Subcommittee was not nearly so charitable, characterizing Superintendent Latschar's statements in particular as "arrogant and self-serving' and "callous and contemptible." French Dec. Ex. A, attachment T.

## IV. Conclusion

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Summary

judgment and deny Defendants' Cross-Motion for Summary Judgment.

Respectfully submitted,

/s/
_____
Nicholas C. Yost (USDC-DC Bar No. 968289)[32]
Matthew G. Adams (CA Bar No. 229021)
SONNENSCHEIN NATH & ROSENTHAL LLP
Attorneys for Plaintiffs
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

---

[32] Mr. Yost is admitted to practice before this court (USDC-DC Bar No. 968289).  Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar. No. 35297).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECENT PAST PRESERVATION )
NETWORK, a Virginia non-profit corporation, )
P.O. Box 100505, Arlington, VA 22210; )
DION NEUTRA, 2440 Neutra Place, Los )
Angeles, CA 90039; and CHRISTINE )
MADRID FRENCH, 2522 Willard Drive, )
Charlottesville, VA 22903, )
                                        )
       Plaintiffs, )
                                          )
       v. )
                                          )
JOHN LATSCHAR in his official capacity as )
SUPERINTENDENT OF GETTYSBURG )
NATIONAL MILITARY PARK, 97 )
Taneytown Rd., Gettysburg, PA 17325; )
DENNIS REIDENBACH in his official )
capacity as ACTING DIRECTOR, )
NORTHEAST REGION OF THE )       Case Number.:  1:06-CV-02077-TFH
NATIONAL PARK SERVICE, 200 Chestnut )       Judge:  Thomas F. Hogan
Street, Philadelphia, PA 19106; MARY )       Deck Type:  Administrative Agency
BOMAR in her official capacity as )                          Review
DIRECTOR OF THE NATIONAL PARK )       Date Filed:  12/05/2006
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; DIRK KEMPTHORNE in his )
official capacity as SECRETARY OF THE )       PLAINTIFFS' RESPONSE TO
UNITED STATES DEPARTMENT OF THE )       DEFENDANTS' STATEMENT OF
INTERIOR, 1849 C Street, N.W., Washington, )       UNDISPUTED MATERIAL FACTS
D.C. 20240; THE NATIONAL PARK )
SERVICE, 1849 C Street, N.W., Washington, )
D.C. 20240; and THE UNITED STATES )
DEPARTMENT OF THE INTERIOR, 1849 C )
Street, N.W., Washington, D.C. 20240, )
                                          )
       Defendants. )
                                          )
                                          )

Although Plaintiffs remain optimistic that this case can and will be resolved by the parties' cross-motions for summary judgment, pursuant to Local Rule LCvR 7(h), they hereby provide their statement in response to Federal Defendants' statement of undisputed material facts.  Unless explicitly noted below, Plaintiffs do not dispute the existence of the documents cited by defendants; rather, they dispute Defendants' characterization of those documents.

Paragraphs 1 through 7 are immaterial.

Defendants' statements in paragraph 10 are inconsistent with the very pages of the administrative record to which they cite.  Plaintiffs dispute the fact that Park Service planning efforts through the 1970s and early 1980s, including the 1982 General Management Plan, were consistent in proposing the eventual elimination of the Cyclorama Center.  AR 146, 3069. Plaintiffs also dispute the fact that the referenced ACHP publication proposed elimination of the Cyclorama Center.  Plaintiffs are unable to understand the first sentence of Defendants' statement in paragraph 10; however, to the extent that sentence suggests that any referenced document proposed or contemplated elimination of the Cyclorama Center, Plaintiffs dispute that sentence as well.  AR 146, 3014-15.

Plaintiffs dispute Defendants' statements in paragraph 11 in that the record contains no evidence of a 1994 assessment proposing to remove modern intrusions from the battlefield.  AR 3069.

Plaintiffs dispute Defendants' statements in paragraph 12 in that there is no evidence in the record that the 1995 EA was intended to be a continuation of a single planning process.  AR 3067-3071.

Plaintiffs dispute Defendants' statements in paragraph 15 in that the Park Service never finalized the 1995 Draft EA or issued findings based on impacts identified in such a document. AR 2270, 3252.

Paragraph 16 contains mixed statements of law and fact.

Paragraph 17 contains mixed statements of law and fact.

Plaintiffs dispute Defendants' statements in paragraph 21 in that the Park Service never finalized the 1995 Draft EA or reached conclusions based on impacts identified in such a document. AR 2270, 3252.

Plaintiffs dispute Defendants' statements in paragraph 25 in that the record contains no evidence of the "issuance" of the 1996 Draft EA. AR 1-13; unpaginated index for supplemental administrative record.

Paragraph 26 contains mixed statements of law and fact.

Paragraph 27 contains mixed questions of law and fact.

Paragraph 28 contains mixed questions of law and fact.

Paragraph 30 contains mixed questions of law and fact. In addition, Plaintiffs dispute the statements in paragraph 30 in that there is no document in the record establishing that the Park Service ever finalized the 1996 Draft EA or issued findings based on impacts identified in such a document.

Paragraph 31 contains mixed questions of law and fact. In addition, Plaintiffs dispute the statements in paragraph 30 in that there is no document in the record establishing that the Park Service ever finalized the 1996 Draft EA or issued findings based on impacts identified in such a document.

Plaintiffs dispute Defendants' statements in paragraph 34 in that the record contains no evidence of the "issuance" of the 1996 Draft EA.  AR 1-13; unpaginated index for supplemental administrative record.

Paragraph 35 contains mixed questions of law and fact.  Plaintiffs dispute Defendants' statements in paragraph 35 in that the record contains no evidence of any "noticing" of termination the 1996 Draft EA.  AR 1-13; 2311-12; unpaginated index for supplemental administrative record.  Plaintiffs also dispute that the Park Service notified the public of "this decision" in that the record does not contain the notice materials.

Paragraph 36 contains mixed questions of law and fact.  Plaintiffs also dispute Defendants' statements in that the record does not actually contain the cited language.  AR 16-17, 172.

Paragraph 39 contains mixed statements of law and fact.

Paragraph 40 contains mixed statements of law and fact.

Paragraph 42 contains mixed statements of law and fact.  Paragraph 42 is immaterial. Plaintiffs also dispute Defendants statements to the extent that those statements imply that the demolition of the Cyclorama Center was planned in the GMP/EIS.  AR 18-20, 222-255, 270-79.

Paragraph 45 contains mixed statements of law and fact.  Plaintiffs also dispute all statements in paragraph 45 in that they imply that the GMP proposed or evaluated demolition of the Cyclorama Center.  AR 18-20, 222-255, 270-79.

Paragraph 46 contains mixed statements of law and fact.  Plaintiffs also dispute all statements in paragraph 46 in that the impacts common to all action alternatives **may** include removal of the Cyclorama Center.  AR 223, 231-32.  Plaintiffs also dispute the statements in paragraph 46 in that the record does not state that removal of the Cyclorama Center would result in benefits to natural resources.

Plaintiffs dispute the statements in Paragraph 47 in that those statements imply that the findings of the DCP were incorporated in the draft GMP/EIS.  The GMP/EIS does not incorporate by reference the findings of the DCP.  AR 1951-2304, 3353.

Paragraph 48 contains mixed statements of law and fact.

Paragraph 49 contains mixed statements of law and fact.

Paragraph 50 contains mixed statements of law and fact.

Paragraph 51 contains mixed statements of law and fact.  Plaintiffs also dispute the statements in paragraph 51.  AR 18-20, 222-255, 270-79, 1606-07.

Paragraph 54 contains mixed statements of law and fact.  Plaintiffs also dispute the statements in paragraph 54.  AR 461, 494-97; Scot Andrew Pitzer, *Top Battlefield Steward*, Gettysburg Times, Feb. 1, 2008, A1 at A5.

Paragraph 55 contains mixed statements of law and fact.

Paragraph 56 contains mixed statements of law and fact.

Paragraph 57 contains mixed statements of law and fact.  Plaintiffs also dispute the statements in paragraph 57.  AR 1606-07.

Paragraph 58 contains mixed statements of law and fact.  Plaintiffs also dispute the statements in paragraph 58.  AR 1606-07.

Paragraph 59 contains mixed statements of law and fact.  Plaintiffs also dispute the statements in paragraph 59.  AR 1606-07.

Paragraph 60 contains mixed statements of law and fact.  Plaintiffs also dispute the statements in paragraph 60.  AR 1606-07.

Paragraph 62 contains mixed statements of law and fact.  Plaintiffs also dispute the statements in paragraph 62 in that the record does not contain evidence of "considerable effort."

Paragraph 63 contains mixed statements of law and fact.

Paragraph 64 contains mixed statements of law and fact. Plaintiffs also dispute the statements in paragraph 64. AR 1606-07.

Paragraph 65 contains mixed statements of law and fact. Plaintiffs also dispute the statements in paragraph 65 in that the Cyclorama Center was used by tens of thousands of visitors. AR 2823-2869. Plaintiffs also dispute the statements in paragraph 65 regarding rehabilitation. AR 1606-07; Declaration of Robert Shoaff; Declaration of David McIlnay; Declaration of Jerry Matyiko.

Paragraph 67 contains mixed statements of law and fact. Plaintiffs specifically dispute the statements in paragraph 67 in that there is no evidence that the cited document was ever "issued." Plaintiffs also dispute the remainder of the statements in paragraph 67. AR 1605-07.

Paragraph 68 contains mixed statements of law and fact. Plaintiffs specifically dispute the statements in paragraph 68 in that there is no evidence that the cited document was ever discussed at the cited event. AR 1519-32.

Paragraph 69 contains mixed statements of law and fact.

Paragraph 71 contains mixed statements of law and fact.

Paragraph 72 contains mixed statements of law and fact.

Paragraph 77 contains mixed statements of law and fact.

Paragraph 78 contains mixed statements of law and fact. Plaintiffs also dispute statements in paragraph 78 in that Alternative C provided only for the removal of intrusions, and that such removal "**may**" include removal of the Cyclorama Center. AR 223, 231-32.

Respectfully submitted,

_____/s/_____
Nicholas C. Yost (USDC-DC Bar No. 968289)[1]
Matthew G. Adams (CA Bar No. 229021)
SONNENSCHEIN NATH & ROSENTHAL LLP
Attorneys for Plaintiffs
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Telephone: (415) 882-5000
Facsimile:  (415) 882-0300

---

[1] Mr. Yost is admitted to practice before this court (USDC-DC Bar No. 968289).   Mr. Yost is admitted to the District of Columbia Bar, but his membership is inactive.  Mr. Yost is an active member of the California Bar and practices under that membership (Bar. No. 35297).

# EXHIBIT 1

APR-09-2008  15:44    Gettysburg Times    717+334+4243    P.02/07

# TOP BATTLEFIELD STEWARD

*Park Superintendent Dr. John A. Latschar attempts to set the record straight on contentious issues that have dogged his Gettysburg career*



Gettysburg National Military Park Supt. Dr. John A. Latschar uses a wall map to describe battlefield boundaries during a *Times* interview.

SCOT ANDREW PITZER
*Times Staff Writer.*

**(Part 1 of 2)**

Gettysburg National Military Park Superintendent Dr. John A. Latschar, during a three-hour interview Wednesday afternoon at his park office, discussed the status of ongoing battlefield projects, talked about his future in Gettysburg; addressed street rumors, and gave his views on several controversial topics, including the park's relationship with the Association of Licensed Battlefield Guides.

Following are his answers to questions posed by the *Times*:

**Is this your retirement job?**

Being a superintendent for the Park Service is one of the best jobs in the world. I couldn't imagine anywhere I'd rather work. I've turned down high-level jobs in Philadelphia and Washington to stay here. My commute to work takes maybe two-and-a-half minutes. I get to live my work, and I'm right here at the battlefield. There's no problem in being reminded every single day what I ought to be doing. Why would I want to work in an office in Philadelphia?

**Have you set a retirement date?**

I'm not a career planner, so I'm not saying never. But I am 60 years old. My current intention is to retire, whenever that happens, right here. I'm going to stick around for as long as I'm having fun, and I'm having fun right now. Seriously, we are able to make — and I say we collectively, because none of this is me alone — we've been able to make significant improvements, I think, to the battlefield itself and for our visitors. We're just dawning on the start of excitement for downtown Gettysburg. We've got a lot of projects still on the plate. Not only do I want to see the museum and visitor center open, I want to see them functioning properly.

**After 13 years here — and the criticism — you're still having fun?**

"In short, yes. I look forward to going to work almost every day. My daddy told me a long time ago that anyone who looks forward to going to work more days a week than not was a lucky son of a gun, and I think that's true."

The visitor center and museum project was originally estimated to cost $43 million, but has ballooned to $125 million. What happened?

"One of the things that we have not successfully conveyed to the public is the difference between the cost of the building and the

(See LATSCHAR, Page A5)

(Continued from Page A1)

cost of the project. As we laid out with the GAO (Government Accountability Office), for example, in our Park Service estimates, we estimated so much for land acquisition, so much for design, and so much for building construction. We didn't estimate the costs that were specific to the Gettysburg Foundation. For example, we didn't estimate what the cost of fund-raising would be, or the Foundation's administrative costs. We didn't realize then, but one thing we understand now, is that if you're going to go out and do major funding, those donors are going to require that you have a reserve and an endowment, because they don't want to see their money going toward a project that they're not sure is going to be there 20 years from now, when they want to bring their grand-kids. So the Foundation added endowment costs and fund-raising costs, which was $20 million of the difference between the first jump, from $43 to $95 million. The rest of the jump was primarily a result of the engineering and architectural estimates, because they didn't need to be estimated originally, nor was there a need."

**Has the scope of the project changed?**

"Let me use this language very carefully — the scope of the project has not changed at all. If you go back to 1998, the terminology and the scope of the project that was published in our General Management Plan has not changed. If you go back there, it says we're going to have a theater, a cyclorama program, a bookstore, a museum, curatorial storage and a food area."

**Then what, specifically, has changed between 1998 and now?**

"Two things. The estimated costs, when the National Park Service first estimated the project in 1998, and the eventual costs. The quality of the project is what I like to emphasize. The Cyclorama restoration (originally budgeted at $1 million but now $16 million) is my favorite example. We stated in the General Management Plan that we needed to restore the Cyclorama painting... but we didn't have a good idea of what that was going to entail. Our studies hadn't been done, and we didn't know that, in order to restore (the painting) to its 1888 appearance, we had to add 14 feet of sky. We also had to put a three-dimensional diorama back in. What changed isn't what we're going to do, as compared to how well we're going to do it."

**(CONT.)**

Case 1:06-cv-02077-TFH   Document 33-2   Filed 04/11/2008   Page 4 of 7

...is the actual size of the new Emmitsburg Pike visitor center, which opens in mid-April," crowd.

"That's another classic example. Once we first put together the architectural program in the General Management Plan in 1998, and said we needed 4,100 feet and so many square feet and we needed a Cyclorama gallery with so many square feet, and so on... we estimated, the square footage that we thought we'd need. Then you add everything together to get to your total, and in the General Management Plan, that was 118,000 square feet. What we didn't have time, or the ability to do when we were in the planning stage, and we couldn't do it until the architects came on board and actually did the architectural work, is that once you put all of that together, then you have to figure out the circulation space, so you don't have bottlenecks. We didn't know how much we would need in circulation space until we got into the actual planning and design phase. That, in a nutshell, is why our General Management Plan said we'd need...

...a 118,000 square-foot building compared to what we have now of 138,000 square-foot building. We've added 20,000 square feet in circulation space. Planning traffic flow in a public use building is just like any other traffic analysis. You have to know where the people are coming from, where they're going to go, and when the entrances go there and your always plan for the peak time.

"Some people in the public area have a hard time figuring out, when they see the cost projections, why the figure has increased so much.

"We've certainly done our best to educate them. There were two different projections when we went from $42 million to $95 million. Actually, when we went from $95 million to $125 million, the first increase marks the difference between the Park Service planning estimates in the General Management Plan — and those planning estimates are just on a planning level, because obviously we hadn't engaged with architects or engineers — and the Gettysburg Foundation's first fund-raising goal of $95 million. The second giant leap, if you will, was just last year when it went from $95 million to $125 million."

## Is the goal still $125 million?

"Yes, but again, that is total project costs... that's not building costs. When we moved to $125 (million), now, we're also talking about the costs of taking down the old visitor center and Cyclorama buildings, and restoring the Cemetery Ridge landscapes. Also, some of that jump was the increased fund-raising costs, because we didn't get the project done as quickly as we originally thought. In 2000, we thought we'd open in 2005. In 2002, we thought we'd reopen in 2006.

"There are critics who don't understand why the fund-raising goal is as high as it is.

"When people ask these questions, it always takes me a split second to recuperate. The news that the Foundation was formally raising its goal from $95 to $125 million, to me, was unblemished great news. It's longterm. It's a vision. It's a goal. I always laugh when people... turn that around and ask, how can you justify the Foundation having to raise its goal to $125 million when they said before they'd only have to raise $95 million, and originally, the Park Service said it would only need $43 million? My initial reaction is where's the problem? It's good news for everybody. I'm going to be very disappointed if, come 2009, when the Foundation has successfully raised $125 million, if they only increase their goal to $150 million. Why not go for more?"

## How did the merger of the Friends of the National Parks at Gettysburg with the Gettysburg Foundation affect the fund-raising goal?

"Prior to the merger, the Foundation was out there concentrating only on raising funds for the museum and visitor center. The Friends were out there doing their thing, and they were raising a million dollars a year for us for multi-purpose projects. Now you have the Friends — with their goals — and make them a part of the Foundation. We forwarded those traditional Friends projects, which are worth about a $1 million a year, to the Foundation, so naturally, the fund-raising goal is going to get higher."

## Is the Gettysburg Foundation effective?

"They're outstanding. The Foundation's commitment throughout the whole process is beyond reproach. At least once a month, for the last two years, they've come to United States...

...where we really want to do something because it'll result in better visitor service or a better exhibit or a little bit more lasting quality... and almost every single time the Foundation has said that they'll raise the extra money."

"The national average for a new visitor center is $5 million, but here it's $105 million. What's the rationale?"

"The answer is, of course, because there are no comparable projects. You may be referring to the GAO study, done years ago, on National Park Service visitor centers, which of course, we participated in. There's no other park in the United States that has a Cyclorama painting, or the space requirements for that painting. There are very few of those visitor centers that were compared in that GAO study, that have museums. Most parks don't have museums. They have visitor centers but not a museum, so with that, those parks are relieved of the responsibility of taking care of artifacts. We have a million artifacts. When we talked to the GAO about that, we told them where all asterisks over their...

Gettysburg section of that report pointing out that we're the only one to have a Cyclorama, and we're one of the few parks that have a museum. That's why we're different, and that's the reason we went into a partnership to raise money. I knew back in 1995, when we were just getting permission to try to conceive a partnership that there was no way that Gettysburg was ever going to get enough, Congressionally, appropriated funds here, and that's because our needs for the new visitor center and Cyclorama were so much greater than other parks. That's why we wanted a partnership, from the 'get-go.' There are smaller partnerships all over the place. As far as the size and complexity of what we're doing right now, yeah, we're the most public partnership in the National Park Service. We're very much in the public eye right now, and that's because we're Gettysburg."

"The GAO visited the battlefield in early December and a second time this month. Was it a big deal?"

"I didn't think it was a big deal. I think it's important, because of what they do for the Park Service. This is the Eleventh GAO investigation that I've been personally involved in, and that's counting my experience at other parks. They spent two full days with us in December. They came back a couple of weeks ago, and spent an hour and a half with us, before spending some time with the Foundation and then some time with other local folks. We think it's all good, because most of our experiences with the GAO have been good. We're no strangers to them, and vice versa. When they came back again this month, they asked us for recommendations that we would have to prove that our current partnership process enables Park Service projects to happen more easily, more efficiently..."

(CONT.)

APR-09-2008  15:46          Gettysburg Times                717+334+4243      P.05/07



DARYL WHEELER/GETTYSBURG TIMES

Superintendent Dr. John Latschar fields questions during an interview with the *Gettysburg Times.*

ciently, and more effectively."

Why is the GAO looking at the GNMP?

"They conduct two types of investigations, and one is what we call educational. Congress basically says, 'Go out there and see what's going on.' The other type of investigation is when Congress has a feeling of suspicion or inappropriateness. We've had both types of visits up here. The GAO came up here several years ago because there were accusations that the Friends of the National Parks at Gettysburg and the GNMP Advisory Commission were acting inappropriately. That was an investigation, but we were cleared."

Which type of investigation was the GAO conducting here recently?

"This is more of an educational examination. Right now, before Congress, there is proposed legislation for the Centennial Challenge, and in a nutshell, it's taking the partnership concept such as we're using here with the Gettysburg Foundation, and making it a nationwide initiative. They're calling it the Centennial Challenge because the 100th anniversary of the National Park Service is coming up in a couple of years. The current administration proposal to Congress is that they're to put up $100 million a year for 10 years, to be matched by the private sector — dollar for dollar — to get major park improvement projects, just like we're seeing here, completed in time for the Centennial, so we'll be ready to serve the American public for the next 100 years. The subcommittee, where this legislation is being debated, asked the GAO to examine how the National Park Service handles donations and contributions. The sub-committee told them to make sure to come to Gettysburg because — guess what — we're the most visible park and partnership in the nation right now."

*Part 2 of the interview in Saturday's Gettysburg Times.*

# GNMP 'Super' Latschar talks money, taking heat

**EDITOR'S NOTE:** *This is the second in a two-part series outlining the views of Gettysburg National Military Park Superintendent Dr. John A. Latschar, expressed during a three-hour interview this week.*

**BY SCOT ANDREW PITZER**
*Times Staff Writer*

*What happens now with the GAO investigation?*

Latschar: "I can tell you for sure, because GAO told me, that there will not be a separate report on Gettysburg. That rumor has been out there, and from what I know, it's not true. Gettysburg is part of a larger nationwide study. The Congressional committee wants that study to be released by August; which fits the Congressional calendar for passage of bills. The GAO also told me that they want to visit up to a half-dozen other parks that are in the sort of stage of forming or cementing partnerships. As far as everything that I'm aware of, we're part of a larger study that's intended to be genuine. The next thing I anticipate from the GAO, if they follow their schedule to publish in August, is that sometime in July we'll get a copy of their draft and be able to comment on it. I don't expect to hear much more from them."

*There are a lot of street rumors.*

Latschar: "The GAO is not going to recommend that I be relieved of my duties. Number one, they don't do that, because it's outside of what they've been chartered to do by Congress. We're not terribly surprised to know that there's rumors out there that I'm going to lose my job as a result of the GAO coming to town, or that there's an Inspector General investigation. It's not surprising to know that some of the names attached to those rumors are the same ones who have been attacking us since the 1990s when the new visitor center first an issue."

*Is the Inspector General investigating the park?*

Latschar: "There is no Inspector General investigation. I've been hearing that for three weeks. What else have I been hearing through the grapevine? I was informed Sunday that I'm going to be arrested this week."

*You've been a lightning rod for personal attacks.*

Latschar: "The third stage of debate is when opponents hope they can attach stigma to the person responsible for the decision, and maybe the decision, itself, will go away. All I can say for certain is that with every single decision we've made here at Gettysburg — from one-way roads to management of white-tail deer, to the new visitor center and museum — inevitably, some of those folks opposed to the decisions have descended to the point of attacking me personally, in the hopes that they can besmirch my name and attach stigma. The battlefield guides are an example. We have a reservation system, and we've been through the process of getting to that system, so now they're down to the personal level. They're now attacking me by attacking my wife. It's regrettable, but it comes with the territory."

*What is the park's relationship with the Association of Licensed Battlefield Guides?*

Latschar: "In the past, we have had a very collegial relationship with the Association of Licensed Battlefield Guides. We view the Association as a shortcut to make it easier for us so we don't have to ask 150 different guides what they think about something... we can just ask the group. But that relationship started to deteriorate under the current president (Rick Hohmann). There's a lot of rhetoric being spilled. There has been less and less negotiation, and more and more screaming and yelling on their side. Some of their concerns, in general, are very realistic because they are about change. It's just as realistic as the merchants on Steinwehr Avenue, when they first figured out, in the 1990s, that we wanted to move a half-mile away. The guides are going through basically the same scenario, because their concern is about change with the new system. They've been doing things one way for a long time."

*The Association has referenced your wife — Terry, who is a Licensed Guide — as being a problem. Was she attending Association meetings, taking notes, and then sharing them with you?*

Latschar: "I don't think there's any issue. When Terry resigned as a ranger and went back to guiding, which was last May... she paid her dues, and started going to meetings. She didn't think anything of it, and I didn't either. One of the reasons that I didn't think anything of it was that I have never not known everything that has happened at an Association meeting, because the Association has never tried to hide their business from the park. If we weren't informed formally by the Association's executive council itself, we were told informally by guides who had gone to the meetings. After she attended her first meeting, I got a letter from Rick (Hohmann), who wrote that he considered it a conflict of interest for my wife to be going to his meetings, and that I should forbid her from doing so. One of my chief rangers asked him: 'Are you sure you want to give the superintendent authority to say which guides can come to Association meetings and which guides cannot?' I have no more moral, legal, or ethical power to say my wife can't go to an Association meeting, if she's paid her dues and joined the Association, than say she can't go to a Red Cross meeting."

*Explain the role that Robert Kinsley has in the visitor center and museum project. He's the developer?*

Latschar: "He's the chairman of the Board of Directors for the Gettysburg Foundation. And like any state chartered 501c3, all decisions are made by the Board of Directors, which I think has 23 people at last count."

*How did you originally cross paths with Mr. Kinsley?*

Latschar: "Way back in 1996, the Park Service released an RFP, which is a request for proposal, for our partner or partners to help us do our project. That's where we first met Mr. Kinsley, because he submitted one of the responses. When Mr. Kinsley's proposal was accepted by the Park Service as a proposal to negotiate, we told him that in order to carry this out, you're going to have to create a non-profit foundation, which he had done by 1998, I believe. That's the Gettysburg Foundation. The Foundation's board is a fundraising board, and as chairman of the board, Mr. Kinsley personally supervises the project, and is the boss of Bob Wilburn, who is the president of the Foundation. All the way through this project, when we're hiring architects or whatever, the architects were hired by the Foundation and its Board."

*Is there a conflict of interest with Mr. Kinsley serving as the Board Chairman and his company working at the Baltimore Pike visitor center site?*

Latschar: "Mr. Kinsley never had any say, if you will, in hiring the architects. He always has, through the board of directors, had oversight into anything that's going on. And as a leading contributor to the project, we're very, very sensitive to his desires, like we are to all of our other major contributors. He's given $8 million in cash toward this project."

*What is the involvement of York-based Kinsley Construction with the visitor center project?*

Latschar: "When it came time to go to construction, Mr. Kinsley came to the Board of Directors with a proposal... to use Kinsley Construction as a construction management firm for the project. A construction management firm doesn't own a hammer, or a saw. A construction management firm takes the architectural drawings, and they review them from a constructability point of view, correct any mistakes, and put them out for bid. Then, they receive and review the bids, and then recommend back to the Foundation who the best bid is. They never touch any dirt. In a project like this, there is no one bid. We've had about 43 bids for sub-contracting over the course of the project."

CONT

APR-09-2008  15:48          Gettysburg Times                           717+334+4243    P.07/07

much is Kinsley struction being paid by the [Gettys]burg Foundation?"

Latschar: "Construction management services for a project like his were estimated to be worth million to $4.5 million. The of that, if you were to go out in the street to hire a construction management firm to manage a project for you... well, that's the price range you could expect to pay for those services. Mr. Kinsley offered those services to he Foundation for at-cost; which means without profit, and without overpaying, thereby saving the Foundation something like '$2 million over the course of construction. There is no profit."

Why is he doing the project at-cost and not for a profit?

Latschar: "Two things: number one is having his heart in the right place. He's already given over $8 million in cash and this is just another way he could serve. Number two: Mr. Kinsley just happens to believe, and having seen his folks at work... I agree with him... that he has the best construction management folks in his part of the country."

Critics have suggested that secrecy was a factor when the Board hired Kinsley Construction.

Latschar: "The Board of Directors did all of the ethical stuff. They recused Mr. Kinsley, and Mrs. Kinsley, because she's on the board. They also recused he secretary and the treasurer, because they're Kinsley employees. They were out of the room while the rest of the board discussed this. They also had an attorney look into it, and we've got all the paperwork. An outside auditing firm was brought in just specifically to audit the cost charged against construction management. So again, everyone can see the audit report and say, yes, indeed Mr. Kinsley didn't make any profit. I went down to Washington and had a solicitor's opinion saying that with those safeguards in place, there was no conflict of interests, and the Park Service approved."

is there a limit on how much money the Gettysburg Foundation can borrow for your project?

Latschar: "There is a contractual limit of $20 million that can be borrowed, but right now, they're only planning to borrow $15 million... and they're tax-free bonds. They're allowed to pay them off over 20 years. We're close enough to the end with this project where I can tell you that they're only going to borrow $15 million."

Why borrow money? Can't the Gettysburg Foundation raise all of the funds?

Latschar: "It could be raised, but it would take longer. You borrow to get the money now. There is a certain percentage that you set aside, that's appropriate to borrow, that can be paid back in a reasonable time through anticipated revenues. When we signed the agreement in the year 2000, we said that they could borrow a certain amount. There's never been a shortfall."

How will the Gettysburg Foundation pay off the $15 million in debt?

Latschar: "They'll pay it off in several major ways. Number one is through the admission fees to the theater and Cyclorama building, which are very similar to our old Electric Map and Cyclorama charges. The Foundation also has a contractor, Event Network, who's going to operate the book store. That will be operated on a commission basis... not rent... so that the Foundation gets a certain percentage of the gross proceeds of the book store. It's an escalating percentage — the more they sell, the more the Foundation gets. They have a contractor to provide food service, Aramark, and again, they'll get an escalating commission rate on the gross sales in the food service area from that contractor. Those are the three or four main ones: the theater; the Cyclorama, the book store and the food service."

What are the projected revenues of your new facility?

Latschar: "We're talking about them collecting... around $7.5 to $8 million a year. We've been doing $4.5 million a year just from our book store, the Electric Map and Cyclorama program, so it's not out of reach."

Latschar: "If there's anything left over at the beginning of the year, then the Park Service and the Foundation decide how to spend it. It could go toward paying down the debt faster, or it could go to new furniture or equipment, or just be donated back the park. The point is, none of that money leaves the site, because the Foundation is a state chartered 501c3 with the sole purpose of supporting the park. If revenues are higher than anticipated, no one on the Board of Directors gets a bonus, because all of them serve without pay. I know that some of the continual critics out there are still convinced that either me or Mr. Kinsley are going to ride off into the sunset with saddle bags full of money, and that just isn't true. It's just not going to happen."

What is your arrangement with Eastern National? Are they still working at the park?

Latschar: "There were two contracts. The contract with Eastern to operate the (new) book store, that's the one they lost to Event Network. But obviously, Eastern is going to operate this book store until the day we close and move... and Event Network takes over the new one. The second contract was to operate our ticketing and reservation system, the Electric Map, and for some custodial services, and that's the one that was violated in October 2006."

Why was Eastern's contract terminated in 2006 and what were the specific violations?

Latschar: "It was a contract... for reservation services... that was terminated amongst a certain amount of turmoil... and the Gettysburg Foundation took over those duties. That contract had certain provisions and Eastern violated about a half-dozen of those provisions. On a Friday night after all of the Park Service people had left work, Eastern took their entire advanced reservation staff 'out of this building and moved them out to Gateway Gettysburg without telling the park. One of the provisions of our contract is that Eastern is prohibited from doing business with any commercial enterprises without the Park Service's approval. Eastern did not inform us. They moved after we closed and went home, after five o'clock on a Friday night. Another provision they violated was that Eastern was to sell tickets only for Gettysburg National Military Park, and only GNMP. In other words, they weren't authorized to do reservations for anybody else, or under

thefts and proprietary information being stolen on computers."

Latschar: "Years ago, there were two or three individuals who were successfully prosecuted for theft from the book store while they were book store employees and one of them was a nephew of mine."

Successfully prosecuted?

Latschar: "Yes, by the Park Service Police. You didn't hear that part, huh? In the 13 years that I've been here, there have probably been six employees of Eastern National who have been successfully prosecuted for theft. That's not all that bad of an average for this kind of an operation. But this, is in the rumor mill, because it's an attempt to get at me. My nephew Dave, who is actually Terry's nephew, worked at the book store, and this is back in 2001-02 so he might have been a minor at the time. He, and two of his colleagues if I remember correctly, were caught with their hand in their tail. They were skimming, and caught on video. Eastern saw it. They were all prosecuted and they all pleaded guilty and they all paid their fines... and they don't work here anymore; they paid their restitution to Eastern for their estimated amount, and they all paid fines. All of that is in our law enforcement records... and it was well before the time that Eastern violated its contract, so they're not related."

Were you involved in the prosecution?

Latschar: "It had nothing to do with me. As soon as a crime is committed here, it goes straight into the law enforcement channels, which I cannot interfere with. It went straight from our law enforcement people to our district attorney in Harrisburg."

TOTAL P.07

# EXHIBIT 2

A5623(2310)

**January 8, 2001**

**Memorandum**

**To: Directorate, Field Directorate and Park Superintendents**

**From: Director /s/ Robert Stanton**

**Subject: Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making**

I am pleased to send you Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making and its accompanying Handbook. Together, these documents set forth the policy and procedures by which the National Park Service carries out its responsibilities under the National Environmental Policy Act (NEPA). NEPA and the National Park Service Organic Act are recognized as the two pieces of "landmark" environmental legislation passed by Congress. The provisions of NEPA also supply the Service with a powerful tool we can use to accomplish our mission of protecting this country's parks for future generations.

Director's Order #12 and the Handbook lay the groundwork for a necessary evolution in the way we approach environmental analysis, public involvement, and making resource-based decisions. They set forth a new direction in using interdisciplinary teams, incorporating scientific and technical information, and establishing a solid administrative record for our actions.

Recent court challenges have stopped or redirected some of the Service's actions and decisions. Court decisions are generally based on the adequacy of environmental analysis under NEPA, and the accompanying administrative record. Common themes seen in the court decisions indicate defects in the NPS decision-making process. The courts have cited a lack of, or failure to incorporate, critical information in decisions. In some cases, there has been a basic disregard of laws, regulations, and policies designed to foster resource preservation and conservation. Because of this, I asked a subcommittee of the National Leadership Council to recommend actions to be taken to address these issues. These recommendations, as well as others, are incorporated in the Director's Order and Handbook. They include:

- Use of interdisciplinary approaches and principles in decision-making;
- Decisions based on technical and scientific information;
- Establishment of benchmarks demonstrating best management processes (such as resource councils and project review teams) in development, analysis, and review of projects;
- Use of alternative dispute resolution and other processes to resolve internal and external disputes;
- Peer review panels to address conflicts among resource specialists regarding validity and interpretation of data and resource information;
- Analysis of impairment to resources as part of the environmental impact analysis process; and
- Post-litigation review and analysis of decision-making for potential improvements to resource-based decisions.

To assist in the implementation of the Director's Order, I am directing the Associate Director, Natural Resource Stewardship and Science to re-direct resources and seek additional funding so that the Environmental Quality Division can provide increased technical assistance to parks and regions according to the general model adopted by other Natural Resource Program Center Divisions. Service-wide funding proposals should also be developed so that parks, system support offices and regions have adequate resources to implement them. Lastly, an advisory group made up of regional environmental coordinators, and others from parks, regions, and SSOs should also be established to provide recommendations on improvement of methods and processes used in

environmental impact analysis and policy implementation.

No amount of policy, guidance, or oversight will be successful unless we make a personal commitment to affirmatively fulfill these responsibilities. Our world and our jobs are more complicated now than in any time in history. With this and other issues we must achieve a level of excellence that others will emulate in exercising our resource stewardship responsibilities.

CFagan:1/3/01/208-7456I:/DIRORDER/12-NEPA/DIRECTORSMEMO

 # National Park Service

## DIRECTOR'S ORDER #12: CONSERVATION PLANNING, ENVIRONMENTAL IMPACT ANALYSIS, AND DECISION-MAKING

**Approved:** /s/ Robert Stanton
Director, National Park Service

**Effective Date:** January 8, 2001

**Sunset Date:** January 8, 2005

NPS-12, "NEPA Compliance," is superseded and replaced by this Director's Order and Handbook 12.

**Contents:**

- I. Background
- II. Purpose and Scope
- III. Authority
- IV. Instructions, Requirements, and Policies
    - 1. Sources of NEPA Guidance
    - 2. Director's Order and Handbook
    - 3. Full and Open Evaluation
    - 4. Technical and Scientific Analysis
    - 5. Unknown or Uncertain Impacts
    - 6. The Administrative Record
    - 7. Prohibition on Impairment
    - 8. Records of Decision
    - 9. Peer Review
    - 10. Alternative Dispute Resolution
    - 11. Interdisciplinary Approach Required
    - 12. Evaluating Proposals by Others
- V. Responsibilities
    - 1. Director
    - 2. Associate Director for Natural Resources Stewardship and Science

3.  Regional Directors
4.  Park Superintendents
5.  WASO Environmental Quality Division
6.  Park Resource Specialists
7.  Project Managers and Contracting Officers

## I. Background

The National Environmental Policy Act of 1969 (NEPA), as amended, is landmark environmen-tal protection legislation establishing a goal for federal decision-making a balance between use and preservation of natural and cultural resources. NEPA requires all federal agencies to: (1) prepare in-depth studies of the impacts of and alternatives to proposed "major federal actions"; (2) use the information contained in such studies in deciding whether to proceed with the actions; and (3) diligently attempt to involve the interested and affected public before any decision affecting the environment is made. The 1916 National Park Service Organic Act directs the National Park Service to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." (16 USC 1)

Read together, the provisions of NEPA and the National Park Service Organic Act are consonant and jointly commit the Service to make informed decisions that perpetuate the conservation and protection of park resources unimpaired for the benefit and enjoyment of future generations. Planning, environmental evaluation and public involvement in management actions that may affect national park system resources are essential in carrying out the trust responsibilities of the National Park Service (NPS). Particularly in this era of heightened environmental concern, it is essential that NPS management decisions (1) be scientifically informed, and (2) insist on resource preservation as the highest of many worthy priorities.

## II. Purpose and Scope

The purpose of this Director's Order is to set forth the policy and procedures by which the NPS will comply with NEPA.

The Council on Environmental Quality (CEQ), part of the Executive Office of the President, is the "caretaker" of NEPA. The NPS will abide by all CEQ NEPA regulations (40 CFR 1500-1508) and any other procedures and requirements imposed by other higher authorities, such as the Department of the Interior (DOI). This Director's Order is not intended, however, to document all those procedures and requirements; for a comprehensive compilation, employees must refer to Handbook 12.

## III. Authority

Authority to issue this Director's Order is contained in the NPS Organic Act (16 U.S.C. 1 et seq.), and in delegations of authority found in Part 245 of the DOI Manual (DM). Other specific authorities and requirements governing NPS conservation planning and environmental impact analysis are found in NEPA (42 U.S.C. 4321 et seq.); 40 C.F.R. 1500-1508; Executive Order 11514 as amended by Executive Order 11991; and the National Parks Omnibus Management Act of 1998 (NPOMA) (16 U.S.C. 5901 et seq.).

## IV. Instructions, Requirements, and Policies

**4.1 Sources of NEPA Guidance.** The NPS will comply with the substantive and procedural requirements of NEPA, 40 CFR 1500-1508, 516 DM, and any additional NPS procedures or instructions regarding NEPA.

**4.2 Director's Order and Handbook.** References in NPS *Management Policies* to public involvement, alternative analysis, and environmental evaluation of NPS and other government actions

on resources administered by the NPS are supplemented by this Director's Order and Handbook 12. The Associate Director for Natural Resources Stewardship and Science will develop and issue Handbook 12, containing uniform Servicewide implementing procedures and such supplemental material as may be necessary to carry out NPS responsibilities under NEPA and related statutes. Where other directives and guidelines appear to differ from this Director's Order and Handbook in the areas of impact analysis and other responsibilities under the National Environmental Policy Act, this Director's Order and Handbook take precedence.

**4.3 Full and Open Evaluation.** The procedures contained in Handbook 12 will ensure that environmental costs and benefits of NPS proposed actions are fully and openly evaluated before actions are taken that may impact the human environment. This evaluation must include provisions for:

- Meaningful participation by the public and other stakeholders;
- Development and critical evaluation of alternative courses of action;
- Rigorous application of scientific and technical information in the planning, evaluation and decision-making processes;
- Use of NPS knowledge and expertise through interdisciplinary teams and processes; and
- Aggressive incorporation of mitigation measures, pollution prevention techniques and
- other principles of sustainable park management in all actions.

**4.4 Technical and Scientific Analysis.** Pursuant to the NPOMA and NEPA, NPS management decisions will be based on ample technical and scientific studies properly considered and appropriate to the decisions made. In making decisions, the NPS will articulate a reasoned connection between technical and scientific information and the final agency action. Technical and scientific analyses on potential impacts that are essential in making a well-reasoned decision will be obtained even though such information may not be readily available. If such information cannot be obtained due to excessive cost or technical impossibility, the proposed alternative for decision will be modified to eliminate the action causing the unknown or uncertain impact or other alternatives will be selected.

**4.5 Unknown or Uncertain Impacts.** When it is not possible to modify alternatives to eliminate an activity with unknown or uncertain potential impacts, and such information is essential to making a well-reasoned decision, the NPS will follow the provisions of the regulations of the Council on Environmental Quality (40 CFR 1502.22). The NPS will state in the environmental document that: (1) such information is incomplete or unavailable; (2) the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and (4) an evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. Reasonably foreseeable impacts -- including impacts that have catastrophic consequences -- will be included, even if their probability of occurrence is low, if such analysis (1) is supported by credible scientific evidence, (2) is not based on pure conjecture, and (3) is within the rule of reason. Scoping processes will be used to help determine data needs.

**4.6 The Administrative Record.** Where an action undertaken by the NPS may cause an adverse effect on park resources, an adequate and public administrative record must reflect the manner in which park unit resource studies have been considered, alternatives examined, mitigations incorporated, and final decisions reached.

**4.7 Prohibition on Impairment.** In managing units of the national park system, the Service may undertake actions that have both beneficial and adverse impacts on park resources and values. However, by the provisions of the laws governing the NPS, the Service is prohibited from taking or authorizing any action that would, or is likely to, impair park resources or values. In addition, under other environmental laws, adverse impacts may be prohibited as well. Impacts that may constitute an impairment of park resources or values will be evaluated and described in impact analysis contained within environmental documents produced by the Service.

**4.8 Records of Decision.** Decisions described in Findings of No Significant Impact and Records of Decision will record information as required by the Council on Environmental Quality and by NPS policies and practices described in the handbook accompanying this order. In addition, such documents will summarize impacts, and whether or not such impacts may constitute an impairment of park resources or values using any criteria established under NPS Management Policies and best professional judgment.

**4.9 Peer Review.** Peer review will be used to address conflicts among resource specialists regarding validity and interpretation of data and resource information. When conflicting information and opinions concerning resource impacts exists, managers must resolve such disputes. Peer review and similar mechanisms will be used as a primary method for resolution of such conflicts. These processes will be reflected in the administrative record.

**4.10 Alternative Dispute Resolution.** In order to reduce the potential for litigation, relationships with established alternative dispute resolution providers and scientific professional societies will be established and used within the NEPA process to provide a vehicle for resolution of internal and external disputes. In those instances where the NPS has been sued successfully under NEPA, or advised by the Department of Justice or the Office of the Solicitor to settle litigation, a review and evaluation of the process will be conducted so that corrections can be made to improve our project planning, evaluation and decision-making processes. *(See also Director's Order #93: Conflict Resolution.)*

**4.11 Interdisciplinary Approach Required.** Laws, regulations, and policies applicable to the NPS require interdisciplinary approaches to problem-solving and decision-making. NPS decisions need to reflect this approach as the standard for management within all units. Both present and new NPS managers must consistently apply the principles of interdisciplinary decision-making in order to achieve our goals as resource stewards and "environmental leaders." Benchmarks demonstrating best management processes in development, analysis, and review of projects (such as resource councils and project review teams) will be established for use by parks and regions.

**4.12 Evaluating Proposals by Others.** The NPS will participate in the early and candid evaluation of proposals by other governments or private entities to avoid adverse environmental impacts to NPS units or other park or recreation resources subject to the provisions of federal law. This is an essential element of effective NPS stewardship. When participating in the environmental impact analysis processes of other entities, the Associate Director for Natural Resources Stewardship and Science will ensure that the NPS's responsibilities for commenting are clearly defined and that the Service and its personnel work with federal, tribal, state and local governments in identifying and evaluating potential impacts to resources under NPS jurisdiction or within areas of NPS expertise. Examples include, but are not limited to:

- Consultation under provisions of Section 4(f) of the Department of Transportation Act;
- Evaluation of noise, visual, or other impacts to national park system resources resulting from external activities;
- Hydropower relicensing projects through FERC procedures
- Impacts of proposed projects on non-NPS areas that have benefited from NPS administered partnership programs (e.g. Land and Water Conservation Fund, Rivers and Trails, National Natural Landmarks, National Register Properties, etc.).
- Analysis of cumulative ecosystem or other impacts upon the integrity of NPS-administered resources; and
- The impacts of any federal activity on other park resources.

Further, other agencies or project proponents will receive responsive and professional evaluation of the potential impacts of their proposals and whether such impacts may result in the derogation of national park system resources or values, or the derogation of other park and recreation resources subject to the provisions of federal law. The purpose of these efforts will be to assist other agencies in avoiding or successfully mitigating impacts to resources and values of NPS units, or on NPS programs administered under other statutory or administrative authorities.

## V. Responsibilities

**5.1 The Director** is ultimately responsible for NEPA planning for all NPS activities. The Director retains signature and approval authority for programmatic environmental impact statements for proposals of nationwide application. While regional directors are delegated authority to approve other types of park-specific EISs, the Director may assume signature authority for any EIS that is unusually controversial or that involves major policy issues.

**5.2 The Associate Director for Natural Resources Stewardship and Science** will work cooperatively with other associate directors, regional directors, support offices, superintendents and field personnel to ensure that training, technical assistance, and other resources are available and fully used to implement the legal, regulatory, and policy requirements of this order.

**5.3 Regional directors** are responsible to the Director for integrating the NEPA process into all regional activities and for NEPA planning in their regions. Regional directors are delegated the authority to approve most park-specific EISs for public review, and are responsible for approval of environmental assessments for public review. Only regional directors may sign a Finding of No Significant Impact (FONSI) or Record of Decision (ROD). Regional directors also accept or reject requests for the NPS to be a cooperating or joint lead agency on another agency's environmental documents.

Regional directors should designate a <u>regional environmental coordinator</u> or similar position for their particular region. Subject to the direction of the regional director, regional environmental coordinators:

- Have functional oversight responsibility for all environmental compliance activities within a given region;
- Usually are the point of contact with the Washington Office, Department of Interior, Office of Environmental Policy and Compliance, and Solicitor's Office on significant environmental issues;
- Provide policy review for all NPS NEPA documents and coordinate external review for the region; and
- Serve as a resource to other NPS professionals for understanding the various environmental requirements under which the Service operates.

Regional directors should also designate an associate regional director to serve as a contact for the peer review and alternative dispute resolution processes described in paragraphs 4.9 and 4.10, above.

**5.4 Park superintendents** are responsible for day-to-day implementation of conservation planning and impact analysis activities related to parks under their administration. They must:

- Assure that within-park actions have been adequately analyzed, an adequate range of alternatives considered, and the public and other agencies appropriately involved;
- Assure that ample resource information appropriate to a decision is available, and the technical and scientific studies appropriate to analyze proposed actions are conducted;
- Assure that resource conflicts and allocations are adequately resolved before projects are implemented;
- Recommend Environmental Assessments, Environmental Impact Statements, RODs and FONSIs for approval by the regional director;
- Assure that all actions approved under a FONSI or ROD are implemented;
- Designate a park resource specialist to serve as coordinator for NEPA and related impact analysis activities;
- Assure that mitigation measures are included in projects once they are approved; and
- Approve actions that fall under established NPS Categorical Exclusions.

**5.5 The WASO Environmental Quality Division**, which is a part of the Natural Resource Program Center and reports to the Associate Director for Natural Resources Stewardship and Science, will:

- Serve as the focal point for all matters relating to NEPA planning and other related environmental mandates;
- Provide technical assistance to parks and regions;
- Provide project management and coordination on nationally significant environmental impact analysis issues and proposals;
- Coordinate NPS review of NEPA and other documents prepared by other agencies; and
- Provide policy review and clearance for NPS Environmental Impact Statements, as requested.

The Environmental Quality Division may provide policy review and clearance for NPS EISs on a case by case basis, depending on the level of controversy or policy issues involved in the proposed action. Information concerning NPS NEPA documents or the NEPA process can be obtained by contacting this office.

**5.6 Park resource specialists** are responsible for:

- Having knowledge of existing technical and scientific information on park resources and the quality of such information;
- Identifying additional resource information needs and technical and scientific studies necessary to ensure that ample resource information appropriate to analyze proposed actions is available;
- Serving as park NEPA coordinator to facilitate conservation planning and impact analysis;
- Having knowledge of impact analysis processes and procedures;
- Working with the park superintendent and other park staff to assure consideration of potential resource impacts in park proposals; and
- Working with contracting officers in parks, regions, and the Washington Office to ensure that mitigating measures identified in environmental documents are included in the subsequent contract documents implementing projects.

**5.7 Project Managers and Contracting Officers** are responsible for working with park staff to assure that mitigating measures and other items identified in environmental documents to provide for resource protection are included in the subsequent documents implementing projects.

---------------- end of Director's Order --------------

# EXHIBIT 3

# Contents

**1.0   Introduction**
    1.1   The DO-12 Handbook and Director's Order ........................................1
    1.2   Intent of NEPA and NPS Mission ........................................3
    1.3   Actions Requiring NEPA Analysis ........................................5
    1.4   NEPA Fundamentals ........................................5
    1.5   Timing of NEPA ........................................8
    1.6   Specificity of Data Needed—Plans and Projects ........................................10

**2.0   Overview of the NEPA Process**
    2.1   The Analysis Process ........................................13
    2.2   Purpose and Need for Action ........................................16
    2.3   Defining the Proposal ........................................16
    2.4   Connected, Cumulative, and Similar Actions ........................................17
    2.5   NEPA Issues ........................................18
    2.6   Internal Scoping ........................................19
    2.7   Alternatives ........................................20
    2.8   Affected Environment ........................................23
    2.9   Impacts ........................................24
    2.10  Determining the Appropriate NEPA Pathway ........................................26
    2.11  Using Contractors ........................................28
    2.12  The Administrative Record ........................................28
    2.13  Working with Other Agencies ........................................29
    2.14  Emergency Actions ........................................31

**3.0   Categorical Exclusions**
    3.1   Definition ........................................33
    3.2   Process to Follow ........................................33
    3.3   CEs for Which No Formal Documentation Is Necessary ........................................34
    3.4   CEs for Which a Record Is Needed ........................................36
    3.5   Exceptions to CEs ........................................40
    3.6   Using the CE Lists ........................................42
    3.7   Public Involvement ........................................43
    3.8   Administrative Process ........................................43
    3.9   Consideration of Multiple Actions ........................................44

**4.0   Environmental Impact Statements**
    4.1   Introduction ........................................45
    4.2   Criteria for Significant Impact ........................................45
    4.3   Ongoing or Continuing Action ........................................47
    4.4   Actions That Normally Require an EIS ........................................47

4.5     EIS Format ........................................................................................48
4.6     The Final EIS ...................................................................................61
4.7     Supplements to Draft and Final EISs .............................................63
4.8     Public Involvement Requirements .................................................63
4.9     Administrative Process of Review of EISs .....................................67
4.10    Terminating the EIS Process ..........................................................67

**5.0     Environmental Assessments**
5.1     Introduction .....................................................................................69
5.2     When to Prepare an EA ...................................................................70
5.3     Length of an EA ..............................................................................70
5.4     Format and Content of an EA .........................................................71
5.5     Public Involvement .........................................................................74
5.6     Administrative Process of Review of EAs ......................................76

**6.0     Decision Documents**
6.1     Categorical Exclusions ...................................................................78
6.2     Record of Decision .........................................................................78
6.3     FONSI ..............................................................................................79
6.4     NEPA after the Decision Document ...............................................81

**7.0     Programmatic Documents and Planning**
7.1     Is NEPA Triggered by Plans? .........................................................83
7.2     When to Begin NEPA on Plans ......................................................86
7.3     Feasibility and Planning .................................................................87
7.4     Tiering .............................................................................................88
7.5     Programs and Policies .....................................................................89
7.6     Long-Term Resource Management ..................................................89

**8.0     NPS Review of Non-NPS NEPA Documents**
8.1     Introduction .....................................................................................91
8.2     Comment Requirements ..................................................................91
8.3     Review Deadlines and Extension Requests ....................................93
8.4     Departmental Comment Letters ......................................................94
8.5     Review Guidelines for EISs ............................................................94
8.6     Style and Format for Environmental Review Comments ...............99

**9.0     Definitions and Acronyms**
9.1     Definitions.....................................................................................103
9.2     Acronyms ......................................................................................107

**Appendix 1**
Environmental Screening Form ...............................................................109

**Appendix 2**
Categorical Exclusion Form ....................................................................113

**Index** ....................................................................................................115

# 1.0 Introduction

1.1 The DO-12 Handbook and Director's Order

1.2 Intent of NEPA and NPS Mission

1.3 Actions Requiring NEPA Analysis

1.4 NEPA Fundamentals

1.5 Timing of NEPA

1.6 Specificity of Data Needed—Plans and Projects

## 1.1 The DO-12 Handbook and Director's Order

### A. NEPA and the Council on Environmental Quality

The National Environmental Policy Act (NEPA) was passed by Congress in 1969 and took effect on January 1, 1970. This landmark legislation established this country's environmental policies, including the goal of achieving productive harmony between human beings and the physical environment for present and future generations. It provided the tools to carry out these goals by mandating that every federal agency prepare an in-depth study of the impacts of "major federal actions having a significant effect on the environment" and alternatives to those actions, and requiring that each agency make that information an integral part of its decisions. NEPA also requires that agencies make a diligent effort to involve the interested and affected public before they make decisions affecting the environment. Besides setting environmental planning policy goals, NEPA created the Council on Environmental Quality (CEQ), an agency of the President's office that would be the "caretaker" of NEPA. CEQ published NEPA regulations in 1978 (40 CFR 1500–1508) and added to them in 1981 with a guidance document titled "Forty Most Asked Questions Concerning CEQ's NEPA Regulations" (40 Most Asked Questions). These regulations apply to all federal agencies, and in them CEQ requires each federal agency to "implement procedures to make the NEPA process more useful to agency decision-makers and the public" (40 CFR 1500.2). Agencies are to review and update these regulations as necessary.

### B. Interior/NPS NEPA guidance and this handbook

The Department of the Interior (Interior) produced its NEPA regulations as Part 516 of its departmental manual (DM), and the National Park Service (NPS) produced several NEPA handbooks. The last update, DO-12, was issued in 1982. Interior has also produced and continuously updates a series of environmental statement and compliance memoranda that further interpret Part 516 and need to be consulted in this process. This handbook is an update and revision of DO-12,

1

and it supersedes the 1982 version. Although it is termed a handbook, most of the sections derive in whole or in part from the CEQ regulation or Interior NEPA guidelines, giving them the force of law. The processes described in this handbook are binding on all NPS personnel. Under the terms of the National Parks Omnibus Management Act of 1998, the "Secretary shall take such measures as are necessary to assure the full and proper utilization of the results of scientific study for park management decisions. In each case in which an action undertaken by the National Park Service may cause a significant adverse effect on a park resource, the administrative record shall reflect the manner in which unit resource studies have been considered." The development of alternatives, analysis of impacts, and incorporation of the best available information, coupled with identification of environmentally preferable courses of action as called for in this handbook, are one set of steps required in meeting this obligation to the public.

This handbook never conflicts with the CEQ regulations, although the NPS has added some requirements that go beyond those imposed by CEQ to help facilitate the requirements of the law that established the NPS (the Organic Act) and other laws and policies that guide our actions.

## C.  Citations in DO-12 and Handbook

Sections of NEPA, the CEQ regulations, the 40 Most Asked Questions, and the Interior departmental manual are cited in DO-12. They are cited as follows:

(1)  NEPA—The section number is in parentheses: (sec. 102 (A)), for example.

(2)  CEQ regulations—The section number is in parentheses: (1502.1).

(3)  40 Most Asked Questions—The number of the question referenced is cited in parentheses: (Q23).

(4)  Interior departmental manual—A section is cited in parentheses as 516 DM followed by the section or appendix number: (516 DM, 7). Environmental statement memoranda are designated as ESM and the year and number: (ESM94–8). Environmental compliance memoranda are designated as ECM and the year and number: (ECM95–2).

## D.  How to use this handbook

This handbook contains the basic information you need for meeting the legal requirements of NEPA and for practicing excellent impact assessment and resource conservation. Also, NPS employees who deal with NEPA on a regular basis should receive training that is periodically updated, so that the goals of NEPA are met throughout all levels of NPS. NPS also has guidance on related topics, such as planning, cultural resource protection, and natural resource management.

Much of the handbook uses the pronoun "you" to speak to the reader. "You" may be an individual from the park, a system support office (SSO), a regional office, a member of a NEPA interdisciplinary team (IDT), a decision-maker, or any other NPS staff or contractor responsible for some piece of the NEPA process.

## 1.2  Intent of NEPA and NPS Mission

### A.  Policy

The declared purpose of NEPA and the mission of the NPS express very similar goals. Both contain language designed to result in the conservation and protection of our nation's resources for the benefit of future generations. NEPA was enacted for a simple reason: to make sure that agencies fully consider the environmental costs and benefits of their proposed actions before they make any decision to undertake those actions.

---

**The purpose of NEPA** as stated in section 2 of the act that created it is to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the Nation...."

---

### B.  Tools

NEPA and the CEQ regulations have put two important mechanisms in place to achieve this stated intent. One is the requirement that all agencies make a careful, complete, and analytic study of the impacts of any proposal that has the potential to affect the environment, and alternatives to that proposal, well before any decisions are made. The other is the mandate that agencies be diligent in involving any interested or affected members of the public in the NEPA process.

Key features of the analysis are made available to the public in one of three types of NEPA documents, depending on the degree of impact to the environment and the process outlined in chapter 2.0 of this handbook. Generally, if the proposal clearly has no potential for measurable environmental impact, it is categorically excluded (see chapter 3.0) and a short 1- or 2-page notice is prepared. If it has the potential for significant environmental impact, an environmental impact statement, or EIS, is required (see chapter 4.0). If the proposal would have a measurable impact on the environment, or if it is unclear whether it has the potential for a significant impact, an environmental assessment (EA) is the appropriate document to prepare (see chapter 5.0). If the EA shows the proposal

---

**The Organic Act creating NPS** states that NPS will "...conserve the scenery and the natural and historic objects and the wildlife therein and...provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations" (16 U.S. Code 1, the National Park Service Organic Act).

---

may have a significant effect, an EIS is also required (unless the provisions of section 5.2 (1) apply). NEPA imposes many additional rules and requirements beyond this simple strategy for determining which level of documentation is appropriate for any given analysis. These rules are part of this handbook and should be read carefully before you begin environmental impact work under NEPA.

## C. Early planning

A key feature of NEPA is that under the CEQ regulations (1502.5) all analysis, public input, and documentation must be completed in time to be a useful part of decision-making. Initiating or completing environmental analysis after a decision has been made, whether formally or informally, is a violation of both the spirit and the letter of the law. NEPA's intent is to encourage planning for conservation and resource management and integration of scientific and technical information into management decisions, rather than an after-the-fact "compliance" effort. A well-done NEPA analysis provides useful information on environmental pros and cons (i.e., impacts) of a variety of reasonable choices (alternatives); this analysis is much like economic cost-benefit or technical or logistical planning. It is an essential prelude to the effective management of park resources.

## D. A procedural act

NEPA's policies encourage agencies to incorporate environmental information and public involvement in making decisions. The detailed and scientifically valid study of impacts and alternatives, and appropriate input from the public, must be available before a federal agency makes any commitment of resources. It is up to the decision-maker how he or she will use this information. If the only way to meet an essential agency goal requires implementing an alternative with the potential for severe adverse environmental impacts, this is ultimately allowed for under NEPA. NEPA is therefore a "procedural," or process-oriented, law, rather than a "substantive," or substance-oriented, one. Other laws, including the Organic Act, are substantive and often prevent an agency from taking action or pieces of an action that have "too great" an impact on a particular resource. The process of environmental analysis under NEPA provides the information that the NPS needs to make substantive decisions for the long-term conservation of resources.

## E. A substantive result

The information and analysis produced through the NEPA process is used by the NPS in making management decisions about NPS administered resources. In making these decisions the NPS is guided by the requirements of the National Park Service Organic Act and related laws. The requirements placed on the NPS by these laws, and especially by the Organic Act mandate that resources are passed on to future generations "unimpaired." Impacts that are likely to, or that would, result in impairment of resources must be fully described and evaluated in environmental documents. In addition, decision documents must confirm the nature and extent of impact and whether

CEQ defines the **human environment** as the natural and physical environment, and the relationship of people with that environment (1508.14).

or not an impairment results from any of the alternatives analyzed or selected for implementation.

## 1.3  Actions Requiring NEPA Analysis

NEPA is far-reaching. Whenever the NPS considers an action that could have impacts on the human environment, NEPA is triggered. This is true whether NPS generates the action or the applicant is a private individual or another federal, state, or local agency. While NEPA is only triggered when there is a physical impact on the environment, the CEQ regulations require analysis of social and economic effects in both an EA and an EIS. Social and economic impacts should be analyzed in any NEPA document where they are affected. Socioeconomic impacts include those to minority and low-income communities as specified in the Environmental Justice Executive Order (EO 12898; Feb. 11, 1994).

Federal actions are defined as projects, activities, or programs funded in whole or in part under the direct or indirect jurisdiction of a federal agency, including those carried out by or on behalf of a federal agency; those carried out with federal financial assistance; those requiring a federal permit, license, or approval; and those subject to state or local regulation administered pursuant to a delegation or approval by a federal agency.

These are some examples of federal actions:
- adopting official policy, such as rules, regulations, and interpretations.
- adopting formal plans, such as those that guide or prescribe uses of federal resources upon which future agency actions will be based.
- adopting programs.
- approving specific projects.
- approving permits for private or other agency actions on federal land or involving federal resources.
- approving grants or other funding that involves a large federal presence (i.e., much of the funding for the proposal is from federal sources).
- conducting ongoing or continuing federal actions.

If any of these actions has the potential to cause environmental impact, whether adverse or beneficial, the NEPA process must be completed before a decision is made.

## 1.4  NEPA Fundamentals

NEPA analyses that follow both the spirit and the letter of the law and that have held up to court challenges display the following characteristics:

### A.  Part of planning

NEPA is the environmental component of agency planning. Under the CEQ regulations, it is to be integrated with other planning "at the earliest possible time to insure planning and decisions reflect environmental values" (1501.2). The NEPA process is always triggered at the "proposal" stage, or when an agency is considering a goal and is "actively pursuing different means of accomplishing that goal" (40 CFR 1508.23) if implementing the goal would have environmental impacts. The proposal stage is during or immediately following the feasibility stage

(1502.5(a)). However, environmental planning is also useful in defining goals, particularly in broader planning, such as for an entire park or park unit.

## B. Systematic

According to NEPA (sec. 102 (A)), NEPA analyses must be systematic. The selection of appropriate issues, impact topics, mitigation strategies, analysis boundaries, and alternatives; the involvement of the interested and affected public; and other aspects of the NEPA process must be based on evidence and on sound, repeatable thought processes.

## C. Part of a public process

CEQ requires agencies to make "diligent" efforts to involve the interested and affected public in the NEPA process (1506.6), regardless of the level of impact and/or documentation. The extent of the public involvement will change depending on the degree of impact and interest in the proposal. Agencies must also "encourage and facilitate public involvement in decisions which affect the quality of the human environment" (1500.2 (d)). If the public finds that an agency did not follow the procedural requirements of NEPA, or that the agency's analysis of a proposal in a NEPA document was lacking or inadequate, relief is often sought through legal action. The Environmental Protection Agency (EPA) reviews and rates the adequacy of all EISs, and CEQ oversees the rules and policies governing the NEPA process and resolves certain types of disputes.

## D. Written in plain language

Because the public has been given an essential role in monitoring the NEPA process, you must write documents in language the general public can understand (1502.8). This means that all jargon, technical terms, and acronyms must be clearly defined, usually in a glossary.

## E. Focused

CEQ requires that NEPA documents be "concise, clear, and to the point." They must "emphasize real environmental issues and alternatives" and be useful to the decision-maker and the public (1500.2). You should keep the discussion of resources that would be affected brief, and keep the length of all other discussions proportionate to the seriousness of the impact (1502.2). "Most important, NEPA documents must concentrate on the issues that are truly significant (i.e., pivotal) to the action in question, rather than amassing needless detail" (1500.1 (b)).

## F. Problem-solving

In an effort to make NEPA documents useful to decision-makers, CEQ requires that they be "analytic rather than encyclopedic" (1500.4). This means you should focus the analysis on solving any environmental problems a proposal might create—that is, on creating reasonable alternatives or mitigation.

## G. Objective

NEPA requires an objective, high-quality scientific analysis of impacts that the proposal or alternatives may create (1500.1 (b)). If you are basing the analysis on the scientific judgment of one expert, this judgment should be substantiated with

literature or other experts' statements and be based on data, education, or experience. Peer review of experts' research and NEPA analysis is one way to obtain input on complex environmental issues.

## H. Based on an interdisciplinary approach

Because NEPA analyses are scientific, objective, and high quality, they must be performed by individuals with credentials appropriate to the issues (1502.6). These individuals must use the interdisciplinary or interactive team approach in defining all important features of the analysis (issues, data-gathering needs, alternatives, etc.) throughout the NEPA process. This approach includes discussions with "cross-functional" disciplines; specialists from the park and other NPS offices, contractors; and decision-makers, as appropriate (NEPA sec. 102 (A), CEQ 1502.6). Members of the interdisciplinary team may come from other federal, state, and local agencies or tribes as well. Parks may wish to use non-agency individuals to provide additional insights.

It is recognized that the park staff may be small and that resource specialists may consist of one or two individuals. The need for an IDT does not mean that a large group of specialists must be assembled for every action under consideration. What it means is that the one or two specialists should be consulting with a number of sources, staff (including maintenance, operations, etc.), and non-agency individuals as needed to make good NEPA-based decisions (see section 2.10).

## I. Candid

A theme that runs through NEPA, case law, and CEQ regulations is that agencies must be candid in their NEPA documentation. Expert agency criticism and public scrutiny help to ensure such disclosure. If reviewing agencies indicate they disagree with the impact analysis, you should record these conflicting opinions in the NEPA document (sec. 102 (D) (iv)). If information important to the decision between alternatives is incomplete or unavailable, you should state this in a NEPA document (CEQ 1502.22).

## J. Based on common sense

NEPA documents are meant to be short, focused, analytic, problem-solving documents that help decision-makers make informed and wise decisions about the use of resources. Alternatives and mitigation must be feasible, both technically and economically. Common sense and usability are precepts that run throughout NEPA.

## K. Inclusive

CEQ requires that agencies examine connected actions, cumulative impacts, secondary or indirect impacts, and similar actions in their NEPA documents. Agencies are specifically prohibited from segmenting projects, also known as piecemealing. "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action" are to be evaluated in a single NEPA document (1502.4).

**L.  Tools to help foster excellent action**

"Ultimately, of course, it is not better documents, but better decisions, that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." (1500.1). A well-done NEPA analysis offers your decision-maker several reasonable options for resolving problems or fulfilling needs that gave rise to the proposal initially while minimizing or correcting impacts to natural resources. It is done early in the planning process, so that its results can be an integral part of the information used to make a project decision.

**M.  Holistic**

In its statements of purpose and policy (sec. 101), NEPA speaks of sustainability, balance, and knowledge and protection of environmental resources, including ecological systems. Congress asks NPS to use NEPA not only as a tool to look at whether to pave a road or build a trail, but as a guide in the larger aspects of NPS decision-making. Topics such as how resource use in a park will affect an entire region or ecosystem, how to preserve resources while allowing for appropriate public use and enjoyment, or how a decision now will affect park management options in the very long-term future are the kinds of issues NEPA was designed to emphasize.

**N.  Ultimately site-specific**

Before you choose to implement an action—to "break ground"—your decision-maker must have detailed site-specific environmental impact information (1501.2 (b)). However, NEPA analysis may be required when broader actions, such as plans, programs, or policies, are under consideration. The data collected to analyze these more general actions should be comparatively general, with progressively more specific data analyzed as you move toward implementing an action. You may rightly prepare one NEPA document to help your decision-maker in choosing between broad actions, and another to help in implementing the selection. This step-wise approach to planning and design is called "tiering" (1508.28; see section 7.4 of this guide for details), and it allows NPS to focus on the right set of alternatives or decisions at the right time.

# 1.5  Timing of NEPA

Your park may follow a NEPA-like process much of the time now. The analysis of options and the environmental pros and cons of each, whether for management prescriptions for a park or for design features of a single building, is the kind of planning that NEPA asks of all agencies, and that may already be integral to decision-making in your park unit. The essence of NEPA is a continuous "checking in" or monitoring of successive decisions to ensure proactive, rather than reactive, conservation and resource planning and management. Although the formal "NEPA process" includes active public involvement and documentation, the integration of environmental information and values into agency decision-making nonetheless helps carry out the intent of both NEPA and the

> **Knowing how early** or how late to begin a NEPA analysis is often a difficult balancing act.

Organic Act, and it should be part of planning at all levels, even for goal-setting for broad park actions such as those in a general management plan or its equivalent.

You must begin the NEPA process whenever your park is in the proposal stage of any of the federal actions described in section 1.3 of this handbook. The proposal stage is defined as the feasibility stage (40 CFR 1502.5 (a)), or the point when your park "has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated" (1508.23).

Knowing how early or how late to begin a NEPA analysis is often a difficult balancing act. You should try to start early, so that environmental information can be a valuable part of the decision-making criteria.

If your park intends to prepare a plan that would make decisions about resource uses, it may be particularly difficult to know when to begin NEPA. Two factors may be helpful in this decision. Because NEPA requires the creation and analysis of alternatives, one factor in deciding when to initiate NEPA may be when a range of options would be most useful for your decision-maker and the public. The other, and more important, factor to consider is whether the kinds of choices you will be making in the plan have the potential for impact to the human environment. If so, NEPA is required. Director's Order 2, the Park Service's planning guideline, has information about the integration of NEPA with all levels of park planning that may be useful if you are beginning a general management plan (GMP) or other plan.

Usually if a plan or project is so specific that it is the only reasonable option, this means you have waited too long to begin NEPA, because all of the important decisions have been made without benefit of environmental analysis. In this case, you may be violating NEPA by using the process "to rationalize or justify decisions already made" (1502.5).

Although **the timing** will vary on a case-by-case basis, two rules should guide you when you choose to begin a NEPA review and analysis:

- All of the steps necessary to complete the NEPA process are to be finished in time to be part of any recommendation or report on the proposal—that is, early enough so that the final document can "serve practically as an important contribution to the decision-making process."

- No action that is the subject of an ongoing NEPA analysis or that would limit the choice of alternatives undergoing NEPA scrutiny should be taken until the NEPA process is complete (1506.1). This includes design work, funding pieces of a project, choosing building contractors, and so forth.

## A.  NEPA and the project proposal/contracting process

Parks often develop project proposals to record the information that is necessary to justify, program, fund, and initiate specific tasks. When funding is requested for a construction or resource management action, the funding request cannot be approved until the NEPA process is complete or the need for environmental

analysis is adequately described and provided for within the request. This step is particularly important for those proposals where internal scoping has indicated that the potential for significant impact exists. In addition, you should not solicit bids or sign a contract for a proposal until the NEPA process is complete, or you will be in violation of the CEQ requirement that "Agencies shall not commit resources prejudicing selection of alternatives before making a final decision" (1506.1).

## B.  When to begin NEPA on plans

NEPA may be activated by many of the plans that NPS produces, including general management planning, certain types of strategic plans, wilderness and resource management actions, and implementation plans (see Director's Order 2 for information on some of these kinds of plans). If the plans are intended to make decisions that, if implemented, could have an impact on the human environment (see section 1.3), the NEPA process is triggered. Most NEPA requirements are compatible with or identical to requirements for sound management planning. In most cases, NEPA requirements are easily integrated into the planning process, and they provide the information that decision-makers need to make informed choices. Rather than create additional burdens in the planning process, following NEPA requirements should help expedite prompt and defensible decision-making.

# 1.6  Specificity of Data Needed—Plans and Projects

Because planning in the NPS includes several distinct stages and types of decisions that involve different scales, the levels of detail in each will vary. When plans are conceptual, such as in the general management plan, the NEPA analysis may be comparably conceptual. Ultimately, however, a decision-maker must have site-specific information before a plan can be implemented (e.g., the ground disturbed, the resource changed). The following are some options for collecting this site-specific information:

> **When plans are conceptual,** such as the general management plan, the NEPA analysis may be comparably conceptual. However, a decision-maker must ultimately have site-specific information before a plan can be implemented.

•   Collect it as part of the EIS on a general management or other large-scale plan. Because funding to implement the plan may be delayed, you may need to update site-specific analysis several times for the same proposal. The advantages of this approach are that decisions made at the planning stage will be more fully informed, and future NEPA work to implement the plan may be minimized, unless data and planning decisions have become outdated by the time the plan is implemented.

•   Collect reconnaissance-level information to make broad policy and planning decisions. Collect site-specific information to

assess implementation options as funding becomes available. The site-specific NEPA document may then be "tiered" (see section 7.4) to the EIS for the broader plan.

- Identify zoned areas within the plan that are likely to be designated for visitor use facilities based on reconnaissance-level data. Collect site-specific data for the smaller developable areas as an element of the plan.

Always include data on impacts to the park's natural and cultural resources and values that have been specifically recognized in the park's enabling legislation; to interpretive, educational, and recreational opportunities; to resources protected by federal, state, or local laws; and to other relevant resources in your park or region. Also see DO-12 section IV (4.3 and 4.4) regarding integration of proper technical and scientific studies appropriate to the decisions under consideration, and taking action when complete information is unavailable.

# 2.0 Overview of the NEPA Process

2.1 The Analysis Process
2.2 Purpose and Need for Action
2.3 Defining the Proposal
2.4 Connected, Cumulative, and Similar Actions
2.5 NEPA Issues
2.6 Internal Scoping
2.7 Alternatives
2.8 Affected Environment
2.9 Impacts
2.10 Determining the Appropriate NEPA Pathway
2.11 Using Contractors
2.12 The Administrative Record
2.13 Working with Other Agencies
2.14 Emergency Actions

## 2.1 The Analysis Process

Chapter 2 of this handbook is focused on the analysis process. Chapters 3 through 5 deal with documentation of the analysis.

CEQ does not mandate a particular analysis process. However, because NEPA is meant to be part of planning and thus should be applied early, you should carefully consider beginning NEPA when your park is framing its purpose or goals for a particular proposal. Over the years, there has been much confusion in the park service concerning the use of the terms "proposed action" and "preferred alternative." The majority of actions in the park service involving NEPA do not have a specific or even conceptual "proposed action" from the onset of the process. In fact, it can be dangerous to start into a NEPA process with a solidified proposal that precludes consideration and equal treatment of other reasonable alternatives.

Typically in the park service, purpose and need as well as objectives can be defined, and from there, a range of alternatives developed, one of which becomes "preferred" at the conclusion of the analysis process. This "preferred alternative" is then identified in the EA or EIS before it is released to the public for review and comment. In these situations, it is not necessary to use the term "proposed action" since what the park is proposing to do is essentially synonymous with the

**Steps** in a typical analysis process:

1. Identify your park's need for action.
2. Identify your park's goals and objectives in taking action.
3. Identify your proposal.
4. Identify issues or problems that need to be addressed to reach park goals and objectives.
5. Resolve these issues by creating reasonable alternatives.
6. Identify information gaps and needs and gather needed data.
7. Identify the impacts of each alternative.

term "preferred alternative." An exception to this might be when a park is analyzing a "proposal" or "proposed action" from an external applicant or "project proponent." For example, a park receives a "proposed action" from an applicant desiring to develop a mining claim. The park responds to the applicant's proposed action by developing a range of alternatives to mitigate impacts of the applicant's proposal. In this case, the applicant's "proposed action" may be very different from the park's preferred alternative. In either case, a simplified version of a typical analysis process is as follows:

1. The best way to begin is by clearly stating your park's need for action. Need is the proper framing of the question "why take action?" It is a "because" statement and should include a statement of problems the park is trying to solve, opportunities it is about to take advantage of, and so forth.

2. The next step is to establish the purpose and objectives, or goals the park must accomplish by taking action for the action to be considered a success. The objectives and goals, or purpose, of the action are different from the purpose of the park. They are the reasons for proposing action.

3. When you have identified what your park hopes to accomplish, the next step is to develop a proposal. CEQ defines "a proposal" as the stage where a park has defined goals and is actively pursuing different means of accomplishing its goals (1508.23). If there is no one "proposal" in mind to meeting goals and objectives, the park may keep the proposal general, such as "NPS proposes to provide visitors an extended experience at the north rim." The next step would be to create a range of alternatives (see step 5 below) that are consistent with the proposal, for instance, building a lodge, renovating cabins in the park, subsidizing overnight accommodations in the local town, etc. As a note, the decision-maker or designee is required to identify a "preferred alternative" (see sections 4.5 E (8) and 5.4 (D)) before an EA or EIS is released for public review. This is the alternative the park service believes would best accomplish its goals after the in-house NEPA analysis has been completed, when the choice of an alternative as "preferred" is appropriate.

4.  The next step is to use the interdisciplinary team (IDT) approach to iden-
    tify issues or environmental problems that need to be addressed to reach
    park goals and objectives and resolve need for action. This step is often
    the beginning of internal scoping (section 2.6), and it should involve a site
    visit (or familiarity of team members with the site) and discussions with
    appropriate agencies. The Environmental Screening Form (ESF; appen-
    dix 1) may serve as a guide in determining affected resources. These may
    later be supplemented with input from public scoping (sections 4.8 and
    5.5). The IDT should pay particular attention to focusing the issues; in
    other words, what specifically may affect a resource, and what about the
    resource might be affected. These specifics will form the basis for your
    impact topics. If your proposal is general, such as "providing an extended
    experience on the north rim," the issues may also be more generalized.
    An example would be "providing an extended experience for visitors may
    require infrastructure that could eliminate habitat and disturb archeolog-
    ical sites."

5.  If the issues show that the proposal would likely result in environmental
    impacts, the team should create a set of reasonable alternatives that miti-
    gate or eliminate these problems, but that still fulfill the stated purpose
    and resolve need—for example, "create a campground, renovate existing
    cabins, subsidize hotels in town." The alternatives themselves may create
    environmental problems, which the team will need to correct by adding
    mitigation or refining the alternatives, or to identify as unresolved issues
    in the NEPA document.

6.  The team should then identify data that it has and will need to describe
    the affected environment and predict impacts of all alternatives. If you
    start collecting data before you know your purpose and need, issues, and
    potential alternatives, you might be spending time needlessly collecting
    irrelevant information.

7.  Using these data, the team predicts impacts of each action in each alter-
    native on those specific environmental resources identified as impact
    topics. For those resources that may experience a discernible impact, the
    team uses the best available methods to predict the extent of the effect.
    This prediction includes a discussion of context, intensity (e.g., degree),
    duration, and timing (e.g., short-term vs. long-term), and a conclusion by
    the park staff and other experts of the relative severity of the impact
    (minor, moderate, or major).

This process may be modified to fit your park's particular need, and it should
include agency and public involvement in identifying and reviewing the docu-
mentation of issues, alternatives, and the extent of impact. Also, some steps will
be unnecessary if no potential for environmental impact exists and the process
outlined in section 3.2 applies.

## 2.2 Purpose and Need for Action

Although the CEQ regulations say little about purpose and need for agency actions, defining them clearly is very important.

### A. Purpose

Purpose is a statement of goals and objectives that NPS intends to fulfill by taking action. These goals can come from a park's statement of purpose and significance (if the action proposed is a GMP, for instance), from management objectives or mission goals, from implementing or other legislation, from a GMP or other plan, from standards and guidelines for a particular management zone, from public or staff input, and from other sources. Because some of these objectives also may resolve needs, there may be overlap between purpose and need. The discussion should be limited to those goals and objectives that are critical to meet if NPS is to consider the proposal successful.

### B. Need

Need is a discussion of existing conditions that need to be changed, problems that need to be remedied, decisions that need to be made, and policies or mandates that need to be implemented. In other words, it explains why your park is proposing this action at this time. It may have elements you would otherwise include in a discussion of project "background." There may be one or several needs that an action will resolve. Need is not a discussion of the need for NEPA or other regulatory compliance, but rather reasons why the park must take action at this time and in this place. Although CEQ describes it as "brief," the discussion of need may require several pages.

You have great latitude in defining your proposal's purpose and need. How you define it will also define the range of alternatives (see section 2.7). If it is defined broadly—for example, "to improve the visitor experience at the north rim of the Grand Canyon"—the range of alternatives will likewise be broad. If it is very narrowly defined—for example, "to provide an extended experience for visitors at the north rim of the Grand Canyon by building a lodge"—you may have violated NEPA by making a decision before the NEPA process has been completed. Try instead to be realistic in identifying your park's reasons for taking action, and also to create a range of reasonable alternatives in which environmental impact information and public involvement would be helpful—for example, "to provide an extended experience for visitors at the north rim of the Grand Canyon."

## 2.3 Defining the Proposal

As explained above (in section 2.1 (3)), you may state your park's proposal quite generally, such as "provide an extended experience for visitors at the north rim of the Grand Canyon." This is essentially a restatement of the park's intent to accomplish its stated objectives or purpose. Alternatives would then be a range of options for fulfilling the stated proposal (e.g., lodge, campground, cabins), with no one way identified as preferred over another until the draft NEPA document is completed.

In the above example, perhaps the park examined alternatives for visitor use on the north rim in a GMP/EIS and concluded that provision of an extended visitor experience through overnight accommodations was appropriate. The implementation of the GMP would result in a subsequent planning/NEPA process defining a more specific proposal tiered from the broader approved GMP. In this case, a specific proposal to implement the GMP might be "provide extended experience at the north rim with a lodge" and the range of alternatives would include a lodge, cabins, tents, and so forth.

Whether a proposal is specific or general, in either case, alternatives should be scrutinized to ensure that environmental damage has been mitigated or eliminated to the greatest extent possible while still achieving your park's purpose in taking action.

## 2.4  Connected, Cumulative, and Similar Actions

When analyzing the proposal and alternatives, you must consider actions that result as a direct or indirect consequence—that is, connected, similar, and cumulative actions. These actions should be incorporated into the description of the proposal and alternatives if relevant.

### A.  Connected actions (1508.25)

Connected actions are those that are "closely related" to the proposal and alternatives. Connected actions automatically trigger other actions, they cannot or will not proceed unless other actions have been taken previously or simultaneously, or they are interdependent parts of a larger action and depend on the larger action for their justification. For instance, if your park proposes building housing for rangers on an existing trailhead parking lot, and the trailhead lot must be relocated as a result, this is an action connected to the proposal of building the housing. The impacts of removing the existing parking lot, relocating the lot, and reducing visitor access to the trailhead must be analyzed in the same NEPA document as the housing.

### B.  Similar actions (1508.25 (a)(3))

Similar actions are those that have similar geography, timing, purpose, or any other feature that provides a basis for evaluating their combined impacts in a single NEPA document. They can be the same as connected or cumulative actions. As an example, if in the future you intend to build a restaurant in association with the lodge on the north rim of the Grand Canyon, the restaurant and any parking, fencing, utilities, and so forth that are connected with it would be a similar action, which should be analyzed in the same NEPA document as the lodge itself.

### C.  Cumulative actions (1508.7, 1508.25 (a)(2))

Cumulative actions are those that have additive impacts on a particular environmental resource. It is irrelevant who takes these actions (i.e., they are not confined to NPS or even federal activities), or whether they took place in the past, are taking place in the present, or will take place in the reasonably foreseeable future.

As an example, if your park is proposing building a small sewage treatment plant and discharging treated wastewater into a river, other activities (i.e., cumulative actions) that also have an additive impact on the river must be included in the analysis on water quality. These activities might include disposal of wastes from recreational vehicles in the park, cattle ranching upstream of the park on public land, or release of water from a reservoir on private property downstream of the park. If you are preparing a GMP or other broad-scale plan, actions on land adjacent to, or even in the region of, the park unit may have combined impacts on resources inside the park boundaries and need to be included in the cumulative impact analysis. One source of information about methods to analyze cumulative impacts is the CEQ's January 1997 report, "Considering Cumulative Effects under the National Environmental Policy Act."

## 2.5  NEPA Issues

In NPS planning, an "issue" often describes concerns or "obstacles" to achieving a park goal. Planning "issues" might be "lack of appropriate level of funding" or "visitors desire more solitude." In NEPA, the goal is minimizing effects of proposals on the human environment and issues are possible barriers to achieving that goal. Planning issues and those issues defined in the NEPA analysis should both be incorporated into the plan/NEPA document as appropriate.

To be more specific, in NEPA, an "issue" describes the relationship between actions (proposed, connected, cumulative, similar) and environmental (natural, cultural, and socioeconomic) resources. Issues are usually problems that either the "no action" alternative has caused, or that any of the alternatives might cause, but they may be questions, concerns, problems, or other relationships, including beneficial ones. As an example, "Building a lodge on the north rim could create a man-made obstacle to an otherwise untouched view of a spectacular natural scene" is an issue that details the relationship between the action (building the lodge) and an environmental resource likely to be affected (the view).

Issues do not predict the degree or intensity of harm the action might cause, but simply alert the reader as to what the environmental problems might be if action is taken. The interdisciplinary approach must be used to decide relevant issues.

> **Internal Scoping**
> According to the CEQ elements of scoping (1501.7), you should use internal scoping to:
> - eliminate issues that are not important.
> - allocate assignments among park IDT members or other participating agencies.
> - find/read any other NEPA documents related to this one.
> - identify any other permits, surveys, or consultations required by other agencies.
> - create a schedule that allows plenty of time to do NEPA well before a decision on the proposal is required.

In determining relevant issues, the IDT should pay particular attention to the specific action element of the alternative causing harm and the specific element of the resource that may be affected. In the example above, the concern might be "the two-story west wing of the lodge" rather than the entire lodge. The resource affected might be the "view of the Colorado River for hikers on a 200-meter stretch of the rim trail." This narrower description will help focus impact topics to just those resources affected, and mitigation measures or alternatives to just those actions causing problems for those resources.

If the team finds that certain issues that it or the public thought would be problematic will not be, it should discuss these in an EA or an EIS as "issues considered but dismissed" and drop them from the analysis.

## 2.6  Internal Scoping

### A.  Introduction

Internal scoping is simply the use of NPS staff (at the SSO, regional, park, or National Program Center level) to decide what needs to be analyzed in a NEPA document. It is an interdisciplinary process, and at a minimum it should be used to define issues, alternatives, and data needs. The IDT may also be used to formulate purpose and need; brainstorm any connected, similar, or cumulative actions associated with the proposal; decide on the appropriate level of documentation; put together a public involvement strategy; and decide other features of the overall NEPA process. The elements of internal scoping included by CEQ are listed in the box on page 18.

External scoping, or early public involvement in the NEPA process, is discussed in section 4.8 (B) of this handbook under Public Involvement.

### B.  Minimum requirements

After you have defined purpose and need, the potential actions to address purpose and need, and any connected or cumulative actions, and determined what the issues and impact topics are likely to be, the IDT should visit the site (if members are not already familiar with it) and speak with appropriate agencies or other experts to determine whether the potential for a measurable impact, significant impact, or resource conflict exists. You must record evidence of the site visit and agency communication in your project or analysis file on the ESF, or use a similar form or process. It is also important to identify a single point of contact for the IDT, in order to avoid miscommunication with other agencies.

You must complete an ESF for any project that may have an impact on the human environment. If your park's project is described on the list in section 3.3 of this handbook, and there is no potential for environmental impact, you do not need to complete an ESF. A sample ESF appears in appendix 1 of this handbook. It may be tailored for your park's use, although certain of the criteria (see appendix 1) are mandatory.

The ESF requires familiarity with the site to complete. The ESF, as well as input from agencies and other experts, is used to decide the appropriate level of documentation for the NEPA analysis (section 2.10). If all agree that no potential for measurable impact to the human environment exists, and the requirements of section 3.2 are met, the action can be categorically excluded from further documentation, and you can complete the categorical exclusion form (CEF) (appendix 2) and attach it to the ESF. If an EA or an EIS is the appropriate choice, the ESF is the beginning of the analysis, or statutory compliance, file.

### C. Actions already analyzed

The environmental impacts of an action may already have been fully examined in a previous NEPA analysis. If all impact topics have been analyzed in site-specific detail, and there are no changes to the proposal or in impacts to environmental resources from those previously analyzed, then no further environmental analysis is required, and you may prepare a memo to file, rather than an ESF. This memo should be reviewed and approved by the Superintendent or his/her designee, in consultation with the regional environmental coordinator.

## 2.7  Alternatives

### A. Range of alternatives

You must examine a full range of alternatives in the analysis documented in either an EIS or an EA. Those alternatives carried forward for analysis must meet project objectives to a large degree, although not necessarily completely. For instance, in the example above (section 2.5), you may choose to add an alternative that analyzes using hotels in the town nearest the north rim of the Grand Canyon, even if your project objective was to provide an extended experience for visitors right at the rim. The alternatives must also be developed with environmental resources (rather than cost, e.g.) as the primary determinant. In other words, they propose different means of accomplishing your park's goals, while at the same time protecting or minimizing impacts to some or all resources. Keep in mind that at this stage, the range of options you consider may not ultimately be fully analyzed as "reasonable alternatives," as explained below.

### B. Reasonable alternatives

CEQ has defined reasonable alternatives as those that are economically and technically feasible, and that show evidence of common sense (Q2a). Alternatives that could not be implemented if they were chosen, or that do not resolve the need for action and fulfill the stated purpose in taking action to a large degree, should be eliminated as unreasonable before impact analysis begins. Unreasonable alternatives may be those that are unreasonably expensive; that cannot be implemented for technical or logistic reasons; that do not meet park mandates; that are inconsistent with carefully considered, up-to-date park statements of purpose and significance or management objectives; or that have severe environmental impacts—although none of these factors automatically renders an alternative unreasonable. CEQ is also clear that agencies should not pare the list down to only those alternatives that are cheap, easy, or your park's favorite approach.

Rather, feasibility is an initial measure of whether the alternative makes sense and is achievable.

In fact, CEQ has added language cautioning against using even what may seem clear criteria for routinely dismissing alternatives as unreasonable. For instance, if an alternative is any of the following, but otherwise feasible, it must be included in the range of alternatives (Q2b):

- outside the scope of what Congress has approved or funded.

- outside the legal jurisdiction of your park.

- undesirable to an outside applicant but reasonable to the park.

- in conflict with a law.

- outside those alternatives provided for by a GMP or other park planning document (particularly if the plan or policy is older or no longer applicable to the issues the park is now facing (1500.1 (a)).

These conditions often are obstacles to implementing an action, because a law may need to be changed, an applicant may need to modify a proposal, or Congress may need to rethink approval or funding. However, CEQ notes that the EA or the EIS analyzing such alternatives may serve as the vehicle for such change.

Alternatives may also be eliminated as unreasonable as the NEPA process progresses. For instance, if initial impact analysis shows that a technically or economically feasible alternative would have profound adverse environmental impacts, it should be eliminated as "environmentally infeasible."

EAs and EISs should include a section discussing those alternatives that were considered but rejected and briefly explain the reasons for their elimination.

## C. No action

The "no action" alternative is developed for two reasons. It is almost always a viable choice in the range of reasonable alternatives, and it sets a baseline of existing impact continued into the future against which to compare impacts of action alternatives. This is important context information in determining the relative magnitude and intensity of impacts (see also, section 4.2(a)). If choosing the true no action alternative (i.e., continuing as is) would violate laws or your park's own policies, you may want to add a "minimum management" alternative to your range. This should not substitute for the no action alternative, because you may lose valuable information on existing impacts by not evaluating the impacts of ongoing activities.

1. **No action for plan modifications**—As a rule, for GMPs, assume the no action alternative would continue present management actions. No action then becomes an accurate baseline to compare against action alternatives. As allowed by CEQ (Q3), you may group all existing plans and policies into an alternative to show the impacts of implementing

them in the future. This alternative should be considered one of the action alternatives, rather than no action.

2. **No action for a project**—This would mean the proposed activity would not take place (Q3). Therefore, no action is the continuation of existing conditions and activities without a particular planning context.

3. **Impacts of no action**—The impacts of no action are the impacts of existing activities or conditions (man-made or natural) projected into the future. If the proposal is to modify a plan, the impacts are the impacts of the unmodified plan. The impacts of no action help readers understand whether the project would degrade or improve conditions in an already degraded environment, or in a relatively pristine one. Analysis of no action must also include the cumulative impacts of all past, present, and reasonably foreseeable actions.

If the proposal is to improve existing conditions, the impacts of no action are particularly important to describe, because they help to define the need for NPS action. If implementing the no action alternative would "result in predictable actions by others," this impact should be part of the effects of no action (Q3).

Impacts of no action help decision-makers understand the comparative impacts of proposals, as well as the absolute impact. For instance, if your park is analyzing the impact to wildlife of a proposal to add a trail in an area already covered with trails, the impacts to wildlife of no action (e.g., from hikers using the trails) are distinctly different from the impacts if this were the first trail into a wilderness area. Compared with the existing impacts, a new trail in the first case may have less of an impact than in the second.

Impacts of no action also provide an assessment of absolute, or total, impact to a resource. In the example above, the impacts of the proposed trail, when added to those of existing trails (no action), may impose greater impacts on wildlife than a single trail in a wilderness would.

Accurately and completely describing the impacts of existing sources—that is, of continuing actions—is critical to understanding the context, duration and intensity of new impacts. For this reason, a full analysis of no action is required in all NPS EISs and EAs. This is true even when your park is under legislative or other command to take action (Q3).

## D.   Environmentally preferred alternative

After the environmental analysis is completed, you must identify the environmentally preferred alternative or alternatives. Descriptions of these alternatives must be included as a separate heading at the end of the alternatives section of the document. The environmentally preferred alternative is the alternative that will promote the national environmental policy expressed in NEPA (Sec. 101 (b)). This includes alternatives that:

- fulfill the responsibilities of each generation as trustee of the environment for succeeding generations.

- ensure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings.

- attain the widest range of beneficial uses of the environment without degradation, risk of health or safety, or other undesirable and unintended consequences.

- preserve important historic, cultural, and natural aspects of our national heritage and maintain, wherever possible, an environment that supports diversity and variety of individual choice.

- achieve a balance between population and resource use that will permit high standards of living and a wide sharing of life's amenities.

- enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Simply put, "this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources" (Q6a). In the NPS, the No Action alternative may also be considered in identifying the environmentally preferred alternative.

Through identification of the environmentally preferable alternative, the NPS decision-makers and the public are clearly faced with the relative merits of choices and must clearly state through the decision-making process the values and policies used in reaching final decisions.

## E. Consistency with sections 101 and 102(1) of NEPA

As required under CEQ regulations 40 CFR 1502.2(d), NEPA documents must include a section stating how each alternative analyzed in detail would or would not achieve the requirements of sections 101 and 102(1) of NEPA and other environmental laws and policies. In the park service, this requirement is met by 1) disclosing how each alternative, one of which is identified as the environmentally preferred, meets the criteria set forth in section 101(b) of NEPA (see above); and 2) any inconsistencies between the alternatives analyzed in detail and other environmental laws and policies.

# 2.8  Affected Environment

## A. Boundary-setting

Once alternatives and issues have been defined, the analysis area boundary should be delineated for each resource. The analysis boundary will be different for each resource. For instance, the impact to soils or vegetation of grading a site for a sewage treatment plant may be confined to the building footprint. The impact to water quality may be the entire length of the river where treated waste-

water is discharged and beyond. If another source of impact to the same river exists upstream, this section of river may also be part of the analysis area for water quality.

Sometimes the analysis boundary for a particular resource will change with different alternatives. In the example above, analyzing three or four different locations for a sewage treatment plant means analyzing impacts to vegetation in those locations.

Fully describing affected environment usually requires knowledge about the extent of impacts, and the description may be refined as impact analysis on a particular proposal proceeds.

In NEPA, "affected" environment means just that—resources expected to experience environmental impacts. Therefore, you should not bother with drawing analysis boundaries or collecting data to describe resources that are not likely to be affected by the alternatives.

For those resources that will sustain impacts, collecting accurate and adequate data on their present status (location, nature, condition, scope, size, etc.) is critical in determining impacts, and must be available before helpful NEPA analysis can begin. A geographic information system or other mapping system not only can be the basis of excellent analyses, but can help parks decide how best to develop or manage resources. In other words, quality data will help in making quality decisions. The list of resources in the ESF (appendix 1) is a good beginning point in determining which resources to consider.

## 2.9  Impacts

An impact differs from an issue. An issue describes an environmental problem or relationship between a resource and an action(s). Impact analysis predicts the degree to which the resource will be affected (see 4.5(g) for more information). Impact topics are derived from issue statements, and should be quite specific. For example, if the impact of building a lodge on the north rim of the Grand Canyon to visitor views is confined to the view of the Colorado River from a 200-meter section of one trail, the impact topic should be "views of the river from a 200-meter section of the trail" rather than "views of the canyon from the north rim." This helps keep the analysis (and documents) focused and analytical.

To help decision-makers completely understand how a resource will be affected, you must include considerations of context, intensity, duration, and timing (1508.27). The following categories of impacts must be considered and analyzed for any park proposal and its alternatives, regardless of how the analysis is documented (CE, EA, or EIS). Impacts, effects, and environmental consequences are synonymous throughout this handbook and the CEQ regulations.

### A.  Direct effects (1508.8)

These are impacts that are caused by the alternatives at the same time and in the same place as the action. For example, grading a building site removes soil and

vegetation at the site and, if an archeological resource is present, destroys surface and subsurface deposits.

## B.  Indirect effects (1508.8)

Indirect effects are impacts caused by the alternatives, that occur later in time or farther in distance than the action. For instance, if allowing a utility to string a transmission line through your park to serve a nearby town is something you reasonably expect will ultimately result in increased growth and encroachment of development on park boundaries, these indirect impacts need to be included in the NEPA document analyzing the transmission line. Implementing a day-use reservation system may have indirect socioeconomic impacts on neighboring businesses or concessions inside the park. These are examples of impacts occurring later in time.

The alternatives may also have indirect effects that occur farther in distance from the action. For instance, discharging effluent into a river would affect the water quality far from the actual site of the release. You do not need to call out direct or indirect effects specifically in a NEPA document, although cumulative impacts do need to be identified separately.

## C.  Cumulative effects (1508.7)

Cumulative effects are "additive" impacts to a particular resource. An EIS or an EA analyzes them without regard to land ownership (i.e., cumulative effects may occur from actions on private or other agency land), and it includes impacts of actions in the past, the present, and the reasonable foreseeable future (see section 2.4, cumulative actions).

Although it is clear that CEQ does not want agencies to segment their proposals into pieces that have less potential for significant impact alone than when viewed together (see 1.4 (F)), the requirement to analyze cumulative impacts goes much farther than this. A complete picture of forces already acting upon a particular environmental resource is essential in making reasonable decisions about the management of that resource. If sources of impact exist, whether they are on private or public land, or whether they were taken in the past, are ongoing now, or have a reasonable chance of occurring in a future when the impacts of the proposal are also ongoing, their combined impacts give decision-makers and the public a clear idea of the "absolute" impact the resource is experiencing. For instance, if your park is proposing clearing vegetation to build a campground in the middle of important elk winter range, last year's timber cut on the adjacent federal forest in elk winter range has an additive impact on the elk population and must be part of the cumulative impact. A large housing development proposed for next year on private land in elk habitat is also going to have an adverse effect, and this should be included if you believe it is reasonable to assume the homes will be built.

For the example above, cumulative impacts can extend over entire watersheds, or thousands of square miles of elk range. Yet, because the action causing an impact is farther away from the park's proposal, in time or geographically, it often has a diminishing additive impact. The IDT is critical in deciding which

actions, activities, or sources of impact to include in a cumulative impact analysis, and the team should use common sense in deciding the extent of the cumulative impacts "boundary" (see section 2.8 (A)). Although a multitude of actions may contribute impact infinitesimally to the same resource that the NPS proposal is expected to affect, only those that resource specialists feel are clear contributors or that can feasibly be analyzed need to be included. As a general rule, the farther removed an action is from the project area or the project start date, the less need there is for detailed and exact analysis of the action's cumulative impacts.

The analysis of cumulative impacts may be particularly important for larger-scale park planning or resource management efforts. To return to the elk example, if elk winter range is a resource that you believe is important to maintain in pristine condition within the park, but a migration corridor between it and elk summer range is proposed for development, knowing how the developed corridor will affect the elk population may be important in deciding how to manage the park's winter range.

## D.  Impairment

The impact analysis must also include a finding on whether or not the actions contained in the alternatives would "impair" park resources. (See DO-55 and this handbook 1-2(E)).

## 2.10  Determining the Appropriate NEPA Pathway

### A.  Documentation

A NEPA review includes documentation of the analysis, which then becomes available to the public. The degree of public input and the detail included in the documentation varies depending on the severity, in context, of the environmental impacts of the proposal and alternatives.

### B.  Five options

Five options to document a NEPA analysis are available:

1.  Memo to file—Prepare a memo to file when the proposal has already been analyzed in site-specific detail in a previous NEPA document, no different impacts or changes to the project are expected, and environmental conditions have not changed. A notation to this effect should be prepared and placed in the project files.

2.  CEs for which no formal documentation is necessary—This option is applicable when the action is described using one of the categories in section 3.3 and no exceptions (section 3.5) exist. If appropriate, and if a project file exists, a memo to file may be placed in the project file.

3.  CEs for which a record is needed—Prepare these records when the action is described using one of the categories in section 3.4 and no

exceptions (section 3.5) exist. Complete the ESF (appendix 1) and the CEF (appendix 2) and include them with the project file.

4.  EIS—Prepare an EIS when the potential for significant impact to the human environment exists (see section 4.2), as indicated by an EA, an ESF, or other scoping, or because the proposed action or alternative is described in section 4.4.

5.  EA—Prepare when:

   (a) the significance of impacts is unknown (e.g., to determine whether an EIS is required).

   (b) the proposed action is not described on either of the CE lists (sections 3.3 and 3.4) or the list of actions that normally require an EIS (section 4.4).

   (c) the proposed action would take several CE categories to describe fully, would involve one or more of the exceptions described in section 3.5, or would involve unresolved conflicts concerning the use of resources.

Each of these options has specific content and public involvement requirements. For options 3, 4, and 5, you should complete the clear definition of objectives, an initial range of alternatives and actions including connected and cumulative actions, internal interdisciplinary scoping (see section 2.6), and an ESF (see section 2.6 (B) (1)) before you determine the appropriate NEPA pathway. For options 1 or 2, no ESF is required, although you should consult the list of exceptions to categorical exclusions (see section 3.5) to see whether any apply.

## C. The choice of pathways

1.  If you believe option 1 above applies, the IDT should re-read the NEPA document that it believes already describes and analyzes the impacts of the action. If it does so in site-specific detail, and the analysis is up-to-date (see section 2.6 (C)), no further documentation is required, although for the administrative record, you must write a memo to file as described above. (Also note that this memo should be approved by the Superintendent or his/her designee after consultation with the regional environmental coordinator.)

2.  If option 1 does not apply, but you believe option 2 does, check the list of actions in section 3.3. If it is described on this list (and no exceptions in section 3.5 apply), you may take action without further paperwork.

3.  If the action is not on the list in section 3.3, or if it is described and analyzed in a previous NEPA document, you should complete internal scoping, complete the ESF form, and check the list of actions in section 3.4.

4.  If the action is described in section 3.4, and no exceptional circumstances (section 3.5) exist, the CE is likely the appropriate pathway. Section 3.2

of this handbook describes the categorical exclusion process in more detail.

5. If the action is not described on the CE list, check the list of actions that normally require the preparation of an EIS (section 4.4). If it is on the list, or the potential for significant impacts exists as indicated by the ESF, you must write an EIS. Chapter 4.0 of this handbook details the process to follow in preparing an EIS.

6. You should prepare an EA if the action is not described on any list, or if one of the following applies:

    - one or more of the categories on the ESF apply or are checked "data needed" or "yes," but you do not know if any will result in significant impacts;

    - several categories in section 3.4 are required to completely describe the project;

    - the action is described in section 3.3 or 3.4, but one or more of the exceptions in section 3.5 apply;

    - unresolved conflicts concerning the use of resources exist; or

    - the significance of impacts is unknown.

If the EA indicates there may be significant impacts, you must prepare an EIS, unless the unique and limited circumstances described in section 5.4 (F)(3) apply and a proposal can be modified with mitigation measures to lessen the severity of impact, sometimes referred to as a "mitigated EA." The use of the terms "significant" and "significance" over the years has become quite contentious in NEPA documents. It is highly recommended that these terms be avoided in EAs and EISs, since these terms apply primarily to the determination of the most appropriate NEPA pathway.

## 2.11  Using Contractors

A NEPA document may be prepared by a contractor for either internally or externally generated proposals if no conflict of interest exists. If a contractor prepares an EIS or an EA, there must be a waiver prepared by NPS and signed by the contractor indicating the contractor has "no financial or other interest in the outcome of the project." (1506.5). Even when a NEPA document is prepared by a contractor, NPS has the responsibility for ensuring its adequacy.

## 2.12  The Administrative Record

The administrative record or project file is a critical part of the decision-making process, because Freedom of Information Act requests and/or litigation will require an organized and complete record for response. All cited documents in the text, as well as complete references that have been summarized or incorpo-

rated by reference in the EIS or the EA, need to be reasonably available for public inspection if NPS receives such a request. Litigation may focus almost entirely on the contents of the record.

At a minimum, items that should be kept in the record include notes of IDT meetings where key decisions about the content of the document, issues to be examined in detail, alternatives, and so forth were made; notes, public comment letters, minutes of meetings, phone calls, e-mail, and documentation of public involvement efforts; copies of EAs or EISs that were circulated within NPS, or to other agencies or entities outside NPS, for review or comment; and drafts of sections written that were later used to create an EA or an EIS. Issues identified by the IDT team or individual members should be included with follow-up documentation on how the issue was resolved.

## 2.13  Working with Other Agencies

### A.  Lead and cooperating agencies

More than one federal agency may be involved in approving a given proposal. Yet, NEPA requires agencies to work together to produce only one NEPA document. The agency in charge of preparing the document is the lead agency, and all others with jurisdiction by law (every agency with permitting or funding authority over some aspect of the proposal) or special expertise who are designated as such by the lead are called cooperating agencies. The CEQ regulations include criteria for designating a lead agency if a conflict exists (1501.5), as well as the rights and responsibilities of cooperating agencies (1501.6). Chapter 8.0 of this handbook also has information on lead and cooperating agencies (see also 516 DM, 2.4.).

NPS may act as a joint lead agency with either another federal agency (1501.5 (b)) or a state or local agency (see section 2.13(B)). However, CEQ regulations clearly encourage the lead and cooperating concept for two or more federal agencies and the joint approach for federal-state documents. In addition, the NPS has committed, along with other major land management agencies, to provide for opportunities for inclusion of state, local, and tribal governments as cooperators in the preparation of environmental documents.

### B.  State agencies

CEQ also asks federal agencies to work closely with state agencies that have requirements for impact analysis, and to make every effort to combine efforts with them (1506.2), including the preparation of a joint state-federal impact document.

### C.  Other environmental and regulatory requirements

Other federal, state, and local laws may have information requirements that overlap with NEPA. The study of these resources and information about their present status (i.e., affected environment), or the impact they may experience from your park's proposal, should be integrated into your NEPA document. Some of these laws and executive orders are listed below, but you must consult local, state, and

other federal agencies as part of scoping to determine all of the applicable requirements and any permits needed for project completion.

1. **Endangered Species Act (ESA)**—Section 7 of the ESA requires that a federal agency consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service on any action that may affect endangered or threatened species or candidate species, or that may result in adverse modification of critical habitat. An EA or an EIS may provide sufficient information to serve as a biological assessment for section 7 purposes. If a separate biological assessment is prepared, it must be part of any NEPA document.

2. **Executive Orders 11988 and 11990, Floodplain Management and Wetland Protection**—These executive orders direct NPS to avoid, to the extent possible, the long- and short-term adverse impacts associated with modifying or occupying floodplains and wetlands. They also require NPS to avoid direct or indirect support of floodplain or wetland development whenever there is a practical alternative. If implementing your park's proposal would result in an adverse impact to a regulated floodplain or wetland, you must include a statement of findings with the finding of no significant impact (FONSI) or the record of decision (ROD).

3. **National Historic Preservation Act (NHPA) section 106**—Section 106 of NHPA requires federal agencies to consider the effects of their proposals on historic properties, and to provide state historic preservation officers, tribal historic preservation officers, and, as necessary, the Advisory Council on Historic Preservation a reasonable opportunity to review and comment on these actions. Section 106 review and NEPA are two separate, distinct processes. They can and should occur simultaneously, and documents can be combined, but one is not a substitute for the other. They should, however, be coordinated to avoid duplication of public involvement or other requirements. The information and mitigation gathered as part of the 106 review must be included in the NEPA document, and the 106 process must be completed before a FONSI or an ROD can be signed on a proposal that affects historic properties.

4. **Executive Order 12898, Environmental Justice in Minority and Low-Income Populations**—This executive order directs federal agencies to assess whether their actions have disproportionately high and adverse human health or environmental effects on minority and low-income populations. You must specifically analyze and evaluate the impact of your proposal on minority and low-income populations and communities, as well as the equity of the distribution of the benefits and risk of the decision in your NEPA document. If it does not apply, this should be noted in the "issues dismissed" section of the NEPA document (see ECM95–3 and ECM98–2).

5. **Secretarial Order 3175 and ECM95–2**—These memoranda require bureaus to explicitly address environmental impacts of their proposed actions on Indian Trust Resources in any environmental document.

## 2.14 Emergency Actions

Emergencies requiring immediate action are exempt from CEQ's regulatory provisions for implementing NEPA (1506.11; 516 DM, 5.8), regardless of whether the actions have the potential for significant impact. In the event of an emergency, you should immediately take any action needed to prevent or reduce either risks to public health or safety or serious resource losses. CEQ and the Department require that both CEQ and OEPC (the Department's Office of Environmental Policy and Compliance) be consulted as soon as possible about NEPA compliance in such an event. If an action is one that would normally require an EIS, consult CEQ as soon as possible for approval of alternative arrangements. The NPS Environmental Quality Division coordinates these requests.

It is important to note that only those actions required to resolve the emergency are exempt. Other related actions (follow-up, connected, long-term, etc.) remain subject to the requirements of NEPA.

Examples of emergency actions are cleanup of immediately threatening hazardous materials spills, fire suppression, and prevention or repair of damage by unanticipated floods or other natural disasters (ESM97–3).

# 3.0 Categorical Exclusions

3.1 Definition

3.2 Process to Follow

3.3 CEs for Which No Formal Documentation Is Necessary

3.4 CEs for Which a Record Is Needed

3.5 Exceptions to CEs

3.6 Using the CE Lists

3.7 Public Involvement

3.8 Administrative Process

3.9 Consideration of Multiple Actions

## 3.1 Definition

In NPS, CEs are applicable to actions that, under normal circumstances, are not considered major federal actions and that have no measurable impacts on the human environment. However, under exceptional circumstances (see section 3.5), these same actions may have measurable or even significant impacts, and a CE would no longer be applicable. Therefore, each time you consider a CE for a park action, it is important to decide whether any exceptional circumstances exist.

Departmental legal activities—including arrests, investigations, patents, claims, and legal opinions—are not considered actions for the purposes of NEPA. Similarly, regulatory and enforcement actions—including inspections, administrative hearings, and related decisions—are not NEPA-related actions.

## 3.2 Process to Follow

NPS has two lists of categorically excluded actions. One (section 3.3) requires no formal documentation. If an action that your park unit is proposing is on this list, you do not need to complete any NEPA-related documentation, and no evidence of internal scoping is required. You may wish to prepare a memo to the project file (if one exists) to show that environmental effects were considered.

In the vast majority of cases, the actions in section 3.3 have no potential for environmental impact. However, you must check the list of exceptions in section 3.5 before you exclude an action listed in section 3.3. If any of these criteria apply, or if you believe the potential for environmental impact exists, you must go through the internal scoping process described in section 2.6 and complete the requirements in sections 3.2, or for an EA or an EIS if appropriate.

The process in using the second list (section 3.4) is more involved. Whereas the actions in section 3.3 would almost never cause environmental impact, these (section 3.4) actions do have the potential for measurable impacts. To be sure no measurable impacts would occur, follow these steps if your park's proposal is described on the list in section 3.4:

1.  Using an interdisciplinary approach, determine whether any connected, cumulative, or similar actions are part of the proposed action. In other words, carefully consider whether it is a piece of a larger action that should be analyzed in a NEPA document.

2.  Use the ESF to ascertain the important environmental issues, and visit the site if the IDT is not familiar with it.

3.  If no exceptional (see section 3.5) circumstances exist, and this fact is confirmed by the ESF, contact interested and affected local, state, and/or federal agencies to see whether any object to the NPS determination that there is no potential for measurable impact.

4.  If interested or affected public exist, make a diligent effort to contact them and obtain their input.

5.  If all (the NPS team, other agencies, and the public) agree there is no potential for measurable impact, document this in the categorical exclusion form (CEF) shown in appendix 2. The CEF requires a brief description of the proposal, identification of the category used in excluding the action from further NEPA analysis, and a signature block. The ESF is attached to and becomes part of the CEF.

6.  If extensive mitigation is required to avoid triggering one of the exceptional circumstances criteria (section 3.5), you must prepare an EA. If minimum mitigation is acceptable to appropriate agencies and any interested or affected public, it should be fully integrated into the project description on the CEF.

7.  You should consider changed environmental circumstances in determining the level of NEPA documentation, and in deciding if the criteria in section 3.4 would apply.

## 3.3   CEs for Which No Formal Documentation Is Necessary

The following list shows actions that usually have no potential for impact to the human environment, and that therefore are not routinely subject to NEPA review and documentation. The list is included here to reinforce the idea that many routine federal government actions are exempt from NEPA. Under normal circumstances, no NEPA-related documentation (including an ESF) is required in order to perform the actions on this list. However, if the criteria in section 3.5 apply, or if for any other reason you believe the action listed below may have an impact on the human environment, procedures described in section 3.2 apply. Some of

these actions (A through H) are substantially the same as the Departmental CEs (516 DM, 2, appendix 1). Others (J through O) have been added by NPS.

A.  Personnel actions and investigations and personnel services contracts.

B.  Internal organizational changes and facility and office reductions and closings.

C.  Routine financial transactions—for example, salaries and expenses, procurement contracts, guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties.

D.  Routine and continuing government business—for example, supervision, administration, operations, maintenance, and replacement activities having limited context and intensity, meaning the activities are limited in size and magnitude or have short-term effects.

E.  Management, formulation, allocation, transfer, and reprogramming of the Department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required.)

F.  Legislative proposals of an administrative or technical nature—for example, changes in authorizations for appropriations; minor boundary changes and land transactions; proposals that would have primarily economic, social, individual, or institutional effects; and comments and reports on referrals of legislative proposals.

G.  Policies, directives, regulations, and guidelines of an administrative, financial, legal, technical, or procedural nature, the environmental effects of which are too broad, speculative, or conjectural to lend themselves to meaningful analysis and which will be subject later to the NEPA process, either collectively or case-by-case.

H.  Activities that are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

I.  Land and boundary surveys.

J.  Preparation and issuance of publications.

K.  Technical assistance to other federal, state, and local agencies or the general public.

L.  Preparation of routine reports required by law or regulation.

M.  Day-to-day maintenance, resource management, and research activities that have no potential for environmental impact or are not otherwise listed in section 3.4.

N.  Issuance of individual hunting or fishing licenses in accordance with state and federal regulations.

O.  Changes in interpretive and environmental education programs.

## 3.4  CEs for Which a Record Is Needed

See section 3.2 for the process to follow when the proposed action is described in one of the following categories:

### A.  Actions related to general administration

(1)  Changes or amendments to an approved action when such changes would cause no environmental impact.

(2)  Minor boundary changes that are accomplished through existing statutory authorities and that result in no change in land use.

**Be sure to check** for exceptional circumstances (section 3.5) and consult the Warning section (3.6) before you decide that your park's action should be categorically excluded!

(3)  Reissuance/renewal of permits, rights-of-way, or easements not involving new environmental impacts, provided that the impacts of the original actions were evaluated in an environmental document.

(4)  Conversion of existing permits to rights-of-way, when such conversions neither continue nor potentially initiate adverse environmental conditions, provided that the impacts of the original actions were evaluated in an environmental document.

(5)  Issuances, extensions, renewals, reissuances, or minor modifications of concession contracts or permits that do not entail new construction or any potential for new environmental impact as a result of concession operations.

(6)  Incidental business permits (formerly called commercial use licenses) involving no construction or potential for new environmental impact.

(7)  Leasing of historic properties in accordance with 36 CFR 18 and NPS-38.

(8)  Modifications or revisions to existing regulations, or the promulgation of new regulations for NPS—administered areas, provided the modifications, revisions, or new regulations do not:

(a)  increase public use to the extent of compromising the nature and character of the area or cause physical damage to it.

    (b) introduce non-compatible uses that might compromise the nature and characteristics of the area or cause physical damage to it.

    (c) conflict with adjacent ownerships or land uses.

    (d) cause a nuisance to adjacent owners or occupants.

(9) At the direction of the NPS responsible official, actions where NPS has concurrence or co-approval with another bureau and the action is a CE for that bureau, and where NPS agrees that there is no potential for environmental impact.

(10) Routine transfers of jurisdiction between the NPS and the District of Columbia accomplished through existing statutory authority, where no change of use in the land is anticipated upon transfer.

## B.  Plans, studies, and reports

(1) Changes or amendments to an approved plan, when such changes have no potential for environmental impact.

(2) Cultural resources maintenance guides, collection management plans, and historic furnishings reports.

(3) Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).

(4) Plans, including priorities, justifications, and strategies, for non-manipulative research, monitoring, inventorying, and information-gathering.

(5) Agreements between NPS offices for plans and studies.

(6) Authorization, funding, or approval for the preparation of statewide comprehensive outdoor recreation plans.

(7) Adoption or approval of academic or research surveys, studies, reports, and similar documents that do not contain and will not result in NPS recommendations.

(8) Land protection plans that propose changes to existing land or visitor use when the changes have no potential for environmental impact.

## C.  Actions related to development

(1) Land acquisition within established park boundaries, if future anticipated uses would have no potential for environmental impact.

(2) Land exchanges that will not lead to anticipated changes in the use of land and that have no potential for environmental impact.

(3) Routine maintenance and repairs to non-historic structures, facilities, utilities, grounds, and trails.

(4) Routine maintenance and repairs to cultural resource sites, structures, utilities, and grounds if the action falls under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide, or if the action would not adversely affect the cultural resource.

(5) Installation of signs, displays, and kiosks.

(6) Installation of navigation aids.

(7) Experimental testing of short duration (no more than one season) of mass transit systems, and changes in operation of existing systems, that have no potential for environmental impact.

(8) Replacement in kind of minor structures and facilities with little or no change in location, capacity, or appearance—for example, comfort stations, pit toilets, fences, kiosks, signs, and campfire circles.

(9) Repair, resurfacing, striping, installation of traffic control devices, and repair/replacement of guardrails, culverts, signs, and other minor existing features on existing roads when no potential for environmental impact exists.

(10) Changes in sanitary facilities operation resulting in no new environmental effects.

(11) Installation of wells, comfort stations, and pit or vault toilets in areas of existing use and in developed areas.

(12) Minor trail relocation or development of compatible trail networks on logging roads or other established routes.

(13) Upgrading or adding new overhead utility facilities on existing poles, or on replacement poles that do not change existing pole line configurations.

(14) Issuance of rights-of-way for overhead utility lines to an individual building or well from an existing line where installation will not result in visual intrusion and will involve no clearance of vegetation other than for placement of poles.

(15) Issuance of rights-of-way for minor overhead utility lines not involving placement of poles or towers and not involving vegetation management or visual intrusion in an area administered by NPS.

(16) Installation of underground utilities in areas showing clear evidence of recent human disturbance or areas within an existing road prism or within an existing overhead utility right-of-way.

(17) Minor landscaping in areas showing clear evidence of recent human disturbance.

(18) Installation of fencing enclosures, exclosures, or boundary fencing posing no effect on wildlife migrations.

## D. Actions related to visitor use

(1) Minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.

(2) Minor changes in programs and regulations pertaining to visitor activities.

(3) Issuance of permits for demonstrations, gatherings, ceremonies, concerts, arts and crafts shows, and so forth, entailing only short-term or readily remediable environmental disturbance.

(4) Designation of trailside camping zones with minimal or no improvements.

## E. Actions related to resource management and protection

(1) Archeological surveys and permits involving only surface collection or small-scale test excavations.

(2) Restoration of noncontroversial (based on internal scoping requirements in section 2.6) native species into suitable habitats within their historic range.

(3) Removal of individual members of a non-threatened/endangered species or populations of pests and exotic plants that pose an imminent danger to visitors or an immediate threat to park resources.

(4) Removal of non-historic materials and structures in order to restore natural conditions when the removal has no potential for environmental impacts, including impacts to cultural landscapes or archeological resources.

(5) Development of standards for, and identification, nomination, certification, and determination of, eligibility of properties for listing in the National Register of Historic Places, the National Historic Landmark and National Natural Landmark Programs, and biosphere reserves.

(6) Non-destructive data collection, inventory (including field, aerial, and satellite surveying and mapping), study, research, and monitoring activities (this is also a Departmental CE).

(7) Designation of environmental study areas and research natural areas, including those closed temporarily or permanently to the public, unless the potential for environmental (including socioeconomic) impact exists.

## F. Actions related to grant programs

(1) Proposed actions essentially the same as those listed in paragraphs A–E above.

(2) Grants for acquisition of areas that will continue in the same use or lower density use with no additional disturbance to the natural setting or type of use.

(3) Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical, or cultural resources of the area or the integrity of the existing setting.

(4) Grants for construction of facilities on lands acquired under a previous NPS or other federal grant, provided that the development is in accord with plans submitted with the acquisition grant, and that environmental documents have been completed on the impacts of the proposal funded by the original grant.

(5) Grants for the construction of new facilities within an existing park or recreation area, provided that the facilities will not:

   (a) conflict with adjacent ownerships or land use, or cause a nuisance to adjacent owners or occupants, such as would happen if use were extended beyond daylight hours.

   (b) introduce motorized recreation vehicles, including off-road vehicles, personal water craft, and snowmobiles.

   (c) introduce active recreation pursuits into a passive recreation area.

   (d) increase public use or introduce non-compatible uses to the extent of compromising the nature and character of the property or causing physical damage to it.

   (e) add or alter access to the park from the surrounding area.

(6) Grants for the restoration, rehabilitation, stabilization, preservation, and reconstruction (or the authorization thereof) of properties listed on or eligible for listing on the National Register of Historic Places, at their same location, and provided that such actions:

   (a) will not alter the integrity of the property or its setting.

   (b) will not increase public use of the area to the extent of compromising the nature and character of the property.

   (c) will not cause a nuisance to adjacent property owners or occupants.

## 3.5  Exceptions to CEs

If the IDT or the NPS decision-maker determines that any of the following exceptions apply to a proposed action, it may not be categorically excluded, and you must prepare either an EA or an EIS. Items A through O are adapted from the list of Departmental exceptions (516 DM, 2, appendix 2). Items N through R are NPS additions. The exceptions apply if any proposed actions:

A.   have material adverse effects on public health or safety.

B.   have adverse effects on such unique geographic characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; or ecologically significant or critical areas.

C.   have highly controversial environmental effects.

D.   have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

E.   establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

F.   are directly related to other actions with individually insignificant, but cumulatively significant, environmental effects.

G.   have adverse effects on properties listed or eligible for listing on the National Register of Historic Places.

H.   have adverse effects on species listed or proposed to be listed on the List of Endangered or Threatened Species, or have adverse effects on designated Critical Habitat for these species.

I.   require compliance with Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act.

J.   threaten to violate a federal, state, local, or tribal law or requirement imposed for the protection of the environment.

K.   involve unresolved conflicts concerning alternative uses of available resources (NEPA sec. 102 (2) (E)).

L.   have a disproportionate, significant adverse effect on low-income or minority populations (EO 12898).

M.   restrict access to and ceremonial use of Indian sacred sites by Indian religious practitioners or adversely affect the physical integrity of such sacred sites (EO 13007).

N.   contribute to the introduction, continued existence, or spread of federally listed noxious weeds (Federal Noxious Weed Control Act).

O.   contribute to the introduction, continued existence, or spread of non-native invasive species or actions that may promote the introduction, growth, or expansion of the range of non-native invasive species (EO 13112).

P.  require a permit from another agency to proceed, unless the agency from whom the permit is required agrees that a CE is appropriate, the action is described in section 3.3 or 3.4, and no exceptional circumstances in section 3.5 apply.

Q.  have the potential for significant impact as indicated by a federal, state, or local agency or Indian tribe.

R.  have the potential to be controversial because of disagreement over possible environemental effects.

## 3.6  Using the CE Lists

You should keep the following issues in mind when you are considering categorically excluding a proposed action:

A.  If two or more categories are required to cover elements of the proposed action, you should consider carefully whether the entire action may have the potential for environmental impact and be better analyzed in an EA or an EIS. To be excludable, the action should easily fit in one category and clearly have no potential for environmental impact.

B.  If an action is described on the list, but has the potential for measurable environmental impact, you must prepare an EA or an EIS.

C.  If an action is described on the list, but mitigation is required to avoid the potential for environmental impact, you should consider an EA or an EIS. Only minimal mitigation should be part of an action categorically excluded, and the effectiveness and enforcement of the mitigation must carry a high degree of certainty.

D.  If a local, state, or federal agency with jurisdiction by law over an affected resource believes the potential for measurable environmental impact exists for an action that a park initially intends to categorically exclude from further analysis, you must prepare an EA or an EIS.

E.  If the action involves "unresolved conflicts concerning alternative uses of available resources (NEPA, sec 102 (E))," alternatives to the proposed action must be developed and studied. If an NPS action described on the list in sec. 3.4 does involve such conflicts, you must prepare an EA or an EIS.

F.  The definition of categorically excluded actions includes those actions that cumulatively do not have the potential for measurable impact on the human environment. If the action is a part of a broader action, or one in a series of similar or related actions, the broader policy, program, or proposal must be the subject of a NEPA analysis first. Elements of the action may subsequently be analyzed more specifically using the tiering approach.

G.  If a project requires surveys or permits under other laws, in particular the National Historic Preservation Act and the Endangered Species Act, it is not a categorical exclusion unless all appropriate agencies agree that a CE is appropriate.

H.  If you will be taking many actions throughout the years that have very little or no potential for environmental impact and would qualify as a CE, it may be a better and more efficient approach to address them programmatically (see sections 3.9 and 7.5 of this handbook).

I.  As a general rule, construction actions are not within the scope of categorical exclusions. However, maintenance activities may be included if listed in section 3.4. Generally, these are maintenance activities that are designed to preserve the integrity of an existing structure or facility. Maintenance activities do not include additions to structures or facilities, or changes in location or capacity.

## 3.7  Public Involvement

No specific public involvement steps are required when you are categorically excluding an action from further NEPA analysis and documentation. However, CEQ requires agencies to always make a "diligent" effort to involve any interested and affected public that exist (1506.6). You should include an internal scoping step to brainstorm whether any interested or affected public exist, and discuss the best method to involve them if they do.

## 3.8  Administrative Process

(Also see section 3.2, Process to Follow)

The decision to categorically exclude an action from further NEPA analysis is documented using the CEF (see appendix 2). This form is signed by the park superintendent or his or her designee. You should attach the CEF to the ESF, and make sure both are available for public inspection upon request. The action may be implemented immediately upon approval and signature of the park superintendent or designee. Because no specific public involvement is required for CE, it is often difficult for those who may be interested to know what actions a park has taken. One way to comply with the diligence requirement (see above) is for parks to maintain a current list of categorically excluded actions and update it quarterly. This list could be sent to a mailing list of interested members of the public, or simply made available upon request.

Any relevant permit information or documentation of consultation with other agencies should be attached to your completed CEF and ESF and become a permanent part of the project files.

## 3.9  Consideration of Multiple Actions

Each year, parks undertake a variety of routine actions and activities that are similar in nature. For example, trails are cleared in the spring, fences are repaired, potholes are filled. These activities should be reviewed in conjunction with the park's budgetary process. Normally, budgets for these activities are developed for a given fiscal year, money is appropriated, and the work gets done. Park staff should consult with each other, develop a list of activities that would most likely be accomplished in the fiscal year, or by season, and consider covering these activities, if they meet the criteria established for a CE, in one CE document.

# 4.0 Environmental Impact Statements

4.1 Introduction

4.2 Criteria for Significant Impact

4.3 Ongoing or Continuing Action

4.4 Actions That Normally Require an EIS

4.5 EIS Format

4.6 The Final EIS

4.7 Supplements to Draft and Final EISs

4.8 Public Involvement Requirements

4.9 Administrative Process of Review of EISs

4.10 Terminating the EIS Process

## 4.1 Introduction

NEPA (sec. 102(2)(C)) requires you to prepare an EIS whenever your park proposes or approves an action whose impacts on the human environment may be significant. CEQ defines actions as "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." Federal approvals of permits for private applicants are also considered actions that trigger the need for NPS NEPA analysis (1508.18).

## 4.2 Criteria for Significant Impact

If something your park is proposing might have a significant impact on the human environment, you must prepare an EIS. It is important, then, to understand how the significance of an impact is gauged. Although significance may often be a subjective judgment, to the maximum extent possible it must be based on the scientific evidence and public input that NEPA provides. Section 4.2 (B) contains the CEQ criteria you should use in deciding whether an EIS may be required. CEQ requires you to evaluate the severity of impacts in several different contexts, if two or more apply.

### A. Context

Evaluating impacts in particular contexts gives valuable comparative information. Context may be temporal (i.e., short-term impacts vs. long-term), but it is

**Are these special resources affected?**

- Public safety or health.
- Wetlands, floodplains, or ecologically sensitive areas.
- Important scientific, cultural, or historic resources.
- Threatened or endangered species or their habitat.

**Is the proposal**

- Likely to be highly controversial or its impact analysis highly debated?
- Likely to involve highly uncertain impacts or unique or unknown risks?
- Likely to pave the way for future actions?
- Part of a larger proposal?
- Likely to violate any law or requirement imposed to protect the environment?

**If so, consider** an EIS rather than an EA or a CE.

most often geographical. For instance, the temporary closure of a 1,000-acre recreation area may have only minor impacts on the nation's recreation users but severe impacts on local residents who depend on the area as the sole source of outdoor recreation for many miles around. Or, building 30 homes in Denver may not have a major impact, whereas building them in Denali National Park could.

**B.   Criteria**

Your team or park decision-maker must consider the following criteria when determining whether an impact may be significant in helping to determine if an EIS is appropriate (1508.27):

(1) Impacts that may have both beneficial and adverse aspects and which on balance may be beneficial, but that may still have significant adverse impacts which require analysis in an EIS.

(2) The degree to which public health and safety are affected.

(3) Any unique characteristics of the area (proximity to historic or cultural resources, wild and scenic rivers, ecologically critical areas, wetlands or floodplains, and so forth).

(4) The degree to which impacts are likely to be highly controversial.

(5) The degree to which the potential impacts are highly uncertain or involve unique or unknown risks.

(6) Whether the action may establish a precedent for future actions with significant effects, or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions that may have individual insignificant impacts but cumulatively significant effects. Significance cannot be avoided by terming an action temporary or breaking it down into small component parts.

**46**   The DO-12 Handbook

(8)  The degree to which the action may adversely affect historic properties in or eligible for listing in the National Register of Historic Places, or other significant scientific, archeological, or cultural resources.

(9)  The degree to which an action may adversely affect an endangered or threatened species or its habitat.

(10)  Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.

## 4.3  Ongoing or Continuing Action

CEQ defines federal actions subject to NEPA evaluation to include "continuing activities" (1508.18) in addition to new projects or programs. If your park is making an explicit or a tacit decision to continue with an activity that may have significant impacts to the environment, and either NEPA has never been done or an outdated or inadequate document was used in deciding to take the original action, you should initiate the NEPA process and prepare a document for public review. A change in an ongoing activity should be considered a new action, and the NEPA process should be followed.

## 4.4  Actions That Normally Require an EIS

You must prepare an EIS for the following proposals:

A.  Wild and Scenic Rivers proposals when any of the following conditions are met:

(1)  Congress has authorized a study of a river segment for inclusion in the system (under sec. 5(a) of the Wild and Scenic Rivers Act) and one of the alternatives being considered is either of the following:

(a)  direct federal management as a component of the National Park System or the National Wildlife Refuge System.

...always prepare an EIS for any NPS proposal that has the potential for significant impacts to the human environment.

(b)  management by state and/or local government, in line with an active federal water resource development proposal, permit, license, or grant pending before a federal agency which, if constructed, would render some or all of the study segment ineligible for the national system.

(2)  The Secretary has designated a river segment (under sec. 2(a) (ii)) as part of an active water resource development proposal that, if constructed, would render some or all of the proposed segment ineligible for the national system.

In no case will an EIS be required for a river that has been determined ineligible for designation because it is not free-flowing or because it has no outstandingly remarkable values.

B.  Proposals for legislative action to make additions to the National Trails system if the proposed trail meets eligibility criteria, even if the trail is not ultimately recommended for designation by the Secretary.

C.  Special resource studies when the following conditions are met:

(1)  The resource being studied meets the criteria for inclusion in the National Park System (i.e., it is nationally significant and is deemed feasible and suitable for inclusion in the system).

(2)  One of the alternatives being considered is designation as a National Park System unit, even if that is ultimately not the recommendation of the Secretary.

D.  A GMP or its equivalent. GMPs may need to be amended for various reasons. Amendments should follow the same procedures in determining the appropriate NEPA pathway on a case-by-case basis.

E.  Wilderness proposals.

F.  Grants, including multi-year grants, whose size or scope will result in major natural or physical changes, including interrelated social and economic changes and residential and land use changes within the project area or its immediate environs.

G.  Parkwide oil and gas management plans.

In addition to the specific conditions listed, you must always prepare an EIS for any proposal that has the potential for significant impacts to the human environment. In rare circumstances, the Environmental Quality Division, through the Associate Director for Natural Resources Stewardship and Science, may grant an exception to the requirement that EISs be prepared for some of the above named actions on a case by case basis, when it is clear that site-specific data indicate that the potential for significant impact does not exist. This determination may only be made after public scoping, initial development of alternatives and impact analysis. In addition, the FONSI on such a document must be made available for public review for 30 days before the agency's final determination whether to prepare an EIS (Q37b).

## 4.5  EIS Format

Unless there is a "compelling reason to do otherwise" (CEQ 1502.10), CEQ requires that you follow its format (laid out in this section) for all EISs. Variations from the CEQ format described in this section must first be approved by the Environmental Quality Division (EQD) and the Department's OEPC.

## A.  Cover sheet (1502.10)

You must make sure the cover sheet does not exceed 1 page. It must include the following:

(a)  a list of responsible agencies including the lead agency and any cooperating agencies.

(b)  the title and location of the proposed action that is the subject of the statement.

(c)  the name, address, and telephone number of an NPS contact person.

(d)  designation of the statement as a draft, final, or supplement.

(e)  a one-paragraph abstract of the statement that identifies significant impacts and alternatives to the proposed action/proposal.

(f)  the date by which comments must be received.

## B.  Summary (1502.12)

Each EIS must contain a summary that adequately and accurately summarizes the statement. You must stress the major conclusions, the areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives) in the summary. Normally, you should not allow the summary to exceed 15 pages.

## C.  Table of contents (1502.10)

You should make sure the table of contents is sufficiently detailed to allow the reader to quickly locate major subject matter in the EIS, particularly specific impact topics and alternatives analyzed in the document.

## D.  Purpose and need for action (1502.13, DM, 4.9)

"Purpose and need for action" is usually the title of chapter 1 of an EIS, although "introduction" may be more appropriate. In this chapter, you must specify the underlying purpose and need to which your park is responding in its proposal (see section 2.2), and you should describe the issues identified by the IDT (see section 2.5). This chapter may introduce a number of factors, including economic or technical considerations, or service or departmental statutory, or legislative mandates. Take care to ensure that this is an objective presentation and not a justification of the proposal.

In the section of this chapter on issues (1500.4 (C), 1502.2 (b)), you should discuss important environmental issues and also dismiss unimportant issues. Important issues may be raised by the public, other agencies, or the IDT. You should include a corresponding impact section for all issues that the IDT retained for full analysis.

If the team found that some issues were not relevant to the scope of the document and decided to drop them from further analysis, this should be stated in the document. You may wish to do this in a paragraph or two at the end of the discussion of issues. You should also include a short statement on the reason the

Environmental Impact Statements    49

issues were dropped. Supporting documentation on why an issue was analyzed or not analyzed must be included in the administrative record.

### E.  Alternatives (1502.14)

Chapter 2 of an EIS describes the proposal (can be general or specific as defined in section 2.1 of this handbook) and alternatives. It also includes a discussion of the range of reasonable alternatives and mitigation measures and a summary of impacts of each alternative. You must describe and evaluate the no action alternative, and all reasonable alternatives retained for analysis in comparative detail.

1. **Introduction**—Alternatives are different ways of meeting park goals or objectives. They are considered the most important section of an EIS. Because alternatives fulfill park objectives to a large degree, they are directly related to the purpose and need. Because they also reduce impacts to important resources, they also are tied to issues. In an EIS or an EA, the no action alternative should be described first as all other alternatives are then compared against changes in the environment from conditions described under the no action alternative projected into the future.

2. **Range of alternatives** (see section 2.7 (A) for more information)—An EIS should include a discussion at the beginning of the alternatives chapter that describes how the IDT arrived at the final range of reasonable alternatives. This discussion should include factors such as agency or environmental constraints; references to policy in planning documents, legislation, or elsewhere; site characteristics; and factors such as sensitive environmental resources that narrowed the range of possibilities. Making reference to purpose (i.e., goals and objectives) and need may be appropriate.

3. **Reasonable alternatives**—CEQ defines reasonable alternatives as those that are technically and economically feasible and that show evidence of common sense (Q2). They also meet project objectives, resolve need, and alleviate potentially significant impacts to important resources. An alternative is not automatically rendered unreasonable if it requires the amending of a park plan or policy; causes a potential conflict with local, state, or federal law; or lies outside the scope of what Congress has approved or funded or outside the legal jurisdiction of the NPS.

   Another point to consider when identifying reasonable alternatives is how they meet the policies set forth in section 101 of NEPA (see section 2.7(D) of this handbook).

4. **Proposed action**—CEQ uses the term "proposal" synonymously with proposed action (1508.23). As described in section 2.3 of this handbook, a proposal may be a specific method of accomplishing objectives or fulfilling need, or it may be a general restatement of NPS's purpose in taking action.

5.  **No action** (see section 2.7(C) for more information on no action)—The no action alternative must be fully analyzed in all EAs and EISs, even if another law prohibits the adoption of the no action alternative or the park is under legislative or other command to act. The no action alternative is usually a viable alternative, but even when it is not, it sets a baseline for comparing the impacts of existing actions with those proposed.

6.  **Alternatives eliminated from further study**—Following the description of alternatives retained for analysis, you should describe alternatives considered but eliminated from further study. This should be limited to those alternatives initially thought to be viable or suggested by the public, but later dismissed. Briefly state in this section the reasons they have been eliminated, and fully document supporting reasons in the administrative record. Reasons to eliminate alternatives include:

    (a)  technical or economic infeasibility.

    (b)  inability to meet project objectives or resolve need.

    (c)  duplication with other, less environmentally damaging or less expensive alternatives.

    (d)  conflict with an up-to-date and valid park plan, statement of purpose and significance, or other policy (see section 7.3 of this handbook), such that a major change in the plan or policy would be needed to implement.

    (e)  too great an environmental impact.

7.  **Cost**—If a cost-benefit analysis has been developed and is important to the decision-maker or the public in choosing between alternatives, either the entire analysis should be appended to the draft EIS or it should be summarized and incorporated by reference into the body of the EIS (1502.23). It is appropriate to include costs of each alternative in the alternatives chapter.

8.  **Preferred alternative**—The preferred alternative is the agency-preferred course of action at the time a draft EIS or a public review EA is released.

    Unless your decision-maker has no preference, the preferred alternative must be identified in the draft EIS "so that agencies and the public can understand the lead agency's orientation" (1502.14 (e), Q4a). You may identify the preferred alternative in an explanatory cover letter to the draft EIS or in the text of the EIS. All final EISs must identify the preferred alternative. Therefore, if no preferred alternative exists at the time the draft EIS is released, you must identify it in the final EIS. For all externally initiated (i.e., non-NPS) proposals, you must identify the NPS-preferred alternative in the draft (and final) EIS (516 DM, 4.10 (2)).

It is important to remember that all alternatives in an EIS must be treated with the same level of detail in the analysis of impacts. (1502.14(b), Q5b).

9. **Environmentally preferred alternative**—You must identify in a draft EIS and EA what the environmentally preferred alternative is so that the public can have the opportunity to comment on it (see section 2.7 (D)).

10. **Summaries**—You should summarize the following in the alternatives chapter:

    (a) the degree to which each alternative meets purpose, need, and objectives.

    (b) the important features of each alternative.

    (c) the impacts of each alternative, including a determination of potential improvement to park resources (see DO-55).

    (d) how each alternative achieves requirements of sections 101 and 102(1) of NEPA, including the environmentally preferred alternative, and any potential conflicts between each alternative and other environmental laws and policies.

    Items (c) and (d) are mandatory (1502.14). The summary usually includes a matrix for easy comparison of alternatives. Although a chart is not required, the comparison must "sharply define" differences between alternatives (1502.14).

    It is helpful to readers if the discussion of issues dismissed and issues kept for further analysis, and the corresponding impact topics, precede the summary of impacts in the alternatives chapter.

## F. Affected environment

CEQ requires that NEPA documents "succinctly describe the environment of the area(s) to be affected or created by alternatives under consideration (1502.15)." This description forms chapter 3 of an EIS. Although you should present enough information to give the reader a general understanding of the environment affected, the length of this chapter should not normally exceed 20 percent of the total EIS.

Describe only those resources that may experience or cause impact or be affected if the proposal or alternatives are implemented. If specific resources would not be affected (e.g., threatened and endangered species) or impacts would be negligible (impact is at a low level of detection), you should list them in the issues discussion as "issues and impact topics considered but dismissed." You should keep data and analyses in this section commensurate with the intensity, context, and duration of the impact.

1. **Incorporation by reference**—An EIS is to be analytic rather than encyclopedic. You should either append, summarize, or incorporate by reference background material, highly technical material, and less important

descriptive information. NPS can incorporate many different kinds of material by reference, and this should be done when "the effect will be to cut down on bulk without impeding agency and public review of the action" (1502.21). Besides written material of all kinds, you can refer in an EIS (or an EA) to conversations, conference proceedings, taped hearings or workshops, and so forth. If you decide to incorporate by reference, you must provide a summary of the relevant text in the NEPA document, and the resource itself must be "reasonably available for inspection by potentially interested persons within the time allowed for comment" on the draft EIS (or EA).

Materials that should be incorporated by reference (and available as part of the project file) include other NEPA documents, lists of common plants and animals, historic resource studies, detailed air and water quality data and standards, separate scientific studies, compilations of demographic and socioeconomic data, and published works.

2.  **Mandatory topics**—You must consider all of the following in an EIS:

    (a) possible conflicts between the proposal and land use plans, policies, or controls for the area concerned (including local, state, or Indian tribe) (1502.16, 1506.2(d)), and the extent to which your park will reconcile the conflict.

    (b) energy requirements and conservation potential (1502.16).

    (c) natural or depletable resource requirements and conservation potential (1502.16).

    (d) urban quality, historic and cultural resources, and design of the built environment (1502.16).

    (e) socially or economically disadvantaged populations (see Environmental Justice EO 12898 for more information).

    (f) wetlands and floodplains (100-year, and 500-year when critical actions as defined in the NPS floodplain management guides are involved) (1508.27).

    (g) prime and unique agricultural lands (1508.27).

    (h) endangered or threatened plants and animals and their habitats (including those proposed for listing, or on state lists) (1508.27).

    (i) important scientific, archeological, and other cultural resources, including historic properties listed or eligible for the National Register of Historic Places (1508.27).

    (j) ecologically critical areas, Wild and Scenic Rivers, or other unique natural resources (1508.27).

    (k) public health and safety (1508.27).

(l)  sacred sites (EO 13007).

(m) Indian Trust resources (ECM95–2).

If these are irrelevant issues in your EIS, include them in the discussion of issues and impact topics dropped from the analysis.

## G.  Impacts

Although alternatives are important, they are useless unless you clearly and correctly assess their impacts in an EIS or an EA. The prediction of impacts of each alternative is the basis of chapter 4 of an EIS.

This discussion must be accurate and focused. If it rambles on about non-issues, or if the data are wrong or mislead the reader, it wastes the reader's time and the park's money. The impacts discussion is not just a reiteration of the proposal or actions, but rather a discussion of the impact should the proposal and alternatives be implemented. For instance, instead of "there will be a bridge from A to B," the discussion will focus on "the impact of building a bridge from A to B" on each resource identified as an issue and impact topic.

Whereas issues describe the impact relationship between actions and resources, impact analysis predicts the magnitude of that relationship. For instance, "building a bridge will disrupt riverbank soils and make the water muddy" is an issue. "Suspended solids in the river will increase from its present 10–15 ppm to 1000 ppm for 2–3 weeks during construction" is the kind of information that belongs in the impact chapter.

CEQ requires that the impact analysis:

(a)  be concise, clear, and to the point (1500.2 (b)).

(b)  emphasize real environmental issues (1500.2 (b)).

(c)  provide reasonable alternatives to the proposed action (or proposal, whether generally or specifically described) that minimize adverse impacts (1500.2 (d)).

(d)  be of high quality, using accurate scientific analyses (1500.1 (b)).

(e)  be scrutinized by other agencies and the public (1500.1 (b)).

(f)  include direct, indirect, and cumulative impacts (1502.16).

You must analyze both beneficial and adverse impacts for the resource in question.

1.  **Displaying impact information**—The role of NPS NEPA documents is to fairly, objectively, and candidly display the projected impacts of each alternative. If you can meaningfully and accurately quantify the magnitude of this impact, this is the best way to present the information. If you have little confidence in an absolute number, you may want to use a range of reasonable impacts; rather than conveying false confidence, docu-


You should give the public and the decision-maker a true picture of how well you can predict an impact.

ments should give the decision-maker and the public a true picture of how well you can predict an impact. You must support qualitative and quantitative impact analyses with the scientific literature and/or other experts' testimony. Such references should be cited liberally in the impact section. CEQ requires that impacts be quantified as much as possible and described in terms of their context, duration, and intensity (see below).

If impacts to a particular resource for one alternative are the same as for another alternative, making reference to that section in the EIS is preferable to repeating the information. You may briefly summarize information in the referenced section to help readers track impacts.

2.  **Context**—You should analyze impacts in several contexts, if the severity varies geographically, over time, or in some other way (CEQ (1508.27 (a))). See section 4.2(a) for more information on context.

3.  **Incomplete or unavailable information**—CEQ (1502.22) requires agencies to obtain information if it is "relevant to reasonably foreseeable significant adverse impacts," if it is "essential to a reasoned choice among alternatives," and if "the overall costs of obtaining it are not exorbitant." The costs are measured not only in money, but also in time (to complete a research study or survey, for instance). If such information is unavailable or if the costs of obtaining it are exorbitant, an EIS must include statements to let the public know this and its effect on NPS's ability to predict impacts to the particular resource. In addition, the proposal may need to be amended or adjusted to ensure that action is not initiated without proper resource information. Existing credible scientific evidence should then be summarized and the impact predicted based on this evidence. CEQ says that reasonably foreseeable impacts include those that have catastrophic consequences, even if their probability of occurrence is low (1502.22, modified in 1986). Also see Director Order 12, Section IV, regarding use of scientific data and information in making resource decisions.

    **EISs and EAs** should routinely inform the public when data are lacking, models are error-prone, or insufficient research or experience is available for predicting impacts accurately.

    Although the CEQ case applies only when the information is "essential" and the impacts significant, EISs and EAs should routinely inform the public when data are lacking, models are error-prone, or insufficient research or experience is available for predicting impacts accurately.

4.  **Impact indicators**—The measurement of impact must be accurate, scientifically credible, and understandable to a lay readership. This is why it

is helpful to include a methodology section preceding the impact analysis for each topic. That section can lay out the criteria or thresholds used to draw a conclusion on the context, intensity, and duration of impact. Defining thresholds and impact indicators requires consultation with resource experts, literature searches in some cases, and best professional judgment. In the case of the suspended solids in the river, an impact topic might be the effect of the muddy water on visitor experience. This impact is more difficult to measure than turbidity itself, but not impossible. One indicator might be the number of visitors passing through the area in the context of the rest of the park—for instance, "Fewer than 2% of the total visitors to the park would be able to see the construction on the river."

5. **Impact thresholds**—Impacts must be quantified as much as possible and interpreted in terms of their context, duration, and intensity. For instance, in the example in section 4.5 (g), the impact is quantified as "suspended solids in the river would increase from its present 10–15 ppm to 1000 ppm for 2–3 weeks during construction." This is adequate for intensity and duration. However, the reader needs a context to understand the full extent and relative importance of the impact. This can be provided by comparing the impact to a relevant standard, such as the state's water quality standards for suspended solids. The methodology section would define the threshold as "any increases in suspended solids that violate the state's water quality standard for this parameter would be considered a 'major' impact." The analysis would follow with "the increase in suspended solids from 10–15 ppm to 1000 ppm is well below the state's water quality standard for this river (3000 ppm)." The analyst should also interpret the quantitative information for a lay audience. In this example, the specialist might conclude, "Because the impact would last only 2–3 weeks and be well below the standard, it would be a minor, short-term adverse impact to water quality."

Notice that criteria were cited (state standards) in the determination of the intensity (in this case, minor) of the impact. Criteria, or thresholds, help to establish the sideboards for understanding the severity and magnitude of the impact. If the analysis simply stated that the suspended solids would increase from 10–15 ppm to 1000 ppm for 2–3 weeks, the public and the decision-maker would be unable to fully understand the extent of the impact.

6. **Mitigation**—In an EIS, you must develop and analyze mitigation "even for impacts that by themselves would not be considered significant" (Q19a). All "relevant, reasonable mitigation measures that could improve the project are to be identified," even if they are outside the jurisdiction of the agency (Q19b). You must also analyze the effectiveness of mitigation measures proposed, and the impacts if the project were to proceed without mitigation. For instance, it should be clear whether mitigation is integral to the project and therefore included as part of the alternative, or dependent on factors such as funding or permission from another agency.

CEQ (1508.20) defines mitigation measures as:

(a) avoiding the impact altogether by not taking a certain action or parts of an action.

(b) minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) compensating for the impact by replacing or providing substitute resources or environments.

7. **Organizing the impact chapter**—The impact section can be organized by alternative, with impact topics as subheadings, or by impact topic, with alternatives as subheadings.

   (a) **Methodology section**—You should begin the discussion of impacts by describing methods used to predict impact. As indicated above, if the methods used are the best available, but they require many assumptions that may not be correct or that have been criticized by other professionals, these assumptions should be explained in the methodology section.

   This section is also a good place to define or explain how data were interpreted. In other words, you should define terms such as "minor" or "major" for a particular impact topic. If relevant, explain the reasoning behind this interpretation—why, say, 100 ppm is a "major" impact but 50 ppm is a "minor" impact (i.e., your methodology included relevant state water quality standards). This is a discussion of thresholds of impact.

   (b) **Regulations and policies section**—Following the methodology section, you may include a separate section that details relevant laws, regulations, and/or park or other policies for each impact topic. This section may help clarify why a particular impact topic is important to discuss, or help support the reasoning for the impact threshold discussion in the methodology section. This section may be placed in the alternatives or purpose and need chapter if more appropriate.

   (c) **Cumulative impact section**—CEQ requires the analysis of cumulative impacts to each resource and for each alternative. This discussion should be identified separately from, but follow the same order as the discussion of, direct or indirect impacts. It should precede the conclusions section (see 6 (d) below).

   Cumulative impact information may be less exact than information on direct and indirect impacts of the alternatives, but a good faith

effort to accurately and completely assess major sources of impact and their contribution to resources affected by the proposal and alternatives should be part of any EIS or EA. For plans or other larger-scope federal actions, the analysis of cumulative effect may be a major focus of the NEPA document requiring regional resource data by which to analyze impacts.

(d) **Conclusions**—At the end of the discussion of impacts of each alternative on each impact topic (e.g., resource), a brief "conclusions" section should summarize all major findings, including whether or not an impairment of resources or values is likely or would occur. It should focus on those impacts that would be major, but include a statement that resources examined would experience less severe impacts as well (if this is true). The conclusions section should not contain information that is not already in the impact section.

8. **Sustainability and long-term management**—Considerations of long-term impact and the effect of foreclosing future options should pervade any EIS or EA, because these are ideas that Congress put forward as the purpose of both NEPA (sec. 101 (b)), and the NPS Organic Act. However, for each alternative no action, you must also include a separate section that focuses on the following required discussions:

> "**Sustainable development** is that which meets the needs of the present without compromising the ability of future generations to meet their needs."
> *World Commission on Environment and Development*

(a) **The relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity** (Sec. 102 (c) (iv))—In other words, are any long-term management possibilities, or the productivity of park resources, being traded for the immediate use of land? Will taking action in this case in combination with other actions have an impact on a particular ecosystem? Is the action being taken something that will affect future generations—is it a sustainable action that can continue over the long term without environmental problems?

(b) **Any irreversible or irretrievable commitments of resources that would be involved if the alternative were implemented** (sec. 102(c)(v))—Irreversible impacts are those effects that cannot be changed over the long term or are permanent. An effect to a resource is irreversible if it (the resource) cannot be reclaimed, restored, or otherwise returned to its condition before the disturbance. For example, a proposal to restore a cultural feature (building) involving construction adjacent to habitat for nesting birds may have irreversible impacts on the birds if they abandon the nests and

do not return to nest. An irretrievable commitment of resources refers to the effects to resources that, once gone, cannot be replaced. In this construction example, if the park chose to avoid potential irreversible impacts to the birds, and deterioration of the building continued, the loss of the building's cultural significance and integrity may not be returned or retrieved in the future. It is important to not worry about the semantics of these terms and instead be thorough in the disclosure to the public of any long-term, permanent effects to park resources.

(c) **Any adverse impacts that could not be avoided if the action were implemented** (sec. 101(c) (ii))—If the action will result in impacts that cannot be fully mitigated or avoided, you should describe these impacts in this section. You should focus this section on "real" environmental issues, or those that would involve major impacts if action were taken.

## H.  Consultation and coordination

This section should include a brief history of public involvement, a list of preparers and their expertise, and a list of recipients of the EIS. If it is the final EIS, it must include a response to comments section.

1.   **History of public involvement**—In this section you should briefly:

(a) summarize important consultations that occurred during the evolution of the proposal, the alternatives, and the EIS.

(b) describe any public scoping sessions or other public involvement efforts.

(c) include names of any federal, state, or local agencies; major organizations; or experts consulted.

(d) identify environmental issues or conflicts discussed during consultation that remain.

(e) include a brief summary of major issues raised during scoping.

(f) describe any relevant existing or proposed cooperative agency mechanisms, or consultation undertaken in compliance with other laws or regulations. (Memoranda of agreement, memoranda of understanding, formal agreements, major cooperative agreements, or documentation indicating final compliance with applicable laws or regulations, such as comments from the state historic preservation office, should be appendixes to the EIS or readily available for public inspection.)

(g) summarize steps taken to identify and involve low-income and minority communities that would be affected by the proposal and alternatives.

2. **List of preparers**—The EIS must include a list of persons primarily responsible for preparing the document or "significant background papers" (1502.17). You should identify people responsible for preparing a particular section and include the qualifications of the preparers—their expertise, experience, and professional disciplines. Normally the list will be no longer than 2 pages.

3. **List of recipients**—You should include a list of all agencies, organizations, and people to whom copies will be sent. The list should be organized alphabetically under "federal agencies," "state and local agencies," "Indian tribes," "organizations," and "individuals." If the list of individuals is longer than 3 pages, it may be placed in the project file instead of the EIS, with a notation in the EIS that the complete list is available from the issuing office. In the final EIS, an updated list of recipients is provided as necessary to indicate who will be receiving the final EIS.

4. **Response to comments**—See section 4.6, "Final EIS," below.

## I. References

The last section of the EIS is dedicated to references, and it should include a bibliography, glossary, index of key words, and appendixes.

1. **Bibliography**—You should include a list of all references cited in the EIS including written material and personal communications.

2. **Glossary**—Define in a glossary any technical or other terms not understandable to an average lay reader. Be sure to define them in plain language. If agency or other acronyms are used in the EIS, define them either in the glossary or in a separate list of acronyms.

3. **Index of key words**—You should include an index that contains (in alphabetical order) enough key words from the EIS to allow the reader to find the information. The entries should relate to the subject matter of the text and should not repeat the general topic headings of the table of contents.

4. **Appendixes** (1502.18)—Appendixes are for amplification or support of critical analyses in the EIS. They are not a data bank or library for total reference support. They should contain only major substantiating data, essential relevant descriptions of environmental components, important professional reports, and copies of major legislative and executive documents, agency agreements, or other information necessary for a complete use of the EIS for analytical/decision-making purposes. If the audience reading the EIS is not likely to be interested in the supporting material, consider keeping a copy of it in the file and readily available if requested rather than sending it out as an appendix.

## 4.6  The Final EIS

Following public review of the draft EIS (see section 4.8 for more information), the office issuing the EIS must finalize the document (unless a decision is made to terminate the EIS, see section 4.10). The final EIS is to be a thorough and correct documentation of the analysis completed by the NPS IDT, with all issues explained or resolved.

### A.  Substantive comments

You are required to respond to all substantive written and oral comments raised by the public or by agencies as part of finalizing the EIS, and to make every reasonable attempt to consider the issues or alternatives raised.

Substantive comments are defined as those that do one or more of the following:

(a)  question, with reasonable basis, the accuracy of information in the EIS.

(b)  question, with reasonable basis, the adequacy of environmental analysis.

(c)  present reasonable alternatives other than those presented in the EIS.

(d)  cause changes or revisions in the proposal.

In other words, they raise, debate, or question a point of fact or policy. Comments in favor of or against the proposed action or alternatives, or comments that only agree or disagree with NPS policy, are not considered substantive.

### B.  Response options

CEQ (1503.4) recognizes several options for responding to comments, including:

(a)  modifying the alternatives as requested.

(b)  developing and evaluating suggested alternatives.

(c)  supplementing, improving, or modifying the analysis.

(d)  making factual corrections.

(e)  explaining why the comments do not warrant further agency response, citing sources, authorities, or reasons that support the agency's position.

**Format of responses**—Responses to public or agency substantive comments that add clarifying or new information should be made in text wherever possible, rather than as lengthy responses to individual comments in a separate section (Q29a).

However, because members of the public or agencies may wish to know how NPS responded to their comment, a short response to each substantive comment, and a section or page citation where the change was made, may be appropriate as well. It is particularly important **for the public and agencies** to be able to track NPS responses, and either a subject or author index or page/section citation or a direct and complete response to agency or tribe comments is required. You may also choose to summarize similar comments and respond to them once, or use a

side-by-side comment-and-response format. In any of these formats, you may refer commentors to other responses or summarize similar comments and respond only once.

You are required to reprint in full any federal, state, or local agency or tribal letters. All public substantive letters must also be reprinted in a final EIS; however, if you have received an exceptionally voluminous number, these comments may be summarized. If you choose to, you may reprint all comment letters in full as part of the final EIS. Reprinted letters should appear in the "consultation and coordination" chapter, or if necessary, in a separate volume of the final EIS.

## C. Cooperating agency comments

When a cooperating agency comments on an NPS document, or when NPS is a cooperating agency on another project, it must (1503.3):

(a) describe alternative methods for analyzing impacts if it criticizes methodology in the EIS; and

(b) specify mitigation measures it finds acceptable if it criticizes the level of impact.

## D. Abbreviated final EIS

If all comments on a draft EIS require only minor responses, you may choose to prepare an errata sheet containing the responses and attach it to the draft (1503.4 (c)) as a final EIS. This is referred to as the "abbreviated" final EIS. Minor is defined as making factual corrections, or explaining why comments do not warrant further agency response.

In deciding whether an abbreviated EIS is appropriate, you should also consider whether the project is controversial or is of national interest, the number of substantive comments received, and the scope of the project. As a general rule, a full final EIS is preferable for NPS documents. Because a draft EIS is often required to understand changes in an abbreviated EIS, send the appropriate number of draft EISs with the abbreviated final EISs to EPA when filing the final.

An abbreviated final EIS must contain a cover sheet, a foreword sheet that explains the document (this must be combined with the draft EIS to be complete), the errata sheets, any responses to comments, and copies of substantive and agency comment letters. You must consult with OEPC through EQD before you prepare an abbreviated final EIS, unless this authority has been delegated.

## E. Changes in the selected alternative

If an NPS decision-maker chooses to modify one of the alternatives after the final EIS has been released and ultimately selects it for implementation, additional analysis is required unless the alternative will have no additional impacts on the human environment or will have impacts that are different from those stated in the EIS. The analysis of this new alternative will usually take the form of a supplement to the EIS (see section 4.7).

## 4.7  Supplements to Draft and Final EISs

When substantial new information is discovered or substantial changes with environmental ramifications are made to the proposal and alternatives, you should prepare a supplement to the EIS. Either a draft or a final EIS may be supplemented. Supplements may be prepared on previous final EISs if they still contain information that is 80 to 90 percent correct but require changes and updating on the remaining 10 to 20 percent. They may also be prepared on draft EISs where agency or public comments have raised substantial new issues that require full-blown analysis and many pages to address fully. Also, as stated above, if a decision-maker modifies an alternative after the EIS has been released as a final document, a supplement is required if the changes result in impacts not analyzed in the EIS.

You must circulate a supplement in the same manner as a draft or final EIS. If there is good reason to believe the interested and affected public will have a copy of the draft or final, you need only circulate the supplement. However, if the supplement has been prepared on an older EIS, or if there is reason to believe the public will not have the entire EIS, both the supplement and the EIS itself must be circulated. It should be made clear to the public whether the entire EIS and supplement are open to comment, or whether the supplement only is the subject of public scrutiny. If the EIS is older (2–3 years in most cases), the entire EIS and supplement should be available for public inspection and comment. You should consider a longer comment period for the supplement if the public needs to request the previously prepared EISs. If the EIS is seriously outdated, you should revise and update the entire document, and release it as a new draft, rather than attempting to supplement the EIS.

## 4.8  Public Involvement Requirements

This section describes the minimum NPS public involvement requirements for an EIS. However, you are encouraged to be "diligent" and creative in your efforts to involve the public in your NEPA procedures and resource planning. Ways of involving the public include issuing quarterly newsletters to update the public on anticipated park actions and opportunities for involvement, using the Internet to facilitate the review of documents or have a dialogue with a commentor, and setting aside handouts or information for park visitors to keep them informed of planning efforts or chances to comment. Park staff often use park friends' groups to keep the public involved in decision-making that may have environmental consequences.

> **Be diligent** and creative in your efforts to involve the public in your NEPA procedures and resource planning.

### A.  Notice of intent

CEQ (1508.22) specifies that a notice of intent (NOI) to prepare an EIS must be placed in the *Federal Register*. The notice must:

(a) describe the proposed action and alternatives, if any, developed to date.

(b) describe the intended scoping process and tell when and where any scoping meetings might be held.

(c) give the name and address of an NPS contact.

(d) state whether the proposed EIS is delegated or non-delegated (see 516 DM, 6.3(b), and ESM95–2), unless you submit a memo to OEPC giving NPS's position at the same time the NOI is issued.

Scoping that has been conducted on an EA which then leads to an EIS does not usually substitute for the official required scoping of the EIS. However, if you stated in the public notice for scoping on the EA that an EIS might be prepared, and the NOI for the EIS indicates that comments on the scope of the alternative and impacts will continue to be considered, scoping for the EA may substitute for additional scoping of the EIS (Q13).

The NOI must include a statement advising the public that individual names and addresses may be included as part of the public record.

## B. Scoping

Scoping is an early and open process to determine the scope of environmental issues and alternatives to be addressed in an EIS. You should conduct both internal scoping (see section 2.6) with appropriate NPS staff (including the IDT) and external scoping with the interested and affected public.

Scoping is done to:

(a) determine important issues.

(b) eliminate issues that are not important or relevant.

(c) divide up assignments.

(d) identify relationships to other planning efforts or documents.

(e) define a time schedule of document preparation and decision-making.

(f) "size the analysis box," which includes defining purpose and need, agency objectives and constraints, and the range of alternatives.

1. **External scoping**—The public plays an integral role in scoping, and external, or public, scoping is required for any EIS. Scoping is a process, not an event or a single meeting. Parks and other issuing offices are encouraged to use public scoping sessions as well as other means to gather early input on EISs. Examples are direct mailings to park visitors, interested organizations, or park neighbors. These letters should include a project description, a map (if relevant), a description of alternatives and issues to date, a request for any additional issues or alternatives, and the commentor's rationale for suggesting they be analyzed. Newsletters, ads in local or national

media, open houses, or literature available for park visitors are also means of gathering early public input.

2. **Scoping with agencies**—Scoping with interested federal, state, and local agencies and Indian tribes should be part of the internal scoping process (see section 2.6 and section 2.13 on cooperating agencies).

   (a) **Historic preservation officers**—You should invite the early participation of the state or tribal historic preservation officer by letter when historic properties are associated with any NPS alternative under consideration in an EA or an EIS.

   (b) **Other agencies**—Any interested agency, or any agency with jurisdiction by law or expertise, must be contacted to obtain early input and should be solicited to be cooperating agencies. This could include federal, state, local or tribal agencies or units of government. If the agency has jurisdiction by law, it must be contacted in writing. If not, it can be involved less formally.

   (c) **Indian tribes**—Early in the scoping of an EIS, the involved decision-maker and members of the IDT should identify potential American Indian issues and the likelihood of tribal/state agency formal interests in NPS proposed actions. Any affected tribes must be invited to scoping meetings and provided with review copies of documents.

## C.  Draft EIS notice of availability/filing with EPA (see ECM95–3)

NPS requires that draft EISs be available for public review for a minimum of 60 calendar days from the day the EPA Notice of Availability (NOA) is published in the *Federal Register* (1506.10). CEQ also requires that you file draft (and final) EISs with EPA (1506.9).

After the draft or final EIS is filed, EPA publishes a NOA in the *Federal Register* to inform the public that a draft or final EIS is ready for public review. In addition, you are required to file an NOA with the *Federal Register* at the same time you send the appropriate number of copies of the EIS to EPA. The publication of the EPA NOA in the *Federal Register* (and *not* the NPS notice) serves as the beginning of the 60-day public review period on the draft (and a 30-day waiting period before the record of decision is signed on the final).

The draft or final EIS must have been transmitted to all appropriate agencies, it must be available to the general public, and the NPS NOA must have been filed with the *Federal Register* before copies of the EIS are filed with the EPA.

## D.  Recipients of draft EIS

You must send a copy of the draft EIS to:

   (a) all federal agencies that have jurisdiction by law or special expertise, and all appropriate federal, state, or local agencies or Indian tribes.

   (b) any interested or affected individuals or organizations.

(c)  anyone who requests a copy.

It is acceptable to send an electronic copy or make an electronic copy available if the person requesting has access to such a copy. After all printed copies have been distributed, persons requesting the EIS should be directed to the nearest library or government office that has a record copy.

For the other departmental requirements for distribution that you must follow, see Procedures for Processing NPS Draft and Final EIS in the field guide.

### E.  Timelines for review of draft EIS

NPS provides a 60-day period for review of its draft EISs, beginning on the date when the EPA publishes its notice of availability in the *Federal Register.* Park offices are encouraged to take late comments if possible.The review period can be extended at the discretion of the responsible federal official with appropriate notification of the EPA (1506.10). The decision may be based on some or all of the following considerations:

1.  Will the extension cause undue delays in projects with life or safety issues?

2.  Will granting the extension jeopardize the overall public participation effort?

3.  Will granting the extension jeopardize decisions that must be made immediately?

4.  Will the extension adversely affect natural, cultural, or even funding resources?

You may also wish to collect comments that arrive a few days after the review period has ended without formally extending the period.

### F.  Public meeting/hearing

You may provide an opportunity for oral input on a draft EIS. If you choose to do this, the meeting/hearing should take place no sooner than 30 days from the time EPA's notice of availability is published. Under 1506.6, you are required to hold a public input session if:

(a)  substantial environmental controversy over the proposed action or substantial interest in holding the session exists.

(b)  another agency with jurisdiction over the action has requested a session and has provided supporting reasons for its request.

The format may be a "workshop," "meeting," "hearing," or other option, but attendees must be allowed to express reasonable substantive concerns with the draft EIS. Speakers may be limited to a certain number of minutes to ensure that all who wish to speak are heard in a reasonable amount of time. Attendees should be reminded that the purpose of the session is to collect input on the adequacy of the EIS and not to express preferences for or against the proposal. NPS may pro-

vide an opportunity for attendees to declare their support or opposition in writing at the public input session, or simply encourage participants to write during the remaining comment-and-review period.

The meeting should be advertised by a reliable method such as a purchased ad, direct mail, Internet electronic mail, notices posted in local gathering spots, or community or other organizations spreading the word. Press releases are published or aired at the discretion of the media, and are not considered as reliable or effective as an advertisement.

### G. Final EIS NOA/filing with EPA

When you have adequately responded to all comments received during the 60-day review and are ready to release the final EIS, you must file the final EIS with EPA and send an NOA to the *Federal Register*. As with the filing requirements for a draft EIS (see 4.8(C)), EPA will publish a separate NOA. Your park must wait at least 30 days from the time EPA publishes the NOA before the park signs a record of decision. When a summary of the ROD, or the entire record, is published in the *Federal Register*, your park may begin to implement the selected alternative or approved plan.

### H. Recipients of final EIS

You should send a full final EIS to:

(a) any individual or organization that has made a substantive comment.

(b) all agencies or tribes that have commented.

(c) anyone who requests it.

It is acceptable to send an electronic copy or make an electronic copy available if the person requesting has access to such a copy. A summary of the final EIS may be sent to all others, including those who received a full draft EIS but did not comment. After all printed copies have been distributed, those requesting the EIS should be directed to the nearest library or government office that has a record copy.

## 4.9 Administrative Process of Review of EISs

The review, distribution, and approval of EISs and their RODs is handled by the Regional Director, unless the proposal is a Secretarial proposal (such as a proposed addition to the National Wild and Scenic Rivers system or the Wilderness System). If a Secretarial proposal is involved, the Secretary or his or her designee handles review and processing (see section 6.2).

## 4.10 Terminating the EIS Process

Terminating the EIS process, for purposes of this section, occurs when the preparation of either a draft or a final EIS is stopped. If appropriate (i.e., there is no potential for significant environmental effects), an EA and a FONSI may be issued instead of a draft EIS to satisfy NEPA requirements. Termination may be done

without consultation outside NPS following publication of the NOI and before public distribution of the draft EIS. If the draft EIS has been released, NPS should normally proceed to follow the EIS process and respond to comments in a final, unless the proposal is abandoned.

Before a GMP EIS can be terminated, you must obtain the approval of the EQD in Washington. Send enough information to EQD so that the division can reasonably determine whether the implementation of any of the alternatives considered in the GMP/EIS meets the criteria for adequate coverage in an environmental assessment (an in-house draft or its equivalent) (see section 4.4 on actions that normally require an EIS).

If an EIS is terminated, the Regional Director or another responsible NPS official must prepare a *Federal Register* notice announcing the termination. The notice should include a brief description of the proposal, a reference to the earlier *Federal Register* NOI, NEPA analysis completed to date, and the reason for terminating the EIS. If the reason for terminating the EIS is the abandonment of the proposal, the *Federal Register* notice should indicate that the NEPA process will be reinitiated if the proposal is revived at a future date.

If an EA and a FONSI are subsequently prepared and substituted for what was originally envisioned to be a draft EIS, the FONSI must be made available for 30 days' public review before the action may be implemented. (The EA would also be available for its normal 30-day public review before you prepare a FONSI.)

NPS normally should take action to cancel an EIS after the draft EIS has been out for three years without being published in final form.

# 5.0 Environmental Assessments

5.1 Introduction
5.2 When to Prepare an EA
5.3 Length of an EA
5.4 Format and Content of an EA
5.5 Public Involvement
5.6 Administrative Process of Review of EAs

## 5.1 Introduction

CEQ originally created the EA primarily to be used when you do not have enough information to decide whether the proposal may have significant impacts. From its original purpose, however, an EA has evolved into a useful planning tool. An EA must lead to a FONSI or an NOI and an EIS. Therefore, if you find through the use of an EA that a proposal does have the potential for significant impact, you must prepare an EIS (unless section 5.4(f)(3) applies). On the other hand, if you find that the alternatives analyzed in the EA would not significantly affect the environment, prepare a FONSI.

The stated purposes of an EA (CEQ 1508.9) are to:

(a) briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI (described above).

(b) aid an agency's compliance with NEPA when no EIS is necessary.

(c) facilitate preparation of an EIS if one is necessary.

However, an EA can be prepared at any time to assist in planning and decision-making (1501.3(b)).

Determining whether an EIS is needed is only one of the purposes of an EA. In fact, today it is clear that the most common rationale for preparing an EA is to aid in an agency's compliance with NEPA, particularly section 102(2)(E), when an EIS may not be necessary. Section 102(2)(E) requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

## 5.2  When to Prepare an EA

An EA should be prepared if:

- an action is not listed as a CE (i.e., in section 3.3 or 3.4), or if the action is not listed as an action normally requiring an EIS (section 4.4), and a decision to prepare an EIS has not been made.

- additional analysis and public input is needed to know whether the potential for significant impact exists.

- preliminary analysis indicates there is no scientific basis to believe significant impacts would occur, but some level of controversy over the use of one or more environmental resources exists.

- the action is described on the list of actions normally categorically excluded, but one of the exceptional circumstances described in section 3.5 applies.

If a proposal analyzed by an EA is found to have significant impacts, instead of requiring an EIS, CEQ (Q40) allows agencies to employ mitigation to reduce impacts to below significance in case of any of the following:

(a) the mitigation is imposed by statute or regulation.

(b) the proposal is rewritten to include mitigation as an integral part of the description.

(c) the proposal is fundamentally changed to avoid the impact.

The effectiveness and enforceability of the mitigation must be guaranteed, and a new EA analyzing only the impacts of the mitigated or changed proposal must be prepared. This is referred to by CEQ as a "mitigated EA."

CEQ warns against trying to avoid an EIS rather than reducing impact through "mitigated EAs." If you need several mitigation measures to avoid a significant impact, or if the mitigation measures are highly speculative or distant in time, you should carefully consider preparing an EIS instead of a mitigated EA. As an example: Construction of a proposed parking lot would result in a loss of a large number of old growth trees. In order to mitigate the loss, the park proposes planting seedlings and waiting 500 years for the lost tree stand to be replaced. This effort at mitigation is too speculative and distant to adequately lessen the significance of the impact.

## 5.3  Length of an EA

It is not uncommon for an NPS proposal to be complex enough that an EA of 30, 40, or even 50-plus pages is needed to fully examine impacts. An EA that is longer than 50 pages may just be an EIS in disguise. You should carefully consider whether this is true of your park's EA, and prepare the EIS if it would be more appropriate (Q36b).

## 5.4  Format and Content of an EA

Although CEQ does not require a particular format for EAs, the format of an NPS EA should be similar to that of an EIS. There are some differences between NPS EAs and EISs, however. For instance, EAs do not require a separate affected environment section, although the baseline information needed to compare impacts must appear somewhere in the EA. Also, unless the EA is more than 50 pages, a summary, an abstract, and a table of contents are not needed. Following is the suggested format for an EA. Many of the sections also detail required content, and they should be read carefully. More detail on the suggested contents and organization of each chapter is presented in the EIS format section (4.5) of this handbook.

### A.  Abstract or summary

If the EA is longer than 50 pages, a one- to two-page summary of important issues and major findings may be appropriate. The summary should stand alone; the reader should not need to read the entire EA to understand the conclusions outlined in it. See section 4.5 of this handbook for more information about summaries.

### B.  Table of contents

If an EA is longer than 50 or so pages, it must include a table of contents following the summary.

### C.  Purpose and need

Sections 2.2 and 4.5 (d) should be consulted in preparing the purpose and need sections of an EA. Usually the first chapter or section of an EA is titled either Purpose and Need or Introduction. This section may also be an appropriate place to discuss issues that were dismissed and issues that were kept for analysis and led to impact topics.

### D.  Alternatives

EAs must fully describe the proposal (general or specific), no action, and a range of reasonable alternatives that meet objectives as laid out in the purpose section, and that reduce or eliminate impacts to important environmental resources. If your park has a preferred alternative at the time an EA is released for public review, it should be identified.

   1.  **Range of Alternatives**—Normally, an EA should fully analyze a range of reasonable alternatives (see section 4.5 (e)). However, if the IDT finds that no reasonable alternatives exist and that the proposal does not have the potential for significant impacts, the EA may instead include a discussion of alternatives considered but rejected, and the reasons why these were rejected. In this case, the EA would analyze only the no action alternative and the park's proposal.

   2.  **Defining the range of alternatives**—If the range of alternatives is quite narrow because objectives have been defined narrowly, the IDT may wish to take a second look at the objectives and whatever led the

team to define the objectives (a park plan, for instance). For example, if the EA is examining different building materials, colors, and styles for a proposed visitor center because the GMP or another plan has stated that any buildings in the park must blend with the natural environment, but the location of the visitor center is a poor one, the team should re-examine the project purpose, the need for the project, and the plan itself. Often GMPs and other plans, or their accompanying NEPA documents, are outdated or are the result of reconnaissance data that, upon site-specific analysis, may turn out to be incorrect or too generalized to be useful. Although the GMP may dictate a visitor center location, if the team finds the location infeasible for technical, economic, or environmental reasons, the EA should examine other sites as alternatives, rather than a narrow range of building materials. Although a modification to the GMP would be required in this example, this kind of constant monitoring and updating of park plans leads to the excellent decision-making that NEPA requires and to the conservation of resources that the NPS Organic Act mandates.

3. **Comparative summaries**—To facilitate review, EAs should include comparative summaries of impacts, features of alternatives, and a discussion of the degree to which each alternative accomplishes the purpose or fulfills the need identified in the purpose and need section.

4. **Costs and benefits**—If a cost-benefit or other economic report has been completed, and relative costs and benefits of alternatives will be used in making decisions between alternatives in an EA, relevant information should be summarized in the EA or the cost-benefit analysis should be attached as an appendix.

5. **No action alternative**—The impacts of the no action alternative are important for comparison purposes, and must be part of any NPS EA. For additional information on how to analyze the impacts of no action, see section 2.7 (c).

6. **Environmentally preferable alternative**—See section 2.7.

## E. Affected environment

Information about the existing environment relevant to understanding the impact of no action, or other alternatives must appear in an EA (see section 2.8).

## F. Impacts

Like an EIS, an EA is focused on "real" environmental issues, it is concise and clear, and it is meant to be a useful tool to decision-makers and the public. Also like an EIS, the analysis in an EA must discuss direct, indirect, and cumulative impacts (see section 2.9). Beneficial impacts should also be analyzed. Also, as in an EIS, the context, duration, and intensity of impacts should be defined and quantified as much as possible (see section 4.5 (g)).

1. **Objectivity** (also see section 2.9)—An EA that results in the issuance of a FONSI must provide adequate support for the statement that no signif-

icant impacts are likely if the proposal or any alternative is implemented. Therefore the objective and accurate presentation of data is particularly important, as is the interpretation of those data in all appropriate contexts (see below). Court battles on EAs have been lost on the basis that the EA included undocumented information, that methods or data were controversial, or that the EA depended on mitigation to reduce impacts to below a "significance" threshold.

2.  **Context** (also see sec. 4.2(a))—CEQ says that one reason EAs are prepared is to determine whether the potential for significant impact exists. If the potential for significant impact exists, an EIS is the more appropriate NEPA document (see section 5.1). Significance is often a relative term, so the context, duration, and intensity of impacts must be measured and compared to impacts of ongoing activities (such as the impact of no action). Without these comparisons, it is difficult or impossible to determine the significance of impact.

3.  **Mitigation**—An environmental assessment is a valuable planning tool in designing a project or proposal with minimal adverse effects to resources. Mitigation should be included as part of the proposal and alternatives and be analyzed in terms of its effectiveness. See section 5.2 for more information.

4.  **Methodology section**—EAs should briefly summarize the methods used to predict impacts.

5.  **Regulations and policies section**—EAs should briefly detail relevant laws, regulations, and park or other policies for each impact topic.

6.  **Cumulative impact section**—A discussion of cumulative impacts is important in EAs and must be included (see sections 2.4(c), 2.9(c)).

7.  **Sustainability and long-term management**—NPS EAs are not required to include separate sections as described in 4.5 (g)(8), although the balancing of short-term needs with long-term ecosystem health, biodiversity, and sound resource planning should be themes that pervade any park EA or EIS.

8.  **Conclusions**—At the end of the discussion of impacts of each alternative on each environmental resource, a brief "conclusions" section should summarize all major findings, including whether or not an impairment of resources or values is likely or would occur.

9.  **Organization**—For EAs shorter than about 30–40 pages, many readers find the impact section is more readable if it is organized by alternative, with impact topics as subheadings. For EAs longer than this, the impact section may be followed more easily if it is organized by impact topic, with alternatives as subheadings. Either is acceptable. Impacts may also be combined with affected environment information in an EA.

### G. Consultation and coordination

This section should list persons, organizations, and agencies that were contacted for information and that assisted in identifying important issues, developing alternatives, or analyzing impacts. Memoranda of agreement or understanding, formal agreements, major cooperative agreements, or documentation indicating final compliance with applicable laws or regulations should be appendixes to the EA or readily available for public inspection. Any scoping or other public involvement efforts should also be detailed, and a brief summary of major issues should be included.

A list of preparers and their qualifications is recommended, as is a list of recipients of the EA.

### H. References

A bibliography, a glossary of terms and acronyms, and appendixes should be part of an EA.

## 5.5  Public Involvement

Regional Directors are delegated the authority to approve the EA prior to its release for public review. Regardless of the specific requirements described in this section, NPS should always make a "diligent" effort to involve the interested and affected public (1506.6 (a)) on a proposal for which an EA is prepared. This is a requirement of NEPA, and in the NPS, it means public scoping sessions, public review of EAs, responses to comments, and other measures normally reserved for EISs if the issuing office believes such measures are needed to comply with the diligence standard.

### A. Scoping

Scoping, or requesting early input before the analysis formally begins, is required on all EAs prepared by NPS. Although public scoping is encouraged where an interested or affected public exists, issuing offices are only required to involve appropriate federal, state, and local agencies and any affected Indian tribe. It is up to you to decide the method of scoping (see DO-12 field guide for suggestions).

### B. Public review

The EA is to be sent out for review by the interested and affected public, including affected agencies and tribes, for a minimum of 30 days. The notice that an EA is available for review is, at a minimum, to be published in the local newspaper of record, posted on the NPS web site, noticed in the *Federal Register*, or otherwise made broadly known to the public. This action, coupled with public distribution through mailing, begins the 30-day review period. The notice should appear in a visible location in the paper (i.e., not in the legal notices section), and anyone who requests a copy of the EA should receive one, until a reasonable number of copies have been distributed. Those who request a copy after this time should be referred to the nearest library or NPS or other government office that has a record copy. It is acceptable to send an electronic copy or make an electronic copy available if the person requesting has access to such a copy.

## C.  Public meetings

Workshops, meetings, hearings, or other opportunities to give oral input on an NPS EA are not required, but they may be appropriate if there is large-scale interest in a proposal. If such a meeting is scheduled, it should take place no sooner than 15 days from the time it is advertised or the notice of availability of the EA is published in the local paper of record, whichever is later. The review period for EAs must extend a minimum of 15 days beyond the date of such a meeting. NPS officials should track comments made at public meetings for later response. Any reliable means of advertising the meeting, including but not limited to publishing in a visible location in the local paper of record, is acceptable.

## D.  Response to comments

If reviewers send written comments, or submit comments at the discretionary public meetings, workshops, and so forth, the issuing office should screen them to determine whether any important new issues or reasonable alternatives or mitigation measures have been suggested. If major substantive issues not covered adequately in the EA are raised, or new alternatives the park wishes to consider are suggested, the EA must be rewritten to incorporate them and reissued for a second 30-day review upon completion. If any of the issues point to the potential for significant impacts, a NOI to prepare an EIS should be prepared and submitted to the *Federal Register.*

If commentors correct or add factual information that has no bearing on the determination of significant impact, the information should be added to the text of the EA when possible. The issuing office may also respond through the use of errata sheets to comments that do not increase the degree of impact described in the EA. The combination of the EA and the errata sheets forms the complete and final record on which the FONSI or decision to prepare an EIS is based. The FONSI itself is not an appropriate document to use to respond to public comments; rather, responses should be attached to the FONSI to complete the record.

Issuing offices are encouraged to make text changes correcting or adding factual information to the EA and attaching the EA, along with the responses to public comments, to the approved FONSI to complete the administrative record.

## E.  Supplemental EAs

CEQ does not recognize supplemental EAs, because an EA should be concise enough so that it can easily be rewritten to accommodate major changes. You should not issue supplements to EAs; either rewrite and reissue the EA, or follow the approach outlined in section 5.5 (D) to finalize the EA.

## F.  Completing the EA process

The combination of the EA, the errata sheets correcting statements of fact as a result of public review of the EA, and responses to public comments form the complete and final record on which the FONSI or decision to prepare an EIS is based. You must notify the public that the EA process has been completed and a FONSI issued, if such is the case. Notification may be through mailings,

publication in a visible location in the local paper of record, a *Federal Register* notice, a news release, or a meeting with concerned agencies and individuals. No waiting period is required following the notice that the completed EA and FONSI are available before the proposal is implemented, unless section 6.3(G) of this handbook applies.

## 5.6    Administrative Process of Review of EAs

After you prepare and finalize an EA, and if the decision-maker selects an alternative with no potential for significant impacts, you must prepare a FONSI. The FONSI describes the selected alternative and states why it was selected and substantiates why it will have no significant impacts (see section 6.3).

A FONSI or notice of intent to prepare an EIS following the completion of an EA must be signed and dated. The signatory for either rests with the Regional Director. In addition, the Regional Director is responsible for deciding when an EA is adequate for public review. Parks must obtain clearance from the Regional Director before releasing an EA for public review and beginning the 30-day review period.

# 6.0 Decision Documents

6.1 Categorical Exclusions
6.2 Record of Decision
6.3 FONSI
6.4 NEPA after the Decision Document

Decision documents record the reasons for selecting a particular alternative. They also supply the support for deciding that no significant impacts would result from alternatives analyzed in an EA. For the five levels of documentation described in section 2.10(B), the following decision documents are prepared:

- For a memo to file—No decision document is required.

- For a CE for which no formal documentation is needed—No decision document is required.

- For a CE requiring documentation—A CEF (appendix 2) must be completed and signed.

- For an EA—A FONSI must be signed.

- For an EIS—A record of decision must be signed.

Impairment determinations and decision documents – In both Findings of No Significant Impact and Records of Decision, the National Park Service has a requirement of affirmatively stating whether or not an impairment to park resources — actions prohibited under the NPS Organic Act—will result from any direct, indirect, or cumulative impact of the action to be selected for implementation. If such an impairment does exist or is likely, a Finding of No Significant Impact cannot be approved. If a preferred alternative has impairment impacts at the EIS/ROD level, that alternative may not be selected for implementation. Both FONSIs and RODs need to provide information on general levels of impact and conclusions as to degrees of impact and any potential for impairment. Both documents must affirmatively state, and contain supporting information in the analysis, that the preferred alternative for selection will not impair park resources or values and, as a result, will not constitute a violation of the NPS Organic Act. Actions that are likely to, or would, cause an impairment may not use a memo to file or Categorical Exclusion as an appropriate vehicle for decision making.

## 6.1  Categorical Exclusions

With the exception of those actions named in section 3.3 (CEs for which no formal documentation is required), the decision to categorically exclude an action from further NEPA analysis is formalized with the signature of the Park Superintendent or his or her designee on a CEF (see appendix 2). This form is attached to the completed ESF form and is the minimum required contents of a NEPA project file for an action described in section 3.4 of this handbook.

## 6.2  Record of Decision

When an EIS has been prepared, the ultimate choice of an alternative, mitigation measures, and the decision rationale are documented in an ROD.

### A.  CEQ requirement

Besides stating the decision, CEQ (1505.2) requires that a ROD include the following:

(1) a summary description of all alternatives analyzed in the EIS.

(2) identification of the environmentally preferable alternative.

(3) the decision rationale—what were the criteria (e.g., cost, degree of environmental impact, technical considerations, degree to which objectives were met, logistics) used in selecting an alternative, how did each alternative measure up against these criteria, how were the criteria weighted, and so forth.

(4) a clear statement of which mitigation measures will be implemented if they are not obviously integral to the alternative selected, and a summary of any monitoring or other enforcement programs or plans. The description of mitigation and monitoring should be specific enough to enable the public to determine whether measures have been effectively implemented, but not be so specific as to duplicate the EIS.

(5) a statement of whether all practical means to avoid or minimize environmental harm from the selected alternative have been adopted, and if not, why not.

### B.  Length

An average ROD should be 10 pages. It should give enough information on the alternatives and their impacts, the decision-maker's rationale in selecting the chosen alternative, and the extent of mitigation and monitoring the public can expect, so that the reader can understand these major issues without referring to the EIS.

### C.  Notice

The ROD or a summary of the ROD must be published in the *Federal Register* as well as in the local newspaper of record.

## D. Signatory

The signatory of RODs is the Regional Director. In some circumstances, the signatory of RODs rests with the Director or Assistant Secretary for Fish, Wildlife and Parks. Recent changes to Departmental procedures regarding "delegated and non-delegated EISs" are to be considered. Consult the EQD to determine the appropriate signatory level.

## E. Wetlands and floodplains

If a preferred alternative proposes actions that would be located in or have adverse effects on a floodplain or wetland, a wetland/floodplain statement of findings must be combined with the draft and final EIS. When it has been signed by the Regional Director, the Statement of Findings is attached to the ROD as a separately identifiable document.

## F. Compliance with section 106 of the National Historic Preservation Act

If the preferred alternative affects a historic property and thus requires consultation under section 106 of the National Historic Preservation Act, the information gathered as part of the section 106 review must be included in the EIS, and the section 106 process must be completed before an ROD can be signed. The ROD must include a statement on consultation under section 106. Revisions made to 36 CFR 800, June 17, 1999, further explain the integration of section 106 with NEPA requirements.

## G. Section 7 of the Endangered Species Act

All consultation requirements defined under section 7 of the Endangered Species Act must be completed before an ROD can be signed.

## H. Impairment

From the facts presented in the analysis in the environmental impact statement and summarized in the ROD, the ROD must indicate that, after a review of the impacts, the alternative selected for implementation will not impair park resources or values and will not violate the NPS Organic Act.

# 6.3 FONSI

When an EA is prepared, the decision-maker must determine prior to public release whether the alternatives have the potential for significant impact. If so, the preparation of an EIS begins, and an NOI to prepare an EIS is sent to the *Federal Register*. If not, the EA proceeds, public comments are solicited, and upon completion of response to comments, a FONSI is signed.

A FONSI is an explanation of why the selected action will have no significant effects on the human environment. It is based on the EA and comments of agencies and the public. The FONSI states which alternative has been selected, very briefly describes other alternatives considered in the EA and discusses how criteria were used and how they were weighed in the selection process. The FONSI is separate from the EA, and it is detailed enough in drawing from sections in the

EA to stand alone. The FONSI is signed by the Regional Director. The FONSI's signature block may also include a line for approval recommendation from the Park Superintendent to the Regional Director.

## A.  Content

A FONSI serves two functions in the NPS. It is the "proof" that no significant impacts would occur if the proposal is implemented, and explains the rationale used in selecting the alternative for implementation. Therefore, after describing the proposed action, a FONSI should follow the list of significance criteria (Section 4.2), and any measures integrated into the selected alternative that apply should be explained. For instance, if the proposal is to allow visitors to view an ongoing archeological excavation, and public safety is an issue (criterion 2 in the list of significance criteria), the alternative selected may include "fencing the site," or "only allow visitation on guided tours with park rangers," and note that "these measures have proven nearly 100% effective in other parks (e.g., Park X, Park Y)" in protecting public safety. This kind of synopsis of information taken from the EA assures readers (including NPS decision-makers and any reviewing court) that concerns that could mean significant impact have been adequately addressed. In most cases, 5 pages are adequate to provide the specific proof required in a FONSI. In cases in which a "mitigated EA" has been prepared—that is, the impact has been reduced to below a "significance threshold" through the use of mitigation—5 pages may not be adequate. The environmentally preferable alternative as indicated in the EA must also be identified. If it is not the selected alternative, reasons for non-selection must be clearly stated. In a FONSI, the reasons must be described for rejecting all alternatives except the one ultimately selected similar to the process described in section 6.2(A) for Records of Decision.

## B.  Mitigation

Because an EA is an analysis document, simply identifying mitigation measures does not commit NPS to adopting or implementing them. If mitigation is integral to an alternative, and this is clearly stated in the EA, adopting the alternative in the FONSI does automatically mean the mitigation is binding. Any mitigation that is dependent on funding or other factors must be specifically adopted and stated as such in the FONSI. It is suggested that a matrix or table be attached to the FONSI itemizing mitigations, critical milestones, and responsible party.

## C.  Errata sheets

If factual corrections need to be made to the EA as a result of comments, you can use errata sheets instead of republishing the entire document. If substantive comments have been made, but do not necessarily require a change in the text of the EA, NPS should respond to these comments in an errata sheet. Because errata sheets in combination with the EA form the completed EA, errata sheets should be sent to all who have commented with a letter noting that the errata sheets and the original EA form the final document. The errata sheets are attached to the FONSI and distributed. See 5.5(D) for more information on use of errata sheets and completion of the record.

### D. Wetlands and floodplains

If the preferred alternative would be located in or adversely affect a floodplain or wetland, and if the EA has led to a FONSI, a wetland/floodplain SOF must be combined with the public review copy of the EA. If the final preferred alternative still results in adverse impact to a floodplain or a wetland but results in a FONSI, a final SOF must be attached to the FONSI as a separately identifiable document.

### E. Section 106 of the NHPA compliance

If the preferred alternative affects a historic property and thus requires consultation under section 106 of NHPA, the information gathered as part of the section 106 review must be included in the NEPA document and the section 106 process must be completed before a FONSI can be signed. The FONSI must include a statement about consultation under section 106.

### F. Section 7 of the Endangered Species Act

All consultation requirements must be completed, as defined by section 7 of the Endangered Species Act, before a FONSI can be signed. It is highly recommended that consultation documentation accompany the public review EA document.

### G. Waiting period for FONSIs (1501.4 (e))

In certain limited cases, NPS must make the FONSI available for a 30-day minimum public review before it decides whether to prepare an EIS or implement the project. If a FONSI has been prepared, the issuing office must wait 30 days before it implements the project or prepares an EIS for the project if the selected alternative (a) is an NPS project, or closely similar to an NPS project, that normally requires an EIS (see section 4.4) or has in the past required an EIS, or (b) is without precedence in the NPS. Notice of such a waiting period should be published in the *Federal Register*, but it must also be published in the local newspaper of record.

### H. Impairment

From the facts presented in the analysis in the environmental assessment and summarized in the FONSI, the FONSI must indicate that, after a review of the impacts, the alternative selected for implementation will not impair park resources or values and will not violate the NPS Organic Act.

### I. Signatory

The signatory authority for a FONSI rests with the Regional Director.

## 6.4 NEPA after the Decision Document

### A. Monitoring

Writing and signing the decision document does not signal the end of the NEPA process, because assumptions are often made that only after-the-fact monitoring can validate. A park may have based its EA and FONSI on actions it will take if monitoring reveals a greater degree of impact than the EA predicts. Monitoring is also important in verifying predictions of impact, or of the effectiveness of miti-

gation measures in a NEPA document. The park preparing the EA or the EIS is responsible for making sure that impacts are no greater than the document says, and that mitigation measures will work as promised. The ROD or FONSI is, in some respects, a "contract" with the public, committing the agency to implement the mitigation and monitoring included in the project. Therefore, it is important that the agency consider budgetary projections when making this commitment. Any monitoring or mitigation must be spelled out in the ROD or the FONSI.

## B. Changes in the selected action

If changes in the selected alternative are made after the FONSI or the ROD has been approved, additional NEPA analysis may be required. These changes may be small ones, such as for design purposes, or on a larger scale. If the changes would result in any changes in environmental impact, you should consider supplementing the EIS, or preparing a new EA or CE.

# 7.0 Programmatic Documents and Planning

7.1 Is NEPA Triggered by Plans?
7.2 When to Begin NEPA on Plans
7.3 Feasibility and Planning
7.4 Tiering
7.5 Programs and Policies
7.6 Long-Term Resource Management

## 7.1 Is NEPA Triggered by Plans?

In the past, NPS has called NEPA a "compliance" action, making you think it only documents a separate NPS planning procedure. This is not true. In fact, NEPA is the law that requires NPS to undertake a specific, scientifically valid conservation planning and impact assessment process. NEPA is only a "compliance" action because it is legally required.

The steps detailed in the CEQ regulations and this handbook are all to be done early in NPS decision-making, as part of the planning process, rather than the traditional permitting or compliance process. According to CEQ, "Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts" (1501.2). You plan based on your park's purpose and significance, its visitor needs, and other resource management or maintenance objectives. NEPA requires that you also follow the steps CEQ has laid out in including resource conservation and environmental impact information as part of the basis for your park's long- and short-term choices. This information is considered essential to NPS decision-making, and it is to be combined with other planning (1501.2(a), 1502.25, Q21). Physically, a plan and a NEPA document may and should be prepared and distributed simultaneously (1501.2 (b)). However, it should be clear, if the two are combined, which sections constitute the NEPA document.

> **You should apply** the same criteria to decide whether NEPA is required for plans as you would for projects, legislation, and so forth; that is, would an alternative contemplated in the plan ultimately affect the human environment?

Despite this clear message from CEQ, it is sometimes less clear in real-life NPS planning whether the "formal" NEPA process, complete with a CE, EA, or EIS and public input, is needed. For instance, you may wish to study the condition of resources or the feasibility of certain park goals or objectives. These studies may not require NEPA analysis, yet they would benefit from some form of environmental planning. Integrating environmental information into the earliest form of park decision-making will result in better decisions, and often in more streamlined subsequent NEPA analyses as well.

When decisions about resource use having the potential for environmental effects are being contemplated, or another kind of planning (housing feasibility studies, parkwide zoning, etc.) is ongoing, a NEPA review process is almost certainly required. In fact, CEQ includes plans as major federal actions (1508.18) requiring NEPA analysis.

Section 4.4 identifies several types of plans that normally require an EIS. NPS plans not on this list are not necessarily exempt from NEPA. Rather, you should apply the same criteria to decide whether environmental analysis is required for plans as you would for projects, legislation, and so forth; that is, would a choice being contemplated in the plan, such as the action, ultimately affect the human environment (section 1.3)?

It may be tempting to assume that only the implementation of a plan, rather than the choices the plan itself represents, will have environmental impact and therefore require NEPA analysis. However, if decisions affecting future land or resource use are being made in a plan or program, NEPA is triggered. This is because CEQ recognizes that a discussion of, and public input on, options (alternatives) and their environmental pros and cons (impacts) would be valuable in making even broad policy-level decisions.

Some examples of NPS planning elements that do not normally require NEPA are collecting and mapping sensitive resource data or determining needs for future planning. Some that do trigger NEPA are GMPs, project and activity plans, establishment of a carrying capacity, zoning of a park or part of a park for future use, implementation plans, concession plans, and climbing management plans.

If it is still unclear whether your park's planning effort requires NEPA analysis, ask yourself these questions:

- Will decisions made in this plan ultimately have an impact on the environment when this plan or program is implemented?

- Is this a formal planning process in some other way?

- Will this plan examine options?

- Would the examination of environmental costs and benefits of these options be helpful in making decisions contemplated in this plan?

- Would resource data be useful in making decisions contemplated in this plan?

- Will this planning effort include public participation?

- Will decisions made in this plan commit resources?

- Will decisions made in this plan preclude future choices?

If the answer to the first question is yes, you should consider the NEPA process outlined in this handbook to be legally required and begin the environmental planning process early enough so the information you gather can be used "as an important contribution to the decision-making process" (1502.5). If the answer to one or more of the other questions is yes (but the answer to the first is no), your IDT or decision-maker should carefully consider whether information on options and the environmental pros and cons of each and/or public input would be valuable. If so, you should initiate the NEPA planning process.

## A.  EISs for general management plans

It is standard NPS practice and policy to prepare an EIS with your park's GMP. This is because a GMP is a major federal action, with long-term management implications for a unit of the NPS. The public considers National Parks to represent the highest standard of federally protected resources. There may not be significant public controversy associated with the GMP, and scoping may not reveal potential for significant impacts, but the act of long-term planning and implementation of park-wide courses of action in and of itself is more appropriately presented in an EIS.

The implementing legislation for NPS, unlike that for other land and resource management agencies, requires *conservation* of park resources. The resources in our care are unique, and so, according to Congress, they deserve this protection. It follows that decisions affecting these special resources have greater potential for significant impact than if they occurred on federal lands managed by other agencies. Decisions made in a GMP or another broad planning document affect proportionately more of these special resources, and so they are even more likely than smaller-scale park actions to have significant impacts and qualify as major federal actions. These are the kind of decisions CEQ believed would benefit from an EIS and its associated full-fledged environmental planning and public involvement effort. Courts have been consistent in requiring EISs for this kind of large-scale agency (including NPS) decision-making.

Another important reason parks should prepare GMP EISs is that they are used to narrow the range of future choices. In other words, parks often use the GMP NEPA document to "tier" (see section 7.4) to more site-specific projects that implement some part of the GMP. As the park collects site-specific information, it may find that the project will have significant impacts and that an EIS is required. However, you may not refer to or tier the GMP NEPA document in this case unless it too was an EIS. This is because preparing an EA/FONSI for the park GMP assures the public that no significant impacts would take place from its implementation. Preparing a subsequent EIS to implement the plan counters and invalidates the original GMP FONSI.

Finally, NEPA documents prepared for broad NPS decision-making, such as those associated with GMPs, are of interest to a larger public audience. This also means they are more likely to be the subject of litigation. EAs and their accompanying FONSIs do poorly in court because they must provide "proof" that significant impact will not occur if the agency takes action. Yet, particularly in the case of programmatic or planning decisions made over very large areas, the data collected are reconnaissance-level, and it is difficult or impossible to prove that no future significant impacts will occur from implementation of that program or policy. The EIS allows you to admit that you do not know the exact nature of future impacts and that they may prove significant when site-specific data are collected.

The Environmental Quality Division, through the Associate Director for Natural Resources Stewardship and Science, may grant an exception to the requirement that EISs be prepared for GMPs on a case-by-case basis, when it is clear that site-specific data indicate that the potential for significant impact does not exist.

## B.  NEPA documents as building blocks

When preparing NEPA documents for plans, you should build on EISs and EAs already completed for broader actions. For example, your park GMP identifies an area of the park as a good spot for hikes because views are excellent, but a few fragile resources exist. When it comes time to prepare a trails plan for this area, you may initially use the GMP EIS as an appropriate source of general information in beginning your trail's NEPA document. You can also assume that the range of alternatives for the trails NEPA analysis has been defined by the GMP, if the data and subsequent conclusions were valid. Your data collection efforts should be more site-specific for the trails NEPA work than for the GMP EIS, but only as detailed as required to make the decisions needed, such as what are the best spots to locate the trail system in this area.

A third NEPA document may be required when it comes time to build one of the trails, because site-specific data are required before the plan can be implemented. (Another approach is to collect site-specific data at the time the trails plan is created—see section 7.2 for a discussion of timing.) Because the decisions are much more specific, the data you collect should be also. You may wish to move a trail a few hundred feet one way or another to avoid affecting a special environmental resource, or you may want to design a section of trail a certain way to avoid, for instance, drainage problems. However, the general location of the trail should be determined by the programmatic trails plan and data collected for it. This process of going from general to specific data collection, and from broad to narrow decision-making, is called tiering. Tiering is explained further in section 7.4.

## 7.2  When to Begin NEPA on Plans

You should be able to integrate NEPA's environmental planning requirements with other park planning easily, and to follow the CEQ regulations requirement to begin "at the earliest possible time to insure that planning and decisions reflect

environmental values.." (CEQ 1501.2). The information provided by a well-done NEPA analysis is vital in making park resource use or management decisions.

NEPA begins on plans as soon as your proposal can be defined. NEPA documents must be prepared early enough so they are "relevant to policy and timed to coincide with meaningful points in agency planning and decision-making" (1502.4). In the GMP process, this is when your park has defined its purpose and significance and is now considering mission goals, management prescriptions, or management zones.



## A.  Level of detail

Before an "on-the-ground" action (e.g., grading a trail, building a campground) can be taken, there must be site-specific environmental information available to a decision-maker in the form of a NEPA document. This means you cannot use programmatic NEPA documents to make site-specific decisions, but must instead follow the process of tiering described in section 7.4.

The timing of this site-specific environmental analysis should be designed to be as close as possible to the point of making real and irrevocable commitments to a project or a course of action. Many NPS plans suggest that certain types of use or development may take place, but recognize that action to pursue a preferred alternative may not be possible for 5, 10, or 20 years, until funds are made available or until other conditions beyond the park's control are satisfied. Many detailed plans and studies have been rendered obsolete as time passes and circumstances change so that environmental analyses are repeated several times for the same project or proposed action. Following the procedure outlined in Section 7.4 (tiering)—collecting reconnaissance-level data for conceptual decisions, for instance, and site-specific information for implementation decisions—will help alleviate this problem.

## 7.3  Feasibility and Planning

NEPA begins at the "proposal" stage—that is, when NPS "has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and the effects can be meaningfully evaluated" (1508.23). Feasibility analysis to define a realistic proposal or goal is sometimes required before NEPA can begin. In the GMP planning process, the definition of the "corral" bounded by the park purpose, significance, and special legislation is a form of feasibility analysis.

For projects or implementation plans, early in the process you can eliminate alternatives that are not feasible because they are unreasonably expensive, are not implementable for technical or logistic reasons, do not meet park mandates,

or are not within legal or other mandatory constraints. This does not mean that alternatives must be cheap or easy, or that those actions within another agency's jurisdiction can be eliminated if they are reasonable in other respects. Rather, it is an initial step to ensure that alternatives that could not be implemented are not subjected to extensive environmental analysis. Likewise, if it appears that a technically or economically feasible alternative would have profound adverse environmental impacts or would not be allowed by another agency from which a permit is required, it should be eliminated as "environmentally infeasible."

Agencies often mistake this winnowing process as one that allows them to choose only their favorite alternatives for analysis without having first completed NEPA. Rather, it is a procedure for eliminating infeasible or duplicative alternatives while still leaving a "full spectrum of reasonable choices" ready to undergo the objective environmental analysis that NEPA dictates.

> **Agencies often mistake** this weeding-out process as one that allows them to choose only their favorite alternatives for analysis without having first completed NEPA.

## 7.4  Tiering

CEQ encourages agencies to use a tiering process, working from broad, general NEPA environmental impact analysis documents to more site-specific ones in decision-making (1502.20). When preparing a large-scale plan that determines broad direction, such as the GMP, information can be less detailed and site-specific, because decisions are made on a gross scale. When land identified as potentially suitable for development is planned for a set of visitor-related facilities, the decision to develop the area is not revisited. Instead, the NEPA document prepared in conjunction with the development plan proposal is "tiered," or procedurally connected to the large-scale plan NEPA document. This narrows the range of alternatives in the development plan analysis to those that explore how and where to site facilities within the designated development area. The decision to designate this as an area for development has already been made. Tiering allows NPS "to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe" (1508.28).

Tiering is not the appropriate tool to use when you are dealing with a previous, broad-scale NEPA document that is outdated or for which there is new information requiring the original decisions to be revisited. For example, a programmatic decision made to develop an area for visitor facilities and evaluated in a previous NEPA analysis would require reanalysis and reevaluation if it is subsequently learned that the site is subject to "flash floods," is the critical habitat of endangered species, or is the location of extensive archeological remains.

The original, or programmatic, NEPA document from which subsequent documents are tiered is almost always an EIS. This is because larger-scale decisions often have larger-scale impacts, and courts are more likely to deem them "major federal actions." Also, if the programmatic document is an EA and not an EIS,



The original or programmatic NEPA document from which subsequent documents are tiered is almost always an EIS. This is because larger-scale decisions often have larger-scale impacts, and courts are more likely to deem them "major federal actions." Also, if the programmatic document is an EA and not an EIS, subsequent NEPA documents tiered to it cannot be EISs without invalidating the original EA.

subsequent NEPA documents tiered to it cannot be EISs without invalidating the original EA (see section 7.1).

Tiering may also help in examining cumulative impacts in proper context. For instance, the cumulative impacts of developing all areas designated as suitable should be part of a large-scale planning NEPA analysis, but it does not need to be repeated as part of a development plan NEPA document. Instead, the development plan EA or EIS should make reference to the appropriate pages of the broader plan NEPA document and note that they are tiered.

## 7.5  Programs and Policies

CEQ includes plans, policies, procedures, and programs in its definition of major federal actions that require NEPA environmental analysis and documentation (1508.18). The time to prepare such documentation is "before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives" (1502.4 (c )(3)). If an NPS-wide or region-wide policy with the potential for environmental impact is proposed (such as "prescribe burning to maintain fuel at natural level," or "use any means short of introducing toxic substances to control exotic weeds"), a programmatic NEPA document should be prepared before parks are charged with implementing it. The park may need to prepare its own subsequent site-specific document and tier (see section 7.4) to the regional or other programmatic document.

Programmatic documents are useful in discussing strategies for implementing many smaller actions, such as road, building, or other park maintenance or vegetation management. Adequately evaluating several years' worth of site-specific impacts in a single EA or EIS from these kinds of day-to-day activities may be the best approach to environmentally sound planning.

## 7.6  Long-Term Resource Management

Programmatic documents on plans, policies, or programs are often ideal places to discuss ecosystem sustainability and management, biodiversity, global warming, community or regional land use planning, and other larger-scale issues. Decisions on land and resource management that take into account maintenance and enhancement of long-term productivity are bound to be more in line with the policy set forth in NEPA (see sec. 102(c)(iv)).

# 8.0 NPS Review of Non-NPS NEPA Documents

8.1 Introduction

8.2 Comment Requirements

8.3 Review Deadlines and Extension Requests

8.4 Departmental Comment Letters

8.5 Review Guidelines for EISs

8.6 Style and Format for Environmental Review Comments

## 8.1  Introduction

NEPA requires that other federal agencies obtain NPS comments on their EISs when NPS has jurisdiction by law over some aspect of the project or special expertise on an environmental impact of the project (1503.1). In addition to NEPA requirements, many federal undertakings require other "environmental" comments and clearances. Examples are Department of Transportation section 4(f) statements and review of the "recreation exhibits" of Federal Energy Regulatory Commission license and permit applications for water projects.

This chapter gives guidance on how you should review and comment on NEPA documents that are prepared by other agencies but that may affect your park unit. In reviewing other agency documents, your primary aims should be to aid other agencies in making the best possible decisions based on quality environmental analyses; to maintain the integrity of the National Park System; and to espouse the full range of other recreation, natural, and cultural resource stewardship roles of the NPS.

## 8.2  Comment Requirements

### A.  How comments should be focused

Your comments on other agencies' environmental documents should:

1.  encourage those agencies to contribute to the protection, preservation, maintenance, safety, and enhancement of existing and potential units of the National Park System; other significant park and recreation values; and historic structures, archeological resources, and other cultural resources including historic properties listed on the National Register of Historic Places, unique cultural resource values including properties

91

listed on the National Register of Historic Landmarks, and unique natural resource values including areas listed in the National Registry of Natural Landmarks.

2.  ensure that the sponsoring agency recognizes benefits and adverse effects to resources within our areas of jurisdiction and expertise, and that those effects are presented in an understandable form to the general public and to decision-makers.

3.  adequately describe practicable alternatives that are less damaging to NPS interests and concerns, and see that these are evaluated realistically and adopted where feasible.

4.  discuss mitigation measures to offset unavoidable adverse effects, and propose them as an integral part of the proposal or alternatives.

## B.  Early involvement

Your ability to influence the proposals of other agencies is greatest at the early stages, before they invest in extensive planning and become committed to a specific alternative means of accomplishing an objective. For this reason, make every effort to provide input and technical assistance at the scoping stage or earlier. This will greatly enhance the credibility of your comments on the draft EIS or a later document. Consultation should continue up through the completion of the decision document.

## C.  Commenting as a cooperating (or joint lead) agency vs. as a reviewing agency

1.  **Cooperating agency**—If the NPS has jurisdiction by law (having permitting or funding authority over some aspect of the proposal) or special expertise, you should request that the NPS be made a cooperating agency in preparation and review of an EIS. The request should be sent to the lead agency (the federal agency preparing the document), and rights and responsibilities should be defined between NPS and the lead agency in a memorandum of understanding or a memorandum of agreement. As a cooperating agency, you may ask for the right to either prepare or review with "veto" authority a section of the document where NPS has particular expertise or interest. You may also ask or be asked to join in IDT meetings, public involvement sessions, or other integral pieces of the NEPA process. You should request permission to become a cooperating agency as early as possible, so that you can participate fully. You may also share the analysis and document preparation responsibility by becoming a joint lead with another federal or state agency (1506.2 (c)). Your park's responsibility may be expanded to research or write several sections of the document if this is the case.

    If you are affected by or interested in a proposal, but do not have jurisdiction by law or special expertise, you may still request cooperating agency status.

2. **Reviewing agency**—As a reviewing agency, NPS may request changes in the document, additional information, mitigation measures, analysis of additional alternatives, and so forth. The degree of response to these requests is largely at the discretion of the lead agency.

## D. Administrative process for review

The administrative process for review of non-NPS EISs is contained in the field guide.

# 8.3 Review Deadlines and Extension Requests

## A. CEQ requirements; screening and review schedules

EISs and some other environmental documents have periods for review and comment set by law or regulation. Section 1506.10 of the CEQ regulations provides 45 days for review and comment on draft EISs and a 30-day no action period following release of final EISs. These times are calculated from the date that EPA publishes a notice of availability in the *Federal Register.* These notices normally appear in the *Federal Register* on Fridays and include the date when comments are due. The CEQ regulations (1501.9) require that EISs be filed with EPA no earlier than they are transmitted to agencies and the public for comment.

Review periods for revised and supplemental draft and final EISs of other agencies are calculated like those for draft and final EISs. Because agencies that circulate draft EISs are under no legal obligation to include in the final EIS comments received after the established deadline passes, you must comment within the set deadline if your concerns are to be given consideration.

When controlled documents arrive from the EQD for review, they should be screened quickly to determine deadlines and relative priority. Review preparation responsibility should be assigned immediately. If screening determines that the proposal is of no consequence to NPS areas of jurisdiction or expertise, and comments are to be routed to EQD or to another Interior bureau that has been designated as lead, a simple "no comment" response may be made. Such a response may be made in writing or telephone or electronic no comment responses may be acceptable at the discretion of the lead agency.

Review schedules should provide intermediate offices such as EQD, OEPC, or other Interior lead bureaus sufficient time to review and process proposed comments. The possibility of mail delays and holiday and weekend "down time" should be considered.

## B. Extensions

Extensions of review deadlines occasionally are needed because of unusual routing or mail delays; required field studies; necessary coordination with other federal, state, or local agencies; or the discovery of unforeseen problems with the proposal. Extensions are obtained from the other agency by OEPC (516 DM, 7B). The need for an extension should be determined early in the review process, and the extension should be requested shortly after receipt of the controlled docu-

ment. The closer the deadline, the more difficult it normally is to obtain an extension. Deadline extensions should be requested only when you anticipate you will be making substantive comments, or when expected impacts require substantive field inspection or coordination. Procedures for obtaining extensions are in appendix G of the field guide.

## 8.4   Departmental Comment Letters

Review of all external proposals, EISs, reports, permits, regulations, and so forth is controlled by OEPC under 516 DM, 7 and the Environmental Review Memorandum series (e.g., ERM 94–2) published by OEPC. Instructions for consolidated review are distributed to bureaus by memorandum from OEPC. Unless direct reply has been established, a consolidated Departmental reply will be prepared. When an NPS office has a document for review, but no Departmental distribution memorandum, that office should contact EQD or OEPC to determine the status.

Comments of NPS and other Interior bureaus, when consolidated into a Departmental review letter, either by a designated lead bureau or by OEPC, are signed either in Washington or by the designated Departmental Regional Environmental Officer (REO). Copies of comment letters signed in WASO are provided through EQD to appropriate field and program offices. REOs supply a signed environmental review letter to the NPS field office, a copy of which the office should in turn send to EQD. EQD and REOs distribute copies of review letters so that NPS analysts and reviewers will know the department's position and can compare it with the comments they submitted. Any time a substantive change to review comments is being considered, the original author of the review comment must be consulted.

## 8.5   Review Guidelines for EISs

### A.   Draft EISs

Review comments on draft EISs or related documents should be confined to NPS areas of jurisdiction and expertise. They should be based on fact, published research, or professionally supported opinion. Your opinions as to the acceptability of project impacts on areas of NPS jurisdiction and expertise should consider both the severity of the impacts and the practicability of proposed mitigating measures. You should urge adoption of measures that are compatible with both NPS interests and project purposes. See DO-12 (IV)(4.6).

1.   **Key sections for reviewers' attention**—EISs are prepared in the format required by section 1502.10 of the CEQ regulations or an approved variation. This format allows a realistic, adequate assessment of project impacts and provides for inclusion of measures to minimize adverse impacts. Sections 1502.11 through 1502.19 of the CEQ regulations and section 4-5 of this handbook explain requirements for individual sections of an EIS. The EIS sections requiring particular NPS review attention are

(a) purpose and need, (b) alternatives including the proposed action, (c) affected environment, and (d) environmental consequences.

2. **Comment requirements for key sections**—Reviewers of EISs should ensure that the above sections satisfactorily address:

(a) NPS concerns previously expressed during scoping or when participating as a cooperating agency.

(b) NPS positions outlined in providing planning aid and technical assistance, especially those related to alternatives preferred by NPS and to suggested mitigating and enhancement measures.

(c) evidence of coordination and consultation with NPS when proposals might affect NPS areas of jurisdiction or expertise, especially when NPS technical assistance or expertise might lead to enhancement or protection of park, recreation, historic, archeological, architectural, or significant natural area values within or associated with proposals, including world heritage sites and biosphere reserves.

(d) consultation with other appropriate groups, including the state historic preservation officer, the Land and Water Conservation Fund state liaison officer, the Advisory Council on Historic Preservation, local historical societies, state heritage program officials, and local authorities, including those that have received grant assistance from NPS.

(e) a "reasonably foreseeable" analysis of potentially significant adverse impacts on areas of NPS jurisdiction and expertise, when impacts are uncertain (1502.22). Reasonably foreseeable includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(f) a clearly defined listing of impacts for each alternative, presented on a comparable basis to allow ready identification of the alternative promising the least damage to NPS interests.

(g) location of the proposal in relation to units of the National Park System and affiliated areas, or of designated National Wild and Scenic Rivers or National Trails under NPS management.

(h) measures that would mitigate, reduce, or eliminate adverse impacts or enhance beneficial impacts of the proposal on NPS areas of jurisdiction and expertise. Impacts may be direct, indirect, primary, and secondary. They include, but are not limited to, changes in air quality, including Class I area visibility; land uses impairing park, recreation, natural, and cultural resource values; water quality; noise levels; wildlife varieties, numbers, migration routes, and habitats within and near areas administered by NPS; park access and regional trans-

portation systems; natural and cultural resource visual settings; regional socioeconomic conditions; and patterns of park visitor use.

(i) location and potential impacts of the proposal in relation to non-federal lands in which the Secretary of the Interior has a legal interest through NPS under terms of a federal deed, grant, or other conveyance. This includes areas that have received grants-in-aid from the Land and Water Conservation Fund (Section 6(f)), the Urban Park and Recreation Recovery Program, and the Historic Preservation Fund. It also includes park, recreation, and historic properties transferred under the Federal Surplus Property statutes or the Recreation Demonstration Projects Act.

(j) location of the proposal relative to historic properties listed on or eligible for listing on the National Register of Historic Places, including National Historic Landmarks.

3. **Reviewing tiered EISs**—The CEQ regulations (1502.20) encourage tiering of EISs. A definition of tiering (producing a programmatic EIS that addresses broad policy issues, followed by other site-specific EISs, each of which does not need to reevaluate, but needs only to refer to the broad policy matters addressed in the programmatic EIS) appears in the CEQ regulations (1508.28). Reviewers should be alert to attempts to substitute tiering for adequate analysis of site-specific impacts. Site-specific analysis may reveal impacts of greater magnitude than those anticipated in programmatic EISs.

4. **Reviews of state and local plans**—The CEQ regulations (1506.2(d)) require that EISs discuss inconsistencies of proposed actions with approved state or local plans or laws. NPS responsibilities relate to a number of state and local plans, including statewide comprehensive outdoor recreation plans, state historic preservation plans, and recreation recovery action plans. Proposals should address measures to reconcile situations where these plans and the proposed actions are at odds.

5. **Secondary, indirect, and cumulative impacts**—You should consider long-term secondary and indirect impacts of proposals as they affect NPS areas of jurisdiction and expertise. You also should consider cumulative effects and be alert to possible project segmentation that could distort or mask them.

6. **NPS EIS comment coordination**—If impacts of a proposal require coordination across NPS program areas (e.g., a proposed HUD regional plan), all affected units should comment.

7. **Permit identification requirements**—Proposals requiring NPS permits, easements, and so forth should be coordinated through the agency's NEPA process. The CEQ regulations (1505.25(b)) call for identification of federal permit, license, and other approval requirements during scoping, and again in review and comments on draft EISs.

When you identify a need for an NPS permit, you should inform the agency proposing the project. State why the permit is required and state a probable NPS position, based on information available at the time.

If you have serious concerns, or if the probable NPS position would be to deny the permit, the applicant should be urged to consult with the appropriate NPS office (provide a name and/or title, address, and telephone number) as early as possible. Mitigation measures or conditions that likely would be imposed before a permit would be issued should be stated in NPS comments on the draft EIS. These concerns and conditions should have been surfaced during the scoping process, and NPS should be a cooperating or joint lead agency, so that the document also covers NPS environmental analysis needs. NPS comments should address site-specific project impacts, measures necessary to minimize harm, or recommended project alternatives. The comments should explicitly indicate any tentative objection, or reservations (or lack of reservations), with reasons stated clearly. The reasons for objections should be based on explicit effects that NPS anticipates, their magnitude (use estimates if necessary), and their significance. Comments based on generalities, frustration with poor procedures, and similar "non-effect" remarks are not useful.

8. **Types of NPS comments on draft EISs**—NPS must respond if it anticipates further involvement with the proposal (e.g., review of permit applications). NPS reviewers may also provide the following types of comments on draft EISs:

(a) No comment—You may send a simple "no comment" response when responding to EQD, if a draft EIS presents an adequate analysis of expected impacts on areas of NPS jurisdiction and expertise (assuming that the proposed action or preferred alternative is acceptable to NPS). A no comment response also is appropriate when a proposal has no known impact on areas of NPS jurisdiction and expertise.

(b) Incomplete or inaccurate EIS—You may respond with a finding that the draft EIS is incomplete or inaccurate in some major and relevant way in its description of the predicted impacts on areas of NPS jurisdiction and expertise. If the draft EIS is so inadequate as to preclude meaningful analysis, and the proposal appears to threaten serious adverse effects on NPS park, recreation, historic, archeological, architectural, or significant natural area interests, your comments should state explicitly how to make the document adequate, and in exceptional cases you may request the proposing agency to prepare and circulate a revised or supplemental draft EIS according to the CEQ regulations (1502.9(a)).

(c) CEQ referral—If there is a possibility that NPS may seek to refer a project to CEQ under provisions of 40 CFR 1504, this must be pointed out to the agency proposing the undertaking at the earliest possible

time in the planning process, but no later than when NPS comments on the draft EIS.

(d) Additional alternatives—You may respond that the draft EIS fails to identify reasonable alternatives or alternative project components with lesser adverse impacts to areas of NPS jurisdiction or expertise, or that NPS favors an alternative other than the alternative preferred in the draft EIS.

(e) Mitigation inadequate—You may respond that you do not believe that adverse impacts will be mitigated adequately.

(f) Inadequate address of concerns raised during scoping—You may respond that concerns you expressed during the scoping process or as a cooperating agency were not addressed adequately or accurately in the draft EIS.

(g) Of course, positive or supportive comments where warranted should be included.

9. **Consequences of declining to review**—NPS reviewers should be extremely cautious about giving up future options by declining to review and comment on EISs or related documents involving proposals that may affect areas of NPS jurisdiction or expertise. Failure to review and comment may be interpreted by sponsoring agencies to mean that (a) NPS has no concerns in a proposed action; (b) the proposal will not significantly affect NPS areas of jurisdiction or expertise; or (c) NPS will issue any permits required for project construction.

## B. Final EISs

During the draft EIS stage, you should identify significant omissions, errors, or unaddressed concerns. Ideally, these concerns will be addressed in the final EIS, making further comment unnecessary. Normally no comments are made on final EISs, unless NPS objects to the proposal itself or to one of its major features. Proposed comments on a final EIS are forwarded through EQD to the OEPC. Depending on the nature and extent of NPS concerns, the comments may request the sponsoring agency to prepare a supplement to its final EIS. Because the sponsoring agency may take action 30 days after release of its final EIS, comments on a final EIS must be handled expeditiously.

1. **Responses to comments made by NPS on draft EISs**
The CEQ regulations (1502.9(b)) require lead agencies to respond in final EISs to comments made on draft EISs, including discussion on responsible opposing views at appropriate points in the final EIS. NPS review of a final EIS should determine whether

(a) the final EIS adequately assesses all important issues raised by NPS on the draft EIS, including documentation on appropriate historical and archeological consultation requests and response letters.

(b) the selected alternative and any accompanying mitigation features are compatible with concerns, recommendations, and objections raised previously by NPS.

(c) new information that is contained in the final EIS, or that became available to NPS only after it released its draft EIS comments, has revealed a significant change in potential impacts of the proposal.

(d) the preferred alternative or the mitigation to be employed eliminates significant or adverse impacts on areas of NPS jurisdiction or expertise.

2. **Justification for comments on finals**
Comments on final EISs may be justified by one or more of the following:

(a) NPS objects to the project because the preferred alternative is unacceptable to NPS, or it fails to incorporate NPS recommendations for mitigation or monitoring requirements after project completion.

(b) changes have been made in the proposed action, aside from adopting mitigating measures, that require additional assessment of environmental impacts on areas of NPS jurisdiction and expertise.

(c) changes in the final EIS are needed because the sponsoring agency has failed to understand the significance of NPS comments and concern on the draft EIS, and it continues to offer the project or proposal in a form that is unacceptable to NPS in whole or in part (see the "Responses to Comments" section above).

(d) Important new information that is consequential to the decision-making process becomes available, or erroneous or obsolete data presented in the final EIS need to be corrected or challenged because of NPS concerns about, or objections to, the project.

## 8.6 Style and Format for Environmental Review Comments

NPS environmental review comments on NEPA and related documents should normally be organized in the format described in this section, although the format occasionally will not fit some of the comments that NPS prepares. Individual review instructions are provided in the EQD and OEPC transmittal forms that accompany the document to the NPS reviewing office.

NPS comments being prepared for submission to other Interior bureaus, including responses to requests for technical assistance, should be in a memorandum format. Comments going directly to non-Interior agencies should be in letter form.

Comments prepared for consolidation with those of other Interior bureaus (e.g., comments addressed to OEPC, the REO, or an Interior lead bureau) should be prepared in memorandum format for signature as directed in the EQD trans-

mittal. The subject line of the memorandum should be identical to that of the incoming OEPC memorandum, and it should include the document's ER or DEC number, which should also appear at the upper left corner of the memorandum.

The comments on NEPA and related documents can be logically arranged under four headings: general comments, interrelated review comments, specific comments, and summary comments, unless the review is only a page or two and these headings would produce needless repetition and a stilted appearance. The reviewer should choose a format that conveys NPS or Departmental information and views, and pinpoints changes the recipient should make. The four headings recommended for use in longer NEPA and related reviews are discussed below. The locations of the interrelated review comments and specific NEPA comments may be interchanged as necessary to produce the most coherent review.

## A.  General comments

This topic heading, if used, should summarize any major NPS concerns with the adequacy and accuracy of the document and should provide comments of a general nature. Any major concerns about the project itself should appear here, concentrating on, but not necessarily limited to, the recommended or selected alternative and its impacts.

This section should include any specific comments that otherwise occur repeatedly throughout the review. Any previous technical assistance, cooperation, reports, or other planning information provided by NPS for the project should be noted.

## B.  Interrelated review comments

The CEQ regulations (1502.25) require that NEPA analyses be integrated with those for other environmental laws and executive orders (e.g., section 4(f) comments, Endangered Species Act comments, Fish and Wildlife Coordination Act comments). Reviewers should ascertain whether the document under review is intended to fulfill such other requirements. If so, address compliance, as appropriate, with such requirements in separate sections of the review. When NPS serves as lead bureau in consolidating the Department's comments, it is especially important to be aware of these interrelated review requirements so that other Interior bureau review responsibilities are adequately represented in the consolidated departmental comments.

## C.  Specific NEPA comments

The format of this section containing EIS or EA comments should follow the organization of the document being reviewed. Page and paragraph numbers should be cited to relate comments to the text. Comments should be written in a form designed to help the sponsoring agency in modifying the next draft or the final work.

Assertions of omissions or inadequacies should be specific, not general, and should suggest how to correct the deficiency. Needed additions or deletions should be stated precisely. If you criticize a lead agency's predictive methods, you

are obligated to describe the methods you prefer, and to give the reasons why, as the CEQ regulations point out (1503.3).

Comments should address significant overlooked or downplayed impacts of a proposed action. They also should ensure that alternatives that would benefit or have less adverse impact on NPS concerns are included and presented adequately. Comments on the EIS section describing the affected environment are appropriate only if a significantly affected component is not described adequately.

## D. Summary comments

If you favor an alternative or project modification that would be beneficial to or have less adverse impact on areas of NPS jurisdiction and expertise, this should be highlighted in the summary section.

Comments and positions on the acceptability of project impacts on areas of NPS jurisdiction or expertise should be included in this section. Comments on the proposal should consider

(1) the intensity, severity, and duration of the impacts.

(2) the objectives and importance of the project.

(3) the practicability of mitigation measures.

Insofar as possible, this section should point out how to make the proposal acceptable with regard to our areas of jurisdiction and expertise. On draft documents, this section should indicate what our position might be unless recommended changes are made.

Summary comments should always state any action relating to the proposal that the Department or NPS has taken, or may take, in accordance with the requirements of various statutes, rules, and regulations for which the department or NPS holds jurisdiction by law. The comments also should note any potential further reviews that NPS may make in considering the issuance of easements or other permits that the proposal would require, and the likely NPS position. If a CEQ referral on a project appears likely, the summary comments should so indicate, and state the particular concern.

This section should close with an offer to meet with the sponsoring agency to discuss comments and concerns. The offer of continued cooperation and assistance is especially important if significant resources are involved or if NPS has complex views and positions that are difficult to describe thoroughly in a letter. Names of NPS personnel who can be of assistance should be listed along with their titles, addresses, and telephone numbers.

# 9.0 Definitions and Acronyms

## 9.1 Definitions

**The controlling definitions for terms under CEQ's NEPA regulations are contained at 40 CFR. The numbers in parentheses refer to the appropriate section of 40 CFR. These definitions are provided as a supplement to those regulatory definitions.**

**Categorical exclusion (CE) (1508.4)**—An action with no measurable environmental impact which is described in one of the categorical exclusion lists in section 3.3 or 3.4 and for which no exceptional circumstances (section 3.5) exist. NPS also uses the acronym "CX" to denote a categorical exclusion.

**Connected actions (1508.25)**—Actions that are closely related. They automatically trigger other actions that have environmental impacts, they cannot or will not proceed unless other actions have been taken previously or simultaneously, or they are interdependent parts of a larger action and/or depend on the larger action for their justification.

**Conservation planning and impact assessment**—Within NPS, this process is synonymous with the NEPA process. This process evaluates alternative courses of action and impacts so that decisions are made in accord with the conservation and preservation mandate of the NPS Organic Act.

**Cooperating agency (1508.5)**—A federal agency other than the one preparing the NEPA document (lead agency) that has jurisdiction over the proposal by virtue of law or special expertise and that has been deemed a cooperating agency by lead agency. State or local governments, and/or Indian tribes, may be designated cooperating agencies as appropriate (see 1508.5 and 1502.6).

**Cultural resources (NPS-28, appendix A)**—Aspects of a cultural system that are valued by or significantly representative of a culture or that contain significant information about a culture. A cultural resource may be a tangible entity or a cultural practice. Tangible cultural resources are categorized as districts, sites, buildings, structures, and objects for the National Register of Historic Places, and as archeological resources, cultural landscapes, structures, museum objects, and ethnographic resources for NPS management purposes.

**Cumulative actions (1508.25)**—Actions that, when viewed with other actions in the past, the present, or the reasonably foreseeable future regardless of who has undertaken or will undertake them, have an additive impact on the resource the proposal would affect.

103

**Cumulative impact** (1508.7)—The impacts of cumulative actions.

**Direct effect** (1508.8)—An impact that occurs as a result of the proposed action or alternative in the same place and at the same time as the action.

**Environmental assessment (EA)** (1508.9)—A brief NEPA document that is prepared to (a) help determine whether the impact of a proposed action or alternatives could be significant; (b) aid NPS in compliance with NEPA by evaluating a proposal that will have no significant impacts, but that may have measurable adverse impacts; or (c) evaluate a proposal that either is not described on the list of categorically excluded actions, or is on the list but exceptional circumstances (section 3.5) apply.

**Environmental impact statement (EIS)** (1508.11)—A detailed NEPA document that is prepared when a proposed action or alternatives have the potential for significant impact on the human environment.

**Environmental screening process**—The analysis that precedes a determination of the appropriate level of NEPA documentation. The minimum requirements of the environmental screening process are a site visit, consultation with any agency that has jurisdiction by law or special expertise, and the completion of a screening checklist. The process must be complete for all NPS actions that have the potential for environmental impact and are not described in section 3.3.

**Environmentally preferred alternative** (1505.2, Q6a)—Of the action alternatives analyzed, the one that would best promote the policies in NEPA section 101. This is usually selected by the IDT members. CEQ encourages agencies to identify an environmentally preferable alternative in the draft EIS or EA, but only requires that it be named in the ROD.

**Exceptional circumstances**—Circumstances that, if they apply to a project described in the NPS categorical exclusion lists (sections 3.3 and 3.4), mean a CE is inappropriate and an EA or an EIS must be prepared because the action may have measurable or significant impacts. Exceptional circumstances are described in section 3.5.

**Finding of no significant impact (FONSI)** (1508.13)—A determination based on an EA and other factors in the public planning record for a proposal that, if implemented, would have no significant impact on the human environment.

**Human environment** (1508.14)—Defined by CEQ as the natural and physical environment, and the relationship of people with that environment (1508.14). Although the socioeconomic environment receives less emphasis than the physical or natural environment in the CEQ regulations, NPS considers it to be an integral part of the human environment.

**Impact topics**—Specific natural, cultural, or socioeconomic resources that would be affected by the proposed action or alternatives (including no action). The magnitude, duration, and timing of the effect to each of these resources is evaluated in the impact section of an EA or an EIS.

**Indirect impact** (1508.8)—Reasonably foreseeable impacts that occur removed in time or space from the proposed action. These are "downstream" impacts, future impacts, or the impacts of reasonably expected connected actions (e.g., growth of an area after a highway to it is complete).

**Issues**—In NEPA, issues are environmental, social, and economic problems or effects that may occur if the proposed action or alternatives (including no action) are implemented or continue to be implemented.

**Lead agency** (1508.16)—The agency either preparing or taking primary responsibility for preparing the NEPA document.

**Major federal action** (1508.18)—Actions that have a large federal presence and that have the potential for significant impacts to the human environment. They include adopting policy, implementing rules or regulations; adopting plans, programs, or projects; ongoing activities; issuing permits; or financing projects completed by another entity.

**Memo to file**—A memo to the planning record or statutory compliance file that NPS offices may complete when (a) NEPA has already been completed in site-specific detail for a proposal, usually as part of a document of larger scope, or (b) a time interval has passed since the NEPA document was approved, but information in that document is still accurate.

**Mitigated EA** (Q40)—An EA that has been rewritten to incorporate mitigation into a proposal or to change a proposal to reduce impacts to below significance.

**Mitigation** (1508.20)—A modification of the proposal or alternative that lessens the intensity of its impact on a particular resource.

**NEPA process**—The objective analysis of a proposed action to determine the degree of its environmental and interrelated social and economic impacts on the human environment, alternatives and mitigation that reduce that impact, and the full and candid presentation of the analysis to, and involvement of, the interested and affected public.

**Notice of intent** (1508.22)—The notice submitted to the *Federal Register* that an EIS will be prepared. It describes the proposed action and alternatives, identifies a contact person in NPS, and gives time, place, and descriptive details of the agency's proposed scoping process.

**Notices of availability**—Separate notices submitted to the *Federal Register* that the draft EIS and the final EIS are ready for distribution.

**Preferred alternative** (1502.14 (e))—The alternative an NPS decision-maker has identified as preferred at the draft EIS stage. It may be the same as the initial proposal or proposed action, or it may be different. It is identified to show the public which alternative is likely to be selected to help focus its comments.

**Programmatic documents**—Broader scope EAs or EISs that describe the impacts of proposed policy changes, programs, or plans.

**Proposal** (1508.23)—The stage at which NPS has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal. The goal can be a project, plan, policy, program, and so forth. NEPA begins when the effects can be meaningfully evaluated.

**Record of decision (ROD)** (1505.2)—The document that is prepared to substantiate a decision based on an EIS. It includes a statement of the decision made, a detailed discussion of decision rationale, and the reasons for not adopting all mitigation measures analyzed, if applicable.

**Scoping** (1508.25)—Internal NPS decision-making on issues, alternatives, mitigation measures, the analysis boundary, appropriate level of documentation, lead and cooperating agency roles, available references and guidance, defining purpose and need, and so forth. External scoping is the early involvement of the interested and affected public.

**Significantly** (1508.27)—A subjective interpretation of the intensity of impact, in several contexts, of the proposed action or alternatives.

**Tiering** (1508.28)—The use of broader, programmatic NEPA documents to discuss and analyze cumulative regional impacts and define policy direction, and the incorporation by reference of this material in subsequent narrower NEPA documents to avoid duplication and focus on issues "ripe for decision" in each case.

## 9.2    Acronyms

| | |
|---|---|
| **CE** | categorical exclusion |
| **CEF** | categorical exclusion form |
| **CEQ** | President's Council on Environmental Quality |
| **CX** | categorical exclusion |
| **DEC** | Division Environmental Comment request issued by NPS Environmental Quality Division-WASO |
| **DM** | departmental manual |
| **DOI** | Department of the Interior |
| **EA** | environmental assessment |
| **ECM** | environmental compliance memorandum |
| **EIS** | environmental impact statement |
| **EO** | executive order |
| **EPA** | Environmental Protection Agency |
| **EQD** | Environmental Quality Division |
| **ER** | Environmental Review issued by the Department of the Interior |
| **ERM** | environmental review memorandum |
| **ESA** | Endangered Species Act |
| **ESM** | environmental statement memorandum |
| **ESF** | environmental screening form |
| **FONSI** | finding of no significant impact |
| **GMP** | general management plan |
| **IDT** | interdisciplinary team |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NMFS** | National Marine Fisheries Service |
| **NOA** | notice of availability |
| **NOI** | notice of intent |
| **NPS** | National Park Service |
| **OEPC** | Office of Environmental Policy and Compliance |
| **REO** | regional environmental officer |
| **ROD** | record of decision |
| **SSO** | system support office |
| **WASO** | Washington DC Office of the National Park Service |

# Appendix 1 — Environmental Screening Form (August 2003)

This form should be attached to all documents sent to the regional director's office for signature. Sections A and B should be filled out by the project initiator (may be coupled with other park project initiation forms). Sections C, D, E, and G are to be completed by the interdisciplinary team members. While you may modify this form to fit your needs, you must ensure that the form includes information detailed below and must have your modifications reviewed and approved by the regional environmental coordinator.

## A. PROJECT INFORMATION

Park Name _____
Project Number _____

Project Type (Check):

☐ Cyclic          ☐ Cultural Cyclic          ☐ Repair/Rehab          ☐ ONPS

☐ NRPP           ☐ CRPP                      ☐ FLHP

☐ Line Item       ☐ Fee Demo                 ☐ Concession
                                                Reimbursable

☐ Other
(specify)_____

Project Location _____
Project Originator/Coordinator _____
Project Title _____
Contract # _____
Contractor Name _____
Administrative Record Location _____
Administrative Record Contact _____

## B. PROJECT DESCRIPTION/LOCATION [To begin the statutory compliance file, attach to this form, maps, site visit notes, agency consultation, data, reports, categorical exclusion form (if relevant), or other relevant materials.]

_____
_____
_____
_____
_____
_____
_____

Preliminary drawings attached? ☐ Yes ☐ No
Background info attached? ☐ Yes ☐ No
Date form initiated _____
Anticipated compliance completion date _____
Projected advertisement/Day labor start _____
Construction start _____

**C. RESOURCE EFFECTS TO CONSIDER** (Tailor the following to meet individual park/unit project needs.)

Please see section F (Instructions for Determining Appropriate NEPA Pathway) prior to completing this section. Also, use the process described in DO-12, 2.9 and 2.10; 3.5; 4.5(G) to (G)(5) and5.4(F) to help determine the context, duration and intensity of effects on resources.

| Are any measurable impacts possible on the following physical, natural or cultural resources? | Yes | No | Data Needed to Determine |
|---|---|---|---|
| 1. Geological resources-soils, bedrock, streambeds, etc. | | | |
| 2. From geohazards | | | |
| 3. Air quality | | | |
| 4. Soundscapes | | | |
| 5. Water quality or quantity | | | |
| 6. Streamflow characteristics | | | |
| 7. Marine or estuarine resources | | | |
| 8. Floodplains or wetlands | | | |
| 9. Land use, including occupancy, income, values, ownership, type of use | | | |
| 10. Rare or unusual vegetation-old growth timber, riparian, alpine | | | |
| 11. Species of special concern (plant or animal; state or federal listed or proposed for listing) or their habitat | | | |
| 12. Unique ecosystems, biosphere reserves, World Heritage sites | | | |
| 13. Unique or important wildlife or wildlife habitat | | | |
| 14. Unique or important fish or fish habitat | | | |
| 15. Introduce or promote nonnative species (plant or animal) | | | |
| 16. Recreation resources, including supply, demand, visitation, activities, etc. | | | |
| 17. Visitor experience, aesthetic resources | | | |
| 18. Cultural resources, including cultural landscapes, ethnographic resources | | | |
| 19. Socioeconomics, including employment, occupation, income changes, tax base, infrastructure | | | |
| 20. Minority and low-income populations, ethnography, size, migration patterns, etc. | | | |
| 21. Energy resources | | | |
| 22. Other agency or tribal land use plans or policies | | | |
| 23. Resource, including energy, conservation potential | | | |
| 24. Urban quality, gateway communities, etc. | | | |
| 25. Long-term management of resources or land/resource productivity | | | |
| 26. Other important environmental resources (e.g., geothermal, paleontological resources) | | | |

| D.  Mandatory Criteria: If implemented, would the proposal: | Yes | No | Data Needed to Determine |
|---|---|---|---|
| A. Have material adverse effects on public health or safety? | | | |
| B. Have adverse effects on such unique characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; or ecologically significant or critical areas, including those listed on the National Register of Natural Landmarks? | | | |
| C. Have highly controversial environmental effects? | | | |
| D. Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | | | |
| E. Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | | | |
| F. Be directly related to other actions with individually insignificant, but cumulatively significant, environmental effects? | | | |
| G. Have adverse effects on properties listed or eligible for listing on the National Register of Historic Places? | | | |
| H. Have adverse effects on species listed or proposed to be listed on the List of Endangered or Threatened Species, or have adverse effects on designated Critical Habitat for these species? | | | |
| I. Require compliance with Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act? | | | |
| J. Threaten to violate a federal, state, local, or tribal law or requirement imposed for the protection of the environment? | | | |
| K. involve unresolved conflicts concerning alternative uses of available resources (NEPA sec. 102(2)(E). | | | |
| L. Have a disproportionate, significant adverse effect on low income or minority populations (EO 12898). | | | |
| M. Restrict access to and ceremonial use of Indian sacred sites by Indian religious practitioners or adversely affect the physical integrity of such sacred sites (EO 130007) | | | |
| N. Contribute to the introduction, continued existence, or spread of federally listed noxious weeds (Federal Noxious Week Control Act). | | | |
| O. Contribute to the introduction, continued existence, or spread of non-native invasive species or actions that may promote the introduction, growth or expansion of the range of nonnative invasive species (EO 13112). | | | |
| P. Require a permit from a federal, state, or local agency to proceed, unless the agency from which the permit is required agrees that a CE is appropriate? | | | |
| Q. Have the potential for significant impact as indicated by a federal, state, or local agency or Indian tribe? | | | |

| R. Have the potential to be controversial because of disagreement over possible environmental effects. | | | |
| S. Have the potential to violate the NPS Organic Act by impairing park resources or values? | | | |

**Please answer the following questions:**

1. Are the personnel preparing this form familiar with the site, and/or has a site visit been conducted? (Attach additional pages noting when site visit took place, staff attending, etc.)

2. Has consultation with all affected agencies or tribes been completed? (Attach additional pages detailing the consultation, including the name, date, and summary of comments from other agency or tribal contacts.)

**E. OTHER INFORMATION (Please answer the following questions/provide requested information.)**

Are personnel preparing this form familiar with the site? ☐Yes ☐No

Did personnel conduct a site visit? ☐Yes ☐No (*If yes, attach meeting notes or additional pages noting when site visit took place, who attended, etc.*)

Is the project in an approved plan such as a General Management Plan or an Implementation Plan with an accompanying environmental document? ☐Yes ☐No
If so, plan name _____

Is the project still consistent with the approved plan? ☐Yes ☐No (*If no, prepare plan/EA or EIS.*)

Is the environmental document accurate and up-to-date? ☐Yes ☐No (*If no, prepare plan/EA or EIS.*) FONSI/ ROD ☐(Check) Date approved _____

Are there any interested or affected agencies or parties? ☐Yes ☐No

Did you make a diligent effort to contact them? ☐Yes ☐No

Has consultation with all affected agencies or tribes been completed? ☐Yes ☐No
(*If so, attach additional pages detailing the consultation, including the name, the dates, and a summary of comments from other agencies or tribal contacts.*)
Are there any connected, cumulative, or similar actions as part of the proposed action?

☐Yes ☐No   (*If so, attach additional pages detailing the other actions.*)

**F. INSTRUCTIONS FOR DETERMINING APPROPRIATE NEPA PATHWAY**

First, always check DO-12, section 3.2, "Process to Follow" in determining whether the action is categorically excluded from additional NEPA analyses.  Other sections within DO-12, including sections 2.9 and 2.10; 3.5; 4.5(G)(4) and (G)(5), and 5.4(F), should also be consulted in determining the appropriate NEPA pathway.  Complete the following tasks: conduct a site visit or ensure that staff is familiar with the site's specifics; consult with affected agencies, and/or tribes; and interested public and complete this environmental screening form.

If your action is described in DO-12 section 3.3, "CE's for Which No Formal Documentation is Necessary," follow the instructions indicated in that section.

If your action is not described in DO-12, section 3.3, and IS described is section 3.4, AND you checked yes or identified "data needed to determine" impacts in any block in section D (Mandatory Criteria), this is an indication that there is potential for significant impacts to the human environment, therefore, you must prepare an EA or EIS or supply missing information to determine context, duration and intensity of impacts.

If your action is described in section 3.4 and NO is checked for all boxes in section D (Mandatory Criteria), BUT you have initially checked "yes" in section C (Resource Effects to Consider) during internal scoping, this means that the team should do additional analyses to determine the context, duration and intensity of effects.  If the magnitude of effects is then determined to be at the negligible or minor level, then usually there is no potential for significant impacts, then an EA or EIS is not required.  If, however, during internal scoping and further investigation, resource effects still remain unknown, or are at the minor to moderate level of intensity, and the potential for significant impacts may be likely, an EA or EIS is required.

In all cases, data collected to determine the appropriate NEPA pathway must be included in the administrative record.

**G. INTERDISIPLINARY TEAM SIGNATORY (All interdisciplinary team members must sign.)**

By signing this form, you affirm the following: you have either completed a site visit or are familiar with the specifics of the site; you have consulted with affected agencies and tribes; and you, to the best of your knowledge, have answered the questions posed in the checklist correctly.

| Interdisciplinary Team Leader Name | Field of Expertise | Date Signed |
|---|---|---|
|  |  |  |
| Technical Specialists Names | Field of Expertise | Date Signed |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**H. SUPERVISORY SIGNATORY**

Based on the environmental impact information contained in the statutory compliance file and in this environmental screening form, environmental documentation for the subject project is complete.

Recommended:

| Compliance Specialist | Telephone Number | Date |
|---|---|---|
|  |  |  |

Approved:

| Superintendent | Telephone Number | Date |
|---|---|---|
|  |  |  |

# Appendix 2

## Categorical Exclusion Form

**Project** _____    **Date** _____

Describe project, including location (reference the attached Environmental Screening Form (ESF), if appropriate):



Describe the category used to exclude action from further NEPA analysis and indicate the number of the category (see section 3–4 of DO-12):



Describe any public or agency involvement effort conducted (reference the attached ESF):



On the basis of the environmental impact information in the statutory compliance file, with which I am familiar, I am categorically excluding the described project from further NEPA analysis. No exceptional circumstances (i.e., all boxes in the ESF are marked "no") or conditions in section 3-6 apply, and the action is fully described in section 3-4 of DO-12.

_____    _____
**Park Superintendent or Designee**        **Date**

_____    _____
**Title**

_____    _____
**NPS Contact Person**                  **Title**

_____    _____
**Address**                              **Phone Number**

113

# Index

**A**

Acronyms ..................................................................................................107
Administrative records ..........................................................................28–29
Advisory Council on Historic Preservation ..............................................30
Analysis boundaries ..............................................................................23–24

**B**

Budgetary projections, decision documents and ......................................82

**C**

Categorical Exclusion Forms
    formalization of, ................................................................................78
    sample ..............................................................................................113
    use of ..................................................................................................43
    use with Environmental Screening Forms ..................................20, 43
Categorical exclusions
    actions related to development and ..............................................37–38
    actions related to general administration and ............................36–37
    actions related to grant programs and ........................................39–40
    actions related to resource management protection and ..................39
    actions related to visitor use and ....................................................39
    administrative process ................................................................43–44
    consideration of multiple actions ....................................................44
    decision document filing and ......................................................77–78
    description ..............................................................................3, 33, 42
    documentation process ................................................................33–34
    documenting a NEPA analysis and ..............................................26–28
    exceptions to ................................................................................40–42
    list of CEs for which no formal documentation is necessary ........34–36
    plans, studies, and reports and ........................................................37
    public involvement in actions ..........................................................43
    using the CE lists ........................................................................42–43
CEFs. *See* Categorical exclusion forms
CEQ. *See* Council on Environmental Quality
CEs. *See* Categorical exclusions
Connected actions ....................................................................................17
"Considering Cumulative Effects under the National Environmental
    Policy Act," ......................................................................................18
Construction actions ................................................................................43
Contractors ..............................................................................................28
Cooperating agencies ........................................................................29, 92
Council on Environmental Quality
    creation of ..........................................................................................1
    criteria for designating a lead agency ..............................................29

emergency actions and........................................................31
NEPA planning process and ........................................83–84
Cumulative actions ................................................................17–18
Cumulative effects .................................................................25–26
Cyclic Maintenance Guide.........................................................38

**D**

Decision documents
budgetary projections and .............................................82
categorical exclusions .....................................................78
changes in the selected action and................................82
findings of no significant impact...............................79–81
monitoring and ...........................................................81–82
records of decision .....................................................78–79
Definitions of terms.........................................................103–106
Direct effects.........................................................................24–25

**E**

EAs. See Environmental assessments
EISs. See Environmental impact statements
Emergency actions ....................................................................31
Endangered Species Act
categorical exclusions and.............................................43
federal agency cooperation and ...................................30
findings of no significant impact and ...........................81
records of decision and..................................................79
Environmental assessments
administrative process of review of ...............................76
administrative record and .........................................28–29
alternatives and .....................................................21, 71–72
categorical exclusions and .......................................40, 42
completing the EA process.......................................75–76
consultation and coordination section..........................74
description ........................................................................3
environmental impact statements and.................67–69, 71
findings of no significant impact and .....................77, 80
format and content of.................................................71–74
for general management plans ................................85–86
length of ..........................................................................70
mitigated EAs ..................................................................70
preferred alternatives and.............................................13
public involvement in ..................................................74–76
public meetings about ...................................................75
public review of...............................................................74
purposes of .....................................................................69
references section...........................................................74
response to comments ...................................................75
scoping and.....................................................................74
supplemental ..................................................................75

tiering and ...............................................................................................88–89
uses for .........................................................................................................69
when to prepare ...........................................................................27–28, 70
Environmental impact statements
    abbreviated final version.......................................................................62
    actions that normally require an EIS.............................................47–48
    administrative record and.................................................................28–29
    alternatives and.......................................................................................21
    categorical exclusions and ..............................................................40, 42
    changes in the selected alternative.......................................................62
    contractor preparation of.......................................................................28
    cooperating agency comments...............................................................62
    criteria for significant impact........................................................45–47
    description...................................................................................................3
    draft EIS notice of availability/filing with EPA................................65
    environmental assessments and..........................................67–69, 71
    exceptions to.............................................................................................48
    final filing with EPA...............................................................................67
    final version...........................................................................61–62, 98–99
    findings of no significant impact and...................................................79
    format of..............................................................................................48–60
    for general management plans........................................................85–86
    historic properties and...........................................................................79
    notice of intent to prepare...............................................................63–64
    ongoing or continuing action.................................................................47
    preferred alternatives and.....................................................................13
    public involvement requirements....................................................63–67
    public meetings/hearings on............................................................66–67
    recipients of draft versions..............................................................65–66
    recipients of final versions.....................................................................67
    records of decision and.....................................................................77, 79
    response options.................................................................................61–62
    review guidelines...............................................................................94–98
    review process...........................................................................................67
    scoping.................................................................................................64–65
    substantive comments.............................................................................61
    supplements to.........................................................................................63
    termination process...........................................................................67–68
    tiering and...........................................................................................88–89
    timelines for review of draft versions..................................................66
    when to prepare...............................................................................27, 45
Environmental Justice in Minority and Low-Income Populations,
    Executive Order 12898.........................................................................30
Environmental Protection Agency, environmental impact
    statements and.....................................................................6, 65–67, 93
Environmental Review Memorandum series.........................................94
Environmental Screening Forms
    NEPA analysis and..........................................................................15, 27

reasons for completing...................................................................19–20

sample...........................................................................................109–112

use with the categorical exclusion form......................................20, 43

uses of.....................................................................................................20

Environmentally preferred alternatives......................................................22–23

ESA. See Endangered Species Act

ESFs. See Environmental Screening Forms

External scoping, environmental impact statements and ...........................64–65

**F**

Federal Noxious Weed Control Act................................................................41

*Federal Register*

environmental assessments and...............................................................74–76

environmental impact statements and.........................................63–68, 93

findings of no significant impact, publication......................................79, 81

records of decision, publication in............................................................78

Findings of no significant impact (FONSI)

content.....................................................................................................80

as contracts with the public .....................................................................82

description...............................................................................................79

endangered species and...........................................................................81

environmental impact statements and.........................................67–69, 75

errata sheets............................................................................................80

floodplains and wetlands and...................................................................30

functions of.............................................................................................80

for general management plans..............................................................85–86

historic properties and.............................................................................81

impairment of park resources and............................................................81

impairment potential and.........................................................................77

mitigation and.........................................................................................80

signatory for............................................................................................81

waiting period for.....................................................................................81

wetlands and floodplains and...................................................................81

Fish and Wildlife Coordination Act..............................................................41

Floodplain Management, Executive Order 11988

categorical exclusions and........................................................................41

NEPA document cooperation and.............................................................30

FONSI. See Findings of no significant impact

Format of environmental impact statements

affected environment............................................................................52–54

alternatives...........................................................................................50–52

consultation and coordination section....................................................59–60

cover sheet...............................................................................................49

impact chapter......................................................................................54–59

mandatory topics ..................................................................................53–54

purpose and need for action...................................................................49–50

references section.....................................................................................60

summary..................................................................................................49

"Forty Most Asked Questions Concerning CEQ's NEPA Regulations," ...............................1
Freedom of Information Act ...........................................................................................28

**G**

General management plans
    EISs for.....................................................................................................................85–86
    reasons to prepare EISs .................................................................................................85
Grant programs
    categorical exclusions and............................................................................................39–40
    environmental impact statements and .............................................................................48

**H**

Handbook
    citations in DO-12 and....................................................................................................2
    DO-12 and........................................................................................................................1–2
    use of ..............................................................................................................................2
Historic Structures Preservation Guide ..............................................................................38

**I**

IDTs. See Interdisciplinary teams
Impact chapter of the EIS
    context analysis...............................................................................................................55
    criteria for .....................................................................................................................45–47
    displaying impact information.........................................................................................54–55
    impact indicators...........................................................................................................55–56
    impact thresholds.............................................................................................................56
    incomplete or unavailable information ..........................................................................55
    mitigation analysis ......................................................................................................56–57, 97
    organizing the impact chapter......................................................................................57–58
    sustainability and long-term management considerations ............................................58–59
Impact chapter of the environmental assessment.............................................................72–73
Impairment of park resources
    decision document filing................................................................................................26
    findings of no significant impact and ............................................................................81
    process review and ........................................................................................................26
Indian Trust resources, evaluating impact of the proposal on ......................................31, 54
Indirect effects.................................................................................................................25
Interdisciplinary teams
    cumulative effects and ..................................................................................................25–26
    identifying issues or environmental problems .................................................................15
    issue definition ..............................................................................................................19
    membership of.................................................................................................................7
    memos to file and...........................................................................................................27
    site visitation .................................................................................................................19
    Internal scoping
    description and process ...............................................................................19–20, 27, 33
    environmental impact statements and ...........................................................................64–65
Issue definition.................................................................................................................18–19

**L**

Lead agencies ............................................................................................29
List of Endangered or Threatened Species ..........................................41
Low-income populations, evaluating impact of the proposal on .......30

**M**

Memos to file
   decision document filing and ............................................................77
   documenting a NEPA analysis and ..................................................26
   using instead of the ESF ...................................................................20
Minority populations, evaluating impact of the proposal on ...........30

**N**

National Environmental Policy Act. *See* also Review of non-NPS NEPA documents
   activating.............................................................................................10
   agency planning and ........................................................................5–6
   analytic rather than encyclopedic nature of documents ...............6
   common sense basis ............................................................................7
   Council on Environmental Quality creation.....................................1
   documentation candor .......................................................................7
   early planning requirement...............................................................4
   federal action examples .....................................................................5
   focus of documents ............................................................................6
   holistic nature of ...............................................................................8
   inclusivity requirement......................................................................7
   interdisciplinary approach.................................................................7
   National Park Service Organic Act and.......................................4, 8–9
   NEPA documents as building blocks................................................86
   objectivity of ....................................................................................6–7
   procedural qualities ...........................................................................4
   project proposal/contracting process...........................................9–10
   public process and ..............................................................................6
   purpose of ...........................................................................................3
   requirements of ..................................................................................1
   site-specific environmental impact information requirement.......8, 10, 87
   specificity of data needed................................................................10
   systematic analyses requirement ......................................................6
   tiering and ..................................................................86, 88–89, 96
   timing of implementation...........................................8–9, 83, 86–87
   tools for implementing .......................................................................3
   tools to help foster excellent action..................................................8
National Historic Landmark Program, categorical exclusions and...................38
National Historic Preservation Act
   categorical exclusions and................................................................43
   federal agency cooperation and.......................................................30
   findings of no significant impact and..............................................81
   records of decision and......................................................................79
National Marine Fisheries Service....................................................................30
National Natural Landmark Program, categorical exclusions and...................38

National Park Service Organic Act.................................................................4, 8–9, 77
National Parks Omnibus Management Act of 1998 ..................................................2
National Register of Historic Places
    categorical exclusions and ..............................................................................38, 41
    environmental impact statements and ................................................................47
National Trails system, environmental impact statements and................................48
NHPA. *See* National Historic Preservation Act
"No action" alternatives .......................................................................................21–22

**O**

Office of Environmental Policy and Compliance, review of non-NPS
        NEPA documents........................................................................................93–94

**P**

Preferred alternatives, environmental impact statements or environmental
        assessments and ..............................................................................13–14, 51–52
Process overview
    administrative record or project file...............................................................28–29
    analysis boundaries.........................................................................................23–24
    analysis process ..............................................................................................13–15
    choice of pathways.........................................................................................27–28
    connected actions .................................................................................................17
    consistency with sections 101 and 102(1) of NEPA .........................................23
    cumulative actions .........................................................................................17–18
    cumulative effects ..........................................................................................25–26
    defining the proposal .....................................................................................16–17
    direct effects...................................................................................................24–25
    emergency actions ...............................................................................................31
    environmentally preferred alternatives ..........................................................22–23
    external scoping ...................................................................................................19
    federal, state, and local laws that overlap with NEPA...................................29–31
    impact categories..................................................................................................24
    impairment of park resources ..............................................................................26
    indirect effects......................................................................................................25
    internal scoping ..............................................................................................19–20
    issue description .............................................................................................18–19
    lead and cooperating agencies and......................................................................29
    need definition......................................................................................................16
    "no action" alternative....................................................................................21–22
    options to document a NEPA analysis ...........................................................26–27
    purpose definition.................................................................................................16
    range of alternatives.............................................................................................20
    reasonable alternatives...................................................................................20–21
    similar actions.......................................................................................................17
    state agencies and................................................................................................29
    using contractors ..................................................................................................28
    working with other agencies ..........................................................................29–31
Programmatic documents and planning
    EISs for general management plans ................................................................85–86

feasibility and planning ...............................................................87–88
long-term resource management and ..........................................89
NEPA as a compliance action..........................................................83
NEPA documents as building blocks.............................................86
programs and policies .......................................................................89
questions to ask...........................................................................84–85
tiering ...............................................................................86, 88–89, 96
Project files.............................................................................................28–29
Proposed actions, environmental impact statements or environmental
assessments and ............................................................................13–14, 50
Protection of Wetlands, Executive Order 11990
categorical exclusions and..............................................................41
NEPA cooperation and......................................................................30

**R**

Reasonable alternatives, environmental impact statements or
environmental assessments and ........................................20–21, 50
Records of decision
CEQ requirements...............................................................................78
as contracts with the public............................................................82
endangered species and...................................................................79
floodplains and wetlands and........................................................30
historic properties and ......................................................................79
impairment potential and ...........................................................77–79
length.......................................................................................................78
notice publication................................................................................78
signatory for...........................................................................................79
wetland/floodplain statements and.............................................79
Review agencies.............................................................................................93
Review of non-NPS NEPA documents
comment requirements...............................................................91–93
consequences of declining to review............................................98
departmental comment letters .......................................................94
extensions of review deadlines.................................................93–94
final EISs...........................................................................................98–99
review deadlines...................................................................................93
review guidelines for EISs............................................................94–98
specific NEPA comments.......................................................100–101
style and format for environmental review comments ...99–101
summary contents............................................................................101
types of NPS comments on draft EISs....................................97–98
RODs. See Records of decision

**S**

Secretarial Order 3175 and ECM95-2 ..........................................31
Similar actions.................................................................................................17
State agencies.................................................................................................28

**T**

Tiering ...............................................................................................86, 88–89, 96

**U**

U.S. Fish and Wildlife Service ................................................................30

**W**

Wetlands and floodplains

findings of no significant impact and ...........................................81

records of decision and................................................................79

Wild and Scenic Rivers proposals, environmental impact statements and.................47–48

# EXHIBIT 4



# National Park Service

## DIRECTOR'S ORDER #2: PARK PLANNING

**Approved:** /s/ Robert Stanton (signed original on file)
Director, National Park Service

**Effective Date:** May 27, 1998

**Sunset Date:** May 27, 2002

### 1.0. Purpose

1.1. This director's order revises and replaces the policies and guidance included in chapter 2 of the *National Park Service Management Policies* (1988) and the NPS-2 *Planning Process Guideline* (1982) as they relate to park planning. Policies and guidelines concerning the studies of potential new additions to the national park system, the national wild and scenic rivers system, and the national trails system outlined in the *Management Policies*, NPS-2, and Special Directive 92-11 will remain in effect until revised by future actions.

1.2. This director's order documents the decision-making processes that result in the goals and actions specific to each unit of the national park system and those units of the national trails system administered by the National Park Service. Park planning is a vital intermediary step that links servicewide planning and decision making to park operations.

1.3. Coordinating and integrating all the various types of park planning is essential. The planning and decision-making framework presented here compiles and integrates all servicewide directives related to park planning, regardless of whether they are associated with the general management planning program, the resource management programs (including compliance with the National Environmental Policy Act and the National Historic Preservation Act), the visitor services program, the construction program, or the performance management system that is being implemented to comply with the Government Performance and Results Act (GPRA). This order will be closely coordinated with other director's orders and updated and revised every two to four years to ensure that direction for park planning remains consistent across the National Park Service.

1.4. The associate director for professional services is delegated the authority to establish program standards for park planning. Together Director's Order 2 and its program standards provide the information needed by park superintendents and other managers throughout the National Park Service to direct effective and efficient park planning in cooperation with the public and our partners. More detailed information about specific procedures, techniques, and tools will be compiled in a separate sourcebook (scheduled for distribution in 1998). The sourcebook will constitute the level three guidance for park planning under the new NPS directive system.

### 2.0. Authority

This director's order is issued pursuant to 16 USC 1 through 4 (the National Park Service Organic Act).

### 3.0. NPS Park Planning Policy

NPS management policies are hereby revised to read as follows.

**3.1.0. General Principles**

3.1.1. The National Park Service will take a comprehensive approach to planning for how resources, visitors, and facilities will be managed to carry out the mission of the National Park Service and each individual park. The National Park Service has a mandate in its Organic Act and other legislation to preserve resources unimpaired for the enjoyment of future generations. NPS park planning will help define what types of resource conditions, visitor uses, and management actions will best achieve that mandate.

3.1.2. The National Park Service will use planning to bring logic, analysis, public involvement, and accountability into the decision-making process.

- *Logic* - Park planning and decision making will be conducted as a continuous, dynamic process that extends from broad visions shared with the public to individual, annual work assignments and evaluations. Each park will be able to demonstrate to decision makers, staff, and the public how decisions relate to one another in terms of a logical, trackable rationale.

- *Public Involvement* - Public participation in planning and decision making will ensure that the National Park Service fully understands and considers the publics' interests in the parks as part of their national heritage, cultural traditions, and community surroundings. To the maximum extent possible, the National Park Service will actively seek out and consult with existing and potential visitors, neighbors, people with traditional cultural ties to park lands, scientists and scholars, concessioners, cooperating associations, other partners, and government agencies. The Park Service will work cooperatively with others to improve the condition of parks, to expand public service, and to integrate parks into sustainable ecological, cultural, and socioeconomic systems.

- *Accountability* - Management teams will be held accountable for identifying and accomplishing long-term goals and annual goals as incremental steps toward fully carrying out the park mission. Such planning will be a critical and essential part of the National Park Service performance management system that is designed to improve the agency's performance and results.

**3.2.0. Major Elements of NPS Park Planning and Decision Making**

1. A logical, trackable rationale for decisions will be created through several levels of planning that become increasingly detailed and complementary by agreeing first on why the park was established and what resource conditions and visitor experiences should exist there, and then by becoming increasingly focused on how those conditions should be achieved. More specifically, park managers and staffs will be able to articulate and share with the public

3.2.3. This director's order recognizes that many parks will initially lack some elements of a logical, trackable rationale as described here and that updating plans to bring them into conformance will take time. In the interim, parks will work off the information in their current approved plans and identify and fill gaps in the overall framework as quickly as feasible.

### 3.3.0. Park Planning Processes

3.3.1. The elements necessary for a logical, trackable rationale for decision making will be created and updated through four closely interrelated planning processes: general management planning, park strategic planning, implementation planning, and annual performance planning. The order of these processes will generally flow from broad-scale general management planning through progressively more specific strategic planning, implementation planning, and annual performance planning and reporting. When scoping a plan, it will be important to distinguish which issues can most appropriately be addressed by general management planning and which will most appropriately be addressed by more detailed strategic or implementation planning. The results of planning and decision making will be monitored by the park staff, and information will be fed back into the processes at appropriate junctures. If goals are not being met, management teams will seek to understand why and to identify appropriate actions for moving closer to goals. Occasionally the broadest level decisions about ultimate goals will be reassessed to reflect new knowledge or previously unforeseen circumstances, then the cycle will resume.

3.3.2. Each process will have its own particular requirements; however, to the maximum extent possible, these processes will accommodate the overarching goal of minimizing duplication and confusion in park planning. This will be accomplished by establishing uniform definitions for decision-making elements shared by more than one process and by explaining how all the elements interrelate in a single park planning and decision-making framework.

3.3.3. Elements that were previously included in other planning processes (e.g., statement for management) are now included in the four NPS park planning processes described below.

## 3.3.1.0. General Management Planning

3.3.1.1. The National Park Service will maintain an up-to-date general management plan (GMP) for each unit of the national park system. The purpose of this plan will be to ensure that each park has a clearly defined direction for resource preservation and visitor use. This basic foundation for decision making will be developed in consultation with servicewide program managers, interested parties, and the general public. It will be based on an adequate analysis of existing and potential resource conditions and visitor experiences, environmental (including natural, cultural, and socioeconomic) impacts, and costs of alternative courses of action.



3.3.1.2. General management planning will constitute the first phase of tiered planning and decision making. It will focus on why the park was established and what resource conditions and visitor experiences should be achieved and maintained over time. The general management plan will take the long view, which many be many years into the future when dealing with the time frames of natural and cultural processes. The plan will consider the park holistically (in its full ecological and cultural contexts) as a unit of the national park system and as part of a surrounding region. It will identify the importance of partnerships with others in protecting park resources and providing appropriate visitor services. The general management plan will also identify connections among the various park programs and park management districts. This will help avoid inadvertently creating new problems in one area, while attempting to solve problems in another. Decisions about site-specific actions will be deferred to implementation planning. More detailed, site-specific analyses of implementation plan alternatives will be required before any major federal action is undertaken.

3.3.1.3. General management plans will contain the following decision-making elements: mission, mission goals, and management prescriptions (refer to the program standards for a detailed description of each element). The management prescriptions will meet all of the GMP legal requirements contained in the National Parks and Recreation Act of 1978 and will address the preservation of the park resources, the types and general intensities of development, visitor carrying capacities for all areas of the unit, and the indications of potential boundary modifications (the program standards for management prescriptions address these GMP legal requirements in detail).

3.3.1.4. General management planning will be conducted by an interdisciplinary team, including park managers and technical experts, who will consult with other knowledgeable persons inside and outside the agency and with the general public. Decisions will be based on a scientific and scholarly understanding of the park ecosystems and cultural contexts (both internal and external to the park boundaries). If information is inadequate, planning and decision making will be deferred until adequate information is available for the type of decisions to be made.

3.3.1.5. During general management planning, resource values and land uses will be systematically analyzed using the best information available, and alternatives and their impacts will be rigorously explored. In reaching decisions concerning future management of park resources, planning teams will seek, to the extent possible, to reach agreement among the park staff, the NPS leadership, other agencies with jurisdiction by law or expertise, and the public.

3.3.1.6. The analysis of GMP alternatives will meet the program standards for NPS implementation of the National Environmental Policy Act (NEPA) and related legislation, including the National Historic Preservation Act (NHPA). An environmental impact statement (EIS) will be prepared for general

management plans. In a few cases, after completion of scoping and where initial analysis of alternatives and impacts clearly indicate that there is no potential for significant impact by any alternative, an exception to the general rule may be made by the associate director, natural resources stewardship and science, after consultation with the Environmental Quality Division. Where both the National Environmental Policy Act and sections 106 and 110 of the National Historic Preservation Act apply, NEPA procedures will be used to inform the public about undertakings with the potential to affect properties listed on or eligible for listing on the National Register of Historic Places, in conjunction with the Advisory Council on Historic Preservation's regulatory provisions on coordination with NEPA. (Refer to the director's orders related to compliance with the National Environmental Policy Act and to cultural resources management.)

3.3.1.7. Public involvement will be adequate to learn about the concerns, issues, expectations, and values of existing and potential visitors, park neighbors, people with traditional cultural ties to lands within the park, concessioners, cooperating associations, other partners, scientists and scholars, and other government agencies. Through public involvement the National Park Service will share information about the planning process, issues, and proposed management actions; learn about the values placed by other people and groups on the same resources and visitor experiences; and build support among local publics, visitors, Congress, and others for implementing the plan.

3.3.1.8. General management planning will be conducted as part of cooperative regional planning whenever possible. NPS participation in cooperative regional planning will be undertaken in the hope of better coordinating and focusing the independent and autonomous efforts of multiple parties. NPS participation in such planning efforts will not be intended to prevent reasonable uses of private lands and will acknowledge the rights and interests of other landowners. While being consistent with NPS management policies and park goals, plans will identify and consider potential effects outside as well as inside the park boundaries and will identify ways to enhance beneficial effects and mitigate adverse effects to the maximum extent possible.

3.3.1.9. General management plans will be reviewed and revised as necessary to keep them current. It is anticipated that such reviews will be needed every 10-15 years or sooner if conditions change more rapidly. Even in parks with strong traditions and entrenched patterns of use and development, decision makers will benefit from occasionally stepping back and reassessing their overall goals, particularly if resources are threatened, sites are crowded, or the park's built environment requires extensive rehabilitation or maintenance. This will give everyone with a major stake in the park an opportunity to revalidate the park's role in the nation and in the region and to reconfirm that the kinds of resource conditions and visitor experiences being pursued are the best possible mix for the future. An approved general management plan may be amended, rather than revised, if conditions and management prescriptions over most of the plan area remain essentially unchanged from those present when the plan was originally approved.

### 3.3.2.0. Strategic Planning

3.3.2.1. Strategic planning, required by the Government Performance and Results Act of 1993, will be conducted for the National Park Service as a whole, and every park, program, and central office will have its own strategic plan. Parks, programs, and central offices engage in strategic planning to achieve better results in their mission of protecting resources and providing for visitor enjoyment. Performance management is a way to measure real progress and the level of accomplishment related to specific park, program, or central office goals.



3.3.2.2. To fulfill the purposes for

implementing the Government Performance and Results Act in the National Park Service, park strategic plans will contain the following decision-making elements: mission, mission goals, long-term goals, and resource assessment (the elements marked with an asterisk in the chart above; refer to the program standards for a detailed description of each element). Park strategic plans will be based on the servicewide strategic plan, incorporating and reporting on the progress made toward meeting the servicewide mission goals and long-term goals.

3.3.2.3. Park strategic plans will be developed according to the eight-step performance management process developed by the National Park Service for compliance with the Government Performance and Results Act. At the park strategic planning level, analysis will be focused on understanding the park's capability to set and meet long-term goals through a resource assessment of its fiscal and human resources. This resource assessment will also include a description of the condition of the natural and cultural resources in the park and the condition (capability) of the park's infrastructure in meeting long-term goals. Managers will consider how the park mission and long-term goals might be pursued in the foreseeable future, and the answers to that question will determine the park's workload, budget, and staffing allocations for the next two to five years.

3.3.2.4. Park strategic plans need to contain all of the components required by the Government Performance and Results Act, including a description of the operational processes and resources required to meet the goals, an identification of key factors external to the park and beyond its control that could significantly affect the achievement of general goals, a description of program evaluations used in establishing or revising goals, and a record of consultation. Because information in park strategic plans is extracted for compilation into the servicewide strategic plan, these plans need to contain similar information.

3.3.2.5. Ideally, the park strategic plan will tier from the general management plan, building on the GMP mission, mission goals, and management prescriptions included in that plan, and rewriting them to be stated as outcomes, if necessary. This director's order recognizes that many parks lack a current general management plan upon which to base their initial GPRA strategic planning effort. An anticipated result of this new director's order will be a general management planning program that will support all parks in developing and maintaining this foundation for decision making. In the interim, parks will work from the information in their existing plans and identify and fill gaps in their overall planning framework as quickly as feasible.

3.3.2.6. Although it shares some elements in common with a general management plan, a park strategic plan will not be a substitute for a general management plan because it does not reflect the comprehensive resource analysis, consultation, and compliance required for a general management plan. Through strategic planning, park staffs will continuously reevaluate the adequacy of the park's general management plan as a foundation for addressing issues, and they may identify the need for a new or revised general management plan. Should a park decide, through its strategic planning process, that a major shift in direction or emphasis is needed, then the strategic plan will identify the need for a

new general management plan or a GMP addendum or amendment. Strategic plans may also identify the need for more detailed implementation plans. General management planning and implementation planning are the appropriate processes for incorporating the requirements of the National Environmental Policy Act and the National Historic Preservation Act to consider impacts on the natural, cultural, and socioeconomic environments.

### 3.3.3.0. Implementation Planning



3.3.3.1. Implementation planning focuses on how to implement an activity or project needed to achieve a long-term goal. The contents of implementation plans may vary widely, depending upon whether the plan is directing a

specific project (such as a project to reintroduce an extirpated species or to develop a trail) or an ongoing activity (such as maintaining a historic structure, managing fire within a natural system, or setting and maintaining a standard for a quality visitor experience). Developing a plan of action for dealing with a complex and sometimes controversial issue often requires a level of detail and thorough analysis that goes well beyond that which is appropriate at the general management planning or strategic planning levels. (For more information about specific types of implementation plans, see the director's orders and related guidance for each program area.)

3.3.3.2. Implementation planning will generally be deferred until the activity or project under consideration has sufficient priority to indicate that action will be taken within the next two to five years. Therefore, implementation planning will usually tier off one of the long-term goals identified in the park strategic plan, and it will analyze and describe how the long-term goal will be achieved. Deferring implementation planning until the action has been given sufficient priority to anticipate funding in the next two to five years will help ensure that decisions about how to best achieve a certain goal are relevant, timely, and based on current data.

3.3.3.3. Implementation plans for actions with the potential to significantly affect the human environment will require formal analysis of alternatives in compliance with the National Environmental Policy Act and related legislation, including the National Historic Preservation Act. Since many issues involving environmental quality and cultural resources will be resolved through implementation planning rather than general management planning, the NEPA and NHPA section 106 processes begun during general management planning will need to continue as part of implementation planning.

3.3.3.4. Implementation planning for one or more projects or activities may overlap general management planning and strategic planning if it is appropriate for the purposes of planning efficiency or public involvement. However, the decisions needed at the general management planning level and the strategic planning level will precede and direct the more detailed decisions about projects and activities. Major actions or commitments aimed at changing resource conditions or visitor use in a park, and major new development or rehabilitation, will be consistent with an approved general management plan and will be linked to a long-term goal in a current strategic plan. Even if they are conducted simultaneously, the general management plan and implementation plan(s) will be contained in separate documents or separate parts of a single document, because the general management plan needs to remain intact after the implementation plans are out of date and no longer needed for reference.

### 3.3.4.0. Park Annual Performance Planning and Annual Performance Reporting



3.3.4.1. Each park will prepare annual performance plans articulating annual goals for the upcoming fiscal year and annual performance reports describing the progress made in meeting the annual goals.

3.3.4.2. Annual performance plans will contain the following decision-making elements: (1) annual performance goals (the outcomes expected to be achieved that fiscal year), which are tiered from the park's long-term goals, (2) an annual work plan (inputs and outputs for the fiscal year) that breaks out park activities to achieve the annual goals and includes FTEs and budgets, and (3) linkages to budget formulation and executive budget documents (refer to the program standards for a detailed description of each element). Because they incorporate decisions made through other planning processes, annual plans do not require public involvement.

3.3.4.3. Annual performance reports will consist of two main parts: (1) a report on the progress made toward meeting the last fiscal year's annual performance plan, and an analysis of the present fiscal year's annual performance plan. The analysis will identify the continuing goals (carryovers) from the last fiscal year and discuss why the park did not accomplish one or more of its annual goals in the past fiscal year. The park annual performance report will relate to the servicewide annual performance report where applicable in order to aggregate park results at the servicewide level.

3.3.4.4. The development of the annual performance plan and report will be synchronized with NPS budget development. The annual performance report will specifically address park performance affected by budget change. Annual performance reports may also be used as the basis of personnel appraisals. Accountability for results should be within an employee's ability to affect results.

## 4.0. Roles, Responsibilities, and Funding

4.1. Park superintendents will be responsible for identifying planning needs, prioritizing planning work as part of unified priority setting for the park, and for securing funding. The superintendent and regional director will be accountable for accomplishing planning projects and for ensuring that they are consistent with all legal mandates, NPS management policy, generally accepted preservation standards and practices, and servicewide direction. The regional director will ensure that the general management plan is prepared in consultation with the associate directors and program managers in the Washington Office and will recommend further consultation with officials in the Department of the Interior on issues that may be of special interest to the secretary. Program managers in the headquarters office will be responsible for formulating and advising on NPS management policy and for managing servicewide program funds to support the planning and information needs of parks in ways that provide the most benefit for the national park system as a whole. The National Leadership Council will approve priorities for servicewide planning program funds. The national program centers and regional support offices will be responsible for completing assigned projects and for providing technical support and consulting services. Refer to table 1 for a complete listing of roles and responsibilities in NPS park planning.

4.2. Project agreements will be developed for each general management planning project and for complex implementation plans. Through these agreements the parties involved in the project, both the client and the provider of the product, will define and agree from the beginning on the scope of the planning project, the information requirements, the products and services to be produced, the roles and responsibilities for production, consultation, and review, and a project schedule, including major milestones. Project agreements will also include a cost estimate that specifies salary costs by contributing office and other costs for travel, contracts, and printing. The cost estimates will be subtotaled according to the major milestones to help determine if the project is starting to significantly exceed the cost estimate during any particular phase. Project agreements for general management plans will be recommended by the superintendent and the principal planning office(s), cleared for policy compliance by the program manager for park planning and special studies, and approved by the regional director. Project agreements for implementation plans will be agreements among the superintendent and the principal planning offices involved.

4.3. Park planning activities will be funded through a variety of sources. The key sources for each kind of planning are identified below:

- General management planning and analysis will be funded primarily through GMP project funds, although salaries of base-funded staff in regions, support offices, and parks are also expected to be a significant source of support for general management planning. GMP funds will not normally be used to collect basic inventory information about natural and cultural resources or visitor use.
- Planning data needs will be scoped in advance of an anticipated start-up to allow for the coordination with resource management and visitor service programs and the completion of an adequate database to support decision making.

- Park strategic planning and annual performance planning and reporting will be funded primarily out of the park operating base.

- Implementation planning will be undertaken using all appropriate and available NPS and non-NPS sources of funds, equipment, services, and personnel. Implementation planning generally will be funded through project funding available for the specific type of project addressed by the plan. If project funds are not available, other sources will be sought. Within the National Park Service this includes park base, regional base, challenge cost-share program, construction project planning, and the volunteers-in-parks program. Outside the National Park Service this includes collaborative projects with other federal agencies, state agencies, local governments, Indian tribes, scientific and educational institutions, and conservation and preservation organizations. Collaborative projects with partners might involve joint funding, sharing personnel and equipment, and providing services at little or no cost to the National Park Service.

4.4. Planning for imminent resource management, visitor services, or construction projects may overlap with general management planning, so long as decisions needed at the general management planning level precede and direct the more detailed decisions about projects and activities. However, only the GMP portion of this decision making will be funded through the GMP program. An exception may be granted for very small historic sites and monuments (a historic home, possibly with grounds, is a good example) if they have no major GMP issues and simple implementation planning needs (costing up to $25,000). For these parks the advantages to the National Park Service of completing implementation planning with GMP funds will be considered in computing the overall cost-effectiveness of the projects.

### Table 1: Roles and Responsibilities in NPS Park Planning

| | General Management Planning | GPRA Strategic Planning, Annual Performance Planning, and Annual Performance Reporting | Implementation Planning |
|---|---|---|---|
| Washington Office | blank space | blank space | blank space |
| Departmental and congressional liaison | Associate director for professional services serves as the principal liaison with the department and Congress on NPS planning projects. | blank space | blank space |
| Policy formulation and consultation | Program manager for park planning and special studies recommends GMP planning policy in coordination with other park planning programs and provides general program guidance.<br><br>Program manager for park planning and special studies advises on GMP project agreements for policy consistency.<br><br>Servicewide program managers advise on GMP draft documents as determined by the project agreement. | Director of strategic planning, in coordination with the GPRA task force, recommends GPRA planning policy in coordination with other park planning programs.<br><br>Director of strategic planning and GPRA task force consult with servicewide program managers on developing the NPS strategic plan, annual performance plan, and annual performance report.<br><br>National Leadership Council approves the servicewide mission statement, mission goals, long-term goals, and annual goals that will be used by the arks, programs, and central offices in | Various servicewide program managers recommend program-specific implementation planning policy in coordination with other park planning programs. |

|  |  | developing their strategic plans. |  |
|---|---|---|---|
| **Budget allocation** | Program manager for park planning and special studies manages the GMP planning program (maintains servicewide GMP priority system, recommends allocation of GMP program funds, approves major program changes, and evaluates accomplishments). Associate director for professional services approves annual GMP fund allocation.<br><br>National Leadership Council approves servicewide priority list and project estimates. | blank space | Various servicewide program managers allocate program-specific implementation planning funds to the field offices to accomplish servicewide program priorities. Funds may be allocated on a project-by-project basis or as discretionary funds to the regional director, depending on the funding source. |

|  | **General Management Planning** | **GPRA Strategic Planning, Annual Performance Planning, and Annual Performance Reporting** | **Implementation Planning** |
|---|---|---|---|
| **Regional Directors** | blank space | blank space | blank space |
| **Budget allocation** | Propose and advance major program changes to the Washington Office.<br><br>Allocate discretionary GMP funds. | Provide linkages from the annual performance plan to budget formulation. | Allocate discretionary implementation planning funds to the field. |
| **Plan approval (policy accountability)** | Approve GMP project agreements.<br><br>Approve GMPs, certifying (based on appropriate consultations) that they are consistent with legal requirements, policy, and national direction. | Approve park strategic plans. | blank space |
| **Park Managers** | blank space | blank space | blank space |
| **Plan initiation** | Define planning needs. | Define planning needs. | Define planning needs. |
| **Plan execution** | Actively participate in all GMP planning activities and assign staff as planning team members. | Actively participate in all park strategic planning activities and assign staff as planning team members. | Actively participate in all implementation planning activities and assign staff as planning team members. |
| **Plan approval (policy accountability)** | Recommend approval of GMP project agreements and GMPs, recommending (based on appropriate consultations) that they are consistent with legal requirements, policy, and national direction. | Recommend approval of park strategic plans. | Approve implementation plans. |
| **Support Offices** |  |  |  |

|  | blank space | blank space | blank space |
|---|---|---|---|
| **Plan Initiation** | Are engaged on a clusterwide basis to compile, concur in, and submit GMP priorities. | blank space | Are engaged on a clusterwide basis to compile, concur in, and submit plan priorities. |
| **Plan execution** | Prepare multiyear project agreements. Execute assigned program in accordance with approved project agreements. | blank space | Execute assigned program. |
| blank space | Provide team members and technical plan review as requested by parks. | Provide team members and technical plan review as requested by parks. | Provide team members and technical plan review as requested by parks. |
| **Denver Service Center** | blank space | blank space | blank space |
| **Plan execution** | Prepare multiyear GMP project agreements. Execute assigned program in accordance with approved project agreements. | blank space | Execute assigned program in accordance with approved project agreements. |

---------------- end of Director's Order ----------------