UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RECENT PAST PRESERVATION NETWORK, a Virginia non-profit corporation, P.O. Box 100505, Arlington, VA 22210; DION NEUTRA, 2440 Neutra Place, Los Angeles, CA 90039; and CHRISTINE MADRID FRENCH, 2422 Willard Drive, Charlottesville, VA 22903, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) | Case Number: 1:06-CV-02077-TFH |
| JOHN LATSCHAR, in his official capacity as Deck Type: Administrative Agency SUPERINTENDENT OF GETTYSBURG Review NATIONAL MILITARY PARK, 97 Taneytown Rd., Gettysburg, PA 17325 DENNIS REIDENBACH, in his official capacity as ACTING DIRECTOR, NORTHEAST REGION OF THE NATIONAL PARK SERVICE, 200 Chestnut Street, Philadelphia, PA 19106; MARY BOMAR,[1/] in her official capacity as DIRECTOR OF THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, DC 20240; DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; THE NATIONAL PARK SERVICE, 1849 C Street, N.W., Washington, D.C. 20240; and THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge: Thomas F. Hogan Deck Type: Administrative Agency Review |
| Defendants. | ) ) ) ) ) | |

**FEDERAL DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

---

[1/] Federal Defendants note that the correct name of the Director of the National Park Service is Mary Bomar, not Marie Bomar. Dennis Reidenbach is now the director of the Northeast Region.

**TABLE OF CONTENTS**

Page

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE PARK SERVICE COMPLIED WITH NEPA  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Plaintiffs' NEPA Claims Are Barred by the Statute of Limitations Because the
            ROD Was Approved More Than Six Years Prior to This Lawsuit . . . . . . . . . . . 2

      B.    The Park Service Conducted a NEPA Analysis and Took a "Hard Look" Prior to
            the Decision to Adopt an Alternative That Included Demolition of the Cyclorama
            Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    The Analysis of the 1995 EA and 1996 EA Were Incorporated By
                  Reference in the GMP/EIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            2.    The GMP/EIS Included An Analysis of Potential Impacts
                  of Demolition of the Cyclorama Building and the MOA Set
                  Forth the Appropriate Mitigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            3.    The Park Service Properly Considered Alternatives
                  to Demolition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            4.    Park Service Internal Guidance Documents Are Not Judicially
                  Enforceable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.   THE PARK SERVICE IS IN COMPLIED WITH THE NHPA  . . . . . . . . . . . . . . . . . . . 21

      A.    The Park Service Complied with Section 110(a)(1)  . . . . . . . . . . . . . . . . . . . . 21

      B.    The Park Service Complied with Section 110(a)(2)  . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLES OF AUTHORITIES

**FEDERAL CASES**

Page

Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.,
    462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Comm'n,
    449 F.2d 1109 (2nd Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

City of Angoon v. Hodel,
    803 F.2d 1016 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,
    1998 U.S. Dist. LEXIS 21441 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Coliseum Square Ass'n, Inc. v. Jackson,
    465 F.3d 215 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Dep't of Transp. v. Public Citizen,
    124 S. Ct. 2204 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ecology Ctr., Inc. v. Austin,
    430 F.3d 1057 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Envtl. Prot. Info. Ctr. v. Blackwell,
    389 F. Supp. 2d 1174 (N.D.Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Jackson Hole Conservation Alliance v. Babbitt,
    96 F. Supp. 2d 1288 (D.Wyo. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Jersey Heights Neighborhood Ass'n v. Glendening,
    174 F.3d 180 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Lee v. Thornburgh,
    877 F.2d 1053 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Natural Res. Def. Council v. Administrator,
    451 F. Supp. 1245 (D.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

Natural Res. Def. Council, Inc. v. U.S. Nuclear Reg. Comm'n,
    606 F.2d 1261 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Nat'l Trust for Historic Pres. v. Blanck,
    938 F. Supp. 2d 908 (D.D.C 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Nat'l Wildlife Fed'n, v U.S. E.P.A.,
    286 F.3d 554 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Oglala Sioux Tribe v. U.S. Army Corps of Engineers,
    537 F. Supp. 2d 161 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Pennaco Energy, Inc. v. U.S. Dep't of Interior,
    377 F.3d 1147 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rivers Unlimited v. U.S. Dep't of Transp.,
    533 F. Supp. 2d (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Salmon River Concerned Citizens v. Robertson,
    32 F.3d 1346 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Save Our Snowplanes v. Norton,
    2007 WL 1959177 (D.Wyo. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Stevens County v. U.S. Department of Interior,
    507 F. Supp. 2d 1127 (E.D. Was. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Town of Norfolk v. U.S. E.P.A.,
    761 F. Supp. 867 (D.Mass.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. v. 162.20 Acres of Land, More or Less, Situated in Clay County, State of Miss.,
    733 F. 2d 377 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

West Virginia Highlands Conservancy v. Johnson,
    – F. Supp. 2d – , 2008 WL 746995 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Wilderness Society v. Norton,
    434 F.3d 584 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

**FEDERAL STATUTES**

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3
5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 470h-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

**FEDERAL REGULATIONS**

36 C.F.R. § 800.5(a)2(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
40 C.F.R. § 1500.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 1502.9(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
40 C.F.R. § 1502.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8, 10
40 C.F.R. § 1506.6(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
40 C.F.R. § 1506.6(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
40 C.F.R. § 1506.10(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**FEDERAL REGISTER**

63 Fed. Reg. 20496 (April 24, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

This case involves an attempt by Plaintiffs to evade the jurisdictional bar set out in 28 U.S.C. § 2401(a) by ignoring the effect of the National Park Service's adoption of a general management plan ("GMP") for Gettysburg National Military Park.  The GMP restores the historic battle lines at Gettysburg, which, by the very nature of the undertaking, requires the demolition of the Cyclorama Building.  The building sits directly in Ziegler's Grove, the scene of the second and third days at the Battle of Gettysburg.  The decision to adopt the GMP was made in the Record of Decision ("ROD") in November 1999, under the National Environmental Policy Act ("NEPA").  Plaintiffs commenced their lawsuit in December 2006, more than seven years after the ROD was adopted.

Plaintiffs seek by necessity to downplay the significance of the most pressing issue in this case, namely that their claims are barred by the generous six year statute of limitations under 28 U.S.C. § 2401(a).  The simple fact is Plaintiffs knew that the Park Service had approved an alternative that included demolition of the Cyclorama Building in November 1999, and Plaintiffs failed to bring any of their claims of inadequacies under NEPA or the National Historic Preservation Act ("NHPA") for more than seven years.  Plaintiffs cannot avoid this jurisdictional bar by asserting their claims concern a failure to act.  The question is when they first had a right to resort to the Court to complain that the Park Service failed to sufficiently comply with NEPA or Section 110 of the NHPA prior to making the decision to restore the historic battle lines at Gettysburg.  Plaintiffs' response brief, laced with ad hominem attacks accusing the Park Service of duplicity and misrepresentations, cannot obscure the fact that Plaintiffs were clearly on notice that upon adoption of the ROD, the decision had been made with regard to the fate of the Cyclorama Building.

Further, regardless of the jurisdictional bar, as detailed below, the Park Service has fully complied with the requirements of NEPA and NHPA in its efforts to restore what is arguably the Civil War's most historic battlefield.  Therefore, this Court should grant the Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion.

## ARGUMENT

**I.    THE PARK SERVICE COMPLIED WITH NEPA**

**A.    Plaintiffs' NEPA Claims Are Barred by the Statute of Limitations Because the ROD Was Approved More Than Six Years Prior to This Lawsuit**

Although Plaintiffs attempt to ignore the jurisdictional bar presented by the statute of limitations by presuming for the first thirty pages of their brief that their case is timely, this is the paramount issue in the case. Plaintiffs are simply out of time to challenge the Park Service's decision to adopt an alternative for the GMP that included the demolition of the Cyclorama Building. In deciding an issue on the grounds of statute of limitations, the proper focus is on "first accru[al]," the 28 U.S.C. § 2401(a) condition of the waiver of sovereign immunity. See Federal Defendants' Memorandum in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("SJ Memo") at 13-16. (Doc. 30).

Here, the approval of the ROD in November 1999, was the final agency action under the Administrative Procedure Act, 5 U.S.C. § 701, et seq., approving the selection of an alternative that included demolition of the Cyclorama Building. It was at that point that the Park Service completed its decision-making process and Plaintiffs' cause of action first began to accrue. It was at that point that the clock began to run on a suit regarding the adequacy of the environmental and historic resource reviews and compliance with applicable laws. It was also at that point that the clock began to run on a suit to allege that no review ever took place prior to the decision to adopt an alternative that included the demolition of the Cyclorama Building. Plaintiffs had six years to bring such claims. However, they chose instead to commence this action on December 5, 2006, more than seven years after the ROD was approved and the decision was made to adopt an alternative that included demolition of the Cyclorama Building. See Complaint (Doc. 1).

Plaintiffs continue to attempt to make an end-run around the jurisdictional obstacle presented by the statute of limitations by claiming that the Park Service's failure to prepare a NEPA

analysis of the demolition of the Cyclorama Building is the final agency action that is at issue here. See Plaintiffs' Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment ("Pl. Resp.") at 30-35.[1] (Doc. 34). They further attempt to evade this bar by asserting, erroneously, that the relief requested is not the invalidation of the General Management Plan and Environmental Impact Statement, Gettysburg National Military Park ("GMP/EIS"), or the ROD. See id. at 31. However, their case squarely challenges the adequacy of the GMP/EIS, and Plaintiffs cannot by seeking to characterize their claims as "failure to act" in performing a proper NEPA analysis defer the commencement of the limitation period. Plaintiffs' cause of action "first accrues" when the decision, allegedly uninformed by the environmental consequences, is made, which in this case was the adoption of the ROD.[2] That is when Plaintiffs could first have sought redress in the courts. However, they did not. Rather, Plaintiffs attempt to re-create history to avoid the plain jurisdictional bar despite the patently clear administrative process that led to the decision to adopt an alternative that included demolition of the Cyclorama Building. Plaintiffs appear to resort to repeated ad hominem attacks because they cannot deny they were aware of and appreciated the impact of the decision to restore the Ziegler's Grove.

However, such attempts must fail, as they were given repeated notice of what the Park Service was contemplating if Alternative C was adopted. For example, in response to a letter

---

[1] Plaintiffs appear to have abandoned their argument in the alternative that the Park Service's decision to demolish the building without allegedly complying with NEPA was arbitrary and capricious under 5 U.S.C. § 706(2). See Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 22-23. (Doc. 28).

[2] Plaintiffs incorrectly allege that the Park Service, in citing to Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180 (4th Cir. 1999), was attempting to argue that the statute of limitations begins to run "from the time at which an agency contemplates action or the moment an interested member of the public grows concerned." See Pl. Resp. at 32. The Park Service has consistently stated that the statute of limitations in this case began to run upon adoption of the ROD. See SJ Memo at 14-21. This case was cited to in order to show that the adoption of the ROD triggered the statute of limitations here because at that point there was a final agency action and at that point the public, including Plaintiffs, was well aware of the import of that final agency action with regard to the Cyclorama Building. See SJ Memo at 15-16.

written by Mr. Neutra in March 1999, the Park Service stated prior to the issuance of the GMP/EIS and execution of the Memorandum of Agreement ("MOA") that it "is considering alternatives other than demolition for the Cyclorama Building....however, NPS has selected as its preferred proposal an alternative that demolished the Cyclorama Building because it believes that the accomplishment of the park's legislative purpose, and the overriding public interest, comes with the preservation of the Cyclorama Painting and with the restoration of the historic landscapes of the Battle of Gettysburg." AR 001527 (emphasis added); see AR 001574 (letter from Dion Neutra).

This response was contained in a document entitled, "Draft Responses to Comments, Revised Section 106 Case Report," dated April 19, 1999.[3] AR 001520-1532. This document was drafted to respond to comments, including from Mr. Neutra, on the February 18, 1999 Section 106 Case Report, Cyclorama Painting, The Battle of Gettysburg, Cyclorama Building, Gettysburg National Military Park ("Section 106 Report"). See SJ Memo at 9, 17; AR 001592-1609. Although this document was labeled "Draft," it was distributed and discussed during the April 20, 1999 Section 106 meeting, despite Plaintiffs' allegations to the contrary. See Pl. Resp. at 33-34. Indeed, as the Park Service explained in the GMP/EIS in direct response to comments made by plaintiff Christine Madrid French at a public hearing, the "[c]omments received from the interested parties [on the Section 106 Report] and NPS responses to those comments were discussed during the April 20, 1999 public consultation meeting." AR 001321 (emphasis added) . Ms. French (listed as Christine Madrid) also attended that meeting on behalf of herself and Mr. Neutra. AR 001517; 001515. Thus, at that point, Plaintiffs had been informed that the preferred alternative included demolition of the Cyclorama Building.

Further, Plaintiffs' argument that letters written by Mr. Neutra to the Park Service during the NEPA and NHPA review processes regarding plans to demolish the Cyclorama Building expressed

---

[3] This document was incorrectly listed in the SJ Memo as being issued on April 11, 1999.

nothing more than "concerns" regarding the Park Service's "contemplation" for the Cyclorama Building, see Pl. Resp. at 31-32, is flatly contradicted by Mr. Neutra's own words. As he proclaimed to the Park Service less than one month after the GMP/EIS was published, "the recent decision to destroy the Cyclorama Center is an outrage that will be charged to your administration if not rescinded." AR 000105 (emphasis added).[4] Finally, Plaintiffs do not attempt to dispute the numerous references in the record showing that preservation experts and other members of the public were fully aware that "removal" of the Cyclorama Building, as contemplated in the GMP/EIS and under the Section 106 review process, encompassed demolition.[5] Nor do they dispute that the record is replete with instances where the Park Service or others contrasted the proposed treatment of the Cyclorama Building, which would be "removed," with that of the Cyclorama Painting, which would be "relocated." See SJ Memo at 17-18.

Thus, there is no action unreasonably withheld or delayed by the Park Service. The final agency decision was made in the ROD to re-create the historic battle lines. The Park Service wishes to stress that every defect claimed by Plaintiffs regarding the NEPA and NHPA processes could have, and should have, been asserted within six years following the issuance of the ROD, as Plaintiffs were well aware that a decision has been made that included demolition of the Cyclorama Building. No matter how Plaintiffs attempt to frame their claims, this jurisdictional bar precludes them from adjudicating their challenge on the merits. See West Virginia Highlands

---

[4] Plaintiffs also do not dispute that reCyclorama, of which Ms. French is the Executive Director, stated on its website that the "Cyclorama Building is slated for demolition under the preferred alternative in the recently approved GMP..." See SJ Memo, Exhibit 1 at 1-2.

[5] Plaintiffs misunderstand the Park Service's discussion regarding the multiple newspaper articles discussing the planned demolition of the Cyclorama Building that were published following the adoption of the ROD. The Park Service never argued that these newspaper articles intended to serve as the required NEPA review or to serve as a proxy for a discussion of the scope of the review in the GMP/EIS, as Plaintiffs imply. See Pl. Resp. at 35. Rather, these articles were cited to show once again that Plaintiffs were well aware of the Park Service's plans during the relevant statute of limitations. See SJ Memo at 18-20.

Conservancy v. Johnson, – F. Supp. 2d – , 2008 WL 746995 at *9-14 (D.D.C. 2008).  On this basis

alone, the Court should grant the Federal Defendant's motion for summary judgment.

**B.     The Park Service Conducted a NEPA Analysis and Took a "Hard Look" Prior to the Decision to Adopt an Alternative That Included Demolition of the Cyclorama Building**

     **1.     The Analysis of the 1995 EA and 1996 EA Were Incorporated By Reference in the GMP/EIS**

     Plaintiffs' assertion that the GMP/EIS did not incorporate by reference the 1995 and 1996

EAs simply lacks merit.  See Pl. Resp. at 22-26.  Although NEPA seeks to further inform public

disclosure and to improve decision-making, the statute does not require bureaucratic makework.

See, e.g., 40 C.F.R. § 1500.1(c) ("NEPA's purpose is not to generate paperwork – even excellent

paperwork – but to foster excellent action.").   Rather, "[f]ederal regulations instruct agencies to

incorporate material into NEPA documents by reference when the effect will be to cut down on bulk

and avoid undue length without impeding agency or public review of the action." Save Our

Snowplanes v. Norton, 2007 WL 1959177 at *10 (D.Wyo. 2007), citing 40 C.F.R. § 1502.21 and 46

Fed.Reg. 18026, 18037 (Mar. 23, 1981) (Counsel on Environmental Quality's 40 most asked

questions). "Incorporation by reference is generally permitted so long as the incorporated material

is reasonably available, the statement is understandable without undue cross-reference, and the

incorporation by reference meets a general standard of reasonableness." Id., citing Baltimore Gas

and Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 100 n. 12 (1983).   Further, even

where an EIS does not precisely cite a document for incorporation in traditional form, if the

reference is "adequate to steer potentially interested persons toward the source document," the

agency has satisfied the requirements of 40 C.F.R. § 1502.21.  See Town of Norfolk v. U.S. E.P.A.,

761 F. Supp. 867, 879 (D.Mass.1991).  Here, the Park Service incorporated by reference the 1995

and 1996 EAs in the GMP/EIS in accordance with 40 C.F.R. § 1502.21, as discussed below.

     Plaintiffs attempt to make much of the fact that the EAs were part of the supplemental

administrative record.  See Pl. Resp. at 22-23.  They also, without any foundation, accuse the Park

Service of duplicity in preparing the administrative record.  Id. at 37-38.  The Park Service wishes to state in no uncertain terms that the accusations with regard to the assembly of the administrative record are false.  The Park Service carefully considered Plaintiffs' requests to include additional documents in the record, and this resulted in the inclusion of the 1995 and 1996 EAs and the public comment letters and the agency responses, as these documents rightly belong in the record because they were before the agency decision-maker at the time of the decision.  None of the other documents presented by Plaintiffs were included because they post-dated the ROD or were not considered by the agency decision-makers.

Plaintiffs also rely on City of Carmel-by-the-Sea v. U.S. Dep't of Trans., 1998 U.S. Dist. LEXIS 21441 (N.D. Cal. 1998) to press this point.  See Pl. Resp. at 23.  However, that case is easily distinguishable, as there the agency did not include in the record the documents supposedly incorporated by reference until six years after the lawsuit was filed, and following at least one round of summary judgment and appeal.  1998 U.S. Dist. LEXIS 21441 at *3-4, 10-11.  The court also found that the agencies did not rely on those documents during the  administrative process in responding to comments by the public.  Id. at *10-11.  Here, in contrast, the documents were included in the record well in advance of the cross-motions for summary judgment, see Doc. 26, and the Park Service cited to the 1995 and 1996 EAs and their public processes multiple times in the draft GMP/EIS and in response to public comments in the final GMP/EIS regarding enhancement of the visitor experience, as well as in the ROD.

Specifically, as the draft GMP/EIS put out for public review and comment made clear on the second page, the 1995 and 1996 EAs were incorporated as an element of the GMP:

Concurrent with the GMP planning process, NPS has identified needs for its primary Visitor Center.  Starting in 1995, NPS prepared a Draft Development Concept Plan/Environmental Assessment (DCP) to explore alternatives for the center.  The DCP included four alternative concepts for the new facilities.  NPS held a series of workshops, focus group meetings and community presentations to understand public concerns, write goals for the facility and set the selection criteria.  After considering public involvement on the DCP, NPS issued a Request for Proposals,

7

> Visitor Center and Museum Facilities, Gettysburg National Military Park (RFP). As a result of the RFP, NPS selected a private-sector partner with whom it is negotiating. <u>Based on the public input received on the DCP, during the GMP planning process and other public comment, NPS determined that it was desirable to incorporate the issue of visitor use and interpretation of the visitor center as an element of this GMP.</u> The proposed visitor center facility is subject to further revision through NPS' planning process. If the planning process does not result in an acceptable proposal, the proposed visitor center facility will not go forward.

AR 001953 (emphasis added); <u>see also</u> AR 002001.

In Chapter 5 of the draft GMP/EIS, the Park Service also noted that it had published a notice of termination for the 1995 and 1996 EAs and that those issues would be incorporated into the GMP/EIS. AR 002269. As the Park Service explained, it does not appear that the notice, which was sent for publication by the Park Service, AR 002311-12, was ever published in the Federal Register. SJ Memo at 7. However, in addition to informing the public at meetings and in a newswletter, AR 000646, this information appeared in the draft GMP/EIS. AR 002269, 002001, 001953. Thus, the public was informed of the incorporation of the EAs into the GMP/EIS.

The draft GMP/EIS further informed the public about the relationship of the GMP/EIS to other plans and processes, including the Collection Storage, Museum and Visitor Center DCP and RFP, stating that between August 1995 and April 1996, NPS prepared the DCP to explore alternatives for the visitor center. AR 001999. In accordance with 40 C.F.R. § 1502.21, a summary of the four alternative concepts evaluated was provided, as follows:

> [A] no action alternative; building a collections and archival storage facility and leaving the Cyclorama and Visitor Centers as they are; renovating the existing visitor center in place and building a new Cyclorama Center; and building a new combined facility incorporating all of these uses. The DCP proposed a cooperative development of a new visitor center and museum facility to house the park's visitor center, museum, cyclorama painting, collection storage, library, archives, research rooms, bookstore and associated office space. <u>This included the removal of the existing visitor and cyclorama centers and the rehabilitation of their sites to reflect the setting of the historic battlefield.</u> As part of the development of this plan, NPS held a series of workshops, focus group meetings, and community presentations to understand public concerns, recalls for the facility, and develop criteria for judging proposals and sites.

AR 001999-2000 (emphasis added); <u>see also</u> AR 001605-1606 (Section 106 Report).

The draft GMP/EIS also set out in Chapter 5, "Consultation and Coordination," the public

involvement and agency consultation that took place as part of the development of the 1995 and 1996 EAs, including consultation with ACHP, SHPO and other agencies, as well as multiple public meetings. AR 002269-2272. There would have been no reason to include this information in the GMP/EIS if the Park Service had not intended to incorporate by reference the 1995 and 1996 EAs and their accompanying consultation and public involvement.

The final GMP/EIS contained much of the same language and information, including the four-page long list of consultation and public involvement for the 1995 and 1996 EAs. See AR 000122; 000170-171; 000457-460; see also SJ Memo at 28-30. Merely because the Park Service also repeated much of this information in response to public comments, as well as in the ROD, see, e.g., AR 000638-639, 000016-17, does not mean that this information was not available during the public comment period on the draft GMP/EIS, as Plaintiffs appear to contend. See Pl. Resp. at 25. Additionally, the NEPA regulations require that an agency wait at least 30 days following the publication of the notice of availability of a FEIS before adopting a ROD. See 40 C.F.R. § 1506.10(b)(2). Here, the Park Service indicated in their notice that there would be a no action period of 30 days, and further, waited almost six months before adopting the ROD. See AR 000108-000110 , 000014-30. A notice of availability of an EIS is intended to inform those persons or agencies who may be interested or affected. 40 C.F.R. § 1506.6(b). Thus, the public, including Plaintiffs, also had the time period prior to adoption of the ROD to consider this information and provide comments on the final GMP/EIS.

Plaintiffs' attempt to draw a distinction between the availability of documents during the public comment periods for the 1996 EA and the GMP/EIS, see Pl. Resp. at 24 (Plaintiffs mistakenly refer to the 1995 EA), is contradicted by the documents themselves. The 1996 EA provided a list of resources available to the public. AR 003353. The GMP/EIS similarly provided a list of references used in preparing the GMP/EIS, which included both the 1995 and 1996 EAs. AR 0022890; see also AR 000473. The NEPA regulations require that an agency make available

9

to the public any underlying documents pursuant to the provisions of the Freedom of Information Act ("FOIA"). <u>See</u> 40 C.F.R. § 1506.6(f). Thus, Plaintiffs are simply incorrect in their assertion that the record contains no evidence of the availability of the 1995 and 1996 EAs during the GMP/EIS process.[9]

Plaintiffs' attempt to distinguish this case from <u>Envtl. Prot. Info. Ctr. v. Blackwell</u>, 389 F. Supp. 2d 1174 (N.D.Cal. 2004) ("<u>EPIC</u>") is unavailing. <u>See</u> Pl. Resp. at 24, n. 14.  The district court in <u>EPIC</u> did not find, as Plaintiffs contend, that the plaintiffs were not prejudiced by the alleged omission of a discussion of certain wildlife reports in an environmental review because they had received the reports through FOIA requests.  Rather, the court found that there was no real likelihood of prejudice because the FOIA requests demonstrated the availability of such reports to the public.  <u>See</u> 389 F. Supp. 2d at 1204, citing 40 C.F.R. § 1506.6(f).  While Plaintiffs never made a FOIA request with regard to the 1995 and 1996 EAs, they could have.  Plaintiffs were clearly aware of the existence of the 1995 EA and the RFP put out in 1996, which was based on the 1996 EA, as evidenced by their Complaint.  <u>See</u> Complaint ¶ 36; <u>see also</u> Pl. Resp. at 23, n. 13.  Thus, Plaintiffs' Complaint, much as the FOIA requests in <u>EPIC</u>, demonstrate the availability of such documents to the public, and the simple fact that Plaintiffs did not make such a FOIA request does not provide grounds for distinguishing this case from <u>EPIC</u>, as Plaintiffs contend.

As demonstrated above, the Park Service properly incorporated the 1995 and 1996 EAs into the GMP/EIS.  The Park Service provided a reasonable summary of the EAs and the alternatives evaluated, and made abundantly clear that the analysis were incorporated into the GMP/EIS.  The 1995 and 1996 EAs were also made reasonably available to the public.  Therefore, this Court should find that the Park Service complied with the requirements of 40 C.F.R. § 1502.21 with regard

---

[9] Further, if anyone had requested a copy of the 1995 or 1996 EAs outside of the FIOA process, they would have been directed to the Adams County Public Library, which had been provided with copies to be made available for public review, or the Park Service offices at Gettysburg. <u>See</u> Reply Declaration of John Latschar, ¶ 3, attached hereto as Exhibit 4.

to the 1995 and 1996 EAs.

**2.      The GMP/EIS Included An Analysis of Potential Impacts of Demolition of the Cyclorama Building and the MOA Set Forth the Appropriate Mitigation**

The Park Service has never suggested that a programmatic document "obviates the need for an implementation-level analysis," as Plaintiffs contend. See Pl. Resp. at 5. Rather, the Park Service has plainly stated that where, as here, an agency has analyzed the impacts of implementing a particular action in a programmatic EIS, the agency is not required to subsequently undertake additional site or project specific review prior to undertaking the action. See SJ Memo at 24-26, citing Pennaco Energy, Inc. v.  U. S. Dep't of Interior, 377 F.3d 1147, 1151 (10th Cir. 2004); Salmon River Concerned Citizens v.  Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994); U.S. v.  162.20 Acres of Land, More Or Less, Situated in Clay County, State of Miss. 733 F. 2d 377, 381 (5th Cir. 1984); Stevens County v. U.S. Department of Interior, 507 F. Supp. 2d 1127, 1135-36 (E.D. Was. 2007).  As the Fifth Circuit held  in 162.20 Acres of Land, More Or Less, a "site-specific impact statement is not necessary...if the programmatic impact statement contains all the analysis required by Section 102(2)(C) of NEPA."  733 F.2d at 381, citing Natural Res. Def. Council v. Administrator, 451 F. Supp. 1245, 1259 (D.D.C. 1978), aff'd Natural Res. Def. Council, Inc. v. U.S. Nuclear Reg. Comm'n, 606 F.2d 1261, 1271-72 (D.C. Cir. 1979) ("NRDC") (finding where discussion in a programmatic document was sufficient, additional environmental analysis was not required).  Here, the GMP/EIS contained an analysis of the impacts of demolition of the Cyclorama Building, and therefore, no additional NEPA review is necessary.

Specifically, the environmental review of action alternatives that included demolition of the Cyclorama Building began in 1995 with the issuance of the 1995 EA, which analyzed impacts of a development concept plan to address visitor use, resource protection and park development issues of constructing a new museum and theater.  AR 003057-3124; SJ Memo at 26-27.  The EA examined the impacts the action alternatives, which included removal of the Cyclorama Building.

AR 003061, 003083, 003087.  In 1996, the Park Service issued a second EA to respond to comments on the 1995 EA and to suggest strategies for finding suitable partners to help the Park Service fund, build and operate those facilities.  AR 003244-45; 003252.  Once again, the 1996 EA examined the environmental consequences of the various alternatives on the Cyclorama Building, which was proposed for removal from Ziegler's Grove.  See AR 003241-43; SJ Memo at 27-28.

In August 1998, the Park Service issued the draft GMP/EIS, which was intended to review the environmental impacts of the proposed general management plan for the park.  Congress established the park in 1895 to preserve the "important topographical features of the battlefield" and to preserve and mark the 1863 battlefield positions.  AR 001973.  In keeping with this legislative mandate, the Park Service identified those battlefield landscape features that were significant to the outcome of the battle, including Ziegler's Grove.  AR 001953-1954.  Therefore, the GMP/EIS analyzed the impacts of removing the Cyclorama Building.

As discussed above, the GMP/EIS incorporated by reference the 1995 and 1996 EAs, which analyzed the impacts of demolishing the Cyclorama Building.  In addition, the GMP/EIS also discusses the impact of removal of the Cyclorama Building from Ziegler's Grove.[7]  The GMP/EIS found that removal of the building would allow for the restoration and rehabilitation of the historic battlefield and significantly improve its historic setting, as well as allow for some minor benefits to natural resources.  AR 000386-387, 000401; see also 000024-26 (ROD).[8]  While the GMP/EIS

---

[7] Plaintiffs once again attempt to rely on Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215 (5th Cir. 2006), to argue that the Park Service's review of demolition impacts was inadequate.  Pl. Resp. at 13.  The Park Service does not dispute that it was required to perform an analysis of the impacts of demolition under NEPA.  However, as the Park Service explained, Coliseum Square did not involve a challenge to the review of the proposed demolition of a housing revitalization project, as Plaintiffs contended, see Pl. Mem. at 26, but rather concerned a challenge to the analysis of the construction and operation of the project.  See SJ Memo at 34, n. 20 (explaining that demolition had largely been completed when the suit was commenced).

[8] The reference in the ROD to the restoration of 38 acres of meadows, orchard and woodlands is correct, despite Plaintiffs' contention to the contrary.  See Pl. Mem. at 15-16.  It is the result of the removal of the old Visitor Center and Cylcorama Building, which accounts for 22 acres, as

does not use the term "demolition," as discussed above, it is clear that the public, including Plaintiffs, understood that "removal" encompassed "demolition." The GMP/EIS also explained that contemporaneous consultation under Section 106 of the NHPA was taking place to develop appropriate mitigation for adverse impacts to the Cyclorama Building. AR 000387. This review process culminated in the execution of the MOA, which was intended to mitigate adverse effects on the Cyclorama Building.[9] If the Park Service had intended to undertake additional site-specific review for demolition of the Cyclorama Building following completion of the GMP/EIS, there would be no need in 1999 to complete the Section 106 process and set out mitigation for demolition of the building. Likewise, while the Park Service committed in the GMP/EIS to consult with ACHP and SHPO "to develop appropriate mitigation policies with regard to the removal of the Cyclorama [Building]," AR 000456, (which was done in the MOA), there is specifically no mention of the need for any further NEPA review. Further, the MOA, which was executed prior to adoption of the ROD, makes no mention of the possibility of moving the building to another location. If that had been an alternative under consideration, the MOA would have likely contained mitigation related to the proposed relocation, which is considered an "adverse effect" under ACHP's regulations. See 36 C.F.R. § 800.5(a)(2)(iii). For example, the MOA would have likely included a stipulation to consult further regarding such things as appropriate landscape plans for the proposed new location or the standards to be employed while moving the historic building.

The Park Service does not contend that the GMP/EIS provides a project specific review for

---

well as to the planned removal of picnic areas, mowed lawn, amphitheater and youth campgrounds. AR002215-2216; AR000388. The Park Service has consistently identified the removal of the Cyclorama Building and Visitor Center as a joint undertaking. AR002052.

[9] The Park Service did not assert, as Plaintiffs contend, that a letter and report from ACHP regarding the proposed demolition of the Cyclorama Building "provide an implementation level analysis of the demolition of the Cyclorama Center." See Pl. Resp. at 12. Rather, they provide further support for the Park Service's decision to adopt an alternative that include demolition of the building to restore the historic nature of Ziegler's Grove. See SJ Memo at 31, n. 17.

every action contemplated in the GMP/EIS, as Plaintiffs suggest. See Pl. Resp. at 16-17. While the GMP/EIS contains the necessary review to approve demolition of the Cyclorama Building, it did not for the National Tower, which, at the time of the GMP/EIS, was a privately owned building. See SJ Memo at 33, n. 19. Thus, the Park Service undertook a site specific review for the National Tower subsequently to the GMP/EIS.[19] This review contains the same type of information as is contained in the 1995 and 1996 EAs and the GMP/EIS with regard to the Cyclorama Building. For example, the Park Service considered for both buildings their potential historic nature, impacts on the visitor's experience, impacts on the historic battlefields, impacts on natural resources, and the presence of hazardous materials. See, e.g., AR 003104-3113 (1995 EA); 003304-3305, 003331-3345 (1996 EA); 000386-387, 000401 (GMP/EIS); Adams Decl., Ex. I at 10-12 (Tower EA). Despite Plaintiffs' suggestion to the contrary, it would not have made sense for the Park Service to expend agency resources on a costly and time consuming environmental review for demolition of a building prior to at least the commencement of condemnation proceedings. See Pl. Resp. at 18. Thus, Plaintiffs' contention that the Tower EA somehow shows that the GMP/EIS did not contain a site-specific analysis for demolition of the Cyclorama Building should be disregarded.

Plaintiffs once again attempt to make much of cost estimates provided in the GMP/EIS. See Pl. Resp. at 19-22. However, they once again simply get it wrong. The GMP/EIS contains three categories of project cost estimates in Appendix 11. SJ Memo at 32. The one that is germane to the Cyclorama Building is project costs assumed by partners on behalf of the Park Service, which totaled, at the time, $39 million.[11] AR 000485-87. As the Park Service explained, this is because

---

[19] The Park Service continues to oppose Plaintiffs' motion to consider this EA. See Doc. 31.

[11] Plaintiffs also point to a recent interview with Superintendent John Latschar, which they assert somehow shows that the GMP/EIS did not review the impacts of demolition of the building. See Pl. Resp. at 20-21. However, as Mr. Latschar explains, first, fund raising goals cover several types of costs, including "project costs." See Latschar Decl., ¶ 7. Project costs are the costs which were identified in the GMP/EIS in Appendix 11. Second, his statement in the Gettysburg Times that "When we moved to $125 (million), now, we're also talking about the

under the Letter of Intent between the Park Service and the Gettysburg National Battlefield Museum Foundation, the Foundation assumed responsibility for both removing the Cyclorama Building and rehabilitating Ziegler's Grove.[12]  AR 000495.  Despite Plaintiffs' assertions to the contrary, this letter cannot be read to say that the Park Service intended to abdicate its responsibility to undertake a NEPA review of the demolition of the building or that the Park Service intended this letter to serve as that review.  Nor has the Park Service ever suggested such a thing.

More importantly, Plaintiffs' assertion that the Park Service would need to perform additional NEPA review after the GMP/EIS finds no support in the Letter of Intent.  While it stated that the Park Services was responsible for providing the Foundation with "plans, drawings and specifications for the restoration of the historic landscapes of Ziegler's Grove," and that the Foundation would "develop a complete set of design plans and construction documents for development of the [new museum and visitor's center], and removal of existing facilities," AR 000495, this in no way could be read to construe that the Park Service would be required to undertake additional NEPA review following the GMP/EIS.  See Pl. Resp. at 21-22.  First, the letter, which was written before the draft GMP/EIS was published, makes no mention of the GMP/EIS process. Second, NEPA contemplates that an agency will study potential impacts prior to implementation, and subsequent development of "plans and specifications" consistent with that review does not trigger additional review, unless those plans somehow reveal new effects not previously considered.  See 40 C.F.R. § 1502.9(c). Plaintiffs do not identify any such effects not already given a hard look. Further, detailed plans are

---

costs of taking down the old visitor center and Cyclorama buildings..." can only be understood in context of the reporter's previous five questions about the size, scale, and cost increases for construction of the new museum and visitor center.  The "now" in his response did not refer to a change in what the $125 million would "now" cover.  Rather, it was meant to call the reporter's attention to a fact that he might have been overlooking, as in "now *don't forget*, the $125 million also covers the cost to take down the old visitor center and Cyclorama buildings."  See id., ¶ 9.

[12] Plaintiffs' assertion that the Park Service failed to identify the partnership between the Park Service and the Foundation, see Pl. Resp. at 19, is puzzling, as they cite to the very page where the Park Service did just that.  See SJ Memo at 32.

normally developed after the ROD, as committing financial resources that would implement the decision prior to undertaking a NEPA review could be construed as impermissible prejudgment in violation of NEPA.

In November 1999, the Park Service announced that Alternative C, which included removal of the building, would be implemented.  AR 000018.  The ROD stated that the selected action "best protects, preserves and enhances the historic, cultural and natural resources at Gettysburg NMP," by allowing the Park Service to preserve and rehabilitate the resources considered significant to the outcome of the battle, to protect the Cyclorama Painting, collections and archives.  The selected action also allows the Park Service "fully to meet the requirements of Gettysburg NMP's legislation at the least cost the environment, park visitors and the Federal budget."  AR 000024.

### 3.    The Park Service Properly Considered Alternatives to Demolition

The selection of alternatives in an EIS is governed by a rule of reason and is reviewed with considerable deference.  See Rivers Unlimited v. U.S. Dep't of Transp., 533 F. Supp. 2d 1 (D.D.C. 2008).   The Park Service examined a reasonable range of alternatives and was not arbitrary or capricious for not having examined every conceivable or feasible alternative with regard to the Cyclorama Building as part of its analysis of the GMP.[13]   See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 551 (1978) (a "detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man").

Plaintiffs assert that the Park Service was "cynical and misleading" in arguing that Plaintiffs could not challenge the alternative analysis, because, Plaintiffs assert, they suggested the Park

---

[13] Plaintiffs' citation to Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109 (2nd Cir. 1971), see Pl. Resp. at 36-37, to argue otherwise should be disregarded, as the cited portion concerned a challenge to NEPA rules promulgated by an agency to govern hearings for challenges to decision by the agency's staff, rather than a challenge regarding an agency's obligation to consider alternatives under the NEPA review process.  See 449 F.2d at 1117-1119.

Service relocate the building in letters written in 2005 and 2006. See Pl. Resp. at 37-38. However, this "suggestion" came years after the ROD was adopted. Plaintiffs did not see fit at any point during the NEPA or NHPA review processes to suggest that the Park Service also evaluate the alternative of relocating the building. Nor do Plaintiffs point to any evidence in the record that this alternative was suggested by any other member of the public. Rather, Plaintiffs' comments centered around their desire that the Park Service not demolish the building. See, e.g., AR 000105, 001515, 001574, 001630 (comments by Mr. Neutra); AR 001321-23, 002325 (comments by Ms. Madrid). Thus, Plaintiffs are barred from raising this issue in litigation, more than seven years after the decision had been made. See Dep't of Transp. v. Public Citizen, 124 S. Ct. 2204, 2214 (2004) (finding respondent had "forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to a proposed action" where they failed to identify additional alternatives the agency should have considered); Nat'l Wildlife Fed'n, v U.S. E.P.A., 286 F.3d 554,562 (D.C. Cir. 2002) ("[i]t is well established that issues not raised in comments before the agency are waived and this Court will not consider them").[14]

Plaintiffs also rely on three inadmissible declarations based on a visit to the Cyclorama Building that took place less than a week prior to Plaintiffs' motion for summary judgment, which assert that the building could be relocated.[15] See Latschar Decl., ¶ 10. Aside from being extra-

---

[14] Plaintiffs reliance on NRDC, 606 F.2d at 1270-71, see Pl. Resp. at 37, to support their argument that they were not required to submit their public comments during the GMP/EIS review process is misplaced. That is because here the Park Service undertook the site specific analysis for demolition of the building in the GMP/EIS, an approach the D.C. Circuit found an agency may, in its discretion, take. See NRDC, 606 F.2d at 1271-72. As Plaintiffs were on notice of this and failed to suggest the alternative of relocation, they waived their right to raise this issue in litigation. Further, the Park Service did not mischaracterize Plaintiffs' position with regard to this case in the SJ Memo. See Pl. Resp. at 35-36, n. 27.

[15] As the Park Service explained in its opposition to Plaintiffs' motion to augment the record, these declarations should properly be disregarded by the Court as extra-record evidence. See Doc. 31. Nor are these declarations, or the other declarations submitted by Plaintiffs, the types of documents that are properly judicially noticed, as they do not provide an accurate and ready determination from sources whose accuracy cannot reasonably be questioned. See Fed R.

record evidence, the declarations do not bother to name the locations to which the building could be moved. They fail to provide anything more than a cursory estimate of partial costs associated with relocation.  Nor do they specify who would be responsible for the cost of relocation, who would assume ownership of the building if it were removed from the park, who would be responsible for its upkeep, or for what purpose the building would be used once relocated.  Simply because Plaintiffs' "experts" assert more than eight years after the fact that relocation is feasible does not make it so.  In sum, Plaintiffs have not presented a "specific, detailed []proposal that ha[s] a chance of success."  See City of Angoon v. Hodel, 803 F.2d 1016, 1022 (9th Cir. 1986).

The Park Service acted reasonably in presenting four alternatives for solving facility concerns in the 1996 EA, which included the possibility of demolition of the Cyclorama Building. AR 003241; 000638-639. The public was given the opportunity to comment on those alternatives, and likewise the public was able to comment on the alternatives presented in the draft GMP/EIS. AR 001999-2000.  Plaintiffs had every opportunity to participate in this process, as well as in the Section 106 review process for the Cyclorama Building, where alternatives to demolition were also explored.  During these reviews, the Park Service considered multiple possibilities with regard to the treatment of the Cyclorama Building, including taking no action, demolition, continued use of the building and adaptive reuse of the building.  See, e.g., AR  000157; 000210-215; 00022-224; 000231; 000233-234; 000256-257; 000264-265; 001605-1607; 003277-96.  However, as the Park Service made clear in response to comments by Mr. Neutra on the Section 106 Case Report, while it was considering a number of alternatives, "NPS has selected as its preferred proposal an alternative that demolished the Cyclorama Building because it believes that the accomplishment of the park's legislative purpose, and the overriding public interest, comes with the preservation of

---

Evid. 201. Rather, they are impermissibly attempts to provide comments by so-called "experts" regarding a course of action Plaintiffs wish the Park Service to take or to introduce documents sent to the Park Service often years after the ROD was adopted or that were not considered by the decision-makers.

the Cyclorama Painting and with the restoration of the historic landscapes of the Battle of Gettysburg." AR 0001527.

Once again, the question is whether the public was on notice that the agency was evaluating alternatives to demolition to the Cyclorama Building. They were, and, given the park's mission, the range of alternatives considered by the Park Service, as well as the decision to ultimately adopt an alternative that included demolition, was not arbitrary or capricious.

### 4.    Park Service Internal Guidance Documents Are Not Judicially Enforceable

Plaintiffs continue to argue, erroneously, that the Park Service violated Director's Order 2 and Director's Order 12. See Pl. Resp. at 26-30. As an initial matter, Plaintiffs' continued reliance on Director's Order 12 is misplaced, as it was not in effect until January 8, 2001, more than a year after the decision was made to adopt an alternative that included demolition of the Cyclorama Building. SJ Memo at 21, n. 8. Thus, it was NPS 12 that was in effect at the time of the GMP/EIS and ROD. Indeed, as the GMP/EIS explicitly states, its "analysis was conducted in accordance with...NPS 12," which "provide[s] general guidance for compliance with the various laws," including NEPA. AR 000358. Therefore, Plaintiffs' argument with regard to Director's Order 12 must properly be disregarded by the Court.[19] Plaintiffs do not attempt to argue that NPS 12 is judicially enforceable, nor can they. See Jackson Hole Conservation Alliance v. Babbitt, 96 F. Supp. 2d 1288, 1297 (D.Wyo. 2000) (finding NPS 2 and NPS 12 are not judicially enforceable). Nor do Plaintiffs allege that the Park Service violated NPS 12.

Plaintiffs are insistent that they are not using Director's Order 2 to invalidate the GMP/EIS,

---

[19] Plaintiffs' arguments as to why Director's Order 12 should be applied are simply not persuasive. First, as discussed above, Plaintiffs misunderstand the Park Service's discussion of the Letter of Intent. See Pl. Resp. at 28-29. Second, Plaintiffs fail to explain how the fact that the Park Service retains ongoing discretion to determine whether a particular action is covered in the GMP/EIS, provides any support for their contention that Director's Order 12 applies here. See Pl. Resp. at 28. Rather, as the Park Service has repeated stated, the analysis in the GMP/EIS, which incorporated the 1995 and 1996 EAs, analyzed the demolition of the building, and that decision was made in 1999, prior to the effective date of Director's Order 12.

or that they are even attempting to enforce what they acknowledge is an "informal guidance document." See Pl. Resp. at 27. Yet they continually undercut their disavowances by making such statements as under Director's Order 2, "the agency could not properly rely on the [GMP/EIS] to authorize demolition of the Cyclorama Center." See id. Indeed, the very heading in Plaintiffs' brief, "Director's Order 2 and Director's Order 12 Handbook Further Establish That the Park Service Violated NEPA," see Pl. Resp. at 26, demonstrates that Plaintiffs are indeed attempting to enforce these internal guidance documents against the Park Service.  However, as the district court held in Jackson Hole, NPS-2, the direct predecessor to Director's Order 2, and NPS-12, which was in effect at the time the GMP/EIS,  "afford no rights," and "any deviation from the dictates of NPS-2 or NPS-12 would not, in and of itself, constitute arbitrary or capricious action."  96 F. Supp. 2d at 1297 (citations omitted).  See SJ Memo at 21-24.[17]

Plaintiffs dismiss out of hand Jackson Hole Conservancy and other cases cited by the Park Service, which are either directly on point or at the very least address similar Park Service guidance documents.  See Pl. Resp. at 28, n. 20.  Yet the only support Plaintiffs provide for their contention that Director's Order 2 is enforceable concerns generalized pronouncements about language.  See id. at 28.  Plaintiffs also argue that because the requirements of Director's Order 2 ultimately flow from a congressional directive, it is binding, citing Wilderness Society v. Norton, 434 F.3d 584, 596-97  (D.C. Cir. 2006).  However, Plaintiffs fail to specify the congressional directive to which they are

---

[17] Further, Plaintiffs' reliance on Ecology Ctr., Inc. v. Austin, 430 F.3d 1057 (9th Cir. 2005), to argue that the Park Service could not rely on the GMP/EIS to authorize demolition of the Cyclorama Building is wrong.  See Pl. Resp. at 27.  The court in that case was concerned because the agency claimed that it had developed a project in compliance with a soil quality standard, which the agency discussed as if it was binding, and compliance with that standard was the only way the agency could show compliance with the substantive mandates of the National Forest Management Act.  430 F.3d at 1069-70.  In contrast, here, Director's Order 2 provides general guidance with regard to park planning, including compliance with NEPA, a procedural statue.  See http://www.nps.gov/policy/DOrders/DOrder12.html; AR 000358 (stating that Director's Order 2 "provide[s] general guidance for compliance with various laws," including NEPA).  More importantly, it is perfectly permissible under NEPA for an agency to undertake a site specific review in a programmatic document, as discussed above.  See SJ Memo at 24-26.

referring.  Further, in Wilderness Society, the D.C. Circuit directly spoke to the issue of the Park Service's 2001 Management Policies, which are the primary source of Park Service policy,[19] finding them not to be judicially enforceable.   See SJ Memo at 22-23.  It is therefore odd that Plaintiffs would attempt to rely on this case to show that Director's Order 2, which is the next level down of guidance documents, is somehow legally binding against the Park Service.  See Pl. Resp. at 28

Further, Plaintiffs' rather narrow reading of Director's Order 2 misses the mark.  There is nothing in the language of Director's Order 2 at Section 3.3.1.2 that could be read to say that the Park Service is not permitted to undertake a site-specific analysis at the same time it engages in an analysis for a GMP. See http://www.nps.gov/refdesk/DOrders/DOrder2.html.  Rather, it provides only that detailed, site-specific analysis of alternatives must be undertaken prior to a federal action. Here, that site-specific analysis occurred in the 1995 and 1996 EAs and the GMP/EIS, as well as through the Section 106 review.  Again, Plaintiffs appear to argue that unless that analysis was done in a separate document, it could not be valid.  See Pl. Resp. at 26-30.  However, as discussed above, NEPA requires no such thing, instead requiring only that the analysis take place prior to undertaking an action.  See also SJ Memo at 24-26. Thus, even if the Court were to find Director's Order 2 to be judicially enforceable, the Park Service complied with both it and NEPA.

For the above reasons, this Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment on Plaintiffs' NEPA claims.

## II.    THE PARK SERVICE COMPLIED WITH THE NHPA

### A.    The Park Service Complied with Section 110(a)(1)

In Nat'l Trust for Historic Pres. v. Blanck, 938 F. Supp. 2d 908 (D.D.C 1996), aff'd 203 F.3d 53 (D.C. Cir. 1999), the district court stated that "Section 110 of the NHPA was [originally] added to the NHPA in 1980 to 'clarif[y] and codif[y] the minimum responsibilities expected of Federal

---

[19] See SJ Memo.at 22, n.10, citing http://www.nps.gov/policy/DOrders/DOrder12.html.

agencies in carrying out the purposes of th[e] Act.' Although the language of the section is broad, it was not 'intended to change the preservation responsibilities of Federal agencies as required by any other laws, executive orders or regulations....'" 938 F.Supp.at 916, quoting Lee v. Thornburgh, 877 F.2d 1053, 1057 (D.C. Cir. 1989). The court also stated that "Section 110 is to be read in conjunction with Section 106 which constitutes the main thrust of the NHPA," and "embod[ies] the requirement that agencies thoroughly consider preservationist goals in all aspects of decisionmaking." See Blanck, 938 F. Supp. at 925. On March 15, 2008, a District of Columbia district court issued a decision affirming the holding in Blanck. In Oglala Sioux Tribe v. U.S. Army Corps of Engineers, 537 F. Supp. 2d 161, 173 (D.D.C. 2008), the court, in granting summary judgment to the agency, stated once again that Section 110 "only requires an agency 'to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process and with its own Historic Preservation Plan.'" Id., quoting Blanck, 938 F. Supp. at 925. Here, the Park Service has done just that.

Originally, Plaintiffs argued that the Park Service had violated Section 110(a)(1) both by failing to "properly use and preserve" the Cyclorama Building, and by failing to properly evaluate "maximum feasible use" of the building. See Pl. Mem. at 41-42. Plaintiffs failed to cite a single case in support of their allegations. As the Park Service amply demonstrated, however, Section 110 does not mandate the preservation of buildings. See SJ Memo at 36-38. In their response, Plaintiffs now abandon their first claim, and instead concentrate only on their process argument. However, as the Park Service has also amply demonstrated, it satisfied its responsibilities under Section 110(a)(1) to "use, to the maximum extent feasible" the Cyclorama Building prior to its decision in 1999 to adopt an alternative that include demolition of the building by analyzing both continued use and adaptive reuse possibilities for the building. See SJ Memo at 38-41.

Plaintiffs' latest claim that the Park Service never evaluated the possibility of the Cyclorama Building serving as a non-museum use in its "continued use analysis" is an exercise in semantics.

See Pl. Resp. at 39. As the Park Service explained, it fully considered the possibility of rehabilitating the building for adaptive reuse, that is, for "non-museum" uses. AR 001607; SJ Memo at 40. Simply because this analysis was set forth under the heading "Other Options Considered but Rejected– Rehabilitation of the Building for Adaptive Use," see AR 001607, which incidentally is where it properly belonged, does not mean it never occurred. This analysis included evaluating the possibility of using the building for long-term administrative use, but the Park Service rejected that option for a variety of reasons. Id. It was not arbitrary or capricious for the Park Service to ultimately conclude that it was "unable to identify any other appropriate public uses for the building," AR 0001607, including as a visitor's center, as the building had not served as one since 1971. AR 001604. Plaintiffs' implication that this review could not properly be contained in the Section 106 Report, see Pl. Resp. at 39, 41, is to elevate form over substance. Further, it was in keeping with the Secretary of the Interior's Standards and Guidelines, which state that where it is no longer feasible to continue the use of a historic structure, the agency should consider an adaptive use that is compatible with the historic property, and that such proposals must be reviewed in accordance with Section 106. 63 Fed. Reg. 20496, 20504 (Apr. 24, 1998).

As the Park Service stated, Section 110 "requires consideration in the planning process to determine if such actions are appropriate," and as part of that process, the Park Service recognized its responsibility here to "balance competing preservation priorities and determine how the park's mission can best be accomplished, and how public interest can best be served." AR 001526-27. Indeed, Blanck stands for the proposition that in this context, where the agency has satisfied its obligation to "use, to the maximum extent feasible," a property as part of the Section 106 review process, the agency is not required to go back and repeat its actions separately under the banner "Section 110 Compliance."

Plaintiffs may not like the outcome of that analysis. However, if, as they have vociferously argued in their response brief, they are not asking this Court to direct a particular outcome, the only

question is the adequacy of the Park Service's actions, which were completed in 1999, following an analysis of continued use and adaptive reuse of the building. SJ Memo at 38-41. The MOA, which was the culmination of the Section 106 review process, was also executed in 1999. Therefore, Plaintiffs are simply out of time to challenge the adequacy of the Park Service's procedural actions under Section 110(a)(1). Further, even if this Court were to somehow reach this question, as discussed above, the Park Service satisfied its obligations under Section 110(a)(1).

## B.  The Park Service Complied with Section 110(a)(2)

Plaintiffs' argument with regard to Section 110(a)(2) does not actually address the requirements of the NHPA or the Park Service's compliance with Section 110(a)(2). See Pl. Resp. at 42-44. They do not dispute that the plain text of the Section 110(a)(2) requires an agency to establish an agency-wide program. See 63 Fed. Reg. at 20500 (an "agency historic preservation program is embodied in agency-wide policies, procedures, and activities"). The Park Service set forth the Cultural Resource Management policy for the agency in their 1988 Management Policies, and thus, it had an agency-wide preservation program in place in 1999. See SJ Memo at 42-43.

Further, the Park Service took steps with the Cyclorama Building with respect to Section 110(a)(2) prior to adoption of the ROD. See SJ Memo at 43-44. In 1994, the Park Service developed a List of Classified Structures for Gettysburg National Military Park, which evaluated park resources and determined that the Cyclorama Building was not eligible for listing on the National Register. In December 1995, the Park Service prepared the DOE, which concluded the building was not eligible for listing on the National Register, and the SHPO concurred in May 1996. However, in 1998, the Cyclorama Building was determined to be eligible for listing on the National Register, and therefore the Park Service began Section 106 consultations with the ACHP, SHPO and consulting parties, including both named plaintiffs, which ultimately culminated in the execution of the MOA setting forth the appropriate mitigation for the building. AR 001532. Thus, Plaintiffs are also time barred from raising the issue of compliance with Section 110(a)(2).

24

While Plaintiffs argue that the Park Service has been less than forthright about its intention to comply with Section 110(a)(2) with respect to the Cyclorama Building, the record amply reflects that this is simply not the case. The exhaustive process undertaken by the Park Service balanced competing preservation priorities to determine how the park's mission can best be accomplished and how to best serve the public interest.  AR 001526.  The Park Services' Management Policies further reflect this process, noting that "[a]chievement of other park purposes may sometimes conflict with and outweigh the value of cultural resource preservation.  The planning process will be the vehicle for weighing conflicting objectives and deciding that a cultural resource should not be preserved."  AR 001527.  Here, following consultation, the Park Service ultimately chose the alternative that included demolition of the Cyclorama Building.  This decision was in keeping with the preservation goals for the park, namely that of rehabilitating Ziegler's Grove.

Therefore, this Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion with respect to Plaintiffs' NHPA claims.

## CONCLUSION

For the reasons stated above, this Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: May 9, 2008.                    Respectfully submitted,

                                       RONALD J. TENPAS
                                       Assistant Attorney General
                                       Environment and Natural Resources Division

Of Counsel:                            /s/ *Samantha Klein*
                                       SAMANTHA KLEIN
MARTHA F. ANSTY                        United States Department of Justice
Attorney                               Environment and Natural Resources Division
Office of the Solicitor, N.E. Region   Natural Resources Section
U.S. Department of the Interior        P.O. Box 663
Winston Prouty Federal Building        Washington, D.C.  20044-0663
11 Lincoln Street                      Phone: (202) 305-0474
Essex Junction, VT 05452               Fax:    (202) 305-0506
Telephone:  (802) 872-0629             E-mail: samantha.klein@usdoj.gov
Fax:  (802) 872-9704                   Counsel for Federal Defendants

Exhibit 6

REPLY DECLARATION OF JOHN A. LATSCHAR

I, John A. Latschar, declare the following:

1. I am employed by the National Park Service, United States Department of the Interior, in Gettysburg, Pennsylvania. I am currently the Superintendent of Gettysburg National Military Park (NMP), Eisenhower National Historic Site (ENHS or EISE), and the Soldiers' National Cemetery. As Superintendent, I am the senior federal official responsible for the management and operation of these three National Park Service sites. I have held this position since August 21, 1994.

2. My duties and responsibilities as Superintendent include management of the planning processes for Gettysburg NPM, such as the Development Concept Plans and General Management Plans, as well as their accompanying environmental documents such as Environmental Assessments and Environmental Impact Statements.

3. The 1995 Draft Development Concept Plan/ Environmental Assessment for the Gettysburg Museum of the Civil War and the 1996 Draft Development Concept Plan/Environmental Assessment for Collections Storage, Visitor and Museum Facilities were maintained the Park Service's Office in Gettysburg. These two EAs were also sent to the Adams County Public Library, 140 Baltimore Street, Gettysburg, Pennsylvania, for public review and inspection. The documents were delivered to the library in April 1995 and April 1996, concurrent with their release for public review.

4. On July 10, 1998, the NPS entered into a Letter of Intent with the Gettysburg National Battlefield Museum Foundation (Gettysburg Foundation). AR000494-497. The Letter of Intent stated that it was the shared objective of the NPS and the Foundation "To rehabilitate the historic appearance and setting of Ziegler's Grove and the high water mark of the battle by removing the existing visitor center and Cyclorama buildings and their associated entry roads and parking, and by restoring

the historic landscape." The Letter of Intent also indicated that it was the Foundation's general responsibility, "In accordance with plans and specifications approved by the NPS, construct the Facilities agreed upon in the agreement and removing the existing facilities [the Cyclorama building and visitor center] and rehabilitate Ziegler's Grove." The Letter of Intent also specified that it was the NPS responsibility to "Provide the Foundation with the plans, drawings and specifications for the restoration of the historic landscapes of Ziegler's Grove, that are within an agreed upon budget."

5.  In August 1998, the NPS released the draft General Management Plan/Environmental Impact Statement for Gettysburg National Military Park. One of the actions proposed in the Management Prescriptions of the GMP was "The Cyclorama and Visitor Center are removed and their sites rehabilitated." AR002052. The draft GMP further stated that "The Visitor Center/Museum facilities construction program would include the removal of the existing Cyclorama Building and existing Visitor Center, and the rehabilitation of their sites." AR002067. The cost estimate for "the Visitor Center/Museum facilities construction program" for Alternative C, the Proposed Plan, was $39,285,000, which included the demolition of the Cyclorama building. Since, per the Letter of Intent, the Foundation had agreed to assume responsibility for all such costs, they were listed under "Partnership Items" of the cost estimate as separate and distinct from the total costs shown for "NPS-funded Items." AR002294.

6.  In June 1999, the NPS released the Final General Management Plan/Environmental Impact Statement for Gettysburg National Military Park. Under the heading of "Construction or Land Acquisition Funded by Partners on behalf of the NPS," was listed the "New Collections Storage, Museum and Visitor Center," with an estimated cost of $39,285,000. AR000487

7.  In January of 2002, after the Gettysburg Foundation completed schematic design for the new facility, the Foundation announced a total fund-raising goal of $95 million. This amount covered several types of costs, including "project costs," the costs of

fund-raising, the costs of Foundation operations during fund-raising and design, and the costs of establishing an endowment. Notably, project costs are the direct costs of development (or demolition) and include the cost estimates for land acquisition, design and construction

8.  In February of 2007, the Foundation announced that it had increased its total fund-raising goal to $125 million. Again, this goal was intended to cover a number of different costs, including project costs.

9.  My statement in the Gettysburg Times that "When we moved to $125 (million), now, we're also talking about the costs of taking down the old visitor center and Cyclorama buildings, and restoring the Cemetery Ridge landscapes" can only be understood in context of the reporter's previous five questions about the size, scale, and cost increases for construction of the park's new museum and visitor center. The "now" in my response did not refer to a change in what the $125 million would "now" cover. Rather, it was meant to call the reporter's attention to a fact that he might have been overlooking, as in "now *don't forget*, the $125 million also covers the cost to take down the old visitor center and Cyclorama buildings, and restore the Cemetery Ridge landscapes." This reminder was necessary because I have found that it is very common for reporters to focus on construction costs for the museum only and to overlook the other important cost elements of the overall project. We constantly had to remind them that the Gettysburg Foundation's fundraising goal included the costs to take down the old visitor center and Cyclorama buildings, and restore the Cemetery Ridge landscapes.

10.  At the request of the Plaintiffs, the Public Affairs Specialist at Gettysburg NMP led Robert Shoaff, Jerry Matyiko and David McIlnay on a tour of the Cyclorama Building during the morning of January 10, 2008.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7th day of May, 2008, in Gettysburg, Pennsylvania

JOHN LATSCHAR, Superintendent
Gettysburg National Military Park
National Park Service
United States Department of the Interior

SWORN AND SUBSCRIBED BEFORE ME
THIS 7th DAY OF May 20 2

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Jamie Greenholt, Notary Public
Gettysburg Boro, Adams County
My Commission Expires July 13, 2011
Member, Pennsylvania Association of Notaries

Attachment A

2084

BY SCOT ANDREW PITZER
*Times Staff Writer*

## (Part 1 of 2)

Gettysburg National Military Park Superintendent Dr. John A. Latschar, during a three-hour interview Wednesday afternoon at his park office, discussed the status of ongoing battlefield projects, talked about his future in Gettysburg, addressed street rumors, and gave his views on several controversial topics, including the park's relationship with the Association of Licensed Battlefield Guides.

Following are his answers to questions posed by the *Times*:

**Is this your retirement job?**

"Being a superintendent for the Park Service is one of the best jobs in the world. I couldn't imagine anywhere I'd rather work. I've turned down high-level jobs in Philadelphia and Washington to stay here. My commute to work takes maybe two-and-a-half minutes. I get to live my work, and I'm right here at the battlefield. There's no problem in being reminded every single day what I ought to be doing. Why would I want to work in an office in Philadelphia?"

**Have you set a retirement date?**

"I'm not a career planner, so I'm not saying never. But I am 60 years old. My current intention is to retire, whenever that happens, right here. I'm going to stick around for as long as I'm having fun, and I'm having fun right now. Seriously, we are able to make — and I say we collectively, because none of this is me alone — we've been able to make significant improvements, I think, to the battlefield itself and for our visitors. We're just dawning on the start of excitement for downtown Gettysburg. We've got a lot of projects still on the plate. Not only do I want to see the museum and visitor center open, I want to see them functioning properly."

**After 13 years here — and the criticism — you're still having fun?**

"In short, yes. I look forward to going to work almost every day. My daddy told me a long time ago that anyone who looks forward to going to work more days a week than not was a lucky son of a gun, and I think that's true."

The visitor center and museum project was originally estimated to cost $43 million, but has ballooned to $125 million. What happened?

"One of the things that we have not successfully conveyed to the public is the difference between the cost of the building and the (See LATSCHAR, Page A5)

**(Continued from Page A1)**

cost of the project. As we laid out with "the GAO (Government Accountability Office), for example, in our Park Service estimates, we estimated so much for land acquisition, so much for design, and so much for building construction. We didn't estimate the costs that were specific to the Gettysburg Foundation. For example, we didn't estimate what the cost of fund-raising would be, or the Foundation's administrative costs. We didn't realize then, but one thing we understand now, is that if you're going to go out and do major funding, those donors are going to require that you have a reserve and an endowment, because they don't want to see their money going toward a project that they're not sure is going to be there 20 years from now when they want to bring their grand-kids. So the Foundation added endowment costs and fund-raising costs, which was $20 million of the difference between the first jump, from $43 to $95 million. The rest of the jump was primarily a result of the engineering and architectural estimates, because they didn't need to be estimated originally, nor was there a need."

**Has the scope of the project changed?**

"Let me use this language very carefully — the scope of the project has not changed at all. If you go back to 1998, the terminology and the scope of the project that was published in our General Management Plan has not changed. If you go back there, it says we're going to have a theater, a Cyclorama program, a book store, a museum, curatorial storage and a food area."

2/01/08
*Gettysburg Times*

**GETTYSBURG NATIONAL MILITARY PARK**
**EISENHOWER NATIONAL HISTORIC SITE**
**97 TANEYTOWN ROAD**
**GETTYSBURG, PA 17325-2804**

Then what, specifically, has changed between 1998 and now?

"Two things: the estimated cost when the National Park Service first estimated the project in 1998, and the eventual costs. The quality of the project is what I like to emphasize. The Cyclorama restoration (originally budgeted at $1 million but now $16 million) is my favorite example. We stated in the General Management Plan that we needed to restore the Cyclorama painting... but we didn't have a good idea of what that was going to entail. Our studies hadn't been done, and we didn't know that, in order to restore (the painting) to its 1888 appearance, we had to add 14 feet of sky, we also had to put a three-dimensional diorama back in. What has changed isn't what we're going to do, as compared to how well we're going to do it."

**Has the actual size of the new Baltimore Pike visitor center, which opens in mid-April, grown?**

"That's another classic example. When we first put together the architectural program in the General Management Plan in 1998... and said we needed a theater and so many square feet, and we needed a Cyclorama gallery with so many square feet, and so on, we estimated the square footage that we thought we'd need. Then you add everything together to get to your total, and in the General Management Plan, that was 118,000 (square feet). What we didn't have time or the ability to do when we were in the planning stage, and we couldn't do it until the architects came on board and actually did the architectural work, is that once you put all of that together, then you have to figure out the circulation space, so you don't have bottlenecks. We didn't know how much we would need in circulation space until we got into the actual planning and design phase. That, in a nutshell, is why our General Management Plan said we'd need a 118,00 square-foot building compared to what we have now with a 139,000 square-foot building. We've added 20,000 square feet in circulation space. Planning traffic flow in a public use building is just like any other traffic analysis. You have to know where the people are coming from, where they're going to go, and when they're going to go there, and you always plan for the peak time."

Some people in the public arena have a hard time figuring out, when they see the cost projections, why the figure has increased so much.

"We've certainly done our best to educate them. There were two distinct permeations: when we went from $42 million to $95 million, and when we went from $95 million to $125 million. The first increase marks the difference between the Park Service planning estimates in the General Management Plan — and those planning estimates are just on a planning level, because obviously, we hadn't engaged with architects or engineers — and the Gettysburg Foundation's first fund-raising goal of $95 million. The second giant leap, if you will, was just last year when it went from $95 million to $125 million."

**Is the goal still $125 million?**

"Yes, but again, that is total project costs... that's not building costs. When we moved to $125 (million), now, we're also talking about the costs of taking down the old visitor center and Cyclorama buildings, and restoring the Cemetery Ridge landscapes. Also, some of that jump was the increased fund-raising costs, because we didn't get the project done as quickly as we originally thought. In 2000, we thought we'd open in 2005. In 2002, we thought we'd reopen in 2006."

**There are critics who don't understand why their fund-raising goal is as high as it is.**

"When people ask these questions, it always takes me a split second to recuperate. The news that the Foundation was formally raising its goal from $95 to $125 million, to me, was unblemished great news. It's longterm. It's a vision. It's a goal. I always laugh when people... turn that around and ask, how can you justify the Foundation having to raise its goal to $125 million when they said before they'd only have to raise $95 million, and originally, the Park Service said it would only need $43 million? My initial reaction is: where's the problem? It's good news for everybody. I'm going to be very disappointed if, come 2009, when the Foundation has successfully raised $125 million, if they only increase their goal to $150 million. Why not go for more?"

384

# Dr. John Latschar



Superintendent Dr. John Latschar fields questions during an interview with the *Gettysburg Times*.

DARRYL WHEELER/GETTYSBURG TIMES

**How did the merger of the Friends of the National Parks at Gettysburg with the Gettysburg Foundation affect the fund-raising goal?**

"Prior to the merger, the Foundation was out there concentrating only on raising funds for the museum and visitor center. The Friends were out there doing their thing, and they were raising a million dollars a year for us for multi-purpose projects. Now you have the Friends — with their goals — and make them a part of the Foundation. We forwarded those traditional Friends projects, which are worth about a $1 million a year, to the Foundation, so naturally, the fund-raising goal is going to get higher."

**Is the Gettysburg Foundation effective?**

"They're outstanding. The Foundation's commitment throughout the whole process is beyond reproach. At least once a month, for the last two years, we welcome GAO auditors

2/1/08

where we really want to do something because it'll result in better visitor service or a better exhibit or a little bit more lasting quality — and almost every single time the Foundation has said that they'll raise the extra money."

**The national average for a new visitor center is $5 million, but here it's $105 million. What's the rationale?**

"The answer is, of course, because there are no comparable projects. You may be referring to the GAO study, done years ago, on National Park Service visitor centers, which of course, we participated in. There's no other park in the United States that has a Cyclorama painting, or the space requirements for that painting. There are very few of those visitor centers that were compared in that GAO study, that have museums. Most parks don't have museums. They have visitor centers but not a museum, so with that, those parks are relieved of the responsibility of taking care of artifacts. We have a million artifacts. When we talked to the GAO about that, we told them there are asterisks over the

Gettysburg section of that report pointing out that we're the only one to have a Cyclorama and we're one of the few parks that have a museum. That's why we're different, and that's the reason we went into a partnership to raise money. I knew back in 1995, when we were just getting permission to try to conceive a partnership that there was no way that Gettysburg was ever going to get enough Congressionally appropriated funds here, and that's because our needs for the new visitor center and Cyclorama were so much greater than other parks. That's why we wanted a partnership from the get-go. There are smaller partnerships all over the place. As far as the size and complexity of what we're doing, right now, yeah, we're the most public partnership in the National Park Service. We're very much in the public eye right now, and that's because we're Gettysburg."

The GAO visited the battlefield in early December and a second time this month. Was it a big deal?

"I think it's a big deal. I think

it's important, because of what they do for the Park Service. This is the eleventh GAO investigation that I've been personally involved in, and that's counting my experience at other parks. They spent two full days with us in December. They came back a couple of weeks ago, and spent an hour and a half with us before spending some time with the Foundation and then some time with other local folks. We think it's all good, because most of our experiences with the GAO have been good. We're no strangers to them and vice versa. When they came back again this month, they asked us for recommendations that we would have to prove that our current partnership process enables Park Service projects to happen more easily, more efficiently, and more effectively."

Gettysburg Times

GETTYSBURG NATIONAL MILITARY PARK
EISENHOWER NATIONAL HISTORIC SITE
97 TANEYTOWN ROAD
GETTYSBURG, PA 17325-2804

484

GETTYSBURG TIMES • FRIDAY, FEBRUARY 1, 2008

### Why is the GAO looking at the GNMP?

"They conduct two types of investigations, and one is what we call educational. Congress basically says: 'Go out there and see what's going on.' The other type of investigation is when Congress has a feeling of suspicion or inappropriateness. We've had both types of visits up here. The GAO came up here several years ago because there were accusations that the Friends of the National Parks...at Gettysburg...and the GNMP Advisory Commission were acting inappropriately. That was an investigation, but we were cleared."

### Which type of investigation was the GAO conducting here recently?

"This is more of an educational examination. Right now, before Congress, there is proposed legislation for the Centennial Challenge, and in a nutshell, it's taking the partnership concept such as we're using here with the Gettysburg Foundation, and making it a nationwide initiative. They're calling it the Centennial Challenge because the 100th anniversary of the National Park Service is coming up in a couple of years. The current administration proposal to Congress is that they're to put up $100 million a year for 10 years, to be matched by the private sector — dollar for dollar — to get major park improvement projects, just like we're seeing here, completed in time for the Centennial, so we'll be ready to serve the American public for the next 100 years. The subcommittee, where this Legislation is being debated, asked the GAO to examine how the National Park Service handles donations and contributions. The sub-committee told them to make sure to come to Gettysburg because — guess what — we're the most visible park and partnership in the nation right now."

*Part 2 of the interview in Saturday's Gettysburg Times.*

2/01/08
Gettysburg Times

GETTYSBURG NATIONAL MILITARY PARK
EISENHOWER NATIONAL HISTORIC SITE
97 TANEYTOWN ROAD
GETTYSBURG, PA 17325-2804

*134*

*GETTYSBURG TIMES • WEEKEND EDITION • SATURDAY, FEBRUARY 2, 2008*

# GNMP 'Super' Latschar talks money, taking heat



DARRYL WHEELER/GETTYSBURG TIMES

**ONE-ON-ONE -** "I know that some of the continual critics out there are still convinced that either me or Mr. Kinsley are going to ride off into the sunset with saddle bags full of money, and that just isn't true," GNMP Superintendent John Latschar said of the Foundation's fund-raising campaign. "It's just not going to happen."

*2/02/08*
*Gettysburg Times*
GETTYSBURG NATIONAL MILITARY PARK
EISENHOWER NATIONAL HISTORIC SITE
97 TANEYTOWN ROAD
GETTYSBURG, PA 17325-2804

284

**EDITOR'S NOTE:** *This is the second in a two-part series outlining the views of Gettysburg National Military Park Superintendent Dr. John A. Latschar, expressed during a three-hour interview this week.*

**BY SCOT ANDREW PITZER**
*Times Staff Writer*

*What happens now with the GAO investigation?*

Latschar: "I can tell you for sure, because GAO told me, that there will not be a separate report on Gettysburg. That rumor has been out there, and from what I know, it's not true. Gettysburg is part of a larger nationwide study. The Congressional committee wants that study to be released by August, which fits the Congressional calendar for passage of bills. The GAO also told me that they want to visit up to a half-dozen other parks that are in some sort of stage of forming or implementing partnerships. As far as everything that I'm aware of, we're part of a larger study that's intended to be genuine. The next thing I anticipate from the GAO, if they follow their schedule to publish in August, is that sometime in July we'll get a copy of their draft and be able to comment on it. I don't expect to hear much more from them."

*There are a lot of street rumors.*

Latschar: "The GAO is not going to recommend that I be relieved of my duties. Number one, they don't do that, because it's outside of what they've been chartered to do by Congress. We're not terribly surprised to know that there's rumors out there that I'm going to lose my job as a result of the GAO coming to town, or that there's an (Inspector General) investigation. It's not surprising to know that some of the names attached to those rumors are the same ones who have been attacking us since the 1990s when the new visitor center was first an issue."

*Is the Inspector General investigating the park?*

Latschar: "There is no Inspector General investigation. I've been hearing that for three weeks. What else have I been hearing through the grapevine? I was informed Sunday that I'm going to be arrested this week."

*You've been a lightning rod for personal attacks.*

Latschar: "The third stage of debate is when opponents hope they can attach stigma to the person responsible for the decision, and maybe the decision, itself, will go away. All I can say for certain is that with every single decision we've made here at Gettysburg — from one-way roads to management of white-tail deer, to the new visitor center and museum — inevitably, some of those folks opposed to the decisions have descended to the point of attacking me personally, in the hopes that they can besmirch my name and attach stigma. The battlefield guides are an example. We have a reservation system, and we've been through the process of getting to that system, so now they're down to the personal level. They're now attacking me by attacking my wife. It's regrettable, but it comes with the territory."

*What is the park's relationship with the Association of Licensed Battlefield Guides?*

Latschar: "In the past, we have had a very collegial relationship with the Association of Licensed Battlefield Guides. We view the Association as a shortcut to make it easier for us so we don't have to ask 150 different guides what they think about something... we can just ask the group. But that relationship started to deteriorate under the current president (Rick Hohmann). There's a lot of rhetoric being spilled. There has been less and less negotiation, and more and more screaming and yelling on their side. Some of their concerns, in general, are very realistic because they are about change. It's just as realistic as the merchants on Steinwehr Avenue when they first figured out, in the 1990s, that we wanted to move a half-mile away. The guides are going through basically the same scenario, because their concern is about change with the new system. They've been doing things one way for a long time."

*The Association has referenced your wife — Terry, who is a Licensed Guide — as being a problem. Was she attending Association meetings, taking notes, and then sharing them with you?*

Latschar: "I don't think there's any issue. When Terry resigned as a ranger and went back to guiding, which was last May... she paid her dues, and started going to meetings. She didn't think anything of it, and I didn't either. One of the reasons that I didn't think anything of it was that I have never not known everything that has happened at an Association meeting, because the Association has never tried to hide their business from the park. If we weren't informed formally by the Association's executive council itself, we were told informally by guides who had gone to the meetings. After she attended her first meeting, I got a letter from Rick (Hohmann), who wrote that he considered it a conflict of interest for my wife to be going to his meetings, and that I should forbid her from doing so. One of my chief rangers asked him: 'Are you sure you want to give the superintendent authority to say which guides can come to Association meetings and which guides cannot?' I have no more moral, legal, or ethical power to say my wife can't go to an Association meeting, if she's paid her dues and joined the Association, than say she can't go to a Red Cross meeting."

2/02/08
Gettysburg Times

GETTYSBURG NATIONAL MILITARY PARK
EISENHOWER NATIONAL HISTORIC SITE
97 TANEYTOWN ROAD
GETTYSBURG, PA 17325-2804

*3 7 4*

**Explain the role that Robert Kinsley has in the visitor center and museum project. He's the developer?**

Latschar: "He's the chairman of the Board of Directors for the Gettysburg Foundation. And like any state chartered 501c3, all decisions are made by the Board of Directors, which I think has 23 people at last count."

**How did you originally cross paths with Mr. Kinsley?**

Latschar: "Way back in 1996, the Park Service released an RFP, which is a request for proposal, for our partner or partners to help us do our project. That's where we first met Mr. Kinsley, because he submitted one of the responses. When Mr. Kinsley's proposal was accepted by the Park Service as a proposal to negotiate, we told him that in order to carry this out, you're going to have to create a non-profit foundation, which he had done by 1998, I believe. That's the Gettysburg Foundation. The Foundation's board is a fundraising board, and as chairman of the board, Mr. Kinsley personally supervises the project, and is the boss of Bob Wilburn, who is the president of the Foundation. All the way through this project, when we're hiring architects or whatever, the architects were hired by the Foundation and its Board."

**Is there a conflict of interest with Mr. Kinsley serving as the Board Chairman and his company working at the Baltimore Pike visitor center site?**

Latschar: "Mr. Kinsley never had any say, if you will, in hiring the architects. He always has, through the board of directors, had oversight into anything that's going on. And as a leading contributor to the project, we're very, very sensitive to his desires, like we are to all of our other major contributors. He's given $8 million in cash toward this project."

**What is the involvement of York-based Kinsley Construction with the visitor center project?**

Latschar: "When it came time to go to construction, Mr. Kinsley came to the Board of Directors with a proposal... to use Kinsley Construction as a construction management firm for the project. A construction management firm doesn't own a hammer, or a saw. A construction management firm takes the architectural drawings, and they review them from a constructability point of view, correct any mistakes, and put them out for bid. Then, they receive and review the bids, and then recommend back to the Foundation who the best bid is. They never touch any dirt. In a project like this, there is no one bid. We've had about 43 bids for sub-contracting over the course of the project."

**How much is Kinsley Construction being paid by the Gettysburg Foundation?**

Latschar: "Construction management services for a project like this were estimated to be worth $2.5 million to $4.5 million. The value of that, if you were to go out on the street to hire a construction management firm to manage a project for you... well, that's the price range you could expect to pay for those services. Mr. Kinsley offered those services to the Foundation for at-cost: which means without profit, and without overpaying, thereby saving the Foundation something like $2 million over the course of construction. There is no profit."

**Why is he doing the project at-cost and not for a profit?**

Latschar: "Two things: number one is having his heart in the right place. He's already given over $8 million in cash and this is just another way he could serve. Number two: Mr. Kinsley just happens to believe, and having seen his folks at work... I agree with him... that he has the best construction management folks in this part of the country."

**Critics have suggested that secrecy was a factor when the Board hired Kinsley Construction.**

Latschar: "The Board of Directors did all of the ethical stuff. They recused Mr. Kinsley, and Mrs. Kinsley, because she's on the board. They also recused the secretary and the treasurer, because they're Kinsley employees. They were out of the room while the rest of the board discussed this. They also had an attorney look into it, and we've got all the paperwork. An outside auditing firm was brought in just specifically to audit the cost charged against construction management. So again, everyone can see the audit report and say, yes indeed Mr. Kinsley didn't make any profit. I went down to Washington and had a solicitor's opinion saying that with those safeguards in place, there was no conflict of interests, and the Park Service approved."

**Is there a limit on how much money the Gettysburg Foundation can borrow for your project?**

Latschar: "There is a contractual limit of $20 million that can be borrowed, but right now, they're only planning to borrow $15 million... and they're tax-free bonds. They're allowed to pay them off over 20 years. We're close enough to the end with this project where I can tell you that they're only going to borrow $15 million."

**Why borrow money? Can't the Gettysburg Foundation raise all of the funds?**

Latschar: "It could be raised, but it would take longer. You borrow to get the money now. There is a certain percentage that you set aside, that's appropriate to borrow, that can be paid back in a reasonable time through anticipated revenues. When we signed the agreement in the year 2000, we said that they could borrow a certain amount. There's never been a shortfall."

**How will the Gettysburg Foundation pay off the $15 million in debt?**

Latschar: "They'll pay it off in several major ways. Number one is through the admission fees to the theater and Cyclorama building, which are very similar to our old Electric Map and Cyclorama charges. The Foundation also has a contractor, Event Network, who's going to operate the book store. That will be operated on commission basis... not rent... so that the Foundation gets a certain percentage of the gross proceeds of the book store. It's an escalating percentage — the more they sell, the more the Foundation gets. They have a contractor to provide food service, Aramark, and again they'll get an escalating commission rate on the gross sales in the food service area from that contractor. Those are the three or four main ones: the theater, the Cyclorama, the book store and the food service."

**What are the projected revenues at your new facility?**

Latschar: "We're talking about them collecting... around $7.5 to $8 million a year. We've been doing $4.5 million a year just from our book store, the Electric Map and Cyclorama program, so it's not out of reach."

*2/02/08*
*Gettysburg Times*

GETTYSBURG NATIONAL MILITARY PARK
EISENHOWER NATIONAL HISTORIC SITE
97 TANEYTOWN ROAD
GETTYSBURG, PA 17325-2804

4 7 4

*Do you or Mr. Kinsley get a cut?*

Latschar: "If there's anything left over at the beginning of the year, then the Park Service and the Foundation decide how to spend it. It could go toward paying down the debt faster, or it could go to new furniture or equipment, or just be donated back the park. The point is, none of that money leaves the site, because the Foundation is a state chartered 501c3 with the sole purpose of supporting the park. If revenues are higher than anticipated, no one on the Board of Directors gets a bonus, because all of them serve without pay. I know that some of the continual critics out there are still convinced that either me or Mr. Kinsley are going to ride off into the sunset with saddle bags full of money, and that just isn't true. It's just not going to happen."

*What is your arrangement with Eastern National? Are they still working at the park?*

Latschar: "There were two contracts. The contract with Eastern to operate the (new) book store, that's the one they lost to Event Network. But obviously, Eastern is going to operate this book store until the day we close and move, and Event Network takes over the new one. The second contract was to operate our ticketing and reservation system, the Electric Map, and for some custodial services, and that's the one that was violated in October 2006."

*Why was Eastern's contract terminated in 2006 and what were the specific violations?*

Latschar: "It was a contract... for reservation services... that was terminated amongst a certain amount of turmoil... and the Gettysburg Foundation took over those duties. That contract had certain provisions and Eastern

violated about a half-dozen of those provisions. On a Friday night after all of the Park Service people had left work, Eastern took their entire advanced reservation staff out of this building and moved them out to Gateway Gettysburg without telling the park. One of the provisions of our contract is that Eastern is prohibited from doing business with any commercial enterprises without the Park Service's approval. Eastern did not inform us. They moved after we closed and went home, after five o'clock on a Friday night. Another provision they violated was that Eastern was to sell tickets only for Gettysburg National Military Park, and only GNMP. In other words, they weren't authorized to do reservations for anybody else, or under any other name."

*There are rumors, in town, about Visitor Center book store thefts and proprietary information being stolen on computers.*

Latschar: "Years ago, there were two or three individuals who were successfully prosecuted for theft from the book store while they were book store employees and one of them was a nephew of mine."

*Successfully prosecuted?*

Latschar: "Yes, by the Park Service Police. You didn't hear that part, huh? In the 13 years that I've been here, there have proba-

bly been six employees of Eastern National who have been successfully prosecuted for theft. That's not all that bad of an average for this kind of an operation. But this is in the rumor mill, because it's an attempt to get at me. My nephew Dave, who is actually Terry's nephew, worked at the book store, and this is back in 2001-02 so he might have been a minor at the time. He, and two of his colleagues if I remember correctly, were caught with their hand in their tail. They were skimming, and caught on video. Eastern saw it. They were all prosecuted and they all pleaded guilty and they all paid their fines... and they don't work here anymore. They paid their restitution to Eastern for the estimated amount, and they all paid fines. All of that is in our law enforcement records... and it was well before the time that Eastern violated its contract, so they're not related."

*Were you involved in the prosecution?*

Latschar: "It had nothing to do with me. As soon as a crime is committed here, it goes straight into the law enforcement channels, which I cannot interfere with. It went straight from our law enforcement people to our district attorney in Harrisburg."

2/02/08
Gettysburg Times

GETTYSBURG NATIONAL MILITARY PARK
EISENHOWER NATIONAL HISTORIC SITE
97 TANEYTOWN ROAD
GETTYSBURG, PA 17325-2804